UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
PARAMOUNT PARKS INC. :
ONE CEDAR POINT DRIVE :
SANDUSKY, OHIO 44870-5259 :
　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　Plaintiff, : Case No. 07 Civ. 10595 (SHS)
　　　　　　　　　　　　　　　　　　　　　　　:　　ECF CASE
　　v. :
　　　　　　　　　　　　　　　　　　　　　　　:
LESTER NAIL :
375 SOUTH MONTEREY DRIVE :
MOORE, SOUTH CAROLINA 29369 :
　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　Defendant. :
-----------------------------------------------------x

## COMPLAINT

Plaintiff Paramount Parks Inc. (hereinafter, "PPI"), by its attorneys, Squire, Sanders & Dempsey L.L.P., for its complaint against Defendant Lester Nail (hereinafter, "Defendant"), alleges as follows:

### NATURE OF THE ACTION

1. In this action, PPI seeks declaratory judgment and damages for acts of breach of contract, unjust enrichment, and misrepresentation/fraud engaged in by Defendant in violation of the laws of the State of New York. Pursuant to an employment agreement between PPI and Defendant, PPI promised to pay and in fact did pay Defendant salary and benefits continuation for so long as he remained exclusively devoted to PPI up until December 31, 2007, even where Defendant's active employment with PPI ended prior to that date. Despite receiving such payments, and despite his contractual obligations, Defendant began working for another company on February 23, 2007, and not only failed to disclose this information to PPI but deliberately concealed this fact and misrepresented to PPI that he remained unemployed. PPI

seeks recovery for the damages it incurred as a result of Defendant's breaches and wrongful conduct, including but not limited to the total value for all compensation and benefits paid to Defendant from February 23, 2007 through October 19, 2007, prejudgment interest, and the award of such other, further, and different relief as the Court may deem just and proper.

**PARTIES, JURISDICTION AND VENUE**

2. PPI is a corporation organized under the laws of the State of Delaware, with a principal place of business in Ohio. PPI is in the parks and entertainment industry.

3. Defendant is a resident of the State of South Carolina.

4. On January 1, 2006, PPI and Defendant entered into an Employment Agreement (hereinafter, the "Agreement"), a copy of which is attached hereto at Exhibit A.

5. At that time, PPI was a subsidiary of CBS Corporation, which was organized under the laws of the State of New York.

6. The Agreement provides that it "and all matters and issues collateral thereto shall be governed by the laws of the State of New York applicable to contracts entered into and performed entirely within the State of New York, with respect to the determination of any claim, dispute or disagreement, which may arise out of the interpretation, performance or breach of this Agreement." (See Exhibit A at ¶ 15)

7. The Agreement also provides that it and all matters and issues collateral to it "will be subject to enforcement and interpretation solely in the appropriate courts of the State of New York." (See Exhibit A at ¶ 15).

8. The amount in controversy in this matter exceeds $75,000.00.

9.      This Court has jurisdiction over PPI's claims by virtue of the Agreement and 28 U.S.C. § 1332.

10.      Venue in this District is proper under the Agreement and 28 U.S.C. § 1391(a).

### TERMS OF THE AGREEMENT

11.      Defendant was employed by PPI pursuant to the terms of the Agreement to serve as the Company's Senior Vice President / General Counsel. (See Exhibit A at ¶ 1(a)).

12.      The term of the Agreement is from January 1, 2006 to December 31, 2007 (hereinafter, the "Employment Term"). (See Exhibit A at ¶ 1(a)).

13.      Both Defendant and PPI have certain obligations for the duration of the Employment Term.

14.      Under the Agreement, Defendant agreed, inter alia, that during the Employment Term [January 1, 2006 through December 31, 2007] he will "***devote all customary business time and attention to the affairs of Paramount***." (See Exhibit A at ¶ 5) (emphasis added).

15.      Defendant also agreed, inter alia, to the following: ***"[D]uring the Employment Term, Executive will not engage in any other occupation*** or engage in the leisure/theme park, motion picture, television, or entertainment business, except for Paramount pursuant to [the] Agreement." (See Exhibit A at § 11) (emphasis added).

16.      In the event Defendant's active employment with PPI was terminated without cause, PPI agreed to provide certain compensation and benefits for the remainder of the Employment Term so long as certain conditions were met:

> If, during the term of this Agreement, the employment of Executive by Paramount should be terminated by Paramount other

than for Cause as defined herein or for Executive's incapacity, then Paramount shall be obligated both to pay to Executive all applicable base salary pursuant to paragraph 2(a) of this Agreement and also Paramount shall continue all applicable plans and/or benefits pursuant to paragraph 3 hereof for the remainder of the Employment Term, *so long as Executive is willing, ready and able to render exclusive services hereunder during the remainder of the Employment Term....*

(See Exhibit A at § 7(c)) (emphasis added).

### THE TERMINATION OF DEFENDANT'S EMPLOYMENT AND PPI'S CONTINUED COMPLIANCE WITH THE TERMS OF THE AGREEMENT

17. On July 27, 2006, PPI provided Defendant with written notice that it was terminating his employment without cause effective August 1, 2006, a copy of which is attached hereto at Exhibit B.

18. At that time, PPI specifically reminded Defendant of his continuing obligations under paragraph 11 of the Agreement, as well as the requirement that he remain "willing, ready and able to render exclusive services" to PPI to continue to receive the compensation and benefits described in paragraph 7(c) of the Agreement. See Exhibit B.

19. After terminating Defendant's employment, PPI continued to provide all compensation and benefits to Defendant pursuant to the terms of paragraph 7(c) of the Agreement.

## **DEFENDANT'S MISREPRESENTATIONS AND BREACHES**

20. From August 1, 2006 on, PPI believed that Defendant was not gainfully employed with any other person or entity.

21. Defendant (and his family) remained covered under PPI's employee benefit policies.

22. Defendant never notified PPI that he was eligible to receive health insurance or other employee benefits from any other source.

23. Defendant never notified PPI that his address had changed.

24. On or about June 2007, Defendant directly or indirectly represented to a PPI representative that he was still unemployed. Further, Defendant participated in the employee benefits enrollment effective July 1, 2007, as an employee of PPI.

25. Then in mid-October 2007, PPI learned from another employee that Defendant was working full-time for Denny's, Inc. ("Denny's").

26. On October 19, 2007, PPI notified Defendant that it was aware of his current employment and that, as a result, PPI would be ceasing all payments of compensation and benefits effective immediately pursuant to the terms of the Agreement. PPI also requested the date he started his alternative employment and notified Defendant of its expectation that Defendant repay the amounts received from PPI since then. A copy of the notice is attached hereto as Exhibit C.

27. PPI further discovered that, upon information and belief, Defendant relocated from North Carolina to South Carolina in May 2007 as a result of his new employment.

28. Defendant eventually disclosed to PPI that he has been employed by Denny's since February 23, 2007.

29. For the period February 23, 2007 to September 30, 2007, Defendant received approximately $100,000.00 in compensation, and for the period February 23, 2007 to October 19, 2007, approximately $8,000.00 in benefits that he was not entitled to under the Agreement.

30. Plaintiff has refused to repay the amounts wrongfully accepted from PPI.

### AS AND FOR A FIRST CAUSE OF ACTION

31. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 30 above as if fully set forth herein.

32. Under the Agreement, Defendant specifically agreed that during the Employment Term he would "devote all customary business time and attention to the affairs of Paramount." (See Exhibit A at ¶ 5).

33. Defendant also expressly agreed that he would "not engage in any other occupation" during the Employment Term. (See Exhibit A at § 11).

34. Defendant began working for Denny's on or about February 23, 2007.

35. Defendant's employment with Denny's during the Employment Term is in direct violation of the Agreement.

36. Defendant is not entitled to any payments or benefits he received from PPI after February 23, 2007 under the Agreement.

37. As a result of Defendant's breach, PPI was damaged in an amount not yet certain but in excess of $75,000.00.

## AS AND FOR A SECOND CAUSE OF ACTION

38.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 37 above as if fully set forth herein.

39.     PPI agreed to continue to provide Defendant with certain compensation and benefits through the end of the Employment Term after a termination only for "so long as Executive is willing, ready and able to render exclusive services hereunder during the remainder of the Employment Term." (See Exhibit A at § 7(c)).

40.     Defendant began working for Denny's on or about February 23, 2007.

41.     Defendant was not entitled to any compensation or benefits under the Agreement once he began working for Denny's, and Defendant's acceptance of compensation and benefits from PPI after he began working for Denny's constitutes a breach of the Agreement.

42.     Further, Defendant's actions frustrated PPI's ability to exercise its rights under the Agreement.

43.     As a result of Defendant's breach or overpayment, Defendant has been damaged in an amount not yet certain but in excess of $75,000.00.

## AS AND FOR A THIRD CAUSE OF ACTION

44.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 43 above as if fully set forth herein.

45. Defendant was not entitled to compensation or benefits once he began working for another person or entity and/or no longer willing, ready, or able to render exclusive services to PPI.

46. Defendant has been unjustly enriched by any compensation and benefits received once he began working for another person or entity and/or was no longer willing, ready, or able to render exclusive services to PPI.

47. Defendant's unjust enrichment has been at the expense of PPI.

48. To remedy Defendant's unjust enrichment, PPI is entitled to repayment for all compensation and benefits wrongfully taken by Defendant, in the approximate amount of $108,000.00.

### AS AND FOR A FOURTH CAUSE OF ACTION

49. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 48 above as if fully set forth herein.

50. On or about 23, February 2007, Defendant knew he was not entitled to continued payments and benefits from PPI by virtue of his employment with Denny's.

51. On or about June 2007, Defendant, either directly or indirectly, misrepresented to PPI that he was not employed.

52. Defendant's statement/s that he was not employed was false and was known by him to be false at the time such statement/s was made.

53. Defendant's misrepresentation was material.

54. Defendant's misrepresentation caused PPI to continue providing compensation and benefits to Defendant under paragraph 7(c) of the Agreement.

55. Defendant knew or had reason to know that PPI would rely on the misrepresentation and continue to provide compensation and benefits to Defendant under the Agreement.

56. PPI in fact reasonably and justifiably relied on the misrepresentation.

57. PPI was damaged as a result of such misrepresentation.

58. Defendant had a duty to disclose his employment status to PPI based on his relationship with PPI.

59. Despite this duty, Defendant made no such disclosures.

60. PPI would have acted differently had it known that Defendant was working for Denny's as early as February 2007. PPI would have ceased providing compensation and benefits under paragraph 7(c) of the Agreement, which it did in October 2007 upon learning of Defendant's employment.

61. PPI was damaged as a result of Defendant's omission and/or concealment.

62. As a result of Defendant's wrongful conduct, PPI has been damaged in an amount not yet certain but in excess of $75,000.00.

**WHEREFORE,** Plaintiff PPI demands judgment against Defendant Lester Nail, as set forth herein, including an award of damages in an amount to be determined at trial; PPI also seeks declaratory judgment against Defendant that Defendant was not entitled to any compensation or benefits under paragraph 7(c) of the Agreement at least once he began working for Denny's and that any compensation or benefits received by him after such time must be returned to PPI; and the award of such other, further, and different relief, including, but not

limited to, prejudgment interest, punitive damages, costs, disbursements, and/or reasonable attorneys' fees incurred in this action as the Court may deem just and proper.

Dated: New York, New York
November 21, 2007

Respectfully submitted,

**SQUIRE, SANDERS & DEMPSEY L.L.P.**

By: _____
Steven Skulnik (SS-7821)

350 Park Avenue
New York, New York 10022
(212) 872-9800

Jill S. Kirila (Ohio Bar # 0068593)
Lori Maiorca Zancourides (Ohio # 0076342)
(pro hac vice admission to be requested)
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
1300 Huntington Center
41 South High Street
Columbus, Ohio 43215

Attorneys for Plaintiff
Paramount Parks Inc.

AGREEMENT made as of the ____ day of _____, 2006, by and between Paramount Parks Inc. ("Paramount"), which is a division of CBS Corporation, and Lester C. Nail ("Executive"), whose address is 9027 Kirkley Court, Charlotte, North Carolina 28277.

<u>W I T N E S S E T H:</u>

WHEREAS, Paramount desires to secure the services of Executive as Senior Vice President / General Counsel, and Executive is willing to perform such services, upon the terms, provisions and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the promises and the mutual covenants hereinafter contained, it is agreed between Paramount and Executive as follows:

1. (a) The term of this Agreement shall be for the period commencing January 1, 2006 and ending December 31, 2007 (the "Employment Term"). Paramount shall employ Executive, and Executive shall accept employment as Senior Vice President / General Counsel.

2. (a) Paramount agrees to pay Executive, and Executive agrees to accept from Paramount for Executive's services hereunder, a base salary of One Hundred Sixty Five Thousand Dollars ($165,000) per annum payable in accordance with the regular payroll practices of Paramount. Base salary shall be payable biweekly or in such other manner as Paramount may designate for employees generally. Executive acknowledges and agrees that he is not eligible for a car allowance.

(b) Paramount agrees Executive shall be eligible to be considered for participation in the CBS Corporation ("CBS") Short Term Incentive Plan ("STIP"), *i.e.*, Paramount's current bonus plan, or any successor plans to STIP. The target annual incentive award for Executive's position will be thirty five percent (35%) of Executive's base salary. The

payment of a STIP bonus, if any, and the precise amount of such payments shall be determined on an annual basis at the sole discretion of the Board of Directors of CBS, or the appropriate committee of such Board.

(c) Paramount agrees Executive shall be eligible to be considered for participation in the CBS Long Term Incentive Plan ("LTIP"), *i.e.*, Paramount's current stock option plan, or any successor plans to LTIP. The award of a stock option grant, if any, and the precise amount of such options that may be granted, shall be determined on an annual basis at the sole discretion of the Board of Directors of CBS, or the appropriate committee of such Board.

3. Executive shall be included in all plans now existing or hereafter adopted for the general benefit of Paramount employees, subject to the provisions of such plans as the same may be in effect from time to time. To the extent Executive participates in any benefit plan, such participation shall be based upon Executive's base salary, unless otherwise indicated in the plan document.

4. Executive's vacation entitlement shall be governed in accordance with Paramount policy.

5. Executive agrees to devote all customary business time and attention to the affairs of Paramount, except during vacation periods and reasonable periods of illness or other incapacity consistent with the practices of Paramount for executives in comparable positions, and agrees that Executive's services shall be completely exclusive to Paramount during the term hereof. Executive further agrees to comply with all applicable Paramount policies, as described in the Paramount Personnel Policy Manual.

6. (a) Executive acknowledges receipt of the CBS Business Conduct Statement. Executive further acknowledges that Executive has read and fully understands all of the

requirements thereof, and acknowledges that at all times during the term hereof, Executive shall perform Executive's services hereunder in full compliance with the CBS Business Conduct Statement, and with any revisions thereof or additions thereto that are provided to Executive in writing, including without limitation any notice provisions therein (notwithstanding any notice provisions to the contrary which may be contained in paragraph 16 of this Agreement).

(b) Executive acknowledges that Paramount is an equal opportunity employer. Executive agrees to comply with Paramount policies regarding employment practices and with applicable Federal, state and local laws prohibiting discrimination on the basis of race, color, national origin, religion, sex, age, sexual orientation, disability, veteran's status, marital status, or height or weight.

7. (a) In the event of the death of Executive, salary payments to be paid pursuant to this Agreement shall cease immediately; provided, however, in the event of death, the estate of Executive shall receive any salary due and not yet paid through the date of Executive's death.

(b) If, during the term of this Agreement, Paramount properly terminates the employment of Executive for Cause, which for these purposes is defined as (i) fraud, misappropriation or embezzlement on the part of Executive, (ii) Executive's willful failure to perform services hereunder or (iii) Executive's intentional breach of the provisions of paragraph 5 or of paragraph 6 hereof, or for Executive's incapacity, then Paramount shall immediately have the right to terminate this Agreement without further obligation; provided, however, that in the event of Executive's incapacity Paramount may terminate this Agreement effective only after the expiration of a period the length of which shall be determined by the Paramount Human Resources Department pursuant to the then applicable Paramount sick leave policy for Paramount exempt staff employees as though such policy were applicable to this Agreement, but

in any event not less than four (4) consecutive weeks.

   (c) If, during the term of this Agreement, the employment of Executive by Paramount should be terminated by Paramount other than for Cause as defined herein or for Executive's incapacity, then Paramount shall be obligated both to pay to Executive all applicable base salary pursuant to paragraph 2(a) of this Agreement and also Paramount shall continue all applicable plans and/or benefits pursuant to paragraph 3 hereof for the remainder of the Employment Term, so long as Executive is willing, ready and able to render exclusive services hereunder during such remainder of the Employment Term. Nothing herein shall obligate Paramount to utilize Executive's services, and Paramount shall have fulfilled all of its obligations hereunder by payment to Executive of the applicable amounts set forth herein for the Employment Term of this Agreement subject to the terms of this paragraph 7(c). Notwithstanding the above, if the employment of Executive is also terminated by Paramount for Cause or by reason of disability or death, this paragraph 7(c) shall not be applicable.

  8. Paramount shall own all right, title and interest in perpetuity to the results of Executive's services and all artistic materials and intellectual properties which are, in whole or in part, created, developed or produced by Executive during the term of this Agreement and which are suggested by or related to Executive's employment hereunder or any activities to which Executive is assigned, and Executive shall not have or claim to have any right, title or interest therein of any kind or nature. Nothing in the preceding sentence is intended to constitute a waiver of the Conflicts Policy.

  9. Executive agrees that, during the Employment Term and for one (1) year thereafter, Executive shall not, in any communications with the press or other media or any customer, client or supplier of Paramount, CBS or any of CBS's affiliated companies, criticize,

ridicule or make any statement which disparages or is derogatory of Paramount, CBS, or any of CBS's affiliated companies or any of their respective directors or senior officers.

10. Executive agrees that, during the Employment Term and for one (1) year thereafter, Executive shall not, directly or indirectly: (i) employ or solicit the employment of any person who is then or has been within six (6) months prior thereto, an employee of Paramount, CBS, or any of CBS's affiliated companies; or (ii) do any act or thing to cause, bring about, or induce any interference with, disturbance to, or interruption of any of the then-existing relationships (whether or not such relationships have been reduced to formal contracts) of Paramount, CBS, or any of CBS's affiliated companies with any customer, employee, consultant or supplier.

11. Executive agrees that during the Employment Term, Executive will not engage in any other occupation or engage in the leisure/theme park, motion picture, television, or entertainment business, except for Paramount pursuant to this Agreement.

12. Executive agrees that during the Employment Term or at any time thereafter, (i) Executive shall not use for any purpose other than the duly authorized business of Paramount or CBS, or disclose to any third party, any information relating to Paramount, CBS or any of its affiliated companies which is proprietary to Paramount, CBS, or any of its affiliated companies ("Confidential Information"), including any trade secret or any written (including in any electronic form) or oral communication incorporating Confidential Information in any way (except as may be required by law or in the performance of Executive's duties under this Agreement consistent with Paramount's and CBS's policies); and (ii) Executive will comply with any and all confidentiality obligations of Paramount and CBS to a third party, whether arising under a written agreement or otherwise. Information shall not be deemed Confidential

5

Information which (x) is or becomes generally available to the public other than as a result of a disclosure by Executive or at Executive's direction or by any other person who directly or indirectly receives such information from Executive, or (y) is or becomes available to Executive on a non-confidential basis from a source which is entitled to disclose it to Executive.

13. (a) Executive agrees that, during the Employment Term, for one (1) year thereafter and, if longer, during the pendency of any litigation or other proceeding, (x) Executive shall not communicate with anyone (other than Executive's own attorneys and tax advisors), except to the extent necessary in the performance of Executive's duties under this Agreement, with respect to the facts or subject matter of any pending or potential litigation, or regulatory or administrative proceeding involving Paramount, CBS or any of CBS's affiliated companies, other than any litigation or other proceeding in which Executive is a party-in-opposition, without giving prior notice to Paramount or its counsel; and (y) in the event that any other party attempts to obtain information or documents from Executive with respect to such matters, either through formal legal process such as a subpoena or by informal means such as interviews, Executive shall promptly notify Paramount or its counsel before providing any information or documents.

(b) Executive agrees to cooperate with Paramount and its attorneys, both during and after the termination of Executive's employment, in connection with any litigation or other proceeding arising out of or relating to matters in which Executive was involved prior to the termination of Executive's employment. Executive's cooperation shall include, without limitation, providing assistance to Paramount's counsel, experts or consultants, and providing truthful testimony in pretrial and trial or hearing proceedings. In the event that Executive's cooperation is requested after the termination of Executive's employment, Paramount will (x) seek to minimize interruptions to Executive's schedule to the extent consistent with its interests

in the matter; and (y) reimburse Executive for all reasonable and appropriate out-of-pocket expenses actually incurred by Executive in connection with such cooperation upon reasonable substantiation of such expenses.

(c) Executive agrees that Executive will not testify voluntarily in any lawsuit or other proceeding which directly or indirectly involves Paramount, CBS or any of CBS's affiliated companies, or which may create the impression that such testimony is endorsed or approved by Paramount, CBS or any of CBS's affiliated companies, without advance notice (including the general nature of the testimony) to and, if such testimony is without subpoena or other compulsory legal process the approval of, the Executive Vice President, General Counsel of CBS.

14. Paramount has entered into this Agreement in order to obtain the benefit of Executive's unique skills, talent, and experience. Executive acknowledges and agrees that any violation of paragraphs 8 through 13 of this Agreement will result in irreparable damage to Paramount and CBS, and, accordingly, Paramount and CBS may obtain injunctive and other equitable relief for any breach or threatened breach of such paragraphs, in addition to any other remedies available to Paramount and CBS.

15. This Agreement contains the entire understanding of the parties with respect to the subject matter thereof, supersedes any and all prior agreements of the parties with respect to the subject matter thereof, and cannot be changed or extended except by a writing signed by both parties hereto. This Agreement shall be binding upon and inure to the benefit of the parties and their respective legal representatives, executors, heirs, administrators, successors and assigns; provided, however, that Executive shall have no right to assign this Agreement or delegate Executive's obligations hereunder. This Agreement and all matters and issues collateral thereto

shall be governed by the laws of the State of New York applicable to contracts entered into and performed entirely within the State of New York, with respect to the determination of any claim, dispute or disagreement, which may arise out of the interpretation, performance or breach of this Agreement, and will be subject to enforcement and interpretation solely in the appropriate courts of the State of New York. If any provision of this Agreement, as applied to either party or to any circumstance, shall be adjudged by a court to be void or unenforceable, the same shall in no way affect any other provision of this Agreement or the validity or enforceability thereof.

16.     All notices or other communications hereunder shall be given in writing and shall be deemed given if served personally or mailed by registered or certified mail, return receipt requested (in which case notice shall be deemed to have been given three (3) days from the date of mailing), to Executive at the address above indicated. In the case of Paramount, directed to: (Attn: Anthony Ambrosio, Executive Vice President Human Resources, CBS Corporation, 51 West 52nd Street, (35th Floor) New York, New York 10019), or at such other addresses as they may hereafter designate in writing.

IN WITNESS WHEREOF, the parties have executed this Agreement as of _____, 2006.

Paramount Parks Inc.

By: _____
EVP HR/ADMIN

By: _____
Lester C. Nail



July 27, 2006

Mr. Lester C. Nail
9027 Kirkley Court
Charlotte, North Carolina 28277

    Re:    Notice of Termination of Employment

Dear Mr. Nail:

    On June 30, 2006 (the "Closing Date"), Bombay Hook LLC and CBS Corporation finalized the transaction with Cedar Fair, L.P. and Magnum Management Corporation (the "Company"), (collectively, the "Cedar Fair Entities"), pursuant to which the Company acquired 100 percent of the outstanding shares of capital stock of Paramount Parks Inc. ("PPI") As a result, your employment agreement, effective as of January 1, 2006 ("Employment Agreement"), has become the benefit and obligation of PPI, as legal successor and/or assign.

    Please be advised that PPI has determined that your services will no longer be needed after August 1, 2006. Accordingly, this letter is your notice under your Employment Agreement that your employment is terminated without cause as of August 1, 2006, and that you will be entitled to receive, subject to applicable taxes and withholdings, and subject to any other terms of the Employment Agreement, the amounts identified in paragraph 7(c) of your Employment Agreement. PPI reminds you of both (1) your non-compete obligations under paragraph 11 of the Employment Agreement, and (2) the "willing, ready and able to render exclusive services" requirement of paragraph 7(c), and any other post-termination obligations of the Employment Agreement.

    PPI is currently considering making an alternative separation proposal to you, which would incorporate a lump sum severance payment, along with other terms in a separation agreement. You will hear from PPI in the near future should it decide to present an alternative separation proposal to you. Should you have any questions, please contact Paramount Parks Inc. c/o Craig Freeman, Cedar Fair, L.P., One Cedar Point Drive, Sandusky, Ohio 44870, (419) 627-2391.

Very truly yours,

*[signature]*

Richard L. Kinzel
President
Paramount Parks, Inc.



October 19, 2007

Lester C. Nail
9027 Kirkley Court
Charlotte, North Carolina 28277

    Re:    <u>Employment Agreement with Paramount Parks Inc.</u>

Dear Mr. Nail:

    As you know, as of July 31, 2006, pursuant to the terms of your Employment Agreement, your employment with Paramount Parks Inc. ("PPI") was terminated without cause. Since that time, PPI has been providing you, subject to applicable taxes and withholdings, and subject to any other terms of the Employment Agreement, the amounts identified in paragraph 7(c) of your Employment Agreement.

    We have recently learned that you have secured alternate employment and are, therefore, no longer able to render exclusive services to PPI. Accordingly, PPI will discontinue providing the above payments and benefits effective immediately, as provided under paragraph 7(c) of your Employment Agreement. You will be receiving information regarding your options under COBRA. You also have the obligation to pay back any amounts that PPI paid to you since you have been otherwise employed.

    Please contact me as soon as possible to discuss the commencement of your new employment. Thank you in advance for your anticipated cooperation.

Very truly yours,

PARAMOUNT PARKS INC.

*Craig Freeman*

Craig Freeman