UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
PARAMOUNT PARKS INC.                    :
                                        :
                    Plaintiff,          :       CASE NO.  07 CV 10595 (SHS)
                                        :
            v.                          :
        :
LESTER NAIL                             :
                                        :
                    Defendant.          :
------------------------------------------------------x

Jill S. Kirila, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury as follows:

1.      I am a member of the bar of the State of Ohio and admitted *pro hac vice* in this Court in the above matter.  I am a partner in the law firm of Squire, Sanders & Dempsey L.L.P., attorneys for Plaintiff Paramount Parks Inc. ("PPI").

2.      I submit this declaration in support of PPI's Motion for Protective Order and Attorneys' Fees (the "Motion") filed contemporaneously herewith.

3.      Attached hereto as Exhibit 1 is a copy of the transcript of the deposition of Defendant Lester Nail, with the exception of the portions marked confidential that are unrelated to the Motion.

4.      Attached hereto as Exhibit 2 is a copy of the transcript of the deposition of Mr. Craig Freeman.

5.      Attached hereto as Exhibit 3 is a copy of the March 10, 2008 electronic mail message that I sent to counsel for Defendant, along with the attached Affidavits of Mr. Richard Kinzel and Mr. Peter Crage.

6.      Attached hereto as Exhibit 4 is a copy of the Court transcript from the February

29, 2008 Court Conference.

7. Attached hereto as Exhibit 5 is a copy of Mr. Nail's Employment Agreement.

8. Attached hereto as Exhibit 6 is a copy of the July 27, 2006 letter sent to Mr. Nail.

9. Attached hereto as Appendix 1 are copies of all unreported, docketed cases cited in PPI's Memorandum of Law in Support of the Motion.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and understanding.

Executed this 2nd day of May, 2008.

/s/ Jill S. Kirila

Jill S. Kirila

Page 1

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    ----------------------------X

4    PARAMOUNT PARKS, INC.,

5            Plaintiff,

6        vs.         No. 07 CV 10595(SS)

7    LESTER NAIL,

8            Defendant.

9    ----------------------------X

10           April 23, 2008
             3:27 p.m.
11

12       ** REDACTED TRANSCRIPT **

13

14

15       Deposition of LESTER NAIL, held at the

16   offices of Squire, Sanders & Dempsey L.L.P.,

17   350 Park Avenue, New York, New York, pursuant

18   to Notice and Agreement, before Thomas R.

19   Nichols, a Registered Professional Reporter

20   and a Notary Public of the State of New York.

21

22

23
         GREENHOUSE REPORTING, INC.
24       875 Sixth Avenue - Suite 1716
         New York, New York  10001
25           (212) 279-5108

Page 2

```
 1
 2      A P P E A R A N C E S:
 3
 4      SQUIRE, SANDERS & DEMPSEY L.L.P.
 5      Attorneys for Plaintiff
 6          1300 Huntington Center
 7          41 South High Street
 8          Columbus, Ohio 43215-6197
 9      BY:   JILL S. KIRILA, ESQ.
10
11      LITTLER MENDELSON
12      A Professional Corporation
13      Attorneys for Defendant
14          885 Third Avenue
15          New York, New York 10022-4834
16      BY:   A. MICHAEL WEBER, ESQ.
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                    L. Nail
 2      L E S T E R   N A I L ,  called as a witness,
 3          having been duly sworn by a Notary Public,
 4          was examined and testified as follows:
 5              THE REPORTER:  Would you please state
 6          your name and home address for the record.
 7              THE WITNESS:  Lester Nail, 375 South
 8          Monterey Drive, Moore, South Carolina 39369.
 9      EXAMINATION BY
10      MS. KIRILA:
11          Q.    Good afternoon, Mr. Nail.  In case you
12      missed it, my name is Jill Kirila and I'm with the
13      law firm of Squire Sanders and representing
14      Paramount Parks in this lawsuit.  I know you sat
15      through most of Mr. Freeman's deposition today.
16              But do you understand that you are
17      here for your deposition today?
18          A.    Yes.
19          Q.    Have you ever been deposed before?
20          A.    Once by telephone many, many years
21      ago.
22          Q.    Do you recall the case in which you
23      were deposed?
24          A.    It was a Wal-Mart case.
25          Q.    In your capacity as counsel?
```

Page 4

```
 1                    L. Nail
 2          A.    As counsel, yes.
 3          Q.    In a deposition my client is entitled
 4      to ask you questions that you are required to
 5      answer under oath.
 6              Do you understand that part of it?
 7          A.    Yes.
 8          Q.    As the court reporter just reminded
 9      you, if we could take turns with our questions and
10      responses that will make the record more clear and
11      enable both of our questions and responses to be
12      taken down hopefully accurately.  OK?
13          A.    Sure.
14          Q.    Also, because you are answering under
15      oath today, it is important that you understand my
16      questions, and so I will ask you if you do not
17      understand one of my questions will you let me
18      know?
19          A.    Yes.
20          Q.    Otherwise I will assume that you've
21      understood and answered the question that I've
22      asked.  Is that fair?
23          A.    Yes.
24          Q.    Is there any reason you could not
25      testify truthfully here today?
```

Page 5

```
 1                    L. Nail
 2          A.    No.
 3          Q.    Are you on any medication that would
 4      interfere with your ability to testify?
 5          A.    No.
 6          Q.    Have you had a drink of alcohol within
 7      the last twelve hours?
 8          A.    No.
 9          Q.    Have you taken any prescription drug
10      within that same amount of time that would impact
11      your ability to testify?
12          A.    No.
13          Q.    Or fail to take any that you're
14      supposed to take that might affect your ability to
15      testify?
16          A.    No.
17          Q.    I assume you have no problems with
18      hearing or communicating in general?
19          A.    No.
20          Q.    As you are doing, it's important to
21      verbalize your responses, again, so that the court
22      reporter can take down your responses accurately
23      as opposed to shaking your head or nonverbal
24      responses.
25              Is that understood?
```

Page 6

L. Nail

1
2   A.   Yes.
3   Q.   I just want to follow up real quickly
4   on the deposition you gave in your capacity as
5   counsel for Wal-Mart.
6        What type of case was that?
7   A.   It was an employment case.
8   Q.   Why were you asked to testify in a
9   deposition in that matter?
10  A.   That's a good question.  I don't know
11  and it was very short deposition.  Overly
12  aggressive plaintiff attorney.
13  Q.   A lot of privileged objections I would
14  imagine?
15  A.   Yes.
16  Q.   Do you remember the nature of the
17  employment?
18  A.   I don't.  A long time ago.
19  Q.   What documents did you review in
20  preparation for your deposition?
21  A.   I looked at the complaint.  I looked
22  at the answer.  I looked at the interrogatories
23  that were filed.  I looked at some documents that
24  your client produced.  I think that's it.
25  Q.   Of the documents that you looked at

Page 7

L. Nail

1
2   that Paramount produced what specific documents do
3   you recall reviewing?
4   A.   Reviewed the notes from Mr. Freeman.
5   Q.   Just for the record, that would have
6   been what was marked as Exhibit K in Mr. Freeman's
7   deposition?  I will hand that to you just for your
8   reference.
9   A.   Yes, if that's K.  Yes, that's it,
10  correct.
11  Q.   What other documents?
12  A.   The e-mail from Sandy Cranford that
13  was introduced in his deposition and the e-mail
14  from Debbie Thompson that was introduced in his
15  deposition.
16  Q.   Any other documents you recall
17  reviewing in preparation for your deposition?
18  A.   I don't recall at this moment.
19  Q.   Other than your attorney or attorneys
20  did you discuss your deposition with anyone?
21  A.   I've informed my wife of the
22  deposition.  Informed my boss of the deposition.
23  Q.   Anyone else that you discussed your
24  deposition with other than counsel?
25  A.   I do not believe so.

Page 8

L. Nail

1
2   Q.   What did you tell your boss about the
3   deposition?
4   A.   I told my boss that I was having my
5   deposition taken today, and in the case which he
6   was already familiar with the case, and told her I
7   would be either out most -- well, all of today and
8   possibly tomorrow.
9   Q.   What is your boss's name?
10  A.   Rhonda Parish.  P-a-r-i-s-h.
11  Q.   Do you know how she first became
12  familiar with this case?
13  A.   Yes, I informed her of it.
14  Q.   Do you know when?
15  A.   It was at some point after the
16  complaint was filed.  I believe.
17  Q.   What did you tell her about the case?
18  A.   I told her that I was being sued by
19  Paramount Parks in a dispute over my employment
20  agreement.
21  Q.   Anything else that you told her with
22  respect to the case?
23  A.   I told her it related to the terms of
24  the willing, ready and able and Paramount Parks'
25  interpretation of that and while they felt like I

Page 9

L. Nail

1
2   had -- why I believe they felt like I had violated
3   the agreement by working at Denny's.
4   Q.   What did she say in response to that?
5   A.   Well, quite literally she said it was
6   ludicrous.
7   Q.   Ludicrous?
8   A.   Yes.
9   Q.   Did she share any more details --
10  A.   No.
11  Q.   -- other than that?
12       Had she seen the employment agreement
13  up until that point.
14  A.   No.
15  Q.   Did you show it to her after that
16  point or at any point?
17  A.   I don't believe I have.
18  Q.   Did you share anything else with her
19  other than what you just testified about regarding
20  the case?
21  A.   No.  Other than I asked her to inform
22  our CEO.
23  Q.   Do you know whether she did that?
24  A.   She said she did.
25  Q.   Did you have any personal

3 (Pages 6 to 9)

L. Nail

1
2  conversations with your CEO regarding this case?
3      A.   No, I did not.
4      Q.   Other than your attorneys who have you
5  discussed this case with?
6      A.   My wife, my boss, Rhonda Parish.  I
7  mentioned it to my sister.  Actually, she -- I
8  think my wife told her and so she asked me about
9  it.  Al Weber.
10         I think -- I think that's it.
11     Q.   If you recall anyone else as you're
12 testifying here today would you let me know?
13     A.   Yes.
14     Q.   Is there anything else about the case
15 that you discussed with Rhonda Parish that you
16 have not told me about?
17     A.   No.  Other -- no.
18     Q.   Just generally, with your wife, what
19 would you have discussed about the case with her?
20     A.   I described for her the general nature
21 of the allegations that were made in the
22 complaint.
23     Q.   Did you discuss with her any
24 recollection she may have had about a conversation
25 with Sandy Cranford?

L. Nail

1
2      A.   I remember the conversation with Sandy
3  Cranford.  So I don't remember if I discussed it
4  with -- I don't believe I discussed it with Linda.
5      Q.   Just to skip ahead and cover that now
6  while we're on the subject, what do you recall
7  about a conversation with your wife and Sandy
8  Cranford?
9      A.   Well, what I remember fairly clearly
10 and to put it in context, my wife and I were on
11 the back deck of our porch having a fairly
12 emotional conversation about the fact that I had
13 not been able to find a job in Charlotte.  I was
14 commuting three and a half hours to Denny's, and
15 we were going to have to put the house on the
16 market.
17         And it was during this conversation
18 that Sandy called and Linda talked to Sandy and,
19 you know, Linda was going in and out.  She was
20 going into the kitchen.  The girls were in and out
21 of the house.  She was walking around on the cell
22 phone and I was sitting out on the back deck.
23         So she was in and out and I know that
24 I told her to tell Sandy that I said hi.  And, you
25 know, at some point in the conversation she told

L. Nail

1
2  Sandy, you know, things would be better if Lester
3  could find a job in Charlotte.
4      Q.   So you were present for that --
5      A.   Yes.
6      Q.   -- part of the conversation?
7      A.   Yes.
8         And let me go back a minute.
9      Q.   Sure.
10     A.   I'm not positive whether Linda called
11 Sandy or Sandy called us.  I know there was some
12 issues with, you know, the medical forms going
13 back and forth.
14     Q.   So this would have been during the
15 benefits enrollment --
16     A.   Yes.
17     Q.   -- period?
18     A.   I believe that's when it took place.
19 It was about that time frame.
20     Q.   In June of 2000 --
21     A.   No, no, I think it was in May.
22     Q.   May of 2007?
23     A.   It had to have been in May.
24     Q.   In May of 2007?
25     A.   Correct.

L. Nail

1
2      Q.   And why do you say it had to be in
3  May?
4      A.   Because we were still in our house in
5  Charlotte.
6      Q.   Do you recall what questions had come
7  up that there would arise the need for a
8  conversation with Sandy Cranford?
9      A.   You know, I really don't.  I don't
10 know if she was calling to verify that she had
11 gotten the documents.  Linda had -- when we'd
12 gotten to the change of enrollment that I gave
13 them to Linda, Linda's a nurse and she takes care
14 of all the claims, health claims, and I just
15 handed them to her and said, Please take care of
16 these, and she did.
17     Q.   So the call with Sandy Cranford would
18 have been after you received those enrollment
19 forms.
20     A.   I believe so.  But I'm not one hundred
21 percent sure.
22     Q.   Would there have been any other reason
23 to talk to Sandy Cranford?
24     A.   Yes.  We were, there were claims
25 being, um, and I don't -- there were a number of

4 (Pages 10 to 13)

Page 14

L. Nail

1  claims that I had had that had been denied because
2  of the changeover.  When I was terminated I got a
3  new number, you know, a health card number.  And I
4  had not -- I had made some claims under my old
5  number.  Actually, quite a few claims.  And all of
6  those claims had been denied because we had given
7  the health care providers my old number.  Because
8  I hadn't been given the new COBRA number.
9              Now, this is not related to the
10 changeover that those documents represented.  This
11 was back.  So there was an ongoing issue of trying
12 to resolve claims and trying to get the right
13 number.
14     Q.    And Sandy would have provided you with
15 that number?
16     A.    Yes.
17     Q.    Did you in fact get the right number?
18     A.    Eventually we did.
19     Q.    And your claims were paid for --
20     A.    Yes, they were.
21     Q.    -- after you were provided the number?
22     A.    Yes, they were.
23     Q.    And you're not sure exactly when, I
24 mean, you believe it was in May of 2007 that this

Page 15

L. Nail

1  conversation between your wife and Sandy --
2      A.    Well, I am sure that the conversation
3  with Sandy that Mr. Freeman referred to in his
4  deposition took place in May.
5      Q.    OK.  Do you remember when in May?
6      A.    No.
7      Q.    You mentioned you were still in your
8  house.  Do you remember when you moved out of your
9  house?
10     A.    Yes.
11     Q.    When?
12     A.    It was the first week of June, I'm
13 thinking June -- well, wait a minute, no.  We
14 closed, I think we closed on the -- well, I'm just
15 going to say early June.  We closed early June and
16 I can't remember when we actually packed up and
17 moved out.  It would have been later.
18     Q.    After the closing?
19     A.    Yes.  Well, there were several, I
20 mean, there was the closing of the Charlotte
21 house, the closing of the Moore house.
22     Q.    And I'm just speaking of the
23 North Carolina house.
24     A.    Right.

Page 16

L. Nail

1      Q.    Did you, do you remember when you
2  closed the sale on your North Carolina house?
3      A.    I do not remember the date.  They
4  changed the date on us several times.
5      Q.    Did you live in your North Carolina
6  home following the closing?
7      A.    Yes.  For a short period of time.
8      Q.    Do you recall for how long?
9      A.    A week or two.
10     Q.    So the buyer let you stay in after --
11     A.    Well, it was a -- yes.  The answer's
12 is yes.  It got complicated.
13     Q.    Anything else you recall about the
14 conversation between Sandy Cranford and your wife
15 and/or you?
16     A.    No.
17     Q.    Were there more than one such
18 telephone conversations that you can recall?
19     A.    Not that day.
20     Q.    On other days?
21     A.    I did not have any further
22 conversations with Sandy after that day.  I do not
23 know if my wife did or not.
24     Q.    Did your wife ever relay any other

Page 17

L. Nail

1  conversations with Sandy Cranford?
2      A.    I don't recall.  I don't believe so.
3      Q.    OK.  Going back to the others with
4  whom you've discussed the case, Al Weber, what did
5  you discuss about this case with Mr. Weber?
6      A.    I called Al and informed him that PPI
7  was suing me over my employment agreement and
8  asked him for the name of his attorney.
9      Q.    Do you recall when that was that you
10 called Al?
11     A.    Sometime after being served.
12     Q.    After you received the complaint?
13     A.    Yes.
14     Q.    Was that the first time you spoke to
15 him regarding a potential dispute?
16     A.    Yes.  Yes.
17     Q.    What did you discuss in that
18 conversation with him when you called him after
19 you received the complaint?
20     A.    Just told him the general nature of
21 the allegations, that Cedar Fair was taking the
22 position that because I had started working at
23 Denny's I violated the agreement.
24     Q.    Did he give you a referral for an

Page 18

L. Nail

1
2  attorney?
3      A.   Yes, he did.
4      Q.   Who was that?
5      A.   I don't remember.
6      Q.   But you did not retain that
7  individual.
8      A.   No, I did not.
9      Q.   Let's go back before that conversation
10  with Mr. Weber.  Had you spoken with him at any
11  point after your termination without cause
12  provisions were triggered in your employment
13  agreement?
14      A.   Yes.
15      Q.   Tell me the first time you spoke with
16  him after that point.
17      A.   After my termination.
18      Q.   Yes.
19      A.   I can't give you a date.  It was, um,
20  some period, I mean, it was -- when was that?
21  '06?  The fall of '06?  So I just too remember.
22  Thirty or sixty days after that.
23      Q.   Did you call him or did he call you?
24      A.   I don't remember.  I don't remember
25  who called who.

Page 19

L. Nail

1
2      Q.   What was the purpose for that call?
3      A.   Just to get together, have coffee,
4  talk about the company, talk about future plans,
5  you know, just...
6      Q.   Did you discuss anything specifically
7  that you can recall with respect to the company?
8      A.   We talked a lot about the history of
9  the company, you know, pre-Cedar Fair, premerger.
10  Just --
11      Q.   And why were you discussing that?
12      A.   Al was doing some research for his
13  dissertation.  It was -- well, I call it research.
14  I don't know what he calls it.
15      Q.   Did you discuss your termination from
16  PPI?
17      A.   I am sure that I did.
18      Q.   What did you say?
19      A.   I cannot, I mean, I'm sure I discussed
20  the fact that, you know, the circumstances about,
21  you know, we all had been let go, what were other
22  guys doing, what did they think they were going to
23  do, what was Al going to do, what did I want to
24  do, you know, that type of conversation.
25      Q.   Anything else that you can recall with

Page 20

L. Nail

1
2  respect to your termination?
3      A.   No.
4      Q.   Did he tell you with respect to his
5  circumstances anything about that?
6      A.   I think he said he was going to take
7  some time to finish his work on his Ph.D.
8      Q.   Do you recall anything else
9  specifically that Mr. Weber said during that first
10  conversation you had with him following your
11  termination without cause?
12      A.   Not specifically.
13      Q.   You would not have discussed the
14  employment agreements in detail at that point,
15  correct?
16      A.   No, I don't believe so.
17      Q.   What other occasions did you speak
18  with Mr. Weber following your termination without
19  cause?
20      A.   I spoke to him last night.
21      Q.   Between then and then the second call
22  when you called him after you received the
23  complaint and last night, were there any other
24  conversations or communications between you and
25  Mr. Weber?

Page 21

L. Nail

1
2      A.   I got a Christmas card.  I got an
3  e-mail from Al asking for my new address.
4      Q.   Do you recall when that e-mail was?
5      A.   Just recently, like within the last
6  two weeks, three weeks.
7      Q.   Did the e-mail say anything other than
8  that?
9      A.   No, just wanted my new address.
10      Q.   Any other communications before your
11  telephone call with him last night?
12      A.   I don't think so.
13      Q.   Tell me how you -- you said you called
14  him last night?
15      A.   Yes, I did.
16      Q.   What was the purpose of your call?
17      A.   Twofold.  One, I was calling to thank
18  him for sending me a copy of his dissertation and
19  a note with it.  The other I was directed by my
20  attorney to ask a question.
21      Q.   And what question did you ask him?
22      A.   I asked him if he was aware of any of
23  the other executives who had had contracts, had
24  negotiated any type of settlement or any type of
25  arrangement with Cedar Fair.

Page 22

```
1                      L. Nail
2        Q.    What did Mr. Weber say?
3        A.    He said that several had tried and to
4   his knowledge none were successful.
5        Q.    Did you ask him any other questions?
6        A.    I told him that Cedar Fair -- that
7   Cedar Fair was of course still suing me and he
8   informed me he had received a call from
9   Mr. Freeman asking about an employment agreement
10  and he told me what he told Mr. Freeman.
11       Q.    What did he say?
12       A.    He said he told Mr. Freeman that it
13  was his understanding that the employment
14  agreement and the section about not working for
15  anyone else or the ready, the willing, able and
16  ready section did not mean that I could not work
17  for anyone else and that it was not intended to
18  mean that I had to be available 24/7 or even in I
19  think his exact words, it didn't mean I had to be
20  available to work a 40-hour week, that the intent
21  was that I needed to be available if the company
22  needed me for ongoing, you know, stuff that had
23  been going on while I was there for, you know,
24  assistance, for, you know, consultation.
25       Q.    Were you aware that Mr. Weber was not
```

Page 23

```
1                      L. Nail
2   involved in the drafting of that, of your
3   employment contract?
4            MR. WEBER:  Objection as to form.
5        A.    I was aware that as president and CEO
6   of the company Mr. Weber told me that he was going
7   to get a contract for me and he was taking steps
8   to get a contract after my promotion.
9        Q.    OK, and we'll get into that in a
10  little bit.  What else did Mr. Weber and you
11  discuss during the conversation last night?
12       A.    I asked him about an individual that I
13  mistakenly thought was seriously ill and I was
14  mistaken.
15       Q.    Nothing to do with this?
16       A.    Nothing to the with this, no.
17       Q.    Other than the ready, willing and able
18  did you discuss any other portions or provisions
19  of your employment agreement?
20       A.    No.
21       Q.    Did he share with you where his
22  understanding of the clause ready, willing and
23  able came from?
24       A.    No.
25       Q.    Did he share with you that he told
```

Page 24

```
1                      L. Nail
2   Mr. Freeman that that was only his interpretation?
3        A.    No, he didn't characterize it that
4   way.
5        Q.    Anything else that you and Mr. Weber
6   discussed last night?
7        A.    No.
8        Q.    Did you ask him to testify in this
9   matter?
10       A.    No.
11       Q.    Did he share any details regarding his
12  own employment situation and separation from PPI?
13       A.    Yes.
14       Q.    What did he tell you?
15       A.    He said he had worked something out
16  with Dick personally.
17       Q.    Did he share the details of that?
18       A.    No, he did not.
19       Q.    Did he tell you that that was subject
20  to a confidentiality agreement?
21       A.    No.
22       Q.    Or just didn't share the details?
23       A.    He did not share the details with me.
24       Q.    Are you aware whether or not your
25  employment agreement was the same employment
```

Page 25

```
1                      L. Nail
2   agreement as that held by Mr. Weber?
3        A.    It was my understanding it was
4   different.
5        Q.    Anything else that you talked with
6   Mr. Weber?
7        A.    No.
8        Q.    And those are the only times that you
9   spoke with him since your termination without
10  cause.
11       A.    I believe so.
12       Q.    Anyone else that you discussed this
13  case with that we haven't talked about already?
14       A.    Can we review who we have identified?
15       Q.    Sure.  You told me your wife, Wanda
16  Parish, your sister and Al Weber.  And I'm not
17  asking about your attorneys.
18       A.    OK.  I believe that's it.
19             And its Rhonda, with an R.
20       Q.    Oh, Rhonda, I'm sorry.
21       A.    That's OK.
22             MS. KIRILA:  Mark this as Plaintiff's
23  Exhibit 1.
24             (Plaintiff's Exhibit 1, two-page
25  résumé of Lester C. Nail, marked for
```

7 (Pages 22 to 25)

Page 26

L. Nail

1    identification, this date.)
2    Q.    You have been handed what we marked as
3    Plaintiff's Exhibit 1. Would you take a look at
4    this two-page document and identify it for me, if
5    you can.
6    A.    Yes, this is a draft of, well, this is
7    a version of my résumé.
8    Q.    Did you prepare this résumé?
9    A.    Yes.
10   Q.    To try to get through some of this
11   information, I want you to look over it and tell
12   me if there's anything that's not accurately
13   stated on here.
14   A.    As of what?
15   Q.    Oh, as of -- I guess, let's see, this
16   is from Paramount's file. So as of 2000, you
17   know, the position here, understanding that you've
18   had subsequent positions, but as of this time in
19   what is reflected on here, are these positions
20   accurate? Is there anything that you know that's
21   missing?
22   A.    No, I do not believe so.
23   Q.    And I understand your current address,
24   I think we have it on the record, in
25

Page 27

L. Nail

1    South Carolina. Previous to that what was your
2    home address?
3    A.    Charlotte was -- how soon we forget --
4    9027 Kirkley, K-i-r-k-l-e-y, Court, Charlotte,
5    North Carolina 29 -- no, 28 --
6    Q.    277 is what I have.
7    A.    277, yes.
8    Q.    And then prior to that where did you
9    reside?
10   A.    Salisbury.
11   Q.    North Carolina?
12   A.    Correct.
13   Q.    Did you have any other residences,
14   even temporary residences after you moved out of
15   the Kirkley court address and before you moved
16   into your current home in South Carolina?
17   A.    No.
18   Q.    No corporate housing or apartments?
19   A.    No.
20   Q.    And you are married to Lindacarol; is
21   that correct?
22   A.    Yes. And that's all one word,
23   L-i-n-d-a-c-a-r-o-l. It's a small C.
24   Q.    Is your education as reflected on
25

Page 28

L. Nail

1    Exhibit 1 correct?
2    A.    Yes.
3    Q.    And you have been, you graduated law
4    school in 1985?
5    A.    Yes.
6    Q.    Have you held a license as an attorney
7    since then?
8    A.    Yes.
9    Q.    Are you currently admitted in any
10   state to practice law?
11   A.    Yes.
12   Q.    Where?
13   A.    Arkansas, and Tennessee.
14   Q.    Am I safe to assume that your
15   positions as in-house counsel do not require you
16   to be admitted to the state in which that --
17   A.    No.
18   Q.    -- company is located?
19   A.    No.
20   Q.    That's correct?
21   A.    That's correct.
22   Q.    So you're not admitted in
23   North Carolina or South Carolina.
24   A.    That's correct.
25

Page 29

L. Nail

1    Q.    Have you ever been?
2    A.    No.
3    Q.    Have you been admitted in the State of
4    New York?
5    A.    No.
6    Q.    And do you keep your licenses
7    up-to-date in Arkansas and Tennessee?
8    A.    Yes.
9    Q.    Have either of those or your license
10   in general ever been sanctioned, suspended or
11   revoked?
12   A.    No.
13   Q.    Where did you grow up, Mr. Nail?
14   A.    I grew up out in the country close to
15   a small town called Cherryville.
16   Q.    What state is that?
17   A.    North Carolina. In Gaston County.
18   Q.    It looks from your résumé that you
19   have moved from state to state from time to time;
20   is that correct?
21        MR. WEBER: Object to the relevancy of
22   these questions.
23   A.    Correct. Well, actually, one, two,
24   three states.
25

L. Nail

1
2    Q.    And you did practice law in each of
3    these -- the first position you have here starts
4    in 1985. Are all of these positions in some
5    capacity relating to the practice of law?
6    A.    Either as private practice or
7    in-house, correct.
8    Q.    What kind of law did you practice at
9    Wallace, Dover & Dixon?
10   A.    Mostly labor and employment.
11   Q.    And Simpson & Graham?
12   A.    It was more general practice.
13   Q.    Young & Perl?
14   A.    It was all labor and employment.
15   Q.    How about at Wal-Mart, what did you do
16   there?
17   A.    Labor and employment.
18   Q.    And Food Lion?
19   A.    Food Lion I was vice president of
20   legal affairs, which meant I managed the legal
21   department and -- which comprised of several
22   attorneys.  I also had several nonattorneys who
23   reported to me.
24   Q.    I had asked you earlier if you had
25   ever been deposed before and you said one time.

L. Nail

1
2    A.    Uh-huh.
3    Q.    Have you ever been involved in any
4    other litigation personally?
5    A.    No. No.
6    Q.    Have you ever testified as a witness
7    in any other proceeding?
8    A.    Yes.
9    Q.    In what context?
10   A.    In Arkansas in the early or the
11   mid-eighties there my landlord was in some type of
12   dispute with I believe a -- his contractor and
13   asked me to testify.
14   Q.    What did you testify about in that
15   case?
16   A.    It was something about the yard.  The
17   common areas wouldn't drain properly and water
18   would back up.  And he asked me to testify to my
19   personal observations about that.
20   Q.    Is there anything on this résumé as of
21   this date that you would change?  That's listed on
22   here.
23   A.    No.
24   Q.    Mr. Nail, you were hired at Paramount
25   Parks in January of 2002; is that correct?

L. Nail

1
2    A.    Correct.
3    Q.    And you started as vice president,
4    associate counsel?
5    A.    I don't --
6    Q.    Why don't you tell me what you did
7    when you started?
8    A.    At Paramount Parks.
9    Q.    Yes, at Paramount Parks.
10   A.    I literally don't remember what my
11   titles was.
12   Q.    What were your duties?
13   A.    To handle all the contracts, all the
14   litigation, with some exceptions.  At the time I
15   was hired there was a general counsel and there
16   were some things that he retained.  Some
17   litigation he handled.
18       But for the most part I took over most
19   of the litigation, most if not all the contract
20   review and any legal advice to the business units,
21   employment issues.  That sort of thing.
22   Q.    When you say handled the contracts,
23   what type of contracts?
24   A.    It could be anything from a 20,000
25   lawn mowing contract to mow the yard, you know,

L. Nail

1
2    mow the grass at one of the parks to a $20 million
3    ride from the Belgians or whoever we bought them
4    from. I'm making that up.  I can't remember who
5    we bought them from, but I remember negotiating
6    with folks over in that part of the world.
7    Q.    Did you have any responsibilities with
8    respect to employment contracts?
9    A.    I don't recall doing any work on
10   employment contracts at PPI.
11   Q.    In fact, when you started are you
12   aware of any executive that had an employment
13   contract?
14   A.    I did not have direct knowledge of any
15   employment contracts.
16   Q.    And you yourself did not have one when
17   you started; is that correct?
18   A.    That's correct.
19   Q.    Was your employment at will at that
20   point?
21   A.    Correct.
22   Q.    Did you report to the general counsel?
23   A.    Yes.
24   Q.    Who was that?
25   A.    Johnny Taylor.

L. Nail

1   Q.   Where was he based or located?
2   A.   In Charlotte.
3   Q.   How long was Mr. Taylor general
4   counsel while you were associate counsel or
5   in-house?
6   A.   Not long.
7   Q.   Do you recall when he left or was no
8   longer employed?
9   A.   I'm thinking sometime in the spring of
10  '06 after I started.  About three months after I
11  started.  He left.
12  Q.   As general counsel.
13  A.   I'm sorry.  What was the question
14  again?
15  Q.   My understanding is you started in
16  2002.
17  A.   That's right, that's right, I'm sorry.
18  2002.  January 2 of 2002.  Johnny left about three
19  months after I started.
20  Q.   In 2002.
21  A.   Correct.
22  Q.   I am just trying to get a timeline
23  here.  And at that point did your position change
24  when Mr. Taylor left?

*(Note: line numbering 1–25 above)*

L. Nail

1   A.   My title did not change, but I started
2   reporting to the new general counsel.
3   Q.   So someone else was hired to become
4   general counsel or to be the new general counsel?
5   A.   Well, it's complicated, but that's
6   correct.
7   Q.   Who was the person serving as the new
8   general counsel after Mr. Taylor?
9   A.   Mike Bartok.  B-a-r-t-o-k, I think.
10  Q.   Do you know who his employer was?
11  A.   I think -- well, when he became
12  general counsel of PPI, Paramount Parks, Inc.,
13  it's my understanding he was employed by Paramount
14  Parks, Inc.
15  Q.   Did he have any other companies that
16  he served as counsel for?
17  A.   Well, he was -- he had previously
18  been, had a position with Paramount Studios and
19  I'm not sure if he gave up all of his
20  responsibilities with Paramount Studios or not.
21  Q.   And you don't know whether he was
22  employed by CBS at any point?
23  A.   I do not know.
24  Q.   Do you recall when Mr. Bartok came in

L. Nail

1   to act as general counsel for PPI?
2   A.   It was sometime shortly after
3   Mr. Taylor left.
4   Q.   Sometime in 2002?
5   A.   Correct.
6   Q.   How long did he stay as general
7   counsel?
8   A.   He stayed as general counsel I believe
9   through the fall of '06.  Or was it '05?
10  Q.   Try it this way.
11  A.   When did Cedar Fair buy us?
12  Q.   Cedar Fair bought in June of '06.
13  A.   OK.  June of '06, so --
14  Q.   Your employment agreement was '05.
15  A.   '05.  So Mike left before -- it would
16  have been the fall of '05.
17  Q.   When he left how did that affect your
18  position?
19  A.   I became general counsel.
20  Q.   In the fall of '05?
21  A.   Yes.
22  Q.   Did your duties at all change from the
23  point that Mr. Taylor left and when you became --
24  before you became general counsel in the fall of

L. Nail

1   2005, or have you already discussed what those
2   duties would have been?
3   A.   If I understand your question, when
4   Johnny left and Mike Bartok became general
5   counsel, my duties essentially became the same,
6   or, you know, stayed the same, but more so.  That
7   Mike didn't handle any litigation, didn't handle
8   any contracts.
9        At that point I truly handled all the
10  litigation, all the contracts, took all the phone
11  calls, except for anything pertaining to what I'll
12  call the executive group, the senior executives
13  and what I'll call the management committee.  I
14  did not participate in the management committee,
15  which would have been the CEO, the CFO, all the
16  senior vice presidents.
17  Q.   Who did have responsibility for that
18  group?
19  A.   Mike Bartok.
20  Q.   So at that point you would not have
21  been involved with respect to any executive issues
22  with respect to any contract issues for
23  compensation?
24  A.   I don't recall.  It's possible that

Page 38

L. Nail

1   L. Nail
2   Mike would have asked my opinion or may have
3   discussed something with me, but I don't recall.
4       Q.   No specific recollection --
5       A.   No.
6       Q.   -- of dealing with any particular
7   executive situation?
8       A.   Well, I will have to ask the question
9   of what's the definition of executive?  I mean,
10  there were some --
11      Q.   Sure.
12      A.   -- senior people that I know that HR
13  consulted with me and Mike Bartok.  The VP of HR,
14  Mike Bartok and myself would discuss situations.
15      Q.   Let me narrow it down.
16      A.   OK.
17      Q.   With respect to anybody that had a
18  written employment contract.
19      A.   I can't answer that question because
20  at the time I did not know who had contracts and
21  who did not.
22      Q.   So you can't have a specific
23  recollection that of seeing a particular contract
24  of someone at PPI at that time.
25      A.   Well, can we put some boundaries

Page 39

L. Nail

1   L. Nail
2   around the time frame?
3       Q.   Absolutely.  Prior to the time that
4   you became general counsel in fall 2005, is it
5   fair to say you would not have had any involvement
6   with respect to employment agreements for
7   employees at PPI?
8       A.   At some point in time I became aware
9   of individuals who had employment contracts.
10      Q.   And you don't recall at what point
11  that was in time?
12      A.   No, I do not.
13      Q.   Who did you become aware of that had
14  employment contracts at PPI?
15      A.   Al Weber, Michael Koontz, all of the
16  general managers of the parks, David Thornton, and
17  there may be others.
18      Q.   How did you become aware that those
19  individuals had employment contracts?
20      A.   Probably through conversations with
21  Mike Bartok and the VP of HR.
22      Q.   And tell me if you would have had.
23  Would you have had any role in the administration
24  of those employment contracts?
25           And this is prior, this is up to the

Page 40

L. Nail

1   point of fall of 2005.
2       A.   What do you mean by administration?
3       Q.   Well, let me ask it this way.  What
4   role did you have with respect to those employment
5   contracts?  If any.
6       A.   I don't -- well, I did not negotiate
7   them.  I did not draft them.  I think it's fair to
8   say I had just had general knowledge that those
9   individuals had contracts.
10      Q.   Do you know whether -- this was before
11  this general knowledge of the employment
12  contracts -- if this was before or after you
13  signed your employment agreement with PPI?
14      A.   This was before.
15      Q.   Before.  So these individuals would
16  have had existing contracts at the time that you
17  entered into yours?  Is that your understanding?
18      A.   Yes.
19      Q.   Do you know who was involved in the
20  drafting of those contracts for those individuals
21  that you listed?
22      A.   I do not.
23      Q.   I'm going to hand you what was
24  previously marked as Defendant's Exhibit B, which

Page 41

L. Nail

1   L. Nail
2   I believe is your contract with Paramount Parks.
3           If I say PPI in exchange for Paramount
4   Parks will you understand?
5       A.   Yes.
6       Q.   Is this in fact your employment
7   agreement with PPI?
8       A.   I believe it is.
9       Q.   And that's your signature on the last
10  page.
11      A.   Yes, it is.
12      Q.   Is this the only employment agreement
13  that you signed with PPI?
14      A.   Yes.
15      Q.   Tell me the circumstances how you came
16  to have an agreement with PPI.  You were
17  previously at will and then you came to sign this.
18  How did that happen?
19      A.   After Mike Bartok left and Al informed
20  me that I would be promoted to general counsel, he
21  started talking about getting a contract for me.
22      MR. WEBER:  This is Al Weber?
23      THE WITNESS:  This is Al Weber.
24      A.   And over the course of time eventually
25  Al delivered this contract to me and that's how it

Page 42

1                      L. Nail
2    came about.
3         Q.    Do you know whether -- I don't think
4    you mentioned him, but Mr. Bartok had an
5    employment agreement with Paramount?
6         A.    I believe he did.
7         Q.    Did you ever see it?
8         A.    I don't -- well, I mean, I recall Mike
9    Koontz at some point during the due diligence
10   handing me -- and I truly can't remember how I
11   came in the possession of I think all of the
12   contracts, and I delivered those to Mike Koontz,
13   the CFO, to keep in his office.
14        Q.    And when you say this was during the
15   due diligence process, associated with the sale of
16   PPI to Cedar Fair?
17        A.    Yes.  And let me back up a minute.
18   All of the contracts for all the executives were
19   kept in a file in the office of the VP of HR in a
20   locked file.  When she left the company her office
21   was beside my office and when she left the company
22   she gave -- I believe she gave me the keys.
23            She had reported to Mike Koontz and my
24   memory is I talked to Mike about it.  Mike said
25   just leave them there, and Mike took possession of

Page 43

1                      L. Nail
2    the keys.
3            At some point we moved out of that
4    space.  And that filing cabinet I think was put
5    into my office.  And I believe that -- I just have
6    this memory of going to Mike saying, you know,
7    what do you want done with the agreements?  And I
8    think he said, Bring them to me.
9            So he gave me the key and somehow I
10   delivered all the contracts to Mike, because I
11   have this memory of all the contracts ending up in
12   Mike Koontz's office.
13        Q.    I need to establish a timeline,
14   because when the VP, and I want to know, at the
15   time that you worked under Mike Bartok had you
16   seen a copy of his employment agreement?
17        A.    I don't believe so.
18        Q.    When you came in possession of all the
19   executive contracts and handed them to Mr. Koontz,
20   was that in connection with the due diligence of
21   the PPI sale to Cedar Fair or earlier?
22        A.    No, I believe that it was in
23   connection with the sale, the due diligence.
24        Q.    Is that the first time you would have
25   had possession of the employment contracts?

Page 44

1                      L. Nail
2         A.    That would have been the first time
3    that I probably physically opened the files, look
4    at them.
5         Q.    Did you review them at that time?
6         A.    No, I did not.
7         Q.    It was just a matter of gathering them
8    and giving them to Mr. Koontz.
9         A.    Right.
10        Q.    And I was asking you how you came to
11   sign this agreement.
12        A.    Right.
13        Q.    And you said that Mr. Weber had got
14   the contract for you and delivered it to you.
15        A.    Yes.
16        Q.    Do you know who drafted the employment
17   agreement?
18        A.    I do not.
19        Q.    Do you know whether or not it was
20   drafted by Mr. Weber?
21        A.    I do not.
22        Q.    Do you have any reason to believe that
23   he did draft this employment contract?
24        A.    I doubt it.
25        Q.    Because he's not a lawyer, correct?

Page 45

1                      L. Nail
2         A.    Correct.
3         Q.    Up until the point that you received
4    this contract had you dealt with any of CBS's
5    in-house counsel?
6         A.    I'm sorry, can you give me a time
7    frame?
8         Q.    Sure.
9         A.    Or can I just -- the first time I
10   dealt with CBS counsel was when I received a phone
11   call from the general counsel of CBS.
12        Q.    When was that?
13        A.    The was when Mike Bartok was still
14   general counsel.  So it would have been in the
15   late summer of '05 possibly.
16        Q.    What was the purpose of that call?
17        A.    Well, number one, to introduce
18   himself.  CBS had just -- this is shortly after
19   Viacom had split into two companies and we were
20   now, Paramount Parks, Inc. now belonged to CBS.
21   So he was calling to introduce himself.
22        Q.    And what was his name?
23        A.    Lou Briskman.  B-r-i-s-k-m-a-n, maybe
24   two Ns.  I'm not sure.
25        Q.    Back to this agreement.  When you

12 (Pages 42 to 45)

Page 46

L. Nail

1
2  received it what did you do with it?
3      A.   I signed it.
4      Q.   Did you sign it that day?
5      A.   I don't remember.
6      Q.   Did you retain counsel to review it?
7      A.   No.
8      Q.   Did you discuss it with anyone?
9      A.   I may have discussed it with my wife.
10  I may have discussed it with Mike Koontz.  And I'm
11  certain I discussed it with Al Weber.
12      Q.   Let me start with Mr. Koontz.  What
13  did you discuss with respect to the agreement with
14  Mr. Koontz?
15      A.   Whether or not I should attempt to
16  negotiate it or just sign it and move on.
17      Q.   What did he say?
18      A.   Sign it and move on.
19      Q.   Did he say why?
20      A.   Because we were hot and heavy into due
21  diligence.  We were extremely busy.  He did not
22  feel like it would be in my best interest to try
23  to, you know, negotiate it.
24      Q.   So when this agreement was presented
25  to you, you were aware that the company was

Page 47

L. Nail

1
2  potentially going to be sold?
3      A.   Yes.
4      Q.   And what was your level of awareness?
5  How much did you know at the time you were given
6  this?
7      A.   I knew quite a bit.
8      Q.   Did Mr. Weber say anything as a reason
9  for presenting you with this agreement was related
10  to that upcoming sale?
11      A.   No.
12      Q.   Anything else that Mr. Koontz and you
13  discussed?
14      A.   No.  It was a very short conversation.
15      Q.   How about Mr. Weber, what did you
16  discuss with Mr. Weber regarding this agreement at
17  or about the time you received and signed it?
18      A.   It was essentially the same
19  conversation.
20      Q.   Whether you should try to negotiate?
21      A.   Correct.
22      Q.   And he said no?
23      A.   Well, no, no.  Al said, you know, do
24  what you think you need to do.  But the inference
25  was don't mess around.

Page 48

L. Nail

1
2      Q.   In fact, you did not suggest any
3  changes to it, correct?
4      A.   No, I did in the.
5      Q.   Do you know what other Paramount park
6  employees were presented with an agreement at or
7  about the same time that you were?
8          And I think for the record I said your
9  agreement was 2005, but this is January 2006.
10      A.   Correct.
11      Q.   OK.
12      A.   And I'm sorry.  The question is?
13          MR. KIRILA:  Could you read back the
14  question.
15      A.   I'm not sure if this is responsive,
16  but let me, the -- I was aware that there were a
17  couple of individuals who their contracts were
18  expiring or close to expiring, and quite frankly
19  through sitting through Mr. Freeman's deposition
20  it refreshed my memory that Pat Jones received a
21  contract and he named a few others that I had
22  forgotten.
23          But I knew that David Thornton's
24  contract was up for renewal or was getting close
25  to expiring.  Pat Jones got a new one.  And I

Page 49

L. Nail

1
2  think there was another individual who was fairly
3  close to expiring.  And I can't remember who it
4  was.
5      Q.   Any other discussions about the
6  agreement other than what you've testified at the
7  time, at or about the time that you received it
8  and executed it?
9      A.   Well, there were -- from the time that
10  Al informed me that he was going to get a contract
11  and the time that I actually received it was a
12  long span every time.
13      Q.   From fall of '05 until January?
14      A.   No, it was not January.  It was more
15  like --
16      Q.   When did you receive it?
17      A.   The best of my memory is late
18  February, possibly early March.  And virtually
19  every time Al would go to New York he would report
20  back to me that, um, you know, every time I go up
21  there I push them to get your contract.  I'm
22  working on it, I'm working on it, I'm working on
23  it.
24      Q.   You understand that the contract came
25  from New York.

Page 50

L. Nail

1  A.    Yes.
2  Q.    And who was based in New York that it
3  would come from?
4  A.    I literally don't know.
5  Q.    Do you know that's where CBS was
6  headquartered?
7  A.    Correct.  Well, let me rephrase that.
8  I know it was coming from the HR department of
9  CBS.
10  Q.    OK.
11  A.    I know that.
12  Q.    Did you have any --
13  A.    I'm sorry, but I don't know an
14  individual.
15  Q.    Got you.  Did you have any discussions
16  with anyone from HR CBS regarding your employment
17  agreement?
18  A.    No.
19  Q.    I think, and tell me if I'm correct,
20  the individual who signed this agreement looks
21  like an Anthony.  Do you know recognize that
22  signature?
23  A.    No, I do not.
24  Q.    It looks like it says EVP HR and

Page 51

L. Nail

1  administration.  Do you know who held that
2  position at Paramount?
3  A.    No, this --
4  Q.    Or would this have been from CBS?
5  A.    This was at CBS.  He was a -- but as
6  you know, PPI was a wholly owned --
7  Q.    -- subsidiary.
8  A.    -- subsidiary of CBS.
9  Q.    Correct.  But you had never had any
10  discussions or communications with whoever signed
11  this document.
12  A.    No, I did not.
13  Q.    And no one else from CBS; is that
14  correct?
15  A.    I may have had a discussion with Lou
16  Briskman or he may have asked me if I was under
17  contract.  I know there were several times during
18  this long period of time that I thought about
19  calling Lou and I know I discussed with Al Weber
20  because I was getting frustrated, Al was getting
21  frustrated over not getting it.
22         And I remember a conversation with Al.
23  Al had been, I think Al call Lou Briskman.  And I
24  don't remember if I called -- well, I had numerous

Page 52

L. Nail

1  discussions with Mr. Briskman, but, you know,
2  thinking about doing it and actually doing it my
3  memory gets blurred, if I actually did it or I
4  just thought about doing it.
5  Q.    Would those conversations have
6  occurred before you received the actual physical
7  agreement?
8  A.    Correct.
9  Q.    How about in just limiting to after
10  you received the agreement?  Anyone at CBS you
11  recall or that you know that you discussed the
12  employment agreement with?
13  A.    There may have been discussions about
14  contracts in general during due diligence, but I
15  don't recall discussing my contract specifically
16  with any attorney from CBS or any, anybody at CBS.
17  Q.    Did you have any role in distributing
18  the employment agreements to the other executives
19  who were getting new contracts at or about the
20  time that you received yours?
21  A.    I don't believe so.  I don't recall.
22  Q.    Anyone else at PPI that you discussed
23  the employment agreement with after you received
24  it, at about the time that you received it and

Page 53

L. Nail

1  signed it, other than Mr. Koontz and Mr. Weber?
2  A.    No.
3  Q.    Is there anyone else from, other than
4  those organizations, that you would have discussed
5  your employment agreement with?
6  A.    Let me just -- I may have said -- I
7  can't recall if, you know, I may have said in
8  passing to David Thornton, you know, I finally got
9  my contract.
10         But I certainly didn't discuss the
11  details, because I know David was also frustrated
12  and was asking me, Have you heard anything?
13  Have you heard anything?  Have you heard anything?
14  That type of thing.  But other than David and --
15  no, I think that's it.
16  Q.    And there's no one that you would have
17  discussed the actual language of the employment
18  agreement with at that time; is that correct?
19  A.    That's correct.
20  Q.    Did you review the agreement before
21  you signed it?
22  A.    Yes, I did.
23  Q.    To what extent would you say?
24  A.    Read it, reread it.  I think I slept

14 (Pages 50 to 53)

Page 54

L. Nail

1 on it. Which is why I don't think I signed it
2 right away. And then after -- my memory is I read
3 it a few times, I slept on it, probably the next
4 day came in and had those two conversations that
5 I've already testified with Mike and Al and then
6 signed it and handed it to Al.
7 Q. If I understand your testimony
8 regarding your conversation with Mr. Koontz and
9 Weber regarding the agreement, you would not have
10 discussed particular provisions or language of the
11 agreement with any specificity.
12 Is that fair to say?
13 A. No, I'm not, you know, I may have -- I
14 may have made a comment to Al about, you know,
15 there were some terms in here that, you know, that
16 I consider vague.
17 I know I had a -- if you will note,
18 it's not dated, and the reason why it's not dated
19 is because I wanted -- in my mind I was thinking
20 about since it was, you know, it could have been
21 early March that I was thinking to ask that it be
22 dated from, you know, the term is from March 1,
23 you know, rather than January 1.
24 Q. And did you suggest that be changed to

*(Line numbers shown: 1–25; last question continues on page 55)*

Page 55

L. Nail

1 anyone?
2 A. No, I did not.
3 Q. With respect to you may have had a
4 comment that some of the positions were vague.
5 A. Yes.
6 Q. Who do you specifically, if anyone,
7 recall saying that to?
8 A. If I had said it to anyone it would
9 have been to Al.
10 Q. Do you have a specific recollection --
11 A. No, I do not.
12 Q. -- of doing that?
13 A. I'm sorry, I'm talking over you.
14 I do not. I do not.
15 Q. Do you have a specific recollection of
16 what you thought may have been vague at the time?
17 A. Yes.
18 Q. And do you know if you specifically
19 discussed that thought with anyone?
20 A. No.
21 Q. You did not discuss that with anyone?
22 A. I do not have a memory of discussing
23 it specifically.
24 Q. Did you ask any questions regarding

Page 56

L. Nail

1 the meaning of any language before you signed it?
2 A. No.
3 Q. Now I'm going to ask you a broader
4 question. I was asking you with whom you
5 discussed the employment agreement at or about the
6 time you received it and signed it.
7 Following that, tell me every one with
8 whom you discussed the employment agreement at PPI
9 other than what you've testified about so far.
10 MR. WEBER: At any time?
11 MS. KIRILA: Following what he just
12 testified about, yes, and other than
13 counsel.
14 A. I'm sorry.
15 Q. Specific conversations regarding your
16 employment agreement.
17 A. Other than what I've testified to?
18 Q. Yes.
19 A. Have I talked to anyone else about
20 any -- any part of my employment contract.
21 Q. Your personal, right, with respect to
22 you.
23 A. Other than the general fact that I had
24 a contract, I don't recall discussing any details

Page 57

L. Nail

1 with anyone other than what I've already testified
2 to.
3 Q. Why don't we take a look at the actual
4 agreement now. The first page, I direct your
5 attention to paragraph 1-A.
6 Would you agree with me that the term
7 of this agreement was from January 1, 2006 and
8 ending December 31, 2007?
9 A. Yes.
10 Q. And that's defined as the employment
11 term --
12 A. Yes.
13 Q. -- in this agreement?
14 A. Yes.
15 MR. WEBER: Objection. The document
16 speaks for itself.
17 Q. Under this agreement, under 2-A, your
18 base salary was 165 per year.
19 How did that compare with what you
20 were making prior to receiving this contract?
21 MR. WEBER: Objection, relevancy.
22 A. It was an increase.
23 Q. Do you recall by how much?
24 A. I don't. My memory is I may have been

Page 58

L. Nail

1
2 making 150, but I'm not sure.
3    Q.   I direct your attention to paragraph
4 5. I'll just read that into the record:
5       "Executive agrees to devote all
6 customary business time and attention to the
7 affairs of Paramount, except during vacation
8 periods and reasonable periods of illness or other
9 incapacity consistent with the practices of
10 Paramount for executives in comparable positions,
11 and agrees that executive services shall be
12 completely exclusive to Paramount during the term
13 hereof.  Executive further agrees to comply with
14 all applicable Paramount policies, as described in
15 the Paramount Personnel Policy Manual."
16       My question to you goes to the clause
17 with respect to "agrees that executive's services
18 shall be completely exclusive to Paramount during
19 the term hereof."
20       How did you interpret that clause with
21 respect to --
22       MR. WEBER:  Objection.  Calls for a
23    legal conclusion.
24    Q.   You can still answer.  How do you
25 interpret that clause with respect to that your

Page 59

L. Nail

1
2 services shall be completely exclusive to
3 Paramount?  What does that mean to you?
4    A.   What that means to me while I am
5 actively employed by Paramount Park, Inc., that I
6 am to -- my services shall be completely exclusive
7 to Paramount.
8    Q.   But you would agree with me that the
9 term of this agreement could conceivably extend
10 beyond your employment termination.
11    A.   No.
12       MR. WEBER:  Objection as to the form.
13    A.   No, I do not agree with you.
14    Q.   So you do not agree that the
15 employment term is defined to include a period of
16 time that could extend beyond your employment
17 termination without cause under this agreement?
18       MR. WEBER:  Objection as to form.
19    Rephrase it?
20       MS. KIRILA:  I can rephrase that.
21    Q.   Are you saying that the employment
22 term defined in paragraph 1(a) could be shorter
23 than December 31, 2007?
24    A.   I'm sorry, say that again?
25    Q.   Sure.  I'm trying to understand your

Page 60

L. Nail

1
2 interpretation.  My interpretation is that this
3 employment term runs until December of '1, 2007
4 regardless of whether you have been terminated
5 without cause.
6    A.   Well, that is where I disagree with
7 you.
8    Q.   And tell me why.
9    A.   I think once I am terminated without
10 cause that this sentence does not apply.
11    Q.   Which sentence are you referring to?
12    A.   The sentence that says -- well,
13 actually, the entire paragraph 5.  It does not
14 apply once I am terminated without cause and I am
15 notified my services are no longer needed by PPI.
16    Q.   And I'm trying to get just your
17 general understanding as to whether you would
18 agree with me that the employment term as defined
19 herein could extend beyond your termination
20 without cause by this agreement.
21       MR. WEBER:  Objection, asked and
22    answered.
23    Q.   You can answer again.
24    A.   I don't agree with you.
25    Q.   OK.  So you believe that the

Page 61

L. Nail

1
2 employment term would end effective as of your
3 termination without cause date?
4       MR. WEBER:  Objection, asked and
5    answered.
6       MS. KIRILA:  No, that wasn't asked.
7    Q.   But you can answer.
8    A.   No, I'm not sure what you're asking.
9    Q.   OK.  Let me try to rephrase.  Here I'm
10 looking at paragraph 1(a) and it defines the
11 employment term to extend to December 31, 2007.
12 And let's break it up.
13       You would agree with me that you could
14 be terminated without cause under this agreement
15 prior to December 31, 2007, correct?
16    A.   I could be terminated without cause
17 under the terms of this agreement.
18    Q.   Prior to December 31, 2007.
19    A.   That is correct.
20    Q.   My question for you is, I define the
21 employment term to continue to December 31, 2007,
22 regardless of whether or not you've been
23 terminated without cause.
24       Is that your interpretation?
25    A.   I do not understand your question.

16 (Pages 58 to 61)

Page 62

L. Nail

1
2     Q.  OK.  Let's try it another way.  If
3 you -- let's back up.
4         Would you agree that after you have
5 been terminated without cause under this agreement
6 that you have any continuing obligations under
7 this agreement?
8     A.  Yes, I would agree with you.
9     Q.  Which continuing obligations would you
10 have under this agreement following your
11 termination without cause?
12         MR. WEBER:  Objection.  The agreement
13     speaks for itself.  It calls for a legal
14     conclusion.
15     A.  Well, let's look under the paragraph
16 that pertains to termination without cause.  I'm
17 looking at, I believe it's 7(c).
18         "If, during the term of this
19 Agreement, employment of Executive" -- and I won't
20 read the whole thing, but under this paragraph
21 7(c) is where I believe that once I am terminated
22 without cause is the primary obligation, and the
23 document speaks for itself as to what my
24 obligation is.
25     Q.  But I need to know your

Page 63

L. Nail

1
2 interpretation.
3     A.  Well, my interpretation --
4         MR. WEBER:  Objection.  Calls for
5     legal conclusion.
6     Q.  You can still answer.
7     A.  OK.  My interpretation of this clause
8 is that when I am terminated without cause that I
9 am entitled to the benefits referred to, the
10 salary and benefits under, whatever it says in
11 here, 2(a)/3, so long as I am willing, ready and
12 able to render exclusive services through the
13 remainder of the employment term.
14     Q.  And your position is that none of the
15 other obligations apply to you post your
16 termination without cause?
17     A.  I would not agree with that statement.
18     Q.  OK, which other, and that's what I
19 asked, which other obligations do you feel would
20 apply to you following a termination without cause
21 under this agreement?
22         MR. WEBER:  Objection.  The agreement
23     speaks for itself.
24     A.  Well, we have to go through the
25 agreement.

Page 64

L. Nail

1
2     Q.  Sure, let's do it.
3     A.  OK.  I believe 8 would continue.
4         I believe 9 would continue.
5         Although obviously, and again, this is
6 why this is difficult, because this is referring
7 to Paramount and CBS.  And so since Cedar Fair is
8 the successor, I'm not sure if Cedar Fair steps
9 into the shoes of CBS or not as, you know, in
10 other words, everywhere it says CBS, I'm not sure
11 if --
12     Q.  Sure.
13     A.  -- it now means Cedar Fair.  If
14 everywhere in the contract it refers to CBS, if it
15 automatically now would pertain to Cedar Fair as
16 the successor.
17     Q.  And that aside, you're aware that
18 Paramount, the Paramount entity did not change as
19 a result of the transaction.
20     A.  Correct.
21     Q.  So with respect to your obligations to
22 Paramount, those would continue, if you had them
23 under this agreement.
24     A.  Correct.
25     Q.  OK.

Page 65

L. Nail

1
2     A.  I believe number 10 would continue.
3         I do not know about 11.  If 11 is a
4 noncompete, I'm not sure that its legally
5 enforceable.
6     Q.  Aside from the legal enforceability of
7 that, do you have an opinion of whether or not
8 that obligation would continue post your
9 termination without cause?
10         MR. WEBER:  Objection.
11     A.  Yes.
12         MR. WEBER:  Calls for legal
13     conclusion.  You may answer.
14     Q.  What is that?
15     A.  My opinion is that this does not apply
16 posttermination with cause.
17     Q.  Why is that?
18         MR. WEBER:  Without cause?
19         THE WITNESS:  Without cause.
20     Q.  Why is that your opinion?
21     A.  Because it doesn't make sense.  When
22 you read the contract as a whole and you consider
23 the intent of the entire contract, and especially
24 the paragraph 7(c), it doesn't make sense.
25     Q.  And you've already testified you

L. Nail

1
2 weren't involved in the drafting of this
3 agreement, correct?
4     A.   That's correct.  I did not draft this
5 document.  I did not have any input into this
6 document.
7     Q.   Let's look at 11.  Would you agree
8 with me that it states in capital letters or
9 capitalized, "Employment Term," in that paragraph?
10 Do you see that?
11     A.   Yes, I do.
12     Q.   With you agree with me that that's
13 defined in this agreement to run until
14 December 31, 2007?
15     A.   I would agree with you that that is,
16 yes, that's a defined term that is explained or
17 set forth in paragraph 1(a).
18     Q.   The other part of that 11, "Executive
19 will not engage in any other occupation," is it
20 your position that that just doesn't apply
21 posttermination without cause or -- explain to me.
22     A.   Yes.
23     Q.   Just because you think it doesn't make
24 sense in the whole scheme of the contract.
25     A.   When you read the entire contract, the

L. Nail

1
2 context of the entire contract, especially the
3 "termination without clause" paragraph, it would
4 not seem -- it defies common sense, but it also is
5 vague.  That paragraph in and of itself is vague.
6     Q.   Paragraph 11?
7     A.   Yes.
8     Q.   In what way is paragraph 11 vague?
9     A.   "Will not engage in any other
10 occupation."  Does it mean any occupation at all
11 or is it an and/or?
12     Q.   Well, it says "any other occupation."
13     A.   I read that as being somewhat vague as
14 to meaning any other occupation in the leisure
15 theme park, motion picture, television or
16 entertainment business except for Paramount
17 pursuant to this agreement.
18     Q.   Mr. Nail, you are an attorney,
19 correct?
20     A.   Yes.
21         MR. WEBER:  Objection.
22     Q.   With a background in employment law.
23     A.   That is correct.
24     Q.   Are you familiar with the purpose of
25 the use of the word "or" in the drafting of

L. Nail

1
2 contracts?
3         MR. WEBER:  Objection to the form.  It
4 calls for legal conclusion.  Unless you're
5 saying this is an expert witness in
6 employment agreements.  If you want to
7 stipulate to that, I will.
8         MS. KIRILA:  No, I don't to make him
9 an expert, but I want his personal
10 understanding.
11         MR. WEBER:  It sounds like you do, so
12 I will stipulate to that effect.
13         MS. KIRILA:  This is his contract.
14 BY MS. KIRILA:
15     Q.   As a party to this contract and based
16 on your experience as it would apply to you,
17 what's your understanding of the use of the word
18 "or" in this paragraph?
19         MR. WEBER:  Objection.  Asked and
20 answered.  You may answer again.
21     A.   I think it's a vague sentence.
22     Q.   Any other provisions that you would
23 interpret as applying to you after your
24 termination without cause under this agreement?
25     A.   12 as it relates to confidentiality.

L. Nail

1
2         Probably 13(a), 13(b), (c).
3 I'm not sure about 14.
4 15 is legalese.
5 16 is just a notice provision.
6     Q.   OK, let me direct you back to
7 paragraph 5.
8     A.   Can we take a break?
9         MS. KIRILA:  We sure can.
10         (A recess was taken from 5:O4 p.m. to
11 5:14 p.m.)
12 BY MS. KIRILA:
13     Q.   Let's go back to your employment
14 agreement at paragraph 5.  And I understand your
15 interpretation is that this exclusive services
16 provision that I'll call it didn't apply to you
17 after you were terminated without cause; is that
18 correct?  Your interpretation?
19     A.   Well, I think you have to read it in
20 context with paragraph 7.  In other words, let's
21 cut to the chase, if PPI called me after
22 termination without cause and said, Lester, we
23 have something we want you to do, pursuant to
24 paragraph 7(c), then, you know, paragraph 5 may
25 apply during that, but I don't think you can cut

Page 70

L. Nail

1
2  and paste.
3         I think that the primary obligation is
4  to be ready, willing and able to perform services
5  for PPI when they call and say, Lester, we got
6  something we want you to do.
7         At that moment I have a choice. I
8  have a decision. I can say, Nope, not going to do
9  it. And they can say, Fine. We're not going to
10 pay you anymore. You've just violated 7(c). Or I
11 can say, You betcha. I'd love to help you. Tell
12 me what to do. And I have complied with paragraph
13 7(c).
14    Q.    You'd would agree with me that
15 Paramount had the right under this contract to
16 terminate you without cause.
17    A.    Yes.
18    Q.    At any time.
19    A.    Yes.
20    Q.    And you'd agree with me that they had
21 a right under that 7(c) to call you back, or at
22 least contact you if they wanted you to perform
23 services as you just testified about.
24    A.    I'm sorry, say that again.
25    Q.    Would they have a right to call you

Page 71

L. Nail

1
2  back after your termination without cause to
3  see --
4         MR. WEBER:  I just want to make a
5     clarification of the term "call you back."
6    Q.    Would you agree with me, and let me
7  just restate the question, that after you were
8  terminated without cause under this agreement that
9  PPI would have the right to use your services as
10 long as you were getting paid under that 7(c)?
11    A.    PPI would have the right to call me
12 and request that I perform services for PPI.
13    Q.    OK. As you said, if you said no, then
14 they would have the right to stop paying you and
15 providing benefits.
16    A.    Yes.
17    Q.    Back to paragraph 5, just as this
18 would apply, and I understand your interpretation,
19 let's just say before you were terminated without
20 cause, how would you interpret this clause that
21 executive services shall be completely exclusive
22 to Paramount? What does that mean to you?
23         MR. WEBER:  Objection. Calls for a
24     legal conclusion and asked and answered.
25    A.    Before termination --

Page 72

L. Nail

1
2    Q.    Before you were terminated without
3  cause, correct.
4    A.    -- how would this apply.
5    Q.    Yes, to you. What does that mean to
6  you? I am just looking for your interpretation of
7  that.
8    A.    I'm not trying to be cute, but I think
9  it means exactly what it says:  Shall be
10 completely exclusive to Paramount.
11    Q.    Could you work somewhere else?
12         MR. WEBER:  If he's --
13         MS. KIRILA:  Correct, prior to --
14         MR. WEBER:  Prior to being terminated?
15         MS. KIRILA:  Terminated without cause,
16     yes.
17    A.    And I'm not trying to be cute. How do
18 you defined work? Do you define work as being
19 legal services that I'm paid for versus, you know,
20 building a Habitat house?
21    Q.    That's a fair question. That's why I
22 am trying to get to, what does that mean to you?
23 How would you interpret that?
24    A.    How I interpret that is I cannot be,
25 you know, perform legal services for anything that

Page 73

L. Nail

1
2  would be in the role as a senior vice president,
3  general counsel to another company for, you know,
4  customary compensation.
5    Q.    So are you saying that this, during
6  your active employment this clause would not
7  prohibit you from getting a nighttime job as a
8  nonlegal occupation?
9    A.    Well, I don't know. Is there a
10 definition of services? Because if you go back to
11 the whereas clause, it says, you know, my services
12 as an executive, as a senior vice
13 president/general counsel is willing to perform
14 such services.
15         I read that to mean the typical, you
16 know, the customary and ordinary services that a
17 senior vice president/general counsel/executive
18 would carry out.
19         But the answer is, I could not go work
20 for Bank of America as a general counsel or any
21 other company in that capacity. Now, if you're
22 asking could I go be a stocker at Home Depot or
23 Lowe's? I doubt it, but, you know.
24    Q.    Well, maybe the first part of this
25 paragraph would help more. It also says:

19 (Pages 70 to 73)

Page 74

L. Nail

1     L. Nail
2    Executive agrees to devote all customary business
3    time and attention to the affairs of Paramount,
4    comma.
5         A.    Bingo.  You know, "customary business
6    time and attention."  Again, as it relates back to
7    senior vice president, general counsel, you know,
8    I mean, the problem here is that services is not a
9    defined term, which is another reason why this
10   contract is vague.  Nowhere in it does it define
11   services other than the whereas clause.
12        Q.    Do you have any familiarity with these
13   type of clauses in other employment agreements?
14        A.    Which clauses?
15        Q.    I'll caught, and if you don't, you
16   don't, but an exclusive services provision.  Does
17   that have any meaning to you outside of your
18   agreement?
19        MR. WEBER:  Objection.  One, I don't
20        know what that term means; two, it calls for
21        a legal conclusion.  Vague.  I don't
22        understand the question, but you can answer.
23        A.    I can't answer the question.
24        Q.    You've never heard of that term,
25   "exclusive services provision"?

Page 75

1     L. Nail
2         A.    I have hear of the term "exclusive
3    services provision."
4         The answer is I am not an expert
5    in post --
6         Q.    Sure, and I don't want your expert
7    opinion.  I just want in terms of interpreting
8    this as it might apply to you.
9         A.    Right.
10        Q.    Are you drawing on anything to help
11   you define that?
12        A.    I'm drawing on my experience, my
13   common sense, my ability to read English.
14        Q.    Have you ever had, and I'm sorry, I
15   don't think you were finished.
16        A.    No, go ahead.
17        Q.    Have you had any experience at
18   drafting what you know as an exclusive services
19   provision in an employment contract?
20        MR. WEBER:  Objection.  Has this
21        witness testified he knows what an exclusive
22        services contract is?
23        MS. KIRILA:  He testified he has heard
24        the term before.  So as he understands it.
25        MR. WEBER:  Objection.  You may

Page 76

1     L. Nail
2    understand it.  I am not sure he can answer
3    the question as you drafted it.  But you can
4    answer if you can.
5         A.    The answer is I don't recall.
6         Q.    At Paramount in your role as general
7    counsel did you have any role in drafting any of
8    the employment agreements for any employees at
9    Paramount?
10        A.    No.
11        Q.    Just to I'm clear, on the first clause
12   of that paragraph 5, "Executive agrees to devote
13   all customary business time and attention to the
14   affairs of Paramount," what does that mean to you?
15        A.    It means customary business time,
16   which, you know, generally eight to five, eight to
17   six, Monday through Friday, with the exception
18   being I will acknowledge in the theme park
19   business it's, you know, it's more than that.
20        Again, that's why this is vague.  This
21   contract, basically these guys, CBS, took an
22   entertainer agreement and tried to shoe horn it
23   into, you know, my situation.
24        Q.    How do you know that?  You didn't even
25   know who drafted it.

Page 77

1     L. Nail
2         A.    I'm making an assumption.
3         Q.    Because it looks like something that
4    wouldn't apply to you.
5         A.    Correct.  I would not have drafted
6    this for an executive at PPI.
7         Q.    OK.
8         A.    You know, in the way it's drafted.
9         Q.    OK.  Let's talk about the time just
10   leading up to the sale of PPI, essentially the
11   stock of PPI to Cedar Fair.
12        A.    OK.
13        Q.    What was your role with respect to
14   that transaction?
15        A.    I participated in the due diligence,
16   which involved the gathering of documents, the
17   gathering of information, the answering of a
18   myriad of questions, participating with the senior
19   executives in the presentation to the potential
20   purchasers.
21        Q.    And that was on behalf of PPI presale,
22   correct?
23        A.    I'm sorry, you lost me there.
24        Q.    Because I know you helped in some of
25   the transition things for PPI after the closing.

20 (Pages 74 to 77)

Page 78

L. Nail

1    
2    And now I'm just talking about preclosing.  Is
3    that what you're testified to?
4        A.    Preclosing, due diligence period, yes,
5    which I consider being, you know, PPI slash CBS --
6        Q.    OK.
7        A.    -- time frame.
8        Q.    Who did you work with specifically
9    from PPI or CBS with respect to the due diligence?
10        A.    There were several people, and I'm
11    sure I'm not going to be able to remember them
12    all.  At PPI I worked with Al Weber, Mike Koontz,
13    Brett Petit.  I am trying to think of who else at
14    the corporate office.  You know, various
15    individuals at the parks when I needed to find out
16    information.
17            At CBS, Darron Bassin.  I think it's
18    B-a-s-s-i-n.  Laura.  I cannot remember Laura's
19    last name.  Were the two CBS folks.
20            There was a gentleman from Citigroup
21    who was our designated contact person for
22    Citigroup.  I worked with him quite a bit.  He
23    also brought in other folks who -- there was a law
24    firm they were using and I can't possibly remember
25    the name of the law firm or the name of the guy,

Page 79

L. Nail

1    
2    the lawyer who I had numerous, numerous, numerous
3    conversations with.
4        Q.    At this time that you were
5    participating in the due diligence you were
6    general counsel for PPI, correct?
7        A.    Yes.
8        Q.    Who were your direct reports?
9        A.    Paralegal, Jo Ann, and that's J-o,
10    it's two words, J-o A-n-n, and Costell.  I believe
11    she was my only direct report.
12        Q.    As general counsel did you oversee or
13    have responsibility for any other departments of
14    PPI other than legal?
15        A.    No.
16        Q.    So not HR.
17        A.    No.
18        Q.    Prior to the closing did you discuss
19    with anyone at PPI or CBS regarding your possible
20    status after the closing?
21        A.    In a roundabout way, you know, the guy
22    from Citigroup and I sort of danced around that,
23    you know, but no, not formal discussions.
24        Q.    Were you told anything either one way
25    or the other with respect to whether or not you

Page 80

L. Nail

1    
2    would likely have a position with PPI following
3    the transaction?
4        A.    By who?
5        Q.    By someone.  This is preclosing at PPI
6    or CBS.
7        A.    No.  I was not told either way,
8    whether I would or would not.
9        Q.    What was your first contact with
10    anyone on the Cedar Fair side that you recall?
11        A.    I remember sitting down with Gordon
12    Kaiser immediately after the presentation when
13    Cedar Fair came to the management presentation.
14    He and I had a discussion about the legal, the
15    legal activity, and I can't remember if this was
16    someone else in there, somebody else from Cedar
17    Fair or not.
18            And of course I understand that Gordon
19    Kaiser was an attorney with an outside counsel.
20    He was not an employee of Cedar Fair.
21        Q.    How about people from Cedar Fair, who
22    do you recall first meeting?
23        A.    There were some gentlemen who came in
24    from Cedar Fair that I met.  They were there to
25    take an inventory.  They may have been the first

Page 81

L. Nail

1    
2    people I met.
3        Q.    You don't recall their names?
4        A.    I don't.
5        Q.    OK.  Who did you have most interaction
6    with from Cedar Fair?
7        A.    Mr. Freeman.
8        Q.    Any other interaction with any other
9    Cedar Fair related individuals?
10        A.    I had a conversation with Peter.
11        Q.    When was that?
12        A.    That would have been pre -- it was
13    postoffer acceptance, but preclosing.
14        Q.    And what was that conversation about?
15        A.    Peter stuck his head in my office or
16    walked into my office, asked me how I was doing.
17    We, you know, just chitchatted a little bit.
18    And he -- I can't -- I think Peter said, We
19    haven't decided what we're going to do with your
20    position, but we will honor your contract.
21        Q.    Did you discuss anything else with
22    Peter?
23        A.    Mainly some small talk.  You know,
24    maybe, you know, how's business kind of thing.
25        Q.    Other than that one time, that one

Page 82

L. Nail

1    conversation with Peter, and just for the record,
2    that's Peter Crage?
3    A.    Yes.
4    Q.    Did you have any other conversations
5    with him?
6    A.    I may have been on the speakerphone
7    with him with Mike Koontz, but I just have a vague
8    recollection of that.
9    Q.    Do you recall the subject matter of
10   that?
11   A.    It would have been a finance subject.
12   Q.    No other conversations with respect to
13   your potential status postclosing?
14   A.    No.
15   Q.    And no other conversations generally
16   that you can recall with Mr. Crage.
17   A.    Well, I cannot, I can't remember if
18   Peter came to the -- at some point after closing
19   and all the, you know, the corporate office was in
20   the process of being shut down.  A number of Cedar
21   Fair people came to tour the corporate office.
22   Mr. Kinzel came.  I'm pretty sure Peter was there.
23   I think Mr. Freeman was there.  There was some
24   marketing people there.

Page 82 (left column)

1         L. Nail
2    conversation with Peter, and just for the record,
3    that's Peter Crage?
4    A.    Yes.
5    Q.    Did you have any other conversations
6    with him?
7    A.    I may have been on the speakerphone
8    with him with Mike Koontz, but I just have a vague
9    recollection of that.
10   Q.    Do you recall the subject matter of
11   that?
12   A.    It would have been a finance subject.
13   Q.    No other conversations with respect to
14   your potential status postclosing?
15   A.    No.
16   Q.    And no other conversations generally
17   that you can recall with Mr. Crage.
18   A.    Well, I cannot, I can't remember if
19   Peter came to the -- at some point after closing
20   and all the, you know, the corporate office was in
21   the process of being shut down.  A number of Cedar
22   Fair people came to tour the corporate office.
23   Mr. Kinzel came.  I'm pretty sure Peter was there.
24   I think Mr. Freeman was there.  There was some
25   marketing people there.

Page 83

1         L. Nail
2         And I am sure that I spoke to Peter.
3    If he was there, I'm sure I spoke to him, but I
4    would not -- the bottom line is we didn't discuss
5    my situation.
6    Q.    And you don't recall the specifics of
7    any conversation.
8    A.    On that day.
9    Q.    Yes, on that day.
10   A.    No.
11   Q.    And other than what you've already
12   recollected here in your testimony.
13   A.    No.
14   Q.    On the day that people from Cedar Fair
15   came down after the closing to tour the Charlotte
16   office did you have any discussions that you can
17   recall with respect to your situation during that
18   visit?
19   A.    With anyone?
20   Q.    With any of those individuals from
21   Cedar Fair.
22   A.    I don't think so.
23   Q.    When is the first time you would
24   have -- if you did.  Did you ever meet Mr. Kinzel?
25   A.    Yes.

Page 84

1         L. Nail
2    Q.    When was the first time you met him?
3    A.    That meeting I just described.
4    Although way earlier, you know, I was on a speaker
5    call where he called to talk to all of the PPI VPs
6    shortly after.  It may have been the day it was
7    announced that they had been awarded the purchase,
8    CBS had accepted the offer.
9    Q.    So that was a conference call with all
10   of the VPs of Paramount?
11   A.    Yes.
12   Q.    Who was on the other side?
13   A.    I think -- I don't know.  I mean, I
14   know Mr. Kinzel did most or all of the talking.  I
15   don't know if anyone one else was on the call.  I
16   don't remember.
17   Q.    What was discussed during that
18   conference call?
19   A.    Just the fact that -- well, the only
20   subject I really remember is I know Mr. Kinzel
21   wanted to immediately get out a notice, some type
22   of written memo, document, communication to all
23   PPI employees.  I just remember that one subject.
24   I'm sure there were others.  I don't remember.
25   Q.    Do you recall any more specifics about

Page 85

1         L. Nail
2    that notice or just that some notice was to go
3    out?
4    A.    Well, it was his desire to send out a
5    notice to each individual employee.
6    Q.    Did he discuss the contents of that?
7    A.    Vaguely, yes.  I think in general
8    terms.
9    Q.    What did he say?
10   A.    I think he, you know, I think he said
11   that Cedar Fair had a fairly standard boilerplate,
12   those are my words, memo that went out when they
13   did an acquisition and he would like to send it
14   over and let us look at it and possibly send it
15   out.
16   Q.    Did that happen?
17   A.    No, not at that time.
18   Q.    Did you ever see such a communication
19   that came from Mr. Kinzel or his office?
20   A.    At some point I think I did, but I
21   don't recall.  But it wasn't during that immediate
22   time frame.
23   Q.    What else was discussed during that
24   conference call that you recall?
25   A.    I don't believe.

Page 86

1                    L. Nail
2        Q.    Nothing about what was going to happen
3    posttransaction?
4        A.    I don't recall.
5        Q.    Other than that one conference call
6    with all the VPs and meeting him in Charlotte when
7    they visited after the closing, any other
8    discussions or meetings with Mr. Kinzel?
9        A.    I don't think so.
10            Well, again, this is trivia, but
11   you're asking for all.  I think I may have met him
12   when we did the tour, you know, go all the way
13   back when we did the management presentation.  I'm
14   sure I met him, because after we broke up, you
15   know, the formal presentation, we walked through
16   the park and I'm almost sure that I walked beside
17   him and shook his hand or met him or was
18   introduced to him, but there was, you know, there
19   was no substantive conversation.  It was just
20   introduction.
21       Q.    And just for the record, the
22   management presentation that you're referring to
23   would have been the presentation by Paramount Park
24   to Cedar Fair related individuals regarding the
25   sale of the company?

Page 87

1                    L. Nail
2        A.    Correct.
3        Q.    Do you recall what month that meeting
4    would have happened?
5        A.    The presentations?
6        Q.    Yes.  The closing was in June 2006.
7        A.    No, I don't remember.  The
8    presentations were a blur.  We did sometimes two a
9    day and for like two or three weeks it seemed
10   like.
11       Q.    Any other meetings that you can recall
12   with Mr. Kinzel or Mr. Crage?
13       A.    No.  Not that I can recall.
14       Q.    And I will ask you about your
15   conversations with Mr. Freeman.  But other than
16   those individuals, and you mentioned Mr. Kaiser,
17   Mr. Freeman, Mr. Crage and Mr. Kinzel, anyone else
18   that you had interaction with from the Cedar Fair
19   side?
20       A.    And the two individuals who came to
21   the office?
22       Q.    Correct.  During the visit to
23   Charlotte.
24       A.    Well, no, these two guys came on their
25   own.  These are the guys that came in to do the

Page 88

1                    L. Nail
2    inventory.
3        Q.    Inventory.  You don't recall their
4    names.
5        A.    I don't.  But the answer is no.  Other
6    than that, I don't recall anybody else.
7        Q.    Tell me about your interaction with
8    Mr. Freeman during the preclosing period.  What
9    did that consist of?
10       A.    Well, first of all, I would like to
11   say for the record it was very professional and
12   very pleasant.  And I remember the first meeting
13   we had in my office and I tried to assemble the
14   documents that would reflect the ongoing
15   litigation and try to go through that.
16            I think I shared the ongoing and the
17   open contract issues and probably just talked in
18   general about what we were doing from, you know,
19   what the -- what I was doing as legal, you know,
20   as in-house legal for PPI.
21       Q.    Did you have any discussions with
22   respect to the executive contracts of any
23   Paramount employees?
24       A.    I don't recall.  I don't think we did,
25   but I just don't remember.

Page 89

1                    L. Nail
2        Q.    I may have asked you this.  I don't
3    think I have, but in your role as general counsel
4    for Paramount did you have any role with respect
5    to the executive agreements for Paramount Park
6    employees?
7        A.    No.  Not in terms of -- I didn't
8    negotiate them.  I didn't draft them.  I didn't
9    present them.  I didn't --
10       Q.    -- look at them to see if they were
11   being carried out?
12       A.    No.
13       Q.    OK.  Aside from company transition
14   issues that you discussed with Mr. Freeman, tell
15   me all conversations or communications you can
16   recall with Mr. Freeman preclosing regarding your
17   personal situation.
18       A.    I can't recall.  I just can't recall.
19   I mean, it's all a blur.
20       Q.    Do you recall any specific
21   conversations with Mr. Freeman regarding your
22   personal situation, either pre or postclosing?
23       A.    Well, not -- well, not preclosing.
24   Postclosing, I remember -- I'm sure we discussed
25   it in some form or fashion.  I'm sure at some

Page 90

L. Nail

1    point, maybe several points, I asked him either
2    directly or indirectly, you know, Hey, what's, you
3    know, what's my status?
4         I don't, I mean, similar to what he
5    testified to, he and I had a lot of discussions
6    both face to face, both over the phone. So a lot
7    of it gets blurred as to what we discussed when.
8         Q.    You're saying as regards your personal
9    situation you had a lot of discussions --
10        A.    No, no.
11        Q.    -- or about everything?
12        A.    About everything.
13        Q.    And you did at some point ask him
14   directly or indirectly what your status was. Do
15   you recall what he said?
16        A.    I don't recall the words. I just
17   recall that Craig was very professional and was
18   professionally vague about it.
19        In other words, I got the impression
20   that he truly didn't know what was being decided.
21   I also assumed that it was in, you know, it was in
22   a state of flux, I assume, since I was asked to
23   stay. The decision as to what to do with my
24   personal situation had not been made, is what my
25   

Page 91

L. Nail

1    assumption was.
2         Q.    And at some point you were asked to
3    stay past the closing, correct?
4         A.    Well, here's what happened.
5         Q.    Tell me about it.
6         A.    The day of closing Al, early in the
7    day Al called us, all the VPs who had contracts
8    into the office, or I'm assuming all the ones who
9    had contracts, into the conference room and said
10   that he had just talked to Mr. Kinzel and
11   Mr. Kinzel said that effective immediately
12   everyone was on administrative leave, whatever
13   that means, and then he turned and looked at me,
14   "except for you." And "Dick wants you to stay.
15   You're not on leave."
16        Q.    Anything else said in that
17   conversation with Al Weber other than what you
18   just said?
19        A.    I recall, I recall asking Al, you
20   know, What am I supposed to do? And he had he
21   didn't know, but he was sure someone from Cedar
22   Fair would be in touch with me shortly.
23        Q.    Is that the first you learned that you
24   would be staying on at least for some time after
25   

Page 92

L. Nail

1    the closing?
2         A.    Correct.
3         Q.    Did someone from Cedar Fair follow up?
4         A.    Yes.
5         Q.    Who was that?
6         A.    I believe it was Mr. Freeman.
7         Q.    What do you recall with respect to any
8    conversations or communications regarding what
9    would happen with your position at that point?
10        A.    Oh, I don't recall anything was said
11   about what would happen with my position.
12        Q.    When did you first learn that the
13   termination without cause provisions under your
14   employment contract were being triggered?
15        A.    I guess when I received the letter
16   from Mr. Kinzel.
17        Q.    So you don't recall any previous
18   conversations with Mr. Freeman regarding what was
19   going to happen or not happen?
20        A.    Well, yes. I remember -- yes. I
21   mean, let me just take you through the scenario.
22        Q.    Sure.
23        A.    After all the other execs left and I
24   was there, I'm sure I received a phone call from
25   

Page 93

L. Nail

1    Mr. Freeman and we, you know, it became very clear
2    to me, you know, probably through his direction
3    that my role was to, as he said earlier, be the
4    person in charge of the corporate office.
5         And, you know, we would go through the
6    litigation. We would go through the contracts.
7    We would go through the basically the layoffs in
8    the corporate office.
9         And I can't remember if he asked me to
10   participate or I volunteered to participate, but I
11   certainly agreed to participate in those layoffs,
12   telling the individuals, and I know that's when
13   Craig came down several times and he and I would
14   call the people in and inform them that they were
15   being laid off and here was a severance package
16   and try to answer their questions.
17        As time went by, either over the
18   phone, you know, there were contract issues.
19   There were issues over what contracts Cedar Fair
20   could terminate immediately versus what couldn't
21   be and what had successors clauses. Just a myriad
22   of things over the course of several weeks.
23        There did come a point in time where I
24   literally had nothing to do. I mean, absolutely
25   

24 (Pages 90 to 93)

Page 94

L. Nail

1  L. Nail
2  literally there was nothing to do.
3        And I know I called Craig and asked
4  him, you know, Craig, there's nothing to do.  Can
5  I be on administrative leave or can I just go
6  home?  I can be back at the office in 20 minutes.
7  It's really pointless for me just to come sit in
8  the office.
9        And he agreed or at least tentatively
10  agreed, and I think it was late in the day to
11  begin with.  I'm not remembering.  But I do
12  remember immediately the next morning getting a
13  call from Mr. Freeman saying I needed to be back
14  at the corporate office.  And was this the
15  conversation where Craig said, Lester, you need to
16  go back to the corporate office because Dick
17  personally picked you to be in charge of the
18  corporate office and he will be upset if you're
19  not there.
20        And I said OK.  That's -- I
21  understand.  And I got in my car and drove to the
22  corporate office and stayed there another,
23  probably, you know, two weeks, ten days, until I
24  got the phone call from Craig saying, you know,
25  Lester, you can go home now and we'll be sending

Page 95

L. Nail

1  you something in writing shortly.
2        Q.    But you knew there was a chance you
3  would be terminated without cause at that point.
4  Is that fair to say?
5        A.    Oh, sure.
6        Q.    Any other specifics about your
7  conversation with Mr. Freeman regarding your
8  status that you recall that you haven't told me
9  about?  Prior to getting the letter that was dated
10  July 27, 2006.
11        A.    I'm not recalling.
12        Q.    I am going to refer you to what we
13  previously marked as Exhibit C, which is the
14  July 27, 2006 notice letter.
15        Do you have that in front of you?
16        A.    Yes, the letter that says "your
17  services will no longer be needed after August 1,
18  2006"?
19        Q.    Yes.
20        A.    Yes.
21        Q.    And did you in fact receive this?
22        A.    Yes, I did.
23        Q.    Were you surprised to get this?
24        A.    No.

Page 96

L. Nail

1  L. Nail
2        Q.    What did you do when you received
3  this?
4        A.    Read it.  Told my wife.
5        Q.    Did you understand that PPI was
6  triggering the termination without cause
7  provisions under your employment agreement?
8        A.    Yes.
9        Q.    What else did you do after you
10  received this letter?
11        A.    Went to pick up my girls at school,
12  mowed the grass.
13        Q.    With respect to, did you respond to
14  anyone at --
15        A.    No.
16        Q.    -- Paramount or Cedar Fair?
17        A.    No.  Not to my recollection.
18        Q.    Did you ask any questions of anyone at
19  Paramount or Cedar Fair regarding this letter?
20        A.    No.
21        Q.    So you did not have any conversations
22  with anyone at Cedar Fair or Paramount Parks
23  regarding the meaning of anything in this letter.
24        A.    Not to my memory.
25        MR. WEBER:  What point in time was

Page 97

L. Nail

1  L. Nail
2  that question directed?  What was the time
3  frame?
4        MS. KIRILA:  I don't know that there
5  was one.  And if not, I'll narrow it.
6        Could you read back the question.
7        (A portion of the record was read.)
8        MS. KIRILA:  I don't know that it
9  needs a time restriction.  I am just asking
10  about this letter, if he has ever discussed
11  it.
12        Q.    Does your answer change based on time?
13        A.    No.
14        Well, I'm sorry.  We are excluding
15  attorneys.
16        Q.    Correct.  Well, if they're Paramount
17  attorneys or Cedar Fair attorneys --
18        A.    No, my personal attorneys.
19        Q.    No, I just asked about --
20        A.    OK.
21        MR. WEBER:  I think your question as I
22  understand it is from the moment from that
23  letter till today did he have any
24  discussions with anybody.
25        MS. KIRILA:  No, that wasn't my

25 (Pages 94 to 97)

Page 98

1                    L. Nail
2        question.  With anyone from PPI or Cedar
3        Fair.
4              MR. WEBER:  I understand that, from
5        the day of this letter till today.  Does
6        that mean current employees of PPI and Cedar
7        Fair?
8              MS. KIRILA:  Let's clarify.
9              MR. WEBER:  That's what I am trying to
10       clarify.
11             MS. KIRILA:  OK, sure.
12       Q.    Let me start with employees of
13       Paramount or Cedar Fair at the time of this
14       letter.
15       A.    Well, are we talking about the piece
16       of paper with the words on it or the subject
17       matter that's contained in it?
18       Q.    No, just right now I am talking about
19       this letter.
20       A.    OK.
21       Q.    What's contained in this letter?  Did
22       you talk to anyone at Paramount or Cedar Fair with
23       respect to this letter and the contents thereof,
24       current or former employees?
25       A.    Well, obviously much much later on I

Page 99

1                    L. Nail
2        talked to Mr. Freeman about the subject matter.
3        Q.    Sure.
4        A.    Some of the subject matter contained
5        in this letter.
6        Q.    OK.
7        A.    But no, I did not talk about this
8        letter at the time I received it.
9        Q.    OK.
10       A.    To anyone at PPI other than the fact I
11       may have, you know, I may have, if I, and I'm not
12       saying I did, but if I ran into Al or if I talked
13       to Al or if I talked to David Thornton, I may have
14       said I got my termination letter, period.
15             MR. WEBER:  My problem is I don't
16       think the question is limited.  I think it's
17       much broader.  As I hear the question, it
18       says any conversation at any time with a
19       former or present PPI or Cedar Fair employee
20       about not just the letter, but references in
21       the letter from the date of this letter till
22       today.
23             MS. KIRILA:  Well, I'll break it up.
24       I am not going to say just the ready,
25       willing and able.  I understand.  He has had

Page 100

1                    L. Nail
2        conversations about that.
3        Q.    But with respect to this letter did
4        you reference getting this letter and discuss the
5        contents with anyone, former or current employees
6        of Paramount or Cedar Fair, prior to -- well, let
7        me just stop there.  Do you recall?
8              MR. WEBER:  That's my problem.  One is
9        the time frame and, two, this references the
10       heart of the case.  The employment
11       agreement, the terms of it.  It references
12       what we're talking about here.
13             MS. KIRILA:  All right.  Let me just
14       start again.
15       Q.    You got this letter.
16       A.    Correct.
17       Q.    You didn't call or follow up with
18       anyone at Paramount Park or Cedar Fair in response
19       to this.  You testified to that.
20       A.    Correct.
21       Q.    In your later discussions with anyone,
22       former or current employees of PPI, did you ever
23       reference this letter, the July 27, 2006 letter
24       specifically?
25       A.    Well --

Page 101

1                    L. Nail
2              MR. WEBER:  I object, because -- I'm
3        sorry.  Maybe I'm a little confused.
4              When you say reference a letter, does
5        that mean I got the letter or mean
6        referenced in any of the content of the
7        letter?
8        Q.    Did you reference receiving this
9        particular letter at any time later?  And I'm not
10       talking about the subject matters discussed
11       therein.
12       A.    Not that I recall.
13       Q.    Did you ever show this letter to
14       anyone other than your attorneys?
15       A.    My wife.
16       Q.    Other than that?
17       A.    I don't believe so.  And I'm not even
18       sure I showed to the my wife.  I think I just
19       referenced it.
20       Q.    Other than what's contained in this
21       letter were you told anything else by anyone at
22       Paramount or Cedar Fair with respect to using your
23       services?
24       A.    I'm sorry, say that.
25       Q.    Sure.  Outside of what's in this

26 (Pages 98 to 101)

Page 102

L. Nail

1        L. Nail
2    letter were you told or did you have discussions
3    with anyone at Paramount or Cedar Fair with
4    respect to using your services?
5        A.    After I received this letter?
6        Q.    Correct.
7        A.    I do not believe so.
8        Q.    With respect to anything you may have
9    been told prior to this letter, you've already
10   told me about, correct?  Regarding your services
11   or status.
12       A.    I'm not sure.  I mean, we --
13       Q.    Well, let's go over it because I want
14   to make sure I understand everything.
15       A.    Right.
16       Q.    Were you told anything else about
17   using your services by anyone at Paramount or
18   Cedar Fair prior to receiving this letter other
19   than what you've already told me about today?
20       A.    Well, there came a point in time where
21   I think Mr. Freeman made it clear to me that there
22   was coming, you know, a point was coming where my
23   services would no longer be needed.
24       Q.    Because you did not tell me about that
25   in any of your conversations with Mr. Freeman.  So

Page 103

1        L. Nail
2    tell me when that occurred.
3        A.    I cannot tell you that.  It was
4    towards the end, it was before the letter, but
5    again, Mr. Freeman and I had numerous
6    conversations, both face to face, over the phone,
7    about multiple subjects.
8        Q.    And I'm just trying to get your
9    recollection specifically as to what was said
10   regarding needing or using your services.
11       A.    Right.
12       Q.    What do you recall?       [6 p.m.]
13       A.    Well, I know there was -- I know there
14   were, you know, more than once I know I had
15   conversations with Mr. Freeman about is there
16   anything else I can do.  Is there something I can
17   do?  This was towards the end when I didn't have
18   anything to do.
19           And I know one specific time he sent
20   me some contracts to review and to write
21   termination letters.  But I do not have a clear
22   memory of, I mean, my memory is what I've already
23   testified to, if I brought it up, and I'm sure I
24   did, and probably, you know, in a roundabout way,
25   if not directly.

Page 104

1        L. Nail
2        I mean, I can't explain to you exactly
3    how I arrived at the conclusion that my services
4    would no longer be needed and I was going to get
5    this letter.  I mean, I just, you know, I knew it
6    was, you know, it was coming.
7        Q.    But Mr. Freeman never said to you that
8    he wouldn't change his mind and use your services
9    in the future, did he?
10       MR. WEBER:  Object as to the form.
11       A.    Mr. Crage never said anything along
12   those lines.
13       Q.    Mr. Freeman?
14       A.    I mean, Mr. Freeman, I'm sorry.  That
15   I recall.  I mean, again, he was very
16   professionally vague about that.  It was obvious
17   to me that he was intentionally being vague about
18   my future status.
19       Q.    Under the contract would you agree
20   with me that Paramount had the right to use your
21   services again as long as it was paying you?
22       A.    Correct.
23       Q.    And at any point were you told that
24   you could disregard any obligations under your
25   agreement by anyone at Paramount or Cedar Fair?

Page 105

1        L. Nail
2        MR. WEBER:  Objection, calls for
3    possibly a legal conclusion.
4        Can you just read that question back
5    again so I understand it.
6        (A portion of the record was read.)
7        MR. WEBER:  Other than what he has
8    been told either orally or in writing.  Is
9    that the question ?
10       MS. KIRILA:  That he has testified to,
11   yes.
12       MR. WEBER:  Right.
13       THE WITNESS:  Sorry.  Could you read
14   it back again?
15       (A portion of the record was read.)
16       A.    No.
17       Q.    And that would include former
18   employees of Paramount.
19       A.    Correct.
20       Q.    Is it fair to say you would not know
21   whether or not Paramount in fact used the services
22   of anyone that it terminated without cause under
23   an agreement?
24       A.    I'm sorry, you lost me.
25       Q.    That was a long question.  Is it fair

L. Nail

1
2  to say that you wouldn't know whether Paramount in
3  fact used the services of any executive who was
4  terminated without cause under an agreement the
5  same as yours?
6      MR. WEBER:  Objection, relevancy.  You
7      can answer.
8      A.    I'm sorry.  If you're asking me did I
9  know whether or not Paramount was using the
10  services of someone who had received one of these
11  letters?
12     Q.    After that point, correct.
13     A.    The answer is I don't know.
14     Q.    What, if anything, or what, if any,
15  status did you consider yourself to have after you
16  were terminated without cause with Paramount?
17     A.    I considered myself terminated.
18     Q.    Did you consider yourself to be still
19  under contract with Paramount?
20     A.    Yes.
21     Q.    But not an active employee.
22     A.    What's an active employee?
23     Q.    Sure.  That's a good question.  How
24  about just an employee generally?  Did you
25  consider yourself to be an employee after you were

L. Nail

1
2  terminated without cause?
3      A.    No, I was not an employee.
4      Q.    But still under contract.
5      A.    Whatever that means.  I had an
6  employment agreement.
7      Q.    My question is, after your termination
8  without cause would you agree that you were still
9  under contract after that point?
10     MR. WEBER:  Objection, calls for legal
11     conclusion.  You can answer.
12     A.    I will agree that I had an employment
13  contract after I was terminated without cause.
14     Q.    I'm going to hand to you what has been
15  marked as Exhibits E and F in Mr. Freeman's
16  deposition.  The first one is an August 9, 2006
17  letter to you from Mr. Freeman.
18         Did you receive this letter?
19     A.    I do not have a present recollection
20  of receiving this letter.
21     Q.    So you don't know whether you received
22  it or not?
23     A.    I think I did.  I just don't remember.
24  I just don't remember seeing it.
25     Q.    And I will represent the Bates label

L. Nail

1
2  at the bottom indicates that this came from --
3      A.    From me?
4      Q.    Yes, your side.
5      A.    I mean, I'm not --
6      Q.    And I understand you may not have a
7  recollection --
8      A.    Right.
9      Q.    -- of it.
10         Do you recall whether you were
11  following up with anyone from Cedar Fair or
12  Paramount regarding this letter?
13     A.    And I don't want to rehash the same
14  conversation we had on the Exhibit C, but I had
15  multiple -- well, strike that.  I had -- I had
16  some conversations, my wife had conversations with
17  Sandy Cranford about the whole -- it's the bullet
18  point two or the second bullet point, the whole
19  insurance/COBRA issue, but we didn't specifically
20  refer to this letter in any of those
21  conversations.
22     Q.    Do you recall the time frame that you
23  first would have had discussions with Sandy?
24     A.    Yes.
25     Q.    When was that?

L. Nail

1
2      A.    August 2nd.
3      Q.    2006.
4      A.    Correct.  Well, no.  I'm sorry.  It
5  would have been -- well, actually my wife did have
6  a conversation with her on August 2nd.  And then I
7  had a conversation with her after that, shortly
8  after that.
9      Q.    So it would have been in this general
10  time frame.
11     A.    Correct.
12     Q.    And I believe you told me what those
13  conversations with Sandy Cranford would have
14  referred to in your benefits claims; is that
15  correct?
16     A.    Yes.
17     Q.    Anything else you would have discussed
18  with Sandy during that time frame, this August
19  2006 time frame?
20     A.    No.
21     Q.    Take a look at the other exhibit,
22  which I believe is a September 12, 2006 letter and
23  proposal.
24         Do you have that?
25     A.    Yes.  Exhibit F?

Page 110

L. Nail

2      Q.   Yes.  Exhibit F.  Do you recall
3  receiving that?
4      A.   Let me look at it.  Yes, I recall
5  receiving this.
6      Q.   What was your understanding of what
7  Paramount was proposing here?
8           MR. WEBER:  Again, objection.  Calls
9      for a legal conclusion to the extent it
10     does.
11     A.   My understanding is what is set forth
12 in the September 12th, 2006 cover letter by
13 Mr. Freeman.
14     Q.   In your words what did you understand
15 this to mean?
16     A.   That Cedar Fair wanted to buy out my
17 employment agreement.
18     Q.   It says, paragraph 2, it would be (1)
19 a lump sum payment of $160,786; (2) a waiver of
20 the requirement that you be willing, ready and
21 able to render exclusive services as provided in
22 paragraph 7(c) of the employment agreement to
23 recover the sum; and (3) modification of the
24 noncompete obligations contained in paragraph 11
25 of the employment agreement so that such

Page 111

L. Nail

2  obligation shall end six months after the
3  termination date.
4           What did you understand, or if you did
5  have an understanding, of what Paramount was
6  offering to waive with respect to Item (2)?
7      A.   Well, first of all, I think this
8  supports my argument that those other paragraphs
9  we discussed do not apply, because he is only
10 referencing paragraph 7(c), which is the
11 termination for cause, the ready willing and able.
12          My understanding is they pay me this
13 lump sum and we both walk away having no other
14 obligations other than I believe there was a,
15 there may have been a continuing obligation on the
16 noncompete, but I'm not sure because I have not
17 read this document in a very long time.
18     Q.   If you look at the third paragraph of
19 this letter, the sentence that states, "In
20 particular, by offering to waive the, quote,
21 willing, ready, and able, quote, requirement, PPI
22 is offering to both pay you a significant sum and
23 allow you to seek employment without affecting
24 that sum."
25     A.   Right, that's what it says.

Page 112

L. Nail

2      Q.   Did you understand that PPI was
3  interpreting your agreement to mean that you could
4  not be employed while receiving continuing
5  payments under the agreement?
6      A.   I'm sorry.  Repeat the question?
7      Q.   Sure.  Even if you did form an
8  impression, did you have an understanding of what
9  PPI was saying to you in that sentence that I just
10 read?
11     A.   No, I do not know -- I am not able to
12 form an opinion of what was in PPI's head when
13 they wrote these words.
14     Q.   Sure, and that's fair.  I guess I am
15 asking you, did you see that and say, Oh, that
16 interpretation is different than my
17 interpretation?
18          Do you remember thinking that?
19     A.   No.  I do not remember -- as you've
20 stated it that's not what I remember.
21     Q.   What do you remember, if anything?
22     A.   I don't really remember a whole lot
23 about it because I remember receiving the letter
24 and frankly setting it aside.
25     Q.   Why did you set it aside?

Page 113

L. Nail

2      A.   I wasn't ready to read it, to try to
3  comprehend it, to make a decision about it.
4      Q.   At some point did you do that?
5      A.   Well, obviously.
6      Q.   At what point?
7      A.   I can't tell you.
8      Q.   Did you respond to this?
9      A.   To who?
10     Q.   To anyone at Paramount or Cedar Fair.
11     A.   Well, before hearing Mr. Freeman's
12 testimony I had no present recollection of
13 responding to this to anyone.  After hearing his
14 testimony that, where he said I called him after
15 receiving this, I still don't have a present
16 recollection of calling him.  But I'm not denying
17 that I -- I just don't remember.
18     Q.   Sure.
19     A.   This was a very trying time.
20     Q.   OK.
21     A.   And I may have called him, but I truly
22 don't have a memory of calling him.
23     Q.   OK.
24     A.   And so the honest answer is, after
25 looking at it, I set it aside and I don't think I

Page 114

L. Nail

1  ever dug it back out and looked at it again.
2  
3      Q.    Did you engage an attorney to review
4  the proposal?
5      A.    I called -- yes, I engaged an
6  attorney. I don't think I sent him this document.
7  I may have discussed it with him -- well, I'm
8  sure I discussed it with him, but, and that's as
9  far as I think I should go with that.
10     Q.    Sure. What attorney did you engage?
11     A.    At this time it was Larry Levine.
12     Q.    But you did not have him respond on
13  your behalf to this?
14     A.    No. Or if he did, I did not authorize
15  it to my memory.
16     Q.    At this time when you received this
17  letter in September 2006, did you have plans at
18  that time to seek alternative employment?
19     A.    Yes.
20     Q.    What were your plans at that point?
21     A.    To look for a job.
22     Q.    Had you started looking at that point?
23     A.    This is in September? I'm sure the
24  answer is yes. I can't pinpoint a specific date,
25  you know, I mean, you know, did I get on

Page 115

L. Nail

1  monster.com and look for jobs? Did I, you know,
2  start talking to people about jobs? You know,
3  yes. During this time frame I was, I'm sure I was
4  actively starting the process of looking.
5      Q.    Do you recall where you interviewed
6  other than eventually at Denny's?
7      A.    Yes.
8          MR. WEBER: Objection as to relevancy.
9      A.    Yes.
10     Q.    You can still answer unless your
11  counsel instructs you not to.
12     A.    Well, I am waiting for you to ask me
13  who.
14     Q.    OK, who?
15     A.    I interviewed at Lowe's Home
16  Improvement.
17     Q.    Anybody else?
18     A.    I had some telephone interviews with
19  recruiters, headhunters. I had one face-to-face
20  interview with a recruiter. That's all I can
21  remember right now.
22     Q.    Were you offered a position at Lowe's?
23     A.    No.
24     Q.    Were you offered a position anywhere

Page 116

L. Nail

1  other than Denny's?
2      A.    No. Well, I take that back. I had an
3  outstanding offer to open my own practice in a
4  legal aid type setting. Actually, it was to
5  create a legal aid office, which is why I was in
6  the process of applying for my North Carolina law
7  license.
8      Q.    Did you ever obtain that?
9      A.    No.
10     Q.    What happened with the legal aid
11  position?
12     A.    It never came about or I never pursued
13  it beyond just the talking stage.
14     Q.    Why not?
15     A.    Because the job at Denny's became
16  available.
17     Q.    Do you recall how many applications
18  you submitted for different legal positions?
19     A.    The only application I remember is the
20  Lowe's application. But I, you know, well, that's
21  the only application I remember filling out.
22     Q.    And you had one at Denny's?
23     A.    Oh, yeah, yeah, yeah, sure, of course,
24  one at Denny's.

Page 117

L. Nail

1      Q.    And following your termination without
2  cause from PPI for some point you did continue to
3  receive pay and benefits pursuant to your
4  agreement?
5      A.    Correct.
6      Q.    At what point did you feel you were no
7  longer receiving the benefits and pay after you
8  were terminated without cause?
9      A.    Well, when I received Mr. Freeman's
10  letters, you know, at some point figured out that
11  the check had been reversed or had been taken out
12  of my checking account, and I put two and two
13  together and knew at that point my pay and
14  benefits were stopped.
15     Q.    Did you have any idea why at that
16  time?
17     A.    I knew what was stated in
18  Mr. Freeman's letters.
19     Q.    Up until that point was there any
20  payment or benefit ever provided to you late
21  before you were cut off in October --
22     A.    Yes.
23     Q.    -- two thousand --
24     A.    Yes.

30 (Pages 114 to 117)

Page 118

```
                    L. Nail
 1
 2        Q.   What was that?
 3        A.   The medical claims that were not paid
 4   back in August of '06.
 5        Q.   And you testified about that, correct?
 6        A.   Yes, we talked about that.
 7        Q.   Anything other than that?
 8        A.   It was never clear to me whether or
 9   not I was entitled to a bonus, should be getting a
10   bonus.  It was never clear to me whether I should
11   be getting, whether I should be allowed to
12   participate in a 401(k), you know, with a company
13   match.
14             Let's see, I knew I wasn't allowed a
15   car allowance.  That was clear in the contract.
16   Oh, I was not provided with the park pass that the
17   VPs were provided.  But again, it was fuzzy to me
18   whether I was entitled to that or not.
19        Q.   In fact, you never asked anyone at
20   Paramount Park with respect to that.
21        A.   I never asked about the park pass and
22   never asked about the bonus.
23             I have a memory of, and this is where
24   I can't remember whether I followed through with
25   it or not.  I know I had a memory of wanting to
```

Page 119

```
                    L. Nail
 1
 2   ask Sandy about the 401(k).
 3        Q.   Any more specific memory than that?
 4        A.   I probably did.  But I know that I
 5   thought about that for a long time and it was my
 6   intent to ask her about it.
 7        Q.   Now, in fact, you did receive a bonus
 8   for your time in 2006 up to the date of closing,
 9   correct?
10             MR. WEBER:  Objection as to the form.
11        A.   Sitting here late in the day, I don't
12   remember.  I received a bonus from CBS.
13        Q.   Was it your understanding that that
14   was to cover the time up through the date of
15   closing in 2006?
16        A.   I'm not remembering what time period
17   it was supposed to cover.
18        Q.   Anything else that was ever late or
19   you felt you had a question about not receiving?
20        A.   No.
21             THE WITNESS:  Can I take a quick
22   break?
23             MS. KIRILA:  Sure can.
24             (A recess was taken from 6:25 p.m. to
25   6:33 p.m.)
```

Page 120

```
                    L. Nail
 1
 2   BY MS. KIRILA:
 3        Q.   Let me refer you to Exhibits I and J.
 4   Looking first at Exhibit I --  well, before you
 5   look at that, I have a follow-up question.  You
 6   mentioned that you had contacted Larry Levine when
 7   you got the one proposal.
 8        A.   Yes.
 9        Q.   Did someone refer you to him or how
10   did you come --
11        A.   Yes.
12        Q.   -- to find him?
13        A.   Yes.
14        Q.   Who did?
15        A.   Probably David Thornton.
16        Q.   Do you know why Mr. Thornton knew
17   Larry Levine?
18        A.   I know that David was using Mr. Levine
19   for his personal situation.
20        Q.   Do you know what Mr. Thornton's
21   personal situation was?
22        A.   No, I do not.
23             MR. WEBER:  Objection as to relevancy.
24        A.   And let me state emphatically that
25   David Thornton was extremely cautious,
```

Page 121

```
                    L. Nail
 1
 2   conservative about his situation.  He never shared
 3   any details with me.
 4        Q.   So you don't know the details --
 5        A.   No.
 6        Q.   -- of anything --
 7        A.   No.
 8        Q.   -- with respect to --
 9        A.   No.
10        Q.   OK.  The October letter, is this the
11   first that you learned you were being cut off from
12   your pay and benefits from Paramount?
13        A.   I think so.
14        Q.   Do you recall when you received this
15   October 19th letter?
16        A.   I think it was attached to the
17   October 23rd letter.
18        Q.   So to your understanding, you didn't
19   receive the October 19th letter by itself before
20   October 23rd.
21        A.   I do not think so.
22        Q.   OK.  With the October 23rd letter,
23   starting with that, which is Exhibit J, it states
24   that "Dear Mr. Nail:  I attempted to deliver the
25   enclosed letter to you via UPS overnight delivery
```

Greenhouse Reporting, Inc.                          (212)279-5108
                    (212) 279-5108

Page 122

L. Nail

1    L. Nail
2    and have been informed that you no longer live at
3    the address we have on file."
4         Do you know what address Paramount
5    would have had on file for you?
6         A.    I can make an assumption.
7         Q.    That it was the North Carolina
8    address?
9         A.    The 9027 Kirkley Court address, yes.
10        Q.    At that point had you ever called to
11   update Paramount with your current home address?
12        A.    Can you be --
13        Q.    Sure.  At any point did you call
14   anyone at Paramount to update your contact
15   information?
16        A.    No.
17        Q.    At this point on October 23rd you were
18   in your new house in South Carolina?
19        A.    Yes.
20        Q.    So sometime after October 23rd that's
21   the first you learned that your pay had been
22   stopped?
23        A.    I can't say that emphatically.
24        Q.    But this letter was the first
25   notification to you that your pay had been, I'll

Page 123

L. Nail

1         L. Nail
2    just say, cut off?
3         A.    Yes.
4         Q.    What did you do when you received this
5    letter?  And by "this letter" I mean the
6    October 23rd with the October 19th enclosure.
7         A.    I'm sorry, what did I do with it?
8         Q.    Yes, when you received this.
9         A.    Told my wife.
10        Probably set it aside for a day or two
11   and then I called Mr. Freeman.
12        Q.    So if this was the first that you were
13   notified that your pay and benefits were cut off,
14   did you even know about any reversal of a direct
15   deposit at this time?
16        A.    I'm not sure when I became aware of
17   that.  Probably when I received a bank statement
18   which clearly reflected that PPI had reversed.
19        Q.    Were you expecting a paycheck on or
20   about October 19th?
21        MR. WEBER:  Objection, relevancy.
22        A.    I am not sure.
23        MS. KIRILA:  It goes to the conversion
24   claim.
25        Q.    Go ahead.

Page 124

L. Nail

1         L. Nail
2         A.    I was expecting, yes, regular
3    paychecks.
4         Q.    And you didn't do anything when you
5    didn't receive your money on October 19th?
6         I'm trying to understand how it is
7    that you went from, you know, not getting a
8    paycheck on the 19th to not discovering that until
9    you got this letter.
10        MR. WEBER:  He testified that he
11   probably got it when the bank sent him a
12   statement probably a week later.
13        MS. KIRILA:  End of the month.
14        MR. WEBER:  Whenever it was.
15        A.    I mean --
16        Q.    I'm just trying to, you didn't have
17   knowledge on October 19th that you didn't get --
18        A.    No.
19        Q.    -- paid.
20        A.    No.
21        Q.    OK.  Let's take a look at the
22   October 19th, 2007 letter.  The second paragraph
23   states that "we have recently learned"?
24        "We have recently learned that you
25   have secured alternate employment and are" --

Page 125

L. Nail

1         L. Nail
2         MR. WEBER:  It would be easier if he
3    reads it himself and saves some time.
4         MS. KIRILA:  I'll conduct the
5    deposition, thank you.
6         Q.    As I was saying, "and are, therefore,
7    no longer able to render exclusive services to
8    PPI."
9         You did not tell Paramount when you
10   did obtain employment at Denny's, correct?
11        MR. WEBER:  Asked and answered.
12        A.    Can you put a time frame on that?
13        Q.    Prior to October 19th, 2007.
14        A.    No.  Well, back up a minute.  I mean,
15   I told Jim Rein before October 19th that I was
16   employed with Denny's.
17        Q.    And that was in October of 2007?
18        A.    That's correct.
19        Q.    Why didn't you tell Paramount when you
20   did obtain a job with Denny's?
21        A.    Well, for several reasons.  Number
22   one, I had no legal duty to tell them.  There's
23   nothing in that contract that requires me to tell
24   them.
25        I have not had any communication with

Page 126

L. Nail

1      L. Nail
2  anyone from PPI about my services.  It was clear
3  to me through the totality of the circumstances
4  that PPI had no intentions of using my services.
5          I quite frankly just didn't think
6  that, um, I don't know.  I wasn't thinking about
7  Cedar Fair when I started my employment with
8  Denny's.
9      Q.   Tell me what your conversation was
10 with Jim Rein.
11         MR. WEBER:  Asked and answered.
12         MS. KIRILA:  No, I didn't ask him what
13 his conversation was.  He said he told Jim
14 Rein.  I didn't ask the circumstances of
15 that.  I am now.
16     A.   Could you repeat the question?
17     Q.   Sure.  What were the circumstances in
18 which you told Jim Rein that you were employed at
19 Denny's?
20     A.   I was in the Charlotte airport.  I was
21 going to my gate.  Jim Rein was standing and there
22 was some sporting event that was on that night.
23 Jim Rein was standing there outside the restaurant
24 bar watching it.  I immediately recognized him as
25 Jim Rein, someone I had worked with for the entire

Page 127

L. Nail

1  time I was at Paramount Parks.
2          I went up, said, hey Jim, how are you
3  doing?  We did some small talk.
4          He said, Where are you working now?
5          I said, I'm working at Denny's.
6          What are you doing?
7          I'm going to, I don't know, wherever I
8  was going.
9          And we talked about -- we probably did
10 the, you know, have you heard from so-and-so.  We
11 probably caught up with mutual people we knew and
12 then I went on to my gate.
13     Q.   So he asked you what are you doing now
14 and you told him.
15     A.   I don't recall.  I don't recall who,
16 you know, who said what.  It was a meeting of two
17 friends.
18         May I add to that?
19     Q.   Sure.
20     A.   I knew full well that Jim Rein was
21 still employed by Cedar Fair.
22         MS. KIRILA:  Mark this as Plaintiff's
23 Exhibit 2.
24         (Plaintiff's Exhibit 2, document

Page 128

L. Nail

1  titled "Paramount Parks Authorization
2  Agreement For Automatic Deposits," marked
3  for identification, this date.)
4      Q.   Mr. Nail, we have handed you what we
5  have marked as Plaintiff's Exhibit 2.
6          Would you take a look at that
7  document, which is at the top of it titled
8  "Paramount Parks Authorization Agreement For
9  Automatic Deposits."
10         Do you recall filling out this form?
11     A.   No, I do not.
12     Q.   Is that your name printed at the
13 bottom?
14     A.   Yes, it is.
15     Q.   And is that your signature?
16     A.   Yes, it is.
17     Q.   And the date reads 6/27/02; is that
18 correct?
19     A.   I'm sorry?
20     Q.   Is that what your handwritten date
21 reads?
22     A.   Yes.
23     Q.   Other than that, you don't have a
24 specific recollection of this form?

Page 129

L. Nail

1      A.   No, I do not.
2          MS. KIRILA:  Mark this as Plaintiff's
3  Exhibit 3.
4          (Plaintiff's Exhibit 3, document dated
5  11/15/07, under logo F & M, Bates No.
6  LES00204, marked for identification, this
7  date.)
8      Q.   Handing you what we have marked as
9  Plaintiff's Exhibit 3, which I will represent is a
10 document that we received from you and it's Bates
11 labeled LES00204.
12         Could you identify this for the
13 record, please?
14     A.   This appears to be a copy of my
15 banking statement from F & M Bank, F & M, the
16 initials.
17     Q.   F & M Bank is located in?
18     A.   The Salisbury/Granite Quarry area of
19 North Carolina which is near Charlotte.
20     Q.   Do you know if they have a branch in
21 South Carolina?
22     A.   No, they do not.
23     Q.   It is dated November 15, 2007.
24     A.   That is correct.

Greenhouse Reporting, Inc.                         (212)279-5108

(212) 279-5108

Page 130

L. Nail

1
2      Q.    Would that have been the date either
3  on or after which you would have received this
4  statement?
5      A.    I do not know.
6      Q.    Do you have any reason to believe that
7  you would have received it before it was dated?
8      A.    No.
9      Q.    And you were working at Denny's at the
10  time of this statement, correct?
11      A.    Correct.
12      Q.    You had a different bank account for
13  your direct deposits for your paychecks from
14  Denny's; is that correct?
15      A.    I'm not sure that I -- I'm not sure
16  that I did direct deposit right away at Denny's.
17  I just don't remember.  I don't recall.
18      Q.    With respect to this bank, why didn't
19  you change banks when you moved to South Carolina?
20      A.    Because we had a number of automatic,
21  my insurance.  I had several life insurance
22  policies that were being automatically deducted
23  from this policy.
24          There were several other -- my
25  mortgage was with this bank.  We liked this bank

Page 131

L. Nail

1
2  very much.  It's a typical small town bank where
3  the tellers know you, and if you have an issue you
4  can call them and they recognize your voice and
5  they do things that Bank of America in downtown
6  Charlotte would never do in a million years.
7      Q.    And you said your mortgage was with
8  this bank.  On the new house in South Carolina --
9      A.    No.
10      Q.    -- or on the North Carolina?
11      A.    On the North Carolina.
12      Q.    Was that mortgage discharged when you
13  sold the house in -- when did you say you sold it?
14      A.    Um, I'm thinking June, early June.
15      Q.    In June of 2007.
16      A.    Yes.  The other reason, my girls still
17  have -- we still to this day have savings accounts
18  with this bank.
19      Q.    Looking at this particular statement,
20  I do see where it shows the deposit in a reversal
21  on 10/19.
22          Did you have any discussions with
23  anyone at the bank about that?
24      A.    My wife did.
25      Q.    And do you know what those discussions

Page 132

L. Nail

1
2  were?
3      A.    My wife called one of the tellers at
4  the bank that she knew, asked what was the
5  circumstances of the reversal, and the bank, the
6  person she talked to said, You'll need to talk to
7  Paramount Parks about that.
8      Q.    Do you know when your wife spoke with
9  the teller?
10      A.    I think it was actually before we
11  received this statement.  Because I -- after I
12  received Mr. Freeman's letter, I became -- I
13  had -- whatever.  It's late and I'm tired.  I
14  can't think of the right word.
15          But it occurred to me that I hadn't
16  gotten the receipt, the deposit advice for this,
17  and I asked Linda to call the bank to see if it
18  was there, or I may have asked her to check.  You
19  can call, you can go on line and check.  I think
20  that's how she found out that it had been
21  reversed.
22      Q.    Sometime after receiving Mr. Freeman's
23  letter.
24      A.    Correct.
25      Q.    From this statement it appears that

Page 133

L. Nail

1
2  nothing bounced as a result of that reversal; is
3  that fair to say?
4      A.    No, this -- you can't tell anything
5  from this.  This doesn't -- this is only page 1
6  and it doesn't reflect all the transactions.
7      Q.    It reflects the current balance at the
8  end of the month that's deposited.
9      A.    Well, if you're asking me did anything
10  bounce?
11      Q.    Did anything bounce?  How about that?
12      A.    We can get through this quicker if we
13  quit being lawyers.
14          No, nothing bounced.
15          And I'm sorry, I just have to clarify.
16  I'm not -- my wife does all the banking and writes
17  all the checks and she is -- I don't think we had
18  an issue with any of the automatic, you know,
19  payments.
20          So when we say a check bounced, I'm
21  still thinking of the old paper check, you know,
22  insufficient funds.  I know I didn't have any of
23  those because -- well, I just -- I just -- I'm
24  sure we didn't have any of those.  I'm not -- I'm
25  not a hundred percent sure that any of the

34 (Pages 130 to 133)

L. Nail
1  automatic deposits were rejected.  Or the
2  automatic withdrawals, or automatic payments, to
3  be specific.
4      Q.    I will refer you to previously marked
5  exhibit H, Defendant's.  Looking at that exhibit,
6  is that the packet of information with respect to
7  enrollment in benefits that you received with a
8  cover letter from Sandy Cranford?
9      A.    Well, this is what I had in my file.
10 Is this everything that was provided to you
11 pursuant to your request for documents?  I mean,
12 and the answer is I don't know if this is
13 everything, but this is all I had in my files.
14     Q.    The letter on the first page of that
15 exhibit is from Sandy Cranford.  In that letter is
16 a reference to -- oh, I'm sorry, it is from Craig
17 Freeman, isn't it?
18     A.    Correct.
19     Q.    There is a reference to Sandy calling.
20         Do you have a specific recollection of
21 whether Sandy Cranford in fact called with respect
22 to that enrollment process?
23     A.    You know, this may have been the call
24 that she made in that conversation we discussed at

L. Nail
1  the very beginning of the deposition.  I don't
2  have an immediate recollection.
3      Q.    The date of that letter is, what is
4  it?  May?
5      A.    May 21st.
6      Q.    At that point had you sold your home
7  in North Carolina yet?
8      A.    I don't -- I don't think so, but I'm
9  not sure.
10     Q.    Would you open up that exhibit to the
11 next page, after that.  Looking at the MetLife.
12        Is that your handwriting where it says
13 Lester C. Nail?
14     A.    No, it's not.
15     Q.    Whose handwriting is that?
16     A.    I believe it's my wife's.
17     Q.    So your wife completed this page?
18     A.    Yes.  I believe so.
19     Q.    It's not your handwriting?
20     A.    It is not my handwriting.
21     Q.    And the address, was that your current
22 address at the time that these forms were
23 completed by your wife or you?
24     A.    Yes, I believe it was.

L. Nail
1      Q.    And if you look at the date that these
2  forms were signed, for example, on the previous
3  page you have got a date of May 29, 2007.
4      A.    Right.
5      Q.    Is that your signature?
6      A.    No, it's not.
7      Q.    Who wrote that employee's signature
8  there?  Do you know?
9      A.    I -- I do not know.
10     Q.    Do you think your wife wrote it or do
11 you think someone else wrote your name there?
12     A.    I believe my wife signed that.
13     Q.    Did you tell her to sign your name for
14 you?
15     A.    I asked her to fill out these
16 documents.
17     Q.    As of May 29, 2007, was your current
18 address the Kirkley Court, Charlotte,
19 North Carolina address?
20     A.    I believe it was, but I'm not one
21 hundred percent sure.  I mean, we were still in
22 the house.
23     Q.    OK.  Tell me how that worked.  Because
24 you mentioned before it was complicated.  But

L. Nail
1  after the closing you remained in the house for a
2  week or two?
3      A.    My memory is when we finally decided
4  to put the house on the market we received a
5  contract almost immediately, which shocked us.  I
6  mean, literally the same day.  We got a contract
7  on the house the same day.
8          The reason why it's complicated is I
9  did not want to sell the house and I did not want
10 to move from Charlotte.  And so, you know, I was,
11 you know, the reason why I said it was complicated
12 is because there were these, you know, extra
13 issues involved.  It wasn't a simple real estate
14 transaction.
15         But once we accepted the contract, you
16 know, there was a closing date and my memory is
17 that got changed several times.  And then after
18 closing we stayed in the house, and it may not
19 have been a week.  It may have been a day or two
20 or it may have been over a weekend.  I just don't
21 remember.
22         I mean, again, this was a very
23 emotionally trying time.  I've got two little
24 girls.  They were both crying every night about

Greenhouse Reporting, Inc.                                    (212)279-5108

L. Nail

1
2 leaving Charlotte. Leaving their friends, leaving
3 their school. Like I said, so forgive me if I
4 don't, you know, you tend to blank out some of
5 that.
6     Q.    Now, you were being paid by Paramount
7 under the contract potentially through December
8 2007, correct?
9     A.    Pursuant to my, the employment
10 agreement, correct.
11     Q.    Why didn't you just wait to get a job
12 until that, those payments ran out?
13     A.    It became very clear to me that
14 getting a job was going to be extremely difficult.
15     Q.    So how did that impact your decision
16 to -- you would need more time to obtain a job?
17 So explain to me why, how that impacted your
18 decision not to stay in Charlotte longer while you
19 were receiving pay from Paramount.
20     A.    I'm sorry, I am not understanding the
21 question.
22     Q.    My question was, you were receiving
23 pay from Paramount potentially through December
24 '07.
25     A.    Uh-huh.

L. Nail

1
2     Q.    Why did you feel the need to move?
3 Was that not enough money I guess is my question
4 that you were receiving that you had to get
5 another job.
6     MR. WEBER:    Objection as to relevancy.
7 You may answer.
8     A.    No, it was not a question as to was it
9 enough money. That was not any part of it.
10     Q.    OK, so explain your thinking. It's
11 just that you felt you needed to get a job then?
12     A.    Yes. Yes. I mean, I needed to be
13 employed. The longer you are unemployed, the less
14 employable you are.
15     And I might add --
16     MR. WEBER:    There's no question.
17     A.    Sorry. Never mind.
18     Q.    Just look through that. Are there any
19 other signatures in that exhibit?
20     A.    There's printing. There's printed
21 names on the MetLife page.
22     MR. WEBER:    Page 7.
23     A.    Page 7. Um, I will point out on page
24 Bates stamped LES-00006 part of this was filled
25 out. In fact, I believe this whole page was

L. Nail

1
2 filled out when we received it.
3     Q.    OK. Page 6.
4     A.    Because my memory is when I looked
5 through them, I mean, number one, I don't
6 recognize my wife's printing.
7     Number two, I remember when I got the
8 package and I flipped through, I thought it was
9 odd that this had already been partially or --
10 completed.
11     Q.    Do you have a page 7, Bates number 7?
12     A.    Yes, I do.
13     Q.    Is that your signature?
14     A.    Yes, that looks like my signature.
15     Q.    Any other signature pages in that
16 exhibit?
17     A.    No.
18     MS. KIRILA:    Let's mark a few exhibits
19 here.
20     (Plaintiff's Exhibit 4, document
21 purported to be Denny's application, marked
22 for identification, this date.)
23     (Plaintiff's Exhibit 5, document
24 headed "Employee Action Form," bearing date
25 stamp February 20, 2007, marked for

L. Nail

1
2 identification, this date.)
3     (Plaintiff's Exhibit 6, document
4 titled "Employee Action Form," bearing date
5 stamp May 18, 2007, marked for
6 identification, this date.)
7     (Plaintiff's Exhibit 7, document
8 purported to be offer letter agreement,
9 marked for identification, this date.)
10     MS. KIRILA:    4 is the Denny's
11 application.
12     5 is an employee action form. There's
13 a date date stamp at the bottom February 20,
14 2007.
15     6 is another employee action form
16 dated or entered May 18, 2007.
17     And the last, 7, is the offer letter
18 agreement.
19     Q.    I'll start with Exhibit 4 first, which
20 is the Denny's application.
21     MR. WEBER:    Tell me where we're going
22 on this. Maybe we'll save some time.
23     MS. KIRILA:    Sure, I'll conduct the
24 deposition, but what I am going on is his
25 employment at Denny's, which is the basis of

36 (Pages 138 to 141)

Page 142

L. Nail

1  
2   the entire suit and whether that's a
3   violation of the agreement or not.
4        MR. WEBER:  Is there any dispute about
5   that?
6        MS. KIRILA:  I think that's why we're
7   here.
8        MR. WEBER:  Any dispute about him
9   being employed by Denny's and when he was?
10        MS. KIRILA:  No, but I need to get
11   these into the record.
12        MR. WEBER:  OK.
13  BY MR. KIRILA:
14   Q.   You applied for -- Denny's is
15  reflected on this Exhibit 4; is that correct?
16   A.   The answer is this appears to be a job
17  application.
18   Q.   Did you complete this?
19   A.   This appears to be my handwriting.
20   Q.   Did you sign it on the last page?
21   A.   Yes, that is my signature.
22   Q.   And I believe you already testified
23  how you came to find the position at Denny's,
24  correct?  I don't remember if you did or not.
25        In a nutshell, tell me how you came to

Page 143

L. Nail

1  
2   get the position at Denny's.
3   A.   Just real quickly, I was -- in filling
4   out the application for my North Carolina bar exam
5   you have to list attorneys, two or three attorneys
6   who know you in every location you have practiced
7   law.
8        Rhonda Parish and I both worked at
9   Wal-Mart at the same time.  So I called her to get
10   her updated contact information and ask her
11   permission to use her as a reference on my
12   North Carolina bar application.
13        In the course of that conversation
14   she, you know, What are you doing?  Blah blah blah
15   blah.  And she informed me that she needed an
16   employment attorney and would I be interested.
17        And I said, you know, I don't
18   remember, recall the exact words, but one thing
19   led to another and I ended up talking to -- I
20   probably said tell me more about it.  And that's
21   when she directed me to Tim Flemming, who -- Tim
22   and I, Tim, um, had some conversations.
23   Q.   What was his position?
24   A.   Tim is general counsel of Denny's Inc.
25   Q.   OK, I'm going to go to Exhibit 7 next,

Page 144

L. Nail

1  
2   which appears to be your offer from Denny's; is
3   that correct?
4   A.   Yes, that's correct.
5   Q.   You signed this on February 15, 2007?
6   A.   That's what is reflected on the
7   document.
8   Q.   So the offer was base salary, you
9   would be making 175,000; is that correct?
10   A.   That's correct.
11   Q.   And that was more than under your
12  employment contract with PPI.
13   A.   I would have to look at it.  It
14  probably is.
15   Q.   We can let the document speak for
16  itself.
17   A.   Yes.
18   Q.   You also had an opportunity for annual
19  incentive at Denny's; is that correct?
20   A.   I am not sure what that means.
21   Q.   Did you get a bonus?
22   A.   Yes.
23   Q.   Was it 30 percent of your base salary?
24   A.   I don't think so.
25   Q.   Do you recall how much in bonus you

Page 145

L. Nail

1  
2   received for the year 2007?
3        MR. WEBER:  Objection as to relevancy.
4   The document speaks for itself.
5   A.   I don't remember the percentage, but I
6   don't think it was 30 percent.
7   Q.   But you did get a bonus and are
8   eligible for a bonus from Denny's.
9   A.   Yes.
10   Q.   You also received relocation
11  assistance?
12   A.   Yes.
13   Q.   And a car allowance; is that correct?
14   A.   Correct.
15   Q.   You did not get a car allowance at
16  PPI.
17   A.   No.  Well, I did not get a car
18  allowance under my agreement, but I did get a car
19  allowance prior to my agreement.
20   Q.   But under your employment agreement
21  from January 2006 forward.
22   A.   Correct.
23   Q.   Is it fair to say you would be making
24  more in compensation from Denny's than you did
25  under your employment agreement at PPI?

L. Nail

1   A.    No.
2   Q.    Why not?
3   A.    Because of the bonus.  I think PPI
4   probably had a greater bonus potential, but I'm
5   not sure about that.
6         I'm not going to sit here and do the
7   math in my head at 7:15 after being up for -- I
8   got up at 4:30 this morning.
9         MR. WEBER:  It is irrelevant anyway.
10        MS. KIRILA:  No, it's not irrelevant.
11  This goes to whether or not -- your story is
12  that he had to get another job.  He made
13  less.
14        MR. WEBER:  What's the difference if
15  he did or he didn't?  How is that relevant
16  to anything?
17        MS. KIRILA:  It goes to your
18  explanation as to why he did what he did.
19  It's also relevant --
20        MR. WEBER:  You asked him the
21  question.  He gave an explanation.  Neither
22  is relevant.  Neither your question nor his
23  explanation, whether he went to work then.
24        MS. KIRILA:  I disagree with that.

L. Nail

1   This is my deposition and this is a case of
2   breach of contract, misrepresentation and I
3   am entitled to know whether or not his
4   package with Denny's was enough to make him
5   not willing to return to PPI.  So it is
6   relevant.
7         MR. WEBER:  Well, ask him that
8   question, because you haven't asked him that
9   question.
10        MS. KIRILA:  I don't have to tell you
11  my legal strategy.
12        MR. WEBER:  Well, none of the
13  questions so far are relevant.  That is my
14  objection.
15        MS. KIRILA:  You either instruct him
16  not to answer --
17        MR. WEBER:  It's on the record.  He
18  can answer all your questions.  We'll be
19  here tonight and tomorrow for your full
20  period and then we're going to proceed with
21  your other depositions, because we'll set
22  some time --
23        MS. KIRILA:  Are you done?
24        MR. WEBER:  -- we'll set some time for

L. Nail

1   Mr. Kinzel's deposition because we're going
2   to take his deposition and you're going to
3   have to move if you want to preclude it,
4   among others.  The deposition started at
5   3:30.  We'll continue for your seven hours.
6         MS. KIRILA:  Just for the record, the
7   deposition of Mr. Freeman lasted more than
8   five and a half hours and out of convenience
9   I'm continuing past business hours when we
10  can reconvene in the morning.
11        MR. WEBER:  And we appreciate that.  I
12  just don't understand why you're asking
13  questions that are not relevant.
14        MS. KIRILA:  Will you stop
15  interrupting my deposition?  Just because
16  you don't understand the relevance of it.
17  You either instruct him not to answer or
18  let's proceed.
19  BY MS. KIRILA:
20  Q.    You also were eligible for, let's look
21  at Exhibit Number 5.  This appears just to be an
22  employment action form regarding your hiring.
23  Let's go to -- and your first day of employment
24  for the record was February 23, 2007?

L. Nail

1   A.    Correct.
2   Q.    If you will look at Exhibit 6.  It
3   looks like it's an employee action form with
4   respect to a 2.9 percent raise that you received
5   in -- when did you receive this raise?
6   A.    I'm sorry.
7   Q.    There's a May 16, 2007 date.  Is that
8   consistent with your recollection?
9   A.    Probably.
10  Q.    There's also noted at the bottom here
11  a $10,000 special bonus.
12  A.    Uh-huh.
13  Q.    What was that for?
14  A.    I remember receiving it.  I don't -- I
15  just remember it was a bonus.
16  Q.    OK.
17  A.    I'm sorry, where do you see that?
18  Q.    It's at the bottom.  Do you see the
19  stamp date "entered May 18, 2007"?
20  A.    Oh, I see it, yes.
21  Q.    No memory of what that was for.
22  A.    You know, I don't remember if that was
23  related to the relocation or -- no, I don't
24  remember.

L. Nail

1
2      MS. KIRILA:  Let's mark Exhibits 8, et
3  cetera.
4      (Plaintiff's Exhibit 8, document
5  headed "Denny's 2007 Long-Term Growth
6  Incentive Program," marked for
7  identification, this date.)
8      MS. KIRILA:  And this will be 9.
9      (Plaintiff's Exhibit 9, document
10  headed "Denny's Corporation Stock Option
11  Award Agreement," marked for identification,
12  this date.)
13     Q.   Exhibits 8 and 9.  8 reflects a
14  long-term growth incentive program.
15         And you are eligible to be a
16  participant in that plan at Denny's, correct?
17     A.   Yes.
18     Q.   Exhibit 9 reads, "Denny's Corporation
19  Stock Option Award Agreement."
20         And you were awarded stock options at
21  Denny's, correct?
22     A.   Correct.
23     Q.   On March 6, 2007?
24     A.   Whatever the documents reflect.
25     Q.   I'm just reading date of grant,

L. Nail

1
2  March 6, 2007.
3      A.   Right.  For the record, the exercise
4  price is 4.61.  Closing price yesterday was 3.04.
5      Q.   I saw that.  But you would agree with
6  me that things can change and these can become
7  valuable.
8      A.   Miracles do happen.
9      Q.   I know it's been higher than its
10  current price in the past.  Are you aware of that?
11     A.   52-week high?  I am not sure what the
12  52-week high is.  I mean, obviously it was higher
13  than the exercise price, but I think -- go ahead.
14     Q.   These are for ten years.
15     A.   OK.
16     Q.   So you would anticipate a chance that
17  the stock could increase over a ten-year period.
18         MR. WEBER:  Objection, hypothetical.
19  You can answer.
20     A.   I'm not holding my breath.
21     Q.   How about look at the last page of
22  this agreement.  You also were awarded performance
23  shares and performance units under the 2007
24  long-term growth incentive program at a value of
25  16,600; is that correct?

L. Nail

1
2      A.   Whatever the document reflects is what
3  it is.  I will tell you I have very little
4  immediate recollection of this.
5      Q.   But this was a document provided by
6  you as reflected by the Bates number in the
7  bottom, correct?
8      A.   I think it was probably -- no.  Well,
9  I don't know if it was me or whether it was
10  pursuant to your subpoena to Denny's.
11     Q.   I will just represent that the Bates
12  numbers with the LES were provided by your
13  counsel.
14     A.   OK, then it is what it is.
15         MS. KIRILA:  Mark this as 10.
16         (Plaintiff's Exhibit 10, document
17  headed "2007 Salaried Enrollment options,"
18  marked for identification, this date.)
19     Q.   You have been handed what has been
20  marked as Exhibit 10.  It appears to be a summary
21  of your benefit options at Denny's; is that
22  correct?
23     A.   Yes.
24     Q.   Do you know whether the employee
25  portion that you would have to pay for these

L. Nail

1
2  benefits here was more or less at Denny's versus
3  PPI?
4      A.   I have no idea.
5      Q.   You never did that calculation?
6      A.   No.
7      Q.   Would it surprise you to learn that
8  your contribution would have been more at PPI
9  under PPI benefits versus Denny's?
10     A.   I'm sorry, you're saying I would have
11  paid more?
12     Q.   For your employee portion.
13     A.   Portion.
14     Q.   Under PPI's plans versus Denny's.
15     A.   Yes, that would surprise me.
16     Q.   But you never did that analysis --
17     A.   No.
18     Q.   -- or calculation.
19     A.   No.
20     Q.   Why didn't you enroll in Denny's
21  benefits once you were eligible?
22         MR. WEBER:  Objection.
23     A.   Because I had a general -- several
24  reasons.  Number one, I had a general thought that
25  the benefits were better under the PPI.  As I just

Page 154

L. Nail

```
1              L. Nail
2    said, I would be shocked to learn that the
3    employee cost was more under PPI.  I wasn't sure
4    when -- and let me preface all this by saying
5    again, my wife, I have delegated benefit decisions
6    to my wife.
7             I remember having a discussion with
8    her about it and her thought was, Look, we know
9    who our doctors are under the PPI.  We don't want
10   to change doctors.  I had a medical condition that
11   I did not want to have to change doctors.  And in
12   fact, I still intend to continue using the doctor
13   in Charlotte.  The same thing with the girls.
14            So for all those reasons and probably
15   more, we decided just to leave it the way it was.
16      Q.   Did you know that you couldn't see
17   those doctors under Denny's benefits plans?
18      A.   I made an assumption.
19            The only thing I know that I looked at
20   hard was the life insurance and I know the life
21   insurance was not as good under the Denny's plan,
22   or at least I came to that conclusion.  I'm not
23   sure the deductibles are equivalent either.
24            MS. KIRILA:  Mark this as Exhibit 11.
25            (Plaintiff's Exhibit 11, one-page
```

Page 155

L. Nail

```
1              L. Nail
2    letter dated March 12, 2007, from Nelson
3    Marchioli to Lester Nail, Bates No.
4    LES00085, marked for identification, this
5    date.)
6       A.   I would like to add one more reason.
7    Another reason is, quite frankly when I had to
8    fill these out I didn't know how long I was going
9    to stay at Denny's.
10      Q.   Why was that?
11      A.   Because almost, you know, shortly
12   after arriving there and, you know, I became --
13   well, became unhappy.  I was commuting three and a
14   half hours.  For all the other reasons we talked
15   about, selling the house.
16            And I know I had a conscious thought
17   of I need to keep the PPI benefits in case I
18   decide to stop working at Denny's.
19      Q.   Did you tell anyone at Denny's about
20   your employment agreement before you accepted the
21   job, your employment agreement with PPI before you
22   accepted the job?
23      A.   No.
24      Q.   So you didn't tell anyone at Denny's
25   that there was a chance you might be called back
```

Page 156

L. Nail

```
1    by your former employer?
2       A.   I didn't see a need to.
3       Q.   Why not?
4       A.   Because Rhonda and I go back a long
5    ways, back to the Wal-Mart days.  I had no idea if
6    I went to Rhonda and said, Lo and behold, didn't
7    think it would happen, but PPI called me -- by the
8    way, again, I knew PPI from the day I left the
9    corporate office, I knew PPI was not going to call
10   me to ask me to do anything.  But if per chance
11   they did, I could go to Rhonda and say, Rhonda,
12   PPI has a case that they need my help with and I
13   need to do whatever.  And there's, there was no
14   doubt in my mind if that situation came up we
15   could work it out.
16      Q.   What if PPI said, Hey, we want you to
17   come back?
18            MR. WEBER:  Hypothetical objection.
19   You may answer.
20      A.   I would have seriously considered it.
21      Q.   After you moved to South Carolina and
22   didn't have to commute anymore, did you enjoy your
23   job at Denny's from that point forward?
24      A.   No.
```

Page 157

L. Nail

```
1       Q.   Why not?
2       A.   Denny's is in -- Denny's, you know,
3    well, first of all, there's some things I can't
4    discuss because of attorney-client privilege.
5       Q.   That's fine.
6             MR. WEBER:  I would like to designate
7    this portion confidential, anything that
8    relates to Denny's, so he can candidly tell
9    you.
10            Is that agreeable.
11            MS. KIRILA:  That's fine, sure.
12
13            (Page 158 has been deemed,
14   "Confidential" and is bound under separate
15   cover.)
```

Page 158

1    L. Nail - Confidential
2
3
4
5
6
7
8
9        (Page 158 has been deemed,
10    "Confidential" and is bound under separate
11    cover.)
12
13
14
15
16
17        (Continued in nonconfidential portion
18    of transcript.)
19
20
21
22
23
24
25

Page 159

1                L. Nail
2    Q.    Now, you have been handed Exhibit 11.
3    Exhibit 11 is a document that you produced which
4    appears to announce the approval of the grant of
5    stock options along with performance shares and
6    performance units as part of the 2007 long-term
7    growth incentive program.
8        Did you in fact receive this letter?
9    A.    I'm sure I did if I produced it to
10    you.
11        MS. KIRILA:  Mark this as Exhibit 12.
12        (Plaintiff's Exhibit 12, 2-page
13    document headed "Expense Detail Report, Tax
14    Year 2007," marked for identification, this
15    date.)
16        MS. KIRILA:  And this is 13.
17        (Plaintiff's Exhibit 13, document
18    headed "Employee Reimbursement Agreement,"
19    marked for identification, this date.)
20    Q.    I've handed you what we marked as
21    Exhibits 12 and 13, which appear to relate to your
22    relocation and reimbursement for your relocation
23    expenses.
24        Do you recognize these exhibits?
25    A.    Yes.

Page 160

1                L. Nail
2    Q.    The first one, if you'll look at the
3    first page.  It says "Expenses Paid to Employee,"
4    total 7,500 --
5    A.    I'm sorry.  Which one?
6    Q.    Exhibit 12, first page.
7    A.    OK.
8    Q.    It says "Total Paid to Employee,"
9    $7,524.35.
10        Is that the amount you received in
11    connection with your relocation from
12    North Carolina?
13    A.    If that's what this document reflects.
14    Q.    The bottom reflects "Total Paid to
15    Other" of 12,937.
16        Is that consistent with your
17    recollection of what was paid on your behalf in
18    connection with your move?
19    A.    Let me say it like this.  I don't have
20    an independent recollection of the amounts.
21        Yes, I know this document, I mean, I
22    recognize this document and I have no reason to
23    dispute it.
24    Q.    Do you see where it says "Lump Sum
25    Allowance"?  There's a date April 4, 2007.

Page 161

1                L. Nail
2    A.    Right.
3    Q.    Is that before or -- would it have
4    been before the date that you moved?
5    A.    No, no, no.  Yes.  That was way before
6    we moved.  In fact, Graebel is the name of the
7    relocation company.  Immediately upon starting
8    employment with Denny's I was assigned a Graebel
9    relocation person and I had to several times talk
10    to her about slowing down.  She was wanting to --
11    she was very efficient, and it got to be rather
12    annoying because she was trying to -- she was
13    trying to pack us up and move us before we were
14    ready.
15    Q.    Would you turn to Exhibit 13.  Is that
16    your signature?
17    A.    Appears to be.
18    Q.    You have no reason to doubt that you
19    signed this?
20    A.    No, no.
21    Q.    Did you understand in looking at
22    paragraph 3 that you would be required to repay
23    any of the --
24    A.    Yes.
25    Q.    -- relocation fees if you -- just let

Page 162

L. Nail

1       L. Nail
2 me finish.
3      A.   Sorry.
4      Q.   -- terminated your employment within
5 twelve months of the relocation?
6      A.   Yes, I was fully aware of that.
7      Q.   Am I safe to assume you did not have
8 any other employment prior to Denny's after
9 Paramount?
10     A.   No, I did not. I mean, no. I mean --
11     Q.   Did you receive any payments --
12     A.   No.
13     Q.   -- for services from anyone?
14     A.   No.
15     Q.   Did you get unemployment compensation?
16     A.   No.
17      MS. KIRILA: Mark this as 14.
18      (Plaintiff's Exhibit 14, one-page
19 letter dated July 7, 2006, from Chuck Becker
20 to Lester Nail, Bates No. LES00236, marked
21 for identification, this date.)
22      MS. KIRILA: And this is 15.
23      (Plaintiff's Exhibit 15, one-page
24 letter dated August 4, 2006, to Lester Nail,
25 Bates No. LES00237, marked for

Page 163

L. Nail

1       L. Nail
2 identification, this date.)
3     Q.   Now I have handed you what we have
4 marked as Exhibits 14 and 15.
5      Do these reflect letters associated
6 with your retention incentive payment you received
7 from CBS in connection with the sale of PPI to
8 Cedar Fair?
9     A.   Yes.
10      MS. KIRILA: Mark these as 16, 17.
11      (Plaintiff's Exhibit 16, one-page
12 letter dated November 27, 2006, from Chuck
13 Becker to Lester Nail, Bates No. LES002368
14 marked for identification, as of this date.)
15      (Plaintiff's Exhibit 17, one-page
16 letter dated January 8, 2007, from Chuck
17 Becker to Lester Nail, plus attachment, Bates
18 Nos. LES00240 and 241, marked for
19 identification, as of this date.)
20     Q.   You have been handed what we marked as
21 Exhibits 16 and 17. These also appear to me to be
22 connected to the retention incentive that you
23 received in connection with the sale of PPI.
24      Is that correct?
25     A.   Yes.

Page 164

L. Nail

1       L. Nail
2     Q.   If you look at Exhibit 17, second
3 page, is that your signature at the bottom?
4     A.   Yes.
5     Q.   And you in fact received the payments
6 in connection with this retention incentive?
7     A.   Yes.
8     Q.   Am I correct that you would have
9 received an initial payment of 50,000 in 2006 an
10 additional payment of 125,000 in 2007 from CBS?
11     A.   That sounds correct.
12     Q.   Is it fair to say that essentially you
13 just had to stay through the closing date to
14 receive that retention?
15     A.   I'm sorry? Start over.
16     Q.   Sure. Is it fair to say that you only
17 had to stay through the closing date and sign a
18 release in order to receive --
19     A.   I don't think so. I think, um, and
20 I'm going to have to read the letter. It's my
21 understanding it wasn't just staying to the day of
22 closing. It was -- well, let's just read the
23 letter.
24     Q.   Sure.
25     A.   Yes, look in the middle of the letter:

Page 165

L. Nail

1       L. Nail
2 In addition, number one, successful closing,
3 continue to be employed exclusively by Paramount
4 through closing if, da da da da da. You
5 continue to represent Paramount -- blah blah blah.
6     Q.   Can we agree that whatever is
7 contained in this letter would outline the
8 conditions for the receipt of this retention
9 incentive?
10     A.   Correct.
11      MS. KIRILA: Mark this as Exhibit 18.
12      (Plaintiff's Exhibit 18, document
13 headed "Acknowledgment and Release," dated
14 November 27, 2006, marked for
15 identification, this date.)
16     Q.   You have been handed what we marked as
17 Exhibit 18, both of which pages of the exhibit
18 state "Acknowledgment and Release" at the top.
19      My question is, is that your signature
20 on both of the pages to this exhibit?
21     A.   Yes, it is.
22     Q.   The first one is dated December 1st,
23 2006. Is that when you would have signed it?
24     A.   Yes.
25     Q.   And the second page is dated July 12,

Page 166

L. Nail

1    2006. Is that when you would have signed the
2    second --
3    A.   Yes.
4    Q.   -- page? OK.
5         MS. KIRILA:  Mark as Exhibit 19.
6         (Plaintiff's Exhibit 19, 8-page
7         document containing columns with what
8         appears to be financial figures, marked for
9         identification, this date.)
10   Q.   I've handed you what we marked as
11   Exhibit 19, just for the record, which we received
12   from your employer, Denny's, and appears to have
13   payroll information to you.
14        Do you have any reason to disagree
15   that this is not your payroll information
16   beginning in the year 2007?
17   A.   I can't read it. I can make out my
18   name and there are a lot of numbers. But, I mean,
19   without comparing it to my check stubs, you know,
20   but I have no reason to believe it's not.
21   Q.   That's my question.
22   A.   Yes, I have no reason to believe if
23   you received this from the Denny's payroll
24   department, I have no reason to believe it's not

Page 167

L. Nail

1    accurate sitting here tonight at whatever time it
2    is. 7:45.
3    Q.   Do you need a break?
4    A.   Real quick?
5    Q.   Yes.
6         (A recess was taken 7:43 p.m. to
7         7:57 p.m.)
8    BY MS. KIRILA:
9    Q.   Mr. Nail, you testified earlier about
10   getting a referral to Larry Levine from David
11   Thornton in your limited conversation you had with
12   David Thornton about his situation.
13        Did you have any other conversations
14   or communications with David Thornton after you
15   were terminated without cause from PPI?
16   A.   Yes.
17   Q.   What other conversations have you had
18   with him?
19   A.   We talked about cars, politics and
20   coffee.
21   Q.   How often did you talk with
22   Mr. Thornton?
23   A.   I lost contact with David in the fall
24   of, was that that fall of, um, '06, I guess.

Page 168

L. Nail

1    Q.   Any other conversations with respect
2    to your postemployment -- let me ask that again.
3    You mentioned once you had other conversations
4    about.
5         Did you have any other conversations
6    with respect to your employment agreement than
7    what you've already testified about?
8    A.   With David Thornton?
9    Q.   Yes.
10   A.   I had no conversations with David
11   about my employment agreement or --
12   Q.   Or with his.
13   A.   Or with his.
14   Q.   OK. Did you ever tell you that he
15   contacted Paramount when he was contemplating
16   taking another position?
17   A.   No.
18   Q.   Have you had any other conversations
19   with any other former Paramount executives who
20   were under contract regarding their situations
21   postemployment without cause?
22   A.   No.
23   Q.   Mr. Nail, in connection with this case
24   you produced some documents that appear to be a

Page 169

L. Nail

1    copy of your calendar. I did not make a copy
2    because I am not going to mark it as an exhibit.
3    But I have just a question.
4         It cuts off at a particular date. Do
5    you have anything after the date that those
6    documents stop?
7    A.   No.
8    Q.   Did you keep a calendar for 2006?
9    A.   Yes.
10   Q.   Do you know what happened to that?
11   A.   Yes, I know exactly what happened to
12   it.
13   Q.   What happened to it?
14   A.   When I was moving I took out these
15   parts and threw away the rest.
16   Q.   My other question is, I did not see
17   any references to anything pertinent to this case
18   in those.
19        Do you know sitting here that there
20   are particular references?
21   A.   In here?
22   Q.   Yes.
23   A.   No. No, no. I mean, no. No, I don't
24   recall making any.

43 (Pages 166 to 169)

Page 170

L. Nail

1
2       Q.    Did you take any notes other than
3   those for your attorney regarding any of the facts
4   at issue in this case?
5       A.    I'm sorry?
6       Q.    Any other notes that you have not
7   produced in the course of discovery in this case?
8       A.    None that I have not produced.  None
9   that -- none that I didn't create at the direction
10  of my attorneys.
11      Q.    So nothing taken contemporaneously
12  with the actions as they were unfolding.
13      A.    No, no, no, no.  I am not as good a
14  note taker as Mr. Freeman.
15      Q.    You sat through much of Mr. Freeman's
16  deposition today, correct?
17      A.    Correct.
18      Q.    Did you hear anything that Mr. Freeman
19  said regarding conversations with you that you
20  felt were flat-out wrong or didn't happen?
21          MR. WEBER:  Objection to the form of
22      the question.  You're asking him to recall,
23      what did you say?  Five and a half hours of
24      testimony?
25          MS. KIRILA:  To the extent he can

Page 171

L. Nail

1
2   recall.
3          MR. WEBER:  Objection.
4       Q.    You can still answer.  If you are
5   sitting here recalling something Mr. Freeman said
6   that you disagree with regarding a conversation.
7          MR. WEBER:  I would request a review
8      of the transcript and then an opportunity to
9      respond in the transcript to anything that
10     he thought was inappropriate or disagreed
11     with.
12         MS. KIRILA:  No, I'm asking here and
13     now.
14      Q.    Do you have a specific recollection of
15  anything like that?
16      A.    Yes.  There were -- I think there were
17  two items that I'm not sure I would characterize
18  as disagree with, but either, one, didn't remember
19  or, two, have a different memory.
20      Q.    What were those two items?
21      A.    May I see his notes?
22      Q.    Sure.  They are Exhibit K.
23         (Handing.)
24      A.    I remember telling him that I was
25  going to get a new attorney because I was not

Page 172

L. Nail

1
2   satisfied with the current attorney.
3          I don't remember a reference to
4   paragraph 7(c).
5          And there was one other.  Oh.  Oh, oh,
6   oh.  That's when he testified that I called him,
7   you know, at some time after receiving the offer,
8   the buyout offer and I think I testified fully to
9   that.
10      Q.    You didn't recall that.
11      A.    I didn't recall that.
12         MS. KIRILA:  Let's mark these other
13     exhibits, please.
14      A.    But I do reserve the right when I
15  review the --
16      Q.    Sure.  I am not holding you to that.
17  Just as you're sitting here today thinking, that's
18  what I am asking you.
19      A.    Those are the only two things that
20  immediately come to mind.
21         MS. KIRILA:  Mark these as Exhibits 20
22     and 21.
23         (Plaintiff's Exhibit 20, W-2
24     statements for the year 2006, marked for
25     identification, this date.)

Page 173

L. Nail

1
2          (Plaintiff's Exhibit 21, W-2
3      statements for the year 2007, marked for
4      identification, as of this date.)
5       Q.    You have been handed what we've marked
6   as Exhibits 20 and 21.  Just for the record, I
7   received these from your counsel and they have
8   your Bates numbers at the bottom.
9          Would you just confirm for me that
10  these are accurate W-2 statements for you for the
11  years 2006, which is Exhibit 20, and 2007, which
12  is Exhibit 21?
13      A.    I will confirm to you that these are
14  W-2s that I received from Paramount Parks, Inc.
15  and Denny's Inc., but I can't -- I have no reason
16  to believe they're not accurate, but I'm not going
17  to confirm that they are accurate.
18      Q.    The second page reflects W-2s received
19  from CBS; is that correct?
20         MR. WEBER:  On Exhibit 20.
21         MS. KIRILA:  On Exhibit 20.
22         MR. WEBER:  Actually, on Exhibit 21
23     also.
24         MS. KIRILA:  I am just asking about 20
25     at this point.

44 (Pages 170 to 173)

L. Nail

1
2    Q.    Because you mentioned from Paramount
3    Parks and --
4    A.    OK, I'm looking at 20.
5    Q.    Actually, not Denny's in 20, correct?
6    Just Paramount and CBS?
7    A.    OK.
8    Q.    Is that correct?
9    A.    I'm sorry, what's the question?
10        MR. WEBER:  We'll designate all
11   financial information related to Mr. Nail as
12   confidential.
13
14        (Page 175 has been deemed,
15   "Confidential" and is bound under separate
16   cover.)
17
18
19
20
21
22
23
24
25

1              L. Nail - Confidential
2
3
4
5
6
7
8
9        (Page 175 has been deemed,
10   "Confidential" and is bound under separate
11   cover.)
12
13
14
15
16
17
18
19
20
21
22
23        (Continued in nonconfidential portion
24   of transcript.)
25

1              L. Nail
2    BY MS. KIRILA:
3        Q.    Mr. Nail, when you completed the
4    enrollment process in May of 2007 for PPI
5    benefits, do you recall that exhibit we looked at?
6        A.    No.
7        Q.    The enrollment forms?
8        A.    Are you talking about this?
9        Q.    Yes.
10       A.    Yes.
11       Q.    We looked at the date that that was
12   signed and it was May 29th, 2007.
13       A.    Right, well, there are two different
14   dates.
15       Q.    Right.  Why don't you tell me what
16   they are?  One is May 29, 2007.
17       A.    One's dated May 29, '07, and the other
18   is dated 5/26/07.
19       Q.    Did you review those forms before they
20   were submitted back to --
21       A.    No.
22       Q.    -- Paramount?
23       A.    No.
24       Q.    Did your wife actually fax them back?
25       A.    Yes.

1              L. Nail
2        Q.    Can you tell me on those dates that
3    they were signed, did you -- was your home in
4    contract for sale at that point?  Your home in
5    North Carolina.
6        A.    Sitting here right now, I can't tell
7    you.  I don't have a memory.  I mean, I don't have
8    the immediate memory of, I mean, I'm not
9    remembering that it went on.  I can't remember
10   sitting here right now what the date of the
11   contract was.
12       Q.    And how about with respect to the
13   purchase of your new home in South Carolina, did
14   you build or buy?
15       A.    No, bought.
16       Q.    Do you remember when you contracted to
17   buy that home?
18       A.    No, I do not remember.
19        MS. KIRILA:  Mark this as Exhibit 22.
20        (Plaintiff's Exhibit 22, 4-page
21   document headed "North Carolina Warranty
22   Deed," marked for identification, this
23   date.)
24       Q.    You have been handed what we marked as
25   Exhibit 22, which I will represent is from the

Page 178

L. Nail

1  county auditor's records.
2
3       This appears to reflect a general
4  warranty deed with respect to your home at 9027
5  Kirkley Court in Charlotte, North Carolina, and
6  the deed is made the 10th day of April, 2007.
7       A.   Uh-huh.
8       Q.   Is that when you sold your house?
9            MR. WEBER:  Was this produced pursuant
10  to any discovery requests?
11           MS. KIRILA:  It wasn't requested.  It
12  was something that counsel pulled off the
13  Internet.
14           MR. WEBER:  This wasn't requested in
15  any of our broad requests?
16           MS. KIRILA:  No, how could it be?  It
17  was something that was pulled off yesterday.
18           MR. WEBER:  If it's relevant to your
19  claim, I guess it must be relevant
20  somewhere.
21           MS. KIRILA:  There you go.  I'm
22  producing it today.  I pulled it off last
23  night.
24           MR. WEBER:  It was not exactly in
25  response to our discovery requests.

Page 179

L. Nail

1
2       MS. KIRILA:  I don't have an
3  obligation to go and pull things off of the
4  Internet that the attorney thinks of after.
5       MR. WEBER:  You have a continuing
6  obligation to supply --
7       MS. KIRILA:  And I am providing it to
8  you the day after.
9       MR. WEBER:  Convenient.
10       MS. KIRILA:  For the record, we did
11  not receive a copy of Exhibit -- I do want
12  this to go on the record -- Exhibit A.
13  BY MR. KIRILA:
14       Q.   In fact, let's go to that Exhibit A,
15  if we could now, Mr. Nail.
16       A.   Are we done with this one?
17       Q.   For a second.  You can put it aside.
18       Exhibit A.  Is that something that you
19  provided to your counsel?
20       A.   I do not recognize this.
21       Q.   Do you know where your counsel
22  obtained that document?
23       MR. WEBER:  Did we produce it?
24       MS. KIRILA:  You used it as an exhibit
25  today.  You did not produce it.

Page 180

L. Nail

1       A.   I'm sorry, what is the question?
2       Q.   Do you know whether you provided that
3  to your counsel or not?
4       A.   I do not know.
5       Q.   Do you believe that you did or you
6  don't know either way?
7       A.   I don't know either way.
8       Q.   OK.  Do you recognize it?
9       A.   I don't.  I mean, it is obvious what
10  it is.
11       Q.   My question was just do you recognize
12  it.
13       A.   It's not leaping out at me, but I have
14  no reason not to believe that I didn't have it in
15  my files.  So I don't know.
16       Q.   Do you recall receiving this?
17       A.   Do I recall receiving this?
18       Q.   Yes.
19       A.   From?
20       Q.   Whoever it's addressed from.
21       A.   CBS --
22       Q.   During the course of your employment.
23       A.   Well, it is from CBS corporate HR to
24  CBS Corporate PPI Inc., and no, I just don't

Page 181

L. Nail

1
2  remember this.
3       Q.   All right.  If you would just go back
4  to the deed.  Does this refresh your recollection
5  at all as to when you would have sold your
6  North Carolina home?
7       A.   No.
8       Q.   Do you think the date is wrong or how
9  do you -- I am just trying to square the dates.
10       MR. WEBER:  Objection.
11       A.   Yes, it is -- I do not -- I do not
12  think we sold the house in April.  And if you look
13  at the registration date is dated June 13th, and
14  my memory is we didn't close until June.
15       Q.   Can you look at the third page of this
16  document.
17       A.   Uh-huh.
18       Q.   Is that your signature above where it
19  says "Lester Claude Nail"?
20       MR. WEBER:  It doesn't look like it.
21       MS. KIRILA:  Objection.  I'm asking
22  the witness if that's his signature.
23       A.   Yes, I think that's my signature.
24       Now, this is what I think -- we filled
25  out, you see, we sold -- the way the relocation

Greenhouse Reporting, Inc.                              (212)279-5108
                        (212) 279-5108

Page 182

L. Nail

1  worked, we actually sold the house to the
2  relocation company and then the relocation company
3  turns around and sells it to the buyer that we
4  contract with. I think the best evidence of the
5  day we sold the house is the contract, because I
6  know that we filled out papers for the relocation
7  company. But --
8      Q.   Do you still have that contract for
9  the sale of your home?
10     A.   Yes. I'm sure we do.
11          MS. KIRILA: Mark this as Exhibit 23.
12          (Plaintiff's Exhibit 23, two-page
13     document headed "Title to Real Estate, State
14     of South Carolina, County of Spartanburg,"
15     marked for identification, this date.)
16          MS. KIRILA: Mark this as 24.
17          (Plaintiff's Exhibit 24, one-page
18     document headed "Spartanburg County
19     Assessor's Office," marked for
20     identification, this date.)
21     Q.   In Exhibit 23 that you have been
22 handed, it appears to me to relate to the purchase
23 of your home in South Carolina; is that correct?
24     A.   Yes.

Page 183

L. Nail

1      Q.   The date on the back, the last page
2  here, states May 31st. May 2007.
3      A.   OK.
4      Q.   Is that consistent with your
5  recollection as to when you purchased the home in
6  South Carolina?
7      A.   It must be.
8      Q.   Is that your -- well, there's not a
9  signature, is there? Was the home built for you?
10     A.   No.
11     Q.   Or it was already preexisting?
12     A.   Preexisting.
13     Q.   Did you move in right after you
14 purchased the home?
15     A.   We moved in sometime in June is my
16 memory. But I can't give you a date.
17     Q.   If you look at Exhibit 24 from the
18 Spartanburg County Assessor's Office, it says
19 "Sale Date, 5/31/2007." I think you said that is
20 consistent when you would have purchased the home.
21          Do you know why it says "permit date,
22 August 1, 2006"?
23     A.   Permit date?
24          MR. WEBER: Right below it.

Page 184

L. Nail

1      A.   I suspect that has something to do
2  with when the house was built and the original
3  permit to build the house was obtained by the
4  builder.
5          The house had been on the market for
6  some time. It -- I suspect that's the day he
7  started building the house or that's when he went
8  down to the county assessor's office, you know,
9  where he got the permit to start construction.
10     Q.   Do you recall how long before you
11 purchased the house that you had been looking at
12 that particular house?
13     A.   The real estate agent -- I took a day
14 off from work and had the real estate agent take
15 me to all the houses that she had, that Linda had
16 looked at that was on her short list. And I'm
17 sorry, what was the question?
18     Q.   You purchased it on May 31, 2007. How
19 long had you been looking at that house prior to
20 the purchase date?
21     A.   I'm -- my memory is about two days. I
22 saw the house, immediately liked it. Linda had
23 already looked at it one time. She liked it. And
24 I think we then immediately went into

Page 185

L. Nail

1  negotiations.
2          MS. KIRILA: That's all the questions
3  I have for you.
4          (Time noted: 8:23 p.m.)

47 (Pages 182 to 185)

Page 186

1          L. Nail

2

3     I, the witness herein, having

4 read the foregoing testimony do hereby

5 certify it to be a true and correct

6 transcript, subject to the corrections,

7 if any, shown on the attached page.

8

9

10

11       _____

12          LESTER NAIL

13

14

15

16 Subscribed and sworn to

17 before me this _____ day

18 of _____, 2008.

19

20

21

22 _____

23

24

25

Page 187

1

2      C E R T I F I C A T E

3 STATE OF NEW YORK    )

4        : ss.

5 COUNTY OF SUFFOLK    )

6

7     I, THOMAS R. NICHOLS, a Notary Public

8 within and for the State of New York, do

9 hereby certify:

10     That LESTER NAIL, the witness whose

11 deposition is hereinbefore set forth, was duly

12 sworn by me and that such deposition is a true

13 record of the testimony given by the witness.

14     I further certify that I am not

15 related to any of the parties to this action

16 by blood or marriage, and that I am in no way

17 interested in the outcome of this matter.

18     IN WITNESS WHEREOF, I have hereunto

19 set my hand this 26th day of April, 2008.

20

21

22       _____

23        THOMAS R. NICHOLS

24

25

Page 188

1
2      I N D E X
3 WITNESS   EXAMINATION BY   PAGE
4 LESTER NAIL   MS. KIRILA    3
5
6      E X H I B I T S
7 PLAINTIFF'S EXHIBITS     PAGE LINE
8 1, two-page résumé of Lester   25 24
   C. Nail
9
2, document titled "Paramount   127 25
10   Parks Authorization Agreement
   For Automatic Deposits
11
3, document dated 11/15/07,   129  5
12   under logo F & M, Bates
   No. LES00204
13
4, document purported to be   140 20
14   Denny's application
15 5, document headed "Employee   140 23
   Action Form," bearing date
16   stamp February 20, 2007
17 6, document titled "Employee   141  3
   Action Form," bearing date
18   stamp May 18, 2007
19 7, document purported to be   141  7
   offer letter agreement
20
8, document headed "Denny's   150  4
21   2007 Long-Term Growth
   Incentive Program"
22
9, document headed "Denny's   150  9
23   Corporation Stock Option
   Award Agreement"
24
10, document headed "2007   152 16
25   Salaried Enrollment options"

Page 189

1
2    I N D E X (Continued.)
3      E X H I B I T S
4 PLAINTIFF'S EXHIBITS     PAGE LINE
5 11, one-page letter dated   154 25
   March 12, 2007, from Nelson
6   Marchioli to Lester Nail,
   Bates No. LES00085
7
12, 2-page document headed   159 12
8   "Expense Detail Report,
   Tax Year 2007"
9
13, document headed "Employee   159 17
10   Reimbursement Agreement"
11 14, one-page letter dated   162 18
   July 7, 2006, from Chuck
12   Becker to Lester Nail, Bates
   No. LES00236
13
14 15, one-page letter dated   162 23
   August 4, 2006, to Lester
15   Nail, Bates No. LES00237
16 16, one-page letter dated   163 11
   November 27, 2006, from Chuck
17   Becker to Lester Nail, Bates
   No. LES002368
18 17, one-page letter dated   163 15
   January 8, 2007, from Chuck
19   Becker to Lester Nail, plus
   attachment, Bates Nos.
20   LES00240 and 241
21 18, document headed   165 12
   "Acknowledgment and Release,"
22   dated November 27, 2006
23 19, 8-page document   166  7
   containing columns with what
24   appears to be financial figures
25

Page 190

1
2              I N D E X (Continued.)
3                 E X H I B I T S
4    PLAINTIFF'S EXHIBITS              PAGE LINE
5    20, W-2 statements for the         172  23
        year 2006
6
     21, W-2 statements for the         173   2
7       year 2007
8    22, 4-page document headed         177  20
        "North Carolina Warranty Deed"
9
     23, two-page document headed       182  13
10      "Title to Real Estate, State
        of South Carolina, County of
11      Spartanburg
12   24, one-page document headed       182  18
        "Spartanburg County
13      Assessor's Office"
14
15
16
17
18
19
20
21
22
23
24
25

Greenhouse Reporting, Inc.                    (212)279-5108

**A**

**ability** 5:4,11,14
75:13
**able** 8:24 11:13
22:15 23:17,23
63:12 70:4 78:11
99:25 110:21
111:11,21 112:11
125:7
**absolutely** 39:3
93:25
**acceptance** 81:13
**accepted** 84:8
137:16 155:20,22
**account** 117:13
130:12
**accounts** 131:17
**accurate** 26:21
167:2 173:10,16
173:17
**accurately** 4:12 5:22
26:13
**acknowledge** 76:18
**Acknowledgment**
165:13,18 189:21
**acquisition** 85:13
**act** 36:2
**action** 140:24 141:4
141:12,15 148:23
149:4 187:15
188:15,17
**actions** 170:12
**active** 73:6 106:21
106:22
**actively** 59:5 115:5
**activity** 80:15
**actual** 52:7 53:18
57:4
**add** 127:19 139:15
155:6
**addition** 165:2
**additional** 164:10
**address** 3:6 21:3,9
26:24 27:3,16
122:3,4,8,9,11
135:22,23 136:19
136:20
**addressed** 180:21
**administration**
39:23 40:3 51:2
**administrative**
91:13 94:5
**admitted** 28:10,17
28:23 29:4
**advice** 32:20 132:16
**affairs** 30:20 58:7
74:3 76:14
**affect** 5:14 36:18
**afternoon** 3:11

**agent** 184:14,15
**aggressive** 6:12
**ago** 3:21 6:18
**agree** 57:7 59:8,13
59:14 60:18,24
61:13 62:4,8 63:17
66:7,12,15 70:14
70:20 71:6 104:19
107:8,12 151:5
165:6
**agreeable** 157:11
**agreed** 93:12 94:9
94:10
**agreement** 1:18
8:20 9:3,12 17:8
17:24 18:13 22:9
22:14 23:19 24:20
24:25 25:2 36:15
40:14 41:7,12,16
42:5 43:16 44:11
44:17 45:25 46:13
46:24 47:9,16 48:6
48:9 49:6 50:18,21
52:8,11,13,24 53:6
53:19,21 54:10,12
56:6,9,17 57:5,8
57:14,18 59:9,17
60:20 61:14,17
62:5,7,10,12,19
63:21,22,25 64:23
66:3,13 67:17
68:24 69:14 71:8
74:18 76:22 96:7
100:11 104:25
105:23 106:4
107:6 110:17,22
110:25 112:3,5
117:5 128:3,9
138:10 141:8,18
142:3 145:18,19
145:20,25 150:11
150:19 151:22
155:20,21 159:18
168:7,12 188:10
188:19,23 189:10
**agreements** 20:14
39:6 43:7 52:19
68:6 74:13 76:8
89:5
**agrees** 58:5,11,13,17
74:2 76:12
**ahead** 11:5 75:16
123:25 151:13
**aid** 116:5,6,11
**airport** 126:20
**AI** 10:9 17:5,7,11
19:12,23 21:3
25:16 39:15 41:19
41:22,23,25 46:11
47:23 49:10,19

51:20,21,23,24,24
54:6,7,15 55:10
78:12 91:7,8,18,20
99:12,13
**alcohol** 5:6
**allegations** 10:21
17:22
**allow** 111:23
**allowance** 118:15
145:13,15,18,19
160:25
**allowed** 118:11,14
**alternate** 124:25
**alternative** 114:18
**America** 73:20
131:5
**amount** 5:10 160:10
**amounts** 160:20
**analysis** 153:16
**and/or** 16:16 67:11
**Ann** 79:9
**announce** 159:4
**announced** 84:7
**annoying** 161:12
**annual** 144:18
**answer** 4:5 6:22
38:19 58:24 60:23
61:7 63:6 65:13
68:20 73:19 74:22
74:23 75:4 76:2,4
76:5 88:5 93:17
97:12 106:7,13
107:11 113:24
114:24 115:11
134:13 139:7
142:16 147:17,19
148:18 151:19
156:20 171:4
**answered** 4:21
60:22 61:5 68:20
71:24 125:11
126:11
**answering** 4:14
77:17
**answer's** 16:12
**Anthony** 50:22
**anticipate** 151:16
**anybody** 38:17
52:17 88:6 97:24
115:18
**anymore** 70:10
156:23
**anyway** 146:10
**apartments** 27:19
**appear** 159:21
163:21 168:25
**appears** 129:15
132:25 142:16,19
144:2 148:22
152:20 159:4

**applicable** 58:14
**application** 116:20
116:21,22 140:21
141:11,20 142:17
143:4,12 188:14
**applications** 116:18
**applied** 142:14
**apply** 60:10,14
63:15,20 65:15
66:20 68:16 69:16
69:25 71:18 72:4
75:8 77:4 111:9
**applying** 68:23
116:7
**appreciate** 148:12
**approval** 159:4
**April** 1:10 160:25
178:6 181:12
187:19
**area** 129:19
**areas** 31:17
**argument** 111:8
**Arkansas** 28:14
29:8 31:10
**arrangement** 21:25
**arrived** 104:3
**arriving** 155:12
**aside** 64:17 65:6
89:13 112:24,25
113:25 123:10
179:17
**asked** 4:22 6:8 9:21
10:8 17:9 21:22
23:12 30:24 31:13
31:18 38:2 51:17
60:21 61:4,6 63:19
68:19 71:24 81:16
89:2 90:2,23 91:3
93:10 94:3 97:19
118:19,21,22
125:11 126:11
127:14 132:4,17
132:18 136:16
146:21 147:9
**asking** 21:3 22:9
25:17 44:10 53:13
56:5 61:8 73:22
86:11 91:20 97:9
106:8 112:15
133:9 148:13
170:22 171:12
172:18 173:24
181:21
**assemble** 88:13
**assessor's** 182:20
183:19 184:9
190:13

**assigned** 161:8
**assistance** 22:24
145:11
**associate** 32:4 34:5
163:5
**assume** 4:20 5:17
28:15 90:23 162:7
**assumed** 90:22
**assuming** 91:9
**assumption** 77:2
91:2 122:6 154:18
**attached** 121:16
186:7
**attachment** 163:17
189:19
**attempt** 46:15
**attempted** 121:24
**attention** 57:6 58:3
58:6 74:3,6 76:13
**attorney** 6:12 7:19
17:9 18:2 21:20
28:7 52:17 67:18
80:19 114:3,6,10
143:16 170:3
171:25 172:2
179:4
**attorneys** 2:5,13
7:19 10:4 25:17
30:22 97:15,17,17
97:18 101:14
143:5,5 170:10
**attorney-client**
157:5
**auditor's** 178:2
**August** 95:18
107:16 109:2,6,18
118:4 162:24
183:23 189:14
**Authorization** 128:2
128:9 188:10
**authorize** 114:14
**automatic** 128:3,10
130:20 133:18
134:2,3,3 188:10
**automatically** 64:15
130:22
**available** 22:18,20
22:21 116:17
**Avenue** 1:17,24
2:14
**Award** 150:11,19
188:23
**awarded** 84:7
150:20 151:22
**aware** 21:22 22:25
23:5 24:24 33:12
39:8,13,18 46:25
48:16 64:17
123:16 151:10

162:6
awareness 47:4
A-n-n 79:10

**B**

B 40:25 188:6 189:3
190:3
back 11:11,22 12:8
12:13 14:12 17:4
18:9 31:18 42:17
45:25 48:13 49:20
62:3 69:6,13 70:21
71:2,5,17 73:10
74:6 86:13 94:6,13
94:16 97:6 105:4
105:14 114:2
116:3 118:4
125:14 155:25
156:5,6,18 176:20
176:24 181:3
183:2
background 67:22
balance 133:7
bank 73:20 123:17
124:11 129:16,18
130:12,18,25,25
131:2,5,8,18,23
132:4,5,17
banking 129:16
133:16
banks 130:19
bar 126:24 143:4,12
Bartok 35:10,25
37:5,20 38:13,14
39:21 41:19 42:4
43:15 45:13
base 57:19 144:8,23
based 34:2 50:3
68:15 97:12
basically 76:21 93:8
basis 141:25
Bassin 78:17
Bates 107:25 129:6
129:11 139:24
140:11 152:6,11
155:3 162:20,25
163:13,17 173:8
188:12 189:6,12
189:14,16,19
bearing 140:24
141:4 188:15,17
Becker 162:19
163:13,17 189:12
189:16,19
beginning 135:2
166:17
behalf 77:21 114:13
160:17
behold 156:7
Belgians 33:3

believe 7:25 8:16
9:2,17 11:4 12:18
13:20 14:25 17:3
20:16 25:11,18
26:23 31:12 36:9
41:2,8 42:6,22
43:5,17,22 44:22
52:22 60:25 62:17
62:21 64:3,4 65:2
79:10 85:25 92:7
101:17 102:7
109:12,22 111:14
130:6 135:17,19
135:25 136:13,21
139:25 142:22
166:21,23,25
173:16 180:6,15
belonged 45:20
benefit 117:21
152:21 154:5
benefits 12:15 63:9
63:10 71:15
109:14 117:4,8,15
121:12 123:13
134:8 153:2,9,21
153:25 154:17
155:17 176:5
best 46:22 49:17
182:5
betcha 70:11
better 12:2 153:25
beyond 59:10,16
60:19 116:14
Bingo 74:5
bit 23:10 47:7 78:22
81:17
blah 143:14,14,14
143:15 165:5,5,5
blank 138:4
blood 187:16
blur 87:8 89:19
blurred 52:4 90:8
boilerplate 85:11
bonus 118:9,10,22
119:7,12 144:21
144:25 145:7,8
146:4,5 149:12,16
boss 7:22 8:2,4 10:6
boss's 8:9
bottom 83:4 108:2
128:14 141:13
149:11,19 152:7
160:14 164:3
173:8
bought 33:3,5 36:13
177:15
bounce 133:10,11
bounced 133:2,14
133:20
bound 157:15

158:10 174:15
175:10
boundaries 38:25
branch 129:21
breach 147:3
break 61:12 69:8
99:23 119:22
167:4
breath 151:20
Brett 78:13
Bring 43:8
Briskman 45:23
51:17,24 52:2
broad 178:15
broader 56:4 99:17
broke 86:14
brought 78:23
103:23
build 177:14 184:4
builder 184:5
building 72:20
184:8
built 183:10 184:3
bullet 108:17,18
business 32:20 58:6
67:16 74:2,5 76:13
76:15,19 81:24
148:10
busy 46:21
buy 36:12 110:16
177:14,17
buyer 16:11 182:4
buyout 172:8
B-a-r-t-o-k 35:10
B-a-s-s-i-n 78:18
B-r-i-s-k-m-a-n
45:23

**C**

c 2:2 25:25 27:24
69:2 95:14 108:14
135:14 187:2,2
188:8
cabinet 43:4
calculation 153:5,18
calendar 169:2,9
call 13:17 18:23,23
19:2,13 20:21
21:11,16 22:8
37:13,14 45:11,16
51:24 69:16 70:5
70:21,25 71:5,11
84:5,9,15,18 85:24
86:5 92:25 93:15
94:13,24 100:17
122:13 131:4
132:17,19 134:24
156:10
called 3:2 11:18
12:10,11 17:7,11

17:19 18:25 20:22
21:13 29:16 51:25
69:21 84:5 91:8
94:3 113:14,21
114:5 122:10
123:11 132:3
134:22 143:9
155:25 156:8
172:6
calling 13:10 21:17
45:21 51:20
113:16,22 134:20
calls 19:14 37:12
58:22 62:13 63:4
65:12 68:4 71:23
74:20 105:2
107:10 110:8
candidly 157:9
capacity 3:25 6:4
30:5 73:21
capital 66:8
capitalized 66:9
car 94:21 118:15
145:13,15,17,18
card 14:4 21:2
care 13:13,15 14:8
Carolina 3:8 15:24
16:3,6 27:2,6,12
27:17 28:24,24
29:18 116:7 122:7
122:18 129:20,22
130:19 131:8,10
131:11 135:8
136:20 143:4,12
156:22 160:12
177:5,13,21 178:5
181:6 182:15,24
183:7 190:8,10
carried 89:11
carry 73:18
cars 167:20
case 3:11,22,24 6:6
6:7 8:5,6,12,17,22
9:20 10:2,5,14,19
17:5,6 25:13 31:15
100:10 147:2
155:17 156:13
168:24 169:18
170:4,7
caught 74:15 127:12
cause 18:11 20:11
20:19 25:10 59:17
60:5,10,14,20 61:3
61:14,16,23 62:5
62:11,16,22 63:8
63:16,20 65:9,16
65:18,19 66:21
68:24 69:17,22
70:16 71:2,8,20
72:3,15 92:14 95:4

96:6 105:22 106:4
106:16 107:2,8,13
111:11 117:3,9
167:16 168:22
cautious 120:25
CBS 35:23 45:10,11
45:18,20 50:6,10
50:17 51:5,6,9,14
52:11,17,17 64:7,9
64:10,14 76:21
78:5,9,17,19 79:19
80:6 84:8 119:12
163:7 164:10
173:19 174:6
180:22,24,25
CBS's 45:4
Cedar 17:22 21:25
22:6,7 36:12,13
42:16 43:21 64:7,8
64:13,15 77:11
80:10,13,16,20,21
80:24 81:6,9 82:21
83:14,21 85:11
86:24 87:18 91:22
92:4 93:20 96:16
96:19,22 97:17
98:2,6,13,22 99:19
100:6,18 101:22
102:3,18 104:25
108:11 110:16
113:10 126:7
127:22 163:8
cell 11:21
Center 2:6
CEO 9:22 10:2 23:5
37:16
certain 46:11
certainly 53:11
93:12
certify 186:5 187:9
187:14 188:14
cetera 150:3
CFO 37:16 42:13
chance 95:3 151:16
155:25 156:11
change 13:12 31:21
34:24 35:2 36:23
64:18 97:12 104:8
130:19 151:6
154:10,11
changed 16:5 54:25
137:18
changeover 14:3,11
changes 48:3
characterize 24:3
171:17
charge 93:5 94:17
Charlotte 11:13
12:3 13:5 15:21
27:4,5 34:3 83:15

86:6 87:23 126:20
129:20 131:6
136:19 137:11
138:2,18 154:13
178:5
**chase** 69:21
**check** 117:12 132:18
132:19 133:20,21
166:20
**checking** 117:13
**checks** 133:17
**Cherryville** 29:16
**chitchatted** 81:17
**choice** 70:7
**Christmas** 21:2
**Chuck** 162:19
163:12,16 189:11
189:16,18
**circumstances**
19:20 20:5 41:15
126:3,14,17 132:5
**Citigroup** 78:20,22
79:22
**claim** 123:24 178:19
**claims** 13:14,14,24
14:2,5,6,7,13,20
109:14 118:3
**clarification** 71:5
**clarify** 98:8,10
133:15
**Claude** 181:19
**clause** 23:22 58:16
58:20,25 63:7 67:3
71:20 73:6,11
74:11 76:11
**clauses** 74:13,14
93:22
**clear** 4:10 76:11
93:2 102:21
103:21 118:8,10
118:15 126:2
138:13
**clearly** 11:9 123:18
**client** 4:3 6:24
**close** 29:15 48:18,24
49:3 181:14
**closed** 15:15,15,16
16:3
**closing** 15:19,21,22
16:7 77:25 79:18
79:20 82:19 83:15
86:7 87:6 91:4,7
92:2 119:8,15
137:2,17,19 151:4
164:13,17,22
165:2,4
**COBRA** 14:9
**coffee** 19:3 167:21
**Columbus** 2:8
**columns** 166:8

189:23
**come** 13:6 50:4
93:24 94:7 120:10
156:18 172:20
**coming** 50:9 102:22
102:22 104:6
**comma** 74:4
**comment** 54:15 55:5
**committee** 37:14,15
**common** 31:17 67:4
75:13
**communicating**
5:18
**communication**
84:22 85:18
125:25
**communications**
20:24 21:10 51:11
89:15 92:9 167:15
**commute** 156:23
**commuting** 11:14
155:13
**companies** 35:16
45:19
**company** 19:4,7,9
22:21 23:6 28:19
42:20,21 46:25
73:3,21 86:25
89:13 118:12
161:7 182:3,3,8
**comparable** 58:10
**compare** 57:20
**comparing** 166:20
**compensation** 37:24
73:4 145:24
162:15
**complaint** 6:21 8:16
10:22 17:13,20
20:23
**complete** 142:18
**completed** 135:18
135:24 140:10
176:3
**completely** 58:12,18
59:2,6 71:21 72:10
**complicated** 16:11
35:6 136:25 137:9
137:12
**complied** 70:12
**comply** 58:13
**comprehend** 113:3
**comprised** 30:21
**conceivably** 59:9
**conclusion** 58:23
62:14 63:5 65:13
68:4 71:24 74:21
104:3 105:3
107:11 110:9
154:22
**condition** 154:10

**conditions** 165:8
**conduct** 125:4
141:23
**conference** 84:9,18
85:24 86:5 91:10
**confidential** 157:8
157:15 158:1,10
174:12,15 175:1
175:10
**confidentiality**
24:20 68:25
**confirm** 173:9,13,17
**confused** 101:3
**connected** 163:22
**connection** 43:20,23
160:11,18 163:7
163:23 164:6
168:24
**conscious** 155:16
**conservative** 121:2
**consider** 54:17
65:22 78:5 106:15
106:18,25
**considered** 106:17
156:21
**consist** 88:9
**consistent** 58:9
149:9 160:16
183:5,21
**construction** 184:10
**consultation** 22:24
**consulted** 38:13
**contact** 70:22 78:21
80:9 122:14
143:10 167:24
**contacted** 120:6
168:16
**contained** 98:17,21
99:4 101:20
110:24 165:7
**containing** 166:8
189:23
**contemplating**
168:16
**contemporaneously**
170:11
**content** 101:6
**contents** 85:6 98:23
100:5
**context** 11:10 31:9
67:2 69:20
**continue** 61:21 64:3
64:4,22 65:2,8
117:3 148:6
154:12 165:3,5
**Continued** 158:17
175:23 189:2
190:2
**continuing** 62:6,9
111:15 112:4

148:10 179:5
**contract** 23:3,7,8
32:19,25 33:13
37:23 38:18,23
41:2,21,25 44:14
44:23 45:4 48:21
48:24 49:10,21,24
51:18 52:16 53:10
56:21,25 57:11
64:14 65:22,23
66:24,25 67:2
68:13,15 70:15
74:10 75:19,22
76:21 81:20 88:17
92:15 93:19
104:19 106:19
107:4,9,13 118:15
125:23 137:6,7,16
138:7 144:12
147:3 168:21
177:4,11 182:5,6,9
**contracted** 177:16
**contractor** 31:12
**contracts** 21:23
32:13,22,23 33:8
33:10,15 37:9,11
38:20 39:9,14,19
39:24 40:6,10,13
40:17,21 42:12,18
43:10,11,19,25
48:17 52:15,20
68:2 88:22 91:8,10
93:7,20 103:20
**contribution** 153:8
**convenience** 148:9
**Convenient** 179:9
**conversation** 10:24
11:2,7,12,17,25
12:6 13:8 15:2,3
16:15 17:19 18:9
19:24 20:10 23:11
47:14,19 51:23
54:9 81:10,14 82:2
83:7 86:19 91:18
94:15 95:8 99:18
108:14 109:6,7
126:9,13 134:25
143:13 167:12
171:6
**conversations** 10:2
16:19,23 17:2
20:24 39:20 52:6
54:5 56:16 79:3
82:5,13,16 87:15
89:15,21 92:9,19
96:21 100:2
102:25 103:6,15
108:16,16,21
109:13 143:22
167:14,18 168:2,4

168:6,11,19
170:19
**conversion** 123:23
**copy** 21:18 43:16
129:15 169:2,2
179:11
**corporate** 27:19
78:14 82:20,22
93:5,9 94:14,16,18
94:22 156:10
180:24,25
**Corporation** 2:12
150:10,18 188:23
**correct** 7:10 12:25
20:15 27:13,22
28:2,21,22,25
29:21,24 30:7
31:25 32:2 33:17
33:18,21 34:22
35:7 36:6 44:25
45:2 47:21 48:3,10
50:8,20 51:10,15
52:9 53:19,20
61:15,19 64:20,24
66:3,4 67:19,23
69:18 72:3,13 77:5
77:22 79:6 87:2,22
91:4 92:3 97:16
100:16,20 102:6
102:10 104:22
105:19 106:12
109:4,11,15 117:6
118:5 119:9
125:10,18 128:19
129:25 130:10,11
130:14 132:24
134:19 138:8,10
142:15,24 144:3,4
144:9,10,19
145:13,14,22
149:2 150:16,21
150:22 151:25
152:7,22 163:24
164:8,11 165:10
170:16,17 173:19
174:5,8 182:24
186:5
**corrections** 186:6
**cost** 154:3
**Costell** 79:10
**counsel** 3:25 4:2 6:5
7:24 28:16 32:4,15
33:22 34:5,5,13
35:3,5,5,9,13,17
36:2,8,9,20,25
37:6 39:4 41:20
45:5,10,11,14 46:6
56:14 73:3,13,20
74:7 76:7 79:6,12
80:19 89:3 115:12

143:24 152:13
173:7 178:12
179:19,21 180:4
**counsel/executive**
73:17
**country** 29:15
**county** 29:18 178:2
182:15,19 183:19
184:9 187:5
190:10,12
**couple** 48:17
**course** 22:7 41:24
80:18 93:23
116:24 143:13
170:7 180:23
**court** 1:2 4:8 5:21
27:5,16 122:9
136:19 178:5
**cover** 11:5 110:12
119:14,17 134:9
157:16 158:11
174:16 175:11
**Crage** 82:3,17 87:12
87:17 104:11
**Craig** 90:18 93:14
94:3,4,15,24
134:17
**Cranford** 7:12
10:25 11:3,8 13:8
13:17,23 16:15
17:2 108:17
109:13 134:9,16
134:22
**create** 116:6 170:9
**crying** 137:25
**current** 26:24 27:17
98:6,24 100:5,22
122:11 133:7
135:22 136:18
151:10 172:2
**currently** 28:10
**customary** 58:6
73:4,16 74:2,5
76:13,15
**cut** 69:21,25 117:22
121:11 123:2,13
**cute** 72:8,17
**cuts** 169:5
**CV** 1:6

**_____**
**D**
**D** 188:2 189:2 190:2
**da** 165:4,4,4,4,4
**danced** 79:22
**Darron** 78:17
**date** 16:4,5 18:19
26:2 31:21 61:3
99:21 111:3
114:24 119:8,14
128:4,18,21 129:8

130:2 135:4 136:2
136:4 137:17
140:22,24 141:2,4
141:6,9,13 149:8
149:20 150:7,12
150:25 152:18
155:5 159:15,19
160:25 161:4
162:21 163:2,14
163:19 164:13,17
165:15 166:10
169:5,6 172:25
173:4 176:11
177:10,23 181:8
181:13 182:16,21
183:2,17,20,22,24
184:21 188:15,17
**dated** 54:19,19,23
95:10 129:5,24
130:7 141:16
155:2 162:19,24
163:12,16 165:13
165:22,25 176:17
176:18 181:13
188:11 189:5,11
189:13,15,18,22
**dates** 176:14 177:2
181:9
**David** 39:16 48:23
53:9,12,15 99:13
120:15,18,25
167:11,13,15,24
168:9,11
**day** 16:20,23 46:4
54:5 83:8,9,14
84:6 87:9 91:7,8
94:10 98:5 119:11
123:10 131:17
137:7,8,20 148:24
156:9 164:21
178:6 179:8 182:6
184:7,14 186:17
187:19
**days** 16:21 18:22
94:23 156:6
184:22
**dealing** 38:6
**dealt** 45:4,10
**Dear** 121:24
**Debbie** 7:14
**December** 57:9
59:23 60:3 61:11
61:15,18,21 66:14
138:7,23 165:22
**decide** 155:18
**decided** 81:19 90:21
137:4 154:15
**decision** 70:8 90:24
113:3 138:15,18
**decisions** 154:5

**deck** 11:11,22
**deducted** 130:22
**deductibles** 154:23
**deed** 177:22 178:4,6
181:4 190:8
**deemed** 157:14
158:9 174:14
175:9
**Defendant** 1:8 2:13
**Defendant's** 40:25
134:6
**defies** 67:4
**define** 61:20 72:18
74:10 75:11
**defined** 57:11 59:15
59:22 60:18 66:13
66:16 72:18 74:9
**defines** 61:10
**definition** 38:9
73:10
**delegated** 154:5
**deliver** 121:24
**delivered** 41:25
42:12 43:10 44:14
**delivery** 121:25
**Dempsey** 1:16 2:4
**denied** 14:2,7
**Denny's** 9:3 11:14
17:24 115:7 116:2
116:16,23,25
125:10,16,20
126:8,19 127:6
130:9,14,16
140:21 141:10,20
141:25 142:9,14
142:23 143:2,24
144:2,19 145:8,24
147:5 150:5,10,16
150:18,21 152:10
152:21 153:2,9,14
153:20 154:17,21
155:9,18,19,24
156:24 157:3,3,9
161:8 162:8
166:13,24 173:15
174:5 188:14,20
188:22
**denying** 113:16
**department** 30:21
50:9 166:25
**departments** 79:13
**deposed** 3:19,23
30:25
**deposit** 123:15
130:16 131:20
132:16
**deposited** 133:8
**deposition** 1:15 3:15
3:17 4:3 6:4,9,11
6:20 7:7,13,15,17

7:20,22,22,24 8:3
8:5 15:5 48:19
107:16 125:5
135:2 141:24
147:2 148:2,3,5,8
148:16 170:16
187:11,12
**depositions** 147:22
**deposits** 128:3,10
130:13 134:2
188:10
**Depot** 73:22
**described** 10:20
58:14 84:3
**designate** 157:7
174:10
**designated** 78:21
**desire** 85:4
**detail** 20:14 159:13
189:8
**details** 9:9 24:11,17
24:22,23 53:12
56:25 121:3,4
**devote** 58:5 74:2
76:12
**Dick** 24:16 91:15
94:16
**difference** 146:15
**different** 25:4
112:16 116:19
130:12 171:19
176:13
**difficult** 64:6 138:14
**diligence** 42:9,15
43:20,23 46:21
52:15 77:15 78:4,9
79:5
**direct** 33:14 57:5
58:3 69:6 79:8,11
123:14 130:13,16
**directed** 21:19 97:2
143:21
**direction** 93:3 170:9
**directly** 90:3,15
103:25
**disagree** 60:6
146:25 166:15
171:6,18
**disagreed** 171:10
**discharged** 131:12
**discovering** 124:8
**discovery** 170:7
178:10,25
**discuss** 7:20 10:23
17:6,18 19:6,15
23:11,18 38:14
46:8,13 47:16
53:11 55:22 79:18
81:21 83:4 85:6
100:4 157:5

**discussed** 7:23 10:5
10:15,19 11:3,4
17:5 19:19 20:13
24:6 25:12 37:2
38:3 46:9,10,11
47:13 51:20 52:12
52:23 53:5,18
54:11 55:20 56:6,9
84:17 85:23 89:14
89:24 90:8 97:10
101:10 109:17
111:9 114:7,8
134:25
**discussing** 19:11
52:16 55:23 56:25
**discussion** 51:16
80:14 154:7
**discussions** 49:5
50:16 51:11 52:2
52:14 79:23 83:16
86:8 88:21 90:6,10
97:24 100:21
102:2 108:23
131:22,25
**dispute** 8:19 17:16
31:12 142:4,8
160:23
**disregard** 104:24
**dissertation** 19:13
21:18
**distributing** 52:18
**DISTRICT** 1:2,2
**Dixon** 30:9
**doctor** 154:12
**doctors** 154:9,10,11
154:17
**document** 26:5
51:12 57:16 62:23
66:5,6 84:22
111:17 114:6
127:25 128:8
129:5,11 140:20
140:23 141:3,7
144:7,15 145:4
150:4,9 152:2,5,16
159:3,13,17
160:13,21,22
165:12 166:8
177:21 179:22
181:16 182:14,19
188:9,11,13,15,17
188:19,20,22,24
189:7,9,21,23
190:8,9,12
**documents** 6:19,23
6:25 7:2,11,16
13:11 14:11 77:16
88:14 134:12
136:17 150:24
168:25 169:7

**doing** 5:20 19:12,22
  33:9 52:3,3,5
  55:13 81:16 88:18
  88:19 127:4,7,14
  143:14
**doubt** 44:24 73:23
  156:15 161:18
**Dover** 30:9
**downtown** 131:5
**draft** 26:7 40:8
  44:23 66:4 89:8
**drafted** 44:16,20
  76:3,25 77:5,8
**drafting** 23:2 40:21
  66:2 67:25 75:18
  76:7
**drain** 31:17
**drawing** 75:10,12
**drink** 5:6
**Drive** 3:8
**drove** 94:21
**drug** 5:9
**due** 42:9,15 43:20
  43:23 46:20 52:15
  77:15 78:4,9 79:5
**dug** 114:2
**duly** 3:3 187:11
**duties** 32:12 36:23
  37:3,6
**duty** 125:22

**E**

**E** 2:2,2 3:2,2 107:15
  187:2,2 188:2,6
  189:2,3 190:2,3
**earlier** 30:24 43:21
  84:4 93:4 167:10
**early** 15:16,16 31:10
  49:18 54:22 91:7
  131:14
**easier** 125:2
**education** 27:25
**effect** 68:12
**effective** 61:2 91:12
**efficient** 161:11
**eight** 76:16,16
**either** 8:7 29:10
  30:6 79:24 80:7
  89:22 90:2 93:18
  105:8 130:2
  147:16 148:18
  154:23 171:18
  180:7,8
**eligible** 145:8
  148:21 150:15
  153:21
**emotional** 11:12
**emotionally** 137:24
**emphatically** 120:24
  122:23

**employable** 139:14
**employed** 34:9
  35:14,23 59:5
  112:4 125:16
  126:18 127:22
  139:13 142:9
  165:3
**employee** 80:20
  85:5 99:19 106:21
  106:22,24,25
  107:3 140:24
  141:4,12,15 149:4
  152:24 153:12
  154:3 159:18
  160:3,8 188:15,17
  189:9
**employees** 39:7 48:6
  76:8 84:23 88:23
  89:6 98:6,12,24
  100:5,22 105:18
**employee's** 136:8
**employer** 35:11
  156:2 166:13
**employment** 6:7,17
  8:19 9:12 17:8
  18:12 20:14 22:9
  22:13 23:3,19
  24:12,25,25 30:10
  30:14,17 32:21
  33:8,10,12,15,19
  36:15 38:18 39:6,9
  39:14,19,24 40:5
  40:12,14 41:6,12
  42:5 43:16,25
  44:16,23 50:17
  52:13,19,24 53:6
  53:18 56:6,9,17,21
  57:11 59:10,15,16
  59:21 60:3,18 61:2
  61:11,21 62:19
  63:13 66:9 67:22
  68:6 69:13 73:6
  74:13 75:19 76:8
  92:15 96:7 100:10
  107:6,12 110:17
  110:22,25 111:23
  114:18 124:25
  125:10 126:7
  138:9 141:25
  143:16 144:12
  145:20,25 148:23
  148:24 155:20,21
  161:8 162:4,8
  168:7,12 180:23
**enable** 4:11
**enclosed** 121:25
**enclosure** 123:6
**ended** 143:19
**enforceability** 65:6
**enforceable** 65:5

**engage** 66:19 67:9
  114:3,10
**engaged** 114:5
**English** 75:13
**enjoy** 156:23
**enroll** 153:20
**enrollment** 12:15
  13:12,18 134:8,23
  152:17 176:4,7
  188:25
**entered** 40:18
  141:16 149:20
**entertainer** 76:22
**entertainment**
  67:16
**entire** 60:13 65:23
  66:25 67:2 126:25
  142:2
**entitled** 4:3 63:9
  118:9,18 147:4
**entity** 64:18
**equivalent** 154:23
**especially** 65:23
  67:2
**ESQ** 2:9,16
**essentially** 37:6
  47:18 77:10
  164:12
**establish** 43:13
**estate** 137:14 182:14
  184:14,15 190:10
**et** 150:2
**event** 126:22
**eventually** 14:19
  41:24 115:7
**evidence** 182:5
**EVP** 50:25
**exact** 22:19 143:18
**exactly** 14:24 72:9
  104:2 169:12
  178:24
**exam** 143:4
**EXAMINATION**
  3:9 188:3
**examined** 3:4
**example** 136:3
**exception** 76:17
**exceptions** 32:14
**exchange** 41:3
**excluding** 97:14
**exclusive** 58:12,18
  59:2,6 63:12 69:15
  71:21 72:10 74:16
  74:25 75:2,18,21
  110:21 125:7
**exclusively** 165:3
**execs** 92:24
**executed** 49:8
**executive** 33:12
  37:13,22 38:7,9

43:19 58:5,11,13
  62:19 66:18 71:21
  73:12 74:2 76:12
  77:6 88:22 89:5
  106:3
**executives** 21:23
  37:13 42:18 52:19
  58:10 77:19
  168:20
**executive's** 58:17
**exercise** 151:3,13
**exhibit** 7:6 25:23,24
  26:4 28:2 40:25
  95:14 108:14
  109:21,25 110:2
  120:4 121:23
  127:24,25 128:6
  129:4,5,10 134:6,6
  134:16 135:11
  139:19 140:16,20
  140:23 141:3,7,19
  142:15 143:25
  148:22 149:3
  150:4,9,18 152:16
  152:20 154:24,25
  159:2,3,11,12,17
  160:6 161:15
  162:18,23 163:11
  163:15 164:2
  165:11,12,17,17
  165:20 166:6,7,12
  169:3 171:22
  172:23 173:2,11
  173:12,20,21,22
  176:5 177:19,20
  177:25 179:11,12
  179:14,18,24
  182:12,13,18,22
  183:18
**exhibits** 107:15
  120:3 140:18
  150:2,13 159:21
  159:24 163:4,21
  172:13,21 173:6
  188:7 189:4 190:4
**existing** 40:17
**expecting** 123:19
  124:2
**Expense** 159:13
  189:8
**expenses** 159:23
  160:3
**experience** 68:16
  75:12,17
**expert** 68:5,9 75:4,6
**expiring** 48:18,18
  48:25 49:3
**explain** 66:21 104:2
  138:17 139:10
**explained** 66:16

**explanation** 146:19
  146:22,24
**extend** 59:9,16
  60:19 61:11
**extent** 53:24 110:9
  170:25
**extra** 137:13
**extremely** 46:21
  120:25 138:14
**e-mail** 7:12,13 21:3
  21:4,7

**F**

**F** 107:15 109:25
  110:2 129:6,16,16
  129:18 187:2
  188:12
**face** 90:7,7 103:6,6
**face-to-face** 115:20
**fact** 11:12 14:18
  19:20 33:11 41:6
  48:2 56:24 84:19
  95:22 99:10
  105:21 106:3
  118:19 119:7
  134:22 139:25
  154:12 159:8
  161:6 164:5
  179:14
**facts** 170:3
**fail** 5:13
**fair** 4:22 17:22 19:9
  21:25 22:6,7 36:12
  36:13 39:5 40:8
  42:16 43:21 54:13
  64:7,8,13,15 72:21
  77:11 80:10,13,17
  80:20,21,24 81:6,9
  82:22 83:14,21
  85:11 86:24 87:18
  91:23 92:4 93:20
  95:5 96:16,19,22
  97:17 98:3,7,13,22
  99:19 100:6,18
  101:22 102:3,18
  104:25 105:20,25
  108:11 110:16
  112:14 113:10
  126:7 127:22
  133:3 145:23
  163:8 164:12,16
**fairly** 11:9,11 49:2
  85:11
**fall** 18:21 36:10,17
  36:21,25 39:4 40:2
  49:13 167:24,25
**familiar** 8:6,12
  67:24
**familiarity** 74:12
**far** 56:10 114:9

147:14
fashion 89:25
fax 176:24
February 49:18
    140:25 141:13
    144:5 148:25
    188:16
feel 46:22 63:19
    117:7 139:2
fees 161:25
felt 8:25 9:2 119:19
    139:11 170:20
figured 117:11
figures 166:9 189:24
file 26:17 42:19,20
    122:3,5 134:10
filed 6:23 8:16
files 44:3 134:14
    180:16
filing 43:4
fill 136:16 155:8
filled 139:24 140:2
    181:24 182:7
filling 116:22
    128:11 143:3
finally 53:9 137:4
finance 82:12
financial 166:9
    174:11 189:24
find 11:13 12:3
    78:15 120:12
    142:23
fine 70:9 157:6,12
finish 20:7 162:2
finished 75:15
firm 3:13 78:24,25
first 8:11 15:13
    17:15 18:15 20:9
    30:3 43:24 44:2
    45:9 57:5 73:24
    76:11 80:9,22,25
    83:23 84:2 88:10
    88:12 91:24 92:13
    107:16 108:23
    111:7 120:4
    121:11 122:21,24
    123:12 134:15
    141:19 148:24
    157:4 160:2,3,6
    165:22
five 76:16 148:9
    170:23
flat-out 170:20
Flemming 143:21
flipped 140:8
flux 90:23
folks 33:6 78:19,23
follow 6:3 92:4
    100:17
followed 118:24

following 16:7 20:10
    20:18 56:8,12
    62:10 63:20 80:2
    108:11 117:2
follows 3:4
follow-up 120:5
Food 30:18,19
foregoing 186:4
forget 27:4
forgive 138:3
forgotten 48:22
form 23:4 59:12,18
    68:3 89:25 104:10
    112:7,12 119:10
    128:11,25 140:24
    141:4,12,15
    148:23 149:4
    170:21 188:15,17
formal 79:23 86:15
former 98:24 99:19
    100:5,22 105:17
    156:2 168:20
forms 12:12 13:19
    135:23 136:3
    176:7,19
forth 12:13 66:17
    110:11 187:11
forward 145:21
    156:24
found 132:20
frame 12:19 39:2
    45:7 78:7 85:22
    97:3 100:9 108:22
    109:10,18,19
    115:4 125:12
frankly 48:18
    112:24 126:5
    155:7
Freeman 7:4 15:4
    22:9,10,12 24:2
    81:7 82:24 87:15
    87:17 88:8 89:14
    89:16,21 92:7,19
    93:2 94:13 95:8
    99:2 102:21,25
    103:5,15 104:7,13
    104:14 107:17
    110:13 123:11
    134:18 148:8
    170:14,18 171:5
Freeman's 3:15 7:6
    48:19 107:15
    113:11 117:10,19
    132:12,22 170:15
Friday 76:17
friends 127:18
    138:2
front 95:16
frustrated 51:21,22
    53:12

full 127:21 147:20
fully 162:6 172:8
funds 133:22
further 16:22 58:13
    187:14
future 19:4 104:9,18
fuzzy 118:17

——————————
G
——————————
Gaston 29:18
gate 126:21 127:13
gathering 44:7
    77:16,17
general 5:18 10:20
    17:21 29:11 30:12
    32:15 33:22 34:4
    34:13 35:3,5,5,9
    35:13 36:2,7,9,20
    36:25 37:5 39:4,16
    40:9,12 41:20
    45:11,14 52:15
    56:24 60:17 73:3
    73:20 74:7 76:6
    79:6,12 85:7 88:18
    89:3 109:9 143:24
    153:23,24 178:3
generally 10:18
    76:16 82:16
    106:24
gentleman 78:24
gentlemen 80:23
getting 41:21 48:24
    51:21,21,22 52:20
    71:10 73:7 94:12
    95:10 100:4 118:9
    118:11 124:7
    138:14 167:11
girls 11:20 96:11
    131:16 137:25
    154:13
give 17:25 18:19
    45:6 183:17
given 14:7,9 47:5
    187:13
giving 44:8
go 12:8 18:9 19:21
    49:19,20 63:24
    69:13 73:10,19,22
    75:16 85:2 86:12
    88:15 93:6,7,8
    94:5,16,25 102:13
    114:9 123:25
    132:19 143:25
    148:24 151:13
    156:5,12 178:21
    179:3,12,14 181:3
goes 58:16 123:23
    146:12,18
going 11:15,19,20
    12:12 15:16 17:4

19:22,23 20:6
    22:23 23:6 40:24
    43:6 47:2 49:10
    56:4 70:8,9 78:11
    81:19 86:2 92:20
    95:13 99:24 104:4
    107:14 126:21
    127:8,9 138:14
    141:21,24 143:25
    146:7 147:21
    148:2,3 155:8
    156:10 164:20
    169:3 171:25
    173:16
good 3:11 6:10
    106:23 154:21
    170:13
Gordon 80:11,18
gotten 13:11,12
    132:16
graduated 28:4
Graebel 161:6,8
Graham 30:11
grant 150:25 159:4
grass 33:2 96:12
greater 146:5
GREENHOUSE
    1:23
grew 29:15
group 37:13,19
grow 29:14
growth 150:5,14
    151:24 159:7
    188:21
guess 26:16 92:16
    112:14 139:3
    167:25 178:19
guy 78:25 79:21
guys 19:22 76:21
    87:24,25

——————————
H
——————————
H 134:6 188:6 189:3
    190:3
Habitat 72:20
half 11:14 148:9
    155:14 170:23
hand 7:7 40:24
    86:17 107:14
    187:19
handed 13:15 26:3
    43:19 54:7 128:5
    152:19 159:2,20
    163:3,20 165:16
    166:11 173:5
    177:24 182:23
handing 42:10
    129:9 171:23
handle 32:13 37:8,8
handled 32:17,22

37:10
handwriting 135:13
    135:16,20,21
    142:19
handwritten 128:21
happen 41:18 85:16
    86:2 92:10,12,20
    92:20 151:8 156:8
    170:20
happened 87:4 91:5
    116:11 169:11,12
    169:14
hard 154:20
head 5:23 81:15
    112:12 146:8
headed 140:24
    150:5,10 152:17
    159:13,18 165:13
    177:21 182:14,19
    188:15,20,22,24
    189:7,9,21 190:8,9
    190:12
headhunters 115:20
headquartered 50:7
health 13:14 14:4,8
hear 75:2 99:17
    170:18
heard 53:13,14,14
    74:24 75:23
    127:11
hearing 5:18 113:11
    113:13
heart 100:19
heavy 46:20
held 1:15 25:2 28:7
    51:2
help 70:11 73:25
    75:10 156:13
helped 77:24
hereinbefore 187:11
hereof 58:13,19
hereunto 187:18
hey 90:3 127:3
    156:17
hi 11:24
high 2:7 151:11,12
higher 151:9,12
hired 31:24 32:15
    35:4
hiring 148:23
history 19:8
holding 151:20
    172:16
home 3:6 16:7 27:3
    27:17 73:22 94:6
    94:25 115:16
    122:11 135:7
    177:3,4,13,17
    178:4 181:6
    182:10,24 183:6

183:10,15,21
**honest** 113:24
**honor** 81:20
**hopefully** 4:12
**horn** 76:22
**hot** 46:20
**hours** 5:7 11:14
148:6,9,10 155:14
170:23
**house** 11:15,21 13:4
15:9,10,22,22,24
16:3 72:20 122:18
131:8,13 136:23
137:2,5,8,10,19
155:15 178:8
181:12 182:2,6
184:3,4,6,8,12,13
184:20,23
**houses** 184:16
**housing** 27:19
**how's** 81:24
**HR** 38:12,13 39:21
42:19 50:9,17,25
79:16 180:24
**hundred** 13:20
133:25 136:22
**Huntington** 2:6
**hypothetical** 151:18
156:19

**I**

**idea** 117:16 153:4
156:6
**identification** 26:2
128:4 129:7
140:22 141:2,6,9
150:7,11 152:18
155:4 159:14,19
162:21 163:2,14
163:19 165:15
166:10 172:25
173:4 177:22
182:16,21
**identified** 25:14
**identify** 26:5 129:13
**ill** 23:13
**illness** 58:8
**imagine** 6:14
**immediate** 85:21
135:3 152:4 177:8
**immediately** 80:12
84:21 91:12 93:21
94:12 126:24
137:6 161:7
172:20 184:23,25
**impact** 5:10 138:15
**impacted** 138:17
**important** 4:15 5:20
**impression** 90:20
112:8

**Improvement**
115:17
**inappropriate**
171:10
**incapacity** 58:9
**incentive** 144:19
150:6,14 151:24
159:7 163:6,22
164:6 165:9
188:21
**include** 59:15
105:17
**increase** 57:23
151:17
**independent** 160:20
**indicates** 108:2
**indirectly** 90:3,15
**individual** 18:7
23:12 49:2 50:15
50:21 85:5
**individuals** 39:9,19
40:10,16,21 48:17
78:15 81:9 83:20
86:24 87:16,20
93:13
**inference** 47:24
**inform** 9:21 93:15
**information** 26:12
77:17 78:16
122:15 134:7
143:10 166:14,16
174:11
**informed** 7:21,22
8:13 17:7 22:8
41:19 49:10 122:2
143:15
**initial** 164:9
**initials** 129:17
**input** 66:5
**instruct** 147:16
148:18
**instructs** 115:12
**insufficient** 133:22
**insurance** 130:21,21
154:20,21
**insurance/COBRA**
108:19
**intend** 154:12
**intended** 22:17
**intent** 22:20 65:23
119:6
**intentionally** 104:17
**intentions** 126:4
**interaction** 81:5,8
87:18 88:7
**interest** 46:22
**interested** 143:16
187:17
**interfere** 5:4
**Internet** 178:13

179:4
**interpret** 58:20,25
68:23 71:20 72:23
72:24
**interpretation** 8:25
24:2 60:2,2 61:24
63:2,3,7 69:15,18
71:18 72:6 112:16
112:17
**interpreting** 75:7
112:3
**interrogatories** 6:22
**interrupting** 148:16
**interview** 115:21
**interviewed** 115:6
115:16
**interviews** 115:19
**introduce** 45:17,21
**introduced** 7:13,14
86:18
**introduction** 86:20
**inventory** 80:25
88:2,3
**involved** 23:2 31:3
37:22 40:20 66:2
77:16 137:14
**involvement** 39:5
**in-house** 28:16 30:7
34:6 45:5 88:20
**irrelevant** 146:10,11
**issue** 14:12 108:19
131:3 133:18
170:4
**issues** 12:12 32:21
37:22,23 88:17
89:14 93:19,20
137:14
**Item** 111:6
**items** 171:17,20

**J**

**J** 120:3 121:23
**January** 31:25
34:19 48:9 49:13
49:14 54:24 57:8
145:21 163:16
189:18
**Jill** 2:9 3:12
**Jim** 125:15 126:10
126:13,18,21,23
126:25 127:3,21
**Jo** 79:9
**job** 11:13 12:3 73:7
114:21 116:16
125:20 138:11,14
138:16 139:5,11
142:16 146:13
155:21,22 156:24
**jobs** 115:2,3
**Johnny** 33:25 34:19

37:5
**Jones** 48:20,25
**July** 95:11,15
100:23 162:19
165:25 189:11
**June** 12:20 15:13,14
15:16,16 36:13,14
87:6 131:14,14,15
181:13,14 183:16
**J-o** 79:9,10

**K**

**K** 7:6,9 171:22
**Kaiser** 80:12,19
87:16
**keep** 29:7 42:13
155:17 169:9
**kept** 42:19
**key** 43:9
**keys** 42:22 43:2
**kind** 30:8 81:24
**Kinzel** 82:23 83:24
84:14,20 85:19
86:8 87:12,17
91:11,12 92:17
**Kinzel's** 148:2
**Kirila** 2:9 3:10,12
25:22 48:13 56:12
59:20 61:6 68:8,13
68:14 69:9,12
72:13,15 75:23
97:4,8,25 98:8,11
99:23 100:13
105:10 119:23
120:2 123:23
124:13 125:4
126:12 127:23
129:3 140:18
141:10,23 142:6
142:10,13 146:11
146:18,25 147:11
147:16,24 148:7
148:15,20 150:2,8
152:15 154:24
157:12 159:11,16
162:17,22 163:10
165:11 166:6
167:9 170:25
171:12 172:12,21
173:21,24 176:2
177:19 178:11,16
178:21 179:2,7,10
179:13,24 181:21
182:12,17 185:3
188:4
**Kirkley** 27:5,16
122:9 136:19
178:5
**kitchen** 11:20
**knew** 47:7 48:23

95:3 104:5 117:14
117:18 118:14
120:16 127:12,21
132:4 156:9,10
**know** 3:14 4:18 6:10
8:11,14 9:23 10:12
11:19,23,25 12:2
12:11,12 13:9,10
14:4 16:24 19:5,9
19:14,20,21,24
22:22,23,24 26:18
26:21 32:25 35:11
35:22,24 37:7
38:12,20 40:11,20
42:3 43:6,14 44:16
44:19 46:23 47:5
47:23 48:5 49:20
50:5,6,9,12,14,22
51:2,7,18,20 52:2
52:12 53:8,9,12
54:14,15,16,18,21
54:23,24 55:19
62:25 64:9 65:3
69:24 72:19,25
73:3,9,11,16,23
74:5,7,20 75:18
76:16,19,23,24,25
78:8,24 78:5,14
79:21,23 81:17,23
81:24 82:20 84:4
84:13,14,15,20
85:10 86:12,15,18
88:18,19 90:3,4,21
90:22 91:21,22
93:2,3,6,13,19
94:3,4,23,24 97:4
97:8 99:11 102:22
103:13,13,14,16
103:19,24 104:5,6
105:20 106:2,9,13
107:21 112:11
114:25,25 115:2,3
116:21 117:11
122:25,25 119:4
120:16,18,20
121:4 122:4
123:14 124:7
126:6 127:8,11,17
129:21 130:5
131:3,25 132:8
133:18,21,22
134:13,24 136:9
136:10 137:11,12
137:13,17 138:4
143:6,14,17 147:4
149:23 151:9
152:9,24 154:8,16
154:19,20 155:8
155:11,12,16
157:3 160:21

166:20 169:11,12
169:20 172:7
179:21 180:3,5,7,8
180:16 182:7
183:22 184:9
**knowledge** 22:4
33:14 40:9,12
124:17
**knows** 75:21
**Koontz** 39:15 42:9
42:12,23 43:19
44:8 46:10,12,14
47:12 53:2 54:9
78:12 82:8
**Koontz's** 43:12
**K-i-r-k-l-e-y** 27:5

———————

**L**

**L** 3:1,2,2 4:1 5:1 6:1
7:1 8:1 9:1 10:1
11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1

131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1
**label** 107:25
**labeled** 129:12
**labor** 30:10,14,17
**laid** 93:16
**landlord** 31:11
**language** 53:18
54:11 56:2
**Larry** 114:11 120:6
120:17 167:11
**lasted** 148:8
**late** 45:15 49:17
94:10 117:21
119:11,18 132:13
**Laura** 78:18
**Laura's** 78:18
**law** 3:13 28:4,11
30:2,5,8 67:22
78:23,25 116:7
143:7
**lawn** 32:25
**lawsuit** 3:14
**lawyer** 44:25 79:2
**lawyers** 133:13
**layoffs** 93:8,12
**leading** 77:10
**leaping** 180:14
**learn** 92:13 153:7
154:2
**learned** 91:24
121:11 122:21
124:23,24
**leave** 42:25 91:13,16
94:5 154:15
**leaving** 138:2,2,2
**led** 143:19
**left** 34:8,12,19,25
36:4,16,18,24 37:5
41:19 42:20,21
92:24 156:9
**legal** 30:20,20 32:20
58:23 62:13 63:5

65:6,12 68:4 71:24
72:19,25 74:21
79:14 80:14,15
88:19,20 105:3
107:10 110:9
116:5,6,11,19
125:22 147:12
**legalese** 69:4
**legally** 65:4
**leisure** 67:14
**LES** 152:12
**Lester** 1:7,15 3:7
12:2 25:25 69:22
70:5 94:15,25
135:14 155:3
162:20,24 163:13
163:17 181:19
186:12 187:10
188:4,8 189:6,12
189:14,16,19
**LES-00006** 139:24
**LES00085** 155:4
189:6
**LES00204** 129:7,12
188:12
**LES00236** 162:20
189:12
**LES002368** 163:13
189:17
**LES00237** 162:25
189:14
**LES00240** 163:18
189:20
**letter** 92:16 95:10
95:15,17 96:10,19
96:23 97:10,23
98:5,14,19,21,23
99:5,8,14,20,21,21
100:3,4,15,23,23
101:4,5,7,9,13,21
102:2,5,9,18 103:4
104:5 107:17,18
107:20 108:12,20
109:22 110:12
111:19 112:23
114:17 121:10,15
121:17,19,22,25
122:24 123:5,5
124:9,22 132:12
132:23 134:9,15
134:16 135:4
141:8,17 155:2
159:8 162:19,24
163:12,16 164:20
164:23,25 165:7
188:19 189:5,11
189:13,15,18
**letters** 66:8 103:21
106:11 117:11,19
163:5

**let's** 18:9 26:16
61:12 62:2,3,15
64:2 66:7 69:13,20
71:19 77:9 98:8
102:13 118:14
124:21 140:18
148:19,21,24
150:2 164:22
172:12 179:14
**level** 47:4
**Levine** 114:11 120:6
120:17,18 167:11
**license** 28:7 29:10
116:8
**licenses** 29:7
**life** 130:21 154:20
154:20
**liked** 130:25 184:23
184:24
**limited** 99:16
167:12
**limiting** 52:10
**Linda** 11:4,18,19
12:10 13:11,13
132:17 184:16,23
**Lindacarol** 27:21
**Linda's** 13:13
**line** 83:4 132:19
188:7 189:4 190:4
**lines** 104:12
**Lion** 30:18,19
**list** 143:5 184:17
**listed** 31:21 40:22
**literally** 9:5 32:10
50:5 93:25 94:2
137:7
**litigation** 31:4 32:14
32:17,19 37:8,11
88:15 93:7
**little** 23:10 81:17
101:3 137:24
152:3
**LITTLER** 2:11
**live** 16:6 122:2
**Lo** 156:7
**located** 28:19 34:2
129:18
**location** 143:6
**locked** 42:20
**logo** 129:6 188:12
**long** 6:18 16:9 34:4
34:7 36:7 49:12
51:19 63:11 71:10
104:21 105:25
111:17 119:5
155:8 156:5
184:11,20
**longer** 34:9 60:15
95:18 102:23
104:4 117:8 122:2

125:7 138:18
139:13
**long-term** 150:5,14
151:24 159:6
188:21
**look** 26:4,12 44:3
57:4 62:15 66:7
85:14 89:10
109:21 110:4
111:18 114:21
115:2 120:5
124:21 128:7
136:2 139:18
144:13 148:21
149:3 151:21
154:8 160:2 164:2
164:25 181:12,15
181:20 183:18
**looked** 6:21,21,22
6:23,25 91:14
114:2 140:4
154:19 176:5,11
184:17,24
**looking** 61:10 62:17
72:6 113:25
114:22 115:5
120:4 131:19
134:6 135:12
161:21 174:4
184:12,20
**looks** 29:19 50:21
50:25 77:3 140:14
149:4
**lost** 77:23 105:24
167:24
**lot** 6:13 19:8 90:6,7
90:10 112:22
166:19
**Lou** 45:23 51:16,20
51:24
**love** 70:11
**Lowe's** 73:23
115:16,23 116:21
**ludicrous** 9:6,7
**lump** 110:19 111:13
160:24
**L-i-n-d-a-c-a-r-o-l**
27:24
**L.L.P** 1:16 2:4

———————

**M**

**M** 129:6,16,16,18
188:12
**making** 33:4 57:21
58:2 77:2 144:9
145:23 169:25
**managed** 30:20
**management** 37:14
37:15 80:13 86:13
86:22

managers 39:16
Manual 58:15
March 49:18 54:22
54:23 150:23
151:2 155:2 189:5
Marchioli 155:3
189:6
mark 25:22 127:23
129:3 140:18
150:2 152:15
154:24 159:11
162:17 163:10
165:11 166:6
169:3 172:12,21
177:19 182:12,17
marked 7:6 25:25
26:3 40:25 95:14
107:15 128:3,6
129:7,9 134:5
140:21,25 141:5,9
150:6,11 152:18
152:20 155:4
159:14,19,20
162:20,25 163:4
163:14,18,20
165:14,16 166:9
166:11 172:24
173:3,5 177:22,24
182:16,20
market 11:16 137:5
184:6
marketing 82:25
marriage 187:16
married 27:21
match 118:13
math 146:8
matter 6:9 24:9 44:7
82:10 98:17 99:2,4
187:17
matters 101:10
mean 14:25 15:21
18:20 19:19 22:16
22:18,19 38:9 40:3
42:8 59:3 67:10
71:22 72:5,22
73:15 74:8 76:14
84:13 89:19 90:5
92:22 93:25 98:6
101:5,5 102:12
103:22 104:2,5,14
104:15 108:5
110:15 112:3
114:25 123:5
124:15 125:14
134:12 136:22
137:7,23 139:12
140:5 151:12
160:21 162:10,10
166:19 169:24
177:7,8 180:10

meaning 56:2 67:14
74:17 96:23
means 59:4 64:13
72:9 74:20 76:15
91:14 107:5
144:20
meant 30:20
medical 12:12 118:3
154:10
medication 5:3
meet 83:24
meeting 80:22 84:3
86:6 87:3 88:12
127:17
meetings 86:8 87:11
memo 84:22 85:12
memory 42:24 43:6
43:11 48:20 49:17
52:4 54:3 55:23
57:25 96:24
103:22,22 113:22
114:15 118:23,25
119:3 137:4,17
140:4 149:22
171:19 177:7,8
181:14 183:17
184:22
MENDELSON 2:11
mentioned 10:7
15:8 42:4 87:16
120:6 136:25
168:4 174:2
mess 47:25
met 80:24 81:2 84:2
86:11,14,17
MetLife 135:12
139:21
Michael 2:16 39:15
middle 164:25
mid-eighties 31:11
Mike 35:10 36:16
37:5,8,20 38:2,13
38:14 39:21 41:19
42:8,12,23,24,24
42:25 43:6,10,12
43:15 45:13 46:10
54:6 78:12 82:8
million 33:2 131:6
mind 54:20 104:8
139:17 156:15
172:20
minute 12:8 15:14
42:17 125:14
minutes 94:6
Miracles 151:8
misrepresentation
147:3
missed 3:12
missing 26:22
mistaken 23:14

mistakenly 23:13
modification 110:23
moment 7:18 70:7
97:22
Monday 76:17
money 124:5 139:3
139:9
monster.com 115:2
Monterey 3:8
month 87:3 124:13
133:8
months 34:11,20
111:2 162:5
Moore 3:8 15:22
morning 94:12
146:9 148:11
mortgage 130:25
131:7,12
motion 67:15
move 46:16,18
137:11 139:2
148:4 160:18
161:13 183:14
moved 15:9,18
27:15,16 29:20
43:3 130:19
156:22 161:4,6
183:16
moving 169:15
mow 32:25 33:2
mowed 96:12
mowing 32:25
multiple 103:7
108:15
mutual 127:12
myriad 77:18 93:22

———————————
          N
———————————
N 2:2 3:2 188:2
189:2 190:2
Nail 1:7,15 3:1,7,11
4:1 5:1 6:1 7:1 8:1
9:1 10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1,25 26:1 27:1
28:1 29:1,14 30:1
31:1,24 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1

64:1 65:1 66:1
67:1,18 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1,24 122:1
123:1 124:1 125:1
126:1 127:1 128:1
128:5 129:1 130:1
131:1 132:1 133:1
134:1 135:1,14
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1,3
156:1 157:1 158:1
159:1 160:1 161:1
162:1,20,24 163:1
163:13,17 164:1
165:1 166:1 167:1
167:10 168:1,24
169:1 170:1 171:1
172:1 173:1 174:1
174:11 175:1
176:1,3 177:1
178:1 179:1,15
180:1 181:1,19
182:1 183:1 184:1
185:1 186:1,12
187:10 188:4,8
189:6,12,14,16,19
name 3:6,12 8:9
17:9 45:22 78:19
78:25,25 128:13
136:12,14 161:6
166:19
named 48:21
names 81:3 88:4
139:21
narrow 38:15 97:5
nature 6:16 10:20
17:21
near 129:20

need 13:7 43:13
47:24 62:25 94:15
132:6 138:16
139:2 142:10
155:17 156:3,13
156:14 167:4
needed 22:21,22
60:15 78:15 94:13
95:18 102:23
104:4 139:11,12
143:15
needing 103:10
needs 97:9
negotiate 40:7 46:16
46:23 47:20 89:8
negotiated 21:24
negotiating 33:5
negotiations 185:2
Neither 146:22,23
Nelson 155:2 189:5
never 51:10 74:24
104:7,11 116:13
116:13 118:8,10
118:19,21,22
121:2 131:6
139:17 153:5,16
new 1:2,17,17,20,24
1:24 2:15,15 14:4
14:9 21:3,9 29:5
35:3,5,8 48:25
49:19,25 50:3
52:20 122:18
131:8 171:25
177:13 187:3,8
Nichols 1:19 187:7
187:23
night 20:20,23
21:11,14 23:11
24:6 126:22
137:25 178:23
nighttime 73:7
nonattorneys 30:22
noncompete 65:4
110:24 111:16
nonconfidential
158:17 175:23
nonlegal 73:8
nonverbal 5:23
Nope 70:8
North 15:24 16:3,6
27:6,12 28:24
29:18 116:7 122:7
129:20 131:10,11
135:8 136:20
143:4,12 160:12
177:5,21 178:5
181:6 190:8
Nos 163:18 189:19
Notary 1:20 3:3
187:7

**note** 21:19 54:18
170:14
**noted** 149:11 185:5
**notes** 7:4 170:2,6
171:21
**notice** 1:18 69:5
84:21 85:2,2,5
95:15
**notification** 122:25
**notified** 60:15
123:13
**November** 129:24
163:12 165:14
189:16,22
**Ns** 45:24
**number** 13:25 14:4
14:4,6,8,9,14,16
14:18,22 45:17
65:2 82:21 125:21
130:20 140:5,7,11
148:22 152:6
153:24 165:2
**numbers** 152:12
166:19 173:8
**numerous** 51:25
79:2,2,2 103:5
**nurse** 13:13
**nutshell** 142:25

———————————
**O**
**oath** 4:5,15
**object** 29:22 101:2
104:10
**objection** 23:4 57:16
57:22 58:22 59:12
59:18 60:21 61:4
62:12 63:4,22
65:10 67:21 68:3
68:19 71:23 74:19
75:20,25 105:2
106:6 107:10
110:8 115:9
119:10 120:23
123:21 139:6
145:3 147:15
151:18 153:22
156:19 170:21
171:3 181:10,21
**objections** 6:13
**obligation** 62:22,24
65:8 70:3 111:2,15
179:3,6
**obligations** 62:6,9
63:15,19 64:21
104:24 110:24
111:14
**observations** 31:19
**obtain** 116:9 125:10
125:20 138:16
**obtained** 179:22

184:4
**obvious** 104:16
180:10
**obviously** 64:5
98:25 113:5
151:12
**occasions** 20:17
**occupation** 66:19
67:10,10,12,14
73:8
**occurred** 52:7 103:2
132:15
**October** 117:22
121:10,15,17,19
121:20,22 122:17
122:20 123:6,6,20
124:5,17,22
125:13,15,17
**odd** 140:9
**offer** 84:8 116:4
141:8,17 144:2,8
172:7,8 188:19
**offered** 115:23,25
**offering** 111:6,20,22
**office** 42:13,19,20
42:21 43:5,12
78:14 81:15,16
82:20,22 83:16
85:19 87:21 88:13
91:9 93:5,9 94:6,8
94:14,16,18,22
116:6 156:10
182:20 183:19
184:9 190:13
**offices** 1:16
**oh** 25:20 26:16
92:11 95:6 112:15
116:24 118:16
134:17 149:21
172:5,5,5,6
**Ohio** 2:8
**OK** 4:12 15:6 17:4
23:9 25:18,21
36:14 38:16 48:11
50:11 60:25 61:9
62:2 63:7,18 64:3
64:25 69:6 71:13
77:7,9,12 78:6
81:5 89:13 94:20
97:20 98:11,20
99:6,9 113:20,23
115:15 121:10,22
124:21 136:24
139:10 140:3
142:12 143:25
149:17 151:15
152:14 160:7
166:5 168:15
174:4,7 180:9
183:4

**old** 14:5,8 133:21
**once** 3:20 60:9,14
62:21 103:14
137:16 153:21
168:4
**ones** 91:9
**One's** 176:17
**one-page** 154:25
162:18,23 163:11
163:15 182:18
189:5,11,13,15,18
190:12
**ongoing** 14:12 22:22
88:14,16
**open** 88:17 116:4
135:11
**opened** 44:3
**opinion** 38:2 65:7
65:15,20 75:7
112:12
**opportunity** 144:18
171:8
**opposed** 5:23
**Option** 150:10,19
188:23
**options** 150:20
152:17,21 159:5
188:25
**orally** 105:8
**order** 164:18
**ordinary** 73:16
**organizations** 53:5
**original** 184:3
**outcome** 187:17
**outline** 165:7
**outside** 74:17 80:19
101:25 126:23
**outstanding** 116:4
**Overly** 6:11
**overnight** 121:25
**oversee** 79:12
**owned** 51:7

———————————
**P**
**P** 2:2,2
**pack** 161:13
**package** 93:16
140:8 147:5
**packed** 15:17
**packet** 134:7
**page** 41:10 57:5
133:5 134:15
135:12,18 136:4
139:21,22,23,23
139:25 140:3,11
142:20 151:21
157:14 158:9
160:3,6 164:3
165:25 166:5
173:18 174:14

175:9 181:15
183:2 186:7 188:3
188:7 189:4 190:4
**pages** 140:15 165:17
165:20
**paid** 14:20 71:10
72:19 118:3
124:19 138:6
153:11 160:3,8,14
160:17
**paper** 98:16 133:21
**papers** 182:7
**paragraph** 57:6
58:3 59:22 60:13
61:10 62:15,20
65:24 66:9,17 67:3
67:5,6,8 68:18
69:7,14,20,24,24
70:12 71:17 73:25
76:12 110:18,22
110:24 111:10,18
124:22 161:22
172:4
**paragraphs** 111:8
**Paralegal** 79:9
**Paramount** 1:4 3:14
7:2 8:19,24 31:24
32:8,9 35:13,14,19
35:21 41:2,3 42:5
45:20 48:5 51:3
58:7,10,12,14,15
58:18 59:3,5,7
64:7,18,18,22
67:16 70:15 71:22
72:10 74:3 76:6,9
76:14 84:10 86:23
88:23 89:4,5 96:16
96:19,22 97:16
98:13,22 100:6,18
101:22 102:3,17
104:20,25 105:18
105:21 106:2,9,16
106:19 108:12
110:7 111:5
113:10 118:20
121:12 122:4,11
122:14 125:9,19
127:2 128:2,9
132:7 138:6,19,23
162:9 165:3,5
168:16,20 173:14
174:2,6 176:22
188:9
**Paramount's** 26:17
**Parish** 8:10 10:6,15
25:16 143:8
**park** 1:17 48:5 59:5
67:15 76:18 86:16
86:23 89:5 100:18
118:16,20,21

**parks** 1:4 3:14 8:19
8:24 31:25 32:8,9
33:2 35:13,15
39:16 41:2,4 45:20
78:15 96:22 127:2
128:2,9 132:7
173:14 174:3
188:10
**part** 4:6 12:6 32:18
33:6 56:21 66:18
73:24 139:9,24
159:6
**partially** 140:9
**participant** 150:16
**participate** 37:15
93:11,11,12
118:12
**participated** 77:15
**participating** 77:18
79:5
**particular** 38:6,23
54:11 101:9
111:20 131:19
169:5,21 184:13
**parties** 187:15
**parts** 169:16
**party** 68:15
**pass** 118:16,21
**passing** 53:9
**paste** 70:2
**Pat** 48:20,25
**pay** 70:10 111:12,22
117:4,8,14 121:12
122:21,25 123:13
138:19,23 152:25
**paycheck** 123:19
124:8
**paychecks** 124:3
130:13
**paying** 71:14 104:21
**payment** 110:19
117:21 163:6
164:9,10
**payments** 112:5
133:19 134:3
138:12 162:11
164:5
**payroll** 166:14,16
166:24
**people** 38:12 78:10
80:21 81:2 82:22
82:25 83:14 93:15
115:3 127:12
**percent** 13:21
133:25 136:22
144:23 145:6
149:5
**percentage** 145:5
**perform** 70:4,22
71:12 72:25 73:13

**performance**
  151:22,23 159:5,6
**period** 12:17 16:8
  18:20 51:19 59:15
  78:4 88:8 99:14
  119:16 147:21
  151:17
**periods** 58:8,8
**Perl** 30:13
**permission** 143:11
**permit** 183:22,24
  184:4,10
**person** 35:8 78:21
  93:5 132:6 161:9
**personal** 9:25 31:19
  56:22 68:9 89:17
  89:22 90:9,25
  97:18 120:19,21
**personally** 24:16
  31:4 94:17
**Personnel** 58:15
**pertain** 64:15
**pertaining** 37:12
**pertains** 62:16
**pertinent** 169:18
**Peter** 81:10,15,18
  81:22 82:2,3,19,23
  83:2
**Petit** 78:13
**phone** 11:22 37:11
  45:10 90:7 92:25
  93:19 94:24 103:6
**physical** 52:7
**physically** 44:3
**Ph.D** 20:7
**pick** 96:11
**picked** 94:17
**picture** 67:15
**piece** 98:15
**pinpoint** 114:24
**place** 12:18 15:5
**plaintiff** 1:5 2:5 6:12
**Plaintiff's** 25:22,24
  26:4 127:23,25
  128:6 129:3,5,10
  140:20,23 141:3,7
  150:4,9 152:16
  154:25 159:12,17
  162:18,23 163:11
  163:15 165:12
  166:7 172:23
  173:2 177:20
  182:13,18 188:7
  189:4 190:4
**plan** 150:16 154:21
**plans** 19:4 114:17
  114:20 153:14
  154:17
**pleasant** 88:12
**please** 3:5 13:15

129:14 172:13
**plus** 163:17 189:19
**point** 8:15 9:13,16
  9:16 11:25 18:11
  18:16 20:14 33:20
  34:24 35:23 36:24
  37:10,21 39:8,10
  40:2 42:9 43:3
  45:3 82:19 85:20
  90:2,14 91:3 92:10
  93:24 95:4 96:25
  102:20,22 104:23
  106:12 107:9
  108:18,18 113:4,6
  114:20,22 117:3,7
  117:11,14,20
  122:10,13,17
  135:7 139:23
  156:24 173:25
  177:4
**pointless** 94:7
**points** 90:2
**policies** 58:14
  130:22
**policy** 58:15 130:23
**politics** 167:20
**porch** 11:11
**portion** 97:7 105:6
  105:15 152:25
  153:12,13 157:8
  158:17 175:23
**portions** 23:18
**position** 17:23 26:18
  30:3 34:24 35:19
  36:19 51:3 63:14
  66:20 80:2 81:20
  92:10,12 115:23
  115:25 116:12
  142:23 143:2,23
  168:17
**positions** 26:19,20
  28:16 30:4 55:5
  58:10 116:19
**positive** 12:10
**possession** 42:11,25
  43:18,25
**possible** 37:25 79:19
**possibly** 8:8 45:15
  49:18 78:24 85:14
  105:3
**post** 63:15 65:8 75:5
**postclosing** 82:14
  89:22,24
**postemployment**
  168:3,22
**postoffer** 81:13
**posttermination**
  65:16 66:21
**posttransaction**
  86:3

**potential** 17:16
  77:19 82:14 146:5
**potentially** 47:2
  138:7,23
**PPI** 17:7 19:16
  24:12 33:10 35:13
  36:2 38:24 39:7,14
  40:14 41:3,7,13,16
  42:16 43:21 51:7
  52:23 56:9 60:15
  69:21 70:5 71:9,11
  71:12 77:6,10,11
  77:21,25 78:5,9,12
  79:6,14,19 80:2,5
  84:5,23 88:20 96:5
  98:2,6 99:10,19
  100:22 111:21
  112:2,9 117:3
  123:18 125:8
  126:2,4 144:12
  145:16,25 146:4
  147:6 153:3,8,9,25
  154:3,9 155:17,21
  156:8,9,10,13,17
  163:7,23 167:16
  176:4 180:25
**PPI's** 112:12 153:14
**practice** 28:11 30:2
  30:5,6,8,12 116:4
**practiced** 143:6
**practices** 58:9
**pre** 81:12 89:22
**preclosing** 78:2,4
  80:5 81:13 88:8
  89:16,23
**preclude** 148:4
**preexisting** 183:12
  183:13
**preface** 154:4
**premerger** 19:9
**preparation** 6:20
  7:17
**prepare** 26:9
**presale** 77:21
**prescription** 5:9
**present** 12:4 89:9
  99:19 107:19
  113:12,15
**presentation** 77:19
  80:12,13 86:13,15
  86:22,23
**presentations** 87:5,8
**presented** 46:24
  48:6
**presenting** 47:9
**president** 23:5
  30:19 32:3 73:2
  74:7
**presidents** 37:17
**president/general**

73:13,17
**pretty** 82:23
**previous** 27:2 92:18
  136:3
**previously** 35:18
  40:25 41:17 95:14
  134:5
**pre-Cedar** 19:9
**price** 151:4,4,10,13
**primary** 62:22 70:3
**printed** 128:13
  139:20
**printing** 139:20
  140:6
**prior** 27:9 39:3,25
  57:21 61:15,18
  72:13,14 79:18
  95:10 100:6 102:9
  102:18 125:13
  145:19 162:8
  184:20
**private** 30:6
**privilege** 157:5
**privileged** 6:13
**probably** 39:20 44:3
  54:4 69:2 88:17
  93:3 94:23 103:24
  119:4 120:15
  123:10,17 124:11
  124:12 127:10,12
  143:20 144:14
  146:5 149:10
  152:8 154:14
**problem** 74:8 99:15
  100:8
**problems** 5:17
**proceed** 147:21
  148:19
**proceeding** 31:7
**process** 42:15 82:21
  115:5 116:7
  134:23 176:4
**produce** 179:23,25
**produced** 6:24 7:2
  159:3,9 168:25
  170:7,8 178:9
**producing** 178:22
**professional** 1:19
  2:12 88:11 90:18
**professionally** 90:19
  104:16
**program** 150:6,14
  151:24 159:7
  188:21
**prohibit** 73:7
**promoted** 41:20
**promotion** 23:8
**properly** 31:17
**proposal** 109:23
  114:4 120:7

**proposing** 110:7
**provided** 14:15,22
  110:21 117:21
  118:16,17 134:11
  152:5,12 179:19
  180:3
**providers** 14:8
**providing** 71:15
  179:7
**provision** 69:5,16
  74:16,25 75:3,19
**provisions** 18:12
  23:18 54:11 68:22
  92:14 96:7
**Public** 1:20 3:3
  187:7
**pull** 179:3
**pulled** 178:12,17,22
**purchase** 84:7
  177:13 182:23
  184:21
**purchased** 183:6,15
  183:21 184:12,19
**purchasers** 77:20
**purported** 140:21
  141:8 188:13,19
**purpose** 19:2 21:16
  45:16 67:24
**pursuant** 1:17 67:17
  69:23 117:4
  134:12 138:9
  152:10 178:9
**pursued** 116:13
**push** 49:21
**put** 11:10,15 38:25
  43:4 117:13
  125:12 137:5
  179:17
**P-a-r-i-s-h** 8:10
**p.m** 1:10 69:10,11
  103:12 119:24,25
  167:7,8 185:5

---

**Q**

**Quarry** 129:19
**question** 4:21 6:10
  21:20,21 34:14
  37:4 38:8,19 48:12
  48:14 56:5 58:16
  61:20,25 71:7
  72:21 74:22,23
  76:3 97:2,6,21
  98:2 99:16,17
  105:4,9,25 106:23
  107:7 112:6
  119:19 120:5
  126:16 138:21,22
  139:3,8,16 146:22
  146:23 147:9,10
  165:19 166:22

169:4,17 170:22
174:9 180:2,12
184:18
**questions** 4:4,9,11
4:16,17 13:6 22:5
29:23 55:25 77:18
93:17 96:18
147:14,19 148:14
185:3
**quick** 119:21 167:5
**quicker** 133:12
**quickly** 6:3 143:3
**quit** 133:13
**quite** 9:5 14:6 47:7
48:18 78:22 126:5
155:7
**quote** 111:20,21

**R**

**R** 1:18 2:2 3:2 25:19
187:2,7,23
**raise** 149:5,6
**ran** 99:12 138:12
**read** 48:13 53:25
54:3 58:4 62:20
65:22 66:25 67:13
69:19 73:15 75:13
96:4 97:6,7 105:4
105:6,13,15
111:17 112:10
113:2 164:20,22
166:18 186:4
**reading** 150:25
**reads** 125:3 128:18
128:22 150:18
**ready** 8:24 22:15,16
23:17,22 63:11
70:4 99:24 110:20
111:11,21 113:2
161:14
**real** 6:3 137:14
143:3 167:5
182:14 184:14,15
190:10
**really** 13:9 84:20
94:7 112:22
**reason** 4:24 13:22
44:22 47:8 54:19
74:9 130:6 131:16
137:9,12 155:6,7
160:22 161:18
166:15,21,23,25
173:15 180:15
**reasonable** 58:8
**reasons** 125:21
153:24 154:14
155:14
**recall** 3:22 7:3,16,18
10:11 11:6 13:6
16:9,14,19 17:3,10

19:7,25 20:8 21:4
33:9 34:8 35:25
37:25 38:3 39:10
42:8 52:12,16,22
53:8 55:8 56:25
57:24 76:5 80:10
80:22 81:3 82:10
82:17 83:6,17
84:25 85:21,24
86:4 87:3,11,13
88:3,6,24 89:16,18
89:18,20 90:16,17
90:18 91:20,20
92:8,11,18 95:9
100:7 101:12
103:12 104:15
108:10,22 110:2,4
115:6 116:18
121:14 127:16,16
128:11 130:17
143:18 144:25
169:25 170:22
171:2 172:10,11
176:5 180:17,18
184:11
**recalling** 95:12
171:5
**receipt** 132:16 165:8
**receive** 49:16 95:22
107:18 117:4
119:7 121:19
124:5 149:6 159:8
162:11 164:14,18
179:11
**received** 13:18
17:13,20 20:22
22:8 45:3,10 46:2
47:17 48:20 49:7
49:11 52:7,11,21
52:24,25 56:7
92:16,25 96:2,10
99:8 102:5 106:10
107:21 114:16
117:10 119:12
121:14 123:4,8,17
129:11 130:3,7
132:11,12 134:8
137:5 140:2 145:2
145:10 149:5
160:10 163:6,23
164:5,9 166:12,24
173:7,14,18
**receiving** 57:21
101:8 102:18
107:20 110:3,5
112:4,23 113:15
117:8 119:19
132:22 138:19,22
139:4 149:15
172:7 180:17,18

**recess** 69:10 119:24
167:7
**recognize** 50:22
131:4 140:6
159:24 160:22
179:20 180:9,12
**recognized** 126:24
**recollected** 83:12
**recollection** 10:24
38:4,23 55:11,16
82:9 96:17 103:9
107:19 108:7
113:12,16 128:25
134:21 135:3
149:9 152:4
160:17,20 171:14
181:4 183:6
**reconvene** 148:11
**record** 3:6 4:10 7:5
26:25 48:8 58:4
82:2 86:21 88:11
97:7 105:6,15
129:14 142:11
147:18 148:7,25
151:3 166:12
173:6 179:10,12
187:13
**records** 178:2
**recover** 110:23
**recruiter** 115:21
**recruiters** 115:20
**REDACTED** 1:12
**refer** 95:13 108:20
120:3,9 134:5
**reference** 7:8 100:4
100:23 101:4,8
134:17,20 143:11
172:3
**referenced** 101:6,19
**references** 99:20
100:9,11 169:18
169:21
**referencing** 111:10
**referral** 17:25
167:11
**referred** 15:4 63:9
109:14
**referring** 60:11 64:6
86:22
**refers** 64:14
**reflect** 88:14 133:6
150:24 163:5
178:3
**reflected** 26:20
27:25 123:18
142:15 144:6
152:6
**reflects** 133:7
150:13 152:2
160:13,14 173:18

**refresh** 181:4
**refreshed** 48:20
**regarding** 9:19 10:2
17:16 24:11 47:16
50:17 54:9,10
55:25 56:16 79:19
86:24 89:16,21
92:9,19 95:8 96:19
96:23 102:10
103:10 108:12
148:23 168:21
170:3,19 171:6
**regardless** 60:4
61:22
**regards** 90:9
**Registered** 1:19
**registration** 181:13
**regular** 124:2
**rehash** 108:13
**reimbursement**
159:18,22 189:10
**Rein** 125:15 126:10
126:14,18,21,23
126:25 127:21
**rejected** 134:2
**relate** 159:21 182:23
**related** 8:23 14:10
47:9 81:9 86:24
149:24 174:11
187:15
**relates** 68:25 74:6
157:9
**relating** 30:5
**relay** 16:25
**release** 164:18
165:13,18 189:21
**relevance** 148:17
**relevancy** 29:22
57:22 106:6 115:9
120:23 123:21
139:6 145:3
**relevant** 146:16,20
146:23 147:7,14
148:14 178:18,19
**relocation** 145:10
149:24 159:22,22
160:11 161:7,9,25
162:5 181:25
182:3,3,7
**remainder** 63:13
**remained** 137:2
**remember** 6:16 11:2
11:3,9 15:6,9,17
16:2,4 18:5,21,24
18:24 32:10 33:4,5
42:10 46:5 49:3
51:23,25 78:11,18
78:24 80:11,15
82:18 84:16,20,23
84:24 87:7 88:12

**refresh** 181:4
88:25 89:24 92:21
93:10 94:12
107:23,24 112:18
112:19,20,21,22
112:23 113:17
115:22 116:20,22
118:24 119:12
130:17 137:22
140:7 142:24
143:18 145:5
149:15,16,23,25
154:7 171:18,24
172:3 177:9,16,18
181:2
**remembering** 94:11
119:16 177:9
**reminded** 4:8
**render** 63:12 110:21
125:7
**renewal** 48:24
**repay** 161:22
**repeat** 112:6 126:16
**rephrase** 50:8 59:19
59:20 61:9
**report** 33:22 49:19
79:11 159:13
189:8
**reported** 30:23
42:23
**reporter** 1:19 3:5
4:8 5:22
**reporting** 1:23 35:3
**reports** 79:8
**represent** 107:25
129:10 152:11
165:5 177:25
**represented** 14:11
**representing** 3:13
**request** 71:12
134:12 171:7
**requested** 178:11,14
**requests** 178:10,15
178:25
**require** 28:16
**required** 4:4 161:22
**requirement** 110:20
111:21
**requires** 125:23
**reread** 53:25
**research** 19:12,13
**reserve** 172:14
**reside** 27:10
**residences** 27:14,15
**resolve** 14:13
**respect** 8:22 19:7
20:2,4 33:8 37:22
37:23 38:17 39:6
40:5 46:13 55:4
56:22 58:17,21,25
64:21 77:13 78:9

79:25 82:13 83:17 88:22 89:4 92:8 96:13 98:23 100:3 101:22 102:4,8 111:6 118:20 121:8 130:18 134:7,22 149:5 168:2,7 177:12 178:4
**respond** 96:13 113:8 114:12 171:9
**responding** 113:13
**response** 9:4 100:18 178:25
**responses** 4:10,11 5:21,22,24
**responsibilities** 33:7 35:21
**responsibility** 37:18 79:13
**responsive** 48:15
**rest** 169:16
**restate** 71:7
**restaurant** 126:23
**restriction** 97:9
**result** 64:19 133:2
**retain** 18:6 46:6
**retained** 32:16
**retention** 163:6,22 164:6,14 165:8
**return** 147:6
**reversal** 123:14 131:20 132:5 133:2
**reversed** 117:12 123:18 132:21
**review** 6:19 25:14 32:20 44:5 46:6 53:21 103:20 114:3 171:7 172:15 176:19
**Reviewed** 7:4
**reviewing** 7:3,17
**revoked** 29:12
**Rhonda** 8:10 10:6 10:15 25:19,20 143:8 156:5,7,12 156:12
**ride** 33:3
**right** 14:13,18 15:25 34:18,18 44:9,12 54:3 56:22 70:15 70:21,25 71:9,11 71:14 75:9 98:18 100:13 102:15 103:11 104:20 105:12 108:8 111:25 115:22 130:16 132:14 136:5 151:3 161:2

172:14 176:13,15 177:6,10 181:3 183:14,25
**role** 39:23 40:5 52:18 73:2 76:6,7 77:13 89:3,4 93:4
**room** 91:10
**roundabout** 79:21 103:24
**run** 66:13
**runs** 60:3
**résumé** 25:25 26:8,9 29:19 31:20 188:8

**S**

**S** 2:2,9 3:2 188:6 189:3 190:3
**safe** 28:15 162:7
**Salaried** 152:17 188:25
**salary** 57:19 63:10 144:8,23
**sale** 16:3 42:15 43:21,23 47:10 77:10 86:25 163:7 163:23 177:4 182:10 183:20
**Salisbury** 27:11
**Salisbury/Granite** 129:19
**sanctioned** 29:11
**Sanders** 1:16 2:4 3:13
**Sandy** 7:12 10:25 11:2,7,18,18,24 12:2,11,11 13:8,17 13:23 14:15 15:2,4 16:15,23 17:2 108:17,23 109:13 109:18 119:2 134:9,16,20,22
**sat** 3:14 170:15
**satisfied** 172:2
**save** 141:22
**saves** 125:3
**savings** 131:17
**saw** 151:5 184:23
**saying** 43:6 55:8 59:21 68:5 73:5 90:9 94:13,24 99:12 112:9 125:6 153:10 154:4
**says** 50:25 60:12 63:10 64:10 67:12 72:9 73:11,25 95:17 99:18 110:18 111:25 135:13 160:3,8,24 181:19 183:19,22
**scenario** 92:22

**scheme** 66:24
**school** 28:5 96:11 138:3
**second** 20:21 108:18 124:22 164:2 165:25 166:3 173:18 179:17
**section** 22:14,16
**secured** 124:25
**see** 26:16 42:7 66:10 71:3 85:18 89:10 112:15 118:14 131:20 132:17 149:18,19,21 154:16 156:3 160:24 169:17 171:21 181:25
**seeing** 38:23 107:24
**seek** 111:23 114:18
**seen** 9:12 43:16
**sell** 137:10
**selling** 155:15
**sells** 182:4
**send** 85:4,13,14
**sending** 21:18 94:25
**senior** 37:13,17 38:12 73:2,12,17 74:7 77:18
**sense** 65:21,24 66:24 67:4 75:13
**sent** 103:19 114:6 124:11
**sentence** 60:10,11 60:12 68:21 111:19 112:9
**separate** 157:15 158:10 174:15 175:10
**separation** 24:12
**September** 109:22 110:12 114:17,23
**seriously** 23:13 156:21
**served** 17:12 35:17
**services** 58:11,17 59:2,6 60:15 63:12 69:15 70:4,23 71:9 71:12,21 72:19,25 73:10,11,14,16 74:8,11,16,25 75:3 75:18,22 95:18 101:23 102:4,10 102:17,23 103:10 104:3,8,21 105:21 106:3,10 110:21 125:7 126:2,4 162:13
**serving** 35:8
**set** 66:17 110:11 112:25 113:25

123:10 147:22,25 187:11,19
**setting** 112:24 116:5
**settlement** 21:24
**seven** 148:6
**severance** 93:16
**shaking** 5:23
**share** 9:9,18 23:21 23:25 24:11,17,22 24:23
**shared** 88:16 121:2
**shares** 151:23 159:5
**shocked** 137:6 154:2
**shoe** 76:22
**shoes** 64:9
**shook** 86:17
**short** 6:11 16:8 47:14 184:17
**shorter** 59:22
**shortly** 36:3 45:18 84:6 91:23 95:2 109:7 155:11
**show** 9:15 101:13
**showed** 101:18
**shown** 186:7
**shows** 131:20
**shut** 82:21
**side** 80:10 84:12 87:19 108:4
**sign** 41:17 44:11 46:4,16,18 136:14 142:20 164:17
**signature** 41:9 50:23 128:16 136:6,8 140:13,14 140:15 142:21 161:16 164:3 165:19 181:18,22 181:23 183:10
**signatures** 139:19
**signed** 40:14 41:13 46:3 47:17 50:21 51:11 53:2,22 54:2 54:7 56:2,7 136:3 136:13 144:5 161:19 165:23 166:2 176:12 177:3
**significant** 111:22
**similar** 90:5
**simple** 137:14
**Simpson** 30:11
**sister** 10:7 25:16
**sit** 94:7 146:7
**sitting** 11:22 48:19 80:11 119:11 167:2 169:20 171:5 172:17 177:6,10
**situation** 24:12 38:7

76:23 83:5,17 89:17,22 90:10,25 120:19,21 121:2 156:15 167:13
**situations** 38:14 168:21
**six** 76:17 111:2
**Sixth** 1:24
**sixty** 18:22
**skip** 11:5
**slash** 78:5
**slept** 53:25 54:4
**slowing** 161:10
**small** 27:24 29:16 81:23 127:4 131:2
**sold** 47:2 131:13,13 135:7 178:8 181:5 181:12,25 182:2,6
**somebody** 80:16
**somewhat** 67:13
**soon** 27:4
**sorry** 25:20 34:14 34:18 45:6 48:12 50:14 55:14 56:15 59:24 70:24 75:14 77:23 97:14 101:3 101:24 104:14 105:13,24 106:8 109:4 112:6 123:7 128:20 133:15 134:17 138:20 139:17 149:7,18 153:10 160:5 162:3 164:15 170:5 174:9 180:2 184:18
**sort** 32:21 79:22
**sounds** 68:11 164:11
**South** 2:7 3:7,8 27:2 27:17 28:24 122:18 129:22 130:19 131:8 156:22 177:13 182:15,24 183:7 190:10
**SOUTHERN** 1:2
**so-and-so** 127:11
**space** 43:4
**span** 49:12
**Spartanburg** 182:15 182:19 183:19 190:11,12
**speak** 20:17 144:15
**speaker** 84:4
**speakerphone** 82:7
**speaking** 15:23
**speaks** 57:17 62:13 62:23 63:23 145:4
**special** 149:12
**specific** 7:2 38:4,22

55:11,16 56:16
89:20 103:19
114:24 119:3
128:25 134:4,21
171:14
**specifically** 19:6
20:9,12 52:16 55:7
55:19,24 78:8
100:24 103:9
108:19
**specificity** 54:12
**specifics** 83:6 84:25
95:7
**split** 45:19
**spoke** 17:15 18:15
20:20 25:9 83:2,3
132:8
**spoken** 18:10
**sporting** 126:22
**spring** 34:10
**square** 181:9
**Squire** 1:16 2:4 3:13
**ss** 187:4
**stage** 116:14
**stamp** 140:25 141:5
141:13 149:20
188:16,18
**stamped** 139:24
**standard** 85:11
**standing** 126:21,23
**start** 46:12 98:12
100:14 115:3
141:19 164:15
184:10
**started** 17:23 32:3,7
33:11,17 34:11,12
34:16,20 35:2
41:21 114:22
126:7 148:5 184:8
**starting** 115:5
121:23 161:7
**starts** 30:3
**state** 1:20 3:5 28:11
28:17 29:4,17,20
29:20 90:23
120:24 165:18
182:14 187:3,8
190:10
**stated** 26:14 112:20
117:18
**statement** 63:17
123:17 124:12
129:16 130:4,10
131:19 132:11,25
**statements** 172:24
173:3,10 190:5,6
**states** 1:2 29:25 66:8
111:19 121:23
124:23 183:3
**status** 79:20 82:14

90:4,15 95:9
102:11 104:18
106:15
**stay** 16:11 36:7
90:24 91:4,15
138:18 155:9
164:13,17
**stayed** 36:9 37:7
94:22 137:19
**staying** 91:25
164:21
**steps** 23:7 64:8
**stipulate** 68:7,12
**stock** 77:11 150:10
150:19,20 151:17
159:5 188:23
**stocker** 73:22
**stop** 71:14 100:7
148:15 155:18
169:7
**stopped** 117:15
122:22
**story** 146:12
**strategy** 147:12
**Street** 2:7
**strike** 108:15
**stubs** 166:20
**stuck** 81:15
**Studios** 35:19,21
**stuff** 22:22
**subject** 11:6 24:19
82:10,12 84:20,23
98:16 99:2,4
101:10 186:6
**subjects** 103:7
**submitted** 116:19
176:20
**subpoena** 152:10
**Subscribed** 186:16
**subsequent** 26:19
**subsidiary** 51:8,9
**substantive** 86:19
**successful** 22:4
165:2
**successor** 64:8,16
**successors** 93:22
**sued** 8:18
**SUFFOLK** 187:5
**suggest** 48:2 54:25
**suing** 17:8 22:7
**suit** 142:2
**Suite** 1:24
**sum** 110:19,23
111:13,22,24
160:24
**summary** 152:20
**summer** 45:15
**supply** 179:6
**supports** 111:8
**supposed** 5:14 91:21

119:17
**sure** 4:13 12:9 13:21
14:24 15:3 19:17
19:19 25:15 35:20
38:11 45:8,24
48:15 58:2 59:25
61:8 64:2,8,10,12
65:4 69:3,9 75:6
76:2 78:11 82:23
83:2,3 84:24 86:14
86:16 89:24,25
91:22 92:23,25
95:6 98:11 99:3
101:18,25 102:12
102:14 103:23
106:23 111:16
112:7,14 113:18
114:8,10,23 115:4
116:24 119:23
122:13 123:16,22
126:17 127:20
130:15,15 133:24
133:25 135:10
136:22 141:23
144:20 146:6
151:11 154:3,23
157:12 159:9
164:16,24 171:17
171:22 172:16
182:11
**surprise** 153:7,15
**surprised** 95:24
**suspect** 184:2,7
**suspended** 29:11
**sworn** 3:3 186:16
187:12

————————
**T**
**T** 3:2 187:2,2 188:6
189:3 190:3
**take** 4:9 5:13,14,22
13:15 20:6 26:4
57:4 69:8 80:25
92:22 109:21
116:3 119:21
124:21 128:7
148:3 170:2
184:15
**taken** 4:12 5:9 8:5
69:10 117:12
119:24 167:7
170:11
**taker** 170:14
**takes** 13:13
**talk** 13:23 19:4,4
77:9 81:23 84:5
98:22 99:7 127:4
132:6 161:9
167:22
**talked** 11:18 19:8

25:5,13 42:24
56:20 88:17 91:11
99:2,12,13 118:6
127:10 132:6
155:14 167:20
**talking** 41:21 55:14
78:2 84:14 98:15
98:18 100:12
101:10 115:3
116:14 143:19
176:8
**Tax** 159:13 189:8
**Taylor** 33:25 34:4
34:25 35:9 36:4,24
**telephone** 3:20
16:19 21:11
115:19
**television** 67:15
**tell** 8:2,17 11:24
18:15 20:4 21:13
24:14,19 26:12
32:6 39:22 41:15
50:20 56:8 60:8
70:11 88:7 89:14
91:6 102:24 103:2
103:3 113:7 125:9
125:19,22,23
126:9 133:4
136:14,24 141:21
142:25 143:20
147:11 152:3
155:19,24 157:9
168:15 176:15
177:2,6
**teller** 132:9
**tellers** 131:3 132:3
**telling** 93:13 171:24
**temporary** 27:15
**ten** 94:23 151:14
**tend** 138:4
**Tennessee** 28:14
29:8
**tentatively** 94:9
**ten-year** 151:17
**term** 54:23 57:7,12
58:12,19 59:9,15
59:22 60:3,18 61:2
61:11,21 62:18
63:13 66:9,16 71:5
74:9,20,24 75:2,24
**terminate** 70:16
93:21
**terminated** 14:3
60:4,9,14 61:14,16
61:23 62:5,21 63:8
69:17 71:8,19 72:2
72:14,15 95:4
105:22 106:4,16
106:17 107:2,13
117:9 162:4

167:16
**termination** 18:11
18:17 19:15 20:2
20:11,18 25:9
59:10,17 60:19
61:3 62:11,16
63:16,20 65:9 67:3
68:24 69:22 71:2
71:25 92:14 96:6
99:14 103:21
107:7 111:3,11
117:2
**terms** 8:23 54:16
61:17 75:7 85:8
89:7 100:11
**testified** 3:4 9:19
31:6 49:6 54:6
56:10,13,18 57:2
65:25 70:23 75:21
75:23 78:3 90:6
100:19 103:23
105:10 118:5
124:10 142:22
167:10 168:8
**testify** 4:25 5:4,11
5:15 6:8 24:8
31:13,14,18
**testifying** 10:12
**testimony** 54:8
83:12 113:12,14
170:24 186:4
187:13
**thank** 21:17 125:5
**theme** 67:15 76:18
**thereof** 98:23
**thing** 32:21 53:15
62:20 81:24
143:18 154:13,19
**things** 12:2 32:16
77:25 93:23 131:5
151:6 157:4
172:19 179:3
**think** 6:24 10:8,10
10:10 12:21 15:15
19:22 20:6 21:12
22:19 26:25 35:10
35:12 40:8 42:3,11
43:4,8 47:24 48:8
49:2 50:20 51:24
53:16,25 54:2 60:9
66:23 68:21 69:19
69:25 70:3 72:8
75:15 78:13,17
81:18 82:24 83:22
84:13 85:7,10,10
85:20 86:9,11
88:16,24 89:3
94:10 97:21 99:16
99:16 101:18

102:21 107:23
111:7 113:25
114:6,9 121:13,16
121:21 126:5
132:10,14,19
133:17 135:9
136:11,12 142:6
144:24 145:6
146:4 151:13
152:8 156:8
164:19,19 171:16
172:8 181:8,12,23
181:24 182:5
183:20 184:25
**thinking** 15:14
34:10 52:3 54:20
54:22 112:18
126:6 131:14
133:21 139:10
172:17
**thinks** 179:4
**third** 2:14 111:18
181:15
**Thirty** 18:22
**Thomas** 1:18 187:7
187:23
**Thompson** 7:14
**Thornton** 39:16
53:9 99:13 120:15
120:16,25 167:12
167:13,15,23
168:9
**Thornton's** 48:23
120:20
**thought** 23:13 51:19
52:5 55:17,20
119:5 140:8
153:24 154:8
155:16 171:10
**thousand** 117:24
**three** 11:14 21:6
29:25 34:11,19
87:9 143:5 155:13
**threw** 169:16
**till** 97:23 98:5 99:21
**Tim** 143:21,21,22
143:24
**time** 5:10 6:18 12:19
16:8 17:15 18:15
20:7 26:19 29:20
29:20 30:25 32:14
38:20,24 39:2,3,8
39:11 40:17 41:24
43:15,24 44:2,5
45:6,9 47:5,17
48:7 49:7,7,9,11
49:12,19,20 51:19
52:21,25 53:19
55:17 56:7,11 58:6
59:16 70:18 74:3,6

76:13,15 77:9 78:7
79:4 81:25 83:23
84:2 85:17,22
91:25 93:18,24
96:25 97:2,9,12
98:13 99:8,18
100:9 101:9
102:20 103:19
108:22 109:10,18
109:19 111:17
113:19 114:11,16
114:18 115:4
117:17 119:5,8,14
119:16 123:15
125:3,12 127:2
130:10 135:23
137:24 138:16
141:22 143:9
147:23,25 167:2
172:7 184:7,24
185:5
**timeline** 34:23 43:13
**times** 16:5 25:8
51:18 54:4 93:14
137:18 161:9
**tired** 132:13
**title** 35:2 182:14
190:10
**titled** 128:2,8 141:4
188:9,17
**titles** 32:11
**today** 3:15,17 4:15
4:25 8:5,7 10:12
97:23 98:5 99:22
102:19 170:16
172:17 178:22
179:25
**told** 8:4,6,18,21,23
10:8,16 11:24,25
17:21 22:6,10,10
22:12 23:6,25
25:15 79:24 80:7
95:9 96:4 101:21
102:2,9,10,16,19
104:23 105:8
109:12 123:9
125:15 126:13,18
127:15
**tomorrow** 8:8
147:20
**tonight** 147:20
167:2
**top** 128:8 165:18
**total** 160:4,8,14
**totality** 126:3
**touch** 91:23
**tour** 82:22 83:15
86:12
**town** 29:16 131:2
**transaction** 64:19

77:14 80:3 137:15
**transactions** 133:6
**transcript** 1:12
158:18 171:8,9
175:24 186:6
**transition** 77:25
89:13
**tried** 22:3 76:22
88:13
**triggered** 18:12
92:15
**triggering** 96:6
**trivia** 86:10
**true** 186:5 187:12
**truly** 37:10 42:10
90:21 113:21
**truthfully** 4:25
**try** 26:11 36:11
46:22 47:20 61:9
62:2 88:15 93:17
113:2
**trying** 14:12,13
34:23 59:25 60:16
72:8,17,22 78:13
98:9 103:8 113:19
124:6,16 137:24
161:12,13 181:9
**turn** 161:15
**turned** 91:14
**turns** 4:9 182:4
**twelve** 5:7 162:5
**two** 16:10 21:6
29:24 45:19,24
54:5 74:20 78:19
79:10 87:8,9,20,24
94:23 100:9
108:18 117:13,13
117:24 123:10
127:17 137:3,20
137:24 140:7
143:5 171:17,19
171:20 172:19
176:13 184:22
**Twofold** 21:17
**two-page** 25:24 26:5
182:13 188:8
190:9
**type** 6:6 19:24 21:24
21:24 31:11 32:23
53:15 74:13 84:21
116:5
**typical** 73:15 131:2

**U**

**Uh-huh** 31:2 138:25
149:13 178:7
181:2,9
**um** 13:25 18:19
49:20 126:6
131:14 139:23

143:22 164:19
167:25
**understand** 3:16 4:6
4:15,17 26:24 37:4
41:4 49:24 54:8
59:25 61:25 69:14
71:18 74:22 76:2
80:18 94:21 96:5
97:22 98:4 99:25
102:14 105:5
108:6 110:14
111:4 112:2 124:6
148:13,17 161:21
**understanding**
22:13 23:22 25:3
26:18 34:16 35:14
40:18 60:17 68:10
68:17 110:6,11
111:5,12 112:8
119:13 121:18
138:20 164:21
**understands** 75:24
**understood** 4:21
5:25
**unemployed** 139:13
**unemployment**
162:15
**unfolding** 170:12
**unhappy** 155:13
**UNITED** 1:2
**units** 32:20 151:23
159:6
**upcoming** 47:10
**update** 122:11,14
**updated** 143:10
**UPS** 121:25
**upset** 94:18
**up-to-date** 29:8
**use** 67:25 68:17 71:9
104:8,20 143:11

**V**

**vacation** 58:7
**vague** 54:17 55:5,17
67:5,5,8,13 68:21
74:10,21 76:20
82:8 90:19 104:16
104:17
**Vaguely** 85:7
**valuable** 151:7
**value** 151:24
**various** 78:14
**verbalize** 5:21
**verify** 13:10
**version** 26:8
**versus** 72:19 93:21
153:2,9,14
**Viacom** 45:19
**vice** 30:19 32:3
37:17 73:2,12,17

74:7
**violated** 9:2 17:24
70:10
**violation** 142:3
**virtually** 49:18
**visit** 83:18 87:22
**visited** 86:7
**voice** 131:4
**volunteered** 93:11
**VP** 38:13 39:21
42:19 43:14
**VPs** 84:5,10 86:6
91:8 118:17
**vs** 1:6

**W**

**wait** 15:14 138:11
**waiting** 115:13
**waive** 111:6,20
**waiver** 110:19
**walk** 111:13
**walked** 81:16 86:15
86:16
**walking** 11:21
**Wallace** 30:9
**Wal-Mart** 3:24 6:5
30:15 143:9 156:6
**Wanda** 25:15
**want** 6:3 19:23
26:12 43:7,14 68:6
68:9 69:23 70:6
71:4 75:6,7 102:13
108:13 137:10,10
148:4 154:9,11
156:17 179:11
**wanted** 21:9 54:20
70:22 84:21
110:16
**wanting** 118:25
161:10
**wants** 91:15
**warranty** 177:21
178:4 190:8
**wasn't** 6:16 85:21
97:25 113:2
118:14 126:6
137:14 154:3
164:21 178:11,14
**watching** 126:24
**water** 31:17
**way** 24:4 36:11 40:4
62:2 67:8 77:8
79:21,24 80:7 84:4
86:12 103:24
154:15 156:9
161:5 180:7,8
181:25 187:16
**ways** 156:6
**Weber** 2:16 10:9
17:5,6 18:10 20:9

20:18,25 22:2,25
23:4,6,10 24:5
25:2,6,16 29:22
39:15 41:22,22,23
44:13,20 46:11
47:8,15,16 51:20
53:2 54:10 56:11
57:16,22 58:22
59:12,18 60:21
61:4 62:12 63:4,22
65:10,12,18 67:21
68:3,11,19 71:4,23
72:12,14 74:19
75:20,25 78:12
91:18 96:25 97:21
98:4,9 99:15 100:8
101:2 104:10
105:2,7,12 106:6
107:10 110:8
115:9 119:10
120:23 123:21
124:10,14 125:2
125:11 126:11
139:6,16,22
141:21 142:4,8,12
145:3 146:10,15
146:21 147:8,13
147:18,25 148:12
151:18 153:22
156:19 157:7
170:21 171:3,7
173:20,22 174:10
178:9,14,18,24
179:5,9,23 181:10
181:20 183:25

**week** 15:13 16:10
22:20 124:12
137:3,20
**weekend** 137:21
**weeks** 21:6,6 87:9
93:23 94:23
**went** 85:12 93:18
96:11 124:7 127:3
127:13 146:24
156:7 177:9 184:8
184:25
**weren't** 66:2
**we'll** 23:9 94:25
141:22 147:19,22
147:25 148:6
174:10
**we're** 11:6 70:9
81:19 100:12
141:21 142:6
147:21 148:2
**we've** 173:5
**WHEREOF** 187:18
**wholly** 51:7
**wife** 7:21 10:6,8,18
11:7,10 15:2 16:15

16:24,25 25:15
46:9 96:4 101:15
101:18 108:16
109:5 123:9
131:24 132:3,8
133:16 135:18,24
136:11,13 154:5,6
176:24
**wife's** 135:17 140:6
**willing** 8:24 22:15
23:17,22 63:11
70:4 73:13 99:25
110:20 111:11,21
147:6
**withdrawals** 134:3
**witness** 3:2,7 31:6
41:23 65:19 68:5
75:21 105:13
119:21 181:22
186:3 187:10,13
187:18 188:3
**word** 27:23 67:25
68:17 132:14
**words** 22:19 64:10
69:20 79:10 85:12
90:17,20 98:16
110:14 112:13
143:18
**work** 20:7 22:16,20
33:9 72:11,18,18
73:19 78:8 146:24
156:16 184:15
**worked** 24:15 43:15
78:12,22 126:25
136:24 143:8
182:2
**working** 9:3 17:23
22:14 49:22,22,22
127:5,6 130:9
155:18
**world** 33:6
**wouldn't** 31:17 77:4
104:8 106:2
**write** 103:20
**writes** 133:16
**writing** 95:2 105:8
**written** 38:18 84:22
**wrong** 170:20 181:8
**wrote** 112:13 136:8
136:11,12
**W-2** 172:23 173:2
173:10 190:5,6
**W-2s** 173:14,18

**X**

**X** 1:3,9 188:2,6
189:2,3 190:2,3

**Y**

**yard** 31:16 32:25

**yeah** 116:24,24,24
**year** 57:19 145:2
159:14 166:17
172:24 173:3
189:8 190:5,7
**years** 3:20 131:6
151:4 173:11
**yesterday** 151:4
178:17
**York** 1:2,17,17,20
1:24,24 2:15,15
29:5 49:19,25 50:3
187:3,8
**Young** 30:13

**$**

**$10,000** 149:12
**$160,786** 110:19
**$20** 33:2
**$7,524.35** 160:9

**0**

**05** 36:10,15,16,17
36:21 45:15 49:13
**06** 18:21,21 34:11
36:10,13,14 118:4
167:25
**07** 1:6 138:24
176:17

**1**

**1** 25:23,24 26:4 28:2
54:23,24 57:8 60:3
95:18 110:18
133:5 183:23
189:5,15
**1st** 165:22
**1(a)** 59:22 61:10
66:17
**1-A** 57:6
**10** 65:2 152:15,16
152:20 188:24
**10th** 178:6
**10/19** 141:24
**10001** 1:24
**10022-4834** 2:15
**10595(SS)** 1:6
**11** 65:3,3 66:7,18
67:6,8 110:24
154:24,25 159:2,3
189:5,15
**11/15/07** 129:6
188:11
**12** 68:25 109:22
155:2 159:11,12
159:21 160:6
165:25 189:5,7,7
189:21
**12th** 110:12
**12,937** 160:15

**125,000** 164:10
**127** 188:9
**129** 188:11
**13** 159:16,17,21
161:15 189:9
190:9
**13th** 181:13
**13(a)** 69:2
**13(b)** 69:2
**1300** 2:6
**14** 69:3 162:17,18
163:4 189:11
**140** 188:13,15
**141** 188:17,19
**15** 69:4 129:24
144:5 162:22,23
163:4 189:13,18
**150** 58:2 188:20,22
**152** 188:24
**154** 189:5
**158** 157:14 158:9
**159** 189:7,9
**16** 69:5 149:8
163:10,11,21
188:24 189:15
**16,600** 151:25
**162** 189:11,13
**163** 189:15,18
**165** 57:19 189:21
**166** 189:23
**17** 163:10,15,21
164:2 189:9,18
**1716** 1:24
**172** 190:5
**173** 190:6
**175** 174:14 175:9
**175,000** 144:9
**177** 190:8
**18** 141:5,16 149:20
165:11,12,17
188:18 189:11,21
190:12
**182** 190:9,12
**19** 166:6,7,12
189:23
**19th** 121:15,19
123:6,20 124:5,8
124:17,22 125:13
125:15
**1985** 28:5 30:4

**2**

**2** 34:19 110:18,19
111:6 127:24,25
128:6 188:9 190:6
**2nd** 109:2,6
**2(a)/3** 63:11
**2-A** 57:18
**2-page** 159:12 189:7
**2.9** 149:5

**20** 94:6 140:25
141:13 172:21,23
173:6,11,20,21,24
174:4,5 188:13,16
190:5,8
**20,000** 32:24
**2000** 12:20 26:17
**2002** 31:25 34:17,19
34:19,21 36:5
**2005** 37:2 39:4 40:2
48:9
**2006** 48:9 57:8 87:6
95:11,15,19
100:23 107:16
109:3,19,22
110:12 114:17
119:8,15 145:21
162:19,24 163:12
164:9 165:14,23
166:2 169:9
172:24 173:11
183:23 189:11,14
189:16,22 190:5
**2007** 12:22,24 14:25
57:9 59:23 60:3
61:11,15,18,21
66:14 124:22
125:13,17 129:24
131:15 136:4,18
138:8 140:25
141:5,14,16 144:5
145:2 148:25
149:8,20 150:5,23
151:2,23 152:17
155:2 159:6,14
160:25 163:16
164:10 166:17
173:3,11 176:4,12
176:16 178:6
183:3 184:19
188:16,18,21,24
189:5,8,18 190:7
**2008** 1:10 186:18
187:19
**21** 172:22 173:2,6
173:12,22 190:6
**21st** 135:6
**212** 1:25
**22** 177:19,20,25
190:8
**23** 1:10 148:25
182:12,13,22
188:15 189:13
190:5,9
**23rd** 121:17,20,22
122:17,20 123:6
**24** 182:17,18 183:18
188:8 190:12
**24/7** 22:18
**241** 163:18 189:20

**25** 188:8,9 189:5
**26th** 187:19
**27** 95:11,15 100:23
   163:12 165:14
   189:16,22
**277** 27:7,8
**279-5108** 1:25
**28** 27:6
**29** 27:6 136:4,18
   176:16,17
**29th** 176:12

_____ **3** _____
**3** 110:23 129:4,5,10
   161:22 188:4,11
   188:17
**3.04** 151:4
**3:27** 1:10
**3:30** 148:6
**30** 144:23 145:6
**31** 57:9 59:23 61:11
   61:15,18,21 66:14
   184:19
**31st** 183:3
**350** 1:17
**375** 3:7
**39369** 3:8

_____ **4** _____
**4** 140:20 141:10,19
   142:15 160:25
   162:24 188:13,20
   189:14
**4-page** 177:20 190:8
**4.61** 151:4
**4:30** 146:9
**40-hour** 22:20
**401(k)** 118:12 119:2
**41** 2:7
**43215-6197** 2:8

_____ **5** _____
**5** 58:4 60:13 69:7,14
   69:24 71:17 76:12
   140:23 141:12
   148:22 188:11,15
**5/26/07** 176:18
**5/31/2007** 183:20
**5:O4** 69:10
**5:14** 69:11
**50,000** 164:9
**52-week** 151:11,12

_____ **6** _____
**6** 103:12 140:3
   141:3,15 149:3
   150:23 151:2
   188:17
**6/27/02** 128:18
**6:25** 119:24

**6:33** 119:25

_____ **7** _____
**7** 69:20 139:22,23
   140:11,11 141:7
   141:17 143:25
   162:19 188:19,19
   189:11,23
**7(c)** 62:17,21 65:24
   69:24 70:10,13,21
   71:10 110:22
   111:10 172:4
**7,500** 160:4
**7:15** 146:8
**7:43** 167:7
**7:45** 167:3
**7:57** 167:8

_____ **8** _____
**8** 64:3 150:2,4,13,13
   163:16 188:20
   189:18
**8-page** 166:7 189:23
**8:23** 185:5
**875** 1:24
**885** 2:14

_____ **9** _____
**9** 64:4 107:16 150:8
   150:9,13,18
   188:22,22
**9027** 27:5 122:9
   178:4

Page 1

1

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3   --------------------------X

4   PARAMOUNT PARKS, INC.,

5           Plaintiff,

6           vs.        No. 07 CV 10595(SS)

7   LESTER NAIL,

8           Defendant.

9   --------------------------X

10          April 23, 2008
            9:02 a.m.
11

12

13

14          Deposition of CRAIG FREEMAN, held at

15   the offices of Squire, Sanders & Dempsey

16   L.L.P., 350 Park Avenue, New York, New York,

17   pursuant to Notice and Agreement, before

18   Thomas R. Nichols, a Registered Professional

19   Reporter and a Notary Public of the State of

20   New York.

21

22

23
            GREENHOUSE REPORTING, INC.
24          875 Sixth Avenue - Suite 1716
            New York, New York  10001
25             (212) 279-5108

Page 2

1
2   A P P E A R A N C E S :
3
4   SQUIRE, SANDERS & DEMPSEY L.L.P.
5   Attorneys for Plaintiff
6       1300 Huntington Center
7       41 South High Street
8       Columbus, Ohio 43215-6197
9   BY:   JILL S. KIRILA, ESQ.
10
11  LITTLER MENDELSON
12  A Professional Corporation
13  Attorneys for Defendant
14      885 Third Avenue
15      New York, New York 10022-4834
16  BY:   MICHAEL P. PAPPAS, ESQ.
17      A. MICHAEL WEBER, ESQ.
18
19  ALSO PRESENT:
20      LESTER NAIL
21
22
23
24
25

Page 3

1                    C. Freeman
2   C R A I G   F R E E M A N , called as a
3       witness, having been duly sworn by a Notary
4       Public, was examined and testified as
5       follows:
6           THE REPORTER:  Could you please state
7       your name and home address for the record.
8           THE WITNESS:  Craig Freeman,
9       849 Crosstree Lane, Sandusky, Ohio 44870.
10  EXAMINATION BY
11  MR. PAPPAS:
12      Q.   Good morning.  My name is Michael
13  Pappas.  I am one of the attorneys for Lester Nail
14  in Paramount Parks' lawsuit against him.
15          From now on I'll refer to Paramount
16  Parks as PPI.  Is that OK?
17      A.   Sure.
18      Q.   Before I begin, I would like to
19  briefly explain some of the ground rules for the
20  deposition.  As you can hear, I have a slight head
21  cold, so if you can't understand what I say,
22  please let me know.
23          I'm going to be asking you a series of
24  questions and you will answer those questions
25  under oath.  You have already been sworn.  That

Page 4

1                    C. Freeman
2   means that you're legally obligated to tell the
3   truth.
4           Do you understand that?
5       A.   Yes.
6       Q.   If there's any question that you don't
7   hear or that you don't understand, I would ask you
8   to please let me know that you either didn't hear
9   it or don't understand it and I'll repeat it or
10  rephrase it.  If you don't indicate -- unless you
11  indicate otherwise, we'll assume that you have
12  heard and understood the question.
13          Do you understand that?
14      A.   Yes.
15      Q.   Have you heard and understood
16  everything I've said so far?
17      A.   Yes.
18      Q.   Please be sure to give all of your
19  answers verbally so that the court reporter can
20  take it down.  In other words, don't nod or shake
21  your head.  And if you want to say yes or no, say
22  yes or no, not "uh-uh" or "uh-huh," because it's
23  harder for the court reporter to understand what
24  you're saying.
25          Finally, please wait for me to finish

Page 5

1                    C. Freeman
2   my entire question before answering.  I understand
3   that you sometimes know what the question is going
4   to be, but it's hard for the court reporter if
5   we're overlapping in our questions and answers.
6           Finally, if you need a break at any
7   time, just let us know.
8           Have you ever had your deposition
9   taken before?
10      A.   Yes.
11      Q.   How many times?
12      A.   Once.
13      Q.   When was that?
14      A.   Several years ago.
15      Q.   Do you remember what type of case that
16  was?
17      A.   It was a personal injury case.
18      Q.   Was that involved in your employment
19  or otherwise?
20      A.   Employment.
21      Q.   Can you elaborate on what the case was
22  about?
23      A.   A woman visiting our, um, the park
24  that I managed in Minnesota tripped and fell and
25  broke her arm and sued us.

Page 6

C. Freeman

1
2 Q. In what capacity were you deposed?
3 A. I was the general manager of the park.
4 Q. Have you ever testified as a witness
5 in any other proceeding?
6 A. Other than that one?
7 Q. Right. Other than that deposition.
8 A. Yes.
9 Q. How many?
10 A. Once.
11 Q. Was that the same case?
12 A. Yes.
13 Q. It went to trial?
14 A. Yes.
15 Q. Have you consumed any alcoholic
16 beverages in the last twelve hours?
17 A. No.
18 Q. Have you taken any drugs or
19 medications in the last 48 hours?
20 A. Yes.
21 Q. What kind?
22 A. Aspirin, vitamin, and I have a
23 prescription that I take.
24 Q. Does the -- do any of those
25 medications affect your ability to speak?

Page 7

C. Freeman

1
2 A. No.
3 Q. Do they affect your ability to hear or
4 understand?
5 A. No.
6 Q. Do they affect your memory?
7 A. No.
8 Q. Do you have any other problems that
9 might affect your ability to think and recall?
10 A. No.
11 Q. No?
12 A. No.
13 Q. Is there any reason that you can't
14 testify truthfully today?
15 A. No.
16 Q. Is there any reason that you can't
17 testify accurately and completely today?
18 A. No.
19 Q. Are you represented by counsel?
20 A. Yes.
21 Q. Who is your counsel?
22 A. Jill Kirila.
23 Q. And she's sitting right next to you,
24 correct?
25 A. Yes.

Page 8

C. Freeman

1
2 Q. Have you reviewed any documents in
3 preparation for your testimony today?
4 A. Yes.
5 Q. What documents have you reviewed?
6 A. The employment agreement.
7 Q. Lester Nail's employment agreement
8 with PPI?
9 A. Yes.
10 Q. Any other documents?
11 A. Just other things that have been part
12 of the discovery process. The complaint and, you
13 know, the other things that have been part of the
14 case, the correspondence back and forth.
15 Q. When you say the complaint, you mean
16 the court complaint filed by PPI, correct?
17 A. Yes.
18 Q. Do you recall any other specific
19 documents that you reviewed?
20 A. The materials that were exchanged as
21 part of the discovery process.
22 Q. The documents each side produced to
23 each other?
24 A. Yes.
25 Q. You reviewed all of those?

Page 9

C. Freeman

1
2 A. I can't say I reviewed all of them.
3 But I looked through them and reviewed some more
4 than others.
5 Q. Do any stand out in your mind as you
6 having taken more time to review?
7 A. None specifically stand out in my
8 mind.
9 Q. Any other documents you've reviewed in
10 preparation for your testimony today?
11 A. Not that I can recall.
12 Q. Did you prepare for your testimony
13 today with an attorney?
14 A. Yes.
15 Q. How many times did you meet to prepare
16 for the deposition?
17 MS. KIRILA: Just an objection. You
18 can answer this question, but do not
19 disclose any of our communications or
20 conversations.
21 A. We had one meeting specifically in
22 preparation for this deposition.
23 Q. Did you have any telephone conferences
24 to prepare?
25 A. We had telephone conferences. I don't

3 (Pages 6 to 9)

Page 10

C. Freeman

1  know that I would designate any of those as
2  specifically for the purpose of preparing for the
3  deposition.
4
5      Q.    When did you have the one meeting to
6  prepare?
7      A.    Last Friday, the 18th of April.
8      Q.    That was with Ms. Kirila?
9      A.    Yes.
10      Q.    Anyone else?
11      A.    Our general counsel was present for
12  that meeting.
13      Q.    Who was that?
14      A.    His name is Duff Milkie.
15      Q.    M-i-l-k-i-e?
16      A.    M-i-l-k-i-e.
17      Q.    Anyone else?
18      A.    No.
19      Q.    How long did that meeting last?
20      A.    About two and a half hours.
21      Q.    Did you review any documents during
22  that preparation meeting?
23      A.    Yes.
24      Q.    The things you've already discussed?
25      A.    Yes.

Page 11

C. Freeman

1
2      Q.    Did any of the documents you reviewed
3  refresh your recollection as to any of the events
4  in this case?
5      A.    I'm sure they did, but I can't -- I
6  can't recall any epiphanies in terms of: Oh, aha!
7      Q.    Other than meeting with your attorney
8  and Mr. Milkie, have you spoken to anyone in
9  preparation for this deposition?
10      A.    Regarding the facts that we're
11  discussing?
12      Q.    Regarding anything about the
13  deposition, including facts that you might be
14  asked about.
15      A.    Yes.
16      Q.    Who did you have that discussion with?
17      A.    Sandy Cranford.
18      Q.    Who is that?
19      A.    She is the director of human resources
20  for Carowinds.
21      Q.    Was that one discussion or more than
22  one discussion?
23      A.    I recall one discussion.
24      Q.    Do you remember when that was?
25      A.    Friday.

Page 12

C. Freeman

1
2      MS. KIRILA:  I am just going to object
3  and instruct you not to answer with respect
4  to conversations on Friday with Sandy
5  regarding any information that I requested
6  you to obtain.
7      Q.    When you say Friday, was that the
8  18th --
9      A.    Yes.
10      Q.    -- of April?
11      How long did that discussion last?
12      A.    Less than five minutes.
13      Q.    And what was discussed?
14      MS. KIRILA:  Objection.  To the extent
15  it reveals anything that I specifically
16  directed you to obtain for me, do not
17  answer.
18      Q.    Did you learn any facts as a result of
19  that discussion?
20      A.    Yes.
21      Q.    What facts did you learn?
22      A.    That really relates to the information
23  that my counsel instructed me to obtain, so I
24  can't respond.
25      Q.    There were no attorneys present during

Page 13

C. Freeman

1
2  that conversation, were there?
3      A.    Yes.
4      Q.    Who was that?
5      A.    Duff Milkie.
6      Q.    He was present during your
7  conversation with Sandy Cranford?
8      A.    Yes.
9      Q.    Have you talked about this case with
10  anyone other than an attorney?  Other than what
11  you've already talked about.
12      A.    I reported to my boss on it.
13      Q.    Who is your boss?
14      A.    Dick Kinzel.
15      Q.    And what's his position?
16      A.    He's president and CEO, chairman,
17  president, CEO of Cedar Fair Entertainment
18  Company.
19      Q.    How many times did you report to
20  Mr. Kinzel about the case?
21      A.    Several times.
22      Q.    During what period of time?
23      A.    From the time the case was filed to
24  the present.
25      Q.    From the time the lawsuit was filed?

4 (Pages 10 to 13)

Page 14

C. Freeman
1
2    A.    Yes.
3    Q.    What did you report to Mr. Kinzel?
4         MS. KIRILA:  Another instruction here.
5    Object to the extent you are communicating
6    anything that I directly instructed you to
7    convey to Mr. Kinzel and any legal strategy.
8    But other than that, you can answer.
9    A.    There were several conversations we
10   had regarding the status of the case.  Some of
11   those conversations occurred in the presence of
12   our attorney, our general counsel.
13        THE WITNESS:  So I would imagine those
14   are protected.
15        MS. KIRILA:  Yes, do not testify as to
16   those.
17   A.    I don't recall specific dates and
18   conversations, and so forth.  They were just
19   general, you know, progress reports, updates, you
20   know, making recommendations, getting direction,
21   that sort of thing.
22   Q.    Can you tell me the substance of
23   anything that was discussed in any of those
24   meetings other than privileged material?
25        MS. KIRILA:  And I will also instruct

Page 15

C. Freeman
1
2    you if you're not sure whether Duff was
3    there or not, do not guess.  Only testify
4    about those which you know Duff was not
5    present or other counsel.
6    A.    I don't have specific recollection of
7    the substance of specific conversations.
8    Q.    Do you recall anything that Mr. Kinzel
9    said in any of those discussions?
10        MS. KIRILA:  Same instruction.
11   A.    Something to the effect that, you
12   know, this could all be over with if Mr. Nail
13   would just write us a check for what he owes us.
14   Q.    Mr. Kinzel said that?
15   A.    Yes.
16   Q.    Did you have any response to that?
17   A.    I had my marching orders.
18   Q.    I am just asking if you responded to
19   that comment at all.
20   A.    I think my response was that I just --
21   I understood.
22   Q.    Do you recall anything else that
23   Mr. Kinzel said in any of those discussions?
24   A.    He has -- he has wondered why Mr. Nail
25   doesn't understand that he owes Cedar Fair this

Page 16

C. Freeman
1
2    money or PPI this money, I'm sorry, owes PPI this
3    money and why he thinks it's OK for him to do what
4    he did.
5    Q.    That's something Mr. Kinzel actually
6    said or that was your impression of what he was
7    thinking?
8    A.    That's a summary of his -- of what he
9    has said.
10   Q.    Anything else?
11   A.    Not that I recall.
12   Q.    In any of your meetings and
13   discussions with Mr. Kinzel where counsel were
14   present was there any nonattorney present from
15   outside the company in any of those meetings?
16   A.    No.
17   Q.    Are you an attorney?
18   A.    No.
19   Q.    Have you ever attended law school?
20   A.    No.
21   Q.    Do you have any type of legal
22   training?
23   A.    Not beyond taking business law courses
24   in college.
25   Q.    Just following up on the last series

Page 17

C. Freeman
1
2    of questions, other than Sandy Cranford and
3    Mr. Kinzel did you have any discussions with any
4    other nonattorneys regarding this case?
5    A.    What type of discussions?
6    Q.    Any type of discussions,
7    correspondence, regarding this case.
8    A.    I'm sure I have mentioned in brief to
9    our human resources director, corporate HR
10   director.
11   Q.    Which is?
12   A.    Her name is Billy Clark.
13   Q.    Do you remember any discussions or
14   correspondence you had with Ms. Clark regarding
15   this case that would not be privileged?
16   A.    Nothing specific.  Just general
17   updates.
18   Q.    Do you recall anything specific that
19   either you or she said in any of those
20   discussions?
21   A.    No.
22   Q.    Anyone other than Ms. Clark,
23   Mr. Kinzel and Ms. Cranford?
24   A.    My assistant.
25   Q.    Who is that?

Page 18

C. Freeman

1
2     A.    Ruth Hufnagle.
3     Q.    Do you have any substantive
4  communications with her about the case?
5     A.    No, just enlisting her assistance to
6  gather documents for discovery, and so forth.
7     Q.    Anyone else?
8     A.    Conversations surrounding that.
9     Q.    Anyone else?
10    A.    Veronica Dowd.
11    Q.    Who is she?
12    A.    She's on my staff, also.  And she is
13 our, she's a human resources manager, corporate
14 human resources manager.
15    Q.    What did you discuss with her about
16 the case?
17    A.    Just information gathering, because
18 she has access to the human resources system.
19    Q.    What specific information did you talk
20 to her about gathering?
21    A.    Just information regarding Mr. Nail's
22 benefits, and so forth.
23    Q.    Benefits and what else?
24    A.    That's really all I recall.
25    Q.    Was that for the purpose of responding

Page 19

C. Freeman

1
2  to discovery requests in this case?
3     A.    Yes.
4     Q.    Anyone else?
5     A.    No.  Not that I recall.
6     Q.    Did you speak to Peter Crage [Craig]
7  about this case?
8     A.    I don't recall any conversations that
9  I had with Mr. Crage.
10    Q.    It's pronounced Crage?
11    A.    Yes.
12    Q.    OK.  In your discussions with
13 Mr. Kinzel you indicated that he wondered why
14 Mr. Nail didn't understand that he owes money,
15 correct?
16    A.    Yes.
17    Q.    Did he say why he believed that
18 Mr. Nail owed the company money?
19    A.    I don't recall him elaborating.
20    Q.    Where did you go to college?
21    A.    Where did I go to college?
22    Q.    Yes.
23    A.    I, my bachelor's degree was from the
24 University of Southern California.
25    Q.    What is your degree in?

Page 20

C. Freeman

1
2     A.    Business administration.
3     Q.    What year did you obtain that degree?
4     A.    1977.
5     Q.    Do you have any other degrees?
6     A.    An associate of arts degree from
7  Fullerton College.
8     Q.    Anything else?
9     A.    MBA from California State University
10 at Fullerton.
11    Q.    Anything else?
12    A.    That's it.
13    Q.    Do you have any other post high school
14 education other than what you've already
15 described?
16    A.    No.
17    Q.    Do you have any professional -- other
18 professional training other than what you've
19 already described?
20    A.    Seminars and things like that.
21    Q.    Relating to what?
22    A.    Gosh.  Business, you know, leadership,
23 professional development.
24    Q.    Anything relating to executive
25 contracts or compensation or anything like that?

Page 21

C. Freeman

1
2     A.    No.
3     Q.    Do you have any professional licenses?
4     A.    No.
5     Q.    Or professional certificates?
6     A.    No.
7     Q.    Have you ever had any training in
8  human resources?
9     A.    Um, seminars regarding union matters.
10    Q.    Other than that?
11    A.    No.
12    Q.    Where are you currently employed?
13    A.    Cedar Fair.
14    Q.    Cedar Fair LP?
15    A.    Cedar Fair LP.  That's the parent
16 company.  Technically my employer is Magnum
17 Management Corporation which is a subsidiary of
18 Cedar Fair LP.
19    Q.    So Magnum is your employer.
20    A.    Yes.
21    Q.    That's a wholly owned subsidiary of
22 Cedar Fair?
23    A.    I'm trying to recall the entity's
24 structure and I believe it is wholly owned by
25 Cedar Fair.

6 (Pages 18 to 21)

C. Freeman

1
2       Q.    What is Magnum -- Magnum's
3   relationship with PPI?
4       A.    It's the parent company of PPI.
5       Q.    So Magnum owns all of the stock of
6   PPI?
7       A.    Yes.
8       Q.    What is your position?
9       A.    Corporate vice president
10  administration.
11      Q.    Are you considered an officer of the
12  corporation?
13      A.    Yes.
14      Q.    Are you a director?
15      A.    No.
16      Q.    How long have you been employed in
17  that position?
18      A.    About a little less than three years.
19      Q.    Do you remember when you started in
20  that position?
21      A.    September of 2005.  There was a little
22  bit of an overlap.  My predecessor retired, so --
23      Q.    Where were you employed before that?
24      A.    I was the general manager of Camp
25  Snoopy in Mall of America.

C. Freeman

1
2       Q.    That was owned by Magnum as well?
3       A.    It had a management contract with
4   Cedar Fair.
5       Q.    Who was your employer when you were GM
6   of Camp Snoopy?
7       A.    I believe it was Magnum.
8       Q.    Who owned the actual Camp Snoopy?
9       A.    It was owned by, um, it was owned by a
10  partnership that controlled, basically controlled
11  the mall property.
12      Q.    What was your position before that?
13      A.    Director of administration at Camp
14  Snoopy.
15      Q.    Same employer?
16      A.    Yes.  Well, Cedar Fair purchased
17  Knott's Berry Farm in 1997.  So my general manager
18  position actually straddled that acquisition.
19      Q.    When was that?  1997?
20      A.    Yes, late December of 1997.
21      Q.    So you were employed by a different
22  employer and then Cedar Fair acquired the Camp
23  Snoopy and you remained employed?
24      A.    Cedar, um, Cedar Fair -- I worked for
25  Knott's Berry Farm.  Knott's Berry Farm had a

C. Freeman

1
2   management agreement for the Camp Snoopy park in
3   Mall of America.  Cedar Fair acquired Knott's
4   Berry Farm in late 1997 and inherited, if you
5   will, or assumed the management agreement.
6       Q.    And you remained employed in the same
7   position --
8       A.    The same position.
9       Q.    -- before and after, correct?
10      A.    Yes.  So that was in 1997.  My
11  position as general manager started in 1996 and
12  prior to that I was director of administration,
13  employed by Knott's Berry Farm.
14      Q.    What are your duties and
15  responsibilities as vice president administration
16  for Magnum?
17      A.    I'm responsible for the corporate
18  human resources function as well as various
19  administrative duties such as license agreements,
20  real estate transactions, asset sales.
21      Q.    Anything else?
22      A.    That's most of it.  I get involved in
23  some of the -- I work with the general counsel
24  quite a bit on contractual matters and legal
25  matters.

C. Freeman

1
2       Q.    You said on contractual and legal
3   matters?
4       A.    Yes.
5       Q.    What type of contractual and legal
6   matters do you work with general counsel on?
7       A.    Things like agreements that the parks
8   enter into for concessionaires or entertainment
9   or, you know, various operating agreements that
10  the parks have and also assist him with his needs
11  and if he's involved in some litigation where I
12  have information or can assist, myself and my
13  staff.
14      Q.    What about employment agreements?
15      A.    Other than this one we're discussing
16  today, I have not had any involvement with him on
17  any employment agreements.
18      Q.    Have your duties and responsibilities
19  changed at all since PPI was acquired from CBS?
20      A.    Yes.
21      Q.    How have they change and when did they
22  change?
23      A.    As we approached the acquisition of
24  PPI, of PPI, I became involved in the due
25  diligence process, information gathering, and I

Page 26

C. Freeman

1  C. Freeman
2  assimilated all of the duties and responsibilities
3  that I had on behalf of Cedar Fair on behalf of
4  the additional parks when the acquisition was
5  consummated.
6      Q.    Anything else?
7      A.    In terms of the types of duties and
8  responsibilities, not really.  It was just more
9  the scope of those responsibilities and the volume
10  of those responsibilities increased dramatically.
11      Q.    Now, you said you were responsible for
12  the corporate HR function.  Is that for all of
13  Cedar Fair or one specific part of it?
14      A.    All of Cedar Fair.
15      Q.    Who do you report to?
16      A.    The president/CEO, Dick Kinzel.
17      Q.    Anyone else?
18      A.    No.
19      Q.    Have you reported directly to him
20  during the whole time that you have been in your
21  current position?
22      A.    Yes.
23          Can I back up and clarify something?
24      Q.    Sure.
25      A.    You asked about my employment history

Page 27

1  C. Freeman
2  originally and I said I had been in my position a
3  little less than three years.  I just wanted to
4  elaborate on that transition period when my
5  predecessor was retiring.
6      So between the time I left Mall of
7  America as general manager, which was end of March
8  2005, and the time he retired, which was beginning
9  of September 2005, I had a position.  I was vice
10  president administration without the corporate
11  responsibilities at that time and I was reporting
12  to the previous corporate VP of administration.
13          In other words, there was a transition
14  period, an overlap, and during that overlap period
15  I was not reporting to Mr. Kinzel.  I was
16  reporting to another individual.
17          But that just -- I just wanted to
18  clear that up.
19      Q.    But since September of '05 you have
20  been reporting directly to Mr. Kinzel?
21      A.    Yes.
22      Q.    Does anyone report to you?
23      A.    Yes.
24      Q.    How many people report to you?
25      A.    Direct reports?

Page 28

C. Freeman

1  C. Freeman
2      Q.    Yes.
3      A.    Three.
4      Q.    Can you identify them?
5      A.    Billy Clark, Ruth Hufnagle, and
6  Michelle Ledger.
7      Q.    And what was Michelle's position?
8      A.    She's the purchasing manager at Cedar
9  Point.
10      Q.    Who does Sandy Cranford report to?
11      A.    She currently reports to the general
12  manager of Carowinds.
13      Q.    Have you had those three same direct
14  reports since the time that you assumed your
15  current position full time?
16      A.    Since September of 2005?
17      Q.    Yes.
18      A.    No.
19      Q.    How has that changed since September
20  of 2005?
21      A.    Prior to the Paramount acquisition we
22  did not really have a corporate human resources
23  function per se.  With the acquisition we
24  increased our human resources staff to create the
25  corporate -- corporate oversight function and

Page 29

1  C. Freeman
2  brought in Billy Clark.
3          With the additional volume and level
4  of responsibilities, we added Ruth Hufnagle as an
5  additional resource.
6      Q.    So prior to the acquisition how many
7  people reported to you directly?
8      A.    One.
9      Q.    And who was that?
10      A.    Her name was Jean Ohlemacher.
11  O-h-l-e-m-a-c-h-e-r.
12      Q.    What was her position?
13      A.    Administrative assistant.
14      Q.    Prior to the time that you started
15  reporting directly to Mr. Kinzel, did you know
16  him?
17      A.    Yes.
18      Q.    Did you have any interactions with
19  him?
20      A.    Yes.
21      Q.    In what capacity?
22      A.    When I was in that interim position
23  from March to September I attended the staff
24  meetings and he would have me work on projects.
25          Prior to that, when I was general

Page 30

C. Freeman

1    manager at the Camp Snoopy park at Mall of America
2    he would -- he would make stewardship visits to
3    the park and I would report to him on the status
4    of our business and we would meet on various
5    issues. And I would have occasional phone
6    conversations with him.
7    Q.    Would you describe him as a pretty
8    hands-on president and CEO?
9    A.    As the business has grown he has been
10   forced to I guess become more and more removed,
11   and in fact from an organizational standpoint
12   he's, um, he's put people, more people between him
13   and the operations.
14   Q.    When did that change start to occur?
15   A.    In early 2005 he brought in a chief
16   operating officer. And the general managers as of
17   that time, the general managers at the parks no
18   longer reported to Mr. Kinzel. They reported to
19   the CEO.
20   Q.    Who was that?
21   A.    Jack Falfas.
22   Q.    Falfas?
23   A.    F-a-l-f-a-s.
24   Q.    Is he still there?

Page 31

C. Freeman

1    A.    Yes.
2    Q.    In the same position?
3    A.    Yes.
4    Q.    Where is your office located?
5    A.    Sandusky, Ohio.
6    Q.    Has it always been located there while
7    you have had this position?
8    A.    Yes.
9    Q.    In your current position what kind of
10   interactions do you have with Mr. Kinzel?
11   A.    I talk to him on the phone and I meet
12   with him on an ad hoc basis when I have things to
13   review and go over with him and attend his staff
14   meetings.
15   Q.    How often would you say you talk to
16   him on the phone?
17   A.    Average, three times a week.
18   Q.    How often does he hold the staff
19   meetings?
20   A.    Generally weekly unless -- unless
21   there's a conflict.
22   Q.    Is there a specific day of the week he
23   usually holds them on?
24   A.    It moves around.

Page 32

C. Freeman

1    Q.    Other than his staff meetings how
2    often do you meet with him in person
3    approximately?
4    A.    Every several weeks.
5    Q.    Where is his office in relation to
6    your office?
7    A.    A couple of miles away.
8    Q.    So he's in a different building?
9    A.    Yes.
10   Q.    In the same city?
11   A.    Yes.
12   Q.    Has your level of interaction with him
13   remained fairly consistent since September 2005?
14   A.    Yes.
15   Q.    In your experience was Mr. Kinzel
16   typically involved in the termination of employees
17   at the vice president level and above?
18   A.    Yes.
19   Q.    How was he involved?
20   A.    Depending on the type of termination,
21   it can be, you know, a specific situational
22   involvement or it could be more of a general
23   involvement.
24   Q.    Was he consulted on all such

Page 33

C. Freeman

1    terminations?
2    MS. KIRILA:  Objection.  To the extent
3    of your knowledge and your involvement you
4    can answer.
5    A.    He authorizes them.
6    Q.    He has to approve them, correct?
7    A.    Yes.
8    Q.    In the weekly staff meetings with
9    Mr. Kinzel were they recorded in any way?
10   A.    No.  I'm sorry, yes.
11   Q.    How were they recorded?
12   A.    One of the attendees takes general
13   notes.
14   Q.    Did you personally take notes during
15   the meetings?
16   A.    For my own benefit?
17   Q.    Yes.
18   A.    Yes.
19   Q.    Do you still have any of those?
20   A.    Yes.
21   Q.    The person who was taking general
22   notes of the meeting, were those distributed
23   afterwards?
24   A.    Yes.

Page 34

C. Freeman

1
2    Q.    They were sort of like the minutes of
3  the meeting?
4    A.    Yes.
5    Q.    And were they distributed to you?
6    A.    Yes.
7    Q.    Do you still have any of those?
8    A.    Yes.
9    Q.    How far back would you say that you
10  keep either your own personal notes or the minutes
11  of those staff meetings?
12    A.    Quite a while.  Going back quite a
13  while.
14    Q.    In your experience did Mr. Kinzel have
15  to approve employment contracts with executives?
16    A.    New employment contracts?
17    Q.    Yes.
18    A.    Yes.
19    Q.    Did he have to approve all employment
20  contracts or only those at a certain level and
21  above?
22    A.    All employment contracts.
23    Q.    In your experience was Mr. Kinzel ever
24  involved in hiring employees?
25    A.    Yes.

Page 35

C. Freeman

1
2    Q.    How was he involved in hiring
3  employees?
4    A.    He conducts interviews for senior
5  level positions.
6    Q.    Did he interview you for your current
7  position?
8    A.    Yes.
9    Q.    And I presume he would have approval
10  over hiring of senior level positions, correct?
11    A.    Yes.
12    Q.    Do you know Peter Crage?
13    A.    Yes.
14    Q.    How do you know him?
15    A.    He is a coworker.
16    Q.    What is his position?
17    A.    Corporate vice president and chief
18  financial officer.
19    Q.    Of what entity?
20    A.    Cedar Fair LP.
21    Q.    How long have you known Peter Crage?
22    A.    Probably six years or so.
23    Q.    How did you first come to know him?
24    A.    When I was the general manager at Mall
25  of America, Camp Snoopy Mall of America, at one

Page 36

C. Freeman

1
2  point he was the corporate treasurer and I met him
3  in those capacities, when we were both in those
4  capacities.
5    Q.    Do you know when he obtained his
6  current position?
7    A.    July of 2005.
8    Q.    As of September 2005 going forward did
9  you have any interactions with him?
10    A.    Yes.
11    Q.    What types of interactions did you
12  have with him?
13    A.    Given that we are peers on the
14  corporate staff, we interact frequently regarding
15  various business matters.
16    Q.    What types of matters?
17    A.    A couple of examples, ride purchases,
18  um --
19    Q.    You said ride, r-i-d-e?
20    A.    Ride, r-i-d-e, ride purchases, um,
21  benefits issues as it relates to the financial
22  implications.
23    Q.    Do you interact on human resources
24  issues?
25    A.    With Mr. Crage?

Page 37

C. Freeman

1
2    Q.    Yes.
3    A.    Not typically unless as I said there's
4  some sort of a financial ramification, like we're
5  bidding out benefit packages or vendors or
6  programs or whatever.  We're both on the
7  retirement plan advisory committee.
8    Q.    Where is Mr. Crage's office in
9  relation to your office?
10    A.    A couple of miles away.
11    Q.    He's in the same building as
12  Mr. Kinzel?
13    A.    Not the same building, but an
14  adjacent, um --
15    Q.    Complex?
16    A.    -- building.  Yes, the same complex.
17    Q.    How frequently would you say that you
18  interact with Mr. Crage?
19    A.    About the same as Mr. Kinzel.  Several
20  times a week.
21    Q.    Is he also at the staff meetings?
22    A.    Yes.
23    Q.    Has your level of interaction with
24  Mr. Crage remained fairly consistent since
25  September of 2005 to the present?

Page 38

C. Freeman

1
2     A.    Yes.
3     Q.    Was Mr. Crage typically involved in
4  termination of employees at the vice president
5  level or above?
6     A.    I wouldn't, um, I wouldn't say that he
7  regularly is, at least not with me.
8     Q.    Do you know of any instances where he
9  was involved?
10     A.    I don't recall any.
11     Q.    Do you know whether he was typically
12  consulted with respect to such terminations?
13     A.    I don't know.
14     Q.    Do you know whether he had to approve
15  such terminations?
16     A.    Not to my knowledge.
17     Q.    And do you know whether he had to
18  approve employment contracts with executives?
19     A.    Not to my knowledge.
20     Q.    Do you know whether he was consulted
21  or involved at all in employment contracts with
22  executives as far as approving them?
23     A.    I don't know.
24     Q.    Was he involved in hiring employees?
25     A.    Yes.

Page 39

C. Freeman

1
2     Q.    How was he involved?
3     A.    He is sometimes part of the interview
4  process.
5     Q.    For any particular level of employee?
6     A.    It depends on the function of the
7  employee and the level of the employee.  For
8  example, someone within his organization, of
9  course he is going to be very much involved in the
10  process.  Anyone outside of his organization is
11  going to be at the discretion of the CEO.
12     Q.    But there have been instances where
13  he's been involved in interviewing people being
14  hired for outside his purview, correct?
15     A.    Yes.
16     Q.    Do you know Lester Nail?
17     A.    Yes.
18     Q.    How do you know Lester?
19     A.    Through his employment at PPI.
20     Q.    What was his position when he worked
21  at PPI?
22     A.    He was general counsel.
23     Q.    Only for PPI or for any other entity?
24     A.    For PPI.
25     Q.    Did you know him before PPI was

Page 40

C. Freeman

1
2  acquired from CBS?
3     A.    I met him during the due diligence
4  process.
5     Q.    Did you know him before that?
6     A.    No.
7     Q.    In your current position and while
8  Mr. Nail was still employed by PPI did you have
9  any interaction with him?
10     A.    Yes.
11     Q.    What kind of interaction did you have?
12     A.    Transition issues regarding legal
13  matters and also human resource matters.
14     Q.    When you say transition issues
15  regarding legal matters, does that refer to after
16  the acquisition when Mr. Nail was on his way out?
17     A.    We, during the due diligence process
18  and through the remainder of Mr. Nail's
19  employment, we discussed and he updated and
20  reviewed with me situations which were ongoing or
21  in process or needed resolution or needed
22  decisions or things that were -- that were within
23  his scope of responsibility that the acquiring
24  entity needed to be aware of.
25     Q.    And that applied to both legal matters

Page 41

C. Freeman

1
2  and HR matters?
3     A.    Yes.  And he and I worked together on
4  the downsizing of the corporate staff.
5     Q.    Where was his office in relation to
6  yours?
7     A.    He was based in Charlotte.
8     Q.    Was that PPI's corporate headquarters
9  when it was owned by CBS?
10     A.    Yes.
11     Q.    And you were in Ohio, correct?
12     A.    Yes.
13     Q.    Did you ever meet with him in person
14  or were all your interactions by other means?
15     A.    We met on a few occasions in person.
16     Q.    Did you go down there or did he go to
17  Ohio?
18     A.    I went down there.
19     Q.    Was he cooperative as far as the
20  transition issues?
21     A.    Generally, yes.
22     Q.    How frequently would you say you
23  interacted with Mr. Nail during the time that you
24  were both there, both employed at the same time?
25     A.    From the effective date of the

11 (Pages 38 to 41)

Page 42

C. Freeman

1
2  acquisition going forward, several times a week.
3      Q.    PPI's currently owned by Magnum is it?
4      A.    Yes.
5      Q.    When was PPI acquired from CBS?
6      A.    June 20, 2006.
7      Q.    And it was acquired directly by Magnum
8  or by Cedar Fair?
9      A.    I -- I don't know the specific
10 legalities of the transaction.  What I'm giving
11 you in terms of who owns who is from my
12 recollection of the entity structure chart the
13 last time I looked at it.
14     Q.    What type of company is Magnum?  Is it
15 a holding company?  What type of business is it
16 engaged in?
17     A.    It's engaged in the amusement park
18 business.
19     Q.    What kind of company is Cedar Fair?
20     A.    It's engaged in the amusement park
21 business as well.
22     Q.    And it's headquartered in Ohio,
23 correct?
24     A.    Yes.
25     Q.    And it has been for some time, right?

Page 43

C. Freeman

1
2      A.    Yes.
3      Q.    Since prior to the acquisition --
4      A.    Yes.
5      Q.    -- of PPI.
6            How many amusement parks does Cedar
7  Fair operate either through itself or through its
8  subsidiaries?
9      A.    I believe eleven amusement parks.
10     Q.    And does that include water parks or
11 is that a separate category?
12     A.    That's a separate category.
13     Q.    How many water parks does it operate?
14     A.    I'm sorry, you said own and/or
15 operate, right?  So that would be twelve amusement
16 parks including Gilroy Gardens under our
17 management contract.  Water parks, separately
18 gated or separate admission water parks, six.
19     Q.    I am just going to run down the names
20 of them.  Tell me if I missed anything, OK?
21           Cedar Point in Ohio?
22     A.    Yes.
23     Q.    Soak City in Ohio.
24           Knott's Berry Farm in California.
25           Knott's Soak City in Orange County,

Page 44

C. Freeman

1
2  California.
3            Knott's Soak City in San Diego.
4            Knott's Soak City in Palm Springs.
5            King's Island in Ohio.
6            Canada's Wonderland, Ontario.
7            King's Dominion in Virginia.
8            Carowinds, North Carolina.
9            Great America in California.
10           Dorney Park in Pennsylvania .
11           Valley Fair in Minnesota.
12           Worlds of Fun in Missouri.
13           Oceans of Fun in Missouri.
14           Michigan's Adventure in Michigan.
15           And Wild Water Kingdom in Ohio.
16           Did I miss anything?
17     A.    Gilroy Gardens you didn't mention.  We
18 don't own it.  We just have a management
19 agreement.
20     Q.    Is that in California?
21     A.    Yes, Gilroy, California.
22     Q.    That's where they have garlic.
23     A.    Garlic capital of the world.
24     Q.    Anything else?
25     A.    So that then should total 18, right?

Page 45

C. Freeman

1
2      Q.    Right.  Is there a Star Trek ride or
3  something?
4      A.    Oh, OK.  That's not a park or a water
5  park.  It's an attraction, yes.
6      Q.    That's in Las Vegas.
7      A.    That's in Las Vegas.
8      Q.    Do you know which, if any, of these
9  properties were acquired as a result of the
10 acquisition of PPI from CBS in 2006?
11     A.    Yes.
12     Q.    Which ones?
13     A.    Star Trek, King's Island, King's
14 Dominion, Carowinds, Great America, Canada's
15 Wonderland, and then the Gilroy Gardens management
16 agreement.
17     Q.    And the management agreement is that
18 somebody else actually owns the place, but it's
19 operated by Cedar Fair?
20     A.    Yes.
21     Q.    Other than amusement and water parks
22 does Cedar Fair own or operates any other
23 properties?
24     A.    We have some hotel properties.
25     Q.    Those are on the premises of some of

12 (Pages 42 to 45)

Page 46

C. Freeman

1     C. Freeman
2 the parks?
3     A.   They are on or adjacent to or nearby.
4 They are associated with the amusement parks.
5     Q.   Do you know how many hotel properties
6 that Cedar Fair owns or operates?
7     A.   Five hotels, yeah, I think they are
8 five hotels and there are campgrounds.
9     Q.   How many campgrounds?
10     A.   I think three or four. Four.
11     Q.   Is Cedar Fair engaged in any other
12 businesses?
13     A.   Not that I can think of right now.
14     Q.   Does it have any subsidiaries that are
15 engaged in any other businesses?
16     A.   No.
17     Q.   Who are -- from now on when I say
18 Cedar Fair, just to make it easy, I mean Cedar
19 Fair and its subsidiaries, OK?
20     A.   Sure.
21     Q.   Who are Cedar Fair's competitors?
22     MS. KIRILA: Objection. Relevance.
23 There's no dispute over noncompete here.
24     You can answer the question, but I'm
25     not going to get into competitiveness when

Page 47

C. Freeman

1     C. Freeman
2     this isn't an issue in the case. Go ahead.
3     A.   Six Flags, Busch Entertainment, I
4 guess Disney, Universal, Herschend Entertainment,
5 H-e-r-s-c-h-e-n-d. I am not sure the C is in
6 there, but we'll go with it. Parc, which is
7 P-a-r-c, I believe is how it's spelled, owns
8 several properties in the U.S. Kennywood
9 Entertainment.
10     Those are the big ones I can think of.
11     Q.   Does Cedar Fair do any business
12 outside of the U.S. and Canada?
13     A.   No.
14     Q.   Were you involved in the acquisition
15 of PPI by Cedar Fair?
16     A.   Yes.
17     Q.   I believe you testified earlier you
18 were involved in the due diligence, correct?
19     A.   Yes.
20     Q.   Were you involved in any other way?
21     A.   Transition, the transition issues
22 related to human resources and legal matters.
23     Q.   That's what you testified to before as
24 far as your interactions with Mr. Nail.
25     A.   Yes.

Page 48

C. Freeman

1     C. Freeman
2     Q.   Is that the same thing?
3     A.   Yes. As well as benefit transition
4 issues, converting the benefits from CBS.
5     Q.   Who did you work with on the benefits
6 transition issues?
7     A.   Internally primarily Sandy Cranford.
8     Q.   Who did you work with at CBS, if
9 anyone, on those benefit transition issues?
10     A.   Primary contact, team leader if you
11 will on that side that I recall was Deb Bernes.
12     Q.   Anything else?
13     A.   That's my recollection of significant
14 things I was involved in.
15     Q.   How were you involved in the due
16 diligence? What did you do?
17     A.   Information gathering, going out to
18 the data site and reviewing agreements and
19 policies and benefits and just gathering
20 information related to the responsibilities that I
21 previously related.
22     Q.   Did you report to anyone at Cedar Fair
23 regarding the due diligence process?
24     A.   I reported to the CEO, Dick Kinzel.
25     Q.   Who else did you work with from Cedar

Page 49

C. Freeman

1     C. Freeman
2 Fair on the due diligence process?
3     A.   Peter Crage and -- oh, our attorneys,
4 Squire Sanders.
5     Q.   Anyone else that you recall who you
6 worked with on due diligence?
7     A.   You know, I have just vague
8 recollections. Nobody specific that I can say I
9 definitely remember working with this person.
10     Q.   Are there any point people at CBS or
11 PPI before the acquisition that you worked with on
12 the due diligence process?
13     A.   Separating due diligence from
14 integration, right?
15     Q.   Correct.
16     A.   Due diligence because we were in a
17 competitive bid situation, it was all very much
18 funneled, and so I really didn't work with anybody
19 at CBS during that process.
20     Q.   What about for the integration, who
21 were the point people?
22     A.   As I mentioned previously, I worked
23 with Lester, Sandy Cranford, Deb Bernes from CBS,
24 our attorneys from Squire Sanders, our benefits
25 consultants, benefits brokers I guess and

13 (Pages 46 to 49)

Page 50

C. Freeman

1  consultants.
2      Q.    What were your interactions with
3  Mr. Nail prior to the closing date of the
4  acquisition?
5      A.    I recall a trip down there a couple of
6  weeks before the closing date where we had pretty
7  much an all-day meeting where Lester gave me an
8  orientation to the, in particular the legal
9  matters that were outstanding and the functions of
10  his area of responsibility.
11      Q.    Was there anyone else in attendance at
12  that meeting?
13      A.    He would, um, as I recall, he would
14  call in the paralegal, or referred to her or asked
15  her questions periodically on an ad hoc basis, but
16  she didn't actually participate in the meeting.
17      Q.    Other than that meeting did you have
18  any interactions with Mr. Nail prior to the
19  closing date of the acquisition?
20      A.    I don't believe we had any other
21  personal meetings. I'm sure we had phone
22  conversations and -- but I don't know what -- I
23  don't have any specific recollection.
24      Q.    Was it regarding similar type

Page 51

C. Freeman

1  transitional matters regarding litigation and what
2  not?
3      A.    I don't recall specifically.
4      Q.    Prior to the closing date of the
5  acquisition were you involved in any discussions
6  regarding what would happen to Mr. Nail and the
7  other incumbent PPI executives after the
8  acquisition closed?
9      A.    Mr. Nail asked me about it on --
10  Mr. Nail asked me about it and I indicated to him
11  that I could not give him an answer.
12      Q.    Was that during the all-day meeting
13  you described?
14      A.    That was, yeah, he did ask about it
15  during that meeting.
16      Q.    What did he ask?
17      A.    He asked about his status.
18      Q.    Whether he would continue to be
19  employed after the acquisition?
20      A.    Um, yes. He asked it in a very -- my
21  recollection is he asked about it in a somewhat
22  roundabout way, but what I inferred from what he
23  was asking was that.
24      Q.    What did you respond?

Page 52

C. Freeman

1      A.    I told him I couldn't answer the
2  question.
3      Q.    Did you know at the time or you
4  couldn't answer it for -- or you weren't permitted
5  to answer it?
6      A.    At that time I don't know whether his
7  specific status had been a hundred percent
8  confirmed.
9      Q.    Other than that discussion with
10  Mr. Nail were you involved in any internal
11  discussions with anyone at Cedar Fair regarding
12  who would stay and who would go after the
13  acquisition?
14      A.    Yes.
15      Q.    Who were those discussions with?
16      A.    Dick Kinzel.
17      Q.    Anyone else?
18      A.    I don't have specific recollection of
19  who would have been present.
20      Q.    Was that one discussion or more than
21  one discussion?
22      A.    I'm sure it was more than one
23  discussion.
24      Q.    When were those discussions in

Page 53

C. Freeman

1  relation to the June 30th, 2006 closing date?
2      A.    I would say there were some before and
3  some after.
4      Q.    Focusing on the ones that took place
5  before the closing date, do you recall how soon
6  before the closing date those took place?
7      A.    No.
8      Q.    Do you recall what was discussed in
9  the discussions before the closing date regarding
10  who would stay and who would go?
11      A.    Not specifically, no.
12      Q.    Were any decisions made?
13      A.    Yes.
14      Q.    What decisions were made?
15      A.    A decision was made to put the, um,
16  put certain members of the senior executive team
17  on administrative leave effective as of the
18  closing date.
19      Q.    Certain members of PPI's executive
20  team.
21      A.    Yes.
22      Q.    Which members?
23      A.    If I tried to come up with a list I'd
24  miss somebody, but...

25      Q.    Was it regarding similar type

25      Q.    What did you respond?

25      A.    When were those discussions in

25      A.    miss somebody, but...

Page 54

C. Freeman

1
2    Q.    Well, give me who you remember with
3  the understanding that it may not be complete.
4    A.    OK.  Mr. Weber.
5    Q.    Al Weber?
6    A.    Al Weber.
7    Q.    What was his position at PPI?
8    A.    CEO.
9          Tim Fisher.
10   Q.    What was his position?
11   A.    I don't recall what his exact title
12 was.
13         Mike Koontz, CFO.
14         David Thornton.
15         Brett Petit or Petit, P-e-t-i-t.
16   Q.    I'm sorry, do you know what position
17 Mr. Thornton was?
18   A.    I don't recall his exact title.
19   Q.    Do you recall it generally?
20   A.    He was a vice president involved in
21 some creative or design capacity.
22   Q.    What about Mr. Petit or Petite?
23   A.    Vice president marketing.
24   Q.    Anyone else?
25   A.    Pat Jones.

Page 55

C. Freeman

1
2    Q.    Position?
3    A.    Vice president resale.
4          Dale Kaetzel.
5    Q.    What was his position?
6    A.    He was the general manager at Canada's
7  Wonderland.
8          I think Bob White might have been part
9  of that group.  He was the general manager at
10 Carowinds.
11         That's all I'm recalling, and even
12 that group I'm -- I'm -- the date, there might be
13 a couple of days, a few days of, you know, where
14 something happened on June 30th and others
15 happened a few days later.
16   Q.    So prior to the June 30th closing date
17 you had discussions with Mr. Kinzel in which it
18 was decided that the individuals that you just
19 listed and possibly others would no longer
20 continue to be employed after the acquisition?
21         MS. KIRILA:  Objection.  Misstates his
22    testimony.  You can answer.
23   A.    We discussed putting them on
24 administrative leave.
25   Q.    What does that mean?

Page 56

C. Freeman

1
2    A.    That means that they would be relieved
3  of their duties during the administrative leave
4  period and continue to be employed.
5    Q.    Did all of those people have
6  employment contracts with PPI?
7    A.    Yes.
8          MS. KIRILA:  Restroom break when you
9    get to a convenient point?
10         MR. PAPPAS:  Now is good.
11         MS. KIRILA:  Five minutes?
12         MR. PAPPAS:  Sure.
13         (A recess was taken from 10:22 to
14   10:31 a.m.)
15 BY MR. PAPPAS:
16   Q.    In your discussions with Mr. Kinzel
17 regarding the individuals that you just testified
18 about being placed on administrative leave, as you
19 put it, who made the decision to select those
20 individuals?
21   A.    The final decision was Mr. Kinzel's.
22   Q.    Did you have, give him any input into
23 that final decision?
24   A.    With respect to the area that I -- oh,
25 OK.  Not with respect to those individuals.

Page 57

C. Freeman

1
2    Q.    Do you know if anyone else had given
3  him input as to those individuals?
4    A.    I don't have specific knowledge.
5    Q.    But it was only you and Mr. Kinzel
6  involved in those discussions regarding selecting
7  those individuals for administrative leave; is
8  that correct?
9    A.    I can't tell you.  I -- there may have
10 been other people involved in the discussions, but
11 I don't recall specifically who.
12   Q.    Was there anyone else present when you
13 and Mr. Kinzel were having those discussions?
14   A.    I don't recall.
15   Q.    Were those discussions on the phone or
16 in person?
17   A.    I don't recall.
18   Q.    In your discussions with Mr. Kinzel
19 prior to the closing date of the acquisition did
20 you and he have occasion to discuss Lester Nail?
21   A.    Can you repeat the question?
22   Q.    Sure, in your discussions with
23 Mr. Kinzel prior to the closing date of the
24 acquisition did you and he have occasion to
25 discuss Mr. Nail?

15 (Pages 54 to 57)

Page 58

C. Freeman

1          C. Freeman
2     A.   Yes.
3     Q.   What was discussed about Mr. Nail?
4     A.   What role he might play
5  postacquisition.
6     Q.   What was discussed about that?
7     A.   Whether given the transitional needs
8  of the business and the issues that were on our
9  plate from legal and human resources standpoint,
10 to what extent we'd be utilizing Mr. Nail's
11 services.
12    Q.   Were any conclusions reached as to
13 what to do with Mr. Nail after the acquisition?
14    A.   After the acquisition?
15    Q.   What to do with him after the
16 acquisition.
17    A.   In these discussions prior to the
18 closing?
19    Q.   Correct.
20    A.   We were not completely sure, which
21 is -- we just weren't completely sure.
22    Q.   Was it your understanding that
23 Mr. Kinzel was considering keeping Mr. Nail on
24 permanently or was it just a matter of when he
25 would ultimately be relieved of his duties?

Page 59

C. Freeman

1          C. Freeman
2          MS. KIRILA:  Object to form.  You can
3     answer.
4     A.   We were -- we were not sure to what
5  extent the outstanding issues and matters would
6  require Mr. Nail's personal attention and for what
7  length of time.
8     Q.   So were any decisions made about
9  Mr. Nail's status prior to the closing date?
10    A.   A decision was made not to include him
11 in the group that was placed on administrative
12 leave.
13    Q.   Then no decision was made as to what
14 would ultimately become of Mr. Nail.  At least no
15 decision was made prior to the closing date.
16    A.   Prior to the closing date I don't
17 recall a decision was made.
18    Q.   Do you know the reasons why those
19 individuals you listed were selected to be placed
20 on administrative leave and relieved of their
21 duties?
22    A.   Because with the integration of the
23 organizations their functions became redundant and
24 so therefore at that time their services were not
25 required.

Page 60

C. Freeman

1          C. Freeman
2     Q.   How do you know that that was the
3  reason?
4     A.   I am looking at the organization that
5  was in place to support the company
6  postacquisition and in looking at the positions
7  that they held, that's my conclusion.
8     Q.   Is that based on any discussions you
9  had with Mr. Kinzel or anyone else or is that
10 simply your conclusion?
11    A.   It's my conclusion.
12    Q.   Did Mr. Kinzel say or give you his
13 reasoning for selecting those individuals?
14    A.   Not that I recall.
15         (Mr. Nail joined the deposition.)
16    Q.   Did you take any notes during your
17 discussions with Mr. Kinzel prior to closing about
18 who would stay and who would go?
19    A.   Not that I recall.
20    Q.   Did he take any notes?
21    A.   Not that I recall.
22    Q.   Are you aware of anything in writing
23 discussing or memorializing those meetings and
24 discussions?
25    A.   Not that I recall.

Page 61

C. Freeman

1          C. Freeman
2     Q.   Did you have any discussions with
3  anyone other than Mr. Kinzel prior to the closing
4  date about which PPI executives would stay and
5  which would go?
6     A.   Not that I recall.
7     Q.   Prior to the closing date of the
8  acquisition did you discuss Mr. Nail with anyone
9  at PPI?
10    A.   Not that I recall.
11    Q.   What about anyone at CBS?
12    A.   Not that I recall.
13    Q.   Prior to the closing date did you
14 discuss Mr. Nail with anyone at Cedar Fair other
15 than Mr. Kinzel?
16    A.   Not that I recall.
17    Q.   Do you recall anything else in your
18 discussions with Mr. Kinzel preclosing that you
19 discussed with him about Mr. Nail?
20    A.   No.
21    Q.   Do you know Mr. Nail's position at PPI
22 prior to the acquisition?
23    A.   General counsel.
24    Q.   And prior to the closing date were you
25 aware that Mr. Nail and other PPI executives had

16 (Pages 58 to 61)

Page 62

C. Freeman

1    C. Freeman
2  employment agreements with PPI?
3     A.    Yes.
4     Q.    How were you aware of that?
5     A.    Through the due diligence process.
6     Q.    Those were provided to you by CBS?
7     A.    Yes.
8     Q.    Did you personally see Mr. Nail's
9  employment agreement prior to the closing?
10    A.    Yes.
11    Q.    When was the first time you saw it?
12    A.    I don't know the specific date.
13    Q.    Did you see all of the executive
14 employment agreements with PPI?
15    A.    I saw several.  I don't know whether
16 there were any I didn't see, but I -- I know I saw
17 several.
18    Q.    Were they all the same agreement or
19 were there variations?
20    A.    There were variations.
21    Q.    Did anyone else have the same type of
22 agreement as Mr. Nail?
23    A.    Yes.
24    Q.    Who?
25    A.    As I recall, Mr. Rankin, Mr. Thornton,

Page 63

1    C. Freeman
2  Ms. Jones, Mr. Zimmerman.
3         Those are the ones I recall.
4     Q.    Were any PPI executives permanently
5  retained as employees after the acquisition?
6     A.    None of us are permanent.
7     Q.    With the intention of continuing their
8  employment indefinitely as opposed to a finite
9  ending date.
10    A.    OK, you're going to have to restate
11 that question.  I'm lost.
12    Q.    Were any of the PPI executives -- was
13 a decision made to retain any of the PPI
14 executives in the employ of PPI after the
15 acquisition?
16    A.    Those that were on employment
17 agreements specifically?
18    Q.    Any PPI executives.
19    A.    How would you define an executive?
20    Q.    Well, let's start stick with the ones
21 who had employment agreements then.
22    A.    Yes.
23    Q.    Which ones?
24    A.    Mr. Zimmerman was retained.
25    Q.    What was his position pre- and

Page 64

C. Freeman

1    C. Freeman
2  postacquisition?
3     A.    He was executive vice president
4  general manager of Kings Dominion.
5     Q.    Anyone else?
6     A.    Mr. Ross was retained.
7     Q.    What was his position pre- and
8  postacquisition?
9     A.    Well, immediately prior to the
10 acquisition he was -- he was like on a special
11 assignment.  He was an executive vice president of
12 the company.  Postacquisition he was the vice
13 president of marketing for King's Island.
14    Q.    Anyone else?
15    A.    Mr. Rankin was retained.
16    Q.    What was his position pre- and
17 postacquisition?
18    A.    He was the vice president and general
19 manager of the Great America Park.
20    Q.    Anyone else?
21    A.    When you say retained, as of what
22 date?
23    Q.    After June 30th, 2006.
24    A.    Mr. Nail was retained.  Actually, as I
25 indicated, as of June 30th everybody was retained

Page 65

1    C. Freeman
2  because they were -- the, um, termination without
3  cause provisions of their employment agreements
4  had not yet been triggered.
5     Q.    When I say retained, I mean who was
6  retained for the purpose of remaining actively
7  employed and performing their duties?
8     A.    OK.  I believe the list I just gave
9  you, I believe that is a complete list.
10    Q.    Were any of the executives with
11 contracts who were employed at the PPI
12 headquarters in Charlotte retained other than
13 Mr. Nail?
14    A.    No.
15    Q.    Were you involved in any discussions
16 about whether the employment agreements of
17 Mr. Nail and the other PPI executives would remain
18 in effect after the acquisition?
19    A.    Yes.
20    Q.    Who were those discussions with?
21    A.    Mr. Kinzel.
22    Q.    What was discussed?
23    A.    What was discussed was I was given
24 direction that we were to honor the employment
25 agreements that were in place.

17 (Pages 62 to 65)

C. Freeman
1
2    Q.    Mr. Kinzel directed you to do that,
3 correct?
4    A.    Yes.
5    Q.    What did you understand him to mean by
6 honor the agreements?
7    A.    That we were to, um, abide by the
8 terms and conditions of those agreements.
9    Q.    Prior to the closing date did you have
10 any discussions with anyone at PPI or CBS
11 regarding Mr. Nail's employment agreement
12 specifically?
13    A.    No.
14    Q.    Did you have any discussions prior to
15 closing with anyone at Cedar Fair regarding
16 Mr. Nail's agreement specifically?
17    A.    No.
18    Q.    Was anyone present in your meeting or
19 discussion with Mr. Kinzel when he said honor the
20 agreements?
21    A.    I don't have specific recollection of
22 who may or may not have been present.
23    Q.    Was there anything that you know of in
24 writing regarding that meeting?
25    A.    Not that I know of.

C. Freeman
1
2    Q.    In 2006 was it Cedar Fair's practice
3 to have written employment contracts with its
4 higher level executives?
5    A.    To the best of my recollection in 2006
6 we, um, the only employee under contract was
7 Mr. Kinzel.
8    Q.    Did you have a written employment
9 contract?
10    A.    Me personally?
11    Q.    Yes.
12    A.    No.
13    Q.    Were you aware of anyone other than
14 Mr. Kinzel who had one?
15    A.    Not at that time.
16    Q.    Subsequently did it become Cedar
17 Fair's practice to have written contracts?
18    A.    Yes.
19    Q.    When did that occur?
20    A.    I don't know exactly.  I don't recall
21 exactly.
22    Q.    Were you involved in that change of
23 practice?
24    A.    No.
25    Q.    Do you know the reason for it?

C. Freeman
1
2    A.    No.
3    Q.    Had you discussed it with anyone?
4    A.    No.
5    Q.    Did you get a contract yourself?
6    A.    No.
7    Q.    Do you know of anybody who did?
8    A.    Yes.
9    Q.    Who?
10    A.    They're disclosed in the, um, public
11 filings.
12    Q.    Do you know if those contracts contain
13 any restrictions on postemployment activities?
14    A.    I don't know.
15    Q.    Who made the decision to retain
16 Mr. Nail after the closing date?
17    A.    That would have been based on a
18 discussion I would have had with Mr. Kinzel.
19    Q.    So did he make the decision or did
20 you?
21    A.    I made the recommendation.  He
22 approved it.
23    Q.    When did that discussion take place?
24    A.    I don't know specifically.  It would
25 have been at or around the closing date.

C. Freeman
1
2    Q.    Was it after the closing date?
3    A.    I doubt it.
4    Q.    Do you recall what specifically was
5 discussed?
6    A.    No.
7    Q.    Did you discuss the reasoning for your
8 recommendation with Mr. Kinzel?
9    A.    My recommendation was based on the
10 outstanding matters that we had to deal with that
11 needed further attention.
12    Q.    Legal matters?
13    A.    Legal and human resource matters.
14    Q.    And legal matters were ongoing
15 lawsuits and what not involving the company?
16    A.    Right.
17    Q.    And HR matters were letting go the
18 remaining people in the Charlotte office?
19       MS. KIRILA:  Objection.
20    A.    Restructuring.
21    Q.    Restructuring?
22    A.    Yes.
23    Q.    What did the restructuring entail?
24       MS. KIRILA:  I am just going to object
25 to the extent that you had discussions with

Page 70

C. Freeman

1
2       Mr. Nail in his capacity as general counsel
3       about that, but you can testify generally.
4       A.    Generally we were looking at the
5   organization structure and which positions would
6   be retained and which positions would not and how
7   the organization would be structured
8   postacquisition.
9       Q.    Did Mr. Kinzel offer any view of your
10  recommendation or did he just say, OK?
11      A.    I don't recall any specific, um,
12  reaction.
13      Q.    Did he question you about it?
14      A.    I don't recall.
15      Q.    Did you tell him what your reasoning
16  was for the recommendation?
17      A.    I'm sure I did.
18      Q.    Did your recommendation -- was your
19  recommendation to retain him until such time as
20  the outstanding matters were resolved or to retain
21  him on an ongoing longer basis?
22      A.    My recommendation was to retain
23  Mr. Nail until we could ascertain with greater
24  certainty what the ongoing needs would be.
25      Q.    So you weren't sure?

Page 71

C. Freeman

1
2       A.    Not a hundred percent, no.
3       Q.    But it was not likely in your view at
4   the time that he would remain actively employed
5   for the remainder of his employment contract term,
6   was it?
7           MS. KIRILA:  Object to form.  Go
8   ahead.
9       A.    I'm sorry.  Could you ask the question
10  again?
11      Q.    Sure.  At the time was it your view
12  that Mr. Nail would continue to be actively
13  employed for the remainder of this employment
14  contract term?
15      A.    Probably not.
16      Q.    Did you have any ballpark estimate of
17  how long it would take for the outstanding matters
18  to be resolved and Mr. Nail could be placed on
19  administrative leave, as you called it, along with
20  the rest of the individuals you listed?
21      A.    Not at that time.
22      Q.    So Mr. Kinzel did not -- strike that.
23  Who communicated to the individuals you listed
24  earlier, Mr. Al Weber, Fisher, Koontz, Thornton,
25  Petit, Jones, Kaetzel and White?  Who communicated

Page 72

C. Freeman

1
2   to them the decision that they would be relieved
3   of their duties effective the closing date?
4       A.    Mr. Kinzel called Mr. Weber and
5   informed him.
6       Q.    Were you present?
7       A.    Yes.
8       Q.    What did you hear him say to
9   Mr. Weber?
10      A.    He told Mr. Weber that effective
11  immediately that those employees would be placed
12  on administrative leave.
13      Q.    Did he use those words?
14      A.    I believe he did.  That's my
15  recollection.
16      Q.    He didn't tell Mr. Weber effective
17  immediately those individuals' employment was
18  terminated without cause?
19      A.    He did not use those words.
20      Q.    Was Mr. Weber on speakerphone?
21      A.    As I recall, yes.
22      Q.    And what did he respond to that?
23      A.    Basically in the affirmative, that he
24  would -- he would take care of it.
25      Q.    He would take care of informing those

Page 73

C. Freeman

1
2   individuals?
3       A.    Yes.
4       Q.    Anything else?
5       A.    Not that I recall.
6       Q.    Did Mr. Kinzel inform Mr. Weber that
7   Mr. Weber himself was also being immediately
8   placed on administrative leave?
9       A.    I believe so.
10      Q.    What was Mr. Weber's reaction to that?
11      A.    He was professional and...
12      Q.    Was there any discussion regarding
13  whether Mr. Weber and the other individuals
14  continued to be paid under their contracts?
15      A.    I don't recall whether that was part
16  of that conversation.
17      Q.    Do you recall anything else about that
18  conversation?
19      A.    It was pretty brief.
20      Q.    Did you have any conversations with
21  Mr. Kinzel immediately before or after that call
22  to Mr. Weber?
23      A.    Just preparing for the call and --
24      Q.    What was said?
25      A.    I don't recall.

19 (Pages 70 to 73)

Page 74

C. Freeman

1              C. Freeman
2      Q.    Did Mr. Weber and those other
3  individuals receive anything in writing regarding
4  their status?
5      A.    With respect to the administrative
6  leave?
7      Q.    Correct.
8      A.    Not that I recall.
9      Q.    So they weren't sent letters that said
10  effective on such and such a date this will
11  happen?
12     A.    Not that I recall.
13     Q.    They weren't provided any written
14  notice of what was going to happen?
15         MS. KIRILA:  Objection.
16     A.    With respect to the administrative
17  leave?
18     Q.    Correct.
19     A.    Not that I recall.
20     Q.    Do you know who would know whether
21  they received such notice, written notice?
22     A.    Well, that notice probably would have
23  come out of my office.
24     Q.    Would someone else in your office have
25  access to that information?

Page 75

1              C. Freeman
2      A.    Yes, if I directed them to try and
3  find it.
4      Q.    Would you be able to check or have
5  someone check to see if those individuals were
6  given written notice of administrative leave?
7  Yes?
8      A.    Yes.
9      Q.    Who informed Mr. Nail that he was
10  going to be retained after the closing date?
11     A.    I don't recall.
12     Q.    Did you?
13     A.    I may have.  I don't recall a
14  conversation.
15     Q.    Did you tell Mr. Nail that Mr. Kinzel
16  had personally picked Mr. Nail as the one person
17  to remain at the headquarters in Charlotte?
18     A.    I don't recall saying that.
19     Q.    You don't recall one way or the other?
20     A.    I don't recall one way or the other.
21         MR. PAPPAS:  Mark this as Defendant's
22  Exhibit A.
23         (Defendant's Exhibit A, memorandum
24  dated June 30, 2006, re:  "The Sale of
25  Paramount Parks, Inc. to Cedar Fair, L.P."

Page 76

C. Freeman

1  marked for identification, this date.)
2      Q.    I show you what has been marked as
3  Defendant's Exhibit A.  Have you ever seen that
4  before?
5      A.    Yes.
6      Q.    What is it?
7      A.    It's a memo that CBS sent to the PPI
8  employees concurrent with the sale of Paramount
9  Parks to Cedar Fair.
10     Q.    Did you have any input into this
11  document?
12     A.    There was some communication between
13  our counsel and CBS regarding this document and I
14  don't know what level of input our counsel had
15  with respect to this document.
16     Q.    I was asking if you personally had any
17  input into it.
18     A.    Oh, me personally, OK.  I don't recall
19  having any input into this document.
20     Q.    If you look under the section entitled
21  "Employment" on the first page, it states that
22  "all active employees of Paramount Parks will
23  remain employees of Paramount Parks, and/or its
24  subsidiaries, i.e., your employer will not change

Page 77

1              C. Freeman
2  as a result of the transaction."
3         Do you see that?
4      A.    Yes.
5      Q.    Is that accurate?
6      A.    Yes.
7         MS. KIRILA:  I am just going to object
8  to the extent that you're asking him for
9  information on a document that he was not
10  the author of.
11        But you can testify as to your
12  understanding as to what happened.
13     Q.    Is that what happened, all active
14  employees of PPI remained employees of PPI and
15  their employer did not change as a result of the
16  transaction?
17     A.    That is correct.
18     Q.    As you stated earlier, Mr. Nail's
19  employment contract with PPI remained in full
20  effect after PPI was acquired by Cedar Fair,
21  correct?
22     A.    Yes.
23     Q.    To your knowledge was Mr. Nail given
24  any severance benefits from PPI or Cedar Fair?
25        MS. KIRILA:  Just object to the extent

20 (Pages 74 to 77)

Page 78

1                    C. Freeman
2       it calls for a legal conclusion under his
3       contract, but you can answer as to your
4       understanding.
5       Q.    Was he given any payments denominated
6    severance pay or separation pay?
7       A.    No, not to my knowledge.
8          MR. PAPPAS:  Mark this as B.
9          (Defendant's Exhibit B, document
10         purported to be Lester Nails' employment
11         contract with PPI, Bates Nos. LES00038
12         through 45, marked for identification, this
13         date.)
14      Q.    I show you what has been marked as
15   Defendant's Exhibit B.  And this is Mr. Nail's
16   employment contract with PPI, correct?
17      A.    It appears to be.
18      Q.    This is the contract that was in
19   effect at the time of PPI's sale to Cedar Fair,
20   right?
21      A.    Yes.
22      Q.    And this is the contract that remained
23   in effect after that sale, correct?
24      A.    Yes.
25      Q.    According to this document Mr. Nail

Page 79

1                    C. Freeman
2    was employed by PPI as senior vice president
3    general counsel.
4          Do you see that?
5       A.    Yes.
6       Q.    Is that consistent with your
7    understanding of the position that he actually
8    held at PPI?
9       A.    Yes.
10      Q.    Do you know what Mr. Nail's duties as
11   senior vice president general counsel at PPI were
12   prior to the sale?
13      A.    Generally.
14      Q.    How did you know?
15      A.    From meetings with Mr. Nail.
16      Q.    What was your understanding of his
17   duties and responsibilities?
18      A.    He was responsible for administering
19   the legal function for PPI.
20      Q.    What does that entail?
21      A.    Contracts, litigation, employment
22   matters, various legal matters relating to the
23   company.
24      Q.    Based on your own experience do you
25   have any knowledge generally about what a

Page 80

1                    C. Freeman
2    corporation's general counsel does?
3       A.    Generally.
4       Q.    And were Mr. Nail's duties as general
5    counsel of PPI consistent with your own general
6    understanding of what a general counsel does?
7       A.    As a subsidiary of a larger publicly
8    traded company, there would -- I don't believe
9    there would have been the SEC, you know, issues
10   involved in the position and perhaps some of the
11   corporate governance, so forth, that a general
12   counsel for a publicly traded entity would have.
13      Q.    Any other differences?
14      A.    Not that come to mind.
15      Q.    When Cedar Fair acquired PPI on
16   June 30, 2006, were any of the incumbent PPI
17   executives who had employment contracts
18   discharged?
19      A.    On June 30th?
20      Q.    After, on or after June 30th.
21      A.    On or after June 30th.  Yes,
22   subsequently the termination without cause
23   provisions of those employment agreements for
24   several of the executives were triggered.
25      Q.    Who were they triggered for and when?

Page 81

1                    C. Freeman
2       A.    Mr. Weber, Mr. Fisher, Mr. Koontz,
3    Ms. Jones, Mr. Kaetzel, Mr. White, Mr. Petit,
4    and --
5       Q.    Mr. Thornton?
6       A.    Mr. Thornton.  And Mr. Nail.
7       Q.    Other than Mr. Nail those were the
8    same individuals that you earlier testified were
9    placed on administrative leave after the closing
10   date, correct?
11      A.    Yes.
12      Q.    When was their status changed from
13   administrative leave to termination without cause?
14      A.    They were sent a letter in late July.
15      Q.    Late July of 2006, correct?
16      A.    Yes.
17      Q.    Do you still have copies of those?
18      A.    Yes.
19      Q.    Do you remember what they said?
20      A.    They were drafted by counsel to comply
21   with the terms of the individual employment
22   agreements.
23      Q.    I am just asking if you remember what
24   they said.
25          MS. KIRILA:  I am just going to object

Page 82

C. Freeman

1    to the extent that you need to refer to a
2    document that's the best evidence.  You can
3    testify as to your general memory.
4        A.    My general recollection is that we
5    were notifying them that effective, I believe it
6    was August 1st, that their services were no longer
7    required and we would be triggering the
8    termination without cause provision of their
9    employment agreement and that their employment
10   agreements would remain intact and their
11   obligations continued.
12       Q.    In between June 20, 2006, and the time
13   these individuals were notified by letter that
14   they were being terminated without cause, did any
15   of them perform any services for PPI or Cedar
16   Fair?
17       A.    Other than Mr. Nail, I'm not aware of
18   any.
19       Q.    Were any of them asked to perform
20   services for PPI or Cedar Fair during that period?
21       A.    Other than Mr. Nail, no, I don't know.
22       Q.    You don't know?
23            Do you know who decided to terminate
24   those individuals without cause?
25

Page 83

C. Freeman

1        A.    That would have been Mr. Kinzel.
2        Q.    Do you know why he decided to do that
3    at that time?
4        A.    I'm trying to recall a specific
5    conversation or discussion and rational reasoning.
6    I just don't recall specifics.
7        Q.    But you did have discussions with him
8    about that, correct?
9        A.    I'm sure I did.
10       Q.    But you don't recall anything that was
11   discussed in those conversations?
12       A.    Not specifically.
13       Q.    Generally?
14       A.    Generally it was to proceed with the
15   termination without cause, under the employment
16   agreements that we would continue to honor those
17   agreements as I indicated previously.
18       Q.    Anything else?
19       A.    Not specifically, no.
20       Q.    Do you have any idea why it was
21   decided at that time to convert these individuals
22   from administrative leave to termination without
23   cause?  In other words, why that?
24       A.    You've asked for my general
25

Page 84

C. Freeman

1    recollection and impression and it would be that,
2    you know, the closing date had occurred.  The dust
3    had settled a little bit and it was time to move
4    on and basically bring it to closure and we had
5    made the, a lot of the restructuring decisions and
6    we were comfortable that at that time we did not
7    require the services of those individuals.
8        Q.    As you've already testified, Mr. Nail
9    was asked to stay on for a period of time after
10   the closing date, correct?
11       A.    Yes.
12       Q.    And that final decision was made by
13   Mr. Kinzel upon your recommendation according to
14   your testimony, right?
15       A.    To retain him?
16       Q.    Yes.
17       A.    Yes.
18       Q.    Didn't you tell Mr. Nail that
19   Mr. Kinzel had personally picked Mr. Nail to stay
20   and help close the corporate office?
21            MS. KIRILA:  Objection.  Asked and
22       answered.
23            MR. PAPPAS:  I apologize if I already
24       asked it.
25

Page 85

C. Freeman

1            MS. KIRILA:  You can answer again.
2        A.    My recollection is that since Mr. Nail
3    was going to be the only remaining senior
4    executive on staff and on the ground in Charlotte,
5    that he was going to be designated, if you will,
6    as the in-charge person and that yes, Mr. Kinzel
7    did direct that.
8        Q.    Did you tell Mr. Nail that all of the
9    other incumbent PPI officers had been sent home?
10       A.    I have a vague recollection of that
11   conversation.
12       Q.    Do you know who communicated to
13   Mr. Nail the fact that the company wanted him to
14   stay on for a period of time after the closing
15   date?
16       A.    That would have been -- I am sure that
17   might have been me.
18       Q.    Do you recall anything about that
19   discussion?
20       A.    No.
21       Q.    Do you recall when it took place?
22       A.    No.
23       Q.    Was it prior or subsequent to the
24   closing date?
25

22 (Pages 82 to 85)

Page 86

C. Freeman

1
2     A.    I don't recall.
3     Q.    Was it in person, on the phone or by
4   e-mail?
5     A.    My recollection is it would have been
6   a telephone conversation, but that's just my
7   recollection.
8     Q.    Do you recall generally anything that
9   either you or he said in that conversation?
10    A.    No.
11    Q.    But you know that you informed him
12  that the company wanted him to stay on for a
13  period of time to help close the corporate office,
14  correct?
15    A.    I'm sure I did.  To help close the
16  corporate office part of that, what you just said,
17  I'm not sure about, but I'm sure we had a
18  conversation about him staying on and assuming a
19  leadership role.
20    Q.    Was there any discussion in that
21  conversation about how long he was being asked to
22  stay on?
23    A.    I don't recall.
24    Q.    Was there any discussion about the
25  fact that although he was being asked to stay on

Page 87

C. Freeman

1
2   it would not be on a permanent basis?
3     A.    I don't recall.  I know that there
4   were several times where Mr. Nail asked me about
5   his status.
6     Q.    And what was your response?
7     A.    I couldn't -- I couldn't give him any
8   information.
9     Q.    You didn't know or you didn't --
10  didn't want to give him that information?
11    A.    It was a, um, as it was an evolving
12  situation wherein Mr. Nail's status was, as I
13  indicated previously, you know, it was
14  undetermined at one point and then by July 27th it
15  became determined as we sorted things out.
16       So, you know, there were points in
17  time where I didn't know.  There were points in
18  time where I knew, but I couldn't say.
19    Q.    At least in the initial conversation
20  you had with him where you informed him that he
21  was being asked to stay for a period of time, you
22  weren't sure at that point how long that would be.
23    A.    Right.
24    Q.    Approximately how long after the
25  closing date did Mr. Nail remain at PPI performing

Page 88

C. Freeman

1
2   work?
3     A.    Approximately, I guess until
4   approximately the 27th.
5     Q.    July 27th, 2006?
6     A.    Yes, that was the date of the letter.
7     Q.    Sorry, I just need a yes.  That was
8   July 27, 2006?
9     A.    You said approximately, so yes.
10    Q.    Do you know what work he was
11  performing during that time period?
12    A.    He was advising me with regard to some
13  employment matters with respect to the
14  restructuring and assisting me, ongoing -- he had
15  some involvement in some ongoing PPI legal
16  matters, some administrative duties with respect
17  to the corporate offices and the staff on location
18  there.
19    Q.    Anything else?
20    A.    That's all I recall.
21    Q.    Did Mr. Nail do everything that was
22  asked of him during that time period?
23    A.    Yes.
24    Q.    Did he ever refuse to perform any
25  services during that time period?

Page 89

C. Freeman

1
2     A.    No.
3     Q.    Did he finish all the work that he had
4   been asked to perform during the transition?
5     A.    The work that could be completed.
6     Q.    So everything he could complete he did
7   complete?
8     A.    To the best of my recollection.
9     Q.    As you started to testify about
10  before, there came a time when it was decided that
11  Mr. Nail's services were no longer needed,
12  correct?
13    A.    Yes.
14    Q.    When did that time come?
15    A.    Mid to late July.
16    Q.    Of 2006?
17    A.    Yes.
18    Q.    Who determined that Mr. Nail's
19  services were no longer needed?
20    A.    I did.
21    Q.    Did you communicate that conclusion to
22  anyone?
23    A.    Mr. Kinzel.
24    Q.    Anyone else?
25    A.    Not that I recall.

23 (Pages 86 to 89)

Page 90

C. Freeman

2    Q.    What was discussed with Mr. Kinzel
3 regarding that?
4    A.    I don't recall specific discussion
5 topics.
6    Q.    Do you recall what the general
7 exchange was between you and Mr. Kinzel regarding
8 that topic?
9    A.    Generally it was that we could absorb
10 or we would plan to absorb the PPI legal functions
11 into the corporate staff and at that time we would
12 not need Mr. Nail's services.
13    Q.    Did you say that to Mr. Kinzel or did
14 he say that to you?
15    A.    My recollection is I said that to
16 Mr. Kinzel.
17    Q.    And was he in agreement with that?
18    A.    Yes.
19    Q.    When you say that the company was
20 going to absorb PPI's legal function into
21 corporate staff, what does that mean?
22    A.    That the contracts, the litigation,
23 the responsibilities that Mr. Nail was responsible
24 for would be absorbed by my staff.  We -- even at
25 the time we were contemplating and made an offer

Page 91

C. Freeman

2 to the paralegal that reported to Mr. Nail to
3 relocate to Sandusky and become a part of my
4 staff.
5    Q.    To the extent that there was work that
6 needed to be performed by an attorney who would be
7 doing that?
8    A.    We would outsource.
9    Q.    Outside counsel?
10    A.    Yes.  Which was Cedar Fair's practice.
11    Q.    And Mr. Kinzel was on board with that
12 plan?
13    A.    Yes.
14    Q.    Do you recall anything specifically
15 that he said to you in that conversation?
16    A.    No.
17    Q.    Was there any discussion regarding
18 what would happen to Mr. Nail now that his
19 services were no longer needed?
20    A.    It was within the context of the
21 triggering of the termination without cause
22 provisions of all of the group of executives.
23    Q.    So it was discussed that along with
24 the other people you testified about before
25 Mr. Nail would also be terminated without cause

Page 92

C. Freeman

2 and receive one of those letters, correct?
3    A.    Correct.
4    Q.    Do you know who first communicated to
5 Mr. Nail that the company would no longer be
6 needing him to perform services?
7    A.    I'm sure it was me.
8    Q.    Do you remember when that was?
9    A.    No.
10    Q.    Sometime in July 2006 though, correct?
11    A.    On or about the date of that letter.
12    Q.    Do you remember anything about that
13 conversation?
14    A.    No.
15    Q.    Do you recall generally what was said?
16    A.    I don't know -- I don't even recall
17 the specific conversation.
18    Q.    Other than you know it took place.
19    A.    I mean, I -- I don't recall the
20 conversation.  I'm not saying it didn't take
21 place, but I just don't recall it.
22    Q.    Somebody informed Mr. Nail prior to
23 sending out the July 27th letter what his status
24 was, correct?
25        MS. KIRILA:  Objection.  Calls for

Page 93

C. Freeman

2 speculation.  You can testify.
3    Q.    Do you know?
4    A.    I don't know.
5    Q.    Is that something that you would have
6 done given your ongoing dealings with Mr. Nail?
7        MR. KIRILA:  Objection to form of the
8        question.  Done as in notifying him of
9        termination or before the letter?
10        If you break the question down, you
11        can answer.
12    Q.    Would verbally communicating with
13 Mr. Nail that his services would no longer be
14 needed be anything that you likely would have done
15 given your ongoing dealings with him?
16    A.    Yes.
17    Q.    And you're not aware that anybody else
18 did that?
19    A.    I am not.
20    Q.    Did you call Mr. Nail and tell him
21 Mr. Kinzel said he could go home?
22    A.    I don't remember that conversation
23 either.
24    Q.    You don't remember one way or the
25 other?

Greenhouse Reporting, Inc.                    (212)279-5108
(212) 279-5108

Page 94

C. Freeman

1
2  A.   I don't remember one way or the other.
3  Q.   Did you ever tell Mr. Nail either in
4  words or substance that you were just the
5  messenger and that Mr. Kinzel makes all of the
6  decisions?
7  A.   I don't recall one way or the other on
8  that one either.
9       MR. PAPPAS:  Take a short break.
10      (A recess was taken from 11:30 a.m. to
11      11:48 a.m.)
12      MR. PAPPAS:  Let's mark this as
13      Defendant's Exhibit C.
14      (Defendant's Exhibit C, letter from
15      Richard Kinzel to Lester Nail dated July 27,
16      2006, marked for identification, this date.)
17  BY MR. PAPPAS:
18  Q.   I show you what has been marked as
19  Defendant's Exhibit C, which is a letter from
20  Richard Kinzel to Mr. Nail dated July 27, 2006,
21  correct?
22  A.   Yes.
23  Q.   You have seen this before, right?
24  A.   Yes.
25  Q.   And is that Mr. Kinzel's signature at

Page 95

C. Freeman

1
2  the bottom?
3  A.   Yes.
4  Q.   Do you know who wrote this letter?
5  A.   Counsel.  Outside counsel.
6  Q.   Mr. Kinzel didn't write it.
7  A.   No.
8  Q.   Do you know if Mr. Kinzel reviewed
9  this letter before he signed it?
10 A.   I handed Mr. Kinzel a stack of these
11 and he signed them all at the same time.
12 Q.   Do you know if he reviewed it before
13 he signed it?
14 A.   I don't know if he reviewed this
15 specific letter.
16 Q.   Did he review drafts?
17 A.   No.
18 Q.   Do you know if he reviewed any of the
19 other letters that you handed him before he signed
20 those?
21 A.   My recollection is that he reviewed
22 them and he reviewed in general what I was handing
23 him.
24 Q.   Were all the letters the same as this
25 one?

Page 96

C. Freeman

1
2  A.   The letters were written specifically
3  to address specifically contracts, specific
4  contracts as we discussed earlier.  There were
5  different contract forms, so there may have been
6  some slight differences.
7  Q.   Do you know whether Mr. Kinzel knew
8  what this letter said before he signed it?
9       MS. KIRILA:  Objection.  Speculation.
10      If you can testify --
11 Q.   If you know.
12      MS. KIRILA:  -- based on your
13      observations.
14 A.   Generally, yes.
15 Q.   Did you discuss this letter with
16 Mr. Kinzel before it was sent out?
17 A.   Not in detail.
18 Q.   Did you discuss it generally?
19 A.   Within the context of sending out all
20 of the letters, yes.
21 Q.   What was discussed?
22 A.   That we were invoking the termination
23 without cause provisions of the employment
24 agreements for these contract employees that were
25 being terminated without cause.

Page 97

C. Freeman

1
2  Q.   Anything else?
3  A.   Not that I recall.
4  Q.   Did you discuss this letter with
5  anyone other than Mr. Kinzel before it was sent
6  out?
7  A.   Counsel, outside counsel.
8  Q.   Did you review this letter before it
9  was sent out?
10 A.   Yes.
11 Q.   And this letter was actually sent to
12 Mr. Nail, correct?
13 A.   Yes.
14      MR. PAPPAS:  Mark this as Exhibit D.
15      (Defendant's Exhibit D, one-page
16      document entitled "Personnel Action Request
17      Form," Bates Nos. PPI000014, marked for
18      identification, this date.)
19 Q.   I show you what has been marked as
20 Defendant's Exhibit D.
21      Do you recognize this?
22 A.   No.
23 Q.   Do you know what it is?
24 A.   I know what it says.  It's not a form
25 I'm familiar with.

25 (Pages 94 to 97)

Page 98

C. Freeman

1
2    Q.    Have you ever seen a form like this?
3    A.    Not to my recollection.
4    Q.    I will represent to you that this form
5    was produced by PPI in discovery and it appears to
6    be a personnel action request form, and even
7    though you haven't seen it before, I would just
8    like to ask you a couple of questions.
9         Do you know who filled this form out?
10   A.    It's signed by Sandy Cranford.
11   Q.    That's her signature where it says
12   "completed by"?
13   A.    As far as I know.
14   Q.    Under Section G, entitled Separation,
15   it states that Mr. Nail's date of termination was
16   August 1st, 2006, correct?
17   A.    Yes.
18        MS. KIRILA:  Objection.  The document
19   speaks for itself, but you can answer.
20   Q.    Yes?
21   A.    Yes.
22   Q.    Under termination code it looks like
23   it says either 102 or 10/2.
24        Do you see that?
25   A.    Yes.

Page 99

C. Freeman

1
2    Q.    Do you know what that means?
3    A.    No.
4    Q.    Is there a list of termination codes
5    at PPI?
6    A.    I don't know.
7    Q.    Is there a list of termination codes
8    at Cedar Fair?
9    A.    I know there are termination codes.  I
10   don't know whether they're corporate-wide or they
11   are park specific.
12   Q.    If there is a list of termination
13   codes at PPI would you be able to get ahold of a
14   copy of that?
15   A.    Yes.
16   Q.    Under rehire status, it does not state
17   that Mr. Nail was eligible for rehire, correct?
18        MS. KIRILA:  Just a continuing
19   objection.  The document speaks for itself.
20   Go ahead.
21   A.    It is silent on rehire status.
22   Q.    Who assumed Mr. Nail's job duties
23   after he was terminated without cause?
24        MS. KIRILA:  Objection.  Assumes facts
25   not in evidence.  You can answer.

Page 100

C. Freeman

1
2    A.    I did and my staff and I delegated to
3    outside counsel.
4    Q.    That's how the legal functions at PPI
5    were performed after Mr. Nail's termination at
6    least through 2007, correct?
7    A.    Yes.
8    Q.    Just to be clear, outside counsel is
9    the Squires Sanders firm.  Is that who you're
10   referring to?
11   A.    Not exclusively.
12   Q.    What other outside counsels were
13   there?
14   A.    Frantz Ward out of Cleveland.  That's
15   the only one I can think of.
16   Q.    Is it various law firms?
17   A.    Yes.  And another piece of the
18   responsibility was the litigation management on
19   general liability claims, and so forth.  That
20   portion of the duties and responsibilities was
21   assumed by our safety director.
22   Q.    Which was who?
23   A.    Kathy Hawkinson.
24   Q.    Did Cedar Fair have a general counsel
25   at the time it acquired PPI?

Page 101

C. Freeman

1
2    A.    No.
3    Q.    At the time Mr. Nail was terminated
4    without cause there were approximately 17 months
5    remaining on his employment contract, correct?  It
6    went until December 31, 2007?
7         I will just ask you.  The contract
8    term expired on December 31, 2007, correct?
9    A.    Yes.
10        MR. PAPPAS:  Mark this as Exhibit E.
11        (Defendant's Exhibit E, 2-page letter
12   from Craig Freeman to Lester Nail, August 9,
13   2006, Bates Nos. LES00016 and 17, marked for
14   identification, this date.)
15   Q.    I show you what has been marked as
16   Defendant's Exhibit E.  And this is a letter that
17   you sent to Mr. Nail on or about August 9, 2006,
18   correct?
19   A.    Yes.
20   Q.    Did you write this?
21   A.    I don't recall whether I drafted this
22   or it was drafted by counsel.
23   Q.    Either you or counsel drafted it?
24   A.    Yes.
25   Q.    Is this letter accurate?

26 (Pages 98 to 101)

Page 102

C. Freeman

1
2      A.    Generally, but I believe we were able
3    to extend coverage without -- without going to
4    COBRA.
5      Q.    You're referring to the second bullet
6    point?
7      A.    Yes.
8      Q.    Could you explain that?
9      A.    Well, in a typical termination
10   situation the employee is offered COBRA, which is
11   the -- are forget what the initials stand for
12   even.
13     Q.    That's OK.
14     A.    It's continuing benefits.  The
15   opportunity to purchase continuing benefits
16   coverage for 18 months after termination, and this
17   would have -- if we were -- if I recall correctly,
18   we were able to continue the coverage without --
19   without going to COBRA, which in essence extended
20   the opportunity for these employees to have the
21   COBRA benefit for up to 18 months after their
22   employment agreement expired.
23     Q.    And that was true not only for
24   Mr. Nail, but for the other individuals that you
25   listed before as being terminated without cause,

Page 103

C. Freeman

1
2    correct?
3      A.    Yes.
4      Q.    Other than that this is accurate?
5      A.    As far as I know.
6      Q.    Did Mr. Kinzel or Mr. Crage review
7    this letter before it went out?
8      A.    No.
9      Q.    Did you discuss it with either of
10   them?
11     A.    No.
12     Q.    Did you discuss it with anyone other
13   than counsel?
14     A.    I would have discussed it with Billy
15   Clark and Sandy Cranford.
16     Q.    Do you recall what was discussed about
17   that with them?
18     A.    Just the putting together and trying
19   our best to get it right.
20     Q.    Did Mr. Nail call you with any
21   questions after you sent him this letter?
22     A.    Not that I recall.
23     Q.    Did his wife?
24     A.    I've never spoken to Mr. Nail's wife.
25           MR. PAPPAS:  Mark this as Exhibit F.

Page 104

C. Freeman

1
2           (Defendant's Exhibit F, cover letter
3      from Craig Freeman to Lester Nail, dated
4      September 12, 2006, with attachment entitled
5      "Separation and Release Agreement," Bates
6      Nos. LES00021 through 29, marked for
7      identification, this date.)
8      Q.    I show you what has been marked as
9    Defendant's Exhibit F.  Have you ever seen this
10   before?
11     A.    Yes.
12     Q.    This is a letter and attachment you
13   sent to Mr. Nail on or about September 12, 2006,
14   correct?
15     A.    Yes.
16     Q.    Did you write this cover letter?
17     A.    I believe it was drafted by counsel.
18     Q.    You reviewed it though before you
19   signed it, right?
20     A.    Yes.
21     Q.    There's a bcc on the second page.  It
22   says Gordon Kaiser.
23           Do you see that?
24     A.    Yes.
25     Q.    Who is that?

Page 105

C. Freeman

1
2      A.    He is with Squire Sanders.
3      Q.    Do you know if either Mr. Kinzel or
4    Mr. Crage reviewed this letter and attachment
5    before it went out?
6      A.    Mr. Crage and Mr. Kinzel would not
7    have reviewed this letter.
8      Q.    How do you know that?
9      A.    It's not something that I would have
10   put in front of them.
11     Q.    Did you discuss the substance of it
12   with either of them?
13     A.    Yes.
14     Q.    Which one?  Or was it both?
15     A.    I know I would have reported to
16   Mr. Kinzel on it.  I don't know about Mr. Crage.
17     Q.    Do you recall what you discussed with
18   Mr. Kinzel about the letter?
19     A.    This was a settlement offer to buy out
20   the employment agreement.  And the discussion was
21   what was an appropriate amount to offer with
22   respect to or with -- compared to the, um, the
23   full payout of the employment agreement if it were
24   allowed to run full term.
25     Q.    What did you say and what did he say?

27 (Pages 102 to 105)

Page 106

C. Freeman

1       A.    Actually, Mr. Crage was involved in
2   the discussion and we, um, and I believe counsel
3   was involved in determining the appropriate
4   calculations to, you know, again determine what
5   was our liability if we went full term with the
6   agreements, what was an offer that was acceptable
7   to the company.
8       Q.    This was an offer that was made to
9   Mr. Nail only or to the other individuals who had
10  employment contracts?  Not the exact offer, but
11  this type of settlement.
12      A.    It was offered to others as well.
13      Q.    All of the other ones or to only
14  select?
15      A.    My recollection is it was offered to
16  all of them.
17      Q.    Did anyone take it?
18      A.    I'm sorry.  My recollection is that it
19  was offered to all of them who had a significant
20  amount of time left on their agreement.
21          No one took it.
22      Q.    What was the purpose of offering this
23  settlement deal?
24      A.    The purpose was to relieve the, both

Page 107

C. Freeman

1   parties to the employment agreements from further
2   responsibility and obligations and duties and, you
3   know, just bring it to closure.
4       Q.    What was the purpose of it from
5   Paramount Park's standpoint?  How did it benefit
6   PPI?
7       A.    It would have benefitted PPI by the
8   lump sum payment was less than what the payout
9   would have been over time.  So there would have
10  been some financial benefit to PPI.
11      Q.    So was it done strictly as a way to
12  potentially save costs?
13      A.    That was part of it.  The other part
14  of it was to save the administration of the
15  employment, the ongoing administration of the
16  employment agreements.
17      Q.    In other words, the continued payment
18  of compensation benefits and what not.
19      A.    Right.
20      Q.    Whose idea was it to make these
21  settlement proposals?
22          MS. KIRILA:  Objection.  I don't know
23      that you were finished with your answer, but
24      if you were.

Page 108

C. Freeman

1       Q.    I'm sorry.
2       A.    I was going to say and the associated
3   paperwork related to keeping track of it all.
4       Q.    Anything else?  No?
5       A.    Anything else?
6       Q.    Any other reasons how it would benefit
7   PPI?
8          MS. KIRILA:  Just an objection as to
9       Mr. Nail's situation or those with different
10      contracts might be different for purposes of
11      rationale, but --
12          MR. PAPPAS:  Mr. Nail.
13      A.    As far as I'm aware, that's it.
14      Q.    Whose idea was it to offer these
15  settlement proposals?
16      A.    I don't recall.
17      Q.    Were you involved in any discussions
18  in which whether to offer these settlements was
19  debated as opposed to what the appropriate amount
20  would be?
21      A.    Discussions related to, OK, you mean
22  whether or not to do it?
23      Q.    Correct.
24      A.    I would have been involved in the

Page 109

C. Freeman

1   discussions.  I don't recall that there was a
2   debate.
3       Q.    Who else was involved in those
4   discussions?
5       A.    Mr. Kinzel and Mr. Crage.
6       Q.    Do you recall what was discussed?
7       A.    For me to go back and develop
8   recommendations.
9       Q.    Recommendations regarding what?
10      A.    Regarding the settlement amounts.
11      Q.    Do you recall who first brought up the
12  topic of possibly offering these settlements?
13      A.    No, as I indicated before, I don't
14  recall.
15      Q.    Were you brought into those
16  discussions when a question had already been
17  presented so to speak?
18      A.    I don't know.
19      Q.    Do you recall anything that,
20  specifically that was discussed during the
21  discussions that you were involved in regarding
22  whether to offer these settlements?
23      A.    I don't recall anything specific, no.
24      Q.    Generally?

Page 110

C. Freeman

1   A.   Generally it was along the lines what
2 I said earlier, let's just bring the situation,
3 try to bring the situations to closure so
4 everybody can move on.
5   Q.   In this letter, the September 12,
6 2006, Exhibit F, refers to a noncompete provision
7 in paragraph 11 of Mr. Nail's PPI employment
8 contract, correct?
9   A.   Yes.
10   Q.   And you state here that PPI's
11 willingness to decrease its rights to enforce that
12 provision would be a considerable value to
13 Mr. Nail.
14      Do you see that?  Second to last
15 paragraph?
16      MS. KIRILA:  Just an objection to the
17      extent the letter speaks for itself, but you
18      can answer.
19      MR. PAPPAS:  I am just directing his
20      attention to that provision.
21      MS. KIRILA:  That's fine.
22   A.   Yes.
23   Q.   Do you know one way or the other
24 whether that noncompetition provision, paragraph

Page 111

C. Freeman

1 11 of the employment agreement, would be legally
2 enforceable?
3      MS. KIRILA:  Objection.  Calls for a
4      legal conclusion, but you can answer as to
5      your --
6   A.   I don't know.  I'm not an attorney.
7   Q.   Did you have any understanding or
8 feeling about that at the time you wrote this
9 letter?
10      MS. KIRILA:  I am just going to object
11      and instruct you not to disclose any
12      discussions with counsel in respect of that.
13   A.   I didn't draft the letter.  I was
14 relying on counsel's advice.
15   Q.   So you had no opinion one way or the
16 other as to whether that noncompete provision was
17 legally enforceable?
18      MS. KIRILA:  Objection.  Misstates his
19      testimony.
20   Q.   Did you at the time have any opinion
21 as to whether that noncompetition provision was
22 legally enforceable?
23   A.   My opinion would have been based on my
24 advice of counsel.

Page 112

C. Freeman

1   Q.   Other than that did you have any
2 independent opinion?
3   A.   No.
4   Q.   Do you have any understanding whether
5 an employer can enforce a noncompete provision
6 under New York law when an employee was terminated
7 without cause?
8      MS. KIRILA:  Same objection and
9      instruction, do not disclose anything you
10      learned from discussions or communications
11      with your counsel.
12   A.   I am not an attorney and I don't know
13 New York law.
14   Q.   Do you have any understanding as to
15 whether a noncompete provision can be enforced
16 against an attorney?
17      MS. KIRILA:  Same objection.
18   A.   Same response.  I do not.  I am not an
19 attorney and I don't know.
20   Q.   I am going to ask you to go back and
21 look at the employment agreement, which is Exhibit
22 B, I believe.  Turn to page 5.
23      Take a look at paragraph 11 where it
24 says:  Executive agrees that during the employment

Page 113

C. Freeman

1 term executive will not engage in any other
2 occupation or engage in a leisure, slash, theme
3 park, motion picture, television, or entertainment
4 business, except for Paramount pursuant to this
5 agreement.
6      Do you see that?
7   A.   Yes.
8   Q.   Do you contend that this provision
9 prohibited Mr. Nail from engaging in other
10 employment after his employment was terminated by
11 PPI?
12   A.   Yes.
13   Q.   And does that apply only to employment
14 with a competitor or any employment at all?
15   A.   Any employment at all.
16   Q.   So if he had gone to work as a cashier
17 at Home Depot that would violate the agreement?
18   A.   Yes.
19   Q.   If he mowed lawns and got paid for
20 doing that, that would violate the agreement?
21   A.   Yes.
22   Q.   What about if he did pro bono legal
23 work, would that violate the agreement?
24      MS. KIRILA:  Continuing objection as

Page 114

C. Freeman

1
2    to calling for a legal conclusion, but you
3    can testify as to your interpretation.
4        A.    OK, again, I'm not an attorney, but my
5    interpretation is an occupation is something
6    you're compensated for.  So pro bono you're not
7    compensated, so...
8        Q.    And that prohibition in paragraph 11
9    would last till December 31, 2007.  Was that your
10    understanding?
11        A.    By virtue of the reference to the
12    employment term, yes.
13        Q.    And since there's no geographical
14    limitation in paragraph 11 would this
15    noncompetition obligation apply anywhere in the
16    world?
17        MS. KIRILA:  Objection to the
18    characterization of it as a noncompetition
19    provision.
20        Q.    I will rephrase it.  Since there's no
21    geographic limitation in paragraph 11, the
22    obligations in paragraph 11 would apply anywhere
23    in the world.  Is that your understanding?
24        A.    That's my understanding.
25        Q.    Did you personally ever tell Mr. Nail

Page 115

C. Freeman

1
2    that he could not work for anyone anywhere in any
3    capacity for the remainder of the contract term?
4        A.    In conversation or in correspondence?
5        Q.    Either way.
6        A.    In correspondence through the letters
7    that were sent to him indicating that his
8    obligations under the employment agreement
9    continued.
10        Q.    Other than that.
11        A.    Other than that, no.
12        Q.    Do you know whether anyone at PPI or
13    Cedar Fair ever told Mr. Nail that?
14        A.    Please repeat the question?
15        Q.    Do you know whether anyone else at PPI
16    or Cedar Fair ever told Mr. Nail that he could not
17    work for anyone anywhere in any capacity for the
18    remainder of his contract term?
19        A.    I have no such knowledge.  I don't
20    know.
21        Q.    Can you identify any business interest
22    that PPI has in preventing Mr. Nail from working
23    for a noncompetitor after PPI terminated his
24    employment?
25        MS. KIRILA:  Objection.  Relevance.

Page 116

C. Freeman

1
2    You can answer.
3        A.    Please repeat the question?
4        Q.    Sure.  Can you identify any business
5    interests that PPI would have in preventing
6    Mr. Nail from working for a noncompetitor of PPI
7    after his employment was terminated?
8        A.    I guess I would say PPI would have a
9    business interest in preventing someone from
10    double dipping, yes.
11        Q.    What do you mean by that?
12        A.    Well, collecting under the employment
13    agreement while they were being paid for another
14    occupation in violation of the employment
15    agreement.
16        Q.    Is there any other business interest
17    that you can identify?
18        A.    No.
19        Q.    Did you ever get a response from
20    Mr. Nail after you sent him the settlement
21    proposal letter which is Exhibit F I believe?
22        A.    My recollection is that Mr. Nail
23    called me, yes.
24        Q.    How soon after the letter went out did
25    you get a call from him?

Page 117

C. Freeman

1
2        A.    I don't know specifically.  Fairly
3    soon.
4        Q.    Within a couple of weeks?
5        A.    That would be my recollection, but I
6    don't know specifically.
7        Q.    It was some time in 2006 though,
8    right?
9        A.    Yes.
10        Q.    What was discussed in that
11    conversation?
12        A.    My recollection of the conversation is
13    that Mr. Nail indicated the offer was not
14    acceptable to him, but his interpretation of the
15    offer was that it was opening discussions and, you
16    know, it was throwing something out there as a
17    starting point.
18        Q.    Did he say why it wasn't acceptable?
19        A.    It was too low.
20        Q.    The buyout amount lump sum payment was
21    too low?
22        A.    Yes.
23        Q.    Did he indicate that it was
24    unacceptable in any other way?
25        A.    I don't recall.  All I recall is him

Page 118

C. Freeman

1         C. Freeman
2  saying that the number was too low.
3      Q.   What was your response?
4      A.   I listened to him, I acknowledged his
5  position.  I think that's all I remember.
6      Q.   Did Mr. Nail propose a specific number
7  that he would be willing to accept?
8      A.   No.
9      Q.   Did you, after you spoke to Mr. Nail
10 did you speak with anyone at your employer about
11 your conversation?
12     A.   I'm sure I reported to Mr. Kinzel.  I
13 don't recall the specific conversation.
14     Q.   Do you recall anything generally about
15 the conversation?
16     A.   No.
17     Q.   You conveyed to him what was discussed
18 in your telephone conversation with Mr. Nail?
19     A.   Yes.
20     Q.   Do you recall how he responded,
21 Mr. Kinzel responded to that?
22     A.   The gist of my conversation was that,
23 um, I reported what, that Mr. Nail had contacted
24 me and the expectation was that Mr. Nail would be
25 coming back with some sort of a counterproposal.

Page 119

C. Freeman

1         C. Freeman
2  And so the gist of my conversation with Mr. Kinzel
3  was let's wait and see what he comes back with.
4      Q.   Did Mr. Nail tell you that he was
5  going to make a proposal or is that something that
6  you inferred from the conversation?
7      A.   I think it was inference.  Because
8  when he said it, you know, he assumed this was an
9  opening position or opening possibility or
10 whatever, I -- anyway, my thinking was OK, fine,
11 we made this move.  Now you need to make a move on
12 your side.
13     Q.   Were there any further discussions
14 with Mr. Nail about this proposal?
15     A.   Not that I recall.
16     Q.   So he didn't call back with a
17 counteroffer?
18     A.   Not that I recall.
19     Q.   And neither you or as far as you know
20 anyone at the company got back to him with a
21 different proposal?
22     A.   No.
23     Q.   Was that the last that you heard about
24 this proposal from Mr. Nail?
25     A.   As far as I recall.

Page 120

C. Freeman

1         C. Freeman
2      Q.   This letter, Exhibit F, that you
3  signed says that PPI would be willing to waive the
4  requirement that Mr. Nail be willing, ready and
5  able to render exclusive services as provided in
6  paragraph 7(c) of the employment agreement.
7           Do you see that?
8      A.   Yes.
9      Q.   Did you have any discussions with
10 anyone as to why PPI would be willing to waive
11 that?
12     A.   Yes.  It was part of the whole closure
13 issue in order to relieve both parties of further
14 responsibility.
15     Q.   Other than that?
16     A.   No.
17         MR. PAPPAS:  I just need to take a
18     one-minute break.
19         (A recess was taken from 12:25 to
20     12:27 p.m.)
21 BY MR. PAPPAS:
22     Q.   Did any of the other individuals who
23 were offered that settlement proposal call you
24 regarding negotiating?
25     A.   My recollection is we got a

Page 121

C. Freeman

1         C. Freeman
2  counterproposal from one individual which was not
3  even worth discussing.
4      Q.   One other person?
5      A.   Yes.
6      Q.   Other than that?
7      A.   I don't recall any others.
8         MR. PAPPAS:  Mark this as Exhibit G.
9         (Defendant's Exhibit G, complaint in
10     present action, marked for identification,
11     this date.)
12     Q.   I show you what has been marked as
13 Defendant's Exhibit G.  Do you recognize this?
14     A.   Yes.
15     Q.   This is the court complaint in this
16 action, correct?
17     A.   Yes.
18     Q.   Turn to paragraph 22, please.
19 Paragraph 22 alleges defendant never notified PPI
20 that he was eligible to receive health insurance
21 or other employee benefits from any other source.
22         Do you see that?
23     A.   Yes.
24     Q.   Do you believe that Mr. Nail breached
25 his PPI employment contract by failing to inform

31 (Pages 118 to 121)

C. Freeman

1
2  PPI that he was eligible to receive health
3  insurance or other employee benefits from another
4  source?
5      A.   I believe that this was tied to his
6  fraud and misrepresentation with regard to his
7  other employment.
8      Q.   Right now I am asking you specifically
9  about his employment agreement, whether him not
10 notifying PPI that he was eligible to receive
11 benefits from another source violated that
12 contract.
13         Do you know one way or the other?
14      MS. KIRILA:  Just an objection to the
15      extent it calls for a legal conclusion for a
16      determination to be made by the court, but
17      you can answer.
18      A.   Yes, I believe it violates his
19 contract.
20      Q.   Which provision does it violate?
21      MS. KIRILA:  The same continuing
22      objection, but you can answer.
23      A.   We're talking about employee benefits,
24 so therefore he would have had to have been
25 employed.  It violates paragraph 5.  It violates

C. Freeman

1
2  paragraph 11 and paragraph 7(c).
3      Q.   How does it violate paragraph 5?
4      A.   Paragraph 5 says:  Executive's
5  services shall be completely exclusive to
6  Paramount during the term hereof.
7      Q.   And that in your view means he was
8  required to notify PPI if he was even eligible to
9  receive employee benefits from another source?
10      A.   Yes.  In my opinion.
11      Q.   How does it violate paragraph 11?
12      A.   Paragraph 11 says:  Executive agrees
13 that during the employment term executive will not
14 engage in any other occupation.
15      Q.   In your view that means that he was
16 required to notify PPI if he was even eligible to
17 receive benefits from another source?
18      A.   Employee benefits, yes.
19      Q.   Any other provisions that you contend
20 he breached by not disclosing his eligibility for
21 benefits from another source?
22      A.   7(c), the ready, willing and able
23 language.
24      Q.   How did that violate 7(c)?
25      A.   If he's receiving other employee

C. Freeman

1
2  benefits, he is an employee of somewhere else and
3  therefore he is not ready, willing and able.
4      Q.   He didn't have to be an employee of
5  PPI to receive benefits from PPI, did he?
6      A.   There are certain benefits that
7  require you to be an active employee.
8      Q.   Well, 7(c) says, if executive is
9  terminated other than for cause, and I'm
10 paraphrasing, but tell me if I'm wrong.
11         If executive is terminated by
12 Paramount other than for cause, Paramount shall
13 continue all applicable plans and/or benefits for
14 the remainder of the employment term.
15         Isn't that what it says?
16      MS. KIRILA:  Just object to the extent
17      that the agreement speaks for itself.
18      A.   So long as the executive is willing,
19 ready and able to render exclusive services
20 hereunder.
21      Q.   Assuming that the person did remain
22 willing, ready and able, benefits would continue
23 even though they had been terminated without
24 cause, correct?
25      A.   (No response).

C. Freeman

1
2      Q.   So the agreement contemplated that the
3  company would continue to pay benefits even after
4  the executive was terminated without cause.  Isn't
5  that what paragraph 7(c) says?
6      A.   That is part of what paragraph 7(c)
7  says.
8      Q.   Going back to the complaint, paragraph
9  23 alleges that defendant never notified PPI that
10 his address had changed.
11         Do you see that?
12      A.   Yes.
13      Q.   Do you contend that that constitutes a
14 breach of the employment agreement?
15      A.   Paragraph 23 in and of itself in my
16 opinion does not.
17      Q.   Does not?
18      A.   No.
19      Q.   Did you ever ask Mr. Nail to keep you
20 advised of his current contact information after
21 he was terminated?
22      A.   We sent him enrollment forms for new
23 benefits with contact information on it or with
24 address and contact information on it.
25      Q.   Other than that did you personally

Page 126

C. Freeman

1        C. Freeman
2    ever ask him to keep you advised of his current
3    contact information and address?
4        A.    No.
5        Q.    Do you know if anyone else asked him
6    to do that?
7        A.    I do not know.
8        Q.    Did you ever tell Mr. Nail that it
9    would breach his employment contract if he were to
10   move and not notify PPI that he moved?
11       A.    I never told him that.
12       Q.    Do you know if anyone else ever told
13   Mr. Nail that?
14       A.    I don't know.
15       Q.    Did you yourself ever ask Mr. Nail to
16   stay in touch because PPI might need his services
17   in the future?
18       A.    No, I didn't.
19       Q.    Do you know if anyone else asked
20   Mr. Nail to do that?
21       A.    No. I don't know.
22       Q.    Take a look at paragraph 24 of the
23   complaint which alleges on or about June 2007
24   defendant directly or indirectly represented to a
25   PPI representative that he was still employed.

Page 127

C. Freeman

1        C. Freeman
2        Do you see that?
3        A.    Still unemployed.
4        Q.    Still unemployed, I'm sorry.
5        Do you see that?
6        A.    Yes.
7        Q.    Do you know what that refers to?
8        A.    A conversation that Sandy Cranford
9    relayed to me.
10       Q.    Can you provide more details about
11   that?
12       A.    Sandy indicated that she was -- during
13   the course of the conversation with Lester's wife
14   she asked something like, How's it going? And the
15   response was, OK, but it would be better if Lester
16   could find a job.
17       Q.    When did Sandy tell you that?
18       A.    Shortly after it happened. After the
19   conversation took place.
20       Q.    Which was supposed to have been when?
21       A.    Supposed to have been on or about June
22   of 2007.
23       Q.    Was anyone else present when Sandy
24   relayed that conversation to you?
25       A.    Not that I recall.

Page 128

C. Freeman

1        Q.    Do you have any idea why she relayed
2    that to you?
3        A.    We were, um, going through a benefits
4    conversion at the time. And it would have just
5    been some information that, um, to update me on
6    people's status.
7        Q.    Did you have any response when she
8    said that?
9        A.    She also indicated that Lester
10   wouldn't even speak to her and she knew he was
11   there because she heard him in the background and
12   she thought that was kind of strange.
13       That was pretty much the gist of the
14   conversation.
15       Q.    Did she say who answered the phone?
16       A.    No.
17       Q.    How did she know that Lester wouldn't
18   speak with her? Did she say?
19       A.    No.
20       Q.    Did she tell you what she heard Lester
21   say in the background?
22       A.    She may have, but I don't recall.
23       Q.    Do you know one way or the other
24   whether Mr. Nail told his wife to state that

Page 129

C. Freeman

1        C. Freeman
2    things would be better if he could find a job?
3        A.    I don't know.
4        Q.    Do you know what Mr. Nail's wife meant
5    when she said that?
6        MS. KIRILA: Objection. Calls for
7    speculation.
8        Q.    It would be speculation for you to say
9    what she meant, correct?
10       A.    What I infer from what Sandy told me
11   was that Lester was still unemployed.
12       Q.    So Mr. Nail himself did not represent
13   that he was still unemployed, correct?
14       MS. KIRILA: Objection.
15       Q.    Did he?
16       MS. KIRILA: You can answer.
17       A.    I wasn't part of that phone
18   conversation. So I don't know what Sandy heard
19   Lester say.
20       Q.    But Sandy did not tell you that Lester
21   himself represented that he was still unemployed,
22   did she?
23       A.    Not that I recall.
24       Q.    She only spoke about what Lester's
25   wife said, right?

33 (Pages 126 to 129)

Page 130

C. Freeman

1    A.    She spoke about what Lester's wife
2  said.  She spoke about Lester talking in the
3  background.  I don't recall if she told me what
4  Lester was saying or if she even could hear what
5  Lester was saying.
6    Q.    In the same paragraph it goes on to
7  allege that defendant participated in the employee
8  benefits enrollment effective July 1st, 2007 as an
9  employee of PPI.
10        Do you see that?
11   A.    Yes.
12        MR. PAPPAS:  Mark this as Exhibit H.
13        (Defendant's Exhibit H, cover letter
14   dated May 21, 2007 from Craig Freeman to
15   Lester Nail with attached document titled
16   "Declaration Section," with other
17   attachments, marked for identification, this
18   date.)
19   Q.    I show you what has been marked as
20 Defendant's Exhibit H, and this is a May 21, 2000
21 letter from you to Lester Nail, correct?
22   A.    Yes.
23   Q.    With attached various benefits forms,
24 correct?

1          C. Freeman
2    A.    She spoke about what Lester's wife
3  said.  She spoke about Lester talking in the
4  background.  I don't recall if she told me what
5  Lester was saying or if she even could hear what
6  Lester was saying.
7    Q.    In the same paragraph it goes on to
8  allege that defendant participated in the employee
9  benefits enrollment effective July 1st, 2007 as an
10 employee of PPI.
11        Do you see that?
12   A.    Yes.
13        MR. PAPPAS:  Mark this as Exhibit H.
14        (Defendant's Exhibit H, cover letter
15   dated May 21, 2007 from Craig Freeman to
16   Lester Nail with attached document titled
17   "Declaration Section," with other
18   attachments, marked for identification, this
19   date.)
20   Q.    I show you what has been marked as
21 Defendant's Exhibit H, and this is a May 21, 2000
22 letter from you to Lester Nail, correct?
23   A.    Yes.
24   Q.    With attached various benefits forms,
25 correct?

Page 131

C. Freeman

1
2    A.    Yes.
3    Q.    Other than the pages Bates numbered
4  LES00004 and LES00005, the forms attached to this
5  letter were attached when you sent the letter to
6  Mr. Nail, correct?  Except that they were blank?
7    A.    I didn't personally do the mailing, so
8  I don't know.  I don't have firsthand knowledge
9  that they were attached.
10   Q.    Did you write the letter, the cover
11 letter?
12   A.    I don't recall.
13   Q.    Did you review it before you signed it
14 and sent it out?
15   A.    I'm sure I did.
16   Q.    That's your signature, right?
17   A.    That is my signature.
18   Q.    And in this letter you instructed
19 Mr. Nail to complete, sign and return these forms
20 at your earliest convenience, correct?
21   A.    Yes.
22   Q.    And if you take a look at the second
23 page of this exhibit, which is Bates numbered
24 Les00002.  Are you there?
25   A.    Yes.

Page 132

C. Freeman

1
2    Q.    What was the purpose of this
3  particular form, do you know?
4    A.    No.
5    Q.    Was it a benefits enrollment type
6  form?
7    A.    It appears to be.
8    Q.    Have you ever seen this type of form
9  before?
10   A.    This particular form, no, I don't
11 recall seeing before.
12   Q.    So you have no familiarity with it, do
13 you?
14   A.    No.
15   Q.    Do you know what the -- PPI was going
16 to do with this form after it received it back
17 from Mr. Nail?
18   A.    It appears enroll Mr. Nail in dental
19 coverage.
20   Q.    Would this form be sent to the
21 insurance company?
22   A.    I don't know.
23   Q.    Do you see where it says, the third
24 line down from the top, "the employee declares
25 that he or she is actively at work on the date of

Page 133

C. Freeman

1
2  this enrollment form"?
3    A.    Yes.
4    Q.    Now, at the time you sent this form to
5  Mr. Nail you knew that he was not actively at work
6  at PPI, correct?
7    A.    Correct.
8    Q.    And you asked him to sign the form
9  anyway, right?
10        MS. KIRILA:  Objection.
11   A.    This is the form that was sent to all
12 of the those enrolling and we did not do a special
13 form.  We did not have the insurance company do a
14 special form for the contract executives.
15   Q.    But this was one of the forms that you
16 told Mr. Nail in your cover letter please
17 complete, sign and return at your earliest
18 convenience, correct?
19        MS. KIRILA:  Objection.  Misstates the
20   letter.  The document speaks for itself.
21   A.    And also if there are any questions,
22 Sandy was going to review and discuss questions
23 that you may have.  She can be reached at, and
24 there's a number there.
25        So if there was any problems, concerns

Greenhouse Reporting, Inc.                    (212)279-5108
(212) 279-5108

Page 134

C. Freeman

1        C. Freeman
2    or questions regarding the form, Mr. Nail could
3    have contacted Sandy Cranford.
4        Q.    Did you ever tell Mr. Nail not to
5    return this form even if he was even eligible for
6    benefits somewhere else?
7            Did you ever tell him that?
8        A.    I never told him that.
9        Q.    Do you know if anyone at PPI told him
10   that?
11       A.    I don't know.
12       Q.    Did you personally ever tell Mr. Nail
13   not to return this form if he was working
14   somewhere else?
15       A.    No.
16       Q.    Did anyone at PPI tell him that to
17   your knowledge?
18       A.    No.
19       Q.    Going back to paragraph 25 of the
20   court complaint, it alleges that in mid-October
21   2007 PPI learned from another employee that
22   defendant was working full time at Denny's, Inc.
23            Do you see that?
24       A.    Yes.
25       Q.    Who is the employee who informed PPI

Page 135

C. Freeman

1        C. Freeman
2    that defendant was working full time at Denny's?
3        A.    Jim Rein.
4        Q.    Jim Ryan?
5        A.    Rein, R-e-i-n.
6        Q.    Who is he?
7        A.    He is our vice president of
8    information technology.
9        Q.    Who did he inform?
10       A.    Me.
11       Q.    What did he say?
12       A.    He said he ran into Lester at the
13   Charlotte airport and Lester was working for
14   Denny's.
15       Q.    Was this a passing conversation or did
16   he come specifically to tell you that?
17       A.    It was a passing conversation.
18       Q.    What did you say in response?
19       A.    I was surprised.
20       Q.    You said that?
21       A.    I said that?  What did I say?
22       Q.    I am just asking what you said in
23   response.
24       A.    I don't recall.
25       Q.    If anything.

Page 136

C. Freeman

1        A.    I don't recall specifically what I
2    said.
3        Q.    Do you recall generally?
4        A.    I expressed, I guess I expressed
5    surprise and asked him if he was sure and...
6        Q.    Have you completed your answer?
7        A.    Yes.
8        Q.    Did Mr. Rein give you any other
9    information other than he ran into Lester at the
10   airport and he was working at Denny's?
11       A.    Not that I recall.
12       Q.    Did he tell you what Lester was doing
13   at Denny's?
14       A.    Not that I recall.
15       Q.    This is the first time you had heard
16   of it?
17       A.    Yes.
18       Q.    What did you do after you heard this?
19       A.    I contacted our -- because I knew this
20   was a breach of the employment agreement, I
21   contacted our payroll department and told them to
22   immediately, and I knew the following day was a
23   payday.  I told them to immediately stop payment
24   to Mr. Nail.

Page 137

C. Freeman

1        C. Freeman
2        Q.    Who specifically did you speak to in
3    payroll?
4        A.    Debbie Thompson, our payroll manager.
5        Q.    Was that done?
6        A.    Yes.
7        Q.    Who else -- strike that.  What did you
8    do then?
9        A.    I drafted a letter to Mr. Nail
10   notifying him that, basically notifying him what
11   was happening.  I probably drafted it with
12   counsel.
13       Q.    You didn't inform Mr. Kinzel or
14   Mr. Crage about the circumstances?
15       A.    Oh, yes, of course.
16       Q.    Did you do that before or after you
17   contacted the payroll department?
18       A.    Before.
19       Q.    Did you speak to both of them together
20   or separately?
21       A.    Together.
22       Q.    And what was discussed?
23       A.    Just that this, Lester had a job and
24   another position that violated his employment
25   agreement and we needed to cut him off

Page 138

1                   C. Freeman
2    immediately.
3        Q.    You said that to them?
4        A.    That was the gist of the conversation.
5    And then they agreed.
6        Q.    Do you recall anything specifically
7    that either of them said in that conversation?
8        A.    No.
9        Q.    Who proposed cutting off his pay
10   immediately?
11       A.    I mean, that was my first thought.  So
12   I guess it was me.
13       Q.    Did you have the authority to do that
14   without approval from Mr. Kinzel?
15       A.    I think I would have done it and told
16   him I did it.
17       Q.    Told him after it was done.
18       A.    Yes.  That's not what happened, but, I
19   mean, I'm speculating.  Would I have or could I
20   have done it?  Yes, I think so.
21       Q.    You proposed this to Mr. Kinzel and
22   Mr. Crage and they said go ahead?
23       A.    Yes.
24       Q.    What else --
25       A.    That's the gist of the conversation.

Page 139

1                   C. Freeman
2        Q.    What else was discussed in that
3    conversation?
4        A.    I don't recall.
5        Q.    Was there any talk of suing Mr. Nail
6    in that conversation?
7        A.    Not in that conversation.  I don't
8    think in that conversation, no.
9        Q.    Do you recall anything else at all
10   about that conversation?
11       A.    No.
12       Q.    Was anyone else present other than the
13   three of you?
14       A.    Yes.
15       Q.    Who?
16       A.    It occurred in the staff meeting, so
17   we had other members of Mr. Kinzel's staff were
18   present.
19       Q.    So it would have been mentioned then
20   in the minutes and notes of the staff meeting?
21            MS. KIRILA:  Objection.  Go ahead.
22       A.    It may be there.  It may not.  I don't
23   know.
24       Q.    Generally things that were
25   discussed -- well, substantive things in the staff

Page 140

1                   C. Freeman
2    meeting were recorded in the minutes, correct?
3        A.    The minutes are not very detailed.
4    They are very bulleted, and, um, it may -- things
5    may or may not be in there depending on the
6    context or the level of detail or, you know,
7    whether it rose to, rose to a level that needed
8    follow-up or continuing discussion or anything
9    like that, or action.
10       Q.    As you sit here today do you recall
11   whether that issue was mentioned in the staff
12   meeting minutes?
13       A.    I don't recall.
14       Q.    Do you still have those minutes?
15       A.    I probably do.
16       Q.    Before you cut off Mr. Nail's pay did
17   you take any steps to confirm whether he was
18   employed at Denny's?
19       A.    No.
20       Q.    Did you ever take any steps to contact
21   Denny's to confirm that he was employed there?
22       A.    Not until the lawsuit was active and I
23   guess -- I don't -- I don't recall.  I'm trying to
24   think of the sequence of events here.
25            I don't recall ever contacting

Page 141

1                   C. Freeman
2    Denny's.  I mean, through discovery we may have
3    gotten some information with regard to his
4    employment at Denny's, but I don't know that we
5    ever directly contacted Denny's.
6        Q.    So all you knew at the time that you
7    directed that his pay be cut off was that he was
8    working at Denny's, somebody told you.
9        A.    Right.
10       Q.    So after your conversation with
11   Mr. Kinzel and Mr. Crage it was then that you
12   contacted Debbie Thompson to immediately stop
13   payment to Mr. Nail; is that correct?
14       A.    Yes.
15       Q.    How soon after that meeting did you
16   contact payroll?
17       A.    Within a couple of hours.
18       Q.    And then you said you with the
19   assistance of counsel drafted a letter to
20   Mr. Nail; is that correct?
21       A.    Yes.
22       Q.    Was that your idea or someone else's?
23       A.    I don't recall.
24       Q.    Was it discussed, the possibility of
25   sending him a letter, was that discussed in your

Page 142

```
1                C. Freeman
2   meeting with Mr. Kinzel and Mr. Crage?
3       A.   No.
4           MR. PAPPAS:  Mark this as Exhibit I.
5       (Defendant's Exhibit I, letter to
6   Lester Nail from Craig Freeman, dated
7   October 19, 2007, Bates No. LES0018, marked
8   for identification, this date.)
9           (A luncheon recess was taken at
10      12:56 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 143

```
1                C. Freeman
2       A F T E R N O O N   S E S S I O N.
3           (Time noted:  1:48 p.m.)
4   C R A I G   F R E E M A N ,  resumed and testified
5       further as follows:
6   EXAMINATION BY (Cont'd.)
7   MR. PAPPAS:
8       Q.   Do you have Exhibit I in front of you?
9       A.   Yes.
10      Q.   I show you what has been marked as
11  Exhibit I.  And you sent this letter to Mr. Nail
12  on or about October 19, 2007; is that correct?
13      A.   Yes.
14      Q.   Did you write it?
15      A.   It was drafted by counsel.  And I
16  forgot to mention that the day before following
17  that meeting I contacted counsel immediately and
18  started consulting with counsel on this matter.
19  So this letter was part of that.
20      Q.   Following the meeting with Mr. Kinzel
21  and Mr. Crage?
22      A.   Yes.
23      Q.   Did you make any revisions to this
24  letter?
25      A.   Not that I recall.
```

Page 144

```
1                C. Freeman
2       Q.   And you reviewed it before you signed
3   it and sent it out, correct?
4       A.   Yes.
5       Q.   Did you discuss the letter with anyone
6   other than counsel?
7       A.   Not that I recall.
8       Q.   That's your signature, correct?
9       A.   Yes.
10      Q.   Did anyone other than you have to
11  approve of this letter before it was sent?
12      A.   No.
13      Q.   Do you know whether Kinzel or Crage
14  ever reviewed the letter before it was sent?
15      A.   No, they didn't.
16      Q.   You know that they did not?
17      A.   I know that they did not.
18      Q.   How do you know that?
19      A.   My recollection is that I worked with
20  counsel on drafting and finalizing it and sending
21  it out and I would not have involved Mr. Kinzel
22  and Mr. Crage in that.
23      Q.   Why not?
24      A.   Because it was pursuant to the
25  conversations we had had the day before.
```

Page 145

```
1                C. Freeman
2       Q.   They knew the letter was going out
3   though, didn't they?
4           MS. KIRILA:  Objection.  Calls for
5       speculation, but you can testify.
6       Q.   Do you know if they knew that the
7   letter such as this was being sent?
8       A.   I don't have a specific recollection
9   of discussing it with either one of them.
10      Q.   Who made the decision to stop paying
11  Mr. Nail under his employment agreement?
12      A.   As I indicated previously, that was my
13  immediate thought and Mr. Kinzel was on board with
14  that.
15      Q.   When did PPI stop making payments to
16  Mr. Nail?
17      A.   Effective with my October 18th call to
18  Debbie Thompson.
19      Q.   So he received all payments through
20  October 18th?
21      A.   All payments that were, that would
22  have been due up to October 18th would have been
23  made.
24      Q.   Were any of those payments
25  subsequently taken out of his bank account via
```

Page 146

C. Freeman

1             C. Freeman
2 direct deposit?
3      A.    None of those payments were.
4      Q.    Were any payments ever taken out of
5 his bank accounts by PPI?
6      A.    Not by PPI.
7      Q.    By Cedar Fair?
8      A.    No.
9      Q.    By anyone?
10     A.    I understand based on documentation I
11 have seen that the bank did.
12     Q.    What bank?
13     A.    Whatever bank it was that those
14 deposits were made into.
15     Q.    Mr. Nail's bank?
16     A.    Yes.
17     Q.    At whose direction?
18           MS. KIRILA:   Objection.   Assumes
19       facts, but you can answer based on your
20       role.
21     A.    Our -- based on the order that we made
22 on October 18th, they were unable to make the
23 correction in time.   So before the money was
24 deposited, so an adjustment was made, a correction
25 was made.

Page 147

1             C. Freeman
2      Q.    I am going to return to that topic in
3 a few minutes.
4           MR. PAPPAS:   First I am going to have
5       this marked as Exhibit J.
6           (Defendant's Exhibit J, letter from
7       Craig Freeman to Lester Nail, October 23,
8       2007, Bates No. LES00019, marked for
9       identification, this date.)
10     Q.    Before looking at J, just take another
11 look at Exhibit I again, the previous letter.
12           Can you take a look at Exhibit I?
13     A.    I'm sorry, yes.
14     Q.    And the second paragraph you say, you
15 will be receiving information regarding your
16 options under COBRA.
17           Do you see that?
18     A.    Yes.
19     Q.    Was Mr. Nail ever given any
20 information regarding his options under COBRA as
21 far as you know?
22     A.    I don't have specific information.
23     Q.    Do you know one way or the other?
24     A.    I don't know one way or the other
25 whether he received that information.

Page 148

1             C. Freeman
2      Q.    Do you know whether it was sent to
3 him?
4     A.    I have no specific knowledge.
5     Q.    Do you have any general knowledge?
6     A.    All I know is that it was supposed to
7 have been sent to him.
8     Q.    At whose direction?
9     A.    It should have been at the direction
10 of someone on my staff.
11     Q.    I will show you what has been marked
12 as Defendant's Exhibit J.   And this is a letter
13 that you sent to Mr. Nail on or about October 23,
14 2007, correct?
15     A.    Yes.
16     Q.    Did you write this?
17     A.    Yes.
18     Q.    Is that your signature?
19     A.    Yes.
20     Q.    Did you discuss this letter with
21 Mr. Kinzel or Mr. Crage before you sent it?
22     A.    Not to my recollection.
23     Q.    Did you discuss it with anyone before
24 you sent it?
25     A.    I don't know.

Page 149

1             C. Freeman
2      Q.    Did anyone other than you review it
3 before it went out?
4     A.    I don't know whether I reviewed this
5 with counsel or not.
6     Q.    Other than counsel?
7     A.    Just my assistant.
8     Q.    Your secretary?
9     A.    Yes.
10     Q.    Did anyone have to approve this before
11 it went out?
12     A.    No.
13     Q.    Do you know if Mr. Nail ever received
14 your October 19, 2007 letter, Exhibit I?
15     A.    He received it with this October 23rd
16 letter because we got the return receipt when it
17 was forwarded to his new address.
18     Q.    So you enclosed another copy of the
19 October 19th letter with your October 23rd letter;
20 is that correct?
21     A.    Yes.
22     Q.    Did you ever hear from Mr. Nail after
23 you sent these letters?
24     A.    Yes.
25     Q.    When did you hear from him?

Page 150

C. Freeman

1
2    A.    Within a matter of days.
3    Q.    Between the time that you learned that
4  Mr. Nail was employed at Denny's and the time you
5  sent out these letters did you make any attempt to
6  contact Mr. Nail?
7    A.    No.
8    Q.    As far as you know did anyone at PPI
9  or Cedar Fair make any attempt to contact Mr. Nail
10  during that time period?
11    A.    No.
12    Q.    As far as you know?
13    A.    I'm sorry, I said no.
14    Q.    I am sorry, I didn't hear you.
15        How soon after you sent out the
16  October 23, 2000 letter, Exhibit J, did you hear
17  from Mr. Nail?
18    A.    My recollection is it was within a
19  matter of days.
20    Q.    Did you hear from him before or after
21  you received the return receipt?
22    A.    I don't know.
23    Q.    When you heard from Mr. Nail he called
24  you, correct?
25    A.    That's my recollection, yes.

Page 151

C. Freeman

1
2    Q.    How long did that initial conversation
3  last?
4    A.    I don't remember.
5    Q.    Do you recall what was discussed in
6  that initial conversation?
7    A.    We had more than one conversation
8  during that time frame and I -- I couldn't tell
9  you what was said in one versus another.
10    Q.    How many conversations did you have
11  after you sent out the October 23rd, 2007 letter?
12    A.    If I had to pick a number, I'd say
13  three.
14    Q.    You're saying that you can't
15  distinguish what was said in one of those
16  conversations as opposed to the other?
17    A.    Not specifically, no.
18    Q.    Can you tell me generally then what
19  was, whatever you remember was said in any of
20  those conversations?
21    A.    Sure. Mr. Nail indicated that he had
22  looked for a position -- he had looked for a job
23  because he was concerned about providing for his
24  family. He at one time said age discrimination
25  was an issue for him.

Page 152

C. Freeman

1
2        He indicated that he contacted a
3  former, I believe it was a former boss that he had
4  worked for and I think he was just -- he was going
5  to use this person for a reference and ended up
6  getting a job offer and that it was not
7  necessarily a job that he would have gone out and
8  sought, but it was -- it was a job, and he
9  indicated that he felt that the contract language
10  was ambiguous and that there was no intent on his
11  part to do anything wrong, that he would, he would
12  come up and personally meet with Dick and Peter
13  and tell them that.
14        He said that the bank transaction that
15  you referred to earlier was a mistake on our part,
16  that he had consulted with his counsel and felt he
17  had a very strong case. He said -- I'm sorry that
18  this is not -- this is according to how it's
19  coming to mind, not necessarily chronologically,
20  so I apologize for that.
21    Q.    I understand.
22    A.    He indicated at one point that if all
23  we were looking to do was not pay the remainder of
24  his employment agreement and just call it even so
25  to speak, that he would be OK with that.

Page 153

C. Freeman

1
2        That's my recollection of those
3  conversations during that time frame.
4    Q.    What was your side of those
5  conversations?
6    A.    I, um, told Mr. Nail that we felt that
7  he needed to pay us back for what we had paid him
8  since he became employed. I asked him when he
9  became employed. And he eventually shared that
10  information, which I don't mention earlier.
11        I told him that other executives that
12  were on contracts had found other employment, but
13  he was the only one who did not contact me.
14        I told him that I had talked to Dick
15  Kinzel about the situation and that Dick had
16  indicated that the way to resolve this was to
17  write a check to pay us the full amount. Pay PPI
18  the full amount.
19        This goes back and forth a little bit,
20  but Lester said, you know, indicated to me that if
21  we were to file a lawsuit that he would file a
22  counterclaim. We would probably end up in
23  mediation.
24        That's pretty much the extent of my
25  recollection of the conversations.

Page 154

C. Freeman

1    Q.    Were all these conversations strictly
2    between the two of you or was anyone else
3    involved?
4    A.    On my side they were strictly between
5    the two of us.  I was the only one on my side of
6    the conversation.
7    Q.    Do you know if anyone was present with
8    Mr. Nail on his side of the conversation?
9    A.    I was under the impression that there
10   was no one else present.
11   Q.    You mentioned that Mr. Nail told you
12   that age discrimination was an issue for him.  Do
13   you know what he was referring to?
14   A.    He didn't elaborate and we didn't
15   discuss it in any great length.  He just made a
16   statement to the extent that, you know, I can tell
17   you that age discrimination is alive and well.
18   Q.    And as a person in charge of the HR
19   function you didn't ask him any follow-up
20   questions as to what he meant by age
21   discrimination?
22   A.    Not that I recall.
23   Q.    And then you mentioned that Mr. Nail
24   said that he had contacted a former boss for a
25

Page 155

C. Freeman

1    reference and got a job offer.  Was he referring
2    to Denny's?
3    A.    Yes.
4    Q.    Do you know who the former boss was?
5    A.    No.
6    Q.    And according to you Mr. Nail said
7    that the Denny's job was not necessarily a job
8    that he would have sought, but it was a job.  He
9    was referring to his Denny's job, correct?
10   A.    Yes.
11   Q.    Was it your impression that Mr. Nail
12   wasn't crazy about his job at Denny's?
13   A.    My impression was that it was not a
14   job that he would have gone out for and applied
15   for.  We didn't talk about his current level of
16   satisfaction with the position.
17   Q.    Did you get the impression that he
18   would have left Denny's if he had got a better
19   offer somewhere else?
20   A.    I didn't really form an impression one
21   way or the other.
22   Q.    You said Mr. Nail told you that he
23   felt his employment contract was ambiguous; is
24   that correct?
25

Page 156

C. Freeman

1    A.    That's what he said.
2    Q.    Do you know what provision he was
3    referring to specifically?
4    A.    I don't recall that we got that
5    specific in our conversation.
6    Q.    Did you have any response to that
7    comment?
8    A.    I don't remember.
9    Q.    Did you have any response to
10   Mr. Nail's offer to personally meet with, you said
11   Dick and Peter, I assume that's Mr. Kinzel and
12   Mr. Crage, correct?
13   A.    Yes.
14   Q.    Did you have any response to his offer
15   to meet with them?
16   A.    I believe I told him I would carry
17   that message forward.
18   Q.    And did you?
19   A.    Yes.
20   Q.    And what was their response?
21   A.    Really it would have been Mr. Kinzel.
22   Mr. Crage was directly involved, but he was not
23   interested in that.
24   Q.    So Mr. Kinzel told you he did not wish
25

Page 157

C. Freeman

1    to meet with Mr. Nail; is that correct?
2    A.    Right.
3    Q.    Did you have any response to
4    Mr. Nail's comment concerning the bank withdrawal
5    transaction?  Where he said it was a mistake on
6    PPI's part.
7    A.    Not that I recall.
8    Q.    Did you have any response to his
9    comment that he would be willing to accept it if
10   PPI stopped paying him on a going forward basis?
11   A.    Getting back to the chronology of
12   these discussions, I believe that that was in --
13   that was early on before I knew what his
14   employment date with Denny's was.
15        At the time my thinking was that if we
16   were not talking about a material amount of time
17   here, you know, because again, my understanding
18   was that the, that as of June he was still
19   unemployed, so rolling forward from this, by the
20   time you find a job and start, and so forth, we
21   might have been talking about a month or so, that
22   maybe that would have been a possibility.  And I
23   could have recommended that.
24        But it really didn't go anywhere based
25

Page 158

C. Freeman

1   C. Freeman
2   on when Mr. Nail actually started his other
3   employment.
4        Q.    When did he tell you he started at
5   Denny's?
6        A.    Do you mean what start date?
7        Q.    Did he tell you what start date he
8   started at Denny's?
9        A.    He did tell me in a subsequent
10  conversation, yes.
11       Q.    When did he say he started?
12       A.    He said he started February 23rd of
13  2007.
14       Q.    Did you have any response to
15  Mr. Nail's comment that he would file a
16  counterclaim and that the case would probably end
17  up in mediation?
18       A.    I don't remember what my response was.
19       Q.    You mentioned that you told Mr. Nail
20  that the other executives with contracts who had
21  found other employment contacted you?
22       A.    Yes.
23       Q.    Who was that?
24       A.    Who were the other executives that
25  contacted me?

Page 159

1        C. Freeman
2        Q.    Correct.
3        A.    Mr. Thornton, Mr. Fisher, Mr. --
4   Mr. Weber. But he didn't contact me. He
5   contacted Mr. Kinzel.
6        Q.    Anyone else?
7        A.    Mr. Kaetzel contacted me, but that was
8   subsequent to this conversation.
9        Q.    Anyone else?
10       A.    Do you have the names again? Because
11  if you can read them back to me or refresh my
12  memory?
13       Q.    Weber, Fisher, Koontz, Thornton,
14  Petit, Jones, Kaetzel and White.
15       A.    Petit.
16       Q.    Were those notifications oral or in
17  writing?
18       A.    You know, I know there were e-mails
19  and telephone calls and I don't know what happened
20  first, what the initial contact was. But they
21  were both.
22       Q.    Did each of those individuals get a
23  job in the theme park or water park industry?
24       A.    I believe so. I'm not specifically
25  aware of what Mr. Thornton's position is, but the

Page 160

1        C. Freeman
2   others were in the industry.
3        Q.    When PPI learned that those
4   individuals had notified them that they had such
5   employment, did PPI continue to pay any of those
6   individuals under their agreements?
7        MS. KIRILA:  I am just going to object
8   to the extent they have differing contracts
9   from Mr. Nail, but you can answer that
10  question.
11       A.    All of them -- all of them contacted
12  me in advance of accepting those positions.
13       Q.    And once they accepted the positions
14  did PPI continue to pay them under their
15  contracts?
16       A.    No.
17       Q.    Did you discuss your various
18  conversations with Mr. Nail with anyone?
19       A.    Mr. Kinzel.
20       Q.    What about Mr. Crage?
21       A.    I don't recall that I did.
22       Q.    Did you communicate to Mr. Kinzel the
23  substance of what you and Mr. Nail had discussed?
24       A.    Yes.
25       Q.    Did you leave anything out?

Page 161

1        C. Freeman
2        A.    I'm sure I summarized. I don't -- I
3   don't know specifically, you know, line by line
4   what we talked about, but it was the substance as
5   you said.
6        Q.    Other than saying that he did not want
7   to meet with Mr. Nail, did Mr. Kinzel have any
8   other comments regarding your summary of your
9   conversations with Mr. Nail?
10       A.    We discussed the issue of whether we
11  would accept Mr. Nail's proposal of discontinuing
12  payment and not seeking anything, any repayment.
13  And that was contingent upon determining how long
14  Mr. Nail had been employed.
15       Q.    Once you determined that did you have
16  any further conversations with Mr. Kinzel about
17  that issue?
18       A.    I'm sure I did.
19       Q.    What was discussed?
20       A.    It was too long a period of time to
21  ignore.
22       Q.    Was that your view or his view?
23       A.    That was what we discussed.
24       Q.    Do you recall who first advanced that
25  view in your discussion?

Page 162

C. Freeman

1        A.   When I found out the date, I knew that
2   it was too long a time frame and so the next time
3   we had the conversation I just pretty much
4   notified Mr. Kinzel that that is what I had found
5   out and that therefore we had to pursue getting
6   repayment.
7        Q.   And he agreed with that?
8        A.   Yes.
9        Q.   Did you tell anyone other than
10  Mr. Kinzel about your discussion with Mr. Nail.
11       A.   The -- well, do I have a specific
12  recollection?  No.
13       Q.   Do you recall generally discussing it
14  with anyone?  Other than Mr. Kinzel?
15       A.   I don't have a specific recollection
16  of discussing it with anyone else.
17            MR. PAPPAS:  Mark this as K.
18            (Defendant's Exhibit K, 3-page
19            handwritten notes with some redacted
20            portions, Bates Nos. PPI00762 through 764,
21            marked for identification, this date.)
22       Q.   I show you what has been marked as
23  Defendant's Exhibit K.  Can you tell me what this
24  is?

Page 163

C. Freeman

1        A.   These are my notes from my
2   conversations with Mr. Nail.
3        Q.   The conversations that you just
4   testified about?
5        A.   Yes.
6        Q.   This is all your handwriting other
7   than the stamp that says redacted privileged?
8        A.   Yes.
9        Q.   Now, the first entry on your notes is
10  dated October 30th.
11            Do you see that?
12       A.   Yes.
13       Q.   Is that your first conversation with
14  Mr. Nail after you sent him the October 23rd
15  letter?
16       A.   I believe so.
17       Q.   And the number next to his name, is
18  that his home phone number?
19       A.   I believe that's his cell phone
20  number.
21       Q.   Can you read that first line?
22       A.   "Where are we going with this?"
23       Q.   What does that refer to?
24       A.   That was a question he asked.

Page 164

C. Freeman

1        Q.   Did you respond to that?
2        A.   I'm sure I did.
3        Q.   Do you recall what your response was?
4        A.   No, I don't.
5        Q.   Can you read the next line?
6        A.   "Disagrees with our interpretation of
7   the agreement."
8        Q.   That's something Mr. Nail said?
9        A.   Yes.
10       Q.   Do you recall your response to that?
11       A.   No.
12       Q.   Do you know what that refers to
13  specifically?
14       A.   The employment agreement.
15       Q.   Do you know what interpretation he is
16  talking about?
17       A.   That we were entitled to -- that he
18  had violated the employment agreement by virtue of
19  accepting the position with Denny's.
20       Q.   Anything else?
21       A.   I believe that's the interpretation we
22  were, that we were discussing.
23       Q.   And the next line I believe says
24  "contract poorly written, ambiguous," correct?

Page 165

C. Freeman

1        A.   Yes.
2        Q.   That again was Mr. Nail's comment?
3        A.   Yes.
4        Q.   And you don't recall your response to
5   that, correct?
6        A.   No.
7        Q.   Not correct or you don't recall?
8        A.   I don't recall.
9        Q.   Then it says, "what can we do?"  Did I
10  read that correctly?
11       A.   "What can we do?"  Yes.
12       Q.   And what does that refer to?
13       A.   I believe this was Lester asking me,
14  you know, what can we do to resolve this.
15       Q.   Did you have a response to that?
16       A.   I don't recall what I said.
17       Q.   What does the next line say?
18       A.   I started to make a note that I didn't
19  complete because I was trying to make notes as
20  Lester was talking.  "Factual things nullify if,"
21  and I don't know where, I don't know what would
22  complete that thought.
23       Q.   Do you have any idea what the first
24  part refers to, "factual things nullify"?

Page 166

C. Freeman

1
2      A.    I don't recall.
3      Q.    Can you read the next entry?
4      A.    It says "if we're coming after him for
5    repayment, we'll have to sue; he'll file
6    counterclaim."
7      Q.    That's the comment you referred to
8    earlier?
9      A.    Yes.
10     Q.    What about the next entry?
11     A.    "If we're just talking the balance of
12   compensation, he wouldn't sue over that."
13     Q.    That's what Mr. Nail told you,
14   correct?
15     A.    Yes.
16     Q.    And the next entry on your notes is
17   dated November 5, 2007, correct?
18     A.    Yes.
19     Q.    Is that your next conversation with
20   Mr. Nail?
21     A.    I believe so.
22     Q.    And first entry says "sincere
23   misunderstanding of what contract," and I can't
24   read that last word.
25     A.    Meant.  M-e-a-n-t, meant.

Page 167

C. Freeman

1
2      Q.    Meant, OK.  Who said that?
3      A.    Lester.
4      Q.    Do you know what he was referring to?
5      A.    I believe he was referring to, um,
6    that his interpretation of the contract and our
7    interpretation of the contract was different and
8    he believed it was a sincere misunderstanding.
9      Q.    Did you have any response to that?
10     A.    I don't recall.
11     Q.    Then the next looks like "won't
12   disclose date"?
13     A.    Right.
14     Q.    What does that refer to?
15     A.    His employment date with Denny's.
16     Q.    So at least at this time Mr. Nail
17   chose not to tell you when he started at Denny's.
18   Is that accurate?
19     A.    Yes.
20     Q.    Can you read the next entry?
21     A.    "Not a fact issue; issue is what does
22   clause mean."
23     Q.    Whose comment is that?
24     A.    Lester.
25     Q.    Did you have any response to that?

Page 168

C. Freeman

1
2      A.    I don't recall.
3      Q.    The next entry says "What will
4    New York court decide?"  Is that correct?
5      A.    Yes.
6      Q.    Was that Lester's comment?
7      A.    Yes.
8      Q.    Do you know what he meant by that?
9            MS. KIRILA:  Objection, calls for
10   speculation.
11     Q.    Based on your conversation with him,
12   what was your understanding of what he meant by
13   that?
14     A.    My understanding was that it would be
15   up to a New York court to decide what the contract
16   or what the clause meant.
17     Q.    Did you have any response to?
18     A.    That not that I recall.
19     Q.    The next entry says "lawyers get
20   involved, slash, settlement."  Did I read that
21   correctly?
22     A.    Yes.
23     Q.    And that refers to the same comment
24   you testified about earlier that Mr. Nail made; is
25   that right?

Page 169

C. Freeman

1
2      A.    Testified earlier before you gave me
3    these?
4      Q.    Yes.
5      A.    Yes.
6      Q.    And he said that he would file a
7    counterclaim and that there would probably be
8    mediation.
9            Is that the same comment or is this
10   something different?
11     A.    This is -- my recollection is this was
12   a general discussion by Mr. Nail regarding, you
13   know, if this -- if a lawsuit gets filed and you
14   get the lawyers involved and maybe there are
15   settlement discussions and maybe it goes to
16   mediation.  He was just kind of trying to outline
17   the process.
18     Q.    The next line says "maybe mediation,"
19   correct?
20     A.    Right.
21     Q.    Then there's a space.  Was there
22   anything in that space or you just skipped a line?
23     A.    I had skipped a line.
24     Q.    But this was the same conversation?
25     A.    Yes.

C. Freeman

1
2    Q.    And it says "Couldn't find job in
3    Charlotte, parentheses, age discrimination alive
4    and well, close parentheses," correct?
5    A.    Right.
6    Q.    What does couldn't find a job in
7    Charlotte refer to?
8    A.    Mr. Nail went back and started
9    discussing his job search process and indicating
10   to me that he couldn't find a job in Charlotte and
11   that's when he made the comment regarding age
12   discrimination.
13   Q.    Do you recall specifically what he
14   said about that?
15   A.    No.
16   Q.    And you didn't ask any follow-up
17   questions about that, correct?
18   A.    No.
19   Q.    No, not correct or no, you did not?
20   A.    No, I did not.  As I recall.
21   Q.    The next line says, "Called Denny's
22   GC.  She had worked with.  She recruited him.
23   Senior director employment law, February 23 start
24   day.  Commuted for some time, parentheses, three
25   months, close parentheses, moved to Spartanburg in

C. Freeman

1
2    June."
3          Did I read that correctly?
4    A.    Yes.
5    Q.    Who called Denny's general counsel?
6    A.    He indicated to me that he called
7    Denny's general counsel.
8    Q.    And she had worked with.  Do you know
9    what that means?
10   A.    She was someone he had worked with in
11   the past.
12   Q.    Mr. Nail told you that she had
13   recruited him?
14   A.    Yes.
15   Q.    And he told you that his position
16   was -- was his position senior director of
17   employment law or was that her position?
18   A.    His position.
19   Q.    At Denny's?
20   A.    At Denny's.
21   Q.    He told you then the start date was
22   February 23rd?
23   A.    Yes.
24   Q.    So initially in that conversation he
25   didn't want to disclose the date, but then later

C. Freeman

1
2    in that conversation he did; is that correct?
3    A.    Yes.
4    Q.    He told you he commuted for about
5    three months from Charlotte to Spartanburg?
6    A.    Yes.
7    Q.    And then moved to Spartanburg in June,
8    correct?
9    A.    Yes.
10   Q.    Did you have any response to those
11   comments?
12   A.    Not that I recall.
13   Q.    The next entry I believe says "thought
14   was; got to provide for family."
15   A.    Yes.
16   Q.    That's what Mr. Nail told you?
17   A.    Yes.
18   Q.    The conversation looks like it's
19   continued on the next page.
20         It says -- this is a continuation of
21   your November 5th call with Mr. Nail; is that
22   correct?
23   A.    Yes.
24   Q.    It says, "New lawyer, Michael Weber,
25   New York, Littler Mendelson."

C. Freeman

1
2          Do you see that?
3    A.    Yes.
4    Q.    Mr. Nail communicated that to you?
5    A.    Yes.
6    Q.    That was his new lawyer?
7    A.    Yes.
8    Q.    Did you have any response to that?
9    A.    Not that I recall.
10   Q.    Can you read the next line?
11   A.    "Larry Levine didn't point out 7(c)."
12   Q.    Do you have any idea what that refers
13   to?
14   A.    Mr. Nail had previously worked with
15   another attorney who I believe was in Charlotte by
16   the name of Larry Levine and actually we had a
17   previous conversation.
18         So the 10/30 conversation, there may
19   have been one before that where this Larry Levine
20   discussion occurred.  Because we talked a little
21   bit about Larry Levine and based on that
22   conversation Mr. Nail didn't feel that Mr. Levine
23   was an appropriate representative for him
24   apparently and changed attorneys and he indicated
25   as part of this conversation that Mr. Levine

C. Freeman

1
2  didn't point out 7(c) in the employment agreement
3  to him.
4       Q.    Did you have any response to that?
5       A.    I don't recall.
6       Q.    Then the next entry I believe says
7  "made mistake taking money out of my checking
8  account"; is that correct?
9       A.    Yes.
10      Q.    That's what you referred to earlier
11  before I gave you these notes?
12      A.    Yes.
13      Q.    There's a block that's blocked out and
14  it says:  Redacted - privileged.
15           Do you see that?
16      A.    Yes.
17      Q.    Who were those notes to?
18      A.    I, through this entire process I was
19  continuously checking with and consulting with my
20  counsel, and so I would in my conversations with
21  counsel I would make notes that were related to
22  this and that's what these sections were.
23      Q.    So all of the ones that are blacked
24  out on this page you're writing about your
25  communications with counsel?

C. Freeman

1
2       A.    Yes.
3       Q.    Is there anything other than that
4  that's blocked out?
5       A.    No.
6       Q.    Were those communications on that same
7  day?
8       A.    I don't know.  They would have had
9  dates associated with them.
10      Q.    Did you distribute these notes to
11  anyone?
12      A.    No.
13      Q.    The next date entry is for
14  November 27, 2007, correct?
15      A.    Yes.
16      Q.    And I believe it says "left Lester a
17  VM."  Well, why don't you read it?  I can't really
18  read it.
19      A.    "Left Lester a voice mail, VM, voice
20  mail, that we have filed a complaint."
21      Q.    And by complaint you mean the court
22  complaint in this action?
23      A.    Yes.
24      Q.    And why did you let Mr. Nail know that
25  a complaint had been filed?

C. Freeman

1
2       A.    Upon consultation with Mr. Kinzel
3  regarding this matter, we decided that we were
4  going to proceed with a complaint and he
5  suggested, he actually suggested that I contact
6  Mr. Nail and give him a heads up so that he didn't
7  just get it cold.
8       Q.    When was the first time you discussed
9  the possibility of filing a court action against
10  Mr. Nail with Mr. Kinzel?
11      A.    I don't recall.
12      Q.    Was it prior to your conversations
13  with Mr. Nail which began on October 30th or
14  subsequent to that?
15      A.    I don't know.
16      Q.    It was after the decision was made to
17  stop making payments to Mr. Nail, correct?
18      A.    Yes.
19      Q.    Sometime between that date, which is
20  about October 18th, and November 27th, a decision
21  was made to sue Mr. Nail?
22      A.    Yes.
23      Q.    I don't want you to tell me about any
24  conversations where counsel was present.
25           Did you have any other conversations

C. Freeman

1
2  with Mr. Kinzel regarding potentially or actually
3  suing Mr. Nail?
4       A.    It would have been just very brief,
5  general updates concerning the status and moving
6  ahead.
7       Q.    Who brought up the idea of suing
8  Mr. Nail first?
9       A.    Mr. Kinzel.
10      Q.    Do you recall when that was?
11      A.    No.
12      Q.    Do you recall what he said?
13      A.    Not specifically.
14      Q.    Do you recall generally what he said
15  other than bringing up the idea?
16      A.    No.
17      Q.    Did you have any response to him
18  bringing up the idea?
19      A.    I discussed with Mr. Kinzel the
20  potential for settling.
21      Q.    What was discussed about that?
22      A.    Just the value of the suit in terms of
23  the court costs and legal fees and so forth versus
24  the recovering full amount and, you know, what
25  would make sense.

Page 178

C. Freeman

1
2    Q.    What was --
3    A.    From a, strictly from a cost
4 standpoint.
5    Q.    What was your view and what was his
6 view on that issue?
7    A.    I was probing.  I was simply probing
8 and his response was we want back everything we're
9 entitled to.
10    Q.    Do you recall anything else about any
11 other discussions you had with either Mr. Kinzel
12 or Mr. Crage regarding suing Mr. Nail?
13        MS. KIRILA:  Objection.  Outside the
14        presence of counsel you can answer.
15        MR. PAPPAS:  Correct.
16    A.    No.
17    Q.    Who ultimately made the decision to
18 sue Mr. Nail, do you know?
19    A.    Mr. Kinzel.
20    Q.    How do you know that?
21    A.    Because I was reporting directly to
22 him on the matter and he would have had to approve
23 that actually.
24    Q.    The last page of your notes --
25    A.    I'm sorry, I just want to elaborate a

Page 179

C. Freeman

1
2 little bit.
3    Q.    Certainly.
4    A.    This was all of course with advice and
5 consultation with counsel through the process as
6 well in terms of, you know, whether -- whether,
7 um, what type of suit would be filed and that sort
8 of thing.  Where it would have to be filed and,
9 you know, just the technicalities and mechanics.
10    Q.    The last page of your notes, the first
11 entry is November 29th, 2007, correct?
12    A.    Yes.
13    Q.    Do you know what that little equal
14 sign is next to that?
15    A.    Yes, I wasn't absolutely sure that
16 that was the date.  So I just indicated it was on
17 or about November 29th because I made this note
18 after the conversation.
19    Q.    The previous notes were made during
20 the conversations?
21    A.    Yes.
22    Q.    And this particular note 11/29 was
23 made sometime after that conversation?
24    A.    Yes.
25    Q.    How soon after?

Page 180

C. Freeman

1
2    A.    It would have been before the next
3 conversation, which was on the 7th or the next
4 voice mail.  So sometime between those two dates.
5    Q.    Can you read the first entry under
6 11/29?
7    A.    "Lester returned call; appreciated
8 heads up."
9    Q.    That refers to you letting him know
10 that the lawsuit was filed?
11    A.    Yes.
12    Q.    Can you read the next entry?
13    A.    "Reiterated there was no intent on his
14 part to violate the agreement and he doesn't
15 believe he did."
16    Q.    Do you have any response to that?
17    A.    I don't recall.
18    Q.    Next entry?
19    A.    "Will come here and look Dick, slash,
20 Peter in the eye and tell them that."
21    Q.    So he is again offering to come and
22 speak to Mr. Crage and Mr. Kinzel; am I correct?
23    A.    That wasn't an again.  This was the
24 comment that I referred to earlier before you gave
25 me these notes.

Page 181

C. Freeman

1
2    Q.    So that was the first time he
3 mentioned that?
4    A.    As far as I can recall, yes.
5    Q.    Did you have any response to that?
6 When you told him that you would send that along.
7 Other than that did you have any response?
8    A.    Not that I recall.
9    Q.    Can you read the next entry?
10    A.    "Discussed whether there is room to
11 negotiate; told him I would talk to Dick."
12    Q.    Mr. Nail was asking you if there was
13 room to negotiate?
14    A.    Yes.
15    Q.    Did you have authority to negotiate at
16 that point?
17    A.    No.
18    Q.    You said you would talk to Dick.
19 That's Mr. Kinzel, correct?
20    A.    Yes.
21    Q.    And then the last line says "He said
22 his New York attorney says he has a very strong
23 case"?
24    A.    Feels.
25    Q.    "Feels he has a very strong case."  Do

46 (Pages 178 to 181)

C. Freeman

1  C. Freeman
2  you know what that refers to?
3      A.   The claim had been filed and he was
4  indicating to me that his New York attorney
5  believes he has a strong case with regard to the
6  lawsuit that's been filed.
7      Q.   Did you have any response to that?
8      A.   Not that I recall.
9      Q.   And then final entry, December 7,
10  2007, correct?
11      A.   Yes.
12      Q.   And did you make these notes during or
13  subsequent to the conversation?
14      A.   This was a voice mail and I made the
15  notes as I -- right after I left the voice mail.
16      Q.   And you left the voice mail for
17  Mr. Nail, correct?
18      A.   Yes.
19      Q.   Can you read what you wrote there?
20      A.   "Told him I talked to RK and there's
21  not flexibility in our position."
22      Q.   What does the next line say?
23      A.   "We feel the employment agreement was
24  breached and he was overpaid by $100,000 plus."
25      Q.   Next?

C. Freeman

1  C. Freeman
2      A.   "Easiest way for him to make this go
3  away is to write us a check -- write a check."
4      Q.   Did you ever speak to Mr. Nail after
5  leaving that voice mail?
6      A.   Not that I recall.
7      Q.   Other than the dates reflected in
8  these notes did you have any other discussions
9  with Mr. Nail after sending him the October 23,
10  2007 letter?
11      A.   As I indicated, there might have been
12  one I missed that probably would have been prior
13  to the 10/30, that I didn't make notes on.
14  Because we did have a discussion where that Larry
15  Levine thing came up and I believe that was within
16  this time frame, but, I mean, probably before the
17  10/30 date.
18      Q.   Do you recall anything that was
19  discussed in that undocumented conversation?
20  Other than Larry Levine?
21      A.   Not specifically, no.
22      Q.   Generally?
23      A.   Generally I believe that was the first
24  time we talked after Mr. Nail received the letter.
25      Q.   And do you recall anything that was

C. Freeman

1  C. Freeman
2  discussed generally?
3      A.   That would have been the conversation
4  where I indicated to him that he was the only
5  contract executive that -- the others found
6  positions, but he was the one who never
7  called and I'm sure he told me he didn't violate,
8  he didn't feel like he had breached the agreement.
9  Generally that sort of conversation.
10      Q.   Do you recall anything else at all
11  that you haven't already testified about, your
12  various discussions with Mr. Nail in October and
13  November of 2007 and December?
14      A.   No, I don't recall.
15      MR. PAPPAS:  Mark this as Exhibit L.
16      (Defendant's Exhibit L, letter to
17  Craig Freeman from Lester Nail, November 1,
18  2007, marked for identification, this date.)
19      Q.   I will show you what has been marked
20  as Defendant's Exhibit L.  This is a letter that
21  you received from Mr. Nail in early November 2007,
22  correct?
23      A.   Yes.
24      Q.   And he says "it was good to talk to
25  you."

C. Freeman

1  C. Freeman
2      Do you see that?
3      A.   Yes.
4      Q.   Does that refer to the October 30th
5  conversation, do you know?
6      A.   Can you repeat the question, please?
7      Q.   I will move on.  He says "I am happy
8  to hear that Cedar Fair had a good year."
9      Do you see that?
10      A.   Yes.
11      Q.   Do you recall discussing with Mr. Nail
12  that Cedar Fair had a good year?
13      A.   We made some small talk and I'm sure
14  he said how are things going, and I said fine, and
15  we didn't get into any specifics.
16      Q.   Did Cedar Fair have a good year?
17      A.   By some measures.
18      Q.   By whose measure?
19      A.   I guess in terms of financial
20  measures, we were on track with the guidance that
21  we had provided the markets.
22      Q.   In Mr. Nail's letter he says, "as you
23  know, PPI has not requested my services at any
24  time for any reason since the date of my
25  termination."

Page 186

C. Freeman

2    Do you see that?
3    A.    Yes.
4    Q.    Was that true as of November 1, 2007?
5    A.    Yes.
6    Q.    Did you ever ask Mr. Nail to perform
7    any services for either PPI or Cedar Fair at any
8    time after his termination?
9    A.    No.
10    Q.    To your knowledge did anyone at PPI or
11    Cedar Fair ever ask Mr. Nail to perform services
12    at any time after his termination?
13    A.    No.
14    Q.    Did you yourself ever consider
15    utilizing Mr. Nail's services at any time after
16    his termination?
17    A.    I don't have specific recollection of
18    any time when I did.
19    Q.    To your knowledge did anyone at PPI or
20    Cedar Fair ever consider utilizing Mr. Nail's
21    services at any time after his termination?
22    A.    Not to my knowledge.
23    Q.    Were you aware of any plans by PPI or
24    Cedar Fair to utilize Mr. Nail's services after
25    his termination?

Page 187

C. Freeman

2    A.    No circumstances arose where that was
3    given consideration.
4    Q.    You had no plans to do that, did you?
5    A.    As I said, no circumstances arose
6    where I needed to utilize Mr. Nail's services.
7    Q.    Did PPI or Cedar Fair ever ask any of
8    the other PPI executives who were terminated to
9    perform services after they were terminated?
10    A.    Yes.
11    Q.    Which ones?
12    A.    Pat Jones.
13    Q.    Anyone else?
14    A.    Would this include asking questions or
15    consulting with?
16    Q.    Whatever you would consider utilizing
17    their services.
18    A.    OK.  There were ad hoc conversations
19    with Mr. Weber.
20    Q.    Al Weber?
21    A.    Al Weber.  Mr. Fisher.  Those were the
22    only ones I'm aware of.
23    Q.    What services were Pat Jones asked to
24    provide after her termination?
25    A.    Pat Jones was reemployed by PPI.

Page 188

C. Freeman

2    Q.    As what?
3    A.    Vice president general manager for
4    Kings Dominion, the amusement park.
5    Q.    When was that?
6    A.    Sometime in the first half of 2007, I
7    believe.
8    Q.    Was her old employment agreement still
9    in effect at that time?
10    A.    Yes, it was.
11    Q.    And how was Mr. Al Weber's services
12    utilized?
13    A.    Ad hoc questions, nothing substantial.
14    Q.    About what?
15    A.    Maybe some of the historical things
16    that had happened.  I just don't recall
17    specifically.
18    Q.    Historical things that had happened in
19    the company or with respect to the employment
20    agreements?
21    A.    In the company.
22    Q.    How long did those ad hoc questions
23    take to ask and to answer?
24    A.    Minutes.
25    Q.    What about Mr. Fisher?

Page 189

C. Freeman

2    A.    Same sort of situation, minutes.
3    Q.    To your knowledge did Mr. Nail ever
4    refuse to perform any services for PPI or Cedar
5    Fair after his termination when asked?
6    A.    No.
7    Q.    Denny's is not a competitor of PPI, is
8    it?
9    MS. KIRILA:  Object to the extent it
10    calls for a legal conclusion, but you can
11    answer.
12    Q.    You didn't list Denny's among the
13    competitors though that you testified about this
14    morning, right?
15    A.    I gave you the significant, the most
16    significant competitors.
17    Q.    Would you consider Denny's to be a
18    competitor of PPI or Cedar Fair?
19    A.    Under a broad definition of
20    competition for discretionary income of the
21    family, you could.
22    Q.    In that sense virtually any company
23    that provides services would be a competitor,
24    correct?
25    (Witness nodded head up and down.)

C. Freeman

1
2      Q.    It's not a competitor of the industry
3   that PPI or Cedar Fair is in, is it?
4      A.    No.
5      Q.    It's a restaurant chain, right?
6      A.    Yes.  PPI has restaurants.
7      Q.    Within its hotels or within its parks?
8      A.    Both.  I'm sorry, PPI has no hotels.
9   Cedar Fair has hotels.
10     Q.    Other than those restaurants -- how
11  many restaurants are there?
12     A.    In the hotels or adjacent to the
13  hotels?
14     Q.    Any restaurant operated by PPI or
15  Cedar Fair.
16     A.    Many, many, many, many, many.
17     Q.    And those are on the properties of the
18  various amusement parks and water parks?
19     A.    Yes.
20     Q.    And they're in the nature of
21  concession stands and things like that?
22     A.    No.  For example, at Knott's Berry
23  Farm we have a TGI Friday's that operates on the
24  property but outside the park that's accessible to
25  anybody off the street.

C. Freeman

1
2         There's also a Chicken Dinner
3   Restaurant, full service restaurant at that
4   facility at that location and again, it's outside
5   the park.  It's not part of the gated admission
6   price.  It is available to anybody.
7         Cedar Point has TGI Friday's outside
8   the park accessible to anybody.
9         Famous Dave's, outside the park.
10  Knott's also has restaurants in their hotel that
11  are accessible to anybody.
12     Q.    Do they operate restaurants
13  independently of the parks?  Restaurants other
14  than that are either on the property of the park
15  or adjacent to the park.
16     A.    The TGI Friday's in Sandusky is
17  located at a hotel property owned by Cedar Fair,
18  but about, I don't know, two, three miles away
19  from the park.
20     Q.    Other than that?
21     A.    No.
22     Q.    Assuming that he had the time to do
23  both, is there anything inherently inconsistent
24  with Mr. Nail performing services for PPI while
25  being employed by Denny's?

C. Freeman

1
2         MS. KIRILA:  Objection.  That's the
3   basis of the suit.  You can answer.
4      Q.    In your view is there anything
5   inherently inconsistent with him performing
6   services for both, assuming he had the time to do
7   both?
8      A.    Assuming he had the time to do both,
9   no.
10     Q.    To your knowledge would PPI -- was PPI
11  involved in any litigation against Denny's?
12     A.    Not to my knowledge.
13     Q.    What about Cedar Fair?
14     A.    Not to my knowledge.
15     Q.    Do you have any knowledge one way or
16  the other whether Mr. Nail would have been willing
17  or able to cease his Denny's employment if he had
18  been requested to perform services for PPI during
19  the contract term?
20         MS. KIRILA:  Object to the extent it
21  calls for a definition of a legal term in a
22  contract, but you can answer.
23     A.    I have no such knowledge.
24     Q.    If Mr. Nail had been willing to cease
25  his Denny's employment at any time if asked to

C. Freeman

1
2   perform services for PPI, do you contend that his
3   Denny's employment still rendered him unable to
4   perform services for PPI?
5         MS. KIRILA:  Same objection.  But you
6   can answer.
7      A.    Could you please repeat the question?
8      Q.    Sure, if Mr. Nail had been willing and
9   able to stop working at Denny's at any time if
10  asked to perform services for PPI, would his mere
11  employment by Denny's have rendered him unable to
12  perform exclusive services for PPI?
13         MS. KIRILA:  Same objection.
14     A.    Not from the point he would have
15  terminated his employment with Denny's.
16     Q.    In March '08 Cedar Fair hired Duffield
17  Milkie as corporate vice president and general
18  counsel; is that correct?
19     A.    February.
20     Q.    February 2008?
21     A.    Yes.
22     Q.    Do you know who hired Mr. Milkie?
23     A.    Cedar Fair.
24     Q.    Do you know the person who hired
25  Mr. Milkie?

C. Freeman

1              C. Freeman
2     A.   He was selected by Mr. Kinzel.
3     Q.   Do you know why he was hired?
4     A.   He was hired to become corporate vice
5 president and general counsel for Cedar Fair LP.
6     Q.   They had never had that type of
7 position before, correct?
8     A.   Correct.
9     Q.   Did you discuss Mr. Milkie's hiring
10 with anyone?
11     A.   Talked with Mr. Crage, Mr. Kinzel.  HR
12 director, my assistant.
13     Q.   Was that before or after he was hired?
14     A.   Before, during and after.
15     Q.   Did you have any input into his
16 hiring?
17     A.   I did not interview Mr. Milkie.
18     Q.   Other than interviewing him did you
19 have any input into his hire?
20     MS. KIRILA:  Objection.  He testified
21 you did not interview him.
22     THE WITNESS:  No.
23     Q.   You can have input other than
24 interviewing someone.  So I am asking other than
25 interviewing did you have any input?

C. Freeman

1              C. Freeman
2     A.   I expressed my opinion.  You know,
3 input is given and input is taken and I don't know
4 how much my opinion was considered.
5     Q.   What was your opinion, that general
6 counsel should or should not be hired?
7     A.   I felt that the position was
8 necessary.
9     Q.   Do you know when Cedar Fair first
10 considered hiring Mr. Milkie.
11     A.   First considered.  The very -- the
12 very first contact that I'm aware of between
13 Mr. Milkie and Cedar Fair regarding a position was
14 in the summer of 2007.
15     Q.   But he wasn't hired until February '08
16 you said?
17     A.   Right.
18     Q.   I want to go back to the reversal of
19 the direct deposit.  Did you authorize that?
20     A.   Yes.  I authorized -- I authorized
21 stopping the payment of the paycheck that was to
22 be paid on the 19th.
23     Q.   Who authorized the reversal of the
24 direct deposit?
25     A.   I guess that would be me.  Because the

C. Freeman

1              C. Freeman
2 bank could not process my order from the 18th
3 before the money went into the account.
4     Q.   So the money was already in the
5 account and you authorized the -- who did you
6 authorize to take the money out of the account?
7     MS. KIRILA:  Object to form.  Compound
8 question.
9     Q.   The money was already in the account,
10 correct?
11     A.   Not when I -- not when I directed that
12 the payment be stopped.
13     Q.   Right, but they couldn't stop it in
14 time and some more money got put into the account,
15 correct?
16     MS. KIRILA:  Objection.  To the extent
17 you know.
18     Q.   Isn't that what you just testified to?
19     A.   The money could not be stopped from
20 going into the account based on the timing of my
21 order to stop the payment.
22     Q.   And if it could not be stopped from
23 going into the account that means that it went
24 into the account, correct?
25     A.   To my knowledge, it did.

C. Freeman

1              C. Freeman
2     Q.   Then what happened?
3     A.   Based on my order to stop the payment
4 on the 18th, a correction was made to reverse it.
5     Q.   Who made that correction?
6     A.   The bank.
7     Q.   Who communicated that to the bank?
8     A.   Debbie Thompson.
9     Q.   Who is Debbie Thompson?
10     A.   Payroll manager.
11     Q.   Of Cedar Fair?
12     A.   PPI.
13     Q.   PPI?  Reports to you?
14     A.   No.
15     Q.   Who does she report to?
16     A.   I believe she reports to Les --
17     THE WITNESS:  What is Les's last name,
18 Lester?  Les in IT?
19     MS. KIRILA:  You can testify to your
20 knowledge.
21     A.   Les in IT.
22     MR. PAPPAS:  Can you mark this as
23 Exhibit M.
24     (Defendant's Exhibit M, e-mail from
25 Craig Freeman to Debbie Thompson, dated

Page 198

C. Freeman

1    C. Freeman
2    October 27, 2007 and e-mail from Thompson to
3    Freeman, dated October 25, 2007, Bates No.
4    PPI000103, marked for identification, this
5    date.)
6    Q.    I show you what has been marked as
7    Defendant's Exhibit M.  The top portion is an
8    e-mail that you sent to Debbie Thompson on
9    October 27, 2007; is that correct?
10   A.    Yes.
11   Q.    And what does that refer to?
12   A.    This refers to my notifying her on
13   Thursday, October 18th, that Lester was not to be
14   paid.
15   Q.    And the e-mail below that is from
16   Debbie Thompson to you and you received that on
17   October 25, 2007; is that correct?
18   A.    Yes.
19   Q.    What does her e-mail refer to?
20   A.    Her e-mail refers to the correction
21   being made.  To reverse the direct deposit.
22   Q.    So after the direct deposit was
23   reversed that meant that Mr. Nail had only been
24   paid through the end of September, 2007; is that
25   correct?

Page 199

C. Freeman

1    C. Freeman
2    A.    Yes.
3    Q.    Did you attempt to get Mr. Nail's
4    authorization to take that money out of his
5    personal bank account?
6    A.    When I gave the direction, the money
7    was not in the account.
8    Q.    Before it was removed did anyone at
9    the company try to get Mr. Nail's authorization to
10   do that?
11   A.    Not that I know of.
12       MR. PAPPAS:  Mark this as Exhibit N.
13       (Defendant's Exhibit N, e-mail from
14   Sandy Cranford to Craig Freeman, dated
15   November 19, 2007, Bates No. PPI000765,
16   marked for identification, this date.)
17   Q.    I show you what has been marked as
18   Defendant's Exhibit N as in Nancy.
19       This is an e-mail from you -- from
20   Sandy Cranford to you dated November 19, 2007,
21   correct?
22   A.    Yes.
23   Q.    Do you know whose handwriting that is?
24   A.    Mine.
25   Q.    And what does this e-mail refer to?

Page 200

C. Freeman

1    C. Freeman
2    A.    This was to calculate the value of the
3    salary and benefits that we had overpaid between
4    February 23rd of 2007 and September 30th of 2007.
5    Q.    And what was the value?
6    A.    $99,000 plus $7,983.50.
7    Q.    Isn't that the salary and benefits
8    combined?
9    A.    Yes.
10   Q.    What is just the benefits?
11   A.    $7,983.50.
12   Q.    Is that accurate as far as you know?
13   Sitting here today.
14   A.    It does not reflect any payroll taxes
15   that would have been paid.
16   Q.    It reflects medical and dental,
17   correct?
18   A.    Life, AD and D.
19   Q.    Everything except payroll taxes?
20   A.    Everything that I'm aware of,
21   everything that I was told.
22   Q.    So other than the salary that you say
23   Mr. Nail was overpaid, and other than the payroll
24   taxes, the amount as far as the value of benefits
25   you would say he owes is what?

Page 201

C. Freeman

1    C. Freeman
2    A.    According to this calculation,
3    7,983.50.
4    Q.    Did you and Mr. Crage ever exchange
5    e-mails about the Lester Nail situation?
6    A.    Not that I recall.
7    Q.    Are you aware of any documents that
8    were in existence relating to Lester Nail's
9    situation that were deleted?
10   A.    No, I'm not.
11   Q.    Are you aware of any that were
12   destroyed?
13   A.    No, I'm not.
14   Q.    Are you aware of any that were lost?
15   A.    No, I'm not.
16       MR. PAPPAS:  Could we just take a
17   quick break?
18       MS. KIRILA:  Yes.
19       (A recess was taken from 3:09 through
20   3:15 p.m.)
21   BY MR. PAPPAS:
22   Q.    I just have a couple of more
23   questions.  Did you ever speak to anyone who was
24   formerly at CBS regarding the meaning of
25   Mr. Nail's employment agreement?

51 (Pages 198 to 201)

Page 202

C. Freeman

1
2    A.    No.
3    Q.    You never spoke to Al Weber about
4  that?
5    A.    Um, not without counsel present.
6    Q.    Which counsel was present?
7    A.    Jill and Mr. Milkie.
8    Q.    Mr. Weber is not employed by PPI or
9  Cedar Fair, is he?
10        MS. KIRILA:  Go ahead.  You can answer
11        that, but I am going to instruct you not to
12        answer because he was consulted in his
13        capacity as a former CEO and officer and
14        within the privilege.
15    Q.    You can answer as to whether he was an
16  employee of PPI or Cedar Fair at the time of that
17  conversation.
18    A.    No, he was not.
19    Q.    When did that conversation take place?
20    A.    Friday, April 18th, 2008.
21    Q.    How long did it last?
22    A.    Ten minutes.
23    Q.    Who was present during that
24  conversation?
25    A.    I was and the two attorneys I

Page 203

C. Freeman

1
2  mentioned.
3    Q.    And Mr. Weber?
4    A.    It was a telephone conversation, yes.
5    Q.    So you, two attorneys from the Squire
6  firm?
7    A.    One from Squire and our general
8  counsel, Mr. Milkie.
9    Q.    And then Mr. Weber was on the other
10  end of the phone?
11    A.    Yes.
12    Q.    Do you know if anybody was with him?
13    A.    I do not know.
14    Q.    Where did that take place?
15    A.    In Squire Sanders' offices in
16  Cleveland.
17    Q.    Do you know where Mr. Weber was at the
18  time?
19    A.    I believe he was in his home office.
20    Q.    Which is where?
21    A.    In North Carolina.
22    Q.    When you say his home office, an
23  office within his home?
24    A.    Yes.
25        MR. PAPPAS:  That's it.  No further

Page 204

C. Freeman

1
2  questions.
3        (Time noted:  3:18 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 205

C. Freeman

1
2
3        I, the witness herein, having
4    read the foregoing testimony do hereby
5    certify it to be a true and correct
6    transcript, subject to the corrections,
7    if any, shown on the attached page.
8
9
10
11    _____
12        CRAIG FREEMAN
13
14
15
16  Subscribed and sworn to
17  before me this _____ day
18  of _____, 2008.
19
20
21
22  _____
23
24
25

Page 206

```
 1
 2                C E R T I F I C A T E
 3   STATE OF NEW YORK    )
 4                : ss.
 5   COUNTY OF SUFFOLK    )
 6
 7        I, THOMAS R. NICHOLS, a Notary Public
 8   within and for the State of New York, do
 9   hereby certify:
10        That CRAIG FREEMAN, the witness whose
11   deposition is hereinbefore set forth, was duly
12   sworn by me and that such deposition is a true
13   record of the testimony given by the witness.
14        I further certify that I am not
15   related to any of the parties to this action
16   by blood or marriage, and that I am in no way
17   interested in the outcome of this matter.
18        IN WITNESS WHEREOF, I have hereunto
19   set my hand this 30th day of April, 2008.
20
21
22        _____
23              THOMAS R. NICHOLS
24
25
```

Page 207

```
 1
 2                I N D E X
 3   WITNESS       EXAMINATION BY      PAGE
 4   CRAIG FREEMAN   MR. PAPPAS         3
 5
 6            E X H I B I T S
 7   DEFENDANT'S EXHIBITS          PAGE LINE
 8   A, memorandum dated June 30,       75  23
        2006, re:  "The Sale of
 9      Paramount Parks, Inc. To
        Cedar Fair, L.P."
10
     B, document purported to be        78   9
11      Lester Nails' employment
        contract with PPI, Bates
12      Nos. LES00038 through 45
13   C, letter from Richard Kinzel      94  14
        to Lester Nail dated July
14      27, 2006
15   D, one-page document entitled      97  15
        "Personnel Action Request
16      Form," Bates No. PPI000014
17   E, 2-page letter from Craig       101  11
        Freeman to Lester Nail,
18      August 9, 2006, Bates Nos.
        LES00016 and 17
19
     F, cover letter from Craig        104   2
20      Freeman to Lester Nail,
        dated September 12, 2006,
21      with attachment entitled
        "Separation and Release
22      Agreement," Bates Nos.
        LES00021 through 29
23
     G, complaint in present action    121   9
24
25
```

Page 208

```
 1
 2            I N D E X (Continued.)
 3            E X H I B I T S
 4   DEFENDANT'S EXHIBITS          PAGE LINE
 5   H, cover letter dated May 21,      130  14
        2007 from Craig Freeman to
 6      Lester Nail with attached
        document titled "Declaration
 7      Section," with other
        attachments
 8
     I, letter to Lester Nail from     142   5
 9      Craig Freeman, dated October
        19, 2007, Bates No. LES0018
10
     J, letter from Craig Freeman to   147   6
11      Lester Nail, October 23, 2007,
        Bates No. LES00019
12
     K, 3-page handwritten notes with  162  19
13      some redacted portions, Bates
        Nos. PPI00762 through 764
14
     L, letter to Craig Freeman from   184  16
15      Lester Nail, November 1, 2007
16   M, e-mail from Craig Freeman to   197  24
        Debbie Thompson, dated
17      October 27, 2007 and e-mail
        from Thompson to Freeman,
18      dated October 25, 2007,
        Bates No. PPI000103
19
     N, e-mail from Sandy Cranford to  199  13
20      Craig Freeman, dated November
        19, 2007, Bates No. PPI000765
21
22
23
24
25
```

53 (Pages 206 to 208)

**A**

**abide** 66:7
**ability** 6:25 7:3,9
  102:2,18 120:5
  123:22 124:3,19
  124:22 192:17
  193:9
**absolutely** 179:15
**absorb** 90:9,10,20
**absorbed** 90:24
**accept** 118:7 157:10
  161:11
**acceptable** 106:7
  117:14,18
**accepted** 160:13
**accepting** 160:12
  164:20
**access** 18:18 74:25
**accessible** 190:24
  191:8,11
**account** 145:25
  174:8 196:3,5,6,9
  196:14,20,23,24
  199:5,7
**accounts** 146:5
**accurate** 77:5
  101:25 103:4
  167:18 200:12
**accurately** 7:17
**acknowledged**
  118:4
**acquired** 23:22 24:3
  25:19 40:2 42:5,7
  45:9 77:20 80:15
  100:25
**acquiring** 40:23
**acquisition** 23:18
  25:23 26:4 28:21
  28:23 29:6 40:16
  42:2 43:3 45:10
  47:14 49:11 50:5
  50:20 51:6,9,20
  52:14 55:20 57:19
  57:24 58:13,14,16
  61:8,22 63:5,15
  64:10 65:18
**action** 97:16 98:6
  121:10,16 140:9
  175:22 176:9
  206:15 207:15,23
**active** 76:23 77:13
  124:7 140:22
**actively** 65:6 71:4
  71:12 132:25
  133:5
**activities** 68:13
**actual** 23:8
**ad** 31:13 50:16
  187:18 188:13,22

200:18
**added** 29:4
**additional** 26:4 29:3
  29:5
**address** 3:7 96:3
  125:10,24 126:3
  149:17
**adjacent** 37:14 46:3
  190:12 191:15
**adjustment** 146:24
**administering** 79:18
**administration** 20:2
  22:10 23:13 24:12
  24:15 27:10,12
  107:15,16
**administrative**
  24:19 29:13 53:18
  55:24 56:3,18 57:7
  59:11,20 71:19
  72:12 73:8 74:5,16
  75:6 81:9,13 83:23
  88:16
**admission** 43:18
  191:5
**advance** 160:12
**advanced** 161:24
**Adventure** 44:14
**advice** 111:15,25
  179:4
**advised** 125:20
  126:2
**advising** 88:12
**advisory** 37:7
**affect** 6:25 7:3,6,9
**affirmative** 72:23
**age** 151:24 154:13
  154:18,21 170:3
  170:11
**ago** 5:14
**agreed** 138:5 162:8
**agreement** 1:17 8:6
  8:7 24:2,5 44:19
  45:16,17 62:9,18
  62:22 66:11,16
  82:10 90:17
  102:22 104:5
  105:20,23 106:21
  111:2 112:22
  113:6,18,21,24
  115:8 116:13,15
  120:6 122:9
  124:17 125:2,14
  136:21 137:25
  145:11 152:24
  164:8,15,19 174:2
  180:14 182:23
  184:8 188:8
  201:25 207:22
**agreements** 24:19
  25:7,9,14,17 48:18

62:2,14 63:17,21
  65:3,16,25 66:6,8
  66:20 80:23 81:22
  82:11 83:17,18
  96:24 106:7 107:2
  107:17 160:6
  188:20
**agrees** 112:25
  123:12
**aha** 11:6
**ahead** 47:2 71:8
  99:20 138:22
  139:21 177:6
  202:10
**ahold** 99:13
**airport** 135:13
  136:11
**Al** 54:5,6 71:24
  187:20,21 188:11
  202:3
**alcoholic** 6:15
**alive** 154:18 170:3
**allege** 130:8
**alleges** 121:19 125:9
  126:23 134:20
**allowed** 105:24
**all-day** 50:8 51:13
**ambiguous** 152:10
  155:24 164:25
**America** 22:25 24:3
  27:7 30:2 35:25,25
  44:9 45:14 64:19
**amount** 105:21
  106:21 108:20
  117:20 153:17,18
  157:17 177:24
  200:24
**amounts** 109:11
**amusement** 42:17
  42:20 43:6,9,15
  45:21 46:4 188:4
  190:18
**and/or** 43:14 76:24
  124:13
**answer** 3:24 9:18
  12:3,17 14:8 33:5
  46:24 51:12 52:2,5
  52:6 55:22 59:3
  78:3 85:2 93:11
  98:19 99:25
  107:24 110:19
  111:5 116:2
  122:17,22 129:16
  136:7 146:19
  160:9 178:14
  188:23 189:11
  192:3,22 193:6
  202:10,12,15
**answered** 84:23
  128:16

**answering** 5:2
**answers** 4:19 5:5
**anybody** 49:18 68:7
  93:17 190:25
  191:6,8,11 203:12
**anyway** 119:10
  133:9
**apologize** 84:24
  152:20
**apparently** 173:24
**appears** 78:17 98:5
  132:7,18
**applicable** 124:13
**applied** 40:25
  155:15
**apply** 113:14 114:15
  114:22
**appreciated** 180:7
**approached** 25:23
**appropriate** 105:21
  106:4 108:20
  173:23
**approval** 35:9
  138:14
**approve** 33:7 34:15
  34:19 38:14,18
  144:11 149:10
  178:22
**approved** 68:22
**approving** 38:22
**approximately** 32:4
  87:24 88:3,4,9
  101:4
**April** 1:10 10:7
  12:10 202:20
  206:19
**area** 50:11 56:24
**arm** 5:25
**arose** 187:2,5
**arts** 20:6
**ascertain** 70:23
**asked** 11:14 26:25
  50:15 51:10,11,18
  51:21,22 82:20
  83:25 84:10,22,25
  86:21,25 87:4,21
  88:22 89:4 126:5
  126:19 127:14
  133:8 136:6 153:8
  163:25 187:23
  189:5 192:25
  193:10
**asking** 3:23 15:18
  51:24 76:17 77:8
  81:23 122:8
  135:22 165:14
  181:12 187:14
  194:24
**Aspirin** 6:22
**asset** 24:20

**assignment** 64:11
**assimilated** 26:2
**assist** 25:10,12
**assistance** 18:5
  141:19
**assistant** 17:24
  29:13 149:7
  194:12
**assisting** 88:14
**associate** 20:6
**associated** 46:4
  108:3 175:9
**assume** 4:11 156:12
**assumed** 24:5 28:14
  99:22 100:21
  119:8
**Assumes** 99:24
  146:18
**assuming** 86:18
  124:21 191:22
  192:6,8
**attached** 130:16,24
  131:4,5,9 205:7
  208:6
**attachment** 104:4
  104:12 105:4
  207:21
**attachments** 130:18
  208:7
**attempt** 150:5,9
  199:3
**attend** 31:14
**attendance** 50:12
**attended** 16:19
  29:23
**attendees** 33:13
**attention** 59:6 69:11
  110:21
**attorney** 9:13 11:7
  13:10 14:12 16:17
  91:6 111:7 112:13
  112:17,20 114:4
  173:15 181:22
  182:4
**attorneys** 2:5,13
  3:13 12:25 49:3,24
  173:24 202:25
  203:5
**attraction** 45:5
**August** 82:7 98:16
  101:12,17 207:18
**author** 77:10
**authority** 138:13
  181:15
**authorization** 199:4
  199:9
**authorize** 195:19
  196:6
**authorized** 195:20
  195:20,23 196:5

**authorizes** 33:6
**available** 191:6
**Avenue** 1:16,24
  2:14
**Average** 31:18
**aware** 40:24 60:22
  61:25 62:4 67:13
  82:18 93:17
  108:14 159:25
  186:23 187:22
  195:12 200:20
  201:7,11,14
**a.m** 1:10 56:14
  94:10,11

**B**

**B** 78:8,9,15 112:23
  207:6,10 208:3
**bachelor's** 19:23
**back** 8:14 26:23
  34:9,12 109:8
  112:21 118:25
  119:3,16,20 125:8
  132:16 134:19
  153:7,19 157:12
  159:11 170:8
  178:8 195:18
**background** 128:12
  128:22 130:4
**balance** 166:11
**ballpark** 71:16
**bank** 145:25 146:5
  146:11,12,13,15
  152:14 157:5
  196:2 197:6,7
  199:5
**based** 41:7 60:8
  68:17 69:9 79:24
  96:12 111:24
  146:10,19,21
  157:25 168:11
  173:21 196:20
  197:3
**basically** 23:10
  72:23 84:5 137:10
**basis** 31:13 50:16
  70:21 87:2 157:11
  192:3
**Bates** 78:11 97:17
  101:13 104:5
  131:3,23 142:7
  147:8 162:21
  198:3 199:15
  207:11,16,18,22
  208:9,11,13,18,20
**bcc** 104:21
**began** 176:13
**beginning** 27:8
**behalf** 26:3,3
**believe** 21:24 23:7

43:9 47:7,17 50:21
65:8,9 72:14 73:9
80:8 82:6 102:2
104:17 106:3
112:23 116:21
121:24 122:5,18
152:3 156:17
157:13 159:24
163:17,20 164:22
164:24 165:14
166:21 167:5
172:13 173:15
174:6 175:16
180:15 183:15,23
188:7 197:16
203:19
**believed** 19:17
  167:8
**believes** 182:5
**benefit** 33:17 37:5
  48:3,9 102:21
  107:6,11 108:7
**benefits** 18:22,23
  36:21 48:4,5,19
  49:24,25 77:24
  102:14,15 107:19
  121:21 122:3,11
  122:23 123:9,17
  123:18,21 124:2,5
  124:6,13,22 125:3
  125:23 128:4
  130:9,24 132:5
  134:6 200:3,7,10
  200:24
**benefitted** 107:8
**Bernes** 48:11 49:23
**Berry** 23:17,25,25
  24:4,13 43:24
  190:22
**best** 67:5 82:3 89:8
  103:19
**better** 127:15 129:2
  155:19
**beverages** 6:16
**beyond** 16:23
**bid** 49:17
**bidding** 37:5
**big** 47:10
**Billy** 17:12 28:5
  29:2 103:14
**bit** 22:22 24:24 84:4
  153:19 173:21
  179:2
**blacked** 174:23
**blank** 131:6
**block** 174:13
**blocked** 174:13
  175:4
**blood** 206:16
**board** 91:11 145:13

**Bob** 55:8
**bono** 113:23 114:6
**boss** 13:12,13 152:3
  154:25 155:5
**bottom** 95:2
**breach** 125:14 126:9
  136:21
**breached** 121:24
  123:20 182:24
  184:8
**break** 5:6 56:8
  93:10 94:9 120:18
  201:17
**Brett** 54:15
**brief** 17:8 73:19
  177:4
**briefly** 3:19
**bring** 84:5 107:4
  110:3,4
**bringing** 177:15,18
**broad** 189:19
**broke** 5:25
**brokers** 49:25
**brought** 29:2 30:16
  109:12,16 177:7
**building** 32:9 37:11
  37:13,16
**bullet** 102:5
**bulleted** 140:4
**Busch** 47:3
**business** 16:23 20:2
  20:22 30:5,10
  36:15 42:15,18,21
  47:11 58:8 113:5
  115:21 116:4,9,16
**businesses** 46:12,15
**buy** 105:19
**buyout** 117:20

**C**

**C** 2:2 3:1,2 4:1 5:1
  6:1 7:1 8:1 9:1
  10:1 11:1 12:1
  13:1 14:1 15:1
  16:1 17:1 18:1
  19:1 20:1 21:1
  22:1 23:1 24:1
  25:1 26:1 27:1
  28:1 29:1 30:1
  31:1 32:1 33:1
  34:1 35:1 36:1
  37:1 38:1 39:1
  40:1 41:1 42:1
  43:1 44:1 45:1
  46:1 47:1,5 48:1
  49:1 50:1 51:1
  52:1 53:1 54:1
  55:1 56:1 57:1
  58:1 59:1 60:1
  61:1 62:1 63:1

64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1,13,14,19 95:1
96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
143:4 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:2,2 207:13
**calculate** 200:2
**calculation** 201:2
**calculations** 106:5
**California** 19:24
  20:9 43:24 44:2,9
  44:20,21
**call** 50:15 73:21,23
  93:20 103:20
  116:25 119:16
  120:23 145:17
  152:24 172:21

180:7
**called** 3:2 71:19
  72:4 116:23
  150:23 170:21
  171:5,6 184:7
**calling** 114:2
**calls** 78:2 92:25
  111:4 122:15
  129:6 145:4
  159:19 168:9
  189:10 192:21
**Camp** 22:24 23:6,8
  23:13,22 24:2 30:2
  35:25
**campgrounds** 46:8
  46:9
**Canada** 47:12
**Canada's** 44:6
  45:14 55:6
**capacities** 36:3,4
**capacity** 6:2 29:21
  54:21 70:2 115:3
  115:17 202:13
**capital** 44:23
**care** 72:24,25
**Carolina** 44:8
  203:21
**Carowinds** 11:20
  28:12 44:8 45:14
  55:10
**carry** 156:17
**case** 5:15,17,21 6:11
  8:14 11:4 13:9,20
  13:23 14:10 17:4,7
  17:15 18:4,16 19:2
  19:7 47:2 152:17
  158:16 181:23,25
  182:5
**cashier** 113:17
**category** 43:11,12
**cause** 65:3 72:18
  80:22 81:13 82:9
  82:15,25 83:16,24
  91:21,25 96:23,25
  99:23 101:4
  102:25 112:8
  124:9,12,24 125:4
**CBS** 25:19 40:2
  41:9 42:5 45:10
  48:4,8 49:10,19,23
  61:11 62:6 66:10
  76:8,14 201:24
**cease** 192:17,24
**Cedar** 13:17 15:25
  21:13,14,15,18,22
  21:25 23:4,16,22
  23:24,24 24:3 26:3
  26:13,14 28:8
  35:20 42:8,19 43:6
  43:21 45:19,22

46:6,11,18,18,21
47:11,15 48:22,25
52:12 61:14 66:15
67:2,16 75:25
76:10 77:20,24
78:19 80:15 82:16
82:21 91:10 99:8
100:24 115:13,16
146:7 150:9 185:8
185:12,16 186:7
186:11,20,24
187:7 189:4,18
190:3,9,15 191:7
191:17 192:13
193:16,23 194:5
195:9,13 197:11
202:9,16 207:9
**cell** 163:20
**Center** 2:6
**CEO** 13:16,17 30:9
30:20 39:11 48:24
54:8 202:13
**certain** 34:20 53:17
53:20 124:6
**Certainly** 179:3
**certainty** 70:24
**certificates** 21:5
**certify** 205:5 206:9
206:14
**CFO** 54:13
**chain** 190:5
**chairman** 13:16
**change** 25:21,22
30:15 67:22 76:25
77:15
**changed** 25:19
28:19 81:12
125:10 173:24
**characterization**
114:18
**charge** 154:19
**Charlotte** 41:7
65:12 69:18 75:17
85:5 135:13 170:3
170:7,10 172:5
173:15
**chart** 42:12
**check** 15:13 75:4,5
153:17 183:3,3
**checking** 174:7,19
**Chicken** 191:2
**chief** 30:16 35:17
**chose** 167:17
**chronologically**
152:19
**chronology** 157:12
**circumstances**
137:14 187:2,5
**city** 32:11 43:23,25
44:3,4

**claim** 182:3
**claims** 100:19
**clarify** 26:23
**Clark** 17:12,14,22
28:5 29:2 103:15
**clause** 167:22
168:16
**clear** 27:18 100:8
**Cleveland** 100:14
203:16
**close** 84:21 86:13,15
170:4,25
**closed** 51:9
**closing** 50:4,7,20
51:5 53:2,6,7,10
53:19 55:16 57:19
57:23 58:18 59:9
59:15,16 60:17
61:3,7,13,24 62:9
66:9,15 68:16,25
69:2 72:3 75:10
81:9 84:3,11 85:15
85:25 87:25
**closure** 84:5 107:4
110:4 120:12
**COBRA** 102:4,10
102:19,21 147:16
147:20
**code** 98:22
**codes** 99:4,7,9,13
**cold** 3:21 176:7
**collecting** 116:12
**college** 16:24 19:20
19:21 20:7
**Columbus** 2:8
**combined** 200:8
**come** 35:23 53:24
74:23 80:14 89:14
135:16 152:12
180:19,21
**comes** 119:3
**comfortable** 84:7
**coming** 118:25
152:19 166:4
**comment** 15:19
156:8 157:5,10
158:15 165:3
166:7 167:23
168:6,23 169:9
170:11 180:24
**comments** 161:8
172:11
**committee** 37:7
**communicate** 89:21
160:22
**communicated**
71:23,25 85:13
92:4 173:4 197:7
**communicating**
14:5 93:12

**communication**
76:13
**communications**
9:19 18:4 112:11
174:25 175:6
**commuted** 170:24
172:4
**company** 13:18
16:15 19:18 21:16
22:4 42:14,15,19
60:5 64:12 69:15
79:23 80:8 85:14
86:12 90:19 92:5
106:8 119:20
125:3 132:21
133:13 188:19,21
189:22 199:9
**compared** 105:22
**compensated** 114:6
114:7
**compensation** 20:25
107:19 166:12
**competition** 189:20
**competitive** 49:17
**competitiveness**
46:25
**competitor** 113:15
189:7,18,23 190:2
**competitors** 46:21
189:13,16
**complaint** 8:12,15
8:16 121:9,15
125:8 126:23
134:20 175:20,21
175:22,25 176:4
207:23
**complete** 54:3 65:9
89:6,7 131:19
133:17 165:20,23
**completed** 89:5
98:12 136:7
**completely** 7:17
58:20,21 123:5
**complex** 37:15,16
**comply** 81:20
**Compound** 196:7
**concerned** 151:23
**concerning** 157:5
177:5
**concerns** 133:25
**concession** 190:21
**concessionaires**
25:8
**conclusion** 60:7,10
60:11 78:2 89:21
111:5 114:2
122:15 189:10
**conclusions** 58:12
**concurrent** 76:9
**conditions** 66:8

**conducts** 35:4
**conferences** 9:23,25
**confirm** 140:17,21
**confirmed** 52:9
**conflict** 31:22
**consider** 186:14,20
187:16 189:17
**considerable** 110:13
**consideration** 187:3
**considered** 22:11
195:4,10,11
**considering** 58:23
**consistent** 32:14
37:24 79:6 80:5
**constitutes** 125:13
**consultants** 49:25
50:2
**consultation** 176:2
179:5
**consulted** 32:25
38:12,20 152:16
202:12
**consulting** 143:18
174:19 187:15
**consumed** 6:15
**consummated** 26:5
**contact** 48:10
125:20,23,24
126:3 140:20
141:16 150:6,9
153:13 159:4,20
176:5 195:12
**contacted** 118:23
134:3 136:20,22
137:17 141:5,12
143:17 152:2
154:25 158:21,25
159:5,7 160:11
**contacting** 140:25
**contain** 68:12
**contemplated** 125:2
**contemplating**
90:25
**contend** 113:9
123:19 125:13
193:2
**context** 91:20 96:19
140:6
**contingent** 161:13
**continuation** 172:20
**continue** 51:19
55:20 56:4 71:12
83:17 102:18
124:13,22 125:3
160:5,14
**continued** 73:14
82:12 107:18
115:9 172:19
208:2
**continuing** 63:7

99:18 102:14,15
113:25 122:21
140:8
**continuously** 174:19
**contract** 23:3 43:17
67:6,9 68:5 71:5
71:14 77:19 78:3
78:11,16,18,22
96:5,24 101:5,7
110:9 115:3,18
121:25 122:12,19
126:9 133:14
152:9 155:24
164:25 166:23
167:6,7 168:15
184:5 192:19,22
207:11
**contracts** 20:25
34:15,16,20,22
38:18,21 56:6
65:11 67:3,17
68:12 73:14 79:21
80:17 90:22 96:3,4
106:11 108:11
153:12 158:20
160:8,15
**contractual** 24:24
25:2,5
**controlled** 23:10,10
**Cont'd** 143:6
**convenience** 131:20
133:18
**convenient** 56:9
**conversation** 13:2,7
73:16,18 75:14
83:6 85:12 86:6,9
86:18,21 87:19
91:15 92:13,17,20
93:22 115:4
117:11,12 118:11
118:13,15,18,22
119:2,6 127:8,13
127:19,24 128:15
129:18 135:15,17
138:4,7,25 139:3,6
139:7,8,10 141:10
151:2,6,7 154:7,9
156:6 158:10
159:8 162:4
163:14 166:19
168:11 169:24
171:24 172:2,18
173:17,18,22,25
179:18,23 180:3
182:13 183:19
184:3,9 185:5
202:17,19,24
203:4
**conversations** 9:20
12:4 14:9,11,18

15:7 18:8 19:8
30:7 50:23 73:20
83:12 144:25
151:10,16,20
153:3,5,25 154:2
160:18 161:9,16
163:3,4 174:20
176:12,24,25
179:20 187:18
**conversion** 128:5
**convert** 83:22
**converting** 48:4
**convey** 14:7
**conveyed** 118:17
**cooperative** 41:19
**copies** 81:17
**copy** 99:14 149:18
**corporate** 17:9
18:13 22:9 24:17
26:12 27:10,12
28:22,25,25 35:17
36:2,14 41:4,8
80:11 84:21 86:13
86:16 88:17 90:11
90:21 193:17
194:4
**corporate-wide**
99:10
**corporation** 2:12
21:17 22:12
**corporation's** 80:2
**correct** 7:24 8:16
19:15 24:9 33:7
35:10 39:14 41:11
42:23 47:18 49:15
57:8 58:19 66:3
74:7,18 77:17,21
78:16,23 81:10,15
83:9 84:11 86:14
89:12 92:2,3,10,24
94:21 97:12 98:16
99:17 100:6 101:5
101:8,18 103:2
104:14 108:24
110:9 121:16
124:24 129:9,13
130:22,25 131:6
131:20 133:6,7,18
140:2 141:13,20
143:12 144:3,8
148:14 149:20
150:24 155:10,25
156:13 157:2
159:2 164:25
165:6,8 166:14,17
168:4 169:19
170:4,17,19 172:2
172:8,22 174:8
175:14 176:17
178:15 179:11

180:22 181:19
182:10,17 184:22
189:24 193:18
194:7,8 196:10,15
196:24 198:9,17
198:25 199:21
200:17 205:5
**correction** 146:23
146:24 197:4,5
198:20
**corrections** 205:6
**correctly** 102:17
165:11 168:21
171:3
**correspondence**
8:14 17:7,14 115:4
115:6
**cost** 178:3
**costs** 107:13 177:23
**counsel** 7:19,21
10:11 12:23 14:12
15:5 16:13 24:23
25:6 39:22 61:23
70:2 76:14,15 79:3
79:11 80:2,5,6,12
81:20 91:9 95:5,5
97:7,7 100:3,8,24
101:22,23 103:13
104:17 106:3
111:13,25 112:12
137:12 141:19
143:15,17,18
144:6,20 149:5,6
152:16 171:5,7
174:20,21,25
176:24 178:14
179:5 193:18
194:5 195:6 202:5
202:6 203:8
**counsels** 100:12
**counsel's** 111:15
**counterclaim**
153:22 158:16
166:6 169:7
**counteroffer** 119:17
**counterproposal**
118:25 121:2
**County** 43:25 206:5
**couple** 32:8 36:17
37:10 50:6 55:13
98:8 117:4 141:17
201:22
**course** 39:9 127:13
137:15 179:4
**courses** 16:23
**court** 1:2 4:19,23
5:4 8:16 121:15
122:16 134:20
168:4,15 175:21
176:9 177:23

**cover** 104:2,16
130:14 131:10
133:16 207:19
208:5
**coverage** 102:3,16
102:18 132:19
**coworker** 35:15
**Crage** 19:6,9,10
35:12,21 36:25
37:18,24 38:3 49:3
103:6 105:4,6,16
106:2 109:6
137:14 138:22
141:11 142:2
143:21 144:13,22
148:21 156:13,23
160:20 178:12
180:22 194:11
201:4
**Crage's** 37:8
**Craig** 1:14 3:8 19:6
101:12 104:3
130:15 142:6
147:7 184:17
197:25 199:14
205:12 206:10
207:4,17,19 208:5
208:9,10,14,16,20
**Cranford** 11:17
13:7 17:2,23 28:10
48:7 49:23 98:10
103:15 127:8
134:3 199:14,20
208:19
**crazy** 155:13
**create** 28:24
**creative** 54:21
**Crosstree** 3:9
**current** 26:21 28:15
31:10 35:6 36:6
40:7 125:20 126:2
155:16
**currently** 21:12
28:11 42:3
**cut** 137:25 140:16
141:7
**cutting** 138:9
**CV** 1:6

──────────
**D**
──────────
**D** 97:14,15,20
200:18 207:2,15
208:2
**Dale** 55:4
**data** 48:18
**date** 41:25 50:4,7,20
51:5 53:2,6,7,10
53:19 55:12,16
57:19,23 59:9,15
59:16 61:4,7,13,24

62:12 63:9 64:22
66:9 68:16,25 69:2
72:3 74:10 75:10
76:2 78:13 81:10
84:3,11 85:16,25
87:25 88:6 92:11
94:16 97:18 98:15
101:14 104:7
121:11 130:19
132:25 142:8
147:9 157:15
158:6,7 162:2,22
167:12,15 171:21
171:25 175:13
176:19 179:16
183:17 184:18
185:24 198:5
199:16
**dated** 75:24 94:15
94:20 104:3
130:15 142:6
163:11 166:17
197:25 198:3
199:14,20 207:8
207:13,20 208:5,9
208:16,18,20
**dates** 14:17 175:9
180:4 183:7
**Dave's** 191:9
**David** 54:14
**day** 31:23 136:23
143:16 144:25
170:24 175:7
205:17 206:19
**days** 55:13,13,15
150:2,19
**deal** 69:10 106:24
**dealings** 93:6,15
**Deb** 48:11 49:23
**debate** 109:3
**debated** 108:20
**Debbie** 137:4
141:12 145:18
197:8,9,25 198:8
198:16 208:16
**December** 23:20
101:6,8 114:9
182:9 184:13
**decide** 184:15
**decided** 55:18 82:24
83:3,22 89:10
176:3
**decision** 53:16 56:19
56:21,23 59:10,13
59:15,17 63:13
68:15,19 72:2
84:13 145:10
176:16,20 178:17
**decisions** 40:22
53:13,15 59:8 84:6

94:6
**Declaration** 130:17
208:6
**declares** 132:24
**decrease** 110:12
**defendant** 1:8 2:13
121:19 125:9
126:24 130:8
134:22 135:2
**Defendant's** 75:21
75:23 76:4 78:9,15
94:13,14,19 97:15
97:20 101:11,16
104:2,9 121:9,13
130:14,21 142:5
147:6 148:12
162:19,24 184:16
184:20 197:24
198:7 199:13,18
207:7 208:4
**define** 63:19
**definitely** 49:9
**definition** 189:19
192:21
**degree** 19:23,25
20:3,6
**degrees** 20:5
**delegated** 100:2
**deleted** 201:9
**Dempsey** 1:15 2:4
**Denny's** 134:22
135:2,14 136:11
136:14 140:18,21
141:2,4,5,8 150:4
155:3,8,10,13,19
157:15 158:5,8
164:20 167:15,17
170:21 171:5,7,19
171:20 189:7,12
189:17 191:25
192:11,17,25
193:3,9,11,15
**denominated** 78:5
**dental** 132:18
200:16
**department** 136:22
137:17
**depending** 32:21
140:5
**depends** 39:6
**deposed** 6:2
**deposit** 146:2
195:19,24 198:21
198:22
**deposited** 146:24
**deposition** 1:14 3:20
5:8 6:7 9:16,22
10:4 11:9,13 60:15
206:11,12
**deposits** 146:14

**Depot** 113:18
**describe** 30:8
**described** 20:15,19
51:14
**design** 54:21
**designate** 10:2
**designated** 85:6
**destroyed** 201:12
**detail** 96:17 140:6
**detailed** 140:3
**details** 127:10
**determination**
122:16
**determine** 106:5
**determined** 87:15
89:18 161:15
**determining** 106:4
161:13
**develop** 109:8
**development** 20:23
**Dick** 13:14 26:16
48:24 52:17
152:12 153:14,15
156:12 180:19
181:11,18
**Diego** 44:3
**differences** 80:13
96:6
**different** 23:21 32:9
96:5 108:10,11
119:21 167:7
169:10
**differing** 160:8
**diligence** 25:25 40:3
40:17 47:18 48:16
48:23 49:2,6,12,13
49:16 62:5
**Dinner** 191:2
**dipping** 116:10
**direct** 27:25 28:13
85:8 146:2 195:19
195:24 198:21,22
**directed** 12:16 66:2
75:2 141:7 196:11
**directing** 110:20
**direction** 14:20
65:24 146:17
148:8,9 199:6
**directly** 14:6 26:19
27:20 29:7,15 42:7
126:24 141:5
156:23 178:21
**director** 11:19 17:9
17:10 22:14 23:13
24:12 100:21
170:23 171:16
194:12
**Disagrees** 164:7
**discharged** 80:18
**disclose** 9:19 111:12

112:10 167:12
171:25
**disclosed** 68:10
**disclosing** 123:20
**discontinuing**
161:11
**discovery** 8:12,21
18:6 19:2 98:5
141:2
**discretion** 39:11
**discretionary**
189:20
**discrimination**
151:24 154:13,18
154:22 170:3,12
**discuss** 18:15 57:20
57:25 61:8,14 69:7
96:15,18 97:4
103:9,12 105:11
133:22 144:5
148:20,23 154:16
160:17 194:9
**discussed** 10:24
12:13 14:23 40:19
53:9 55:23 58:3,6
61:19 65:22,23
68:3 69:5 83:12
90:2 91:23 96:4,21
103:14,16 105:17
109:7,21 117:10
118:17 137:22
139:2,25 141:24
141:25 151:5
160:23 161:10,19
161:23 176:8
177:19,21 181:10
183:19 184:2
**discussing** 11:11
11:25 60:23 121:3
145:9 162:14,17
164:23 170:9
185:11
**discussion** 11:16,21
11:22,23 12:11,19
52:10,21,22,24
66:19 68:18,23
73:12 83:6 85:20
86:20,24 90:4
91:17 105:20
106:3 140:8
161:25 162:11
169:12 173:20
183:14
**discussions** 15:9,23
16:13 17:3,5,6,13
17:20 19:12 51:6
52:12,16,25 53:10
55:17 56:16 57:6
57:10,13,15,18,22
58:17 60:8,17,24

61:2,18 65:15,20
66:10,14 69:25
83:8 108:18,22
109:2,5,17,22
111:13 112:11
117:15 119:13
120:9 157:13
169:15 178:11
183:8 184:12
**Disney** 47:4
**dispute** 46:23
**distinguish** 151:15
**distribute** 175:10
**distributed** 33:23
34:5
**DISTRICT** 1:2,2
**document** 76:12,14
76:16,20 77:9 78:9
78:25 82:3 97:16
98:18 99:19
130:16 133:20
207:10,15 208:6
**documentation**
146:10
**documents** 8:2,5,10
8:19,22 9:9 10:21
11:2 18:6 201:7
**doing** 91:7 113:21
136:13
**Dominion** 44:7
45:14 64:4 188:4
**Dorney** 44:10
**double** 116:10
**doubt** 69:3
**Dowd** 18:10
**downsizing** 41:4
**draft** 111:14
**drafted** 81:20
101:21,22,23
104:17 137:9,11
141:19 143:15
**drafting** 144:20
**drafts** 95:16
**dramatically** 26:10
**drugs** 6:18
**due** 25:24 40:3,17
47:18 48:15,23
49:2,6,12,13,16
62:5 145:22
**Duff** 10:14 13:5
15:2,4
**Duffield** 193:16
**duly** 3:3 206:11
**dust** 84:3
**duties** 24:14,19
25:18 26:2,7 56:3
58:25 59:21 65:7
72:3 79:10,17 80:4
88:16 99:22
100:20 107:3

**E**

**E** 2:2,2 3:2,2 101:10
101:11,16 143:2,2
143:4,4 206:2,2
207:2,6,17 208:2,3
**earlier** 47:17 71:24
77:18 81:8 96:4
110:3 152:15
153:10 166:8
168:24 169:2
174:10 180:24
**earliest** 131:20
133:17
**early** 30:16 157:14
184:21
**Easiest** 183:2
**easy** 46:18
**education** 20:14
**effect** 15:11 65:18
77:20 78:19,23
188:9
**effective** 41:25
53:18 72:3,10,16
74:10 82:6 130:9
145:17
**either** 4:8 17:19
34:10 43:7 86:9
93:23 94:3,8 98:23
101:23 103:9
105:3,12 115:5
138:7 145:9
178:11 186:7
191:14
**elaborate** 5:21 27:4
154:15 178:25
**elaborating** 19:19
**eleven** 43:9
**eligibility** 123:20
**eligible** 99:17
121:20 122:2,10
123:8,16 134:5
**else's** 141:22
**employ** 63:14
**employed** 21:12
22:16,23 23:21,23
24:6,13 40:8 41:24
51:20 55:20 56:4
65:7,11 71:4,13
79:2 122:25
126:25 140:18,21
150:4 153:8,9
161:14 191:25
202:8
**employee** 39:5,7,7
67:6 102:10 112:7
121:21 122:3,23
123:9,18,25 124:2
124:4,7 130:8,10
132:24 134:21,25
202:16

**employees** 32:17
34:24 35:3 38:4,24
63:5 72:11 76:9,23
76:24 77:14,14
96:24 102:20
**employer** 21:16,19
23:5,15,22 76:25
77:15 112:6
118:10
**employment** 5:18
5:20 8:6,7 25:14
25:17 26:25 34:15
34:16,19,22 38:18
38:21 39:19 40:19
56:6 62:2,9,14
63:8,16,21 65:3,16
65:24 66:11 67:3,8
71:5,13 72:17
76:22 77:19 78:10
78:16 79:21 80:17
80:23 81:21 82:10
82:10 83:16 88:13
96:23 101:5
102:22 105:20,23
106:11 107:2,16
107:17 110:8
111:2 112:22,25
113:11,11,14,15
113:16 114:12
115:8,24 116:7,12
116:14 120:6
121:25 122:7,9
123:13 124:14
125:14 126:9
136:21 137:24
141:4 145:11
152:24 153:12
155:24 157:15
158:3,21 160:5
164:15,19 167:15
170:23 171:17
174:2 182:23
188:8,19 192:17
192:25 193:3,11
193:15 201:25
207:11
**enclosed** 149:18
**ended** 152:5
**enforce** 110:12
112:6
**enforceable** 111:3
111:18,23
**enforced** 112:16
**engage** 113:2,3
123:14
**engaged** 42:16,17
42:20 46:11,15
**engaging** 113:10
**enlisting** 18:5
**enroll** 132:18

**enrolling** 133:12
**enrollment** 125:22
  130:9 132:5 133:2
**entail** 69:23 79:20
**enter** 25:8
**entertainment**
  13:17 25:8 47:3,4
  47:9 113:4
**entire** 5:2 174:18
**entitled** 76:21 97:16
  98:14 104:4
  164:18 178:9
  207:15,21
**entity** 35:19 39:23
  40:24 42:12 80:12
**entity's** 21:23
**entry** 163:10 166:3
  166:10,16,22
  167:20 168:3,19
  172:13 174:6
  175:13 179:11
  180:5,12,18 181:9
  182:9
**epiphanies** 11:6
**equal** 179:13
**ESQ** 2:9,16,17
**essence** 102:19
**estate** 24:20
**estimate** 71:16
**events** 11:3 140:24
**eventually** 153:9
**everybody** 64:25
  110:5
**evidence** 82:3 99:25
**evolving** 87:11
**exact** 54:11,18
  106:11
**exactly** 67:20,21
**EXAMINATION**
  3:10 143:6 207:3
**examined** 3:4
**example** 39:8
  190:22
**examples** 36:17
**exchange** 90:7 201:4
**exchanged** 8:20
**exclusive** 120:5
  123:5 124:19
  193:12
**exclusively** 100:11
**executive** 20:24
  53:17,20 62:13
  63:19 64:3,11 85:5
  112:25 113:2
  123:12,13 124:8
  124:11,18 125:4
  184:5
**executives** 34:15
  38:18,22 51:8 61:4
  61:25 63:4,12,14

63:18 65:10,17
67:4 80:17,24
91:22 133:14
153:11 158:20,24
187:8
**Executive's** 123:4
**exhibit** 75:22,23
  76:4 78:9,15 94:13
  94:14,19 97:14,15
  97:20 101:10,11
  101:16 103:25
  104:2,9 110:7
  112:22 116:21
  120:2 121:8,9,13
  130:13,14,21
  131:23 142:4,5
  143:8,11 147:5,6
  147:11,12 148:12
  149:14 150:16
  162:19,24 184:15
  184:16,20 197:23
  197:24 198:7
  199:12,13,18
**EXHIBITS** 207:7
  208:4
**existence** 201:8
**expectation** 118:24
**experience** 32:16
  34:14,23 79:24
**expired** 101:8
  102:22
**explain** 3:19 102:8
**expressed** 136:5,5
  195:2
**extend** 102:3
**extended** 102:19
**extent** 12:14 14:5
  33:3 58:10 59:5
  69:25 77:8,25 82:2
  91:5 110:18
  122:15 124:16
  153:24 154:17
  160:8 189:9
  192:20 196:16
**eye** 180:20
**e-mail** 86:4 197:24
  198:2,8,15,19,20
  199:13,19,25
  208:16,17,19
**e-mails** 159:18
  201:5

___
**F**
___
**F** 3:2 103:25 104:2,9
  110:7 116:21
  120:2 143:2,4
  206:2 207:19
**facility** 191:4
**fact** 30:12 85:14
  86:25 167:21

**facts** 11:10,13 12:18
  12:21 99:24
  146:19
**factual** 165:21,25
**failing** 121:25
**Fair** 13:17 15:25
  21:13,14,15,18,22
  21:25 23:4,16,22
  23:24 24:3 26:3,13
  26:14 35:20 42:8
  42:19 43:7 44:11
  45:19,22 46:6,11
  46:18,19 47:11,15
  48:22 49:2 52:12
  61:14 66:15 75:25
  76:10 77:20,24
  78:19 80:15 82:17
  82:21 99:8 100:24
  115:13,16 146:7
  150:9 185:8,12,16
  186:7,11,20,24
  187:7 189:5,18
  190:3,9,15 191:17
  192:13 193:16,23
  194:5 195:9,13
  197:11 202:9,16
  207:9
**fairly** 32:14 37:24
  117:2
**Fair's** 46:21 67:2,17
  91:10
**Falfas** 30:22,23
**familiar** 97:25
**familiarity** 132:12
**family** 151:24
  172:14 189:21
**Famous** 191:9
**far** 4:16 34:9 38:20
  41:19 47:24 98:13
  103:5 108:14
  119:19,25 147:21
  150:8,12 181:4
  200:12,24
**Farm** 23:17,25,25
  24:4,13 43:24
  190:23
**February** 158:12
  170:23 171:22
  193:19,20 195:15
  200:4
**feel** 173:22 182:23
  184:8
**feeling** 111:9
**Feels** 181:24,25
**fees** 177:23
**fell** 5:24
**felt** 152:9,16 153:6
  155:24 195:7
**file** 153:21,21
  158:15 166:5

169:6
**filed** 8:16 13:23,25
  169:13 175:20,25
  179:7,8 180:10
  182:3,6
**filing** 176:9
**filings** 68:11
**filled** 98:9
**final** 56:21,23 84:13
  182:9
**finalizing** 144:20
**Finally** 4:25 5:6
**financial** 35:18
  36:21 37:4 107:11
  185:19
**find** 75:3 127:16
  129:2 157:21
  170:2,6,10
**fine** 110:22 119:10
  185:14
**finish** 4:25 89:3
**finished** 107:24
**finite** 63:8
**firm** 100:9 203:6
**firms** 100:16
**first** 35:23 62:11
  76:22 92:4 109:12
  136:16 138:11
  147:4 159:20
  161:24 163:10,14
  163:22 165:24
  166:22 176:8
  177:8 179:10
  180:5 181:2
  183:23 188:6
  195:9,11,12
**firsthand** 131:8
**Fisher** 54:9 71:24
  81:2 159:3,13
  187:21 188:25
**five** 12:12 46:7,8
  56:11
**Flags** 47:3
**flexibility** 182:21
**Focusing** 53:5
**following** 16:25
  136:23 143:16,20
**follows** 3:5 143:5
**follow-up** 140:8
  154:20 170:16
**forced** 30:11
**foregoing** 205:4
**forget** 102:11
**forgot** 143:16
**form** 59:2 71:7 93:7
  97:17,24 98:2,4,6
  98:9 132:3,6,8,10
  132:16,20 133:2,4
  133:8,11,13,14
  134:2,5,13 155:21

196:7 207:16
**former** 152:3,3
  154:25 155:5
  202:13
**formerly** 201:24
**forms** 96:5 125:22
  130:24 131:4,19
  133:15
**forth** 8:14 14:18
  18:6,22 80:11
  100:19 153:19
  157:21 177:23
  206:11
**forward** 36:8 42:2
  156:18 157:11,20
**forwarded** 149:17
**found** 153:12
  158:21 162:2,5
  184:5
**four** 46:10,10
**frame** 151:8 153:3
  162:3 183:16
**Frantz** 100:14
**fraud** 122:6
**Freeman** 1:14 3:1,8
  4:1 5:1 6:1 7:1 8:1
  9:1 10:1 11:1 12:1
  13:1 14:1 15:1
  16:1 17:1 18:1
  19:1 20:1 21:1
  22:1 23:1 24:1
  25:1 26:1 27:1
  28:1 29:1 30:1
  31:1 32:1 33:1
  34:1 35:1 36:1
  37:1 38:1 39:1
  40:1 41:1 42:1
  43:1 44:1 45:1
  46:1 47:1 48:1
  49:1 50:1 51:1
  52:1 53:1 54:1
  55:1 56:1 57:1
  58:1 59:1 60:1
  61:1 62:1 63:1
  64:1 65:1 66:1
  67:1 68:1 69:1
  70:1 71:1 72:1
  73:1 74:1 75:1
  76:1 77:1 78:1
  79:1 80:1 81:1
  82:1 83:1 84:1
  85:1 86:1 87:1
  88:1 89:1 90:1
  91:1 92:1 93:1
  94:1 95:1 96:1
  97:1 98:1 99:1
  100:1 101:1,12
  102:1 103:1 104:1
  104:3 105:1 106:1
  107:1 108:1 109:1

110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
130:15 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1,6
143:1 144:1 145:1
146:1 147:1,7
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1,17 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
197:25 198:1,3
199:1,14 200:1
201:1 202:1 203:1
204:1 205:1,12
206:10 207:4,17
207:20 208:5,9,10
208:14,16,17,20
**frequently** 36:14
37:17 41:22
**Friday** 10:7 11:25
12:4,7 202:20
**Friday's** 190:23
191:7,16
**front** 105:10 143:8
**full** 28:15 77:19
105:23,24 106:6
134:22 135:2
153:17,18 177:24
191:3
**Fullerton** 20:7,10
**Fun** 44:12,13
**function** 24:18
26:12 28:23,25
39:6 79:19 90:20
154:20
**functions** 50:10
59:23 90:10 100:4
**funneled** 49:18
**further** 69:11 107:2

119:13 120:13
143:5 161:16
203:25 206:14
**future** 126:17
**F-a-l-f-a-s** 30:24

_____
**G**

**G** 3:2 98:14 121:8,9
121:13 143:4
207:23
**Gardens** 43:16
44:17 45:15
**garlic** 44:22,23
**gated** 43:18 191:5
**gather** 18:6
**gathering** 18:17,20
25:25 48:17,19
**GC** 170:22
**general** 6:3 10:11
14:12,19 17:16
22:24 23:17 24:11
24:23 25:6 27:7
28:11 29:25 30:17
30:18 32:23 33:13
33:22 35:24 39:22
55:6,9 61:23 64:4
64:18 70:2 79:3,11
80:2,4,5,6,11 82:4
82:5 83:25 90:6
95:22 100:19,24
148:5 169:12
171:5,7 177:5
188:3 193:17
194:5 195:5 203:7
**generally** 31:21
41:21 54:19 70:3,4
79:13,25 80:3
83:14,15 86:8 90:9
92:15 96:14,18
102:2 109:25
110:2 118:14
136:4 139:24
151:18 162:14
177:14 183:22,23
184:2,9
**geographic** 114:21
**geographical**
114:13
**getting** 14:20 152:6
157:12 162:6
**Gilroy** 43:16 44:17
44:21 45:15
**gist** 118:22 119:2
128:14 138:4,25
**give** 4:18 51:12 54:2
56:22 60:12 87:7
87:10 136:9 176:6
**given** 36:13 57:2
58:7 65:23 75:6
77:23 78:5 93:6,15

147:19 187:3
195:3 206:13
**giving** 42:10
**GM** 23:5
**go** 19:20,21 31:14
41:16,16 47:2,6
52:13 53:11 60:18
61:5 69:17 71:7
93:21 99:20 109:8
112:21 138:22
139:21 157:25
183:2 195:18
202:10
**goes** 130:7 153:19
169:15
**going** 3:23 5:3 12:2
34:12 36:8 39:9,11
42:2 43:19 46:25
48:17 63:10 69:24
74:14 75:10 77:7
81:25 85:4,6 90:20
102:3,19 108:3
111:11 112:21
119:5 125:8
127:14 128:4
132:15 133:22
134:19 145:2
147:2,4 152:4
157:11 160:7
163:23 176:4
185:14 196:20,23
202:11
**good** 3:12 56:10
184:24 185:8,12
185:16
**Gordon** 104:22
**Gosh** 20:22
**gotten** 141:3
**governance** 80:11
**great** 44:9 45:14
64:19 154:16
**greater** 70:23
**GREENHOUSE**
1:23
**ground** 3:19 85:5
**group** 55:9,12 59:11
91:22
**grown** 30:10
**guess** 15:3 30:11
47:4 49:25 88:3
116:8 136:5
138:12 140:23
185:19 195:25
**guidance** 185:20

_____
**H**

**H** 130:13,14,21
207:6 208:3,5
**half** 10:20 188:6
**hand** 206:19

**handed** 95:10,19
**handing** 95:22
**hands-on** 30:9
**handwriting** 163:7
199:23
**handwritten** 162:20
208:12
**happen** 51:7 74:11
74:14 91:18
**happened** 55:14,15
77:12,13 127:18
138:18 159:19
188:16,18 197:2
**happening** 137:11
**happy** 185:7
**hard** 5:4
**harder** 4:23
**Hawkinson** 100:23
**head** 3:20 4:21
189:25
**headquartered**
42:22
**headquarters** 41:8
65:12 75:17
**heads** 176:6 180:8
**health** 121:20 122:2
**hear** 3:20 4:7,8 7:3
72:8 130:5 149:22
149:25 150:14,16
150:20 185:8
**heard** 4:12,15
119:23 128:12,21
129:18 136:16,19
150:23
**held** 1:14 60:7 79:8
**help** 84:21 86:13,15
**hereinbefore** 206:11
**hereof** 123:6
**hereunder** 124:20
**hereunto** 206:18
**Herschend** 47:4
**he'll** 166:5
**high** 2:7 20:13
**higher** 67:4
**hire** 194:19
**hired** 39:14 193:16
193:22,24 194:3,4
194:13 195:6,15
**hiring** 34:24 35:2,10
38:24 194:9,16
195:10
**historical** 188:15,18
**history** 26:25
**hoc** 31:13 50:16
187:18 188:13,22
**hold** 31:19
**holding** 42:15
**holds** 31:24
**home** 3:7 85:10
93:21 113:18

163:19 203:19,22
203:23
**honor** 65:24 66:6,19
83:17
**hotel** 45:24 46:5
191:10,17
**hotels** 46:7,8 190:7
190:8,9,12,13
**hours** 6:16,19 10:20
141:17
**How's** 127:14
**HR** 17:9 26:12 41:2
69:17 154:19
194:11
**Hufnagle** 18:2 28:5
29:4
**human** 11:19 17:9
18:13,14,18 21:8
24:18 28:22,24
36:23 40:13 47:22
58:9 69:13
**hundred** 52:8 71:2
**Huntington** 2:6
**H-e-r-s-c-h-e-n-d**
47:5

_____
**I**

**idea** 83:21 107:21
108:15 128:2
141:22 165:24
173:12 177:7,15
177:18
**identification** 76:2
78:12 94:16 97:18
101:14 104:7
121:10 130:18
142:8 147:9
162:22 184:18
198:4 199:16
**identify** 28:4 115:21
116:4,17
**ignore** 161:21
**imagine** 14:13
**immediate** 145:13
**immediately** 64:9
72:11,17 73:7,21
136:23,24 138:2
138:10 141:12
143:17
**implications** 36:22
**impression** 16:6
84:2 154:10
155:12,14,18,21
**include** 43:10 59:10
187:14
**including** 11:13
43:16
**income** 189:20
**inconsistent** 191:23
192:5

increased 26:10
  28:24
incumbent 51:8
  80:16 85:10
indefinitely 63:8
independent 112:3
independently
  191:13
indicate 4:10,11
  117:23
indicated 19:13
  51:11 64:25 83:18
  87:13 109:14
  117:13 127:12
  128:10 145:12
  151:21 152:2,9,22
  153:16,20 171:6
  173:24 179:16
  183:11 184:4
indicating 115:7
  170:9 182:4
indirectly 126:24
individual 27:16
  81:21 121:2
individuals 55:18
  56:17,20,25 57:3,7
  59:19 60:13 71:20
  71:23 72:17 73:2
  73:13 74:3 75:5
  81:8 82:14,25
  83:22 84:8 102:24
  106:10 120:22
  159:22 160:4,6
industry 159:23
  160:2 190:2
infer 129:10
inference 119:7
inferred 51:23
  119:6
inform 73:6 121:25
  135:9 137:13
information 12:5,22
  18:17,19,21 25:12
  25:25 48:17,20
  74:25 77:9 87:8,10
  125:20,23,24
  126:3 128:6 135:8
  136:10 141:3
  147:15,20,22,25
  153:10
informed 72:5 75:9
  86:11 87:20 92:22
  134:25
informing 72:25
inherently 191:23
  192:5
inherited 24:4
initial 87:19 151:2,6
  159:20
initially 171:24

initials 102:11
injury 5:17
input 56:22 57:3
  76:11,15,18,20
  194:15,19,23,25
  195:3,3
instances 38:8 39:12
instruct 12:3 14:25
  111:12 202:11
instructed 12:23
  14:6 131:18
instruction 14:4
  15:10 112:10
insurance 121:20
  122:3 132:21
  133:13
intact 82:11
integration 49:14,20
  59:22
intent 152:10
  180:13
intention 63:7
interact 36:14,23
  37:18
interacted 41:23
interaction 32:13
  37:23 40:9,11
interactions 29:18
  31:11 36:9,11
  41:14 47:24 50:3
  50:19
interest 115:21
  116:9,16
interested 156:24
  206:17
interests 116:5
interim 29:22
internal 52:11
Internally 48:7
interpretation 114:3
  114:5 117:14
  164:7,16,22 167:6
  167:7
interview 35:6 39:3
  194:17,21
interviewing 39:13
  194:18,24,25
interviews 35:4
invoking 96:22
involved 5:18 24:22
  25:11,24 32:17,20
  34:24 35:2 38:3,9
  38:21,24 39:2,9,13
  47:14,18,20 48:14
  48:15 51:6 52:11
  54:20 57:6,10
  65:15 67:22 80:10
  106:2,4 108:18,25
  109:4,22 144:21
  154:4 156:23

168:20 169:14
  192:11
involvement 25:16
  32:23,24 33:4
  88:15
involving 69:15
in-charge 85:7
Island 44:5 45:13
  64:13
issue 47:2 120:13
  140:11 151:25
  154:13 161:10,17
  167:21,21 178:6
issues 30:6 36:21,24
  40:12,14 41:20
  47:21 48:4,6,9
  58:8 59:5 80:9
i.e 76:25

_____
|        J         |
_____

J 147:5,6,10 148:12
  150:16 208:10
Jack 30:22
Jean 29:10
Jill 2:9 7:22 202:7
Jim 135:3,4
job 99:22 127:16
  129:2 137:23
  151:22 152:6,7,8
  155:2,8,8,9,10,13
  155:15 157:21
  159:23 170:2,6,9
  170:10
joined 60:15
Jones 54:25 63:2
  71:25 81:3 159:14
  187:12,23,25
July 36:7 81:14,15
  87:14 88:5,8 89:15
  92:10,23 94:15,20
  130:9 207:13
June 42:6 53:2
  55:14,16 64:23,25
  75:24 80:16,19,20
  80:21 82:13
  126:23 127:21
  157:19 171:2
  172:7 207:8

_____
|        K         |
_____

K 162:18,19,24
  208:12
Kaetzel 55:4 71:25
  81:3 159:7,14
Kaiser 104:22
Kathy 100:23
keep 34:10 125:19
  126:2
keeping 58:23 108:4
Kennywood 47:8

kind 6:21 31:10
  40:11 42:19
  128:13 169:16
Kingdom 44:15
Kings 64:4 188:4
King's 44:5,7 45:13
  45:13 64:13
Kinzel 13:14,20
  14:3,7 15:8,14,23
  16:5,13 17:3,23
  19:13 26:16 27:15
  27:20 29:15 30:19
  31:11 32:16 33:10
  34:14,23 37:12,19
  48:24 52:17 55:17
  56:16 57:5,13,18
  57:23 58:23 60:9
  60:12,17 61:3,15
  61:18 65:21 66:2
  66:19 67:7,14
  68:18 69:8 70:9
  71:22 72:4 73:6,21
  75:15 83:2 84:14
  84:20 85:7 89:23
  90:2,7,13,16 91:11
  93:21 94:5,15,20
  95:6,8,10 96:7,16
  97:5 103:6 105:3,6
  105:16,18 109:6
  118:12,21 119:2
  137:13 138:14,21
  141:11 142:2
  143:20 144:13,21
  145:13 148:21
  153:15 156:12,22
  156:25 159:5
  160:19,22 161:7
  161:16 162:5,11
  162:15 176:2,10
  177:2,9,19 178:11
  178:19 180:22
  181:19 194:2,11
  207:13
Kinzel's 56:21 94:25
  139:17
Kirila 2:9 7:22 9:17
  10:8 12:2,14 14:4
  14:15,25 15:10
  33:3 46:22 55:21
  56:8,11 59:2 69:19
  69:24 71:7 74:15
  77:7,25 81:25
  84:22 85:2 92:25
  93:7 96:9,12 98:18
  99:18,24 107:23
  108:9 110:17,22
  111:4,11,19 112:9
  112:18 113:25
  114:17 115:25
  122:14,21 124:16

129:6,14,16
  133:10,19 139:21
  145:4 146:18
  160:7 168:9
  178:13 189:9
  192:2,20 193:5,13
  194:20 196:7,16
  197:19 201:18
  202:10
knew 87:18 96:7
  128:11 133:5
  136:20,23 141:6
  145:2,6 157:14
  162:2
Knott's 23:17,25,25
  24:3,13 43:24,25
  44:3,4 190:22
  191:10
know 3:22 4:8 5:3,7
  8:13 10:2 14:19,20
  15:4,12 20:22 25:9
  29:15 32:22 35:12
  35:14,23 36:5 38:8
  38:11,13,14,17,20
  38:23 39:16,18,25
  40:5 42:9 45:8
  46:5 49:7 50:23
  52:4,7 54:16 55:13
  57:2 59:18 60:2
  61:21 62:12,15,16
  66:23,25 67:20,25
  68:7,12,14,24
  74:20,20 76:15
  79:10,14 80:9
  82:22,23,24 83:3
  84:3 85:13 86:11
  87:3,9,13,16,17
  88:10 92:4,16,18
  93:3,4 95:4,8,12
  95:14,18 96:7,11
  97:23,24 98:9,13
  99:2,6,9,10 103:5
  105:3,8,15,16
  106:5 107:4,23
  109:19 110:24
  111:7 112:13,20
  115:12,15,20
  117:2,6,16 119:8
  119:19 122:13
  126:5,7,12,14,19
  126:21 127:7
  128:18,24 129:3,4
  129:18 131:8
  132:3,15,22 134:9
  134:11 139:23
  140:6 141:4
  144:13,16,17,18
  145:6 147:21,23
  147:24 148:2,6,25
  149:4,13 150:8,12

150:22 153:20
154:8,14,17 155:5
156:3 157:18
159:18,18,19
161:3,3 164:13,16
165:15,22,22
167:4 168:8
169:13 171:8
175:8,24 176:15
177:24 178:18,20
179:6,9,13 180:9
182:2 185:5,23
191:18 193:22,24
194:3 195:2,3,9
196:17 199:11,23
200:12 203:12,13
203:17
**knowledge** 33:4
38:16,19 57:4
77:23 78:7 79:25
115:19 131:8
134:17 148:4,5
186:10,19,22
189:3 192:10,12
192:14,15,23
196:25 197:20
**known** 35:21
**Koontz** 54:14 71:24
81:2 159:13

_____
**L**

**L** 184:15,16,20
208:14
**Lane** 3:9
**language** 123:23
152:9
**larger** 80:7
**Larry** 173:11,16,19
173:21 183:14,20
**Las** 45:6,7
**late** 23:20 24:4
81:14,15 89:15
**law** 16:19,23 100:16
112:7,14 170:23
171:17
**lawns** 113:20
**lawsuit** 3:14 13:25
140:22 153:21
169:13 180:10
182:6
**lawsuits** 69:15
**lawyer** 172:24 173:6
**lawyers** 168:19
169:14
**leader** 48:10
**leadership** 20:22
86:19
**learn** 12:18,21
**learned** 112:11
134:21 150:3

160:3
**leave** 53:18 55:24
56:3,18 57:7 59:12
59:20 71:19 72:12
73:8 74:6,17 75:6
81:9,13 83:23
160:25
**leaving** 183:5
**Ledger** 28:6
**left** 27:6 106:21
155:19 175:16,19
182:15,16
**legal** 14:7 16:21
24:24 25:2,5 40:12
40:15,25 47:22
50:9 58:9 69:12,13
69:14 78:2 79:19
79:22 88:15 90:10
90:20 100:4 111:5
113:23 114:2
122:15 177:23
189:10 192:21
**legalities** 42:10
**legally** 4:2 111:2,18
111:23
**leisure** 113:3
**length** 59:7 154:16
**Les** 197:16,18,21
**Lester** 1:7 2:20 3:13
8:7 39:16,18 49:23
50:8 57:20 78:10
94:15 101:12
104:3 127:15
128:10,18,21
129:11,19,20
130:3,5,6,16,22
135:12,13 136:10
136:13 137:23
142:6 147:7
153:20 165:14,21
167:3,24 175:16
175:19 180:7
184:17 197:18
198:13 201:5,8
207:11,13,17,20
208:6,8,11,15
**Lester's** 127:13
129:24 130:2
168:6
**Les's** 197:17
**Les00002** 131:24
**LES0004** 131:4
**LES00005** 131:4
**LES00016** 101:13
207:18
**LES00019** 147:8
208:11
**LES00021** 104:6
207:22
**LES00038** 78:11

207:12
**LES0018** 142:7
208:9
**letter** 81:14 82:14
88:6 92:11,23 93:9
94:14,19 95:4,9,15
96:8,15 97:4,8,11
101:11,16,25
103:7,21 104:2,12
104:16 105:4,7,18
110:6,18 111:10
111:14 116:21,24
120:2 130:14,22
131:5,5,10,11,18
133:16,20 137:9
141:19,25 142:5
143:11,19,24
144:5,11,14 145:2
145:7 147:6,11
148:12,20 149:14
149:16,19,19
150:16 151:11
163:16 183:10,24
184:16,20 185:22
207:13,17,19
208:5,8,10,14
**letters** 74:9 92:2
95:19,24 96:2,20
115:6 149:23
150:5
**letting** 69:17 180:9
**let's** 63:20 94:12
110:3 119:3
**level** 29:3 32:13,18
34:20 35:5,10
37:23 38:5 39:5,7
67:4 76:15 140:6,7
155:16
**Levine** 173:11,16,19
173:21,22,25
183:15,20
**liability** 100:19
106:6
**license** 24:19
**licenses** 21:3
**Life** 200:18
**limitation** 114:14,21
**line** 132:24 161:3,3
163:22 164:6,24
165:18 169:18,22
169:23 170:21
173:10 181:21
182:22 207:7
208:4
**lines** 110:2
**list** 53:24 65:8,9
99:4,7,12 189:12
**listed** 55:19 59:19
71:20,23 102:25
**listened** 118:4

**litigation** 25:11 51:2
79:21 90:22
100:18 192:11
**little** 22:18,21 27:3
84:4 153:19
173:20 179:2,13
**Littler** 2:11 172:25
**located** 31:5,7
191:17
**location** 88:17 191:4
**long** 10:19 12:11
22:16 35:21 71:17
86:21 87:22,24
124:18 151:2
161:13,20 162:3
188:22 202:21
**longer** 30:19 55:19
70:21 82:7 89:11
89:19 91:19 92:5
93:13
**look** 76:21 112:22
112:24 126:22
131:22 147:11,12
180:19
**looked** 9:3 42:13
151:22,22
**looking** 60:4,6 70:4
147:10 152:23
**looks** 98:22 167:11
172:18
**lost** 63:11 201:14
**lot** 84:6
**low** 117:19,21 118:2
**LP** 21:14,15,18
35:20 194:5
**lump** 107:9 117:20
**luncheon** 142:9
**L.L.P** 1:16 2:4
**L.P** 75:25 207:9

_____
**M**

**M** 3:2 143:4 197:23
197:24 198:7
208:16
**Magnum** 21:16,19
22:2,5 23:2,7
24:16 42:3,7,14
**Magnum's** 22:2
**mail** 175:19,20
180:4 182:14,15
182:16 183:5
**mailing** 131:7
**making** 14:20
145:15 176:17
**mall** 22:25 23:11
24:3 27:6 30:2
35:24,25
**managed** 5:24
**management** 21:17
23:3 24:2,5 43:17

44:18 45:15,17
100:18
**manager** 6:3 18:13
18:14 22:24 23:17
24:11 27:7 28:8,12
30:2 35:24 55:6,9
64:4,19 137:4
188:3 197:10
**managers** 30:17,18
**March** 27:7 29:23
193:16
**marching** 15:17
**mark** 75:21 78:8
94:12 97:14
101:10 103:25
121:8 130:13
142:4 162:18
184:15 197:22
199:12
**marked** 76:2,3
78:12,14 94:16,18
97:17,19 101:13
101:15 104:6,8
121:10,12 130:18
130:20 142:7
143:10 147:5,8
148:11 162:22,23
184:18,19 198:4,6
199:16,17
**marketing** 54:23
64:13
**markets** 185:21
**marriage** 206:16
**material** 14:24
157:17
**materials** 8:20
**matter** 58:24 143:18
150:2,19 176:3
178:22 206:17
**matters** 21:9 24:24
24:25 25:3,6 36:15
36:16 40:13,13,15
40:25 41:2 47:22
50:10 51:2 59:5
69:10,12,13,14,17
70:20 71:17 79:22
79:22 88:13,16
**MBA** 20:9
**mean** 8:15 46:18
55:25 65:5 66:5
90:21 92:19
108:22 116:11
138:11,19 141:2
158:6 167:22
175:21 183:16
**meaning** 201:24
**means** 4:2 41:14
56:2 99:2 123:7,15
171:9 196:23
**meant** 129:4,9

154:21 166:25,25
167:2 168:8,12,16
198:23
**measure** 185:18
**measures** 185:17,20
**mechanics** 179:9
**mediation** 153:23
158:17 169:8,16
169:18
**medical** 200:16
**medications** 6:19,25
**meet** 9:15 30:5
31:12 32:3 41:13
152:12 156:11,16
157:2 161:7
**meeting** 9:21 10:5
10:12,19,22 11:7
33:23 34:3 50:8,13
50:17,18 51:13,16
66:18,24 139:16
139:20 140:2,12
141:15 142:2
143:17,20
**meetings** 14:24
16:12,15 29:24
31:15,20 32:2 33:9
33:16 34:11 37:21
50:22 60:23 79:15
**members** 53:17,20
53:23 139:17
**memo** 76:8
**memorandum**
75:23 207:8
**memorializing**
60:23
**memory** 7:6 82:4
159:12
**Mendelson** 2:11
172:25
**mention** 44:17
143:16 153:10
**mentioned** 17:8
49:22 139:19
140:11 154:12,24
158:19 181:3
203:2
**mere** 193:10
**message** 156:18
**messenger** 94:5
**met** 36:2 40:3 41:15
**Michael** 2:16,17
3:12 172:24
**Michelle** 28:6
**Michelle's** 28:7
**Michigan** 44:14
**Michigan's** 44:14
**Mid** 89:15
**mid-October** 134:20
**Mike** 54:13
**miles** 32:8 37:10

191:18
**Milkie** 10:14 11:8
13:5 193:17,22,25
194:17 195:10,13
202:7 203:8
**Milkie's** 194:9
**mind** 9:5,8 80:14
152:19
**Mine** 199:24
**Minnesota** 5:24
44:11
**minutes** 12:12 34:2
34:10 56:11
139:20 140:2,3,12
140:14 147:3
188:24 189:2
202:22
**misrepresentation**
122:6
**missed** 43:20 183:12
**Missouri** 44:12,13
**Misstates** 55:21
111:19 133:19
**mistake** 152:15
157:6 174:7
**misunderstanding**
166:23 167:8
**money** 16:2,2,3
19:14,18 146:23
174:7 196:3,4,6,9
196:14,19 199:4,6
**month** 157:22
**months** 101:4
102:16,21 170:25
172:5
**morning** 3:12
189:14
**motion** 113:4
**move** 84:4 110:5
119:11,11 126:10
185:7
**moved** 126:10
170:25 172:7
**moves** 31:25
**moving** 177:5
**mowed** 113:20
**M-e-a-n-t** 166:25
**M-i-l-k-i-e** 10:15,16

_____
**N**
**N** 2:2 3:2 143:2,2,2
143:4 199:12,13
199:18 207:2
208:2,19
**Nail** 1:7 2:20 3:13
15:12,24 19:14,18
39:16 40:8,16
41:23 47:24 50:4
50:19 51:7,10,11
52:11 57:20,25

58:3,13,23 59:14
60:15 61:8,14,19
61:25 62:22 64:24
65:13,17 68:16
70:2,23 71:12,18
75:9,15,16 77:23
78:25 79:15 81:6,7
82:18,22 84:9,19
84:20 85:3,9,14
87:4,25 88:21
90:23 91:2,18,25
92:5,22 93:6,13,20
94:3,15,20 97:12
99:17 101:3,12,17
102:24 103:20
104:3,13 106:10
108:13 110:14
113:10 114:25
115:13,16,22
116:6,20,22
117:13 118:6,9,18
118:23,24 119:4
119:14,24 120:4
121:24 125:19
126:8,13,15,20
128:25 129:12
130:16,22 131:6
131:19 132:17,18
133:5,16 134:2,4
134:12 136:25
137:9 139:5
141:13,20 142:6
143:11 145:11,16
147:7,19 148:13
149:13,22 150:4,6
150:9,17,23
151:21 153:6
154:9,12,24 155:7
155:12,23 157:2
158:2,19 160:9,18
160:23 161:7,9,24
162:11 163:3,15
164:9 166:13,20
167:16 168:24
169:12 170:8
171:12 172:16,21
173:4,14,22
175:24 176:6,10
176:13,17,21
177:3,8 178:12,18
181:12 182:17
183:4,9,24 184:12
184:17,21 185:11
186:6,11 189:3
191:24 192:16,24
193:8 198:23
200:23 201:5
207:13,17,20
208:6,8,11,15
**Nails** 78:10 207:11

**Nail's** 8:7 18:21
40:18 58:10 59:6,9
61:21 62:8 66:11
66:16 77:18 78:15
79:10 80:4 87:12
89:11,18 90:12
98:15 99:22 100:5
103:24 108:10
110:8 129:4
140:16 146:15
156:11 157:5
158:15 161:11
165:3 185:22
186:15,20,24
187:6 199:3,9
201:8,25
**name** 3:7,12 10:14
17:12 29:10
163:18 173:16
197:17
**names** 43:19 159:10
**Nancy** 199:18
**nature** 190:20
**nearby** 46:3
**necessarily** 152:7,19
155:8
**necessary** 195:8
**need** 5:6 82:2 88:7
90:12 119:11
120:17 126:16
**needed** 40:21,21,24
69:11 89:11,19
91:6,19 93:14
137:25 140:7
153:7 187:6
**needing** 92:6
**needs** 25:10 58:7
70:24
**negotiate** 181:11,13
181:15
**negotiating** 120:24
**neither** 119:19
**never** 103:24 121:19
125:9 126:11
134:8 184:6 194:6
202:3
**new** 1:2,16,16,20,24
1:24 2:15,15 34:16
112:7,14 125:22
149:17 168:4,15
172:24,25 173:6
181:22 182:4
206:3,8
**Nichols** 1:18 206:7
206:23
**nod** 4:20
**nodded** 189:25
**nonattorney** 16:14
**nonattorneys** 17:4
**noncompete** 46:23

110:7 111:17
112:6,16
**noncompetition**
110:25 111:22
114:15,18
**noncompetitor**
115:23 116:6
**North** 44:8 203:21
**Nos** 78:11 97:17
101:13 104:6
162:21 207:12,16
207:18,22 208:13
**Notary** 1:19 3:3
206:7
**note** 165:19 179:17
179:22
**noted** 143:3 204:3
**notes** 33:14,15,23
34:10 60:16,20
139:20 162:20
163:2,10 165:20
166:16 174:11,17
174:21 175:10
178:24 179:10,19
180:25 182:12,15
183:8,13 208:12
**notice** 1:17 74:14,21
74:21,22 75:6
**notifications** 159:16
**notified** 82:14
121:19 125:9
160:4 162:5
**notify** 123:8,16
126:10
**notifying** 82:6 93:8
122:10 137:10,10
198:12
**November** 166:17
172:21 175:14
176:20 179:11,17
184:13,17,21
186:4 199:15,20
208:15,20
**nullify** 165:21,25
**number** 118:2,6
133:24 151:12
163:18,19,21
**numbered** 131:3,23

_____
**O**
**O** 143:2,2,2
**oath** 3:25
**object** 12:2 14:5
59:2 69:24 71:7
77:7,25 81:25
111:11 124:16
189:19 192:10
192:20 196:7
**objection** 9:17 12:14
33:3 46:22 55:21

69:19 74:15 84:22
92:25 93:7 96:9
98:18 99:19,24
107:23 108:9
110:17 111:4,19
112:9,18 113:25
114:17 115:25
122:14,22 129:6
129:14 133:10,19
139:21 145:4
146:18 168:9
178:13 192:2
193:5,13 194:20
196:16
**obligated** 4:2
**obligation** 114:15
**obligations** 82:12
107:3 114:22
115:8
**observations** 96:13
**obtain** 12:6,16,23
20:3
**obtained** 36:5
**occasion** 57:20,24
**occasional** 30:6
**occasions** 41:15
**occupation** 113:3
114:5 116:14
123:14
**occur** 30:15 67:19
**occurred** 14:11 84:3
139:16 173:20
**Oceans** 44:13
**October** 142:7
143:12 145:17,20
145:22 146:22
147:7 148:13
149:14,15,19,19
150:16 151:11
163:11,15 176:13
176:20 183:9
184:12 185:4
198:2,3,9,13,17
208:9,11,17,18
**offer** 70:9 90:25
105:19,21 106:7,9
106:11 108:15,19
109:23 117:13,15
152:6 155:2,20
156:11,15
**offered** 102:10
106:13,16,20
120:23
**offering** 106:23
109:13 180:21
**office** 31:5 32:6,7
37:8,9 41:5 69:18
74:23,24 84:21
86:13,16 203:19
203:22,23

**officer** 22:11 30:17
35:18 202:13
**officers** 85:10
**offices** 1:15 88:17
203:15
**oh** 11:6 45:4 49:3
56:24 76:19
137:15
**Ohio** 2:8 3:9 31:6
41:11,17 42:22
43:21,23 44:5,15
**Ohlemacher** 29:10
**OK** 3:16 16:3 19:12
43:20 45:4 46:19
54:4 56:25 63:10
65:8 70:10 76:19
102:13 108:22
114:4 119:10
127:15 152:25
167:2 187:18
**old** 188:8
**once** 5:12 6:10
160:13 161:15
**ones** 45:12 47:10
53:5 63:3,20,23
106:14 174:23
187:11,22
**one-minute** 120:18
**one-page** 97:15
207:15
**ongoing** 40:20 69:14
70:21,24 88:14,15
93:6,15 107:16
**Ontario** 44:6
**opening** 117:15
119:9,9
**operate** 43:7,13,15
191:12
**operated** 45:19
190:14
**operates** 45:22 46:6
190:23
**operating** 25:9
30:17
**operations** 30:14
**opinion** 111:16,21
111:24 112:3
123:10 125:16
195:2,4,5
**opportunity** 102:15
102:20
**opposed** 63:8
108:20 151:16
**options** 147:16,20
**oral** 159:16
**Orange** 43:25
**order** 120:13 146:21
196:2,21 197:3
**orders** 15:17
**organization** 39:8

39:10 60:4 70:5,7
**organizational**
30:12
**organizations** 59:23
**orientation** 50:9
**originally** 27:2
**outcome** 206:17
**outline** 169:16
**outside** 16:15 39:10
39:14 47:12 91:9
95:5 97:7 100:3,8
100:12 178:13
190:24 191:4,7,9
**outsource** 91:8
**outstanding** 50:10
59:5 69:10 70:20
71:17
**overlap** 22:22 27:14
27:14
**overlapping** 5:5
**overpaid** 182:24
200:3,23
**oversight** 28:25
**owed** 19:18
**owes** 15:13,25 16:2
19:14 200:25
**owned** 21:21,24
23:2,8,9,9 41:9
42:3 191:17
**owns** 22:5 42:11
45:18 46:6 47:7
**O-h-l-e-m-a-c-h-e-r**
29:11

———————————
          **P**
———————————
**P** 2:2,2,16
**packages** 37:5
**page** 76:22 104:21
112:23 131:23
172:19 174:24
178:24 179:10
205:7 207:3,7
208:4
**pages** 131:3
**paid** 73:14 113:20
116:13 153:7
195:22 198:14,24
200:15
**Palm** 44:4
**paperwork** 108:4
**Pappas** 2:16 3:11,13
56:10,12,15 75:21
78:8 84:24 94:9,12
94:17 97:14
101:10 103:25
108:13 110:20
120:17,21 121:8
130:13 142:4
143:7 147:4
162:18 178:15

184:15 197:22
199:12 201:16,21
203:25 207:4
**paragraph** 110:8,16
110:25 112:24
114:8,14,21,22
120:6 121:18,19
122:25 123:2,2,3,4
123:11,12 125:5,6
125:8,15 126:22
130:7 134:19
147:14
**paralegal** 50:15
91:2
**Paramount** 1:4 3:14
3:15 28:21 75:25
76:9,23,24 107:6
113:5 123:6
124:12,12 207:9
**paraphrasing**
124:10
**Parc** 47:6
**parent** 21:15 22:4
**parentheses** 170:3,4
170:24,25
**park** 1:16 5:23 6:3
24:2 30:2,4 42:17
42:20 44:10 45:4,5
64:19 99:11 113:4
159:23,23 188:4
190:24 191:5,8,9
191:14,15,19
**parks** 1:4 3:14,16
25:7,10 26:4 30:18
43:6,9,10,13,16,17
43:18 45:21 46:2,4
75:25 76:10,23,24
190:7,18,18
191:13 207:9
**Park's** 107:6
**part** 8:11,13,21
26:13 39:3 55:8
73:15 86:16 91:3
107:14,14 120:12
125:6 129:17
143:19 152:11,15
157:7 165:25
173:25 180:14
191:5
**participate** 50:17
**participated** 130:8
**particular** 39:5 50:9
132:3,10 179:22
**parties** 107:2 120:13
206:15
**partnership** 23:10
**passing** 135:15,17
**Pat** 54:25 187:12,23
187:25
**pay** 78:6,6 125:3

138:9 140:16
141:7 152:23
153:7,17,17 160:5
160:14
**paycheck** 195:21
**payday** 136:24
**paying** 145:10
157:11
**payment** 107:9,18
117:20 136:24
141:13 161:12
195:21 196:12,21
197:3
**payments** 78:5
145:15,19,21,24
146:3,4 176:17
**payout** 105:23 107:9
**payroll** 136:22
137:3,4,17 141:16
197:10 200:14,19
200:23
**peers** 36:13
**Pennsylvania** 44:10
**people** 27:24 29:7
30:13,13 39:13
49:10,21 56:5
57:10 69:18 91:24
**people's** 128:7
**percent** 52:8 71:2
**perform** 82:16,20
88:24 89:4 92:6
186:6,11 187:9
189:4 192:18
193:2,4,10,12
**performed** 91:6
100:5
**performing** 65:7
87:25 88:11
191:24 192:5
**period** 13:22 27:4
27:14,14 56:4
82:21 84:10 85:15
86:13 87:21 88:11
88:22,25 150:10
161:20
**periodically** 50:16
**permanent** 63:6
87:2
**permanently** 58:24
63:4
**permitted** 52:5
**person** 32:3 33:22
41:13,15 49:9
57:16 75:16 85:7
86:3 121:4 124:21
152:5 154:19
193:24
**personal** 5:17 34:10
50:22 59:6 199:5
**personally** 33:15

62:8 67:10 75:16
76:17,19 84:20
114:25 125:25
131:7 134:12
152:12 156:11
**personnel** 97:16
98:6 207:15
**Peter** 19:6 35:12,21
49:3 152:12
156:12 180:20
**Petit** 54:15,15,22
71:25 81:3 159:14
159:15
**Petite** 54:22
**phone** 30:6 31:12,17
50:22 57:15 86:3
128:16 129:17
163:19,20 203:10
**pick** 151:12
**picked** 75:16 84:20
**picture** 113:4
**piece** 100:17
**place** 45:18 53:5,7
60:5 65:25 68:23
85:22 92:18,21
127:19 202:19
203:14
**placed** 56:18 59:11
59:19 71:18 72:11
73:8 81:9
**Plaintiff** 1:5 2:5
**plan** 37:7 90:10
91:12
**plans** 124:13 186:23
187:4
**plate** 58:9
**play** 58:4
**please** 3:6,22 4:8,18
4:25 115:14 116:3
121:18 133:16
185:6 193:7
**plus** 182:24 200:6
**point** 28:9 36:2
43:21 49:10,21
56:9 87:14,22
102:6 117:17
152:22 173:11
174:2 181:16
191:7 193:14
**points** 87:16,17
**policies** 48:19
**poorly** 164:25
**portion** 100:20
198:7
**portions** 162:21
208:13
**position** 13:15 22:8
22:17,20 23:12,18
24:7,8,11 26:21
27:2,9 28:7,15

29:12,22 31:3,8,10
35:7,16 36:6 39:20
40:7 54:7,10,16
55:2,5 61:21 63:25
64:7,16 79:7 80:10
118:5 119:9
137:24 151:22
155:17 159:25
164:20 171:15,16
171:17,18 182:21
194:7 195:7,13
**positions** 35:5,10
60:6 70:5,6 160:12
160:13 184:6
**possibility** 119:9
141:24 157:23
176:9
**possibly** 55:19
109:13
**post** 20:13
**postacquisition** 58:5
60:6 64:2,8,12,17
70:8
**postemployment**
68:13
**potential** 177:20
**potentially** 107:13
177:2
**PPI** 3:16 8:8,16 16:2
16:2 22:3,4,6
25:19,24,24 39:19
39:21,23,24,25
40:8 42:5 43:5
45:10 47:15 49:11
51:8 54:7 56:6
61:4,9,21,25 62:2
62:14 63:4,12,13
63:14,18 65:11,17
66:10 76:8 77:14
77:14,19,20,24
78:11,16 79:2,8,11
79:19 80:5,15,16
82:16,21 85:10
87:25 88:15 90:10
98:5 99:5,13 100:4
100:25 107:7,8,11
108:8 110:8
113:12 115:12,15
115:22,23 116:5,6
116:8 120:3,10
121:19,25 122:2
122:10 123:8,16
124:5,5 125:9
126:10,16,25
130:10 132:15
133:6 134:9,16,21
134:25 145:15
146:5,6 150:8
153:17 157:11
160:3,5,14 185:23

186:7,10,19,23
187:7,8,25 189:4,7
189:18 190:3,6,8
190:14 191:24
192:10,10,18
193:2,4,10,12
197:12,13 202:8
202:16 207:11
**PPI's** 41:8 42:3
53:20 78:19 90:20
110:11 157:7
**PPI000014** 97:17
207:16
**PPI000103** 198:4
208:18
**PPI000765** 199:15
208:20
**PPI00762** 162:21
208:13
**practice** 67:2,17,23
91:10
**pre** 63:25 64:7,16
**preclosing** 61:18
**predecessor** 22:22
27:5
**premises** 45:25
**preparation** 8:3
9:10,22 10:22 11:9
**prepare** 9:12,15,24
10:6
**preparing** 10:3
73:23
**prescription** 6:23
**presence** 14:11
178:14
**present** 2:19 10:11
12:25 13:6,24 15:5
16:14,14 37:25
52:20 57:12 66:18
66:22 72:6 121:10
127:23 139:12,18
154:8,11 176:24
202:5,6,23 207:23
**presented** 109:18
**president** 13:16,17
22:9 24:15 27:10
30:9 32:18 35:17
38:4 54:20,23 55:3
64:3,11,13,18 79:2
79:11 135:7 188:3
193:17 194:5
**president/CEO**
26:16
**presume** 35:9
**pretty** 30:8 50:7
73:19 128:14
153:24 162:4
**preventing** 115:22
116:5,9
**previous** 27:12

147:11 173:17
179:19
**previously** 48:21
49:22 83:18 87:13
145:12 173:14
**price** 191:6
**primarily** 48:7
**Primary** 48:10
**prior** 24:12 28:21
29:6,14,25 43:3
50:4,19 51:5 55:16
57:19,23 58:17
59:9,15,16 60:17
61:3,7,13,22,24
62:9 64:9 66:9,14
79:12 85:24 92:22
176:12 183:12
**privilege** 202:14
**privileged** 14:24
17:15 163:8
174:14
**pro** 113:23 114:6
**probably** 35:22
71:15 74:22
137:11 140:15
153:22 158:16
169:7 183:12,16
**probing** 178:7,7
**problems** 7:8
133:25
**proceed** 83:15 176:4
**proceeding** 6:5
**process** 8:12,21
25:25 39:4,10 40:4
40:17,21 48:23
49:2,12,19 62:5
169:17 170:9
174:18 179:5
196:2
**produced** 8:22 98:5
**professional** 1:18
2:12 20:17,18,23
21:3,5 73:11
**programs** 37:6
**progress** 14:19
**prohibited** 113:10
**prohibition** 114:8
**projects** 29:24
**pronounced** 19:10
**properties** 45:9,23
45:24 46:5 47:8
190:17
**property** 23:11
190:24 191:14,17
**proposal** 116:21
119:5,14,21,24
120:23 161:11
**proposals** 107:22
108:16
**propose** 118:6

**proposed** 138:9,21
**protected** 14:14
**provide** 127:10
172:14 187:24
**provided** 62:6 74:13
120:5 185:21
**provides** 189:23
**providing** 151:23
**provision** 82:9
110:7,13,21,25
111:17,22 112:6
112:16 113:9
114:19 122:20
156:3
**provisions** 65:3
80:23 91:22 96:23
123:19
**public** 1:19 3:4
68:10 206:7
**publicly** 80:7,12
**purchase** 102:15
**purchased** 23:16
**purchases** 36:17,20
**purchasing** 28:8
**purported** 78:10
207:10
**purpose** 10:3 18:25
65:6 106:23,25
107:5 132:2
**purposes** 108:11
**pursuant** 1:17 113:5
144:24
**pursue** 162:6
**purview** 39:14
**put** 30:13 53:16,17
56:19 105:10
196:14
**putting** 55:23
103:18
**P-a-r-c** 47:7
**P-e-t-i-t** 54:15
**p.m** 120:20 142:10
143:3 201:20
204:3

---

**Q**

**question** 4:6,12 5:2
5:3 9:18 46:24
52:3 57:21 63:11
70:13 71:9 93:8,10
109:17 115:14
116:3 160:10
163:25 185:6
193:7 196:8
**questions** 3:24,24
5:5 17:2 50:16
98:8 103:21
133:21,22 134:2
154:21 170:17
187:14 188:13,22

201:23 204:2
**quick** 201:17
**quite** 24:24 34:12,12

---
**R**

**R** 1:18 2:2 3:2,2
  143:2,4,4 206:2,7
  206:23
**ramification** 37:4
**ran** 135:12 136:10
**Rankin** 62:25 64:15
**rational** 83:6
**rationale** 108:12
**reached** 58:12
  133:23
**reaction** 70:12
  73:10
**read** 159:11 163:22
  164:6 165:11
  166:3,24 167:20
  168:20 171:3
  173:10 175:17,18
  180:5,12 181:9
  182:19 205:4
**ready** 120:4 123:22
  124:3,19,22
**real** 24:20
**really** 12:22 18:24
  26:8 28:22 49:18
  155:21 156:22
  157:25 175:17
**reason** 7:13,16 60:3
  67:25 185:24
**reasoning** 60:13
  69:7 70:15 83:6
**reasons** 59:18 108:7
**recall** 7:9 8:18 9:11
  11:6,23 14:17 15:8
  15:22 16:11 17:18
  18:24 19:5,8,19
  21:23 38:10 48:11
  49:5 50:6,14 51:4
  53:6,9 54:11,18,19
  57:11,14,17 59:17
  60:14,19,21,25
  61:6,10,12,16,17
  62:25 63:3 67:20
  69:4 70:11,14
  72:21 73:5,15,17
  73:25 74:8,12,19
  75:11,13,18,19,20
  76:19 83:5,7,11
  85:19,22 86:2,8,23
  87:3 88:20 89:25
  90:4,6 91:14 92:15
  92:16,19,21 94:7
  97:3 101:21
  102:17 103:16,22
  105:17 108:17
  109:2,7,12,15,20

109:24 117:25,25
  118:13,14,20
  119:15,18,25
  121:7 127:25
  128:23 129:23
  130:4 131:12
  132:11 135:24
  136:2,4,12,15
  138:6 139:4,9
  140:10,13,23,25
  141:23 143:25
  144:7 151:5
  154:23 156:5
  157:8 160:21
  161:24 162:14
  164:4,11 165:5,8,9
  165:17 166:2
  167:10 168:2,18
  170:13,20 172:12
  173:9 174:5
  176:11 177:10,12
  177:14 178:10
  180:17 181:4,8
  182:8 183:6,18,25
  184:10,14 185:11
  188:16 201:6
**recalling** 55:11
**receipt** 149:16
  150:21
**receive** 74:3 92:2
  121:20 122:2,10
  123:9,17 124:5
**received** 74:21
  132:16 145:19
  147:25 149:13,15
  150:21 183:24
  184:21 198:16
**receiving** 123:25
  147:15
**recess** 56:13 94:10
  120:19 142:9
  201:19
**recognize** 97:21
  121:13
**recollection** 11:3
  15:6 42:12 48:13
  50:24 51:22 52:19
  66:21 67:5 72:15
  82:5 84:2 85:3,11
  86:5,7 89:8 90:15
  95:21 98:3 106:16
  106:19 116:22
  117:5,12 120:25
  144:19 145:8
  148:22 150:18,25
  153:2,25 162:13
  162:16 169:11
  186:17
**recollections** 49:8
**recommendation**

68:21 69:8,9 70:10
  70:16,18,19,22
  84:14
**recommendations**
  14:20 109:9,10
**recommended**
  157:24
**record** 3:7 206:13
**recorded** 33:10,12
  140:2
**recovering** 177:24
**recruited** 170:22
  171:13
**redacted** 162:20
  163:8 174:14
  208:13
**redundant** 59:23
**reemployed** 187:25
**refer** 3:15 40:15
  82:2 163:24
  165:13 167:14
  170:7 185:4
  198:11,19 199:25
**reference** 114:11
  152:5 155:2
**referred** 50:15
  152:15 166:7
  174:10 180:24
**referring** 100:10
  102:5 154:14
  155:2,10 156:4
  167:4,5
**refers** 110:7 127:7
  164:13 165:25
  168:23 173:12
  180:9 182:2
  198:12,20
**reflect** 200:14
**reflected** 183:7
**reflects** 200:16
**refresh** 11:3 159:11
**refuse** 88:24 189:4
**regard** 88:12 122:6
  141:3 182:5
**regarding** 11:10,12
  12:5 14:10 17:4,7
  17:14 18:21 21:9
  36:14 40:12,15
  48:23 50:25 51:2,7
  52:12 53:10 56:17
  57:6 66:11,15,24
  73:12 74:3 76:14
  90:3,7 91:17
  109:10,11,22
  120:24 134:2
  147:15,20 161:8
  169:12 170:11
  176:3 177:2
  178:12 195:13
  201:24

**Registered** 1:18
**regularly** 38:7
**rehire** 99:16,17,21
**Rein** 135:3,5 136:9
**Reiterated** 180:13
**related** 47:22 48:20
  48:21 108:4,22
  174:21 206:15
**relates** 12:22 36:21
**relating** 20:21,24
  79:22 201:8
**relation** 32:6 37:9
  41:5 53:2
**relationship** 22:3
**relayed** 127:9,24
  128:2
**Release** 104:5
  207:21
**Relevance** 46:22
  115:25
**relieve** 106:25
  120:13
**relieved** 56:2 58:25
  59:20 72:2
**relocate** 91:3
**relying** 111:15
**remain** 65:17 71:4
  75:17 76:24 82:11
  87:25 124:21
**remainder** 40:18
  71:5,13 115:3,18
  124:14 152:23
**remained** 23:23
  24:6 32:14 37:24
  77:14,19 78:22
**remaining** 65:6
  69:18 85:4 101:5
**remember** 5:15
  11:24 17:13 22:19
  49:9 54:2 81:19,23
  92:8,12 93:22,24
  94:2 118:5 151:4
  151:19 156:9
  158:18
**removed** 30:11
  199:8
**render** 120:5 124:19
**rendered** 193:3,11
**repayment** 161:12
  162:7 166:5
**repeat** 4:9 57:21
  115:14 116:3
  185:6 193:7
**rephrase** 4:10
  114:20
**report** 13:19 14:3
  26:15 27:22,24
  28:10 30:4 48:22
  197:15
**reported** 13:12

26:19 29:7 30:19
  30:19 48:24 91:2
  105:15 118:12,23
**reporter** 1:19 3:6
  4:19,23 5:4
**reporting** 1:23
  27:11,15,16,20
  29:15 178:21
**reports** 14:19 27:25
  28:11,14 197:13
  197:16
**represent** 98:4
  129:12
**representative**
  126:25 173:23
**represented** 7:19
  126:24 129:21
**request** 97:16 98:6
  207:15
**requested** 12:5
  185:23 192:18
**requests** 19:2
**require** 59:6 84:8
  124:7
**required** 59:25 82:8
  123:8,16
**requirement** 120:4
**resale** 55:3
**resolution** 40:21
**resolve** 153:16
  165:15
**resolved** 70:20
  71:18
**resource** 29:5 40:13
  69:13
**resources** 11:19
  17:9 18:13,14,18
  21:8 24:18 28:22
  28:24 36:23 47:22
  58:9
**respect** 12:3 38:12
  56:24,25 74:5,16
  76:16 88:13,16
  105:22 111:13
  188:19
**respond** 12:24 51:25
  72:22 164:2
**responded** 15:18
  118:20,21
**responding** 18:25
**response** 15:16,20
  87:6 112:19
  116:19 118:3
  124:25 127:15
  128:8 135:18,23
  156:7,10,15,21
  157:4,9 158:14,18
  164:4,11 165:5,16
  167:9,25 168:17
  172:10 173:8

174:4 177:17
178:8 180:16
181:5,7 182:7
**responsibilities**
24:15 25:18 26:2,8
26:9,10 27:11 29:4
48:20 79:17 90:23
100:20
**responsibility** 40:23
50:11 100:18
107:3 120:14
**responsible** 24:17
26:11 79:18 90:23
**rest** 71:20
**restate** 63:10
**restaurant** 190:5,14
191:3,3
**restaurants** 190:6
190:10,11 191:10
191:12,13
**restrictions** 68:13
**Restroom** 56:8
**restructuring** 69:20
69:21,23 84:6
88:14
**result** 12:18 45:9
77:2,15
**resumed** 143:4
**retain** 63:13 68:15
70:19,20,22 84:16
**retained** 63:5,24
64:6,15,21,24,25
65:5,6,12 70:6
75:10
**retired** 22:22 27:8
**retirement** 37:7
**retiring** 27:5
**return** 131:19
133:17 134:5,13
147:2 149:16
150:21
**returned** 180:7
**reveals** 12:15
**reversal** 195:18,23
**reverse** 197:4
198:21
**reversed** 198:23
**review** 9:6 10:21
31:14 95:16 97:8
103:6 131:13
133:22 149:2
**reviewed** 8:2,5,19
8:25 9:2,3,9 11:2
40:20 95:8,12,14
95:18,21,22
104:18 105:4,7
144:2,14 149:4
**reviewing** 48:18
**revisions** 143:23
**Richard** 94:15,20

207:13
**ride** 36:17,19,20,20
45:2
**right** 6:7 7:23 42:25
43:15 44:25 45:2
46:13 49:14 69:16
78:20 84:15 87:23
94:23 103:19
104:19 107:20
117:8 122:8
129:25 131:16
133:9 141:9 157:3
167:13 168:25
169:20 170:5
182:15 189:14
190:5 195:17
196:13
**rights** 110:12
**RK** 182:20
**role** 58:4 86:19
146:20
**rolling** 157:20
**room** 181:10,13
**rose** 140:7,7
**Ross** 64:6
**roundabout** 51:23
**rules** 3:19
**run** 43:19 105:24
**Ruth** 18:2 28:5 29:4
**Ryan** 135:4
**R-e-i-n** 135:5
**r-i-d-e** 36:19,20

——————————
**S**
**S** 2:2,9 143:2,2,2
207:6 208:3
**safety** 100:21
**salary** 200:3,7,22
**sale** 75:24 76:9
78:19,23 79:12
207:8
**sales** 24:20
**San** 44:3
**Sanders** 1:15 2:4
49:4,24 100:9
105:2 203:15
**Sandusky** 3:9 31:6
91:3 191:16
**Sandy** 11:17 12:4
13:7 17:2 28:10
48:7 49:23 98:10
103:15 127:8,12
127:17,23 129:10
129:18,20 133:22
134:3 199:14,20
208:19
**satisfaction** 155:17
**save** 107:13,15
**saw** 62:11,15,16
**saying** 4:24 75:18

92:20 118:2 130:5
130:6 151:14
161:6
**says** 97:24 98:11,23
104:22 112:25
120:3 123:4,12
124:8,15 125:5,7
132:23 163:8
164:24 165:10
166:4,22 168:3,19
169:18 170:2,21
172:13,20,24
174:6,14 175:16
181:21,22 184:24
185:7,22
**school** 16:19 20:13
**scope** 26:9 40:23
**se** 28:23
**search** 170:9
**SEC** 80:9
**second** 102:5 104:21
110:15 131:22
147:14
**secretary** 149:8
**section** 76:21 98:14
130:17 208:7
**sections** 174:22
**see** 62:8,13,16 75:5
77:3 79:4 98:24
104:23 110:15
113:7 119:3 120:7
121:22 125:11
127:2,5 130:11
132:23 134:23
147:17 163:12
173:2 174:15
185:2,9 186:2
**seeing** 132:11
**seeking** 161:12
**seen** 76:4 94:23 98:2
98:7 104:9 132:8
146:11
**select** 56:19 106:15
**selected** 59:19 194:2
**selecting** 57:6 60:13
**seminars** 20:20 21:9
**send** 181:6
**sending** 92:23 96:19
141:25 144:20
183:9
**senior** 35:4,10 53:17
79:2,11 85:4
170:23 171:16
**sense** 177:25 189:22
**sent** 74:9 76:8 81:14
85:10 96:16 97:5,9
97:11 101:17
103:21 104:13
115:7 116:20
125:22 131:5,14

132:20 133:4,11
143:11 144:3,11
144:14 145:7
148:2,7,13,21,24
149:23 150:5,15
151:11 163:15
198:8
**separate** 43:11,12
43:18
**separately** 43:17
137:20
**Separating** 49:13
**separation** 78:6
98:14 104:5
207:21
**September** 22:21
27:9,19 28:16,19
29:23 32:14 36:8
37:25 104:4,13
110:6 198:24
200:4 207:20
**sequence** 140:24
**series** 3:23 16:25
**service** 191:3
**services** 58:11 59:24
82:7,16,21 84:8
88:25 89:11,19
90:12 91:19 92:6
93:13 120:5 123:5
124:19 126:16
185:23 186:7,11
186:15,21,24
187:6,9,17,23
188:11 189:4,23
191:24 192:6,18
193:2,4,10,12
**set** 206:11,19
**settled** 84:4
**settlement** 105:19
106:12,24 107:22
108:16 109:11
116:20 120:23
168:20 169:15
**settlements** 108:19
109:13,23
**settling** 177:20
**severance** 77:24
78:6
**shake** 4:20
**shared** 153:9
**short** 94:9
**Shortly** 127:18
**show** 76:3 78:14
94:18 97:19
101:15 104:8
121:12 130:20
143:10 148:11
162:23 184:19
198:6 199:17
**shown** 205:7

**side** 8:22 48:11
119:12 153:4
154:5,6,9
**sign** 131:19 133:8
133:17 179:14
**signature** 94:25
98:11 131:16,17
144:8 148:18
**signed** 95:9,11,13,19
96:8 98:10 104:19
120:3 131:13
144:2
**significant** 48:13
106:20 189:15,16
**silent** 99:21
**similar** 50:25
**simply** 60:10 178:7
**sincere** 166:22
167:8
**sit** 140:10
**site** 48:18
**sitting** 7:23 200:13
**situation** 49:17
87:12 102:10
108:10 110:3
153:15 189:2
201:5,9
**situational** 32:22
**situations** 40:20
110:4
**six** 35:22 43:18 47:3
**Sixth** 1:24
**skipped** 169:22,23
**slash** 113:3 168:20
180:19
**slight** 3:20 96:6
**small** 185:13
**Snoopy** 22:25 23:6,8
23:14,23 24:2 30:2
35:25
**Soak** 43:23,25 44:3
44:4
**somebody** 45:18
53:25 92:22 141:8
**somewhat** 51:22
**soon** 63:6 116:24
117:3 141:15
150:15 179:25
**sorry** 16:2 33:11
43:14 54:16 71:9
88:7 106:19 108:2
127:4 147:13
150:13,14 152:17
178:25 190:8
**sort** 14:21 34:2 37:4
118:25 179:7
184:9 189:2
**sorted** 87:15
**sought** 152:8 155:9
**source** 121:21 122:4

122:11 123:9,17
123:21
**South** 2:7
**Southern** 1:2 19:24
**space** 169:21,22
**Spartanburg** 170:25
172:5,7
**speak** 6:25 19:6
109:18 118:10
128:11,19 137:2
137:19 152:25
180:22 183:4
201:23
**speakerphone** 72:20
**speaks** 98:19 99:19
110:18 124:17
133:20
**special** 64:10 133:12
133:14
**specific** 8:18 14:17
15:6,7 17:16,18
18:19 26:13 31:23
32:22 42:9 49:8
50:24 52:8,19 57:4
62:12 66:21 70:11
83:5 90:4 92:17
95:15 96:3 99:11
109:24 118:6,13
145:8 147:22
148:4 156:6
162:12,16 186:17
**specifically** 9:7,21
10:3 12:15 51:4
53:12 57:11 63:17
66:12,16 68:24
69:4 83:13,20
91:14 96:2,3
109:21 117:2,6
122:8 135:16
136:2 137:2 138:6
151:17 156:4
159:24 161:3
164:14 170:13
177:13 183:21
188:17
**specifics** 83:7
185:15
**speculating** 138:19
**speculation** 93:2
96:9 129:7,8 145:5
168:10
**spelled** 47:7
**spoke** 118:9 129:24
130:2,3 202:3
**spoken** 11:8 103:24
**Springs** 44:4
**Squire** 1:15 2:4 49:4
49:24 105:2 203:5
203:7,15
**Squires** 100:9

**ss** 206:4
**stack** 95:10
**staff** 18:12 25:13
28:24 29:23 31:14
31:19 32:2 33:9
34:11 36:14 37:21
41:4 85:5 88:17
90:11,21,24 91:4
100:2 139:16,17
139:20,25 140:11
148:10
**stamp** 163:8
**stand** 9:5,7 102:11
**standpoint** 30:12
58:9 107:6 178:4
**stands** 190:21
**Star** 45:2,13
**start** 30:15 63:20
157:21 158:6,7
170:23 171:21
**started** 22:19 24:11
29:14 89:9 143:18
158:2,4,8,11,12
165:19 167:17
170:8
**starting** 117:17
**state** 1:19 3:6 20:9
99:16 110:11
128:25 206:3,8
**stated** 77:18
**statement** 154:17
**states** 1:2 76:22
98:15
**status** 14:10 30:4
51:18 52:8 59:9
74:4 81:12 87:5,12
92:23 99:16,21
128:7 177:5
**stay** 52:13 53:11
60:18 61:4 84:10
84:20 85:15 86:12
86:22,25 87:21
126:16
**staying** 86:18
**steps** 140:17,20
**stewardship** 30:3
**stick** 63:20
**stock** 22:5
**stop** 136:24 141:12
145:10,15 176:17
193:9 196:13,21
197:3
**stopped** 157:11
196:12,19,22
**stopping** 195:21
**straddled** 23:18
**strange** 128:13
**strategy** 14:7
**street** 2:7 190:25
**strictly** 107:12

154:2,5 178:3
**strike** 71:22 137:7
**strong** 152:17
181:22,25 182:5
**structure** 21:24
42:12 70:5
**structured** 70:7
**subject** 205:6
**Subscribed** 205:16
**subsequent** 85:24
158:9 159:8
176:14 182:13
**subsequently** 67:16
80:22 145:25
**subsidiaries** 43:8
46:14,19 76:25
**subsidiary** 21:17,21
80:7
**substance** 14:22
15:7 94:4 105:11
160:23 161:4
**substantial** 188:13
**substantive** 18:3
139:25
**sue** 166:5,12 176:21
178:18
**sued** 5:25
**SUFFOLK** 206:5
**suggested** 176:5,5
**suing** 139:5 177:3,7
178:12
**suit** 177:22 179:7
192:3
**Suite** 1:24
**sum** 107:9 117:20
**summarized** 161:2
**summary** 16:8
161:8
**summer** 195:14
**support** 60:5
**supposed** 127:20,21
148:6
**sure** 3:17 4:18 11:5
15:2 17:8 26:24
46:20 47:5 50:22
52:23 56:12 57:22
58:20,21 59:4
70:17,25 71:11
83:10 85:17 86:15
86:17,17 87:22
92:7 116:4 118:12
131:15 136:6
151:21 161:2,18
164:3 179:15
184:7 185:13
193:8
**surprise** 136:6
**surprised** 135:19
**surrounding** 18:8
**sworn** 3:3,25 205:16

206:12
**system** 18:18

——————————

**T**

**T** 143:2 206:2,2
207:6 208:3
**take** 4:20 6:23 33:15
60:16,20 68:23
71:17 72:24,25
92:20 94:9 106:18
112:24 120:17
126:22 131:22
140:17,20 147:10
147:12 188:23
196:6 199:4
201:16 202:19
203:14
**taken** 5:9 6:18 9:6
56:13 94:10
120:19 142:9
145:25 146:4
195:3 201:19
**takes** 33:13
**talk** 18:19 31:12,16
139:5 155:16
181:11,18 184:24
185:13
**talked** 13:9,11
153:14 161:4
173:20 182:20
183:24 194:11
**talking** 122:23
130:3 157:17,22
164:17 165:21
166:11
**taxes** 200:14,19,24
**team** 48:10 53:17,21
**technicalities** 179:9
**Technically** 21:16
**technology** 135:8
**telephone** 9:23,25
86:6 118:18
159:19 203:4
**television** 113:4
**tell** 4:2 14:22 43:20
57:9 70:15 72:16
75:15 84:19 85:9
93:20 94:3 114:25
119:4 124:10
126:8 127:17
128:21 129:20
134:4,7,12,16
135:16 136:13
151:8,18 152:13
154:17 158:4,7,9
162:10,24 167:17
176:23 180:20
**Ten** 202:22
**term** 71:5,14 101:8
105:24 106:6

113:2 114:12
115:3,18 123:6,13
124:14 192:19,21
**terminate** 82:24
**terminated** 72:18
82:15 91:25 96:25
99:23 101:3
102:25 112:7
113:11 115:23
116:7 124:9,11,23
125:4,21 187:8,9
193:15
**termination** 32:17
32:21 38:4 65:2
80:22 81:13 82:9
83:16,23 91:21
93:9 96:22 98:15
98:22 99:4,7,9,12
100:5 102:9,16
185:25 186:8,12
186:16,21,25
187:24 189:5
**terminations** 33:2
38:12,15
**terms** 11:6 26:7
42:11 66:8 81:21
177:22 179:6
185:19
**testified** 3:4 6:4
47:17,23 56:17
81:8 84:9 91:24
143:4 163:5
168:24 169:2
184:11 189:13
194:20 196:18
**testify** 7:14,17 14:15
15:3 70:3 77:11
82:4 89:9 93:2
96:10 114:3 145:5
197:19
**testimony** 8:3 9:10
9:12 55:22 84:15
111:20 205:4
206:13
**TGI** 190:23 191:7
191:16
**theme** 113:3 159:23
**thing** 14:21 48:2
179:8 183:15
**things** 8:11,13 10:24
20:20 25:7 31:13
40:22 48:14 87:15
129:2 139:24,25
140:4 165:21,25
185:14 188:15,18
190:21
**think** 7:9 15:20 46:7
46:10,13 47:10
55:8 100:15 118:5
119:7 138:15,20

139:8 140:24
152:4
**thinking** 16:7
119:10 157:16
**thinks** 16:3
**third** 2:14 132:23
**Thomas** 1:18 206:7
206:23
**Thompson** 137:4
141:12 145:18
197:8,9,25 198:2,8
198:16 208:16,17
**Thornton** 54:14,17
62:25 71:24 81:5,6
159:3,13
**Thornton's** 159:25
**thought** 128:13
138:11 145:13
165:23 172:13
**three** 22:18 27:3
28:3,13 31:18
46:10 139:13
151:13 170:24
172:5 191:18
**throwing** 117:16
**Thursday** 198:13
**tied** 122:5
**till** 114:9
**Tim** 54:9
**time** 5:7 9:6 13:22
13:23,25 26:20
27:6,8,11 28:14,15
29:14 30:18 41:23
41:24 42:13,25
52:4,7 59:7,24
62:11 67:15 70:19
71:4,11,21 78:19
82:13 83:4,22 84:4
84:7,10 85:15
86:13 87:17,18,21
88:11,22,25 89:10
89:14 90:11,25
95:11 100:25
101:3 106:21
107:10 111:9,21
117:7 128:5 133:4
134:22 135:2
136:16 141:6
143:3 146:23
150:3,4,10 151:8
151:24 153:3
157:16,17,21
161:20 162:3,3
167:16 170:24
176:8 181:2
183:16,24 185:24
186:8,12,15,18,21
188:9 191:22
192:6,8,25 193:9
196:14 202:16

203:18 204:3
**times** 5:11 9:15
13:19,21 31:18
37:20 42:2 87:4
**timing** 196:20
**title** 54:11,18
**titled** 130:16 208:6
**today** 7:14,17 8:3
9:10,13 25:16
140:10 200:13
**told** 52:2 72:10
115:13,16 126:11
126:12 128:25
129:10 130:4
133:16 134:8,9
136:22,24 138:15
138:17 141:8
153:6,11,14
154:12 155:23
156:17,25 158:19
166:13 171:12,15
171:21 172:4,16
181:6,11 182:20
184:7 200:21
**top** 132:24 198:7
**topic** 90:8 109:13
147:2
**topics** 90:5
**total** 44:25
**touch** 126:16
**track** 108:4 185:20
**traded** 80:8,12
**training** 16:22 20:18
21:7
**transaction** 42:10
77:2,16 152:14
157:6
**transactions** 24:20
**transcript** 205:6
**transition** 27:4,13
40:12,14 41:20
47:21,21 48:3,6,9
89:4
**transitional** 51:2
58:7
**treasurer** 36:2
**Trek** 45:2,13
**trial** 6:13
**tried** 53:24
**triggered** 65:4 80:24
80:25
**triggering** 82:8
91:21
**trip** 50:6
**tripped** 5:24
**true** 102:23 186:4
205:5 206:12
**truth** 4:3
**truthfully** 7:14
**try** 75:2 110:4 199:9

**trying** 21:23 83:5
103:18 140:23
165:20 169:16
**Turn** 112:23 121:18
**twelve** 6:16 43:15
**two** 10:20 154:3,6
180:4 191:18
202:25 203:5
**type** 5:15 16:21 17:5
17:6 25:5 32:21
42:14,15 50:25
62:21 106:12
132:5,8 179:7
194:6
**types** 26:7 36:11,16
**typical** 102:9
**typically** 32:17 37:3
38:3,11

**U**

**uh-huh** 4:22
**uh-uh** 4:22
**ultimately** 58:25
59:14 178:17
**um** 5:23 21:9 23:9
23:24 30:13 36:18
36:20 37:14 38:6
50:14 51:21 53:16
65:2 66:7 67:6
68:10 70:11 87:11
105:22 106:3
118:23 128:4,6
140:4 153:6 167:5
179:7 202:5
**unable** 146:22 193:3
193:11
**unacceptable**
117:24
**understand** 3:21 4:4
4:7,9,13,23 5:2
7:4 15:25 19:14
66:5 146:10
152:21
**understanding** 54:3
58:22 77:12 78:4
79:7,16 80:6 111:8
112:5,15 114:10
114:23,24 157:18
168:12,14
**understood** 4:12,15
15:21
**undetermined** 87:14
**undocumented**
183:19
**unemployed** 127:3,4
129:11,13,21
157:20
**union** 21:9
**UNITED** 1:2
**Universal** 47:4

**University** 19:24
20:9
**update** 128:6
**updated** 40:19
**updates** 14:19 17:17
177:5
**use** 72:13,19 152:5
**usually** 31:24
**utilize** 186:24 187:6
**utilized** 188:12
**utilizing** 58:10
186:15,20 187:16
**U.S** 47:8,12

**V**

**vague** 49:7 85:11
**Valley** 44:11
**value** 110:13 177:22
200:2,5,24
**variations** 62:19,20
**various** 24:18 25:9
30:5 36:15 79:22
100:16 130:24
160:17 184:12
190:18
**Vegas** 45:6,7
**vendors** 37:5
**verbally** 4:19 93:12
**Veronica** 18:10
**versus** 91:9 177:23
**vice** 22:9 24:15 27:9
32:18 35:17 38:4
54:20,23 55:3 64:3
64:11,12,18 79:2
79:11 135:7 188:3
193:17 194:4
**view** 70:9 71:3,11
123:7,15 161:22
161:22,25 178:5,6
192:4
**violate** 113:18,21,24
122:20 123:3,11
123:24 180:14
184:7
**violated** 122:11
137:24 164:19
**violates** 122:18,25
122:25
**violation** 116:14
**Virginia** 44:7
**virtually** 189:22
**virtue** 114:11
164:19
**visiting** 5:23
**visits** 30:3
**vitamin** 6:22
**VM** 175:17,19
**voice** 175:19,19
180:4 182:14,15
182:16 183:5

**volume** 26:9 29:3
**VP** 27:12
**vs** 1:6

**W**

**wait** 4:25 119:3
**waive** 120:3,10
**want** 4:21 87:10
161:6 171:25
176:23 178:8,25
195:18
**wanted** 27:3,17
85:14 86:12
**Ward** 100:14
**wasn't** 117:18
129:17 155:13
179:15 180:23
195:15
**water** 43:10,13,17
43:18 44:15 45:4
45:21 159:23
190:18
**way** 33:10 40:16
47:20 51:23 75:19
75:20 93:24 94:2,7
107:12 110:24
111:16 115:5
117:24 122:13
128:24 147:23,24
153:16 155:22
183:2 192:15
206:16
**Weber** 2:17 54:4,5,6
71:24 72:4,9,10,16
72:20 73:6,7,13,22
74:2 81:2 159:4,13
172:24 187:19,20
187:21 202:3,8
203:3,9,17
**Weber's** 73:10
188:11
**week** 31:18,23 37:20
42:2
**weekly** 31:21 33:9
**weeks** 32:5 50:7
117:4
**went** 6:13 41:18
101:6 103:7 105:5
106:6 116:24
149:3,11 170:8
196:3,23
**weren't** 52:5 58:21
70:25 74:9,13
87:22
**we'll** 4:11 47:6
166:5
**we're** 5:5 11:10
25:15 37:4,6
122:23 166:4,11
178:8

**WHEREOF** 206:18
**White** 55:8 71:25
   81:3 159:14
**wholly** 21:21,24
**wife** 103:23,24
   127:13 128:25
   129:4,25 130:2
**Wild** 44:15
**willing** 118:7 120:3
   120:4,10 123:22
   124:3,18,22
   157:10 192:16,24
   193:8
**willingness** 110:12
**wish** 156:25
**withdrawal** 157:5
**witness** 3:3,8 6:4
   14:13 189:25
   194:22 197:17
   205:3 206:10,13
   206:18 207:3
**woman** 5:23
**wondered** 15:24
   19:13
**Wonderland** 44:6
   45:15 55:7
**word** 166:24
**words** 4:20 27:13
   72:13,19 83:24
   94:4 107:18
**work** 24:23 25:6
   29:24 48:5,8,25
   49:18 88:2,10 89:3
   89:5 91:5 113:17
   113:24 115:2,17
   132:25 133:5
**worked** 23:24 39:20
   41:3 49:6,11,22
   144:19 152:4
   170:22 171:8,10
   173:14
**working** 49:9
   115:22 116:6
   134:13,22 135:2
   135:13 136:11
   141:8 193:9
**world** 44:23 114:16
   114:23
**Worlds** 44:12
**worth** 121:3
**wouldn't** 38:6,6
   128:11,18 166:12
**write** 15:13 95:6
   101:20 104:16
   131:10 143:14
   148:16 153:17
   183:3,3
**writing** 60:22 66:24
   74:3 159:17
   174:24

**written** 67:3,8,17
   74:13,21 75:6 96:2
   164:25
**wrong** 124:10
   152:11
**wrote** 95:4 111:9
   182:19

_____
**X**
**X** 1:3,9 207:2,6
   208:2,3

_____
**Y**
**yeah** 46:7 51:15
**year** 20:3 185:8,12
   185:16
**years** 5:14 22:18
   27:3 35:22
**York** 1:2,16,16,20
   1:24,24 2:15,15
   112:7,14 168:4,15
   172:25 181:22
   182:4 206:3,8

_____
**Z**
**Zimmerman** 63:2
   63:24

_____
**$**
**$100,000** 182:24
**$7,983.50** 200:6,11
**$99,000** 200:6

_____
**0**
**05** 27:19
**07** 1:6
**08** 193:16 195:15

_____
**1**
**1** 184:17 186:4
   208:15
**1st** 82:7 98:16 130:9
**1:48** 143:3
**10/2** 98:23
**10/30** 173:18 183:13
   183:17
**10:22** 56:13
**10:31** 56:14
**10001** 1:24
**10022-4834** 2:15
**101** 207:17
**102** 98:23
**104** 207:19
**10595(SS)** 1:6
**11** 110:8 111:2
   112:24 114:8,14
   114:21,22 123:2
   123:11,12 207:17
**11/29** 179:22 180:6
**11:30** 94:10

**11:48** 94:11
**12** 104:4,13 110:6
   207:20
**12:25** 120:19
**12:27** 120:20
**12:56** 142:10
**121** 207:23
**13** 208:19
**130** 208:5
**1300** 2:6
**14** 207:13 208:5
**142** 208:8
**147** 208:10
**15** 207:15
**16** 208:14
**162** 208:12
**17** 101:4,13 207:18
**1716** 1:24
**18** 44:25 102:16,21
**18th** 10:7 12:8
   145:17,20,22
   146:22 176:20
   196:2 197:4
   198:13 202:20
**184** 208:14
**19** 142:7 143:12
   149:14 199:15,20
   208:9,12,20
**19th** 149:19 195:22
**197** 208:16
**1977** 20:4
**199** 208:19
**1996** 24:11
**1997** 23:17,19,20
   24:4,10

_____
**2**
**2** 207:19
**2-page** 101:11
   207:17
**20** 42:6 82:13
**2000** 130:21 150:16
**2005** 22:21 27:8,9
   28:16,20 30:16
   32:14 36:7,8 37:25
**2006** 42:6 45:10
   53:2 64:23 67:2,5
   75:24 80:16 81:15
   82:13 88:5,8 89:16
   92:10 94:16,20
   98:16 101:13,17
   104:4,13 110:7
   117:7 207:8,14,18
   207:20
**2007** 100:6 101:6,8
   114:9 126:23
   127:22 130:9,15
   134:21 142:7
   143:12 147:8
   148:14 149:14

**151:11 158:13
   166:17 175:14
   179:11 182:10
   183:10 184:13,18
   184:21 186:4
   188:6 195:14
   198:2,3,9,17,24
   199:15,20 200:4,4
   208:5,9,11,15,17
   208:18,20
**2008** 1:10 193:20
   202:20 205:18
   206:19
**21** 130:15,21 208:5
**212** 1:25
**22** 121:18,19
**23** 1:10 125:9,15
   147:7 148:13
   150:16 170:23
   183:9 207:8
   208:11
**23rd** 149:15,19
   151:11 158:12
   163:15 171:22
   200:4
**24** 126:22 208:16
**25** 134:19 198:3,17
   208:18
**27** 88:8 94:15,20
   175:14 198:2,9
   207:14 208:17
**27th** 87:14 88:4,5
   92:23 176:20
**279-5108** 1:25
**29** 104:6 207:22
**29th** 179:11,17

_____
**3**
**3** 207:4
**3-page** 162:19
   208:12
**3:09** 201:19
**3:15** 201:20
**3:18** 204:3
**30** 75:24 80:16
   207:8
**30th** 53:2 55:14,16
   64:23,25 80:19,20
   80:21 163:11
   176:13 185:4
   200:4 206:19
**31** 101:6,8 114:9
**350** 1:16

_____
**4**
**41** 2:7
**43215-6197** 2:8
**44870** 3:9
**45** 78:12 207:12
**48** 6:19

**5**
**5** 112:23 122:25
   123:3,4 166:17
   208:8
**5th** 172:21

_____
**6**
**6** 208:10

_____
**7**
**7** 182:9
**7th** 180:3
**7(c)** 120:6 123:2,22
   123:24 124:8
   125:5,6 173:11
   174:2
**7,983.50** 201:3
**75** 207:8
**764** 162:21 208:13
**78** 207:10

_____
**8**
**849** 3:9
**875** 1:24
**885** 2:14

_____
**9**
**9** 101:12,17 207:10
   207:18,23
**9:02** 1:10
**94** 207:13
**97** 207:15

**Zancourides, Lori Maiorca**

| | |
|---|---|
| **From:** | Kirila, Jill S. |
| **Sent:** | Monday, March 10, 2008 3:53 PM |
| **To:** | Weber, Michael; Pappas, Michael P. |
| **Cc:** | Zancourides, Lori Maiorca |
| **Subject:** | PPI v. Nail |
| **Attachments:** | COLUMBUS-#617760-v1-Affidavits.PDF |

Counsel:

As we discussed at the Court Conference, attached are affidavits from Mr. Kinzel and Mr. Crage evidencing that neither of them have any direct or unique knowledge relevant to this case. Accordingly, I trust that you will withdraw your deposition notices. Please let me know as soon as possible if we will need to seek court protection. Also, please advise if you need an alternative date for Mr. Freeman's deposition. As I indicated earlier, it may make sense to coordinate with Mr. Nail's deposition, which is currently scheduled for March 28th.

Thanks,

Jill

Jill S. Kirila
Squire, Sanders & Dempsey L.L.P.

41 South High Street
Columbus, Ohio  43215
614.365.2772
614.365.2499 fax

221 E. Fourth St., Suite 2900
Cincinnati, Ohio  45202-4095
1.513.361.1285
Fax: +1.513.361.1201


Beijing  Bratislava  Brussels  Budapest  Caracas  Cincinnati  Cleveland  Columbus  Frankfurt
Hong Kong  Houston  London  Los Angeles  Miami  Moscow  New York  Palo Alto  Phoenix
Prague  Rio de Janeiro  San Francisco  Santo Domingo  Shanghai  Tallahassee  Tampa
Tokyo  Tysons Corner  Warsaw  Washington DC  West Palm Beach
Associated Offices:  Bucharest  Buenos Aires  Dublin  Kyiv  Milan  Santiago
NOTICE:  This email message and all attachments transmitted with it are intended solely for the use of the addressees and may contain legally privileged, protected or confidential information.  If you have received this message in error, please notify the sender immediately by email reply and please delete this message from your computer and destroy any copies.

COLUMBUS-#61776
0-v1-Affidavits...

STATE OF OHIO                              :
                                           : ss.
COUNTY OF ERIE                             :

## AFFIDAVIT OF RICHARD L. KINZEL

I, Richard L. Kinzel, having been duly sworn and cautioned, state as follows:

1.      On June 30, 2006, Cedar Fair, L.P. ("Cedar Fair") acquired Paramount Parks Inc. ("PPI") through a stock acquisition. At that time I was, and am still the President and Chief Executive Officer of Cedar Fair; after the transaction I have also served as the President and Chief Executive Officer of PPI. My office is located in Sandusky, Ohio.

2.      I am aware that, prior to the transaction, Lester Nail was employed by PPI pursuant to the terms of his Employment Agreement to serve as the Company's Senior Vice President / General Counsel. In connection with the transaction, Mr. Nail (along with other PPI executives) were terminated without cause under the terms of their respective employment agreements. This information is certainly not unique to me.

3.      I had no direct conversations with Mr. Nail regarding his employment with PPI, the terms of his Employment Agreement, or the termination of his employment.

4.      I have not had any communications with Mr. Nail since PPI triggered the termination without cause provision of his Employment Agreement.

5.      Through information that has been provided to me from time to time, I am generally aware that PPI continued to pay Mr. Nail compensation and benefits under the terms of his Employment Agreement for some time after his employment with PPI ended; however, I have no direct or unique knowledge involving the details of any such payments.

6.    I have no direct knowledge of Mr. Nail's employment with Denny's or the circumstances surrounding PPI's discovery of such employment.

7.    Any relevant knowledge I may have about Mr. Nail is indirect and could be acquired through lower-ranking officers, employees, or agents of PPI.

8    As the President and Chief Executive Officer of Cedar Fair and PPI, it would be unduly burdensome to be deposed in the litigation matter between PPI and Mr. Nail, in New York or otherwise, particularly given my lack of firsthand or unique knowledge of the matters in that case.

Further affiant sayeth naught.

Richard L. Kinzel

Sworn to before me this __6th__ day of March, 2008.

Notary Public
My Commission Expires: _9-22-12_

[SEAL]

Brenda S. Lakner
Notary Public, State of Ohio
My Commission Expires on September 22, 2012

- 2 -

STATE OF OHIO                        :

                                       : ss.

COUNTY OF ERIE                   :

## AFFIDAVIT OF PETER J. CRAGE

I, Peter J. Crage, having been duly sworn and cautioned, state as follows:

1.       On June 30, 2006, Cedar Fair, L.P. ("Cedar Fair") acquired Paramount Parks Inc. ("PPI") through a stock acquisition. At that time I was, and am still the Corporate Vice President of Finance and Chief Financial Officer of Cedar Fair; after the transaction, I have also served as the Chief Financial Officer of PPI. My office is located in Sandusky, Ohio.

2.       I am aware that, prior to the transaction, Lester Nail was employed by PPI pursuant to the terms of his Employment Agreement to serve as the Company's Senior Vice President / General Counsel. I am also aware that, in connection with the transaction, Mr. Nail (along with other PPI executives) were terminated without cause under the terms of their respective employment agreements. This information is certainly not unique to me.

4.       I had no direct conversations with Mr. Nail regarding his employment with PPI, the terms of his Employment Agreement, or the termination of his employment.

5.       I have not had any communications with Mr. Nail since PPI triggered the termination without cause provisions of his Employment Agreement.

6.       Through information that has been provided to me from time to time, I am generally aware that PPI continued to pay Mr. Nail compensation and benefits under the terms of his Employment Agreement for some time after his employment with PPI ended; however, I have no direct or unique knowledge involving the details of any such payments.

7.     I have no direct knowledge of Mr. Nail's employment with Denny's or the circumstances surrounding PPI's discovery of such employment.

8.     Any relevant knowledge I may have about Mr. Nail is indirect and could be acquired through lower-ranking officers, employees, or agents of PPI.

9.     As the Chief Financial Officer of Cedar Fair and PPI, it would be unduly burdensome to be deposed in the litigation matter between PPI and Mr. Nail, in New York or otherwise, particularly given my lack of firsthand or unique knowledge of the matters in that case.

Further affiant sayeth naught.

_____
Peter J. Crage

Sworn to before me this _6th_ day of March, 2008.

_____
Notary Public
My Commission Expires:  _9-22-12_

[SEAL]          Brenda S. Lakner
                Notary Public, State of Ohio
                My Commission Expires on September 22, 2012

- 2 -

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2
                                         .
 3   PARAMOUNT PARKS, INC.,              .   Case No. 07-cv-10595-SHS
                                         .
 4                     Plaintiff,        .
                                         .   New York, New York
 5                vs.                    .   Friday, February 29, 2008
                                         .
 6   LESTER NAIL,                        .
                                         .
 7                     Defendant.        .
     . . . . . . . . . . . . . . . .
 8
                     TRANSCRIPT OF PRETRIAL CONFERENCE
 9              BEFORE THE HONORABLE SIDNEY H. STEIN
                   UNITED STATES MAGISTRATE JUDGE
10
     APPEARANCES:   (On the Record)
11
     For the Plaintiff:          Jill Suzanne Kirila, Esq.
12                               SQUIRE, SANDERS & DEMPSEY, LLP
                                 41 South High Street
13                               Columbus, Ohio 43215

14                               Steven Skulnik, Esq.
                                 SQUIRE, SANDERS & DEMPSEY, LLP
15                               350 Park Avenue
                                 New York, New York 10022
16
     For the Defendant:          A. Michael Weber, Esq.
17                               LITTLER MENDELSON, P.C.
                                 885 Third Avenue, 16th Floor
18                               New York, New York 10022

19

20
     Audio Operator:             Electronically Recorded
21                               by Court Personnel

22   Transcription Company:      Rand Reporting & Transcription, LLC
                                 80 Broad Street, Fifth Floor
23                               New York, New York 10004
                                 (212) 504-2919
24                               www.randreporting.com

25   Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.
```

1    (Proceedings commence)

2        THE CLERK:  Paramount Parks v. Lester Nail, 07-cv-

3  10595.  Counsels, please state your names for the record.

4        MS. KIRILA:  Good morning, Your Honor.  It's Jill

5  Kirila for plaintiff.

6        MR. SKULNIK:  And also Steven Skulnik both of us from

7  Squire Sanders for plaintiff.

8        THE COURT:  All right.  Good morning.

9        MR. WEBER:  Michael Weber, Littler Mendelson for

10 defendant.

11       THE COURT:  All right.  Good morning.  Please be

12 seated.  I'm going to tape this because I wanted to resolve the

13 pending motion.  So please speak loudly and clearly when you do

14 speak.

15       The -- I was a little surprised to see the motion

16 filed, and I think it's fairly easy of resolution, but it

17 doesn't -- I don't think the resolution of the pending motion

18 for judgment on the pleadings to dismiss the third counterclaim

19 really does much in moving the case forward.  It seems to me

20 that it's just clearing the underbrush away which I guess

21 there's no problem in doing that.

22       But it seems to me that -- I mean, I'm singing the

23 same song on all of the cases this morning for some reason,

24 that this is fairly straightforward case with a limited -- with

25 a discreet amount of money, let's put it like that way -- let's

1    put it that way, which I think is about $108,000 if I remember

2    the pleadings correctly.  So, if that's the framework we're

3    talking about, it doesn't really make that much sense to be

4    making lots of procedural motions or for that matter setting

5    forth fifty-seven affirmative defenses and twenty-eight

6    counterclaims although I realize that's not the numbers we have

7    here.

8              I'm just suggesting I think that the parties should

9    develop a more focused approach to the case and try to resolve

10   it.

11             First thing I saw the Rule 26 report filed, which I

12   appreciate.  Not that many cases do it even though it's

13   required by the rules.  And I think I can help you with that.

14   Paragraph 1 on your Rule 26 report is fine.  That is automatic

15   disclosures by March 14th, joinder March 31; time for amendment

16   of pleadings as per Federal Rules, I don't know what that

17   means.  So it's okay with me.

18             Number four, initial documents and interrogatories

19   February 11.  That's fine, because that's past.  Date for

20   completion of all depositions.  I'm not sure you really need

21   that amount of time.  Again, given the fact that it's fairly

22   straightforward I'm not sure why you can't do the depositions

23   by the end of April which gives you two months.

24             Does anybody want to tell me otherwise?  That's what

25   my proposal to make it April 30th.  Plaintiff?

4

1      MS. KIRILA:  Thank you, Your Honor.  Just briefly as

2 to the motion you mentioned, the reason we filed that motion

3 was because that was the only counterclaim that carried

4 potential attorney's fees recovery and that was the reason to

5 --

6      THE COURT:  Okay.

7      MS. KIRILA:  -- try to clean that up because we agree

8 this is a very straightforward case, and in fact, we'd like to

9 move for judgment as a matter of law on the contract as soon as

10 we can.  We would agree with that proposed schedule for the

11 depositions provided that the depositions that the defendant

12 has in mind are reasonable to get to the resolution of this

13 issue.

14      THE COURT:  All right.  Let me hear defense.  Any

15 problem I can't set in your Paragraph 5 change July 2 to April

16 30?

17      MR. WEBER:  No objection.

18      THE COURT:  All right.  I'm going to do that.  And

19 then I'll set the last day for all discovery to May 23, just

20 gives you another three weeks to clean it up.

21      All right.  Then Paragraph 1 is March 14; Paragraph 2

22 is March 31; Paragraph 3 doesn't say anything; Paragraph 4 is

23 February 11; Paragraph 5 is April 30; Paragraph 6 is May -- May

24 23, and we'll set the next pretrial conference at -- you know,

25 we'll have mid-discovery status conference.

1           Let's make it April 25, 2008 at 11 a.m.  That way,

2   discovery -- fact discovery will essentially be over,

3   depositions will be essentially over.  I'll be able to talk

4   with you about where we go from there.

5           All right.  Now, defendant on this third counterclaim

6   as I understand your position in your brief, you're claiming --

7   you're suing under New York labor law, Section 193.  Is that

8   right?

9           MR. WEBER:  Yes, Your Honor.

10          THE COURT:  But that section not entirely on its face,

11  but certainly the way it's been interpreted consistent with

12  what it says facially is that it's really just for deductions,

13  and you're not arguing about deductions.  In other words, one

14  of the leading cases on that is that Northern District case,

15  which I have here.  I think it was Judge Heard, yes.

16          Ireton-Hewitt v. Champion Home Builders; they all

17  follow this basic pattern that says the purpose of 193 is to

18  prohibit employers from making unauthorized deductions intended

19  to place the risk of loss for such things as damaged spoiled

20  merchandise or lost profits on the employer.  That's the

21  purpose of 193.  And the "deductions" that you're complaining

22  about in that third counterclaim are not deductions at all as I

23  see it and as I think the cases see it.

24          You're arguing that he should have been paid for that

25  period where they weren't paying him.  I think it's from

1   October to the end of the year, and you're arguing that they

2   shouldn't have gone back and I guess they took out a electronic

3   deposit.  That's not a deduction under 193 according to the

4   cases.  At least that's what my research has yielded.

5           Now, I'll let you try to talk me out of that now, but

6   my strong inclination is to hold with what I think the other

7   cases have said, and that's that 193 has to do with people who,

8   you know, an employer as a wage earner.  It's like in the old

9   days, well, five dollars for heating the place that we're

10  charging you and two dollars for -- because we have to get

11  insurance on you and three fifty and then -- do you remember

12  the movie "They Shoot Horses, Don't They."  They want a hundred

13  dollars or something but then they took off laundry service and

14  --

15          MR. WEBER:  Right.

16          THE COURT:  -- and end up with Jane Fonda had nothing

17  at the end.  Whatever it was, but that's what it's designed

18  for, not not paying under a contract.  That's how I see it.  Go

19  ahead, sir.

20          MR. WEBER:  I think that historically, you're right,

21  Your Honor.  That's how that section has been interpreted.  I

22  don't think the counterclaim necessarily does not apply here to

23  193.  In other words, we haven't conducted discovery to see

24  what other actions the plaintiff took to withhold not only

25  compensation and reverse a check, but there may be other monies

1  that we're entitled by way of bonus, pension, 401K, other

2  monies that may have actually been withheld or deducted as

3  well.  So I --

4       THE COURT:  But you have no -- at this point, you have

5  no basis for asserting that.  Is that right?

6       MR. WEBER:  Well, we know -- we know that there was a

7  reversal of a direct deposit.

8       THE COURT:  Right.  And you're suing for that in the

9  others -- in the other counterclaims.  That's okay.

10      MR. WEBER:  Right.  So we don't know more than that

11 right now.  We haven't obviously gotten any discovery from the

12 plaintiff to know for certain.  I think there is a basis under

13 193, and I agree with Your Honor, I think historically it was

14 looked narrowly as to those types of deductions that you just

15 identified.  I don't think it says that there isn't a viable

16 claim when you do the things that plaintiff did here to the

17 defendant.  That's our position.

18      THE COURT:  Okay.

19      MR. WEBER:  I think it's premature to rule until we

20 have some full discovery on the issue.

21      THE COURT:  Well, I don't think it's premature,

22 because you have to have a factual basis for the assertions.

23 You have to have enough facts now under the ink-ball standard

24 to have a plausible claim and you have no reason to believe any

25 of those improper deductions were taken.  I think you're

1  covered if they were on the other claims, but I'm going to --

2  I'm going to grant the motion now.

3       If discovery yields that you think -- you know, they

4  took $20 out for laundry service or the types of deductions

5  that one -- that you and I both agree apparently 193 was

6  designed to prohibit, I'll let you reinstate it, but I'm trying

7  to get the case to move forward on the basis of what you really

8  want, and that's apparently you think he was entitled under the

9  contract to be paid.

10      If you know your basic theory now without any

11  prejudice to the case, tell me what it is, because at least on

12  what I see, the contract says you can't work for somebody else.

13  They claim he was working for somebody else, and therefore,

14  they didn't have to pay him and he could be fired without

15  cause.  What's the -- what -- how is the basic factual defense

16  shaping up, again, without prejudice because it would just

17  start --

18           MR. WEBER:  Well, the contract doesn't say that.

19           THE COURT:  Okay.

20           MR. WEBER:  The contract says that the defendant had

21  to be ready, willing and able to provide services for the

22  plaintiff.

23           THE COURT:  And that's all?

24           MR. WEBER:  That's it.

25           THE COURT:  And, if he was full-time employed by

9

1    Denny's, how is he able to provide services?

2             MR. WEBER:  Well, the plaintiff never asked him and

3    there are discussions that took place prior to his termination

4    that would -- that we will establish through discovery that he

5    was not obligated to do any work, was not obligated to provide

6    services.

7             THE COURT:  Wait, was not obligated -- you mean --

8    what's that argument?  How is he not obligated to provide

9    services?

10            MR. WEBER:  He was told that he did not have to

11   provide any services.

12            THE COURT:  Sure --

13            MR. WEBER:  And the contract --

14            THE COURT:  Sure, wait.  We're firing you without any

15   case.  We just --

16            MR. WEBER:  Right.

17            THE COURT:  -- I don't know why we're having the

18   reduction.  We can do that under the contract, and don't worry,

19   you don't have to show up.  I understand that, but that -- does

20   that change the contract that says he has to be ready, willing

21   and able to provide services?

22            MR. WEBER:  Two separate points.

23            THE COURT:  Okay.

24            MR. WEBER:  They're relevant and connected, but the

25   obligation to -- since the plaintiff never asked him, they

1  can't prove that he was not ready, willing and able to provide

2  the service.

3          THE COURT:  Why can't they do that if they prove he

4  was working full time at Denny's?

5          MR. WEBER:  Because he will testify that he was ready,

6  willing and able to provide services with the understanding

7  that he might have to disrupt his life, but he was told that he

8  wouldn't have to.  So he made a decision with the understanding

9  from defendant -- from plaintiff's witnesses who we've noticed

10  for deposition that he wouldn't have to worry.  So he made --

11          THE COURT:  Is it -- I'm just trying to understand.

12  Are you saying that plaintiff's witnesses knew he was working

13  at Denny's but he could go and do that.  He didn't have to

14  worry?

15          MR. WEBER:  I don't think they necessarily knew from

16  what they say in their papers, but before he left, they said

17  not to worry.  So he made a decision that in reality he was not

18  going to need -- he was prepared to because that was his

19  obligation, if they asked him.  He was ready, willing and able.

20  They never asked him.  They never asked him.

21          He was prepared to pick up, go back, whatever he had

22  to do, but based on conversation he had with the plaintiff's

23  witnesses, he felt fairly certain that wasn't going to happen

24  --

25          THE COURT:  All right.

1          MR. WEBER:  -- but they never asked him.

2          THE COURT:  Okay.  Is this -- is this your argument --

3          MR. WEBER:  Among others.

4          THE COURT:  -- yes, he was -- pardon me?

5          MR. WEBER:  Yes, among others.

6          THE COURT:  No, I understand.  Again, I'm just trying

7  to see where the case is going.  You can charge your argument

8  as discovery goes on.  That's not the issue now.

9          Is your argument that yes, he was working at Denny's

10  but he was willing to -- I don't know, work the evening shift

11  at Denny's if the plaintiff ever asked him to work for them or

12  for that matter quit his job at Denny's if he was ever asked to

13  do anything by plaintiff, but they never asked him to do

14  anything?

15          MR. WEBER:  Correct.

16          THE COURT:  Okay.  So he was ready, willing and able,

17  matter of fact, he would love to work for plaintiff but he had

18  to feed his family, and if only they had called, he would have

19  come running to work for them?

20          MR. WEBER:  More or less.

21          THE COURT:  Okay.  I understand the theory.

22  Plaintiff?

23          MR. WEBER:  And, Your Honor, if I may just continue on

24  this point.  We have one discovery dispute already and the

25  individual that we -- two individuals we sought to depose, one

1    wrote the termination letter and the other -- and both this one

2    -- this individual, Mr. Kinzel and Mr. Cragy (phonetic) had

3    conversations with the defendant about the issues that we're

4    discussing this morning.  The plaintiff's attorney said they

5    don't want to produce him for discovery.  We've noticed three

6    depositions.  They're very relevant to our case, both on the

7    defense and on the counterclaim.

8         So I just want to get that out in front of Your

9    Honor's --

10         THE COURT:  All right.  But I really need discovery

11   disputes -- there's a requirement that you meet and confer.  I

12   need you to be talking about that before you come to me because

13   --

14         MR. WEBER:  We did.

15         THE COURT:  -- I'm astonished at the number of -- I am

16   astonished at the number of discovery disputes where somebody

17   raises it in open court and the other side says well, I didn't

18   know that was an issue.

19         MR. WEBER:  Well, we've already done that through e-

20   mails and the position the plaintiff's counsel is taking is

21   that they may have information but others have other

22   information that may be more relevant.  That's not for the

23   plaintiff's attorney to determine.

24         THE COURT:  Okay.

25         MR. WEBER:  We know that they have information that's

1    very relevant to the case.

2         THE COURT:  Okay.  Let's -- let's go back and talk

3    about what the position of the plaintiff is in general in the

4    face of an argument that, of course, we are ready, willing and

5    able.  Who would wan to work at Denny's.  I'd much rather work

6    at Paramount Parks, Inc.  All you had to do was call and I'd

7    come running.  Go ahead.

8         MS. KIRILA:  Your Honor, even if you assume that's

9    true and that ready, willing and able doesn't mean what it

10   sounds to me like it means, you're ignoring two other separate

11   parts of the agreement, both of which were breached here, that

12   he -- that he provide his exclusive services for the remainder

13   of the term.

14        Now, he got paid for the remainder of the term.  He

15   had an obligation to provide that exclusivity.  That's a

16   separate provision in Paragraph 5 and --

17        THE COURT:  And he says he agrees to provide his

18   exclusive services to Paramount Parks through the end of the

19   agreement?

20        MS. KIRILA:  Through the term hereof, yes.

21        THE COURT:  Okay.

22        MS. KIRILA:  And then in Paragraph 11, again, another

23   separate independent obligation, it says executive shall not

24   engage in any other occupation during the employment term.

25   Same thing.

1          THE COURT:  Ooh, ooh.  All right.

2          MS. KIRILA:  So, even if you assume that there's some

3    argument there, we don't need it, and that's why I'd like to

4    move on those bases as soon as we can, and two of the

5    depositions that were notices this is the CEO and the CFO of a

6    publicly traded company, the parent that bought Paramount

7    Parks, had nothing to do with the underlying contract.

8          In fact, they inherited it, met the obligations when

9    they changed over their executives and so they have no

10   knowledge whatsoever about the terms of Mr. Nail's employment,

11   that contract or how it came about.  They just followed the

12   written letter of it and they expect Mr. Nail to do the same.

13         THE COURT:  But the defendant just said that they had

14   conversations with his client over it.

15         MR. WEBER:  And he signed --

16         THE COURT:  Wait.

17         MS. KIRILA:  May I finish.  Even if there is some

18   argument hat they had conversations with him, that's not going

19   to trump the written word of the agreement.  It has nothing to

20   do with those other sections in paragraph --

21         THE COURT:  No, but if they had conversations with him

22   about the contract, he's entitled -- this is, you know,

23   discovery.  He's entitled to ask them about those

24   conversations.

25         MS. KIRILA:  And it's my understanding there were no

1    such conversations.

2            THE COURT:  Okay.  All right.

3            MS. KIRILA:  And this is merely an attempt to get them

4    to come to New York and waste their time so that we'll drop the

5    suit.

6            THE COURT:  Okay.  All right.  I understand.  Sir?

7            MR. WEBER:  Your Honor, with respect to several of

8    these provisions, they're void because when you terminate

9    someone without cause any non-competition restrictions are

10   voided, number one.  Number two, it's a violation of the Code

11   of Professional Ethics --

12           THE COURT:  Well, wait.  Wait, wait, wait.  And,

13   again, we're probably getting ahead of ourselves, but I want to

14   figure out where we're going, a contractual arrangement to

15   provide exclusive services whether or not those services are

16   called upon has nothing to do with the law -- I don't think the

17   law in New York on the validity of non-competition agreements.

18           MR. WEBER:  Separate issue.

19           THE COURT:  Right.  So, if that contract says you will

20   provide your exclusive services through the end of the

21   agreement, probably means what it says.

22           MR. WEBER:  Says that you stand ready, willing and

23   able to provide those services.

24           THE COURT:  I thought -- I thought you were pointing

25   me to a separate provision that says --

1           MS. KIRILA:  I am, Your Honor.

2           THE COURT:  All right.

3           MS. KIRILA:  Paragraph 5 and Paragraph 11.

4           THE COURT:  All right.  But the parties will work this

5    out.

6           MR. WEBER:  Yes, Your Honor.

7           THE COURT:  Or not.

8           MR. WEBER:  Or not.

9           THE COURT:  Tell me about the -- what you think your

10   client had conversations with the two higher-ups that you

11   wanted to --

12          MR. WEBER:  He did -- he did have conversations, Your

13   Honor, very specific ones with the individuals that we've

14   noticed for depositions.

15          THE COURT:  Okay.  You've noticed their depositions

16   already?

17          MR. WEBER:  Yes, sir.

18          THE COURT:  Okay.  What I want you to do then is to

19   send me a -- and if you feel you've, you know, run the string

20   in terms of talking about this, send me a letter and it will be

21   a letter application, a motion for protective order against the

22   depositions and tell me why that they have no knowledge, they

23   had conversations, and find out from Mr. Weber what -- the

24   reasons why he thinks they have so you can address it up front,

25   and then Mr. Weber respond in a letter, I'll accept those

1    representations as representations of your client.  If you want

2    to attach an affidavit of your client, you're certainly

3    entitled to but I still will accept if you don't want to go

4    through that --

5            MR. WEBER:  Well, Your Honor --

6            THE COURT:  -- I'll accept what you say in the letter.

7    Go ahead.

8            MR. WEBER:  I appreciate that you're saying, but I'd

9    like to take these witnesses' deposition first and -- before I

10   necessarily say -- what my client is going to say.  I'd like to

11   pin them down before they hear what my client is going to say.

12   That's my right --

13           THE COURT:  Okay.  But here's -- I understand that

14   also, but they're going to move for a protective order, and

15   their motion is going to be these people have absolutely

16   nothing to say about this, and they're mucks-a-mucks, and -- I

17   don't mean that pejoratively.  I mean, you know, they are major

18   officers of a public -- public corporation, and there are

19   57,000 employees who sue them, you know, they're busy men.

20   That's what you're going to be saying, and they shouldn't have

21   to come away from what they do for you.  You can in part

22   undercut that in your response if you want and say we'll go

23   there and we'll go to their suites so their time isn't taken.

24   Whatever it is.

25           But, if she says they have absolutely no knowledge,

1    that's pretty powerful to me and you're going to have to tell

2    me why you think they do have some knowledge, the extent --

3            MR. WEBER:  I'm fine with that, Your Honor.

4            THE COURT:  -- that you want to disclose the specifics

5    is up to you, but if she says they're higher-ups, they're busy

6    people, they have nothing to do with this, they took it only

7    because the contract came with a company that they purchased.

8    Sounds good to me unless you tell me otherwise.

9            MR. WEBER:  I have no problem with that, Your Honor.

10   My objection is that I had to somehow disclose what my client

11   was going to say first.  I don't have a problem with them

12   making a motion and saying in a sworn affidavit I know nothing.

13   Let them take that position.  Fine with me.  And if they take

14   that position and they say absolutely, we had no conversation

15   with the defendant, no knowledge of this case, nothing

16   whatsoever, then I'll reconsider the affidavit -- I want to see

17   that in an affidavit, Your Honor.

18           THE COURT:  All right.  Then we'll do it, then you

19   both -- then I won't -- I was trying to make it easier for you.

20   Then any factual representations of the client should be made

21   formally in an accompanying affidavit.

22           So we'll go the formal route, don't even do it by

23   letter.  I was trying to make it easier.  Do it by notice of

24   motion.  Okay?

25           MS. KIRILA:  Yes, Your Honor.

1          THE COURT:  With a memorandum and affidavit.

2          MR. WEBER:  To your point, Your Honor, I don't mind

3    not having the motion if I get a sworn affidavit.  If counsel

4    wants to submit that first --

5          THE COURT:  Okay.  I'm going to --

6          MR. WEBER:  -- that may be sufficient --

7          THE COURT:  -- I'm not going to micro-manage this.

8    You understand.  Present it to me in the way that you -- that's

9    the most efficient for each of you.  In terms -- and you have

10   the schedule here, and make -- and if you can't resolve it,

11   make that motion sooner rather than later because I want to

12   hold to these dates and it sounds like you would want me to

13   hold to these dates.  Okay.

14         Let me render a decision on the motion on the

15   counterclaim because I am going to get rid of it to clean this

16   up, and if -- if Mr. Weber -- I'm going to not only get rid of

17   it to clean it up because I think that's what the law in the

18   circuit is supports the granting of the motion to dismiss the

19   third counterclaim, but Mr. Weber, if discovery yields the --

20   you know, deduction for the rotten cantaloupe in violation of

21   Labor Law 193, I'll let you put it back on.  Okay?

22         MR. WEBER:  Thank you, Your Honor.

23         THE COURT:  Sure.  Let me set the basis forth because

24   I'd like to show everybody in the courtroom that I still know

25   how to read cases.

1          The -- there's a motion for judgment on the pleadings

2    to dismiss the third counterclaim, and under Rule 12(c), the

3    standards are the same as under 12(b).  That's DeMuria v.

4    Hawkes, 328 F.3d 704, 706 at Note 1, (2nd Cir. 2003), and as

5    you both know, the standards now under 12(b), and therefore,

6    under 12(c) -- 12(b)(6), that is, and under 12(c) are governed

7    by Twombly -- Bell Atlantic Corp. v. Twombly, 550 U.S. at 127

8    S.Ct. 1955 at 1974 (2007).

9          And that establishes under the Second Circuit the law

10   on Twombly which is Iqbal v. Hasty, 490 F.3d. 143 at 157, (2nd

11   Cir. 2007) that the factual allegations have to be enough to

12   raise a right to relief about the speculative level; at this

13   point, it's totally speculative.

14         I'm assuming the truth of the facts asserted in the

15   counterclaim and drawing all reasonable inferences from those

16   facts in favor of the plaintiff.  As we said, the third

17   counterclaim asserts a violation under Labor Law 190 and in the

18   briefing on this, it became clear that the defendant is really

19   moving under 193.

20         The defendant is not disagreeing with me that the case

21   is primarily Ireton-Hewitt v. Champion Home Builders Co., 501

22   F.Supp. 2d. 341 at 353 (N.D.N.Y. 2007) states that the 193 was

23   intended to place the risk of loss for such thins as damage,

24   spoiled merchandise or lost profits on the employer rather than

25   the employee.

1    And refusal to pay wages is not covered by 193.

2 That's what we're dealing with here as I understand it.  That's

3 <u>Monagle v. Scholastic, Inc.</u>, 2007 District Lexis 19788 at Star

4 5 (S.D. March 9, 2007), and <u>Irritant Hewitt</u> at 353 and <u>Kletter</u>

5 <u>v. Fleming</u> (phonetic), 32 A.D.3d 566 at 567 (Third Dept. 2006).

6    The alleged failure to pay wages by Paramount Parks is

7 not cognizable under 193.  That's true also not only of the

8 failure to pay wages, but also the alleged reversal of the

9 payment that is taking out his salary from his bank account,

10 because again, 193 has to do with deductions and not payment of

11 salary.  That's <u>Gennes</u>, G-e-n-n-e-s <u>v. Yellow Book</u>, 23 A.D.3d

12 520 at 521, (Second Dept. 2005), and <u>Hudacs v. Frito-Lay Inc.</u>,

13 90 N.Y.2d 342 at 348, 49.  That's a 1997 decision of the New

14 York Court of Appeals.

15    Now, the defendant refers me to the recent

16 certification by the Second Circuit in the <u>Pactor</u> (phonetic)

17 case but that -- I don't have to be concerned about that,

18 because that certification isn't on point for this

19 determination.

20    My finding is that defendant has not alleged any

21 cognizable unauthorized deduction from defendant's wages and

22 therefore, I'm granting the motion to dismiss the Rule C motion

23 for judgment on the pleadings.

24    All right.  I think we have a way of proceeding.  I'll

25 handle this discovery dispute.  I'd urge the parties as I did

1  in the other case to get together and see if they could resolve

2  this, but if not, it looks like it will be a very interesting

3  case.  Thank you all.

4          MR. WEBER:  Thank you, Your Honor.

5          MS. KIRILA:  Thank you, Your Honor.

6      (Proceedings concluded)

7                           * * * * *

8                        CERTIFICATION

9          I certify that the foregoing is a correct transcript

10  from the electronic sound recording of the proceedings in the

11  above-entitled matter to the best of my knowledge and ability.

12

13

14   *Kathleen M. Price*
                                        May 1, 2008
    _____
15  Kathleen Price AAERT Cert. No. 325
    Certified Court Transcriptionist
16  Rand Reporting & Transcription, LLC

17

18

19

20

21

22

23

24

25

AGREEMENT made as of the ____ day of _____, 2006, by and between Paramount Parks Inc. ("Paramount"), which is a division of CBS Corporation, and Lester C. Nail ("Executive"), whose address is 9027 Kirkley Court, Charlotte, North Carolina 28277.

W I T N E S S E T H:

WHEREAS, Paramount desires to secure the services of Executive as Senior Vice President / General Counsel, and Executive is willing to perform such services, upon the terms, provisions and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the promises and the mutual covenants hereinafter contained, it is agreed between Paramount and Executive as follows:

1.      (a)      The term of this Agreement shall be for the period commencing January 1, 2006 and ending December 31, 2007 (the "Employment Term").  Paramount shall employ Executive, and Executive shall accept employment as Senior Vice President / General Counsel.

2.      (a)      Paramount agrees to pay Executive, and Executive agrees to accept from Paramount for Executive's services hereunder, a base salary of One Hundred Sixty Five Thousand Dollars ($165,000) per annum payable in accordance with the regular payroll practices of Paramount.  Base salary shall be payable biweekly or in such other manner as Paramount may designate for employees generally.  Executive acknowledges and agrees that he is not eligible for a car allowance.

        (b)      Paramount agrees Executive shall be eligible to be considered for participation in the CBS Corporation ("CBS") Short Term Incentive Plan ("STIP"), *i.e.*, Paramount's current bonus plan, or any successor plans to STIP.  The target annual incentive award for Executive's position will be thirty five percent (35%) of Executive's base salary.  The

1

payment of a STIP bonus, if any, and the precise amount of such payments shall be determined on an annual basis at the sole discretion of the Board of Directors of CBS, or the appropriate committee of such Board.

(c) Paramount agrees Executive shall be eligible to be considered for participation in the CBS Long Term Incentive Plan ("LTIP"), *i.e.*, Paramount's current stock option plan, or any successor plans to LTIP. The award of a stock option grant, if any, and the precise amount of such options that may be granted, shall be determined on an annual basis at the sole discretion of the Board of Directors of CBS, or the appropriate committee of such Board.

3. Executive shall be included in all plans now existing or hereafter adopted for the general benefit of Paramount employees, subject to the provisions of such plans as the same may be in effect from time to time. To the extent Executive participates in any benefit plan, such participation shall be based upon Executive's base salary, unless otherwise indicated in the plan document.

4. Executive's vacation entitlement shall be governed in accordance with Paramount policy.

5. Executive agrees to devote all customary business time and attention to the affairs of Paramount, except during vacation periods and reasonable periods of illness or other incapacity consistent with the practices of Paramount for executives in comparable positions, and agrees that Executive's services shall be completely exclusive to Paramount during the term hereof. Executive further agrees to comply with all applicable Paramount policies, as described in the Paramount Personnel Policy Manual.

6. (a) Executive acknowledges receipt of the CBS Business Conduct Statement. Executive further acknowledges that Executive has read and fully understands all of the

2

requirements thereof, and acknowledges that at all times during the term hereof, Executive shall perform Executive's services hereunder in full compliance with the CBS Business Conduct Statement, and with any revisions thereof or additions thereto that are provided to Executive in writing, including without limitation any notice provisions therein (notwithstanding any notice provisions to the contrary which may be contained in paragraph 16 of this Agreement).

(b)     Executive acknowledges that Paramount is an equal opportunity employer. Executive agrees to comply with Paramount policies regarding employment practices and with applicable Federal, state and local laws prohibiting discrimination on the basis of race, color, national origin, religion, sex, age, sexual orientation, disability, veteran's status, marital status, or height or weight.

7.     (a)     In the event of the death of Executive, salary payments to be paid pursuant to this Agreement shall cease immediately; provided, however, in the event of death, the estate of Executive shall receive any salary due and not yet paid through the date of Executive's death.

(b)     If, during the term of this Agreement, Paramount properly terminates the employment of Executive for Cause, which for these purposes is defined as (i) fraud, misappropriation or embezzlement on the part of Executive, (ii) Executive's willful failure to perform services hereunder or (iii) Executive's intentional breach of the provisions of paragraph 5 or of paragraph 6 hereof, or for Executive's incapacity, then Paramount shall immediately have the right to terminate this Agreement without further obligation; provided, however, that in the event of Executive's incapacity Paramount may terminate this Agreement effective only after the expiration of a period the length of which shall be determined by the Paramount Human Resources Department pursuant to the then applicable Paramount sick leave policy for Paramount exempt staff employees as though such policy were applicable to this Agreement, but

3

in any event not less than four (4) consecutive weeks.

       (c)    If, during the term of this Agreement, the employment of Executive by Paramount should be terminated by Paramount other than for Cause as defined herein or for Executive's incapacity, then Paramount shall be obligated both to pay to Executive all applicable base salary pursuant to paragraph 2(a) of this Agreement and also Paramount shall continue all applicable plans and/or benefits pursuant to paragraph 3 hereof for the remainder of the Employment Term, so long as Executive is willing, ready and able to render exclusive services hereunder during such remainder of the Employment Term. Nothing herein shall obligate Paramount to utilize Executive's services, and Paramount shall have fulfilled all of its obligations hereunder by payment to Executive of the applicable amounts set forth herein for the Employment Term of this Agreement subject to the terms of this paragraph 7(c). Notwithstanding the above, if the employment of Executive is also terminated by Paramount for Cause or by reason of disability or death, this paragraph 7(c) shall not be applicable.

       8.    Paramount shall own all right, title and interest in perpetuity to the results of Executive's services and all artistic materials and intellectual properties which are, in whole or in part, created, developed or produced by Executive during the term of this Agreement and which are suggested by or related to Executive's employment hereunder or any activities to which Executive is assigned, and Executive shall not have or claim to have any right, title or interest therein of any kind or nature. Nothing in the preceding sentence is intended to constitute a waiver of the Conflicts Policy.

       9.    Executive agrees that, during the Employment Term and for one (1) year thereafter, Executive shall not, in any communications with the press or other media or any customer, client or supplier of Paramount, CBS or any of CBS's affiliated companies, criticize,

4

ridicule or make any statement which disparages or is derogatory of Paramount, CBS, or any of CBS's affiliated companies or any of their respective directors or senior officers.

10.    Executive agrees that, during the Employment Term and for one (1) year thereafter, Executive shall not, directly or indirectly: (i) employ or solicit the employment of any person who is then or has been within six (6) months prior thereto, an employee of Paramount, CBS, or any of CBS's affiliated companies; or (ii) do any act or thing to cause, bring about, or induce any interference with, disturbance to, or interruption of any of the then-existing relationships (whether or not such relationships have been reduced to formal contracts) of Paramount, CBS, or any of CBS's affiliated companies with any customer, employee, consultant or supplier.

11.    Executive agrees that during the Employment Term, Executive will not engage in any other occupation or engage in the leisure/theme park, motion picture, television, or entertainment business, except for Paramount pursuant to this Agreement.

12.    Executive agrees that during the Employment Term or at any time thereafter, (i) Executive shall not use for any purpose other than the duly authorized business of Paramount or CBS, or disclose to any third party, any information relating to Paramount, CBS or any of its affiliated companies which is proprietary to Paramount, CBS, or any of its affiliated companies ("Confidential Information"), including any trade secret or any written (including in any electronic form) or oral communication incorporating Confidential Information in any way (except as may be required by law or in the performance of Executive's duties under this Agreement consistent with Paramount's and CBS's policies); and (ii) Executive will comply with any and all confidentiality obligations of Paramount and CBS to a third party, whether arising under a written agreement or otherwise. Information shall not be deemed Confidential

5

Information which (x) is or becomes generally available to the public other than as a result of a disclosure by Executive or at Executive's direction or by any other person who directly or indirectly receives such information from Executive, or (y) is or becomes available to Executive on a non-confidential basis from a source which is entitled to disclose it to Executive.

13.    (a)    Executive agrees that, during the Employment Term, for one (1) year thereafter and, if longer, during the pendency of any litigation or other proceeding, (x) Executive shall not communicate with anyone (other than Executive's own attorneys and tax advisors), except to the extent necessary in the performance of Executive's duties under this Agreement, with respect to the facts or subject matter of any pending or potential litigation, or regulatory or administrative proceeding involving Paramount, CBS or any of CBS's affiliated companies, other than any litigation or other proceeding in which Executive is a party-in-opposition, without giving prior notice to Paramount or its counsel; and (y) in the event that any other party attempts to obtain information or documents from Executive with respect to such matters, either through formal legal process such as a subpoena or by informal means such as interviews, Executive shall promptly notify Paramount or its counsel before providing any information or documents.

(b)    Executive agrees to cooperate with Paramount and its attorneys, both during and after the termination of Executive's employment, in connection with any litigation or other proceeding arising out of or relating to matters in which Executive was involved prior to the termination of Executive's employment.  Executive's cooperation shall include, without limitation, providing assistance to Paramount's counsel, experts or consultants, and providing truthful testimony in pretrial and trial or hearing proceedings.  In the event that Executive's cooperation is requested after the termination of Executive's employment, Paramount will (x) seek to minimize interruptions to Executive's schedule to the extent consistent with its interests

6

in the matter; and (*y*) reimburse Executive for all reasonable and appropriate out-of-pocket expenses actually incurred by Executive in connection with such cooperation upon reasonable substantiation of such expenses.

(c)    Executive agrees that Executive will not testify voluntarily in any lawsuit or other proceeding which directly or indirectly involves Paramount, CBS or any of CBS's affiliated companies, or which may create the impression that such testimony is endorsed or approved by Paramount, CBS or any of CBS's affiliated companies, without advance notice (including the general nature of the testimony) to and, if such testimony is without subpoena or other compulsory legal process the approval of, the Executive Vice President, General Counsel of CBS.

14.    Paramount has entered into this Agreement in order to obtain the benefit of Executive's unique skills, talent, and experience.  Executive acknowledges and agrees that any violation of paragraphs 8 through 13 of this Agreement will result in irreparable damage to Paramount and CBS, and, accordingly, Paramount and CBS may obtain injunctive and other equitable relief for any breach or threatened breach of such paragraphs, in addition to any other remedies available to Paramount and CBS.

15.    This Agreement contains the entire understanding of the parties with respect to the subject matter thereof, supersedes any and all prior agreements of the parties with respect to the subject matter thereof, and cannot be changed or extended except by a writing signed by both parties hereto.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective legal representatives, executors, heirs, administrators, successors and assigns; provided, however, that Executive shall have no right to assign this Agreement or delegate Executive's obligations hereunder.  This Agreement and all matters and issues collateral thereto

7

shall be governed by the laws of the State of New York applicable to contracts entered into and performed entirely within the State of New York, with respect to the determination of any claim, dispute or disagreement, which may arise out of the interpretation, performance or breach of this Agreement, and will be subject to enforcement and interpretation solely in the appropriate courts of the State of New York. If any provision of this Agreement, as applied to either party or to any circumstance, shall be adjudged by a court to be void or unenforceable, the same shall in no way affect any other provision of this Agreement or the validity or enforceability thereof.

16.    All notices or other communications hereunder shall be given in writing and shall be deemed given if served personally or mailed by registered or certified mail, return receipt requested (in which case notice shall be deemed to have been given three (3) days from the date of mailing), to Executive at the address above indicated. In the case of Paramount, directed to: (Attn: Anthony Ambrosio, Executive Vice President Human Resources, CBS Corporation, 51 West 52nd Street, (35th Floor) New York, New York 10019), or at such other addresses as they may hereafter designate in writing.

IN WITNESS WHEREOF, the parties have executed this Agreement as of _____ ___, 2006.

Paramount Parks Inc.

By: _____

EVP HR/ADMIN

By: _____
Lester C. Nail

8



*Paramount Parks*

July 27, 2006

Mr. Lester C. Nail
9027 Kirkley Court
Charlotte, North Carolina 28277

      Re:   Notice of Termination of Employment

Dear Mr. Nail:

     On June 30, 2006 (the "Closing Date"), Bombay Hook LLC and CBS Corporation finalized the transaction with Cedar Fair, L.P. and Magnum Management Corporation (the "Company"), (collectively, the "Cedar Fair Entities"), pursuant to which the Company acquired 100 percent of the outstanding shares of capital stock of Paramount Parks Inc. ("PPI") As a result, your employment agreement, effective as of January 1, 2006 ("Employment Agreement"), has become the benefit and obligation of PPI, as legal successor and/or assign.

     Please be advised that PPI has determined that your services will no longer be needed after August 1, 2006. Accordingly, this letter is your notice under your Employment Agreement that your employment is terminated without cause as of August 1, 2006, and that you will be entitled to receive, subject to applicable taxes and withholdings, and subject to any other terms of the Employment Agreement, the amounts identified in paragraph 7(c) of your Employment Agreement. PPI reminds you of both (1) your non-compete obligations under paragraph 11 of the Employment Agreement, and (2) the "willing, ready and able to render exclusive services" requirement of paragraph 7(c), and any other post-termination obligations of the Employment Agreement.

     PPI is currently considering making an alternative separation proposal to you, which would incorporate a lump sum severance payment, along with other terms in a separation agreement. You will hear from PPI in the near future should it decide to present an alternative separation proposal to you. Should you have any questions, please contact Paramount Parks Inc. c/o Craig Freeman, Cedar Fair, L.P., One Cedar Point Drive, Sandusky, Ohio 44870, (419) 627-2391.

Very truly yours,

Richard L. Kinzel
President
Paramount Parks, Inc.

LEXSEE 1993 US DIST LEXIS 12600

**CONSOLIDATED RAIL CORPORATION, Plaintiff, v. PRIMARY INDUSTRIES CORPORATION, Defendant. CONSOLIDATED RAIL CORPORATION, Plaintiff, v. PRIMARY COAL, INC., Defendant.**

**92 Civ. 4927 (PNL), 92 Civ. 6313 (PNL)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1993 U.S. Dist. LEXIS 12600*

**September 10, 1993, Decided**
**September 10, 1993, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In plaintiff common carrier's suit to recover freight charges, defendant corporations filed a counterclaim for damages. The matter came before the court on the common carrier's motion for a protective order precluding certain depositions and directing that others be conducted in a certain location, as well as on the corporations' cross-motion for an order compelling discovery responses and extending the deadline for completion of discovery.

**OVERVIEW:** The common carrier sought to preclude the depositions of three of its executive officers, each of whom submitted an affidavit stating that he had no personal knowledge of the facts underlying the issues in the case. The court noted that while highly-placed executives were not immune from discovery, permitting unfettered discovery of them could serve as a potent tool for harassment. Hence, the court deferred the depositions of the executives until such time as it was demonstrated that they had unique knowledge pertinent to the issues. The court also granted the common carrier's request that the depositions of seven of its employees be taken in the city where its headquarters were located, noting that it was more efficient for the corporations' counsel to travel to such city than for the common carrier's attorney and witnesses to go to New York. The court denied the corporations' request to compel production of documents because the documents were of doubtful relevance to any issue in the case and were not pertinent to the common carrier's pending summary judgment motion. The court

decided to hold the discovery deadline in abeyance until disposition of the summary judgment motion.

**OUTCOME:** The court granted the common carrier's motion for a protective order precluding certain depositions and directing that others be conducted in a certain location. The court denied the corporations' cross-motion for an order compelling discovery responses. The court also ordered that the discovery deadline would be held in abeyance until disposition of the common carrier's motion for summary judgment.

**CORE TERMS:** deposition, discovery, summary judgment, deadline, coal, highly-placed, travel, protective, precluding, notice, defer

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Protective Orders*
[HN1] Highly-placed executives are not immune from discovery. The fact that a witness has a busy schedule is simply not a basis for foreclosing otherwise proper discovery. Moreover, a claim that the witness lacks knowledge is subject to testing by the examining party.

*Civil Procedure > Discovery > Protective Orders*
[HN2] Permitting unfettered discovery of corporate executives would threaten disruption of their business and could serve as a potent tool for harassment in

1993 U.S. Dist. LEXIS 12600, *

litigation. Accordingly, where other witnesses have the same knowledge, it may be appropriate to preclude a redundant deposition of a highly-placed executive.

**JUDGES: [*1]** FRANCIS IV

**OPINION BY:** JAMES C. FRANCIS IV

**OPINION**

*MEMORANDUM AND ORDER*

JAMES C. FRANCIS IV

UNITED STATES MAGISTRATE JUDGE

The plaintiff in these related actions, Consolidated Rail Corporation ("Conrail"), has moved for a protective order precluding certain depositions and directing that others be conducted in Philadelphia, Pennsylvania. The defendants, Primary Industries Corp. and Primary Coal, Inc. (collectively referred to as "Primary"), have cross-moved for an order compelling discovery responses and extending the deadline for completion of discovery. Each of these issues will be addressed in turn.

*Background*

Conrail, a common carrier, seeks to recover freight charges that it contends are owed by Primary, a coal producer. Primary has counterclaimed, asserting that it suffered damages when Conrail wrongfully closed its port facility at Philadelphia and diverted its coal traffic to Baltimore. Conrail has filed a motion for summary judgment on statute of limitations grounds which is currently pending.

*Discussion*

A. *Executive Officer Depositions*

Primary has served a notice for the deposition of ten Conrail employees. Conrail has agreed to produce seven of these witnesses, but has **[*2]** moved for a protective order precluding the depositions of three others: James Hagan, Chairman, President, and Chief Executive Officer of Conrail; Robert Swert, Vice President of Labor Relations; and David LeVan, Senior Vice President of Operations. Each of these individuals has submitted an affidavit attesting that he has no personal knowledge of the facts underlying the claims and counterclaims in these

cases except for what he may have learned from other Conrail employees.

[HN1] Highly-placed executives are not immune from discovery. "The fact that the witness has a busy schedule is simply not a basis for foreclosing otherwise proper discovery." *CBS, Inc. v. Ahern, 102 F.R.D. 820, 822 (S.D.N.Y. 1984)* (citation omitted). Moreover, a claim that the witness lacks knowledge is subject to testing by the examining party. *See Amherst Leasing Corp. v. Emhart Corp., 65 F.R.D. 121, 122 (D. Conn. 1974).*

At the same time, [HN2] permitting unfettered discovery of corporate executives could threaten disruption of their business and could serve as a potent tool for harassment in litigation. Accordingly, where other witnesses have the same knowledge, **[*3]** it may be appropriate to preclude a redundant deposition of a highly-placed executive. *See CBS, 102 F.R.D. at 822 n.2; Amherst, 65 F.R.D. at 123.*

Given these considerations, it is appropriate in these cases to defer any live depositions of the three named executives until it has been demonstrated that they have some unique knowledge pertinent to the issues in these cases. Primary may seek to establish such a foundation through Rule 31 depositions upon written questions of these executives as well as through the deposition testimony of other witnesses. Until such a showing has been made, however, these three individuals shall not be deposed in person.

B. *Site of Depositions*

Conrail next contends that the depositions of its seven remaining witnesses should be held in Philadelphia, where Conrail's headquarters are located, rather than in New York, as the deposition notice indicates.

This request has merit. It is far more efficient to require Primary's counsel to travel to Philadelphia than it is to require Conrail's attorney and seven witnesses to come to New York. *See Huynh v. Werke, 90 F.R.D. 447, 449 (S.D. Ohio 1981).* **[*4]** Moreover, it is possible that documents available in Conrail's offices but not previously disclosed in discovery will be necessary for the depositions.

Accordingly, the depositions of Conrail's employees shall be taken in Philadelphia. Since Conrail, as the

plaintiff, would normally be expected to produce its witnesses for deposition in the forum district, it shall initially bear the costs of conducting the depositions in Philadelphia, including the travel and accommodation expenses of Primary's counsel, as well as his reasonable attorney's fees. *See id.;* local civil rule 15. These costs shall ultimately be taxed against the losing party at the conclusion of the litigation.

C. *Document Requests*

   In its cross-motion, Primary seeks to compel production of a variety of documents primarily related to the reasons that Conrail closed its Philadelphia facility. Such documents are of doubtful relevance to any issue in the cases and are clearly not pertinent to Conrail's pending summary judgment motion. Since the request for this discovery will be moot if the summary judgment motion is granted, the motion to compel is denied without prejudice to renewing it after the dispositive motion **[*5]**

is decided.

D. *Discovery Schedule*

   Finally, Primary seeks an extension of the discovery deadline. Because of the pending summary judgment motion, the parties may decide to defer some discovery until the motion is decided. The discovery deadline shall therefore be held in abeyance until the motion for summary judgment has been determined.

   SO ORDERED.

   JAMES C. FRANCIS IV

   UNITED STATES MAGISTRATE JUDGE

   Dated: New York, New York

   September 10, 1993

LEXSEE 1991 U.S. DIST. LEXIS 333

**WILLIAM T. JULIANO, et al, Plaintiffs, v. ITT CORPORATION, et al, Defendants**

**Civil No. 90-1575 (CSF)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

*1991 U.S. Dist. LEXIS 333*

**January 2, 1991, Filed**

**NOTICE:    [*1]  NOT FOR PUBLICATION**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** The parties consented to the entry of an order granting plaintiff corporation temporary injunctive relief, which the court approved. The corporation asked the court to find defendant protesters in contempt of the order or, alternatively, to modify that order. While the contempt motion was pending, the protesters filed a motion to compel the deposition of the corporation's chief executive officer (CEO). The corporation sought a protective order.

**OVERVIEW:** The protesters argued that the CEO possessed personal knowledge of the facts relevant to the motion for contempt or for modification. The corporation countered that the CEO had no personal knowledge of the facts and asserted that his deposition was made solely for the purpose of harassment. The court denied the motion to compel and granted the protective order. The court found that the protesters had not demonstrated how the CEO's deposition testimony would be relevant to the subject matter involved in the pending contempt proceeding. Only the court could determine whether the protesters' conduct constituted contempt of the order or warranted its modification. Nothing revealed in a deposition of any officer of the corporation could have any bearing on that determination. Therefore, the information sought was fully irrelevant and could have no possible bearing on the issues and warranted the denial of the motion to compel.

**OUTCOME:** The court vacated the notice to take the CEO's deposition, denied the motion to compel his deposition, and denied the motion for a stay of the

proceedings. The court granted the corporation's motion for a protective order barring the CEO's oral deposition until such time as the motion for contempt or modification was resolved.

**CORE TERMS:** deposition, contempt, protective order, modification, discovery, barring, subsidiary, notice, picketing, customer, temporary, pending action, subject matter, good cause, injunctive relief, loan sharks, personal knowledge, consolidated, injunction, stationery, presently, finance, vacated, printed, picket, modify, crooks, front

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Civil Procedure > Discovery > Relevance*
[HN1] Under the Federal Rules of Civil Procedure, there is a liberal policy for providing discovery: Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence. *Fed. R. Civ. P. 26(b)(1)*. Any matter that would bear on, or reasonably could lead to other matters that could bear on, any issue that is or may be in the case is relevant and discoverable under these rules. The general rule, therefore, is that the

1991 U.S. Dist. LEXIS 333, *1

broad test of relevancy at the discovery stage compels the denial of a motion that a deposition not be taken.

*Civil Procedure > Discovery > Methods > Oral Depositions*
*Civil Procedure > Discovery > Protective Orders*
*Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend*

[HN2] Under *Fed. R. Civ. P. 26(c)*, the court may order that discovery not be had to protect a person from annoyance or oppression, upon motion by a party and for good cause shown.

**JUDGES:** Clarkson S. Fisher, United States District Judge.

**OPINION BY:** FISHER

**OPINION**

Before the court are the defendants' motions to compel a deposition and for a stay of the proceedings, and the plaintiff's motion for a protective order barring the deposition. For the reasons set forth below, the court will deny the motions to compel and for a stay, and grant the motion for a protective order barring the deposition until the motion for contempt or for modification of a consent order presently pending before the court is resolved.

*FACTS AND PROCEDURAL HISTORY*

On July 27, 1990, the plaintiff in this action, ITT Corporation ("ITT"), filed a request for injunctive relief and the issuance of a temporary restraining order. [1] The court denied ITT's request for temporary restraints, but ordered defendants William T. Juliano ("Juliano") and Americans Concerned to Improve Our Nation or ACTION ("ACTION") to show cause why a preliminary injunction should not issue. On July 31, 1990, the parties consented to the entry of an order granting temporary injunctive relief, which the court approved.

1    On August 2, 1990, this court consolidated ITT's action, originally styled *ITT Corporation v. Juliano,* No. 90-2980, with *Juliano v. ITT Corporation,* No. 90-1575.

[*2] The consent order provided as follows:

1. Neither Mr. Juliano nor any member of ACTION,

nor any other person under Mr. Juliano's or ACTION's direction or control shall display signs containing the words "loan sharks" or "crooks" nor shall they verbally use the term "loan sharks" or "crooks" in any solicitation of verbal communication made as a part of any picketing of offices of ITT or its subsidiaries.

2. Neither Mr. Juliano nor any member of ACTION, nor any other person under Mr. Juliano's or ACTION's direction or control shall characterize the rates of interest charged by ITT or any of its finance subsidiaries as "illegal," "unlawful," or "usurious." This provision shall not be construed to prevent Juliano or ACTION from displaying a Wall Street Journal article previously displayed which characterizes certain activities of ITT in California.

3. No more than three persons shall picket on the sidewalk immediately in front of any office of ITT Financial Services or any other ITT subsidiary and no picketing in front of any ITT Financial Services or ITT subsidiary office shall at any time block ingress or egress to or from the office involved.

4. In connection with any picketing [*3] of any ITT offices, pickets shall not directly state to customers or potential customers "Don't sign on the dotted line" or "Don't do business with ITT, ITT Financial Services, ITT Consumer Finance" or any other language that the direct impact of which is to urge a potential or actual customer not to do business with ITT or its subsidiaries.

5. It is further ordered that the interim relief reflected in this Consent Order is without prejudice to the position of either side on the merits of any of the pending litigation among the parties. Either side may apply at any time for relief from the Court to modify this Order and to seek such other relief as may be appropriate.

IT IS FURTHER ORDERED that the requirement of an injunction bond imposed in the Court's Order of Friday, July 27, 1990, is hereby vacated and no bond shall be required by reason of the parties' consent to this Order; and

IT IS FURTHER ORDERED that this Court shall retain jurisdiction to enforce this Order.

*ITT Corp. v. Juliano,* No. 90-2780 (D.N.J. July 31, 1990) (consent order entered with court's approval), later consolidated with *Juliano v. ITT Corp.,* No. 90-1575.

Subsequent to the entry of this order, **[*4]** Juliano sent a letter, printed on ACTION stationery and dated August 3, 1990, to Rand V. Araskog ("Araskog"), Chairman of the Board and Chief Executive Officer of ITT. He sent another to Timothy Ryan, Director of the Office of Thrift Supervision, also printed on ACTION stationery and dated August 3, 1990. In the letters, Juliano indicated that copies were being sent to numerous other parties.

ITT maintains that Juliano's letters contain disparaging statements about ITT, in violation of the consent order entered on July 31, 1990. Consequently, ITT filed a motion on August 29, 1990, asking the court to find the defendants in contempt of the order, or, alternatively, to modify that order. On September 18, 1990, while the motion for contempt or modification was pending, Juliano and ACTION filed a notice to take the deposition of Araskog. When ITT refused to present Araskog, Juliano and ACTION filed a motion to compel the deposition on November 15, 1990. In response, on November 19, 1990, ITT filed a motion for a protective order barring the defendants from proceeding with the oral deposition of Araskog.

Juliano and ACTION maintain that Araskog possesses personal knowledge of the facts **[*5]** relevant to the motion for contempt or for modification. ITT counters that Araskog has no personal knowledge of the facts and asserts that the demand for his deposition is made solely for the purpose of harassment. The motions to compel and for a protective order are presently before the court.

*ANALYSIS*

[HN1] Under the Federal Rules of Civil Procedure, there is a liberal policy for providing discovery:

Parties may obtain discovery regarding any matter, not privileged, which is *relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party* . . . It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

*Fed. Civ. R. 26(b)(1)* (emphasis added). Any matter that would bear on, or reasonably could lead to other matters that could bear on, any issue that is or may be in the case is relevant and discoverable under these rules. *Tele-Radio Systems Ltd. v. De Forest Electronics, Inc., 92 F.R.D. 371, 375 (D.N.J. 1981)* (citing **[*6]** *Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978))*; *see also Hickman v. Taylor, 329 U.S. 495, 507 (1947)*; *Leksi, Inc. v. Federal Ins. Co., 129 F.R.D. 99, 104 (D.N.J. 1989)*. The general rule, therefore, is that the broad test of relevancy at the discovery stage compels the denial of a motion that a deposition not be taken. 8 C. Wright & A. Miller, *Federal Practice and Procedure,* § 2037, at 275 (1970).

However, the question before the court in this action is whether the mailing and content of the letters dated August 3, 1990, constitute contempt of the consent order or warrant its modification. In order to obtain discovery in accordance with *rule 26*, Juliano and ACTION must demonstrate how the deposition testimony of Araskog would be "relevant to the subject matter involved in the pending action . . . ." *Fed. R. Civ. P. 26(b)(1)*. This they cannot do. Only the court may determine whether the Juliano's conduct constitutes contempt of the order or warrants its modification. Nothing revealed in a deposition of any corporate officer of ITT could have any bearing on that determination. Therefore, the information sought is "'fully irrelevant and could have no possible **[*7]** bearing on the issues'" and warrants the denial of the motion to compel. *Grinnell Corp. v. Hackett, 70 F.R.D. 326, 334 (D.R.I. 1976)* (quoting 8 C. Wright & A. Miller, *Federal Practice and Procedure,* § 2037, at 275 (1970)).

Because Juliano and ACTION cannot meet the threshold requirement of *rule 26*, the court vacates the notice to take the deposition of Araskog, denies the motion to compel his deposition and denies the motion for a stay of the proceedings.

[HN2] Under *rule 26(c)*, the court may order that discovery not be had to protect a person from annoyance or oppression, upon motion by a party and for good cause shown. *Fed. R. Civ. P. 26(c)*. In accordance with this rule, the court grants the motion for a protective order barring the oral deposition of Araskog until such time as the motion for contempt or modification is resolved. An order accompanies this opinion. No costs.

ORDER - January 2, 1991, Filed and Entered

This matter having come before the court on motion

1991 U.S. Dist. LEXIS 333, *7

by defendants William T. Juliano and Americans Concerned to Improve Our Nation or ACTION to compel the deposition of Rand V. Araskog and to stay the proceedings; and on motion by plaintiff ITT Corporation for a protective **[*8]** order barring the deposition of Rand V. Araskog; and the court having considered the argument and submissions in support of the motions; and good cause appearing,

IT IS on this 2nd day of January, 1991,

ORDERED that the notice to take the deposition of Rand V. Araskog be and hereby is vacated; that the motion to compel the deposition of Rand V. Araskog be and hereby is denied; and that the motion for a stay of the proceedings be and hereby is denied;

FURTHER ORDERED that the motion for a protective order barring the oral deposition of Rand V. Araskog be and hereby is granted until such time as the motion for contempt or modification is resolved.

LEXSEE 2002 U.S. DIST. LEXIS 19691

**RONALD A. KATZ TECHNOLOGY LICENSING, L.P., Plaintiff, v. VERIZON COMMUNICATIONS, INC., and CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, Defendants.**

**CIVIL ACTION NO. 01-5627**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2002 U.S. Dist. LEXIS 19691*

**October 16, 2002, Filed**

**DISPOSITION:**     Motion to compel discovery granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff company sued defendants, corporation and partnership, and alleged the infringement of patents in the area of interactive telephone technology. The corporation moved for summary judgment on the grounds that it was merely a holding company. The district court allowed the company discovery into the issues raised in the corporation's summary judgment motion. The company then filed a motion to compel extensive discovery from the corporation.

**OVERVIEW:** The company sought to compel the production of documents and the depositions of three witnesses. The court found that considering the failure of the company to allege that piercing the corporate veils of the corporation's subsidiaries was necessary to prevent fraud, injustice, illegality, or criminal conduct, piercing the corporate veil was not within the subject matter of the case under *Fed. R. Civ. P. 26*. The company's motion to compel documents that dealt with the corporation's role in the provision of services utilizing the technology in question was granted because those requests sought to discover material relevant to the company's properly alleged claims. The company's motions to compel documents that dealt solely with the corporation's subsidiaries' provision of services and those dealing with the organization of the corporation's subsidiaries were denied because the documents would not have produced

any relevant information as to either the company's agency theory of liability or its theory of inducing infringement. Those requests also would have placed an undue burden on the corporation. Compelling the deposition of the first witness would have been an undue burden.

**OUTCOME:** The company's motion to compel discovery was granted as to those documents that dealt with the corporation's role in the provision of services that utilized the technology in question, and was denied as to those documents that dealt solely with the corporation's subsidiaries' provision of services and that dealt with the organization of the corporation's subsidiaries. The company's motion to compel deposition of three witnesses was denied.

**CORE TERMS:** subsidiary, discovery, deposition, infringement, technology, corporate veil, piercing, subject matter, alter-ego, patent, discover, production of documents, inducement, provision of services, undue burden, infringe, aimed, relevant information, theory of liability, infringed, outweighs, patented, inducing, induced, responsive, legal standards, prevent fraud, fishing expedition, corporate entity, reasonably calculated to lead

**LexisNexis(R) Headnotes**

***Civil Procedure > Discovery > Methods > General Overview***

2002 U.S. Dist. LEXIS 19691, *

*Civil Procedure > Discovery > Relevance*
[HN1] Resolving discovery disputes is the responsibility of a district court. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. *Fed. R. Civ. P. 26(b)(1)*(2002). While the scope of discovery under that rule is broad, it is far from unlimited. The rule requires the district court, when considering a motion to compel, to determine whether the material sought is relevant to the subject matter of the litigation.

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Discovery > Relevance*
*Civil Procedure > Discovery > Undue Burdens*
[HN2] In addition to limiting discovery to material relevant to the subject matter of the litigation, *Fed. R. Civ. P. 26* provides for further limitations. A court may limit discovery when it is obtainable from some other source that is more convenient, less burdensome, or less expensive. *Fed. R. Civ. P. 26(b)(2)*. In addition, discovery should not be allowed when the burden or expense of the proposed discovery outweighs its likely benefit. *Fed. R. Civ. P. 26(b)(2)*.

*Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > General Overview*
*Torts > Vicarious Liability > Corporations > Subsidiary Corporations*
[HN3] Holding a parent liable for the actions of a subsidiary is the exception rather than the rule. Traditionally, piercing the corporate veil has been an equitable remedy. That extraordinary remedy is used when the court must prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime. Further, the fraud that a court seeks to prevent by employing that doctrine must be fraud facilitated by the use of the corporate form.

*Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > General Overview*
[HN4] The United States Supreme Court has held that a parent corporation's exercise of the level of control normally afforded to stockholders falls short of a justification to pierce the corporate veil.

*Business & Corporate Law > Agency Relationships > Establishment > Elements > General Overview*
*Torts > Vicarious Liability > Corporations > General Overview*
[HN5] One corporation whose shares are owned by a second corporation does not, by that fact alone, become the agent of the second company.

*Patent Law > Infringement Actions > Infringing Acts > Contributory, Indirect & Induced Infringement*
*Patent Law > Remedies > Bad Faith Enforcement*
[HN6] A defendant may be liable for infringement if it actively induces infringement of a patent. *35 U.S.C.S. § 271(b)(2002)*. Inducement consists of intent and an act that causes, aids, or abets infringement. The first step in that analysis is to determine whether the requisite intent to aid or abet infringement is present. Under that theory, a party who induces infringement may be liable as if they themselves had infringed.

*Civil Procedure > Discovery > Disclosures > Mandatory Disclosures*
*Civil Procedure > Discovery > Methods > Oral Depositions*
[HN7] A defendant is not required to produce for deposition a person who is not a party.

**COUNSEL:** **[*1]** For Ronald A Katz, PLAINTIFF: Gregory P Miller, Michael A Morse, Miller, Alfano & Raspanti, PC, Philadelphia PA, USA. Stanley Young, Nitin Subhedar, Heller, Ehrman, White & McAuliffe, Menlo Park CA, USA. Robert T Haslam, Michael T Markman, Heller, Ehrman, White & McAuliffe, LLP, Menlo Park CA, USA. Lillian C Henry, Sarah Elizabeth Mitchell, Heller, Ehrman, White & McAuliffe, LLP, San Francisco CA, USA. Roderick R McKelvie, Fish & Neave, Washington DC, USA. Christopher J Harnett, Gene W Lee, Fish & Neave, New York NY, USA.

For Verizon Communications Inc., DEFENDANT: Arlin M Adams, Schnader Harrison Segal & Lewis, Philadelphia PA, USA. Matthew J Siembieda, Timothy D Katsiff, Blank Rome Comisky & McCauley LLP, Philadelphia PA, USA.

For Verizon Pennsylvania Inc., MOVANT: Arlin M Adams, Schnader Harrison Segal & Lewis, Philadelphia PA, USA.

For Cellco Partnership, DEFENDANT: Robert C Heim, Dechert, Price & Rhoads, Philadelphia PA, USA. Marc S Segal, Dechert Price & Rhoads, Philadelphia PA, USA. Matthew J Siembieda, Blank Rome Comisky & McCauley LLP, Philadelphia PA, USA.

**JUDGES:** Newcomer, S.J.

**OPINION BY:** Newcomer

**OPINION**

Currently before the Court is the Plaintiff Ronald A. Katz Technology **[*2]** Licensing, L.P.'s (hereinafter referred to as RAKTL) Motion to Compel Discovery from Defendant Verizon Communications Incorporated (hereinafter referred to as VCI). The Plaintiff seeks to compel the production of documents and certain depositions. For the reasons stated below, RAKTL's motion is granted in part, and denied in part.

### I. BACKGROUND

RAKTL brought this suit alleging the infringement of fourteen patents in the area of interactive telephone technology. RAKTL named two defendants, Cellco Partnership and VCI. VCI moved for Summary Judgment on the grounds that it is merely a holding company, and therefore, does not provide any services that make use of the alleged technology. This Court allowed RAKTL limited discovery into the issues raised in VCI's Motion for Summary Judgment. Ronald A. Katz Technology v. Verizon Communications Incorporated, No. 01-CV-5627 (E.D.Pa. filed Jan. 23, 2001)(ordering limited discovery).

Following this order RAKTL sought extensive discovery from VCI. RAKTL noticed the depositions of fourteen potential witnesses, requested a deposition under *Federal Rule of Civil Procedure 30(b)(6)* on a total of twenty-two topics, and made over **[*3]** fifty-eight document requests. A dispute arose over the propriety of these requests, leading to the current motion. In its motion, RAKTL seeks to compel the production of documents in response to 23 of its document requests. Further, RAKTL seeks to compel the depositions of three witnesses: Lawrence T. Babbio, Bruce S. Gordon, and Timothy McCallion. The motion also seeks to compel a deposition pursuant to *rule 30(b)(6)* as to "VCI's involvement in and coordination of the development and imposition of nationwide or company-wide standards or goals for the provision of any aspect of any Verizon

Accused Service." Plaintiff's Motion to Compel Appendix A, RAKTL v. VCI, (E.D.Pa. 2002)(01-CV-5627). We now turn to the merits of RAKTL's motion to compel this discovery.

### II. LEGAL STANDARDS

[HN1] Resolving discovery disputes is the responsibility of the District Court. "For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action." *FED. R. CIV. P. 26(b)(1)*(2002). While the scope of discovery under this rule is broad, it is far from unlimited. The rule requires the District Court, when considering a motion to compel, to determine **[*4]** whether the material sought is relevant to the "subject matter of the litigation." See *United Steelworkers of Am. v. Allegheny Ludlum Corp., 2002 U.S. Dist. LEXIS 17816, 2002 WL 31002836(W.D.Pa. 2002)*(stating that a court must determine what is properly part of the litigation). The court must prevent discovery from being used as a fishing expedition. *Zuk v. Eastern Pa. Psychiatric Institute, 103 F.3d 294, 299 (3d Cir. 1996)*.

[HN2] In addition to limiting discovery to material relevant to the subject matter of the litigation, *Rule 26* provides for further limitations. A court may limit discovery when it is "obtainable from some other source that is more convenient, less burdensome, or less expensive." *FED. R. CIV. P. 26(b)(2)*(2002). In addition, discovery should not be allowed when "the burden or expense of the proposed discovery outweighs its likely benefit." *FED. R. CIV. P. 26(b)(2)*(2002).

### III. RAKTL'S LEGAL THEORIES IN RESPONSE TO VCI'S MOTION

We first turn to the legal claims raised by RAKTL in order to determine what discovery is relevant to the subject matter of this action. This should not be confused as an inquiry into the merits of these claims. At this stage **[*5]** the issue is not whether a party may ultimately prevail on a theory, but whether the allegations are sufficient to justify the discovery sought. *Jackam v. Hospital Corp. of Am. Mideast, Ltd., 800 F.2d 1577, 1579-80 (11th Cir. 1986)*; see In re Towner Petroleum Co. Securities Litigation, 1986 WL 2444 at *4(E.D.Pa. 1986).

RATKL seeks discovery to support the imposition of parental liability of VCI. RAKTL appears to accept the

basic premise of VCI's Summary Judgment Motion, that VCI does not directly provide any services which could infringe on RACKTL's patents. Rather, if there was any infringement it occurred through subsidiaries of VCI. RAKTL claims that three theories are at issue in this case that cause VCI to be liable for the actions of its subsidiaries. First, RAKTL claims that VCI is liable for infringement as the alter-ego of its subsidiaries, a theory also commonly referred to as piercing the corporate veil. 1 Second, it claims that VCI is liable under an agency theory. Specifically, RAKTL claims that VCI's subsidiaries were acting as agents of VCI when they allegedly infringed on RAKTL's patents. Third, RAKTL claims that VCI is liable because [*6] they induced infringement by its subsidiaries.

> 1 While the precise nomenclature of the doctrine is not clear, the legal standards governing the doctrine are identical whether courts call it alter-ego liability or piercing the corporate veil. *Phoenix Canada Oil Co., Ltd. v. Texaco, Inc., 842 F.2d 1466, 1476 (3d Cir. 1988).*

## A. ALTER EGO LIABILITY- PIERCING THE CORPORATE VEIL

The Plaintiff argues that the documents and depositions requested will lead to the discovery of admissible evidence concerning whether VCI is susceptible to alter-ego liability through piercing the corporate veil of its subsidiaries. [HN3] Holding a parent liable for the actions of a subsidiary is the exception rather than the rule. *United States v. Best Foods, 524 U.S. 51, 55-56, 141 L. Ed. 2d 43, 118 S. Ct. 1876 (1998).* Traditionally, piercing the corporate veil has been an equitable remedy. *Pearson v. Component Tech., 247 F.3d 471, 484 (3d Cir. 2001).* This extraordinary remedy is used [*7] "when the court must prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime." *Zubik v. Zubik, 384 F.2d 267, 272 (3d Cir. 1967).* Further, the fraud that a court seeks to prevent by employing this doctrine must be fraud facilitated by the use of the corporate form. *Id. at 273* (footnote omitted). See also *American Bell Inc. v. Federation of Tel. Workers of Pa., 736 F.2d 879, 889 (3d Cir.1984)* (stating that piercing is warranted when a subsidiary "was created merely to avoid the effect of ... laws"); *Operating Engineers Pension Trust v. Reed, 726 F.2d 513, 515 (9th Cir.1984)* (evaluating the "fraudulent

intent behind the corporation"); *Luckett v. Bethlehem Steel Corp., 618 F.2d 1373, 1379 (10th Cir. 1980)*("[a] court will disregard the corporate entity where fraud or illegal or inequitable conduct is the result of the use of the corporate structures").

RAKTL has failed to make sufficient allegations to warrant discovery into an alter-ego/piercing the corporate veil claim. The Plaintiff has never alleged [*8] that piercing the corporate veils of VCI's subsidiaries is necessary to prevent fraud, injustice, illegality, or criminal conduct. 2 They merely alleged "that VERIZON is a well-coordinated, centrally controlled entity." Plaintiff's Motion to Compel at 10, RAKTL v. VCI, (E.D.Pa. 2002)(01-CV-5627). [HN4] The United States Supreme Court has held that a parent corporation's exercise of the level of control normally afforded to stockholders falls short of a justification to pierce the corporate veil. *United States v. Best Foods, 524 U.S. 51, 61 55-56, 141 L. Ed. 2d 43, 118 S. Ct. 1876 (1998).* Moreover, RAKTL has failed to allege, nor could they allege, one of the basic requirements for any equitable remedy, that legal remedies are not sufficient. *19 AM. JUR. 2D, CORPORATIONS § 2243* (2002). 3 Considering the failure of RAKTL to properly make these necessary allegations, piercing the corporate veil is not within the subject matter of this case for purposes of *Rule 26.* See *Uttis v. General Motors Corp., 62 F.R.D. 560, 562-3 (E.D.Pa. 1974)*(refusing to permit discovery into a theory previously not at issue in the case); *Abu-Nassar v. Elders Futures, 1991 U.S. Dist. LEXIS 3794, 1991 WL 45062 at 16 (S.D.N.Y. 1991)* [*9] (finding that discovery on a claim that was not validly alleged was "nothing more than a 'fishing expedition'").

> 2 An independent review of RAKTL's complaint finds no allegation of fraud in its pleading. Even under the liberal federal pleading rules, fraud must be plead with particularity. *FED. R. CIV. P. 9(b)*(2002). No particular claims of fraud are contained in any of RAKTL's submissions to this Court.
>
> 3 In this case, VCI's subsidiaries are capable of paying substantial damages awards. There is no indication that these companies would not be able to compensate RAKTL for any and all damages that were caused by their infringement.

## B. AGENCY LIABILITY

RAKTL further claims that VCI potentially could be

liable because its subsidiaries were acting as agents of the parent corporation. [HN5] "One corporation whose shares are owned by a second corporation does not, by that fact alone, become the agent of the second company." *Phoenix Canada Oil Co., Ltd. v. Texaco, Inc., 842 F.2d 1466, 1477 (3d Cir. 1988)*. [*10] VCI may be liable, however, if it is directing the specific actions of the alleged agent. See *Mobil Oil Corp. v. Linear Films, Inc., 718 F. Supp. 260, 272 (D.Del. 1989)*. Any evidence of this direction must be centered around the allegedly infringing transaction. See Id. While there is not sufficient basis to justify discovery into an alter-ego theory, we find that there are sufficiently based allegations to allow RAKTL to pursue discovery into VCI's direction of its subsidiaries with regard specifically to the use of the patented technology.

## C. INDUCING INFRINGEMENT

The final theory that RAKTL puts forward to justify its requested discovery is that VCI is inducing infringement and is thus in violation of federal law. [HN6] The Defendant may be liable for infringement if it "actively induced infringement of a patent." *35 U.S.C § 271(b)(2002)*. Inducement consists of intent and an act that causes, aids, or abets infringement. *Water Tech. Corp. v. Calco. Ltd., 850 F.2d 660, 668 (Fed. Cir. 1988)*. The first step in this analysis is to determine whether the requisite intent to aid or abet infringement is present. *Symbol Technologies, Inc. v. Metrologic Instruments, Inc., 771 F. Supp. 1390 (E.D.Pa. 1991)*. [*11] Under this theory, a party who induces infringement may be liable as if they themselves had infringed, and accordingly this theory is within the subject matter of *Water Tech.'s* allegations in this case.

We now turn to the specific requests contained in RAKTL's motion to compel.

## IV. RAKTL'S REQUESTS FOR DISCOVERY

### A. PRODUCTION OF DOCUMENTS

RAKTL's requests for the production of documents can be organized into three groups: those dealing with VCI's role in the provision of services utilizing the technology in question (Document requests 8, 9, 10, 11, 22, 33, 34, 46, 57, 58); those dealing solely with VCI's subsidiaries' provision of those services (Document requests 17, 18, 22, 33, 34, 40, 42, 46, 50, 56, 57, 58); and those dealing with the organization of VCI's

subsidiaries (Document requests 7, 21, 35, 37, 43, 45, 54). [4] The Motion to Compel the first category of documents is granted because these requests seek to discover material relevant to RAKTL's properly alleged claims. The documents responsive to the second two categories, however, will not produce any relevant information as to either RAKTL's agency theory of liability or its theory of inducing infringement. [*12] Further, these requests would place an undue burden on VCI. Therefore, the Motion to Compel the production of these documents will be denied.

4  This categorization of the document requests in issue largely follows RATKL's own division. Plaintiff's Motion to Compel at 2, RAKTL v. VCI, (E.D.Pa. 2002)(01-CV-5627). The Court, however, can not agree with some of RAKTL's characterizations of its requests. For example, RATKL claims that Request Number 21, which asks for all of the documents in Mr. Babbio's possession relating to the provision of wireline services, is a request pertaining to VCI's coordination over the provision of the accused services. In actuality this request seeks to discover *all* of Mr. Babbio's correspondence regarding the provision of almost any service by a VCI subsidiary. Accordingly this request is more properly considered as requesting documents relating to the general organization of VCI and its subsidiaries.

The document requests aimed at discovering information about RATKL's role [*13] in the provision of services using the patented technology are reasonably calculated to lead to admissible evidence. Each of these requests seeks documents from the Defendant VCI, not from its subsidiaries. The documents sought via these requests include communications and directives by high ranking employees of VCI regarding the provision of services that could infringe on the patents-at-issue. [5] These documents are aimed at discovering conduct on the part of the Defendant that either induced infringement by a subsidiary or directed a subsidiary to infringe; and therefore could potentially support VCI's liability.

5  An example of these requests reads:

Request No. 8

Produce all Communications from any officer or director of

Defendant VCI to any Verizon Subsidiary relating to any VERIZON Accused Service.

Plaintiff's Motion to Compel at Appendix A, RAKTL v. VCI, (E.D.Pa. 2002)(01-CV-5627).

RAKTL's request for documents concerning the provision of services using patented technology by [*14] VCI's subsidiaries are not relevant to either an agency or inducement theory. [6] Both of these theories focus on the actions of the Defendant. The documents sought in these requests would at best show that a non-party, a VCI subsidiary, infringed on a patent. They are not relevant to establishing the parental liability of VCI.

    6   As stated in section 3.A., supra, an alter-ego theory of liability has not been sufficiently alleged to warrant allowing discovery on that basis.

Further, these requests would place an undue burden on VCI. To obtain the requested documents VCI would have to search the files of literally hundreds of subsidiaries who are not even parties to this action. Accordingly, the burden placed on VCI of producing these documents clearly outweighs their usefulness.

Several of the requests at issue, specifically requests 33, 34, 46, 57, 58, are either explicitly or implicitly aimed at documents from both VCI and its subsidiaries, and arguably fall into both of the first two categories. [7] To the [*15] extent that these requests are aimed at VCI's documents, they seek evidence relevant to the subject matter of the litigation; but to the extent they seek activities undertaken solely by VCI subsidiaries they are not. Accordingly, the Motion to Compel is granted with regard to documents concerning VCI activity; but not as to activity that was exclusively undertaken by its subsidiaries.

    7   These requests use terms without specifying, as RAKTL does in other requests, whether they are asking for documents form VCI or VCI subsidiaries. Request Number 58 for example simply states:

        Produce all DOCUMENTS relating to negotiations, agreements, and/or contracts with local service providers for use of local networks to provide

VERIZON Accused Services.

Plaintiff's Motion to Compel Appendix A, RAKTL v. VCI(E.D.Pa. 2002)(01-CV-5627).

The third category of requests are irrelevant to any actual issues in this case, and producing the documents requested would be unduly burdensome on VCI. RAKTL seeks to discover [*16] an inconceivable number of documents pertaining to the structure and management of VCI's subsidiaries, including: the names and job descriptions of all the officers and directors of the over one-hundred VCI subsidiaries; organizational charts of each of these subsidiaries; and all documents of VCI and all the minutes from board meetings of VCI relating to the management of those subsidiaries. Plaintiff's Motion to Compel Appendix A, Request Nos. 7, 35, 43, and 54, RAKTL v. VCI(E.D.Pa. 2002)(01-CV-5627). The vast majority of these documents have no role in leading to the discovery of evidence relevant to patent infringement, let alone VCI's involvement in it.

Moreover, the substantial effort that would be required to produce these voluminous documents represents a undue burden on VCI. Like the previous category, these requests would force VCI to produce documents not in its possession, but in the possession of its subsidiaries. Accordingly, RAKTL's motion to compel these documents is denied.

## B. DEPOSITION OF MR. BABBIO

RAKTL asks this Court to compel the deposition of Lawrence T. Babbio, VCI's President and Vice-Chairman. At the current time, the burden that attending [*17] a deposition would have on Mr. Babbio significantly outweighs any benefit the deposition would provide to RAKTL. See *FED. R. CIV. P. 26(b)(2)*(2002). It appears that Mr. Babbio could not provide any relevant information and that RAKTL has failed to utilize other available means of discovery.

Currently, it is doubtful that Mr. Babbio has any information that would be helpful to RAKTL. In its motion, RAKTL merely states that Mr. Babbio has personal knowledge of highly probative material. Plaintiff's Motion to Compel at 14-15, RAKTL v. VCI, (E.D.Pa. 2002)(01-CV-5627). RAKTL points to several publicly available sources in attempt to support this statement. Theses sources, however, only show that Mr. Babbio is an important executive with high level

managerial responsibilities. These sources are entirely consistent with a declaration offered by Mr. Babbio stating that he deals only with general policy and procedures relating to the management of VCI subsidiaries. Defendant's Response Brief, Ex. A P4, RAKTL v. VCI(E.D.Pa. 2002)(01-CV-5627). In his declaration he further affirmed that he does not have any knowledge of what technology is used in the provision of any of those subsidiaries' **[*18]** services which may infringe on the patents-at-issue. Defendant's Response Brief, Ex. A P7, RAKTL v. VCI(E.D.Pa. 2002)(01-CV-5627).

Forcing Mr. Babbio to attend a deposition would be a large and unnecessary burden. No one disputes that Mr. Babbio has a very busy schedule and travels extensively. Defendant's Response Brief, Ex. A P10, RAKTL v. VCI(E.D.Pa. 2002)(01-CV-5627). Moreover, VCI has offered RAKTL other witnesses, including other executives. [8] RAKTL's only response to these offers appears to be that these lower level employees do not know the information that RAKTL seeks to discover. However, as stated above, they have not offered any sound basis for concluding that Mr. Babbio has knowledge of any relevant information. Because compelling the deposition of Mr. Babbio would be an undue burden and RAKTL has failed to make use of less intrusive methods of discovery, this portion of RATKL's motion must be denied.

8  This court actually ordered that the depositions of three individuals be taken by the middle of August. Ronald A. Katz Technology v. Verizon Communications Incorporated, No. 01-CV-5627 (E.D.Pa. filed July 17, 2002)(ordering depositions of Thomas Tualke, Albin Moschner, and William Ball). These deposition were not taken by that deadline.

**[*19] C. DEPOSITIONS OF MESSRS. GORDON AND MCCALLION**

RAKTL's Motion to Compel the depositions of Messrs. Gordon and McCallion is denied because neither of them is a party to this ligation and therefore their depositions may not be noticed. Mr. Gordon is an executive with a Verizon subsidiary, Verizon Services Corporation. Timothy McCallion is an executive of another Verizon subsidiary, Verizon California Incorporated. [HN7] VCI is not required to produce for deposition a person who is not a party. *Trans Pacific Ins.*

*Co. v. Trans-Pacific Ins. Co., 136 F.R.D. 385, 392 (E.D.Pa. 1991).*

While RAKTL does not dispute that neither Mr. Gordon, nor Mr. McCallion are officers, directors, or employees of VCI, RAKTL claims, nonetheless, that VCI should make them available for deposition as managing agents. There is no reason to believe that either of these two gentlemen exercise any managerial control over VCI. While they may be managing agents of a VCI subsidiary, this does not give them any direct relationship with the Defendant.

**D. DEPOSITION UNDER *FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6)***

RAKTL requests that this Court compel a deposition regarding Topic Five of **[*20]** "Plaintiff's Notices of Deposition Pursuant to *Fed. R. Civ. P. 30(b)(6)*." This request is reasonably calculated to lead to evidence that may support both the agency and inducement theory of liability. While this request seeks to discover company-wide or nationwide activity, it is limited to VCI's role in directing that activity. These actions go to the heart of any agency liability or inducement of infringement. Accordingly, RAKTL's Motion to compel a deposition pursuant to *Rule 30(b)(6)* is granted.

**V. CONCLUSION**

For the above reasons, RAKTL's motion to compel is denied in part and granted in part. An appropriate order is attached to this opinion.

**ORDER**

AND NOW, this     day of October, 2002, upon consideration of the Plaintiff's Motion to Compel Discovery (doc. 36), Defendant VCI's response (doc. 42), and Plaintiff's reply (doc. 45) the following is hereby ORDERED:

1) VCI shall, within ten (10) days, forward all documents responsive to Plaintiff's Document Requests 8, 9, 10, 11, and 22.

2) VCI shall, within ten (10) days, produce all documents responsive to Plaintiff's Document Requests 33, 34, 46, 57, and 58, however, VCI is not compelled to produce **[*21]** any documents that pertain exclusively to business dealings of VCI's subsidiaries;

3) VCI shall, within ten (10) days, make available for deposition a witness capable of testifying regarding Topic 5 on "Plaintiff's Notices of Deposition Pursuant to *Fed. R. Civ. P. 30(b)(6).*"

4) The portion of Plaintiff's motion seeking to compel responses to Plaintiff's Document requests 7, 17, 18, 21, 35, 37, 40, 42, 43, 45, 50, 54, and 56 is DENIED.

5) The portion of Plaintiff's Motion seeking to compel the depositions of Lawrence T. Babbio, Mr. Bruce Gordon, and Mr. Timothy McCallion is DENIED;

6) Plaintiff's Response Brief to VCI's Summary Judgment Motion shall be due no later than November 4, 2002;

7) VCI's Rely Brief shall be due no later than November 11, 2002;

8) Oral argument on said motion shall be held on November 19, 2002 at 9:30 AM in Courtroom 13A, United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania, 19106.