LITTLER MENDELSON, P.C.
A. Michael Weber (AW-8760)
Michael P. Pappas (MP-6716)
885 Third Avenue
New York, New York 10022
(212) 583-9600

Attorneys for Defendant

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PARAMOUNT PARKS, INC.,

                    Plaintiff,                          Case No. 07 Civ. 10595 (SHS) (MJD)

          -against-

LESTER NAIL,

                    Defendant.

---

## DECLARATION OF A. MICHAEL WEBER

A. Michael Weber, an attorney duly admitted to this court, hereby declares under penalty of perjury as follows:

1.       I am a member of the firm Littler Mendelson, P.C., attorneys of record for the Defendant in this action.  I make this declaration in opposition to Plaintiff's motion for a protective order and attorneys' fees, and in support of Defendant's cross-motion for sanctions and attorneys' fees.

2.       Attached hereto as Exhibit 1 are true and correct copies of pages from the transcript of Craig Freedman's deposition, taken on April 23, 2008.

3.    Attached hereto as Exhibit 2 is a true and correct copy of a document marked and identified as Exhibit C at the deposition of Craig Freeman taken on April 23, 2008.

4.    Attached hereto as Exhibit 3 are true and correct copies of e-mails I sent to PPI's counsel on April 15 and 16, 2008, in which I sought assurance that PPI would not call Richard Kinzel to testify.  PPI refused to provide such assurance.

5.    Attached hereto as Exhibit 4 are true and correct copies of pages from the transcript of the court conference held on February 29, 2008.

6.    Attached hereto as Exhibit 5 are true and correct copies of e-mails I received from PPI's counsel on February 19, March 10, and March 28, 2008, in which they represented that Mr. Kinzel had no personal knowledge regarding the subject matter of PPI's claims or Defendant's counterclaims.

7.    Attached hereto as Exhibit 6 is the Affidavit of Richard Kinzel, sworn to March 6, 2008, which was provided to me by PPI's counsel on March 10, 2008.

8.    Attached hereto as Exhibit 7 is an e-mail I sent to PPI's counsel on March 27, 2008, in which I stated that Defendant would defer determining whether to seek Mr. Kinzel's deposition until after a lower-level official, Mr. Freeman, had been deposed.

9.    Attached hereto as Exhibit 8 is a letter I sent to PPI's counsel on April 24, 2008, in which I provided notice that Defendant would seek sanctions against PPI and Mr. Kinzel based on PPI's unreasonable refusal to produce Mr. Kinzel for deposition, as well as PPI's and Mr. Kinzel's false representations that Mr. Kinzel lacked relevant knowledge relating to this matter.

Dated: May 8, 2008                                   S/
                                                A. Michael Weber

2

# DECLARATION OF
# A. MICHAEL WEBER


# EXHIBIT 1

Page 1

1

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3   ----------------------------X

4   PARAMOUNT PARKS, INC.,

5          Plaintiff,

6      vs.          No. 07 CV 10595(SS)

7   LESTER NAIL,

8          Defendant.

9   ----------------------------X

10          April 23, 2008
            9:02 a.m.
11

12

13

14          Deposition of CRAIG FREEMAN, held at

15   the offices of Squire, Sanders & Dempsey

16   L.L.P., 350 Park Avenue, New York, New York,

17   pursuant to Notice and Agreement, before

18   Thomas R. Nichols, a Registered Professional

19   Reporter and a Notary Public of the State of

20   New York.

21

22

23

            GREENHOUSE REPORTING, INC.
24       875 Sixth Avenue - Suite 1716
         New York, New York  10001
25          (212) 279-5108

Page 10

C. Freeman

1  know that I would designate any of those as
2  specifically for the purpose of preparing for the
3  deposition.
4      Q.    When did you have the one meeting to
5  prepare?
6      A.    Last Friday, the 18th of April.
7      Q.    That was with Ms. Kirila?
8      A.    Yes.
9      Q.    Anyone else?
10     A.    Our general counsel was present for
11 that meeting.
12     Q.    Who was that?
13     A.    His name is Duff Milkie.
14     Q.    M-i-l-k-i-e?
15     A.    M-i-l-k-i-e.
16     Q.    Anyone else?
17     A.    No.
18     Q.    How long did that meeting last?
19     A.    About two and a half hours.
20     Q.    Did you review any documents during
21 that preparation meeting?
22     A.    Yes.
23     Q.    The things you've already discussed?
24     A.    Yes.

Page 11

C. Freeman

1      Q.    Did any of the documents you reviewed
2  refresh your recollection as to any of the events
3  in this case?
4      A.    I'm sure they did, but I can't -- I
5  can't recall any epiphanies in terms of:  Oh, aha!
6      Q.    Other than meeting with your attorney
7  and Mr. Milkie, have you spoken to anyone in
8  preparation for this deposition?
9      A.    Regarding the facts that we're
10 discussing?
11     Q.    Regarding anything about the
12 deposition, including facts that you might be
13 asked about.
14     A.    Yes.
15     Q.    Who did you have that discussion with?
16     A.    Sandy Cranford.
17     Q.    Who is that?
18     A.    She is the director of human resources
19 for Carowinds.
20     Q.    Was that one discussion or more than
21 one discussion?
22     A.    I recall one discussion.
23     Q.    Do you remember when that was?
24     A.    Friday.

Page 12

C. Freeman

1      MS. KIRILA:  I am just going to object
2  and instruct you not to answer with respect
3  to conversations on Friday with Sandy
4  regarding any information that I requested
5  you to obtain.
6      Q.    When you say Friday, was that the
7  18th --
8      A.    Yes.
9      Q.    -- of April?
10     How long did that discussion last?
11     A.    Less than five minutes.
12     Q.    And what was discussed?
13     MS. KIRILA:  Objection.  To the extent
14 it reveals anything that I specifically
15 directed you to obtain for me, do not
16 answer.
17     Q.    Did you learn any facts as a result of
18 that discussion?
19     A.    Yes.
20     Q.    What facts did you learn?
21     A.    That really relates to the information
22 that my counsel instructed me to obtain, so I
23 can't respond.
24     Q.    There were no attorneys present during

Page 13

C. Freeman

1  that conversation, were there?
2      A.    Yes.
3      Q.    Who was that?
4      A.    Duff Milkie.
5      Q.    He was present during your
6  conversation with Sandy Cranford?
7      A.    Yes.
8      Q.    Have you talked about this case with
9  anyone other than an attorney?  Other than what
10 you've already talked about.
11     A.    I reported to my boss on it.
12     Q.    Who is your boss?
13     A.    Dick Kinzel.
14     Q.    And what's his position?
15     A.    He's president and CEO, chairman,
16 president, CEO of Cedar Fair Entertainment
17 Company.
18     Q.    How many times did you report to
19 Mr. Kinzel about the case?
20     A.    Several times.
21     Q.    During what period of time?
22     A.    From the time the case was filed to
23 the present.
24     Q.    From the time the lawsuit was filed?

4 (Pages 10 to 13)

Page 14

C. Freeman

1
2    A.    Yes.
3    Q.    What did you report to Mr. Kinzel?
4         MS. KIRILA:  Another instruction here.
5    Object to the extent you are communicating
6    anything that I directly instructed you to
7    convey to Mr. Kinzel and any legal strategy.
8    But other than that, you can answer.
9    A.    There were several conversations we
10   had regarding the status of the case.  Some of
11   those conversations occurred in the presence of
12   our attorney, our general counsel.
13        THE WITNESS:  So I would imagine those
14   are protected.
15        MS. KIRILA:  Yes, do not testify as to
16   those.
17   A.    I don't recall specific dates and
18   conversations, and so forth.  They were just
19   general, you know, progress reports, updates, you
20   know, making recommendations, getting direction,
21   that sort of thing.
22   Q.    Can you tell me the substance of
23   anything that was discussed in any of those
24   meetings other than privileged material?
25        MS. KIRILA:  And I will also instruct

Page 15

C. Freeman

1
2    you if you're not sure whether Duff was
3    there or not, do not guess.  Only testify
4    about those which you know Duff was not
5    present or other counsel.
6    A.    I don't have specific recollection of
7    the substance of specific conversations.
8    Q.    Do you recall anything that Mr. Kinzel
9    said in any of those discussions?
10        MS. KIRILA:  Same instruction.
11   A.    Something to the effect that, you
12   know, this could all be over with if Mr. Nail
13   would just write us a check for what he owes us.
14   Q.    Mr. Kinzel said that?
15   A.    Yes.
16   Q.    Did you have any response to that?
17   A.    I had my marching orders.
18   Q.    I am just asking if you responded to
19   that comment at all.
20   A.    I think my response was that I just --
21   I understood.
22   Q.    Do you recall anything else that
23   Mr. Kinzel said in any of those discussions?
24   A.    He has -- he has wondered why Mr. Nail
25   doesn't understand that he owes Cedar Fair this

Page 16

C. Freeman

1
2    money or PPI this money, I'm sorry, owes PPI this
3    money and why he thinks it's OK for him to do what
4    he did.
5    Q.    That's something Mr. Kinzel actually
6    said or that was your impression of what he was
7    thinking?
8    A.    That's a summary of his -- of what he
9    has said.
10   Q.    Anything else?
11   A.    Not that I recall.
12   Q.    In any of your meetings and
13   discussions with Mr. Kinzel where counsel were
14   present was there any nonattorney present from
15   outside the company in any of those meetings?
16   A.    No.
17   Q.    Are you an attorney?
18   A.    No.
19   Q.    Have you ever attended law school?
20   A.    No.
21   Q.    Do you have any type of legal
22   training?
23   A.    Not beyond taking business law courses
24   in college.
25   Q.    Just following up on the last series

Page 17

C. Freeman

1
2    of questions, other than Sandy Cranford and
3    Mr. Kinzel did you have any discussions with any
4    other nonattorneys regarding this case?
5    A.    What type of discussions?
6    Q.    Any type of discussions,
7    correspondence, regarding this case.
8    A.    I'm sure I have mentioned in brief to
9    our human resources director, corporate HR
10   director.
11   Q.    Which is?
12   A.    Her name is Billy Clark.
13   Q.    Do you remember any discussions or
14   correspondence you had with Ms. Clark regarding
15   this case that would not be privileged?
16   A.    Nothing specific.  Just general
17   updates.
18   Q.    Do you recall anything specific that
19   either you or she said in any of those
20   discussions?
21   A.    No.
22   Q.    Anyone other than Ms. Clark,
23   Mr. Kinzel and Ms. Cranford?
24   A.    My assistant.
25   Q.    Who is that?

5 (Pages 14 to 17)

Page 18

C. Freeman

1
2     A.    Ruth Hufnagle.
3     Q.    Do you have any substantive
4  communications with her about the case?
5     A.    No, just enlisting her assistance to
6  gather documents for discovery, and so forth.
7     Q.    Anyone else?
8     A.    Conversations surrounding that.
9     Q.    Anyone else?
10    A.    Veronica Dowd.
11    Q.    Who is she?
12    A.    She's on my staff, also.  And she is
13  our, she's a human resources manager, corporate
14  human resources manager.
15    Q.    What did you discuss with her about
16  the case?
17    A.    Just information gathering, because
18  she has access to the human resources system.
19    Q.    What specific information did you talk
20  to her about gathering?
21    A.    Just information regarding Mr. Nail's
22  benefits, and so forth.
23    Q.    Benefits and what else?
24    A.    That's really all I recall.
25    Q.    Was that for the purpose of responding

Page 19

C. Freeman

1
2  to discovery requests in this case?
3     A.    Yes.
4     Q.    Anyone else?
5     A.    No.  Not that I recall.
6     Q.    Did you speak to Peter Crage [Craig]
7  about this case?
8     A.    I don't recall any conversations that
9  I had with Mr. Crage.
10    Q.    It's pronounced Crage?
11    A.    Yes.
12    Q.    OK.  In your discussions with
13  Mr. Kinzel you indicated that he wondered why
14  Mr. Nail didn't understand that he owes money,
15  correct?
16    A.    Yes.
17    Q.    Did he say why he believed that
18  Mr. Nail owed the company money?
19    A.    I don't recall him elaborating.
20    Q.    Where did you go to college?
21    A.    Where did I go to college?
22    Q.    Yes.
23    A.    I, my bachelor's degree was from the
24  University of Southern California.
25    Q.    What is your degree in?

Page 20

C. Freeman

1
2     A.    Business administration.
3     Q.    What year did you obtain that degree?
4     A.    1977.
5     Q.    Do you have any other degrees?
6     A.    An associate of arts degree from
7  Fullerton College.
8     Q.    Anything else?
9     A.    MBA from California State University
10  at Fullerton.
11    Q.    Anything else?
12    A.    That's it.
13    Q.    Do you have any other post high school
14  education other than what you've already
15  described?
16    A.    No.
17    Q.    Do you have any professional -- other
18  professional training other than what you've
19  already described?
20    A.    Seminars and things like that.
21    Q.    Relating to what?
22    A.    Gosh.  Business, you know, leadership,
23  professional development.
24    Q.    Anything relating to executive
25  contracts or compensation or anything like that?

Page 21

C. Freeman

1
2     A.    No.
3     Q.    Do you have any professional licenses?
4     A.    No.
5     Q.    Or professional certificates?
6     A.    No.
7     Q.    Have you ever had any training in
8  human resources?
9     A.    Um, seminars regarding union matters.
10    Q.    Other than that?
11    A.    No.
12    Q.    Where are you currently employed?
13    A.    Cedar Fair.
14    Q.    Cedar Fair LP?
15    A.    Cedar Fair LP.  That's the parent
16  company.  Technically my employer is Magnum
17  Management Corporation which is a subsidiary of
18  Cedar Fair LP.
19    Q.    So Magnum is your employer.
20    A.    Yes.
21    Q.    That's a wholly owned subsidiary of
22  Cedar Fair?
23    A.    I'm trying to recall the entity's
24  structure and I believe it is wholly owned by
25  Cedar Fair.

6 (Pages 18 to 21)

Page 30

C. Freeman

1             C. Freeman
2   manager at the Camp Snoopy park at Mall of America
3   he would -- he would make stewardship visits to
4   the park and I would report to him on the status
5   of our business and we would meet on various
6   issues.  And I would have occasional phone
7   conversations with him.
8      Q.   Would you describe him as a pretty
9   hands-on president and CEO?
10     A.   As the business has grown he has been
11   forced to I guess become more and more removed,
12   and in fact from an organizational standpoint
13   he's, um, he's put people, more people between him
14   and the operations.
15      Q.   When did that change start to occur?
16     A.   In early 2005 he brought in a chief
17   operating officer.  And the general managers as of
18   that time, the general managers at the parks no
19   longer reported to Mr. Kinzel.  They reported to
20   the CEO.
21      Q.   Who was that?
22     A.   Jack Falfas.
23      Q.   Falfas?
24     A.   F-a-l-f-a-s.
25      Q.   Is he still there?

Page 31

C. Freeman

1             C. Freeman
2     A.   Yes.
3      Q.   In the same position?
4     A.   Yes.
5      Q.   Where is your office located?
6     A.   Sandusky, Ohio.
7      Q.   Has it always been located there while
8   you have had this position?
9     A.   Yes.
10     Q.   In your current position what kind of
11   interactions do you have with Mr. Kinzel?
12     A.   I talk to him on the phone and I meet
13   with him on an ad hoc basis when I have things to
14   review and go over with him and attend his staff
15   meetings.
16     Q.   How often would you say you talk to
17   him on the phone?
18     A.   Average, three times a week.
19     Q.   How often does he hold the staff
20   meetings?
21     A.   Generally weekly unless -- unless
22   there's a conflict.
23     Q.   Is there a specific day of the week he
24   usually holds them on?
25     A.   It moves around.

Page 32

C. Freeman

1             C. Freeman
2     Q.   Other than his staff meetings how
3   often do you meet with him in person
4   approximately?
5     A.   Every several weeks.
6     Q.   Where is his office in relation to
7   your office?
8     A.   A couple of miles away.
9     Q.   So he's in a different building?
10     A.   Yes.
11     Q.   In the same city?
12     A.   Yes.
13     Q.   Has your level of interaction with him
14   remained fairly consistent since September 2005?
15     A.   Yes.
16     Q.   In your experience was Mr. Kinzel
17   typically involved in the termination of employees
18   at the vice president level and above?
19     A.   Yes.
20     Q.   How was he involved?
21     A.   Depending on the type of termination,
22   it can be, you know, a specific situational
23   involvement or it could be more of a general
24   involvement.
25     Q.   Was he consulted on all such

Page 33

C. Freeman

1             C. Freeman
2   terminations?
3        MS. KIRILA:  Objection.  To the extent
4     of your knowledge and your involvement you
5     can answer.
6     A.   He authorizes them.
7     Q.   He has to approve them, correct?
8     A.   Yes.
9     Q.   In the weekly staff meetings with
10   Mr. Kinzel were they recorded in any way?
11     A.   No.  I'm sorry, yes.
12     Q.   How were they recorded?
13     A.   One of the attendees takes general
14   notes.
15     Q.   Did you personally take notes during
16   the meetings?
17     A.   For my own benefit?
18     Q.   Yes.
19     A.   Yes.
20     Q.   Do you still have any of those?
21     A.   Yes.
22     Q.   The person who was taking general
23   notes of the meeting, were those distributed
24   afterwards?
25     A.   Yes.

(212)279-5108

(212) 279-5108

Page 34

C. Freeman

2  Q.  They were sort of like the minutes of
3  the meeting?
4  A.  Yes.
5  Q.  And were they distributed to you?
6  A.  Yes.
7  Q.  Do you still have any of those?
8  A.  Yes.
9  Q.  How far back would you say that you
10 keep either your own personal notes or the minutes
11 of those staff meetings?
12 A.  Quite a while.  Going back quite a
13 while.
14 Q.  In your experience did Mr. Kinzel have
15 to approve employment contracts with executives?
16 A.  New employment contracts?
17 Q.  Yes.
18 A.  Yes.
19 Q.  Did he have to approve all employment
20 contracts or only those at a certain level and
21 above?
22 A.  All employment contracts.
23 Q.  In your experience was Mr. Kinzel ever
24 involved in hiring employees?
25 A.  Yes.

Page 35

C. Freeman

2  Q.  How was he involved in hiring
3  employees?
4  A.  He conducts interviews for senior
5  level positions.
6  Q.  Did he interview you for your current
7  position?
8  A.  Yes.
9  Q.  And I presume he would have approval
10 over hiring of senior level positions, correct?
11 A.  Yes.
12 Q.  Do you know Peter Crage?
13 A.  Yes.
14 Q.  How do you know him?
15 A.  He is a coworker.
16 Q.  What is his position?
17 A.  Corporate vice president and chief
18 financial officer.
19 Q.  Of what entity?
20 A.  Cedar Fair LP.
21 Q.  How long have you known Peter Crage?
22 A.  Probably six years or so.
23 Q.  How did you first come to know him?
24 A.  When I was the general manager at Mall
25 of America, Camp Snoopy Mall of America, at one

Page 36

C. Freeman

2  point he was the corporate treasurer and I met him
3  in those capacities, when we were both in those
4  capacities.
5  Q.  Do you know when he obtained his
6  current position?
7  A.  July of 2005.
8  Q.  As of September 2005 going forward did
9  you have any interactions with him?
10 A.  Yes.
11 Q.  What types of interactions did you
12 have with him?
13 A.  Given that we are peers on the
14 corporate staff, we interact frequently regarding
15 various business matters.
16 Q.  What types of matters?
17 A.  A couple of examples, ride purchases,
18 um --
19 Q.  You said ride, r-i-d-e?
20 A.  Ride, r-i-d-e, ride purchases, um,
21 benefits issues as it relates to the financial
22 implications.
23 Q.  Do you interact on human resources
24 issues?
25 A.  With Mr. Crage?

Page 37

C. Freeman

2  Q.  Yes.
3  A.  Not typically unless as I said there's
4  some sort of a financial ramification, like we're
5  bidding out benefit packages or vendors or
6  programs or whatever.  We're both on the
7  retirement plan advisory committee.
8  Q.  Where is Mr. Crage's office in
9  relation to your office?
10 A.  A couple of miles away.
11 Q.  He's in the same building as
12 Mr. Kinzel?
13 A.  Not the same building, but an
14 adjacent, um --
15 Q.  Complex?
16 A.  -- building.  Yes, the same complex.
17 Q.  How frequently would you say that you
18 interact with Mr. Crage?
19 A.  About the same as Mr. Kinzel.  Several
20 times a week.
21 Q.  Is he also at the staff meetings?
22 A.  Yes.
23 Q.  Has your level of interaction with
24 Mr. Crage remained fairly consistent since
25 September of 2005 to the present?

Page 46

C. Freeman

1 C. Freeman
2 the parks?
3    A.    They are on or adjacent to or nearby.
4 They are associated with the amusement parks.
5    Q.    Do you know how many hotel properties
6 that Cedar Fair owns or operates?
7    A.    Five hotels, yeah, I think they are
8 five hotels and there are campgrounds.
9    Q.    How many campgrounds?
10    A.    I think three or four.  Four.
11    Q.    Is Cedar Fair engaged in any other
12 businesses?
13    A.    Not that I can think of right now.
14    Q.    Does it have any subsidiaries that are
15 engaged in any other businesses?
16    A.    No.
17    Q.    Who are -- from now on when I say
18 Cedar Fair, just to make it easy, I mean Cedar
19 Fair and its subsidiaries, OK?
20    A.    Sure.
21    Q.    Who are Cedar Fair's competitors?
22        MS. KIRILA:  Objection.  Relevance.
23    There's no dispute over noncompete here.
24        You can answer the question, but I'm
25    not going to get into competitiveness when

Page 47

C. Freeman

1 C. Freeman
2    this isn't an issue in the case.  Go ahead.
3    A.    Six Flags, Busch Entertainment, I
4 guess Disney, Universal, Herschend Entertainment,
5 H-e-r-s-c-h-e-n-d.  I am not sure the C is in
6 there, but we'll go with it.  Parc, which is
7 P-a-r-c, I believe is how it's spelled, owns
8 several properties in the U.S.  Kennywood
9 Entertainment.
10        Those are the big ones I can think of.
11    Q.    Does Cedar Fair do any business
12 outside of the U.S. and Canada?
13    A.    No.
14    Q.    Were you involved in the acquisition
15 of PPI by Cedar Fair?
16    A.    Yes.
17    Q.    I believe you testified earlier you
18 were involved in the due diligence, correct?
19    A.    Yes.
20    Q.    Were you involved in any other way?
21    A.    Transition, the transition issues
22 related to human resources and legal matters.
23    Q.    That's what you testified to before as
24 far as your interactions with Mr. Nail.
25    A.    Yes.

Page 48

C. Freeman

1 C. Freeman
2    Q.    Is that the same thing?
3    A.    Yes.  As well as benefit transition
4 issues, converting the benefits from CBS.
5    Q.    Who did you work with on the benefits
6 transition issues?
7    A.    Internally primarily Sandy Cranford.
8    Q.    Who did you work with at CBS, if
9 anyone, on those benefit transition issues?
10    A.    Primary contact, team leader if you
11 will on that side that I recall was Deb Bernes.
12    Q.    Anything else?
13    A.    That's my recollection of significant
14 things I was involved in.
15    Q.    How were you involved in the due
16 diligence?  What did you do?
17    A.    Information gathering, going out to
18 the data site and reviewing agreements and
19 policies and benefits and just gathering
20 information related to the responsibilities that I
21 previously related.
22    Q.    Did you report to anyone at Cedar Fair
23 regarding the due diligence process?
24    A.    I reported to the CEO, Dick Kinzel.
25    Q.    Who else did you work with from Cedar

Page 49

C. Freeman

1 C. Freeman
2 Fair on the due diligence process?
3    A.    Peter Crage and -- oh, our attorneys,
4 Squire Sanders.
5    Q.    Anyone else that you recall who you
6 worked with on due diligence?
7    A.    You know, I have just vague
8 recollections.  Nobody specific that I can say I
9 definitely remember working with this person.
10    Q.    Are there any point people at CBS or
11 PPI before the acquisition that you worked with on
12 the due diligence process?
13    A.    Separating due diligence from
14 integration, right?
15    Q.    Correct.
16    A.    Due diligence because we were in a
17 competitive bid situation, it was all very much
18 funneled, and so I really didn't work with anybody
19 at CBS during that process.
20    Q.    What about for the integration, who
21 were the point people?
22    A.    As I mentioned previously, I worked
23 with Lester, Sandy Cranford, Deb Bernes from CBS,
24 our attorneys from Squire Sanders, our benefits
25 consultants, benefits brokers I guess and

13 (Pages 46 to 49)

Page 50

C. Freeman

1  C. Freeman
2  consultants.
3      Q.    What were your interactions with
4  Mr. Nail prior to the closing date of the
5  acquisition?
6      A.    I recall a trip down there a couple of
7  weeks before the closing date where we had pretty
8  much an all-day meeting where Lester gave me an
9  orientation to the, in particular the legal
10 matters that were outstanding and the functions of
11 his area of responsibility.
12     Q.    Was there anyone else in attendance at
13 that meeting?
14     A.    He would, um, as I recall, he would
15 call in the paralegal, or referred to her or asked
16 her questions periodically on an ad hoc basis, but
17 she didn't actually participate in the meeting.
18     Q.    Other than that meeting did you have
19 any interactions with Mr. Nail prior to the
20 closing date of the acquisition?
21     A.    I don't believe we had any other
22 personal meetings. I'm sure we had phone
23 conversations and -- but I don't know what -- I
24 don't have any specific recollection.
25     Q.    Was it regarding similar type

Page 51

C. Freeman

1  C. Freeman
2  transitional matters regarding litigation and what
3  not?
4      A.    I don't recall specifically.
5      Q.    Prior to the closing date of the
6  acquisition were you involved in any discussions
7  regarding what would happen to Mr. Nail and the
8  other incumbent PPI executives after the
9  acquisition closed?
10     A.    Mr. Nail asked me about it on --
11 Mr. Nail asked me about it and I indicated to him
12 that I could not give him an answer.
13     Q.    Was that during the all-day meeting
14 you described?
15     A.    That was, yeah, he did ask about it
16 during that meeting.
17     Q.    What did he ask?
18     A.    He asked about his status.
19     Q.    Whether he would continue to be
20 employed after the acquisition?
21     A.    Um, yes. He asked it in a very -- my
22 recollection is he asked about it in a somewhat
23 roundabout way, but what I inferred from what he
24 was asking was that.
25     Q.    What did you respond?

Page 52

C. Freeman

1  C. Freeman
2      A.    I told him I couldn't answer the
3  question.
4      Q.    Did you know at the time or you
5  couldn't answer it for -- or you weren't permitted
6  to answer it?
7      A.    At that time I don't know whether his
8  specific status had been a hundred percent
9  confirmed.
10     Q.    Other than that discussion with
11 Mr. Nail were you involved in any internal
12 discussions with anyone at Cedar Fair regarding
13 who would stay and who would go after the
14 acquisition?
15     A.    Yes.
16     Q.    Who were those discussions with?
17     A.    Dick Kinzel.
18     Q.    Anyone else?
19     A.    I don't have specific recollection of
20 who would have been present.
21     Q.    Was that one discussion or more than
22 one discussion?
23     A.    I'm sure it was more than one
24 discussion.
25     Q.    When were those discussions in

Page 53

C. Freeman

1  C. Freeman
2  relation to the June 30th, 2006 closing date?
3      A.    I would say there were some before and
4  some after.
5      Q.    Focusing on the ones that took place
6  before the closing date, do you recall how soon
7  before the closing date those took place?
8      A.    No.
9      Q.    Do you recall what was discussed in
10 the discussions before the closing date regarding
11 who would stay and who would go?
12     A.    Not specifically, no.
13     Q.    Were any decisions made?
14     A.    Yes.
15     Q.    What decisions were made?
16     A.    A decision was made to put the, um,
17 put certain members of the senior executive team
18 on administrative leave effective as of the
19 closing date.
20     Q.    Certain members of PPI's executive
21 team.
22     A.    Yes.
23     Q.    Which members?
24     A.    If I tried to come up with a list I'd
25 miss somebody, but...

14 (Pages 50 to 53)

Page 54

C. Freeman

1
2    Q.    Well, give me who you remember with
3    the understanding that it may not be complete.
4    A.    OK.  Mr. Weber.
5    Q.    Al Weber?
6    A.    Al Weber.
7    Q.    What was his position at PPI?
8    A.    CEO.
9          Tim Fisher.
10   Q.    What was his position?
11   A.    I don't recall what his exact title
12   was.
13         Mike Koontz, CFO.
14         David Thornton.
15         Brett Petit or Petit, P-e-t-i-t.
16   Q.    I'm sorry, do you know what position
17   Mr. Thornton was?
18   A.    I don't recall his exact title.
19   Q.    Do you recall it generally?
20   A.    He was a vice president involved in
21   some creative or design capacity.
22   Q.    What about Mr. Petit or Petite?
23   A.    Vice president marketing.
24   Q.    Anyone else?
25   A.    Pat Jones.

Page 55

C. Freeman

1
2    Q.    Position?
3    A.    Vice president resale.
4          Dale Kaetzel.
5    Q.    What was his position?
6    A.    He was the general manager at Canada's
7    Wonderland.
8          I think Bob White might have been part
9    of that group.  He was the general manager at
10   Carowinds.
11         That's all I'm recalling, and even
12   that group I'm -- I'm -- the date, there might be
13   a couple of days, a few days of, you know, where
14   something happened on June 30th and others
15   happened a few days later.
16   Q.    So prior to the June 30th closing date
17   you had discussions with Mr. Kinzel in which it
18   was decided that the individuals that you just
19   listed and possibly others would no longer
20   continue to be employed after the acquisition?
21         MS. KIRILA:  Objection.  Misstates his
22   testimony.  You can answer.
23   A.    We discussed putting them on
24   administrative leave.
25   Q.    What does that mean?

Page 56

C. Freeman

1
2    A.    That means that they would be relieved
3    of their duties during the administrative leave
4    period and continue to be employed.
5    Q.    Did all of those people have
6    employment contracts with PPI?
7    A.    Yes.
8          MS. KIRILA:  Restroom break when you
9    get to a convenient point?
10         MR. PAPPAS:  Now is good.
11         MS. KIRILA:  Five minutes?
12         MR. PAPPAS:  Sure.
13         (A recess was taken from 10:22 to
14   10:31 a.m.)
15   BY MR. PAPPAS:
16   Q.    In your discussions with Mr. Kinzel
17   regarding the individuals that you just testified
18   about being placed on administrative leave, as you
19   put it, who made the decision to select those
20   individuals?
21   A.    The final decision was Mr. Kinzel's.
22   Q.    Did you have, give him any input into
23   that final decision?
24   A.    With respect to the area that I -- oh,
25   OK.  Not with respect to those individuals.

Page 57

C. Freeman

1
2    Q.    Do you know if anyone else had given
3    him input as to those individuals?
4    A.    I don't have specific knowledge.
5    Q.    But it was only you and Mr. Kinzel
6    involved in those discussions regarding selecting
7    those individuals for administrative leave; is
8    that correct?
9    A.    I can't tell you.  I -- there may have
10   been other people involved in the discussions, but
11   I don't recall specifically who.
12   Q.    Was there anyone else present when you
13   and Mr. Kinzel were having those discussions?
14   A.    I don't recall.
15   Q.    Were those discussions on the phone or
16   in person?
17   A.    I don't recall.
18   Q.    In your discussions with Mr. Kinzel
19   prior to the closing date of the acquisition did
20   you and he have occasion to discuss Lester Nail?
21   A.    Can you repeat the question?
22   Q.    Sure, in your discussions with
23   Mr. Kinzel prior to the closing date of the
24   acquisition did you and he have occasion to
25   discuss Mr. Nail?

15 (Pages 54 to 57)

C. Freeman

1               C. Freeman
2    A.   Yes.
3    Q.   What was discussed about Mr. Nail?
4    A.   What role he might play
5 postacquisition.
6    Q.   What was discussed about that?
7    A.   Whether given the transitional needs
8 of the business and the issues that were on our
9 plate from legal and human resources standpoint,
10 to what extent we'd be utilizing Mr. Nail's
11 services.
12    Q.   Were any conclusions reached as to
13 what to do with Mr. Nail after the acquisition?
14    A.   After the acquisition?
15    Q.   What to do with him after the
16 acquisition.
17    A.   In these discussions prior to the
18 closing?
19    Q.   Correct.
20    A.   We were not completely sure, which
21 is -- we just weren't completely sure.
22    Q.   Was it your understanding that
23 Mr. Kinzel was considering keeping Mr. Nail on
24 permanently or was it just a matter of when he
25 would ultimately be relieved of his duties?

1               C. Freeman
2    MS. KIRILA:  Object to form.  You can
3 answer.
4    A.   We were -- we were not sure to what
5 extent the outstanding issues and matters would
6 require Mr. Nail's personal attention and for what
7 length of time.
8    Q.   So were any decisions made about
9 Mr. Nail's status prior to the closing date?
10    A.   A decision was made not to include him
11 in the group that was placed on administrative
12 leave.
13    Q.   Then no decision was made as to what
14 would ultimately become of Mr. Nail.  At least no
15 decision was made prior to the closing date.
16    A.   Prior to the closing date I don't
17 recall a decision was made.
18    Q.   Do you know the reasons why those
19 individuals you listed were selected to be placed
20 on administrative leave and relieved of their
21 duties?
22    A.   Because with the integration of the
23 organizations their functions became redundant and
24 so therefore at that time their services were not
25 required.

1               C. Freeman
2    Q.   How do you know that that was the
3 reason?
4    A.   I am looking at the organization that
5 was in place to support the company
6 postacquisition and in looking at the positions
7 that they held, that's my conclusion.
8    Q.   Is that based on any discussions you
9 had with Mr. Kinzel or anyone else or is that
10 simply your conclusion?
11    A.   It's my conclusion.
12    Q.   Did Mr. Kinzel say or give you his
13 reasoning for selecting those individuals?
14    A.   Not that I recall.
15       (Mr. Nail joined the deposition.)
16    Q.   Did you take any notes during your
17 discussions with Mr. Kinzel prior to closing about
18 who would stay and who would go?
19    A.   Not that I recall.
20    Q.   Did he take any notes?
21    A.   Not that I recall.
22    Q.   Are you aware of anything in writing
23 discussing or memorializing those meetings and
24 discussions?
25    A.   Not that I recall.

1               C. Freeman
2    Q.   Did you have any discussions with
3 anyone other than Mr. Kinzel prior to the closing
4 date about which PPI executives would stay and
5 which would go?
6    A.   Not that I recall.
7    Q.   Prior to the closing date of the
8 acquisition did you discuss Mr. Nail with anyone
9 at PPI?
10    A.   Not that I recall.
11    Q.   What about anyone at CBS?
12    A.   Not that I recall.
13    Q.   Prior to the closing date did you
14 discuss Mr. Nail with anyone at Cedar Fair other
15 than Mr. Kinzel?
16    A.   Not that I recall.
17    Q.   Do you recall anything else in your
18 discussions with Mr. Kinzel preclosing that you
19 discussed with him about Mr. Nail?
20    A.   No.
21    Q.   Do you know Mr. Nail's position at PPI
22 prior to the acquisition?
23    A.   General counsel.
24    Q.   And prior to the closing date were you
25 aware that Mr. Nail and other PPI executives had

| | |
|---|---|
| Page 62 | Page 64 |

**Page 62**

C. Freeman

1
2 employment agreements with PPI?
3      A.    Yes.
4      Q.    How were you aware of that?
5      A.    Through the due diligence process.
6      Q.    Those were provided to you by CBS?
7      A.    Yes.
8      Q.    Did you personally see Mr. Nail's
9 employment agreement prior to the closing?
10     A.    Yes.
11     Q.    When was the first time you saw it?
12     A.    I don't know the specific date.
13     Q.    Did you see all of the executive
14 employment agreements with PPI?
15     A.    I saw several. I don't know whether
16 there were any I didn't see, but I -- I know I saw
17 several.
18     Q.    Were they all the same agreement or
19 were there variations?
20     A.    There were variations.
21     Q.    Did anyone else have the same type of
22 agreement as Mr. Nail?
23     A.    Yes.
24     Q.    Who?
25     A.    As I recall, Mr. Rankin, Mr. Thornton,

**Page 63**

C. Freeman

1
2 Ms. Jones, Mr. Zimmerman.
3      Those are the ones I recall.
4      Q.    Were any PPI executives permanently
5 retained as employees after the acquisition?
6      A.    None of us are permanent.
7      Q.    With the intention of continuing their
8 employment indefinitely as opposed to a finite
9 ending date.
10     A.    OK, you're going to have to restate
11 that question. I'm lost.
12     Q.    Were any of the PPI executives -- was
13 a decision made to retain any of the PPI
14 executives in the employ of PPI after the
15 acquisition?
16     A.    Those that were on employment
17 agreements specifically?
18     Q.    Any PPI executives.
19     A.    How would you define an executive?
20     Q.    Well, let's start stick with the ones
21 who had employment agreements then.
22     A.    Yes.
23     Q.    Which ones?
24     A.    Mr. Zimmerman was retained.
25     Q.    What was his position pre- and

**Page 64**

C. Freeman

1
2 postacquisition?
3      A.    He was executive vice president
4 general manager of Kings Dominion.
5      Q.    Anyone else?
6      A.    Mr. Ross was retained.
7      Q.    What was his position pre- and
8 postacquisition?
9      A.    Well, immediately prior to the
10 acquisition he was -- he was like on a special
11 assignment. He was an executive vice president of
12 the company. Postacquisition he was the vice
13 president of marketing for King's Island.
14     Q.    Anyone else?
15     A.    Mr. Rankin was retained.
16     Q.    What was his position pre- and
17 postacquisition?
18     A.    He was the vice president and general
19 manager of the Great America Park.
20     Q.    Anyone else?
21     A.    When you say retained, as of what
22 date?
23     Q.    After June 30th, 2006.
24     A.    Mr. Nail was retained. Actually, as I
25 indicated, as of June 30th everybody was retained

**Page 65**

C. Freeman

1
2 because they were -- the, um, termination without
3 cause provisions of their employment agreements
4 had not yet been triggered.
5      Q.    When I say retained, I mean who was
6 retained for the purpose of remaining actively
7 employed and performing their duties?
8      A.    OK. I believe the list I just gave
9 you, I believe that is a complete list.
10     Q.    Were any of the executives with
11 contracts who were employed at the PPI
12 headquarters in Charlotte retained other than
13 Mr. Nail?
14     A.    No.
15     Q.    Were you involved in any discussions
16 about whether the employment agreements of
17 Mr. Nail and the other PPI executives would remain
18 in effect after the acquisition?
19     A.    Yes.
20     Q.    Who were those discussions with?
21     A.    Mr. Kinzel.
22     Q.    What was discussed?
23     A.    What was discussed was I was given
24 direction that we were to honor the employment
25 agreements that were in place.

17 (Pages 62 to 65)

Page 66

C. Freeman

1
2     Q.    Mr. Kinzel directed you to do that,
3  correct?
4     A.    Yes.
5     Q.    What did you understand him to mean by
6  honor the agreements?
7     A.    That we were to, um, abide by the
8  terms and conditions of those agreements.
9     Q.    Prior to the closing date did you have
10  any discussions with anyone at PPI or CBS
11  regarding Mr. Nail's employment agreement
12  specifically?
13     A.    No.
14     Q.    Did you have any discussions prior to
15  closing with anyone at Cedar Fair regarding
16  Mr. Nail's agreement specifically?
17     A.    No.
18     Q.    Was anyone present in your meeting or
19  discussion with Mr. Kinzel when he said honor the
20  agreements?
21     A.    I don't have specific recollection of
22  who may or may not have been present.
23     Q.    Was there anything that you know of in
24  writing regarding that meeting?
25     A.    Not that I know of.

Page 67

C. Freeman

1
2     Q.    In 2006 was it Cedar Fair's practice
3  to have written employment contracts with its
4  higher level executives?
5     A.    To the best of my recollection in 2006
6  we, um, the only employee under contract was
7  Mr. Kinzel.
8     Q.    Did you have a written employment
9  contract?
10     A.    Me personally?
11     Q.    Yes.
12     A.    No.
13     Q.    Were you aware of anyone other than
14  Mr. Kinzel who had one?
15     A.    Not at that time.
16     Q.    Subsequently did it become Cedar
17  Fair's practice to have written contracts?
18     A.    Yes.
19     Q.    When did that occur?
20     A.    I don't know exactly.  I don't recall
21  exactly.
22     Q.    Were you involved in that change of
23  practice?
24     A.    No.
25     Q.    Do you know the reason for it?

Page 68

C. Freeman

1
2     A.    No.
3     Q.    Had you discussed it with anyone?
4     A.    No.
5     Q.    Did you get a contract yourself?
6     A.    No.
7     Q.    Do you know of anybody who did?
8     A.    Yes.
9     Q.    Who?
10     A.    They're disclosed in the, um, public
11  filings.
12     Q.    Do you know if those contracts contain
13  any restrictions on postemployment activities?
14     A.    I don't know.
15     Q.    Who made the decision to retain
16  Mr. Nail after the closing date?
17     A.    That would have been based on a
18  discussion I would have had with Mr. Kinzel.
19     Q.    So did he make the decision or did
20  you?
21     A.    I made the recommendation.  He
22  approved it.
23     Q.    When did that discussion take place?
24     A.    I don't know specifically.  It would
25  have been at or around the closing date.

Page 69

C. Freeman

1
2     Q.    Was it after the closing date?
3     A.    I doubt it.
4     Q.    Do you recall what specifically was
5  discussed?
6     A.    No.
7     Q.    Did you discuss the reasoning for your
8  recommendation with Mr. Kinzel?
9     A.    My recommendation was based on the
10  outstanding matters that we had to deal with that
11  needed further attention.
12     Q.    Legal matters?
13     A.    Legal and human resource matters.
14     Q.    And legal matters were ongoing
15  lawsuits and what not involving the company?
16     A.    Right.
17     Q.    And HR matters were letting go the
18  remaining people in the Charlotte office?
19          MS. KIRILA:  Objection.
20     A.    Restructuring.
21     Q.    Restructuring?
22     A.    Yes.
23     Q.    What did the restructuring entail?
24          MS. KIRILA:  I am just going to object
25  to the extent that you had discussions with

18 (Pages 66 to 69)

C. Freeman

1                 C. Freeman
2      Mr. Nail in his capacity as general counsel
3  about that, but you can testify generally.
4       A.    Generally we were looking at the
5  organization structure and which positions would
6  be retained and which positions would not and how
7  the organization would be structured
8  postacquisition.
9       Q.    Did Mr. Kinzel offer any view of your
10 recommendation or did he just say, OK?
11      A.    I don't recall any specific, um,
12 reaction.
13      Q.    Did he question you about it?
14      A.    I don't recall.
15      Q.    Did you tell him what your reasoning
16 was for the recommendation?
17      A.    I'm sure I did.
18      Q.    Did your recommendation -- was your
19 recommendation to retain him until such time as
20 the outstanding matters were resolved or to retain
21 him on an ongoing longer basis?
22      A.    My recommendation was to retain
23 Mr. Nail until we could ascertain with greater
24 certainty what the ongoing needs would be.
25      Q.    So you weren't sure?

C. Freeman

1                 C. Freeman
2       A.    Not a hundred percent, no.
3       Q.    But it was not likely in your view at
4  the time that he would remain actively employed
5  for the remainder of his employment contract term,
6  was it?
7       MS. KIRILA:  Object to form.  Go
8  ahead.
9       A.    I'm sorry.  Could you ask the question
10 again?
11      Q.    Sure.  At the time was it your view
12 that Mr. Nail would continue to be actively
13 employed for the remainder of this employment
14 contract term?
15      A.    Probably not.
16      Q.    Did you have any ballpark estimate of
17 how long it would take for the outstanding matters
18 to be resolved and Mr. Nail could be placed on
19 administrative leave, as you called it, along with
20 the rest of the individuals you listed?
21      A.    Not at that time.
22      Q.    So Mr. Kinzel did not -- strike that.
23 Who communicated to the individuals you listed
24 earlier, Mr. Al Weber, Fisher, Koontz, Thornton,
25 Petit, Jones, Kaetzel and White?  Who communicated

C. Freeman

1                 C. Freeman
2  to them the decision that they would be relieved
3  of their duties effective the closing date?
4       A.    Mr. Kinzel called Mr. Weber and
5  informed him.
6       Q.    Were you present?
7       A.    Yes.
8       Q.    What did you hear him say to
9  Mr. Weber?
10      A.    He told Mr. Weber that effective
11 immediately that those employees would be placed
12 on administrative leave.
13      Q.    Did he use those words?
14      A.    I believe he did.  That's my
15 recollection.
16      Q.    He didn't tell Mr. Weber effective
17 immediately those individuals' employment was
18 terminated without cause?
19      A.    He did not use those words.
20      Q.    Was Mr. Weber on speakerphone?
21      A.    As I recall, yes.
22      Q.    And what did he respond to that?
23      A.    Basically in the affirmative, that he
24 would -- he would take care of it.
25      Q.    He would take care of informing those

C. Freeman

1                 C. Freeman
2  individuals?
3       A.    Yes.
4       Q.    Anything else?
5       A.    Not that I recall.
6       Q.    Did Mr. Kinzel inform Mr. Weber that
7  Mr. Weber himself was also being immediately
8  placed on administrative leave?
9       A.    I believe so.
10      Q.    What was Mr. Weber's reaction to that?
11      A.    He was professional and...
12      Q.    Was there any discussion regarding
13 whether Mr. Weber and the other individuals
14 continued to be paid under their contracts?
15      A.    I don't recall whether that was part
16 of that conversation.
17      Q.    Do you recall anything else about that
18 conversation?
19      A.    It was pretty brief.
20      Q.    Did you have any conversations with
21 Mr. Kinzel immediately before or after that call
22 to Mr. Weber?
23      A.    Just preparing for the call and --
24      Q.    What was said?
25      A.    I don't recall.

19 (Pages 70 to 73)

1                 C. Freeman
2      Q.    Did Mr. Weber and those other
3  individuals receive anything in writing regarding
4  their status?
5      A.    With respect to the administrative
6  leave?
7      Q.    Correct.
8      A.    Not that I recall.
9      Q.    So they weren't sent letters that said
10  effective on such and such a date this will
11  happen?
12      A.    Not that I recall.
13      Q.    They weren't provided any written
14  notice of what was going to happen?
15          MS. KIRILA:  Objection.
16      A.    With respect to the administrative
17  leave?
18      Q.    Correct.
19      A.    Not that I recall.
20      Q.    Do you know who would know whether
21  they received such notice, written notice?
22      A.    Well, that notice probably would have
23  come out of my office.
24      Q.    Would someone else in your office have
25  access to that information?

1                 C. Freeman
2      A.    Yes, if I directed them to try and
3  find it.
4      Q.    Would you be able to check or have
5  someone check to see if those individuals were
6  given written notice of administrative leave?
7  Yes?
8      A.    Yes.
9      Q.    Who informed Mr. Nail that he was
10  going to be retained after the closing date?
11      A.    I don't recall.
12      Q.    Did you?
13      A.    I may have.  I don't recall a
14  conversation.
15      Q.    Did you tell Mr. Nail that Mr. Kinzel
16  had personally picked Mr. Nail as the one person
17  to remain at the headquarters in Charlotte?
18      A.    I don't recall saying that.
19      Q.    You don't recall one way or the other?
20      A.    I don't recall one way or the other.
21          MR. PAPPAS:  Mark this as Defendant's
22  Exhibit A.
23          (Defendant's Exhibit A, memorandum
24  dated June 30, 2006, re:  "The Sale of
25  Paramount Parks, Inc. to Cedar Fair, L.P."

1                 C. Freeman
2  marked for identification, this date.)
3      Q.    I show you what has been marked as
4  Defendant's Exhibit A.  Have you ever seen that
5  before?
6      A.    Yes.
7      Q.    What is it?
8      A.    It's a memo that CBS sent to the PPI
9  employees concurrent with the sale of Paramount
10  Parks to Cedar Fair.
11      Q.    Did you have any input into this
12  document?
13      A.    There was some communication between
14  our counsel and CBS regarding this document and I
15  don't know what level of input our counsel had
16  with respect to this document.
17      Q.    I was asking if you personally had any
18  input into it.
19      A.    Oh, me personally, OK.  I don't recall
20  having any input into this document.
21      Q.    If you look under the section entitled
22  "Employment" on the first page, it states that
23  "all active employees of Paramount Parks will
24  remain employees of Paramount Parks, and/or its
25  subsidiaries, i.e., your employer will not change

1                 C. Freeman
2  as a result of the transaction."
3      Q.    Do you see that?
4      A.    Yes.
5      Q.    Is that accurate?
6      A.    Yes.
7          MS. KIRILA:  I am just going to object
8      to the extent that you're asking him for
9      information on a document that he was not
10      the author of.
11          But you can testify as to your
12      understanding as to what happened.
13      Q.    Is that what happened, all active
14  employees of PPI remained employees of PPI and
15  their employer did not change as a result of the
16  transaction?
17      A.    That is correct.
18      Q.    As you stated earlier, Mr. Nail's
19  employment contract with PPI remained in full
20  effect after PPI was acquired by Cedar Fair,
21  correct?
22      A.    Yes.
23      Q.    To your knowledge was Mr. Nail given
24  any severance benefits from PPI or Cedar Fair?
25          MS. KIRILA:  Just object to the extent

Page 78

C. Freeman

1  it calls for a legal conclusion under his
2  contract, but you can answer as to your
3  understanding.
4      Q.    Was he given any payments denominated
5  severance pay or separation pay?
6      A.    No, not to my knowledge.
7          MR. PAPPAS:  Mark this as B.
8          (Defendant's Exhibit B, document
9          purported to be Lester Nails' employment
10         contract with PPI, Bates Nos. LES00038
11         through 45, marked for identification, this
12         date.)
13     Q.    I show you what has been marked as
14 Defendant's Exhibit B.  And this is Mr. Nail's
15 employment contract with PPI, correct?
16     A.    It appears to be.
17     Q.    This is the contract that was in
18 effect at the time of PPI's sale to Cedar Fair,
19 right?
20     A.    Yes.
21     Q.    And this is the contract that remained
22 in effect after that sale, correct?
23     A.    Yes.
24     Q.    According to this document Mr. Nail

Page 79

C. Freeman

1  was employed by PPI as senior vice president
2  general counsel.
3          Do you see that?
4      A.    Yes.
5      Q.    Is that consistent with your
6  understanding of the position that he actually
7  held at PPI?
8      A.    Yes.
9      Q.    Do you know what Mr. Nail's duties as
10 senior vice president general counsel at PPI were
11 prior to the sale?
12     A.    Generally.
13     Q.    How did you know?
14     A.    From meetings with Mr. Nail.
15     Q.    What was your understanding of his
16 duties and responsibilities?
17     A.    He was responsible for administering
18 the legal function for PPI.
19     Q.    What does that entail?
20     A.    Contracts, litigation, employment
21 matters, various legal matters relating to the
22 company.
23     Q.    Based on your own experience do you
24 have any knowledge generally about what a

Page 80

C. Freeman

1  corporation's general counsel does?
2      A.    Generally.
3      Q.    And were Mr. Nail's duties as general
4  counsel of PPI consistent with your own general
5  understanding of what a general counsel does?
6      A.    As a subsidiary of a larger publicly
7  traded company, there would -- I don't believe
8  there would have been the SEC, you know, issues
9  involved in the position and perhaps some of the
10 corporate governance, so forth, that a general
11 counsel for a publicly traded entity would have.
12     Q.    Any other differences?
13     A.    Not that come to mind.
14     Q.    When Cedar Fair acquired PPI on
15 June 30, 2006, were any of the incumbent PPI
16 executives who had employment contracts
17 discharged?
18     A.    On June 30th?
19     Q.    After, on or after June 30th.
20     A.    On or after June 30th.  Yes,
21 subsequently the termination without cause
22 provisions of those employment agreements for
23 several of the executives were triggered.
24     Q.    Who were they triggered for and when?

Page 81

C. Freeman

1      A.    Mr. Weber, Mr. Fisher, Mr. Koontz,
2  Ms. Jones, Mr. Kaetzel, Mr. White, Mr. Petit,
3  and --
4      Q.    Mr. Thornton?
5      A.    Mr. Thornton.  And Mr. Nail.
6      Q.    Other than Mr. Nail those were the
7  same individuals that you earlier testified were
8  placed on administrative leave after the closing
9  date, correct?
10     A.    Yes.
11     Q.    When was their status changed from
12 administrative leave to termination without cause?
13     A.    They were sent a letter in late July.
14     Q.    Late July of 2006, correct?
15     A.    Yes.
16     Q.    Do you still have copies of those?
17     A.    Yes.
18     Q.    Do you remember what they said?
19     A.    They were drafted by counsel to comply
20 with the terms of the individual employment
21 agreements.
22     Q.    I am just asking if you remember what
23 they said.
24          MS. KIRILA:  I am just going to object

21 (Pages 78 to 81)

Page 82

C. Freeman

1  C. Freeman
2  to the extent that you need to refer to a
3  document that's the best evidence. You can
4  testify as to your general memory.
5      A.    My general recollection is that we
6  were notifying them that effective, I believe it
7  was August 1st, that their services were no longer
8  required and we would be triggering the
9  termination without cause provision of their
10  employment agreement and that their employment
11  agreements would remain intact and their
12  obligations continued.
13     Q.    In between June 20, 2006, and the time
14  these individuals were notified by letter that
15  they were being terminated without cause, did any
16  of them perform any services for PPI or Cedar
17  Fair?
18     A.    Other than Mr. Nail, I'm not aware of
19  any.
20     Q.    Were any of them asked to perform
21  services for PPI or Cedar Fair during that period?
22     A.    Other than Mr. Nail, no, I don't know.
23     Q.    You don't know?
24         Do you know who decided to terminate
25  those individuals without cause?

Page 83

1  C. Freeman
2      A.    That would have been Mr. Kinzel.
3      Q.    Do you know why he decided to do that
4  at that time?
5      A.    I'm trying to recall a specific
6  conversation or discussion and rational reasoning.
7  I just don't recall specifics.
8      Q.    But you did have discussions with him
9  about that, correct?
10     A.    I'm sure I did.
11     Q.    But you don't recall anything that was
12  discussed in those conversations?
13     A.    Not specifically.
14     Q.    Generally?
15     A.    Generally it was to proceed with the
16  termination without cause, under the employment
17  agreements that we would continue to honor those
18  agreements as I indicated previously.
19     Q.    Anything else?
20     A.    Not specifically, no.
21     Q.    Do you have any idea why it was
22  decided at that time to convert these individuals
23  from administrative leave to termination without
24  cause? In other words, why that?
25     A.    You've asked for my general

Page 84

1  C. Freeman
2  recollection and impression and it would be that,
3  you know, the closing date had occurred. The dust
4  had settled a little bit and it was time to move
5  on and basically bring it to closure and we had
6  made the, a lot of the restructuring decisions and
7  we were comfortable that at that time we did not
8  require the services of those individuals.
9      Q.    As you've already testified, Mr. Nail
10  was asked to stay on for a period of time after
11  the closing date, correct?
12     A.    Yes.
13     Q.    And that final decision was made by
14  Mr. Kinzel upon your recommendation according to
15  your testimony, right?
16     A.    To retain him?
17     Q.    Yes.
18     A.    Yes.
19     Q.    Didn't you tell Mr. Nail that
20  Mr. Kinzel had personally picked Mr. Nail to stay
21  and help close the corporate office?
22         MS. KIRILA:  Objection. Asked and
23     answered.
24         MR. PAPPAS:  I apologize if I already
25     asked it.

Page 85

1  C. Freeman
2      MS. KIRILA:  You can answer again.
3      A.    My recollection is that since Mr. Nail
4  was going to be the only remaining senior
5  executive on staff and on the ground in Charlotte,
6  that he was going to be designated, if you will,
7  as the in-charge person and that yes, Mr. Kinzel
8  did direct that.
9      Q.    Did you tell Mr. Nail that all of the
10  other incumbent PPI officers had been sent home?
11     A.    I have a vague recollection of that
12  conversation.
13     Q.    Do you know who communicated to
14  Mr. Nail the fact that the company wanted him to
15  stay on for a period of time after the closing
16  date?
17     A.    That would have been -- I am sure that
18  might have been me.
19     Q.    Do you recall anything about that
20  discussion?
21     A.    No.
22     Q.    Do you recall when it took place?
23     A.    No.
24     Q.    Was it prior or subsequent to the
25  closing date?

22 (Pages 82 to 85)

Page 86

C. Freeman

1  C. Freeman
2      A.   I don't recall.
3      Q.   Was it in person, on the phone or by
4  e-mail?
5      A.   My recollection is it would have been
6  a telephone conversation, but that's just my
7  recollection.
8      Q.   Do you recall generally anything that
9  either you or he said in that conversation?
10     A.   No.
11     Q.   But you know that you informed him
12 that the company wanted him to stay on for a
13 period of time to help close the corporate office,
14 correct?
15     A.   I'm sure I did.  To help close the
16 corporate office part of that, what you just said,
17 I'm not sure about, but I'm sure we had a
18 conversation about him staying on and assuming a
19 leadership role.
20     Q.   Was there any discussion in that
21 conversation about how long he was being asked to
22 stay on?
23     A.   I don't recall.
24     Q.   Was there any discussion about the
25 fact that although he was being asked to stay on

Page 87

1  C. Freeman
2  it would not be on a permanent basis?
3      A.   I don't recall.  I know that there
4  were several times where Mr. Nail asked me about
5  his status.
6      Q.   And what was your response?
7      A.   I couldn't -- I couldn't give him any
8  information.
9      Q.   You didn't know or you didn't --
10 didn't want to give him that information?
11     A.   It was a, um, as it was an evolving
12 situation wherein Mr. Nail's status was, as I
13 indicated previously, you know, it was
14 undetermined at one point and then by July 27th it
15 became determined as we sorted things out.
16          So, you know, there were points in
17 time where I didn't know.  There were points in
18 time where I knew, but I couldn't say.
19     Q.   At least in the initial conversation
20 you had with him where you informed him that he
21 was being asked to stay for a period of time, you
22 weren't sure at that point how long that would be.
23     A.   Right.
24     Q.   Approximately how long after the
25 closing date did Mr. Nail remain at PPI performing

Page 88

1  C. Freeman
2  work?
3      A.   Approximately, I guess until
4  approximately the 27th.
5      Q.   July 27th, 2006?
6      A.   Yes, that was the date of the letter.
7      Q.   Sorry, I just need a yes.  That was
8  July 27, 2006?
9      A.   You said approximately, so yes.
10     Q.   Do you know what work he was
11 performing during that time period?
12     A.   He was advising me with regard to some
13 employment matters with respect to the
14 restructuring and assisting me, ongoing -- he had
15 some involvement in some ongoing PPI legal
16 matters, some administrative duties with respect
17 to the corporate offices and the staff on location
18 there.
19     Q.   Anything else?
20     A.   That's all I recall.
21     Q.   Did Mr. Nail do everything that was
22 asked of him during that time period?
23     A.   Yes.
24     Q.   Did he ever refuse to perform any
25 services during that time period?

Page 89

1  C. Freeman
2      A.   No.
3      Q.   Did he finish all the work that he had
4  been asked to perform during the transition?
5      A.   The work that could be completed.
6      Q.   So everything he could complete he did
7  complete?
8      A.   To the best of my recollection.
9      Q.   As you started to testify about
10 before, there came a time when it was decided that
11 Mr. Nail's services were no longer needed,
12 correct?
13     A.   Yes.
14     Q.   When did that time come?
15     A.   Mid to late July.
16     Q.   Of 2006?
17     A.   Yes.
18     Q.   Who determined that Mr. Nail's
19 services were no longer needed?
20     A.   I did.
21     Q.   Did you communicate that conclusion to
22 anyone?
23     A.   Mr. Kinzel.
24     Q.   Anyone else?
25     A.   Not that I recall.

23 (Pages 86 to 89)

Page 90

1               C. Freeman
2     Q.   What was discussed with Mr. Kinzel
3 regarding that?
4     A.   I don't recall specific discussion
5 topics.
6     Q.   Do you recall what the general
7 exchange was between you and Mr. Kinzel regarding
8 that topic?
9     A.   Generally it was that we could absorb
10 or we would plan to absorb the PPI legal functions
11 into the corporate staff and at that time we would
12 not need Mr. Nail's services.
13     Q.   Did you say that to Mr. Kinzel or did
14 he say that to you?
15     A.   My recollection is I said that to
16 Mr. Kinzel.
17     Q.   And was he in agreement with that?
18     A.   Yes.
19     Q.   When you say that the company was
20 going to absorb PPI's legal function into
21 corporate staff, what does that mean?
22     A.   That the contracts, the litigation,
23 the responsibilities that Mr. Nail was responsible
24 for would be absorbed by my staff.  We -- even at
25 the time we were contemplating and made an offer

Page 91

1               C. Freeman
2 to the paralegal that reported to Mr. Nail to
3 relocate to Sandusky and become a part of my
4 staff.
5     Q.   To the extent that there was work that
6 needed to be performed by an attorney who would be
7 doing that?
8     A.   We would outsource.
9     Q.   Outside counsel?
10     A.   Yes.  Which was Cedar Fair's practice.
11     Q.   And Mr. Kinzel was on board with that
12 plan?
13     A.   Yes.
14     Q.   Do you recall anything specifically
15 that he said to you in that conversation?
16     A.   No.
17     Q.   Was there any discussion regarding
18 what would happen to Mr. Nail now that his
19 services were no longer needed?
20     A.   It was within the context of the
21 triggering of the termination without cause
22 provisions of all of the group of executives.
23     Q.   So it was discussed that along with
24 the other people you testified about before
25 Mr. Nail would also be terminated without cause

Page 92

1               C. Freeman
2 and receive one of those letters, correct?
3     A.   Correct.
4     Q.   Do you know who first communicated to
5 Mr. Nail that the company would no longer be
6 needing him to perform services?
7     A.   I'm sure it was me.
8     Q.   Do you remember when that was?
9     A.   No.
10     Q.   Sometime in July 2006 though, correct?
11     A.   On or about the date of that letter.
12     Q.   Do you remember anything about that
13 conversation?
14     A.   No.
15     Q.   Do you recall generally what was said?
16     A.   I don't know -- I don't even recall
17 the specific conversation.
18     Q.   Other than you know it took place.
19     A.   I mean, I -- I don't recall the
20 conversation.  I'm not saying it didn't take
21 place, but I just don't recall it.
22     Q.   Somebody informed Mr. Nail prior to
23 sending out the July 27th letter what his status
24 was, correct?
25        MS. KIRILA:  Objection.  Calls for

Page 93

1               C. Freeman
2 speculation.  You can testify.
3     Q.   Do you know?
4     A.   I don't know.
5     Q.   Is that something that you would have
6 done given your ongoing dealings with Mr. Nail?
7        MR. KIRILA:  Objection to form of the
8 question.  Done as in notifying him of
9 termination or before the letter?
10     If you break the question down, you
11 can answer.
12     Q.   Would verbally communicating with
13 Mr. Nail that his services would no longer be
14 needed be anything that you likely would have done
15 given your ongoing dealings with him?
16     A.   Yes.
17     Q.   And you're not aware that anybody else
18 did that?
19     A.   I am not.
20     Q.   Did you call Mr. Nail and tell him
21 Mr. Kinzel said he could go home?
22     A.   I don't remember that conversation
23 either.
24     Q.   You don't remember one way or the
25 other?

24 (Pages 90 to 93)

Page 94

1  C. Freeman
2  A.  I don't remember one way or the other.
3  Q.  Did you ever tell Mr. Nail either in
4  words or substance that you were just the
5  messenger and that Mr. Kinzel makes all of the
6  decisions?
7  A.  I don't recall one way or the other on
8  that one either.
9  MR. PAPPAS: Take a short break.
10  (A recess was taken from 11:30 a.m. to
11  11:48 a.m.)
12  MR. PAPPAS: Let's mark this as
13  Defendant's Exhibit C.
14  (Defendant's Exhibit C, letter from
15  Richard Kinzel to Lester Nail dated July 27,
16  2006, marked for identification, this date.)
17  BY MR. PAPPAS:
18  Q.  I show you what has been marked as
19  Defendant's Exhibit C, which is a letter from
20  Richard Kinzel to Mr. Nail dated July 27, 2006,
21  correct?
22  A.  Yes.
23  Q.  You have seen this before, right?
24  A.  Yes.
25  Q.  And is that Mr. Kinzel's signature at

Page 95

1  C. Freeman
2  the bottom?
3  A.  Yes.
4  Q.  Do you know who wrote this letter?
5  A.  Counsel. Outside counsel.
6  Q.  Mr. Kinzel didn't write it.
7  A.  No.
8  Q.  Do you know if Mr. Kinzel reviewed
9  this letter before he signed it?
10  A.  I handed Mr. Kinzel a stack of these
11  and he signed them all at the same time.
12  Q.  Do you know if he reviewed it before
13  he signed it?
14  A.  I don't know if he reviewed this
15  specific letter.
16  Q.  Did he review drafts?
17  A.  No.
18  Q.  Do you know if he reviewed any of the
19  other letters that you handed him before he signed
20  those?
21  A.  My recollection is that he reviewed
22  them and he reviewed in general what I was handing
23  him.
24  Q.  Were all the letters the same as this
25  one?

Page 96

1  C. Freeman
2  A.  The letters were written specifically
3  to address specifically contracts, specific
4  contracts as we discussed earlier. There were
5  different contract forms, so there may have been
6  some slight differences.
7  Q.  Do you know whether Mr. Kinzel knew
8  what this letter said before he signed it?
9  MS. KIRILA: Objection. Speculation.
10  If you can testify --
11  Q.  If you know.
12  MS. KIRILA: -- based on your
13  observations.
14  A.  Generally, yes.
15  Q.  Did you discuss this letter with
16  Mr. Kinzel before it was sent out?
17  A.  Not in detail.
18  Q.  Did you discuss it generally?
19  A.  Within the context of sending out all
20  of the letters, yes.
21  Q.  What was discussed?
22  A.  That we were invoking the termination
23  without cause provisions of the employment
24  agreements for these contract employees that were
25  being terminated without cause.

Page 97

1  C. Freeman
2  Q.  Anything else?
3  A.  Not that I recall.
4  Q.  Did you discuss this letter with
5  anyone other than Mr. Kinzel before it was sent
6  out?
7  A.  Counsel, outside counsel.
8  Q.  Did you review this letter before it
9  was sent out?
10  A.  Yes.
11  Q.  And this letter was actually sent to
12  Mr. Nail, correct?
13  A.  Yes.
14  MR. PAPPAS: Mark this as Exhibit D.
15  (Defendant's Exhibit D, one-page
16  document entitled "Personnel Action Request
17  Form," Bates Nos. PPI000014, marked for
18  identification, this date.)
19  Q.  I show you what has been marked as
20  Defendant's Exhibit D.
21  Do you recognize this?
22  A.  No.
23  Q.  Do you know what it is?
24  A.  I know what it says. It's not a form
25  I'm familiar with.

25 (Pages 94 to 97)

| | |
|---|---|
| **Page 134** | **Page 136** |

| Page 134 | Page 136 |
|---|---|

C. Freeman

2 or questions regarding the form, Mr. Nail could
3 have contacted Sandy Cranford.
4    Q.   Did you ever tell Mr. Nail not to
5 return this form even if he was even eligible for
6 benefits somewhere else?
7      Did you ever tell him that?
8    A.   I never told him that.
9    Q.   Do you know if anyone at PPI told him
10 that?
11    A.   I don't know.
12    Q.   Did you personally ever tell Mr. Nail
13 not to return this form if he was working
14 somewhere else?
15    A.   No.
16    Q.   Did anyone at PPI tell him that to
17 your knowledge?
18    A.   No.
19    Q.   Going back to paragraph 25 of the
20 court complaint, it alleges that in mid-October
21 2007 PPI learned from another employee that
22 defendant was working full time at Denny's, Inc.
23      Do you see that?
24    A.   Yes.
25    Q.   Who is the employee who informed PPI

---

C. Freeman

1    A.   I don't recall specifically what I
3 said.
4    Q.   Do you recall generally?
5    A.   I expressed, I guess I expressed
6 surprise and asked him if he was sure and...
7    Q.   Have you completed your answer?
8    A.   Yes.
9    Q.   Did Mr. Rein give you any other
10 information other than that he ran into Lester at the
11 airport and he was working at Denny's?
12    A.   Not that I recall.
13    Q.   Did he tell you what Lester was doing
14 at Denny's?
15    A.   Not that I recall.
16    Q.   This is the first time you had heard
17 of it?
18    A.   Yes.
19    Q.   What did you do after you heard this?
20    A.   I contacted our -- because I knew this
21 was a breach of the employment agreement, I
22 contacted our payroll department and told them to
23 immediately, and I knew the following day was a
24 payday. I told them to immediately stop payment
25 to Mr. Nail.

---

| Page 135 | Page 137 |
|---|---|

C. Freeman

2 that defendant was working full time at Denny's?
3    A.   Jim Rein.
4    Q.   Jim Ryan?
5    A.   Rein, R-e-i-n.
6    Q.   Who is he?
7    A.   He is our vice president of
8 information technology.
9    Q.   Who did he inform?
10    A.   Me.
11    Q.   What did he say?
12    A.   He said he ran into Lester at the
13 Charlotte airport and Lester was working for
14 Denny's.
15    Q.   Was this a passing conversation or did
16 he come specifically to tell you that?
17    A.   It was a passing conversation.
18    Q.   What did you say in response?
19    A.   I was surprised.
20    Q.   You said that?
21    A.   I said that? What did I say?
22    Q.   I am just asking what you said in
23 response.
24    A.   I don't recall.
25    Q.   If anything.

---

C. Freeman

2    Q.   Who specifically did you speak to in
3 payroll?
4    A.   Debbie Thompson, our payroll manager.
5    Q.   Was that done?
6    A.   Yes.
7    Q.   Who else -- strike that. What did you
8 do then?
9    A.   I drafted a letter to Mr. Nail
10 notifying him that, basically notifying him what
11 was happening. I probably drafted it with
12 counsel.
13    Q.   You didn't inform Mr. Kinzel or
14 Mr. Crage about the circumstances?
15    A.   Oh, yes, of course.
16    Q.   Did you do that before or after you
17 contacted the payroll department?
18    A.   Before.
19    Q.   Did you speak to both of them together
20 or separately?
21    A.   Together.
22    Q.   And what was discussed?
23    A.   Just that this, Lester had a job and
24 another position that violated his employment
25 agreement and we needed to cut him off

---

35 (Pages 134 to 137)

Page 138

C. Freeman

1
2 immediately.
3     Q.    You said that to them?
4     A.    That was the gist of the conversation.
5 And then they agreed.
6     Q.    Do you recall anything specifically
7 that either of them said in that conversation?
8     A.    No.
9     Q.    Who proposed cutting off his pay
10 immediately?
11    A.    I mean, that was my first thought.  So
12 I guess it was me.
13    Q.    Did you have the authority to do that
14 without approval from Mr. Kinzel?
15    A.    I think I would have done it and told
16 him I did it.
17    Q.    Told him after it was done.
18    A.    Yes.  That's not what happened, but, I
19 mean, I'm speculating.  Would I have or could I
20 have done it?  Yes, I think so.
21    Q.    You proposed this to Mr. Kinzel and
22 Mr. Crage and they said go ahead?
23    A.    Yes.
24    Q.    What else --
25    A.    That's the gist of the conversation.

Page 139

C. Freeman

1
2     Q.    What else was discussed in that
3 conversation?
4     A.    I don't recall.
5     Q.    Was there any talk of suing Mr. Nail
6 in that conversation?
7     A.    Not in that conversation.  I don't
8 think in that conversation, no.
9     Q.    Do you recall anything else at all
10 about that conversation?
11    A.    No.
12    Q.    Was anyone else present other than the
13 three of you?
14    A.    Yes.
15    Q.    Who?
16    A.    It occurred in the staff meeting, so
17 we had other members of Mr. Kinzel's staff were
18 present.
19    Q.    So it would have been mentioned then
20 in the minutes and notes of the staff meeting?
21         MS. KIRILA:  Objection.  Go ahead.
22    A.    It may be there.  It may not.  I don't
23 know.
24    Q.    Generally things that were
25 discussed -- well, substantive things in the staff

Page 140

C. Freeman

1
2 meeting were recorded in the minutes, correct?
3     A.    The minutes are not very detailed.
4 They are very bulleted, and, um, it may -- things
5 may or may not be in there depending on the
6 context or the level of detail or, you know,
7 whether it rose to, rose to a level that needed
8 follow-up or continuing discussion or anything
9 like that, or action.
10    Q.    As you sit here today do you recall
11 whether that issue was mentioned in the staff
12 meeting minutes?
13    A.    I don't recall.
14    Q.    Do you still have those minutes?
15    A.    I probably do.
16    Q.    Before you cut off Mr. Nail's pay did
17 you take any steps to confirm whether he was
18 employed at Denny's?
19    A.    No.
20    Q.    Did you ever take any steps to contact
21 Denny's to confirm that he was employed there?
22    A.    Not until the lawsuit was active and I
23 guess -- I don't -- I don't recall.  I'm trying to
24 think of the sequence of events here.
25         I don't recall ever contacting

Page 141

C. Freeman

1
2 Denny's.  I mean, through discovery we may have
3 gotten some information with regard to his
4 employment at Denny's, but I don't know that we
5 ever directly contacted Denny's.
6     Q.    So all you knew at the time that you
7 directed that his pay be cut off was that he was
8 working at Denny's, somebody told you.
9     A.    Right.
10    Q.    So after your conversation with
11 Mr. Kinzel and Mr. Crage it was then that you
12 contacted Debbie Thompson to immediately stop
13 payment to Mr. Nail; is that correct?
14    A.    Yes.
15    Q.    How soon after that meeting did you
16 contact payroll?
17    A.    Within a couple of hours.
18    Q.    And then you said you with the
19 assistance of counsel drafted a letter to
20 Mr. Nail; is that correct?
21    A.    Yes.
22    Q.    Was that your idea or someone else's?
23    A.    I don't recall.
24    Q.    Was it discussed, the possibility of
25 sending him a letter, was that discussed in your

36 (Pages 138 to 141)

| | |
|---|---|
| Page 142 | Page 144 |

**Page 142**

```
1                   C. Freeman
2    meeting with Mr. Kinzel and Mr. Crage?
3        A.    No.
4        MR. PAPPAS:  Mark this as Exhibit I.
5        (Defendant's Exhibit I, letter to
6    Lester Nail from Craig Freeman, dated
7    October 19, 2007, Bates No. LES0018, marked
8    for identification, this date.)
9        (A luncheon recess was taken at
10   12:56 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 143**

```
1                   C. Freeman
2    A F T E R N O O N   S E S S I O N.
3        (Time noted:  1:48 p.m.)
4    C R A I G   F R E E M A N , resumed and testified
5        further as follows:
6    EXAMINATION BY (Cont'd.)
7    MR. PAPPAS:
8        Q.    Do you have Exhibit I in front of you?
9        A.    Yes.
10       Q.    I show you what has been marked as
11   Exhibit I.  And you sent this letter to Mr. Nail
12   on or about October 19, 2007; is that correct?
13       A.    Yes.
14       Q.    Did you write it?
15       A.    It was drafted by counsel.  And I
16   forgot to mention that the day before following
17   that meeting I contacted counsel immediately and
18   started consulting with counsel on this matter.
19   So this letter was part of that.
20       Q.    Following the meeting with Mr. Kinzel
21   and Mr. Crage?
22       A.    Yes.
23       Q.    Did you make any revisions to this
24   letter?
25       A.    Not that I recall.
```

**Page 144**

```
1                   C. Freeman
2        Q.    And you reviewed it before you signed
3    it and sent it out, correct?
4        A.    Yes.
5        Q.    Did you discuss the letter with anyone
6    other than counsel?
7        A.    Not that I recall.
8        Q.    That's your signature, correct?
9        A.    Yes.
10       Q.    Did anyone other than you have to
11   approve of this letter before it was sent?
12       A.    No.
13       Q.    Do you know whether Kinzel or Crage
14   ever reviewed the letter before it was sent?
15       A.    No, they didn't.
16       Q.    You know that they did not?
17       A.    I know that they did not.
18       Q.    How do you know that?
19       A.    My recollection is that I worked with
20   counsel on drafting and finalizing it and sending
21   it out and I would not have involved Mr. Kinzel
22   and Mr. Crage in that.
23       Q.    Why not?
24       A.    Because it was pursuant to the
25   conversations we had had the day before.
```

**Page 145**

```
1                   C. Freeman
2        Q.    They knew the letter was going out
3    though, didn't they?
4        MS. KIRILA:  Objection.  Calls for
5        speculation, but you can testify.
6        Q.    Do you know if they knew that the
7    letter such as this was being sent?
8        A.    I don't have a specific recollection
9    of discussing it with either one of them.
10       Q.    Who made the decision to stop paying
11   Mr. Nail under his employment agreement?
12       A.    As I indicated previously, that was my
13   immediate thought and Mr. Kinzel was on board with
14   that.
15       Q.    When did PPI stop making payments to
16   Mr. Nail?
17       A.    Effective with my October 18th call to
18   Debbie Thompson.
19       Q.    So he received all payments through
20   October 18th?
21       A.    All payments that were, that would
22   have been due up to October 18th would have been
23   made.
24       Q.    Were any of those payments
25   subsequently taken out of his bank account via
```

37 (Pages 142 to 145)

Page 146

C. Freeman

1    C. Freeman
2    direct deposit?
3        A.    None of those payments were.
4        Q.    Were any payments ever taken out of
5    his bank accounts by PPI?
6        A.    Not by PPI.
7        Q.    By Cedar Fair?
8        A.    No.
9        Q.    By anyone?
10       A.    I understand based on documentation I
11   have seen that the bank did.
12       Q.    What bank?
13       A.    Whatever bank it was that those
14   deposits were made into.
15       Q.    Mr. Nail's bank?
16       A.    Yes.
17       Q.    At whose direction?
18           MS. KIRILA:  Objection.  Assumes
19   facts, but you can answer based on your
20   role.
21       A.    Our -- based on the order that we made
22   on October 18th, they were unable to make the
23   correction in time.  So before the money was
24   deposited, so an adjustment was made, a correction
25   was made.

Page 147

C. Freeman

1    C. Freeman
2        Q.    I am going to return to that topic in
3    a few minutes.
4            MR. PAPPAS:  First I am going to have
5    this marked as Exhibit J.
6        (Defendant's Exhibit J, letter from
7    Craig Freeman to Lester Nail, October 23,
8    2007, Bates No. LES00019, marked for
9    identification, this date.)
10       Q.    Before looking at J, just take another
11   look at Exhibit I again, the previous letter.
12           Can you take a look at Exhibit I?
13       A.    I'm sorry, yes.
14       Q.    And the second paragraph you say, you
15   will be receiving information regarding your
16   options under COBRA.
17           Do you see that?
18       A.    Yes.
19       Q.    Was Mr. Nail ever given any
20   information regarding his options under COBRA as
21   far as you know?
22       A.    I don't have specific information.
23       Q.    Do you know one way or the other?
24       A.    I don't know one way or the other
25   whether he received that information.

Page 148

C. Freeman

1    C. Freeman
2        Q.    Do you know whether it was sent to
3    him?
4        A.    I have no specific knowledge.
5        Q.    Do you have any general knowledge?
6        A.    All I know is that it was supposed to
7    have been sent to him.
8        Q.    At whose direction?
9        A.    It should have been at the direction
10   of someone on my staff.
11       Q.    I will show you what has been marked
12   as Defendant's Exhibit J.  And this is a letter
13   that you sent to Mr. Nail on or about October 23,
14   2007, correct?
15       A.    Yes.
16       Q.    Did you write this?
17       A.    Yes.
18       Q.    Is that your signature?
19       A.    Yes.
20       Q.    Did you discuss this letter with
21   Mr. Kinzel or Mr. Crage before you sent it?
22       A.    Not to my recollection.
23       Q.    Did you discuss it with anyone before
24   you sent it?
25       A.    I don't know.

Page 149

C. Freeman

1    C. Freeman
2        Q.    Did anyone other than you review it
3    before it went out?
4        A.    I don't know whether I reviewed this
5    with counsel or not.
6        Q.    Other than counsel?
7        A.    Just my assistant.
8        Q.    Your secretary?
9        A.    Yes.
10       Q.    Did anyone have to approve this before
11   it went out?
12       A.    No.
13       Q.    Do you know if Mr. Nail ever received
14   your October 19, 2007 letter, Exhibit I?
15       A.    He received it with this October 23rd
16   letter because we got the return receipt when it
17   was forwarded to his new address.
18       Q.    So you enclosed another copy of the
19   October 19th letter with your October 23rd letter;
20   is that correct?
21       A.    Yes.
22       Q.    Did you ever hear from Mr. Nail after
23   you sent these letters?
24       A.    Yes.
25       Q.    When did you hear from him?

38 (Pages 146 to 149)

Page 150

C. Freeman

1    A.    Within a matter of days.
3    Q.    Between the time that you learned that
4  Mr. Nail was employed at Denny's and the time you
5  sent out these letters did you make any attempt to
6  contact Mr. Nail?
7    A.    No.
8    Q.    As far as you know did anyone at PPI
9  or Cedar Fair make any attempt to contact Mr. Nail
10  during that time period?
11    A.    No.
12    Q.    As far as you know?
13    A.    I'm sorry, I said no.
14    Q.    I am sorry, I didn't hear you.
15          How soon after you sent out the
16  October 23, 2000 letter, Exhibit J, did you hear
17  from Mr. Nail?
18    A.    My recollection is it was within a
19  matter of days.
20    Q.    Did you hear from him before or after
21  you received the return receipt?
22    A.    I don't know.
23    Q.    When you heard from Mr. Nail he called
24  you, correct?
25    A.    That's my recollection, yes.

Page 151

C. Freeman

2    Q.    How long did that initial conversation
3  last?
4    A.    I don't remember.
5    Q.    Do you recall what was discussed in
6  that initial conversation?
7    A.    We had more than one conversation
8  during that time frame and I -- I couldn't tell
9  you what was said in one versus another.
10    Q.    How many conversations did you have
11  after you sent out the October 23rd, 2007 letter?
12    A.    If I had to pick a number, I'd say
13  three.
14    Q.    You're saying that you can't
15  distinguish what was said in one of those
16  conversations as opposed to the other?
17    A.    Not specifically, no.
18    Q.    Can you tell me generally then what
19  was, whatever you remember was said in any of
20  those conversations?
21    A.    Sure.  Mr. Nail indicated that he had
22  looked for a position -- he had looked for a job
23  because he was concerned about providing for his
24  family.  He at one time said age discrimination
25  was an issue for him.

Page 152

C. Freeman

2          He indicated that he contacted a
3  former, I believe it was a former boss that he had
4  worked for and I think he was just -- he was going
5  to use this person for a reference and ended up
6  getting a job offer and that it was not
7  necessarily a job that he would have gone out and
8  sought, but it was -- it was a job, and he
9  indicated that he felt that the contract language
10  was ambiguous and that there was no intent on his
11  part to do anything wrong, that he would, he would
12  come up and personally meet with Dick and Peter
13  and tell them that.
14          He said that the bank transaction that
15  you referred to earlier was a mistake on our part,
16  that he had consulted with his counsel and felt he
17  had a very strong case.  He said -- I'm sorry that
18  this is not -- this is according to how it's
19  coming to mind, not necessarily chronologically,
20  so I apologize for that.
21    Q.    I understand.
22    A.    He indicated at one point that if all
23  we were looking to do was not pay the remainder of
24  his employment agreement and just call it even so
25  to speak, that he would be OK with that.

Page 153

C. Freeman

2          That's my recollection of those
3  conversations during that time frame.
4    Q.    What was your side of those
5  conversations?
6    A.    I, um, told Mr. Nail that we felt that
7  he needed to pay us back for what we had paid him
8  since he became employed.  I asked him when he
9  became employed.  And he eventually shared that
10  information, which I didn't mention earlier.
11          I told him that other executives that
12  were on contracts had found other employment, but
13  he was the only one who did not contact me.
14          I told him that I had talked to Dick
15  Kinzel about the situation and that Dick had
16  indicated that the way to resolve this was to
17  write a check to pay us the full amount.  Pay PPI
18  the full amount.
19          This goes back and forth a little bit,
20  but Lester said, you know, indicated to me that if
21  we were to file a lawsuit that he would file a
22  counterclaim.  We would probably end up in
23  mediation.
24          That's pretty much the extent of my
25  recollection of the conversations.

39 (Pages 150 to 153)

Page 154

C. Freeman

1
2      Q.    Were all these conversations strictly
3  between the two of you or was anyone else
4  involved?
5      A.    On my side they were strictly between
6  the two of us.  I was the only one on my side of
7  the conversation.
8      Q.    Do you know if anyone was present with
9  Mr. Nail on his side of the conversation?
10      A.    I was under the impression that there
11  was no one else present.
12      Q.    You mentioned that Mr. Nail told you
13  that age discrimination was an issue for him.  Do
14  you know what he was referring to?
15      A.    He didn't elaborate and we didn't
16  discuss it in any great length.  He just made a
17  statement to the extent that, you know, I can tell
18  you that age discrimination is alive and well.
19      Q.    And as a person in charge of the HR
20  function you didn't ask him any follow-up
21  questions as to what he meant by age
22  discrimination?
23      A.    Not that I recall.
24      Q.    And then you mentioned that Mr. Nail
25  said that he had contacted a former boss for a

Page 155

C. Freeman

1
2  reference and got a job offer.  Was he referring
3  to Denny's?
4      A.    Yes.
5      Q.    Do you know who the former boss was?
6      A.    No.
7      Q.    And according to you Mr. Nail said
8  that the Denny's job was not necessarily a job
9  that he would have sought, but it was a job.  He
10  was referring to his Denny's job, correct?
11      A.    Yes.
12      Q.    Was it your impression that Mr. Nail
13  wasn't crazy about his job at Denny's?
14      A.    My impression was that it was not a
15  job that he would have gone out for and applied
16  for.  We didn't talk about his current level of
17  satisfaction with the position.
18      Q.    Did you get the impression that he
19  would have left Denny's if he had got a better
20  offer somewhere else?
21      A.    I didn't really form an impression one
22  way or the other.
23      Q.    You said Mr. Nail told you that he
24  felt his employment contract was ambiguous; is
25  that correct?

Page 156

C. Freeman

1
2      A.    That's what he said.
3      Q.    Do you know what provision he was
4  referring to specifically?
5      A.    I don't recall that we got that
6  specific in our conversation.
7      Q.    Did you have any response to that
8  comment?
9      A.    I don't remember.
10      Q.    Did you have any response to
11  Mr. Nail's offer to personally meet with, you said
12  Dick and Peter, I assume that's Mr. Kinzel and
13  Mr. Crage, correct?
14      A.    Yes.
15      Q.    Did you have any response to his offer
16  to meet with them?
17      A.    I believe I told him I would carry
18  that message forward.
19      Q.    And did you?
20      A.    Yes.
21      Q.    And what was their response?
22      A.    Really it would have been Mr. Kinzel.
23  Mr. Crage was directly involved, but he was not
24  interested in that.
25      Q.    So Mr. Kinzel told you he did not wish

Page 157

C. Freeman

1
2  to meet with Mr. Nail; is that correct?
3      A.    Right.
4      Q.    Did you have any response to
5  Mr. Nail's comment concerning the bank withdrawal
6  transaction?  Where he said it was a mistake on
7  PPI's part.
8      A.    Not that I recall.
9      Q.    Did you have any response to his
10  comment that he would be willing to accept it if
11  PPI stopped paying him on a going forward basis?
12      A.    Getting back to the chronology of
13  these discussions, I believe that that was in --
14  that was early on before I knew what his
15  employment date with Denny's was.
16          At the time my thinking was that if we
17  were not talking about a material amount of time
18  here, you know, because again, my understanding
19  was that the, that as of June he was still
20  unemployed, so rolling forward from this, by the
21  time you find a job and start, and so forth, we
22  might have been talking about a month or so, that
23  maybe that would have been a possibility.  And I
24  could have recommended that.
25          But it really didn't go anywhere based

40 (Pages 154 to 157)

Page 158

```
1              C. Freeman
2    on when Mr. Nail actually started his other
3    employment.
4        Q.   When did he tell you he started at
5    Denny's?
6        A.   Do you mean what start date?
7        Q.   Did he tell you what start date he
8    started at Denny's?
9        A.   He did tell me in a subsequent
10   conversation, yes.
11       Q.   When did he say he started?
12       A.   He said he started February 23rd of
13   2007.
14       Q.   Did you have any response to
15   Mr. Nail's comment that he would file a
16   counterclaim and that the case would probably end
17   up in mediation?
18       A.   I don't remember what my response was.
19       Q.   You mentioned that you told Mr. Nail
20   that the other executives with contracts who had
21   found other employment contacted you?
22       A.   Yes.
23       Q.   Who was that?
24       A.   Who were the other executives that
25   contacted me?
```

Page 159

```
1              C. Freeman
2        Q.   Correct.
3        A.   Mr. Thornton, Mr. Fisher, Mr. --
4    Mr. Weber. But he didn't contact me. He
5    contacted Mr. Kinzel.
6        Q.   Anyone else?
7        A.   Mr. Kaetzel contacted me, but that was
8    subsequent to this conversation.
9        Q.   Anyone else?
10       A.   Do you have the names again? Because
11   if you can read them back to me or refresh my
12   memory?
13       Q.   Weber, Fisher, Koontz, Thornton,
14   Petit, Jones, Kaetzel and White.
15       A.   Petit.
16       Q.   Were those notifications oral or in
17   writing?
18       A.   You know, I know there were e-mails
19   and telephone calls and I don't know what happened
20   first, what the initial contact was. But they
21   were both.
22       Q.   Did each of those individuals get a
23   job in the theme park or water park industry?
24       A.   I believe so. I'm not specifically
25   aware of what Mr. Thornton's position is, but the
```

Page 160

```
1              C. Freeman
2    others were in the industry.
3        Q.   When PPI learned that those
4    individuals had notified them that they had such
5    employment, did PPI continue to pay any of those
6    individuals under their agreements?
7             MS. KIRILA:  I am just going to object
8        to the extent they have differing contracts
9        from Mr. Nail, but you can answer that
10       question.
11       A.   All of them -- all of them contacted
12   me in advance of accepting those positions.
13       Q.   And once they accepted the positions
14   did PPI continue to pay them under their
15   contracts?
16       A.   No.
17       Q.   Did you discuss your various
18   conversations with Mr. Nail with anyone?
19       A.   Mr. Kinzel.
20       Q.   What about Mr. Crage?
21       A.   I don't recall that I did.
22       Q.   Did you communicate to Mr. Kinzel the
23   substance of what you and Mr. Nail had discussed?
24       A.   Yes.
25       Q.   Did you leave anything out?
```

Page 161

```
1              C. Freeman
2        A.   I'm sure I summarized. I don't -- I
3    don't know specifically, you know, line by line
4    what we talked about, but it was the substance as
5    you said.
6        Q.   Other than saying that he did not want
7    to meet with Mr. Nail, did Mr. Kinzel have any
8    other comments regarding your summary of your
9    conversations with Mr. Nail?
10       A.   We discussed the issue of whether we
11   would accept Mr. Nail's proposal of discontinuing
12   payment and not seeking anything, any repayment.
13   And that was contingent upon determining how long
14   Mr. Nail had been employed.
15       Q.   Once you determined that did you have
16   any further conversations with Mr. Kinzel about
17   that issue?
18       A.   I'm sure I did.
19       Q.   What was discussed?
20       A.   It was too long a period of time to
21   ignore.
22       Q.   Was that your view or his view?
23       A.   That was what we discussed.
24       Q.   Do you recall who first advanced that
25   view in your discussion?
```

41 (Pages 158 to 161)

Page 162

C. Freeman

1
2    A.    When I found out the date, I knew that
3    it was too long a time frame and so the next time
4    we had the conversation I just pretty much
5    notified Mr. Kinzel that that is what I had found
6    out and that therefore we had to pursue getting
7    repayment.
8    Q.    And he agreed with that?
9    A.    Yes.
10    Q.    Did you tell anyone other than
11    Mr. Kinzel about your discussion with Mr. Nail?
12    A.    The -- well, do I have a specific
13    recollection?  No.
14    Q.    Do you recall generally discussing it
15    with anyone?  Other than Mr. Kinzel?
16    A.    I don't have a specific recollection
17    of discussing it with anyone else.
18    MR. PAPPAS:  Mark this as K.
19    (Defendant's Exhibit K, 3-page
20    handwritten notes with some redacted
21    portions, Bates Nos. PPI00762 through 764,
22    marked for identification, this date.)
23    Q.    I show you what has been marked as
24    Defendant's Exhibit K.  Can you tell me what this
25    is?

Page 163

C. Freeman

1
2    A.    These are my notes from my
3    conversations with Mr. Nail.
4    Q.    The conversations that you just
5    testified about?
6    A.    Yes.
7    Q.    This is all your handwriting other
8    than the stamp that says redacted privileged?
9    A.    Yes.
10    Q.    Now, the first entry on your notes is
11    dated October 30th.
12    Do you see that?
13    A.    Yes.
14    Q.    Is that your first conversation with
15    Mr. Nail after you sent him the October 23rd
16    letter?
17    A.    I believe so.
18    Q.    And the number next to his name, is
19    that his home phone number?
20    A.    I believe that's his cell phone
21    number.
22    Q.    Can you read that first line?
23    A.    "Where are we going with this?"
24    Q.    What does that refer to?
25    A.    That was a question he asked.

Page 164

C. Freeman

1
2    Q.    Did you respond to that?
3    A.    I'm sure I did.
4    Q.    Do you recall what your response was?
5    A.    No, I don't.
6    Q.    Can you read the next line?
7    A.    "Disagrees with our interpretation of
8    the agreement."
9    Q.    That's something Mr. Nail said?
10    A.    Yes.
11    Q.    Do you recall your response to that?
12    A.    No.
13    Q.    Do you know what that refers to
14    specifically?
15    A.    The employment agreement.
16    Q.    Do you know what interpretation he is
17    talking about?
18    A.    That we were entitled to -- that he
19    had violated the employment agreement by virtue of
20    accepting the position with Denny's.
21    Q.    Anything else?
22    A.    I believe that's the interpretation we
23    were, that we were discussing.
24    Q.    And the next line I believe says
25    "contract poorly written, ambiguous," correct?

Page 165

C. Freeman

1
2    A.    Yes.
3    Q.    That again was Mr. Nail's comment?
4    A.    Yes.
5    Q.    And you don't recall your response to
6    that, correct?
7    A.    No.
8    Q.    Not correct or you don't recall?
9    A.    I don't recall.
10    Q.    Then it says, "what can we do?"  Did I
11    read that correctly?
12    A.    "What can we do?"  Yes.
13    Q.    And what does that refer to?
14    A.    I believe this was Lester asking me,
15    you know, what can we do to resolve this.
16    Q.    Did you have a response to that?
17    A.    I don't recall what I said.
18    Q.    What does the next line say?
19    A.    I started to make a note that I didn't
20    complete because I was trying to make notes as
21    Lester was talking.  "Factual things nullify if,"
22    and I don't know where, I don't know what would
23    complete that thought.
24    Q.    Do you have any idea what the first
25    part refers to, "factual things nullify"?

42 (Pages 162 to 165)

Page 174

C. Freeman

1    C. Freeman
2    didn't point out 7(c) in the employment agreement
3    to him.
4        Q.    Did you have any response to that?
5        A.    I don't recall.
6        Q.    Then the next entry I believe says
7    "made mistake taking money out of my checking
8    account"; is that correct?
9        A.    Yes.
10       Q.    That's what you referred to earlier
11   before I gave you these notes?
12       A.    Yes.
13       Q.    There's a block that's blocked out and
14   it says:  Redacted - privileged.
15           Do you see that?
16       A.    Yes.
17       Q.    Who were those notes to?
18       A.    I, through this entire process I was
19   continuously checking with and consulting with my
20   counsel, and so I would in my conversations with
21   counsel I would make notes that were related to
22   this and that's what these sections were.
23       Q.    So all of the ones that are blacked
24   out on this page you're writing about your
25   communications with counsel?

Page 175

1    C. Freeman
2        A.    Yes.
3        Q.    Is there anything other than that
4    that's blocked out?
5        A.    No.
6        Q.    Were those communications on that same
7    day?
8        A.    I don't know.  They would have had
9    dates associated with them.
10       Q.    Did you distribute these notes to
11   anyone?
12       A.    No.
13       Q.    The next date entry is for
14   November 27, 2007, correct?
15       A.    Yes.
16       Q.    And I believe it says "left Lester a
17   VM."  Well, why don't you read it?  I can't really
18   read it.
19       A.    "Left Lester a voice mail, VM, voice
20   mail, that we have filed a complaint."
21       Q.    And by complaint you mean the court
22   complaint in this action?
23       A.    Yes.
24       Q.    And why did you let Mr. Nail know that
25   a complaint had been filed?

Page 176

1    C. Freeman
2        A.    Upon consultation with Mr. Kinzel
3    regarding this matter, we decided that we were
4    going to proceed with a complaint and he
5    suggested, he actually suggested that I contact
6    Mr. Nail and give him a heads up so that he didn't
7    just get it cold.
8        Q.    When was the first time you discussed
9    the possibility of filing a court action against
10   Mr. Nail with Mr. Kinzel?
11       A.    I don't recall.
12       Q.    Was it prior to your conversations
13   with Mr. Nail which began on October 30th or
14   subsequent to that?
15       A.    I don't know.
16       Q.    It was after the decision was made to
17   stop making payments to Mr. Nail, correct?
18       A.    Yes.
19       Q.    Sometime between that date, which is
20   about October 18th, and November 27th, a decision
21   was made to sue Mr. Nail?
22       A.    Yes.
23       Q.    I don't want you to tell me about any
24   conversations where counsel was present.
25           Did you have any other conversations

Page 177

1    C. Freeman
2    with Mr. Kinzel regarding potentially or actually
3    suing Mr. Nail?
4        A.    It would have been just very brief,
5    general updates concerning the status and moving
6    ahead.
7        Q.    Who brought up the idea of suing
8    Mr. Nail first?
9        A.    Mr. Kinzel.
10       Q.    Do you recall when that was?
11       A.    No.
12       Q.    Do you recall what he said?
13       A.    Not specifically.
14       Q.    Do you recall generally what he said
15   other than bringing up the idea?
16       A.    No.
17       Q.    Did you have any response to him
18   bringing up the idea?
19       A.    I discussed with Mr. Kinzel the
20   potential for settling.
21       Q.    What was discussed about that?
22       A.    Just the value of the suit in terms of
23   the court costs and legal fees and so forth versus
24   the recovering full amount and, you know, what
25   would make sense.

45 (Pages 174 to 177)

Page 178

C. Freeman

1  
2    Q.    What was --
3    A.    From a, strictly from a cost
4  standpoint.
5    Q.    What was your view and what was his
6  view on that issue?
7    A.    I was probing. I was simply probing
8  and his response was we want back everything we're
9  entitled to.
10   Q.    Do you recall anything else about any
11 other discussions you had with either Mr. Kinzel
12 or Mr. Crage regarding suing Mr. Nail?
13       MS. KIRILA:  Objection. Outside the
14   presence of counsel you can answer.
15       MR. PAPPAS:  Correct.
16   A.    No.
17   Q.    Who ultimately made the decision to
18 sue Mr. Nail, do you know?
19   A.    Mr. Kinzel.
20   Q.    How do you know that?
21   A.    Because I was reporting directly to
22 him on the matter and he would have had to approve
23 that actually.
24   Q.    The last page of your notes --
25   A.    I'm sorry, I just want to elaborate a

Page 179

C. Freeman

1  
2  little bit.
3    Q.    Certainly.
4    A.    This was all of course with advice and
5  consultation with counsel through the process as
6  well in terms of, you know, whether -- whether,
7  um, what type of suit would be filed and that sort
8  of thing. Where it would have to be filed and,
9  you know, just the technicalities and mechanics.
10   Q.    The last page of your notes, the first
11 entry is November 29th, 2007, correct?
12   A.    Yes.
13   Q.    Do you know what that little equal
14 sign is next to that?
15   A.    Yes, I wasn't absolutely sure that
16 that was the date. So I just indicated it was on
17 or about November 29th because I made this note
18 after the conversation.
19   Q.    The previous notes were made during
20 the conversations?
21   A.    Yes.
22   Q.    And this particular note 11/29 was
23 made sometime after that conversation?
24   A.    Yes.
25   Q.    How soon after?

Page 180

C. Freeman

1  
2    A.    It would have been before the next
3  conversation, which was on the 7th or the next
4  voice mail. So sometime between those two dates.
5    Q.    Can you read the first entry under
6  11/29?
7    A.    "Lester returned call; appreciated
8  heads up."
9    Q.    That refers to you letting him know
10 that the lawsuit was filed?
11   A.    Yes.
12   Q.    Can you read the next entry?
13   A.    "Reiterated there was no intent on his
14 part to violate the agreement and he doesn't
15 believe he did."
16   Q.    Do you have any response to that?
17   A.    I don't recall.
18   Q.    Next entry?
19   A.    "Will come here and look Dick, slash,
20 Peter in the eye and tell them that."
21   Q.    So he is again offering to come and
22 speak to Mr. Crage and Mr. Kinzel; am I correct?
23   A.    That wasn't an again. This was the
24 comment that I referred to earlier before you gave
25 me these notes.

Page 181

C. Freeman

1  
2    Q.    So that was the first time he
3  mentioned that?
4    A.    As far as I can recall, yes.
5    Q.    Did you have any response to that?
6  When you told him that you would send that along.
7  Other than that did you have any response?
8    A.    Not that I recall.
9    Q.    Can you read the next entry?
10   A.    "Discussed whether there is room to
11 negotiate; told him I would talk to Dick."
12   Q.    Mr. Nail was asking you if there was
13 room to negotiate?
14   A.    Yes.
15   Q.    Did you have authority to negotiate at
16 that point?
17   A.    No.
18   Q.    You said you would talk to Dick.
19 That's Mr. Kinzel, correct?
20   A.    Yes.
21   Q.    And then the last line says "He said
22 his New York attorney says he has a very strong
23 case"?
24   A.    Feels.
25   Q.    "Feels he has a very strong case." Do

46 (Pages 178 to 181)

Page 190

C. Freeman

1          C. Freeman
2      Q.  It's not a competitor of the industry
3  that PPI or Cedar Fair is in, is it?
4      A.  No.
5      Q.  It's a restaurant chain, right?
6      A.  Yes.  PPI has restaurants.
7      Q.  Within its hotels or within its parks?
8      A.  Both.  I'm sorry, PPI has no hotels.
9  Cedar Fair has hotels.
10      Q.  Other than those restaurants -- how
11  many restaurants are there?
12      A.  In the hotels or adjacent to the
13  hotels?
14      Q.  Any restaurant operated by PPI or
15  Cedar Fair.
16      A.  Many, many, many, many, many.
17      Q.  And those are on the properties of the
18  various amusement parks and water parks?
19      A.  Yes.
20      Q.  And they're in the nature of
21  concession stands and things like that?
22      A.  No.  For example, at Knott's Berry
23  Farm we have a TGI Friday's that operates on the
24  property but outside the park that's accessible to
25  anybody off the street.

Page 191

C. Freeman

1          C. Freeman
2  There's also a Chicken Dinner
3  Restaurant, full service restaurant at that
4  facility at that location and again, it's outside
5  the park.  It's not part of the gated admission
6  price.  It is available to anybody.
7      Cedar Point has TGI Friday's outside
8  the park accessible to anybody.
9      Famous Dave's, outside the park.
10  Knott's also has restaurants in their hotel that
11  are accessible to anybody.
12      Q.  Do they operate restaurants
13  independently of the parks?  Restaurants other
14  than that are either on the property of the park
15  or adjacent to the park.
16      A.  The TGI Friday's in Sandusky is
17  located at a hotel property owned by Cedar Fair,
18  but about, I don't know, two, three miles away
19  from the park.
20      Q.  Other than that?
21      A.  No.
22      Q.  Assuming that he had the time to do
23  both, is there anything inherently inconsistent
24  with Mr. Nail performing services for PPI while
25  being employed by Denny's?

Page 192

C. Freeman

1          C. Freeman
2      MS. KIRILA:  Objection.  That's the
3  basis of the suit.  You can answer.
4      Q.  In your view is there anything
5  inherently inconsistent with him performing
6  services for both, assuming he had the time to do
7  both?
8      A.  Assuming he had the time to do both,
9  no.
10      Q.  To your knowledge would PPI -- was PPI
11  involved in any litigation against Denny's?
12      A.  Not to my knowledge.
13      Q.  What about Cedar Fair?
14      A.  Not to my knowledge.
15      Q.  Do you have any knowledge one way or
16  the other whether Mr. Nail would have been willing
17  or able to cease his Denny's employment if he had
18  been requested to perform services for PPI during
19  the contract term?
20      MS. KIRILA:  Object to the extent it
21  calls for a definition of a legal term in a
22  contract, but you can answer.
23      A.  I have no such knowledge.
24      Q.  If Mr. Nail had been willing to cease
25  his Denny's employment at any time if asked to

Page 193

C. Freeman

1          C. Freeman
2  perform services for PPI, do you contend that his
3  Denny's employment still rendered him unable to
4  perform services for PPI?
5      MS. KIRILA:  Same objection.  But you
6  can answer.
7      A.  Could you please repeat the question?
8      Q.  Sure, if Mr. Nail had been willing and
9  able to stop working at Denny's at any time if
10  asked to perform services for PPI, would his mere
11  employment by Denny's have rendered him unable to
12  perform exclusive services for PPI?
13      MS. KIRILA:  Same objection.
14      A.  Not from the point he would have
15  terminated his employment with Denny's.
16      Q.  In March '08 Cedar Fair hired Duffield
17  Milkie as corporate vice president and general
18  counsel; is that correct?
19      A.  February.
20      Q.  February 2008?
21      A.  Yes.
22      Q.  Do you know who hired Mr. Milkie?
23      A.  Cedar Fair.
24      Q.  Do you know the person who hired
25  Mr. Milkie?

49 (Pages 190 to 193)

Page 194

C. Freeman

1
2     A.    He was selected by Mr. Kinzel.
3     Q.    Do you know why he was hired?
4     A.    He was hired to become corporate vice
5  president and general counsel for Cedar Fair LP.
6     Q.    They had never had that type of
7  position before, correct?
8     A.    Correct.
9     Q.    Did you discuss Mr. Milkie's hiring
10  with anyone?
11     A.    Talked with Mr. Crage, Mr. Kinzel. HR
12  director, my assistant.
13     Q.    Was that before or after he was hired?
14     A.    Before, during and after.
15     Q.    Did you have any input into his
16  hiring?
17     A.    I did not interview Mr. Milkie.
18     Q.    Other than interviewing him did you
19  have any input into his hire?
20        MS. KIRILA: Objection. He testified
21  you did not interview him.
22        THE WITNESS: No.
23     Q.    You can have input other than
24  interviewing someone. So I am asking other than
25  interviewing did you have any input?

Page 195

C. Freeman

1
2     A.    I expressed my opinion. You know,
3  input is given and input is taken and I don't know
4  how much my opinion was considered.
5     Q.    What was your opinion, that general
6  counsel should or should not be there?
7     A.    I felt that the position was
8  necessary.
9     Q.    Do you know when Cedar Fair first
10  considered hiring Mr. Milkie?
11     A.    First considered. The very -- the
12  very first contact that I'm aware of between
13  Mr. Milkie and Cedar Fair regarding a position was
14  in the summer of 2007.
15     Q.    But he wasn't hired until February '08
16  you said?
17     A.    Right.
18     Q.    I want to go back to the reversal of
19  the direct deposit. Did you authorize that?
20     A.    Yes. I authorized -- I authorized
21  stopping the payment of the paycheck that was to
22  be paid on the 19th.
23     Q.    Who authorized the reversal of the
24  direct deposit?
25     A.    I guess that would be me. Because the

Page 196

C. Freeman

1
2  bank could not process my order from the 18th
3  before the money went into the account.
4     Q.    So the money was already in the
5  account and you authorized the -- who did you
6  authorize to take the money out of the account?
7        MS. KIRILA: Object to form. Compound
8  question.
9     Q.    The money was already in the account,
10  correct?
11     A.    Not when I -- not when I directed that
12  the payment be stopped.
13     Q.    Right, but they couldn't stop it in
14  time and some more money got put into the account,
15  correct?
16        MS. KIRILA: Objection. To the extent
17  you know.
18     Q.    Isn't that what you just testified to?
19     A.    The money could not be stopped from
20  going into the account based on the timing of my
21  order to stop the payment.
22     Q.    And if it could not be stopped from
23  going into the account that means that it went
24  into the account, correct?
25     A.    To my knowledge, it did.

Page 197

C. Freeman

1
2     Q.    Then what happened?
3     A.    Based on my order to stop the payment
4  on the 18th, a correction was made to reverse it.
5     Q.    Who made that correction?
6     A.    The bank.
7     Q.    Who communicated that to the bank?
8     A.    Debbie Thompson.
9     Q.    Who is Debbie Thompson?
10     A.    Payroll manager.
11     Q.    Of Cedar Fair?
12     A.    PPI.
13     Q.    PPI? Reports to you?
14     A.    No.
15     Q.    Who does she report to?
16     A.    I believe she reports to Les --
17        THE WITNESS: What is Les's last name,
18  Lester? Les in IT?
19        MS. KIRILA: You can testify to your
20  knowledge.
21     A.    Les in IT.
22        MR. PAPPAS: Can you mark this as
23  Exhibit M.
24        (Defendant's Exhibit M, e-mail from
25  Craig Freeman to Debbie Thompson, dated

50 (Pages 194 to 197)

Page 198

```
 1                  C. Freeman
 2        October 27, 2007 and e-mail from Thompson to
 3        Freeman, dated October 25, 2007, Bates No.
 4        PPI000103, marked for identification, this
 5        date.)
 6        Q.    I show you what has been marked as
 7     Defendant's Exhibit M.  The top portion is an
 8     e-mail that you sent to Debbie Thompson on
 9     October 27, 2007; is that correct?
10        A.    Yes.
11        Q.    And what does that refer to?
12        A.    This refers to my notifying her on
13     Thursday, October 18th, that Lester was not to be
14     paid.
15        Q.    And the e-mail below that is from
16     Debbie Thompson to you and you received on
17     October 25, 2007; is that correct?
18        A.    Yes.
19        Q.    What does her e-mail refer to?
20        A.    Her e-mail refers to the correction
21     being made.  To reverse the direct deposit.
22        Q.    So after the direct deposit was
23     reversed that meant that Mr. Nail had only been
24     paid through the end of September, 2007; is that
25     correct?
```

Page 199

```
 1                  C. Freeman
 2        A.    Yes.
 3        Q.    Did you attempt to get Mr. Nail's
 4     authorization to take that money out of his
 5     personal bank account?
 6        A.    When I gave the direction, the money
 7     was not in the account.
 8        Q.    Before it was removed did anyone at
 9     the company try to get Mr. Nail's authorization to
10     do that?
11        A.    Not that I know of.
12        MR. PAPPAS:  Mark this as Exhibit N.
13        (Defendant's Exhibit N, e-mail from
14     Sandy Cranford to Craig Freeman, dated
15     November 19, 2007, Bates No. PPI000765,
16     marked for identification, this date.)
17        Q.    I show you what has been marked as
18     Defendant's Exhibit N as in Nancy.
19        This is an e-mail from you -- from
20     Sandy Cranford to you dated November 19, 2007,
21     correct?
22        A.    Yes.
23        Q.    Do you know whose handwriting that is?
24        A.    Mine.
25        Q.    And what does this e-mail refer to?
```

Page 200

```
 1                  C. Freeman
 2        A.    This was to calculate the value of the
 3     salary and benefits that we had overpaid between
 4     February 23rd of 2007 and September 30th of 2007.
 5        Q.    And what was the value?
 6        A.    $99,000 plus $7,983.50.
 7        Q.    Isn't that the salary and benefits
 8     combined?
 9        A.    Yes.
10        Q.    What is just the benefits?
11        A.    $7,983.50.
12        Q.    Is that accurate as far as you know?
13     Sitting here today.
14        A.    It does not reflect any payroll taxes
15     that would have been paid.
16        Q.    It reflects medical and dental,
17     correct?
18        A.    Life, AD and D.
19        Q.    Everything except payroll taxes?
20        A.    Everything that I'm aware of,
21     everything that I was told.
22        Q.    So other than the salary that you say
23     Mr. Nail was overpaid, and other than the payroll
24     taxes, the amount as far as the value of benefits
25     you would say he owes is what?
```

Page 201

```
 1                  C. Freeman
 2        A.    According to this calculation,
 3     7,983.50.
 4        Q.    Did you and Mr. Crage ever exchange
 5     e-mails about the Lester Nail situation?
 6        A.    Not that I recall.
 7        Q.    Are you aware of any documents that
 8     were in existence relating to Lester Nail's
 9     situation that were deleted?
10        A.    No, I'm not.
11        Q.    Are you aware of any that were
12     destroyed?
13        A.    No, I'm not.
14        Q.    Are you aware of any that were lost?
15        A.    No, I'm not.
16        MR. PAPPAS:  Could we just take a
17     quick break?
18        MS. KIRILA:  Yes.
19        (A recess was taken from 3:09 through
20     3:15 p.m.)
21     BY MR. PAPPAS:
22        Q.    I just have a couple of more
23     questions.  Did you ever speak to anyone who was
24     formerly at CBS regarding the meaning of
25     Mr. Nail's employment agreement?
```

51 (Pages 198 to 201)

# DECLARATION OF
# A. MICHAEL WEBER

## EXHIBIT 2



*Paramount Parks*

July 27, 2006

PLF
EXHIBIT NO.
TRN        FOR ID  _C_
           4-23-08

Mr. Lester C. Nail
9027 Kirkley Court
Charlotte, North Carolina 28277

Re:    Notice of Termination of Employment

Dear Mr. Nail:

On June 30, 2006 (the "Closing Date"), Bombay Hook LLC and CBS Corporation finalized the transaction with Cedar Fair, L.P. and Magnum Management Corporation (the "Company"), (collectively, the "Cedar Fair Entities"), pursuant to which the Company acquired 100 percent of the outstanding shares of capital stock of Paramount Parks Inc. ("PPI") As a result, your employment agreement, effective as of January 1, 2006 ("Employment Agreement"), has become the benefit and obligation of PPI, as legal successor and/or assign.

Please be advised that PPI has determined that your services will no longer be needed after August 1, 2006. Accordingly, this letter is your notice under your Employment Agreement that your employment is terminated without cause as of August 1, 2006, and that you will be entitled to receive, subject to applicable taxes and withholdings, and subject to any other terms of the Employment Agreement, the amounts identified in paragraph 7(c) of your Employment Agreement. PPI reminds you of both (1) your non-compete obligations under paragraph 11 of the Employment Agreement, and (2) the "willing, ready and able to render exclusive services" requirement of paragraph 7(c), and any other post-termination obligations of the Employment Agreement.

PPI is currently considering making an alternative separation proposal to you, which would incorporate a lump sum severance payment, along with other terms in a separation agreement. You will hear from PPI in the near future should it decide to present an alternative separation proposal to you. Should you have any questions, please contact Paramount Parks Inc. c/o Craig Freeman, Cedar Fair, L.P., One Cedar Point Drive, Sandusky, Ohio 44870, (419) 627-2391.

Very truly yours,

Richard L. Kinzel
President
Paramount Parks, Inc.

5720 Red Oak Boulevard · Suite 315 · Charlotte NC 28217 · 704 561 4100 p / 704 525 3960 f
*paramountparks.com*

LES00015

# DECLARATION OF
# A. MICHAEL WEBER

# EXHIBIT 3

**From:** Weber, Michael
**Sent:** Wednesday, April 16, 2008 12:20 PM
**To:** 'Kirila, Jill S.'
**Subject:** RE: PPI v. Nail

I need an answer to my question by tomorrow.

**From:** Weber, Michael
**Sent:** Tuesday, April 15, 2008 3:04 PM
**To:** Kirila, Jill S.
**Subject:** RE: PPI v. Nail

Jill,

On behalf of our client, we reject your offer.

Please confirm in writing that the two individuals you claim have no knowledge of the facts in this case will not testify in the trial.

Michael

# DECLARATION OF
# A. MICHAEL WEBER

# EXHIBIT 4

1                    UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK
2
                                      .
3   PARAMOUNT PARKS, INC.,            .    Case No. 07-cv-10595-SHS
                                      .
4                    Plaintiff,       .
                                      .
5              vs.                    .    New York, New York
                                      .    Friday, February 29, 2008
6   LESTER NAIL,                      .
                                      .
7                    Defendant.       .
    . . . . . . . . . . . . . .       .
8
                    TRANSCRIPT OF PRETRIAL CONFERENCE
9             BEFORE THE HONORABLE SIDNEY H. STEIN
                    UNITED STATES MAGISTRATE JUDGE
10
    APPEARANCES:   (On the Record)
11
    For the Plaintiff:         Jill Suzanne Kirila, Esq.
12                             SQUIRE, SANDERS & DEMPSEY, LLP
                               41 South High Street
13                             Columbus, Ohio 43215
14                             Steven Skulnik, Esq.
                               SQUIRE, SANDERS & DEMPSEY, LLP
15                             350 Park Avenue
                               New York, New York 10022
16
    For the Defendant:         A. Michael Weber, Esq.
17                             LITTLER MENDELSON, P.C.
                               885 Third Avenue, 16th Floor
18                             New York, New York 10022
19

20
    Audio Operator:            Electronically Recorded
21                             by Court Personnel
22  Transcription Company:     Rand Reporting & Transcription, LLC
                               80 Broad Street, Fifth Floor
23                             New York, New York 10004
                               (212) 504-2919
24                             www.randreporting.com
25  Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.

14

1        THE COURT:  Ooh, ooh.  All right.

2        MS. KIRILA:  So, even if you assume that there's some

3   argument there, we don't need it, and that's why I'd like to

4   move on those bases as soon as we can, and two of the

5   depositions that were notices this is the CEO and the CFO of a

6   publicly traded company, the parent that bought Paramount

7   Parks, had nothing to do with the underlying contract.

8        In fact, they inherited it, met the obligations when

9   they changed over their executives and so they have no

10  knowledge whatsoever about the terms of Mr. Nail's employment,

11  that contract or how it came about.  They just followed the

12  written letter of it and they expect Mr. Nail to do the same.

13       THE COURT:  But the defendant just said that they had

14  conversations with his client over it.

15       MR. WEBER:  And he signed --

16       THE COURT:  Wait.

17       MS. KIRILA:  May I finish.  Even if there is some

18  argument hat they had conversations with him, that's not going

19  to trump the written word of the agreement.  It has nothing to

20  do with those other sections in paragraph --

21       THE COURT:  No, but if they had conversations with him

22  about the contract, he's entitled -- this is, you know,

23  discovery.  He's entitled to ask them about those

24  conversations.

25       MS. KIRILA:  And it's my understanding there were no

1          MS. KIRILA:  I am, Your Honor.

2          THE COURT:  All right.

3          MS. KIRILA:  Paragraph 5 and Paragraph 11.

4          THE COURT:  All right.  But the parties will work this

5    out.

6          MR. WEBER:  Yes, Your Honor.

7          THE COURT:  Or not.

8          MR. WEBER:  Or not.

9          THE COURT:  Tell me about the -- what you think your

10   client had conversations with the two higher-ups that you

11   wanted to --

12         MR. WEBER:  He did -- he did have conversations, Your

13   Honor, very specific ones with the individuals that we've

14   noticed for depositions.

15         THE COURT:  Okay.  You've noticed their depositions

16   already?

17         MR. WEBER:  Yes, sir.

18         THE COURT:  Okay.  What I want you to do then is to

19   send me a -- and if you feel you've, you know, run the string

20   in terms of talking about this, send me a letter and it will be

21   a letter application, a motion for protective order against the

22   depositions and tell me why that they have no knowledge, they

23   had conversations, and find out from Mr. Weber what -- the

24   reasons why he thinks they have so you can address it up front,

25   and then Mr. Weber respond in a letter, I'll accept those

17

1    representations as representations of your client.  If you want

2    to attach an affidavit of your client, you're certainly

3    entitled to but I still will accept if you don't want to go

4    through that --

5            MR. WEBER:  Well, Your Honor --

6            THE COURT:  -- I'll accept what you say in the letter.

7    Go ahead.

8            MR. WEBER:  I appreciate that you're saying, but I'd

9    like to take these witnesses' deposition first and -- before I

10    necessarily say -- what my client is going to say.  I'd like to

11    pin them down before they hear what my client is going to say.

12    That's my right --

13            THE COURT:  Okay.  But here's -- I understand that

14    also, but they're going to move for a protective order, and

15    their motion is going to be these people have absolutely

16    nothing to say about this, and they're mucks-a-mucks, and -- I

17    don't mean that pejoratively.  I mean, you know, they are major

18    officers of a public -- public corporation, and there are

19    57,000 employees who sue them, you know, they're busy men.

20    That's what you're going to be saying, and they shouldn't have

21    to come away from what they do for you.  You can in part

22    undercut that in your response if you want and say we'll go

23    there and we'll go to their suites so their time isn't taken.

24    Whatever it is.

25            But, if she says they have absolutely no knowledge,

18

1  that's pretty powerful to me and you're going to have to tell

2  me why you think they do have some knowledge, the extent --

3           MR. WEBER:  I'm fine with that, Your Honor.

4           THE COURT:  -- that you want to disclose the specifics

5  is up to you, but if she says they're higher-ups, they're busy

6  people, they have nothing to do with this, they took it only

7  because the contract came with a company that they purchased.

8  Sounds good to me unless you tell me otherwise.

9           MR. WEBER:  I have no problem with that, Your Honor.

10  My objection is that I had to somehow disclose what my client

11  was going to say first.  I don't have a problem with them

12  making a motion and saying in a sworn affidavit I know nothing.

13  Let them take that position.  Fine with me.  And if they take

14  that position and they say absolutely, we had no conversation

15  with the defendant, no knowledge of this case, nothing

16  whatsoever, then I'll reconsider the affidavit -- I want to see

17  that in an affidavit, Your Honor.

18           THE COURT:  All right.  Then we'll do it, then you

19  both -- then I won't -- I was trying to make it easier for you.

20  Then any factual representations of the client should be made

21  formally in an accompanying affidavit.

22           So we'll go the formal route, don't even do it by

23  letter.  I was trying to make it easier.  Do it by notice of

24  motion.  Okay?

25           MS. KIRILA:  Yes, Your Honor.

22

1  in the other case to get together and see if they could resolve

2  this, but if not, it looks like it will be a very interesting

3  case.  Thank you all.

4         MR. WEBER:  Thank you, Your Honor.

5         MS. KIRILA:  Thank you, Your Honor.

6     (Proceedings concluded)

7                              * * * * *

8                         CERTIFICATION

9         I certify that the foregoing is a correct transcript

10 from the electronic sound recording of the proceedings in the

11 above-entitled matter to the best of my knowledge and ability.

12

13

14        *Kathleen M. Price*

15 _____        May 1, 2008
   Kathleen Price AAERT Cert. No. 325
   Certified Court Transcriptionist
16 Rand Reporting & Transcription, LLC

17

18

19

20

21

22

23

24

25

# DECLARATION OF
# A. MICHAEL WEBER

# EXHIBIT 5

Paramount Parks v. Nail

## Pappas, Michael P.

| | |
|---|---|
| **From:** | Kirila, Jill S. [JKirila@ssd.com] |
| **Sent:** | Tuesday, February 19, 2008 10:21 AM |
| **To:** | Pappas, Michael P. |
| **Cc:** | Weber, Michael; Zancourides, Lori Maiorca; Skulnik, Steven |
| **Subject:** | RE: Paramount Parks v. Nail |

*Counsel,*

*Please be advised that we object to your attempts to depose Mr. Kinzel and Mr. Crage in the litigation matter. Neither Mr. Kinzel or Mr. Crage have direct knowledge that would be relevant to this matter, and, certainly, even if they had some tangential knowledge of the dispute with Mr. Nail, there are lower-ranking executives or employees with access to the same information. Accordingly, we view your attempts to depose Mr. Kinzel and Mr. Crage as harassment, burdensome, and unnecessarily duplicative and will not produce either executive for depositions as noticed. Please let me know as soon as possible if you intend to pursue their depositions, and I will proceed with seeking court protection.*

*Further, seeing as neither Mr. Nail nor Mr. Freeman reside in New York, I would suggest that we attempt to coordinate their depositions so that they can be completed in one trip. I am not available on March 14. I would be happy to discuss available dates with you at your convenience.*

*Thank you,*

*Jill*

---

**From:** Pappas, Michael P. [mailto:MPappas@littler.com]
**Sent:** Monday, February 11, 2008 3:21 PM
**To:** Kirila, Jill S.
**Cc:** Weber, Michael
**Subject:** Paramount Parks v. Nail

Dear Ms. Kirila:

Per our discussion earlier this afternoon, attached are deposition notices.

Very truly yours,

Michael P. Pappas

<<Document.pdf>>

- - - -

To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this document (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

This email may contain confidential and privileged material for the sole use of the

**Pappas, Michael P.**

| | |
|---|---|
| **From:** | Kirila, Jill S. [JKirila@ssd.com] |
| **Sent:** | Monday, March 10, 2008 3:53 PM |
| **To:** | Weber, Michael; Pappas, Michael P. |
| **Cc:** | Zancourides, Lori Maiorca |
| **Subject:** | PPI v. Nail |
| **Attachments:** | COLUMBUS-#617760-v1-Affidavits.PDF |

Counsel:

As we discussed at the Court Conference, attached are affidavits from Mr. Kinzel and Mr. Crage evidencing that neither of them have any direct or unique knowledge relevant to this case. Accordingly, I trust that you will withdraw your deposition notices. Please let me know as soon as possible if we will need to seek court protection. Also, please advise if you need an alternative date for Mr. Freeman's deposition. As I indicated earlier, it may make sense to coordinate with Mr. Nail's deposition, which is currently scheduled for March 28th.

Thanks,

Jill

Jill S. Kirila
Squire, Sanders & Dempsey L.L.P.

41 South High Street
Columbus, Ohio  43215
614.365.2772
614.365.2499 fax

221 E. Fourth St., Suite 2900
Cincinnati, Ohio  45202-4095
1.513.361.1285
Fax: +1.513.361.1201

Beijing  Bratislava  Brussels  Budapest  Caracas  Cincinnati  Cleveland  Columbus  Frankfurt  Hong Kong  Houston  London  Los Angeles  Miami  Moscow  New York  Palo Alto  Phoenix  Prague  Rio de Janeiro  San Francisco  Santo Domingo  Shanghai  Tallahassee  Tampa  Tokyo  Tysons Corner  Warsaw  Washington DC  West Palm Beach

Associated Offices: Bucharest  Buenos Aires  Dublin  Kyiv  Milan  Santiago
NOTICE:  This email message and all attachments transmitted with it are intended solely for the use of the addressees and may contain legally privileged, protected or confidential information.  If you have received this message in error, please notify the sender immediately by email reply and please delete this message from your computer and destroy any copies.

## Pappas, Michael P.

| | |
|---|---|
| **From:** | Zancourides, Lori Maiorca [LZancourides@ssd.com] |
| **Sent:** | Friday, March 28, 2008 4:55 PM |
| **To:** | Weber, Michael |
| **Cc:** | Pappas, Michael P.; Kirila, Jill S.; Skulnik, Steven |
| **Subject:** | RE: Nail Deposition |

Mr. Nail's deposition will start at 9 a.m. per the notice we sent you yesterday. We do not expect Mr. Nail's deposition to be lengthy and, as such, are confident that there will be plenty of time for your deposition of Mr. Freeman after Mr. Nail's deposition concludes. We've been more than accommodating in rescheduling Mr. Nail's deposition considering you just told us last week that the March 28th date for Mr. Nail's deposition "no longer works" for you (despite the fact that it was noticed back on February 11th). It was not until yesterday that you re-raised the issue of deposing Mr. Freeman, despite the fact that we offered on more than one occasion to schedule the two depositions together with no response.

As for Mr. Kinzel and Mr. Crage, there is simply no basis for deposing either executive in this case, as their affidavits evidence. We are confident Mr. Freeman's deposition will be consistent with those affidavits, but, in the unlikely event something changes, we can discuss it at that time.

We will look to receive your client's initial disclosures by Monday, March 31st. Please let me know when we can expect to receive responses to both sets of discovery we have sent you (responses to the first set are past due and responses to the second set are due today).

---

**From:** Weber, Michael [mailto:MWeber@littler.com]
**Sent:** Thursday, March 27, 2008 5:00 PM
**To:** Zancourides, Lori Maiorca
**Cc:** Pappas, Michael P.; Kirila, Jill S.; Skulnik, Steven
**Subject:** RE: Nail Deposition

I want to do Mr. Freeman's deposition before Mr. Nail's. We are reserving our right to depose the other representatives of Plaintiff that we noticed and will make the determination of deposing them after we depose Mr. Freeman.

I expect that initial disclosures will go out Monday.

---

**From:** Zancourides, Lori Maiorca [mailto:LZancourides@ssd.com]
**Sent:** Thursday, March 27, 2008 4:56 PM
**To:** Weber, Michael
**Cc:** Pappas, Michael P.; Kirila, Jill S.; Skulnik, Steven
**Subject:** RE: Nail Deposition

Thanks. Attached is a revised Notice of Deposition for Mr. Nail reflecting the April 25th date. The 23rd does not work, but we can do Mr. Freeman's deposition after Mr. Nail's on the 25th.

On a related note, please let me know when we can expect to receive your client's initial disclosures and responses to PPI's discovery requests.

# DECLARATION OF
# A. MICHAEL WEBER

# EXHIBIT 6

STATE OF OHIO                :
                       : ss.

COUNTY OF ERIE           :

### AFFIDAVIT OF RICHARD L. KINZEL

I, Richard L. Kinzel, having been duly sworn and cautioned, state as follows:

1.　　On June 30, 2006, Cedar Fair, L.P. ("Cedar Fair") acquired Paramount Parks Inc. ("PPI") through a stock acquisition. At that time I was, and am still the President and Chief Executive Officer of Cedar Fair; after the transaction I have also served as the President and Chief Executive Officer of PPI. My office is located in Sandusky, Ohio.

2.　　I am aware that, prior to the transaction, Lester Nail was employed by PPI pursuant to the terms of his Employment Agreement to serve as the Company's Senior Vice President / General Counsel. In connection with the transaction, Mr. Nail (along with other PPI executives) were terminated without cause under the terms of their respective employment agreements. This information is certainly not unique to me.

3.　　I had no direct conversations with Mr. Nail regarding his employment with PPI, the terms of his Employment Agreement, or the termination of his employment.

4.　　I have not had any communications with Mr. Nail since PPI triggered the termination without cause provision of his Employment Agreement.

5.　　Through information that has been provided to me from time to time, I am generally aware that PPI continued to pay Mr. Nail compensation and benefits under the terms of his Employment Agreement for some time after his employment with PPI ended; however, I have no direct or unique knowledge involving the details of any such payments.

6.    I have no direct knowledge of Mr. Nail's employment with Denny's or the circumstances surrounding PPI's discovery of such employment.

7.    Any relevant knowledge I may have about Mr. Nail is indirect and could be acquired through lower-ranking officers, employees, or agents of PPI.

8    As the President and Chief Executive Officer of Cedar Fair and PPI, it would be unduly burdensome to be deposed in the litigation matter between PPI and Mr. Nail, in New York or otherwise, particularly given my lack of firsthand or unique knowledge of the matters in that case.

Further affiant sayeth naught.

Richard L. Kinzel

Sworn to before me this 6th day of March, 2008.

Notary Public
My Commission Expires: 9-22-12

[SEAL]                    **Brenda S. Lakner**
                          Notary Public, State of Ohio
                          My Commission Expires on September 22, 2012

- 2 -

# DECLARATION OF
# A. MICHAEL WEBER

# EXHIBIT 7

## Pappas, Michael P.

| | |
|---|---|
| **From:** | Weber, Michael |
| **Sent:** | Friday, March 28, 2008 5:00 PM |
| **To:** | Zancourides, Lori Maiorca |
| **Cc:** | Pappas, Michael P.; Kirila, Jill S.; Skulnik, Steven |
| **Subject:** | RE: Nail Deposition |

We noticed plaintiff's depositions first and we expect to take them before Mr. Nail's. As a courtesy to you, we will consider not deposing Mr. Kinzel and Mr. Crage but we will make that final decision after we depose Mr. Freeman, which will occur before Mr. Nail's. Please give me some dates for Mr. Freeman's deposition if he can't make it on the 23rd.

---

**From:** Zancourides, Lori Maiorca [mailto:LZancourides@ssd.com]
**Sent:** Friday, March 28, 2008 4:55 PM
**To:** Weber, Michael
**Cc:** Pappas, Michael P.; Kirila, Jill S.; Skulnik, Steven
**Subject:** RE: Nail Deposition

Mr. Nail's deposition will start at 9 a.m. per the notice we sent you yesterday. We do not expect Mr. Nail's deposition to be lengthy and, as such, are confident that there will be plenty of time for your deposition of Mr. Freeman after Mr. Nail's deposition concludes. We've been more than accommodating in rescheduling Mr. Nail's deposition considering you just told us last week that the March 28th date for Mr. Nail's deposition "no longer works" for you (despite the fact that it was noticed back on February 11th). It was not until yesterday that you re-raised the issue of deposing Mr. Freeman, despite the fact that we offered on more than one occasion to schedule the two depositions together with no response.

As for Mr. Kinzel and Mr. Crage, there is simply no basis for deposing either executive in this case, as their affidavits evidence. We are confident Mr. Freeman's deposition will be consistent with those affidavits, but, in the unlikely event something changes, we can discuss it at that time.

We will look to receive your client's initial disclosures by Monday, March 31st. Please let me know when we can expect to receive responses to both sets of discovery we have sent you (responses to the first set are past due and responses to the second set are due today).

---

**From:** Weber, Michael [mailto:MWeber@littler.com]
**Sent:** Thursday, March 27, 2008 5:00 PM
**To:** Zancourides, Lori Maiorca
**Cc:** Pappas, Michael P.; Kirila, Jill S.; Skulnik, Steven
**Subject:** RE: Nail Deposition

I want to do Mr. Freeman's deposition before Mr. Nail's. We are reserving our right to depose the other representatives of Plaintiff that we noticed and will make the determination of deposing them after we depose Mr. Freeman.

I expect that initial disclosures will go out Monday.

---

**From:** Zancourides, Lori Maiorca [mailto:LZancourides@ssd.com]
**Sent:** Thursday, March 27, 2008 4:56 PM
**To:** Weber, Michael

# DECLARATION OF
# A. MICHAEL WEBER

# EXHIBIT 8



April 24, 2008

A. Michael Weber
mweber@littler.com

**VIA FAX & REGULAR MAIL**

Jill S. Kirila, Esq.
Squire, Sanders & Dempsey, LLP
1300 Huntington Center
41 South High Street
Columbus, Ohio 43215

Re:    **Paramount Parks, Inc. v. Nail**
       **07-CV-10595 (SDS) (MHD)**

Dear Ms. Kirila:

We write in a final attempt to resolve without court intervention the parties' dispute concerning the deposition of Richard Kinzel. As you know, although we believe we have the clear right to depose Mr. Kinzel under the Federal Rules and supporting legal authorities, we agreed in good faith to first depose a lower-level official, Craig Freeman, before determining whether to pursue Mr. Kinzel's deposition over Plaintiff's objection. Based on Mr. Freeman's testimony yesterday (which you observed), it is clear that Mr. Kinzel was intimately and personally involved in virtually all of the events at issue in this lawsuit, that he either made or approved all of the relevant decisions concerning Mr. Nail, and that he has first-hand personal knowledge of important facts. Additionally, given Mr. Freeman's poor memory of most of his relevant dealings with Mr. Kinzel, Plaintiff cannot contend that the same information was available through Mr. Freeman's testimony.

Under the circumstances, and given that you have refused to stipulate that Plaintiff would not call Mr. Kinzel as a trial witness, Plaintiff cannot in good faith maintain its objection to producing Mr. Kinzel for deposition. Therefore, we ask that Plaintiff withdraw its objection and produce Mr. Kinzel for deposition as soon as possible. Please advise us of your position on this matter no later than Wednesday, April 30, 2008. If Plaintiff continues to refuse to produce Mr. Kinzel for deposition, we will promptly seek court intervention, including a motion to compel Mr. Kinzel's deposition, a request for sanctions based on Plaintiff's taking what we view as a wholly frivolous legal position, and a request for sanctions against Mr. Kinzel personally for submitting an affidavit stating that he has no personal knowledge about this case.

Jill S. Kirila, Esq.
April 24, 2008
Page 2

Indeed, based on your client's testimony yesterday, it is clearer than ever that Plaintiff's entire lawsuit against Mr. Nail is frivolous and without legal or factual foundation. Among other things, Mr. Freeman testified unequivocally that: (i) Mr. Nail never failed or refused to provide services to PPI after his termination; (ii) PPI never asked Mr. Nail to provide services after his termination; (iii) no circumstances arose under which PPI would have even considered availing itself of Mr. Nail's services after his termination; (iv) PPI had no intention of ever invoking the exclusive services provision of Mr. Nail's employment agreement after his termination; (v) Cedar Fair did not contact Mr. Nail in connection with its new General Counsel position that had been under consideration since mid-2007, even though it purportedly believed Mr. Nail was still unemployed at the time; (vi) PPI had no business interest recognizable under New York law for prohibiting Mr. Nail from working at Denny's; (vii) there was nothing inherently inconsistent with Mr. Nail performing services for PPI while being employed at Denny's; and (viii) if Mr. Nail was willing to leave his Denny's employment upon being asked to perform services for PPI, it would not have violated his employment agreement.

Based on these facts, PPI cannot possibly seek to now invoke the "ready, willing, and able" clause to deprive Mr. Nail of the compensation that PPI was contractually obligated to pay him after terminating his employment for a definite term without cause. Indeed, we believe that if Plaintiff continues to pursue these claims in the face of this evidence, it would constitute sanctionable bad faith under Rule 11. Accordingly, we request that Plaintiff immediately agree to dismiss all claims against Mr. Nail with prejudice. In return, Mr. Nail will agree to dismiss his counterclaims with prejudice, will not seek to depose Mr. Kinzel, and will not seek sanctions. At an absolute minimum, Plaintiff should dismiss its fraud cause of action against Mr. Nail since the evidence categorically demonstrates that Mr. Nail had no intention to defraud Plaintiff, had no legal obligation to inform Plaintiff of his new employment, and made no material misrepresentations. The only fraud that was committed in this case was the fraud Plaintiff perpetrated upon its benefits providers by knowingly and falsely representing that Mr. Nail and others were active employees even after PPI had terminated their employment without cause and they were no longer performing services.

Again, please advise us of Plaintiff's position on these issues no later than Wednesday, April 30, 2008, so that we may act accordingly.

Very truly yours,

A. Michael Weber

AMW/ej