UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
PARAMOUNT PARKS INC.                    :
                                        :
                    Plaintiff,          :      CASE No.  07 CV 10595 (SHS)
                                        :
            v.                          :
        :
LESTER NAIL                             :
                                        :
                    Defendant.          :
-----------------------------------------------------x


Jill S. Kirila, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury as follows:

1.      I am a member of the bar of the State of Ohio and admitted *pro hac vice* in this Court in the above matter.  I am a partner in the law firm of Squire, Sanders & Dempsey L.L.P., attorneys for Plaintiff Paramount Parks Inc. ("PPI").

2.      I submit this declaration in support of PPI's Reply in Support of Its Motion for Protective Order and Attorneys' Fees (the "Reply") filed contemporaneously herewith.

3.      On April 16, 2008, I contacted Defense Counsel A. Michael Weber by telephone to discuss, among other case issues, his request that PPI stipulate that it would not call Mr. Kinzel and Mr. Crage to testify in this case.  In that conversation, I conveyed to counsel that PPI had no intentions of calling either Mr. Kinzel or Mr. Crage to testify in this case; however, I informed Mr. Weber that because I did not know what Defendant was going to testify or claim that either said to him (his deposition occurred on April 23) that might be relevant to this case, PPI could not obviously stipulate so as to prevent it from offering testimony in direct rebuttal to such allegations.

4.      Attached hereto as Appendix 1 are copies of all unreported, docketed cases cited

in PPI's Reply.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and understanding.

Executed this 9th day of May, 2008.

_____ /s/ Jill S. Kirila_____ _____
Jill S. Kirila

# Appendix 1

LEXSEE



Positive
As of: May 09, 2008

CONSOLIDATED RAIL CORPORATION, Plaintiff, v. PRIMARY INDUSTRIES CORPORATION, Defendant. CONSOLIDATED RAIL CORPORATION, Plaintiff, v. PRIMARY COAL, INC., Defendant.

92 Civ. 4927 (PNL), 92 Civ. 6313 (PNL)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

1993 U.S. Dist. LEXIS 12600

September 10, 1993, Decided
September 10, 1993, Filed

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In plaintiff common carrier's suit to recover freight charges, defendant corporations filed a counterclaim for damages. The matter came before the court on the common carrier's motion for a protective order precluding certain depositions and directing that others be conducted in a certain location, as well as on the corporations' cross-motion for an order compelling discovery responses and extending the deadline for completion of discovery.

**OVERVIEW:** The common carrier sought to preclude the depositions of three of its executive officers, each of whom submitted an affidavit stating that he had no personal knowledge of the facts underlying the issues in the case. The court noted that while highly-placed executives were not immune from discovery, permitting unfettered discovery of them could serve as a potent tool for harassment. Hence, the court deferred the depositions of the executives until such time as it was demonstrated that they had unique knowledge pertinent to the issues. The court also granted the common carrier's request that the depositions of seven of its employees be taken in the city where its headquarters were located, noting that it

was more efficient for the corporations' counsel to travel to such city than for the common carrier's attorney and witnesses to go to New York. The court denied the corporations' request to compel production of documents because the documents were of doubtful relevance to any issue in the case and were not pertinent to the common carrier's pending summary judgment motion. The court decided to hold the discovery deadline in abeyance until disposition of the summary judgment motion.

**OUTCOME:** The court granted the common carrier's motion for a protective order precluding certain depositions and directing that others be conducted in a certain location. The court denied the corporations' cross-motion for an order compelling discovery responses. The court also ordered that the discovery deadline would be held in abeyance until disposition of the common carrier's motion for summary judgment.

**CORE TERMS:** deposition, discovery, summary judgment, deadline, coal, highly-placed, travel, protective, precluding, notice, defer

**LexisNexis(R) Headnotes**

1993 U.S. Dist. LEXIS 12600, *
51 Fed. R. Serv. 3d (Callaghan) 708; 2001-2 Trade Cas. (CCH) P73,421

*Civil Procedure > Discovery > Protective Orders*
[HN1]Highly-placed executives are not immune from discovery. The fact that a witness has a busy schedule is simply not a basis for foreclosing otherwise proper discovery. Moreover, a claim that the witness lacks knowledge is subject to testing by the examining party.

*Civil Procedure > Discovery > Protective Orders*
[HN2]Permitting unfettered discovery of corporate executives would threaten disruption of their business and could serve as a potent tool for harassment in litigation. Accordingly, where other witnesses have the same knowledge, it may be appropriate to preclude a redundant deposition of a highly-placed executive.

**JUDGES:** [*1] FRANCIS IV

**OPINION BY:** JAMES C. FRANCIS IV

**OPINION**

*MEMORANDUM AND ORDER*

JAMES C. FRANCIS IV

UNITED STATES MAGISTRATE JUDGE

The plaintiff in these related actions, Consolidated Rail Corporation ("Conrail"), has moved for a protective order precluding certain depositions and directing that others be conducted in Philadelphia, Pennsylvania. The defendants, Primary Industries Corp. and Primary Coal, Inc. (collectively referred to as "Primary"), have cross-moved for an order compelling discovery responses and extending the deadline for completion of discovery. Each of these issues will be addressed in turn.

*Background*

Conrail, a common carrier, seeks to recover freight charges that it contends are owed by Primary, a coal producer. Primary has counterclaimed, asserting that it suffered damages when Conrail wrongfully closed its port facility at Philadelphia and diverted its coal traffic to Baltimore. Conrail has filed a motion for summary judgment on statute of limitations grounds which is currently pending.

*Discussion*

A. *Executive Officer Depositions*

Primary has served a notice for the deposition of ten Conrail employees. Conrail has agreed to produce seven of these witnesses, but has [*2] moved for a protective order precluding the depositions of three others: James Hagan, Chairman, President, and Chief Executive Officer of Conrail; Robert Swert, Vice President of Labor Relations; and David LeVan, Senior Vice President of Operations. Each of these individuals has submitted an affidavit attesting that he has no personal knowledge of the facts underlying the claims and counterclaims in these cases except for what he may have learned from other Conrail employees.

[HN1]Highly-placed executives are not immune from discovery. "The fact that the witness has a busy schedule is simply not a basis for foreclosing otherwise proper discovery." *CBS, Inc. v. Ahern, 102 F.R.D. 820, 822 (S.D.N.Y. 1984)* (citation omitted). Moreover, a claim that the witness lacks knowledge is subject to testing by the examining party. See *Amherst Leasing Corp. v. Emhart Corp., 65 F.R.D. 121, 122 (D. Conn. 1974)*.

At the same time, [HN2]permitting unfettered discovery of corporate executives would threaten disruption of their business and could serve as a potent tool for harassment in litigation. Accordingly, where other witnesses have the same knowledge, [*3] it may be appropriate to preclude a redundant deposition of a highly-placed executive. See *CBS, 102 F.R.D. at 822 n.2; Amherst, 65 F.R.D. at 123.*

Given these considerations, it is appropriate in these cases to defer any live depositions of the three named executives until it has been demonstrated that they have some unique knowledge pertinent to the issues in these cases. Primary may seek to establish such a foundation through Rule 31 depositions upon written questions of these executives as well as through the deposition testimony of other witnesses. Until such a showing has been made, however, these three individuals shall not be deposed in person.

B. *Site of Depositions*

Conrail next contends that the depositions of its seven remaining witnesses should be held in Philadelphia, where Conrail's headquarters are located, rather than in New York, as the deposition notice

Page 2

1993 U.S. Dist. LEXIS 12600, *3
51 Fed. R. Serv. 3d (Callaghan) 708; 2001-2 Trade Cas. (CCH) P73,421

indicates.

This request has merit. It is far more efficient to require Primary's counsel to travel to Philadelphia than it is to require Conrail's attorney and seven witnesses to come to New York. *See Huynh v. Werke, 90 F.R.D. 447, 449 (S.D. Ohio 1981).* [*4] Moreover, it is possible that documents available in Conrail's offices but not previously disclosed in discovery will be necessary for the depositions.

Accordingly, the depositions of Conrail's employees shall be taken in Philadelphia. Since Conrail, as the plaintiff, would normally be expected to produce its witnesses for deposition in the forum district, it shall initially bear the costs of conducting the depositions in Philadelphia, including the travel and accommodation expenses of Primary's counsel, as well as his reasonable attorney's fees. *See id.;* local civil rule 15. These costs shall ultimately be taxed against the losing party at the conclusion of the litigation.

C. *Document Requests*

In its cross-motion, Primary seeks to compel production of a variety of documents primarily related to the reasons that Conrail closed its Philadelphia facility.

Such documents are of doubtful relevance to any issue in the cases and are clearly not pertinent to Conrail's pending summary judgment motion. Since the request for this discovery will be moot if the summary judgment motion is granted, the motion to compel is denied without prejudice to renewing it after the dispositive motion [*5] is decided.

D. *Discovery Schedule*

Finally, Primary seeks an extension of the discovery deadline. Because of the pending summary judgment motion, the parties may decide to defer some discovery until the motion is decided. The discovery deadline shall therefore be held in abeyance until the motion for summary judgment has been determined.

SO ORDERED.

JAMES C. FRANCIS IV

UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York

September 10, 1993

LEXSEE



Cited
As of: May 09, 2008

NOEL P. DALY, M.D. and JEAN DALY, Plaintiffs, v. DELTA AIRLINES, INC.,
Defendant

No. 90 Civ. 5700 (MEL)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

1991 U.S. Dist. LEXIS 2762

March 7, 1991, Decided
March 7, 1991, Filed

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff doctor filed a motion for a protective order to preclude defendant airlines from insisting upon the doctor's presence at a deposition in New York on the grounds of hardship and inconvenience as the doctor resided in Ireland.

**OVERVIEW:** The doctor filed an action against the airline for damages based upon the airline's alleged negligence and willful misconduct in allowing one of its food and beverage carts to strike the doctor on the knee while he was seated on an airplane travelling from Los Angeles, California to Dublin, Ireland. The doctor's complaint sought compensation for the alleged physical injury, and requested the maximum $ 75,000.00 award provided for under the Warsaw Convention, in addition to $ 1,000,000.00 for alleged, although unspecified, willful misconduct. The airlines noticed the doctor for deposition in federal court in New York, and the doctor filed a motion for a protective order, attaching an affidavit by his attorney and a brief memorandum asserting that the doctor resided in Ireland and that having to travel to New York would have been a hardship and inconvenience. The court denied the motion, finding that the doctor made no showing of substantial hardship,

having made only conclusory statements. Because the doctor filed his lawsuit in New York, it was not unreasonable to require him to come to the district where he was litigating a claim.

**OUTCOME:** The court denied the doctor's motion for a protective order, subject to the conditions that the airline had to schedule the doctor's deposition and his physical examination for the same day, and consult with the doctor as to his availability.

**CORE TERMS:** deposition, travel, telephone, inconvenience, hardship, discovery, arrange, willful misconduct, physical examination, interrogation, protective order, examining physician, deposing, demeanor, doctor

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Methods > Oral Depositions*
*Civil Procedure > Discovery > Methods > Written Depositions*
[HN1]A deposition on written questions is not the functional equivalent of a face-to-face deposition under

1991 U.S. Dist. LEXIS 2762, *
30 Fed. R. Serv. 2d (Callaghan) 1389; 39 Fed. R. Serv. 2d (Callaghan) 1389

Fed. R. Civ. P. 30.

**JUDGES:** [*1] Michael H. Dolinger, United States Magistrate.

**OPINION BY:** DOLINGER

**OPINION**

*MEMORANDUM AND ORDER*

Plaintiff Dr. Noel P. Daly, an anesthesiologist residing and practicing in Ireland, seeks a protective order precluding defendant Delta Airlines, Inc. from insisting upon his presence at a deposition in this district. The motion is denied upon certain conditions noted below.

Plaintiff and his wife have sued Delta for damages based upon Delta's alleged negligence and willful misconduct in allowing one of its food and beverage carts to strike plaintiff on the knee while he was seated on an airplane travelling from Los Angeles, California to Dublin, Ireland. Plaintiff seeks compensation for the alleged physical injury, and specifically requests the maximum $ 75,000.00 award provided for under the Warsaw Convention, and an additional $ 1,000,000.00 for the alleged, although unspecified, willful misconduct. In addition, his wife seeks $ 500,000.00 for the loss of plaintiff's services.

Defendant has noticed plaintiff for a deposition in New York, and plaintiff seeks to avoid having to travel here for such a purpose. Asserting personal inconvenience, he suggests that defendant can obtain the same or equivalent [*2] information by a deposition on written questions or by a telephone deposition.

We reject the suggestion that [HN1]a deposition on written questions is the functional equivalent of a face-to-face Rule 30 deposition. *See, e.g.,* Cordes, "Discovery," in *Federal Civil Practice* 325 (G. Vairo ed. 1989)). As Prof. Moore notes, "usually written or epistolary interrogation is not as an effective method as oral or confrontory interrogation for obtaining discovery, especially when the deponent is an adverse party or a hostile witness." 4A J. Moore, J. Lucas & D. Epstein, *Moore's Federal Practice* para. 31.02 at 31-4.1 to -5 (2d ed. 1990). *See also id.* at 31-6 to -7.

The proposal for a telephone deposition presents a closer question. Generally it may be assumed that most deposing counsel would prefer to see the witness whom they are deposing. First, the witness's demeanor may be a significant consideration in assessing how effective a witness he will be at trial. Second, the witness's demeanor can also guide an attorney in probing for areas in which the witness may be less confident or sure of himself. Third, although an attorney preparing for a deposition will presumably segregate and [*3] identify for himself in advance the documents that he intends to use at the deposition, there will inevitably be occasions on which he decides on the spot to use additional documents as deposition exhibits. This procedure may be somewhat constrained by the use of a telephone deposition since the deposition exhibits must be forwarded to the witness in advance. [1] Moreover, the use of a telephone deposition lessens the ability of the examining attorney to obtain a spontaneous reaction from the witness, since he will presumably have access to the documents before he is questioned about them.

> 1 The advent of fax machines may alleviate this problem, although at the cost of some delay in the proceedings.

All other things being equal, if these were the only considerations militating in favor of a deposition in this district, and if the plaintiff demonstrated substantial hardship in having to travel to New York, the court would seriously entertain the prospect of a telephone deposition in this case. Two considerations, however, [*4] militate in favor of ordering that the deposition proceed here.

First, plaintiff makes no showing of substantial hardship. He offers the affidavit of his attorney, who makes no reference to hardship, and a memorandum of law which notes simply that plaintiff now resides and practices anesthesiology in Dublin and asserts conclusorily that "his absence would be an inconvenience to his colleagues and to the surgical patients in need of his services." (Plaintiffs' Memorandum of Law at 3.) This hardly constitutes a showing of inordinate hardship, economic or otherwise. *See, e.g., Seuthe v. Renwal Products, Inc.,* 38 F.R.D. 323, 325 (S.D.N.Y. 1965); *Rifkin v. United States Lines, Inc.,* 177 F. Supp. 875, 876 (S.D.N.Y. 1959). The cost of a round-trip ticket from Dublin to New York is little more than $ 1,000.00, a figure that is unlikely to be unduly expensive for one in

1991 U.S. Dist. LEXIS 2762, *4
30 Fed. R. Serv. 2d (Callaghan) 1389; 39 Fed. R. Serv. 2d (Callaghan) 1389

plaintiff's profession and medical specialty, and an amount that must be measured against the *ad damnum* of more than $ 1,500,000.00 sought by plaintiff and his wife. [2] *See, e.g.,* Clem v. Allied Van Lines Int'l Corp., 102 F.R.D. 938, 940 (S.D.N.Y. 1984); Slade v. Transatlantic Fin. Corp., 21 F.R.D. [*5] 146, 147 (S.D.N.Y. 1957). Moreover, since the flight from Dublin to New York is only approximately seven hours, plaintiff can travel here, attend his deposition -- which is likely not to be extensive -- and return home in no more than two to three days. In view of the fact that plaintiff chose to file his lawsuit here rather than in Ireland, it is hardly unreasonable to expect that he make himself available in the district where he is litigating his million dollar claim, and to which he must come in any event to testify at trial.

> 2    Although plaintiffs' counsel concedes that plaintiff is unlikely to recover more than $ 75,000.00, the willful misconduct claim against defendant has not been withdrawn and must be considered as part of plaintiffs' potential recovery in this action.

Second, it appears that plaintiff must come to New York in any event as part of pre-trial discovery since Delta represents that it wishes to conduct a physical examination of him. Although plaintiff proposes that Delta retain a physician in Ireland [*6] to examine him, this is not a tenable position. It must be assumed that the defendant's examining physician will be a potential trial witness, and if Delta were required to utilize the services of an Irish doctor, it would be obliged to arrange for that doctor to travel to New York in order to testify, with the attendant added expense and inconvenience. [3]

> 3    Although conceivably Delta could instead arrange for an overseas deposition of the physician, *see* Fed. R. Civ. P. 28, this would be potentially awkward from a procedural point of view, since counsel would have to travel to Ireland or arrange for local counsel. In any event, a live appearance by a witness at trial is usually advantageous for the party calling the witness and there is no reason why Delta should be disadvantaged in this manner.

In view of these considerations, plaintiff's motion must be denied. Nonetheless in order to minimize the inconvenience and expense to plaintiff, defendant is to schedule plaintiff's deposition and physical examination for [*7] the same day. To this end counsel are to consult as to the availability of plaintiff and of an examining physician, and defendant will be expected to schedule the deposition and physical examination on a date and at a time reasonably convenient for plaintiff.

## CONCLUSION

For the reasons stated, plaintiff's motion for a protective order is denied, subject to the conditions noted. [4]

> 4    Plaintiffs have not sought reimbursement for the expenses of this deposition and have not offered any evidentiary basis to justify such an award.

SO ORDERED.

LEXSEE



Positive
As of: May 09, 2008

**DUBAI ISLAMIC BANK, Plaintiff, -against- CITIBANK, N.A., Defendant.**

**99 Civ. 1930 (RMB)(THK)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2002 U.S. Dist. LEXIS 9794**

**May 28, 2002, Decided
May 31, 2002, Filed**

**DISPOSITION:** [*1] Plaintiff's motion for a protective order shielding its employees from being subject to deposition by notice granted with respect to Sayed Kamel Mansour, Mohammad Sadiq Mohammad Ali, and Sayed Najamul Hassan, and denied with respect to all others.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant domestic bank sought orders for plaintiff foreign bank to produce ten deposition witnesses in the United States, claiming they were officers, directors, or managing agents. The foreign bank sought orders protecting those witnesses, all of whom were abroad, and asking to require the discovery of some of the witnesses take place abroad, by letters rogatory, and barring the deposition of others.

**OVERVIEW:** A managing agent could be deposed on notice. The court analyzed each of the foreign bank employees sought, to see whether he was a managing agent. For example, the former head of the foreign department was subject to notice deposition because, as the person responsible for interbank transfers (foreign exchange), the bank vested him with significant enough responsibility and discretion to be considered a managing agent, even if he did not hold the specific title. The

domestic bank produced enough information to make his status as department head, and responsibilities in litigated matters a close question, resolved in favor of deposition taking place. The fact that the bank retained him after demotion, waived its civil claims against him, and assisted in his escaping criminal liability, despite his undisputed involvement in a quarter-billion dollar fraud against it, strongly suggested he was indebted to the bank, and thus was subject to its control. The court found six other witnesses were similar agents and subject to deposition for similar reasons; the three others had less authority. The deponents' reluctance to travel did not defeat the foreign bank's obligation to produce them.

**OUTCOME:** The foreign bank's motion for a protective order shielding its employees from being subject to deposition by notice was granted with respect to three employees, and denied with respect to all others, who were found to be managing agents and subject to notice deposition and ordered to travel to the United States for in-person depositions.

**CORE TERMS:** deposition, managing agents, travel, notice, deponent, discovery, signature authority, involvement, deposed, depose, demoted, hardship, manager, lawsuit, clerk, undisputed, traveling, salary, declaration, subordinate, signature, grade, visa, protective order, Federal Rules, former officer, interviewed,

2002 U.S. Dist. LEXIS 9794, *1
30 Fed. R. Serv. 2d (Callaghan) 1389; 39 Fed. R. Serv. 2d (Callaghan) 1389

supervisor, compelled, signatories

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Methods > Oral Depositions*
*Civil Procedure > Pretrial Matters > Subpoenas*
*International Trade Law > Trade Agreements > General Overview*
[HN1]Under Fed. R. Civ. P. 30(b)(1), a specific officer, director, or managing agent of a corporate party may be compelled to give testimony pursuant to a notice of deposition. A corporate employee or agent who does not qualify as an officer, director, or managing agent is not subject to deposition by notice. Such an employee is treated as any other non-party witness, and must be subpoenaed pursuant to Fed. R. Civ. P. 45; or, if the witness is overseas, the procedures of the Hague Convention or other applicable treaty must be utilized.

*Business & Corporate Law > Agency Relationships > Agents Distinguished > General Agents*
*Civil Procedure > Discovery > Methods > Oral Depositions*
[HN2]The test for a managing agent is not formulaic. Rather, the question of whether a person is a managing agent, and therefore subject to a notice of deposition, is answered pragmatically and on a fact-specific basis.

*Business & Corporate Law > Agency Relationships > Authority to Act > Business Transactions > General Overview*
[HN3]Courts in the Southern District of New York have generally considered five factors in determining whether an individual is a managing agent: 1) whether the individual is invested with general powers allowing him to exercise judgment and discretion in corporate matters; 2) whether the individual can be relied upon to give testimony, at his employer's request, in response to the demands of the examining party; 3) whether any person or persons are employed by the corporate employer in positions of higher authority than the individual designated in the area regarding which the information is sought by the examination; 4) the general responsibilities of the individual respecting the matters involved in the litigation; and 5) whether the individual can be expected

to identify with the interests of the corporation.

*Business & Corporate Law > Agency Relationships > Types > General Overview*
*Civil Procedure > Discovery > Disclosures > Mandatory Disclosures*
*Civil Procedure > Discovery > Methods > Oral Depositions*
[HN4]Although typically a corporation cannot be required to produce a former officer or agent for deposition, this rule is not woodenly applied. Rather, courts within and without this district have adopted a practical approach that focuses not only on the formal connection between the witness and the party at the time of the deposition, but also on their functional relationships.Courts have accorded managing agent status to individuals who no longer exercised authority over the actions in question (and even to individuals who no longer held any position of authority in a corporation), so long as those individuals retained some role in the corporation or at least maintained interests consonant with rather than adverse to its interests.

*Civil Procedure > Discovery > Methods > Oral Depositions*
[HN5]Although the examining party bears the burden of establishing the status of the witness, the exact nature of this burden is not perfectly clear. In any event, the burden is modest, and all doubts are to be resolved in favor of the examining party. Thus, the examining party satisfies its burden when it produces enough evidence to show that there is at least a close question whether the proposed deponent is the managing agent. This approach permits discovery to proceed, while deferring until trial the ultimate question of whether the witness's testimony is binding on the corporation.

*Civil Procedure > Trials > Depositions*
[HN6]An agent's history of cooperating with a party in discovery may be probative of the party's ability to rely on the agent to testify.

*Civil Procedure > Trials > Depositions*
[HN7]As a general rule, a plaintiff who brings suit in a particular forum may not avoid appearing for examination in that forum.

2002 U.S. Dist. LEXIS 9794, *1
30 Fed. R. Serv. 2d (Callaghan) 1389; 39 Fed. R. Serv. 2d (Callaghan) 1389

*Civil Procedure > Discovery > Methods > Oral Depositions*
[HN8]Generally it is less cumbersome and more illuminating to conduct a face-to-face deposition.

**COUNSEL:** For DUBAI ISLAMIC BANK, plaintiff: John K. Crossman, Drier & Baritz, LLP, New York, NY.

For CITIBANK, N.A., defendant: Denis J. McInerney, Davis Polk & Wardwell, New York, NY.

**JUDGES:** THEODORE H. KATZ, United States Magistrate Judge.

**OPINION BY:** THEODORE H. KATZ

**OPINION**

*MEMORANDUM OPINION AND ORDER*

**THEODORE H. KATZ, United States Magistrate Judge.**

This case involves a banking relationship gone sour. Plaintiff Dubai Islamic Bank ("DIB") and Defendant Citibank entered an agreement in 1975 that included, *inter alia*, the establishment of a correspondent account by DIB in Citibank's New York office. Plaintiff alleges that Citibank had a duty to safeguard DIB's correspondent account by adhering to anti-money laundering procedures and so-called "know your customer" rules. Citibank's alleged dereliction of these and other obligations, DIB claims, led to the unauthorized transfer of more than $ 151,000,000 from DIB's correspondent account. [*2] These fraudulent transfers were, it is alleged, the handiwork of a group of international financial terrorists led by one Foutanga Dit Babani Sissoko, to whose accounts the stolen money was credited. Because Citibank allegedly "slept," as counsel for DIB has put it, the fraud proceeded unchecked for over two years, from late 1995 to early 1998.

The initial Complaint alleged Citibank's liability for DIB's losses on numerous legal grounds, some of which were dismissed for failure to state a claim. The causes of action that survive include those based on negligence, unjust enrichment, and Article 4A of New York's Uniform Commercial Code. In defending the case, Citibank has emphasized the complicity of various high-ranking DIB officers in the alleged scheme to

defraud. Citibank points out that criminal investigations in Dubai, conducted by Dubai law enforcement agencies with the assistance of KPMG, which performed an independent audit, led to the convictions of a number of officers and other DIB employees for their active roles in the fraud. [1] Apparently, authorizations for many, if not all, of the fraudulent transfers out of DIB's account were issued by DIB's own executives.

> 1   A more complete summary of the nature of this action and the facts alleged in the Complaint may be found in Judge Berman's opinion regarding Citibank's motion to dismiss. *See Dubai Islamic Bank v. Citibank, N.A., 126 F. Supp. 2d 659, 662-64 (S.D.N.Y. 2000)*. DIB is currently seeking leave to file an amended complaint.

[*3] Presently before the Court is the application of Citibank for an order directing Plaintiff to produce certain witnesses for deposition, and the corresponding application of DIB for a protective order regarding those witnesses. Citibank seeks to depose, in New York, each of ten employees of DIB, whom it contends may be compelled to appear for deposition by virtue of their status as officers, directors, or managing agents of DIB. [2] DIB contends that none of the ten employees, all of whom live and work in Dubai, may be compelled to appear for deposition under the Federal Rules of Civil Procedure. DIB also advances numerous equitable concerns that it believes militate against its employees' being required to travel to New York. DIB therefore requests that Citibank be required to take discovery of certain witnesses in Dubai, through letters rogatory or otherwise; that Citibank take depositions of certain other witnesses in Dubai or London (the latter at Citibank's expense, and only "if DIB is able to convince" the witnesses to travel to London); and that Citibank be barred altogether from deposing certain other witnesses. (Letter of Frank C. Welzer, Esq. (an attorney for DIB), May 3, 2002 ("Welzer [*4] May 3, 2002 Let."), at 1-2.)

> 2   Citibank has issued letters rogatory to depose in Dubai some of these witnesses, as well as other witnesses living in Dubai who are not the subject of the instant motions. Citibank maintains, and the Court agrees, that these letters do not prejudice its right to seek depositions by the more conventional means available under the Federal Rules of Civil Procedure. *See Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court, 482 U.S. 522,*

2002 U.S. Dist. LEXIS 9794, *4
30 Fed. R. Serv. 2d (Callaghan) 1389; 39 Fed. R. Serv. 2d (Callaghan) 1389

536, 107 S. Ct. 2542, 2551-52, 96 L. Ed. 2d 461 (1987) ("The [Hague] Convention was intended as a permissive supplement, not a pre-emptive replacement, for other means of obtaining evidence located abroad.") Moreover, whether the letters rogatory will even prove availing remains an open question.

The issue of the deposition of DIB employees in New York has been the subject of several conferences and voluminous submissions to this Court. At the March 29, 2002, conference, the Court determined that it was unable to decide [*5] the status of the employees in question based on the record before it, and ordered DIB to produce an affidavit from a high-level employee of DIB detailing the responsibilities and status within DIB of each of the ten proposed deponents, as well as the reasons why each employee could not be compelled to appear for deposition in New York. The Court has received this document (Supplement Declaration of A.R. Ellison in Support of Plaintiff's Motion for a Protective Order ("Ellison Decl.") [3], as well as the parties' subsequent submissions in response thereto (Letter of D. Scott Tucker, Esq. (an attorney for Citibank), Apr. 25, 2002 ("Tucker Apr. 25, 2002 Let."); Welzer May 3, 2002 Let.) In deciding the instant applications, the Court has also reviewed the parties' earlier submissions and accompanying exhibits.

    3    Until his recent death, Mr. Ellison was an advisor to the Executive Committee of DIB.

## DISCUSSION

### I. Governing Legal Standards

[HN1]Under Rule 30(b)(1) of the Federal Rules of Civil Procedure, [*6] a specific officer, director, or managing agent of a corporate party may be compelled to give testimony pursuant to a notice of deposition. A corporate employee or agent who does not qualify as an officer, director, or managing agent is not subject to deposition by notice. See, e.g., United States v. Afram Lines (USA), Ltd., 159 F.R.D. 408, 413 (S.D.N.Y. 1994); Sugarhill Records Ltd. v. Motown Record Corp., 105 F.R.D. 166, 169 (S.D.N.Y. 1985); DeNota v. Pennsylvania R.R. Co., 16 F.R.D. 567, 567 (S.D.N.Y. 1954). Such an employee is treated as any other non-party witness, and must be subpoenaed pursuant to Rule 45 of the Federal Rules of Civil Procedure; or, if the witness is overseas, the procedures of the Hague Convention or other applicable treaty must be utilized. See Afram Lines, 159 F.R.D. at 413; see also In re Honda Am. Motor Co., 168 F.R.D. 535, 540 (D. Md. 1996) (citing Afram Lines).

[HN2]"The test for a managing agent is not formulaic." Boss Mfg. Co. v. Hugo Boss AG, 1999 U.S. Dist. LEXIS 133, No. 97 Civ. 8495 (SHS)(MHD), 1999 WL 20828, at *3 (S.D.N.Y. Jan. 13, 1999). Rather, the question of whether [*7] a person is a managing agent, and therefore subject to a notice of deposition, is answered pragmatically and on a fact-specific basis. See 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2103, at 39 (2d ed. 1994); see also Afram Lines, 159 F.R.D. at 413 ("Because of the vast variety of factual circumstances to which the concept must be applied, the standard . . . remains a functional one to be determined largely on a case-by-case basis.") (quoting Founding Church of Scientology of Washington, D.C., Inc. v. Webster, 256 U.S. App. D.C. 54, 802 F.2d 1448, 1452 (D.C. Cir. 1986) (citation omitted)). "The term 'managing agent' should not be given too literal an interpretation," Tomingas v. Douglas Aircraft Co., 45 F.R.D. 94, 96 (S.D.N.Y. 1968), and "as in all matters appertaining to discovery, it is the ends of justice that are to be served." Church of Scientology, 802 F.2d at 1453.

With these principles in mind, [HN3]courts in this district have generally considered five factors in determining whether an individual is a managing agent:

    1) whether the individual [*8] is invested with general powers allowing him to exercise judgment and discretion in corporate matters; 2) whether the individual can be relied upon to give testimony, at his employer's request, in response to the demands of the examining party; 3) whether any person or persons are employed by the corporate employer in positions of higher authority than the individual designated in the area regarding which the information is sought by the examination; 4) the general responsibilities of the individual respecting the matters involved in the litigation; and 5) whether the individual can be expected to identify with the interests of the corporation.

2002 U.S. Dist. LEXIS 9794, *8
30 Fed. R. Serv. 2d (Callaghan) 1389; 39 Fed. R. Serv. 2d (Callaghan) 1389

*Sugarhill Records*, 105 F.R.D. at 170 (internal quotations and citations omitted); *accord Afram Lines*, 159 F.R.D. at 413; *Zurich Ins. Co. v. Essex Crane Rental Corp.*, 1991 U.S. Dist. LEXIS 863, No. 90 Civ. 2263 (SWK) (JCF), 1991 WL 12133, at *1 (S.D.N.Y. Jan. 29, 1991); *see also Boss Mfg.*, 1999 U.S. Dist. LEXIS 133, 1999 WL 20828, at *3 (recognizing that although the number of factors generally considered by courts ranges from three to five, courts in this district have considered the five factors listed above).

[HN4]Although [*9] typically a corporation cannot be required to produce a former officer or agent for deposition, *see, e.g., Boss Mfg.*, 1999 U.S. Dist. LEXIS 133, 1999 WL 20828, at *2 (stating that the rationale for this is that the corporation lacks control over the former agent), this rule is not woodenly applied. Rather, courts within and without this district have adopted a "practical" approach "that focuses not only on the formal connection between the witness and the party at the time of the deposition, but also on their functional relationships." *See Afram Lines*, 159 F.R.D. at 414 (adopting flexible approach but finding no managing agent status on facts); *see also Independent Prods. Corp. v. Loew's, Inc.*, 24 F.R.D. 19, 26 (S.D.N.Y. 1959)(upholding deposition notices of former officers of plaintiffs who stood "ready to serve plaintiffs" despite severance of formal ties); *Curry v. States Marine Corp. of Del.*, 16 F.R.D. 376, 377 (S.D.N.Y. 1954)(upholding deposition notice of master in charge of vessel at time of accident despite his current reduced status as chief mate of another one of defendant's vessels); *Smith v. Shoe Show of Rocky Mount, Inc.*, 2001 U.S. Dist. LEXIS 8618, No. 00-30141, 2001 WL 1747184, [*10] at *2 (D. Mass. Aug. 26, 2001)(finding that former district manager, whose conduct as such was "at the heart of Plaintiff's claims," remained a managing agent despite current reduced status as store manager); *Libbey Glass, Inc. v. Oneida, Ltd.*, 197 F.R.D. 342, 351 (N. D. Ohio 1999)("In any event, it is clear that the deponent need not have a formal association with the corporation to be deemed its managing agent . . . . Likewise, the deponent need not be associated with the corporation at the time of his deposition."); *Alcan Int'l Ltd. v. S.A. Day Mfg. Co.*, 176 F.R.D. 75, 79 (W.D.N.Y. 1996)(requiring deposition of retired officer with unique knowledge of subject matter of litigation); *Calgene, Inc. v. Enzo Biochem, Inc.*, 1993 U.S. Dist. LEXIS 20217, No. Civ. S93-0195, 1993 WL 645999, at *8 (E. D. Cal. Aug. 23, 1993)(holding that consultant and advisory board

member who identified with interests of company and who had "power regarding the subject matter of the litigation" was managing agent); *Boston Diagnostics Dev. Corp. v. Kollsman Mfg. Co.*, 123 F.R.D. 415, 416 (D. Mass. 1988)(ordering deposition of current employee based on his managing agent [*11] status at the time of the transactions at issue in the lawsuit); *but see Reed Paper Co. v. Procter & Gamble Distrib. Co.*, 144 F.R.D. 2, 4-5 nn.2-3 (D. Me. 1992)(criticizing *Boston Diagnostics*). Summarizing this pragmatic approach, the D.C. Circuit has observed,

> Courts have accorded managing agent status to individuals who no longer exercised authority over the actions in question (and even to individuals who no longer held any position of authority in a corporation), so long as those individuals retained some role in the corporation or at least maintained interests consonant with rather than adverse to its interests.

*Church of Scientology*, 802 F.2d at 1456.

Finally, [HN5]although the examining party bears the burden of establishing the status of the witness, *see Sugarhill Records*, 105 F.R.D. at 170, the exact nature of this burden is not perfectly clear, *see Boss Mfg.*, 1999 U.S. Dist. LEXIS 133, 1999 WL 20828, at *4 ("It is not entirely clear whether the burden [of establishing the deponent's status] is one of production or persuasion or both."); *Afram Lines*, 159 F.R.D. at 414 (suggesting that the burden may [*12] vary depending on whether the examining party has had complete discovery on the issue or whether the deponent is an employee of the opposing party). In any event, the burden is "modest," *Boss Mfg.*, 1999 U.S. Dist. LEXIS 133, 1999 WL 20828, at *4, and all doubts are to be resolved in favor of the examining party, *Afram Lines*, 159 F.R.D. at 414; *Sugarhill Records*, 105 F.R.D. at 171. Thus, the examining party satisfies its burden when it produces "enough evidence to show that there is at least a close question whether the proposed deponent is the managing agent." *Afram Lines*, 159 F.R.D. at 413; *accord Boss Mfg.*, 1999 U.S. Dist. LEXIS 133, 1999 WL 20828, at *4 (citing *Afram Lines*). This approach permits discovery to proceed, while deferring until trial the ultimate question of whether the witness's testimony is binding on the corporation. *See Afram Lines*, 159 F.R.D. at 413-14; *Zurich Ins. Co.*, 1991 U.S. Dist. LEXIS 863, 1991 WL 12133, at *2; *Sugarhill Records*,

2002 U.S. Dist. LEXIS 9794, *12
30 Fed. R. Serv. 2d (Callaghan) 1389; 39 Fed. R. Serv. 2d (Callaghan) 1389

105 F.R.D. at 171; see also Federal Practice and Procedure § 2103 ("The determination of whether a particular person is a 'managing agent' will be made by the trial [*13] court when the deposition is sought to be introduced. . . ."). The witness's deposition testimony itself may well provide the best evidence of his or her status. See Afram Lines, 159 F.R.D. 413-14 (stating that it is proper to defer final determination of managing agent status until trial since at that time examining party will have had full discovery regarding that status); Boss Mfg., 1999 U.S. Dist. LEXIS 133, 1999 WL 20828, at *4 ("[A] determination that the witness is a managing agent may be made provisionally . . . while awaiting the deposition testimony before determining whether the witness is an agent for purposes of binding the corporation."); Hughes Bros., Inc. v. Callanan Rd. Improvement Co., 41 F.R.D. 450, 454 (S.D.N.Y. 1967) (noting that a showing of managing agent status for the purposes of compelling a deposition "might well be overcome by the testimonial evidence produced at that very examination").

## II. Status of the Ten DIB Employees

Keeping the above principles in mind, the Court will now address seriatim the status of the employees Citibank is seeking to depose.

### 1. Valiyakatt Ahmed Khalid

Mr. Khalid's status [*14] as a managing agent regarding the events relevant to this litigation is not seriously in doubt. Numerous documents, including DIB's own personnel file, indicate that Mr. Khalid was Head of the Foreign Department during the time period relevant to this litigation. (Tucker Apr. 25, 2002 Let. at 3-4.) DIB disputes that this was his title, but concedes that he was "the person responsible for interbank transfers (foreign exchange) in the foreign section." (Ellison Decl. at 2.) As such, he was seemingly vested with significant enough responsibility and discretion to be considered a managing agent, even if he did not hold the specific title of head of the department. In any event, Citibank has produced more than enough information to make his status as department head, much less his substantial responsibilities "respecting the matters involved in the litigation," a close question that should be resolved in favor of Mr. Khalid's deposition's taking place. The Court further notes that for all its focus on Mr. Khalid's title, DIB does not even appear to dispute that Mr. Khalid's responsibilities in his former position rendered him an officer or managing agent. [4]

4    The Court finds further justification for resolving doubts in favor of Citibank on this issue given the inconsistent representations that have been made by DIB regarding Mr. Khalid's status. As late as last August, counsel for DIB represented to Citibank and to this Court that DIB was actively engaging in both civil and criminal proceedings against Mr. Khalid, when in fact, DIB had issued certificates of release against Mr. Khalid and two others, Messrs. Al Rais and Hassan, a year earlier. (Affidavit of D. Scott Tucker, Esq., in Support of Application for Order Directing Plaintiff to Produce Certain Witnesses for Depositions, Dec. 20, 2001 ("Tucker Aff."), Ex. A at 44, 46.) Only Citibank's independent research led to the correction of this error.

[*15] DIB resists producing Mr. Khalid for deposition on the grounds that he is merely a clerk [5] in the foreign section of the Operations Department. Mr. Ellison represents that Khalid was demoted from his previous position as "person responsible for interbank transfers" because of his involvement in the fraud and because of the criminal proceedings against him. (Ellison Decl. at 2.) Mr. Ellison also states that Mr. Khalid no longer has any signature authority (whereas previously he had "B" authority). Mr. Khalid was convicted of fraud in the Dubai Court of First Instance, yet later had his conviction overturned (along with two other DIB employees, whom Citibank also seeks to depose, see infra).

5    DIB's records indicate that his position was changed to "First Banker" (Tucker Aff., Ex. I), a term that may or may not be synonymous with "clerk," but which Mr. Ellison does not explain.

Although the parties dispute whether DIB posted bail for Mr. Khalid, there is no dispute about the more significant fact that DIB [*16] waived its civil case against Mr. Khalid and maintained him in its employ, and that the appellate court relied in part on these circumstances in overturning Mr. Khalid's conviction. Moreover, in addition to retaining Mr. Khalid as an employee, DIB continues to pay him the same salary and to maintain him at the same grade, a fact Mr. Ellison acknowledges, albeit backhandedly. Mr. Ellison states that this rather remarkable situation - the bank's retention, at the same position grade and salary, of an employee admittedly involved in a massive fraud scheme against it

- results from DIB's "staff policies," which do not contain "any provision for demotion by way of reduction in grade, or by reduction in salary or allowances." (*Id.*)

The Court is persuaded that Mr. Khalid may be considered a managing agent for the purpose of noticing his deposition. The fact that DIB retained Mr. Khalid in its employ, waived its civil claims against him, and assisted in his escaping criminal liability, despite his undisputed involvement in a quarter-billion dollar fraud against it, strongly suggests that Mr. Khalid is greatly indebted to DIB, and thus remains subject to its control. That his interests [*17] remain aligned with DIB is supported by his continuing to draw the same salary and enjoy the same position grade as he did prior to the events in question. Moreover, DIB cannot be heard to claim that Mr. Khalid is not authorized to testify for DIB, when DIB admits that it retains him precisely for that reason. Mr. Ellison explains that DIB retains Mr. Khalid because, as a non-national of the United Arab Emirates, his right to remain in Dubai under his employment visa depends entirely on his sponsorship by DIB. If terminated, "Khalid would return to his home in . . . India . . . and his testimony would be lost *to DIB*, Khalid, and other interested parties." (Ellison Decl. at 2-3 (emphasis added).) This admission strongly suggests that, even if he no longer retains a position of authority, Khalid, who has been employed by DIB since 1975, remains "ready to serve" DIB, *Loew's,* 24 F.R.D. at 26, and that he has "maintained interests consonant with rather than adverse to [DIB's] interests," *Church of Scientology,* 802 F.2d at 1456; *see also Afram Lines,* 159 F.R.D. at 415 [HN6]("An agent's history of cooperating with a party in discovery [*18] may be probative of the party's ability to rely on the agent to testify.") The purpose of the general rule against requiring former officers to testify - namely, "to protect the party from the admissions of disgruntled former officers and agents," Fed. Practice and Procedure § 2103 - will thus not be frustrated in this case. As the cases cited above demonstrate, "this principle has been applied in light of its purpose. When the person involved retains such a connection with the corporation as to be loyal to it, his or her deposition has been considered that of the corporation, and the same result had been reached when the person, even though no longer a managing agent, is still in the employee of the party." *Id.*

Accordingly, this Court holds that Mr. Khalid is a managing agent subject to deposition by notice. [6]

6    DIB also claims there are several additional problems with taking Mr. Khalid's deposition in New York. These concerns, as well as all such non-status-related objections respecting other witnesses, are discussed below, in the next section.

[*19] *2. Mohammed Abdullah Ali Al Rais*

With respect to the current motion, the issues concerning the status of Mohammed Abdullah Al Rais are substantially similar to those concerning Mr. Khalid. Mr. Al Rais was Chief of Cashiers during the period involved in this litigation. [7] (Ellison Decl. at 4.) Like Mr. Khalid, Mr. Al Rais was subsequently demoted from his position of high authority, to a clerical position, following his involvement in the criminal fraud. (His current position title is apparently "First Banker." (Tucker Aff., Ex. J.)) Like Mr. Khalid, Mr. Al Rais was convicted in the Dubai Court of First Instance but subsequently exonerated on appeal, in part due to DIB's having absolved him of civil liability and maintained him in its employ. Mr. Al Rais also continues to enjoy the same salary and grade as he did prior to the fraud. Finally, as with Mr. Khalid, Citibank has offered significant, apparently unrefuted evidence of Mr. Al Rais's importance to the transactions at issue in this dispute. (Tucker Apr. 25, 2002 Let. at 7-8 & citations therein.) Indeed, Mr. Al Rais's extensive involvement in many of pertinent events in this case is corroborated by Mr. Ellison's representation [*20] that Mr. Al Rais has testified more than twenty times in related matters in the Dubai courts.

7    In presenting Mr. Al Rais's former position as an undisputed fact, the Court relies on Mr. Ellison's sworn declaration, along with the evidence submitted by Citibank, and not DIB counsel's unsworn, belated, and equivocal statement that "we now understand that Mr. Al Rais did not hold the position of 'Chief Cashier' at DIB, but that the Chief Cashier responsible for the safe and its contents during the period of the fraud was Mohammed Ayyoub." (Welzer May 3, 2002 Let. at 6.) Moreover, as with Mr. Khalid, DIB's perpetually shifting representations concerning Mr. Al Rais raise more questions than they answer, and persuade this Court of the wisdom of resolving doubts regarding the proposed deponents' status in favor of Citibank.

2002 U.S. Dist. LEXIS 9794, *20
30 Fed. R. Serv. 2d (Callaghan) 1389; 39 Fed. R. Serv. 2d (Callaghan) 1389

In light of his obvious importance to the matters at issue and his equally clear position of authority, and for substantially the same reasons as stated above with respect to Mr. Khalid, this [*21] Court finds Mr. Al Rais is a managing agent of DIB who therefore is subject to deposition by notice. In so ruling, the Court has taken into account the additional reason proffered by Mr. Ellison why Mr. Al Rais may not testify on DIB's behalf, namely, that Mr. Al Rais is attempting to find a new job and "would happily leave DIB tomorrow . . . [but] he needs to support his family and to finish funding his pension." (Ellison Decl. at 5.) Putting aside the fact that this hearsay statement is not competent evidence, the Court notes that this is an insufficient ground for defeating managing agent status. The near universal need to earn income and provide for one's retirement does not imply disloyalty to one's employer, and does not change one's status within the organization (just as, conversely, an independently wealthy low-level functionary would not become a managing agent subject to deposition by notice merely because he loved his job).

### 3. Sayed Najamul Hassan

Like Messrs. Khalid and Al Rais, Mr. Hassan was convicted for his apparently significant personal involvement in the fraud [8], exonerated on appeal after being given a release of liability by DIB, and retained as [*22] an employee of DIB. Unlike Khalid and Al Rais, however, Mr. Hassan was a mere clerk in the Foreign Department at the time of the events in question (and remains one now). Citibank does not contest this fact, but contends that Mr. Hassan's "role in the fraud transcended that of a clerk because he was actively involved in forging hundreds of fraudulent documents directly related to the transfers at issue in this case." (Tucker Apr. 25, 2002 Let. at 10.) The Court agrees that Mr. Hassan's importance to the events in question appears supported by the record; unfortunately for Citibank, however, this is not the test for managing agent. There is no evidence that Mr. Hassan's position gave him any independent discretion, and even his role in the fraud appears to be that of a facilitator and subordinate. *See Libbey Glass, 197 F.R.D. at 351* (individual who "may well have played an important role" in events giving rise to lawsuit was not managing agent because he "facilitated, but did not control" those events).

8    Mr. Ellison states that Mr. Hassan was prosecuted "for criminal breach of trust and

practising black magic." (Ellison Decl. at 5.)

[*23] Accordingly, Mr. Hassan is not an officer, director, or managing agent, and thereby is not subject to deposition by notice.

### 4. Mohammed Abul Quashem Fazar Rahman

Mr. Rahman is undisputedly Assistant Head or Deputy Head of the Foreign Department, and was so at the time of the fraud. DIB does not contest his high-ranking status in the bank, but seeks to avoid his deposition on the grounds that "it would not be a prudent use of time" because Mr. Rahman allegedly lacks recollection of the events in question. (Welzer May 3, 2002 Let. at 7.) DIB states that he was not "formally" interviewed by either the Dubai authorities or KPMG, and argues that this tends to show his lack of importance to the events in question. Nevertheless, Citibank states that its primary interest in deposing Mr. Rahman does not stem from his alleged direct involvement in the fraud. Rather, Citibank maintains that it seeks to learn of the procedures, operations, and practices of the Foreign Department, of which Mr. Rahman was Deputy Head, and which sent all of the wire transfers at issue in this case. Moreover, there remain questions about Mr. Rahman's direct involvement and knowledge in these transfers, [*24] a fact suggested by the independent auditor's report, which concluded that it was "important" to interview him to ascertain his role in the fraud.

Accordingly, DIB's motion for a protective order regarding Mr. Rahman is denied.

### 5. Mohammad Sadiq Mohammad Ali

According to Mr. Ellison, Mr. Sadiq is a "supervisor" in the foreign section. (Ellison Decl. at 8.) The independent auditor's report submitted by Citibank lists Mr. Sadiq as Mr. Khalid's Deputy in the Foreign Department. Mr. Ellison states that Mr. Sadiq merely performs "routine work . . . including checking and signing vouchers for incoming and outgoing remittances, checking and signing outward Telexes and SWIFT messages. . . ." (Ellison Decl. at 7.) Mr. Ellison admits that Mr. Sadiq has "B" level signature authority, but downplays the significance of such authority. Mr. Ellison states that "A" and "B" level signatories are "back-office workers empowered to complete the paperwork for transactions approved elsewhere." (*Id. at 8.*) Mr. Ellison notes that Mr. Sadiq signs between 200 and 250 transfer

2002 U.S. Dist. LEXIS 9794, *24
30 Fed. R. Serv. 2d (Callaghan) 1389; 39 Fed. R. Serv. 2d (Callaghan) 1389

vouchers per day, and that he has no recollection of any particular events or transactions with respect to the fraud. [*25] Finally, Mr. Ellison notes that Mr. Sadiq was not interviewed as part of the official criminal investigation in Dubai, nor was he interviewed by KPMG, although KPMG did indicate he might be a useful witness.

Citibank argues that Mr. Ellison's assessment of the significance of signature authority is contradicted by Mr. Ellison's own answers to previous interrogatories, in which he stated, "For persons associated with DIB with duties to act for DIB, *see* signature book to be produced." (Tucker Apr. 25, 2002 Let. at 13.) Citibank also points out that the signature book itself states that officials listed therein are "authorized to sign on behalf of the bank" with respect to "financial commitments or disposal of Dubai Islamic Bank assets." (*Id.*) Additionally, Citibank notes that many of DIB's most important officers and directors, including the chairman of the board and the CEO, are included in the signature book, a fact that obviously undermines the assertion that such signatories are merely "back-office employees." Finally, Citibank also points to evidence that Mr. Sadiq may have been centrally involved in the fraud, inasmuch as he was Khalid's deputy and may also have received [*26] instruction from Mr. Ayoub. (*Id.* at 13-14.)

The Court agrees with Citibank that DIB's characterization of the significance of such signature authority is contradictory, if not implausible. From the language of the signature book itself, as well as Mr. Ellison's representation in his interrogatory, the signatories appear to be vested with the type of discretion and authority that come with managing agent status. On the other hand, the fact that Mr. Sadiq signs upwards of 200 transfers a day suggests that each individual act of signing may not entail such a great exercise of judgment and discretion after all. In sum, the record before the Court is sparse and ambiguous on this score. More significant, however, is the fact that Citibank has pointed to little else that tends to show a high level of authority on the part of Mr. Sadiq either in general or with respect to the matters in this litigation. Even the KPMG report, on which Citibank primarily relies, suggests that Mr. Sadiq's role, if any, was likely that of subordinate, both to Mr. Ayoub and to Mr. Khalid, his direct supervisor. Thus, even if Mr. Sadiq had involvement in and recollection of the transactions in question, which [*27] he denies having, his status does not appear to be that of officer and managing agent. As stated, the test for managing agent

does not turn on one's mere possession of relevant information. Rather, the witness must possess authority to speak and act on behalf of the corporation. The Court is not prepared to find that Mr. Sadiq's signature authority, standing more or less alone, confers him with such authority.

Accordingly, the Court finds Mr. Sadiq is not a managing agent subject to deposition by notice, and grants DIB's motion for a protective order with respect to Mr. Sadiq. [9]

> [9]    However, the Court notes that if Citibank remains committed to taking discovery from Mr. Sadiq, he apparently remains on good terms with DIB and thus, most likely, is amenable to DIB's directions. DIB has in fact offered to try to persuade Mr. Sadiq to appear for deposition (albeit in London). The Court therefore suggests that, in the interest of compromise, DIB try to make Mr. Sadiq available for deposition in Dubai, in the event counsel for Citibank travels there.

[*28] **6. *Rafat Karim Ahmed Karim***

According to Mr. Ellison, Mr. Karim is a "supervisor" in the communications section and has "limited decision-making authority." (Ellison Decl. at 8.) Mr. Ellison admits that he has "B" level signature authority, and that he works with the SWIFT and Telex systems apparently at issue in this litigation. Mr. Ellison states that he reports to the department manager, who in turn reports to the Operations Manager. In response, Citibank notes that the auditor's report identifies Mr. Karim as an "officer in [DIB's] Foreign Remittance Department," and indicates that he monitored DIB's correspondent accounts, such as the one that DIB held with Citibank. (Tucker Apr. 25, 2002 Let. at 14.) Citibank also notes that DIB's records indicate that Mr. Karim is a "Senior Banker," and that he signed many of the transfers at issue in this case. (*Id.*) DIB replies that the reference in the KPMG report to Mr. Karim as an "officer" is an example of the inaccuracy of the report (which was critical of DIB), and should thus be discounted. (Welzer May 3, 2002 Let at 9.)

The foregoing persuades this Court that Mr. Karim's status as an officer or managing agent is at [*29] least a close call, and that he should thus be subject to deposition by notice. His signature authority and supervisory position indicate that he holds general powers to exercise

judgment and discretion, that he can be relied on to give testimony, and that he identifies with the interests of DIB. Although he may not be the highest ranking official in his department, which weighs against his being found a managing agent, this factor is counterbalanced by his seeming direct supervisory authority over many of transactions at issue in this case. Accordingly, under the five-factor test, the Court finds that Mr. Karim is a managing agent who may be required to appear for deposition by notice on DIB's behalf.

### 7. Sayed Kamel Mansour

According to Mr. Ellison, Mr. Mansour is a clerk in the General Accounts department, who has never had signature authority and whose job entails "the purely clerical function of taking figures from the general ledger trial balance and inserting those numbers into slots on the proforma for the U.A.E. Central Bank returns." (Ellison Decl. at 9.) Mr. Ellison also affirms that Mr. Mansour at all relevant times performed his duties solely according to instructions [*30] he received from his superior, Mr. El Refaie. In addition, Mr. Ellison states that Mr. Mansour has "absolutely no memory of Mr. El Refaie ever indicating to him that anything should be covered up," despite statements in the KPMG report suggesting otherwise. (*Id.* at 9.)

Citibank states that contrary to Mr. Ellison's assertion, Mr. Mansour is listed in DIB's signature book as having "B" signature authority. Citibank also notes that DIB's July 2001 list of employees describes Mr. Mansour not as a clerk but as an accountant. In addition, Citibank points to portions of the KPMG report suggesting that Mr. Mansour was directly involved in both the fraud and the alleged coverup. Citibank also notes that KPMG indicated that Mr. Mansour "needed to be interviewed" regarding his knowledge of the fraud, inasmuch as he was "one of the signatories" on a particular accounting voucher. (Tucker Apr. 25, 2002 Let at 15-16.)

Other than his disputed signature authority, there is scant evidence suggesting that Mr. Mansour is or was in a position of discretion and significant responsibility. Unlike others with signature authority, Mr. Mansour does not seem to have now, or have had, a managerial role [*31] in the company generally, or with respect to the events at issue. Even accepting that his title is "accountant" and not "clerk," this title does not suggest managing agent status. Moreover, it is apparently not

contested that his role in the events was a subordinate one, inasmuch as he took orders from Mr. Refaie. Regardless of whether the content of the orders included a direction to cover up the fraud, Mr. Mansour was still acting at Mr. Refaie's behest. As stated above, the mere fact that Mr. Mansour may have been directly implicated in the matters involved in this litigation, and thus have important information, does not alter his status.

Accordingly, the Court finds that Mr. Mansour is not an officer, director, or managing agent subject to notice of deposition. In the interest of compromise, DIB has offered to provide Citibank with a written response to any inquiries it may have of Mr. Mansour. Accordingly, Citibank shall promptly provide DIB with such inquiries if it wishes to avail itself of this procedure, or, alternately, should attempt to arrange for Mr. Mansour's deposition in Dubai.

### 8. Ibrahim Eissa Lootah

Mr. Ellison states that, upon information and belief, [*32] Mr. Lootah, "while technically still an 'employee' of DIB, has virtually no responsibilities at DIB. He was demoted from branch manager of DIB's Al Souk branch almost immediately after discovery of the fraud and now he does not have any real responsibilities. He has no signature authority . . . . He does very little (if any) actual work for DIB. . . ." (Ellison Decl. at 9-10.) Mr. Ellison provides no explanation of why Mr. Lootah remains an employee of DIB despite his having been demoted, apparently on account of involvement in the fraud. On the other hand, Mr. Welzer, one of DIB's attorneys, states that "DIB does not believe that Mr. Lootah was involved in the fraud, although he (like many others) was under the cloud of suspicion that was initially cast following the discovery of the massive fraud in 1998." (Welzer May 3, 2002 Let. at 11.)

Citibank points to the apparently undisputed fact that Mr. Lootah was a high-level officer of the bank during the relevant period. Mr. Lootah had "A" level signature authority, and, according to DIB's counsel's own representation, was "one of eight branch managers who reported to an executive committee made up of the most senior officers at DIB. [*33] " (Welzer May 3, 2002 Let. at 10.) Though Mr. Welzer offers this as an explanation of why Mr. Lootah was *not* a senior official, it appears to the Court to indicate just the opposite. Regardless of whom he reported to, Mr. Lootah obviously had substantial managerial authority over a significant

2002 U.S. Dist. LEXIS 9794, *33

30 Fed. R. Serv. 2d (Callaghan) 1389; 39 Fed. R. Serv. 2d (Callaghan) 1389

segment of the bank, given his position as head of a branch. His independent discretion and judgment are further indicated by his having the same level of signature authority as DIB's CEO. (Tucker Apr. 25, 2002 Let. at 16.) Moreover, it is not clear that he did not play some role in the events at issue in this litigation, though what exactly he may have done remains unclear.

Finally, as with Messrs. Al Rais and Khalid, his continued employment with DIB, after coming under a "cloud of suspicion" for involvement in the fraud, indicates an ongoing identity of interest between Mr. Lootah and DIB. As Citibank notes, it is bizarre indeed that DIB would retain an employee, apparently at a high salary, for four years and running, who was demoted because of suspected participation in a quarter-billion-dollar fraud. Such a situation cries out for an explanation, which has not been forthcoming. The [*34] Court notes that DIB's explanations for why Mr. Lootah is still employed are contradictory: on one hand, Mr. Ellison asserts that Mr. Lootah was demoted on account of the fraud; on the other, Mr. Welzer claims that DIB does not believe Mr. Lootah was even involved in the fraud. If Welzer's version is in fact the correct one, the Court is left to wonder why, or whether, Mr. Lootah was demoted at all. If he was demoted on account of involvement in the fraud, yet continues to be retained four years later, the Court can only infer that DIB, in light of such extraordinary magnanimity toward Mr. Lootah, continues to exercise control over him, and that it can rely on him to testify at its behest. In any event, the unexplained contradictions surrounding Mr. Lootah's current status, coupled with his previously high-level status, more than suffice to make Mr. Lootah's status a "close call," warranting his being subject to deposition by notice.

### 9. Fawzi Mohammed Lootah

Mr. Ellison states that Mr. Lootah is a "supervisor" in the foreign Murabaha follow-up and collections department, but that he has neither "decision-making discretion" nor signature authority for financial transactions. [*35] (Ellison Decl. at 10.) Nevertheless, it is undisputed that Mr. Lootah was head of the Foreign Section during the relevant period. Citibank cites testimony of a DIB manager stating that Mr. Lootah supervised Mr. Khalid, and argues that Mr. Lootah therefore has highly relevant information regarding matters central to this litigation. (Tucker Apr. 25, 2002

Let. at 17-18.) Counsel for DIB asserts that Mr. Khalid was not under Mr. Lootah's supervision, a fact not addressed in Mr. Ellison's declaration. (Welzer May 3, 2002 Let. at 11.) In any event, Mr. Ellison states that Mr. Lootah had "very little, if any, actual involvement in the events at issue in this lawsuit" and that "other witnesses," whom he does not identify, have "specific and better knowledge" regarding the information relevant to this lawsuit. (Ellison Decl. at 10.) Mr. Ellison notes that the Dubai police and public prosecutor did not interview Mr. Lootah.

Regardless of Mr. Lootah's role in the matters at issue, which the Court finds unclear at this point and thus a fact that should be resolved in favor of his examination, the other factors for determining managing agent status suggest that Mr. Lootah is such an agent. His [*36] former role as department head clearly gave him substantial authority, and even now he retains a supervisory position. Moreover, even if he was not involved in the fraud, as DIB suggests he was not, the same lack of explanation for his apparent demotion, if indeed one has occurred, exists as in the case of Mr. Ibrahim Eissa Lootah. His continued employment by DIB suggests an identity of interests, and that he may relied on to testify at DIB's behest.

Accordingly, the Court holds that Mr. Fawzi Lootah, as a managing agent, may be deposed on notice pursuant to the Federal Rules. However, given DIB's assertion that Mr. Lootah had little involvement in the events at issue and thus has little relevant information, the Court suggests that Mr. Lootah's deposition be scheduled for a time after the depositions of the other witnesses herein discussed. This Court's suggestion does not excuse DIB of its obligation to produce Mr. Lootah, but simply attempts to accommodate DIB by having Citibank depose Mr. Lootah only after determining that he may have information not otherwise obtained. This suggestion is not binding, and may be disregarded in the event that scheduling Mr. Lootah later rather [*37] than sooner becomes impracticable.

### 10. Mr. Zohair Al Rabi'i

Mr. Al Rabi'i was the head of the Computer Department during the relevant time period. Citibank has pointed to documents, including the KPMG report, suggesting both that the computerized accounting systems may have been an important aspect of the fraud, and that Mr. Al Rabi'i may have instructed a subordinate,

2002 U.S. Dist. LEXIS 9794, *37
30 Fed. R. Serv. 2d (Callaghan) 1389; 39 Fed. R. Serv. 2d (Callaghan) 1389

Chandra Shekar, to assist the former CFO in the fraud. (Tucker Apr. 25, 2002 Let. at 18-19.) Regardless of his role, given his status as department head, it seems relatively clear that his former position qualified Mr. Rabi'i as an officer or managing agent.

As for his current position, Mr. Ellison's declaration simply states that he "works in the compliance department," without providing his title. (Ellison Decl. at 11.) Mr. Ellison states that "he does things like review daily transactions," and "doesn't implement things by his own volition; he merely recommends a course of action." (*Id.*) The Court finds these vague, conclusory assertions, which are sandwiched between a litany of equitable claims of why Mr. Al Rabi'i should not be forced to come to New York, unconvincing. Given his undisputed prior [*38] position as a department head, the Court is satisfied that the status of Mr. Al Rabi'i as a managing agent remains at least a close question, and that he can be expected to identify with DIB, and to testify at its request. Accordingly, he is subject to deposition by notice.

DIB also argues that a former subordinate of Mr. Rabi'i, Mr. Shekar, should testify in his stead. Mr. Ellison asserts that Mr. Shekar was the "de facto head" of the IT department, and that he "performed most of the work" there. (Ellison Decl. at 11.) Nevertheless, it is undisputed that he has now left DIB, and thus cannot be deposed as an officer or managing agent. Although DIB has stated that it "might" be able to produce him in New York (*id. at 11*), Citibank correctly points out that his testimony would not constitute a party admission.

As a compromise, the Court offers DIB the following proposal: it may produce Mr. Shekar for deposition in New York, instead of Mr. Rabi'i, on condition that it stipulate to the admissibility at trial, as a party admission of DIB, of Mr. Shekar's deposition testimony. Such a stipulation is appropriate, given Mr. Ellison's representations that Mr. Shekar was the "de facto head" [*39] of the department - and thus had de facto managing agent status - and that Mr. Shekar stands ready to serve DIB upon its request. Further, this compromise attempts to accommodate both parties' interest in having the most knowledgeable witness deposed. If DIB does not consent to this procedure, it must produce Mr. Rabi'i for deposition, for the reasons stated above. Moreover, if Mr. Shekar is deposed and his testimony supports the contention that Mr. Rabi'i is a managing agent and may have relevant knowledge that Mr. Shekar lacks, the Court

will entertain a renewed application for the deposition of Mr. Rabi'i.

### III. Location of Depositions

For each proposed deponent, DIB has raised various equitable reasons why it believes he should not be required to appear in New York for a deposition. Citibank insists that any other solution but requiring these deponents to come to New York is both unfair and impracticable. The Court has considered the equities and the practicalities of the situation regarding each proposed witness, and, in its discretion, concludes that DIB has not overcome the presumption that a plaintiff who brings suit in a particular forum should be prepared to [*40] send its agents to be deposed there.

[HN7]As a general rule, a plaintiff who brings suit in a particular forum may not avoid appearing for examination in that forum. See, e.g., *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, 2002 U.S. Dist. LEXIS 9218, 97 Civ. 4978 (LMM)(ABP), 2002 WL 1041356, at *1 (S.D.N.Y. May 23, 2002)("It is well settled that a plaintiff is ordinarily required to make him or herself available for a deposition in the jurisdiction in which the action is brought."); *Daly v. Delta Airlines, Inc.*, 1991 U.S. Dist. LEXIS 2762, No. 90 Civ. 5700(MEL)(MHD), 1991 WL 33392, at *1 (S.D.N.Y. Mar. 7, 1991) (absent showing of substantial hardship, and "in view of the fact that plaintiff chose to file his lawsuit here rather than in Ireland, it is hardly unreasonable to expect that he make himself available in the district where he is litigating his million dollar claim"); *Clem v. Allied Int'l*, 102 F.R.D. 938, 939-40 (S.D.N.Y. 1984) (nonresident plaintiff who sues in Southern District of New York must appear for deposition here absent compelling circumstances); *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway and Sons*, 54 F.R.D. 280, 281 (S.D.N.Y. 1971) ("Since [*41] plaintiff has chosen this forum, it cannot impose upon defendant the extraordinary expense and burden of traveling to a foreign country to conduct a deposition except on a showing of burden and hardship to the plaintiff."); Michael C. Silberberg, *Civil Practice in the Southern District of New York* § 17.11 (2d ed. 2000) ("The deposition of a plaintiff usually may be taken in the Southern District of New York notwithstanding the plaintiff's residence outside the district. The reason is that the plaintiff selected the Southern District as the forum for trial.")(collecting cases); *cf. Sugarhill Records*, 105 F.R.D. at 171 ("[Defendant] Motown is a large

2002 U.S. Dist. LEXIS 9794, *41
30 Fed. R. Serv. 2d (Callaghan) 1389; 39 Fed. R. Serv. 2d (Callaghan) 1389

corporation and cannot seriously contend that travel on behalf of the corporation by one of its managing agents is unexpected or that such travel to New York for deposition imposes a severe burden on it."). In the end, the decision as to the location of the deposition lies within the discretion of the court. See *Sugarhill Records, 105 F.R.D. at 171*; *Federal Practice and Procedure* § 2112.

DIB attempts to avoid the normal rule on several grounds. Some of these grounds are common to all of the [*42] proposed deponents; some are specific to individual deponents. The Court will address the general objections first, then turn to the objections particular to individual deponents.

DIB claims that many of the managing agents in question do not want to travel to the United States in general, and New York City in particular, in light of the perceived dangers related to the aftermath of events on September 11, 2001. Citibank contends that the risk for foreign travelers in New York is minimal, and in any event pales in comparison with the threat posed to Americans traveling in the Middle East.

The Court agrees with Citibank that the dangers to each party are not completely symmetrical. There is no evidence that foreign visitors to New York face any threat - or at least any threat greater than that to New Yorkers in general. See *A.I.A. Holdings, S.A. v. Lehman Bros., Inc., 2002 U.S. Dist. LEXIS 9607, 97* Civ. 4978 (LMM)(ABP), 2002 WL 538833, at *4 (S.D.N.Y. Apr. 10, 2002) ("To the extent that Omaya and Huda assert anxiety concerning traveling to New York, their anxieties are baseless. There is no evidence in the record suggesting that individuals of Middle-Eastern ancestry have been subject to acts [*43] of revenge since the mass murders of September 11."). On the other hand, the State Department has issued warnings to Americans traveling abroad in general, and to the Middle East in particular. (Tucker Apr. 25, 2002 Let., Exs. 2-3.) More importantly, the Court agrees with those courts that have concluded that whatever the increased dangers both in the United States and throughout the world, the U.S. judicial system remains open for business, and its normal operations cannot be upset by mere invocation of the tragedy of September 11. See *In re Vitamins Antitrust Litig.*, Misc. No. 99-197, MDL No. 1285, (D.D.C. Nov. 30, 2001),Memorandum Opinion Re: Deposition Locations, attached as Ex. C. to Letter of D. Scott Tucker, Esq., Jan.

10, 2002 ("Tucker Jan. 10, 2002 Let."), at 11. ("World events do not change the obligations of the foreign defendants with respect to this litigation."); *Dean Foods Co. v. Eastman Chem. Co.*, No. C 00-4379, C 00-4402,(N. D. Cal. Oct. 10, 2001), Order Re Depositions, attached as Ex. D to Tucker Jan. 10, 2002 Let., at 3. ("The business of the United States continues, and part of that business is the conduct of litigation."); *see also American Int'l Tel., Inc. v. Mony Travel Servs., Inc., 203 F.R.D. 153, 155 (S.D.N.Y. 2001)* [*44] ("The Court can perceive no reason why Duran's alleged fear of flying should require someone else to take to the skies."). In the *Mony Travel* case, the court noted that post-September 11 excuses carried less weight where the party had been seeking to avoid appearing for deposition since before that date. See *Mony Travel, 203 F.R.D. at 155.* Though not prepared to conclude that DIB has intentionally sought to frustrate Citibank's legitimate discovery demands, the Court notes that Citibank had been attempting to depose many of the individuals in question since well before last September. In any event, the reluctance of nearly all of the proposed deponents to travel to the United States after September 11, 2001, as reported in the Ellison Affidavit, does not defeat DIB's obligation to produce them for deposition in New York.

DIB also claims that many of its witnesses cannot come to New York because of family obligations. In particular, many of its witnesses are fathers of "traditional Muslim families" that depend on them not only financially, but also for such services as driving, something most of their wives cannot do. While not unsympathetic to the disruption to [*45] daily family life that foreign travel may cause, the Court nonetheless cannot allow the simple fact that the proposed deponents are Muslims with dependent families to overcome DIB's discovery obligations. Permitting such an excuse would effectively insulate an entire segment of the global population from the ordinary rules of discovery, regardless of having availed itself of the U.S. court system. Moreover, each of the deponents need appear in New York for at most a couple of days.

DIB also contends that although it filed its Complaint in New York, it had no choice but to do so, apparently referring to the forum selection clause in its contract with Citibank. (Letter of Frank C. Welzer, Esq., Jan. 7, 2002, at 7.) However, as Citibank rightly contends, the fact that DIB agreed to such a clause only supports the conclusion that its officers should be

Page 13

required to appear in this forum for deposition. (Tucker Jan. 10, 2002 Let. at 6 n.6.) Moreover, the Court notes that this is not a case involving an individual plaintiff with limited financial resources, in which being forced to appear in a foreign forum would pose a significant economic hardship. Compare [*46] *Normande v. Grippo*, 2002 U.S. Dist. LEXIS 501, No. 01 Civ. 7441(JSR)(THK), 2002 WL 59427, at *2 (S.D.N.Y. Jan. 16, 2002)(permitting telephonic deposition of Brazilian plaintiff where plaintiff was *pro se*, had limited resources, and would have been forced to travel to New York with her infant child, and where case was neither complex nor involved many documents; thus, hardship to plaintiff in coming to New York clearly outweighed any prejudice to defendant from conducting deposition by telephone).

Another common objection raised by DIB is the uncertainty surrounding the ability of some of the deponents to secure travel visas to the United States. However, Citibank has represented its willingness to work with DIB - and, as necessary, the State Department - to help secure the necessary travel documents. [10]

> 10 Obviously, if visas cannot be secured - after a good faith, diligent, and documented attempt - the Court will be confronted with a new set of circumstances that would require reconsideration of this decision.

In his Declaration, Mr. Ellison [*47] asserts that several of the proposed deponents have medical problems that make their traveling to New York unadvisable. Mr. Khalid has asthma (Ellison Decl. at 3); Mr. Rahman has "slightly raised blood pressure" and also risks "deep vein thrombosis" if subjected to long-distance air travel (*id. at 6-7*); Mr. Fawzi Lootah has recently had eye surgery, and "says that he cannot fly anywhere" (*id. at 10*); and Mr. Karim has "a blood pressure problem, which he controls by medication" (*id. at 8*). None of these conditions, except for Mr. Lootah's, is supported by any documentation, and even Mr. Lootah's medical records conspicuously do not contain a doctor's note prohibiting air travel. Indeed, Mr. Lootah's eye surgery took place in India, not Dubai, and thus presumably required his traveling by air. As for the conditions of Messrs. Rahman and Khalid, DIB has been on notice for approximately a year with respect to each witness that Citibank wished to depose him in New York, and has never until now even suggested, despite extensive communication with this Court and Citibank concerning their depositions, that a

medical condition might make coming here a problem. Accordingly, these [*48] medical objections, based on chronic conditions that presumably could have been raised at any time in the past year, have been waived. *See A.I.A. Holdings*, 2002 U.S. Dist. LEXIS 9607, 2002 WL 538833, at *4. Finally, as for Mr. Karim's blood pressure problem, Mr. Ellison himself concedes that this is controlled by medication; merely having a correctable medical condition does not render one unable to travel.

Finally, DIB notes that many of the proposed witnesses have miscellaneous personal obligations, such as the administration of a father's estate or the preparation for a daughter's wedding, that allegedly make travel to the United States undesirable or unfeasible. However, none of these objections appear to this Court to involve a substantial hardship or other compelling grounds for setting aside the normal rule regarding the location of depositions, and none presents an insurmountable practical difficulty. Moreover, Citibank has indicated its willingness to work with DIB to accommodate these personal concerns, such as by arranging the depositions of Mr. Al Rais and Mr. Ibrahim Lootah so as not to conflict with their required court appearances in Dubai. Further, Mr. Al Rais's alleged weariness [*49] of testifying about the fraud does not constitute the type of compelling circumstance that would justify his being excused from testifying here; rather, it underscores his apparent importance to the matters at hand.

The Court has also considered DIB's various other objections to producing these witnesses in New York, and finds them without merit. Whatever hardship and practical difficulties may attend the appearance in New York of the seven managing agents herein discussed would be multiplied by requiring the taking of discovery in Dubai or elsewhere. Requiring depositions to take place in Dubai, or even London, would entail both sides to send abroad, for a far longer period than any one witness would be required to travel to New York, an entourage of lawyers, reporters, and translators, not to mention countless boxes of relevant documentary materials. The logistical and financial burden of such an operation, not to mention the personal risk to those involved, greatly exceeds that of sending seven witnesses to New York for one or two days each. As for DIB's suggestion that Citibank conduct telephonic or videotaped depositions, this is not a case where financial hardship or other good [*50] cause exists for departing from ordinary discovery procedures. Moreover, because

Page 14

2002 U.S. Dist. LEXIS 9794, *50
30 Fed. R. Serv. 2d (Callaghan) 1389; 39 Fed. R. Serv. 2d (Callaghan) 1389

of the language barriers and the need for interpreters, telephone depositions would not be practical. *Cf. Daly, 1991 U.S. Dist. LEXIS 2762, 1991 WL 33392*, at *1 [HN8](noting that generally it is less cumbersome and more illuminating to conduct a face-to-face deposition). Additionally, the Court notes that given the highly contentious nature of this lawsuit, the availability of the Court to resolve disputes that may arise during depositions counsels in favor of conducting them in New York.

The fact that letters rogatory regarding some of the witnesses are pending in Dubai does not preclude Citibank, the Defendant in this case, from conducting normal discovery in accordance with the Federal Rules. Indeed, as far as this Court is aware, these letters have been pending a long time, and may ultimately prove fruitless. Finally, the Court also notes that DIB's objection that Citibank is seeking to depose an excessive number of witnesses is not well taken; as of January, DIB had deposed seventeen Citibank fact witnesses, versus four DIB witnesses that Citibank had deposed. (Tucker Jan 10, 2002 Let. at 2.) Though several more [*51] DIB witnesses have either been deposed or scheduled to be deposed since then, pursuant to this Court's direction, the disparity remains. As the Plaintiff in a quarter-billion-dollar lawsuit, DIB cannot avoid its

obligations to furnish Citibank with a meaningful opportunity to take discovery.

## CONCLUSION

For the foregoing reasons, DIB's motion for a protective order shielding its employees from being subject to deposition by notice is granted with respect to Sayed Kamel Mansour, Mohammad Sadiq Mohammad Ali, and Sayed Najamul Hassan, and denied with respect to all others. Additionally, DIB may avoid producing Mr. Al Rabi'i for deposition upon the conditions discussed above. Regardless of whether DIB objects to any other portion of this Order, DIB shall immediately begin securing the visas and other travel documents necessary for the witnesses' travel to the United States; DIB shall provide the Court a written report of the status of all outstanding visa applications by June 30, 2002.

## SO ORDERED.

THEODORE H. KATZ

United States Magistrate Judge

Dated: New York, New York

May 28, 2002

LEXSEE



Warning
As of: May 09, 2008

**ROBERT LOUIS SANSTROM, on behalf of himself and all others similarly situated, Plaintiffs, - against - MARGARITA ROSA, individually and as Commissioner of the Division of Human Rights of the Executive Department of New York State, and MARIO CUOMO, individually and as Governor of the State of New York, Defendants.**

**93 Civ. 7146 (RLC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**1996 U.S. Dist. LEXIS 11923**

**August 16, 1996, Decided
August 16, 1996, FILED**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff civil rights claimants filed an action against defendants, the Commissioner of the Division of Human Rights of the Executive Department of New York State, the former Governor of New York, and the Division of Human Rights, under 42 U.S.C.S. § 1983. The claimants asserted that the Division had delayed the investigation and processing of their claims. Pursuant to Fed. R. Civ. P. 37, the claimants brought a motion to compel discovery.

**OVERVIEW:** The claimants sought to hold defendants in contempt for violating a previous discovery order. The court granted the motion. It was clear to the court that defendants had not turned over all of the material relating to office of regulatory and management assistance reports. Unfortunately, the manner in which defendants produced the materials precluded a positive identification of what items remained outstanding. Defendants admitted that there were transition documents that they could not locate. The claimants should have been apprised of this, and defendants' failure to do so constituted further

evidence of their negligence in meeting their discovery obligations. The documents defendants supplied regarding employee redeployment to help with the Division's backlogs and delays did not sufficiently respond to the claimants' request. Defendants failed to present any valid legal argument that the former Governor should not have been deposed. The fact that the former Governor had a busy schedule was simply not a basis for foreclosing otherwise proper discovery. The claimants were also entitled to discovery regarding the Division's funding and staffing levels.

**OUTCOME:** The court granted the claimants' motion to compel discovery and ordered defendants to produce all outstanding documents relating to the office of regulatory and management assistance reports, transition documents, and employee redeployment. The court also ordered the former Governor to appear for deposition and for defendants to complete the statistical chart.

**CORE TERMS:** deposition, governor, discovery, chart, oral argument, statistical, attorney's fees, responding, notice, outstanding, transition, state employees, uncovering, destroyed, missing, backlog, column,

1996 U.S. Dist. LEXIS 11923, *
51 Fed. R. Serv. 3d (Callaghan) 708; 2001-2 Trade Cas. (CCH) P73,421

produce documents, affirmative action, citation omitted, convenience, destruction, prejudiced, contempt, claimant, deposed, locate, spent, busy, interrogatories

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Misconduct*
[HN1]Striking pleadings is generally reserved for the most egregious discovery violations and should be used only as a last resort.

*Civil Procedure > Discovery > Misconduct*
*Civil Procedure > Sanctions > Contempt > Civil Contempt*
[HN2]An answer is stricken where a defendant disobeyed court orders to respond to deposition questions and produce documents, was jailed for civil contempt, repeatedly perjured himself, and evinced a continuing and absolute disrespect for the discovery process.

*Civil Procedure > Discovery > Misconduct*
*Evidence > Documentary Evidence > General Overview*
[HN3]A court declines to strike an answer where the chaotic state of a defendant's documentary evidence suggests that failure to meet discovery obligations is not willful but results from gross negligence.

*Civil Procedure > Discovery > Methods > Oral Depositions*
[HN4]The fact that a witness has a busy schedule is simply not a basis for foreclosing otherwise proper discovery.

*Civil Procedure > Discovery > Methods > Oral Depositions*
[HN5]An order precluding the deposition of a witness is of course the exception rather than the rule in federal court.

*Civil Procedure > Discovery > Methods > Oral Depositions*
*Civil Procedure > Discovery > Undue Burdens*
[HN6]When a witness sought to be deposed is a high-level government official, a party must show both

the need for the deposition and that it will not hinder governmental functions.

*Civil Procedure > Discovery > Methods > Oral Depositions*
*Civil Procedure > Discovery > Privileged Matters > General Overview*
[HN7]The mere fact that a witness may be asked questions that seek to elicit privileged matter does not provide a colorable basis for precluding the entire deposition.

*Civil Rights Law > Practice & Procedure > Civil Rights Commissions > Authority*
[HN8]Thirty-three day letters are used to determine whether a complainant still wishes to proceed on a claim pending before the New York State Division of Human Rights.

*Civil Procedure > Discovery > Methods > Oral Depositions*
[HN9]When a deposition request is made under Fed. R. Civ. P. 30(b)(6), it is the duty of the responding party to produce someone responsive to that demand. If in the course of the deposition it becomes apparent that the person designated is not able to provide testimony on the matters specified in the notice, it is the duty of the responding organization immediately to make a new designation substituting someone who can give the needed testimony.

*Civil Procedure > Discovery > Misconduct*
[HN10]Destruction of documents provides ground for imposition of sanctions where a party or counsel has prior knowledge of their relevance.

*Civil Procedure > Discovery > Misconduct*
*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > General Overview*
[HN11]Fed. R. Civ. P. 37(a)(4)(A) mandates the award of attorney's fees to a prevailing moving party absent a determination that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust.

**COUNSEL:**    [*1]    For  NEW  YORK  STATE NATIONAL ORGANIZATION FOR WOMEN, NEW

1996 U.S. Dist. LEXIS 11923, *1
51 Fed. R. Serv. 3d (Callaghan) 708; 2001-2 Trade Cas. (CCH) P73,421

YORK CITY CHAPTER OF THE NATIONAL ORGANIZATION FOR WOMEN, intervenor-plaintiffs: Robert L Becker, Raff & Becker, New York, NY.

For DELLIE BRITT, on behalf of himself and all others similarly situated, intervenor-plaintiff: Gerald J. Dunbar, Gerald J. Dunbar, Esq., Brooklyn, NY.

For CLARICE SEEGARS, intervenor-plaintiff: Steven L. Brown, Greater Upstate Law Project, Inc., Rochester, NY.

For MARGARITA ROSA, defendant: June Duffy, Robert Abrams, Attorney General, NYS, New York, NY.

For MARGARITA ROSA, intervenor-defendant: June Duffy, (See above).

**JUDGES:** JAMES C. FRANCIS IV, UNITED STATES MAGISTRATE JUDGE

**OPINION BY:** JAMES C. FRANCIS IV

**OPINION**

*MEMORANDUM AND ORDER*

JAMES C. FRANCIS IV

UNITED STATES MAGISTRATE JUDGE

The plaintiffs in this action bring suit pursuant to 42 U.S.C. § 1983 against the New York State Division of Human Rights (the "SDHR"). They allege that the SDHR's delay in investigating and processing their claims of discrimination violated their rights to due process and equal protection as guaranteed by the Fourteenth Amendment to the United States Constitution. The plaintiffs seek declaratory and injunctive relief, as well as compensatory damages for each class member.

In a prior determination, the Court dismissed the named plaintiff, Robert Sanstrom, for mootness and allowed Jane Doe, Bernadette Thomas, Dellie Britt, and Clarice Seegars to intervene. The Court further granted the motion of the New York City and Westchester Chapters of the National Organization for Women ("NOW") to intervene, except that their claim for compensatory damages was dismissed. Former Governor Mario Cuomo's motion to dismiss was denied, and a class was provisionally certified. The class consists of all

persons whose cases have been or may [*2] be subject to dismissal or whose monetary judgments have been reduced because the SDHR took longer than three years to adjudicate their claims.

The parties are currently in the midst of discovery, and the plaintiffs have now moved pursuant to Rule 37 of the Federal Rules of Civil Procedure, seeking (1) to hold the defendants in contempt for violation of a previous discovery order, (2) to compel the deposition of former Governor Mario Cuomo, [1] (3) to compel the defendants to complete a statistical chart created by the plaintiffs, (4) to require the defendants to provide a statistically valid stratified sample of cases that were dismissed for administrative convenience because the SDHR could not locate the claimant or had classified the claimant as uncooperative, and (5) to be awarded attorney's fees, costs, and expenses for taking the deposition of John Lind, Deputy Commissioner for Regional Affairs at the SDHR. In addition, the plaintiffs move for sanctions, seeking (1) to strike a portion of defendants' Answers and (2) to be awarded attorney's fees, costs, and expenses incurred in uncovering the scope of the allegedly unproduced documents and in making the instant motion.

[1]    Both Governor Cuomo and Margarita Rosa, former Commissioner of the SDHR, are named in the complaint in their official and individual capacities. They have since been replaced in their official roles by Governor George Pataki and Acting Commissioner Edward Mercado. Both, however, remain as defendants in their individual capacities.

[*3] *Background*

On January 30, 1995, the plaintiffs served their First Request for Documents on the defendants, and on June 30, 1995, they served their Second Request for the Production of Documents. Declaration of David Raff dated March 15, 1996 ("Raff Decl."), Exh. 7, 8. The defendants served their response to both document requests on July 31, 1995. Although the defendants produced numerous documents at that time, the plaintiffs contend that the responses were not complete. Raff Decl. at P 7. In a letter to the defendants dated September 15, 1995, the plaintiffs listed each document they believed had not been produced. Raff Decl., Exh. 1. The defendants did not respond.

The plaintiffs also served a Notice of Deposition on

Page 3

1996 U.S. Dist. LEXIS 11923, *3
51 Fed. R. Serv. 3d (Callaghan) 708; 2001-2 Trade Cas. (CCH) P73,421

Governor Cuomo on or about October 3, 1995. Raff Decl., Exh. 12. The defendants objected to the plaintiffs' request and offered instead to respond to written interrogatories. The defendants further stated that if the answers to the written interrogatories indicated that an oral deposition was justified, they would then consider producing Governor Cuomo. Declaration of June Duffy dated April 19, 1996 ("Duffy Decl.") at P 24. When the plaintiffs objected to [*4] this procedure, the defendants responded that Governor Cuomo would not be produced due to his busy schedule. Raff Decl., Exh. 13. The parties again wrote to the defendants on December 8, 1995, to identify the documents that the defendants had not yet produced. Raff Decl., Exh. 2.

The parties appeared before me in an attempt to resolve these issues. As a result of that conference, I issued an order on January 16, 1996 directing the defendants to produce certain outstanding documents by February 9, 1996.

Subsequent to my order, the plaintiffs sent two letters setting forth the documents which they believed to be covered by the order and still outstanding. Raff Decl., Exh. 3, 4. The plaintiffs acknowledge that the defendants turned over some additional materials after the January 16 order, Raff Decl. at P 4 n. 3, and the defendants claim that they have continued to produce documents following the filing of the instant motion. Duffy Decl. at P 3.

*Discussion*

A. *January 16, 1996 Order*

At oral argument on July 23, 1996, the plaintiffs identified four document categories that the defendants have failed to produce. Prior to seeking the intervention of the court, the plaintiffs [*5] sought to resolve these issues with the defendants. However, in violation of my order, the defendants failed either to produce documents or to provide the plaintiffs any formal response with respect to those documents claimed to be missing.

The defendants have argued that the scope and extent of discovery in this case has required them to expend substantial amounts of time in compiling responses. Nevertheless, that does not excuse them from requesting an extension of time, coming forward with the reasons for delay, and exercising diligence in complying with my order. The defendants' behavior has caused considerable delay and necessitated the current motion.

*1. ORMA reports*

The plaintiffs seek reports made by the Office of Regulatory and Management Assistance ("ORMA") prepared in 1988 and 1994 as well as five additional items relating to those reports. Raff Decl., Exh. 3 at 6. The plaintiffs have indicated that they have received the actual reports but not the additional items. Tr. at 5. [2] The defendants claim to have produced everything. However, it seems clear that the defendants have not turned over all of the ORMA material. Tr. at 299-30. Unfortunately, the manner in which [*6] the defendants have produced some ORMA materials precludes a positive identification of what items remain outstanding. Therefore, the defendants shall, within thirty days of the date of this order, produce all documents referenced in numbers 1-5 in Section E of Mr. Raff's letter dated February 26, 1996. Raff Decl., Exh. 3. If the defendants have already responded to any of these items, they shall provide the plaintiffs with a written statement indicating which documents respond to that item.

    2    "Tr." refers to the transcript of the oral argument held before me on July 23, 1996.

*2. Computer Tracking System*

The plaintiffs have made a number of requests relating to the SDHR's computer tracking system ("CTS"). In the course of a deposition, the plaintiffs requested information from the system regarding the number of complainants who do not have private counsel. Raff Decl., Exh. 3, p. 8. The defendants previously claimed that they were unable to extract that information from the CTS. The plaintiffs dispute this [*7] assertion. However, the parties indicated at oral argument that their respective computer experts will meet to resolve this issue. Tr. at 7.

*3. Transition Documents*

In order to show that Governors Cuomo and Pataki had notice of the various problems that the plaintiffs allege have plagued the SDHR, the plaintiffs have requested documents prepared at the time each governor assumed office by both the SDHR and the governors' respective transition teams. The plaintiffs contend that these documents would contain an analysis of the SDHR at the time that each governor took office as well as information relating to staffing levels, backlogs, and delay. The plaintiffs also seek these documents as

evidence of the governors' personal knowledge of the conditions at the SDHR. The plaintiffs made this request in their first and second requests for documents. Raff Decl., Exh. 7, 8.

At oral argument, the defendants admitted for the first time that there were transition documents that they cannot locate. Tr. at 31. The plaintiffs should have been apprised of this situation long ago. The defendants' failure to do so constitutes further evidence of their negligence in meeting their discovery obligations. [*8] The defendants shall produce all transition documents prepared by the SDHR or the governors' respective transition teams within thirty days of the date of this order. The defendants shall further prepare a list of all documents which they were unable to locate.

#### 4. Redeployment of Other State Employees

In their complaint, the plaintiffs contend that state employees from other agencies trained in affirmative action procedures could have been redeployed to help with the backlogs and delay at the SDHR. The defendants respond that redeployment of other state employees would not have aided the SDHR in reducing its backlog and in fact would have disrupted the work of those other agencies. Answer to Intervenor NOW Complaint at P 24.

The plaintiffs have requested documents regarding staff members at other state agencies who had knowledge of affirmative action procedures. Raff Decl., Exh. 7 at PP 13, 14. These requests were reiterated in later letters from the plaintiffs to the defendants. Raff Decl., Exh. 1, 3, 4. The defendants finally responded on July 15, 1996, eight days before this conference and nearly 18 months after the plaintiffs made the original request.

At oral argument, [*9] the plaintiffs contended that the documents that the defendants produced were nonresponsive. Tr. at 16. Upon review of the documents produced by the defendants, I agree that the documents do not sufficiently respond to the plaintiffs' request. The information is divided into a number of sections. One section, which is undated, contains a table that includes the name of each agency, the relevant job titles, an unexplained column marked "J.C." and a column marked "# of positions." Also in this section is information stating the minimum qualifications necessary to hold each of the various positions. Several other sections are computer printouts, also undated, that contain unexplained statistical data. A number of other sections

appear to be job descriptions and qualifications, but these too are undated. The final section contains a table similar to the first section, but this data bears a date of 1982. It is impossible to extract any useful information from these materials, and, in addition, no documents were produced to account for the years 1981 through 1986.

As a sanction for the defendants' failure to respond adequately to this particular request, the plaintiffs request that the [*10] portion of the defendants' answer that relates to redeployment be stricken.

While I agree that the defendants' failure to meet their discovery obligations has prejudiced the plaintiffs, [HN1]striking pleadings is generally reserved for the most egregious discovery violations and should be used only as a last resort. *See, e.g., Amway Corp. v. Shapiro Express Co., 102 F.R.D. 564, 569-70 (S.D.N.Y. 1984)* ([HN2]answer stricken where defendant disobeyed court orders to respond to deposition questions and produce documents, was jailed for civil contempt, "repeatedly perjured himself and . . . evinced a continuing and absolute disrespect for the discovery process"); *cf. Monaghan v. SZS 33 Associates, L.P., 148 F.R.D. 500, 509 (S.D.N.Y. 1993)* ([HN3]court declined to strike answer where the chaotic state of defendant's documentary evidence suggested that failure to meet discovery obligations was not willful but resulted from gross negligence). Here, the defendants' errors seem to have stemmed more from negligence than willfulness. Accordingly, I decline to strike any portion of the defendants' answer at this time. However, the defendants shall produce: (1) statistical data from 1981 through 1996 [*11] for other state employees with knowledge of affirmative action policies as indicated in the plaintiffs' document requests, (2) a cover sheet explaining the meaning of any column headings in the data, and (3) a witness to explain other portions of the data should the plaintiffs require additional information. The defendants shall produce this information within 30 days of the date of this order.

#### B. Deposition of Governor Cuomo

Pursuant to Rule 30 of the Federal Rules of Civil Procedure, the plaintiffs served Governor Cuomo with a notice to appear for a deposition on November 7, 1995. Raff Decl., Exh. 12. The plaintiffs seek to learn "what former Governor Cuomo knew about the backlog and the delay problems at SDHR; when he first learned there were problems in processing cases in a timely manner;

1996 U.S. Dist. LEXIS 11923, *11
51 Fed. R. Serv. 3d (Callaghan) 708; 2001-2 Trade Cas. (CCH) P73,421

what steps, if any, he took to remedy the problems; and if he did not take remedial steps, why he failed to do so." Raff Decl. at P 26. Because the defendants have refused to produce Governor Cuomo, the plaintiffs now seek an order compelling him to appear for a deposition.

The defendants have failed to present to this court any valid legal argument that Governor Cuomo should not be deposed. [*12] They first assert that "given time constraints, the former Governor simply cannot be deposed in each of the hundreds of cases in which he is named as a defendant." Raff Decl., Exh. 13. This argument is meritless. In the first place, Governor Cuomo has not submitted an affidavit to the Court to substantiate the claim that he is too busy. Secondly, [HN4]"the fact that the witness has a busy schedule is simply not a basis for foreclosing otherwise proper discovery." *CBS, Inc. v. Ahern, 102 F.R.D. 820, 822 (S.D.N.Y. 1984)* (citation omitted).

As a second argument, Governor Cuomo contends that the plaintiffs should be precluded from taking his deposition due to his status as a high government official. Defendants' Memorandum at 12. This argument similarly lacks merit. [HN5]"An order precluding the deposition of a witness is of course the exception rather than the rule in federal court." *Martin v. Valley National Bank of Arizona, 140 F.R.D. 291, 314 (S.D.N.Y. 1991)* (citations omitted). It is true that [HN6]when the witness sought to be deposed is a high-level government official, a party must show both the need for the deposition and that it will not hinder governmental functions. *Id.* However, [*13] because Mr. Cuomo is no longer governor, he cannot claim this privilege. *See, e.g., Gibson v. Carmody, 1991 U.S. Dist. LEXIS 11225,* No. 89 Civ. 5358 (LMM), 1991 WL 161087 at *1 (S.D.N.Y. Aug. 14, 1991) (allowing deposition of former New York City Police Commissioner). Furthermore, even if he were still governor, his deposition would be required because he "possesses particular information necessary to the development . . . of the [plaintiffs'] case, which cannot be reasonably obtained by another discovery mechanism." *American Broadcasting Companies v. United States Information Agency, 599 F. Supp. 765, 769 (D.D.C. 1984)* (citation omitted); *see also Martin, 140 F.R.D. at 314; Virgo Corp. v. Paiewonsky, 39 F.R.D. 9, 11 (D.V.I. 1966).* Here, it is critical that the plaintiffs prove Governor Cuomo's personal involvement in order to recover damages under *42 U.S.C. § 1983. Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986).*

As a corollary to this argument, Governor Cuomo maintains the "plaintiff[s] should not be allowed to inquire into the thought processes of a government decision maker or to invade the internal deliberations of the executive branch of the State government." Defendants' [*14] Memorandum in Opposition at 13. However, [HN7]the mere fact that a witness may be asked questions that seek to elicit privileged matter does not provide a colorable basis for precluding the entire deposition. To the extent that there is an objection to a particular question on the grounds of privilege, that objection may be made at the deposition and I will rule on it accordingly. Therefore, defendant Cuomo shall appear for a deposition at a time and place to be determined by the parties, but to occur within 30 days of the date of this order.

*C. Completion of the statistical chart*

The plaintiffs' discovery requests seek information on the SDHR's funding and staffing levels from 1981 to the present. In order that the parties may stipulate to this data, and to avoid disputes over the actual numbers, the plaintiffs have prepared a chart for the relevant years which contains a variety of information on funding and staffing levels gleaned from documents produced by the defendants. They then requested that the defendants complete this chart. This request is the functional equivalent of a set of interrogatories. While a great majority of the information on this chart has already been entered, [*15] a number of cells are still blank. Although the defendants have stated that they have spent considerable time with this chart, some of the information sought remains outstanding since September of 1995. Raff Decl., Exh. 1.

I note that since the original drafting of this chart, additional data has been requested. For example, the chart that the plaintiffs provided to the Court at oral argument contains a column not listed on prior forms entitled "actual disbursements." Raff Decl., Exh. 1 at 5. I further note that the defendants were not ordered to produce any data prior to 1986 until my January 16, 1996 order. However, six months have passed since that order was issued and the defendants have still failed to provide any information pertaining to the SDHR's budget requests from 1981-82 through 1985-86. The defendants shall complete the chart or produce the documents necessary to do so within 30 days of the date of this decision.

*D. Discovery of statistical data*

1996 U.S. Dist. LEXIS 11923, *15
51 Fed. R. Serv. 3d (Callaghan) 708; 2001-2 Trade Cas. (CCH) P73,421

In conjunction with their claim that the SDHR routinely dismisses backlogged cases, the plaintiffs have requested statistical data from the SDHR for analysis by their expert, Richard Faust. After his initial analysis, Mr. [*16] Faust has determined that a proper analysis will require a statistically valid stratified sample of cases closed for administrative convenience. Raff Decl. at P 33. In a letter dated January 29, 1996, the plaintiffs sought to establish a joint protocol for obtaining the necessary data. Raff Decl., Exh. 14. The defendants, in their papers responding to this motion, have indicated that they are willing to proceed as proposed in the January 29 letter. Duffy Decl. at P 23.

E. *Deposition of John Lind*

The plaintiffs, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, requested the deposition of an SDHR staff person with knowledge of the procedural operations of SDHR, specifically concerning 33-day letters, [3] procedures for contacting claimants, and the use of administrative convenience dismissals. Raff Decl. at P 36. The defendants produced John Lind, Deputy Commissioner for Regional Affairs. The plaintiffs contend that Mr. Lind was not sufficiently knowledgeable in these areas. Raff Decl. at P 37.

[3] [HN8]33-day letters are used to determine whether a complainant still wishes to proceed on a claim pending before the SDHR.

[*17] [HN9]When a deposition request is made under Rule 30(b)(6), it is the duty of the responding party to produce someone responsive to that demand. "If in the course of the deposition it becomes apparent that the person . . . designated [is] not able to provide testimony on the matters specified in the notice, it is the duty of the [responding organization] immediately to make a new designation substituting someone who can give the needed testimony." 8A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 2103, at 31-32 (1994).

I have reviewed the transcript of the deposition provided by the plaintiffs. Although Mr. Lind did not have knowledge of the practices of the SDHR ranging back to 1981, he did testify extensively about the SDHR's current practices and procedures. The plaintiffs make much of the defendants' acknowledgement that they could produce someone with more knowledge than Mr. Lind. However, when a Rule 30(b)(6) request seeks

information about a wide variety of topics such that no single witness could testify as to each and every one, the obligation of the responding party is produce additional witness with relevant knowledge. *See id.* [*18] The defendants have offered to do so in this case.

In addition, the plaintiffs' actions belie their assertion that the deposition was not useful. The plaintiffs made no representation at the deposition that Mr. Lind was not an appropriate deponent. Furthermore, at the end of a full day of testimony, the plaintiffs' counsel indicated that he wished to schedule another date to continue. Deposition of John Lind, dated January 11, 1996, at 128. Having failed to give the defendants an opportunity to produce another witness prior to this motion, the plaintiffs' request for fees and costs associated with taking Mr. Lind's deposition is denied.

F. *Destruction of Documents*

At oral argument the plaintiffs suggested that the defendants may have destroyed relevant documents. The defendants have admitted that the SDHR destroyed some documents "improperly." Tr. at 28. However, at this point the plaintiffs can not identify which documents may have been destroyed or the extent to which they were prejudiced. Without a showing of prejudice, sanctions are inappropriate at this time. If in the future the plaintiffs are able to present evidence that they have been prejudiced by the defendants' destruction [*19] of relevant evidence, I will at that time entertain a motion for an appropriate sanction. *See, e.g., Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 72-76 (S.D.N.Y. 1991) ([HN10]destruction of documents provides ground for imposition of sanctions where party or counsel has prior knowledge of their relevance).

G. *Attorney's fees and costs*

Pursuant to Rule 37(a)(4) of the Federal Rules of Civil Procedure, the plaintiffs seek attorney's fees, costs and expenses for making this motion and for the time spent uncovering the scope of the allegedly missing documents.

1. *Fees for the discovery motion*

Rule 37(a)(4)(A) [HN11]mandates the award of attorney's fees to a prevailing moving party absent a determination that the opposition to the motion "was substantially justified or that other circumstances make

1996 U.S. Dist. LEXIS 11923, *19
51 Fed. R. Serv. 3d (Callaghan) 708; 2001-2 Trade Cas. (CCH) P73,421

an award of expenses unjust." The defendants' conduct here clearly warrants an award of attorney's fees. They have delayed as long as 18 months in responding to certain requests, ignored a court order, and advanced meritless legal arguments. In sum, the defendants have taken an approach to discovery that has caused inordinate delay in these proceedings. For these reasons, I award [*20] the plaintiffs reasonable attorney's fees for making this motion, except for time spent preparing those portions of the motion that deal with the Lind deposition. The plaintiffs shall submit their request for fees with supporting documentation within 30 days of the date of this motion. The defendants shall submit any opposing papers two weeks thereafter and the plaintiffs may reply one week after that.

### 2. Fees for uncovering the scope of missing documents

The plaintiffs have included in their prayer for relief a request for fees as they relate to "uncovering the extent of the missing documents." Notice of Motion at 2. The plaintiffs do not explain what this means. This request could encompass two different situations. On one hand, it could be construed as a request for fees to determine the extent to which documents have been destroyed by the defendants. If so, the request is premature. On the other hand, the request could relate to the time required to determine which documents the defendants have failed to produce. Taken in this context, an award of fees for the making of this motion is a sufficient sanction.

### Conclusion

For the reasons set forth above, the defendants [*21] shall, within thirty days of the date of this order, (1) produce all outstanding documents as indicated in Part A of this decision, (2) produce former Governor Cuomo for deposition, and (3) complete the statistical chart. Failure to comply with any portion of this order shall result in a finding of contempt and the imposition of an appropriate sanction. It is further ordered that the plaintiffs may submit documentation of the costs and attorneys' fees incurred in connection with this motion.

SO ORDERED.

JAMES C. FRANCIS IV

UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York

August 16, 1996

LEXSEE

THE ALVIN SCHWARTZ, M.D., P.A., EMPLOYER/EMPLOYEE PROFIT
SHARING PLAN, DAVID SCHWARTZ, VICTOR SCHWARTZ, HARVEY
SHAPIRO and FAITH STAHL, as Custodian for MICHAEL STAHL, Plaintiffs, v.
STEPHEN O'GRADY, TAYLOR GILMAN & NICHOLS, LIMITED, and
DISCOUNT CORPORATION OF NEW YORK FUTURES, Defendants

No. 86 Civ. 4243 (JMC)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

1988 U.S. Dist. LEXIS 15566

December 21, 1988, Decided

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant futures
commission broker filed a motion for an order
compelling two plaintiff limited partners to appear for
deposition in New York City in the partners' action that
alleged that the broker and others violated the
Commodity Exchange Act, the Securities Exchange Act
of 1934, Racketeer Influenced and Corrupt Organizations
statute and other state law claims.

**OVERVIEW:** The partners' complaint was initially
dismissed for failure to plead fraud with the particularity
required by Fed. R. Civ. P. 9(b), but the court granted the
partners' leave to file an amended complaint. A motion to
dismiss the amended complaint for the same reason was
granted in part and denied in part. The broker served
notices of deposition on two partners. Counsel for the
partners notified the broker that one partner would not
appear because he no longer wished to be a plaintiff in
the case, and the second partner would not appear
because he was residing in Paris, France and appearing in
New York City would impose financial hardship. The
court granted in part and denied in part the broker's
motion to compel appearance. The court dismissed the
first partner from the action with prejudice and concluded
that the motion to compel that partner to appear was
moot. The court was not persuaded that undue hardship
would be imposed on the second partner, because the
partner failed to provide evidence of his financial position

or of the cost of travel for the deposition. The court held
that the broker was entitled to depose the partner face to
face to adequately prepare for trial.

**OUTCOME:** The court granted the broker's motion for
an order compelling one partner to appear for depositions
because that partner did not show financial hardship that
would result from such an appearance. The court denied
the motion as to the partner who no longer wished to be a
plaintiff in the action against the broker.

**CORE TERMS:** deposition, commodity, trading,
misrepresentation, transportation, particularity, hardship,
attend, bring suit, general partner, letter dated,
partnership

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Methods > Oral
Depositions*
[HN1]Absent extreme hardship, a plaintiff should appear
for deposition in his chosen forum.

**OPINION BY:** [*1] CANNELLA

**OPINION**

*MEMORANDUM AND ORDER*

Page 1

1988 U.S. Dist. LEXIS 15566, *1
30 Fed. R. Serv. 2d (Callaghan) 1389; 39 Fed. R. Serv. 2d (Callaghan) 1389

*JOHN M. CANNELLA, UNITED STATES DISTRICT JUDGE*

Defendant Discount Corporation of New York Futures' motion for an order compelling plaintiffs David Schwartz and Harvey Shapiro to appear for depositions in New York City is granted in part and denied in part. *Fed. R. Civ. P. 37.*

## BACKGROUND

Plaintiffs are limited partners in five commodity trading funds formed as limited partnerships under New Jersey law [the "Funds"]. They bring suit on behalf of themselves and derivatively on behalf of the Funds.

Defendant Stephen G. O'Grady was a general partner and commodities trading advisor to the Funds. Defendant Taylor, Gilman & Nichols, Ltd. [TG&N], O'Grady's agent, is a New York limited partnership engaged in the business of commodity futures trading and futures arbitrage. Defendant Discount Corporation of New York Futures ["Discount"] was the futures commission broker for the Funds.

During 1983 and 1984, plaintiffs invested approximately $ 640,000 into the Funds. By May 1985, their entire investment had been lost. Upon discovery of the losses, plaintiffs, by letter dated July 3, 1985, made demand upon O'Grady for documents and records of the Funds' trading [*2] activity. Plaintiffs renewed their demand by letter dated August 6, 1985; no documents or records were received. Due to his role in managing the Funds, plaintiffs did not make demand upon O'Grady to bring suit on behalf of the Funds. They did, however, make such a demand upon Mark Schwartz, who along with O'Grady was one of the two general partners of one of the Funds, but Schwartz refused.

On May 28, 1986, plaintiffs commenced this action, alleging violations of the Commodity Exchange Act, the Securities Exchange Act of 1934, the RICO statute and other state law claims. Discount moved to dismiss the complaint, inter alia, for failure to plead fraud with the particularity required by *Fed. R. Civ. P. 9(b).* The Court granted the motion with leave to file an amended complaint. *See* Memorandum and Order, 86 Civ. 4243 (JMC) (S.D.N.Y. April 6, 1987). On or about April 27, 1987, plaintiffs filed an amended complaint. Defendants O'Grady and TG&N moved to dismiss the amended complaint for failure to plead fraud with the particularity

required by *Fed. R. Civ. P. 9(b).* That motion was granted in part and denied in part. *See* Memorandum and Order, 86 Civ. 4243 (JMC) (S.D.N.Y. Dec. [*3] 15, 1987).

On August 18, 1988 Discount served Notices of Depositions on plaintiffs David Schwartz and Harvey Shapiro. By agreement between the parties the depositions were postponed from that date. On October 12, 1988 counsel for plaintiffs notified Discount that plaintiff Shapiro would not appear for his deposition as he no longer wished to be a plaintiff in this case. Plaintiffs' counsel further advised Discount that David Schwartz was presently residing in Paris, France and, therefore, would not appear for a deposition in New York.

Discount now moves for an order compelling Schwartz and Shapiro to appear for depositions in New York City. Plaintiff Schwartz opposes the motion and seeks to have his deposition taken by telephone, or in the alternative, taken through the use of written interrogatories.

## DISCUSSION

The law is well settled that [HN1]"absent extreme hardship, [a] plaintiff should appear for deposition in his chosen forum." *Clem v. Allied Van Lines Int'l Corp., 102 F.R.D. 938, 940 (S.D.N.Y. 1984).* Plaintiff Schwartz claims that the cost of transportation to New York City to attend a deposition would be prohibitive. Schwartz further contends that he is "an individual of meager [*4] financial means." Affirmation of Joseph T. Moldovan at para. 3, 86 Civ. 4243 (JMC)(S.D.N.Y. Nov. 4, 1988). The Court, however, is not persuaded that deposing Schwartz in New York City would impose an extreme hardship upon him. [1]

> 1   Plaintiff Schwartz makes much of the fact that Discount did not serve the Notice of Deposition until one year after the action had been commenced. Schwartz contends that Discount could have deposed him in New York City prior to his leaving the country. Schwartz does not dispute, however, that he never informed Discount that he would be leaving the country so that they could schedule the deposition prior to his departure. The Court, however, does not find the issue dispositive.

Plaintiff David Schwartz has neither provided the

1988 U.S. Dist. LEXIS 15566, *4
30 Fed. R. Serv. 2d (Callaghan) 1389; 39 Fed. R. Serv. 2d (Callaghan) 1389

*Court with the details of his financial position, nor the cost of transportation from Paris to New York City. The Court, therefore, is unable to assess the prohibitiveness of the cost of the deposition.* Moreover, this is an action for fraud and misrepresentation and resolution of certain issues will necessarily depend on the testimony of the plaintiffs, *e.g.*, Schwartz's reliance on misrepresentations by defendants. Under [*5] these facts, Discount is entitled to depose Schwartz face to face in order to adequately prepare for trial. *See Clem*, 102 F.R.D. at 940 (citing Slade v. Transatlantic Fin. Corp., 21 F.R.D. 146, 147 (S.D.N.Y. 1957)).

In addition, plaintiff Harvey Shapiro has refused to attend a deposition in New York City claiming that he no longer wishes to be a plaintiff in this action. Accordingly, Harvey Shapiro is dismissed from the action with prejudice. Discount's motion to compel Shapiro to appear for a deposition in New York City is, therefore, moot.

*CONCLUSION*

*Defendant Discount's motion to compel plaintiff David Schwartz to appear for a deposition in New York City is granted.* Fed. R. Civ. P. 37. *David Schwartz is hereby ordered to submit to examination in New York City at a time and place to be agreed upon by counsel. Plaintiff Harvey Shapiro is dismissed from the action with prejudice.*

*SO ORDERED.*

*Dated: New York, New York*

*December 21, 1988*