UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
PARAMOUNT PARKS INC.                      :
                                          :
                    Plaintiff,            :        CASE NO.  07 CV 10595 (SHS)
                                          :
            v.                            :
                            :
LESTER NAIL                               :
                                          :
                    Defendant.            :
-------------------------------------------------------x

        Jill S. Kirila, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury as

follows:

        1.      I am a member of the bar of the State of Ohio and admitted *pro hac vice* in this

Court in the above matter.  I am a partner in the law firm of Squire, Sanders & Dempsey L.L.P.,

attorneys for Plaintiff Paramount Parks Inc. ("PPI").

        2.      I submit this declaration in support of PPI's Motion for Summary Judgment (the

"Motion") filed contemporaneously herewith.

        3.      Attached hereto as Exhibit 1  is a copy of the transcript of the deposition of

Defendant Lester Nail, with the exception of the portions marked confidential that are not cited

in the Motion.

        4.      Attached hereto as Exhibit 2 (Exhibits 2, 5-17, 22-23, B, C, E, F and H to

Defendant's deposition)  is a copy of all exhibits from Defendant's deposition that are referenced

in the Motion.

        5.      Attached hereto as Exhibit 3 is a copy of the transcript of the deposition of Mr.

Craig Freeman.

        6.      Attached hereto as Exhibit 4 (Exhibits C, I, and J to Mr. Freeman's deposition) is

a copy of all exhibits from Mr. Freeman's deposition that are referenced in the Motion.

7.      Attached hereto as Exhibit 5 is a copy of the transcript of Ms. Sandy Cranford.

8.      Attached hereto as Appendix 1 are copies of all unreported, docketed cases cited in PPI's Memorandum of Law in Support of the Motion.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and understanding.


Executed this 11th day of July, 2008.

                                        /s/ Jill S. Kirila
                                        Jill S. Kirila



Page 1

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK

3    ---------------------------X

4    PARAMOUNT PARKS, INC.,

5            Plaintiff,

6        vs.        No. 07 CV 10595(SS)

7    LESTER NAIL,

8            Defendant.

9    ---------------------------X

10           April 23, 2008
             3:27 p.m.

11

12       ** REDACTED TRANSCRIPT **

13

14

15       Deposition of LESTER NAIL, held at the

16   offices of Squire, Sanders & Dempsey L.L.P.,

17   350 Park Avenue, New York, New York, pursuant

18   to Notice and Agreement, before Thomas R.

19   Nichols, a Registered Professional Reporter

20   and a Notary Public of the State of New York.

21

22

23
             GREENHOUSE REPORTING, INC.
24       875 Sixth Avenue - Suite 1716
             New York, New York  10001
25           (212) 279-5108

Page 2

1
2    A P P E A R A N C E S :
3
4    SQUIRE, SANDERS & DEMPSEY L.L.P.
5    Attorneys for Plaintiff
6       1300 Huntington Center
7       41 South High Street
8       Columbus, Ohio 43215-6197
9    BY:   JILL S. KIRILA, ESQ.
10
11   LITTLER MENDELSON
12   A Professional Corporation
13   Attorneys for Defendant
14      885 Third Avenue
15      New York, New York 10022-4834
16   BY:   A. MICHAEL WEBER, ESQ.
17
18
19
20
21
22
23
24
25

Page 3

1                    L. Nail
2    L E S T E R   N A I L ,  called as a witness,
3       having been duly sworn by a Notary Public,
4       was examined and testified as follows:
5           THE REPORTER:  Would you please state
6       your name and home address for the record.
7           THE WITNESS:  Lester Nail, 375 South
8       Monterey Drive, Moore, South Carolina 39369.
9    EXAMINATION BY
10   MS. KIRILA:
11       Q.    Good afternoon, Mr. Nail.  In case you
12   missed it, my name is Jill Kirila and I'm with the
13   law firm of Squire Sanders and representing
14   Paramount Parks in this lawsuit.  I know you sat
15   through most of Mr. Freeman's deposition today.
16           But do you understand that you are
17   here for your deposition today?
18       A.    Yes.
19       Q.    Have you ever been deposed before?
20       A.    Once by telephone many, many years
21   ago.
22       Q.    Do you recall the case in which you
23   were deposed?
24       A.    It was a Wal-Mart case.
25       Q.    In your capacity as counsel?

Page 4

1                    L. Nail
2       A.    As counsel, yes.
3       Q.    In a deposition my client is entitled
4    to ask you questions that you are required to
5    answer under oath.
6           Do you understand that part of it?
7       A.    Yes.
8       Q.    As the court reporter just reminded
9    you, if we could take turns with our questions and
10   responses that will make the record more clear and
11   enable both of our questions and responses to be
12   taken down hopefully accurately.  OK?
13       A.    Sure.
14       Q.    Also, because you are answering under
15   oath today, it is important that you understand my
16   questions, and so I will ask you if you do not
17   understand one of my questions will you let me
18   know?
19       A.    Yes.
20       Q.    Otherwise I will assume that you've
21   understood and answered the question that I've
22   asked.  Is that fair?
23       A.    Yes.
24       Q.    Is there any reason you could not
25   testify truthfully here today?

Page 5

1                    L. Nail
2       A.    No.
3       Q.    Are you on any medication that would
4    interfere with your ability to testify?
5       A.    No.
6       Q.    Have you had a drink of alcohol within
7    the last twelve hours?
8       A.    No.
9       Q.    Have you taken any prescription drug
10   within that same amount of time that would impact
11   your ability to testify?
12       A.    No.
13       Q.    Or fail to take any that you're
14   supposed to take that might affect your ability to
15   testify?
16       A.    No.
17       Q.    I assume you have no problems with
18   hearing or communicating in general?
19       A.    No.
20       Q.    As you are doing, it's important to
21   verbalize your responses, again, so that the court
22   reporter can take down your responses accurately
23   as opposed to shaking your head or nonverbal
24   responses.
25           Is that understood?

Page 6

L. Nail

1
2    A.   Yes.
3    Q.   I just want to follow up real quickly
4    on the deposition you gave in your capacity as
5    counsel for Wal-Mart.
6         What type of case was that?
7    A.   It was an employment case.
8    Q.   Why were you asked to testify in a
9    deposition in that matter?
10   A.   That's a good question.  I don't know
11   and it was very short deposition.  Overly
12   aggressive plaintiff attorney.
13   Q.   A lot of privileged objections I would
14   imagine?
15   A.   Yes.
16   Q.   Do you remember the nature of the
17   employment?
18   A.   I don't.  A long time ago.
19   Q.   What documents did you review in
20   preparation for your deposition?
21   A.   I looked at the complaint.  I looked
22   at the answer.  I looked at the interrogatories
23   that were filed.  I looked at some documents that
24   your client produced.  I think that's it.
25   Q.   Of the documents that you looked at

Page 7

L. Nail

1
2    that Paramount produced what specific documents do
3    you recall reviewing?
4    A.   Reviewed the notes from Mr. Freeman.
5    Q.   Just for the record, that would have
6    been what was marked as Exhibit K in Mr. Freeman's
7    deposition?  I will hand that to you just for your
8    reference.
9    A.   Yes, if that's K.  Yes, that's it,
10   correct.
11   Q.   What other documents?
12   A.   The e-mail from Sandy Cranford that
13   was introduced in his deposition and the e-mail
14   from Debbie Thompson that was introduced in his
15   deposition.
16   Q.   Any other documents you recall
17   reviewing in preparation for your deposition?
18   A.   I don't recall at this moment.
19   Q.   Other than your attorney or attorneys
20   did you discuss your deposition with anyone?
21   A.   I've informed my wife of the
22   deposition.  Informed my boss of the deposition.
23   Q.   Anyone else that you discussed your
24   deposition with other than counsel?
25   A.   I do not believe so.

Page 8

L. Nail

1
2    Q.   What did you tell your boss about the
3    deposition?
4    A.   I told my boss that I was having my
5    deposition taken today, and in the case which he
6    was already familiar with the case, and told her I
7    would be either out most -- well, all of today and
8    possibly tomorrow.
9    Q.   What is your boss's name?
10   A.   Rhonda Parish.  P-a-r-i-s-h.
11   Q.   Do you know how she first became
12   familiar with this case?
13   A.   Yes, I informed her of it.
14   Q.   Do you know when?
15   A.   It was at some point after the
16   complaint was filed.  I believe.
17   Q.   What did you tell her about the case?
18   A.   I told her that I was being sued by
19   Paramount Parks in a dispute over my employment
20   agreement.
21   Q.   Anything else that you told her with
22   respect to the case?
23   A.   I told her it related to the terms of
24   the willing, ready and able and Paramount Parks'
25   interpretation of that and while they felt like I

Page 9

L. Nail

1
2    had -- why I believe they felt like I had violated
3    the agreement by working at Denny's.
4    Q.   What did she say in response to that?
5    A.   Well, quite literally she said it was
6    ludicrous.
7    Q.   Ludicrous?
8    A.   Yes.
9    Q.   Did she share any more details --
10   A.   No.
11   Q.   -- other than that?
12        Had she seen the employment agreement
13   up until that point.
14   A.   No.
15   Q.   Did you show it to her after that
16   point or at any point?
17   A.   I don't believe I have.
18   Q.   Did you share anything else with her
19   other than what you just testified about regarding
20   the case?
21   A.   No.  Other than I asked her to inform
22   our CEO.
23   Q.   Do you know whether she did that?
24   A.   She said she did.
25   Q.   Did you have any personal

3 (Pages 6 to 9)

L. Nail

1
2  conversations with your CEO regarding this case?
3     A.   No, I did not.
4     Q.   Other than your attorneys who have you
5  discussed this case with?
6     A.   My wife, my boss, Rhonda Parish.  I
7  mentioned it to my sister.  Actually, she -- I
8  think my wife told her and so she asked me about
9  it.  Al Weber.
10       I think -- I think that's it.
11    Q.   If you recall anyone else as you're
12 testifying here today would you let me know?
13    A.   Yes.
14    Q.   Is there anything else about the case
15 that you discussed with Rhonda Parish that you
16 have not told me about?
17    A.   No.  Other -- no.
18    Q.   Just generally, with your wife, what
19 would you have discussed about the case with her?
20    A.   I described for her the general nature
21 of the allegations that were made in the
22 complaint.
23    Q.   Did you discuss with her any
24 recollection she may have had about a conversation
25 with Sandy Cranford?

L. Nail

1
2     A.   I remember the conversation with Sandy
3  Cranford.  So I don't remember if I discussed it
4  with -- I don't believe I discussed it with Linda.
5     Q.   Just to skip ahead and cover that now
6  while we're on the subject, what do you recall
7  about a conversation with your wife and Sandy
8  Cranford?
9     A.   Well, what I remember fairly clearly
10 and to put it in context, my wife and I were on
11 the back deck of our porch having a fairly
12 emotional conversation about the fact that I had
13 not been able to find a job in Charlotte.  I was
14 commuting three and a half hours to Denny's, and
15 we were going to have to put the house on the
16 market.
17       And it was during this conversation
18 that Sandy called and Linda talked to Sandy and,
19 you know, Linda was going in and out.  She was
20 going into the kitchen.  The girls were in and out
21 of the house.  She was walking around on the cell
22 phone and I was sitting out on the back deck.
23       So she was in and out and I know that
24 I told her to tell Sandy that I said hi.  And, you
25 know, at some point in the conversation she told

L. Nail

1
2  Sandy, you know, things would be better if Lester
3  could find a job in Charlotte.
4     Q.   So you were present for that --
5     A.   Yes.
6     Q.   -- part of the conversation?
7     A.   Yes.
8        And let me go back a minute.
9     Q.   Sure.
10    A.   I'm not positive whether Linda called
11 Sandy or Sandy called us.  I know there was some
12 issues with, you know, the medical forms going
13 back and forth.
14    Q.   So this would have been during the
15 benefits enrollment --
16    A.   Yes.
17    Q.   -- period?
18    A.   I believe that's when it took place.
19 It was about that time frame.
20    Q.   In June of 2000 --
21    A.   No, no, I think it was in May.
22    Q.   May of 2007?
23    A.   It had to have been in May.
24    Q.   In May of 2007?
25    A.   Correct.

L. Nail

1
2     Q.   And why do you say it had to be in
3  May?
4     A.   Because we were still in our house in
5  Charlotte.
6     Q.   Do you recall what questions had come
7  up that there would arise the need for a
8  conversation with Sandy Cranford?
9     A.   You know, I really don't.  I don't
10 know if she was calling to verify that she had
11 gotten the documents.  Linda had -- when we'd
12 gotten to the change of enrollment that I gave
13 them to Linda, Linda's a nurse and she takes care
14 of all the claims, health claims, and I just
15 handed them to her and said, Please take care of
16 these, and she did.
17    Q.   So the call with Sandy Cranford would
18 have been after you received those enrollment
19 forms.
20    A.   I believe so.  But I'm not one hundred
21 percent sure.
22    Q.   Would there have been any other reason
23 to talk to Sandy Cranford?
24    A.   Yes.  We were, there were claims
25 being, um, and I don't -- there were a number of

Page 14

L. Nail

1    L. Nail
2    claims that I had had that had been denied because
3    of the changeover. When I was terminated I got a
4    new number, you know, a health card number. And I
5    had not -- I had made some claims under my old
6    number. Actually, quite a few claims. And all of
7    those claims had been denied because we had given
8    the health care providers my old number. Because
9    I hadn't been given the new COBRA number.
10        Now, this is not related to the
11   changeover that those documents represented. This
12   was back. So there was an ongoing issue of trying
13   to resolve claims and trying to get the right
14   number.
15        Q.    And Sandy would have provided you with
16   that number?
17        A.    Yes.
18        Q.    Did you in fact get the right number?
19        A.    Eventually we did.
20        Q.    And your claims were paid for --
21        A.    Yes, they were.
22        Q.    -- after you were provided the number?
23        A.    Yes, they were.
24        Q.    And you're not sure exactly when, I
25   mean, you believe it was in May of 2007 that this

Page 15

L. Nail

1    L. Nail
2    conversation between your wife and Sandy --
3        A.    Well, I am sure that the conversation
4    with Sandy that Mr. Freeman referred to in his
5    deposition took place in May.
6        Q.    OK. Do you remember when in May?
7        A.    No.
8        Q.    You mentioned you were still in your
9    house. Do you remember when you moved out of your
10   house?
11       A.    Yes.
12       Q.    When?
13       A.    It was the first week of June, I'm
14   thinking June -- well, wait a minute, no. We
15   closed, I think we closed on the -- well, I'm just
16   going to say early June. We closed early June and
17   I can't remember when we actually packed up and
18   moved out. It would have been later.
19       Q.    After the closing?
20       A.    Yes. Well, there were several, I
21   mean, there was the closing of the Charlotte
22   house, the closing of the Moore house.
23       Q.    And I'm just speaking of the
24   North Carolina house.
25       A.    Right.

Page 16

L. Nail

1    L. Nail
2        Q.    Did you, do you remember when you
3    closed the sale on your North Carolina house?
4        A.    I do not remember the date. They
5    changed the date on us several times.
6        Q.    Did you live in your North Carolina
7    home following the closing?
8        A.    Yes. For a short period of time.
9        Q.    Do you recall for how long?
10       A.    A week or two.
11       Q.    So the buyer let you stay in after --
12       A.    Well, it was a -- yes. The answer's
13   is yes. It got complicated.
14       Q.    Anything else you recall about the
15   conversation between Sandy Cranford and your wife
16   and/or you?
17       A.    No.
18       Q.    Were there more than one such
19   telephone conversations that you can recall?
20       A.    Not that day.
21       Q.    On other days?
22       A.    I did not have any further
23   conversations with Sandy after that day. I do not
24   know if my wife did or not.
25       Q.    Did your wife ever relay any other

Page 17

L. Nail

1    L. Nail
2    conversations with Sandy Cranford?
3        A.    I don't recall. I don't believe so.
4        Q.    OK. Going back to the others with
5    whom you've discussed the case, Al Weber, what did
6    you discuss about this case with Mr. Weber?
7        A.    I called Al and informed him that PPI
8    was suing me over my employment agreement and
9    asked him for the name of his attorney.
10       Q.    Do you recall when that was that you
11   called Al?
12       A.    Sometime after being served.
13       Q.    After you received the complaint?
14       A.    Yes.
15       Q.    Was that the first time you spoke to
16   him regarding a potential dispute?
17       A.    Yes. Yes.
18       Q.    What did you discuss in that
19   conversation with him when you called him after
20   you received the complaint?
21       A.    Just told him the general nature of
22   the allegations, that Cedar Fair was taking the
23   position that because I had started working at
24   Denny's I violated the agreement.
25       Q.    Did he give you a referral for an

5 (Pages 14 to 17)

Page 18

L. Nail

1  attorney?
2
3      A.   Yes, he did.
4      Q.   Who was that?
5      A.   I don't remember.
6      Q.   But you did not retain that
7  individual.
8      A.   No, I did not.
9      Q.   Let's go back before that conversation
10  with Mr. Weber.  Had you spoken with him at any
11  point after your termination without cause
12  provisions were triggered in your employment
13  agreement?
14      A.   Yes.
15      Q.   Tell me the first time you spoke with
16  him after that point.
17      A.   After my termination.
18      Q.   Yes.
19      A.   I can't give you a date.  It was, um,
20  some period, I mean, it was -- when was that?
21  '06?  The fall of '06?  So I just too remember.
22  Thirty or sixty days after that.
23      Q.   Did you call him or did he call you?
24      A.   I don't remember.  I don't remember
25  who called who.

Page 19

L. Nail

1
2      Q.   What was the purpose for that call?
3      A.   Just to get together, have coffee,
4  talk about the company, talk about future plans,
5  you know, just...
6      Q.   Did you discuss anything specifically
7  that you can recall with respect to the company?
8      A.   We talked a lot about the history of
9  the company, you know, pre-Cedar Fair, premerger.
10  Just --
11      Q.   And why were you discussing that?
12      A.   Al was doing some research for his
13  dissertation.  It was -- well, I call it research.
14  I don't know what he calls it.
15      Q.   Did you discuss your termination from
16  PPI?
17      A.   I am sure that I did.
18      Q.   What did you say?
19      A.   I cannot, I mean, I'm sure I discussed
20  the fact that, you know, the circumstances about,
21  you know, we all had been let go, what were other
22  guys doing, what did they think they were going to
23  do, what was Al going to do, what did I want to
24  do, you know, that type of conversation.
25      Q.   Anything else that you can recall with

Page 20

L. Nail

1  respect to your termination?
2
3      A.   No.
4      Q.   Did he tell you with respect to his
5  circumstances anything about that?
6      A.   I think he said he was going to take
7  some time to finish his work on his Ph.D.
8      Q.   Do you recall anything else
9  specifically that Mr. Weber said during that first
10  conversation you had with him following your
11  termination without cause?
12      A.   Not specifically.
13      Q.   You would not have discussed the
14  employment agreements in detail at that point,
15  correct?
16      A.   No, I don't believe so.
17      Q.   What other occasions did you speak
18  with Mr. Weber following your termination without
19  cause?
20      A.   I spoke to him last night.
21      Q.   Between then and then the second call
22  when you called him after you received the
23  complaint and last night, were there any other
24  conversations or communications between you and
25  Mr. Weber?

Page 21

L. Nail

1
2      A.   I got a Christmas card.  I got an
3  e-mail from Al asking for my new address.
4      Q.   Do you recall when that e-mail was?
5      A.   Just recently, like within the last
6  two weeks, three weeks.
7      Q.   Did the e-mail say anything other than
8  that?
9      A.   No, just wanted my new address.
10      Q.   Any other communications before your
11  telephone call with him last night?
12      A.   I don't think so.
13      Q.   Tell me how you -- you said you called
14  him last night?
15      A.   Yes, I did.
16      Q.   What was the purpose of your call?
17      A.   Twofold.  One, I was calling to thank
18  him for sending me a copy of his dissertation and
19  a note with it.  The other I was directed by my
20  attorney to ask a question.
21      Q.   And what question did you ask him?
22      A.   I asked him if he was aware of any of
23  the other executives who had had contracts, had
24  negotiated any type of settlement or any type of
25  arrangement with Cedar Fair.

Page 22

```
1                    L. Nail
2        Q.    What did Mr. Weber say?
3        A.    He said that several had tried and to
4   his knowledge none were successful.
5        Q.    Did you ask him any other questions?
6        A.    I told him that Cedar Fair -- that
7   Cedar Fair was of course still suing me and he
8   informed me he had received a call from
9   Mr. Freeman asking about an employment agreement
10  and he told me what he told Mr. Freeman.
11       Q.    What did he say?
12       A.    He said he told Mr. Freeman that it
13  was his understanding that the employment
14  agreement and the section about not working for
15  anyone else or the ready, the willing, able and
16  ready section did not mean that I could not work
17  for anyone else and that it was not intended to
18  mean that I had to be available 24/7 or even in I
19  think his exact words, it didn't mean I had to be
20  available to work a 40-hour week, that the intent
21  was that I needed to be available if the company
22  needed me for ongoing, you know, stuff that had
23  been going on while I was there for, you know,
24  assistance, for, you know, consultation.
25       Q.    Were you aware that Mr. Weber was not
```

Page 23

```
1                    L. Nail
2   involved in the drafting of that, of your
3   employment contract?
4             MR. WEBER:  Objection as to form.
5        A.    I was aware that as president and CEO
6   of the company Mr. Weber told me that he was going
7   to get a contract for me and he was taking steps
8   to get a contract after my promotion.
9        Q.    OK, and we'll get into that in a
10  little bit.  What else did Mr. Weber and you
11  discuss during the conversation last night?
12       A.    I asked him about an individual that I
13  mistakenly thought was seriously ill and I was
14  mistaken.
15       Q.    Nothing to do with this?
16       A.    Nothing to the with this, no.
17       Q.    Other than the ready, willing and able
18  did you discuss any other portions or provisions
19  of your employment agreement?
20       A.    No.
21       Q.    Did he share with you where his
22  understanding of the clause ready, willing and
23  able came from?
24       A.    No.
25       Q.    Did he share with you that he told
```

Page 24

```
1                    L. Nail
2   Mr. Freeman that that was only his interpretation?
3        A.    No, he didn't characterize it that
4   way.
5        Q.    Anything else that you and Mr. Weber
6   discussed last night?
7        A.    No.
8        Q.    Did you ask him to testify in this
9   matter?
10       A.    No.
11       Q.    Did he share any details regarding his
12  own employment situation and separation from PPI?
13       A.    Yes.
14       Q.    What did he tell you?
15       A.    He said he had worked something out
16  with Dick personally.
17       Q.    Did he share the details of that?
18       A.    No, he did not.
19       Q.    Did he tell you that that was subject
20  to a confidentiality agreement?
21       A.    No.
22       Q.    Or just didn't share the details?
23       A.    He did not share the details with me.
24       Q.    Are you aware whether or not your
25  employment agreement was the same employment
```

Page 25

```
1                    L. Nail
2   agreement as that held by Mr. Weber?
3        A.    It was my understanding it was
4   different.
5        Q.    Anything else that you talked with
6   Mr. Weber?
7        A.    No.
8        Q.    And those are the only times that you
9   spoke with him since your termination without
10  cause.
11       A.    I believe so.
12       Q.    Anyone else that you discussed this
13  case with that we haven't talked about already?
14       A.    Can we review who we have identified?
15       Q.    Sure.  You told me your wife, Wanda
16  Parish, your sister and Al Weber.  And I'm not
17  asking about your attorneys.
18       A.    OK.  I believe that's it.
19             And its Rhonda, with an R.
20       Q.    Oh, Rhonda, I'm sorry.
21       A.    That's OK.
22             MS. KIRILA:  Mark this as Plaintiff's
23  Exhibit 1.
24             (Plaintiff's Exhibit 1, two-page
25  résumé of Lester C. Nail, marked for
```

7 (Pages 22 to 25)

Page 26

L. Nail

1    identification, this date.)
2    Q.   You have been handed what we marked as
3    Plaintiff's Exhibit 1.  Would you take a look at
4    this two-page document and identify it for me, if
5    you can.
6    A.   Yes, this is a draft of, well, this is
7    a version of my résumé.
8    Q.   Did you prepare this résumé?
9    A.   Yes.
10   Q.   To try to get through some of this
11   information, I want you to look over it and tell
12   me if there's anything that's not accurately
13   stated on here.
14   A.   As of what?
15   Q.   Oh, as of -- I guess, let's see, this
16   is from Paramount's file.  So as of 2000, you
17   know, the position here, understanding that you've
18   had subsequent positions, but as of this time in
19   what is reflected on here, are these positions
20   accurate?  Is there anything that you know that's
21   missing?
22   A.   No, I do not believe so.
23   Q.   And I understand your current address,
24   I think we have it on the record, in
25

Page 27

L. Nail

1    South Carolina.  Previous to that what was your
2    home address?
3    A.   Charlotte was -- how soon we forget --
4    9027 Kirkley, K-i-r-k-l-e-y, Court, Charlotte,
5    North Carolina 29 -- no, 28 --
6    Q.   277 is what I have.
7    A.   277, yes.
8    Q.   And then prior to that where did you
9    reside?
10   A.   Salisbury.
11   Q.   North Carolina?
12   A.   Correct.
13   Q.   Did you have any other residences,
14   even temporary residences after you moved out of
15   the Kirkley court address and before you moved
16   into your current home in South Carolina?
17   A.   No.
18   Q.   No corporate housing or apartments?
19   A.   No.
20   Q.   And you are married to Lindacarol; is
21   that correct?
22   A.   Yes.  And that's all one word,
23   L-i-n-d-a-c-a-r-o-l.  It's a small C.
24   Q.   Is your education as reflected on

Page 28

L. Nail

1    Exhibit 1 correct?
2    A.   Yes.
3    Q.   And you have been, you graduated law
4    school in 1985?
5    A.   Yes.
6    Q.   Have you held a license as an attorney
7    since then?
8    A.   Yes.
9    Q.   Are you currently admitted in any
10   state to practice law?
11   A.   Yes.
12   Q.   Where?
13   A.   Arkansas, and Tennessee.
14   Q.   Am I safe to assume that your
15   positions as in-house counsel do not require you
16   to be admitted to the state in which that --
17   A.   No.
18   Q.   -- company is located?
19   A.   No.
20   Q.   That's correct?
21   A.   That's correct.
22   Q.   So you're not admitted in
23   North Carolina or South Carolina.
24   A.   That's correct.
25

Page 29

L. Nail

1    Q.   Have you ever been?
2    A.   No.
3    Q.   Have you been admitted in the State of
4    New York?
5    A.   No.
6    Q.   And do you keep your licenses
7    up-to-date in Arkansas and Tennessee?
8    A.   Yes.
9    Q.   Have either of those or your license
10   in general ever been sanctioned, suspended or
11   revoked?
12   A.   No.
13   Q.   Where did you grow up, Mr. Nail?
14   A.   I grew up out in the country close to
15   a small town called Cherryville.
16   Q.   What state is that?
17   A.   North Carolina.  In Gaston County.
18   Q.   It looks from your résumé that you
19   have moved from state to state from time to time;
20   is that correct?
21   MR. WEBER:  Object to the relevancy of
22   these questions.
23   A.   Correct.  Well, actually, one, two,
24   three states.
25

8 (Pages 26 to 29)

L. Nail

1
2      Q.    And you did practice law in each of
3  these -- the first position you have here starts
4  in 1985. Are all of these positions in some
5  capacity relating to the practice of law?
6      A.    Either as private practice or
7  in-house, correct.
8      Q.    What kind of law did you practice at
9  Wallace, Dover & Dixon?
10     A.    Mostly labor and employment.
11     Q.    And Simpson & Graham?
12     A.    It was more general practice?
13     Q.    Young & Perl?
14     A.    It was all labor and employment.
15     Q.    How about at Wal-Mart, what did you do
16  there?
17     A.    Labor and employment.
18     Q.    And Food Lion?
19     A.    Food Lion I was vice president of
20  legal affairs, which meant I managed the legal
21  department and -- which comprised of several
22  attorneys. I also had several nonattorneys who
23  reported to me.
24     Q.    I had asked you earlier if you had
25  ever been deposed before and you said one time.

L. Nail

1
2      A.    Uh-huh.
3      Q.    Have you ever been involved in any
4  other litigation personally?
5      A.    No. No.
6      Q.    Have you ever testified as a witness
7  in any other proceeding?
8      A.    Yes.
9      Q.    In what context?
10     A.    In Arkansas in the early or the
11  mid-eighties there my landlord was in some type of
12  dispute with I believe a -- his contractor and
13  asked me to testify.
14     Q.    What did you testify about in that
15  case?
16     A.    It was something about the yard. The
17  common areas wouldn't drain properly and water
18  would back up. And he asked me to testify to my
19  personal observations about that.
20     Q.    Is there anything on this résumé as of
21  this date that you would change? That's listed on
22  here.
23     A.    No.
24     Q.    Mr. Nail, you were hired at Paramount
25  Parks in January of 2002; is that correct?

L. Nail

1
2      A.    Correct.
3      Q.    And you started as vice president,
4  associate counsel?
5      A.    I don't --
6      Q.    Why don't you tell me what you did
7  when you started?
8      A.    At Paramount Parks.
9      Q.    Yes, at Paramount Parks.
10     A.    I literally don't remember what my
11  titles was.
12     Q.    What were your duties?
13     A.    To handle all the contracts, all the
14  litigation, with some exceptions. At the time I
15  was hired there was a general counsel and there
16  were some things that he retained. Some
17  litigation he handled.
18           But for the most part I took over most
19  of the litigation, most if not all the contract
20  review and any legal advice to the business units,
21  employment issues. That sort of thing.
22     Q.    When you say handled the contracts,
23  what type of contracts?
24     A.    It could be anything from a 20,000
25  lawn mowing contract to mow the yard, you know,

L. Nail

1
2  mow the grass at one of the parks to a $20 million
3  ride from the Belgians or whoever we bought them
4  from. I'm making that up. I can't remember who
5  we bought them from, but I remember negotiating
6  with folks over in that part of the world.
7      Q.    Did you have any responsibilities with
8  respect to employment contracts?
9      A.    I don't recall doing any work on
10  employment contracts at PPI.
11     Q.    In fact, when you started are you
12  aware of any executive that had an employment
13  contract?
14     A.    I did not have direct knowledge of any
15  employment contracts.
16     Q.    And you yourself did not have one when
17  you started; is that correct?
18     A.    That's correct.
19     Q.    Was your employment at will at that
20  point?
21     A.    Correct.
22     Q.    Did you report to the general counsel?
23     A.    Yes.
24     Q.    Who was that?
25     A.    Johnny Taylor.

9 (Pages 30 to 33)

L. Nail

1
2    Q.    Where was he based or located?
3    A.    In Charlotte.
4    Q.    How long was Mr. Taylor general
5 counsel while you were associate counsel or
6 in-house?
7    A.    Not long.
8    Q.    Do you recall when he left or was no
9 longer employed?
10    A.    I'm thinking sometime in the spring of
11 '06 after I started.  About three months after I
12 started.  He left.
13    Q.    As general counsel.
14    A.    I'm sorry.  What was the question
15 again?
16    Q.    My understanding is you started in
17 2002.
18    A.    That's right, that's right, I'm sorry.
19 2002.  January 2 of 2002.  Johnny left about three
20 months after I started.
21    Q.    In 2002.
22    A.    Correct.
23    Q.    I am just trying to get a timeline
24 here.  And at that point did your position change
25 when Mr. Taylor left?

L. Nail

1
2    A.    My title did not change, but I started
3 reporting to the new general counsel.
4    Q.    So someone else was hired to become
5 general counsel or to be the new general counsel?
6    A.    Well, it's complicated, but that's
7 correct.
8    Q.    Who was the person serving as the new
9 general counsel after Mr. Taylor?
10    A.    Mike Bartok.  B-a-r-t-o-k, I think.
11    Q.    Do you know who his employer was?
12    A.    I think -- well, when he became
13 general counsel of PPI, Paramount Parks, Inc.,
14 it's my understanding he was employed by Paramount
15 Parks, Inc.
16    Q.    Did he have any other companies that
17 he served as counsel for?
18    A.    Well, he was -- he had previously
19 been, had a position with Paramount Studios and
20 I'm not sure if he gave up all of his
21 responsibilities with Paramount Studios or not.
22    Q.    And you don't know whether he was
23 employed by CBS at any point?
24    A.    I do not know.
25    Q.    Do you recall when Mr. Bartok came in

L. Nail

1
2 to act as general counsel for PPI?
3    A.    It was sometime shortly after
4 Mr. Taylor left.
5    Q.    Sometime in 2002?
6    A.    Correct.
7    Q.    How long did he stay as general
8 counsel?
9    A.    He stayed as general counsel I believe
10 through the fall of '06.  Or was it '05?
11    Q.    Try it this way.
12    A.    When did Cedar Fair buy us?
13    Q.    Cedar Fair bought in June of '06.
14    A.    OK.  June of '06, so --
15    Q.    Your employment agreement was '05.
16    A.    '05.  So Mike left before -- it would
17 have been the fall of '05.
18    Q.    When he left how did that affect your
19 position?
20    A.    I became general counsel.
21    Q.    In the fall of '05?
22    A.    Yes.
23    Q.    Did your duties at all change from the
24 point that Mr. Taylor left and when you became --
25 before you became general counsel in the fall of

L. Nail

1
2 2005, or have you already discussed what those
3 duties would have been?
4    A.    If I understand your question, when
5 Johnny left and Mike Bartok became general
6 counsel, my duties essentially became the same,
7 or, you know, stayed the same, but more so.  That
8 Mike didn't handle any litigation, didn't handle
9 any contracts.
10          At that point I truly handled all the
11 litigation, all the contracts, took all the phone
12 calls, except for anything pertaining to what I'll
13 call the executive group, the senior executives
14 and what I'll call the management committee.  I
15 did not participate in the management committee,
16 which would have been the CEO, the CFO, all the
17 senior vice presidents.
18    Q.    Who did have responsibility for that
19 group?
20    A.    Mike Bartok.
21    Q.    So at that point you would not have
22 been involved with respect to any executive issues
23 with respect to any contract issues for
24 compensation?
25    A.    I don't recall.  It's possible that

L. Nail

1  
2  Mike would have asked my opinion or may have
3  discussed something with me, but I don't recall.
4      Q.   No specific recollection --
5      A.   No.
6      Q.   -- of dealing with any particular
7  executive situation?
8      A.   Well, I will have to ask the question
9  of what's the definition of executive?  I mean,
10 there were some --
11     Q.   Sure.
12     A.   -- senior people that I know that HR
13 consulted with me and Mike Bartok.  The VP of HR,
14 Mike Bartok and myself would discuss situations.
15     Q.   Let me narrow it down.
16     A.   OK.
17     Q.   With respect to anybody that had a
18 written employment contract.
19     A.   I can't answer that question because
20 at the time I did not know who had contracts and
21 who did not.
22     Q.   So you can't have a specific
23 recollection that of seeing a particular contract
24 of someone at PPI at that time.
25     A.   Well, can we put some boundaries

L. Nail

1  
2  around the time frame?
3      Q.   Absolutely.  Prior to the time that
4  you became general counsel in fall 2005, is it
5  fair to say you would not have had any involvement
6  with respect to employment agreements for
7  employees at PPI?
8      A.   At some point in time I became aware
9  of individuals who had employment contracts.
10     Q.   And you don't recall at what point
11 that was in time?
12     A.   No, I do not.
13     Q.   Who did you become aware of that had
14 employment contracts at PPI?
15     A.   Al Weber, Michael Koontz, all of the
16 general managers of the parks, David Thornton, and
17 there may be others.
18     Q.   How did you become aware that those
19 individuals had employment contracts?
20     A.   Probably through conversations with
21 Mike Bartok and the VP of HR.
22     Q.   And tell me if you would have had.
23 Would you have had any role in the administration
24 of those employment contracts?
25          And this is prior, this is up to the

L. Nail

1  
2  point of fall of 2005.
3      A.   What do you mean by administration?
4      Q.   Well, let me ask it this way.  What
5  role did you have with respect to those employment
6  contracts?  If any.
7      A.   I don't -- well, I did not negotiate
8  them.  I did not draft them.  I think it's fair to
9  say I had just had general knowledge that those
10 individuals had contracts.
11     Q.   Do you know whether -- this was before
12 this general knowledge of the employment
13 contracts -- if this was before or after you
14 signed your employment agreement with PPI?
15     A.   This was before.
16     Q.   Before.  So these individuals would
17 have had existing contracts at the time that you
18 entered into yours?  Is that your understanding?
19     A.   Yes.
20     Q.   Do you know who was involved in the
21 drafting of those contracts for those individuals
22 that you listed?
23     A.   I do not.
24     Q.   I'm going to hand you what was
25 previously marked as Defendant's Exhibit B, which

L. Nail

1  
2  I believe is your contract with Paramount Parks.
3          If I say PPI in exchange for Paramount
4  Parks will you understand?
5      A.   Yes.
6      Q.   Is this in fact your employment
7  agreement with PPI?
8      A.   I believe it is.
9      Q.   And that's your signature on the last
10 page.
11     A.   Yes, it is.
12     Q.   Is this the only employment agreement
13 that you signed with PPI?
14     A.   Yes.
15     Q.   Tell me the circumstances how you came
16 to have an agreement with PPI.  You were
17 previously at will and then you came to sign this.
18 How did that happen?
19     A.   After Mike Bartok left and Al informed
20 me that I would be promoted to general counsel, he
21 started talking about getting a contract for me.
22     MR. WEBER:  This is Al Weber?
23     THE WITNESS:  This is Al Weber.
24     A.   And over the course of time eventually
25 Al delivered this contract to me and that's how it

Page 42

L. Nail

1  came about.
2      Q.   Do you know whether -- I don't think
3  you mentioned him, but Mr. Bartok had an
4  employment agreement with Paramount?
5      A.   I believe he did.
6      Q.   Did you ever see it?
7      A.   I don't -- well, I mean, I recall Mike
8  Koontz at some point during the due diligence
9  handing me -- and I truly can't remember how I
10 came into the possession of I think all of the
11 contracts, and I delivered those to Mike Koontz,
12 the CFO, to keep in his office.
13     Q.   And when you say this was during the
14 due diligence process, associated with the sale of
15 PPI to Cedar Fair?
16     A.   Yes.  And let me back up a minute.
17 All of the contracts for all the executives were
18 kept in a file in the office of the VP of HR in a
19 locked file.  When she left the company her office
20 was beside my office and when she left the company
21 she gave -- I believe she gave me the keys.
22         She had reported to Mike Koontz and my
23 memory is I talked to Mike about it.  Mike said
24 just leave them there, and Mike took possession of

Page 43

L. Nail

1  the keys.
2          At some point we moved out of that
3  space.  And that filing cabinet I think was put
4  into my office.  And I believe that -- I just have
5  this memory of going to Mike saying, you know,
6  what do you want done with the agreements?  And I
7  think he said, Bring them to me.
8          So he gave me the key and somehow I
9  delivered all the contracts to Mike, because I
10 have this memory of all the contracts ending up in
11 Mike Koontz's office.
12     Q.   I need to establish a timeline,
13 because when the VP, and I want to know, at the
14 time that you worked under Mike Bartok had you
15 seen a copy of his employment agreement?
16     A.   I don't believe so.
17     Q.   When you came in possession of all the
18 executive contracts and handed them to Mr. Koontz,
19 was that in connection with the due diligence of
20 the PPI sale to Cedar Fair or earlier?
21     A.   No, I believe that it was in
22 connection with the sale, the due diligence.
23     Q.   Is that the first time you would have
24 had possession of the employment contracts?

Page 44

L. Nail

1      A.   That would have been the first time
2  that I probably physically opened the files, look
3  at them.
4      Q.   Did you review them at that time?
5      A.   No, I did not.
6      Q.   It was just a matter of gathering them
7  and giving them to Mr. Koontz.
8      A.   Right.
9      Q.   And I was asking you how you came to
10 sign this agreement?
11     A.   Right.
12     Q.   And you said that Mr. Weber had got
13 the contract for you and delivered it to you.
14     A.   Yes.
15     Q.   Do you know who drafted the employment
16 agreement?
17     A.   I do not.
18     Q.   Do you know whether or not it was
19 drafted by Mr. Weber?
20     A.   I do not.
21     Q.   Do you have any reason to believe that
22 he did draft this employment contract?
23     A.   I doubt it.
24     Q.   Because he's not a lawyer, correct?

Page 45

L. Nail

1      A.   Correct.
2      Q.   Up until the point that you received
3  this contract had you dealt with any of CBS's
4  in-house counsel?
5      A.   I'm sorry, can you give me a time
6  frame?
7      Q.   Sure.
8      A.   Or can I just -- the first time I
9  dealt with CBS counsel was when I received a phone
10 call from the general counsel of CBS.
11     Q.   When was that?
12     A.   The was when Mike Bartok was still
13 general counsel.  So it would have been in the
14 late summer of '05 possibly.
15     Q.   What was the purpose of that call?
16     A.   Well, number one, to introduce
17 himself.  CBS had just -- this is shortly after
18 Viacom had split into two companies and we were
19 now, Paramount Parks, Inc. now belonged to CBS.
20 So he was calling to introduce himself.
21     Q.   And what was his name?
22     A.   Lou Briskman.  B-r-i-s-k-m-a-n, maybe
23 two Ns.  I'm not sure.
24     Q.   Back to this agreement.  When you

12 (Pages 42 to 45)

L. Nail

1  received it what did you do with it?
2
3     A.   I signed it.
4     Q.   Did you sign it that day?
5     A.   I don't remember.
6     Q.   Did you retain counsel to review it?
7     A.   No.
8     Q.   Did you discuss it with anyone?
9     A.   I may have discussed it with my wife.
10  I may have discussed it with Mike Koontz.  And I'm
11  certain I discussed it with Al Weber.
12    Q.   Let me start with Mr. Koontz.  What
13  did you discuss with respect to the agreement with
14  Mr. Koontz?
15    A.   Whether or not I should attempt to
16  negotiate it or just sign it and move on.
17    Q.   What did he say?
18    A.   Sign it and move on.
19    Q.   Did he say why?
20    A.   Because we were hot and heavy into due
21  diligence.  We were extremely busy.  He did not
22  feel like it would be in my best interest to try
23  to, you know, negotiate it.
24    Q.   So when this agreement was presented
25  to you, you were aware that the company was

L. Nail

1
2  potentially going to be sold?
3     A.   Yes.
4     Q.   And what was your level of awareness?
5  How much did you know at the time you were given
6  this?
7     A.   I knew quite a bit.
8     Q.   Did Mr. Weber say anything as a reason
9  for presenting you with this agreement was related
10  to that upcoming sale?
11    A.   No.
12    Q.   Anything else that Mr. Koontz and you
13  discussed?
14    A.   No.  It was a very short conversation.
15    Q.   How about Mr. Weber, what did you
16  discuss with Mr. Weber regarding this agreement at
17  or about the time you received and signed it?
18    A.   It was essentially the same
19  conversation.
20    Q.   Whether you should try to negotiate?
21    A.   Correct.
22    Q.   And he said no?
23    A.   Well, no, no.  Al said, you know, do
24  what you think you need to do.  But the inference
25  was don't mess around.

L. Nail

1
2     Q.   In fact, you did not suggest any
3  changes to it, correct?
4     A.   No, I did in the.
5     Q.   Do you know what other Paramount park
6  employees were presented with an agreement at or
7  about the same time that you were?
8         And I think for the record I said your
9  agreement was 2005, but this is January 2006.
10    A.   Correct.
11    Q.   OK.
12    A.   And I'm sorry.  The question is?
13        MR. KIRILA:  Could you read back the
14  question.
15    A.   I'm not sure if this is responsive,
16  but let me, the -- I was aware that there were a
17  couple of individuals who their contracts were
18  expiring or close to expiring, and quite frankly
19  through sitting through Mr. Freeman's deposition
20  it refreshed my memory that Pat Jones received a
21  contract and he named a few others that I had
22  forgotten.
23        But I knew that David Thornton's
24  contract was up for renewal or was getting close
25  to expiring.  Pat Jones got a new one.  And I

L. Nail

1
2  think there was another individual who was fairly
3  close to expiring.  And I can't remember who it
4  was.
5     Q.   Any other discussions about the
6  agreement other than what you've testified at the
7  time, at or about the time that you received it
8  and executed it?
9     A.   Well, there were -- from the time that
10  Al informed me that he was going to get a contract
11  and the time that I actually received it was a
12  long span every time.
13    Q.   From fall of '05 until January?
14    A.   No, it was not January.  It was more
15  like --
16    Q.   When did you receive it?
17    A.   The best of my memory is late
18  February, possibly early March.  And virtually
19  every time Al would go to New York he would report
20  back to me that, um, you know, every time I go up
21  there I push them to get your contract.  I'm
22  working on it, I'm working on it, I'm working on
23  it.
24    Q.   You understand that the contract came
25  from New York.

Page 50

L. Nail

1
2  A.   Yes.
3  Q.   And who was based in New York that it
4  would come from?
5  A.   I literally don't know.
6  Q.   Do you know that's where CBS was
7  headquartered?
8  A.   Correct.  Well, let me rephrase that.
9  I know it was coming from the HR department of
10  CBS.
11  Q.   OK.
12  A.   I know that.
13  Q.   Did you have any --
14  A.   I'm sorry, but I don't know an
15  individual.
16  Q.   Got you.  Did you have any discussions
17  with anyone from HR CBS regarding your employment
18  agreement?
19  A.   No.
20  Q.   I think, and tell me if I'm correct,
21  the individual who signed this agreement looks
22  like an Anthony.  Do you know recognize that
23  signature?
24  A.   No, I do not.
25  Q.   It looks like it says EVP HR and

Page 51

L. Nail

1
2  administration.  Do you know who held that
3  position at Paramount?
4  A.   No, this --
5  Q.   Or would this have been from CBS?
6  A.   This was at CBS.  He was a -- but as
7  you know, PPI was a wholly owned --
8  Q.   -- subsidiary.
9  A.   -- subsidiary of CBS.
10  Q.   Correct.  But you had never had any
11  discussions or communications with whoever signed
12  this document.
13  A.   No, I did not.
14  Q.   And no one else from CBS; is that
15  correct?
16  A.   I may have had a discussion with Lou
17  Briskman or he may have asked me if I was under
18  contract.  I know there were several times during
19  this long period of time that I thought about
20  calling Lou and I know I discussed with Al Weber
21  because I was getting frustrated, Al was getting
22  frustrated over not getting it.
23     And I remember a conversation with Al.
24  Al had been, I think Al call Lou Briskman.  And I
25  don't remember if I called -- well, I had numerous

Page 52

L. Nail

1
2  discussions with Mr. Briskman, but, you know,
3  thinking about doing it and actually doing it my
4  memory gets blurred, if I actually did it or I
5  just thought about doing it.
6  Q.   Would those conversations have
7  occurred before you received the actual physical
8  agreement?
9  A.   Correct.
10  Q.   How about in just limiting to after
11  you received the agreement?  Anyone at CBS you
12  recall or that you know that you discussed the
13  employment agreement with?
14  A.   There may have been discussions about
15  contracts in general during due diligence, but I
16  don't recall discussing my contract specifically
17  with any attorney from CBS or any, anybody at CBS.
18  Q.   Did you have any role in distributing
19  the employment agreements to the other executives
20  who were getting new contracts at or about the
21  time that you received yours?
22  A.   I don't believe so.  I don't recall.
23  Q.   Anyone else at PPI that you discussed
24  the employment agreement with after you received
25  it, at about the time that you received it and

Page 53

L. Nail

1
2  signed it, other than Mr. Koontz and Mr. Weber?
3  A.   No.
4  Q.   Is there anyone else from, other than
5  those organizations, that you would have discussed
6  your employment agreement with?
7  A.   Let me just -- I may have said -- I
8  can't recall if, you know, I may have said in
9  passing to David Thornton, you know, I finally got
10  my contract.
11     But I certainly didn't discuss the
12  details, because I know David was also frustrated
13  and was asking me about, Have you heard anything?
14  Have you heard anything?  Have you heard anything?
15  That type of thing.  But other than David and --
16  no, I think that's it.
17  Q.   And there's no one that you would have
18  discussed the actual language of the employment
19  agreement with at that time; is that correct?
20  A.   That's correct.
21  Q.   Did you review the agreement before
22  you signed it?
23  A.   Yes, I did.
24  Q.   To what extent would you say?
25  A.   Read it, reread it.  I think I slept

Page 54

L. Nail

1  on it. Which is why I don't think I signed it
2  right away. And then after -- my memory is I read
3  it a few times, I slept on it, probably the next
4  day came in and had those two conversations that
5  I've already testified with Mike and Al and then
6  signed it and handed it to Al.
7      Q.   If I understand your testimony
8  regarding your conversation with Mr. Koontz and
9  Weber regarding the agreement, you would not have
10  discussed particular provisions or language of the
11  agreement with any specificity.
12      Is that fair to say?
13      A.   No, I'm not, you know, I may have -- I
14  may have made a comment to Al about, you know,
15  there were some terms in here that, you know, that
16  I consider vague.
17      I know I had a -- if you will note,
18  it's not dated, and the reason why it's not dated
19  is because I wanted -- in my mind I was thinking
20  about since it was, you know, it could have been
21  early March that I was thinking to ask that it be
22  dated from, you know, the term is from March 1,
23  you know, rather than January 1.
24      Q.   And did you suggest that be changed to

Page 55

L. Nail

1  anyone?
2      A.   No, I did not.
3      Q.   With respect to you may have had a
4  comment that some of the positions were vague.
5      A.   Yes.
6      Q.   Who do you specifically, if anyone,
7  recall saying that to?
8      A.   If I had said it to anyone it would
9  have been to Al.
10      Q.   Do you have a specific recollection --
11      A.   No, I do not.
12      Q.   -- of doing that?
13      A.   I'm sorry, I'm talking over you.
14      I do not. I do not.
15      Q.   Do you have a specific recollection of
16  what you thought may have been vague at the time?
17      A.   Yes.
18      Q.   And do you know if you specifically
19  discussed that thought with anyone?
20      A.   No.
21      Q.   You did not discuss that with anyone?
22      A.   I do not have a memory of discussing
23  it specifically.
24      Q.   Did you ask any questions regarding

Page 56

L. Nail

1  the meaning of any language before you signed it?
2      A.   No.
3      Q.   Now I'm going to ask you a broader
4  question. I was asking you with whom you
5  discussed the employment agreement at or about the
6  time you received it and signed it.
7      Following that, tell me every one with
8  whom you discussed the employment agreement at PPI
9  other than what you've testified about so far.
10      MR. WEBER:  At any time?
11      MS. KIRILA:  Following what he just
12      testified about, yes, and other than
13      counsel.
14      A.   I'm sorry.
15      Q.   Specific conversations regarding your
16  employment agreement.
17      A.   Other than what I've testified to?
18      Q.   Yes.
19      A.   Have I talked to anyone else about
20  any -- any part of my employment contract.
21      Q.   Your personal, right, with respect to
22  you.
23      A.   Other than the general fact that I had
24  a contract, I don't recall discussing any details

Page 57

L. Nail

1  with anyone other than what I've already testified
2  to.
3      Q.   Why don't we take a look at the actual
4  agreement now. The first page, I direct your
5  attention to paragraph 1-A.
6      Would you agree with me that the term
7  of this agreement was from January 1, 2006 and
8  ending December 31, 2007?
9      A.   Yes.
10      Q.   And that's defined as the employment
11  term --
12      A.   Yes.
13      Q.   -- in this agreement?
14      A.   Yes.
15      MR. WEBER:  Objection. The document
16      speaks for itself.
17      Q.   Under this agreement, under 2-A, your
18  base salary was 165 per year.
19      How did that compare with what you
20  were making prior to receiving this contract?
21      MR. WEBER:  Objection, relevancy.
22      A.   It was an increase.
23      Q.   Do you recall by how much?
24      A.   I don't. My memory is I may have been

Page 58

L. Nail

1                L. Nail
2 making 150, but I'm not sure.
3     Q.   I direct your attention to paragraph
4 5. I'll just read that into the record:
5     "Executive agrees to devote all
6 customary business time and attention to the
7 affairs of Paramount, except during vacation
8 periods and reasonable periods of illness or other
9 incapacity consistent with the practices of
10 Paramount for executives in comparable positions,
11 and agrees that executive services shall be
12 completely exclusive to Paramount during the term
13 hereof. Executive further agrees to comply with
14 all applicable Paramount policies, as described in
15 the Paramount Personnel Policy Manual."
16     My question to you goes to the clause
17 with respect to "agrees that executive's services
18 shall be completely exclusive to Paramount during
19 the term hereof."
20     How did you interpret that clause with
21 respect to --
22     MR. WEBER: Objection. Calls for a
23     legal conclusion.
24     Q.   You can still answer. How do you
25 interpret that clause with respect to that your

Page 59

1                L. Nail
2 services shall be completely exclusive to
3 Paramount? What does that mean to you?
4     A.   What that means to me is while I am
5 actively employed by Paramount Park, Inc., that I
6 am to -- my services shall be completely exclusive
7 to Paramount.
8     Q.   But you would agree with me that the
9 term of this agreement could conceivably extend
10 beyond your employment termination.
11     A.   No.
12     MR. WEBER: Objection as to the form.
13     A.   No, I do not agree with you.
14     Q.   So you do not agree that the
15 employment term is defined to include a period of
16 time that could extend beyond your employment
17 termination without cause under this agreement?
18     MR. WEBER: Objection as to form.
19     Rephrase it?
20     MS. KIRILA: I can rephrase that.
21     Q.   Are you saying that the employment
22 term defined in paragraph 1(a) could be shorter
23 than December 31, 2007?
24     A.   I'm sorry, say that again?
25     Q.   Sure. I'm trying to understand your

Page 60

1                L. Nail
2 interpretation. My interpretation is that this
3 employment term runs until December of '1, 2007
4 regardless of whether you have been terminated
5 without cause.
6     A.   Well, that is where I disagree with
7 you.
8     Q.   And tell me why.
9     A.   I think once I am terminated without
10 cause that this sentence does not apply.
11     Q.   Which sentence are you referring to?
12     A.   The sentence that says -- well,
13 actually, the entire paragraph 5. It does not
14 apply once I am terminated without cause and I am
15 notified my services are no longer needed by PPI.
16     Q.   And I'm trying to get just your
17 general understanding as to whether you would
18 agree with me that the employment term as defined
19 herein could extend beyond your termination
20 without cause by this agreement.
21     MR. WEBER: Objection, asked and
22     answered.
23     Q.   You can answer again.
24     A.   I don't agree with you.
25     Q.   OK. So you believe that the

Page 61

1                L. Nail
2 employment term would end effective as of your
3 termination without cause date?
4     MR. WEBER: Objection, asked and
5     answered.
6     MS. KIRILA: No, that wasn't asked.
7     Q.   But you can answer.
8     A.   No, I'm not sure what you're asking.
9     Q.   OK. Let me try to rephrase. Here I'm
10 looking at paragraph 1(a) and it defines the
11 employment term to extend to December 31, 2007.
12 And let's break it up.
13     You would agree with me that you could
14 be terminated without cause under this agreement
15 prior to December 31, 2007, correct?
16     A.   I could be terminated without cause
17 under the terms of this agreement.
18     Q.   Prior to December 31, 2007.
19     A.   That is correct.
20     Q.   My question for you is, I define the
21 employment term to continue to December 31, 2007,
22 regardless of whether or not you've been
23 terminated without cause.
24     Is that your interpretation?
25     A.   I do not understand your question.

16 (Pages 58 to 61)

L. Nail

1
2      Q.    OK. Let's try it another way.  If
3  you -- let's back up.
4            Would you agree that after you have
5  been terminated without cause under this agreement
6  that you have any continuing obligations under
7  this agreement?
8      A.    Yes, I would agree with you.
9      Q.    Which continuing obligations would you
10 have under this agreement following your
11 termination without cause?
12           MR. WEBER:  Objection.  The agreement
13 speaks for itself.  It calls for a legal
14 conclusion.
15     A.    Well, let's look under the paragraph
16 that pertains to termination without cause.  I'm
17 looking at, I believe it's 7(c).
18           "If, during the term of this
19 Agreement, employment of Executive" -- and I won't
20 read the whole thing, but under this paragraph
21 7(c) is where I believe that once I am terminated
22 without cause is the primary obligation, and the
23 document speaks for itself as to what my
24 obligation is.
25     Q.    But I need to know your

L. Nail

1
2  interpretation.
3      A.    Well, my interpretation --
4            MR. WEBER:  Objection.  Calls for
5  legal conclusion.
6      Q.    You can still answer.
7      A.    OK. My interpretation of this clause
8  is that when I am terminated without cause that I
9  am entitled to the benefits referred to, the
10 salary and benefits under, whatever it says in
11 here, 2(a)/3, so long as I am willing, ready and
12 able to render exclusive services through the
13 remainder of the employment term.
14     Q.    And your position is that none of the
15 other obligations apply to you post your
16 termination without cause?
17     A.    I would not agree with that statement.
18     Q.    OK, which other, and that's what I
19 asked, which other obligations do you feel would
20 apply to you following a termination without cause
21 under this agreement?
22           MR. WEBER:  Objection.  The agreement
23 speaks for itself.
24     A.    Well, we have to go through the
25 agreement.

L. Nail

1
2      Q.    Sure, let's do it.
3      A.    OK.  I believe 8 would continue.
4            I believe 9 would continue.
5            Although obviously, and again, this is
6  why this is difficult, because this is referring
7  to Paramount and CBS.  And so since Cedar Fair is
8  the successor, I'm not sure if Cedar Fair steps
9  into the shoes of CBS or not as, you know, in
10 other words, everywhere it says CBS, I'm not sure
11 if --
12     Q.    Sure.
13     A.    -- it now means Cedar Fair.  If
14 everywhere in the contract it refers to CBS, if it
15 automatically now would pertain to Cedar Fair as
16 the successor.
17     Q.    And that aside, you're aware that
18 Paramount, the Paramount entity did not change as
19 a result of the transaction.
20     A.    Correct.
21     Q.    So with respect to your obligations to
22 Paramount, those would continue, if you had them
23 under this agreement.
24     A.    Correct.
25     Q.    OK.

L. Nail

1
2      A.    I believe number 10 would continue.
3            I do not know about 11.  If 11 is a
4  noncompete, I'm not sure that its legally
5  enforceable.
6      Q.    Aside from the legal enforceability of
7  that, do you have an opinion of whether or not
8  that obligation would continue post your
9  termination without cause?
10           MR. WEBER:  Objection.
11     A.    Yes.
12           MR. WEBER:  Calls for legal
13 conclusion.  You may answer.
14     Q.    What is that?
15     A.    My opinion is that this does not apply
16 posttermination with cause.
17     Q.    Why is that?
18           MR. WEBER:  Without cause?
19           THE WITNESS:  Without cause.
20     Q.    Why is that your opinion?
21     A.    Because it doesn't make sense.  When
22 you read the contract as a whole and you consider
23 the intent of the entire contract, and especially
24 the paragraph 7(c), it doesn't make sense.
25     Q.    And you've already testified you

L. Nail

1  weren't involved in the drafting of this
2  agreement, correct?
3  A.  That's correct.  I did not draft this
4  document.  I did not have any input into this
5  document.
6  Q.  Let's look at 11.  Would you agree
7  with me that it states in capital letters or
8  capitalized, "Employment Term," in that paragraph?
9  Do you see that?
10  A.  Yes, I do.
11  Q.  With you agree with me that that's
12  defined in this agreement to run until
13  December 31, 2007?
14  A.  I would agree with you that that is,
15  yes, that's a defined term that is explained or
16  set forth in paragraph 1(a).
17  Q.  The other part of that 11, "Executive
18  will not engage in any other occupation," is it
19  your position that that just doesn't apply
20  posttermination without cause or -- explain to me.
21  A.  Yes.
22  Q.  Just because you think it doesn't make
23  sense in the whole scheme of the contract.
24  A.  When you read the entire contract, the

L. Nail

1  context of the entire contract, especially the
2  "termination without clause" paragraph, it would
3  not seem -- it defies common sense, but it also is
4  vague.  That paragraph in and of itself is vague.
5  Q.  Paragraph 11?
6  A.  Yes.
7  Q.  In what way is paragraph 11 vague?
8  A.  "Will not engage in any other
9  occupation."  Does it mean any occupation at all
10  or is it an and/or?
11  Q.  Well, it says "any other occupation."
12  A.  I read that as being somewhat vague as
13  to meaning any other occupation in the leisure
14  theme park, motion picture, television or
15  entertainment business except for Paramount
16  pursuant to this agreement.
17  Q.  Mr. Nail, you are an attorney,
18  correct?
19  A.  Yes.
20  MR. WEBER:  Objection.
21  Q.  With a background in employment law.
22  A.  That is correct.
23  Q.  Are you familiar with the purpose of
24  the use of the word "or" in the drafting of

L. Nail

1  contracts?
2  MR. WEBER:  Objection to the form.  It
3  calls for legal conclusion.  Unless you're
4  saying this is an expert witness in
5  employment agreements.  If you want to
6  stipulate to that, I will.
7  MS. KIRILA:  No, I don't to make him
8  an expert, but I want his personal
9  understanding.
10  MR. WEBER:  It sounds like you do, so
11  I will stipulate to that effect.
12  MS. KIRILA:  This is his contract.
13  BY MS. KIRILA:
14  Q.  As a party to this contract and based
15  on your experience as it would apply to you,
16  what's your understanding of the use of the word
17  "or" in this paragraph?
18  MR. WEBER:  Objection.  Asked and
19  answered.  You may answer again.
20  A.  I think it's a vague sentence.
21  Q.  Any other provisions that you would
22  interpret as applying to you after your
23  termination without cause under this agreement?
24  A.  12 as it relates to confidentiality.

L. Nail

1  Probably 13(a), 13(b), (c).
2  I'm not sure about 14.
3  15 is legalese.
4  16 is just a notice provision.
5  Q.  OK, let me direct you back to
6  paragraph 5.
7  A.  Can we take a break?
8  MS. KIRILA:  We sure can.
9  (A recess was taken from 5:04 p.m. to
10  5:14 p.m.)
11  BY MS. KIRILA:
12  Q.  Let's go back to your employment
13  agreement at paragraph 5.  And I understand your
14  interpretation is that this exclusive services
15  provision that I'll call it didn't apply to you
16  after you were terminated without cause; is that
17  correct?  Your interpretation?
18  A.  Well, I think you have to read it in
19  context with paragraph 7.  In other words, let's
20  cut to the chase, if PPI called me after
21  termination without cause and said, Lester, we
22  have something we want you to do, pursuant to
23  paragraph 7(c), then, you know, paragraph 5 may
24  apply during that, but I don't think you can cut

L. Nail

1  and paste.
2      I think that the primary obligation is
3  to be ready, willing and able to perform services
4  for PPI when they call and say, Lester, we got
5  something we want you to do.
6      At that moment I have a choice.  I
7  have a decision.  I can say, Nope, not going to do
8  it.  And they can say, Fine.  We're not going to
9  pay you anymore.  You've just violated 7(c).  Or I
10  can say, You betcha.  I'd love to really.  Tell
11  me what to do.  And I have complied with paragraph
12  7(c).
13      Q.    You'd would agree with me that
14  Paramount had the right under this contract to
15  terminate you without cause.
16      A.    Yes.
17      Q.    At any time.
18      A.    Yes.
19      Q.    And you'd agree with me that they had
20  a right under that 7(c) to call you back, or at
21  least contact you if they wanted you to perform
22  services as you just testified about.
23      A.    I'm sorry, say that again.
24      Q.    Would they have a right to call you

L. Nail

1  back after your termination without cause to
2  see --
3      MR. WEBER:  I just want to make a
4      clarification of the term "call you back."
5      Q.    Would you agree with me, and let me
6  just restate the question, that after you were
7  terminated without cause under this agreement that
8  PPI would have the right to use your services as
9  long as you were getting paid under that 7(c)?
10      A.    PPI would have the right to call me
11  and request that I perform services for PPI.
12      Q.    OK.  As you said, if you said no, then
13  they would have the right to stop paying you and
14  providing benefits.
15      A.    Yes.
16      Q.    Back to paragraph 5, just as this
17  would apply, and I understand your interpretation,
18  let's just say before you were terminated without
19  cause, how would you interpret this clause that
20  executive services shall be completely exclusive
21  to Paramount?  What does that mean to you?
22      MR. WEBER:  Objection.  Calls for a
23      legal conclusion and asked and answered.
24      A.    Before termination --

L. Nail

1      Q.    Before you were terminated without
2  cause, correct.
3      A.    -- how would this apply.
4      Q.    Yes, to you.  What does that mean to
5  you?  I am just looking for your interpretation of
6  that.
7      A.    I'm not trying to be cute, but I think
8  it means exactly what it says:  Shall be
9  completely exclusive to Paramount.
10      Q.    Could you work somewhere else?
11      MR. WEBER:  If he's --
12      MS. KIRILA:  Correct, prior to --
13      MR. WEBER:  Prior to being terminated?
14      MS. KIRILA:  Terminated without cause,
15      yes.
16      A.    And I'm not trying to be cute.  How do
17  you defined work?  Do you define work as being
18  legal services that I'm paid for versus, you know,
19  building a Habitat house?
20      Q.    That's a fair question.  That's why I
21  am trying to get to, what does that mean to you?
22  How would you interpret that?
23      A.    How I interpret that is I cannot be,
24  you know, perform legal services for anything that

L. Nail

1  would be in the role as a senior vice president,
2  general counsel to another company for, you know,
3  customary compensation.
4      Q.    So are you saying that this, during
5  your active employment this clause would not
6  prohibit you from getting a nighttime job as a
7  nonlegal occupation?
8      A.    Well, I don't know.  Is there a
9  definition of services?  Because if you go back to
10  the whereas clause, it says, you know, my services
11  as an executive, as a senior vice
12  president/general counsel is willing to perform
13  such services.
14      I read that to mean the typical, you
15  know, the customary and ordinary services that a
16  senior vice president/general counsel/executive
17  would carry out.
18      But the answer is, I could not go work
19  for Bank of America as a general counsel or any
20  other company in that capacity.  Now, if you're
21  asking could I go be a stocker at Home Depot or
22  Lowe's?  I could do it, but, you know.
23      Q.    Well, maybe the first part of this
24  paragraph would help more.  It also says:

19 (Pages 70 to 73)

Page 74

L. Nail

1  Executive agrees to devote all customary business
2  time and attention to the affairs of Paramount,
3  comma.
4       A.    Bingo.  You know, "customary business
5  time and attention."  Again, as it relates back to
6  senior vice president, general counsel, you know,
7  I mean, the problem here is that services is not a
8  defined term, which is another reason why this
9  contract is vague.  Nowhere in it does it define
10 services other than the whereas clause.
11      Q.    Do you have any familiarity with these
12 type of clauses in other employment agreements?
13      A.    Which clauses?
14      Q.    I'll caught, and if you don't, you
15 don't, but an exclusive services provision.  Does
16 that have any meaning to you outside of your
17 agreement?
18            MR. WEBER:  Objection.  One, I don't
19      know what that term means; two, it calls for
20      a legal conclusion.  Vague.  I don't
21      understand the question, but you can answer.
22      A.    I can't answer the question.
23      Q.    You've never heard of that term,
24 "exclusive services provision"?

Page 75

L. Nail

1       A.    I have hear of the term "exclusive
2  services provision."
3            The answer is I am not an expert
4  in post --
5       Q.    Sure, and I don't want your expert
6  opinion.  I just want in terms of interpreting
7  this as it might apply to you.
8       A.    Right.
9       Q.    Are you drawing on anything to help
10 you define that?
11      A.    I'm drawing on my experience, my
12 common sense, my ability to read English.
13      Q.    Have you ever had, and I'm sorry, I
14 don't think you were finished.
15      A.    No, go ahead.
16      Q.    Have you had any experience at
17 drafting what you know as an exclusive services
18 provision in an employment contract?
19            MR. WEBER:  Objection.  Has this
20      witness testified he knows what an exclusive
21      services contract is?
22            MS. KIRILA:  He testified he has heard
23      the term before.  So as he understands it.
24            MR. WEBER:  Objection.  You may

Page 76

L. Nail

1  understand it.  I am not sure he can answer
2  the question as you drafted it.  But you can
3  answer if you can.
4       A.    The answer is I don't recall.
5       Q.    At Paramount in your role as general
6  counsel did you have any role in drafting any of
7  the employment agreements for any employees at
8  Paramount?
9       A.    No.
10      Q.    Just to I'm clear, on the first clause
11 of that paragraph 5, "Executive agrees to devote
12 all customary business time and attention to the
13 affairs of Paramount," what does that mean to you?
14      A.    It means customary business time,
15 which, you know, generally eight to five, eight to
16 six, Monday through Friday, with the exception
17 being I will acknowledge in the theme park
18 business it's, you know, it's more than that.
19            Again, that's why this is vague.  This
20 contract, basically these guys, CBS, took an
21 entertainer agreement and tried to shoe horn it
22 into, you know, my situation.
23      Q.    How do you know that?  You didn't even
24 know who drafted it.

Page 77

L. Nail

1       A.    I'm making an assumption.
2       Q.    Because it looks like something that
3  wouldn't apply to you.
4       A.    Correct.  I would not have drafted
5  this for an executive at PPI.
6       Q.    OK.
7       A.    You know, in the way it's drafted.
8       Q.    OK.  Let's talk about the time just
9  leading up to the sale of PPI, essentially the
10 stock of PPI to Cedar Fair.
11      A.    OK.
12      Q.    What was your role with respect to
13 that transaction?
14      A.    I participated in the due diligence,
15 which involved the gathering of documents, the
16 gathering of information, the answering of a
17 myriad of questions, participating with the senior
18 executives in the presentation to the potential
19 purchasers.
20      Q.    And that was on behalf of PPI presale,
21 correct?
22      A.    I'm sorry, you lost me there.
23      Q.    Because I know you helped in some of
24 the transition things for PPI after the closing.

Greenhouse Reporting, Inc.                    (212)279-5108
                    (212) 279-5108

L. Nail

1      L. Nail
2   And now I'm just talking about preclosing.  Is
3   that what you're testified to?
4      A.    Preclosing, due diligence period, yes,
5   which I consider being, you know, PPI slash CBS --
6      Q.    OK.
7      A.    -- time frame.
8      Q.    Who did you work with specifically
9   from PPI or CBS with respect to the due diligence?
10     A.    There were several people, and I'm
11  sure I'm not going to be able to remember them
12  all.  At PPI I worked with Al Weber, Mike Koontz,
13  Brett Petit.  I am trying to think of who else at
14  the corporate office.  You know, various
15  individuals at the parks when I needed to find out
16  information.
17         At CBS, Darron Bassin.  I think it's
18  B-a-s-s-i-n.  Laura.  I cannot remember Laura's
19  last name.  Were the two CBS folks.
20         There was a gentleman from Citigroup
21  who was our designated contact person for
22  Citigroup.  I worked with him quite a bit.  He
23  also brought in other folks who -- there was a law
24  firm they were using and I can't possibly remember
25  the name of the law firm or the name of the guy,

1      L. Nail
2   the lawyer who I had numerous, numerous, numerous
3   conversations with.
4      Q.    At this time that you were
5   participating in the due diligence you were
6   general counsel for PPI, correct?
7      A.    Yes.
8      Q.    Who were your direct reports?
9      A.    Paralegal, Jo Ann, and that's J-o,
10  it's two words, J-o A-n-n, and Costell.  I believe
11  she was my only direct report.
12     Q.    As general counsel did you oversee or
13  have responsibility for any other departments of
14  PPI other than legal?
15     A.    No.
16     Q.    So not HR.
17     A.    No.
18     Q.    Prior to the closing did you discuss
19  with anyone at PPI or CBS regarding your possible
20  status after the closing?
21     A.    In a roundabout way, you know, the guy
22  from Citigroup and I sort of danced around that,
23  you know, but no, not formal discussions.
24     Q.    Were you told anything either one way
25  or the other with respect to whether or not you

1      L. Nail
2   would likely have a position with PPI following
3   the transaction?
4      A.    By who?
5      Q.    By someone.  This is preclosing at PPI
6   or CBS.
7      A.    No.  I was not told either way,
8   whether I would or would not.
9      Q.    What was your first contact with
10  anyone on the Cedar Fair side that you recall?
11     A.    I remember sitting down with Gordon
12  Kaiser immediately after the presentation when
13  Cedar Fair came to the management presentation.
14  He and I had a discussion about the legal, the
15  legal activity, and I can't remember if this was
16  someone else in there, somebody else from Cedar
17  Fair or not.
18         And of course I understand that Gordon
19  Kaiser was an attorney with an outside counsel.
20  He was not an employee of Cedar Fair.
21     Q.    How about people from Cedar Fair, who
22  do you recall first meeting?
23     A.    There were some gentlemen who came in
24  from Cedar Fair that I met.  They were there to
25  take an inventory.  They may have been the first

1      L. Nail
2   people I met.
3      Q.    You don't recall their names?
4      A.    I don't.
5      Q.    OK.  Who did you have most interaction
6   with from Cedar Fair?
7      A.    Mr. Freeman.
8      Q.    Any other interaction with any other
9   Cedar Fair related individuals?
10     A.    I had a conversation with Peter.
11     Q.    When was that?
12     A.    That would have been pre -- it was
13  postoffer acceptance, but preclosing.
14     Q.    And what was that conversation about?
15     A.    Peter stuck his head in my office or
16  walked into my office, asked me how I was doing.
17  We, you know, just chitchatted a little bit.
18  And he -- I can't -- I think Peter said, We
19  haven't decided what we're going to do with your
20  position, but we will honor your contract.
21     Q.    Did you discuss anything else with
22  Peter?
23     A.    Mainly some small talk.  You know,
24  maybe, you know, how's business kind of thing.
25     Q.    Other than that one time, that one

L. Nail

1
2    conversation with Peter, and just for the record,
3    that's Peter Crage?
4        A.    Yes.
5        Q.    Did you have any other conversations
6    with him?
7        A.    I may have been on the speakerphone
8    with him with Mike Koontz, but I just have a vague
9    recollection of that.
10       Q.    Do you recall the subject matter of
11   that?
12       A.    It would have been a finance subject.
13       Q.    No other conversations with respect to
14   your potential status postclosing?
15       A.    No.
16       Q.    And no other conversations generally
17   that you can recall with Mr. Crage.
18       A.    Well, I cannot, I can't remember if
19   Peter came to the -- at some point after closing
20   and all the, you know, the corporate office was in
21   the process of being shut down.  A number of Cedar
22   Fair people came to tour the corporate office.
23   Mr. Kinzel came.  I'm pretty sure Peter was there.
24   I think Mr. Freeman was there.  There was some
25   marketing people there.

L. Nail

1
2            And I am sure that I spoke to Peter.
3    If he was there, I'm sure I spoke to him, but I
4    would not -- the bottom line is we didn't discuss
5    my situation.
6        Q.    And you don't recall the specifics of
7    any conversation.
8        A.    On that day.
9        Q.    Yes, on that day.
10       A.    No.
11       Q.    And other than what you've already
12   recollected here in your testimony.
13       A.    No.
14       Q.    On the day that people from Cedar Fair
15   came down after the closing to tour the Charlotte
16   office did you have any discussions that you can
17   recall with respect to your situation during that
18   visit?
19       A.    With anyone?
20       Q.    With any of those individuals from
21   Cedar Fair.
22       A.    I don't think so.
23       Q.    When is the first time you would
24   have -- if you did.  Did you ever meet Mr. Kinzel?
25       A.    Yes.

L. Nail

1
2        Q.    When was the first time you met him?
3        A.    That meeting I just described.
4    Although way earlier, you know, I was on a speaker
5    call where he called to talk to all of the PPI VPs
6    shortly after.  It may have been the day it was
7    announced that they had been awarded the purchase,
8    CBS had accepted the offer.
9        Q.    So that was a conference call with all
10   of the VPs of Paramount?
11       A.    Yes.
12       Q.    Who was on the other side?
13       A.    I think -- I don't know.  I mean, I
14   know Mr. Kinzel did most or all of the talking.  I
15   don't know if anyone one else was on the call.  I
16   don't remember.
17       Q.    What was discussed during that
18   conference call?
19       A.    Just the fact that -- well, the only
20   subject I really remember is I know Mr. Kinzel
21   wanted to immediately get out a notice, some type
22   of written memo, document, communication to all
23   PPI employees.  I just remember that one subject.
24   I'm sure there were others.  I don't remember.
25       Q.    Do you recall any more specifics about

L. Nail

1
2    that notice or just that some notice was to go
3    out?
4        A.    Well, it was his desire to send out a
5    notice to each individual employee.
6        Q.    Did he discuss the contents of that?
7        A.    Vaguely, yes.  I think in general
8    terms.
9        Q.    What did he say?
10       A.    I think he, you know, I think he said
11   that Cedar Fair had a fairly standard boilerplate,
12   those are my words, memo that went out when they
13   did an acquisition and he would like to send it
14   over and let us look at it and possibly send it
15   out.
16       Q.    Did that happen?
17       A.    No, not at that time.
18       Q.    Did you ever see such a communication
19   that came from Mr. Kinzel or his office?
20       A.    At some point I think I did, but I
21   don't recall.  But it wasn't during that immediate
22   time frame.
23       Q.    What else was discussed during that
24   conference call that you recall?
25       A.    I don't believe.

Page 86

L. Nail

1
2      Q.    Nothing about what was going to happen
3  posttransaction?
4      A.    I don't recall.
5      Q.    Other than that one conference call
6  with all the VPs and meeting him in Charlotte when
7  they visited after the closing, any other
8  discussions or meetings with Mr. Kinzel?
9      A.    I don't think so.
10            Well, again, this is trivia, but
11  you're asking for all.  I think I may have met him
12  when we did the tour, you know, go all the way
13  back when we did the management presentation.  I'm
14  sure I met him, because after we broke up, you
15  know, the formal presentation, we walked through
16  the park and I'm almost sure that I walked beside
17  him and shook his hand or met him or was
18  introduced to him, but there was, you know, there
19  was no substantive conversation.  It was just
20  introduction.
21      Q.    And just for the record, the
22  management presentation that you're referring to
23  would have been the presentation by Paramount Park
24  to Cedar Fair related individuals regarding the
25  sale of the company?

Page 87

L. Nail

1
2      A.    Correct.
3      Q.    Do you recall what month that meeting
4  would have happened?
5      A.    The presentations?
6      Q.    Yes.  The closing was in June 2006.
7      A.    No, I don't remember.  The
8  presentations were a blur.  We did sometimes two a
9  day and for like two or three weeks it seemed
10  like.
11      Q.    Any other meetings that you can recall
12  with Mr. Kinzel or Mr. Crage?
13      A.    No.  Not that I can recall.
14      Q.    And I will ask you about your
15  conversations with Mr. Freeman.  But other than
16  those individuals, and you mentioned Mr. Kaiser,
17  Mr. Freeman, Mr. Crage and Mr. Kinzel, anyone else
18  that you had interaction with from the Cedar Fair
19  side?
20      A.    And the two individuals who came to
21  the office?
22      Q.    Correct.  During the visit to
23  Charlotte.
24      A.    Well, no, these two guys came in on their
25  own.  These are the guys that came in to do the

Page 88

L. Nail

1
2  inventory.
3      Q.    Inventory.  You don't recall their
4  names.
5      A.    I don't.  But the answer is no.  Other
6  than that, I don't recall anybody else.
7      Q.    Tell me about your interaction with
8  Mr. Freeman during the preclosing period.  What
9  did that consist of?
10      A.    Well, first of all, I would like to
11  say for the record it was very professional and
12  very pleasant.  And I remember the first meeting
13  we had in my office and I tried to assemble the
14  documents that would reflect the ongoing
15  litigation and try to go through that.
16            I think I shared the ongoing and the
17  open contract issues and probably just talked in
18  general about what we were doing from, you know,
19  what the -- what I was doing as legal, you know,
20  as in-house legal for PPI.
21      Q.    Did you have any discussions with
22  respect to the executive contracts of any
23  Paramount employees?
24      A.    I don't recall.  I don't think we did,
25  but I just don't remember.

Page 89

L. Nail

1
2      Q.    I may have asked you this.  I don't
3  think I have, but in your role as general counsel
4  for Paramount did you have any role with respect
5  to the executive agreements for Paramount Park
6  employees?
7      A.    No.  Not in terms of -- I didn't
8  negotiate them.  I didn't draft them.  I didn't
9  present them.  I didn't --
10      Q.    -- look at them to see if they were
11  being carried out?
12      A.    No.
13      Q.    OK.  Aside from company transition
14  issues that you discussed with Mr. Freeman, tell
15  me all conversations or communications you can
16  recall with Mr. Freeman preclosing regarding your
17  personal situation.
18      A.    I can't recall.  I just can't recall.
19  I mean, it's all a blur.
20      Q.    Do you recall any specific
21  conversations with Mr. Freeman regarding your
22  personal situation, either pre or postclosing?
23      A.    Well, not -- well, not preclosing.
24  Postclosing, I remember -- I'm sure we discussed
25  it in some form or fashion.  I'm sure at some

Page 90

L. Nail

1    L. Nail
2    point, maybe several points, I asked him either
3    directly or indirectly, you know, Hey, what's, you
4    know, what's my status?
5        I don't, I mean, similar to what he
6    testified to, he and I had a lot of discussions
7    both face to face, both over the phone.  So a lot
8    of it gets blurred as to what we discussed when.
9        Q.    You're saying as regards your personal
10   situation you had a lot of discussions --
11       A.    No, no.
12       Q.    -- or about everything?
13       A.    About everything.
14       Q.    And you did at some point ask him
15   directly or indirectly what your status was.  Do
16   you recall what he said?
17       A.    I don't recall the words.  I just
18   recall that Craig was very professional and was
19   professionally vague about it.
20           In other words, I got the impression
21   that he truly didn't know what was being decided.
22   I also assumed that it was in, you know, it was in
23   a state of flux, I assume, since I was asked to
24   stay.  The decision as to what to do with my
25   personal situation had not been made, is what my

Page 91

L. Nail

1    L. Nail
2    assumption was.
3        Q.    And at some point you were asked to
4    stay past the closing, correct?
5        A.    Well, here's what happened.
6        Q.    Tell me about it.
7        A.    The day of closing Al, early in the
8    day Al called us, all the VPs who had contracts
9    into the office, or I'm assuming all the ones who
10   had contracts, into the conference room and said
11   that he had just talked to Mr. Kinzel and
12   Mr. Kinzel said that effective immediately
13   everyone was on administrative leave, whatever
14   that means, and then he turned and looked at me,
15   "except for you."  And "Dick wants you to stay.
16   You're not on leave."
17       Q.    Anything else said in that
18   conversation with Al Weber other than what you
19   just said?
20       A.    I recall, I recall asking Al, you
21   know, What am I supposed to do?  And he had he
22   didn't know, but he was sure someone from Cedar
23   Fair would be in touch with me shortly.
24       Q.    Is that the first you learned that you
25   would be staying on at least for some time after

Page 92

L. Nail

1    L. Nail
2    the closing?
3        A.    Correct.
4        Q.    Did someone from Cedar Fair follow up?
5        A.    Yes.
6        Q.    Who was that?
7        A.    I believe it was Mr. Freeman.
8        Q.    What do you recall with respect to any
9    conversations or communications regarding what
10   would happen with your position at that point?
11       A.    Oh, I don't recall anything was said
12   about what would happen with my position.
13       Q.    When did you first learn that the
14   termination without cause provisions under your
15   employment contract were being triggered?
16       A.    I guess when I received the letter
17   from Mr. Kinzel.
18       Q.    So you don't recall any previous
19   conversations with Mr. Freeman regarding what was
20   going to happen or not happen?
21       A.    Well, yes.  I remember -- yes.  I
22   mean, let me just take you through the scenario.
23       Q.    Sure.
24       A.    After all the other execs left and I
25   was there, I'm sure I received a phone call from

Page 93

L. Nail

1    L. Nail
2    Mr. Freeman and we, you know, it became very clear
3    to me, you know, probably through his direction
4    that my role was to, as he said earlier, be the
5    person in charge of the corporate office.
6            And, you know, we would go through the
7    litigation.  We would go through the contracts.
8    We would go through the basically the layoffs in
9    the corporate office.
10           And I can't remember if he asked me to
11   participate or I volunteered to participate, but I
12   certainly agreed to participate in those layoffs,
13   telling the individuals, and I know that's when
14   Craig came down several times and he and I would
15   call the people in and inform them that they were
16   being laid off and here was a severance package
17   and try to answer their questions.
18           As time went by, either over the
19   phone, you know, there were contract issues.
20   There were issues over what contracts Cedar Fair
21   could terminate immediately versus what couldn't
22   be and what had successors clauses.  Just a myriad
23   of things over the course of several weeks.
24           There did come a point in time where I
25   literally had nothing to do.  I mean, absolutely

L. Nail

1   L. Nail
2   literally there was nothing to do.
3         And I know I called Craig and asked
4   him, you know, Craig, there's nothing to do.  Can
5   I be on administrative leave or can I just go
6   home?  I can be back at the office in 20 minutes.
7   It's really pointless for me just to come sit in
8   the office.
9         And he agreed or at least tentatively
10  agreed, and I think it was late in the day to
11  begin with.  I'm not remembering.  But I do
12  remember immediately the next morning getting a
13  call from Mr. Freeman saying I needed to be back
14  at the corporate office.  And was this the
15  conversation where Craig said, Lester, you need to
16  go back to the corporate office because Dick
17  personally picked you to be in charge of the
18  corporate office and he will be upset if you're
19  not there.
20        And I said OK.  That's -- I
21  understand.  And I got in my car and drove to the
22  corporate office and stayed there another,
23  probably, you know, two weeks, ten days, until I
24  got the phone call from Craig saying, you know,
25  Lester, you can go home now and we'll be sending

L. Nail

1   L. Nail
2   you something in writing shortly.
3         Q.   But you knew there was a chance you
4   would be terminated without cause at that point.
5   Is that fair to say?
6         A.   Oh, sure.
7         Q.   Any other specifics about your
8   conversation with Mr. Freeman regarding your
9   status that you recall that you haven't told me
10  about?  Prior to getting the letter that was dated
11  July 27, 2006.
12        A.   I'm not recalling.
13        Q.   I am going to refer you to what we
14  previously marked as Exhibit C, which is the
15  July 27, 2006 notice letter.
16        Do you have that in front of you?
17        A.   Yes, the letter that says "your
18  services will no longer be needed after August 1,
19  2006"?
20        Q.   Yes.
21        A.   Yes.
22        Q.   And did you in fact receive this?
23        A.   Yes, I did.
24        Q.   Were you surprised to get this?
25        A.   No.

L. Nail

1   L. Nail
2         Q.   What did you do when you received
3   this?
4         A.   Read it.  Told my wife.
5         Q.   Did you understand that PPI was
6   triggering the termination without cause
7   provisions under your employment agreement?
8         A.   Yes.
9         Q.   What else did you do after you
10  received this letter?
11        A.   Went to pick up my girls at school,
12  mowed the grass.
13        Q.   With respect to, did you respond to
14  anyone at --
15        A.   No.
16        Q.   -- Paramount or Cedar Fair?
17        A.   No.  Not to my recollection.
18        Q.   Did you ask any questions of anyone at
19  Paramount or Cedar Fair regarding this letter?
20        A.   No.
21        Q.   So you did not have any conversations
22  with anyone at Cedar Fair or Paramount Parks
23  regarding the meaning of anything in this letter.
24        A.   Not to my memory.
25        MR. WEBER:  What point in time was

L. Nail

1   L. Nail
2   that question directed?  What was the time
3   frame?
4         MS. KIRILA:  I don't know that there
5   was one.  And if not, I'll narrow it.
6         Could you read back the question.
7         (A portion of the record was read.)
8         MS. KIRILA:  I don't know that it
9   needs a time restriction.  I am just asking
10  about this letter, if he has ever discussed
11  it.
12        Q.   Does your answer change based on time?
13        A.   No.
14        Well, I'm sorry.  We are excluding
15  attorneys.
16        Q.   Correct.  Well, if they're Paramount
17  attorneys or Cedar Fair attorneys --
18        A.   No, my personal attorneys.
19        Q.   No, I just asked about --
20        A.   OK.
21        MR. WEBER:  I think your question as I
22  understand it is from the moment from that
23  letter till today did he have any
24  discussions with anybody.
25        MS. KIRILA:  No, that wasn't my

25 (Pages 94 to 97)

L. Nail

1 question. With anyone from PPI or Cedar
2
3 Fair.
4         MR. WEBER: I understand that, from
5 the day of this letter till today. Does
6 that mean current employees of PPI and Cedar
7 Fair?
8         MS. KIRILA: Let's clarify.
9         MR. WEBER: That's what I am trying to
10 clarify.
11         MS. KIRILA: OK, sure.
12     Q.    Let me start with employees of
13 Paramount or Cedar Fair at the time of this
14 letter.
15     A.    Well, are we talking about the piece
16 of paper with the words on it or the subject
17 matter that's contained in it?
18     Q.    No, just right now I am talking about
19 this letter.
20     A.    OK.
21     Q.    What's contained in this letter? Did
22 you talk to anyone at Paramount or Cedar Fair with
23 respect to this letter and the contents thereof,
24 current or former employees?
25     A.    Well, obviously much much later on I

L. Nail

1
2 talked to Mr. Freeman about the subject matter.
3     Q.    Sure.
4     A.    Some of the subject matter contained
5 in this letter.
6     Q.    OK.
7     A.    But no, I did not talk about this
8 letter at the time I received it.
9     Q.    OK.
10     A.    To anyone at PPI other than the fact I
11 may have, you know, I may have, if I, and I'm not
12 saying I did, but if I ran into Al or if I talked
13 to Al or if I talked to David Thornton, I may have
14 said I got my termination letter, period.
15         MR. WEBER: My problem is I don't
16 think the question is limited. I think it's
17 much broader. As I hear the question, it
18 says any conversation at any time with a
19 former or present PPI or Cedar Fair employee
20 about not just the letter, but references in
21 the letter from the date of this letter till
22 today.
23         MS. KIRILA: Well, I'll break it up.
24 I am not going to say just the ready,
25 willing and able. I understand. He has had

L. Nail

1
2 conversations about that.
3     Q.    But with respect to this letter did
4 you reference getting this letter and discuss the
5 contents with anyone, former or current employees
6 of Paramount or Cedar Fair, prior to -- well, let
7 me just stop there. Do you recall?
8         MR. WEBER: That's my problem. One is
9 the time frame and, two, this references the
10 heart of the case. The employment
11 agreement, the terms of it. It references
12 what we're talking about here.
13         MS. KIRILA: All right. Let me just
14 start again.
15     Q.    You got this letter.
16     A.    Correct.
17     Q.    You didn't call or follow up with
18 anyone at Paramount Park or Cedar Fair in response
19 to this. You testified to that.
20     A.    Correct.
21     Q.    In your later discussions with anyone,
22 former or current employees of PPI, did you ever
23 reference this letter, the July 27, 2006 letter
24 specifically?
25     A.    Well --

L. Nail

1
2         MR. WEBER: I object, because -- I'm
3 sorry. Maybe I'm a little confused.
4         When you say reference a letter, does
5 that mean I got the letter or mean
6 referenced in any of the content of the
7 letter?
8     Q.    Did you reference receiving this
9 particular letter at any time later? And I'm not
10 talking about the subject matters discussed
11 therein.
12     A.    Not that I recall.
13     Q.    Did you ever show this letter to
14 anyone other than your attorneys?
15     A.    My wife.
16     Q.    Other than that?
17     A.    I don't believe so. And I'm not even
18 sure I showed to the my wife. I think I just
19 referenced it.
20     Q.    Other than what's contained in this
21 letter were you told anything else by anyone at
22 Paramount or Cedar Fair with respect to using your
23 services?
24     A.    I'm sorry, say that.
25     Q.    Sure. Outside of what's in this

L. Nail

1            L. Nail
2   letter were you told or did you have discussions
3   with anyone at Paramount or Cedar Fair with
4   respect to using your services?
5       A.   After I received this letter?
6       Q.   Correct.
7       A.   I do not believe so.
8       Q.   With respect to anything you may have
9   been told prior to this letter, you've already
10   told me about, correct? Regarding your services
11   or status.
12       A.   I'm not sure. I mean, we --
13       Q.   Well, let's go over it because I want
14   to make sure I understand everything.
15       A.   Right.
16       Q.   Were you told anything else about
17   using your services by anyone at Paramount or
18   Cedar Fair prior to receiving this letter other
19   than what you've already told me about today?
20       A.   Well, there came a point in time where
21   I think Mr. Freeman made it clear to me that there
22   was coming, you know, a point was coming where my
23   services would no longer be needed.
24       Q.   Because you did not tell me about that
25   in any of your conversations with Mr. Freeman. So

1            L. Nail
2   tell me when that occurred.
3       A.   I cannot tell you that. It was
4   towards the end, it was before the letter, but
5   again, Mr. Freeman and I had numerous
6   conversations, both face to face, over the phone,
7   about multiple subjects.
8       Q.   And I'm just trying to get your
9   recollection specifically as to what was said
10   regarding needing or using your services.
11       A.   Right.
12       Q.   What do you recall?      [6 p.m.]
13       A.   Well, I know there was -- I know there
14   were, you know, more than once I know I had
15   conversations with Mr. Freeman about is there
16   anything else I can do. Is there something I can
17   do? This was towards the end when I didn't have
18   anything to do.
19       And I know one specific time he sent
20   me some contracts to review and to write
21   termination letters. But I do not have a clear
22   memory of, I mean, my memory is what I've already
23   testified to, if I brought it up, and I'm sure I
24   did, and probably, you know, in a roundabout way,
25   if not directly.

1            L. Nail
2       I mean, I can't explain to you exactly
3   how I arrived at the conclusion that my services
4   would no longer be needed and I was going to get
5   this letter. I mean, I just, you know, I knew it
6   was, you know, it was coming.
7       Q.   But Mr. Freeman never said to you that
8   he wouldn't change his mind and use your services
9   in the future, did he?
10       MR. WEBER: Object as to the form.
11       A.   Mr. Crage never said anything along
12   those lines.
13       Q.   Mr. Freeman?
14       A.   I mean, Mr. Freeman, I'm sorry. That
15   I recall. I mean, again, he was very
16   professionally vague about that. It was obvious
17   to me that he was intentionally being vague about
18   my future status.
19       Q.   Under the contract would you agree
20   with me that Paramount had the right to use your
21   services again as long as it was paying you?
22       A.   Correct.
23       Q.   And at any point were you told that
24   you could disregard any obligations under your
25   agreement by anyone at Paramount or Cedar Fair?

1            L. Nail
2       MR. WEBER: Objection, calls for
3   possibly a legal conclusion.
4       Can you just read that question back
5   again so I understand it.
6       (A portion of the record was read.)
7       MR. WEBER: Other than what he has
8   been told either orally or in writing. Is
9   that the question ?
10       MS. KIRILA: That he has testified to,
11   yes.
12       MR. WEBER: Right.
13       THE WITNESS: Sorry. Could you read
14   it back again?
15       (A portion of the record was read.)
16       A.   No.
17       Q.   And that would include former
18   employees of Paramount.
19       A.   Correct.
20       Q.   Is it fair to say you would not know
21   whether or not Paramount in fact used the services
22   of anyone that it terminated without cause under
23   an agreement?
24       A.   I'm sorry, you lost me.
25       Q.   That was a long question. Is it fair

L. Nail

1  L. Nail
2  to say that you wouldn't know whether Paramount in
3  fact used the services of any executive who was
4  terminated without cause under an agreement the
5  same as yours?
6      MR. WEBER: Objection, relevancy. You
7  can answer.
8      A.  I'm sorry. If you're asking me did I
9  know whether or not Paramount was using the
10  services of someone who had received one of these
11  letters?
12     Q.  After that point, correct.
13     A.  The answer is I don't know.
14     Q.  What, if anything, or what, if any,
15  status did you consider yourself to have after you
16  were terminated without cause with Paramount?
17     A.  I considered myself terminated.
18     Q.  Did you consider yourself to be still
19  under contract with Paramount?
20     A.  Yes.
21     Q.  But not an active employee.
22     A.  What's an active employee?
23     Q.  Sure. That's a good question. How
24  about just an employee generally? Did you
25  consider yourself to be an employee after you were

L. Nail

1  L. Nail
2  terminated without cause?
3      A.  No, I was not an employee.
4      Q.  But still under contract.
5      A.  Whatever that means. I had an
6  employment agreement.
7      Q.  My question is, after your termination
8  without cause would you agree that you were still
9  under contract after that point?
10     MR. WEBER: Objection, calls for legal
11  conclusion. You can answer.
12     A.  I will agree that I had an employment
13  contract after I was terminated without cause.
14     Q.  I'm going to hand to you what has been
15  marked as Exhibits E and F in Mr. Freeman's
16  deposition. The first one is an August 9, 2006
17  letter to you from Mr. Freeman.
18         Did you receive this letter?
19     A.  I do not have a present recollection
20  of receiving this letter.
21     Q.  So you don't know whether you received
22  it or not?
23     A.  I think I did. I just don't remember.
24  I just don't remember seeing it.
25     Q.  And I will represent the Bates label

L. Nail

1  L. Nail
2  at the bottom indicates that this came from --
3      A.  From me?
4      Q.  Yes, your side.
5      A.  I mean, I'm not --
6      Q.  And I understand you may not have a
7  recollection --
8      A.  Right.
9      Q.  -- of it.
10         Do you recall whether you were
11  following up with anyone from Cedar Fair or
12  Paramount regarding this letter?
13     A.  And I don't want to rehash the same
14  conversation we had on the Exhibit C, but I had
15  multiple -- well, strike that. I had -- I had
16  some conversations, my wife had conversations with
17  Sandy Cranford about the whole -- it's the bullet
18  point two or the second bullet point, the whole
19  insurance/COBRA issue, but we didn't specifically
20  refer to this letter in any of those
21  conversations.
22     Q.  Do you recall the time frame that you
23  first would have had discussions with Sandy?
24     A.  Yes.
25     Q.  When was that?

L. Nail

1  L. Nail
2      A.  August 2nd.
3      Q.  2006.
4      A.  Correct. Well, no. I'm sorry. It
5  would have been -- well, actually my wife did have
6  a conversation with her on August 2nd. And then I
7  had a conversation with her after that, shortly
8  after that.
9      Q.  So it would have been in this general
10  time frame.
11     A.  Correct.
12     Q.  And I believe you told me what those
13  conversations with Sandy Cranford would have
14  referred to in your benefits claims; is that
15  correct?
16     A.  Yes.
17     Q.  Anything else you would have discussed
18  with Sandy during that time frame, this August
19  2006 time frame?
20     A.  No.
21     Q.  Take a look at the other exhibit,
22  which I believe is a September 12, 2006 letter and
23  proposal.
24         Do you have that?
25     A.  Yes. Exhibit F?

L. Nail

1
2      Q.    Yes.  Exhibit F.  Do you recall
3  receiving that?
4      A.    Let me look at it.  Yes, I recall
5  receiving this.
6      Q.    What was your understanding of what
7  Paramount was proposing here?
8          MR. WEBER:  Again, objection.  Calls
9      for a legal conclusion to the extent it
10     does.
11     A.    My understanding is what is set forth
12  in the September 12th, 2006 cover letter by
13  Mr. Freeman.
14     Q.    In your words what did you understand
15  this to mean?
16     A.    That Cedar Fair wanted to buy out my
17  employment agreement.
18     Q.    It says, paragraph 2, it would be (1)
19  a lump sum payment of $160,786; (2) a waiver of
20  the requirement that you be willing, ready, and
21  able to render exclusive services as provided in
22  paragraph 7(c) of the employment agreement to
23  recover the sum; and (3) modification of the
24  noncompete obligations contained in paragraph 11
25  of the employment agreement so that such

L. Nail

1
2  obligation shall end six months after the
3  termination date.
4          What did you understand, or if you did
5  have an understanding, of what Paramount was
6  offering to waive with respect to Item (2)?
7      A.    Well, first of all, I think this
8  supports my argument that those other paragraphs
9  we discussed do not apply, because he is only
10  referencing paragraph 7(c), which is the
11  termination for cause, the ready willing and able.
12         My understanding is they pay me this
13  lump sum and we both walk away having no other
14  obligations other than I believe there was a,
15  there may have been a continuing obligation on the
16  noncompete, but I'm not sure because I have not
17  read this document in a very long time.
18     Q.    If you look at the third paragraph of
19  this letter, the sentence that states, "In
20  particular, by offering to waive the, quote,
21  willing, ready, and able, quote, requirement, PPI
22  is offering to both pay you a significant sum and
23  allow you to seek employment without affecting
24  that sum."
25     A.    Right, that's what it says.

L. Nail

1
2      Q.    Did you understand that PPI was
3  interpreting your agreement to mean that you could
4  not be employed while receiving continuing
5  payments under the agreement?
6      A.    I'm sorry.  Repeat the question?
7      Q.    Sure.  Even if you did form an
8  impression, did you have an understanding of what
9  PPI was saying to you in that sentence that I just
10  read?
11     A.    No, I do not know -- I am not able to
12  form an opinion of what was in PPI's head when
13  they wrote these words.
14     Q.    Sure, and that's fair.  I guess I am
15  asking you, did you see that and say, Oh, that
16  interpretation is different than my
17  interpretation?
18         Do you remember thinking that?
19     A.    No.  I do not remember -- as you've
20  stated it that's not what I remember.
21     Q.    What do you remember, if anything?
22     A.    I don't really remember a whole lot
23  about it because I remember receiving the letter
24  and frankly setting it aside.
25     Q.    Why did you set it aside?

L. Nail

1
2      A.    I wasn't ready to read it, to try to
3  comprehend it, to make a decision about it.
4      Q.    At some point did you do that?
5      A.    Well, obviously.
6      Q.    At what point?
7      A.    I can't tell you.
8      Q.    Did you respond to this?
9      A.    To who?
10     Q.    To anyone at Paramount or Cedar Fair.
11     A.    Well, before hearing Mr. Freeman's
12  testimony I had no present recollection of
13  responding to this to anyone.  After hearing his
14  testimony that, where he said I called him after
15  receiving this, I still don't have a present
16  recollection of calling him.  But I'm not denying
17  that I -- I just don't remember.
18     Q.    Sure.
19     A.    This was a very trying time.
20     Q.    OK.
21     A.    And I may have called him, but I truly
22  don't have a memory of calling him.
23     Q.    OK.
24     A.    And so the honest answer is, after
25  looking at it, I set it aside and I don't think I

Page 114

```
 1                 L. Nail
 2   ever dug it back out and looked at it again.
 3        Q.   Did you engage an attorney to review
 4   the proposal?
 5        A.   I called -- yes, I engaged an
 6   attorney.  I don't think I sent him this document.
 7   I may have discussed it with him --  well, I'm
 8   sure I discussed it with him, but, and that's as
 9   far as I think I should go with that.
10        Q.   Sure.  What attorney did you engage?
11        A.   At this time it was Larry Levine.
12        Q.   But you did not have him respond on
13   your behalf to this?
14        A.   No.  Or if he did, I did not authorize
15   it to my memory.
16        Q.   At this time when you received this
17   letter in September 2006, did you have plans at
18   that time to seek alternative employment?
19        A.   Yes.
20        Q.   What were your plans at that point?
21        A.   To look for a job.
22        Q.   Had you started looking at that point?
23        A.   This is in September?  I'm sure the
24   answer is yes.  I can't pinpoint a specific date,
25   you know, I mean, you know, did I get on
```

Page 115

```
 1                 L. Nail
 2   monster.com and look for jobs?  Did I, you know,
 3   start talking to people about jobs?  You know,
 4   yes.  During this time frame I was, I'm sure I was
 5   actively starting the process of looking.
 6        Q.   Do you recall where you interviewed
 7   other than eventually at Denny's?
 8        A.   Yes.
 9             MR. WEBER:  Objection as to relevancy.
10        A.   Yes.
11        Q.   You can still answer unless your
12   counsel instructs you not to.
13        A.   Well, I am waiting for you to ask me
14   who.
15        Q.   OK, who?
16        A.   I interviewed at Lowe's Home
17   Improvement.
18        Q.   Anybody else?
19        A.   I had some telephone interviews with
20   recruiters, headhunters.  I had one face-to-face
21   interview with a recruiter.  That's all I can
22   remember right now.
23        Q.   Were you offered a position at Lowe's?
24        A.   No.
25        Q.   Were you offered a position anywhere
```

Page 116

```
 1                 L. Nail
 2   other than Denny's?
 3        A.   No.  Well, I take that back.  I had an
 4   outstanding offer to open my own practice in a
 5   legal aid type setting.  Actually, it was to
 6   create a legal aid office, which is why I was in
 7   the process of applying for my North Carolina law
 8   license.
 9        Q.   Did you ever obtain that?
10        A.   No.
11        Q.   What happened with the legal aid
12   position?
13        A.   It never came about or I never pursued
14   it beyond just the talking stage.
15        Q.   Why not?
16        A.   Because the job at Denny's became
17   available.
18        Q.   Do you recall how many applications
19   you submitted for different legal positions?
20        A.   The only application I remember is the
21   Lowe's application.  But I, you know, well, that's
22   the only application I remember filling out.
23        Q.   And you had one at Denny's?
24        A.   Oh, yeah, yeah, yeah, sure, of course,
25   one at Denny's.
```

Page 117

```
 1                 L. Nail
 2        Q.   And following your termination without
 3   cause from PPI for some point you did continue to
 4   receive pay and benefits pursuant to your
 5   agreement?
 6        A.   Correct.
 7        Q.   At what point did you feel you were no
 8   longer receiving the benefits and pay after you
 9   were terminated without cause?
10        A.   Well, when I received Mr. Freeman's
11   letters, you know, at some point figured out that
12   the check had been reversed or had been taken out
13   of my checking account, and I put two and two
14   together and knew at that point my pay and
15   benefits were stopped.
16        Q.   Did you have any idea why at that
17   time?
18        A.   I knew what was stated in
19   Mr. Freeman's letters.
20        Q.   Up until that point was there any
21   payment or benefit ever provided to you late
22   before you were cut off in October --
23        A.   Yes.
24        Q.   -- two thousand --
25        A.   Yes.
```

Page 118

L. Nail

1
2     Q.    What was that?
3     A.    The medical claims that were not paid
4  back in August of '06.
5     Q.    And you testified about that, correct?
6     A.    Yes, we talked about that.
7     Q.    Anything other than that?
8     A.    It was never clear to me whether or
9  not I was entitled to a bonus, should be getting a
10 bonus.  It was never clear to me whether I should
11 be getting, whether I should be allowed to
12 participate in a 401(k), you know, with a company
13 match.
14          Let's see, I knew I wasn't allowed a
15 car allowance.  That was clear in the contract.
16 Oh, I was not provided with the park pass that the
17 VPs were provided.  But again, it was fuzzy to me
18 whether I was entitled to that or not.
19    Q.    In fact, you never asked anyone at
20 Paramount Park with respect to that.
21    A.    I never asked about the park pass and
22 never asked about the bonus.
23          I have a memory of, and this is where
24 I can't remember whether I followed through with
25 it or not.  I know I had a memory of wanting to

Page 119

L. Nail

1
2  ask Sandy about the 401(k).
3     Q.    Any more specific memory than that?
4     A.    I probably did.  But I know that I
5  thought about that for a long time and it was my
6  intent to ask her about it.
7     Q.    Now, in fact, you did receive a bonus
8  for your time in 2006 up to the date of closing,
9  correct?
10          MR. WEBER:  Objection as to the form.
11    A.    Sitting here late in the day, I don't
12 remember.  I received a bonus from CBS.
13    Q.    Was it your understanding that that
14 was to cover the time up through the date of
15 closing in 2006?
16    A.    I'm not remembering what time period
17 it was supposed to cover.
18    Q.    Anything else that was ever late or
19 you felt you had a question about not receiving?
20    A.    No.
21          THE WITNESS:  Can I take a quick
22 break?
23          MS. KIRILA:  Sure can.
24          (A recess was taken from 6:25 p.m. to
25 6:33 p.m.)

Page 120

L. Nail

1
2  BY MS. KIRILA:
3     Q.    Let me refer you to Exhibits I and J.
4  Looking first at Exhibit I -- well, before you
5  look at that, I have a follow-up question.  You
6  mentioned that you had contacted Larry Levine when
7  you got the one proposal.
8     A.    Yes.
9     Q.    Did someone refer you to him or how
10 did you come --
11    A.    Yes.
12    Q.    -- to find him?
13    A.    Yes.
14    Q.    Who did?
15    A.    Probably David Thornton.
16    Q.    Do you know why Mr. Thornton knew
17 Larry Levine?
18    A.    I know that David was using Mr. Levine
19 for his personal situation.
20    Q.    Do you know what Mr. Thornton's
21 personal situation was?
22    A.    No, I do not.
23          MR. WEBER:  Objection as to relevancy.
24    A.    And let me state emphatically that
25 David Thornton was extremely cautious,

Page 121

L. Nail

1
2  conservative about his situation.  He never shared
3  any details with me.
4     Q.    So you don't know the details --
5     A.    No.
6     Q.    -- of anything --
7     A.    No.
8     Q.    -- with respect to --
9     A.    No.
10    Q.    OK.  The October letter, is this the
11 first that you learned you were being cut off from
12 your pay and benefits from Paramount?
13    A.    I think so.
14    Q.    Do you recall when you received this
15 October 19th letter?
16    A.    I think it was attached to the
17 October 23rd letter.
18    Q.    So to your understanding, you didn't
19 receive the October 19th letter by itself before
20 October 23rd.
21    A.    I do not think so.
22    Q.    OK.  With the October 23rd letter,
23 starting with that, which is Exhibit J, it states
24 that "Dear Mr. Nail:  I attempted to deliver the
25 enclosed letter to you via UPS overnight delivery

31 (Pages 118 to 121)

L. Nail

1
2 and have been informed that you no longer live at
3 the address we have on file."
4        Do you know what address Paramount
5 would have had on file for you?
6    A.    I can make an assumption.
7    Q.    That it was the North Carolina
8 address?
9    A.    The 9027 Kirkley Court address, yes.
10    Q.    At that point had you ever called to
11 update Paramount with your current home address?
12    A.    Can you be --
13    Q.    Sure.  At any point did you call
14 anyone at Paramount to update your contact
15 information?
16    A.    No.
17    Q.    At this point on October 23rd you were
18 in your new house in South Carolina?
19    A.    Yes.
20    Q.    So sometime after October 23rd that's
21 the first you learned that your pay had been
22 stopped?
23    A.    I can't say that emphatically.
24    Q.    But this letter was the first
25 notification to you that your pay had been, I'll

L. Nail

1
2 just say, cut off?
3    A.    Yes.
4    Q.    What did you do when you received this
5 letter?  And by "this letter" I mean the
6 October 23rd with the October 19th enclosure.
7    A.    I'm sorry, what did I do with it?
8    Q.    Yes, when you received this.
9    A.    Told my wife.
10        Probably set it aside for a day or two
11 and then I called Mr. Freeman.
12    Q.    So if this was the first that you were
13 notified that your pay and benefits were cut off,
14 did you even know about any reversal of a direct
15 deposit at this time?
16    A.    I'm not sure when I became aware of
17 that.  Probably when I received a bank statement
18 which clearly reflected that PPI had reversed.
19    Q.    Were you expecting a paycheck on or
20 about October 19th?
21        MR. WEBER:  Objection, relevancy.
22    A.    I am not sure.
23        MS. KIRILA:  It goes to the conversion
24 claim.
25    Q.    Go ahead.

L. Nail

1
2    A.    I was expecting, yes, regular
3 paychecks.
4    Q.    And you didn't do anything when you
5 didn't receive your money on October 19th?
6        I'm trying to understand how it is
7 that you went from, you know, not getting a
8 paycheck on the 19th to not discovering that until
9 you got this letter.
10        MR. WEBER:  He testified that he
11 probably got it when the bank sent him a
12 statement probably a week later.
13        MS. KIRILA:  End of the month.
14        MR. WEBER:  Whenever it was.
15    A.    I mean --
16    Q.    I'm just trying to, you didn't have
17 knowledge on October 19th that you didn't get --
18    A.    No.
19    Q.    -- paid.
20    A.    No.
21    Q.    OK.  Let's take a look at the
22 October 19th, 2007 letter.  The second paragraph
23 states that "we have recently learned"?
24        "We have recently learned that you
25 have secured alternate employment and are" --

L. Nail

1
2        MR. WEBER:  It would be easier if he
3 reads it himself and saves some time.
4        MS. KIRILA:  I'll conduct the
5 deposition, thank you.
6    Q.    As I was saying, "and are, therefore,
7 no longer able to render exclusive services to
8 PPI."
9        You did not tell Paramount when you
10 did obtain employment at Denny's, correct?
11        MR. WEBER:  Asked and answered.
12    A.    Can you put a time frame on that?
13    Q.    Prior to October 19th, 2007.
14    A.    No.  Well, back up a minute.  I mean,
15 I told Jim Rein before October 19th that I was
16 employed with Denny's.
17    Q.    And that was in October of 2007?
18    A.    That's correct.
19    Q.    Why didn't you tell Paramount when you
20 did obtain a job with Denny's?
21    A.    Well, for several reasons.  Number
22 one, I had no legal duty to tell them.  There's
23 nothing in that contract that requires me to tell
24 them.
25        I have not had any communication with

Page 126

```
1                    L. Nail
2    anyone from PPI about my services.  It was clear
3    to me through the totality of the circumstances
4    that PPI had no intentions of using my services.
5           I quite frankly just didn't think
6    that, um, I don't know.  I wasn't thinking about
7    Cedar Fair when I started my employment with
8    Denny's.
9           Q.   Tell me what your conversation was
10   with Jim Rein.
11          MR. WEBER:  Asked and answered.
12          MS. KIRILA:  No, I didn't ask him what
13   his conversation was.  He said he told Jim
14   Rein.  I didn't ask the circumstances of
15   that.  I am now.
16          A.   Could you repeat the question?
17          Q.   Sure.  What were the circumstances in
18   which you told Jim Rein that you were employed at
19   Denny's?
20          A.   I was in the Charlotte airport.  I was
21   going to my gate.  Jim Rein was standing and there
22   was some sporting event that was on that night.
23   Jim Rein was standing there outside the restaurant
24   bar watching it.  I immediately recognized him as
25   Jim Rein, someone I had worked with for the entire
```

Page 127

```
1                    L. Nail
2    time I was at Paramount Parks.
3           I went up, said, hey Jim, how are you
4    doing?  We did some small talk.
5           He said, Where are you working now?
6           I said, I'm working at Denny's.
7           What are you doing?
8           I'm going to, I don't know, wherever I
9    was going.
10          And we talked about -- we probably did
11   the, you know, have you heard from so-and-so.  We
12   probably caught up with mutual people we knew and
13   then I went on to my gate.
14          Q.   So he asked you what are you doing now
15   and you told him.
16          A.   I don't recall.  I don't recall who,
17   you know, who said what.  It was a meeting of two
18   friends.
19          May I add to that?
20          Q.   Sure.
21          A.   I knew full well that Jim Rein was
22   still employed by Cedar Fair.
23          MS. KIRILA:  Mark this as Plaintiff's
24   Exhibit 2.
25          (Plaintiff's Exhibit 2, document
```

Page 128

```
1                    L. Nail
2    titled "Paramount Parks Authorization
3    Agreement For Automatic Deposits," marked
4    for identification, this date.)
5           Q.   Mr. Nail, we have handed you what we
6    have marked as Plaintiff's Exhibit 2.
7           Would you take a look at that
8    document, which is at the top of it titled
9    "Paramount Parks Authorization Agreement For
10   Automatic Deposits."
11          Do you recall filling out this form?
12          A.   No, I do not.
13          Q.   Is that your name printed at the
14   bottom?
15          A.   Yes, it is.
16          Q.   And is that your signature?
17          A.   Yes, it is.
18          Q.   And the date reads 6/27/02; is that
19   correct?
20          A.   I'm sorry?
21          Q.   Is that what your handwritten date
22   reads?
23          A.   Yes.
24          Q.   Other than that, you don't have a
25   specific recollection of this form?
```

Page 129

```
1                    L. Nail
2           A.   No, I do not.
3           MS. KIRILA:  Mark this as Plaintiff's
4    Exhibit 3.
5           (Plaintiff's Exhibit 3, document dated
6    11/15/07, under logo F & M, Bates No.
7    LES00204, marked for identification, this
8    date.)
9           Q.   Handing you what we have marked as
10   Plaintiff's Exhibit 3, which I will represent is a
11   document that we received from you and it's Bates
12   labeled LES00204.
13          Could you identify this for the
14   record, please?
15          A.   This appears to be a copy of my
16   banking statement from F & M Bank, F & M, the
17   initials.
18          Q.   F & M Bank is located in?
19          A.   The Salisbury/Granite Quarry area of
20   North Carolina which is near Charlotte.
21          Q.   Do you know if they have a branch in
22   South Carolina?
23          A.   No, they do not.
24          Q.   It is dated November 15, 2007.
25          A.   That is correct.
```

33 (Pages 126 to 129)

L. Nail

1
2      Q.    Would that have been the date either
3    on or after which you would have received this
4    statement?
5      A.    I do not know.
6      Q.    Do you have any reason to believe that
7    you would have received it before it was dated?
8      A.    No.
9      Q.    And you were working at Denny's at the
10   time of this statement, correct?
11     A.    Correct.
12     Q.    You had a different bank account for
13   your direct deposits for your paychecks from
14   Denny's; is that correct?
15     A.    I'm not sure that I -- I'm not sure
16   that I did direct deposit right away at Denny's.
17   I just don't remember. I don't recall.
18     Q.    With respect to this bank, why didn't
19   you change banks when you moved to South Carolina?
20     A.    Because we had a number of automatic,
21   my insurance. I had several life insurance
22   policies that were being automatically deducted
23   from this policy.
24         There were several other -- my
25   mortgage was with this bank. We liked this bank

L. Nail

1
2    very much. It's a typical small town bank where
3    the tellers know you, and if you have an issue you
4    can call them and they recognize your voice and
5    they do things that Bank of America in downtown
6    Charlotte would never do in a million years.
7      Q.    And you said your mortgage was with
8    this bank. On the new house in South Carolina --
9      A.    No.
10     Q.    -- or on the North Carolina?
11     A.    On the North Carolina.
12     Q.    Was that mortgage discharged when you
13   sold the house in -- when did you say you sold it?
14     A.    Um, I'm thinking June, early June.
15     Q.    In June of 2007.
16     A.    Yes. The other reason, my girls still
17   have -- we still to this day have savings accounts
18   with this bank.
19     Q.    Looking at this particular statement,
20   I do see where it shows the deposit in a reversal
21   on 10/19.
22         Did you have any discussions with
23   anyone at the bank about that?
24     A.    My wife did.
25     Q.    And do you know what those discussions

L. Nail

1
2    were?
3      A.    My wife called one of the tellers at
4    the bank that she knew, asked what was the
5    circumstances of the reversal, and the bank, the
6    person she talked to said, You'll need to talk to
7    Paramount Parks about that.
8      Q.    Do you know when your wife spoke with
9    the teller?
10     A.    I think it was actually before we
11   received this statement. Because I -- after I
12   received Mr. Freeman's letter, I became -- I
13   had -- whatever. It's late and I'm tired. I
14   can't think of the right word.
15         But it occurred to me that I hadn't
16   gotten the receipt, the deposit advice for this,
17   and I asked Linda to call the bank to see if it
18   was there, or I may have asked her to check. You
19   can call, you can go on line and check. I think
20   that's how she found out that it had been
21   reversed.
22     Q.    Sometime after receiving Mr. Freeman's
23   letter.
24     A.    Correct.
25     Q.    From this statement it appears that

L. Nail

1
2    nothing bounced as a result of that reversal; is
3    that fair to say?
4      A.    No, this -- you can't tell anything
5    from this. This doesn't -- this is only page 1
6    and it doesn't reflect all the transactions.
7      Q.    It reflects the current balance at the
8    end of the month that's deposited.
9      A.    Well, if you're asking me did anything
10   bounce?
11     Q.    Did anything bounce? How about that?
12     A.    We can get through this quicker if we
13   quit being lawyers.
14         No, nothing bounced.
15         And I'm sorry, I just have to clarify.
16   I'm not -- my wife does all the banking and writes
17   all the checks and she is -- I don't think we had
18   an issue with any of the automatic, you know,
19   payments.
20         So when we say a check bounced, I'm
21   still thinking of the old paper check, you know,
22   insufficient funds. I know I didn't have any of
23   those because -- well, I just -- I just -- I'm
24   sure we didn't have any of those. I'm not -- I'm
25   not a hundred percent sure that any of the

Page 134

L. Nail

1 automatic deposits were rejected. Or the
2 automatic withdrawals, or automatic payments, to
3 be specific.
4     Q.    I will refer you to previously marked
5 exhibit H, Defendant's. Looking at that exhibit,
6 is that the packet of information with respect to
7 enrollment in benefits that you received with a
8 cover letter from Sandy Cranford?
9     A.    Well, this is what I had in my file.
10 Is this everything that was provided to you
11 pursuant to your request for documents? I mean,
12 and the answer is I don't know if this is
13 everything, but this is all I had in my files.
14     Q.    The letter on the first page of that
15 exhibit is from Sandy Cranford. In that letter is
16 a reference to -- oh, I'm sorry, it is from Craig
17 Freeman, isn't it?
18     A.    Correct.
19     Q.    There is a reference to Sandy calling.
20     Do you have a specific recollection of
21 whether Sandy Cranford in fact called with respect
22 to that enrollment process?
23     A.    You know, this may have been the call
24 that she made in that conversation we discussed at

Page 135

L. Nail

1 the very beginning of the deposition. I don't
2 have an immediate recollection.
3     Q.    The date of that letter is, what is
4 it? May?
5     A.    May 21st.
6     Q.    At that point had you sold your home
7 in North Carolina yet?
8     A.    I don't -- I don't think so, but I'm
9 not sure.
10     Q.    Would you open up that exhibit to the
11 next page, after that. Looking at the MetLife.
12     Is that your handwriting where it says
13 Lester C. Nail?
14     A.    No, it's not.
15     Q.    Whose handwriting is that?
16     A.    I believe it's my wife's.
17     Q.    So your wife completed this page?
18     A.    Yes. I believe so.
19     Q.    It's not your handwriting?
20     A.    It is not my handwriting.
21     Q.    And the address, was that your current
22 address at the time that these forms were
23 completed by your wife or you?
24     A.    Yes, I believe it was.

Page 136

L. Nail

1     Q.    And if you look at the date that these
2 forms were signed, for example, on the previous
3 page you have got a date of May 29, 2007.
4     A.    Right.
5     Q.    Is that your signature?
6     A.    No, it's not.
7     Q.    Who wrote that employee's signature
8 there? Do you know?
9     A.    I -- I do not know.
10     Q.    Do you think your wife wrote it or do
11 you think someone else wrote your name there?
12     A.    I believe my wife signed that.
13     Q.    Did you tell her to sign your name for
14 you?
15     A.    I asked her to fill out these
16 documents.
17     Q.    As of May 29, 2007, was your current
18 address the Kirkley Court, Charlotte,
19 North Carolina address?
20     A.    I believe it was, but I'm not one
21 hundred percent sure. I mean, we were still in
22 the house.
23     Q.    OK. Tell me how that worked. Because
24 you mentioned before it was complicated. But

Page 137

L. Nail

1 after the closing you remained in the house for a
2 week or two?
3     A.    My memory is when we finally decided
4 to put the house on the market we received a
5 contract almost immediately, which shocked us. I
6 mean, literally the same day. We got a contract
7 on the house the same day.
8     The reason why it's complicated is I
9 did not want to sell the house and I did not want
10 to move from Charlotte. And so, you know, I was,
11 you know, the reason why I said it was complicated
12 is because there were these, you know, extra
13 issues involved. It wasn't a simple real estate
14 transaction.
15     But once we accepted the contract, you
16 know, there was a closing date and my memory is
17 that got changed several times. And then after
18 closing we stayed in the house, and it may not
19 have been a week. It may have been a day or two
20 or it may have been over a weekend. I just don't
21 remember.
22     I mean, again, this was a very
23 emotionally trying time. I've got two little
24 girls. They were both crying every night about

L. Nail

1
2  leaving Charlotte.  Leaving their friends, leaving
3  their school.  Like I said, so forgive me if I
4  don't, you know, you tend to blank out some of
5  that.
6      Q.   Now, you were being paid by Paramount
7  under the contract potentially through December
8  2007, correct?
9      A.   Pursuant to my, the employment
10  agreement, correct.
11      Q.   Why didn't you just wait to get a job
12  until that, those payments ran out?
13      A.   It became very clear to me that
14  getting a job was going to be extremely difficult.
15      Q.   So how did that impact your decision
16  to -- you would need more time to obtain a job?
17  So explain to me why, how that impacted your
18  decision not to stay in Charlotte longer while you
19  were receiving pay from Paramount.
20      A.   I'm sorry, I am not understanding the
21  question.
22      Q.   My question was, you were receiving
23  pay from Paramount potentially through December
24  '07.
25      A.   Uh-huh.

L. Nail

1
2      Q.   Why did you feel the need to move?
3  Was that not enough money I guess is my question
4  that you were receiving that you had to get
5  another job.
6      MR. WEBER:  Objection as to relevancy.
7  You may answer.
8      A.   No, it was not a question as to was it
9  enough money.  That was not any part of it.
10      Q.   OK, so explain your thinking.  It's
11  just that you felt you needed to get a job then?
12      A.   Yes.  Yes.  I mean, I needed to be
13  employed.  The longer you are unemployed, the less
14  employable you are.
15      And I might add --
16      MR. WEBER:  There's no question.
17      A.   Sorry.  Never mind.
18      Q.   Just look through that.  Are there any
19  other signatures in that exhibit?
20      A.   There's printing.  There's printed
21  names on the MetLife page.
22      MR. WEBER:  Page 7.
23      A.   Page 7.  Um, I will point out on page
24  Bates stamped LES-00006 part of this was filled
25  out.  In fact, I believe this whole page was

L. Nail

1
2  filled out when we received it.
3      Q.   OK.  Page 6.
4      A.   Because my memory is when I looked
5  through them, I mean, number one, I don't
6  recognize my wife's printing.
7      Number two, I remember when I got the
8  package and I flipped through, I thought it was
9  odd that this had already been partially or --
10  completed.
11      Q.   Do you have a page 7, Bates number 7?
12      A.   Yes, I do.
13      Q.   Is that your signature?
14      A.   Yes, that looks like my signature.
15      Q.   Any other signature pages in that
16  exhibit?
17      A.   No.
18      MS. KIRILA:  Let's mark a few exhibits
19  here.
20      (Plaintiff's Exhibit 4, document
21  purported to be Denny's application, marked
22  for identification, this date.)
23      (Plaintiff's Exhibit 5, document
24  headed "Employee Action Form," bearing date
25  stamp February 20, 2007, marked for

L. Nail

1
2  identification, this date.)
3      (Plaintiff's Exhibit 6, document
4  titled "Employee Action Form," bearing date
5  stamp May 18, 2007, marked for
6  identification, this date.)
7      (Plaintiff's Exhibit 7, document
8  purported to be offer letter agreement,
9  marked for identification, this date.)
10      MS. KIRILA:  4 is the Denny's
11  application.
12      5 is an employee action form.  There's
13  a date stamp at the bottom February 20,
14  2007.
15      6 is another employee action form
16  dated or entered May 18, 2007.
17      And the last, 7, is the offer letter
18  agreement.
19      Q.   I'll start with Exhibit 4 first, which
20  is the Denny's application.
21      MR. WEBER:  Tell me where we're going
22  on this.  Maybe we'll save some time.
23      MS. KIRILA:  Sure, I'll conduct the
24  deposition, but what I am going on is his
25  employment at Denny's, which is the basis of

Page 142

```
1              L. Nail
2       the entire suit and whether that's a
3       violation of the agreement or not.
4           MR. WEBER:  Is there any dispute about
5       that?
6           MS. KIRILA:  I think that's why we're
7       here.
8           MR. WEBER:  Any dispute about him
9       being employed by Denny's and when he was?
10          MS. KIRILA:  No, but I need to get
11      these into the record.
12          MR. WEBER:  OK.
13  BY MR. KIRILA:
14      Q.   You applied for -- Denny's is
15  reflected on this Exhibit 4; is that correct?
16      A.   The answer is this appears to be a job
17  application.
18      Q.   Did you complete this?
19      A.   This appears to be my handwriting.
20      Q.   Did you sign it on the last page?
21      A.   Yes, that is my signature.
22      Q.   And I believe you already testified
23  how you came to find the position at Denny's,
24  correct?  I don't remember if you did or not.
25          In a nutshell, tell me how you came to
```

Page 143

```
1              L. Nail
2   get the position at Denny's.
3       A.   Just real quickly, I was -- in filling
4   out the application for my North Carolina bar exam
5   you have to list attorneys, two or three attorneys
6   who know you in every location you have practiced
7   law.
8           Rhonda Parish and I both worked at
9   Wal-Mart at the same time.  So I called her to get
10  her updated contact information and ask her
11  permission to use her as a reference on my
12  North Carolina bar application.
13          In the course of that conversation
14  she, you know, What are you doing?  Blah blah blah
15  blah.  And she informed me that she needed an
16  employment attorney and would I be interested.
17          And I said, you know, I don't
18  remember, recall the exact words, but one thing
19  led to another and I ended up talking to -- I
20  probably said tell me more about it.  And that's
21  when she directed me to Tim Flemming, who -- Tim
22  and I, Tim, um, had some conversations.
23      Q.   What was his position?
24      A.   Tim is general counsel of Denny's Inc.
25      Q.   OK, I'm going to go to Exhibit 7 next,
```

Page 144

```
1              L. Nail
2   which appears to be your offer from Denny's; is
3   that correct?
4       A.   Yes, that's correct.
5       Q.   You signed this on February 15, 2007?
6       A.   That's what is reflected on the
7   document.
8       Q.   So the offer was base salary, you
9   would be making 175,000; is that correct?
10      A.   That's correct.
11      Q.   And that was more than under your
12  employment contract with PPI.
13      A.   I would have to look at it.  It
14  probably is.
15      Q.   We can let the document speak for
16  itself.
17      A.   Yes.
18      Q.   You also had an opportunity for annual
19  incentive at Denny's; is that correct?
20      A.   I am not sure what that means.
21      Q.   Did you get a bonus?
22      A.   Yes.
23      Q.   Was it 30 percent of your base salary?
24      A.   I don't think so.
25      Q.   Do you recall how much in bonus you
```

Page 145

```
1              L. Nail
2   received for the year 2007?
3           MR. WEBER:  Objection as to relevancy.
4       The document speaks for itself.
5       A.   I don't remember the percentage, but I
6   don't think it was 30 percent.
7       Q.   But you did get a bonus and are
8   eligible for a bonus from Denny's.
9       A.   Yes.
10      Q.   You also received relocation
11  assistance?
12      A.   Yes.
13      Q.   And a car allowance; is that correct?
14      A.   Correct.
15      Q.   You did not get a car allowance at
16  PPI.
17      A.   No.  Well, I did not get a car
18  allowance under my agreement, but I did get a car
19  allowance prior to my agreement.
20      Q.   But under your employment agreement
21  from January 2006 forward.
22      A.   Correct.
23      Q.   Is it fair to say you would be making
24  more in compensation from Denny's than you did
25  under your employment agreement at PPI?
```

L. Nail

1    A.   No.

2    Q.   Why not?

3    A.   Because of the bonus. I think PPI

4 probably had a greater bonus potential, but I'm

5 not sure about that.

6    I'm not going to sit here and do the

7 math in my head at 7:15 after being up for -- I

8 got up at 4:30 this morning.

9    MR. WEBER: It is irrelevant anyway.

10    MS. KIRILA: No, it's not irrelevant.

11 This goes to whether or not -- your story is

12 that he had to get another job. He made

13 less.

14    MR. WEBER: What's the difference if

15 he did or he didn't? How is that relevant

16 to anything?

17    MS. KIRILA: It goes to your

18 explanation as to why he did what he did.

19 It's also relevant --

20    MR. WEBER: You asked him the

21 question. He gave an explanation. Neither

22 is relevant. Neither your question nor his

23 explanation, whether he went to work then.

24    MS. KIRILA: I disagree with that.

L. Nail

1  This is my deposition and this is a case of

2 breach of contract, misrepresentation and I

3 am entitled to know whether or not his

4 package with Denny's was enough to make him

5 not willing to return to PPI. So it is

6 relevant.

7    MR. WEBER: Well, ask him that

8 question, because you haven't asked him that

9 question.

10    MS. KIRILA: I don't have to tell you

11 my legal strategy.

12    MR. WEBER: Well, none of the

13 questions so far are relevant. That is my

14 objection.

15    MS. KIRILA: You either instruct him

16 not to answer --

17    MR. WEBER: It's on the record. He

18 can answer all your questions. We'll be

19 here tonight and tomorrow for your full

20 period and then we're going to proceed with

21 your other depositions, because we'll set

22 some time --

23    MS. KIRILA: Are you done?

24    MR. WEBER: -- we'll set some time for

L. Nail

1 Mr. Kinzel's deposition because we're going

2 to take his deposition and you're going to

3 have to move if you want to preclude it,

4 among others. The deposition started at

5 3:30. We'll continue for your seven hours.

6    MS. KIRILA: Just for the record, the

7 deposition of Mr. Freeman lasted more than

8 five and a half hours and out of convenience

9 I'm continuing past business hours when we

10 can reconvene in the morning.

11    MR. WEBER: And we appreciate that. I

12 just don't understand why you're asking

13 questions that are not relevant.

14    MS. KIRILA: Will you stop

15 interrupting my deposition? Just because

16 you don't understand the relevance of it.

17 You either instruct him not to answer or

18 let's proceed.

19 BY MS. KIRILA:

20    Q.  You also were eligible for, let's look

21 at Exhibit Number 5. This appears just to be an

22 employment action form regarding your hiring.

23 Let's go to -- and your first day of employment

24 for the record was February 23, 2007?

L. Nail

1    A.   Correct.

2    Q.   If you will look at Exhibit 6. It

3 looks like it's an employee action form with

4 respect to a 2.9 percent raise that you received

5 in -- when did you receive this raise?

6    A.   I'm sorry.

7    Q.   There's a May 16, 2007 date. Is that

8 consistent with your recollection?

9    A.   Probably.

10    Q.   There's also noted at the bottom here

11 a $10,000 special bonus.

12    A.   Uh-huh.

13    Q.   What was that for?

14    A.   I remember receiving it. I don't -- I

15 just remember it was a bonus.

16    Q.   OK.

17    A.   I'm sorry, where do you see that?

18    Q.   It's at the bottom. Do you see the

19 stamp date "entered May 18, 2007"?

20    A.   Oh, I see it, yes.

21    Q.   No memory of what that was for.

22    A.   You know, I don't remember if that was

23 related to the relocation or -- no, I don't

24 remember.

L. Nail

1
2       MS. KIRILA:  Let's mark Exhibits 8, et
3   cetera.
4       (Plaintiff's Exhibit 8, document
5   headed "Denny's 2007 Long-Term Growth
6   Incentive Program," marked for
7   identification, this date.)
8       MS. KIRILA:  And this will be 9.
9       (Plaintiff's Exhibit 9, document
10  headed "Denny's Corporation Stock Option
11  Award Agreement," marked for identification,
12  this date.)
13      Q.    Exhibits 8 and 9.  8 reflects a
14  long-term growth incentive program.
15          And you are eligible to be a
16  participant in that plan at Denny's, correct?
17      A.    Yes.
18      Q.    Exhibit 9 reads, "Denny's Corporation
19  Stock Option Award Agreement."
20          And you were awarded stock options at
21  Denny's, correct?
22      A.    Correct.
23      Q.    On March 6, 2007?
24      A.    Whatever the documents reflect.
25      Q.    I'm just reading date of grant,

L. Nail

1
2   March 6, 2007.
3       A.    Right.  For the record, the exercise
4   price is 4.61.  Closing price yesterday was 3.04.
5       Q.    I saw that.  But you would agree with
6   me that things can change and these can become
7   valuable.
8       A.    Miracles do happen.
9       Q.    I know it's been higher than its
10  current price in the past.  Are you aware of that?
11      A.    52-week high?  I am not sure what the
12  52-week high is.  I mean, obviously it was higher
13  than the exercise price, but I think -- go ahead.
14      Q.    These are for ten years.
15      A.    OK.
16      Q.    So you would anticipate a chance that
17  the stock could increase over a ten-year period.
18          MR. WEBER:  Objection, hypothetical.
19  You can answer.
20      A.    I'm not holding my breath.
21      Q.    How about look at the last page of
22  this agreement.  You also were awarded performance
23  shares and performance units under the 2007
24  long-term growth incentive program at a value of
25  16,600; is that correct?

L. Nail

1
2       A.    Whatever the document reflects is what
3   it is.  I will tell you I have very little
4   immediate recollection of this.
5       Q.    But this was a document provided by
6   you as reflected by the Bates number in the
7   bottom, correct?
8       A.    I think it was probably -- no.  Well,
9   I don't know if it was me or whether it was
10  pursuant to your subpoena to Denny's.
11      Q.    I will just represent that the Bates
12  numbers with the LES were provided by your
13  counsel.
14      A.    OK, then it is what it is.
15          MS. KIRILA:  Mark this as 10.
16          (Plaintiff's Exhibit 10, document
17  headed "2007 Salaried Enrollment options,"
18  marked for identification, this date.)
19      Q.    You have been handed what has been
20  marked as Exhibit 10.  It appears to be a summary
21  of your benefit options at Denny's; is that
22  correct?
23      A.    Yes.
24      Q.    Do you know whether the employee
25  portion that you would have to pay for these

L. Nail

1
2   benefits here was more or less at Denny's versus
3   PPI?
4       A.    I have no idea.
5       Q.    You never did that calculation?
6       A.    No.
7       Q.    Would it surprise you to learn that
8   your contribution would have been more at PPI
9   under PPI benefits versus Denny's?
10      A.    I'm sorry, you're saying I would have
11  paid more?
12      Q.    For your employee portion.
13      A.    Portion.
14      Q.    Under PPI's plans versus Denny's.
15      A.    Yes, that would surprise me.
16      Q.    But you never did that analysis --
17      A.    No.
18      Q.    -- or calculation.
19      A.    No.
20      Q.    Why didn't you enroll in Denny's
21  benefits once you were eligible?
22          MR. WEBER:  Objection.
23      A.    Because I had a general -- several
24  reasons.  Number one, I had a general thought that
25  the benefits were better under the PPI.  As I just

Page 154

L. Nail

1    said, I would be shocked to learn that the
2    employee cost was more under PPI. I wasn't sure
3    when -- and let me preface all this by saying
4    again, my wife, I have delegated benefit decisions
5    to my wife.
6        I remember having a discussion with
7    her about it and her thought was, Look, we know
8    who our doctors are under the PPI. We don't want
9    to change doctors. I had a medical condition that
10   I did not want to have to change doctors. And in
11   fact, I still intend to continue using the doctor
12   in Charlotte. The same thing with the girls.
13       So for all those reasons and probably
14   more, we decided just to leave it the way it was.
15   Q.    Did you know that you couldn't see
16   those doctors under Denny's benefits plans?
17   A.    I made an assumption.
18       The only thing I know that I looked at
19   hard was the life insurance and I know the life
20   insurance was not as good under the Denny's plan,
21   or at least I came to that conclusion. I'm not
22   sure the deductibles are equivalent either.
23       MS. KIRILA: Mark this as Exhibit 11.
24       (Plaintiff's Exhibit 11, one-page

Page 155

L. Nail

1    letter dated March 12, 2007, from Nelson
2    Marchioli to Lester Nail, Bates No.
3    LES00085, marked for identification, this
4    date.)
5    A.    I would like to add one more reason.
6    Another reason is, quite frankly when I had to
7    fill these out I didn't know how long I was going
8    to stay at Denny's.
9    Q.    Why was that?
10   A.    Because almost, you know, shortly
11   after arriving there and, you know, I became --
12   well, became unhappy. I was commuting three and a
13   half hours. For all the other reasons we talked
14   about, selling the house.
15       And I know I had a conscious thought
16   of I need to keep the PPI benefits in case I
17   decide to stop working at Denny's.
18   Q.    Did you tell anyone at Denny's about
19   your employment agreement before you accepted the
20   job, your employment agreement with PPI before you
21   accepted the job?
22   A.    No.
23   Q.    So you didn't tell anyone at Denny's
24   that there was a chance you might be called back

Page 156

L. Nail

1    by your former employer?
2    A.    I didn't see a need to.
3    Q.    Why not?
4    A.    Because Rhonda and I go back a long
5    ways, back to the Wal-Mart days. I had no idea if
6    I went to Rhonda and said, Lo and behold, didn't
7    think it would happen, but PPI called me -- by the
8    way, again, I knew PPI from the day I left the
9    corporate office, I knew PPI was not going to call
10   me to ask me to do anything. But if per chance
11   they did, I could go to Rhonda and say, Rhonda,
12   PPI has a case that they need my help with and I
13   need to do whatever. And there's, there was no
14   doubt in my mind if that situation came up we
15   could work it out.
16   Q.    What if PPI said, Hey, we want you to
17   come back?
18       MR. WEBER: Hypothetical objection.
19   You may answer.
20   A.    I would have seriously considered it.
21   Q.    After you moved to South Carolina and
22   didn't have to commute anymore, did you enjoy your
23   job at Denny's from that point forward?
24   A.    No.

Page 157

L. Nail

1    Q.    Why not?
2    A.    Denny's is in -- Denny's, you know,
3    well, first of all, there's some things I can't
4    discuss because of attorney-client privilege.
5    Q.    That's fine.
6        MR. WEBER: I would like to designate
7    this portion confidential, anything that
8    relates to Denny's, so he can candidly tell
9    you.
10       Is that agreeable.
11       MS. KIRILA: That's fine, sure.
12
13       (Page 158 has been deemed,
14   "Confidential" and is bound under separate
15   cover.)

Page 158

1    L. Nail - Confidential
2
3
4
5
6
7
8
9         (Page 158 has been deemed,
10    "Confidential" and is bound under separate
11    cover.)
12
13
14
15
16
17         (Continued in nonconfidential portion
18    of transcript.)
19
20
21
22
23
24
25

Page 159

1                    L. Nail
2         Q.    Now, you have been handed Exhibit 11.
3    Exhibit 11 is a document that you produced which
4    appears to announce the approval of the grant of
5    stock options along with performance shares and
6    performance units as part of the 2007 long-term
7    growth incentive program.
8         Did you in fact receive this letter?
9         A.    I'm sure I did if I produced it to
10    you.
11         MS. KIRILA:  Mark this as Exhibit 12.
12         (Plaintiff's Exhibit 12, 2-page
13    document headed "Expense Detail Report, Tax
14    Year 2007," marked for identification, this
15    date.)
16         MS. KIRILA:  And this is 13.
17         (Plaintiff's Exhibit 13, document
18    headed "Employee Reimbursement Agreement,"
19    marked for identification, this date.)
20         Q.    I've handed you what we marked as
21    Exhibits 12 and 13, which appear to relate to your
22    relocation and reimbursement for your relocation
23    expenses.
24         Do you recognize these exhibits?
25         A.    Yes.

Page 160

1                    L. Nail
2         Q.    The first one, if you'll look at the
3    first page.  It says "Expenses Paid to Employee,"
4    total 7,500 --
5         A.    I'm sorry.  Which one?
6         Q.    Exhibit 12, first page.
7         A.    OK.
8         Q.    It says "Total Paid to Employee,"
9    $7,524.35.
10         Is that the amount you received in
11    connection with your relocation from
12    North Carolina?
13         A.    If that's what this document reflects.
14         Q.    The bottom reflects "Total Paid to
15    Other" of 12,937.
16         Is that consistent with your
17    recollection of what was paid on your behalf in
18    connection with your move?
19         A.    Let me say it like this.  I don't have
20    an independent recollection of the amounts.
21         Yes, I know this document, I mean, I
22    recognize this document and I have no reason to
23    dispute it.
24         Q.    Do you see where it says "Lump Sum
25    Allowance"?  There's a date April 4, 2007.

Page 161

1                    L. Nail
2         A.    Right.
3         Q.    Is that before or -- would it have
4    been before the date that you moved?
5         A.    No, no, no.  Yes.  That was way before
6    we moved.  In fact, Graebel is the name of the
7    relocation company.  Immediately upon starting
8    employment with Denny's I was assigned a Graebel
9    relocation person and I had to several times talk
10    to her about slowing down.  She was wanting to --
11    she was very efficient, and it got to be rather
12    annoying because she was trying to -- she was
13    trying to pack us up and move us before we were
14    ready.
15         Q.    Would you turn to Exhibit 13.  Is that
16    your signature?
17         A.    Appears to be.
18         Q.    You have no reason to doubt that you
19    signed this?
20         A.    No, no.
21         Q.    Did you understand in looking at
22    paragraph 3 that you would be required to repay
23    any of the --
24         A.    Yes.
25         Q.    -- relocation fees if you -- just let

L. Nail

1
2  me finish.
3      A.   Sorry.
4      Q.   -- terminated your employment within
5  twelve months of the relocation?
6      A.   Yes, I was fully aware of that.
7      Q.   Am I safe to assume you did not have
8  any other employment prior to Denny's after
9  Paramount?
10     A.   No, I did not.  I mean, no.  I mean --
11     Q.   Did you receive any payments --
12     A.   No.
13     Q.   -- for services from anyone?
14     A.   No.
15     Q.   Did you get unemployment compensation?
16     A.   No.
17         MS. KIRILA:  Mark this as 14.
18         (Plaintiff's Exhibit 14, one-page
19     letter dated July 7, 2006, from Chuck Becker
20     to Lester Nail, Bates No. LES00236, marked
21     for identification, this date.)
22         MS. KIRILA:  And this is 15.
23         (Plaintiff's Exhibit 15, one-page
24     letter dated August 4, 2006, to Lester Nail,
25     Bates No. LES00237, marked for

L. Nail

1
2      identification, this date.)
3      Q.   Now I have handed you what we have
4  marked as Exhibits 14 and 15.
5          Do these reflect letters associated
6  with your retention incentive payment you received
7  from CBS in connection with the sale of PPI to
8  Cedar Fair?
9      A.   Yes.
10         MS. KIRILA:  Mark these as 16, 17.
11         (Plaintiff's Exhibit 16, one-page
12     letter dated November 27, 2006, from Chuck
13     Becker to Lester Nail, Bates No. LES002368
14     marked for identification, as of this date.)
15         (Plaintiff's Exhibit 17, one-page
16     letter dated January 8, 2007, from Chuck
17     Becker to Lester Nail, plus attachment, Bates
18     Nos. LES00240 and 241, marked for
19     identification, as of this date.)
20     Q.   You have been handed what we marked as
21  Exhibits 16 and 17.  These also appear to me to be
22  connected to the retention incentive that you
23  received in connection with the sale of PPI.
24         Is that correct?
25     A.   Yes.

L. Nail

1
2      Q.   If you look at Exhibit 17, second
3  page, is that your signature at the bottom?
4      A.   Yes.
5      Q.   And you in fact received the payments
6  in connection with this retention incentive?
7      A.   Yes.
8      Q.   Am I correct that you would have
9  received an initial payment of 50,000 in 2006 an
10  additional payment of 125,000 in 2007 from CBS?
11     A.   That sounds correct.
12     Q.   Is it fair to say that essentially you
13  just had to stay through the closing date to
14  receive that retention?
15     A.   I'm sorry?  Start over.
16     Q.   Sure.  Is it fair to say that you only
17  had to stay through the closing date and sign a
18  release in order to receive --
19     A.   I don't think so.  I think, um, and
20  I'm going to have to read the letter.  It's my
21  understanding it wasn't just staying to the day of
22  closing.  It was -- well, let's just read the
23  letter.
24     Q.   Sure.
25     A.   Yes, look in the middle of the letter:

L. Nail

1
2  In addition, number one, successful closing,
3  continue to be employed exclusively by Paramount
4  through closing if, da da da da da.  You
5  continue to represent Paramount -- blah blah blah.
6      Q.   Can we agree that whatever is
7  contained in this letter would outline the
8  conditions for the receipt of this retention
9  incentive?
10     A.   Correct.
11         MS. KIRILA:  Mark this as Exhibit 18.
12         (Plaintiff's Exhibit 18, document
13     headed "Acknowledgment and Release," dated
14     November 27, 2006, marked for
15     identification, this date.)
16     Q.   You have been handed what we marked as
17  Exhibit 18, both of which pages of the exhibit
18  state "Acknowledgment and Release" at the top.
19         My question is, is that your signature
20  on both of the pages to this exhibit?
21     A.   Yes, it is.
22     Q.   The first one is dated December 1st,
23  2006.  Is that when you would have signed it?
24     A.   Yes.
25     Q.   And the second page is dated July 12,

L. Nail

1  2006.  Is that when you would have signed the
2  second --
3    A.   Yes.
4    Q.   -- page?  OK.
5        MS. KIRILA:  Mark as Exhibit 19.
6        (Plaintiff's Exhibit 19, 8-page
7        document containing columns with what
8        appears to be financial figures, marked for
9        identification, this date.)
10   Q.   I've handed you what we marked as
11  Exhibit 19, just for the record, which we received
12  from your employer, Denny's, and appears to have
13  payroll information to you.
14       Do you have any reason to disagree
15  that this is not your payroll information
16  beginning in the year 2007?
17   A.   I can't read it.  I can make out my
18  name and there are a lot of numbers.  But, I mean,
19  without comparing it to my check stubs, you know,
20  but I have no reason to believe it's not.
21   Q.   That's my question.
22   A.   Yes, I have no reason to believe if
23  you received this from the Denny's payroll
24  department, I have no reason to believe it's not

L. Nail

1  accurate sitting here tonight at whatever time it
2  is.  7:45.
3    Q.   Do you need a break?
4    A.   Real quick?
5    Q.   Yes.
6        (A recess was taken 7:43 p.m. to
7        7:57 p.m.)
8  BY MS. KIRILA:
9    Q.   Mr. Nail, you testified earlier about
10  getting a referral to Larry Levine from David
11  Thornton in your limited conversation you had with
12  David Thornton about his situation.
13       Did you have any other conversations
14  or communications with David Thornton after you
15  were terminated without cause from PPI?
16   A.   Yes.
17   Q.   What other conversations have you had
18  with him?
19   A.   We talked about cars, politics and
20  coffee.
21   Q.   How often did you talk with
22  Mr. Thornton?
23   A.   I lost contact with David in the fall
24  of, was that that fall of, um, '06, I guess.

L. Nail

1    Q.   Any other conversations with respect
2  to your postemployment -- let me ask that again.
3  You mentioned once you had other conversations
4  about.
5        Did you have any other conversations
6  with respect to your employment agreement than
7  what you've already testified about?
8    A.   With David Thornton?
9    Q.   Yes.
10   A.   I had no conversations with David
11  about my employment agreement or --
12   Q.   Or with his.
13   A.   Or with his.
14   Q.   OK.  Did you ever tell you that he
15  contacted Paramount when he was contemplating
16  taking another position?
17   A.   No.
18   Q.   Have you had any other conversations
19  with any other former Paramount executives who
20  were under contract regarding their situations
21  postemployment without cause?
22   A.   No.
23   Q.   Mr. Nail, in connection with this case
24  you produced some documents that appear to be a

L. Nail

1  copy of your calendar.  I did not make a copy
2  because I am not going to mark it as an exhibit.
3  But I have just a question.
4        It cuts off at a particular date.  Do
5  you have anything after the date that those
6  documents stop?
7    A.   No.
8    Q.   Did you keep a calendar for 2006?
9    A.   Yes.
10   Q.   Do you know what happened to that?
11   A.   Yes, I know exactly what happened to
12  it.
13   Q.   What happened to it?
14   A.   When I was moving I took out these
15  parts and threw away the rest.
16   Q.   My other question is, I did not see
17  any references to anything pertinent to this case
18  in those.
19       Do you know sitting here that there
20  are particular references?
21   A.   In here?
22   Q.   Yes.
23   A.   No.  No, no.  I mean, no.  No, I don't
24  recall making any.

Page 170

L. Nail

1
2     Q.    Did you take any notes other than
3   those for your attorney regarding any of the facts
4   at issue in this case?
5     A.    I'm sorry?
6     Q.    Any other notes that you have not
7   produced in the course of discovery in this case?
8     A.    None that I have not produced. None
9   that -- none that I didn't create at the direction
10  of my attorneys.
11    Q.    So nothing taken contemporaneously
12  with the actions as they were unfolding.
13    A.    No, no, no, no. I am not as good a
14  note taker as Mr. Freeman.
15    Q.    You sat through much of Mr. Freeman's
16  deposition today, correct?
17    A.    Correct.
18    Q.    Did you hear anything that Mr. Freeman
19  said regarding conversations with you that you
20  felt were flat-out wrong or didn't happen?
21          MR. WEBER: Objection to the form of
22      the question. You're asking him to recall,
23      what did you say? Five and a half hours of
24      testimony?
25          MS. KIRILA: To the extent he can

Page 171

L. Nail

1
2   recall.
3           MR. WEBER: Objection.
4     Q.    You can still answer. If you are
5   sitting here recalling something Mr. Freeman said
6   that you disagree with regarding a conversation.
7           MR. WEBER: I would request a review
8       of the transcript and then an opportunity to
9       respond in the transcript to anything that
10      he thought was inappropriate or disagreed
11      with.
12          MS. KIRILA: No, I'm asking here and
13      now.
14    Q.    Do you have a specific recollection of
15  anything like that?
16    A.    Yes. There were -- I think there were
17  two items that I'm not sure I would characterize
18  as disagree with, but either, one, didn't remember
19  or, two, have a different memory.
20    Q.    What were those two items?
21    A.    May I see his notes?
22    Q.    Sure. They are Exhibit K.
23      (Handing.)
24    A.    I remember telling him that I was
25  going to get a new attorney because I was not

Page 172

L. Nail

1
2   satisfied with the current attorney.
3           I don't remember a reference to
4   paragraph 7(c).
5           And there was one other. Oh. Oh, oh,
6   oh. That's when he testified that I called him,
7   you know, at some time after receiving the offer,
8   the buyout offer and I think I testified fully to
9   that.
10    Q.    You didn't recall that.
11    A.    I didn't recall that.
12          MS. KIRILA: Let's mark these other
13      exhibits, please.
14    A.    But I do reserve the right when I
15  review the --
16    Q.    Sure. I am not holding you to that.
17  Just as you're sitting here today thinking, that's
18  what I am asking you.
19    A.    Those are the only two things that
20  immediately come to mind.
21          MS. KIRILA: Mark these as Exhibits 20
22      and 21.
23          (Plaintiff's Exhibit 20, W-2
24      statements for the year 2006, marked for
25      identification, this date.)

Page 173

L. Nail

1
2           (Plaintiff's Exhibit 21, W-2
3      statements for the year 2007, marked for
4      identification, as of this date.)
5     Q.    You have been handed what we've marked
6   as Exhibits 20 and 21. Just for the record, I
7   received these from your counsel and they have
8   your Bates numbers at the bottom.
9           Would you just confirm for me that
10  these are accurate W-2 statements for you for the
11  years 2006, which is Exhibit 20, and 2007, which
12  is Exhibit 21?
13    A.    I will confirm to you that these are
14  W-2s that I received from Paramount Parks, Inc.
15  and Denny's Inc., but I can't -- I have no reason
16  to believe they're not accurate, but I'm not going
17  to confirm that they are accurate.
18    Q.    The second page reflects W-2s received
19  from CBS; is that correct?
20          MR. WEBER: On Exhibit 20.
21          MS. KIRILA: On Exhibit 20.
22          MR. WEBER: Actually, on Exhibit 21
23      also.
24          MS. KIRILA: I am just asking about 20
25      at this point.

L. Nail

1
2      Q.    Because you mentioned from Paramount
3  Parks and --
4      A.    OK, I'm looking at 20.
5      Q.    Actually, not Denny's in 20, correct?
6  Just Paramount and CBS?
7      A.    OK.
8      Q.    Is that correct?
9      A.    I'm sorry, what's the question?
10         MR. WEBER:  We'll designate all
11  financial information related to Mr. Nail as
12  confidential.
13
14         (Page 175 has been deemed,
15  "Confidential" and is bound under separate
16  cover.)
17
18
19
20
21
22
23
24
25

L. Nail - Confidential

1
2
3
4
5
6
7
8
9         (Page 175 has been deemed,
10  "Confidential" and is bound under separate
11  cover.)
12
13
14
15
16
17
18
19
20
21
22
23         (Continued in nonconfidential portion
24  of transcript.)
25

L. Nail

1
2  BY MS. KIRILA:
3      Q.    Mr. Nail, when you completed the
4  enrollment process in May of 2007 for PPI
5  benefits, do you recall that exhibit we looked at?
6      A.    No.
7      Q.    The enrollment forms?
8      A.    Are you talking about this?
9      Q.    Yes.
10      A.    Yes.
11      Q.    We looked at the date that that was
12  signed and it was May 29th, 2007.
13      A.    Right, well, there are two different
14  dates.
15      Q.    Right.  Why don't you tell me what
16  they are?  One is May 29, 2007.
17      A.    One's dated May 29, '07, and the other
18  is dated 5/26/07.
19      Q.    Did you review those forms before they
20  were submitted back to --
21      A.    No.
22      Q.    -- Paramount?
23      A.    No.
24      Q.    Did your wife actually fax them back?
25      A.    Yes.

L. Nail

1
2      Q.    Can you tell me on those dates that
3  they were signed, did you -- was your home in
4  contract for sale at that point?  Your home in
5  North Carolina.
6      A.    Sitting here right now, I can't tell
7  you.  I don't have a memory.  I mean, I don't have
8  the immediate memory of, I mean, I'm not
9  remembering that it went on.  I can't remember
10  sitting here right now what the date of the
11  contract was.
12      Q.    And how about with respect to the
13  purchase of your new home in South Carolina, did
14  you build or buy?
15      A.    No, bought.
16      Q.    Do you remember when you contracted to
17  buy that home?
18      A.    No, I do not remember.
19         MS. KIRILA:  Mark this as Exhibit 22.
20         (Plaintiff's Exhibit 22, 4-page
21  document headed "North Carolina Warranty
22  Deed," marked for identification, this
23  date.)
24      Q.    You have been handed what we marked as
25  Exhibit 22, which I will represent is from the

L. Nail

1  L. Nail
2  county auditor's records.
3         This appears to reflect a general
4  warranty deed with respect to your home at 9027
5  Kirkley Court in Charlotte, North Carolina, and
6  the deed is made the 10th day of April, 2007.
7      A.   Uh-huh.
8      Q.   Is that when you sold your house?
9         MR. WEBER:  Was this produced pursuant
10  to any discovery requests?
11        MS. KIRILA:  It wasn't requested.  It
12  was something that counsel pulled off the
13  Internet.
14        MR. WEBER:  This wasn't requested in
15  any of our broad requests?
16        MS. KIRILA:  No, how could it be?  It
17  was something that was pulled off yesterday.
18        MR. WEBER:  If it's relevant to your
19  claim, I guess it must be relevant
20  somewhere.
21        MS. KIRILA:  There you go.  I'm
22  producing it today.  I pulled it off last
23  night.
24        MR. WEBER:  It was not exactly in
25  response to our discovery requests.

1  L. Nail
2         MS. KIRILA:  I don't have an
3  obligation to go and pull things off of the
4  Internet that the attorney thinks of after.
5         MR. WEBER:  You have a continuing
6  obligation to supply --
7         MS. KIRILA:  And I am providing it to
8  you the day after.
9         MR. WEBER:  Convenient.
10        MS. KIRILA:  For the record, we did
11  not receive a copy of Exhibit -- I do want
12  this to go on the record -- Exhibit A.
13  BY MR. KIRILA:
14     Q.   In fact, let's go to that Exhibit A,
15  if we could now, Mr. Nail.
16     A.   Are we done with this one?
17     Q.   For a second.  You can put it aside.
18        Exhibit A.  Is that something that you
19  provided to your counsel?
20     A.   I do not recognize this.
21     Q.   Do you know where your counsel
22  obtained that document?
23        MR. WEBER:  Did we produce it?
24        MS. KIRILA:  You used it as an exhibit
25  today.  You did not produce it.

1  L. Nail
2      A.   I'm sorry, what is the question?
3      Q.   Do you know whether you provided that
4  to your counsel or not?
5      A.   I do not know.
6      Q.   Do you believe that you did or you
7  don't know either way?
8      A.   I don't know either way.
9      Q.   OK.  Do you recognize it?
10     A.   I don't.  I mean, it is obvious what
11  it is.
12     Q.   My question was just do you recognize
13  it.
14     A.   It's not leaping out at me, but I have
15  no reason not to believe that I didn't have it in
16  my files.  So I don't know.
17     Q.   Do you recall receiving this?
18     A.   Do I recall receiving this?
19     Q.   Yes.
20     A.   From?
21     Q.   Whoever it's addressed from.
22     A.   CBS --
23     Q.   During the course of your employment.
24     A.   Well, it is from CBS corporate HR to
25  CBS Corporate PPI Inc., and no, I just don't

1  L. Nail
2  remember this.
3      Q.   All right.  If you would just go back
4  to the deed.  Does this refresh your recollection
5  at all as to when you would have sold your
6  North Carolina home?
7      A.   No.
8      Q.   Do you think the date is wrong or how
9  do you -- I am just trying to square the dates.
10        MR. WEBER:  Objection.
11     A.   Yes, it is -- I do not -- I do not
12  think we sold the house in April.  And if you look
13  at the registration date is dated June 13th, and
14  my memory is we didn't close until June.
15     Q.   Can you look at the third page of this
16  document.
17     A.   Uh-huh.
18     Q.   Is that your signature above where it
19  says "Lester Claude Nail"?
20        MR. WEBER:  It doesn't look like it.
21        MS. KIRILA:  Objection.  I'm asking
22  the witness if that's his signature.
23     A.   Yes, I think that's my signature.
24        Now, this what I think -- we filled
25  out, you see, we sold -- the way the relocation

L. Nail

1     L. Nail
2  worked, we actually sold the house to the
3  relocation company and then the relocation company
4  turns around and sells it to the buyer that we
5  contract with. I think the best evidence of the
6  day we sold the house is the contract, because I
7  know that we filled out papers for the relocation
8  company. But --
9       Q.    Do you still have that contract for
10 the sale of your home?
11      A.    Yes. I'm sure we do.
12           MS. KIRILA: Mark this as Exhibit 23.
13           (Plaintiff's Exhibit 23, two-page
14      document headed "Title to Real Estate, State
15      of South Carolina, County of Spartanburg,"
16      marked for identification, this date.)
17           MS. KIRILA: Mark this as 24.
18           (Plaintiff's Exhibit 24, one-page
19      document headed "Spartanburg County
20      Assessor's Office," marked for
21      identification, this date.)
22      Q.    In Exhibit 23 that you have been
23 handed, it appears to me to relate to the purchase
24 of your home in South Carolina; is that correct?
25      A.    Yes.

1     L. Nail
2       Q.    The date on the back, the last page
3  here, states May 31st. May 2007.
4       A.    OK.
5       Q.    Is that consistent with your
6  recollection as to when you purchased the home in
7  South Carolina?
8       A.    It must be.
9       Q.    Is that your -- well, there's not a
10 signature, is there? Was the home built for you?
11      A.    No.
12      Q.    Or it was already preexisting?
13      A.    Preexisting.
14      Q.    Did you move in right after you
15 purchased the home?
16      A.    We moved in sometime in June is my
17 memory. But I can't give you a date.
18      Q.    If you look at Exhibit 24 from the
19 Spartanburg County Assessor's Office, it says
20 "Sale Date, 5/31/2007." I think you said that is
21 consistent when you would have purchased the home.
22           Do you know why it says "permit date,
23 August 1, 2006"?
24      A.    Permit date?
25           MR. WEBER: Right below it.

1     L. Nail
2       A.    I suspect that has something to do
3  with when the house was built and the original
4  permit to build the house was obtained by the
5  builder.
6            The house had been on the market for
7  some time. It -- I suspect that's the day he
8  started building the house or that's when he went
9  down to the county assessor's office, you know,
10 where he got the permit to start construction.
11      Q.    Do you recall how long before you
12 purchased the house that you had been looking at
13 that particular house?
14      A.    The real estate agent -- I took a day
15 off from work and had the real estate agent take
16 me to all the houses that she had, that Linda had
17 looked at that was on her short list. And I'm
18 sorry, what was the question?
19      Q.    You purchased it on May 31, 2007. How
20 long had you been looking at that house prior to
21 the purchase date?
22      A.    I'm -- my memory is about two days. I
23 saw the house, immediately liked it. Linda had
24 already looked at it one time. She liked it. And
25 I think we then immediately went into

1     L. Nail
2  negotiations.
3            MS. KIRILA: That's all the questions
4  I have for you.
5            (Time noted: 8:23 p.m.)

Page 186

L. Nail

1
2
3        I, the witness herein, having
4    read the foregoing testimony do hereby
5    certify it to be a true and correct
6    transcript, subject to the corrections,
7    if any, shown on the attached page.
8
9
10
11    _____
12            LESTER NAIL
13
14
15
16    Subscribed and sworn to
17    before me this _____ day
18    of _____, 2008.
19
20
21
22    _____
23
24
25

---

Page 187

1
2        C E R T I F I C A T E
3    STATE OF NEW YORK    )
4                        : ss.
5    COUNTY OF SUFFOLK    )
6
7        I, THOMAS R. NICHOLS, a Notary Public
8    within and for the State of New York, do
9    hereby certify:
10        That LESTER NAIL, the witness whose
11    deposition is hereinbefore set forth, was duly
12    sworn by me and that such deposition is a true
13    record of the testimony given by the witness.
14        I further certify that I am not
15    related to any of the parties to this action
16    by blood or marriage, and that I am in no way
17    interested in the outcome of this matter.
18        IN WITNESS WHEREOF, I have hereunto
19    set my hand this 26th day of April, 2008.
20
21
22    _____
23            THOMAS R. NICHOLS
24
25

---

Page 188

1
2            I N D E X
3    WITNESS      EXAMINATION BY      PAGE
4    LESTER NAIL    MS. KIRILA          3
5
6            E X H I B I T S
7    PLAINTIFF'S EXHIBITS        PAGE LINE
8    1, two-page résumé of Lester    25  24
          C. Nail
9
10    2, document titled "Paramount    127  25
          Parks Authorization Agreement
          For Automatic Deposits
11
12    3, document dated 11/15/07,    129  5
          under logo F & M, Bates
          No. LES00204
13
14    4, document purported to be    140  20
          Denny's application
15    5, document headed "Employee    140  23
          Action Form," bearing date
16        stamp February 20, 2007
17    6, document titled "Employee    141  3
          Action Form," bearing date
18        stamp May 18, 2007
19    7, document purported to be    141  7
          offer letter agreement
20
21    8, document headed "Denny's    150  4
          2007 Long-Term Growth
          Incentive Program"
22
23    9, document headed "Denny's    150  9
          Corporation Stock Option
          Award Agreement"
24
25    10, document headed "2007    152  16
          Salaried Enrollment options"

---

Page 189

1
2        I N D E X (Continued.)
3        E X H I B I T S
4    PLAINTIFF'S EXHIBITS        PAGE LINE
5    11, one-page letter dated    154  25
          March 12, 2007, from Nelson
6        Marchioli to Lester Nail,
          Bates No. LES00085
7
8    12, 2-page document headed    159  12
          "Expense Detail Report,
9        Tax Year 2007"
10    13, document headed "Employee    159  17
          Reimbursement Agreement"
11    14, one-page letter dated    162  18
          July 7, 2006, from Chuck
12        Becker to Lester Nail, Bates
          No. LES00236
13
14    15, one-page letter dated    162  23
          August 4, 2006, to Lester
15        Nail, Bates No. LES00237
16    16, one-page letter dated    163  11
          November 27, 2006, from Chuck
17        Becker to Lester Nail, Bates
          No. LES002368
18    17, one-page letter dated    163  15
          January 8, 2007, from Chuck
19        Becker to Lester Nail, plus
          attachment, Bates Nos.
20        LES00240 and 241
21    18, document headed    165  12
          "Acknowledgment and Release,"
22        dated November 27, 2006
23    19, 8-page document    166  7
          containing columns with what
24        appears to be financial figures
25

Page 190

```
 1
 2          I N D E X (Continued.)
 3            E X H I B I T S
 4   PLAINTIFF'S EXHIBITS          PAGE LINE
 5   20, W-2 statements for the       172  23
          year 2006
 6
     21, W-2 statements for the       173   2
 7        year 2007
 8   22, 4-page document headed       177  20
          "North Carolina Warranty Deed"
 9
     23, two-page document headed     182  13
10        "Title to Real Estate, State
          of South Carolina, County of
11        Spartanburg
12   24, one-page document headed     182  18
          "Spartanburg County
13        Assessor's Office"
14
15
16
17
18
19
20
21
22
23
24
25
```

Greenhouse Reporting, Inc.                          (212)279-5108

**A**

**ability** 5:4,11,14
    75:13
**able** 8:24 11:13
    22:15 23:17,23
    63:12 70:4 78:11
    99:25 110:21
    111:11,21 112:11
    125:7
**absolutely** 39:3
    93:25
**acceptance** 81:13
**accepted** 84:8
    137:16 155:20,22
**account** 117:13
    130:12
**accounts** 131:17
**accurate** 26:21
    167:2 173:10,16
    173:17
**accurately** 4:12 5:22
    26:13
**acknowledge** 76:18
**Acknowledgment**
    165:13,18 189:21
**acquisition** 85:13
**act** 36:2
**action** 140:24 141:4
    141:12,15 148:23
    149:4 187:15
    188:15,17
**actions** 170:12
**active** 73:6 106:21
    106:22
**actively** 59:5 115:5
**activity** 80:15
**actual** 52:7 53:18
    57:4
**add** 127:19 139:15
    155:6
**addition** 165:2
**additional** 164:10
**address** 3:6 21:3,9
    26:24 27:3,16
    122:3,4,8,9,11
    135:22,23 136:19
    136:20
**addressed** 180:21
**administration**
    39:23 40:3 51:2
**administrative**
    91:13 94:5
**admitted** 28:10,17
    28:23 29:4
**advice** 32:20 132:16
**affairs** 30:20 58:7
    74:3 76:14
**affect** 5:14 36:18
**afternoon** 3:11

**agent** 184:14,15
**aggressive** 6:12
**ago** 3:21 6:18
**agree** 57:7 59:8,13
    59:14 60:18,24
    61:13 62:4,8 63:17
    66:7,12,15 70:14
    70:20 71:6 104:19
    107:8,12 151:5
    165:6
**agreeable** 157:11
**agreed** 93:12 94:9
    94:10
**agreement** 1:18
    8:20 9:3,12 17:8
    17:24 18:13 22:9
    22:14 23:19 24:20
    24:25 25:2 36:15
    40:14 41:7,12,16
    42:5 43:16 44:11
    44:17 45:25 46:13
    46:24 47:9,16 48:6
    48:9 49:6 50:18,21
    52:8,11,13,24 53:6
    53:19,21 54:10,12
    56:6,9,17 57:5,8
    57:14,18 59:9,17
    60:20 61:14,17
    62:5,7,10,12,19
    63:21,22,25 64:23
    66:3,13 67:17
    68:24 69:14 71:8
    74:18 76:22 96:7
    100:11 104:25
    105:23 106:4
    107:6 110:17,22
    110:25 112:3,5
    117:5 128:3,9
    138:10 141:8,18
    142:3 145:18,19
    145:20,25 150:11
    150:19 151:22
    155:20,21 159:18
    168:7,12 188:10
    188:19,23 189:10
**agreements** 20:14
    39:6 43:7 52:19
    68:6 74:13 76:8
    89:5
**agrees** 58:5,11,13,17
    74:2 76:12
**ahead** 11:5 75:16
    123:25 151:13
**aid** 116:5,6,11
**airport** 126:20
**Al** 10:9 17:5,7,11
    19:12,23 21:3
    25:16 39:15 41:19
    41:22,23,25 46:11
    47:23 49:10,19

    51:20,21,23,24,24
    54:6,7,15 55:10
    78:12 91:7,8,18,20
    99:12,13
**alcohol** 5:6
**allegations** 10:21
    17:22
**allow** 111:23
**allowance** 118:15
    145:13,15,18,19
    160:25
**allowed** 118:11,14
**alternate** 124:25
**alternative** 114:18
**America** 73:20
    131:5
**amount** 5:10 160:10
**amounts** 160:20
**analysis** 153:16
**and/or** 16:16 67:11
**Ann** 79:9
**announce** 159:4
**announced** 84:7
**annoying** 161:12
**annual** 144:18
**answer** 4:5 6:22
    38:19 58:24 60:23
    61:7 63:6 65:13
    68:20 73:19 74:22
    74:23 75:4 76:2,4
    76:5 88:5 93:17
    97:12 106:7,13
    107:11 113:24
    114:24 115:11
    134:13 139:7
    142:16 147:17,19
    148:18 151:19
    156:20 171:4
**answered** 4:21
    60:22 61:5 68:20
    71:24 125:11
    126:11
**answering** 4:14
    77:17
**answer's** 16:12
**Anthony** 50:22
**anticipate** 151:16
**anybody** 38:17
    52:17 88:6 97:24
    115:18
**anymore** 70:10
    156:23
**anyway** 146:10
**apartments** 27:19
**appear** 159:21
    163:21 168:25
**appears** 129:15
    132:25 142:16,19
    144:2 148:22
    152:20 159:4

**161:17** 166:9,13
    178:3 182:23
    189:24
**applicable** 58:14
**application** 116:20
    116:21,22 140:21
    141:11,20 142:17
    143:4,12 188:14
**applications** 116:18
**applied** 142:14
**apply** 60:10,14
    63:15,20 65:15
    66:20 68:16 69:16
    69:25 71:18 72:4
    75:8 77:4 111:9
**applying** 68:23
    116:7
**appreciate** 148:12
**approval** 159:4
**April** 1:10 160:25
    178:6 181:12
    187:19
**area** 129:19
**areas** 31:17
**argument** 111:8
**Arkansas** 28:14
    29:8 31:10
**arrangement** 21:25
**arrived** 104:3
**arriving** 155:12
**aside** 64:17 65:6
    89:13 112:24,25
    113:25 123:10
    179:17
**asked** 4:22 6:8 9:21
    10:8 17:9 21:22
    23:12 30:24 31:13
    31:18 38:2 51:17
    60:21 61:4,6 63:19
    68:19 71:24 81:16
    89:2 90:2,23 91:3
    93:10 94:3 97:19
    118:19,21,22
    125:11 126:11
    127:14 132:4,17
    132:18 136:16
    146:21 147:9
**asking** 21:3 22:9
    25:17 44:10 53:13
    56:5 61:8 73:22
    86:11 91:20 97:9
    106:8 112:15
    133:9 148:13
    170:22 171:12
    172:18 173:24
    181:21
**assemble** 88:13
**assessor's** 182:20
    183:19 184:9
    190:13

**assigned** 161:8
**assistance** 22:24
    145:11
**associate** 32:4 34:5
    163:5
**associated** 42:15
    163:5
**assume** 4:20 5:17
    28:15 90:23 162:7
**assumed** 90:22
**assuming** 91:9
**assumption** 77:2
    91:2 122:6 154:18
**attached** 121:16
    186:7
**attachment** 163:17
    189:19
**attempt** 46:15
**attempted** 121:24
**attention** 57:6 58:3
    58:6 74:3,6 76:13
**attorney** 6:12 7:19
    17:9 18:2 21:20
    28:7 52:17 67:18
    80:19 114:3,6,10
    143:16 170:3
    171:25 172:2
    179:4
**attorneys** 2:5,13
    7:19 10:4 25:17
    30:22 97:15,17,17
    97:18 101:14
    143:5,5 170:10
**attorney-client**
    157:5
**auditor's** 178:2
**August** 95:18
    107:16 109:2,6,18
    118:4 162:24
    183:23 189:14
**Authorization** 128:2
    128:9 188:10
**authorize** 114:14
**automatic** 128:3,10
    130:20 133:18
    134:2,3,3 188:10
**automatically** 64:15
    130:22
**available** 22:18,20
    22:21 116:17
**Avenue** 1:17,24
    2:14
**Award** 150:11,19
    188:23
**awarded** 84:7
    150:20 151:22
**aware** 21:22 22:25
    23:5 24:24 33:12
    39:8,13,18 46:25
    48:16 64:17
    123:16 151:10

162:6
awareness 47:4
A-n-n 79:10

**B**

**B** 40:25 188:6 189:3
    190:3
**back** 11:11,22 12:8
    12:13 14:12 17:4
    18:9 31:18 42:17
    45:25 48:13 49:20
    62:3 69:6,13 70:21
    71:2,5,17 73:10
    74:6 86:13 94:6,13
    94:16 97:6 105:4
    105:14 114:2
    116:3 118:4
    125:14 155:25
    156:5,6,18 176:20
    176:24 181:3
    183:2
**background** 67:22
**balance** 133:7
**bank** 73:20 123:17
    124:11 129:16,18
    130:12,18,25,25
    131:2,5,8,18,23
    132:4,5,17
**banking** 129:16
    133:16
**banks** 130:19
**bar** 126:24 143:4,12
**Bartok** 35:10,25
    37:5,20 38:13,14
    39:21 41:19 42:4
    43:15 45:13
**base** 57:19 144:8,23
**based** 34:2 50:3
    68:15 97:12
**basically** 76:21 93:8
**basis** 141:25
**Bassin** 78:17
**Bates** 107:25 129:6
    129:11 139:24
    140:11 152:6,11
    155:3 162:20,25
    163:13,17 173:8
    188:12 189:6,12
    189:14,16,19
**bearing** 140:24
    141:4 188:15,17
**Becker** 162:19
    163:13,17 189:12
    189:16,19
**beginning** 135:2
    166:17
**behalf** 77:21 114:13
    160:17
**behold** 156:7
**Belgians** 33:3

**believe** 7:25 8:16
    9:2,17 11:4 12:18
    13:20 14:25 17:3
    20:16 25:11,18
    26:23 31:12 36:9
    41:2,8 42:6,22
    43:5,17,22 44:22
    52:22 60:25 62:17
    62:21 64:3,4 65:2
    79:10 85:25 92:7
    101:17 102:7
    109:12,22 111:14
    130:6 135:17,19
    135:25 136:13,21
    139:25 142:22
    166:21,23,25
    173:16 180:6,15
**belonged** 45:20
**benefit** 117:21
    152:21 154:5
**benefits** 12:15 63:9
    63:10 71:15
    109:14 117:4,8,15
    121:12 123:13
    134:8 153:2,9,21
    153:25 154:17
    155:17 176:5
**best** 46:22 49:17
    182:5
**betcha** 70:11
**better** 12:2 153:25
**beyond** 59:10,16
    60:19 116:14
**Bingo** 74:5
**bit** 23:10 47:7 78:22
    81:17
**blah** 143:14,14,14
    143:15 165:5,5,5
**blank** 138:4
**blood** 187:16
**blur** 87:8 89:19
**blurred** 52:4 90:8
**boilerplate** 85:11
**bonus** 118:9,10,22
    119:7,12 144:21
    144:25 145:7,8
    146:4,5 149:12,16
**boss** 7:22 8:2,4 10:6
**boss's** 8:9
**bottom** 83:4 108:2
    128:14 141:13
    149:11,19 152:7
    160:14 164:3
    173:8
**bought** 33:3,5 36:13
    177:15
**bounce** 133:10,11
**bounced** 133:2,14
    133:20
**bound** 157:15

158:10 174:15
    175:10
**boundaries** 38:25
**branch** 129:21
**breach** 147:3
**break** 61:12 69:8
    99:23 119:22
    167:4
**breath** 151:20
**Brett** 78:13
**Bring** 43:8
**Briskman** 45:23
    51:17,24 52:2
**broad** 178:15
**broader** 56:4 99:17
**broke** 86:14
**brought** 78:23
    103:23
**build** 177:14 184:4
**builder** 184:5
**building** 72:20
    184:8
**built** 183:10 184:3
**bullet** 108:17,18
**business** 32:20 58:6
    67:16 74:2,5 76:13
    76:15,19 81:24
    148:10
**busy** 46:21
**buy** 36:12 110:16
    177:14,17
**buyer** 16:11 182:4
**buyout** 172:8
**B-a-r-t-o-k** 35:10
**B-a-s-s-i-n** 78:18
**B-r-i-s-k-m-a-n**
    45:23

**C**

**c** 2:2 25:25 27:24
    69:2 95:14 108:14
    135:14 187:2,2
    188:8
**cabinet** 43:4
**calculation** 153:5,18
**calendar** 169:2,9
**call** 13:17 18:23,23
    19:2,13 20:21
    21:11,16 22:8
    37:13,14 45:11,16
    51:24 69:16 70:5
    70:21,25 71:5,11
    84:5,9,15,18 85:24
    86:5 92:25 93:15
    94:13,24 100:17
    122:13 131:4
    132:17,19 134:24
    156:10
**called** 3:2 11:18
    12:10,11 17:7,11

17:19 18:25 20:22
    21:13 29:16 51:25
    69:21 84:5 91:8
    94:3 113:14,21
    114:5 122:10
    123:11 132:3
    134:22 143:9
    155:25 156:8
    172:6
**calling** 13:10 21:17
    45:21 51:20
    113:16,22 134:20
**calls** 19:14 37:12
    58:22 62:13 63:4
    65:12 68:4 71:23
    74:20 105:2
    107:10 110:8
**candidly** 157:9
**capacity** 3:25 6:4
    30:5 73:21
**capital** 66:8
**capitalized** 66:9
**car** 94:21 118:15
    145:13,15,17,18
**card** 14:4 21:2
**care** 13:13,15 14:8
**Carolina** 3:8 15:24
    16:3,6 27:2,6,12
    27:17 28:24,24
    29:18 116:7 122:7
    122:18 129:20,22
    130:19 131:8,10
    131:11 135:8
    136:20 143:4,12
    156:22 160:12
    177:5,13,21 178:5
    181:6 182:15,24
    183:7 190:8,10
**carried** 89:11
**carry** 73:18
**cars** 167:20
**case** 3:11,22,24 6:6
    6:7 8:5,6,12,17,22
    9:20 10:2,5,14,19
    17:5,6 25:13 31:15
    100:10 147:2
    155:17 156:13
    168:24 169:18
    170:4,7
**caught** 74:15 127:12
**cause** 18:11 20:11
    20:19 25:10 59:17
    60:5,10,14,20 61:3
    61:14,16,23 62:5
    62:11,16,22 63:8
    63:16,20 65:9,16
    65:18,19 66:21
    68:24 69:17,22
    70:16 71:2,8,20
    72:3,15 92:14 95:4

96:6 105:22 106:4
    106:16 107:2,8,13
    111:11 117:3,9
    167:16 168:22
**cautious** 120:25
**CBS** 35:23 45:10,11
    45:18,20 50:6,10
    50:17 51:5,6,9,14
    52:11,17,17 64:7,9
    64:10,14 76:21
    78:5,9,17,19 79:19
    80:6 84:8 119:12
    163:7 164:10
    173:19 174:6
    180:22,24,25
**CBS's** 45:4
**Cedar** 17:22 21:25
    22:6,7 36:12,13
    42:16 43:21 64:7,8
    64:13,15 77:11
    80:10,13,16,20,21
    80:24 81:6,9 82:21
    83:14,21 85:11
    86:24 87:18 91:22
    92:4 93:20 96:16
    96:19,22 97:17
    98:2,6,13,22 99:19
    100:6,18 101:22
    102:3,18 104:25
    108:11 110:16
    113:10 126:7
    127:22 163:8
**cell** 11:21
**Center** 2:6
**CEO** 9:22 10:2 23:5
    37:16
**certain** 46:11
**certainly** 53:11
    93:12
**certify** 186:5 187:9
    187:14
**cetera** 150:3
**CFO** 37:16 42:13
**chance** 95:3 151:16
    155:25 156:11
**change** 13:12 31:21
    34:24 35:2 36:23
    64:18 97:12 104:8
    130:19 151:6
    154:10,11
**changed** 16:5 54:25
    137:18
**changeover** 14:3,11
**changes** 48:3
**characterize** 24:3
    171:17
**charge** 93:5 94:17
**Charlotte** 11:13
    12:3 13:5 15:21
    27:4,5 34:3 83:15

86:6 87:23 126:20
129:20 131:6
136:19 137:11
138:2,18 154:13
178:5
**chase** 69:21
**check** 117:12 132:18
132:19 133:20,21
166:20
**checking** 117:13
**checks** 133:17
**Cherryville** 29:16
**chitchatted** 81:17
**choice** 70:7
**Christmas** 21:2
**Chuck** 162:19
163:12,16 189:11
189:16,18
**circumstances**
19:20 20:5 41:15
126:3,14,17 132:5
**Citigroup** 78:20,22
79:22
**claim** 123:24 178:19
**claims** 13:14,14,24
14:2,5,6,7,13,20
109:14 118:3
**clarification** 71:5
**clarify** 98:8,10
133:15
**Claude** 181:19
**clause** 23:22 58:16
58:20,25 63:7 67:3
71:20 73:6,11
74:11 76:11
**clauses** 74:13,14
93:22
**clear** 4:10 76:11
93:2 102:21
103:21 118:8,10
118:15 126:2
138:13
**clearly** 11:9 123:18
**client** 4:3 6:24
**close** 29:15 48:18,24
49:3 181:14
**closed** 15:15,15,16
16:3
**closing** 15:19,21,22
16:7 77:25 79:18
79:20 82:19 83:15
86:7 87:6 91:4,7
92:2 119:8,15
137:2,17,19 151:4
164:13,17,22
165:2,4
**COBRA** 14:9
**coffee** 19:3 167:21
**Columbus** 2:8
**columns** 166:8

189:23
**come** 13:6 50:4
93:24 94:7 120:10
156:18 172:20
**coming** 50:9 102:22
102:22 104:6
**comma** 74:4
**comment** 54:15 55:5
**committee** 37:14,15
**common** 31:17 67:4
75:13
**communicating**
5:18
**communication**
84:22 85:18
125:25
**communications**
20:24 21:10 51:11
89:15 92:9 167:15
**commute** 156:23
**commuting** 11:14
155:13
**companies** 35:16
45:19
**company** 19:4,7,9
22:21 23:6 28:19
42:20,21 46:25
73:3,21 86:25
89:13 118:12
161:7 182:3,3,8
**comparable** 58:10
**compare** 57:20
**comparing** 166:20
**compensation** 37:24
73:4 145:24
162:15
**complaint** 6:21 8:16
10:22 17:13,20
20:23
**complete** 142:18
**completed** 135:18
135:24 140:10
176:3
**completely** 58:12,18
59:2,6 71:21 72:10
**complicated** 16:11
35:6 136:25 137:9
137:12
**complied** 70:12
**comply** 58:13
**comprehend** 113:3
**comprised** 30:21
**conceivably** 59:9
**conclusion** 58:23
62:14 63:5 65:13
68:4 71:24 74:21
104:3 105:3
107:11 110:9
154:22
**condition** 154:10

**conditions** 165:8
**conduct** 125:4
141:23
**conference** 84:9,18
85:24 86:5 91:10
**confidential** 157:8
157:15 158:1,10
174:12,15 175:1
175:10
**confidentiality**
24:20 68:25
**confirm** 173:9,13,17
**confused** 101:3
**connected** 163:22
**connection** 43:20,23
160:11,18 163:7
163:23 164:6
168:24
**conscious** 155:16
**conservative** 121:2
**consider** 54:17
65:22 78:5 106:15
106:18,25
**considered** 106:17
156:21
**consist** 88:9
**consistent** 58:9
149:9 160:16
183:5,21
**construction** 184:10
**consultation** 22:24
**consulted** 38:13
**contact** 70:22 78:21
80:9 122:14
143:10 167:24
**contacted** 120:6
168:16
**contained** 98:17,21
99:4 101:20
110:24 165:7
**containing** 166:8
189:23
**contemplating**
168:16
**contemporaneously**
170:11
**content** 101:6
**contents** 85:6 98:23
100:5
**context** 11:10 31:9
67:2 69:20
**continue** 61:21 64:3
64:4,22 65:2,8
117:3 148:6
154:12 165:3,5
**Continued** 158:17
175:23 189:2
190:2
**continuing** 62:6,9
111:15 112:4

148:10 179:5
**contract** 23:3,7,8
32:19,25 33:13
37:23 38:18,23
41:2,21,25 44:14
44:23 45:4 48:21
48:24 49:10,21,24
51:18 52:16 53:10
56:21,25 57:21
64:14 65:22,23
66:24,25 67:2
68:13,15 70:15
74:10 75:19,22
76:21 81:20 88:17
92:15 93:19
104:19 106:19
107:4,9,13 118:15
125:23 137:6,7,16
138:7 144:12
147:3 168:21
177:4,11 182:5,6,9
**contracted** 177:16
**contractor** 31:12
**contracts** 21:23
32:13,22,23 33:8
33:10,15 37:9,11
38:20 39:9,14,19
39:24 40:6,10,13
40:17,21 42:12,18
43:10,11,19,25
48:17 52:15,20
68:2 88:22 91:8,10
93:7,20 103:20
**contribution** 153:8
**convenience** 148:9
**Convenient** 179:9
**conversation** 10:24
11:2,7,12,17,25
12:6 13:8 15:2,3
16:15 17:19 18:9
19:24 20:10 23:11
47:14,19 51:23
54:9 81:10,14 82:2
83:7 86:19 91:18
94:15 95:8 99:18
108:14 109:6,7
126:9,13 134:25
143:13 167:12
171:6
**conversations** 10:2
16:19,23 17:2
20:24 39:20 52:6
54:5 56:16 79:3
82:5,13,16 87:15
89:15,21 92:9,19
96:21 100:2
102:25 103:6,15
108:16,16,21
109:13 143:22
167:14,18 168:2,4

168:6,11,19
170:19
**conversion** 123:23
**copy** 21:18 43:16
129:15 169:2,2
179:11
**corporate** 27:19
78:14 82:20,22
93:5,9 94:14,16,18
94:22 156:10
180:24,25
**Corporation** 2:12
150:10,18 188:23
**correct** 7:10 12:25
20:15 27:13,22
28:2,21,22,25
29:21,24 30:7
31:25 32:2 33:17
33:18,21 34:22
35:7 36:6 44:25
45:2 47:21 48:3,10
50:8,20 51:10,15
52:9 53:19,20
61:15,19 64:20,24
66:3,4 67:19,23
69:18 72:3,13 77:5
77:22 79:6 87:2,22
91:4 92:3 97:16
100:16,20 102:6
102:10 104:22
105:19 106:12
109:4,11,15 117:6
118:5 119:9
125:10,18 128:19
129:25 130:10,11
130:14 132:24
134:19 138:8,10
142:15,24 144:3,4
144:9,10,19
145:13,14,22
149:2 150:16,21
150:22 151:25
152:7,22 163:24
164:8,11 165:10
170:16,17 173:19
174:5,8 182:24
186:5
**corrections** 186:6
**cost** 154:3
**Costell** 79:10
**counsel** 3:25 4:2 6:5
7:24 28:16 32:4,15
33:22 34:5,5,13
35:3,5,5,9,13,17
36:2,8,9,20,25
37:6 39:4 41:20
45:5,10,11,14 46:6
56:14 73:3,13,20
74:7 76:7 79:6,12
80:19 89:3 115:12

143:24 152:13
173:7 178:12
179:19,21 180:4
**counsel/executive**
73:17
**country** 29:15
**county** 29:18 178:2
182:15,19 183:19
184:9 187:5
190:10,12
**couple** 48:17
**course** 22:7 41:24
80:18 93:23
116:24 143:13
170:7 180:23
**court** 1:2 4:8 5:21
27:5,16 122:9
136:19 178:5
**cover** 11:5 110:12
119:14,17 134:9
157:16 158:11
174:16 175:11
**Crage** 82:3,17 87:12
87:17 104:11
**Craig** 90:18 93:14
94:3,4,15,24
134:17
**Cranford** 7:12
10:25 11:3,8 13:8
13:17,23 16:15
17:2 108:17
109:13 134:9,16
134:22
**create** 116:6 170:9
**crying** 137:25
**current** 26:24 27:17
98:6,24 100:5,22
122:11 133:7
135:22 136:18
151:10 172:2
**currently** 28:10
**customary** 58:6
73:4,16 74:2,5
76:13,15
**cut** 69:21,25 117:22
121:11 123:2,13
**cute** 72:8,17
**cuts** 169:5
**CV** 1:6

_____
**D**
**D** 188:2 189:2 190:2
**da** 165:4,4,4,4,4
**danced** 79:22
**Darron** 78:17
**date** 16:4,5 18:19
26:2 31:21 61:3
99:21 111:3
114:24 119:8,14
128:4,18,21 129:8

130:2 135:4 136:2
136:4 137:17
140:22,24 141:2,4
141:6,9,13 149:8
149:20 150:7,12
150:25 152:18
155:5 159:15,19
160:25 161:4
162:21 163:2,14
163:19 164:13,17
165:15 166:10
169:5,6 172:25
173:4 176:11
177:10,23 181:8
181:13 182:16,21
183:2,17,20,22,24
184:21 188:15,17
**dated** 54:19,19,23
95:10 129:5,24
130:7 141:16
155:2 162:19,24
163:12,16 165:13
165:22,25 176:17
176:18 181:13
188:11 189:5,11
189:13,15,18,22
**dates** 176:14 177:2
181:9
**David** 39:16 48:23
53:9,12,15 99:13
120:15,18,25
167:11,13,15,24
168:9,11
**day** 16:20,23 46:4
54:5 83:8,9,14
84:6 87:9 91:7,8
94:10 98:5 119:11
123:10 131:17
137:7,8,20 148:24
156:9 164:21
178:6 179:8 182:6
184:7,14 186:17
187:19
**days** 16:21 18:22
94:23 156:6
184:22
**dealing** 38:6
**dealt** 45:4,10
**Dear** 121:24
**Debbie** 7:14
**December** 57:9
59:23 60:3 61:11
61:15,18,21 66:14
138:7,23 165:22
**decide** 155:18
**decided** 81:19 90:21
137:4 154:15
**decision** 70:8 90:24
113:3 138:15,18
**decisions** 154:5

**deck** 11:11,22
**deducted** 130:22
**deductibles** 154:23
**deed** 177:22 178:4,6
181:4 190:8
**deemed** 157:14
158:9 174:14
175:9
**Defendant** 1:8 2:13
**Defendant's** 40:25
134:6
**defies** 67:4
**define** 61:20 72:18
74:10 75:11
**defined** 57:11 59:15
59:22 60:18 66:13
66:16 72:18 74:9
**defines** 61:10
**definition** 38:9
73:10
**delegated** 154:5
**deliver** 121:24
**delivered** 41:25
42:12 43:10 44:14
**delivery** 121:25
**Dempsey** 1:16 2:4
**denied** 14:2,7
**Denny's** 9:3 11:14
17:24 115:7 116:2
116:16,23,25
125:10,16,20
126:8,19 127:6
130:9,14,16
140:21 141:10,20
141:25 142:9,14
142:23 143:2,24
144:2,19 145:8,24
147:5 150:5,10,16
150:18,21 152:10
152:21 153:2,9,14
153:20 154:17,21
155:9,18,19,24
156:24 157:3,3,9
161:8 162:8
166:13,24 173:15
174:5 188:14,20
188:22
**denying** 113:16
**department** 30:21
50:9 166:25
**departments** 79:13
**deposed** 3:19,23
30:25
**deposit** 123:15
130:16 131:20
132:16
**deposited** 133:8
**deposition** 1:15 3:15
3:17 4:3 6:4,9,11
6:20 7:7,13,15,17

7:20,22,22,24 8:3
8:5 15:5 48:19
107:16 125:5
135:2 141:24
147:2 148:2,3,5,8
148:16 170:16
187:11,12
**depositions** 147:22
**deposits** 128:3,10
130:13 134:2
188:10
**Depot** 73:22
**described** 10:20
58:14 84:3
**designate** 157:7
174:10
**designated** 78:21
**desire** 85:4
**detail** 20:14 159:13
189:8
**details** 9:9 24:11,17
24:22,23 53:12
56:25 121:3,4
**devote** 58:5 74:2
76:12
**Dick** 24:16 91:15
94:16
**difference** 146:15
**different** 25:4
112:16 116:19
130:12 171:19
176:13
**difficult** 64:6 138:14
**diligence** 42:9,15
43:20,23 46:21
52:15 77:15 78:4,9
79:5
**direct** 33:14 57:5
58:3 69:6 79:8,11
123:14 130:13,16
**directed** 21:19 97:2
143:21
**direction** 93:3 170:9
**directly** 90:3,15
103:25
**disagree** 60:6
146:25 166:15
171:6,18
**disagreed** 171:10
**discharged** 131:12
**discovering** 124:8
**discovery** 170:7
178:10,25
**discuss** 7:20 10:23
17:6,18 19:6,15
23:11,18 38:14
46:8,13 47:16
53:11 55:22 79:18
81:21 83:4 85:6
100:4 157:5

**discussed** 7:23 10:5
10:15,19 11:3,4
17:5 19:19 20:13
24:6 25:12 37:2
38:3 46:9,10,11
47:13 51:20 52:12
52:23 53:5,18
54:11 55:20 56:6,9
84:17 85:23 89:14
89:24 90:8 97:10
101:10 109:17
111:9 114:7,8
134:25
**discussing** 19:11
52:16 55:23 56:25
**discussion** 51:16
80:14 154:7
**discussions** 49:5
50:16 51:11 52:2
52:14 79:23 83:16
86:8 88:21 90:6,10
97:24 100:21
102:2 108:23
131:22,25
**dispute** 8:19 17:16
31:12 142:4,8
160:23
**disregard** 104:24
**dissertation** 19:13
21:18
**distributing** 52:18
**DISTRICT** 1:2,2
**Dixon** 30:9
**doctor** 154:12
**doctors** 154:9,10,11
154:17
**document** 26:5
51:12 57:16 62:23
66:5,6 84:22
111:17 114:6
127:25 128:8
129:5,11 140:20
140:23 141:3,7
144:7,15 145:4
150:4,9 152:2,5,16
159:3,3,17
160:13,21,22
165:12 166:8
177:21 179:22
181:16 182:14,19
188:9,11,13,15,17
188:19,20,22,24
189:7,9,21,23
190:8,9,12
**documents** 6:19,23
6:25 7:2,11,16
13:11 14:11 77:16
88:14 134:12
136:17 150:24
168:25 169:7

**doing** 5:20 19:12,22
  33:9 52:3,3,5
  55:13 81:16 88:18
  88:19 127:4,7,14
  143:14
**doubt** 44:24 73:23
  156:15 161:18
**Dover** 30:9
**downtown** 131:5
**draft** 26:7 40:8
  44:23 66:4 89:8
**drafted** 44:16,20
  76:3,25 77:5,8
**drafting** 23:2 40:21
  66:2 67:25 75:18
  76:7
**drain** 31:17
**drawing** 75:10,12
**drink** 5:6
**Drive** 3:8
**drove** 94:21
**drug** 5:9
**due** 42:9,15 43:20
  43:23 46:20 52:15
  77:15 78:4,9 79:5
**dug** 114:2
**duly** 3:3 187:11
**duties** 32:12 36:23
  37:3,6
**duty** 125:22

**E**

**E** 2:2,2 3:2,2 107:15
  187:2,2 188:2,6
  189:2,3 190:2,3
**earlier** 30:24 43:21
  84:4 93:4 167:10
**early** 15:16,16 31:10
  49:18 54:22 91:7
  131:14
**easier** 125:2
**education** 27:25
**effect** 68:12
**effective** 61:2 91:12
**efficient** 161:11
**eight** 76:16,16
**either** 8:7 29:10
  30:6 79:24 80:7
  89:22 90:2 93:18
  105:8 130:2
  147:16 148:18
  154:23 171:18
  180:7,8
**eligible** 145:8
  148:21 150:15
  153:21
**emotional** 11:12
**emotionally** 137:24
**emphatically** 120:24
  122:23

**employable** 139:14
**employed** 34:9
  35:14,23 59:5
  112:4 125:16
  126:18 127:22
  139:13 142:9
  165:3
**employee** 80:20
  85:5 99:19 106:21
  106:22,24,25
  107:3 140:24
  141:4,12,15 149:4
  152:24 153:12
  154:3 159:18
  160:3,8 188:15,17
  189:9
**employees** 39:7 48:6
  76:8 84:23 88:23
  89:6 98:6,12,24
  100:5,22 105:18
**employee's** 136:8
**employer** 35:11
  156:2 166:13
**employment** 6:7,17
  8:19 9:12 17:8
  18:12 20:14 22:9
  22:13 23:3,19
  24:12,25,25 30:10
  30:14,17 32:21
  33:8,10,12,15,19
  36:15 38:18 39:6,9
  39:14,19,24 40:5
  40:12,14 41:6,12
  42:5 43:16,25
  44:16,23 50:17
  52:13,19,24 53:6
  53:18 56:6,9,17,21
  57:11 59:10,15,16
  59:21 60:3,18 61:2
  61:11,21 62:19
  63:13 66:9 67:22
  68:6 69:13 73:6
  74:13 75:19 76:8
  92:15 96:7 100:10
  107:6,12 110:17
  110:22,25 111:23
  114:18 124:25
  125:10 126:7
  138:9 141:25
  143:16 144:12
  145:20,25 148:23
  148:24 155:20,21
  161:8 162:4,8
  168:7,12 180:23
**enable** 4:11
**enclosed** 121:25
**enclosure** 123:6
**ended** 143:19
**enforceability** 65:6
**enforceable** 65:5

**engage** 66:19 67:9
  114:3,10
**engaged** 114:5
**English** 75:13
**enjoy** 156:23
**enroll** 153:20
**enrollment** 12:15
  13:12,18 134:8,23
  152:17 176:4,7
  188:25
**entered** 40:18
  141:16 149:20
**entertainer** 76:22
**entertainment**
  67:16
**entire** 60:13 65:23
  66:25 67:2 126:25
  142:2
**entitled** 4:3 63:9
  118:9,18 147:4
**entity** 64:18
**equivalent** 154:23
**especially** 65:23
  67:2
**ESQ** 2:9,16
**essentially** 37:6
  47:18 77:10
  164:12
**establish** 43:13
**estate** 137:14 182:14
  184:14,15 190:10
**et** 150:2
**event** 126:22
**eventually** 14:19
  41:24 115:7
**evidence** 182:5
**EVP** 50:25
**exact** 22:19 143:18
**exactly** 14:24 72:9
  104:2 169:12
  178:24
**exam** 143:4
**EXAMINATION**
  3:9 188:3
**examined** 3:4
**example** 136:3
**exception** 76:17
**exceptions** 32:14
**exchange** 41:3
**excluding** 97:14
**exclusive** 58:12,18
  59:2,6 63:12 69:15
  71:21 72:10 74:16
  74:25 75:2,18,21
  110:21 125:7
**exclusively** 165:3
**execs** 92:24
**executed** 49:8
**executive** 33:12
  37:13,22 38:7,9

**43:19 58:5,11,13
  62:19 66:18 71:21
  73:12 74:2 76:12
  77:6 88:22 89:5
  106:3
**executives** 21:23
  37:13 42:18 52:19
  58:10 77:19
  168:20
**executive's** 58:17
**exercise** 151:3,13
**exhibit** 7:6 25:23,24
  26:4 28:2 40:25
  95:14 108:14
  109:21,25 110:2
  120:4 121:23
  127:24,25 128:6
  129:4,5,10 134:6,6
  134:16 135:11
  139:19 140:16,20
  140:23 141:3,7,19
  142:15 143:25
  148:22 149:3
  150:4,9,18 152:16
  152:20 154:24,25
  159:2,3,11,12,17
  160:6 161:15
  162:18,23 163:11
  163:15 164:2
  165:11,12,17,17
  165:20 166:6,7,12
  169:3 171:22
  172:23 173:2,11
  173:12,20,21,22
  176:5 177:19,20
  177:25 179:11,12
  179:14,18,24
  182:12,13,18,22
  183:18
**exhibits** 107:15
  120:3 140:18
  150:2,13 159:21
  159:24 163:4,21
  172:13,21 173:6
  188:7 189:4 190:4
**existing** 40:17
**expecting** 123:19
  124:2
**Expense** 159:13
  189:8
**expenses** 159:23
  160:3
**experience** 68:16
  75:12,17
**expert** 68:5,9 75:4,6
**expiring** 48:18,18
  48:25 49:3
**explain** 66:21 104:2
  138:17 139:10
**explained** 66:16

**explanation** 146:19
  146:22,24
**extend** 59:9,16
  60:19 61:11
**extent** 53:24 110:9
  170:25
**extra** 137:13
**extremely** 46:21
  120:25 138:14
**e-mail** 7:12,13 21:3
  21:4,7

**F**

**F** 107:15 109:25
  110:2 129:6,16,16
  129:18 187:2
  188:12
**face** 90:7,7 103:6,6
**face-to-face** 115:20
**fact** 11:12 14:18
  19:20 33:11 41:6
  48:2 56:24 84:19
  95:22 99:10
  105:21 106:3
  118:19 119:7
  134:22 139:25
  154:12 159:8
  161:6 164:5
  179:14
**facts** 170:3
**fail** 5:13
**fair** 4:22 17:22 19:9
  21:25 22:6,7 36:12
  36:13 39:5 40:8
  42:16 43:21 54:13
  64:7,8,13,15 72:21
  77:11 80:10,13,17
  80:20,21,24 81:6,9
  82:22 83:14,21
  85:11 86:24 87:18
  91:23 92:4 93:20
  95:5 96:16,19,22
  97:17 98:3,7,13,22
  99:19 100:6,18
  101:22 102:3,18
  104:25 105:20,25
  108:11 110:16
  112:14 113:10
  126:7 127:22
  133:3 145:23
  163:8 164:12,16
**fairly** 11:9,11 49:2
  85:11
**fall** 18:21 36:10,17
  36:21,25 39:4 40:2
  49:13 167:24,25
**familiar** 8:6,12
  67:24
**familiarity** 74:12
**far** 56:10 114:9

147:14
fashion 89:25
fax 176:24
February 49:18
 140:25 141:13
 144:5 148:25
 188:16
feel 46:22 63:19
 117:7 139:2
fees 161:25
felt 8:25 9:2 119:19
 139:11 170:20
figured 117:11
figures 166:9 189:24
file 26:17 42:19,20
 122:3,5 134:10
filed 6:23 8:16
files 44:3 134:14
 180:16
filing 43:4
fill 136:16 155:8
filled 139:24 140:2
 181:24 182:7
filling 116:22
 128:11 143:3
finally 53:9 137:4
finance 82:12
financial 166:9
 174:11 189:24
find 11:13 12:3
 78:15 120:12
 142:23
fine 70:9 157:6,12
finish 20:7 162:2
finished 75:15
firm 3:13 78:24,25
first 8:11 15:13
 17:15 18:15 20:9
 30:3 43:24 44:2
 45:9 57:5 73:24
 76:11 80:9,22,25
 83:23 84:2 88:10
 88:12 91:24 92:13
 107:16 108:23
 111:7 120:4
 121:11 122:21,24
 123:12 134:15
 141:19 148:24
 157:4 160:2,3,6
 165:22
five 76:16 148:9
 170:23
flat-out 170:20
Flemming 143:21
flipped 140:8
flux 90:23
folks 33:6 78:19,23
follow 6:3 92:4
 100:17
followed 118:24

following 16:7 20:10
 20:18 56:8,12
 62:10 63:20 80:2
 108:11 117:2
follows 3:4
follow-up 120:5
Food 30:18,19
foregoing 186:4
forget 27:4
forgive 138:3
forgotten 48:22
form 23:4 59:12,18
 68:3 89:25 104:10
 112:7,12 119:10
 128:11,25 140:24
 141:4,12,15
 148:23 149:4
 170:21 188:15,17
formal 79:23 86:15
former 98:24 99:19
 100:5,22 105:17
 156:2 168:20
forms 12:12 13:19
 135:23 136:3
 176:7,19
forth 12:13 66:17
 110:11 187:11
forward 145:21
 156:24
found 132:20
frame 12:19 39:2
 45:7 78:7 85:22
 97:3 100:9 108:22
 109:10,18,19
 115:4 125:12
frankly 48:18
 112:24 126:5
 155:7
Freeman 7:4 15:4
 22:9,10,12 24:2
 81:7 82:24 87:15
 87:17 88:8 89:14
 89:16,21 92:7,19
 93:2 94:13 95:8
 99:2 102:21,25
 103:5,15 104:7,13
 104:14 107:17
 110:13 123:11
 134:18 148:8
 170:14,18 171:5
Freeman's 3:15 7:6
 48:19 107:15
 113:11 117:10,19
 132:12,22 170:15
Friday 76:17
friends 127:18
 138:2
front 95:16
frustrated 51:21,22
 53:12

full 127:21 147:20
fully 162:6 172:8
funds 133:22
further 16:22 58:13
 187:14
future 19:4 104:9,18
fuzzy 118:17

————————
G
Gaston 29:18
gate 126:21 127:13
gathering 44:7
 77:16,17
general 5:18 10:20
 17:21 29:11 30:12
 32:15 33:22 34:4
 34:13 35:3,5,5,9
 35:13 36:2,7,9,20
 36:25 37:5 39:4,16
 40:9,12 41:20
 45:11,14 52:15
 56:24 60:17 73:3
 73:20 74:7 76:6
 79:6,12 85:7 88:18
 89:3 109:9 143:24
 153:23,24 178:3
generally 10:18
 76:16 82:16
 106:24
gentleman 78:20
gentlemen 80:23
getting 41:21 48:24
 51:21,21,22 52:20
 71:10 73:7 94:12
 95:10 100:4 118:9
 118:11 124:7
 138:14 167:11
girls 11:20 96:11
 131:16 137:25
 154:13
give 17:25 18:19
 45:6 183:17
given 14:7,9 47:5
 187:13
giving 44:8
go 12:8 18:9 19:21
 49:19,20 63:24
 69:13 73:10,19,22
 75:16 85:2 86:12
 88:15 93:6,7,8
 94:5,16,25 102:13
 114:9 123:25
 132:19 143:25
 148:24 151:13
 156:5,12 178:21
 179:3,12,14 181:3
goes 58:16 123:23
 146:12,18
going 11:15,19,20
 12:12 15:16 17:4

19:22,23 20:6
 22:23 23:6 40:24
 43:6 47:2 49:10
 56:4 70:8,9 78:11
 81:19 86:2 92:20
 95:13 99:24 104:4
 107:14 126:21
 127:8,9 138:14
 141:21,24 143:25
 146:7 147:21
 148:2,3 155:8
 156:10 164:20
 169:3 171:25
 173:16
good 3:11 6:10
 106:23 154:21
 170:13
Gordon 80:11,18
gotten 13:11,12
 132:16
graduated 28:4
Graebel 161:6,8
Graham 30:11
grant 150:25 159:4
grass 33:2 96:12
greater 146:5
GREENHOUSE
 1:23
grew 29:15
group 37:13,19
grow 29:14
growth 150:5,14
 151:24 159:7
 188:21
guess 26:16 92:16
 112:14 139:3
 167:25 178:19
guy 78:25 79:21
guys 19:22 76:21
 87:24,25

————————
H
H 134:6 188:6 189:3
 190:3
Habitat 72:20
half 11:14 148:9
 155:14 170:23
hand 7:7 40:24
 86:17 107:14
 187:19
handed 13:15 26:3
 43:19 54:7 128:5
 152:19 159:2,20
 163:3,20 165:16
 166:11 173:5
 177:24 182:23
handing 42:10
 129:9 171:23
handle 32:13 37:8,8
handled 32:17,22

37:10
handwriting 135:13
 135:16,20,21
 142:19
handwritten 128:21
happen 41:18 85:16
 86:2 92:10,12,20
 92:20 151:8 156:8
 170:20
happened 87:4 91:5
 116:11 169:11,12
 169:14
hard 154:20
head 5:23 81:15
 112:12 146:8
headed 140:24
 150:5,10 152:17
 159:13,18 165:13
 177:21 182:14,19
 188:15,20,22,24
 189:7,9,21 190:8,9
 190:12
headhunters 115:20
headquartered 50:7
health 13:14 14:4,8
hear 75:2 99:17
 170:18
heard 53:13,14,14
 74:24 75:23
 127:11
hearing 5:18 113:11
 113:13
heart 100:19
heavy 46:20
held 1:15 25:2 28:7
 51:2
help 70:11 73:25
 75:10 156:13
helped 77:24
hereinbefore 187:11
hereof 58:13,19
hereunto 187:18
hey 90:3 127:3
 156:17
hi 11:24
high 2:7 151:11,12
higher 151:9,12
hired 31:24 32:15
 35:4
hiring 148:23
history 19:8
holding 151:20
 172:16
home 3:6 16:7 27:3
 27:17 73:22 94:6
 94:25 115:16
 122:11 135:7
 177:3,4,13,17
 178:4 181:6
 182:10,24 183:6

183:10,15,21
**honest** 113:24
**honor** 81:20
**hopefully** 4:12
**horn** 76:22
**hot** 46:20
**hours** 5:7 11:14
148:6,9,10 155:14
170:23
**house** 11:15,21 13:4
15:9,10,22,22,24
16:3 72:20 122:18
131:8,13 136:23
137:2,5,8,10,19
155:15 178:8
181:12 182:2,6
184:3,4,6,8,12,13
184:20,23
**houses** 184:16
**housing** 27:19
**how's** 81:24
**HR** 38:12,13 39:21
42:19 50:9,17,25
79:16 180:24
**hundred** 13:20
133:25 136:22
**Huntington** 2:6
**hypothetical** 151:18
156:19

**I**

**idea** 117:16 153:4
156:6
**identification** 26:2
128:4 129:7
140:22 141:2,6,9
150:7,11 152:18
155:4 159:14,19
162:21 163:2,14
163:19 165:15
166:10 172:25
173:4 177:22
182:16,21
**identified** 25:14
**identify** 26:5 129:13
**ill** 23:13
**illness** 58:8
**imagine** 6:14
**immediate** 85:21
135:3 152:4 177:8
**immediately** 80:12
84:21 91:12 93:21
94:12 126:24
137:6 161:7
172:20 184:23,25
**impact** 5:10 138:15
**impacted** 138:17
**important** 4:15 5:20
**impression** 90:20
112:8

**Improvement**
115:17
**inappropriate**
171:10
**incapacity** 58:9
**incentive** 144:19
150:6,14 151:24
159:7 163:6,22
164:6 165:9
188:21
**include** 59:15
105:17
**increase** 57:23
151:17
**independent** 160:20
**indicates** 108:2
**indirectly** 90:3,15
**individual** 18:7
23:12 49:2 50:15
50:21 85:5
**individuals** 39:9,19
40:10,16,21 48:17
78:15 81:9 83:20
86:24 87:16,20
93:13
**inference** 47:24
**inform** 9:21 93:15
**information** 26:12
77:17 78:16
122:15 134:7
143:10 166:14,16
174:11
**informed** 7:21,22
8:13 17:7 22:8
41:19 49:10 122:2
143:15
**initial** 164:9
**initials** 129:17
**input** 66:5
**instruct** 147:16
148:18
**instructs** 115:12
**insufficient** 133:22
**insurance** 130:21,21
154:20,21
**insurance/COBRA**
108:19
**intend** 154:12
**intended** 22:17
**intent** 22:20 65:23
119:6
**intentionally** 104:17
**intentions** 126:4
**interaction** 81:5,8
87:18 88:7
**interest** 46:22
**interested** 143:16
187:17
**interfere** 5:4
**Internet** 178:13

179:4
**interpret** 58:20,25
68:23 71:20 72:23
72:24
**interpretation** 8:25
24:2 60:2,2 61:24
63:2,3,7 69:15,18
71:18 72:6 112:16
112:17
**interpreting** 75:7
112:3
**interrogatories** 6:22
**interrupting** 148:16
**interview** 115:21
**interviewed** 115:6
115:16
**interviews** 115:19
**introduce** 45:17,21
**introduced** 7:13,14
86:18
**introduction** 86:20
**inventory** 80:25
88:2,3
**involved** 23:2 31:3
37:22 40:20 66:2
77:16 137:14
**involvement** 39:5
**in-house** 28:16 30:7
34:6 45:5 88:20
**irrelevant** 146:10,11
**issue** 14:12 108:19
131:3 133:18
170:4
**issues** 12:12 32:21
37:22,23 88:17
89:14 93:19,20
137:14
**Item** 111:6
**items** 171:17,20

**J**

**J** 120:3 121:23
**January** 31:25
34:19 48:9 49:13
49:14 54:24 57:8
145:21 163:16
189:18
**Jill** 2:9 3:12
**Jim** 125:15 126:10
126:13,18,21,23
126:25 127:3,21
**Jo** 79:9
**job** 11:13 12:3 73:7
114:21 116:16
125:20 138:11,14
138:16 139:5,11
142:16 146:13
155:21,22 156:24
**jobs** 115:2,3
**Johnny** 33:25 34:19

37:5
**Jones** 48:20,25
**July** 95:11,15
100:23 162:19
165:25 189:11
**June** 12:20 15:13,14
15:16,16 36:13,14
87:6 131:14,14,15
181:13,14 183:16
**J-o** 79:9,10

**K**

**K** 7:6,9 171:22
**Kaiser** 80:12,19
87:16
**keep** 29:7 42:13
155:17 169:9
**kept** 42:19
**key** 43:9
**keys** 42:22 43:2
**kind** 30:8 81:24
**Kinzel** 82:23 83:24
84:14,20 85:19
86:8 87:12,17
91:11,12 92:17
**Kinzel's** 148:2
**Kirila** 2:9 3:10,12
25:22 48:13 56:12
59:20 61:6 68:8,13
68:14 69:9,12
72:13,15 75:23
97:4,8,25 98:8,11
99:23 100:13
105:10 119:23
120:2 123:23
124:13 125:4
126:12 127:23
129:3 140:18
141:10,23 142:6
142:10,13 146:11
146:18,25 147:11
147:16,24 148:7
148:15,20 150:2,8
152:15 154:24
157:12 159:11,16
162:17,22 163:10
165:11 166:6
167:9 170:25
171:12 172:12,21
173:21,24 176:2
177:19 178:11,16
178:21 179:2,7,10
179:13,24 181:21
182:12,17 185:3
188:4
**Kirkley** 27:5,16
122:9 136:19
178:5
**kitchen** 11:20
**knew** 47:7 48:23

95:3 104:5 117:14
117:18 118:14
120:16 127:12,21
132:4 156:9,10
**know** 3:14 4:18 6:10
8:11,14 9:23 10:12
11:19,23,25 12:2
12:11,12 13:9,10
14:4 16:24 19:5,9
19:14,20,21,24
22:22,23,24 26:18
26:21 32:25 35:11
35:22,24 37:7
38:12,20 40:11,20
42:3 43:6,14 44:16
44:19 46:23 47:5
47:23 48:5 49:20
50:5,6,9,12,14,22
51:2,7,18,20 52:2
52:12 53:8,9,12
54:14,15,16,18,21
54:23,24 55:19
62:25 64:9 65:3
69:24 72:19,25
73:3,9,11,16,23
74:5,7,20 75:18
76:16,19,23,24,25
77:8,24 78:5,14
79:21,23 81:17,23
81:24 82:20 84:4
84:18,19 90:3,4,21
85:10 86:12,15,18
88:18,19 90:3,4,21
90:22 91:21,22
93:2,3,6,13,19
94:3,4,23,24 97:4
97:8 99:11 102:22
103:13,13,14,14
103:19,24 104:5,6
105:20 106:2,9,13
107:21 112:11
114:25,25 115:2,3
116:21 117:11
122:6,25 119:4
120:16,18,20
121:4 122:4
123:14 124:7
126:6 127:8,11,17
129:21 130:5
131:3,25 132:8
133:18,21,22
134:13,24 136:9
136:10 137:11,12
137:13,17 138:4
143:6,14,17 147:4
149:23 151:9
152:9,24 154:8,16
154:19,20 155:8
155:11,12,16
157:3 160:21

166:20 169:11,12
169:20 172:7
179:21 180:3,5,7,8
180:16 182:7
183:22 184:9
**knowledge** 22:4
33:14 40:9,12
124:17
**knows** 75:21
**Koontz** 39:15 42:9
42:12,23 43:19
44:8 46:10,12,14
47:12 53:2 54:9
78:12 82:8
**Koontz's** 43:12
**K-i-r-k-l-e-y** 27:5

——————————
**L**

**L** 3:1,2,2 4:1 5:1 6:1
7:1 8:1 9:1 10:1
11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1

131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1
**label** 107:25
**labeled** 129:12
**labor** 30:10,14,17
**laid** 93:16
**landlord** 31:11
**language** 53:18
54:11 56:2
**Larry** 114:11 120:6
120:17 167:11
**lasted** 148:8
**late** 45:15 49:17
94:10 117:21
119:11,18 132:13
**Laura** 78:18
**Laura's** 78:18
**law** 3:13 28:4,11
30:2,5,8 67:22
78:23,25 116:7
143:7
**lawn** 32:25
**lawsuit** 3:14
**lawyer** 44:25 79:2
**lawyers** 133:13
**layoffs** 93:8,12
**leading** 77:10
**leaping** 180:14
**learn** 92:13 153:7
154:2
**learned** 91:24
121:11 122:21
124:23,24
**leave** 42:25 91:13,16
94:5 154:15
**leaving** 138:2,2,2
**led** 143:19
**left** 34:8,12,19,25
36:4,16,18,24 37:5
41:19 42:20,21
92:24 156:9
**legal** 30:20,20 32:20
58:23 62:13 63:5

65:6,12 68:4 71:24
72:19,25 74:21
79:14 80:14,15
88:19,20 105:3
107:10 110:9
116:5,6,11,19
125:22 147:12
**legalese** 69:4
**legally** 65:4
**leisure** 67:14
**LES** 152:12
**Lester** 1:7,15 3:7
12:2 25:25 69:22
70:5 94:15,25
135:14 155:3
162:20,24 163:13
163:17 181:19
186:12 187:10
188:4,8 189:6,12
189:14,16,19
**LES-00006** 139:24
**LES00085** 155:4
189:6
**LES00204** 129:7,12
188:12
**LES00236** 162:20
189:12
**LES002368** 163:13
189:17
**LES00237** 162:25
189:14
**LES00240** 163:18
189:20
**letter** 92:16 95:10
95:15,17 96:10,19
96:23 97:10,23
98:5,14,19,21,23
99:5,8,14,20,21,21
100:3,4,15,23,23
101:4,5,7,9,13,21
102:2,5,9,18 103:4
104:5 107:17,18
107:20 108:12,20
109:22 110:12
111:19 112:23
114:17 121:10,15
121:17,19,22,25
122:24 123:5,5
124:9,22 132:12
132:23 134:9,15
134:16 135:4
141:8,17 155:2
159:8 162:19,24
163:12,16 164:20
164:23,25 165:7
188:19 189:5,11
189:13,15,18
**letters** 66:8 103:21
106:11 117:11,19
163:5

**let's** 18:9 26:16
61:12 62:2,3,15
64:2 66:7 69:13,20
71:19 77:9 98:8
102:13 118:14
124:21 140:18
148:19,21,24
150:2 164:22
172:12 179:14
**level** 47:4
**Levine** 114:11 120:6
120:17,18 167:11
**license** 28:7 29:10
116:8
**licenses** 29:7
**life** 130:21 154:20
154:20
**liked** 130:25 184:23
184:24
**limited** 99:16
167:12
**limiting** 52:10
**Linda** 11:4,18,19
12:10 13:11,13
132:17 184:16,23
**Lindacarol** 27:21
**Linda's** 13:13
**line** 83:4 132:19
188:7 189:4 190:4
**lines** 104:12
**Lion** 30:18,19
**list** 143:5 184:17
**listed** 31:21 40:22
**literally** 9:5 32:10
50:5 93:25 94:2
137:7
**litigation** 31:4 32:14
32:17,19 37:8,11
88:15 93:7
**little** 23:10 81:17
101:3 137:24
152:3
**LITTLER** 2:11
**live** 16:6 122:2
**Lo** 156:7
**located** 28:19 34:2
129:18
**location** 143:6
**locked** 42:20
**logo** 129:6 188:12
**long** 6:18 16:9 34:4
34:7 36:7 49:12
51:19 63:11 71:10
104:21 105:25
111:17 119:5
155:8 156:5
184:11,20
**longer** 34:9 60:15
95:18 102:23
104:4 117:8 122:2

125:7 138:18
139:13
**long-term** 150:5,14
151:24 159:6
188:21
**look** 26:4,12 44:3
57:4 62:15 66:7
85:14 89:10
109:21 110:4
111:18 114:21
115:2 120:5
124:21 128:7
136:2 139:18
144:13 148:21
149:3 151:21
154:8 160:2 164:2
164:25 181:12,15
181:20 183:18
**looked** 6:21,21,22
6:23,25 91:14
114:2 140:4
154:19 176:5,11
184:17,24
**looking** 61:10 62:17
72:6 113:25
114:22 115:5
120:4 131:19
134:6 135:12
161:21 174:4
184:12,20
**looks** 29:19 50:21
50:25 77:3 140:14
149:4
**lost** 77:23 105:24
167:24
**lot** 6:13 19:8 90:6,7
90:10 112:22
166:19
**Lou** 45:23 51:16,20
51:24
**love** 70:11
**Lowe's** 73:23
115:16,23 116:21
**ludicrous** 9:6,7
**lump** 110:19 111:13
160:24
**L-i-n-d-a-c-a-r-o-l**
27:24
**L.L.P** 1:16 2:4

——————————
**M**

**M** 129:6,16,16,18
188:12
**making** 33:4 57:21
58:2 77:2 144:9
145:23 169:25
**managed** 30:20
**management** 37:14
37:15 80:13 86:13
86:22

managers 39:16
Manual 58:15
March 49:18 54:22
54:23 150:23
151:2 155:2 189:5
Marchioli 155:3
189:6
mark 25:22 127:23
129:3 140:18
150:2 152:15
154:24 159:11
162:17 163:10
165:11 166:6
169:3 172:12,21
177:19 182:12,17
marked 7:6 25:25
26:3 40:25 95:14
107:15 128:3,6
129:7,9 134:5
140:21,25 141:5,9
150:6,11 152:18
152:20 155:4
159:14,19,20
162:20,25 163:4
163:14,18,20
165:14,16 166:9
166:11 172:24
173:3,5 177:22,24
182:16,20
market 11:16 137:5
184:6
marketing 82:25
marriage 187:16
married 27:21
match 118:13
math 146:8
matter 6:9 24:9 44:7
82:10 98:17 99:2,4
187:17
matters 101:10
mean 14:25 15:21
18:20 19:19 22:16
22:18,19 38:9 40:3
42:8 59:3 67:10
71:22 72:5,22
73:15 74:8 76:14
84:13 89:19 90:5
92:22 93:25 98:6
101:5,5 102:12
103:22 104:2,5,14
104:15 108:5
110:15 112:3
114:25 123:5
124:15 125:14
134:12 136:22
137:7,23 139:12
140:5 151:12
160:21 162:10,10
166:19 169:24
177:7,8 180:10

meaning 56:2 67:14
74:17 96:23
means 59:4 64:13
72:9 74:20 76:15
91:14 107:5
144:20
meant 30:20
medical 12:12 118:3
154:10
medication 5:3
meet 83:24
meeting 80:22 84:3
86:6 87:3 88:12
127:17
meetings 86:8 87:11
memo 84:22 85:12
memory 42:24 43:6
43:11 48:20 49:17
52:4 54:3 55:23
57:25 96:24
103:22,22 113:22
114:15 118:23,25
119:3 137:4,17
140:4 149:22
171:19 177:7,8
181:14 183:17
184:22
MENDELSON 2:11
mentioned 10:7
15:8 42:4 87:16
120:6 136:25
168:4 174:2
mess 47:25
met 80:24 81:2 84:2
86:11,14,17
MetLife 135:12
139:21
Michael 2:16 39:15
middle 164:25
mid-eighties 31:11
Mike 35:10 36:16
37:5,8,20 38:2,13
38:14 39:21 41:19
42:8,12,23,24,24
42:25 43:6,10,12
43:15 45:13 46:10
54:6 78:12 82:8
million 33:2 131:6
mind 54:20 104:8
139:17 156:15
172:20
minute 12:8 15:14
42:17 125:14
minutes 94:6
Miracles 151:8
misrepresentation
147:3
missed 3:12
missing 26:22
mistaken 23:14

mistakenly 23:13
modification 110:23
moment 7:18 70:7
97:22
Monday 76:17
money 124:5 139:3
139:9
monster.com 115:2
Monterey 3:8
month 87:3 124:13
133:8
months 34:11,20
111:2 162:5
Moore 3:8 15:22
morning 94:12
146:9 148:11
mortgage 130:25
131:7,12
motion 67:15
move 46:16,18
137:11 139:2
148:4 160:18
161:13 183:14
moved 15:9,18
27:15,16 29:20
43:3 130:19
156:22 161:4,6
183:16
moving 169:15
mow 32:25 33:2
mowed 96:12
mowing 32:25
multiple 103:7
108:15
mutual 127:12
myriad 77:18 93:22

_____

**N**

N 2:2 3:2 188:2
189:2 190:2
Nail 1:7,15 3:1,7,11
4:1 5:1 6:1 7:1 8:1
9:1 10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1,25 26:1 27:1
28:1 29:1,14 30:1
31:1,24 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1

64:1 65:1 66:1
67:1,18 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1,24 122:1
123:1 124:1 125:1
126:1 127:1 128:1
128:5 129:1 130:1
131:1 132:1 133:1
134:1 135:1,14
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1,3
156:1 157:1 158:1
159:1 160:1 161:1
162:1,20,24 163:1
163:13,17 164:1
165:1 166:1 167:1
167:10 168:1,24
169:1 170:1 171:1
172:1 173:1 174:1
174:11 175:1
176:1,3 177:1
178:1 179:1,15
180:1 181:1,19
182:1 183:1 184:1
185:1 186:1,12
187:10 188:4,8
189:6,12,14,16,19
name 3:6,12 8:9
17:9 45:22 78:19
78:25,25 128:13
136:12,14 161:6
166:19
named 48:21
names 81:3 88:4
139:21
narrow 38:15 97:5
nature 6:16 10:20
17:21
near 129:20

need 13:7 43:13
47:24 62:25 94:15
132:6 138:16
139:2 142:10
155:17 156:3,13
156:14 167:4
needed 22:21,22
60:15 78:15 94:13
95:18 102:23
104:4 139:11,12
143:15
needing 103:10
needs 97:9
negotiate 40:7 46:16
46:23 47:20 89:8
negotiated 21:24
negotiating 33:5
negotiations 185:2
Neither 146:22,23
Nelson 155:2 189:5
never 51:10 74:24
104:7,11 116:13
116:13 118:8,10
118:19,21,22
121:2 131:6
139:17 153:5,16
new 1:2,17,17,20,24
1:24 2:15,15 14:4
14:9 21:3,9 29:5
35:3,5,8 48:25
49:19,25 50:3
52:20 122:18
131:8 171:25
177:13 187:3,8
Nichols 1:19 187:7
187:23
night 20:20,23
21:11,14 23:11
24:6 126:22
137:25 178:23
nighttime 73:7
nonattorneys 30:22
noncompete 65:4
110:24 111:16
nonconfidential
158:17 175:23
nonlegal 73:8
nonverbal 5:23
Nope 70:8
North 15:24 16:3,6
27:6,12 28:24
29:18 116:7 122:7
129:20 131:10,11
135:8 136:20
143:4,12 160:12
177:5,21 178:5
181:6 190:8
Nos 163:18 189:19
Notary 1:20 3:3
187:7

**note** 21:19 54:18
170:14
**noted** 149:11 185:5
**notes** 7:4 170:2,6
171:21
**notice** 1:18 69:5
84:21 85:2,2,5
95:15
**notification** 122:25
**notified** 60:15
123:13
**November** 129:24
163:12 165:14
189:16,22
**Ns** 45:24
**number** 13:25 14:4
14:4,6,8,9,14,16
14:18,22 45:17
65:2 82:21 125:21
130:20 140:5,7,11
148:22 152:6
153:24 165:2
**numbers** 152:12
166:19 173:8
**numerous** 51:25
79:2,2,2 103:5
**nurse** 13:13
**nutshell** 142:25

———————
**O**
**oath** 4:5,15
**object** 29:22 101:2
104:10
**objection** 23:4 57:16
57:22 58:22 59:12
59:18 60:21 61:4
62:12 63:4,22
65:10 67:21 68:3
68:19 71:23 74:19
75:20,25 105:2
106:6 107:10
110:8 115:9
119:10 120:23
123:21 139:6
145:3 147:15
151:18 153:22
156:19 170:21
171:3 181:10,21
**objections** 6:13
**obligation** 62:22,24
65:8 70:3 111:2,15
179:3,6
**obligations** 62:6,9
63:15,19 64:21
104:24 110:24
111:14
**observations** 31:19
**obtain** 116:9 125:10
125:20 138:16
**obtained** 179:22

**184:4
**obvious** 104:16
180:10
**obviously** 64:5
98:25 113:5
151:12
**occasions** 20:17
**occupation** 66:19
67:10,10,12,14
73:8
**occurred** 52:7 103:2
132:15
**October** 117:22
121:10,15,17,19
121:20,22 122:17
122:20 123:6,6,20
124:5,17,22
125:13,15,17
**odd** 140:9
**offer** 84:8 116:4
141:8,17 144:2,8
172:7,8 188:19
**offered** 115:23,25
**offering** 111:6,20,22
**office** 42:13,19,20
42:21 43:5,12
78:14 81:15,16
82:20,22 83:16
85:19 87:21 88:13
91:9 93:5,9 94:6,8
94:14,16,18,22
116:6 156:10
182:20 183:19
184:9 190:13
**offices** 1:16
**oh** 25:20 26:16
92:11 95:6 112:15
116:24 118:16
134:17 149:21
172:5,5,5,6
**Ohio** 2:8
**OK** 4:12 15:6 17:4
23:9 25:18,21
36:14 38:16 48:11
50:11 60:25 61:9
62:2 63:7,18 64:3
64:25 69:6 71:13
77:7,9,12 78:6
81:5 89:13 94:20
97:20 98:11,20
99:6,9 113:20,23
115:15 121:10,22
124:21 136:24
139:10 140:3
142:12 143:25
149:17 151:15
152:14 160:7
166:5 168:15
174:4,7 180:9
183:4

**old** 14:5,8 133:21
**once** 3:20 60:9,14
62:21 103:14
137:16 153:21
168:4
**ones** 91:9
**One's** 176:17
**one-page** 154:25
162:18,23 163:11
163:15 182:18
189:5,11,13,15,18
190:12
**ongoing** 14:12 22:22
88:14,16
**open** 88:17 116:4
135:11
**opened** 44:3
**opinion** 38:2 65:7
65:15,20 75:7
112:12
**opportunity** 144:18
171:8
**opposed** 5:23
**Option** 150:10,19
188:23
**options** 150:20
152:17,21 159:5
188:25
**orally** 105:8
**order** 164:18
**ordinary** 73:16
**organizations** 53:5
**original** 184:3
**outcome** 187:17
**outline** 165:7
**outside** 74:17 80:19
101:25 126:23
**outstanding** 116:4
**Overly** 6:11
**overnight** 121:25
**oversee** 79:12
**owned** 51:7

———————
**P**
**P** 2:2,2
**pack** 161:13
**package** 93:16
140:8 147:5
**packed** 15:17
**packet** 134:7
**page** 41:10 57:5
133:5 134:15
135:12,18 136:4
139:21,22,23,23
139:25 140:3,11
142:20 151:21
157:14 158:9
160:3,6 164:3
165:25 166:5
173:18 174:14

**175:9 181:15
183:2 186:7 188:3
188:7 189:4 190:4
**pages** 140:15 165:17
165:20
**paid** 14:20 71:10
72:19 118:3
124:19 138:6
153:11 160:3,8,14
160:17
**paper** 98:16 133:21
**papers** 182:7
**paragraph** 57:6
58:3 59:22 60:13
61:10 62:15,20
65:24 66:9,17 67:3
67:5,6,8 68:18
69:7,14,20,24,24
70:12 71:17 73:25
76:12 110:18,22
110:24 111:10,18
124:22 161:22
172:4
**paragraphs** 111:8
**Paralegal** 79:9
**Paramount** 1:4 3:14
7:2 8:19,24 31:24
32:8,9 35:13,14,19
35:21 41:2,3 42:5
45:20 48:5 51:3
58:7,10,12,14,15
58:18 59:3,5,7
64:7,18,18,22
67:16 70:15 71:22
72:10 74:3 76:6,9
76:14 84:10 86:23
88:23 89:4,5 96:16
96:19,22 97:16
98:13,22 100:6,18
101:22 102:3,17
104:20,25 105:18
105:21 106:2,9,16
106:19 108:12
110:7 111:5
113:10 118:20
121:12 122:4,11
122:14 125:9,19
127:2 128:2,9
132:7 138:6,19,23
162:9 165:3,5
168:16,20 173:14
174:2,6 176:22
188:9
**Paramount's** 26:17
**Parish** 8:10 10:6,15
25:16 143:8
**park** 1:17 48:5 59:5
67:15 76:18 86:16
86:23 89:5 100:18
118:16,20,21

**parks** 1:4 3:14 8:19
8:24 31:25 32:8,9
33:2 35:13,15
39:16 41:2,4 45:20
78:15 96:22 127:2
128:2,9 132:7
173:14 174:3
188:10
**part** 4:6 12:6 32:18
33:6 56:21 66:18
73:24 139:9,24
159:6
**partially** 140:9
**participant** 150:16
**participate** 37:15
93:11,11,12
118:12
**participated** 77:15
**participating** 77:18
79:5
**particular** 38:6,23
54:11 101:9
111:20 131:19
169:5,21 184:13
**parties** 187:15
**parts** 169:16
**party** 68:15
**pass** 118:16,21
**passing** 53:9
**paste** 70:2
**Pat** 48:20,25
**pay** 70:10 111:12,22
117:4,8,14 121:12
122:21,25 123:13
138:19,23 152:25
**paycheck** 123:19
124:8
**paychecks** 124:3
130:13
**paying** 71:14 104:21
**payment** 110:19
117:21 163:6
164:9,10
**payments** 112:5
133:19 134:3
138:12 162:11
164:5
**payroll** 166:14,16
166:24
**people** 38:12 78:10
80:21 81:2 82:22
82:25 83:14 93:15
115:3 127:12
**percent** 13:21
133:25 136:22
144:23 145:6
149:5
**percentage** 145:5
**perform** 70:4,22
71:12 72:25 73:13

**performance**
151:22,23 159:5,6
**period** 12:17 16:8
18:20 51:19 59:15
78:4 88:8 99:14
119:16 147:21
151:17
**periods** 58:8,8
**Perl** 30:13
**permission** 143:11
**permit** 183:22,24
184:4,10
**person** 35:8 78:21
93:5 132:6 161:9
**personal** 9:25 31:19
56:22 68:9 89:17
89:22 90:9,25
97:18 120:19,21
**personally** 24:16
31:4 94:17
**Personnel** 58:15
**pertain** 64:15
**pertaining** 37:12
**pertains** 62:16
**pertinent** 169:18
**Peter** 81:10,15,18
81:22 82:2,3,19,23
83:2
**Petit** 78:13
**phone** 11:22 37:11
45:10 90:7 92:25
93:19 94:24 103:6
**physical** 52:7
**physically** 44:3
**Ph.D** 20:7
**pick** 96:11
**picked** 94:17
**picture** 67:15
**piece** 98:15
**pinpoint** 114:24
**place** 12:18 15:5
**plaintiff** 1:5 2:5 6:12
**Plaintiff's** 25:22,24
26:4 127:23,25
128:6 129:3,5,10
140:20,23 141:3,7
150:4,9 152:16
154:25 159:12,17
162:18,23 163:11
163:15 165:12
166:7 172:23
173:2 177:20
182:13,18 188:7
189:4 190:4
**plan** 150:16 154:21
**plans** 19:4 114:17
114:20 153:14
154:17
**pleasant** 88:12
**please** 3:5 13:15

129:14 172:13
**plus** 163:17 189:19
**point** 8:15 9:13,16
9:16 11:25 18:11
18:16 20:14 33:20
34:24 35:23 36:24
37:10,21 39:8,10
40:2 42:9 43:3
45:3 82:19 85:20
90:2,14 91:3 92:10
93:24 95:4 96:25
102:20,22 104:23
106:12 107:9
108:18,18 113:4,6
114:20,22 117:3,7
117:11,14,20
122:10,13,17
135:7 139:23
156:24 173:25
177:4
**pointless** 94:7
**points** 90:2
**policies** 58:14
130:22
**policy** 58:15 130:23
**politics** 167:20
**porch** 11:11
**portion** 97:7 105:6
105:15 152:25
153:12,13 157:8
158:17 175:23
**portions** 23:18
**position** 17:23 26:18
30:3 34:24 35:19
36:19 51:3 63:14
66:20 80:2 81:20
92:10,12 115:23
115:25 116:12
142:23 143:2,23
168:17
**positions** 26:19,20
28:16 30:4 55:5
58:10 116:19
**positive** 12:10
**possession** 42:11,25
43:18,25
**possible** 37:25 79:19
**possibly** 8:8 45:15
49:18 78:24 85:14
105:3
**post** 63:15 65:8 75:5
**postclosing** 82:14
89:22,24
**postemployment**
168:3,22
**postoffer** 81:13
**posttermination**
65:16 66:21
**posttransaction**
86:3

**potential** 17:16
77:19 82:14 146:5
**potentially** 47:2
138:7,23
**PPI** 17:7 19:16
24:12 33:10 35:13
36:2 38:24 39:7,14
40:14 41:3,7,13,16
42:16 43:21 51:7
52:23 56:9 60:15
69:21 70:5 71:9,11
71:12 77:6,10,11
77:21,25 78:5,9,12
79:6,14,19 80:2,5
84:5,23 88:20 96:5
98:2,6 99:10,19
100:22 111:21
112:2,9 117:3
123:18 125:8
126:2,4 144:12
145:16,25 146:4
147:6 153:3,8,9,25
154:3,9 155:17,21
156:8,9,10,13,17
163:7,23 167:16
176:4 180:25
**PPI's** 112:12 153:14
**practice** 28:11 30:2
30:5,6,8,12 116:4
**practiced** 143:6
**practices** 58:9
**pre** 81:12 89:22
**preclosing** 78:2,4
80:5 81:13 88:8
89:16,23
**preclude** 148:4
**preexisting** 183:12
183:13
**preface** 154:4
**premerger** 19:9
**preparation** 6:20
7:17
**prepare** 26:9
**presale** 77:21
**prescription** 5:9
**present** 12:4 89:9
99:19 107:19
113:12,15
**presentation** 77:19
80:12,13 86:13,15
86:22,23
**presentations** 87:5,8
**presented** 46:24
48:6
**presenting** 47:9
**president** 23:5
30:19 32:3 73:2
74:7
**presidents** 37:17
**president/general**

73:13,17
**pretty** 82:23
**previous** 27:2 92:18
136:3
**previously** 35:18
40:25 41:17 95:14
134:5
**pre-Cedar** 19:9
**price** 151:4,4,10,13
**primary** 62:22 70:3
**printed** 128:13
139:20
**printing** 139:20
140:6
**prior** 27:9 39:3,25
57:21 61:15,18
72:13,14 79:18
95:10 100:6 102:9
102:18 125:13
145:19 162:8
184:20
**private** 30:6
**privilege** 157:5
**privileged** 6:13
**probably** 39:20 44:3
54:4 69:2 88:17
93:3 94:23 103:24
119:4 120:15
123:10,17 124:11
124:12 127:10,12
143:20 144:14
146:5 149:10
152:8 154:14
**problem** 74:8 99:15
100:8
**problems** 5:17
**proceed** 147:21
148:19
**proceeding** 31:7
**process** 42:15 82:21
115:5 116:7
134:23 176:4
**produce** 179:23,25
**produced** 6:24 7:2
159:3,9 168:25
170:7,8 178:9
**producing** 178:22
**professional** 1:19
2:12 88:11 90:18
**professionally** 90:19
104:16
**program** 150:6,14
151:24 159:7
188:21
**prohibit** 73:7
**promoted** 41:20
**promotion** 23:8
**properly** 31:17
**proposal** 109:23
114:4 120:7

**proposing** 110:7
**provided** 14:15,22
110:21 117:21
118:16,17 134:11
152:5,12 179:19
180:3
**providers** 14:8
**providing** 71:15
179:7
**provision** 69:5,16
74:16,25 75:3,19
**provisions** 18:12
23:18 54:11 68:22
92:14 96:7
**Public** 1:20 3:3
187:7
**pull** 179:3
**pulled** 178:12,17,22
**purchase** 84:7
177:13 182:23
184:21
**purchased** 183:6,15
183:21 184:12,19
**purchasers** 77:20
**purported** 140:21
141:8 188:13,19
**purpose** 19:2 21:16
45:16 67:24
**pursuant** 1:17 67:17
69:23 117:4
134:12 138:9
152:10 178:9
**pursued** 116:13
**push** 49:21
**put** 11:10,15 38:25
43:4 117:13
125:12 137:5
179:17
**P-a-r-i-s-h** 8:10
**p.m** 1:10 69:10,11
103:12 119:24,25
167:7,8 185:5

―――――――――

**Q**

**Quarry** 129:19
**question** 4:21 6:10
21:20,21 34:14
37:4 38:8,19 48:12
48:14 56:5 58:16
61:20,25 71:7
72:21 74:22,23
76:3 97:2,6,21
98:2 99:16,17
105:4,9,25 106:23
107:7 112:6
119:19 120:5
126:16 138:21,22
139:3,8,16 146:22
146:23 147:9,10
165:19 166:22

169:4,17 170:22
174:9 180:2,12
184:18
**questions** 4:4,9,11
4:16,17 13:6 22:5
29:23 55:25 77:18
93:17 96:18
147:14,19 148:14
185:3
**quick** 119:21 167:5
**quicker** 133:12
**quickly** 6:3 143:3
**quit** 133:13
**quite** 9:5 14:6 47:7
48:18 78:22 126:5
155:7
**quote** 111:20,21

**R**

**R** 1:18 2:2 3:2 25:19
187:2,7,23
**raise** 149:5,6
**ran** 99:12 138:12
**read** 48:13 53:25
54:3 58:4 62:20
65:22 66:25 67:13
69:19 73:15 75:13
96:4 97:6,7 105:4
105:6,13,15
111:17 112:10
113:2 164:20,22
166:18 186:4
**reading** 150:25
**reads** 125:3 128:18
128:22 150:18
**ready** 8:24 22:15,16
23:17,22 63:11
70:4 99:24 110:20
111:11,21 113:2
161:14
**real** 6:3 137:14
143:3 167:5
182:14 184:14,15
190:10
**really** 13:9 84:20
94:7 112:22
**reason** 4:24 13:22
44:22 47:8 54:19
74:9 130:6 131:16
137:9,12 155:6,7
160:22 161:18
166:15,21,23,25
173:15 180:15
**reasonable** 58:8
**reasons** 125:21
153:24 154:14
155:14
**recall** 3:22 7:3,16,18
10:11 11:6 13:6
16:9,14,19 17:3,10

19:7,25 20:8 21:4
33:9 34:8 35:25
37:25 38:3 39:10
42:8 52:12,16,22
53:8 55:8 56:25
57:24 76:5 80:10
80:22 81:3 82:10
82:17 83:6,17
84:25 85:21,24
86:4 87:3,11,13
88:3,6,24 89:16,18
89:18,20 90:16,17
90:18 91:20,20
92:8,11,18 95:9
100:7 101:12
103:12 104:15
108:10,22 110:2,4
115:6 116:18
121:14 127:16,16
128:11 130:17
143:18 144:25
169:25 170:22
171:2 172:10,11
176:5 180:17,18
184:11
**recalling** 95:12
171:5
**receipt** 132:16 165:8
**receive** 49:16 95:22
107:18 117:4
119:7 121:19
124:5 149:6 159:8
162:11 164:14,18
179:11
**received** 13:18
17:13,20 20:22
22:8 45:3,10 46:2
47:17 48:20 49:7
49:11 52:7,11,21
52:24,25 56:7
92:16,25 96:2,10
99:8 102:5 106:10
107:21 114:16
117:10 119:12
121:14 123:4,8,17
129:11 130:3,7
132:11,12 134:8
137:5 140:2 145:2
145:10 149:5
160:10 163:6,23
164:5,9 166:12,24
173:7,14,18
**receiving** 57:21
101:8 102:18
107:20 110:3,5
112:4,23 113:15
117:8 119:19
132:22 138:19,22
139:4 149:15
172:7 180:17,18

**recess** 69:10 119:24
167:7
**recognize** 50:22
131:4 140:6
159:24 160:22
179:20 180:9,12
**recognized** 126:24
**recollected** 83:12
**recollection** 10:24
38:4,23 55:11,16
82:9 96:17 103:9
107:19 108:7
113:12,16 128:25
134:21 135:3
149:9 152:4
160:17,20 171:14
181:4 183:6
**reconvene** 148:11
**record** 3:6 4:10 7:5
26:25 48:8 58:4
82:2 86:21 88:11
97:7 105:6,15
129:14 142:11
147:18 148:7,25
151:3 166:12
173:6 179:10,12
187:13
**records** 178:2
**recover** 110:23
**recruiter** 115:21
**recruiters** 115:20
**REDACTED** 1:12
**refer** 95:13 108:20
120:3,9 134:5
**reference** 7:8 100:4
100:23 101:4,8
134:17,20 143:11
172:3
**referenced** 101:6,19
**references** 99:20
100:9,11 169:18
169:21
**referencing** 111:10
**referral** 17:25
167:11
**referred** 15:4 63:9
109:14
**referring** 60:11 64:6
86:22
**refers** 64:14
**reflect** 88:14 133:6
150:24 163:5
178:3
**reflected** 26:20
27:25 123:18
142:15 144:6
152:6
**reflects** 133:7
150:13 152:2
160:13,14 173:18

**refresh** 181:4
**refreshed** 48:20
**regarding** 9:19 10:2
17:16 24:11 47:16
50:17 54:9,10
55:25 56:16 79:19
86:24 89:16,21
92:9,19 95:8 96:19
96:23 102:10
103:10 108:12
148:23 168:21
170:3,19 171:6
**regardless** 60:4
61:22
**regards** 90:9
**Registered** 1:19
**registration** 181:13
**regular** 124:2
**rehash** 108:13
**reimbursement**
159:18,22 189:10
**Rein** 125:15 126:10
126:14,18,21,23
126:25 127:21
**rejected** 134:2
**relate** 159:21 182:23
**related** 8:23 14:10
47:9 81:9 86:24
149:24 174:11
187:15
**relates** 68:25 74:6
157:9
**relating** 30:5
**relay** 16:25
**release** 164:18
165:13,18 189:21
**relevance** 148:17
**relevancy** 29:22
57:22 106:6 115:9
120:23 123:21
139:6 145:3
**relevant** 146:16,20
146:23 147:7,14
148:14 178:18,19
**relocation** 145:10
149:24 159:22,22
160:11 161:7,9,25
162:5 181:25
182:3,3,7
**remainder** 63:13
**remained** 137:2
**remember** 6:16 11:2
11:3,9 15:6,9,17
16:2,4 18:5,21,24
18:24 32:10 33:4,5
42:10 46:5 49:3
51:23,25 78:11,18
78:24 80:11,15
82:18 84:16,20,23
84:24 87:7 88:12

88:25 89:24 92:21
93:10 94:12
107:23,24 112:18
112:19,20,21,22
112:23 113:17
115:22 116:20,22
118:24 119:12
130:17 137:22
140:7 142:24
143:18 145:5
149:15,16,23,25
154:7 171:18,24
172:3 177:9,16,18
181:2
**remembering** 94:11
119:16 177:9
**reminded** 4:8
**render** 63:12 110:21
125:7
**renewal** 48:24
**repay** 161:22
**repeat** 112:6 126:16
**rephrase** 50:8 59:19
59:20 61:9
**report** 33:22 49:19
79:11 159:13
189:8
**reported** 30:23
42:23
**reporter** 1:19 3:5
4:8 5:22
**reporting** 1:23 35:3
**reports** 79:8
**represent** 107:25
129:10 152:11
165:5 177:25
**represented** 14:11
**representing** 3:13
**request** 71:12
134:12 171:7
**requested** 178:11,14
**requests** 178:10,15
178:25
**require** 28:16
**required** 4:4 161:22
**requirement** 110:20
111:21
**requires** 125:23
**reread** 53:25
**research** 19:12,13
**reserve** 172:14
**reside** 27:10
**residences** 27:14,15
**resolve** 14:13
**respect** 8:22 19:7
20:2,4 33:8 37:22
37:23 38:17 39:6
40:5 46:13 55:4
56:22 58:17,21,25
64:21 77:13 78:9

79:25 82:13 83:17
88:22 89:4 92:8
96:13 98:23 100:3
101:22 102:4,8
111:6 118:20
121:8 130:18
134:7,22 149:5
168:2,7 177:12
178:4
**respond** 96:13 113:8
114:12 171:9
**responding** 113:13
**response** 9:4 100:18
178:25
**responses** 4:10,11
5:21,22,24
**responsibilities** 33:7
35:21
**responsibility** 37:18
79:13
**responsive** 48:15
**rest** 169:16
**restate** 71:7
**restaurant** 126:23
**restriction** 97:9
**result** 64:19 133:2
**retain** 18:6 46:6
**retained** 32:16
**retention** 163:6,22
164:6,14 165:8
**return** 147:6
**reversal** 123:14
131:20 132:5
133:2
**reversed** 117:12
123:18 132:21
**review** 6:19 25:14
32:20 44:5 46:6
53:21 103:20
114:3 171:7
172:15 176:19
**Reviewed** 7:4
**reviewing** 7:3,17
**revoked** 29:12
**Rhonda** 8:10 10:6
10:15 25:19,20
143:8 156:5,7,12
156:12
**ride** 33:3
**right** 14:13,18 15:25
34:18,18 44:9,12
54:3 56:22 70:15
70:21,25 71:9,11
71:14 75:9 98:18
100:13 102:15
103:11 104:20
105:12 108:8
111:25 115:22
130:16 132:14
136:5 151:3 161:2

172:14 176:13,15
177:6,10 181:3
183:14,25
**role** 39:23 40:5
52:18 73:2 76:6,7
77:13 89:3,4 93:4
**room** 91:10
**roundabout** 79:21
103:24
**run** 66:13
**runs** 60:3
**résumé** 25:25 26:8,9
29:19 31:20 188:8

──────────

**S**

**S** 2:2,9 3:2 188:6
189:3 190:3
**safe** 28:15 162:7
**Salaried** 152:17
188:25
**salary** 57:19 63:10
144:8,23
**sale** 16:3 42:15
43:21,23 47:10
77:10 86:25 163:7
163:23 177:4
182:10 183:20
**Salisbury** 27:11
**Salisbury/Granite**
129:19
**sanctioned** 29:11
**Sanders** 1:16 2:4
3:13
**Sandy** 7:12 10:25
11:2,7,18,18,24
12:2,11,11 13:8,17
13:23 14:15 15:2,4
16:15,23 17:2
108:17,23 109:13
109:18 119:2
134:9,16,20,22
**sat** 3:14 170:15
**satisfied** 172:2
**save** 141:22
**saves** 125:3
**savings** 131:17
**saw** 151:5 184:23
**saying** 43:6 55:8
59:21 68:5 73:5
90:9 94:13,24
99:12 112:9 125:6
153:10 154:4
**says** 50:25 60:12
63:10 64:10 67:12
72:9 73:11,25
95:17 99:18
110:18 111:25
135:13 160:3,8,24
181:19 183:19,22
**scenario** 92:22

**scheme** 66:24
**school** 28:5 96:11
138:3
**second** 20:21 108:18
124:22 164:2
165:25 166:3
173:18 179:17
**section** 22:14,16
**secured** 124:25
**see** 26:16 42:7 66:10
71:3 85:18 89:10
112:15 118:14
131:20 132:17
149:18,19,21
154:16 156:3
160:24 169:17
171:21 181:25
**seeing** 38:23 107:24
**seek** 111:23 114:18
**seen** 9:12 43:16
**sell** 137:10
**selling** 155:15
**sells** 182:4
**send** 85:4,13,14
**sending** 21:18 94:25
**senior** 37:13,17
38:12 73:2,12,17
74:7 77:18
**sense** 65:21,24
66:24 67:4 75:13
**sent** 103:19 114:6
124:11
**sentence** 60:10,11
60:12 68:21
111:19 112:9
**separate** 157:15
158:10 174:15
175:10
**separation** 24:12
**September** 109:22
110:12 114:17,23
**seriously** 23:13
156:21
**served** 17:12 35:17
**services** 58:11,17
59:2,6 60:15 63:12
69:15 70:4,23 71:9
71:12,21 72:19,25
73:10,11,14,16
74:8,11,16,25 75:3
75:18,22 95:18
101:23 102:4,10
102:17,23 103:10
104:3,8,21 105:21
106:3,10 110:21
125:7 126:2,4
162:13
**serving** 35:8
**set** 66:17 110:11
112:25 113:25

123:10 147:22,25
187:11,19
**setting** 112:24 116:5
**settlement** 21:24
**seven** 148:6
**severance** 93:16
**shaking** 5:23
**share** 9:9,18 23:21
23:25 24:11,17,22
24:23
**shared** 88:16 121:2
**shares** 151:23 159:5
**shocked** 137:6 154:2
**shoe** 76:22
**shoes** 64:9
**shook** 86:17
**short** 6:11 16:8
47:14 184:17
**shorter** 59:22
**shortly** 36:3 45:18
84:6 91:23 95:2
109:7 155:11
**show** 9:15 101:13
**showed** 101:18
**shown** 186:7
**shows** 131:20
**shut** 82:21
**side** 80:10 84:12
87:19 108:4
**sign** 41:17 44:11
46:4,16,18 136:14
142:20 164:17
**signature** 41:9
50:23 128:16
136:6,8 140:13,14
140:15 142:21
161:16 164:3
165:19 181:18,22
181:23 183:10
**signatures** 139:19
**signed** 40:14 41:13
46:3 47:17 50:21
51:11 53:2,22 54:2
54:7 56:2,7 136:3
136:13 144:5
161:19 165:23
166:2 176:12
177:3
**significant** 111:22
**similar** 90:5
**simple** 137:14
**Simpson** 30:11
**sister** 10:7 25:16
**sit** 94:7 146:7
**sitting** 11:22 48:19
80:11 119:11
167:2 169:20
171:5 172:17
177:6,10
**situation** 24:12 38:7

76:23 83:5,17
89:17,22 90:10,25
120:19,21 121:2
156:15 167:13
**situations** 38:14
168:21
**six** 76:17 111:2
**Sixth** 1:24
**sixty** 18:22
**skip** 11:5
**slash** 78:5
**slept** 53:25 54:4
**slowing** 161:10
**small** 27:24 29:16
81:23 127:4 131:2
**sold** 47:2 131:13,13
135:7 178:8 181:5
181:12,25 182:2,6
**somebody** 80:16
**somewhat** 67:13
**soon** 27:4
**sorry** 25:20 34:14
34:18 45:6 48:12
50:14 55:14 56:15
59:24 70:24 75:14
77:23 97:14 101:3
101:24 104:14
105:13,24 106:8
109:4 112:6 123:7
128:20 133:15
134:17 138:20
139:17 149:7,18
153:10 160:5
162:3 164:15
170:5 174:9 180:2
184:18
**sort** 32:21 79:22
**sounds** 68:11 164:11
**South** 2:7 3:7,8 27:2
27:17 28:24
122:18 129:22
130:19 131:8
156:22 177:13
182:15,24 183:7
190:10
**SOUTHERN** 1:2
**so-and-so** 127:11
**space** 43:4
**span** 49:12
**Spartanburg** 182:15
182:19 183:19
190:11,12
**speak** 20:17 144:15
**speaker** 84:4
**speakerphone** 82:7
**speaking** 15:23
**speaks** 57:17 62:13
62:23 63:23 145:4
**special** 149:12
**specific** 7:2 38:4,22

55:11,16 56:16
89:20 103:19
114:24 119:3
128:25 134:4,21
171:14
**specifically** 19:6
20:9,12 52:16 55:7
55:19,24 78:8
100:24 103:9
108:19
**specificity** 54:12
**specifics** 83:6 84:25
95:7
**split** 45:19
**spoke** 17:15 18:15
20:20 25:9 83:2,3
132:8
**spoken** 18:10
**sporting** 126:22
**spring** 34:10
**square** 181:9
**Squire** 1:16 2:4 3:13
**ss** 187:4
**stage** 116:14
**stamp** 140:25 141:5
141:13 149:20
188:16,18
**stamped** 139:24
**standard** 85:11
**standing** 126:21,23
**start** 46:12 98:12
100:14 115:3
141:19 164:15
184:10
**started** 17:23 32:3,7
33:11,17 34:11,12
34:16,20 35:2
41:21 114:22
126:7 148:5 184:8
**starting** 115:5
121:23 161:7
**starts** 30:3
**state** 1:20 3:5 28:11
28:17 29:4,17,20
29:20 90:23
120:24 165:18
182:14 187:3,8
190:10
**stated** 26:14 112:20
117:18
**statement** 63:17
123:17 124:12
129:16 130:4,10
131:19 132:11,25
**statements** 172:24
173:3,10 190:5,6
**states** 1:2 29:25 66:8
111:19 121:23
124:23 183:3
**status** 79:20 82:14

90:4,15 95:9
102:11 104:18
106:15
**stay** 16:11 36:7
90:24 91:4,15
138:18 155:9
164:13,17
**stayed** 36:9 37:7
94:22 137:19
**staying** 91:25
164:21
**steps** 23:7 64:8
**stipulate** 68:7,12
**stock** 77:11 150:10
150:19,20 151:17
159:5 188:23
**stocker** 73:22
**stop** 71:14 100:7
148:15 155:18
169:7
**stopped** 117:15
122:22
**story** 146:12
**strategy** 147:12
**Street** 2:7
**strike** 108:15
**stubs** 166:20
**stuck** 81:15
**Studios** 35:19,21
**stuff** 22:22
**subject** 11:6 24:19
82:10,12 84:20,23
98:16 99:2,4
101:10 186:6
**subjects** 103:7
**submitted** 116:19
176:20
**subpoena** 152:10
**Subscribed** 186:16
**subsequent** 26:19
**subsidiary** 51:8,9
**substantive** 86:19
**successful** 22:4
165:2
**successor** 64:8,16
**successors** 93:22
**sued** 8:18
**SUFFOLK** 187:5
**suggest** 48:2 54:25
**suing** 17:8 22:7
**suit** 142:2
**Suite** 1:24
**sum** 110:19,23
111:13,22,24
160:24
**summary** 152:20
**summer** 45:15
**supply** 179:6
**supports** 111:8
**supposed** 5:14 91:21

119:17
**sure** 4:13 12:9 13:21
14:24 15:3 19:17
19:19 25:15 35:20
38:11 45:8,24
48:15 58:2 59:25
61:8 64:2,8,10,12
65:4 69:3,9 75:6
76:2 78:11 82:23
83:2,3 84:24 86:14
86:16 89:24,25
91:22 92:23,25
95:6 98:11 99:3
101:18,25 102:12
102:14 103:23
106:23 111:16
112:7,14 113:18
114:8,10,23 115:4
116:24 119:23
122:13 123:16,22
126:17 127:20
130:15,15 133:24
133:25 135:10
136:22 141:23
144:20 146:6
151:11 154:3,23
157:12 159:9
164:16,24 171:17
171:22 172:16
182:11
**surprise** 153:7,15
**surprised** 95:24
**suspect** 184:2,7
**suspended** 29:11
**sworn** 3:3 186:16
187:12

_____

**T**

**T** 3:2 187:2,2 188:6
189:3 190:3
**take** 4:9 5:13,14,22
13:15 20:6 26:4
57:4 69:8 80:25
92:22 109:21
116:3 119:21
124:21 128:7
148:3 170:2
184:15
**taken** 4:12 5:9 8:5
69:10 117:12
119:24 167:7
170:11
**taker** 170:14
**takes** 13:13
**talk** 13:23 19:4,4
77:9 81:23 84:5
98:22 99:7 127:4
132:6 161:9
167:22
**talked** 11:18 19:8

25:5,13 42:24
56:20 88:17 91:11
99:2,12,13 118:6
127:10 132:6
155:14 167:20
**talking** 41:21 55:14
78:2 84:14 98:15
98:18 100:12
101:10 115:3
116:14 143:19
176:8
**Tax** 159:13 189:8
**Taylor** 33:25 34:4
34:25 35:9 36:4,24
**telephone** 3:20
16:19 21:11
115:19
**television** 67:15
**tell** 8:2,17 11:24
18:15 20:4 21:13
24:14,19 26:12
32:6 39:22 41:15
50:20 56:8 60:8
70:11 88:7 89:14
91:6 102:24 103:2
103:3 113:7 125:9
125:19,22,23
126:9 133:4
136:14,24 141:21
142:25 143:20
147:11 152:3
155:19,24 157:9
168:15 176:15
177:2,6
**teller** 132:9
**tellers** 131:3 132:3
**telling** 93:13 171:24
**temporary** 27:15
**ten** 94:23 151:14
**tend** 138:4
**Tennessee** 28:14
29:8
**tentatively** 94:9
**ten-year** 151:17
**term** 54:23 57:7,12
58:12,19 59:9,15
59:22 60:3,18 61:2
61:11,21 62:18
63:13 66:9,16 71:5
74:9,20,24 75:2,24
**terminate** 70:16
93:21
**terminated** 14:3
60:4,9,14 61:14,16
61:23 62:5,21 63:8
69:17 71:8,19 72:2
72:14,15 95:4
105:22 106:4,16
106:17 107:2,13
117:9 162:4

167:16
**termination** 18:11
18:17 19:15 20:2
20:11,18 25:9
59:10,17 60:19
61:3 62:11,16
63:16,20 65:9 67:3
68:24 69:22 71:2
71:25 92:14 96:6
99:14 103:21
107:7 111:3,11
117:2
**terms** 8:23 54:16
61:17 75:7 85:8
89:7 100:11
**testified** 3:4 9:19
31:6 49:6 54:6
56:10,13,18 57:2
65:25 70:23 75:21
75:23 78:3 90:6
100:19 103:23
105:10 118:5
124:10 142:22
167:10 168:8
173:7
**testify** 4:25 5:4,11
5:15 6:8 24:8
31:13,14,18
**testifying** 10:12
**testimony** 54:8
83:12 113:12,14
170:24 186:4
187:13
**thank** 21:17 125:5
**theme** 67:15 76:18
**thereof** 98:23
**thing** 32:21 53:15
62:20 81:24
143:18 154:13,19
**things** 12:2 32:16
77:25 93:23 131:5
151:6 157:4
172:19 179:3
**think** 6:24 10:8,10
10:10 12:21 15:15
19:22 20:6 21:12
22:19 26:25 35:10
35:12 40:8 42:3,11
43:4,8 47:24 48:8
49:2 50:20 51:24
53:16,25 54:2 60:9
66:23 68:21 69:19
69:25 70:3 72:8
75:15 78:13,17
81:18 82:24 83:22
84:13 85:7,10,10
85:20 86:9,11
88:16,24 89:3
94:10 97:21 99:16
99:16 101:18

102:21 107:23
111:7 113:25
114:6,9 121:13,16
121:21 126:5
132:10,14,19
133:17 135:9
136:11,12 142:6
144:24 145:6
146:4 151:13
152:8 156:8
164:19,19 171:16
172:8 181:8,12,23
181:24 182:5
183:20 184:25
**thinking** 15:14
34:10 52:3 54:20
54:22 112:18
126:6 131:14
133:21 139:10
172:17
**thinks** 179:4
**third** 2:14 111:18
181:15
**Thirty** 18:22
**Thomas** 1:18 187:7
187:23
**Thompson** 7:14
**Thornton** 39:16
53:9 99:13 120:15
120:16,25 167:12
167:13,15,23
168:9
**Thornton's** 48:23
120:20
**thought** 23:13 51:19
52:5 55:17,20
119:5 140:8
153:24 154:8
155:16 171:10
**thousand** 117:24
**three** 11:14 21:6
29:25 34:11,19
87:9 143:5 155:13
**threw** 169:16
**till** 97:23 98:5 99:21
**Tim** 143:21,21,22
143:24
**time** 5:10 6:18 12:19
16:8 17:15 18:15
20:7 26:19 29:20
29:20 30:25 32:14
38:20,24 39:2,3,8
39:11 40:17 41:24
43:15,24 44:2,5
45:6,9 47:5,17
48:7 49:7,7,9,11
49:12,19,20 51:19
52:21,25 53:19
55:17 56:7,11 58:6
59:16 70:18 74:3,6

76:13,15 77:9 78:7
79:4 81:25 83:23
84:2 85:17,22
91:25 93:18,24
96:25 97:2,9,12
98:13 99:8,18
100:9 101:9
102:20 103:19
108:22 109:10,18
109:19 111:17
113:19 114:11,16
114:18 115:4
117:17 119:5,8,14
119:16 123:15
125:3,12 127:2
130:10 135:23
137:24 138:16
141:22 143:9
147:23,25 167:2
172:7 184:7,24
185:5
**timeline** 34:23 43:13
**times** 16:5 25:8
51:18 54:4 93:14
137:18 161:9
**tired** 132:13
**title** 35:2 182:14
190:10
**titled** 128:2,8 141:4
188:9,17
**titles** 32:11
**today** 3:15,17 4:15
4:25 8:5,7 10:12
97:23 98:5 99:22
102:19 170:16
172:17 178:22
179:25
**told** 8:4,6,18,21,23
10:8,16 11:24,25
17:21 22:6,10,10
22:12 23:6,25
25:15 79:24 80:7
95:9 96:4 101:21
102:2,9,10,16,19
104:23 105:8
109:12 123:9
125:15 126:13,18
127:15
**tomorrow** 8:8
147:20
**tonight** 147:20
167:2
**top** 128:8 165:18
**total** 160:4,8,14
**totality** 126:3
**touch** 91:23
**tour** 82:22 83:15
86:12
**town** 29:16 131:2
**transaction** 64:19

77:14 80:3 137:15
**transactions** 133:6
**transcript** 1:12
158:18 171:8,9
175:24 186:6
**transition** 77:25
89:13
**tried** 22:3 76:22
88:13
**triggered** 18:12
92:15
**triggering** 96:6
**trivia** 86:10
**true** 186:5 187:12
**truly** 37:10 42:10
90:21 113:21
**truthfully** 4:25
**try** 26:11 36:11
46:22 47:20 61:9
62:2 88:15 93:17
113:2
**trying** 14:12,13
34:23 59:25 60:16
72:8,17,22 78:13
98:9 103:8 113:19
124:6,16 137:24
161:12,13 181:9
**turn** 161:15
**turned** 91:14
**turns** 4:9 182:4
**twelve** 5:7 162:5
**two** 16:10 21:6
29:24 45:19,24
54:5 74:20 78:19
79:10 87:8,9,20,24
94:23 100:9
108:18 117:13,13
117:24 123:10
127:17 137:3,20
137:24 140:7
143:5 171:17,19
171:20 172:19
176:13 184:22
**Twofold** 21:17
**two-page** 25:24 26:5
182:13 188:8
190:9
**type** 6:6 19:24 21:24
21:24 31:11 32:23
53:15 74:13 84:21
116:5
**typical** 73:15 131:2

**U**

**Uh-huh** 31:2 138:25
149:13 178:7
181:17
**um** 13:25 18:19
49:20 126:6
131:14 139:23

143:22 164:19
167:25
**understand** 3:16 4:6
4:15,17 26:24 37:4
41:4 49:24 54:8
59:25 61:25 69:14
71:18 74:22 76:2
80:18 94:21 96:5
97:22 98:4 99:25
102:14 105:5
108:6 110:14
111:4 112:12 124:6
148:13,17 161:21
**understanding**
22:13 23:22 25:3
26:18 34:16 35:14
40:18 60:17 68:10
68:17 110:6,11
111:5,12 112:8
119:13 121:18
138:20 164:21
**understands** 75:24
**understood** 4:21
5:25
**unemployed** 139:13
**unemployment**
162:15
**unfolding** 170:12
**unhappy** 155:13
**UNITED** 1:2
**units** 32:20 151:23
159:6
**upcoming** 47:10
**update** 122:11,14
**updated** 143:10
**UPS** 121:25
**upset** 94:18
**up-to-date** 29:8
**use** 67:25 68:17 71:9
104:8,20 143:11

**V**

**vacation** 58:7
**vague** 54:17 55:5,17
67:5,5,8,13 68:21
74:10,21 76:20
82:8 90:19 104:16
104:17
**Vaguely** 85:7
**valuable** 151:7
**value** 151:24
**various** 78:14
**verbalize** 5:21
**verify** 13:10
**version** 26:8
**versus** 72:19 93:21
153:2,9,14
**Viacom** 45:19
**vice** 30:19 32:3
37:17 73:2,12,17

74:7
**violated** 9:2 17:24
70:10
**violation** 142:3
**virtually** 49:18
**visit** 83:18 87:22
**visited** 86:7
**voice** 131:4
**volunteered** 93:11
**VP** 38:13 39:21
42:19 43:14
**VPs** 84:5,10 86:6
91:8 118:17
**vs** 1:6

**W**

**wait** 15:14 138:11
**waiting** 115:13
**waive** 111:6,20
**waiver** 110:19
**walk** 111:13
**walked** 81:16 86:15
86:16
**walking** 11:21
**Wallace** 30:9
**Wal-Mart** 3:24 6:5
30:15 143:9 156:6
**Wanda** 25:15
**want** 6:3 19:23
26:12 43:7,14 68:6
68:9 69:23 70:6
71:4 75:6,7 102:13
108:13 137:10,10
148:4 154:9,11
156:17 179:11
**wanted** 21:9 54:20
70:22 84:21
110:16
**wanting** 118:25
161:10
**wants** 91:15
**warranty** 177:21
178:4 190:8
**wasn't** 61:6 85:21
97:25 113:2
118:14 126:6
137:14 154:3
164:21 178:11,14
**watching** 126:24
**water** 31:17
**way** 24:4 36:11 40:4
62:2 67:8 77:8
79:21,24 80:7 84:4
86:12 103:24
154:15 156:9
161:5 180:7,8
181:25 187:16
**ways** 156:6
**Weber** 2:16 10:9
17:5,6 18:10 20:9

20:18,25 22:2,25
23:4,6,10 24:5
25:2,6,16 29:22
39:15 41:22,22,23
44:13,20 46:11
47:8,15,16 51:20
53:2 54:10 56:11
57:16,22 58:22
59:12,18 60:21
61:4 62:12 63:4,22
65:10,12,18 67:21
68:3,11,19 71:4,23
72:12,14 74:19
75:20,25 78:12
91:18 96:25 97:21
98:4,9 99:15 100:8
101:2 104:10
105:2,7,12 106:6
107:10 110:8
115:9 119:10
120:23 123:21
124:10,14 125:2
125:11 126:11
139:6,16,22
141:21 142:4,8,12
145:3 146:10,15
146:21 147:8,13
147:18,25 148:12
151:18 153:22
156:19 157:7
170:21 171:3,7
173:20,22 174:10
178:9,14,18,24
179:5,9,23 181:10
181:20 183:25
**week** 15:13 16:10
22:20 124:12
137:3,20
**weekend** 137:21
**weeks** 21:6,6 87:9
93:23 94:23
**went** 85:12 93:18
96:11 124:7 127:3
127:13 146:24
156:7 177:9 184:8
184:25
**weren't** 66:2
**we'll** 23:9 94:25
141:22 147:19,22
147:25 148:6
174:10
**we're** 11:6 70:9
81:19 100:12
141:21 142:6
147:21 148:2
**we've** 173:5
**WHEREOF** 187:18
**wholly** 51:7
**wife** 7:21 10:6,8,18
11:7,10 15:2 16:15

16:24,25 25:15
46:9 96:4 101:15
101:18 108:16
109:5 123:9
131:24 132:3,8
133:16 135:18,24
136:11,13 154:5,6
176:24
**wife's** 135:17 140:6
**willing** 8:24 22:15
23:17,22 63:11
70:4 73:13 99:25
110:20 111:11,21
147:6
**withdrawals** 134:3
**witness** 3:2,7 31:6
41:23 65:19 68:5
75:21 105:13
119:21 181:22
186:3 187:10,13
187:18 188:3
**word** 27:23 67:25
68:17 132:14
**words** 22:19 64:10
69:20 79:10 85:12
90:17,20 98:16
110:14 112:13
143:18
**work** 20:7 22:16,20
33:9 72:11,18,18
73:19 78:8 146:24
156:16 184:15
**worked** 24:15 43:15
78:12,22 126:25
136:24 143:8
182:2
**working** 9:3 17:23
22:14 49:22,22,22
127:5,6 130:9
155:18
**world** 33:6
**wouldn't** 31:17 77:4
104:8 106:2
**write** 103:20
**writes** 133:16
**writing** 95:2 105:8
**written** 38:18 84:22
**wrong** 170:20 181:8
**wrote** 112:13 136:8
136:11,12
**W-2** 172:23 173:2
173:10 190:5,6
**W-2s** 173:14,18

_____
**X**
**X** 1:3,9 188:2,6
189:2,3 190:2,3

_____
**Y**
**yard** 31:16 32:25

**yeah** 116:24,24,24
**year** 57:19 145:2
159:14 166:17
172:24 173:3
189:8 190:5,7
**years** 3:20 131:6
151:14 173:11
**yesterday** 151:4
178:17
**York** 1:2,17,17,20
1:24,24 2:15,15
29:5 49:19,25 50:3
187:3,8
**Young** 30:13

_____
**$**
**$10,000** 149:12
**$160,786** 110:19
**$20** 33:2
**$7,524.35** 160:9

_____
**0**
**05** 36:10,15,16,17
36:21 45:15 49:13
**06** 18:21,21 34:11
36:10,13,14 118:4
167:25
**07** 1:6 138:24
176:17

_____
**1**
**1** 25:23,24 26:4 28:2
54:23,24 57:8 60:3
95:18 110:18
133:5 183:23
189:5,15
**1st** 165:22
**1(a)** 59:22 61:10
66:17
**1-A** 57:6
**10** 65:2 152:15,16
152:20 188:24
**10th** 178:6
**10/19** 141:21
**10001** 1:24
**10022-4834** 2:15
**10595(SS)** 1:6
**11** 65:3,3 66:7,18
67:6,8 110:24
154:24,25 159:2,3
189:5,15
**11/15/07** 129:6
188:11
**12** 68:25 109:22
155:2 159:11,12
159:21 160:6
165:25 189:5,7,7
189:21
**12th** 110:12
**12,937** 160:15

**125,000** 164:10
**127** 188:9
**129** 188:11
**13** 159:16,17,21
161:15 189:9
190:9
**13th** 181:13
**13(a)** 69:2
**13(b)** 69:2
**1300** 2:6
**14** 69:3 162:17,18
163:4 189:11
**140** 188:13,15
**141** 188:17,19
**15** 69:4 129:24
144:5 162:22,23
163:4 189:13,18
**150** 58:2 188:20,22
**152** 188:24
**154** 189:5
**158** 157:14 158:9
**159** 189:7,9
**16** 69:5 149:8
163:10,11,21
188:24 189:15
**16,600** 151:25
**162** 189:11,13
**163** 189:15,18
**165** 57:19 189:21
**166** 189:23
**17** 163:10,15,21
164:2 189:9,18
**1716** 1:24
**172** 190:5
**173** 190:6
**175** 174:14 175:9
**175,000** 144:9
**177** 190:8
**18** 141:5,16 149:20
165:11,12,17
188:18 189:11,21
190:12
**182** 190:9,12
**19** 166:6,7,12
189:23
**19th** 121:15,19
123:6,20 124:5,8
124:17,22 125:13
125:15
**1985** 28:5 30:4

_____
**2**
**2** 34:19 110:18,19
111:6 127:24,25
128:6 188:9 190:6
**2nd** 109:2,6
**2(a)/3** 63:11
**2-A** 57:18
**2-page** 159:12 189:7
**2.9** 149:5

**20** 94:6 140:25
141:13 172:21,23
173:6,11,20,21,24
174:4,5 188:13,16
190:5,8
**20,000** 32:24
**2000** 12:20 26:17
**2002** 31:25 34:17,19
34:19,21 36:5
**2005** 37:2 39:4 40:2
48:9
**2006** 48:9 57:8 87:6
95:11,15,19
100:23 107:16
109:3,19,22
110:12 114:17
119:8,15 145:21
162:19,24 163:12
164:9 165:14,23
166:2 169:9
172:24 173:11
183:23 189:11,14
189:16,22 190:5
**2007** 12:22,24 14:25
57:9 59:23 60:3
61:11,15,18,21
66:14 124:22
125:13,17 129:24
131:15 136:4,18
138:8 140:25
141:5,14,16 144:5
145:2 148:25
149:8,20 150:5,23
151:2,23 152:17
155:2 159:6,14
160:25 163:16
164:10 166:17
173:3,11 176:4,12
176:16 178:6
183:3 184:19
188:16,18,21,24
189:5,8,18 190:7
**2008** 1:10 186:18
187:19
**21** 172:22 173:2,6
173:12,22 190:6
**21st** 135:6
**212** 1:25
**22** 177:19,20,25
190:8
**23** 1:10 148:25
182:12,13,22
188:15 189:13
190:5,9
**23rd** 121:17,20,22
122:17,20 123:6
**24** 182:17,18 183:18
188:8 190:12
**24/7** 22:18
**241** 163:18 189:20

**25** 188:8,9 189:5
**26th** 187:19
**27** 95:11,15 100:23
   163:12 165:14
   189:16,22
**277** 27:7,8
**279-5108** 1:25
**28** 27:6
**29** 27:6 136:4,18
   176:16,17
**29th** 176:12

—————— **3** ——————
**3** 110:23 129:4,5,10
   161:22 188:4,11
   188:17
**3.04** 151:4
**3:27** 1:10
**3:30** 148:6
**30** 144:23 145:6
**31** 57:9 59:23 61:11
   61:15,18,21 66:14
   184:19
**31st** 183:3
**350** 1:17
**375** 3:7
**39369** 3:8

—————— **4** ——————
**4** 140:20 141:10,19
   142:15 160:25
   162:24 188:13,20
   189:14
**4-page** 177:20 190:8
**4.61** 151:4
**4:30** 146:9
**40-hour** 22:20
**401(k)** 118:12 119:2
**41** 2:7
**43215-6197** 2:8

—————— **5** ——————
**5** 58:4 60:13 69:7,14
   69:24 71:17 76:12
   140:23 141:12
   148:22 188:11,15
**5/26/07** 176:18
**5/31/2007** 183:20
**5:O4** 69:10
**5:14** 69:11
**50,000** 164:9
**52-week** 151:11,12

—————— **6** ——————
**6** 103:12 140:3
   141:3,15 149:3
   150:23 151:2
   188:17
**6/27/02** 128:18
**6:25** 119:24

**6:33** 119:25

—————— **7** ——————
**7** 69:20 139:22,23
   140:11,11 141:7
   141:17 143:25
   162:19 188:19,19
   189:11,23
**7(c)** 62:17,21 65:24
   69:24 70:10,13,21
   71:10 110:22
   111:10 172:4
**7,500** 160:4
**7:15** 146:8
**7:43** 167:7
**7:45** 167:3
**7:57** 167:8

—————— **8** ——————
**8** 64:3 150:2,4,13,13
   163:16 188:20
   189:18
**8-page** 166:7 189:23
**8:23** 185:5
**875** 1:24
**885** 2:14

—————— **9** ——————
**9** 64:4 107:16 150:8
   150:9,13,18
   188:22,22
**9027** 27:5 122:9
   178:4

PLF
EXHIBIT
TRN
DEFT
NO.
FOR ID       2
4/23/08

## PARAMOUNT PARKS AUTHORIZATION AGREEMENT FOR AUTOMATIC DEPOSITS

Authorization for Paramount Parks to automatically credit the following account(s):

**First Account**
Bank Name _F & M Granite Quarry NC_
Transit/ABA # _053103040_
Account # _5471516_

Type of Account (Circle One)
~~Checking~~
Savings

Amount of Deposit (Circle One)
~~Full Deposit~~
Remaining Balance
Amount $ _____

**Second Account**
Bank Name _____
Transit/ABA # _____
Account # _____

JUL 3 1 2002

Type of Account (Circle One)
Checking
Savings

Amount of Deposit (Circle One)
Full Deposit
Remaining Balance
Amount $ _____

**Third Account**
Bank Name _____
Transit/ABA # _____
Account # _____

Type of Account (Circle One)
Checking
Savings

Amount of Deposit (Circle One)
Full Deposit
Remaining Balance
Amount $ _____

I understand that this authorization will be in effect until I notify the payroll department in writing of any changes 10 days prior to effective paydate. I also understand that if corrections in the credit amount are necessary, an adjustment (credit or debit) may be made.

THIS AUTHORIZATION IS NONNEGOTIABLE AND NONTRANSFERABLE.

_Lester C. Neil_
PRINT EMPLOYEE NAME

_6-27-02_
DATE

_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_
SOCIAL SECURITY NUMBER

_____
SIGNATURE

THIS FORM WILL NOT BE ACCEPTED WITH OUT THE FOLLWING ITEMS:

1) A VOIDED CHECK OR A COPY OF A CHECK FOR EACH CHECKING ACCOUNT CIRCLED.

2) A VOIDED DEPOSIT SLIP OR COPY OF DEPOSIT SLIP FOR EACH SAVINGS ACCOUNT CIRCLED.

PPI000016

DEFT
EXHIBIT NO. 5
TRN    FOR ID   4/23/08

## Employee Action Form (EAF): New Hire

View history...

**Status:** Approved

**Hiring Manager:** Tim Flemming

### Employee Information

| | | | | | |
|---|---|---|---|---|---|
| Employee Social Security Number | Employee Number | Assigned Unit/Dept | Work State | Process Level | Effective Date This Action | Date of Birth |
| 241742222 (no spaces or hyphens) | 46223 | 9725 SC | SC | 2009 | 02/23/2007 | 01/01/76 |

03-28-60

| | | | | |
|---|---|---|---|---|
| Employee Last Name | First Name | Middle In | Preferred Name | Gender | Date of Hire |
| NAIL | LESTER | C | LESTER | ● Male  ○ Female | 02/14/2007 |

Driver's License #

Drug Test Required: ○ Yes ● No

**Work Location:** ● Support Center  ○ Field  ○ Unit

Emergency Contact: Linda Nail

Emergency Number: 704-341-7883

| | | | |
|---|---|---|---|
| Home Phone 704-341-7883 | Office Phone 704-341-7883 | Mobile Phone 704-975-0182 | Pager Number/Pin | Fax Number |

### EEOC

● White-WH
○ Black-BL
○ Asian or Pacific Islander-AS
○ Hispanic-HI
○ American Native-AN

### Address

Street Address: 9027 Kirkley Ct

City: Charlotte
State: NC
Zip Code: 28277

### Alignment

Division: S850
Region: S180
Area

### Transfer

From Unit/Dept    State
To Unit/Dept    State

---

### Job Code/Rate of Pay

### New Hire - Complete Section A Only

**Section A - New Hire or Old Job/Rate**

● Salaried Exempt
○ Salaried Non-Exempt
○ Hourly
○ Temporary
○ Contractor

Rate of Pay (Annual): $175,000.00

Supervisor: Tim Flemming

Job Code: 20LDLEA

Job Title: LEAD LITIGATION & EMPLOYMENT ATTORNEY

**Section B - New Job/Rate**

● Salaried Exempt
○ Salaried Non-Exempt
○ Hourly
○ Temporary
○ Contractor

Rate of Pay (Annual)    % Increase

Supervisor:

Job Code    Job Title

---

### Leave of Absence

○ Start
○ Return

○ Personal
○ Military
○ School

○ Medical
○ Family
○ Workers Comp

### Termination

Last Day Worked
Return Date

Last Day Worked
Reason Code

### Functional Requirements

☒ LAPTOP HARDWARE
☐ DESKTOP HARDWARE
☐ PHONE CALLING CARD
☒ VOICE MAIL
☒ AMERICAN EXPRESS CARD

☐ FLEET (CAR)
☐ FLASH REPORT INFORMATI
☒ CAR ALLOWANCE
☐ OTHER
☐ NONE

---

### Approvals / Date

| | |
|---|---|
| Human Resources: Tania Patino | 02/16/2007 |
| 1st Level Supervisor's Name: Tim Flemming | 02/16/2007 |
| 2nd Level Supervisor's Name | |

### Comments

Rec'd 2/20/07

Debbie, Pay for 4 days worked w/e 02/28/2007.

30% annual incentive, relo, $3510 annual car allowance, 3 weeks vacation

Special Requests: Please set laptop up with all proper access ASAP.

ENTERED FEB 2 0 2007

PLF    DEFT
EXHIBIT NO.    6
TRN    FOR ID
4/23/05

**Employee Action Form (EAF): Other Adjustment**

Status: Approved          View history...

Hiring Manager: Rhonda Parish

## Employee Information

| Employee Social Security Number | Employee Number | Assigned Unit/Dept | Work State | Process Level | Effective Date This Action | Date of Birth |
|---|---|---|---|---|---|---|
| 241742222 (no spaces or hyphens) | 462231 | 9725 | SC | 2009 | 05/17/2007 | 03/28/60 |

| Employee Last Name | First Name | Middle In | Preferred Name | Gender | Date of Hire |
|---|---|---|---|---|---|
| NAIL | LESTER | C | LESTER | ○ Male  ○ Female | |

| Driver's License # | Drug Test Required | | | |
|---|---|---|---|---|
| | ○ Yes  ● No | | | |

Work Location
● Support Center  ○ Field      ○ Unit

Emergency Contact          Emergency Number

| Home Phone | Office Phone | Mobile Phone | Pager Number/Pin | Fax Number |
|---|---|---|---|---|
| | 8952 | | | |

| EEOC | Address | Alignment | Transfer |
|---|---|---|---|
| ○ White-WH | Street Address | Division S850 | From Unit/Dept  State |
| ○ Black-BL | 9027 Kirkley Court | Region S180 | |
| ○ Asian or Pacific Islander-AS | | Area | |
| ○ Hispanic-HI | City Charlotte  State NC  Zip Code 28277 | | To Unit/Dept  State |
| ○ American Native-AN | | | |

## Job Code/Rate of Pay

### Other Adjustment - Complete Sections A, B, & Comment

| Section A - New Hire or Old Job/Rate | Section B - New Job/Rate |
|---|---|
| ● Salaried Exempt | ● Salaried Exempt |
| ○ Salaried Non-Exempt | ○ Salaried Non-Exempt |
| ○ Hourly          Rate of Pay (Annual) $175,000.00 | ○ Hourly     Rate of Pay (Annual) $180,000.00    % Increase 2.9% |
| ○ Temporary | ○ Temporary |
| ○ Contractor | ○ Contractor |
| Supervisor: Rhonda Parish | Supervisor: Rhonda Parish |
| Job Code 20DRSLE | Job Code 20DRSLE |
| Job Title SR. DIR. LITIGATION & EMPLOYMENT | Job Title SR. DIR. LITIGATION & EMPLOYMENT |

| Leave of Absence | Termination | Functional Requirements |
|---|---|---|
| ○ Start  ○ Personal  ○ Medical | Last Day Worked | ☐ LAPTOP HARDWARE    ☐ FLEET (CAR) |
| ○ Return  ○ Military  ○ Family | Last Day Worked | ☐ DESKTOP HARDWARE   ☐ FLASH REPORT INFORMATI |
| ○ School  ○ Workers Comp | Return Date | ☐ PHONE CALLING CARD  ☐ CAR ALLOWANCE |
| | Reason Code | ☐ VOICE MAIL    ☐ OTHER |
| | | ☐ AMERICAN EXPRESS CARD  ☒ NONE |

| Approvals | Dates | Comments |
|---|---|---|
| Human Resources Tania Patino | 05/16/2007 | $10,000 special bonus |
| 1st Level Supervisor's Name Rhonda Parish | 05/16/2007 | ENTERED MAY 1 8 2007 |
| 2nd Level Supervisor's Name | | |

Special Requests:

PLF    DEFT
EXHIBIT NO. 7
TRN    FOR ID

4/23/08

Mr. Lester C. Nail
9027 Kirkley Ct
Charlotte, NC  28277


February 14, 2007


Dear Lester,

We enjoyed getting reacquainted yesterday and are delighted to offer you the opportunity to join Denny's as our lead litigation and employment attorney. Reporting to you will be the entire investigations group, in Spartanburg and the field, and the three legal assistants in Spartanburg who currently support litigation and investigations analysis.

This letter outlines the terms of our offer.

### START DATE
We look forward to what you decide.

### BASE SALARY
Your annual base salary will be $175,000.00 and will be paid to you biweekly via direct deposit.

### ANNUAL INCENTIVE
You will participate in Denny's 2007 Incentive Program.  For 2007, your target incentive will be 30% of your base salary.  Payouts depend upon the achievement of predetermined goals, which are established annually.  The program (including bonus targets and performance goals) is governed by a plan document and changes each year.

### RELOCATION
We will assist you with your relocation to the Greenville/Spartanburg area.  We provide an extremely comprehensive relocation assistance program.  Please contact Vickie Ferguson at 864-597-7439 to begin the relocation process.

### BENEFITS
You will be eligible to enroll in our group benefits program immediately.  You may enroll for medical, dental, vision, and additional life coverage at any time during your first 30 days of employment.  These coverages can be effective retroactive to your date of hire or may be deferred until 30 days after your date of hire.  You will be eligible to join the Denny's Deferred Compensation Plan, a fully vested, matched savings plan, and our 401(k) plan after six months of service.

**CAR ALLOWANCE**
You will receive an annual car allowance of $3,510 paid biweekly via direct deposit.
Applicable taxes will be withheld.  You will, however, be reimbursed for all reasonable
and documented business mileage.

**VACATION**
You will be eligible for 3 weeks of vacation annually.

We have already shared the good news with the whole legal team, which has breathed a
collective sigh of relief.  We look forward to leadership to put us on the best footing
possible as we manage claims and rebuild a first-class people function.

If these terms are acceptable, please sign one copy of this letter and return it to me.
Should you have any questions about any portion of this offer, please call me directly.

Welcome to the Denny's team!

Sincerely,


_Timothy E. Flemming_

**ACKNOWLEDGED:**

Lester C. Nail          Feb  15, 2007

PLE    DEFT
EXHIBIT NO. _____
TRN    FOR ID
4/23/08    **Denny's**

# Denny's 2007 Long-Term Growth Incentive Program

## Program Concept

The Compensation Committee of the Board of Directors has approved the 2007 Long-Term Growth Incentive (LTGI) Program, an incentive compensation program pursuant to and subject to the Denny's Corporation 2004 Omnibus Incentive Plan.

Under the program, participants are granted awards consisting of a target number of performance shares (which convert to and are settled in shares of Denny's stock on a one-for-one basis) and a target number of performance units (which pay out in cash based on the value of Denny's stock on the date of grant). From 0% to 200% of the target award of performance shares and performance units may be earned based on the level of achievement of certain pre-established performance criteria.

Example: Assume the participant has been awarded 1,000 performance shares and 1,000 performance units. If the fair market value of Denny's common stock on the date of grant is $4.70, the target cash award for the performance units is $4,700 (1,000 units x $4.70). Subject to the Company's achievement of the performance goals described below, the target award that would be earned if target level goals are achieved is 1,000 shares of stock and $4,700. The minimum award that could be earned is 0 shares of stock and $0, and the maximum award that could be earned is 2,000 shares of stock and $9,400.

## Eligibility

Director-level employees and above are eligible for 2007 awards.

## Performance Period

Performance shares and performance units will be earned based on Company performance during a one-year fiscal period ending December 26, 2007. Earned awards will vest according to the schedule set forth below.

## How Performance Is Measured

For the 2007 grant, the number of performance shares and performance units earned will depend on the actual results of two Company metrics: 2007 Systemwide Revenues and 2007 Cash Available to Pay Down Debt. Cash Available to Pay Down Debt is defined as Free Cash Flow plus proceeds from asset sales and re-franchisings

Each of the two 2007 performance measures has a 50% weighting and is calculated independently. Thus, if one measure is met but the other is not, there will still be some level of payout.

The actual results for the two performance metrics will be measured as soon as practicable after the last day of the performance period.

1

LES00075

The grid below shows the performance/payout relationship. Payout for performance between points is interpolated on a straight-line basis.

| Systemwide Revenues (50% Weight) | | | Cash Available to Pay Down Debt (50% Weight) | | |
|---|---|---|---|---|---|
| Performance Level | Goal ($M) | Payout as % of Target | Performance Level | Goal ($M) | Payout as % of Target |
| Outstanding | $2,504 | 200% | Outstanding | $45 | 200% |
| Target | $2,480 | 100% | Target | $30 | 100% |
| Threshold (Plan) | $2,440 | 50% | Threshold (Plan) | $15 | 50% |
| Below Threshold | < $2,440 | 0% | Below Threshold | < $15 | 0% |

## Vesting Schedule

Earned awards vest according to the following schedule:

- 15% of the earned performance shares and performance units vests on December 26, 2007
- 35% of the earned performance shares and performance units vests on December 31, 2008
- 50% of the earned performance shares and performance units vests on December 30, 2009

Participants must be employed on the vesting date in order to vest in the award (except in cases of death, disability or retirement as noted below).

Termination for cause creates an exception to the vesting rule. Such a termination results in forfeiture of any unpaid award, even if it otherwise had vested.

## Form and Timing of Payout

The portion of the award granted as performance shares will pay out in Denny's stock while the portion granted as performance units will pay out in cash. No stock or cash is transferred until the date of the payout. Payout will occur as soon as practicable after vesting, but no later than the first March 15th that occurs after vesting.

Any required tax withholding will be made first from the cash portion of the award, then from the stock portion.

LES00076

## Impact of Termination Events

The following table shows the impact of various termination events:

| Termination Event | Payout |
|---|---|
| Death | • Death during the performance period will result in the participant earning a pro rata amount of the target award, paid out as soon as administratively practicable at the end of the performance period. <br> • Death during the vesting period will result in full and accelerated vesting of earned awards, paid out as soon as administratively practicable. |
| Long-Term Disability | • Long-term disability during the performance period will result in the participant earning a pro rata amount of the award that otherwise would have been earned (e.g., at actual performance), paid out in accordance with the regular vesting and payout schedule. <br> • Long-term disability during the vesting period will result in continued vesting of earned awards as if no termination of employment had occurred, paid out in accordance with the regular vesting and payout schedule. |
| Retirement | • Retirement during the performance period will result in the participant earning a pro rata amount of the award that otherwise would have been earned (e.g., at actual performance), paid out in accordance with the regular vesting and payout schedule. <br> • Retirement during the vesting period will result in continued vesting of earned awards, as if no termination of employment had occurred, paid out in accordance with the regular vesting and payout schedule. |
| Termination for Cause | • Vested and unvested awards will be forfeited. No payout will occur even if awards had vested. |
| Other Voluntary or Involuntary Termination | • Vested, but unpaid awards will be paid out in accordance with the regular vesting and payout schedule. Unvested awards will be forfeited. |
| Change in Control | • All awards will be paid out in full at target immediately prior to the effective date of the Change in Control. |

## Impact on Other Plans

Awards are not considered pay for purposes of Denny's retirement or welfare plans.

## Stock Ownership Requirements

Participants in the plan must retain 50% of the shares delivered until separation from the Company.

## Deferral Opportunities

There will be no specific deferral opportunities under this plan.

## Financial Statements

The Company will provide electronically to all plan participants annually a copy of either its annual report to shareholders or its Annual Report on Form 10-K, which shall include the Company's audited financial statements for the Company's most recent fiscal year. Copies of the above documents are available upon request.

LES00077

# Denny's Corporation
# Stock Option Award Agreement

Lester Nail
9027 Kirkley Court
Charlotte, NC 28277

PLF    DEFT
EXHIBIT NO. _____ 9
TRN    FOR ID
4/23/08

Dear Lester,

Congratulations on your selection as a participant in the Denny's stock option program. You have been granted the right to purchase from Denny's Corporation (the "Company") shares of its common stock, $.01 par value, pursuant to the provisions of the Denny's Corporation 2004 Omnibus Incentive Plan ("the Plan") and to the terms and conditions set forth in this Agreement.

Terms used in this Agreement that are defined in the Plan shall have the initial letter of the word capitalized and shall have the meanings ascribed to them in the Plan. If there is any inconsistency between the terms of this Agreement and the terms of the Plan, the Plan's terms shall supersede and replace the conflicting terms of this Agreement.

The options granted to you under this Agreement are nonqualified stock options.

## Overview of Your Stock Option

1. **Number of Options Granted:**    3,600

2. **Date of Grant:**    03/06/07

3. **Exercise Price:**    $4.61

4. **Option Term:** The Options have been granted for a period of ten (10) years from the Date of Grant (the "Option Term").

5. **Vesting and Exercise:** Options do not provide you with any rights or interests until they vest and become exercisable. Unless vesting is accelerated in accordance with the Plan or in the discretion of the Committee, the Options shall vest as shown below:

| Percentage of Option That Vests | Date on Which percentage of Option Vests, Assuming You Remain Employed On The Applicable Date |
|---|---|
| 33 1/3% | 03/06/08 |
| 33 1/3% | 03/06/09 |
| 33 1/3% | 03/06/10 |

6. **How to Exercise:** The Options hereby granted shall be exercised by (1) contacting the Company's Stock Option Coordinator (currently, Kelly Land) at (864/597-8671), (2) submitting a written notice (in the form required by the Company on the date of exercise) specifying the number of shares you then desire to purchase. Unless the exercise is through a broker-assisted "cashless exercise" (as described

1

LES00086

below) or any other cashless exercise arrangement approved by the Compensation and Incentives Committee of the Board of Directors, such written notice must be accompanied by full payment in cash, shares of stock of the Company previously acquired by you (which shares may be delivered by attestation or actual delivery of one or more certificates), or any combination thereof, for the applicable Exercise Price, plus any applicable tax withholding amount; provided, however, that if shares of stock are used for this purpose, such shares must have been held by you for at least such period of time, if any, as necessary to avoid the recognition of an expense under generally accepted accounting principles as a result of the exercise of the Options. The fair market value of the surrendered shares of stock as of the last trading day immediately prior to the exercise date shall be used in valuing and shares used in payment of the Option Price or applicable tax withholding amounts. To the extent permitted under Regulation T of the Federal Reserve Board, and subject to applicable securities laws and at the discretion of Compensation and Incentives Committee, the Option may be exercised through a broker in a so-called "cashless exercise" whereby the broker sells the Option shares and delivers cash sales proceeds to the Company in payment of the exercise price. In such case, the date of exercise shall be deemed to be the date on which notice of exercise is received by the Company and the exercise price shall be delivered to the Company on the settlement date.)

Notwithstanding the above, the Company has the authority and the right to deduct or withhold an amount sufficient to satisfy federal, state, and local taxes (including any FICA obligation) required by law to be withheld with respect to any taxable event arising as a result of the exercise of the Option. Such withholding requirement may be satisfied, in whole or in part, at the election of the Company, by withholding Option shares having a fair market value on the date of withholding equal to the minimum amount (and not any greater amount) required to be withheld for tax purposes, all in accordance with such procedures as the Committee establishes.

As soon as practicable after receipt of such written notification and payment and satisfaction of applicable tax withholding requirements, the Company shall issue or transfer to you, when applicable, the number of Shares with respect to which such Options shall be so exercised and shall deliver to you either a certificate or certificates for such shares or evidence of book entry of such Shares registered in your name.

**7.  Impact of Termination of Employment:**  The vesting and term of your options will change if you terminate employment during the Option Term, according to the following table (but in no event shall the term of an Option be extended beyond the original Option Term):

| Employment Event | Impact of Termination on Vesting | Exercise Period for Vested Options Following Termination (After Which the Options Shall Lapse) |
|---|---|---|
| Leave of absence < 90 days ................. | Continue vesting | No change |
| Death ......................................... | Vest fully | 1 year |
| Disability [1] ................................... | Continue vesting until lapse | 1 year |
| Retirement [2] ................................. | Continue vesting until lapse | 1 year |
| Voluntary resignation........................ | Vesting stops | 60 days |

LES00087

| Employment Event | Impact of Termination on Vesting | Exercise Period for Vested Options Following Termination (After Which the Options Shall Lapse) |
|---|---|---|
| Involuntary termination other than for Cause[3]............................................ | Vesting stops | 60 days |
| Involuntary termination for Cause[3].......... | Vesting stops | None. Must exercise prior to termination |
| Involuntary termination within 24 months of a Change in Control[4]....................... | Vest fully | 5 years |

[1] Disability means any physical or mental condition which would qualify a Participant for a disability benefit under the long-term disability plan maintained by the Company and applicable to that particular Participant.

[2] Retirement means the voluntary termination of employment from the Company or an Affiliate for any reason other than a leave of absence, death or disability on or after attainment of the age of fifty-five.

[3] Cause as a reason for a Participant's termination of employment shall have the meaning assigned such term in the employment agreement, if any, between such Participant and the Company or an Affiliate, provided, however that if there is no such employment agreement in which such term is defined, "Cause" shall mean any of the following acts by the Participant, as determined by the Board: gross neglect of duty, prolonged absence from duty without the consent of the Company, intentionally engaging in any activity that is in conflict with or adverse to the business or other interests of the Company, or willful misconduct, misfeasance or malfeasance of duty which is reasonably determined to be detrimental to the Company.

[4] Please see the definition of Change in Control in the Plan.

**8. Restrictions on Transfer and Pledge:** No right or interest in the Options may be pledged, encumbered, or hypothecated to or in favor of any party other than the Company, or shall be subject to any lien, obligation, or liability to any other party other than the Company. The Options are not assignable or transferable by you other than by will or the laws of descent and distribution or pursuant to a domestic relations order that would satisfy Section 414(p)(1)(A) of the Code if such Section applied to an Option under the Plan; provided, however, that the Committee may (but need not) permit other transfers. The Options may be exercised during your lifetime only by you or any permitted transferee.

**9. Beneficiary Designation:** You may, in the manner determined by the Committee, designate a beneficiary to exercise your rights hereunder and to receive any distribution with respect to the Options upon your death. A beneficiary, legal guardian, legal representative, or other person claiming any rights hereunder is subject to all terms and conditions of this Agreement and the Plan, and to any additional restrictions deemed necessary or appropriate by the Committee. If no beneficiary has been designated or survives you, the Options may be exercised by the legal representative of your estate, and payment shall be made to your estate. Subject to the foregoing, a beneficiary designation may be changed or revoked by you at any time provided the change or revocation is filed with the Company.

3

LES00088

**10. Limitation of Rights:** The Options do not confer to you any rights of a shareholder of the Company unless and until Shares are in fact issued in connection with the exercise of the Options. Nothing in this Agreement shall interfere with or limit in any way the right of the Company to terminate your service at any time, nor confer upon you any right to continue in the service of the Company.

**11. Covenants:** Without the prior written consent of the Company, which may be granted or withheld in the Company's sole and absolute discretion, during the term of your employment with the Company, and for a period of twelve (12) calendar months thereafter, you hereby agree that you shall not, directly or indirectly:

**a)    Disclosure of Information.** Use, attempt to use, disclose, or otherwise make known to any person (other than in the course of employment with the Company or any Subsidiaries or Affiliate thereof) any knowledge or information of a confidential or proprietary nature (including all unpublished matters) relating to, without limitation, the business, strategy, plans, properties, accounting, books and records, trade secrets, or memoranda of the Company or its Affiliates.

**(b)    Solicitation.** Whether for your own account or for the account of any other Person, solicit, employ, or retain (or arrange to have any other Person to solicit, employ, or retain) or otherwise participate in the employment or retention of any individual who is or has been within one (1) year an employee or consultant of the Company or any of its Subsidiaries.

**12. Requirements of Law:** The granting of Options and the issuance of Shares under the Plan shall be subject to all applicable laws, rules, and regulations, and to such approvals by any governmental agencies or national securities exchanges as may be required.

**13. Restrictions on Issuance of Shares:** If at any time the Committee shall determine in its discretion, that registration, listing or qualification of the Shares covered by the Options upon any Exchange or under any foreign, federal, or local law or practice, or the consent or approval of any governmental regulatory body, is necessary or desirable as a condition to the exercise of the Options, the Options may not be exercised in whole or in part unless and until such registration, listing, qualification, consent or approval shall have been effected or obtained free of any conditions not acceptable to the Committee.

**14. Applicable Laws and Consent to Jurisdiction:** The validity, construction, interpretation, and enforceability of this Agreement shall be determined and governed by the laws of the state of Delaware without giving effect to the principles of conflicts of law. For the purpose of litigating any dispute that arises under this Agreement, the parties hereby consent to exclusive jurisdiction and agree that such litigation shall be conducted in the federal or state courts of the state of Delaware, county of New Castle.

**15. Financial Statements:** The Company will provide to you annually a copy of either its annual report to shareholders or its Annual Report on Form 10-K, which shall include the Company's audited financial statements for the Company's most recent fiscal year.

**16. Successors:** This Agreement shall be binding upon any successor of the Company, in accordance with the terms of this Agreement and the Plan.

**17. Plan Controls:** The terms contained in the Plan are incorporated into and made a part of this Agreement and this Agreement shall be governed by and construed in accordance with the Plan. In the event of any actual or alleged conflict between the provisions of the Plan and the provisions of this Agreement, the provisions of the Plan shall be controlling and determinative.

LES00089

**18. Severability:** If any one or more of the provision contained in the Agreement is invalid, illegal or unenforceable, the other provision of this Agreement will be construed and enforced as if the invalid, illegal or unenforceable provision had never been included.

**19. Notice:** Notices and communications under this Agreement must be in writing and either personally delivered or sent by registered or certified United States mail, return receipt requested, postage prepaid. Notices to the Company must be addressed to:

Denny's Corporation
203 East Main Street
Spartanburg, South Carolina 29319-0001
Attn: Secretary

or any other address designated by the Company in a written notice to you. Notices to you will be directed to your address then currently on file with the Company, or at any other address given by you in a written notice to the Company.

Please refer any questions you may have regarding your stock options to the Stock Option Coordinator (currently, Kelly Land) of the Legal Department at (864/597-8671). Once again, congratulations on receipt of your stock option.

Sincerely,

Denny's Corporation
Rhonda J. Parish
Executive Vice President, Chief Legal Officer
and Secretary

Please acknowledge your agreement to participate in the Plan and this Agreement, and to abide by all of the governing terms and provisions, by signing the following representation:

**Agreement to Participate**

By signing a copy of this Agreement and returning it to the Stock Option Coordinator of the Legal Department of Denny's Corporation. I acknowledge that I have read the Plan, and that I fully understand all of my rights under the Plan, as well as all of the terms and conditions which may limit my eligibility to exercise this Option.

_____
Participant

LES00090

203 East Main Street, Spartanburg, SC 29319
864-597-8000

# Denny's

REDACTED

---

*Performance Share and Performance Unit*
*Award Certificate*

**Denny's Corporation**
ID: 13-3487402
203 East Main Street
Spartanburg, SC 29319

---

Lester Nail
9027 Kirkley Court
Charlotte, NC 28277

You have been awarded performance shares and performance units under the 2007 Long-Term Growth Incentive Program pursuant to the Denny's Corporation 2004 Omnibus Incentive Plan which provides you the opportunity to receive shares of Denny's Corporation $.01 par value common stock and cash at a future time under the terms indicated below:

| | |
|---|---|
| **Effective Date of Awards:** | 03/06/07 |
| **Number of Performance Shares Awarded:** | 3,600 |
| **Number of Performance Units Awarded:** | 3,600  ( $16,600 ) |

---

No right or interest in these awards may be pledged, encumbered, or hypothecated to or in favor of any party other than Denny's Corporation (the "Company"), or shall be subject to any lien, obligation, or liability to any party other than the Company. This award is not assignable or transferable by you other than by will or the laws of descent and distribution.

This award is governed by the terms of the 2007 Long-Term Growth Incentive Program and the Denny's Corporation 2004 Omnibus Incentive Plan, both of which are attached to this award certificate for your reference.

---

_____
For Denny's Corporation

_____
Date

"Great Food and Great Service by Great People... Every Time!"

PLF DEFT
EXHIBIT NO. 10
TRN FOR ID
4/23/08

## 2007 SALARIED ENROLLMENT OPTIONS

### 1. Medical Plan Options

| | Emp Only | Emp + 1 | Emp + 2 or more |
|---|---|---|---|
| ☐ $500 deductible - Aetna PPO Nationwide | $70.81 | $149.47 | $256.80 |
| ☐ $1500 deductible - Aetna PPO Nationwide | $47.76 | $103.33 | $187.62 |
| ☐ $150 deductible (limited coverage) | $34.93 | $77.65 | $149.11 |
| ☐ Blue Choice - SC (HMO #126) | $67.37 | $164.22 | $285.25 |
| ☐ No Medical Coverage | $0.00 | $0.00 | $0.00 |

### 2. Dental Plan Options

| | Emp Only | Emp + 1 | Emp + 2 or more |
|---|---|---|---|
| ☐ $25 deductible (full coverage) | $9.42 | $19.58 | $40.34 |
| ☐ $50 deductible (basic coverage) | $4.48 | $10.24 | $20.99 |
| No dental coverage | $0.00 | $0.00 | $0.00 |

### 3. Vision Plan Options

| | Emp Only | Emp + 1 | Emp + 2 or more |
|---|---|---|---|
| ☐ Vision coverage | $3.62 | $5.25 | $9.42 |
| No vision coverage | $0.00 | $0.00 | $0.00 |

### 4. Employee Life Insurance Plan

| | | Costs |
|---|---|---|
| A. Company paid: 1 x base pay | ( ) | $0.00 |
| B. Additional 1 x base pay | ( ) | $0.81 |
| C. Additonal 2 x base pay | ( ) | $1.67 |
| D. Additonal 3 x base pay | ( ) | $2.48 |
| E. Additonal 4 x base pay | ( ) | $3.29 |
| No additional coverage | ( ) | $0.00 |

### 5. Spousal Life Insurance Plan

| | | Costs |
|---|---|---|
| A. $20,000 of coverage | ( ) | $1.11 |
| B. $40,000 of coverage | ( ) | $2.22 |
| C. $60,000 of coverage | ( ) | $3.32 |
| D. $80,000 of coverage | ( ) | $4.43 |
| E. $100,000 of coverage | ( ) | $5.54 |
| No spousal life coverage | ( ) | $0.00 |

### 6. Children Life Insurance Plan

| | | Costs |
|---|---|---|
| A. $5,000 - each child | ( ) | $0.34 |
| B. $10,000 - each child | ( ) | $0.70 |
| No children's life coverage | ( ) | $0.00 |

### 7. Long Term Disability Plan

| | | Costs |
|---|---|---|
| A. Basic Coverage (50% of base pay) | ( ) | $1.72 |
| B. Supplemental Coverage (60% of base pay) | ( ) | $5.03 |

### 8. Personal Accident Insurance Plan

| | | Emp Only | | Emp & Fam |
|---|---|---|---|---|
| A. $25,000 | ( ) | $0.17 | ) | $0.29 |
| B. $50,000 | ( ) | $0.35 | ) | $0.58 |
| C. $100,000 | ( ) | $0.69 | ) | $1.15 |
| D. $150,000 | ( ) | $1.04 | ) | $1.73 |
| E. $250,000 | ( ) | $1.73 | ) | $2.89 |
| No personal accident coverage | ( ) | $0.00 | ) | $0.00 |

LES00080

203 East Main Street, Spartanburg, SC 29319
864-597-8000

**Denny's**

March 12, 2007

PLF
EXHIBIT NO.    DEFT
TRN            FOR ID    11
              4/23/8

Lester Nail
9027 Kirkley Court
Charlotte, NC 28277

Dear Lester,

I'm pleased to announce that on March 6, 2007, the Compensation Committee of the Denny's Board of Directors approved the granting of stock options, along with performance shares and performance units as part of our 2007 Long-Term Growth Incentive (LTGI) Program. With a focus on continued transformation and growth of the brand, I expect that 2007 will be a very exciting year for all of us at Denny's. And, as a leader in the Denny's organization, I'm counting on you to look for opportunities to take Denny's to a new level while keeping a focus on delighting our guests, growing our sales, and attracting and developing our internal talent.

In recognition for all you do and will do-- and all that I expect us to do in 2007 – I'm excited to award you with a Long-Term Incentive Award with an economic value, as of the grant date, 20% of your base salary. Your 2007 Long-Term Incentive Award is comprised of an equal number of stock options, performance shares (to be paid in Denny's stock) and performance units (to be paid in cash). The actual performance shares and performance units earned under the 2007 LTGI Program will be based on the Company's achievement of two key metrics: Systemwide Revenues of $2.48 B (a 4.2% increase over 2006 actual results) and Cash Flow to Pay Down Debt (which would allow us to reduce debt from $453 M in 2006 to below $400 M in 2007). These two performance measures are calculated independently of one another, so, if one metric is met, but the other is not, there will still be some level of payout. Please refer to the enclosed Stock Option Award Agreement, Award Certificate, and 2007 Long-Term Growth Incentive Program Document for additional details of your award.

I know you are working hard every day to grow our guest counts and move the Denny's brand forward, and I thank you for your dedication and leadership. Many thanks for joining our Denny's Team. I look forward to an outstanding 2007!

Nelson Marchioli
CEO and President

"Great Food and Great Service by Great People... Every Time!"

LES00085

**EXPENSE DETAIL REPORT**
Tax Year 2007

PLF    DEFT
EXHIBIT NO. _____
TRN    FOR ID

4/23/08

Name of Employee _____ Lester Nail _____

| Description | Amount | Reference |
|---|---|---|
| **Expenses Paid To Employee** | | |
| Relocation Allowance | $ 4,000.00 | Relocation Allowance Gross $4000/Net $2414 |
| Lump Sum | $ 3,524.35 | Lump Sum Allowance 04/04/07 |
| Total Paid To Employee: | $ 7,524.35 | |
| **Expenses Paid To Other** | | |
| Household Goods Surface | $ 12,812.38 | Household Goods Shipment |
| Household Goods Surface | $ 125.00 | Inv 8240157 Household Goods |
| Total Paid To Other: | $ 12,937.38 | |
| Total Expenses: | $ 20,461.73 | |

Prepared: February 5, 2008                    Denny's Domestic

LES00205

## EMPLOYEE MOVING EXPENSE INFORMATION
### (Taxation based on United States IRS Regulations)
Tax Year 2007

Name of Employee:    Lester Nail

| Moving Expense Payments | | Amount Paid To Employee | Amount Paid To a 3rd Party | Total |
|---|---|---|---|---|
| **Qualified (Excludable) Moving Expenses** | | | | |
| The following amounts were not added into your wages | | | | |
| Transportation and storage of household goods | | $ 0.00 | $ 12,937.38 | $ 12,937.38 |
| Travel and lodging while moving from old to new | | $ 0.00 | $ 0.00 | $ 0.00 |
| | **Qualified Total:** | $ 0.00 | $ 12,937.38 | $ 12,937.38 |
| **Non-Qualified (Taxable) Moving Expenses** | | | | |
| The following amounts are taxable | | | | |
| All other taxable moving expenses | | $ 7,524.35 | $ 0.00 | $ 7,524.35 |
| Tax Assistance | | $ 0.00 | $ 2,315.81 | $ 2,315.81 |
| | **Non-Qualified Total:** | $ 7,524.35 | $ 2,315.81 | $ 9,840.16 |
| | **GRAND TOTAL:** | $ 7,524.35 | $ 15,253.19 | $ 22,777.54 |

**Summary of Tax Assistance Amounts:**

| | |
|---|---|
| Federal | $ 1,460.04 |
| State | $ 409.00 |
| OASDI | $ 362.09 |
| Medicare | $ 84.68 |
| **Total Tax Assistance:** | $ 2,315.81 * |

*If the above box contains zeros, please consult your Relocation Policy for tax assistance guidelines.

Prepared February 5, 2008                    Denny's Domestic

LES00206

PLF    DEFT
EXHIBIT NO.
TRN    FOR ID

13
1/23/08

*Denny's Domestic Relocation Program*

## EMPLOYEE REIMBURSEMENT AGREEMENT

In order to receive relocation benefits, the Employee Reimbursement Agreement must be signed and returned to Graebel Relocation Services before any relocation related expenses are paid/reimbursed.

Employee Name: _____Lester C. Nail_____

Social Security Number: ___ ___    Payroll #: _____

Effective Date of Transfer: _____    New Manager: _____

This Agreement is effective as of date signed. It is between _____Denny's Inc_____ (Company) and

_____Lester C. Nail_____ ("Employee").

1 As of the effective date of this Agreement, Company has or will spend a sum of money for the purpose of reassigning the Employee and the Employee's eligible household members to Company's new work location.

2 Prior to the effective date of this Agreement, the Employee received a Relocation Policy, which is incorporated herein by reference. This Policy sets forth those items which Company will either pay on behalf of the Employee or reimburse to the Employee, including, but not limited to, those expenses associated with the purchase of a primary residence, homefinding and temporary living allowance, mortgage assistance, cancellation and location of rental dwellings, final move travel, movement of household goods and automobile(s).

3 In consideration of Company's direct payment and/or reimbursement of expenses associated with the Employee's relocation, the Employee agrees that should the Employee terminate employment with the Company after receiving relocation benefits, and within 12 months of the relocation, the Employee agrees to repay in full all direct payments and/or reimbursements.

4 The Employee confirms that neither he/she nor any other household member is receiving relocation benefits from any other company or source. The Employee acknowledges that relocation benefits paid by the Company would be subject to reduction, if benefits were also paid by another source.

Further, the Employee agrees to binding arbitration of any disputes arising out of this agreement, whether oral or in writing. In addition, the prevailing party in any such dispute will also be entitled to an award of attorney's fees in addition to any other relief granted by the arbitrator.

_____    3-27-07
Employee - Signature                        Date Signed

**Send This Form To:**
Graebel Relocation
1000 Mansell Exchange West, Suite 270
Alpharetta, GA 30022
Fax 770-674-2958

*Revised 1/15/04*

**REDACTED**

LES00079

**CHARLES M. BECKER**
SENIOR VICE PRESIDENT
HUMAN RESOURCES

**CBS CORPORATION**
51 WEST 52 STREET
NEW YORK, NEW YORK 10019-6188

(212) 975-4681
FAX (212) 975-4687
cmbecker@cbs.com



July 7, 2006

Lester Nail
9027 Kirkley Court
Charlotte, North Carolina 28277

Dear Lester:

In order to process the first payment of your retention incentive, we will need for you to sign the attached general release. As noted in a letter dated June 2, 2006, (we have included a copy for your reference) eligibility for the Retention Incentive is contingent upon you executing a general release as provided by CBS Corporation.

Attached is the general release we will need for you to sign and return.  Please return the signed original to me at the following address:

Chuck Becker
SVP,  Human Resources Operations
CBS Corporation
51 West 52nd Street
19th Floor
New York, NY 10019

We have included a pre-addressed postage paid return envelope for your convenience.

Sincerely,

Chuck Becker

LES00236

CHARLES M. BECKER
SENIOR VICE PRESIDENT
HUMAN RESOURCES

CBS CORPORATION
51 WEST 52 STREET
NEW YORK, NEW YORK 10019-6188

(212) 975-4681
FAX (212) 975-4687
cmbecker@cbs.com



August 4, 2006

Lester Nail
9027 Kirkley Court
Charlotte, North Carolina 28277

Dear Lester:

In accordance with your retention incentive letter dated June 2, 2006, the first payment of your retention incentive in the amount of $50,000 (subject to applicable withholdings and deductions required by law) has been processed.

Attached is a '**live**' check dated August 4, 2006. Your '**live**' check may be cashed or deposited up to 90 days from the pay date as shown on the check. After 90 days, the check becomes void. Please retain your check stub which details the applicable taxes withheld for your records.

Given that CBS Corporation processed your check and was unaware of how much Paramount Parks had already collected in Social Security taxes for 2006, it is possible that you may have overpaid your Social Security taxes for the year. If you overpaid your Social Security taxes for the year, you may want to seek reimbursement of the overpayment when you file your 2006 taxes.

For 2006, the social security wage base is $94,200 and the Social Security tax rate is 6.2%. The maximum Social Security tax employees will pay in 2006 is $5,840.40. There is no limit to wages subject to the Medicare tax at the 1.45% rate.

Sincerely,

LES00237

CHARLES M. BECKER
SENIOR VICE PRESIDENT
HUMAN RESOURCES

**CBS CORPORATION**
51 WEST 52 STREET
NEW YORK, NEW YORK 10019 6188

(212) 975-4681
FAX (212) 975-4637
cmbecker@cbs.com

PLF  DEFT
EXHIBIT NO. ___
TRN  FOR ID

*16*

*1/23/a*

November 27, 2006

Lester Nail
9027 Kirkley Court
Charlotte, NC  28277

Dear Lester:

In order to process the second and final payment of your retention incentive, we will need for you to sign the attached general release.  As noted in a letter dated June 2, 2006, (we have included a copy for your reference) eligibility for the Retention Incentive is contingent upon you executing a general release as provided by CBS Corporation.

Attached is the general release we will need for you to sign and return.  Please return the signed original to me at the following address:

Chuck Becker
SVP Human Resources Operations
CBS Corporation
51 West 52nd Street
19th Floor
New York, NY 10019

We have included a pre-addressed postage paid return envelope for your convenience.

Sincerely,

Chuck Becker

LES00238

CHARLES M. BECKER
SENIOR VICE PRESIDENT
HUMAN RESOURCES

**CBS CORPORATION**
51 WEST 52 STREET
NEW YORK, NEW YORK 10019 6188

(212) 975 4681
FAX (212) 975 4687
cmbecker@cbs.com

PLF
EXHIBIT NO. DEFT
TRN FOR ID

January 8, 2007

Lester Nail
9027 Kirkley Court
Charlotte, NC 28277

Dear Lester:

In accordance with your retention incentive letter dated June 2, 2006, the final payment of your retention incentive in the amount of $125,000 (subject to applicable withholdings and deductions required by law) has been processed.

Attached is a 'live' check dated January 4, 2007. Your 'live' check may be cashed or deposited up to 90 days from the pay date as shown on the check. After 90 days, the check becomes void. Please retain your check stub which details the applicable taxes withheld for your records.

If you have any questions please call me at 212-975-4681, or Debbie DiRaimo at 212-975-4257.

Sincerely,

Chuck Becker

LES00240



**CBS CORPORATION**

From: **Al Weber**
To: **Lester Nail**
Date: **June 2, 2006**

### RE: Retention Incentive

As you know, CBS Corporation announced it has reached an agreement with Cedar Fair, L.P. to sell its Paramount Parks business. Recognizing that your continued support is essential to the success of this transaction, you will be eligible to receive a Retention Incentive of $175,000, which amount is subject to an offset/reduction and other conditions as detailed below (and also subject to applicable withholding and deductions required by law).

This incentive was designed to retain and maximize your services for helping in the successful close of the sale. Your Retention Incentive will be processed for payment in the following lump sum amounts as of the closing date of the sale of Paramount Parks to Cedar Fair, L.P. (the "Closing Date"). $50,000 will be processed at the Closing Date and the remainder in the amount of $125,000 will be processed six months after the Closing Date.

The amount of the Retention Incentive for which you are eligible will be offset and reduced by the gross proceeds realized, if any, from the exercise (before the payment of the Retention Incentive) of CBS Corporation stock options that are "out-of-the-money" as of the Closing Date.

In addition, eligibility for the Retention Incentive is contingent upon the following:

1. The successful closing of the sale of Paramount Parks to Cedar Fair, L.P.
2. You continue to be employed exclusively by Paramount Parks through the Closing Date, or, if earlier, the date you receive notice from CBS Corporation in writing that your services are no longer required as determined by CBS Corporation in its sole discretion, provided, however, that if your employment is terminated for Cause (as defined below), you will not be entitled to receive any Retention Incentive.
3. You continue to represent Paramount Parks and perform your duties in a satisfactory manner (as determined by CBS Corporation in its sole discretion) through the Closing Date, including continued assistance with the transition process.
4. You execute a general release on a form acceptable to CBS Corporation.

If you voluntarily terminate your employment prior to the Closing Date, or if your employment is terminated for Cause, you will forfeit your eligibility to receive any Retention Incentive. For purposes of this letter, Cause is defined as embezzlement, fraud or other conduct which would constitute a felony, dishonesty, material breach of a CBS Corporation or Paramount Parks policy, or willful unauthorized disclosure of confidential information.

Please acknowledge your understanding and agreement of the Retention Incentive offer by signing in the space provided below. Return the signed original to: Chuck Becker, SVP, Human Resources Operations, CBS Corporation, 51 West 52nd Street, 19th Floor, New York, NY 10019 for execution on behalf of CBS Corporation. If you have any questions concerning this matter, please contact Chuck at 212.975.4681.

Accepted and Agreed:

CBS Corporation                        Date    02 June 06

Lester Nail                            Date    June 2, 06

LES00241



FOR REGISTRATION JUDITH A GIBSON
REGISTER OF DEEDS
MECKLENBURG COUNTY, NC
2007 JUN 13 03:03 PM
BK:22398 PG:649-652 FEE:$20.00
EXCISE TAX $1,254.00
INSTRUMENT # 2007121230

2007121230

# NORTH CAROLINA GENERAL WARRANTY DEED

Excise Tax $ *1,254.00*

Parcel Identifier No. 223-465-20 Verified by Mecklenburg County on the ____ day of _____, 20____.
By: _____

Mail/Box to: Grantee, 9027 Kirkley Court, Charlotte, NC 28277
This instrument was prepared by: McMillan & Terry, P.A. (LPM)      Title Insurance Company: Chicago Title Insurance Company
Brief description for the index: Lot 19, Block 2, KENSINGTON @ BALLANTYNE, Ph 2, Map 1, Map Book 28, Page 176

THIS DEED made this the 10th day of April, 2007, by and between

| GRANTOR | GRANTEE |
|---|---|
| Lester Claude Nail and wife, Linda Carol Nail | John M. Pownall and wife, Jane Pownall |
| | Property Address: |
| | 9027 Kirkley Court |
| | Charlotte, NC 28277 |

Enter in appropriate block for each party: name, address, and, if appropriate, character of entity, e.g., corporation or partnership.

The designation Grantor and Grantee as used herein shall include said parties, their heirs, successors, and assigns, and shall include singular, plural, masculine, feminine or neuter as required by context.

WITNESSETH, that the Grantor, for a valuable consideration paid by the Grantee, the receipt of which is hereby acknowledged, has and by these presents does grant, bargain, sell and convey unto the Grantee in fee simple, all that certain lot or parcel of land situated in the City of Charlotte, _____ Township, Mecklenburg County, North Carolina and more particularly described as follows:

See Exhibit "A"

The property hereinabove described was acquired by Grantor by instrument recorded in Book 13639, Page 661.

A map showing the above described property is recorded in Plat Book 28, Page 176.

N.C. Bar Assoc. Form No. 3 © 1976, Revised © 1977, 2002

Exhibit "A"

BEING all of Lot 19 in Block 2 of Kensington @ Ballantyne, Phase 2, Map 1, as same is shown on map thereof recorded in Map Book 28 page 176 in the Mecklenburg County Public Registry.



N.C. Bar Assoc. Form No. 3 © 1976, Revised © 1977, 2002

TO HAVE AND TO HOLD the aforesaid lot or parcel of land and all privileges and appurtenances thereto belonging to the Grantee in fee simple.

And the Grantor covenants with the Grantee, that Grantor is seized of the premises in fee simple, has the right to convey the same in fee simple, that title is marketable and free and clear of all encumbrances, and that Grantor will warrant and defend the title against the lawful claims of all persons whomsoever, other than the following exceptions:

         Title to the property hereinabove described is subject to the following exceptions:

         All such valid and enforceable easements, restrictions and rights of way of record and the lien of *ad valorem* taxes for the current year which the grantee herein assumes and agrees to pay.

IN WITNESS WHEREOF, the Grantor has duly executed the foregoing as of the day and year first above written.

_____ (SEAL)
**Lester Claude Nail**

_____ (SEAL)
**Linda Carol Nail**

_____ (SEAL)

_____ (SEAL)

USE BLACK INK ONLY

---

| SEAL-STAMP | |
|---|---|

State of North Carolina - County of Mecklenburg.

I, the undersigned Notary Public of Union County and State aforesaid, certify that Lester Claude Nail either personally known to me or proven by satisfactory evidence, personally appeared before me this day, and acknowledged the voluntary execution of the foregoing instrument by he/she/them for the purposes stated therein. Witness my hand and Notarial stamp or seal this 10th day of April , 20 07 .

My Commission Expires: April 14, 2009

Notary Public
Notary's Name: Michele Feleppa

---

| SEAL-STAMP | |
|---|---|

State of North Carolina - County of Mecklenburg

I, the undersigned Notary Public of Union County and State aforesaid, certify that Linda Carol Nail either personally known to me or proven by satisfactory evidence, personally appeared before me this day, and acknowledged the voluntary execution of the foregoing instrument by he/she/them for the purposes stated therein. Witness my hand and Notarial stamp or seal this 10th day of April , 20 09 .

My Commission Expires: April 14, 2009

Notary Public
Notary's Name: Michele Feleppa

---

The following Certificate(s) of _____ is/are certified to be correct.
This instrument and this certificate are duly registered at the date and time and in the Book and Page shown on the first page hereof.
       Register of Deeds for _____ County
By: _____ Deputy/Assistant – Register of Deeds

NC Bar Association Form No. 3 © 1976, Revised © 1977, 2002



JUDITH A. GIBSON
REGISTER OF DEEDS, MECKLENBURG
COUNTY & COURTS OFFICE BUILDING
720 EAST FOURTH STREET
CHARLOTTE, NC 28202

## PLEASE RETAIN YELLOW TRAILER PAGE

It is part of the recorded document, and must be submitted with original for re-recording and/or cancellation.

| | |
|---|---|
| **Filed For Registration:** | 06/13/2007 03:03 PM |
| **Book:** | RE 22368 Page: 649-652 |
| **Document No.:** | 2007121230 |
| | DEED 4 PGS $20.00 |
| **NC REAL ESTATE EXCISE TAX:** | $1,254.00 |
| **Recorder:** | ANNA GRAY |



*2007121230*

Unofficial Document

DEED88 - UPG558

DEFT
EXHIBIT NO. _23_
FOR ID
1/23/08

**Address of Grantee:**

375 S. Monterey Drive
Moore, SC 29369

DEE-2007-31263
Recorded 2 Pages on 6/13/2007 10:20:37 AM
Recording Fee: $10.00 Documentary Stamps: $2,083.10
Office of Register of Deeds, Spartanburg, S.C.
Stephen Ford, Register

**STATE OF SOUTH CAROLINA**    )
                               )    **TITLE TO REAL ESTATE**
**COUNTY OF SPARTANBURG**      )

      **KNOW ALL MEN BY THESE PRESENTS**, that **Allan J. Bennett Construction, Inc.** ("Grantor"), in consideration of Five Hundred Sixty Three Thousand and No/100 Dollars ($563,000.00) the receipt of which is hereby acknowledged, has/have granted, bargained, sold and released, and by these presents do(es) grant, bargain, sell and release unto **Lester C. Nail and Lindacarol Nail** ("Grantee"), the Grantee's heirs (or successors) and assigns forever the following property, to-wit:

      All that certain piece, parcel or lot of land in the County of Spartanburg, State of South Carolina, situate, lying and being on 375 South Monterey Drive and being shown and designated as Lot No. 72 A and 72B on a Plat of Phase 3, River Mist dated August 30, 2004, made by Husky & Husky, Inc., recorded in Plat Book 157, Page 444, ROD Office for Spartanburg County. Lot #72A contains 1.19 Acres, Lot #72B contains 2.12 Acres in the flood plain. For a more detailed  description, reference is hereby made to the plat above referred to.

      This being the same property conveyed to Allan J. Bennett Construction, Inc. by Deed of Westside Property, Inc., dated April 5, 2006 and recorded in Deed Book 85-M at Page 243, RMC Office for Spartanburg County.

**Tax Map #:**6-46-00-002.66

      **TOGETHER** with all and singular the rights, members, hereditaments and appurtenances to said premises belonging or in anywise incident or appertaining.

      **TO HAVE AND TO HOLD**, all and singular the premises before mentioned unto the Grantee(s), and the Grantee's(s') heirs (or successors) and assigns forever.

      And the Grantor(s) do(es) hereby bind the Grantor(s) and the Grantor's(s') heirs (or successors), executors and administrators to warrant and forever defend all and singular said premises unto the Grantee(s) and the Grantee's(s') heirs (or successors) and assigns against the Grantor(s) and the Grantor's(s') heirs (or successors) and against every person whomsoever lawfully claiming or to claim the same or any part thereof, except as to restrictions and easements of record, if any.

88--UPG559

**WITNESS** the Grantor's(s') hand(s) and seal(s) this 31st day of May, 2007.

SIGNED, sealed and delivered
in the presence of:

Allen J. Bennett Construction, Inc.

_____ (SEAL)

By: _____

Its: _____

* * * * *

STATE OF SOUTH CAROLINA  )

                         )    **ACKNOWLEDGMENT**

COUNTY OF SPARTANBURG    )

I, Raven N Rogers , do hereby certify that Allen J. Bennett, personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

**WITNESS** my hand and official seal this the 31st day of May, 2007.

_____
Notary Public for South Carolina

My Commission expires: 9-1-2016

PLF
EXHIBIT
TRN    DEF    FOR ID    *B*    *4-23-08*

AGREEMENT made as of the ____ day of _____, 2006, by and between Paramount Parks Inc. ("Paramount"), which is a division of CBS Corporation, and Lester C. Nail ("Executive"), whose address is 9027 Kirkley Court, Charlotte, North Carolina 28277.

### W I T N E S S E T H:

WHEREAS, Paramount desires to secure the services of Executive as Senior Vice President / General Counsel, and Executive is willing to perform such services, upon the terms, provisions and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the promises and the mutual covenants hereinafter contained, it is agreed between Paramount and Executive as follows:

1.    (a)    The term of this Agreement shall be for the period commencing January 1, 2006 and ending December 31, 2007 (the "Employment Term"). Paramount shall employ Executive, and Executive shall accept employment as Senior Vice President / General Counsel.

2.    (a)    Paramount agrees to pay Executive, and Executive agrees to accept from Paramount for Executive's services hereunder, a base salary of One Hundred Sixty Five Thousand Dollars ($165,000) per annum payable in accordance with the regular payroll practices of Paramount. Base salary shall be payable biweekly or in such other manner as Paramount may designate for employees generally. Executive acknowledges and agrees that he is not eligible for a car allowance.

(b)    Paramount agrees Executive shall be eligible to be considered for participation in the CBS Corporation ("CBS") Short Term Incentive Plan ("STIP"), *i.e.*, Paramount's current bonus plan, or any successor plans to STIP. The target annual incentive award for Executive's position will be thirty five percent (35%) of Executive's base salary. The

1

payment of a STIP bonus, if any, and the precise amount of such payments shall be determined on an annual basis at the sole discretion of the Board of Directors of CBS, or the appropriate committee of such Board.

(c)    Paramount agrees Executive shall be eligible to be considered for participation in the CBS Long Term Incentive Plan ("LTIP"), *i.e.*, Paramount's current stock option plan, or any successor plans to LTIP.  The award of a stock option grant, if any, and the precise amount of such options that may be granted, shall be determined on an annual basis at the sole discretion of the Board of Directors of CBS, or the appropriate committee of such Board.

3.    Executive shall be included in all plans now existing or hereafter adopted for the general benefit of Paramount employees, subject to the provisions of such plans as the same may be in effect from time to time.  To the extent Executive participates in any benefit plan, such participation shall be based upon Executive's base salary, unless otherwise indicated in the plan document.

4.    Executive's vacation entitlement shall be governed in accordance with Paramount policy.

5.    Executive agrees to devote all customary business time and attention to the affairs of Paramount, except during vacation periods and reasonable periods of illness or other incapacity consistent with the practices of Paramount for executives in comparable positions, and agrees that Executive's services shall be completely exclusive to Paramount during the term hereof.  Executive further agrees to comply with all applicable Paramount policies, as described in the Paramount Personnel Policy Manual.

6.    (a)    Executive acknowledges receipt of the CBS Business Conduct Statement. Executive further acknowledges that Executive has read and fully understands all of the

2

LES00039

requirements thereof, and acknowledges that at all times during the term hereof, Executive shall perform Executive's services hereunder in full compliance with the CBS Business Conduct Statement, and with any revisions thereof or additions thereto that are provided to Executive in writing, including without limitation any notice provisions therein (notwithstanding any notice provisions to the contrary which may be contained in paragraph 16 of this Agreement).

(b)     Executive acknowledges that Paramount is an equal opportunity employer. Executive agrees to comply with Paramount policies regarding employment practices and with applicable Federal, state and local laws prohibiting discrimination on the basis of race, color, national origin, religion, sex, age, sexual orientation, disability, veteran's status, marital status, or height or weight.

7.    (a)     In the event of the death of Executive, salary payments to be paid pursuant to this Agreement shall cease immediately; provided, however, in the event of death, the estate of Executive shall receive any salary due and not yet paid through the date of Executive's death.

(b)     If, during the term of this Agreement, Paramount properly terminates the employment of Executive for Cause, which for these purposes is defined as (i) fraud, misappropriation or embezzlement on the part of Executive, (ii) Executive's willful failure to perform services hereunder or (iii) Executive's intentional breach of the provisions of paragraph 5 or of paragraph 6 hereof, or for Executive's incapacity, then Paramount shall immediately have the right to terminate this Agreement without further obligation; provided, however, that in the event of Executive's incapacity Paramount may terminate this Agreement effective only after the expiration of a period the length of which shall be determined by the Paramount Human Resources Department pursuant to the then applicable Paramount sick leave policy for Paramount exempt staff employees as though such policy were applicable to this Agreement, but

3

LES00040

... any event not less than four (4) consecutive weeks.

        (c)    If, during the term of this Agreement, the employment of Executive by Paramount should be terminated by Paramount other than for Cause as defined herein or for Executive's incapacity, then Paramount shall be obligated both to pay to Executive all applicable base salary pursuant to paragraph 2(a) of this Agreement and also Paramount shall continue all applicable plans and/or benefits pursuant to paragraph 3 hereof for the remainder of the Employment Term, so long as Executive is willing, ready and able to render exclusive services hereunder during such remainder of the Employment Term. Nothing herein shall obligate Paramount to utilize Executive's services, and Paramount shall have fulfilled all of its obligations hereunder by payment to Executive of the applicable amounts set forth herein for the Employment Term of this Agreement subject to the terms of this paragraph 7(c). Notwithstanding the above, if the employment of Executive is also terminated by Paramount for Cause or by reason of disability or death, this paragraph 7(c) shall not be applicable.

        8.    Paramount shall own all right, title and interest in perpetuity to the results of Executive's services and all artistic materials and intellectual properties which are, in whole or in part, created, developed or produced by Executive during the term of this Agreement and which are suggested by or related to Executive's employment hereunder or any activities to which Executive is assigned, and Executive shall not have or claim to have any right, title or interest therein of any kind or nature. Nothing in the preceding sentence is intended to constitute a waiver of the Conflicts Policy.

        9.    Executive agrees that, during the Employment Term and for one (1) year thereafter, Executive shall not, in any communications with the press or other media or any customer, client or supplier of Paramount, CBS or any of CBS's affiliated companies, criticize,

4

LES00041

ridicule or make any statement which disparages or is derogatory of Paramount, CBS, or any of CBS's affiliated companies or any of their respective directors or senior officers.

10.    Executive agrees that, during the Employment Term and for one (1) year thereafter, Executive shall not, directly or indirectly: (i) employ or solicit the employment of any person who is then or has been within six (6) months prior thereto, an employee of Paramount, CBS, or any of CBS's affiliated companies; or (ii) do any act or thing to cause, bring about, or induce any interference with, disturbance to, or interruption of any of the then-existing relationships (whether or not such relationships have been reduced to formal contracts) of Paramount, CBS, or any of CBS's affiliated companies with any customer, employee, consultant or supplier.

11.    Executive agrees that during the Employment Term, Executive will not engage in any other occupation or engage in the leisure/theme park, motion picture, television, or entertainment business, except for Paramount pursuant to this Agreement.

12.    Executive agrees that during the Employment Term or at any time thereafter, (i) Executive shall not use for any purpose other than the duly authorized business of Paramount or CBS, or disclose to any third party, any information relating to Paramount, CBS or any of its affiliated companies which is proprietary to Paramount, CBS, or any of its affiliated companies ("Confidential Information"), including any trade secret or any written (including in any electronic form) or oral communication incorporating Confidential Information in any way (except as may be required by law or in the performance of Executive's duties under this Agreement consistent with Paramount's and CBS's policies); and (ii) Executive will comply with any and all confidentiality obligations of Paramount and CBS to a third party, whether arising under a written agreement or otherwise.  Information shall not be deemed Confidential

5

LES00042

Information which (x) is or becomes generally available to the public other than as a result of a disclosure by Executive or at Executive's direction or by any other person who directly or indirectly receives such information from Executive, or (y) is or becomes available to Executive on a non-confidential basis from a source which is entitled to disclose it to Executive.

13.    (a)    Executive agrees that, during the Employment Term, for one (1) year thereafter and, if longer, during the pendency of any litigation or other proceeding, (x) Executive shall not communicate with anyone (other than Executive's own attorneys and tax advisors), except to the extent necessary in the performance of Executive's duties under this Agreement, with respect to the facts or subject matter of any pending or potential litigation, or regulatory or administrative proceeding involving Paramount, CBS or any of CBS's affiliated companies, other than any litigation or other proceeding in which Executive is a party-in-opposition, without giving prior notice to Paramount or its counsel; and (y) in the event that any other party attempts to obtain information or documents from Executive with respect to such matters, either through formal legal process such as a subpoena or by informal means such as interviews, Executive shall promptly notify Paramount or its counsel before providing any information or documents.

(b)    Executive agrees to cooperate with Paramount and its attorneys, both during and after the termination of Executive's employment, in connection with any litigation or other proceeding arising out of or relating to matters in which Executive was involved prior to the termination of Executive's employment.    Executive's cooperation shall include, without limitation, providing assistance to Paramount's counsel, experts or consultants, and providing truthful testimony in pretrial and trial or hearing proceedings.    In the event that Executive's cooperation is requested after the termination of Executive's employment, Paramount will (x) seek to minimize interruptions to Executive's schedule to the extent consistent with its interests

6

LES00043

in the matter; and (y) reimburse Executive for all reasonable and appropriate out-of-pocket expenses actually incurred by Executive in connection with such cooperation upon reasonable substantiation of such expenses.

(c)    Executive agrees that Executive will not testify voluntarily in any lawsuit or other proceeding which directly or indirectly involves Paramount, CBS or any of CBS's affiliated companies, or which may create the impression that such testimony is endorsed or approved by Paramount, CBS or any of CBS's affiliated companies, without advance notice (including the general nature of the testimony) to and, if such testimony is without subpoena or other compulsory legal process the approval of, the Executive Vice President, General Counsel of CBS.

14.    Paramount has entered into this Agreement in order to obtain the benefit of Executive's unique skills, talent, and experience. Executive acknowledges and agrees that any violation of paragraphs 8 through 13 of this Agreement will result in irreparable damage to Paramount and CBS, and, accordingly, Paramount and CBS may obtain injunctive and other equitable relief for any breach or threatened breach of such paragraphs, in addition to any other remedies available to Paramount and CBS.

15.    This Agreement contains the entire understanding of the parties with respect to the subject matter thereof, supersedes any and all prior agreements of the parties with respect to the subject matter thereof, and cannot be changed or extended except by a writing signed by both parties hereto. This Agreement shall be binding upon and inure to the benefit of the parties and their respective legal representatives, executors, heirs, administrators, successors and assigns; provided, however, that Executive shall have no right to assign this Agreement or delegate Executive's obligations hereunder. This Agreement and all matters and issues collateral thereto

7

LES00044

shall be governed by the laws of the State of New York applicable to contracts entered into and performed entirely within the State of New York, with respect to the determination of any claim, dispute or disagreement, which may arise out of the interpretation, performance or breach of this Agreement, and will be subject to enforcement and interpretation solely in the appropriate courts of the State of New York. If any provision of this Agreement, as applied to either party or to any circumstance, shall be adjudged by a court to be void or unenforceable, the same shall in no way affect any other provision of this Agreement or the validity or enforceability thereof.

16.    All notices or other communications hereunder shall be given in writing and shall be deemed given if served personally or mailed by registered or certified mail, return receipt requested (in which case notice shall be deemed to have been given three (3) days from the date of mailing), to Executive at the address above indicated. In the case of Paramount, directed to: (Attn: Anthony Ambrosio, Executive Vice President Human Resources, CBS Corporation, 51 West 52nd Street, (35th Floor) New York, New York 10019), or at such other addresses as they may hereafter designate in writing.

IN WITNESS WHEREOF, the parties have executed this Agreement as of _____ ___, 2006.

Paramount Parks Inc.

By: _____
EVP HR/ADMIN

By: _____
Lester C. Nail

8

LES00045



July 27, 2006

PLF
EXHIBIT NO. DEFT
TRN FOR ID C 4-13-08

Mr. Lester C. Nail
9027 Kirkley Court
Charlotte, North Carolina 28277

      Re:    Notice of Termination of Employment

Dear Mr. Nail:

      On June 30, 2006 (the "Closing Date"), Bombay Hook LLC and CBS Corporation finalized the transaction with Cedar Fair, L.P. and Magnum Management Corporation (the "Company"), (collectively, the "Cedar Fair Entities"), pursuant to which the Company acquired 100 percent of the outstanding shares of capital stock of Paramount Parks Inc. ("PPI") As a result, your employment agreement, effective as of January 1, 2006 ("Employment Agreement"), has become the benefit and obligation of PPI, as legal successor and/or assign.

      Please be advised that PPI has determined that your services will no longer be needed after August 1, 2006. Accordingly, this letter is your notice under your Employment Agreement that your employment is terminated without cause as of August 1, 2006, and that you will be entitled to receive, subject to applicable taxes and withholdings, and subject to any other terms of the Employment Agreement, the amounts identified in paragraph 7(c) of your Employment Agreement. PPI reminds you of both (1) your non-compete obligations under paragraph 11 of the Employment Agreement, and (2) the "willing, ready and able to render exclusive services" requirement of paragraph 7(c), and any other post-termination obligations of the Employment Agreement.

      PPI is currently considering making an alternative separation proposal to you, which would incorporate a lump sum severance payment, along with other terms in a separation agreement. You will hear from PPI in the near future should it decide to present an alternative separation proposal to you. Should you have any questions, please contact Paramount Parks Inc. c/o Craig Freeman, Cedar Fair, L.P., One Cedar Point Drive, Sandusky, Ohio 44870, (419) 627-2391.

Very truly yours,

Richard L. Kinzel
President
Paramount Parks, Inc.

LES00015



PLF DEFT  *E*
EXHIBIT NO.
TRN    FOR ID
        4-23-08

August 9, 2006


Mr. Lester C. Nail
9027 Kirkley Court
Charlotte, NC   28277

Dear Mr. Nail:

Due to the termination of your employment with Paramount Parks, Inc., you may have questions regarding how compensation and benefits will continue for the balance of the Employment Term under your employment agreement. We wanted to address in this letter some issues that may be of immediate concern to you.

- You will continue to be paid on the pay cycle and in the manner that you were last paid as an active PPI employee. For example, this Friday you will receive your final paycheck as a PPI employee and your first severance payment. If you had previously elected direct deposit, this compensation will be processed accordingly. This arrangement will continue for as long as you are entitled to receive post-termination compensation and/or benefits under your employment agreement. In the unlikely event that PPI changes its payroll procedures for active employees, the pay procedures for you would follow.

- The medical and dental insurance carriers have not changed (although new ID cards are being mailed to all participants). You may continue on the plan in which you were last enrolled as an active employee. In order for coverage to be uninterrupted, you must elect COBRA coverage in accordance with COBRA rules. You will be receiving enrollment information shortly. PPI will pay the COBRA premium representing the employer's contribution, but you will continue to be responsible for any employee contribution, which will continue in the form of a deduction from your severance payments.

- In accordance with the terms of your employment agreement, your life insurance will continue pursuant to the current PPI policy for the duration of the severance period (or the "Employment Term") set forth in your employment agreement.

LES00016

Mr. Lester C. Nail
August 9, 2006
Page 2

Of course, the continuation of any of the above referenced payments or benefits are subject to any other applicable provisions of your employment agreement.

Please don't hesitate to contact me should you have additional questions.

Sincerely,

Craig J. Freeman

Cc:    Billy Clark



PLF (DEPT
EXHIBIT NO.
TRN   FOR ID

4-23-08

September 12, 2006

Mr. Lester C. Nail
9027 Kirkley Court
Charlotte, North Carolina 28277

**Re:    Employment Agreement**

Dear Lester,

At this time, Paramount Parks Inc. ("PPI") would like to offer you a separation proposal to effectuate a mutually beneficial resolution of your employment and relationship with PPI.

We are proposing that, in full settlement of any amounts still owed to you under the Employment Agreement or otherwise and in exchange for your signing a full separation and release agreement, PPI would provide to you: (1) a lump sum payment of $160,786.00; (2) a waiver of the requirement that you be "willing, ready and able to render exclusive services" (as provided in Paragraph 7(c) of the Employment Agreement) to recover this sum; and (3) modification of the non-compete obligations contained in paragraph 11 of the Employment Agreement so that such obligation shall end six (6) months after the Termination Date.

I have enclosed a Separation and Release Agreement for you herein. As I believe you will conclude, this offer is more than generous under the terms of your Employment Agreement. In particular, by offering to waive the "willing, ready, and able" requirement, PPI is offering to both pay you a significant sum and allow you to seek employment without affecting that sum. Receiving this amount in one lump sum is certainly also advantageous.

Further, under the terms of the Separation and Release Agreement, PPI would also be willing to significantly decrease its rights to enforce the non-competition provision contained in Paragraph 11 of the Employment Agreement. We believe this would be a considerable value to you.

We look forward to hearing from you once you have had an opportunity to review the terms of the enclosed agreement.

Sincerely,

Craig Freeman

Craig Freeman

LES00021

Mr. Nail                                                    September 12, 2006
Page 2

bcc:    Gordon Kaiser
        Jill S. Kirila

LES00022

## SEPARATION AND RELEASE AGREEMENT

This is a SEPARATION AND RELEASE AGREEMENT (the "**Agreement**") between PARAMOUNT PARKS INC. ("**PPI**") and LESTER C. NAIL, an individual ("**Mr. Nail**"), (collectively, the "**Parties**").

### RECITALS

WHEREAS, Mr. Nail has been employed by PPI and/or CBS Corporation ("**CBS**") and/or an affiliate, business unit, or predecessor of CBS (collectively, "**CBS Entities**") pursuant to an Employment Agreement commencing January 1, 2006, (the "**Employment Agreement**," a copy of which is attached hereto as Exhibit A); and

WHEREAS, as of June 30, 2006, as a result of the stock acquisition of PPI, PPI has become a subsidiary of Magnum Management Corporation, which is a wholly owned subsidiary of Cedar Fair, L.P., and, to the extent it was not already, the Employment Agreement has been assigned to and /or has become the benefit and obligation of PPI as legal successor thereto; and

WHEREAS, PPI has decided to terminate Mr. Nail's employment, effective August 1, 2006; and

WHEREAS, the Parties desire to amicably terminate the Employment Agreement through a buyout and agree to certain other terms relating to the termination of Mr. Nail's employment; and

WHEREAS, the Parties desire to set forth this negotiated Agreement to effectuate the terms of their agreement;

### AGREEMENT

NOW, THEREFORE, for the mutual consideration provided herein, the adequacy of which is hereby acknowledged, the Parties agree as follows:

### 1.    **Effect of Transaction.**

Mr. Nail acknowledges and agrees that on June 30, 2006 (the "**Closing Date**"), to the extent it was not already, PPI became a legal successor and PPI is entitled to enforce and has assumed obligations under the Employment Agreement as a successor and/or assign as a result of the stock acquisition of PPI (the "**Transaction**"). Mr. Nail acknowledges and agrees that as of the Closing Date, he is no longer an employee, officer, manager, member, or in any other way associated with the CBS Entities.

### 2.    **Termination.**

Effective August 1, 2006 (the "**Termination Date**"), Mr. Nail agrees that his employment with PPI is terminated. To the extent applicable, Mr. Nail also resigns, effective as of the Termination Date, from any and all officer and/or director positions of PPI and/or related entities, and as a member of any other boards or committees or from any other positions on or in

LES00023

which Mr. Nail served for or on behalf of PPI and/or the CBS Entities, to the extent such resignation has not already occurred as part of the Transaction. Mr. Nail agrees to cooperate in the completion of any paperwork or provision of any information necessary or requested to complete such resignations.

3.    **Severance Payments and Other Consideration Provided to Mr. Nail.**

Effective August 1, 2006, PPI will treat Mr. Nail as terminated other than for cause under paragraph 7(c) of the Employment Agreement.

PPI agrees to pay Mr. Nail a single sum of One Hundred Sixty Thousand Seven Hundred Eighty-Six Dollars ($160,786.00) less all applicable taxes and withholdings and less all amounts paid to or on behalf of Mr. Nail after September 3, 2006 pursuant to paragraph 8(c) of the Employment Agreement (except for any payment for the pay period ending September 3, 2006, which amount shall not be deducted from the above lump sum amount), to be paid to Mr. Nail within ten (10) days after the "Effective Date" (as hereafter defined). This amount does not include payment for any accrued and unused vacation or holiday pay, which the Parties agree was previously paid in Mr. Nail's final paycheck. Mr. Nail and PPI agree that Mr. Nail is no longer obligated or required to be willing, ready and able to render exclusive services to PPI. The Parties also agree that the non-compete obligations contained in paragraph 11 of the Employment Agreement will be modified in the sole respect that the Non-Compete Period shall end six (6) months after the Termination Date. The Parties acknowledge and agree that the consideration provided to Mr. Nail under the terms of this Agreement includes a buyout of any rights, payments or benefits that have or may become due to Mr. Nail under the Employee Agreement, including, but not limited to, any payments under Paragraph 7 therein or under any other company policy/plan or otherwise.

Mr. Nail acknowledges and agrees that all participation in any benefit plans or policies that continued after the Termination Date and all payments made therefore will end on the Effective Date, except that medical and dental coverage may continue thereafter pursuant to a group health plan continuation coverage COBRA election made by Mr. Nail, in accordance with COBRA's election requirements, at Mr. Nail's cost for COBRA premiums.

The Parties expressly acknowledge and agree that all payments, benefits, and obligations to or of the Parties under the Employment Agreement are hereby, except for certain continuing obligations of Mr. Nail as provided in this Agreement, terminated and forfeited, as applicable. The Parties expressly acknowledge and agree that all payments and benefits under this paragraph are conditioned upon Mr. Nail's performance of his obligations under this Agreement and will be terminated and/or forfeited, as applicable, if Mr. Nail breaches his obligations under paragraph 5 hereunder or otherwise under this Agreement. However, termination or forfeiture of these payments will not preclude PPI from seeking additional damages arising from any such breach by Mr. Nail.

4.    **Release and Waiver of Claims.**

(a)    Mr. Nail, on behalf of himself and his heirs, administrators, executors, personal representatives, and assigns, forever releases PPI, the CBS Entities, and each such

- 2 -

LES00024

entities' Related Persons (which term **Related Persons**" includes, as applicable, affiliates and each of their successors, assigns, predecessors, directors, officers, shareholders, members, partners (both general and limited), employees, representatives, agents, counsel and insurers, and the heirs, administrators, executors, successors, and assigns of each of the foregoing, including but not limited to Cedar Fair, L.P., Magnum Management Corporation and those entities' affiliates) from, and covenants not to bring suit or otherwise institute legal proceedings against any of them arising in whole or in part from, all claims arising from events occurring prior to the execution of this Agreement that Mr. Nail now has or may have of any nature whatsoever, be they common law or statutory, legal or equitable, in contract (expressly including but not limited to foregoing any rights he may have under the Employment Agreement) or tort, including but not limited to claims arising out of Mr. Nail's employment with the CBS Entities and/or PPI and/or the termination of that employment or Employment Agreement. This release includes, but is not limited to, any claim of discrimination on any basis, including race, color, national origin, religion, sex, age or handicap arising under any federal, state, or local statute, ordinance, order or law, including the Age Discrimination in Employment Act, as amended; any claim for advance notice of termination; and any claim that the Released Parties, jointly or severally, breached any contract or promise, express or implied, or any term or condition of Mr. Nail's employment; any claim for promissory estoppel arising out of Mr. Nail's employment with PPI; and any claims under any employee benefit plans or programs or arrangements, and any claims under the Employee Retirement and Income Security Act of 1974, as amended ("ERISA"), except as provided in paragraph 6(d); and any other issue arising out of Mr. Nail's employment with PPI and/or his resignation or separation from such employment. Mr. Nail hereby waives all rights to assert a claim for relief available under any laws, including but not limited to attorney fees, damages, reinstatement, back pay, or injunctive relief. Should Mr. Nail institute any claim released by this paragraph 4, or should any other person institute such a claim on his behalf, Mr. Nail will reimburse PPI or applicable party, as applicable, for any legal fees and expense incurred in defending such a claim.

    **(b)**    Mr. Nail hereby represents and warrants that he has not assigned to any third party or filed with any agency or court any claim released by this paragraph 4.

5.    **Other Covenants.**

    **(a)**    Mr. Nail agrees to abide by and reaffirms those covenants in paragraphs 8; 9; 10; 11 (as modified in this Agreement); 12; 13; and, solely to the extent they relate to paragraphs 8, 9, 10, 12 and 13, paragraph 14; and paragraph 16 of the Employment Agreement that survive the termination of the Employment Agreement or his employment thereunder, and Mr. Nail understands and agrees that such covenants run to the benefit of PPI.

    **(b)**    Mr. Nail agrees that his confidentiality obligations contained in paragraph 12 of the Employment Agreement extend to all information shared with him in his capacity as an employee, officer, director, member, agent, or representative of the CBS Entities and/or PPI that is or was proprietary to the CBS Entities and/or PPI or their Related Persons.

    **(c)**    Mr. Nail agrees to keep the terms of this Agreement completely confidential and not to disclose any information concerning the Agreement to anyone other than his attorneys, tax accountants, or financial advisors as is reasonably necessary, provided that, if

- 3 -

LES00025

Mr. Nail makes a disclosure to any such person and such person makes a disclosure that, if made by Mr. Nail, would breach this paragraph 5(c), such disclosure will be considered to be a breach of this paragraph 5(c) by Mr. Nail.

        **(d)**    Mr. Nail agrees to refrain from any publication, oral or written, of a disparaging, defamatory, or otherwise derogatory nature pertaining to the Transaction, PPI, and/or PPI's Related Persons.

        **(e)**    Mr. Nail agrees to reasonably cooperate with PPI in the defense of any claims, demands, allegations, or other assertion of legal rights made against PPI, its Related Persons, and/or the CBS Entities by a third party and relating to events occurring prior to the execution of this Agreement of which Mr. Nail has or may have knowledge. Mr. Nail agrees that he will not communicate in any fashion with any party, including any representative thereof or legal counsel therefor, engaged in or considering legal proceedings against PPI, its Related Persons, and/or the CBS Entities other than as required by a facially valid subpoena, court order, administrative order, or other legal process requiring such communication and, further, that within 5 business days of his receipt of any such legal process will provide the at-issue entity/ies with notice thereof. Mr. Nail further agrees to reasonably cooperate with any efforts of PPI, its Related Persons, and/or the CBS Entities to quash any such legal process.

        **(f)**    Mr. Nail agrees to make himself reasonably available in person and by phone, fax, and e-mail to consult with PPI and others designated by it about matters about which he has knowledge arising from his employment with the CBS Entities and/or PPI and otherwise as PPI determines is appropriate.

        **(g)**    Mr. Nail represents and warrants that he has returned all confidential information (as defined in the Employment Agreement) and all other property, both tangible and intangible, of PPI, the CBS Entities, and such entities' Related Persons to PPI.

6.    **Miscellaneous.**

        **(a)**    The Parties agree and understand that this Agreement and all rights hereunder shall inure to the benefit of, shall be enforceable by, and shall be binding upon Mr. Nail's personal representatives, heirs executors, and administrators, and shall inure to the benefit of, shall be enforceable by, and shall be binding upon the successors and assigns of PPI. The Parties agree that this Agreement may not be assigned by Mr. Nail.

        **(b)**    Mr. Nail acknowledges and agrees that PPI is, in entering into Agreement, relying upon the representations and warranties made by Mr. Nail in this Agreement and, in the absence of those representations and warranties, would not have entered into this Agreement.

        **(c)**    All notices or communications required to be given under this Agreement shall be given in writing, by personal delivery or mail at the Parties' respective addresses as follows, or at such other address as may be designated in writing by either party:

    Paramount Parks Inc.        Lester C. Nail
    c/o Cedar Fair, L.P.        9027 Kirkley Court
    One Cedar Point Drive        Charlotte, North Carolina 28277

- 4 -

LES00026

Sandusky, Ohio 44870
Attention: Craig Freeman

As of the Termination Date, all notices to be given under the Employment Agreement shall be sent to PPI at the above listed address.

(d)    This Agreement contains the entire agreement of the Parties about the subjects in it, and it replaces all prior contemporaneous oral or written agreements, understandings, statements, representations, and promises by either party.    Mr. Nail acknowledges and agrees that any payments made to him or his estate under this Agreement are in full settlement and discharge of any and all rights or claims which Mr. Nail or his estate may have against PPI, the CBS Entities, and/or any Related Person of such entities arising out of Mr. Nail's Employment Agreement, employment with CBS Entities and/or PPI, or the termination thereof, that he is entitled to no additional payments from PPI, the CBS Entities, or any Related Person of such entities not specifically referenced in this Agreement (other than claims against the CBS Entities for benefits, if any, to which Mr. Nail is entitled under the CBS 401(k) Plan, CBS Excess 401(k) Plan, CBS Bonus Deferred Plan, CBS Retirement Plan, CBS 2004 Long Term Management Incentive Plan, CBS Senior Executive Short Term Incentive Plan, CBS Health Plan, or the PPI group health plan), and that he has no outstanding business or other expenses reimbursable by PPI and/or the CBS Entities that have not been submitted to PPI and, accordingly, that no reimbursement is owed for such.  To the extent any term in this Agreement is inconsistent with any term in the Employment Agreement, this Agreement will govern.

(e)    Each provision of this Agreement is severable.    Should any court, arbitrator, or other tribunal of competent jurisdiction declare any provision(s) of this Agreement invalid or unenforceable by reason of any rule of law or public policy, all other provisions hereof will remain in full force and effect.

(f)    The Parties hereby authorize any court, arbitrator or other tribunal of competent jurisdiction to modify any provision(s) of this Agreement held to be invalid or unenforceable to the extent necessary to permit such provision(s) to be legally enforced to the maximum extent permissible and to then enforce the provision(s) as modified.

(g)    To the extent permitted by federal law, this Agreement and any post-termination obligations under the Employment Agreement that survive herein will be governed by and construed in accordance with the laws of Ohio.

(h)    The Parties hereby acknowledge and agree that each Party had the opportunity for individual negotiation of this Agreement and that this Agreement reflects the individually negotiated agreement of the Parties.

7.    **Mr. Nail's Consideration of this Agreement.**

(a)    Mr. Nail agrees that no promises or agreements have been made to him except those contained in this Agreement.

(b)    Mr. Nail agrees that he has been advised to consult with an attorney before executing this Agreement. Mr. Nail has been given at least 21 calendar days after receipt of this

- 5 -

LES00027

Agreement (the "**Consideration Period**"), if he so desires, to consider this agreement before signing it. If Mr. Nail signs this Agreement, the date on which he signs the Agreement shall be the "Execution Date." If not signed and returned to PPI so that it is received no later than the end of the Consideration Period, this Agreement will not be valid. In addition, if Mr. Nail during the Consideration Period engages in conduct that would have breached the terms of this Agreement if it had been effective, the offer of this Agreement will be withdrawn and his execution of this Agreement will not be valid. In the event Mr. Nail executes and returns this Agreement prior to the end of the Consideration Period, he acknowledges that the decision to do so was voluntary and that Mr. Nail had the opportunity to consider this Agreement for the entire Consideration Period.

(c)    The Parties agree that this Agreement will not become effective until 7 calendar days after the Execution Date and that Mr. Nail may, within 7 calendar days after the Execution Date, revoke the Agreement in its entirety by written notice to PPI. If written notice of revocation is not received by the 8th day after the execution of this Agreement by Mr. Nail, this Agreement will become effective and enforceable on that day (the "**Effective Date**").

**Mr. Nail represents and agrees that he has fully read and understands the meaning of this Agreement and is voluntarily entering into this Agreement with the intention of giving up all claims against PPI, the CBS Entities, and any Related Person of such entities. Mr. Nail acknowledges that he is not in entering into this Agreement relying on any representations by PPI, the CBS Entities, and any Related Person of such entities concerning the meaning of any aspect of this Agreement.**

Date: _____, 2006    _____
                               **Lester C. Nail**


                               **PARAMOUNT PARKS INC.**

Date: _____, 2006    By: _____

                               Name: _____

                               Title: _____

- 6 -

LES00028

<u>EXHIBIT A</u>
<u>TO</u>
<u>SEPARATION AND RELEASE AGREEMENT</u>

**EMPLOYMENT AGREEMENT COMMENCING JANUARY 1, 2006 IS ATTACHED HERETO AND MADE A PART HEREOF.**

LES00029





May 21, 2007

Lester Nail
9027 Kirkley Court
Charlotee, NC 28277

Dear Lester,

Effective July 1, 2007, Paramount Parks, Inc. will be changing its benefit plans. Enclosed are the relevant forms you need to complete in order to continue your coverage under the new plans. Please complete, sign and return these forms at your earliest convenience, but in no event later than May 30, 2007. You may also fax them.

Forms should be sent to:

Sandy Cranford
Carowinds
14523 Carowinds Blvd.
P.O. Box 410289
Charlotte, NC 28273
Fax: (704) 583-9133

Sandy will be contacting you early next week to review and discuss any questions you may have or she can be reached at (704) 831-4450.

Sincerely,

Craig Freeman

LES00001

Page 1

1

2  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK

3  ---------------------------X

4  PARAMOUNT PARKS, INC.,

5         Plaintiff,

6       vs.        No. 07 CV 10595(SS)

7  LESTER NAIL,

8         Defendant.

9  ---------------------------X

10         April 23, 2008
           9:02 a.m.

11

12

13

14      Deposition of CRAIG FREEMAN, held at

15  the offices of Squire, Sanders & Dempsey

16  L.L.P., 350 Park Avenue, New York, New York,

17  pursuant to Notice and Agreement, before

18  Thomas R. Nichols, a Registered Professional

19  Reporter and a Notary Public of the State of

20  New York.

21

22

23
           GREENHOUSE REPORTING, INC.
24         875 Sixth Avenue - Suite 1716
           New York, New York  10001
25             (212) 279-5108

Page 2

1
2  A P P E A R A N C E S:
3
4  SQUIRE, SANDERS & DEMPSEY L.L.P.
5  Attorneys for Plaintiff
6      1300 Huntington Center
7      41 South High Street
8      Columbus, Ohio 43215-6197
9  BY:  JILL S. KIRILA, ESQ.
10
11  LITTLER MENDELSON
12  A Professional Corporation
13  Attorneys for Defendant
14      885 Third Avenue
15      New York, New York 10022-4834
16  BY:  MICHAEL P. PAPPAS, ESQ.
17      A. MICHAEL WEBER, ESQ.
18
19  ALSO PRESENT:
20      LESTER NAIL
21
22
23
24
25

Page 3

1              C. Freeman
2  C R A I G   F R E E M A N,  called as a
3      witness, having been duly sworn by a Notary
4      Public, was examined and testified as
5      follows:
6          THE REPORTER:  Could you please state
7      your name and home address for the record.
8          THE WITNESS:  Craig Freeman,
9      849 Crosstree Lane, Sandusky, Ohio 44870.
10  EXAMINATION BY
11  MR. PAPPAS:
12      Q.   Good morning.  My name is Michael
13  Pappas.  I am one of the attorneys for Lester Nail
14  in Paramount Parks' lawsuit against him.
15          From now on I'll refer to Paramount
16  Parks as PPI.  Is that OK?
17      A.   Sure.
18      Q.   Before I begin, I would like to
19  briefly explain some of the ground rules for the
20  deposition.  As you can hear, I have a slight head
21  cold, so if you can't understand what I say,
22  please let me know.
23          I'm going to be asking you a series of
24  questions and you will answer those questions
25  under oath.  You have already been sworn.  That

Page 4

1              C. Freeman
2  means that you're legally obligated to tell the
3  truth.
4          Do you understand that?
5      A.   Yes.
6      Q.   If there's any question that you don't
7  hear or that you don't understand, I would ask you
8  to please let me know that you either didn't hear
9  it or don't understand it and I'll repeat it or
10  rephrase it.  If you don't indicate -- unless you
11  indicate otherwise, we'll assume that you have
12  heard and understood the question.
13          Do you understand that?
14      A.   Yes.
15      Q.   Have you heard and understood
16  everything I've said so far?
17      A.   Yes.
18      Q.   Please be sure to give all of your
19  answers verbally so that the court reporter can
20  take it down.  In other words, don't nod or shake
21  your head.  And if you want to say yes or no, say
22  yes or no, not "uh-uh" or "uh-huh," because it's
23  harder for the court reporter to understand what
24  you're saying.
25          Finally, please wait for me to finish

Page 5

1              C. Freeman
2  my entire question before answering.  I understand
3  that you sometimes know what the question is going
4  to be, but it's hard for the court reporter if
5  we're overlapping in our questions and answers.
6          Finally, if you need a break at any
7  time, just let us know.
8          Have you ever had your deposition
9  taken before?
10      A.   Yes.
11      Q.   How many times?
12      A.   Once.
13      Q.   When was that?
14      A.   Several years ago.
15      Q.   Do you remember what type of case that
16  was?
17      A.   It was a personal injury case.
18      Q.   Was that involved in your employment
19  or otherwise?
20      A.   Employment.
21      Q.   Can you elaborate on what the case was
22  about?
23      A.   A woman visiting our, um, the park
24  that I managed in Minnesota tripped and fell and
25  broke her arm and sued us.

C. Freeman

1
2    Q.    In what capacity were you deposed?
3    A.    I was the general manager of the park.
4    Q.    Have you ever testified as a witness
5    in any other proceeding?
6    A.    Other than that one?
7    Q.    Right.  Other than that deposition.
8    A.    Yes.
9    Q.    How many?
10   A.    Once.
11   Q.    Was that the same case?
12   A.    Yes.
13   Q.    It went to trial?
14   A.    Yes.
15   Q.    Have you consumed any alcoholic
16   beverages in the last twelve hours?
17   A.    No.
18   Q.    Have you taken any drugs or
19   medications in the last 48 hours?
20   A.    Yes.
21   Q.    What kind?
22   A.    Aspirin, vitamin, and I have a
23   prescription that I take.
24   Q.    Does the -- do any of those
25   medications affect your ability to speak?

C. Freeman

1
2    A.    No.
3    Q.    Do they affect your ability to hear or
4    understand?
5    A.    No.
6    Q.    Do they affect your memory?
7    A.    No.
8    Q.    Do you have any other problems that
9    might affect your ability to think and recall?
10   A.    No.
11   Q.    No?
12   A.    No.
13   Q.    Is there any reason that you can't
14   testify truthfully today?
15   A.    No.
16   Q.    Is there any reason that you can't
17   testify accurately and completely today?
18   A.    No.
19   Q.    Are you represented by counsel?
20   A.    Yes.
21   Q.    Who is your counsel?
22   A.    Jill Kirila.
23   Q.    And she's sitting right next to you,
24   correct?
25   A.    Yes.

C. Freeman

1
2    Q.    Have you reviewed any documents in
3    preparation for your testimony today?
4    A.    Yes.
5    Q.    What documents have you reviewed?
6    A.    The employment agreement.
7    Q.    Lester Nail's employment agreement
8    with PPI?
9    A.    Yes.
10   Q.    Any other documents?
11   A.    Just other things that have been part
12   of the discovery process.  The complaint and, you
13   know, the other things that have been part of the
14   case, the correspondence back and forth.
15   Q.    When you say the complaint, you mean
16   the court complaint filed by PPI, correct?
17   A.    Yes.
18   Q.    Do you recall any other specific
19   documents that you reviewed?
20   A.    The materials that were exchanged as
21   part of the discovery process.
22   Q.    The documents each side produced to
23   each other?
24   A.    Yes.
25   Q.    You reviewed all of those?

C. Freeman

1
2    A.    I can't say I reviewed all of them.
3    But I looked through them and reviewed some more
4    than others.
5    Q.    Do any stand out in your mind as you
6    having taken more time to review?
7    A.    None specifically stand out in my
8    mind.
9    Q.    Any other documents you've reviewed in
10   preparation for your testimony today?
11   A.    Not that I can recall.
12   Q.    Did you prepare for your testimony
13   today with an attorney?
14   A.    Yes.
15   Q.    How many times did you meet to prepare
16   for the deposition?
17        MS. KIRILA:  Just an objection.  You
18   can answer this question, but do not
19   disclose any of our communications or
20   conversations.
21   A.    We had one meeting specifically in
22   preparation for this deposition.
23   Q.    Did you have any telephone conferences
24   to prepare?
25   A.    We had telephone conferences.  I don't

Page 10

C. Freeman

1    know that I would designate any of those as
2    specifically for the purpose of preparing for the
3    deposition.
4
5        Q.    When did you have the one meeting to
6    prepare?
7        A.    Last Friday, the 18th of April.
8        Q.    That was with Ms. Kirila?
9        A.    Yes.
10       Q.    Anyone else?
11       A.    Our general counsel was present for
12   that meeting.
13       Q.    Who was that?
14       A.    His name is Duff Milkie.
15       Q.    M-i-l-k-i-e?
16       A.    M-i-l-k-i-e.
17       Q.    Anyone else?
18       A.    No.
19       Q.    How long did that meeting last?
20       A.    About two and a half hours.
21       Q.    Did you review any documents during
22   that preparation meeting?
23       A.    Yes.
24       Q.    The things you've already discussed?
25       A.    Yes.

Page 11

C. Freeman

1
2        Q.    Did any of the documents you reviewed
3    refresh your recollection as to any of the events
4    in this case?
5        A.    I'm sure they did, but I can't -- I
6    can't recall any epiphanies in terms of:  Oh, aha!
7        Q.    Other than meeting with your attorney
8    and Mr. Milkie, have you spoken to anyone in
9    preparation for this deposition?
10       A.    Regarding the facts that we're
11   discussing?
12       Q.    Regarding anything about the
13   deposition, including facts that you might be
14   asked about.
15       A.    Yes.
16       Q.    Who did you have that discussion with?
17       A.    Sandy Cranford.
18       Q.    Who is that?
19       A.    She is the director of human resources
20   for Carowinds.
21       Q.    Was that one discussion or more than
22   one discussion?
23       A.    I recall one discussion.
24       Q.    Do you remember when that was?
25       A.    Friday.

Page 12

C. Freeman

1
2        MS. KIRILA:  I am just going to object
3    and instruct you not to answer with respect
4    to conversations on Friday with Sandy
5    regarding any information that I requested
6    you to obtain.
7        Q.    When you say Friday, was that the
8    18th --
9        A.    Yes.
10       Q.    -- of April?
11       How long did that discussion last?
12       A.    Less than five minutes.
13       Q.    And what was discussed?
14       MS. KIRILA:  Objection.  To the extent
15   it reveals anything that I specifically
16   directed you to obtain for me, do not
17   answer.
18       Q.    Did you learn any facts as a result of
19   that discussion?
20       A.    Yes.
21       Q.    What facts did you learn?
22       A.    That really relates to the information
23   that my counsel instructed me to obtain, so I
24   can't respond.
25       Q.    There were no attorneys present during

Page 13

C. Freeman

1
2    that conversation, were there?
3        A.    Yes.
4        Q.    Who was that?
5        A.    Duff Milkie.
6        Q.    He was present during your
7    conversation with Sandy Cranford?
8        A.    Yes.
9        Q.    Have you talked about this case with
10   anyone other than an attorney?  Other than what
11   you've already talked about.
12       A.    I reported to my boss on it.
13       Q.    Who is your boss?
14       A.    Dick Kinzel.
15       Q.    And what's his position?
16       A.    He's president and CEO, chairman,
17   president, CEO of Cedar Fair Entertainment
18   Company.
19       Q.    How many times did you report to
20   Mr. Kinzel about the case?
21       A.    Several times.
22       Q.    During what period of time?
23       A.    From the time the case was filed to
24   the present.
25       Q.    From the time the lawsuit was filed?

4 (Pages 10 to 13)

C. Freeman

1
2    A.    Yes.
3    Q.    What did you report to Mr. Kinzel?
4        MS. KIRILA:    Another instruction here.
5    Object to the extent you are communicating
6    anything that I directly instructed you to
7    convey to Mr. Kinzel and any legal strategy.
8    But other than that, you can answer.
9    A.    There were several conversations we
10   had regarding the status of the case.  Some of
11   those conversations occurred in the presence of
12   our attorney, our general counsel.
13       THE WITNESS:  So I would imagine those
14   are protected.
15       MS. KIRILA:  Yes, do not testify as to
16   those.
17   A.    I don't recall specific dates and
18   conversations, and so forth.  They were just
19   general, you know, progress reports, updates, you
20   know, making recommendations, getting direction,
21   that sort of thing.
22   Q.    Can you tell me the substance of
23   anything that was discussed in any of those
24   meetings other than privileged material?
25       MS. KIRILA:  And I will also instruct

C. Freeman

1
2    you if you're not sure whether Duff was
3    there or not, do not guess.  Only testify
4    about those which you know Duff was not
5    present or other counsel.
6    A.    I don't have specific recollection of
7    the substance of specific conversations.
8    Q.    Do you recall anything that Mr. Kinzel
9    said in any of those discussions?
10       MS. KIRILA:  Same instruction.
11   A.    Something to the effect that, you
12   know, this could all be over with if Mr. Nail
13   would just write us a check for what he owes us.
14   Q.    Mr. Kinzel said that?
15   A.    Yes.
16   Q.    Did you have any response to that?
17   A.    I had my marching orders.
18   Q.    I am just asking if you responded to
19   that comment at all.
20   A.    I think my response was that I just --
21   I understood.
22   Q.    Do you recall anything else that
23   Mr. Kinzel said in any of those discussions?
24   A.    He has -- he has wondered why Mr. Nail
25   doesn't understand that he owes Cedar Fair this

C. Freeman

1
2    money or PPI this money, I'm sorry, owes PPI this
3    money and why he thinks it's OK for him to do what
4    he did.
5    Q.    That's something Mr. Kinzel actually
6    said or that was your impression of what he was
7    thinking?
8    A.    That's a summary of his -- of what he
9    has said.
10   Q.    Anything else?
11   A.    Not that I recall.
12   Q.    In any of your meetings and
13   discussions with Mr. Kinzel where counsel were
14   present was there any nonattorney present from
15   outside the company in any of those meetings?
16   A.    No.
17   Q.    Are you an attorney?
18   A.    No.
19   Q.    Have you ever attended law school?
20   A.    No.
21   Q.    Do you have any type of legal
22   training?
23   A.    Not beyond taking business law courses
24   in college.
25   Q.    Just following up on the last series

C. Freeman

1
2    of questions, other than Sandy Cranford and
3    Mr. Kinzel did you have any discussions with any
4    other nonattorneys regarding this case?
5    A.    What type of discussions?
6    Q.    Any type of discussions,
7    correspondence, regarding this case.
8    A.    I'm sure I have mentioned in brief to
9    our human resources director, corporate HR
10   director.
11   Q.    Which is?
12   A.    Her name is Billy Clark.
13   Q.    Do you remember any discussions or
14   correspondence you had with Ms. Clark regarding
15   this case that would not be privileged?
16   A.    Nothing specific.  Just general
17   updates.
18   Q.    Do you recall anything specific that
19   either you or she said in any of those
20   discussions?
21   A.    No.
22   Q.    Anyone other than Ms. Clark,
23   Mr. Kinzel and Ms. Cranford?
24   A.    My assistant.
25   Q.    Who is that?

Page 18

C. Freeman

1     A.    Ruth Hufnagle.
2     Q.    Do you have any substantive
3  communications with her about the case?
4     A.    No, just enlisting her assistance to
5  gather documents for discovery, and so forth.
6     Q.    Anyone else?
7     A.    Conversations surrounding that.
8     Q.    Anyone else?
9     A.    Veronica Dowd.
10    Q.    Who is she?
11    A.    She's on my staff, also. And she is
12  our, she's a human resources manager, corporate
13  human resources manager.
14    Q.    What did you discuss with her about
15  the case?
16    A.    Just information gathering, because
17  she has access to the human resources system.
18    Q.    What specific information did you talk
19  to her about gathering?
20    A.    Just information regarding Mr. Nail's
21  benefits, and so forth.
22    Q.    Benefits and what else?
23    A.    That's really all I recall.
24    Q.    Was that for the purpose of responding
25

Page 19

C. Freeman

1  to discovery requests in this case?
2     A.    Yes.
3     Q.    Anyone else?
4     A.    No. Not that I recall.
5     Q.    Did you speak to Peter Crage [Craig]
6  about this case?
7     A.    I don't recall any conversations that
8  I had with Mr. Crage.
9     Q.    It's pronounced Crage?
10    A.    Yes.
11    Q.    OK. In your discussions with
12  Mr. Kinzel you indicated that he wondered why
13  Mr. Nail didn't understand that he owes money,
14  correct?
15    A.    Yes.
16    Q.    Did he say why he believed that
17  Mr. Nail owed the company money?
18    A.    I don't recall him elaborating.
19    Q.    Where did you go to college?
20    A.    Where did I go to college?
21    Q.    Yes.
22    A.    I, my bachelor's degree was from the
23  University of Southern California.
24    Q.    What is your degree in?
25

Page 20

C. Freeman

1     A.    Business administration.
2     Q.    What year did you obtain that degree?
3     A.    1977.
4     Q.    Do you have any other degrees?
5     A.    An associate of arts degree from
6  Fullerton College.
7     Q.    Anything else?
8     A.    MBA from California State University
9  at Fullerton.
10    Q.    Anything else?
11    A.    That's it.
12    Q.    Do you have any other post high school
13  education other than what you've already
14  described?
15    A.    No.
16    Q.    Do you have any professional -- other
17  professional training other than what you've
18  already described?
19    A.    Seminars and things like that.
20    Q.    Relating to what?
21    A.    Gosh. Business, you know, leadership,
22  professional development.
23    Q.    Anything relating to executive
24  contracts or compensation or anything like that?
25

Page 21

C. Freeman

1     A.    No.
2     Q.    Do you have any professional licenses?
3     A.    No.
4     Q.    Or professional certificates?
5     A.    No.
6     Q.    Have you ever had any training in
7  human resources?
8     A.    Um, seminars regarding union matters.
9     Q.    Other than that?
10    A.    No.
11    Q.    Where are you currently employed?
12    A.    Cedar Fair.
13    Q.    Cedar Fair LP?
14    A.    Cedar Fair LP. That's the parent
15  company. Technically my employer is Magnum
16  Management Corporation which is a subsidiary of
17  Cedar Fair LP.
18    Q.    So Magnum is your employer.
19    A.    Yes.
20    Q.    That's a wholly owned subsidiary of
21  Cedar Fair?
22    A.    I'm trying to recall the entity's
23  structure and I believe it is wholly owned by
24  Cedar Fair.
25

6 (Pages 18 to 21)

Page 22

C. Freeman

1

2  Q.  What is Magnum -- Magnum's
3  relationship with PPI?
4  A.  It's the parent company of PPI.
5  Q.  So Magnum owns all of the stock of
6  PPI?
7  A.  Yes.
8  Q.  What is your position?
9  A.  Corporate vice president
10 administration.
11 Q.  Are you considered an officer of the
12 corporation?
13 A.  Yes.
14 Q.  Are you a director?
15 A.  No.
16 Q.  How long have you been employed in
17 that position?
18 A.  About a little less than three years.
19 Q.  Do you remember when you started in
20 that position?
21 A.  September of 2005.  There was a little
22 bit of an overlap.  My predecessor retired, so --
23 Q.  Where were you employed before that?
24 A.  I was the general manager of Camp
25 Snoopy in Mall of America.

Page 23

C. Freeman

1

2  Q.  That was owned by Magnum as well?
3  A.  It had a management contract with
4  Cedar Fair.
5  Q.  Who was your employer when you were GM
6  of Camp Snoopy?
7  A.  I believe it was Magnum.
8  Q.  Who owned the actual Camp Snoopy?
9  A.  It was owned by, um, it was owned by a
10 partnership that controlled, basically controlled
11 the mall property.
12 Q.  What was your position before that?
13 A.  Director of administration at Camp
14 Snoopy.
15 Q.  Same employer?
16 A.  Yes.  Well, Cedar Fair purchased
17 Knott's Berry Farm in 1997.  So my general manager
18 position actually straddled that acquisition.
19 Q.  When was that?  1997?
20 A.  Yes, late December of 1997.
21 Q.  So you were employed by a different
22 employer and then Cedar Fair acquired the Camp
23 Snoopy and you remained employed?
24 A.  Cedar, um, Cedar Fair -- I worked for
25 Knott's Berry Farm.  Knott's Berry Farm had a

Page 24

C. Freeman

1

2  management agreement for the Camp Snoopy park in
3  Mall of America.  Cedar Fair acquired Knott's
4  Berry Farm in late 1997 and inherited, if you
5  will, or assumed the management agreement.
6  Q.  And you remained employed in the same
7  position --
8  A.  The same position.
9  Q.  -- before and after, correct?
10 A.  Yes.  So that was in 1997.  My
11 position as general manager started in 1996 and
12 prior to that I was director of administration,
13 employed by Knott's Berry Farm.
14 Q.  What are your duties and
15 responsibilities as vice president administration
16 for Magnum?
17 A.  I'm responsible for the corporate
18 human resources function as well as various
19 administrative duties such as license agreements,
20 real estate transactions, asset sales.
21 Q.  Anything else?
22 A.  That's most of it.  I get involved in
23 some of the -- I work with the general counsel
24 quite a bit on contractual matters and legal
25 matters.

Page 25

C. Freeman

1

2  Q.  You said on contractual and legal
3  matters?
4  A.  Yes.
5  Q.  What type of contractual and legal
6  matters do you work with general counsel on?
7  A.  Things like agreements that the parks
8  enter into for concessionaires or entertainment
9  or, you know, various operating agreements that
10 the parks have and also assist him with his needs
11 and if he's involved in some litigation where I
12 have information or can assist, myself and my
13 staff.
14 Q.  What about employment agreements?
15 A.  Other than this one we're discussing
16 today, I have not had any involvement with him on
17 any employment agreements.
18 Q.  Have your duties and responsibilities
19 changed at all since PPI was acquired from CBS?
20 A.  Yes.
21 Q.  How have they change and when did they
22 change?
23 A.  As we approached the acquisition of
24 PPI, of PPI, I became involved in the due
25 diligence process, information gathering, and I

7 (Pages 22 to 25)

C. Freeman

1
2 assimilated all of the duties and responsibilities
3 that I had on behalf of Cedar Fair on behalf of
4 the additional parks when the acquisition was
5 consummated.
6     Q.    Anything else?
7     A.    In terms of the types of duties and
8 responsibilities, not really.  It was just more
9 the scope of those responsibilities and the volume
10 of those responsibilities increased dramatically.
11     Q.    Now, you said you were responsible for
12 the corporate HR function.  Is that for all of
13 Cedar Fair or one specific part of it?
14     A.    All of Cedar Fair.
15     Q.    Who do you report to?
16     A.    The president/CEO, Dick Kinzel.
17     Q.    Anyone else?
18     A.    No.
19     Q.    Have you reported directly to him
20 during the whole time that you have been in your
21 current position?
22     A.    Yes.
23           Can I back up and clarify something?
24     Q.    Sure.
25     A.    You asked about my employment history

C. Freeman

1
2 originally and I said I had been in my position a
3 little less than three years.  I just wanted to
4 elaborate on that transition period when my
5 predecessor was retiring.
6           So between the time I left Mall of
7 America as general manager, which was end of March
8 2005, and the time he retired, which was beginning
9 of September 2005, I had a position.  I was vice
10 president administration without the corporate
11 responsibilities at that time and I was reporting
12 to the previous corporate VP of administration.
13           In other words, there was a transition
14 period, an overlap, and during that overlap period
15 I was not reporting to Mr. Kinzel.  I was
16 reporting to another individual.
17           But that just -- I just wanted to
18 clear that up.
19     Q.    But since September of '05 you have
20 been reporting directly to Mr. Kinzel?
21     A.    Yes.
22     Q.    Does anyone report to you?
23     A.    Yes.
24     Q.    How many people report to you?
25     A.    Direct reports?

C. Freeman

1
2     Q.    Yes.
3     A.    Three.
4     Q.    Can you identify them?
5     A.    Billy Clark, Ruth Hufnagle, and
6 Michelle Ledger.
7     Q.    And what was Michelle's position?
8     A.    She's the purchasing manager at Cedar
9 Point.
10     Q.    Who does Sandy Cranford report to?
11     A.    She currently reports to the general
12 manager of Carowinds.
13     Q.    Have you had those three same direct
14 reports since the time that you assumed your
15 current position full time?
16     A.    Since September of 2005?
17     Q.    Yes.
18     A.    No.
19     Q.    How has that changed since September
20 of 2005?
21     A.    Prior to the Paramount acquisition we
22 did not really have a corporate human resources
23 function per se.  With the acquisition we
24 increased our human resources staff to create the
25 corporate -- corporate oversight function and

C. Freeman

1
2 brought in Billy Clark.
3           With the additional volume and level
4 of responsibilities, we added Ruth Hufnagle as an
5 additional resource.
6     Q.    So prior to the acquisition how many
7 people reported to you directly?
8     A.    One.
9     Q.    And who was that?
10     A.    Her name was Jean Ohlemacher.
11 O-h-l-e-m-a-c-h-e-r.
12     Q.    What was her position?
13     A.    Administrative assistant.
14     Q.    Prior to the time that you started
15 reporting directly to Mr. Kinzel, did you know
16 him?
17     A.    Yes.
18     Q.    Did you have any interactions with
19 him?
20     A.    Yes.
21     Q.    In what capacity?
22     A.    When I was in that interim position
23 from March to September I attended the staff
24 meetings and he would have me work on projects.
25           Prior to that, when I was general

C. Freeman

1
2    manager at the Camp Snoopy park at Mall of America
3    he would -- he would make stewardship visits to
4    the park and I would report to him on the status
5    of our business and we would meet on various
6    issues. And I would have occasional phone
7    conversations with him.
8        Q.    Would you describe him as a pretty
9    hands-on president and CEO?
10       A.    As the business has grown he has been
11   forced to I guess become more and more removed,
12   and in fact from an organizational standpoint
13   he's, um, he's put people, more people between him
14   and the operations.
15       Q.    When did that change start to occur?
16       A.    In early 2005 he brought in a chief
17   operating officer. And the general managers as of
18   that time, the general managers at the parks no
19   longer reported to Mr. Kinzel. They reported to
20   the CEO.
21       Q.    Who was that?
22       A.    Jack Falfas.
23       Q.    Falfas?
24       A.    F-a-l-f-a-s.
25       Q.    Is he still there?

C. Freeman

1
2        A.    Yes.
3        Q.    In the same position?
4        A.    Yes.
5        Q.    Where is your office located?
6        A.    Sandusky, Ohio.
7        Q.    Has it always been located there while
8    you have had this position?
9        A.    Yes.
10       Q.    In your current position what kind of
11   interactions do you have with Mr. Kinzel?
12       A.    I talk to him on the phone and I meet
13   with him on an ad hoc basis when I have things to
14   review and go over with him and attend his staff
15   meetings.
16       Q.    How often would you say you talk to
17   him on the phone?
18       A.    Average, three times a week.
19       Q.    How often does he hold the staff
20   meetings?
21       A.    Generally weekly unless -- unless
22   there's a conflict.
23       Q.    Is there a specific day of the week he
24   usually holds them on?
25       A.    It moves around.

C. Freeman

1
2        Q.    Other than his staff meetings how
3    often do you meet with him in person
4    approximately?
5        A.    Every several weeks.
6        Q.    Where is his office in relation to
7    your office?
8        A.    A couple of miles away.
9        Q.    So he's in a different building?
10       A.    Yes.
11       Q.    In the same city?
12       A.    Yes.
13       Q.    Has your level of interaction with him
14   remained fairly consistent since September 2005?
15       A.    Yes.
16       Q.    In your experience was Mr. Kinzel
17   typically involved in the termination of employees
18   at the vice president level and above?
19       A.    Yes.
20       Q.    How was he involved?
21       A.    Depending on the type of termination,
22   it can be, you know, a specific situational
23   involvement or it could be more of a general
24   involvement.
25       Q.    Was he consulted on all such

C. Freeman

1
2    terminations?
3        MS. KIRILA: Objection. To the extent
4    of your knowledge and your involvement you
5    can answer.
6        A.    He authorizes them.
7        Q.    He has to approve them, correct?
8        A.    Yes.
9        Q.    In the weekly staff meetings with
10   Mr. Kinzel were they recorded in any way?
11       A.    No. I'm sorry, yes.
12       Q.    How were they recorded?
13       A.    One of the attendees takes general
14   notes.
15       Q.    Did you personally take notes during
16   the meetings?
17       A.    For my own benefit?
18       Q.    Yes.
19       A.    Yes.
20       Q.    Do you still have any of those?
21       A.    Yes.
22       Q.    The person who was taking general
23   notes of the meeting, were those distributed
24   afterwards?
25       A.    Yes.

C. Freeman

1
2    Q.    They were sort of like the minutes of
3  the meeting?
4    A.    Yes.
5    Q.    And were they distributed to you?
6    A.    Yes.
7    Q.    Do you still have any of those?
8    A.    Yes.
9    Q.    How far back would you say that you
10  keep either your own personal notes or the minutes
11  of those staff meetings?
12    A.    Quite a while.  Going back quite a
13  while.
14    Q.    In your experience did Mr. Kinzel have
15  to approve employment contracts with executives?
16    A.    New employment contracts?
17    Q.    Yes.
18    A.    Yes.
19    Q.    Did he have to approve all employment
20  contracts or only those at a certain level and
21  above?
22    A.    All employment contracts.
23    Q.    In your experience was Mr. Kinzel ever
24  involved in hiring employees?
25    A.    Yes.

C. Freeman

1
2    Q.    How was he involved in hiring
3  employees?
4    A.    He conducts interviews for senior
5  level positions.
6    Q.    Did he interview you for your current
7  position?
8    A.    Yes.
9    Q.    And I presume he would have approval
10  over hiring of senior level positions, correct?
11    A.    Yes.
12    Q.    Do you know Peter Crage?
13    A.    Yes.
14    Q.    How do you know him?
15    A.    He is a coworker.
16    Q.    What is his position?
17    A.    Corporate vice president and chief
18  financial officer.
19    Q.    Of what entity?
20    A.    Cedar Fair LP.
21    Q.    How long have you known Peter Crage?
22    A.    Probably six years or so.
23    Q.    How did you first come to know him?
24    A.    When I was the general manager at Mall
25  of America, Camp Snoopy Mall of America, at one

C. Freeman

1
2  point he was the corporate treasurer and I met him
3  in those capacities, when we were both in those
4  capacities.
5    Q.    Do you know when he obtained his
6  current position?
7    A.    July of 2005.
8    Q.    As of September 2005 going forward did
9  you have any interactions with him?
10    A.    Yes.
11    Q.    What types of interactions did you
12  have with him?
13    A.    Given that we are peers on the
14  corporate staff, we interact frequently regarding
15  various business matters.
16    Q.    What types of matters?
17    A.    A couple of examples, ride purchases,
18  um --
19    Q.    You said ride, r-i-d-e?
20    A.    Ride, r-i-d-e, ride purchases, um,
21  benefits issues as it relates to the financial
22  implications.
23    Q.    Do you interact on human resources
24  issues?
25    A.    With Mr. Crage?

C. Freeman

1
2    Q.    Yes.
3    A.    Not typically unless as I said there's
4  some sort of a financial ramification, like we're
5  bidding out benefit packages or vendors or
6  programs or whatever.  We're both on the
7  retirement plan advisory committee.
8    Q.    Where is Mr. Crage's office in
9  relation to your office?
10    A.    A couple of miles away.
11    Q.    He's in the same building as
12  Mr. Kinzel?
13    A.    Not the same building, but an
14  adjacent, um --
15    Q.    Complex?
16    A.    -- building.  Yes, the same complex.
17    Q.    How frequently would you say that you
18  interact with Mr. Crage?
19    A.    About the same as Mr. Kinzel.  Several
20  times a week.
21    Q.    Is he also at the staff meetings?
22    A.    Yes.
23    Q.    Has your level of interaction with
24  Mr. Crage remained fairly consistent since
25  September of 2005 to the present?

C. Freeman

1
2  A.  Yes.
3  Q.  Was Mr. Crage typically involved in
4  termination of employees at the vice president
5  level or above?
6  A.  I wouldn't, um, I wouldn't say that he
7  regularly is, at least not with me.
8  Q.  Do you know of any instances where he
9  was involved?
10  A.  I don't recall any.
11  Q.  Do you know whether he was typically
12  consulted with respect to such terminations?
13  A.  I don't know.
14  Q.  Do you know whether he had to approve
15  such terminations?
16  A.  Not to my knowledge.
17  Q.  And do you know whether he had to
18  approve employment contracts with executives?
19  A.  Not to my knowledge.
20  Q.  Do you know whether he was consulted
21  or involved at all in employment contracts with
22  executives as far as approving them?
23  A.  I don't know.
24  Q.  Was he involved in hiring employees?
25  A.  Yes.

C. Freeman

1
2  Q.  How was he involved?
3  A.  He is sometimes part of the interview
4  process.
5  Q.  For any particular level of employee?
6  A.  It depends on the function of the
7  employee and the level of the employee.  For
8  example, someone within his organization, of
9  course he is going to be very much involved in the
10  process.  Anyone outside of his organization is
11  going to be at the discretion of the CEO.
12  Q.  But there have been instances where
13  he's been involved in interviewing people being
14  hired for outside his purview, correct?
15  A.  Yes.
16  Q.  Do you know Lester Nail?
17  A.  Yes.
18  Q.  How do you know Lester?
19  A.  Through his employment at PPI.
20  Q.  What was his position when he worked
21  at PPI?
22  A.  He was general counsel.
23  Q.  Only for PPI or for any other entity?
24  A.  For PPI.
25  Q.  Did you know him before PPI was

C. Freeman

1
2  acquired from CBS?
3  A.  I met him during the due diligence
4  process.
5  Q.  Did you know him before that?
6  A.  No.
7  Q.  In your current position and while
8  Mr. Nail was still employed by PPI did you have
9  any interaction with him?
10  A.  Yes.
11  Q.  What kind of interaction did you have?
12  A.  Transition issues regarding legal
13  matters and also human resource matters.
14  Q.  When you say transition issues
15  regarding legal matters, does that refer to after
16  the acquisition when Mr. Nail was on his way out?
17  A.  We, during the due diligence process
18  and through the remainder of Mr. Nail's
19  employment, we discussed and he updated and
20  reviewed with me situations which were ongoing or
21  in process or needed resolution or needed
22  decisions or things that were -- that were within
23  his scope of responsibility that the acquiring
24  entity needed to be aware of.
25  Q.  And that applied to both legal matters

C. Freeman

1
2  and HR matters?
3  A.  Yes.  And he and I worked together on
4  the downsizing of the corporate staff.
5  Q.  Where was his office in relation to
6  yours?
7  A.  He was based in Charlotte.
8  Q.  Was that PPI's corporate headquarters
9  when it was owned by CBS?
10  A.  Yes.
11  Q.  And you were in Ohio, correct?
12  A.  Yes.
13  Q.  Did you ever meet with him in person
14  or were all your interactions by other means?
15  A.  We met on a few occasions in person.
16  Q.  Did you go down there or did he go to
17  Ohio?
18  A.  I went down there.
19  Q.  Was he cooperative as far as the
20  transition issues?
21  A.  Generally, yes.
22  Q.  How frequently would you say you
23  interacted with Mr. Nail during the time that you
24  were both there, both employed at the same time?
25  A.  From the effective date of the

Page 42

C. Freeman

1 acquisition going forward, several times a week.
2
3      Q.    PPI's currently owned by Magnum is it?
4      A.    Yes.
5      Q.    When was PPI acquired from CBS?
6      A.    June 20, 2006.
7      Q.    And it was acquired directly by Magnum
8 or by Cedar Fair?
9      A.    I -- I don't know the specific
10 legalities of the transaction.  What I'm giving
11 you in terms of who owns who is from my
12 recollection of the entity structure chart the
13 last time I looked at it.
14      Q.    What type of company is Magnum?  Is it
15 a holding company?  What type of business is it
16 engaged in?
17      A.    It's engaged in the amusement park
18 business.
19      Q.    What kind of company is Cedar Fair?
20      A.    It's engaged in the amusement park
21 business as well.
22      Q.    And it's headquartered in Ohio,
23 correct?
24      A.    Yes.
25      Q.    And it has been for some time, right?

Page 43

C. Freeman

1
2      A.    Yes.
3      Q.    Since prior to the acquisition --
4      A.    Yes.
5      Q.    -- of PPI.
6           How many amusement parks does Cedar
7 Fair operate either through itself or through its
8 subsidiaries?
9      A.    I believe eleven amusement parks.
10      Q.    And does that include water parks or
11 is that a separate category?
12      A.    That's a separate category.
13      Q.    How many water parks does it operate?
14      A.    I'm sorry, you said own and/or
15 operate, right?  So that would be twelve amusement
16 parks including Gilroy Gardens under our
17 management contract.  Water parks, separately
18 gated or separate admission water parks, six.
19      Q.    I am just going to run down the names
20 of them.  Tell me if I missed anything, OK?
21           Cedar Point in Ohio?
22      A.    Yes.
23      Q.    Soak City in Ohio.
24           Knott's Berry Farm in California.
25           Knott's Soak City in Orange County,

Page 44

C. Freeman

1
2 California.
3           Knott's Soak City in San Diego.
4           Knott's Soak City in Palm Springs.
5           King's Island in Ohio.
6           Canada's Wonderland, Ontario.
7           King's Dominion in Virginia.
8           Carowinds, North Carolina.
9           Great America in California.
10           Dorney Park in Pennsylvania .
11           Valley Fair in Minnesota.
12           Worlds of Fun in Missouri.
13           Oceans of Fun in Missouri.
14           Michigan's Adventure in Michigan.
15           And Wild Water Kingdom in Ohio.
16           Did I miss anything?
17      A.    Gilroy Gardens you didn't mention.  We
18 don't own it.  We just have a management
19 agreement.
20      Q.    Is that in California?
21      A.    Yes, Gilroy, California.
22      Q.    That's where they have garlic.
23      A.    Garlic capital of the world.
24      Q.    Anything else?
25      A.    So that then should total 18, right?

Page 45

C. Freeman

1
2      Q.    Right.  Is there a Star Trek ride or
3 something?
4      A.    Oh, OK.  That's not a park or a water
5 park.  It's an attraction, yes.
6      Q.    That's in Las Vegas.
7      A.    That's in Las Vegas.
8      Q.    Do you know which, if any, of these
9 properties were acquired as a result of the
10 acquisition of PPI from CBS in 2006?
11      A.    Yes.
12      Q.    Which ones?
13      A.    Star Trek, King's Island, King's
14 Dominion, Carowinds, Great America, Canada's
15 Wonderland, and then the Gilroy Gardens management
16 agreement.
17      Q.    And the management agreement is that
18 somebody else actually owns the place, but it's
19 operated by Cedar Fair?
20      A.    Yes.
21      Q.    Other than amusement and water parks
22 does Cedar Fair own or operates any other
23 properties?
24      A.    We have some hotel properties.
25      Q.    Those are on the premises of some of

12 (Pages 42 to 45)

Page 46

1                    C. Freeman
2    the parks?
3         A.    They are on or adjacent to or nearby.
4    They are associated with the amusement parks.
5         Q.    Do you know how many hotel properties
6    that Cedar Fair owns or operates?
7         A.    Five hotels, yeah, I think they are
8    five hotels and there are campgrounds.
9         Q.    How many campgrounds?
10        A.    I think three or four.  Four.
11        Q.    Is Cedar Fair engaged in any other
12   businesses?
13        A.    Not that I can think of right now.
14        Q.    Does it have any subsidiaries that are
15   engaged in any other businesses?
16        A.    No.
17        Q.    Who are -- from now on when I say
18   Cedar Fair, just to make it easy, I mean Cedar
19   Fair and its subsidiaries, OK?
20        A.    Sure.
21        Q.    Who are Cedar Fair's competitors?
22             MS. KIRILA:  Objection.  Relevance.
23        There's no dispute over noncompete here.
24             You can answer the question, but I'm
25        not going to get into competitiveness when

Page 47

1                    C. Freeman
2         this isn't an issue in the case.  Go ahead.
3         A.    Six Flags, Busch Entertainment, I
4    guess Disney, Universal, Herschend Entertainment,
5    H-e-r-s-c-h-e-n-d.  I am not sure the C is in
6    there, but we'll go with it.  Parc, which is
7    P-a-r-c, I believe is how it's spelled, owns
8    several properties in the U.S.  Kennywood
9    Entertainment.
10             Those are the big ones I can think of.
11        Q.    Does Cedar Fair do any business
12   outside of the U.S. and Canada?
13        A.    No.
14        Q.    Were you involved in the acquisition
15   of PPI by Cedar Fair?
16        A.    Yes.
17        Q.    I believe you testified earlier you
18   were involved in the due diligence, correct?
19        A.    Yes.
20        Q.    Were you involved in any other way?
21        A.    Transition, the transition issues
22   related to human resources and legal matters.
23        Q.    That's what you testified to before as
24   far as your interactions with Mr. Nail.
25        A.    Yes.

Page 48

1                    C. Freeman
2         Q.    Is that the same thing?
3         A.    Yes.  As well as benefit transition
4    issues, converting the benefits from CBS.
5         Q.    Who did you work with on the benefits
6    transition issues?
7         A.    Internally primarily Sandy Cranford.
8         Q.    Who did you work with at CBS, if
9    anyone, on those benefit transition issues?
10        A.    Primary contact, team leader if you
11   will on that side that I recall was Deb Bernes.
12        Q.    Anything else?
13        A.    That's my recollection of significant
14   things I was involved in.
15        Q.    How were you involved in the due
16   diligence?  What did you do?
17        A.    Information gathering, going out to
18   the data site and reviewing agreements and
19   policies and benefits and just gathering
20   information related to the responsibilities that I
21   previously related.
22        Q.    Did you report to anyone at Cedar Fair
23   regarding the due diligence process?
24        A.    I reported to the CEO, Dick Kinzel.
25        Q.    Who else did you work with from Cedar

Page 49

1                    C. Freeman
2    Fair on the due diligence process?
3         A.    Peter Crage and -- oh, our attorneys,
4    Squire Sanders.
5         Q.    Anyone else that you recall who you
6    worked with on due diligence?
7         A.    You know, I have just vague
8    recollections.  Nobody specific that I can say I
9    definitely remember working with this person.
10        Q.    Are there any point people at CBS or
11   PPI before the acquisition that you worked with on
12   the due diligence process?
13        A.    Separating due diligence from
14   integration, right?
15        Q.    Correct.
16        A.    Due diligence because we were in a
17   competitive bid situation, it was all very much
18   funneled, and so I really didn't work with anybody
19   at CBS during that process.
20        Q.    What about for the integration, who
21   were the point people?
22        A.    As I mentioned previously, I worked
23   with Lester, Sandy Cranford, Deb Bernes from CBS,
24   our attorneys from Squire Sanders, our benefits
25   consultants, benefits brokers I guess and

13 (Pages 46 to 49)

C. Freeman

1    consultants.
2
3    Q.    What were your interactions with
4    Mr. Nail prior to the closing date of the
5    acquisition?
6    A.    I recall a trip down there a couple of
7    weeks before the closing date where we had pretty
8    much an all-day meeting where Lester gave me an
9    orientation to the, in particular the legal
10   matters that were outstanding and the functions of
11   his area of responsibility.
12   Q.    Was there anyone else in attendance at
13   that meeting?
14   A.    He would, um, as I recall, he would
15   call in the paralegal, or referred to her or asked
16   her questions periodically on an ad hoc basis, but
17   she didn't actually participate in the meeting.
18   Q.    Other than that meeting did you have
19   any interactions with Mr. Nail prior to the
20   closing date of the acquisition?
21   A.    I don't believe we had any other
22   personal meetings. I'm sure we had phone
23   conversations and -- but I don't know what -- I
24   don't have any specific recollection.
25   Q.    Was it regarding similar type

C. Freeman

1
2    transitional matters regarding litigation and what
3    not?
4    A.    I don't recall specifically.
5    Q.    Prior to the closing date of the
6    acquisition were you involved in any discussions
7    regarding what would happen to Mr. Nail and the
8    other incumbent PPI executives after the
9    acquisition closed?
10   A.    Mr. Nail asked me about it on --
11   Mr. Nail asked me about it and I indicated to him
12   that I could not give him an answer.
13   Q.    Was that during the all-day meeting
14   you described?
15   A.    That was, yeah, he did ask about it
16   during that meeting.
17   Q.    What did he ask?
18   A.    He asked about his status.
19   Q.    Whether he would continue to be
20   employed after the acquisition?
21   A.    Um, yes. He asked it in a very -- my
22   recollection is he asked about it in a somewhat
23   roundabout way, but what I inferred from what he
24   was asking was that.
25   Q.    What did you respond?

C. Freeman

1
2    A.    I told him I couldn't answer the
3    question.
4    Q.    Did you know at the time or you
5    couldn't answer it for -- or you weren't permitted
6    to answer it?
7    A.    At that time I don't know whether his
8    specific status had been a hundred percent
9    confirmed.
10   Q.    Other than that discussion with
11   Mr. Nail were you involved in any internal
12   discussions with anyone at Cedar Fair regarding
13   who would stay and who would go after the
14   acquisition?
15   A.    Yes.
16   Q.    Who were those discussions with?
17   A.    Dick Kinzel.
18   Q.    Anyone else?
19   A.    I don't have specific recollection of
20   who would have been present.
21   Q.    Was that one discussion or more than
22   one discussion?
23   A.    I'm sure it was more than one
24   discussion.
25   Q.    When were those discussions in

C. Freeman

1
2    relation to the June 30th, 2006 closing date?
3    A.    I would say there were some before and
4    some after.
5    Q.    Focusing on the ones that took place
6    before the closing date, do you recall how soon
7    before the closing date those took place?
8    A.    No.
9    Q.    Do you recall what was discussed in
10   the discussions before the closing date regarding
11   who would stay and who would go?
12   A.    Not specifically, no.
13   Q.    Were any decisions made?
14   A.    Yes.
15   Q.    What decisions were made?
16   A.    A decision was made to put the, um,
17   put certain members of the senior executive team
18   on administrative leave effective as of the
19   closing date.
20   Q.    Certain members of PPI's executive
21   team.
22   A.    Yes.
23   Q.    Which members?
24   A.    If I tried to come up with a list I'd
25   miss somebody, but...

Page 54

| | |
|---|---|
| 1 | C. Freeman |
| 2 | Q. Well, give me who you remember with |
| 3 | the understanding that it may not be complete. |
| 4 | A. OK. Mr. Weber. |
| 5 | Q. Al Weber? |
| 6 | A. Al Weber. |
| 7 | Q. What was his position at PPI? |
| 8 | A. CEO. |
| 9 | Tim Fisher. |
| 10 | Q. What was his position? |
| 11 | A. I don't recall what his exact title |
| 12 | was. |
| 13 | Mike Koontz, CFO. |
| 14 | David Thornton. |
| 15 | Brett Petit or Petit, P-e-t-i-t. |
| 16 | Q. I'm sorry, do you know what position |
| 17 | Mr. Thornton was? |
| 18 | A. I don't recall his exact title. |
| 19 | Q. Do you recall it generally? |
| 20 | A. He was a vice president involved in |
| 21 | some creative or design capacity. |
| 22 | Q. What about Mr. Petit or Petite? |
| 23 | A. Vice president marketing. |
| 24 | Q. Anyone else? |
| 25 | A. Pat Jones. |

Page 55

| | |
|---|---|
| 1 | C. Freeman |
| 2 | Q. Position? |
| 3 | A. Vice president resale. |
| 4 | Dale Kaetzel. |
| 5 | Q. What was his position? |
| 6 | A. He was the general manager at Canada's |
| 7 | Wonderland. |
| 8 | I think Bob White might have been part |
| 9 | of that group. He was the general manager at |
| 10 | Carowinds. |
| 11 | That's all I'm recalling, and even |
| 12 | that group I'm -- I'm -- the date, there might be |
| 13 | a couple of days, a few days of, you know, where |
| 14 | something happened on June 30th and others |
| 15 | happened a few days later. |
| 16 | Q. So prior to the June 30th closing date |
| 17 | you had discussions with Mr. Kinzel in which it |
| 18 | was decided that the individuals that you just |
| 19 | listed and possibly others would no longer |
| 20 | continue to be employed after the acquisition? |
| 21 | MS. KIRILA: Objection. Misstates his |
| 22 | testimony. You can answer. |
| 23 | A. We discussed putting them on |
| 24 | administrative leave. |
| 25 | Q. What does that mean? |

Page 56

| | |
|---|---|
| 1 | C. Freeman |
| 2 | A. That means that they would be relieved |
| 3 | of their duties during the administrative leave |
| 4 | period and continue to be employed. |
| 5 | Q. Did all of those people have |
| 6 | employment contracts with PPI? |
| 7 | A. Yes. |
| 8 | MS. KIRILA: Restroom break when you |
| 9 | get to a convenient point? |
| 10 | MR. PAPPAS: Now is good. |
| 11 | MS. KIRILA: Five minutes? |
| 12 | MR. PAPPAS: Sure. |
| 13 | (A recess was taken from 10:22 to |
| 14 | 10:31 a.m.) |
| 15 | BY MR. PAPPAS: |
| 16 | Q. In your discussions with Mr. Kinzel |
| 17 | regarding the individuals that you just testified |
| 18 | about being placed on administrative leave, as you |
| 19 | put it, who made the decision to select those |
| 20 | individuals? |
| 21 | A. The final decision was Mr. Kinzel's. |
| 22 | Q. Did you have, give him any input into |
| 23 | that final decision? |
| 24 | A. With respect to the area that I -- oh, |
| 25 | OK. Not with respect to those individuals. |

Page 57

| | |
|---|---|
| 1 | C. Freeman |
| 2 | Q. Do you know if anyone else had given |
| 3 | him input as to those individuals? |
| 4 | A. I don't have specific knowledge. |
| 5 | Q. But it was only you and Mr. Kinzel |
| 6 | involved in those discussions regarding selecting |
| 7 | those individuals for administrative leave; is |
| 8 | that correct? |
| 9 | A. I can't tell you. I -- there may have |
| 10 | been other people involved in the discussions, but |
| 11 | I don't recall specifically who. |
| 12 | Q. Was there anyone else present when you |
| 13 | and Mr. Kinzel were having those discussions? |
| 14 | A. I don't recall. |
| 15 | Q. Were those discussions on the phone or |
| 16 | in person? |
| 17 | A. I don't recall. |
| 18 | Q. In your discussions with Mr. Kinzel |
| 19 | prior to the closing date of the acquisition did |
| 20 | you and he have occasion to discuss Lester Nail? |
| 21 | A. Can you repeat the question? |
| 22 | Q. Sure, in your discussions with |
| 23 | Mr. Kinzel prior to the closing date of the |
| 24 | acquisition did you and he have occasion to |
| 25 | discuss Mr. Nail? |

C. Freeman

1
2      A.    Yes.
3      Q.    What was discussed about Mr. Nail?
4      A.    What role he might play
5   postacquisition.
6      Q.    What was discussed about that?
7      A.    Whether given the transitional needs
8   of the business and the issues that were on our
9   plate from legal and human resources standpoint,
10  to what extent we'd be utilizing Mr. Nail's
11  services.
12     Q.    Were any conclusions reached as to
13  what to do with Mr. Nail after the acquisition?
14     A.    After the acquisition?
15     Q.    What to do with him after the
16  acquisition.
17     A.    In these discussions prior to the
18  closing?
19     Q.    Correct.
20     A.    We were not completely sure, which
21  is -- we just weren't completely sure.
22     Q.    Was it your understanding that
23  Mr. Kinzel was considering keeping Mr. Nail on
24  permanently or was it just a matter of when he
25  would ultimately be relieved of his duties?

C. Freeman

1
2         MS. KIRILA:  Object to form.  You can
3   answer.
4      A.    We were -- we were not sure to what
5   extent the outstanding issues and matters would
6   require Mr. Nail's personal attention and for what
7   length of time.
8      Q.    So were any decisions made about
9   Mr. Nail's status prior to the closing date?
10     A.    A decision was made not to include him
11  in the group that was placed on administrative
12  leave.
13     Q.    Then no decision was made as to what
14  would ultimately become of Mr. Nail.  At least no
15  decision was made prior to the closing date.
16     A.    Prior to the closing date I don't
17  recall a decision was made.
18     Q.    Do you know the reasons why those
19  individuals you listed were selected to be placed
20  on administrative leave and relieved of their
21  duties?
22     A.    Because with the integration of the
23  organizations their functions became redundant and
24  so therefore at that time their services were not
25  required.

C. Freeman

1
2      Q.    How do you know that that was the
3   reason?
4      A.    I am looking at the organization that
5   was in place to support the company
6   postacquisition and in looking at the positions
7   that they held, that's my conclusion.
8      Q.    Is that based on any discussions you
9   had with Mr. Kinzel or anyone else or is that
10  simply your conclusion?
11     A.    It's my conclusion.
12     Q.    Did Mr. Kinzel say or give you his
13  reasoning for selecting those individuals?
14     A.    Not that I recall.
15        (Mr. Nail joined the deposition.)
16     Q.    Did you take any notes during your
17  discussions with Mr. Kinzel prior to closing about
18  who would stay and who would go?
19     A.    Not that I recall.
20     Q.    Did he take any notes?
21     A.    Not that I recall.
22     Q.    Are you aware of anything in writing
23  discussing or memorializing those meetings and
24  discussions?
25     A.    Not that I recall.

C. Freeman

1
2      Q.    Did you have any discussions with
3   anyone other than Mr. Kinzel prior to the closing
4   date about which PPI executives would stay and
5   which would go?
6      A.    Not that I recall.
7      Q.    Prior to the closing date of the
8   acquisition did you discuss Mr. Nail with anyone
9   at PPI?
10     A.    Not that I recall.
11     Q.    What about anyone at CBS?
12     A.    Not that I recall.
13     Q.    Prior to the closing date did you
14  discuss Mr. Nail with anyone at Cedar Fair other
15  than Mr. Kinzel?
16     A.    Not that I recall.
17     Q.    Do you recall anything else in your
18  discussions with Mr. Kinzel preclosing that you
19  discussed with him about Mr. Nail?
20     A.    No.
21     Q.    Do you know Mr. Nail's position at PPI
22  prior to the acquisition?
23     A.    General counsel.
24     Q.    And prior to the closing date were you
25  aware that Mr. Nail and other PPI executives had

16 (Pages 58 to 61)

C. Freeman

1
2  employment agreements with PPI?
3      A.    Yes.
4      Q.    How were you aware of that?
5      A.    Through the due diligence process.
6      Q.    Those were provided to you by CBS?
7      A.    Yes.
8      Q.    Did you personally see Mr. Nail's
9  employment agreement prior to the closing?
10     A.    Yes.
11     Q.    When was the first time you saw it?
12     A.    I don't know the specific date.
13     Q.    Did you see all of the executive
14 employment agreements with PPI?
15     A.    I saw several.  I don't know whether
16 there were any I didn't see, but I -- I know I saw
17 several.
18     Q.    Were they all the same agreement or
19 were there variations?
20     A.    There were variations.
21     Q.    Did anyone else have the same type of
22 agreement as Mr. Nail?
23     A.    Yes.
24     Q.    Who?
25     A.    As I recall, Mr. Rankin, Mr. Thornton,

C. Freeman

1
2  Ms. Jones, Mr. Zimmerman.
3            Those are the ones I recall.
4      Q.    Were any PPI executives permanently
5  retained as employees after the acquisition?
6      A.    None of us are permanent.
7      Q.    With the intention of continuing their
8  employment indefinitely as opposed to a finite
9  ending date.
10     A.    OK, you're going to have to restate
11 that question.  I'm lost.
12     Q.    Were any of the PPI executives -- was
13 a decision made to retain any of the PPI
14 executives in the employ of PPI after the
15 acquisition?
16     A.    Those that were on employment
17 agreements specifically?
18     Q.    Any PPI executives.
19     A.    How would you define an executive?
20     Q.    Well, let's start stick with the ones
21 who had employment agreements then.
22     A.    Yes.
23     Q.    Which ones?
24     A.    Mr. Zimmerman was retained.
25     Q.    What was his position pre- and

C. Freeman

1
2  postacquisition?
3      A.    He was executive vice president
4  general manager of Kings Dominion.
5      Q.    Anyone else?
6      A.    Mr. Ross was retained.
7      Q.    What was his position pre- and
8  postacquisition?
9      A.    Well, immediately prior to the
10 acquisition he was -- he was like on a special
11 assignment.  He was an executive vice president of
12 the company.  Postacquisition he was the vice
13 president of marketing for King's Island.
14     Q.    Anyone else?
15     A.    Mr. Rankin was retained.
16     Q.    What was his position pre- and
17 postacquisition?
18     A.    He was the vice president and general
19 manager of the Great America Park.
20     Q.    Anyone else?
21     A.    When you say retained, as of what
22 date?
23     Q.    After June 30th, 2006.
24     A.    Mr. Nail was retained.  Actually, as I
25 indicated, as of June 30th everybody was retained

C. Freeman

1
2  because they were -- the, um, termination without
3  cause provisions of their employment agreements
4  had not yet been triggered.
5      Q.    When I say retained, I mean who was
6  retained for the purpose of remaining actively
7  employed and performing their duties?
8      A.    OK.  I believe the list I just gave
9  you, I believe that is a complete list.
10     Q.    Were any of the executives with
11 contracts who were employed at the PPI
12 headquarters in Charlotte retained other than
13 Mr. Nail?
14     A.    No.
15     Q.    Were you involved in any discussions
16 about whether the employment agreements of
17 Mr. Nail and the other PPI executives would remain
18 in effect after the acquisition?
19     A.    Yes.
20     Q.    Who were those discussions with?
21     A.    Mr. Kinzel.
22     Q.    What was discussed?
23     A.    What was discussed was I was given
24 direction that we were to honor the employment
25 agreements that were in place.

C. Freeman

1
2  Q.  Mr. Kinzel directed you to do that,
3  correct?
4  A.  Yes.
5  Q.  What did you understand him to mean by
6  honor the agreements?
7  A.  That we were to, um, abide by the
8  terms and conditions of those agreements.
9  Q.  Prior to the closing date did you have
10  any discussions with anyone at PPI or CBS
11  regarding Mr. Nail's employment agreement
12  specifically?
13  A.  No.
14  Q.  Did you have any discussions prior to
15  closing with anyone at Cedar Fair regarding
16  Mr. Nail's agreement specifically?
17  A.  No.
18  Q.  Was anyone present in your meeting or
19  discussion with Mr. Kinzel when he said honor the
20  agreements?
21  A.  I don't have specific recollection of
22  who may or may not have been present.
23  Q.  Was there anything that you know of in
24  writing regarding that meeting?
25  A.  Not that I know of.

C. Freeman

1
2  Q.  In 2006 was it Cedar Fair's practice
3  to have written employment contracts with its
4  higher level executives?
5  A.  To the best of my recollection in 2006
6  we, um, the only employee under contract was
7  Mr. Kinzel.
8  Q.  Did you have a written employment
9  contract?
10  A.  Me personally?
11  Q.  Yes.
12  A.  No.
13  Q.  Were you aware of anyone other than
14  Mr. Kinzel who had one?
15  A.  Not at that time.
16  Q.  Subsequently did it become Cedar
17  Fair's practice to have written contracts?
18  A.  Yes.
19  Q.  When did that occur?
20  A.  I don't know exactly.  I don't recall
21  exactly.
22  Q.  Were you involved in that change of
23  practice?
24  A.  No.
25  Q.  Do you know the reason for it?

C. Freeman

1
2  A.  No.
3  Q.  Had you discussed it with anyone?
4  A.  No.
5  Q.  Did you get a contract yourself?
6  A.  No.
7  Q.  Do you know of anybody who did?
8  A.  Yes.
9  Q.  Who?
10  A.  They're disclosed in the, um, public
11  filings.
12  Q.  Do you know if those contracts contain
13  any restrictions on postemployment activities?
14  A.  I don't know.
15  Q.  Who made the decision to retain
16  Mr. Nail after the closing date?
17  A.  That would have been based on a
18  discussion I would have had with Mr. Kinzel.
19  Q.  So did he make the decision or did
20  you?
21  A.  I made the recommendation.  He
22  approved it.
23  Q.  When did that discussion take place?
24  A.  I don't know specifically.  It would
25  have been at or around the closing date.

C. Freeman

1
2  Q.  Was it after the closing date?
3  A.  I doubt it.
4  Q.  Do you recall what specifically was
5  discussed?
6  A.  No.
7  Q.  Did you discuss the reasoning for your
8  recommendation with Mr. Kinzel?
9  A.  My recommendation was based on the
10  outstanding matters that we had to deal with that
11  needed further attention.
12  Q.  Legal matters?
13  A.  Legal and human resource matters.
14  Q.  And legal matters were ongoing
15  lawsuits and what not involving the company?
16  A.  Right.
17  Q.  And HR matters were letting go the
18  remaining people in the Charlotte office?
19  MS. KIRILA:  Objection.
20  A.  Restructuring.
21  Q.  Restructuring?
22  A.  Yes.
23  Q.  What did the restructuring entail?
24  MS. KIRILA:  I am just going to object
25  to the extent that you had discussions with

Page 70

C. Freeman

1
2     Mr. Nail in his capacity as general counsel
3     about that, but you can testify generally.
4     A.    Generally we were looking at the
5  organization structure and which positions would
6  be retained and which positions would not and how
7  the organization would be structured
8  postacquisition.
9     Q.    Did Mr. Kinzel offer any view of your
10  recommendation or did he just say, OK?
11     A.    I don't recall any specific, um,
12  reaction.
13     Q.    Did he question you about it?
14     A.    I don't recall.
15     Q.    Did you tell him what your reasoning
16  was for the recommendation?
17     A.    I'm sure I did.
18     Q.    Did your recommendation -- was your
19  recommendation to retain him until such time as
20  the outstanding matters were resolved or to retain
21  him on an ongoing longer basis?
22     A.    My recommendation was to retain
23  Mr. Nail until we could ascertain with greater
24  certainty what the ongoing needs would be.
25     Q.    So you weren't sure?

Page 71

C. Freeman

1
2     A.    Not a hundred percent, no.
3     Q.    But it was not likely in your view at
4  the time that he would remain actively employed
5  for the remainder of his employment contract term,
6  was it?
7          MS. KIRILA:  Object to form.  Go
8  ahead.
9     A.    I'm sorry.  Could you ask the question
10  again?
11     Q.    Sure.  At the time was it your view
12  that Mr. Nail would continue to be actively
13  employed for the remainder of this employment
14  contract term?
15     A.    Probably not.
16     Q.    Did you have any ballpark estimate of
17  how long it would take for the outstanding matters
18  to be resolved and Mr. Nail could be placed on
19  administrative leave, as you called it, along with
20  the rest of the individuals you listed?
21     A.    Not at that time.
22     Q.    So Mr. Kinzel did not -- strike that.
23  Who communicated to the individuals you listed
24  earlier, Mr. Al Weber, Fisher, Koontz, Thornton,
25  Petit, Jones, Kaetzel and White?  Who communicated

Page 72

C. Freeman

1
2  to them the decision that they would be relieved
3  of their duties effective the closing date?
4     A.    Mr. Kinzel called Mr. Weber and
5  informed him.
6     Q.    Were you present?
7     A.    Yes.
8     Q.    What did you hear him say to
9  Mr. Weber?
10     A.    He told Mr. Weber that effective
11  immediately that those employees would be placed
12  on administrative leave.
13     Q.    Did he use those words?
14     A.    I believe he did.  That's my
15  recollection.
16     Q.    He didn't tell Mr. Weber effective
17  immediately those individuals' employment was
18  terminated without cause?
19     A.    He did not use those words.
20     Q.    Was Mr. Weber on speakerphone?
21     A.    As I recall, yes.
22     Q.    And what did he respond to that?
23     A.    Basically in the affirmative, that he
24  would -- he would take care of it.
25     Q.    He would take care of informing those

Page 73

C. Freeman

1
2  individuals?
3     A.    Yes.
4     Q.    Anything else?
5     A.    Not that I recall.
6     Q.    Did Mr. Kinzel inform Mr. Weber that
7  Mr. Weber himself was also being immediately
8  placed on administrative leave?
9     A.    I believe so.
10     Q.    What was Mr. Weber's reaction to that?
11     A.    He was professional and...
12     Q.    Was there any discussion regarding
13  whether Mr. Weber and the other individuals
14  continued to be paid under their contracts?
15     A.    I don't recall whether that was part
16  of that conversation.
17     Q.    Do you recall anything else about that
18  conversation?
19     A.    It was pretty brief.
20     Q.    Did you have any conversations with
21  Mr. Kinzel immediately before or after that call
22  to Mr. Weber?
23     A.    Just preparing for the call and --
24     Q.    What was said?
25     A.    I don't recall.

19 (Pages 70 to 73)

C. Freeman

1             C. Freeman
2    Q.    Did Mr. Weber and those other
3  individuals receive anything in writing regarding
4  their status?
5    A.    With respect to the administrative
6  leave?
7    Q.    Correct.
8    A.    Not that I recall.
9    Q.    So they weren't sent letters that said
10  effective on such and such a date this will
11  happen?
12    A.    Not that I recall.
13    Q.    They weren't provided any written
14  notice of what was going to happen?
15        MS. KIRILA:  Objection.
16    A.    With respect to the administrative
17  leave?
18    Q.    Correct.
19    A.    Not that I recall.
20    Q.    Do you know who would know whether
21  they received such notice, written notice?
22    A.    Well, that notice probably would have
23  come out of my office.
24    Q.    Would someone else in your office have
25  access to that information?

1             C. Freeman
2    A.    Yes, if I directed them to try and
3  find it.
4    Q.    Would you be able to check or have
5  someone check to see if those individuals were
6  given written notice of administrative leave?
7  Yes?
8    A.    Yes.
9    Q.    Who informed Mr. Nail that he was
10  going to be retained after the closing date?
11    A.    I don't recall.
12    Q.    Did you?
13    A.    I may have.  I don't recall a
14  conversation.
15    Q.    Did you tell Mr. Nail that Mr. Kinzel
16  had personally picked Mr. Nail as the one person
17  to remain at the headquarters in Charlotte?
18    A.    I don't recall saying that.
19    Q.    You don't recall one way or the other?
20    A.    I don't recall one way or the other.
21        MR. PAPPAS:  Mark this as Defendant's
22  Exhibit A.
23        (Defendant's Exhibit A, memorandum
24  dated June 30, 2006, re:  "The Sale of
25  Paramount Parks, Inc. to Cedar Fair, L.P."

1             C. Freeman
2  marked for identification, this date.)
3    Q.    I show you what has been marked as
4  Defendant's Exhibit A.  Have you ever seen that
5  before?
6    A.    Yes.
7    Q.    What is it?
8    A.    It's a memo that CBS sent to the PPI
9  employees concurrent with the sale of Paramount
10  Parks to Cedar Fair.
11    Q.    Did you have any input into this
12  document?
13    A.    There was some communication between
14  our counsel and CBS regarding this document and I
15  don't know what level of input our counsel had
16  with respect to this document.
17    Q.    I was asking if you personally had any
18  input into it.
19    A.    Oh, me personally, OK.  I don't recall
20  having any input into this document.
21    Q.    If you look under the section entitled
22  "Employment" on the first page, it states that
23  "all active employees of Paramount Parks will
24  remain employees of Paramount Parks, and/or its
25  subsidiaries, i.e., your employer will not change

1             C. Freeman
2  as a result of the transaction."
3        Do you see that?
4    A.    Yes.
5    Q.    Is that accurate?
6    A.    Yes.
7        MS. KIRILA:  I am just going to object
8  to the extent that you're asking him for
9  information on a document that he was not
10  the author of.
11        But you can testify as to your
12  understanding as to what happened.
13    Q.    Is that what happened, all active
14  employees of PPI remained employees of PPI and
15  their employer did not change as a result of the
16  transaction?
17    A.    That is correct.
18    Q.    As you stated earlier, Mr. Nail's
19  employment contract with PPI remained in full
20  effect after PPI was acquired by Cedar Fair,
21  correct?
22    A.    Yes.
23    Q.    To your knowledge was Mr. Nail given
24  any severance benefits from PPI or Cedar Fair?
25        MS. KIRILA:  Just object to the extent

Page 78

```
 1              C. Freeman
 2    it calls for a legal conclusion under his
 3    contract, but you can answer as to your
 4    understanding.
 5       Q.    Was he given any payments denominated
 6    severance pay or separation pay?
 7       A.    No, not to my knowledge.
 8          MR. PAPPAS:  Mark this as B.
 9          (Defendant's Exhibit B, document
10          purported to be Lester Nails' employment
11          contract with PPI, Bates Nos. LES00038
12          through 45, marked for identification, this
13          date.)
14       Q.    I show you what has been marked as
15    Defendant's Exhibit B.  And this is Mr. Nail's
16    employment contract with PPI, correct?
17       A.    It appears to be.
18       Q.    This is the contract that was in
19    effect at the time of PPI's sale to Cedar Fair,
20    right?
21       A.    Yes.
22       Q.    And this is the contract that remained
23    in effect after that sale, correct?
24       A.    Yes.
25       Q.    According to this document Mr. Nail
```

Page 79

```
 1              C. Freeman
 2    was employed by PPI as senior vice president
 3    general counsel.
 4          Do you see that?
 5       A.    Yes.
 6       Q.    Is that consistent with your
 7    understanding of the position that he actually
 8    held at PPI?
 9       A.    Yes.
10       Q.    Do you know what Mr. Nail's duties as
11    senior vice president general counsel at PPI were
12    prior to the sale?
13       A.    Generally.
14       Q.    How did you know?
15       A.    From meetings with Mr. Nail.
16       Q.    What was your understanding of his
17    duties and responsibilities?
18       A.    He was responsible for administering
19    the legal function for PPI.
20       Q.    What does that entail?
21       A.    Contracts, litigation, employment
22    matters, various legal matters relating to the
23    company.
24       Q.    Based on your own experience do you
25    have any knowledge generally about what a
```

Page 80

```
 1              C. Freeman
 2    corporation's general counsel does?
 3       A.    Generally.
 4       Q.    And were Mr. Nail's duties as general
 5    counsel of PPI consistent with your own general
 6    understanding of what a general counsel does?
 7       A.    As a subsidiary of a larger publicly
 8    traded company, there would -- I don't believe
 9    there would have been the SEC, you know, issues
10    involved in the position and perhaps some of the
11    corporate governance, so forth, that a general
12    counsel for a publicly traded entity would have.
13       Q.    Any other differences?
14       A.    Not that come to mind.
15       Q.    When Cedar Fair acquired PPI on
16    June 30, 2006, were any of the incumbent PPI
17    executives who had employment contracts
18    discharged?
19       A.    On June 30th?
20       Q.    After, on or after June 30th.
21       A.    On or after June 30th.  Yes,
22    subsequently the termination without cause
23    provisions of those employment agreements for
24    several of the executives were triggered.
25       Q.    Who were they triggered for and when?
```

Page 81

```
 1              C. Freeman
 2       A.    Mr. Weber, Mr. Fisher, Mr. Koontz,
 3    Ms. Jones, Mr. Kaetzel, Mr. White, Mr. Petit,
 4    and --
 5       Q.    Mr. Thornton?
 6       A.    Mr. Thornton.  And Mr. Nail.
 7       Q.    Other than Mr. Nail those were the
 8    same individuals that you earlier testified were
 9    placed on administrative leave after the closing
10    date, correct?
11       A.    Yes.
12       Q.    When was their status changed from
13    administrative leave to termination without cause?
14       A.    They were sent a letter in late July.
15       Q.    Late July of 2006, correct?
16       A.    Yes.
17       Q.    Do you still have copies of those?
18       A.    Yes.
19       Q.    Do you remember what they said?
20       A.    They were drafted by counsel to comply
21    with the terms of the individual employment
22    agreements.
23       Q.    I am just asking if you remember what
24    they said.
25          MS. KIRILA:  I am just going to object
```

21 (Pages 78 to 81)

Page 82

C. Freeman

1    to the extent that you need to refer to a
2    document that's the best evidence. You can
3    testify as to your general memory.
4        A.    My general recollection is that we
5    were notifying them that effective, I believe it
6    was August 1st, that their services were no longer
7    required and we would be triggering the
8    termination without cause provision of their
9    employment agreement and that their employment
10   agreements would remain intact and their
11   obligations continued.
12       Q.    In between June 20, 2006, and the time
13   these individuals were notified by letter that
14   they were being terminated without cause, did any
15   of them perform any services for PPI or Cedar
16   Fair?
17       A.    Other than Mr. Nail, I'm not aware of
18   any.
19       Q.    Were any of them asked to perform
20   services for PPI or Cedar Fair during that period?
21       A.    Other than Mr. Nail, no, I don't know.
22       Q.    You don't know?
23           Do you know who decided to terminate
24   those individuals without cause?

Page 83

C. Freeman

1        A.    That would have been Mr. Kinzel.
2        Q.    Do you know why he decided to do that
3    at that time?
4        A.    I'm trying to recall a specific
5    conversation or discussion and rational reasoning.
6    I just don't recall specifics.
7        Q.    But you did have discussions with him
8    about that, correct?
9        A.    I'm sure I did.
10       Q.    But you don't recall anything that was
11   discussed in those conversations?
12       A.    Not specifically.
13       Q.    Generally?
14       A.    Generally it was to proceed with the
15   termination without cause, under the employment
16   agreements that we would continue to honor those
17   agreements as I indicated previously.
18       Q.    Anything else?
19       A.    Not specifically, no.
20       Q.    Do you have any idea why it was
21   decided at that time to convert these individuals
22   from administrative leave to termination without
23   cause? In other words, why that?
24       A.    You've asked for my general

Page 84

C. Freeman

1    recollection and impression and it would be that,
2    you know, the closing date had occurred. The dust
3    had settled a little bit and it was time to move
4    on and basically bring it to closure and we had
5    made the, a lot of the restructuring decisions and
6    we were comfortable that at that time we did not
7    require the services of those individuals.
8        Q.    As you've already testified, Mr. Nail
9    was asked to stay on for a period of time after
10   the closing date, correct?
11       A.    Yes.
12       Q.    And that final decision was made by
13   Mr. Kinzel upon your recommendation according to
14   your testimony, right?
15       A.    To retain him?
16       Q.    Yes.
17       A.    Yes.
18       Q.    Didn't you tell Mr. Nail that
19   Mr. Kinzel had personally picked Mr. Nail to stay
20   and help close the corporate office?
21           MS. KIRILA:  Objection.  Asked and
22       answered.
23           MR. PAPPAS:  I apologize if I already
24       asked it.

Page 85

C. Freeman

1        MS. KIRILA:  You can answer again.
2        A.    My recollection is that since Mr. Nail
3    was going to be the only remaining senior
4    executive on staff and on the ground in Charlotte,
5    that he was going to be designated, if you will,
6    as the in-charge person and that yes, Mr. Kinzel
7    did direct that.
8        Q.    Did you tell Mr. Nail that all of the
9    other incumbent PPI officers had been sent home?
10       A.    I have a vague recollection of that
11   conversation.
12       Q.    Do you know who communicated to
13   Mr. Nail the fact that the company wanted him to
14   stay on for a period of time after the closing
15   date?
16       A.    That would have been -- I am sure that
17   might have been me.
18       Q.    Do you recall anything about that
19   discussion?
20       A.    No.
21       Q.    Do you recall when it took place?
22       A.    No.
23       Q.    Was it prior or subsequent to the
24   closing date?

C. Freeman

1      A.   I don't recall.
2      Q.   Was it in person, on the phone or by
3  e-mail?
4      A.   My recollection is it would have been
5  a telephone conversation, but that's just my
6  recollection.
7      Q.   Do you recall generally anything that
8  either you or he said in that conversation?
9      A.   No.
10     Q.   But you know that you informed him
11  that the company wanted him to stay on for a
12  period of time to help close the corporate office,
13  correct?
14     A.   I'm sure I did.  To help close the
15  corporate office part of that, what you just said,
16  I'm not sure about, but I'm sure we had a
17  conversation about him staying on and assuming a
18  leadership role.
19     Q.   Was there any discussion in that
20  conversation about how long he was being asked to
21  stay on?
22     A.   I don't recall.
23     Q.   Was there any discussion about the
24  fact that although he was being asked to stay on

C. Freeman

1  it would not be on a permanent basis?
2      A.   I don't recall.  I know that there
3  were several times where Mr. Nail asked me about
4  his status.
5      Q.   And what was your response?
6      A.   I couldn't -- I couldn't give him any
7  information.
8      Q.   You didn't know or you didn't --
9  didn't want to give him that information?
10     A.   It was a, um, as it was an evolving
11  situation wherein Mr. Nail's status was, as I
12  indicated previously, you know, it was
13  undetermined at one point and then by July 27th it
14  became determined as we sorted things out.
15         So, you know, there were points in
16  time where I didn't know.  There were points in
17  time where I knew, but I couldn't say.
18     Q.   At least in the initial conversation
19  you had with him where you informed him that he
20  was being asked to stay for a period of time, you
21  weren't sure at that point how long that would be.
22     A.   Right.
23     Q.   Approximately how long after the
24  closing date did Mr. Nail remain at PPI performing

C. Freeman

1  work?
2      A.   Approximately, I guess until
3  approximately the 27th.
4      Q.   July 27th, 2006?
5      A.   Yes, that was the date of the letter.
6      Q.   Sorry, I just need a yes.  That was
7  July 27, 2006?
8      A.   You said approximately, so yes.
9      Q.   Do you know what work he was
10  performing during that time period?
11     A.   He was advising me with regard to some
12  employment matters with respect to the
13  restructuring and assisting me, ongoing -- he had
14  some involvement in some ongoing PPI legal
15  matters, some administrative duties with respect
16  to the corporate offices and the staff on location
17  there.
18     Q.   Anything else?
19     A.   That's all I recall.
20     Q.   Did Mr. Nail do everything that was
21  asked of him during that time period?
22     A.   Yes.
23     Q.   Did he ever refuse to perform any
24  services during that time period?

C. Freeman

1      A.   No.
2      Q.   Did he finish all the work that he had
3  been asked to perform during the transition?
4      A.   The work that could be completed.
5      Q.   So everything he could complete he did
6  complete?
7      A.   To the best of my recollection.
8      Q.   As you started to testify about
9  before, there came a time when it was decided that
10  Mr. Nail's services were no longer needed,
11  correct?
12     A.   Yes.
13     Q.   When did that time come?
14     A.   Mid to late July.
15     Q.   Of 2006?
16     A.   Yes.
17     Q.   Who determined that Mr. Nail's
18  services were no longer needed?
19     A.   I did.
20     Q.   Did you communicate that conclusion to
21  anyone?
22     A.   Mr. Kinzel.
23     Q.   Anyone else?
24     A.   Not that I recall.

C. Freeman

1
2    Q.    What was discussed with Mr. Kinzel
3 regarding that?
4    A.    I don't recall specific discussion
5 topics.
6    Q.    Do you recall what the general
7 exchange was between you and Mr. Kinzel regarding
8 that topic?
9    A.    Generally it was that we could absorb
10 or we would plan to absorb the PPI legal functions
11 into the corporate staff and at that time we would
12 not need Mr. Nail's services.
13    Q.    Did you say that to Mr. Kinzel or did
14 he say that to you?
15    A.    My recollection is I said that to
16 Mr. Kinzel.
17    Q.    And was he in agreement with that?
18    A.    Yes.
19    Q.    When you say that the company was
20 going to absorb PPI's legal function into
21 corporate staff, what does that mean?
22    A.    That the contracts, the litigation,
23 the responsibilities that Mr. Nail was responsible
24 for would be absorbed by my staff.  We -- even at
25 the time we were contemplating and made an offer

C. Freeman

1
2 to the paralegal that reported to Mr. Nail to
3 relocate to Sandusky and become a part of my
4 staff.
5    Q.    To the extent that there was work that
6 needed to be performed by an attorney who would be
7 doing that?
8    A.    We would outsource.
9    Q.    Outside counsel?
10    A.    Yes.  Which was Cedar Fair's practice.
11    Q.    And Mr. Kinzel was on board with that
12 plan?
13    A.    Yes.
14    Q.    Do you recall anything specifically
15 that he said to you in that conversation?
16    A.    No.
17    Q.    Was there any discussion regarding
18 what would happen to Mr. Nail now that his
19 services were no longer needed?
20    A.    It was within the context of the
21 triggering of the termination without cause
22 provisions of all of the group of executives.
23    Q.    So it was discussed that along with
24 the other people you testified about before
25 Mr. Nail would also be terminated without cause

C. Freeman

1 and receive one of those letters, correct?
2    A.    Correct.
3    Q.    Do you know who first communicated to
4 Mr. Nail that the company would no longer be
5 needing him to perform services?
6    A.    I'm sure it was me.
7    Q.    Do you remember when that was?
8    A.    No.
9    Q.    Sometime in July 2006 though, correct?
10    A.    On or about the date of that letter.
11    Q.    Do you remember anything about that
12 conversation?
13    A.    No.
14    Q.    Do you recall generally what was said?
15    A.    I don't know -- I don't even recall
16 the specific conversation.
17    Q.    Other than you know it took place.
18    A.    I mean, I -- I don't recall the
19 conversation.  I'm not saying it didn't take
20 place, but I just don't recall it.
21    Q.    Somebody informed Mr. Nail prior to
22 sending out the July 27th letter what his status
23 was, correct?
24        MS. KIRILA:  Objection.  Calls for
25

C. Freeman

1 speculation.  You can testify.
2    Q.    Do you know?
3    A.    I don't know.
4    Q.    Is that something that you would have
5 done given your ongoing dealings with Mr. Nail?
6        MR. KIRILA:  Objection to form of the
7    question.  Done as in notifying him of
8    termination or before the letter?
9        If you break the question down, you
10    can answer.
11    Q.    Would verbally communicating with
12 Mr. Nail that his services would no longer be
13 needed be anything that you likely would have done
14 given your ongoing dealings with him?
15    A.    Yes.
16    Q.    And you're not aware that anybody else
17 did that?
18    A.    I am not.
19    Q.    Did you call Mr. Nail and tell him
20 Mr. Kinzel said he could go home?
21    A.    I don't remember that conversation
22 either.
23    Q.    You don't remember one way or the
24 other?

C. Freeman

1     C. Freeman
2     A.    I don't remember one way or the other.
3     Q.    Did you ever tell Mr. Nail either in
4  words or substance that you were just the
5  messenger and that Mr. Kinzel makes all of the
6  decisions?
7     A.    I don't recall one way or the other on
8  that one either.
9         MR. PAPPAS:  Take a short break.
10        (A recess was taken from 11:30 a.m. to
11        11:48 a.m.)
12        MR. PAPPAS:  Let's mark this as
13        Defendant's Exhibit C.
14        (Defendant's Exhibit C, letter from
15        Richard Kinzel to Lester Nail dated July 27,
16        2006, marked for identification, this date.)
17  BY MR. PAPPAS:
18    Q.    I show you what has been marked as
19  Defendant's Exhibit C, which is a letter from
20  Richard Kinzel to Mr. Nail dated July 27, 2006,
21  correct?
22    A.    Yes.
23    Q.    You have seen this before, right?
24    A.    Yes.
25    Q.    And is that Mr. Kinzel's signature at

1     C. Freeman
2  the bottom?
3     A.    Yes.
4     Q.    Do you know who wrote this letter?
5     A.    Counsel.  Outside counsel.
6     Q.    Mr. Kinzel didn't write it.
7     A.    No.
8     Q.    Do you know if Mr. Kinzel reviewed
9  this letter before he signed it?
10    A.    I handed Mr. Kinzel a stack of these
11  and he signed them all at the same time.
12    Q.    Do you know if he reviewed it before
13  he signed it?
14    A.    I don't know if he reviewed this
15  specific letter.
16    Q.    Did he review drafts?
17    A.    No.
18    Q.    Do you know if he reviewed any of the
19  other letters that you handed him before he signed
20  those?
21    A.    My recollection is that he reviewed
22  them and he reviewed in general what I was handing
23  him.
24    Q.    Were all the letters the same as this
25  one?

1     C. Freeman
2     A.    The letters were written specifically
3  to address specifically contracts, specific
4  contracts as we discussed earlier.  There were
5  different contract forms, so there may have been
6  some slight differences.
7     Q.    Do you know whether Mr. Kinzel knew
8  what this letter said before he signed it?
9         MS. KIRILA:  Objection.  Speculation.
10        If you can testify --
11    Q.    If you know.
12        MS. KIRILA:  -- based on your
13        observations.
14    A.    Generally, yes.
15    Q.    Did you discuss this letter with
16  Mr. Kinzel before it was sent out?
17    A.    Not in detail.
18    Q.    Did you discuss it generally?
19    A.    Within the context of sending out all
20  of the letters, yes.
21    Q.    What was discussed?
22    A.    That we were invoking the termination
23  without cause provisions of the employment
24  agreements for these contract employees that were
25  being terminated without cause.

1     C. Freeman
2     Q.    Anything else?
3     A.    Not that I recall.
4     Q.    Did you discuss this letter with
5  anyone other than Mr. Kinzel before it was sent
6  out?
7     A.    Counsel, outside counsel.
8     Q.    Did you review this letter before it
9  was sent out?
10    A.    Yes.
11    Q.    And this letter was actually sent to
12  Mr. Nail, correct?
13    A.    Yes.
14        MR. PAPPAS:  Mark this as Exhibit D.
15        (Defendant's Exhibit D, one-page
16        document entitled "Personnel Action Request
17        Form," Bates Nos. PPI000014, marked for
18        identification, this date.)
19    Q.    I show you what has been marked as
20  Defendant's Exhibit D.
21        Do you recognize this?
22    A.    No.
23    Q.    Do you know what it is?
24    A.    I know what it says.  It's not a form
25  I'm familiar with.

25 (Pages 94 to 97)

Page 98

C. Freeman

1
2    Q.    Have you ever seen a form like this?
3    A.    Not to my recollection.
4    Q.    I will represent to you that this form
5    was produced by PPI in discovery and it appears to
6    be a personnel action request form, and even
7    though you haven't seen it before, I would just
8    like to ask you a couple of questions.
9          Do you know who filled this form out?
10   A.    It's signed by Sandy Cranford.
11   Q.    That's her signature where it says
12   "completed by"?
13   A.    As far as I know.
14   Q.    Under Section G, entitled Separation,
15   it states that Mr. Nail's date of termination was
16   August 1st, 2006, correct?
17   A.    Yes.
18         MS. KIRILA:  Objection.  The document
19   speaks for itself, but you can answer.
20   Q.    Yes?
21   A.    Yes.
22   Q.    Under termination code it looks like
23   it says either 102 or 10/2.
24         Do you see that?
25   A.    Yes.

Page 99

C. Freeman

1
2    Q.    Do you know what that means?
3    A.    No.
4    Q.    Is there a list of termination codes
5    at PPI?
6    A.    I don't know.
7    Q.    Is there a list of termination codes
8    at Cedar Fair?
9    A.    I know there are termination codes.  I
10   don't know whether they're corporate-wide or they
11   are park specific.
12   Q.    If there is a list of termination
13   codes at PPI would you be able to get ahold of a
14   copy of that?
15   A.    Yes.
16   Q.    Under rehire status, it does not state
17   that Mr. Nail was eligible for rehire, correct?
18         MS. KIRILA:  Just a continuing
19   objection.  The document speaks for itself.
20   Go ahead.
21   A.    It is silent on rehire status.
22   Q.    Who assumed Mr. Nail's job duties
23   after he was terminated without cause?
24         MS. KIRILA:  Objection.  Assumes facts
25   not in evidence.  You can answer.

Page 100

C. Freeman

1
2    A.    I did and my staff and I delegated to
3    outside counsel.
4    Q.    That's how the legal functions at PPI
5    were performed after Mr. Nail's termination at
6    least through 2007, correct?
7    A.    Yes.
8    Q.    Just to be clear, outside counsel is
9    the Squires Sanders firm.  Is that who you're
10   referring to?
11   A.    Not exclusively.
12   Q.    What other outside counsels were
13   there?
14   A.    Frantz Ward out of Cleveland.  That's
15   the only one I can think of.
16   Q.    Is it various law firms?
17   A.    Yes.  And another piece of the
18   responsibility was the litigation management on
19   general liability claims, and so forth.  That
20   portion of the duties and responsibilities was
21   assumed by our safety director.
22   Q.    Which was who?
23   A.    Kathy Hawkinson.
24   Q.    Did Cedar Fair have a general counsel
25   at the time it acquired PPI?

Page 101

C. Freeman

1
2    A.    No.
3    Q.    At the time Mr. Nail was terminated
4    without cause there were approximately 17 months
5    remaining on his employment contract, correct?  It
6    went until December 31, 2007?
7          I will just ask you.  The contract
8    term expired on December 31, 2007, correct?
9    A.    Yes.
10         MR. PAPPAS:  Mark this as Exhibit E.
11         (Defendant's Exhibit E, 2-page letter
12   from Craig Freeman to Lester Nail, August 9,
13   2006, Bates Nos. LES00016 and 17, marked for
14   identification, this date.)
15   Q.    I show you what has been marked as
16   Defendant's Exhibit E.  And this is a letter that
17   you sent to Mr. Nail on or about August 9, 2006,
18   correct?
19   A.    Yes.
20   Q.    Did you write this?
21   A.    I don't recall whether I drafted this
22   or it was drafted by counsel.
23   Q.    Either you or counsel drafted it?
24   A.    Yes.
25   Q.    Is this letter accurate?

26 (Pages 98 to 101)

C. Freeman

1
2     A.    Generally, but I believe we were able
3  to extend coverage without -- without going to
4  COBRA.
5     Q.    You're referring to the second bullet
6  point?
7     A.    Yes.
8     Q.    Could you explain that?
9     A.    Well, in a typical termination
10  situation the employee is offered COBRA, which is
11  the -- are forget what the initials stand for
12  even.
13     Q.    That's OK.
14     A.    It's continuing benefits.  The
15  opportunity to purchase continuing benefits
16  coverage for 18 months after termination, and this
17  would have -- if we were -- if I recall correctly,
18  we were able to continue the coverage without --
19  without going to COBRA, which in essence extended
20  the opportunity for these employees to have the
21  COBRA benefit for up to 18 months after their
22  employment agreement expired.
23     Q.    And that was true not only for
24  Mr. Nail, but for the other individuals that you
25  listed before as being terminated without cause,

C. Freeman

1
2  correct?
3     A.    Yes.
4     Q.    Other than that this is accurate?
5     A.    As far as I know.
6     Q.    Did Mr. Kinzel or Mr. Crage review
7  this letter before it went out?
8     A.    No.
9     Q.    Did you discuss it with either of
10  them?
11     A.    No.
12     Q.    Did you discuss it with anyone other
13  than counsel?
14     A.    I would have discussed it with Billy
15  Clark and Sandy Cranford.
16     Q.    Do you recall what was discussed about
17  that with them?
18     A.    Just the putting together and trying
19  our best to get it right.
20     Q.    Did Mr. Nail call you with any
21  questions after you sent him this letter?
22     A.    Not that I recall.
23     Q.    Did his wife?
24     A.    I've never spoken to Mr. Nail's wife.
25         MR. PAPPAS:  Mark this as Exhibit F.

C. Freeman

1
2         (Defendant's Exhibit F, cover letter
3     from Craig Freeman to Lester Nail, dated
4     September 12, 2006, with attachment entitled
5     "Separation and Release Agreement," Bates
6     Nos. LES00021 through 29, marked for
7     identification, this date.)
8     Q.    I show you what has been marked as
9  Defendant's Exhibit F.  Have you ever seen this
10  before?
11     A.    Yes.
12     Q.    This is a letter and attachment you
13  sent to Mr. Nail on or about September 12, 2006,
14  correct?
15     A.    Yes.
16     Q.    Did you write this cover letter?
17     A.    I believe it was drafted by counsel.
18     Q.    You reviewed it though before you
19  signed it, right?
20     A.    Yes.
21     Q.    There's a bcc on the second page.  It
22  says Gordon Kaiser.
23         Do you see that?
24     A.    Yes.
25     Q.    Who is that?

C. Freeman

1
2     A.    He is with Squire Sanders.
3     Q.    Do you know if either Mr. Kinzel or
4  Mr. Crage reviewed this letter and attachment
5  before it went out?
6     A.    Mr. Crage and Mr. Kinzel would not
7  have reviewed this letter.
8     Q.    How do you know that?
9     A.    It's not something that I would have
10  put in front of them.
11     Q.    Did you discuss the substance of it
12  with either of them?
13     A.    Yes.
14     Q.    Which one?  Or was it both?
15     A.    I know I would have reported to
16  Mr. Kinzel on it.  I don't know about Mr. Crage.
17     Q.    Do you recall what you discussed with
18  Mr. Kinzel about the letter?
19     A.    This was a settlement offer to buy out
20  the employment agreement.  And the discussion was
21  what was an appropriate amount to offer with
22  respect to or with -- compared to the, um, the
23  full payout of the employment agreement if it were
24  allowed to run full term.
25     Q.    What did you say and what did he say?

Page 106

C. Freeman

1          C. Freeman
2     A.    Actually, Mr. Crage was involved in
3  the discussion and we, um, and I believe counsel
4  was involved in determining the appropriate
5  calculations to, you know, again determine what
6  was our liability if we went full term with the
7  agreements, what was an offer that was acceptable
8  to the company.
9     Q.    This was an offer that was made to
10 Mr. Nail only or to the other individuals who had
11 employment contracts?  Not the exact offer, but
12 this type of settlement.
13    A.    It was offered to others as well.
14    Q.    All of the other ones or to only
15 select?
16    A.    My recollection is it was offered to
17 all of them.
18    Q.    Did anyone take it?
19    A.    I'm sorry.  My recollection is that it
20 was offered to all of them who had a significant
21 amount of time left on their agreement.
22          No one took it.
23    Q.    What was the purpose of offering this
24 settlement deal?
25    A.    The purpose was to relieve the, both

Page 107

C. Freeman

1          C. Freeman
2  parties to the employment agreements from further
3  responsibility and obligations and duties and, you
4  know, just bring it to closure.
5     Q.    What was the purpose of it from
6  Paramount Park's standpoint?  How did it benefit
7  PPI?
8     A.    It would have benefitted PPI by the
9  lump sum payment was less than what the payout
10 would have been over time.  So there would have
11 been some financial benefit to PPI.
12    Q.    So was it done strictly as a way to
13 potentially save costs?
14    A.    That was part of it.  The other part
15 of it was to save the administration of the
16 employment, the ongoing administration of the
17 employment agreements.
18    Q.    In other words, the continued payment
19 of compensation benefits and what not.
20    A.    Right.
21    Q.    Whose idea was it to make these
22 settlement proposals?
23          MS. KIRILA:  Objection.  I don't know
24    that you were finished with your answer, but
25    if you were.

Page 108

C. Freeman

1          C. Freeman
2     Q.    I'm sorry.
3     A.    I was going to say and the associated
4  paperwork related to keeping track of it all.
5     Q.    Anything else?  No?
6     A.    Anything else?
7     Q.    Any other reasons how it would benefit
8  PPI?
9          MS. KIRILA:  Just an objection as to
10    Mr. Nail's situation or those with different
11    contracts might be different for purposes of
12    rationale, but --
13          MR. PAPPAS:  Mr. Nail.
14    A.    As far as I'm aware, that's it.
15    Q.    Whose idea was it to offer these
16 settlement proposals?
17    A.    I don't recall.
18    Q.    Were you involved in any discussions
19 in which whether to offer these settlements was
20 debated as opposed to what the appropriate amount
21 would be?
22    A.    Discussions related to, OK, you mean
23 whether or not to do it?
24    Q.    Correct.
25    A.    I would have been involved in the

Page 109

C. Freeman

1          C. Freeman
2  discussions.  I don't recall that there was a
3  debate.
4     Q.    Who else was involved in those
5  discussions?
6     A.    Mr. Kinzel and Mr. Crage.
7     Q.    Do you recall what was discussed?
8     A.    For me to go back and develop
9  recommendations.
10    Q.    Recommendations regarding what?
11    A.    Regarding the settlement amounts.
12    Q.    Do you recall who first brought up the
13 topic of possibly offering these settlements?
14    A.    No, as I indicated before, I don't
15 recall.
16    Q.    Were you brought into those
17 discussions when a question had already been
18 presented so to speak?
19    A.    I don't know.
20    Q.    Do you recall anything that,
21 specifically that was discussed during the
22 discussions that you were involved in regarding
23 whether to offer these settlements?
24    A.    I don't recall anything specific, no.
25    Q.    Generally?

Page 110

C. Freeman

1
2    A.    Generally it was along the lines what
3  I said earlier, let's just bring the situation,
4  try to bring the situations to closure so
5  everybody can move on.
6    Q.    In this letter, the September 12,
7  2006, Exhibit F, refers to a noncompete provision
8  in paragraph 11 of Mr. Nail's PPI employment
9  contract, correct?
10    A.    Yes.
11    Q.    And you state here that PPI's
12  willingness to decrease its rights to enforce that
13  provision would be a considerable value to
14  Mr. Nail.
15        Do you see that?  Second to last
16  paragraph?
17        MS. KIRILA:  Just an objection to the
18    extent the letter speaks for itself, but you
19    can answer.
20        MR. PAPPAS:  I am just directing his
21    attention to that provision.
22        MS. KIRILA:  That's fine.
23    A.    Yes.
24    Q.    Do you know one way or the other
25  whether that noncompetition provision, paragraph

Page 111

C. Freeman

1
2  11 of the employment agreement, would be legally
3  enforceable?
4        MS. KIRILA:  Objection.  Calls for a
5    legal conclusion, but you can answer as to
6    your --
7    A.    I don't know.  I'm not an attorney.
8    Q.    Did you have any understanding or
9  feeling about that at the time you wrote this
10  letter?
11        MS. KIRILA:  I am just going to object
12    and instruct you not to disclose any
13    discussions with counsel in respect of that.
14    A.    I didn't draft the letter.  I was
15  relying on counsel's advice.
16    Q.    So you had no opinion one way or the
17  other as to whether that noncompete provision was
18  legally enforceable?
19        MS. KIRILA:  Objection.  Misstates his
20    testimony.
21    Q.    Did you at the time have any opinion
22  as to whether that noncompetition provision was
23  legally enforceable?
24    A.    My opinion would have been based on my
25  advice of counsel.

Page 112

C. Freeman

1
2    Q.    Other than that did you have any
3  independent opinion?
4    A.    No.
5    Q.    Do you have any understanding whether
6  an employer can enforce a noncompete provision
7  under New York law when an employee was terminated
8  without cause?
9        MS. KIRILA:  Same objection and
10    instruction, do not disclose anything you
11    learned from discussions or communications
12    with your counsel.
13    A.    I am not an attorney and I don't know
14  New York law.
15    Q.    Do you have any understanding as to
16  whether a noncompete provision can be enforced
17  against an attorney?
18        MS. KIRILA:  Same objection.
19    A.    Same response.  I do not.  I am not an
20  attorney and I don't know.
21    Q.    I am going to ask you to go back and
22  look at the employment agreement, which is Exhibit
23  B, I believe.  Turn to page 5.
24        Take a look at paragraph 11 where it
25  says:  Executive agrees that during the employment

Page 113

C. Freeman

1
2  term executive will not engage in any other
3  occupation or engage in a leisure, slash, theme
4  park, motion picture, television, or entertainment
5  business, except for Paramount pursuant to this
6  agreement.
7        Do you see that?
8    A.    Yes.
9    Q.    Do you contend that this provision
10  prohibited Mr. Nail from engaging in other
11  employment after his employment was terminated by
12  PPI?
13    A.    Yes.
14    Q.    And does that apply only to employment
15  with a competitor or any employment at all?
16    A.    Any employment at all.
17    Q.    So if he had gone to work as a cashier
18  at Home Depot that would violate the agreement?
19    A.    Yes.
20    Q.    If he mowed lawns and got paid for
21  doing that, that would violate the agreement?
22    A.    Yes.
23    Q.    What about if he did pro bono legal
24  work, would that violate the agreement?
25        MS. KIRILA:  Continuing objection as

C. Freeman

1
2    to calling for a legal conclusion, but you
3    can testify as to your interpretation.
4        A.    OK, again, I'm not an attorney, but my
5    interpretation is an occupation is something
6    you're compensated for.  So pro bono you're not
7    compensated, so...
8        Q.    And that prohibition in paragraph 11
9    would last till December 31, 2007.  Was that your
10   understanding?
11       A.    By virtue of the reference to the
12   employment term, yes.
13       Q.    And since there's no geographical
14   limitation in paragraph 11 would this
15   noncompetition obligation apply anywhere in the
16   world?
17           MS. KIRILA:  Objection to the
18       characterization of it as a noncompetition
19       provision.
20       Q.    I will rephrase it.  Since there's no
21   geographic limitation in paragraph 11, the
22   obligations in paragraph 11 would apply anywhere
23   in the world.  Is that your understanding?
24       A.    That's my understanding.
25       Q.    Did you personally ever tell Mr. Nail

C. Freeman

1
2    that he could not work for anyone anywhere in any
3    capacity for the remainder of the contract term?
4        A.    In conversation or in correspondence?
5        Q.    Either way.
6        A.    In correspondence through the letters
7    that were sent to him indicating that his
8    obligations under the employment agreement
9    continued.
10       Q.    Other than that.
11       A.    Other than that, no.
12       Q.    Do you know whether anyone at PPI or
13   Cedar Fair ever told Mr. Nail that?
14       A.    Please repeat the question?
15       Q.    Do you know whether anyone else at PPI
16   or Cedar Fair ever told Mr. Nail that he could not
17   work for anyone anywhere in any capacity for the
18   remainder of his contract term?
19       A.    I have no such knowledge.  I don't
20   know.
21       Q.    Can you identify any business interest
22   that PPI has in preventing Mr. Nail from working
23   for a noncompetitor after PPI terminated his
24   employment?
25           MS. KIRILA:  Objection.  Relevance.

C. Freeman

1
2        You can answer.
3        A.    Please repeat the question?
4        Q.    Sure.  Can you identify any business
5    interests that PPI would have in preventing
6    Mr. Nail from working for a noncompetitor of PPI
7    after his employment was terminated?
8        A.    I guess I would say PPI would have a
9    business interest in preventing someone from
10   double dipping, yes.
11       Q.    What do you mean by that?
12       A.    Well, collecting under the employment
13   agreement while they were being paid for another
14   occupation in violation of the employment
15   agreement.
16       Q.    Is there any other business interest
17   that you can identify?
18       A.    No.
19       Q.    Did you ever get a response from
20   Mr. Nail after you sent him the settlement
21   proposal letter which is Exhibit F I believe?
22       A.    My recollection is that Mr. Nail
23   called me, yes.
24       Q.    How soon after the letter went out did
25   you get a call from him?

C. Freeman

1
2        A.    I don't know specifically.  Fairly
3    soon.
4        Q.    Within a couple of weeks?
5        A.    That would be my recollection, but I
6    don't know specifically.
7        Q.    It was some time in 2006 though,
8    right?
9        A.    Yes.
10       Q.    What was discussed in that
11   conversation?
12       A.    My recollection of the conversation is
13   that Mr. Nail indicated the offer was not
14   acceptable to him, but his interpretation of the
15   offer was that it was opening discussions and, you
16   know, it was throwing something out there as a
17   starting point.
18       Q.    Did he say why it wasn't acceptable?
19       A.    It was too low.
20       Q.    The buyout amount lump sum payment was
21   too low?
22       A.    Yes.
23       Q.    Did he indicate that it was
24   unacceptable in any other way?
25       A.    I don't recall.  All I recall is him

C. Freeman
1
2  saying that the number was too low.
3      Q.   What was your response?
4      A.   I listened to him, I acknowledged his
5  position.  I think that's all I remember.
6      Q.   Did Mr. Nail propose a specific number
7  that he would be willing to accept?
8      A.   No.
9      Q.   Did you, after you spoke to Mr. Nail
10 did you speak with anyone at your employer about
11 your conversation?
12     A.   I'm sure I reported to Mr. Kinzel.  I
13 don't recall the specific conversation.
14     Q.   Do you recall anything generally about
15 the conversation?
16     A.   No.
17     Q.   You conveyed to him what was discussed
18 in your telephone conversation with Mr. Nail?
19     A.   Yes.
20     Q.   Do you recall how he responded,
21 Mr. Kinzel responded to that?
22     A.   The gist of my conversation was that,
23 um, I reported what, that Mr. Nail had contacted
24 me and the expectation was that Mr. Nail would be
25 coming back with some sort of a counterproposal.

C. Freeman
1
2  And so the gist of my conversation with Mr. Kinzel
3  was let's wait and see what he comes back with.
4      Q.   Did Mr. Nail tell you that he was
5  going to make a proposal or is that something that
6  you inferred from the conversation?
7      A.   I think it was inference.  Because
8  when he said it, you know, he assumed this was an
9  opening position or opening possibility or
10 whatever, I -- anyway, my thinking was OK, fine,
11 we made this move.  Now you need to make a move on
12 your side.
13     Q.   Were there any further discussions
14 with Mr. Nail about this proposal?
15     A.   Not that I recall.
16     Q.   So he didn't call back with a
17 counteroffer?
18     A.   Not that I recall.
19     Q.   And neither you or as far as you know
20 anyone at the company got back to him with a
21 different proposal?
22     A.   No.
23     Q.   Was that the last that you heard about
24 this proposal from Mr. Nail?
25     A.   As far as I recall.

C. Freeman
1
2      Q.   This letter, Exhibit F, that you
3  signed says that PPI would be willing to waive the
4  requirement that Mr. Nail be willing, ready and
5  able to render exclusive services as provided in
6  paragraph 7(c) of the employment agreement.
7           Do you see that?
8      A.   Yes.
9      Q.   Did you have any discussions with
10 anyone as to why PPI would be willing to waive
11 that?
12     A.   Yes.  It was part of the whole closure
13 issue in order to relieve both parties of further
14 responsibility.
15     Q.   Other than that?
16     A.   No.
17         MR. PAPPAS:  I just need to take a
18 one-minute break.
19         (A recess was taken from 12:25 to
20 12:27 p.m.)
21 BY MR. PAPPAS:
22     Q.   Did any of the other individuals who
23 were offered that settlement proposal call you
24 regarding negotiating?
25     A.   My recollection is we got a

C. Freeman
1
2  counterproposal from one individual which was not
3  even worth discussing.
4      Q.   One other person?
5      A.   Yes.
6      Q.   Other than that?
7      A.   I don't recall any others.
8         MR. PAPPAS:  Mark this as Exhibit G.
9         (Defendant's Exhibit G, complaint in
10 present action, marked for identification,
11 this date.)
12     Q.   I show you what has been marked as
13 Defendant's Exhibit G.  Do you recognize this?
14     A.   Yes.
15     Q.   This is the court complaint in this
16 action, correct?
17     A.   Yes.
18     Q.   Turn to paragraph 22, please.
19 Paragraph 22 alleges defendant never notified PPI
20 that he was eligible to receive health insurance
21 or other employee benefits from any other source.
22          Do you see that?
23     A.   Yes.
24     Q.   Do you believe that Mr. Nail breached
25 his PPI employment contract by failing to inform

Page 122

```
1              C. Freeman
2   PPI that he was eligible to receive health
3   insurance or other employee benefits from another
4   source?
5       A.   I believe that this was tied to his
6   fraud and misrepresentation with regard to his
7   other employment.
8       Q.   Right now I am asking you specifically
9   about his employment agreement, whether him not
10  notifying PPI that he was eligible to receive
11  benefits from another source violated that
12  contract.
13           Do you know one way or the other?
14       MS. KIRILA:  Just an objection to the
15       extent it calls for a legal conclusion for a
16       determination to be made by the court, but
17       you can answer.
18       A.   Yes, I believe it violates his
19  contract.
20       Q.   Which provision does it violate?
21       MS. KIRILA:  The same continuing
22       objection, but you can answer.
23       A.   We're talking about employee benefits,
24  so therefore he would have had to have been
25  employed.  It violates paragraph 5.  It violates
```

Page 123

```
1              C. Freeman
2   paragraph 11 and paragraph 7(c).
3       Q.   How does it violate paragraph 5?
4       A.   Paragraph 5 says:  Executive's
5   services shall be completely exclusive to
6   Paramount during the term hereof.
7       Q.   And that in your view means he was
8   required to notify PPI if he was even eligible to
9   receive employee benefits from another source?
10       A.   Yes.  In my opinion.
11       Q.   How does it violate paragraph 11?
12       A.   Paragraph 11 says:  Executive agrees
13  that during the employment term executive will not
14  engage in any other occupation.
15       Q.   In your view that means that he was
16  required to notify PPI if he was even eligible to
17  receive benefits from another source?
18       A.   Employee benefits, yes.
19       Q.   Any other provisions that you contend
20  he breached by not disclosing his eligibility for
21  benefits from another source?
22       A.   7(c), the ready, willing and able
23  language.
24       Q.   How did that violate 7(c)?
25       A.   If he's receiving other employee
```

Page 124

```
1              C. Freeman
2   benefits, he is an employee of somewhere else and
3   therefore he is not ready, willing and able.
4       Q.   He didn't have to be an employee of
5   PPI to receive benefits from PPI, did he?
6       A.   There are certain benefits that
7   require you to be an active employee.
8       Q.   Well, 7(c) says, if executive is
9   terminated other than for cause, and I'm
10  paraphrasing, but tell me if I'm wrong.
11           If executive is terminated by
12  Paramount other than for cause, Paramount shall
13  continue all applicable plans and/or benefits for
14  the remainder of the employment term.
15           Isn't that what it says?
16       MS. KIRILA:  Just object to the extent
17       that the agreement speaks for itself.
18       A.   So long as the executive is willing,
19  ready and able to render exclusive services
20  hereunder.
21       Q.   Assuming that the person did remain
22  willing, ready and able, benefits would continue
23  even though they had been terminated without
24  cause, correct?
25       A.   (No response).
```

Page 125

```
1              C. Freeman
2       Q.   So the agreement contemplated that the
3   company would continue to pay benefits even after
4   the executive was terminated without cause.  Isn't
5   that what paragraph 7(c) says?
6       A.   That is part of what paragraph 7(c)
7   says.
8       Q.   Going back to the complaint, paragraph
9   23 alleges that defendant never notified PPI that
10  his address had changed.
11           Do you see that?
12       A.   Yes.
13       Q.   Do you contend that that constitutes a
14  breach of the employment agreement?
15       A.   Paragraph 23 in and of itself in my
16  opinion does not.
17       Q.   Does not?
18       A.   No.
19       Q.   Did you ever ask Mr. Nail to keep you
20  advised of his current contact information after
21  he was terminated?
22       A.   We sent him enrollment forms for new
23  benefits with contact information on it or with
24  address and contact information on it.
25       Q.   Other than that did you personally
```

32 (Pages 122 to 125)

C. Freeman

1    C. Freeman
2  ever ask him to keep you advised of his current
3  contact information and address?
4      A.   No.
5      Q.   Do you know if anyone else asked him
6  to do that?
7      A.   I do not know.
8      Q.   Did you ever tell Mr. Nail that it
9  would breach his employment contract if he were to
10  move and not notify PPI that he moved?
11     A.   I never told him that.
12     Q.   Do you know if anyone else ever told
13  Mr. Nail that?
14     A.   I don't know.
15     Q.   Did you yourself ever ask Mr. Nail to
16  stay in touch because PPI might need his services
17  in the future?
18     A.   No, I didn't.
19     Q.   Do you know if anyone else asked
20  Mr. Nail to do that?
21     A.   No. I don't know.
22     Q.   Take a look at paragraph 24 of the
23  complaint which alleges on or about June 2007
24  defendant directly or indirectly represented to a
25  PPI representative that he was still employed.

1    C. Freeman
2     Do you see that?
3      A.   Still unemployed.
4      Q.   Still unemployed, I'm sorry.
5     Do you see that?
6      A.   Yes.
7      Q.   Do you know what that refers to?
8      A.   A conversation that Sandy Cranford
9  relayed to me.
10     Q.   Can you provide more details about
11  that?
12     A.   Sandy indicated that she was -- during
13  the course of the conversation with Lester's wife
14  she asked something like, How's it going? And the
15  response was, OK, but it would be better if Lester
16  could find a job.
17     Q.   When did Sandy tell you that?
18     A.   Shortly after it happened.  After the
19  conversation took place.
20     Q.   Which was supposed to have been when?
21     A.   Supposed to have been on or about June
22  of 2007.
23     Q.   Was anyone else present when Sandy
24  relayed that conversation to you?
25     A.   Not that I recall.

1    C. Freeman
2      Q.   Do you have any idea why she relayed
3  that to you?
4      A.   We were, um, going through a benefits
5  conversion at the time.  And it would have just
6  been some information that, um, to update me on
7  people's status.
8      Q.   Did you have any response when she
9  said that?
10     A.   She also indicated that Lester
11  wouldn't even speak to her and she knew he was
12  there because she heard him in the background and
13  she thought that was kind of strange.
14         That was pretty much the gist of the
15  conversation.
16     Q.   Did she say who answered the phone?
17     A.   No.
18     Q.   How did she know that Lester wouldn't
19  speak with her?  Did she say?
20     A.   No.
21     Q.   Did she tell you what she heard Lester
22  say in the background?
23     A.   She may have, but I don't recall.
24     Q.   Do you know one way or the other
25  whether Mr. Nail told his wife to state that

1    C. Freeman
2  things would be better if he could find a job?
3      A.   I don't know.
4      Q.   Do you know what Mr. Nail's wife meant
5  when she said that?
6         MS. KIRILA:  Objection.  Calls for
7  speculation.
8      Q.   It would be speculation for you to say
9  what she meant, correct?
10     A.   What I infer from what Sandy told me
11  was that Lester was still unemployed.
12     Q.   So Mr. Nail himself did not represent
13  that he was still unemployed, correct?
14         MS. KIRILA:  Objection.
15     Q.   Did he?
16         MS. KIRILA:  You can answer.
17     A.   I wasn't part of that phone
18  conversation.  So I don't know what Sandy heard
19  Lester say.
20     Q.   But Sandy did not tell you that Lester
21  himself represented that he was still unemployed,
22  did she?
23     A.   Not that I recall.
24     Q.   She only spoke about what Lester's
25  wife said, right?

C. Freeman

1              C. Freeman
2    A.   She spoke about what Lester's wife
3 said. She spoke about Lester talking in the
4 background. I don't recall if she told me what
5 Lester was saying or if she even could hear what
6 Lester was saying.
7    Q.   In the same paragraph it goes on to
8 allege that defendant participated in the employee
9 benefits enrollment effective July 1st, 2007 as an
10 employee of PPI.
11       Do you see that?
12    A.   Yes.
13       MR. PAPPAS: Mark this as Exhibit H.
14       (Defendant's Exhibit H, cover letter
15    dated May 21, 2007 from Craig Freeman to
16    Lester Nail with attached document titled
17    "Declaration Section," with other
18    attachments, marked for identification, this
19    date.)
20    Q.   I show you what has been marked as
21 Defendant's Exhibit H, and this is a May 21, 2000
22 letter from you to Lester Nail, correct?
23    A.   Yes.
24    Q.   With attached various benefits forms,
25 correct?

1              C. Freeman
2    A.   Yes.
3    Q.   Other than the pages Bates numbered
4 LES00004 and LES00005, the forms attached to this
5 letter were attached when you sent the letter to
6 Mr. Nail, correct? Except that they were blank?
7    A.   I didn't personally do the mailing, so
8 I don't know. I don't have firsthand knowledge
9 that they were attached.
10    Q.   Did you write the letter, the cover
11 letter?
12    A.   I don't recall.
13    Q.   Did you review it before you signed it
14 and sent it out?
15    A.   I'm sure I did.
16    Q.   That's your signature, right?
17    A.   That is my signature.
18    Q.   And in this letter you instructed
19 Mr. Nail to complete, sign and return these forms
20 at your earliest convenience, correct?
21    A.   Yes.
22    Q.   And if you take a look at the second
23 page of this exhibit, which is Bates numbered
24 Les00002. Are you there?
25    A.   Yes.

1              C. Freeman
2    Q.   What was the purpose of this
3 particular form, do you know?
4    A.   No.
5    Q.   Was it a benefits enrollment type
6 form?
7    A.   It appears to be.
8    Q.   Have you ever seen this type of form
9 before?
10    A.   This particular form, no, I don't
11 recall seeing before.
12    Q.   So you have no familiarity with it, do
13 you?
14    A.   No.
15    Q.   Do you know what the -- PPI was going
16 to do with this form after it received it back
17 from Mr. Nail?
18    A.   It appears enroll Mr. Nail in dental
19 coverage.
20    Q.   Would this form be sent to the
21 insurance company?
22    A.   I don't know.
23    Q.   Do you see where it says, the third
24 line down from the top, "the employee declares
25 that he or she is actively at work on the date of

1              C. Freeman
2 this enrollment form"?
3    A.   Yes.
4    Q.   Now, at the time you sent this form to
5 Mr. Nail you knew that he was not actively at work
6 at PPI, correct?
7    A.   Correct.
8    Q.   And you asked him to sign the form
9 anyway, right?
10       MS. KIRILA: Objection.
11    A.   This is the form that was sent to all
12 of the those enrolling and we did not do a special
13 form. We did not have the insurance company do a
14 special form for the contract executives.
15    Q.   But this was one of the forms that you
16 told Mr. Nail in your cover letter please
17 complete, sign and return at your earliest
18 convenience, correct?
19       MS. KIRILA: Objection. Misstates the
20    letter. The document speaks for itself.
21    A.   And also if there are any questions,
22 Sandy was going to review and discuss questions
23 that you may have. She can be reached at, and
24 there's a number there.
25       So if there was any problems, concerns

C. Freeman

1    C. Freeman
2  or questions regarding the form, Mr. Nail could
3  have contacted Sandy Cranford.
4        Q.    Did you ever tell Mr. Nail not to
5  return this form even if he was even eligible for
6  benefits somewhere else?
7            Did you ever tell him that?
8        A.    I never told him that.
9        Q.    Do you know if anyone at PPI told him
10  that?
11        A.    I don't know.
12        Q.    Did you personally ever tell Mr. Nail
13  not to return this form if he was working
14  somewhere else?
15        A.    No.
16        Q.    Did anyone at PPI tell him that to
17  your knowledge?
18        A.    No.
19        Q.    Going back to paragraph 25 of the
20  court complaint, it alleges that in mid-October
21  2007 PPI learned from another employee that
22  defendant was working full time at Denny's, Inc.
23            Do you see that?
24        A.    Yes.
25        Q.    Who is the employee who informed PPI

1            C. Freeman
2  that defendant was working full time at Denny's?
3        A.    Jim Rein.
4        Q.    Jim Ryan?
5        A.    Rein, R-e-i-n.
6        Q.    Who is he?
7        A.    He is our vice president of
8  information technology.
9        Q.    Who did he inform?
10        A.    Me.
11        Q.    What did he say?
12        A.    He said he ran into Lester at the
13  Charlotte airport and Lester was working for
14  Denny's.
15        Q.    Was this a passing conversation or did
16  he come specifically to tell you that?
17        A.    It was a passing conversation.
18        Q.    What did you say in response?
19        A.    I was surprised.
20        Q.    You said that?
21        A.    I said that? What did I say?
22        Q.    I am just asking what you said in
23  response.
24        A.    I don't recall.
25        Q.    If anything.

1        A.    I don't recall specifically what I
2  said.
3        Q.    Do you recall generally?
4        A.    I expressed, I guess I expressed
5  surprise and asked him if he was sure and...
6        Q.    Have you completed your answer?
7        A.    Yes.
8        Q.    Did Mr. Rein give you any other
9  information other than he ran into Lester at the
10  airport and he was working at Denny's?
11        A.    Not that I recall.
12        Q.    Did he tell you what Lester was doing
13  at Denny's?
14        A.    Not that I recall.
15        Q.    This is the first time you had heard
16  of it?
17        A.    Yes.
18        Q.    What did you do after you heard this?
19        A.    I contacted our -- because I knew this
20  was a breach of the employment agreement, I
21  contacted our payroll department and told them to
22  immediately, and I knew the following day was a
23  payday. I told them to immediately stop payment
24  to Mr. Nail.

1            C. Freeman
2        Q.    Who specifically did you speak to in
3  payroll?
4        A.    Debbie Thompson, our payroll manager.
5        Q.    Was that done?
6        A.    Yes.
7        Q.    Who else -- strike that. What did you
8  do then?
9        A.    I drafted a letter to Mr. Nail
10  notifying him that, basically notifying him what
11  was happening. I probably drafted it with
12  counsel.
13        Q.    You didn't inform Mr. Kinzel or
14  Mr. Crage about the circumstances?
15        A.    Oh, yes, of course.
16        Q.    Did you do that before or after you
17  contacted the payroll department?
18        A.    Before.
19        Q.    Did you speak to both of them together
20  or separately?
21        A.    Together.
22        Q.    And what was discussed?
23        A.    Just that this, Lester had a job and
24  another position that violated his employment
25  agreement and we needed to cut him off

Page 138

C. Freeman

1  immediately.
2      Q.    You said that to them?
3      A.    That was the gist of the conversation.
4  And then they agreed.
5      Q.    Do you recall anything specifically
6  that either of them said in that conversation?
7      A.    No.
8      Q.    Who proposed cutting off his pay
9  immediately?
10      A.    I mean, that was my first thought.  So
11  I guess it was me.
12      Q.    Did you have the authority to do that
13  without approval from Mr. Kinzel?
14      A.    I think I would have done it and told
15  him I did it.
16      Q.    Told him after it was done.
17      A.    Yes.  That's not what happened, but, I
18  mean, I'm speculating.  Would I have or could I
19  have done it?  Yes, I think so.
20      Q.    You proposed this to Mr. Kinzel and
21  Mr. Crage and they said go ahead?
22      A.    Yes.
23      Q.    What else --
24      A.    That's the gist of the conversation.

Page 139

C. Freeman

1      Q.    What else was discussed in that
2  conversation?
3      A.    I don't recall.
4      Q.    Was there any talk of suing Mr. Nail
5  in that conversation?
6      A.    Not in that conversation.  I don't
7  think in that conversation, no.
8      Q.    Do you recall anything else at all
9  about that conversation?
10      A.    No.
11      Q.    Was anyone else present other than the
12  three of you?
13      A.    Yes.
14      Q.    Who?
15      A.    It occurred in the staff meeting, so
16  we had other members of Mr. Kinzel's staff were
17  present.
18      Q.    So it would have been mentioned then
19  in the minutes and notes of the staff meeting?
20      MS. KIRILA:  Objection.  Go ahead.
21      A.    It may be there.  It may not.  I don't
22  know.
23      Q.    Generally things that were
24  discussed -- well, substantive things in the staff

Page 140

C. Freeman

1  meeting were recorded in the minutes, correct?
2      A.    The minutes are not very detailed.
3  They are very bulleted, and, um, it may -- things
4  may or may not be in there depending on the
5  context or the level of detail or, you know,
6  whether it rose to, rose to a level that needed
7  follow-up or continuing discussion or anything
8  like that, or action.
9      Q.    As you sit here today do you recall
10  whether that issue was mentioned in the staff
11  meeting minutes?
12      A.    I don't recall.
13      Q.    Do you still have those minutes?
14      A.    I probably do.
15      Q.    Before you cut off Mr. Nail's pay did
16  you take any steps to confirm whether he was
17  employed at Denny's?
18      A.    No.
19      Q.    Did you ever take any steps to contact
20  Denny's to confirm that he was employed there?
21      A.    Not until the lawsuit was active and I
22  guess -- I don't -- I don't recall.  I'm trying to
23  think of the sequence of events here.
24      I don't recall ever contacting

Page 141

C. Freeman

1  Denny's.  I mean, through discovery we may have
2  gotten some information with regard to his
3  employment at Denny's, but I don't know that we
4  ever directly contacted Denny's.
5      Q.    So all you knew at the time that you
6  directed that his pay be cut off was that he was
7  working at Denny's, somebody told you.
8      A.    Right.
9      Q.    So after your conversation with
10  Mr. Kinzel and Mr. Crage it was then that you
11  contacted Debbie Thompson to immediately stop
12  payment to Mr. Nail; is that correct?
13      A.    Yes.
14      Q.    How soon after that meeting did you
15  contact payroll?
16      A.    Within a couple of hours.
17      Q.    And then you said you with the
18  assistance of counsel drafted a letter to
19  Mr. Nail; is that correct?
20      A.    Yes.
21      Q.    Was that your idea or someone else's?
22      A.    I don't recall.
23      Q.    Was it discussed, the possibility of
24  sending him a letter, was that discussed in your

36 (Pages 138 to 141)

Page 142

C. Freeman

1          C. Freeman
2   meeting with Mr. Kinzel and Mr. Crage?
3        A.   No.
4            MR. PAPPAS:  Mark this as Exhibit I.
5        (Defendant's Exhibit I, letter to
6   Lester Nail from Craig Freeman, dated
7   October 19, 2007, Bates No. LES0018, marked
8   for identification, this date.)
9            (A luncheon recess was taken at
10   12:56 p.m.)

Page 143

1          C. Freeman
2   A F T E R N O O N   S E S S I O N.
3        (Time noted:  1:48 p.m.)
4   C R A I G   F R E E M A N ,  resumed and testified
5        further as follows:
6   EXAMINATION BY (Cont'd.)
7   MR. PAPPAS:
8        Q.   Do you have Exhibit I in front of you?
9        A.   Yes.
10        Q.   I show you what has been marked as
11   Exhibit I.  And you sent this letter to Mr. Nail
12   on or about October 19, 2007; is that correct?
13        A.   Yes.
14        Q.   Did you write it?
15        A.   It was drafted by counsel.  And I
16   forgot to mention that the day before following
17   that meeting I contacted counsel immediately and
18   started consulting with counsel on this matter.
19   So this letter was part of that.
20        Q.   Following the meeting with Mr. Kinzel
21   and Mr. Crage?
22        A.   Yes.
23        Q.   Did you make any revisions to this
24   letter?
25        A.   Not that I recall.

Page 144

1          C. Freeman
2        Q.   And you reviewed it before you signed
3   it and sent it out, correct?
4        A.   Yes.
5        Q.   Did you discuss the letter with anyone
6   other than counsel?
7        A.   Not that I recall.
8        Q.   That's your signature, correct?
9        A.   Yes.
10        Q.   Did anyone other than you have to
11   approve of this letter before it was sent?
12        A.   No.
13        Q.   Do you know whether Kinzel or Crage
14   ever reviewed the letter before it was sent?
15        A.   No, they didn't.
16        Q.   You know that they did not?
17        A.   I know that they did not.
18        Q.   How do you know that?
19        A.   My recollection is that I worked with
20   counsel on drafting and finalizing it and sending
21   it out and I would not have involved Mr. Kinzel
22   and Mr. Crage in that.
23        Q.   Why not?
24        A.   Because it was pursuant to the
25   conversations we had had the day before.

Page 145

1          C. Freeman
2        Q.   They knew the letter was going out
3   though, didn't they?
4            MS. KIRILA:  Objection.  Calls for
5        speculation, but you can testify.
6        Q.   Do you know if they knew that the
7   letter such as this was being sent?
8        A.   I don't have a specific recollection
9   of discussing it with either one of them.
10        Q.   Who made the decision to stop paying
11   Mr. Nail under his employment agreement?
12        A.   As I indicated previously, that was my
13   immediate thought and Mr. Kinzel was on board with
14   that.
15        Q.   When did PPI stop making payments to
16   Mr. Nail?
17        A.   Effective with my October 18th call to
18   Debbie Thompson.
19        Q.   So he received all payments through
20   October 18th?
21        A.   All payments that were, that would
22   have been due up to October 18th would have been
23   made.
24        Q.   Were any of those payments
25   subsequently taken out of his bank account via

37 (Pages 142 to 145)

C. Freeman

1    direct deposit?
2        A.    None of those payments were.
3        Q.    Were any payments ever taken out of
4    his bank accounts by PPI?
5        A.    Not by PPI.
6        Q.    By Cedar Fair?
7        A.    No.
8        Q.    By anyone?
9        A.    I understand based on documentation I
10   have seen that the bank did.
11       Q.    What bank?
12       A.    Whatever bank it was that those
13   deposits were made into.
14       Q.    Mr. Nail's bank?
15       A.    Yes.
16       Q.    At whose direction?
17             MS. KIRILA:  Objection.  Assumes
18       facts, but you can answer based on your
19       role.
20       A.    Our -- based on the order that we made
21   on October 18th, they were unable to make the
22   correction in time.  So before the money was
23   deposited, so an adjustment was made, a correction
24   was made.

C. Freeman

1        Q.    I am going to return to that topic in
2    a few minutes.
3            MR. PAPPAS:  First I am going to have
4        this marked as Exhibit J.
5            (Defendant's Exhibit J, letter from
6        Craig Freeman to Lester Nail, October 23,
7        2007, Bates No. LES00019, marked for
8        identification, this date.)
9        Q.    Before looking at J, just take another
10   look at Exhibit I again, the previous letter.
11           Can you take a look at Exhibit I?
12       A.    I'm sorry, yes.
13       Q.    And the second paragraph you say, you
14   will be receiving information regarding your
15   options under COBRA.
16           Do you see that?
17       A.    Yes.
18       Q.    Was Mr. Nail ever given any
19   information regarding his options under COBRA as
20   far as you know?
21       A.    I don't have specific information.
22       Q.    Do you know one way or the other?
23       A.    I don't know one way or the other
24   whether he received that information.

C. Freeman

1        Q.    Do you know whether it was sent to
2    him?
3        A.    I have no specific knowledge.
4        Q.    Do you have any general knowledge?
5        A.    All I know is that it was supposed to
6    have been sent to him.
7        Q.    At whose direction?
8        A.    It should have been at the direction
9    of someone on my staff.
10       Q.    I will show you what has been marked
11   as Defendant's Exhibit J.  And this is a letter
12   that you sent to Mr. Nail on or about October 23,
13   2007, correct?
14       A.    Yes.
15       Q.    Did you write this?
16       A.    Yes.
17       Q.    Is that your signature?
18       A.    Yes.
19       Q.    Did you discuss this letter with
20   Mr. Kinzel or Mr. Crage before you sent it?
21       A.    Not to my recollection.
22       Q.    Did you discuss it with anyone before
23   you sent it?
24       A.    I don't know.

C. Freeman

1        Q.    Did anyone other than you review it
2    before it went out?
3        A.    I don't know whether I reviewed this
4    with counsel or not.
5        Q.    Other than counsel?
6        A.    Just my assistant.
7        Q.    Your secretary?
8        A.    Yes.
9        Q.    Did anyone have to approve this before
10   it went out?
11       A.    No.
12       Q.    Do you know if Mr. Nail ever received
13   your October 19, 2007 letter, Exhibit I?
14       A.    He received it with this October 23rd
15   letter because we got the return receipt when it
16   was forwarded to his new address.
17       Q.    So you enclosed another copy of the
18   October 19th letter with your October 23rd letter;
19   is that correct?
20       A.    Yes.
21       Q.    Did you ever hear from Mr. Nail after
22   you sent these letters?
23       A.    Yes.
24       Q.    When did you hear from him?

Page 150

C. Freeman

1    A.    Within a matter of days.
2    Q.    Between the time that you learned that
3 Mr. Nail was employed at Denny's and the time you
4 sent out these letters did you make any attempt to
5 contact Mr. Nail?
6    A.    No.
7    Q.    As far as you know did anyone at PPI
8 or Cedar Fair make any attempt to contact Mr. Nail
9 during that time period?
10    A.    No.
11    Q.    As far as you know?
12    A.    I'm sorry, I said no.
13    Q.    I am sorry, I didn't hear you.
14        How soon after you sent out the
15 October 23, 2000 letter, Exhibit J, did you hear
16 from Mr. Nail?
17    A.    My recollection is it was within a
18 matter of days.
19    Q.    Did you hear from him before or after
20 you received the return receipt?
21    A.    I don't know.
22    Q.    When you heard from Mr. Nail he called
23 you, correct?
24    A.    That's my recollection, yes.

Page 151

C. Freeman

1    Q.    How long did that initial conversation
2 last?
3    A.    I don't remember.
4    Q.    Do you recall what was discussed in
5 that initial conversation?
6    A.    We had more than one conversation
7 during that time frame and I -- I couldn't tell
8 you what was said in one versus another.
9    Q.    How many conversations did you have
10 after you sent out the October 23rd, 2007 letter?
11    A.    If I had to pick a number, I'd say
12 three.
13    Q.    You're saying that you can't
14 distinguish what was said in one of those
15 conversations as opposed to the other?
16    A.    Not specifically, no.
17    Q.    Can you tell me generally then what
18 was, whatever you remember was said in any of
19 those conversations?
20    A.    Sure.  Mr. Nail indicated that he had
21 looked for a position -- he had looked for a job
22 because he was concerned about providing for his
23 family.  He at one time said age discrimination
24 was an issue for him.

Page 152

C. Freeman

1        He indicated that he contacted a
2 former, I believe it was a former boss that he had
3 worked for and I think he was just -- he was going
4 to use this person for a reference and ended up
5 getting a job offer and that it was not
6 necessarily a job that he would have gone out and
7 sought, but it was -- it was a job, and he
8 indicated that he felt that the contract language
9 was ambiguous and that there was no intent on his
10 part to do anything wrong, that he would, he would
11 come up and personally meet with Dick and Peter
12 and tell them that.
13        He said that the bank transaction that
14 you referred to earlier was a mistake on our part,
15 that he had consulted with his counsel and felt he
16 had a very strong case.  He said -- I'm sorry that
17 this is not -- this is according to how it's
18 coming to mind, not necessarily chronologically,
19 so I apologize for that.
20    Q.    I understand.
21    A.    He indicated at one point that if all
22 we were looking to do was not pay the remainder of
23 his employment agreement and just call it even so
24 to speak, that he would be OK with that.

Page 153

C. Freeman

1        That's my recollection of those
2 conversations during that time frame.
3    Q.    What was your side of those
4 conversations?
5    A.    I, um, told Mr. Nail that we felt that
6 he needed to pay us back for what we had paid him
7 since he became employed.  I asked him when he
8 became employed.  And he eventually shared that
9 information, which I don't mention earlier.
10        I told him that other executives that
11 were on contracts had found other employment, but
12 he was the only one who did not contact me.
13        I told him that I had talked to Dick
14 Kinzel about the situation and that Dick had
15 indicated that the way to resolve this was to
16 write a check to pay us the full amount.  Pay PPI
17 the full amount.
18        This goes back and forth a little bit,
19 but Lester said, you know, indicated to me that if
20 we were to file a lawsuit that he would file a
21 counterclaim.  We would probably end up in
22 mediation.
23        That's pretty much the extent of my
24 recollection of the conversations.

C. Freeman

1  Q. Were all these conversations strictly
2  between the two of you or was anyone else
3  involved?
4  A. On my side they were strictly between
5  the two of us. I was the only one on my side of
6  the conversation.
7  Q. Do you know if anyone was present with
8  Mr. Nail on his side of the conversation?
9  A. I was under the impression that there
10  was no one else present.
11  Q. You mentioned that Mr. Nail told you
12  that age discrimination was an issue for him. Do
13  you know what he was referring to?
14  A. He didn't elaborate and we didn't
15  discuss it in any great length. He just made a
16  statement to the extent that, you know, I can tell
17  you that age discrimination is alive and well.
18  Q. And as a person in charge of the HR
19  function you didn't ask him any follow-up
20  questions as to what he meant by age
21  discrimination?
22  A. Not that I recall.
23  Q. And then you mentioned that Mr. Nail
24  said that he had contacted a former boss for a
25

C. Freeman

1  reference and got a job offer. Was he referring
2  to Denny's?
3  A. Yes.
4  Q. Do you know who the former boss was?
5  A. No.
6  Q. And according to you Mr. Nail said
7  that the Denny's job was not necessarily a job
8  that he would have sought, but it was a job. He
9  was referring to his Denny's job, correct?
10  A. Yes.
11  Q. Was it your impression that Mr. Nail
12  wasn't crazy about his job at Denny's?
13  A. My impression was that it was not a
14  job that he would have gone out for and applied
15  for. We didn't talk about his current level of
16  satisfaction with the position.
17  Q. Did you get the impression that he
18  would have left Denny's if he had got a better
19  offer somewhere else?
20  A. I didn't really form an impression one
21  way or the other.
22  Q. You said Mr. Nail told you that he
23  felt his employment contract was ambiguous; is
24  that correct?
25

C. Freeman

1  A. That's what he said.
2  Q. Do you know what provision he was
3  referring to specifically?
4  A. I don't recall that we got that
5  specific in our conversation.
6  Q. Did you have any response to that
7  comment?
8  A. I don't remember.
9  Q. Did you have any response to
10  Mr. Nail's offer to personally meet with, you said
11  Dick and Peter, I assume that's Mr. Kinzel and
12  Mr. Crage, correct?
13  A. Yes.
14  Q. Did you have any response to his offer
15  to meet with them?
16  A. I believe I told him I would carry
17  that message forward.
18  Q. And did you?
19  A. Yes.
20  Q. And what was their response?
21  A. Really it would have been Mr. Kinzel.
22  Mr. Crage was directly involved, but he was not
23  interested in that.
24  Q. So Mr. Kinzel told you he did not wish
25

C. Freeman

1  to meet with Mr. Nail; is that correct?
2  A. Right.
3  Q. Did you have any response to
4  Mr. Nail's comment concerning the bank withdrawal
5  transaction? Where he said it was a mistake on
6  PPI's part.
7  A. Not that I recall.
8  Q. Did you have any response to his
9  comment that he would be willing to accept it if
10  PPI stopped paying him on a going forward basis?
11  A. Getting back to the chronology of
12  these discussions, I believe that that was in --
13  that was early on before I knew what his
14  employment date with Denny's was.
15  At the time my thinking was that if we
16  were not talking about a material amount of time
17  here, you know, because again, my understanding
18  was that the, that as of June he was still
19  unemployed, so rolling forward from this, by the
20  time you find a job and start, and so forth, we
21  might have been talking about a month or so, that
22  maybe that would have been a possibility. And I
23  could have recommended that.
24  But it really didn't go anywhere based
25

C. Freeman

1  
2  on when Mr. Nail actually started his other
3  employment.
4      Q.   When did he tell you he started at
5  Denny's?
6      A.   Do you mean what start date?
7      Q.   Did he tell you what start date he
8  started at Denny's?
9      A.   He did tell me in a subsequent
10  conversation, yes.
11     Q.   When did he say he started?
12     A.   He said he started February 23rd of
13  2007.
14     Q.   Did you have any response to
15  Mr. Nail's comment that he would file a
16  counterclaim and that the case would probably end
17  up in mediation?
18     A.   I don't remember what my response was.
19     Q.   You mentioned that you told Mr. Nail
20  that the other executives with contracts who had
21  found other employment contacted you?
22     A.   Yes.
23     Q.   Who was that?
24     A.   Who were the other executives that
25  contacted me?

C. Freeman

1  
2      Q.   Correct.
3      A.   Mr. Thornton, Mr. Fisher, Mr. --
4  Mr. Weber.  But he didn't contact me.  He
5  contacted Mr. Kinzel.
6      Q.   Anyone else?
7      A.   Mr. Kaetzel contacted me, but that was
8  subsequent to this conversation.
9      Q.   Anyone else?
10     A.   Do you have the names again?  Because
11  if you can read them back to me or refresh my
12  memory?
13     A.   Weber, Fisher, Koontz, Thornton,
14  Petit, Jones, Kaetzel and White.
15     A.   Petit.
16     Q.   Were those notifications oral or in
17  writing?
18     A.   You know, I know there were e-mails
19  and telephone calls and I don't know what happened
20  first, what the initial contact was.  But they
21  were both.
22     Q.   Did each of those individuals get a
23  job in the theme park or water park industry?
24     A.   I believe so.  I'm not specifically
25  aware of what Mr. Thornton's position is, but the

C. Freeman

1  
2  others were in the industry.
3      Q.   When PPI learned that those
4  individuals had notified them that they had such
5  employment, did PPI continue to pay any of those
6  individuals under their agreements?
7      MS. KIRILA:  I am just going to object
8  to the extent they have differing contracts
9  from Mr. Nail, but you can answer that
10  question.
11     A.   All of them -- all of them contacted
12  me in advance of accepting those positions.
13     Q.   And once they accepted the positions
14  did PPI continue to pay them under their
15  contracts?
16     A.   No.
17     Q.   Did you discuss your various
18  conversations with Mr. Nail with anyone?
19     A.   Mr. Kinzel.
20     Q.   What about Mr. Crage?
21     A.   I don't recall that I did.
22     Q.   Did you communicate to Mr. Kinzel the
23  substance of what you and Mr. Nail had discussed?
24     A.   Yes.
25     Q.   Did you leave anything out?

C. Freeman

1  
2      A.   I'm sure I summarized.  I don't -- I
3  don't know specifically, you know, line by line
4  what we talked about, but it was the substance as
5  you said.
6      Q.   Other than saying that he did not want
7  to meet with Mr. Nail, did Mr. Kinzel have any
8  other comments regarding your summary of your
9  conversations with Mr. Nail?
10     A.   We discussed the issue of whether we
11  would accept Mr. Nail's proposal of discontinuing
12  payment and not seeking anything, any repayment.
13  And that was contingent upon determining how long
14  Mr. Nail had been employed.
15     Q.   Once you determined that did you have
16  any further conversations with Mr. Kinzel about
17  that issue?
18     A.   I'm sure I did.
19     Q.   What was discussed?
20     A.   It was too long a period of time to
21  ignore.
22     Q.   Was that your view or his view?
23     A.   That was what we discussed.
24     Q.   Do you recall who first advanced that
25  view in your discussion?

Page 162

C. Freeman

1
2     A.    When I found out the date, I knew that
3  it was too long a time frame and so the next time
4  we had the conversation I just pretty much
5  notified Mr. Kinzel that that is what I had found
6  out and that therefore we had to pursue getting
7  repayment.
8     Q.    And he agreed with that?
9     A.    Yes.
10    Q.    Did you tell anyone other than
11  Mr. Kinzel about your discussion with Mr. Nail?
12    A.    The -- well, do I have a specific
13  recollection?  No.
14    Q.    Do you recall generally discussing it
15  with anyone?  Other than Mr. Kinzel?
16    A.    I don't have a specific recollection
17  of discussing it with anyone else.
18        MR. PAPPAS:  Mark this as K.
19        (Defendant's Exhibit K, 3-page
20     handwritten notes with some redacted
21     portions, Bates Nos. PPI00762 through 764,
22     marked for identification, this date.)
23    Q.    I show you what has been marked as
24  Defendant's Exhibit K.  Can you tell me what this
25  is?

Page 163

C. Freeman

1
2     A.    These are my notes from my
3  conversations with Mr. Nail.
4     Q.    The conversations that you just
5  testified about?
6     A.    Yes.
7     Q.    This is all your handwriting other
8  than the stamp that says redacted privileged?
9     A.    Yes.
10    Q.    Now, the first entry on your notes is
11  dated October 30th.
12        Do you see that?
13    A.    Yes.
14    Q.    Is that your first conversation with
15  Mr. Nail after you sent him the October 23rd
16  letter?
17    A.    I believe so.
18    Q.    And the number next to his name, is
19  that his home phone number?
20    A.    I believe that's his cell phone
21  number.
22    Q.    Can you read that first line?
23    A.    "Where are we going with this?"
24    Q.    What does that refer to?
25    A.    That was a question he asked.

Page 164

C. Freeman

1
2     Q.    Did you respond to that?
3     A.    I'm sure I did.
4     Q.    Do you recall what your response was?
5     A.    No, I don't.
6     Q.    Can you read the next line?
7     A.    "Disagrees with our interpretation of
8  the agreement."
9     Q.    That's something Mr. Nail said?
10    A.    Yes.
11    Q.    Do you recall your response to that?
12    A.    No.
13    Q.    Do you know what that refers to
14  specifically?
15    A.    The employment agreement.
16    Q.    Do you know what interpretation he is
17  talking about?
18    A.    That we were entitled to -- that he
19  had violated the employment agreement by virtue of
20  accepting the position with Denny's.
21    Q.    Anything else?
22    A.    I believe that's the interpretation we
23  were, that we were discussing.
24    Q.    And the next line I believe says
25  "contract poorly written, ambiguous," correct?

Page 165

C. Freeman

1
2     A.    Yes.
3     Q.    That again was Mr. Nail's comment?
4     A.    Yes.
5     Q.    And you don't recall your response to
6  that, correct?
7     A.    No.
8     Q.    Not correct or you don't recall?
9     A.    I don't recall.
10    Q.    Then it says, "what can we do?"  Did I
11  read that correctly?
12    A.    "What can we do?"  Yes.
13    Q.    And what does that refer to?
14    A.    I believe this was Lester asking me,
15  you know, what can we do to resolve this.
16    Q.    Did you have a response to that?
17    A.    I don't recall what I said.
18    Q.    What does the next line say?
19    A.    I started to make a note that I didn't
20  complete because I was trying to make notes as
21  Lester was talking.  "Factual things nullify if,"
22  and I don't know where, I don't know what would
23  complete that thought.
24    Q.    Do you have any idea what the first
25  part refers to, "factual things nullify"?

Page 166

C. Freeman
1
2     A.    I don't recall.
3     Q.    Can you read the next entry?
4     A.    It says "if we're coming after him for
5  repayment, we'll have to sue; he'll file
6  counterclaim."
7     Q.    That's the comment you referred to
8  earlier?
9     A.    Yes.
10    Q.    What about the next entry?
11    A.    "If we're just talking the balance of
12 compensation, he wouldn't sue over that."
13    Q.    That's what Mr. Nail told you,
14 correct?
15    A.    Yes.
16    Q.    And the next entry on your notes is
17 dated November 5, 2007, correct?
18    A.    Yes.
19    Q.    Is that your next conversation with
20 Mr. Nail?
21    A.    I believe so.
22    Q.    And first entry says "sincere
23 misunderstanding of what contract," and I can't
24 read that last word.
25    A.    Meant.  M-e-a-n-t, meant.

Page 167

C. Freeman
1
2     Q.    Meant, OK.  Who said that?
3     A.    Lester.
4     Q.    Do you know what he was referring to?
5     A.    I believe he was referring to, um,
6  that his interpretation of the contract and our
7  interpretation of the contract was different and
8  he believed it was a sincere misunderstanding.
9     Q.    Did you have any response to that?
10    A.    I don't recall.
11    Q.    Then the next looks like "won't
12 disclose date"?
13    A.    Right.
14    Q.    What does that refer to?
15    A.    His employment date with Denny's.
16    Q.    So at least at this time Mr. Nail
17 chose not to tell you when he started at Denny's.
18 Is that accurate?
19    A.    Yes.
20    Q.    Can you read the next entry?
21    A.    "Not a fact issue; issue is what does
22 clause mean."
23    Q.    Whose comment is that?
24    A.    Lester.
25    Q.    Did you have any response to that?

Page 168

C. Freeman
1
2     A.    I don't recall.
3     Q.    The next entry says "What will
4  New York court decide?"  Is that correct?
5     A.    Yes.
6     Q.    Was that Lester's comment?
7     A.    Yes.
8     Q.    Do you know what he meant by that?
9        MS. KIRILA:  Objection, calls for
10 speculation.
11    Q.    Based on your conversation with him,
12 what was your understanding of what he meant by
13 that?
14    A.    My understanding was that it would be
15 up to a New York court to decide what the contract
16 or what the clause meant.
17    Q.    Did you have any response to?
18    A.    That not that I recall.
19    Q.    The next entry says "lawyers get
20 involved, slash, settlement."  Did I read that
21 correctly?
22    A.    Yes.
23    Q.    And that refers to the same comment
24 you testified about earlier that Mr. Nail made; is
25 that right?

Page 169

C. Freeman
1
2     A.    Testified earlier before you gave me
3  these?
4     Q.    Yes.
5     A.    Yes.
6     Q.    And he said that he would file a
7  counterclaim and that there would probably be
8  mediation.
9        Is that the same comment or is this
10 something different?
11    A.    This is -- my recollection is this was
12 a general discussion by Mr. Nail regarding, you
13 know, if this -- if a lawsuit gets filed and you
14 get the lawyers involved and maybe there are
15 settlement discussions and maybe it goes to
16 mediation.  He was just kind of trying to outline
17 the process.
18    Q.    The next line says "maybe mediation,"
19 correct?
20    A.    Right.
21    Q.    Then there's a space.  Was there
22 anything in that space or you just skipped a line?
23    A.    I had skipped a line.
24    Q.    But this was the same conversation?
25    A.    Yes.

C. Freeman

1     Q.   And it says "Couldn't find job in
3   Charlotte, parentheses, age discrimination alive
4   and well, close parentheses," correct?
5     A.   Right.
6     Q.   What does couldn't find a job in
7   Charlotte refer to?
8     A.   Mr. Nail went back and started
9   discussing his job search process and indicating
10  to me that he couldn't find a job in Charlotte and
11  that's when he made the comment regarding age
12  discrimination.
13    Q.   Do you recall specifically what he
14  said about that?
15    A.   No.
16    Q.   And you didn't ask any follow-up
17  questions about that, correct?
18    A.   No.
19    Q.   No, not correct or no, you did not?
20    A.   No, I did not.  As I recall.
21    Q.   The next line says, "Called Denny's
22  GC.  She had worked with.  She recruited him.
23  Senior director employment law, February 23 start
24  day.  Commuted for some time, parentheses, three
25  months, close parentheses, moved to Spartanburg in

C. Freeman

2   June."
3         Did I read that correctly?
4     A.   Yes.
5     Q.   Who called Denny's general counsel?
6     A.   He indicated to me that he called
7   Denny's general counsel.
8     Q.   And she had worked with.  Do you know
9   what that means?
10    A.   She was someone he had worked with in
11  the past.
12    Q.   Mr. Nail told you that she had
13  recruited him?
14    A.   Yes.
15    Q.   And he told you that his position
16  was -- was his position senior director of
17  employment law or was that her position?
18    A.   His position.
19    Q.   At Denny's?
20    A.   At Denny's.
21    Q.   He told you then the start date was
22  February 23rd?
23    A.   Yes.
24    Q.   So initially in that conversation he
25  didn't want to disclose the date, but then later

C. Freeman

1   in that conversation he did; is that correct?
3     A.   Yes.
4     Q.   He told you he commuted for about
5   three months from Charlotte to Spartanburg?
6     A.   Yes.
7     Q.   And then moved to Spartanburg in June,
8   correct?
9     A.   Yes.
10    Q.   Did you have any response to those
11  comments?
12    A.   Not that I recall.
13    Q.   The next entry I believe says "thought
14  was; got to provide for family."
15    A.   Yes.
16    Q.   That's what Mr. Nail told you?
17    A.   Yes.
18    Q.   The conversation looks like it's
19  continued on the next page.
20        It says -- this is a continuation of
21  your November 5th call with Mr. Nail; is that
22  correct?
23    A.   Yes.
24    Q.   It says, "New lawyer, Michael Weber,
25  New York, Littler Mendelson."

C. Freeman

2         Do you see that?
3     A.   Yes.
4     Q.   Mr. Nail communicated that to you?
5     A.   Yes.
6     Q.   That was his new lawyer?
7     A.   Yes.
8     Q.   Did you have any response to that?
9     A.   Not that I recall.
10    Q.   Can you read the next line?
11    A.   "Larry Levine didn't point out 7(c)."
12    Q.   Do you have any idea what that refers
13  to?
14    A.   Mr. Nail had previously worked with
15  another attorney who I believe was in Charlotte by
16  the name of Larry Levine and actually we had a
17  previous conversation.
18        So the 10/30 conversation, there may
19  have been one before that where this Larry Levine
20  discussion occurred.  Because we talked a little
21  bit about Larry Levine and based on that
22  conversation Mr. Nail didn't feel that Mr. Levine
23  was an appropriate representative for him
24  apparently and changed attorneys and he indicated
25  as part of this conversation that Mr. Levine

C. Freeman

1              C. Freeman
2  didn't point out 7(c) in the employment agreement
3  to him.
4      Q.   Did you have any response to that?
5      A.   I don't recall.
6      Q.   Then the next entry I believe says
7  "made mistake taking money out of my checking
8  account"; is that correct?
9      A.   Yes.
10     Q.   That's what you referred to earlier
11  before I gave you these notes?
12     A.   Yes.
13     Q.   There's a block that's blocked out and
14  it says:  Redacted - privileged.
15         Do you see that?
16     A.   Yes.
17     Q.   Who were those notes to?
18     A.   I, through this entire process I was
19  continuously checking with and consulting with my
20  counsel, and so I would in my conversations with
21  counsel I would make notes that were related to
22  this and that's what these sections were.
23     Q.   So all of the ones that are blacked
24  out on this page you're writing about your
25  communications with counsel?

C. Freeman

1              C. Freeman
2     A.   Yes.
3     Q.   Is there anything other than that
4  that's blocked out?
5     A.   No.
6     Q.   Were those communications on that same
7  day?
8     A.   I don't know.  They would have had
9  dates associated with them.
10     Q.   Did you distribute these notes to
11  anyone?
12     A.   No.
13     Q.   The next date entry is for
14  November 27, 2007, correct?
15     A.   Yes.
16     Q.   And I believe it says "left Lester a
17  VM."  Well, why don't you read it?  I can't really
18  read it.
19     A.   "Left Lester a voice mail, VM, voice
20  mail, that we have filed a complaint."
21     Q.   And by complaint you mean the court
22  complaint in this action?
23     A.   Yes.
24     Q.   And why did you let Mr. Nail know that
25  a complaint had been filed?

C. Freeman

1              C. Freeman
2     A.   Upon consultation with Mr. Kinzel
3  regarding this matter, we decided that we were
4  going to proceed with a complaint and he
5  suggested, he actually suggested that I contact
6  Mr. Nail and give him a heads up so that he didn't
7  just get it cold.
8     Q.   When was the first time you discussed
9  the possibility of filing a court action against
10  Mr. Nail with Mr. Kinzel?
11     A.   I don't recall.
12     Q.   Was it prior to your conversations
13  with Mr. Nail which began on October 30th or
14  subsequent to that?
15     A.   I don't know.
16     Q.   It was after the decision was made to
17  stop making payments to Mr. Nail, correct?
18     A.   Yes.
19     Q.   Sometime between that date, which is
20  about October 18th, and November 27th, a decision
21  was made to sue Mr. Nail?
22     A.   Yes.
23     Q.   I don't want you to tell me about any
24  conversations where counsel was present.
25         Did you have any other conversations

C. Freeman

1              C. Freeman
2  with Mr. Kinzel regarding potentially or actually
3  suing Mr. Nail?
4     A.   It would have been just very brief,
5  general updates concerning the status and moving
6  ahead.
7     Q.   Who brought up the idea of suing
8  Mr. Nail first?
9     A.   Mr. Kinzel.
10     Q.   Do you recall when that was?
11     A.   No.
12     Q.   Do you recall what he said?
13     A.   Not specifically.
14     Q.   Do you recall generally what he said
15  other than bringing up the idea?
16     A.   No.
17     Q.   Did you have any response to him
18  bringing up the idea?
19     A.   I discussed with Mr. Kinzel the
20  potential for settling.
21     Q.   What was discussed about that?
22     A.   Just the value of the suit in terms of
23  the court costs and legal fees and so forth versus
24  the recovering full amount and, you know, what
25  would make sense.

Page 178

C. Freeman

1
2    Q.    What was --
3    A.    From a, strictly from a cost
4    standpoint.
5    Q.    What was your view and what was his
6    view on that issue?
7    A.    I was probing.  I was simply probing
8    and his response was we want back everything we're
9    entitled to.
10    Q.    Do you recall anything else about any
11    other discussions you had with either Mr. Kinzel
12    or Mr. Crage regarding suing Mr. Nail?
13    MS. KIRILA:  Objection.  Outside the
14    presence of counsel you can answer.
15    MR. PAPPAS:  Correct.
16    A.    No.
17    Q.    Who ultimately made the decision to
18    sue Mr. Nail, do you know?
19    A.    Mr. Kinzel.
20    Q.    How do you know that?
21    A.    Because I was reporting directly to
22    him on the matter and he would have had to approve
23    that actually.
24    Q.    The last page of your notes --
25    A.    I'm sorry, I just want to elaborate a

Page 179

C. Freeman

1
2    little bit.
3    Q.    Certainly.
4    A.    This was all of course with advice and
5    consultation with counsel through the process as
6    well in terms of, you know, whether -- whether,
7    um, what type of suit would be filed and that sort
8    of thing.  Where it would have to be filed and,
9    you know, just the technicalities and mechanics.
10    Q.    The last page of your notes, the first
11    entry is November 29th, 2007, correct?
12    A.    Yes.
13    Q.    Do you know what that little equal
14    sign is next to that?
15    A.    Yes, I wasn't absolutely sure that
16    that was the date.  So I just indicated it was on
17    or about November 29th because I made this note
18    after the conversation.
19    Q.    The previous notes were made during
20    the conversations?
21    A.    Yes.
22    Q.    And this particular note 11/29 was
23    made sometime after that conversation?
24    A.    Yes.
25    Q.    How soon after?

Page 180

C. Freeman

1
2    A.    It would have been before the next
3    conversation, which was on the 7th or the next
4    voice mail.  So sometime between those two dates.
5    Q.    Can you read the first entry under
6    11/29?
7    A.    "Lester returned call; appreciated
8    heads up."
9    Q.    That refers to you letting him know
10    that the lawsuit was filed?
11    A.    Yes.
12    Q.    Can you read the next entry?
13    A.    "Reiterated there was no intent on his
14    part to violate the agreement and he doesn't
15    believe he did."
16    Q.    Do you have any response to that?
17    A.    I don't recall.
18    Q.    Next entry?
19    A.    "Will come here and look Dick, slash,
20    Peter in the eye and tell them that."
21    Q.    So he is again offering to come and
22    speak to Mr. Crage and Mr. Kinzel; am I correct?
23    A.    That wasn't an again.  This was the
24    comment that I referred to earlier before you gave
25    me these notes.

Page 181

C. Freeman

1
2    Q.    So that was the first time he
3    mentioned that?
4    A.    As far as I can recall, yes.
5    Q.    Did you have any response to that?
6    When you told him that you would send that along.
7    Other than that did you have any response?
8    A.    Not that I recall.
9    Q.    Can you read the next entry?
10    A.    "Discussed whether there is room to
11    negotiate; told him I would talk to Dick."
12    Q.    Mr. Nail was asking you if there was
13    room to negotiate?
14    A.    Yes.
15    Q.    Did you have authority to negotiate at
16    that point?
17    A.    No.
18    Q.    You said you would talk to Dick.
19    That's Mr. Kinzel, correct?
20    A.    Yes.
21    Q.    And then the last line says "He said
22    his New York attorney says he has a very strong
23    case"?
24    A.    Feels.
25    Q.    "Feels he has a very strong case."  Do

C. Freeman

1   C. Freeman
2   you know what that refers to?
3       A.   The claim had been filed and he was
4   indicating to me that his New York attorney
5   believes he has a strong case with regard to the
6   lawsuit that's been filed.
7       Q.   Did you have any response to that?
8       A.   Not that I recall.
9       Q.   And then final entry, December 7,
10  2007, correct?
11      A.   Yes.
12      Q.   And did you make these notes during or
13  subsequent to the conversation?
14      A.   This was a voice mail and I made the
15  notes as I -- right after I left the voice mail.
16      Q.   And you left the voice mail for
17  Mr. Nail, correct?
18      A.   Yes.
19      Q.   Can you read what you wrote there?
20      A.   "Told him I talked to RK and there's
21  not flexibility in our position."
22      Q.   What does the next line say?
23      A.   "We feel the employment agreement was
24  breached and he was overpaid by $100,000 plus."
25      Q.   Next?

C. Freeman

1   C. Freeman
2       A.   "Easiest way for him to make this go
3   away is to write us a check -- write a check."
4       Q.   Did you ever speak to Mr. Nail after
5   leaving that voice mail?
6       A.   Not that I recall.
7       Q.   Other than the dates reflected in
8   these notes did you have any other discussions
9   with Mr. Nail after sending him the October 23,
10  2007 letter?
11      A.   As I indicated, there might have been
12  one I missed that probably would have been prior
13  to the 10/30, that I didn't make notes on.
14  Because we did have a discussion where that Larry
15  Levine thing came up and I believe that was within
16  this time frame, but, I mean, probably before the
17  10/30 date.
18      Q.   Do you recall anything that was
19  discussed in that undocumented conversation?
20  Other than Larry Levine?
21      A.   Not specifically, no.
22      Q.   Generally?
23      A.   Generally I believe that was the first
24  time we talked after Mr. Nail received the letter.
25      Q.   And do you recall anything that was

C. Freeman

1   C. Freeman
2   discussed generally?
3       A.   That would have been the conversation
4   where I indicated to him that he was the only
5   contract executive that -- the others found
6   positions, but he was the only one who never
7   called and I'm sure he told me he didn't violate,
8   he didn't feel like he had breached the agreement.
9   Generally that sort of conversation.
10      Q.   Do you recall anything else at all
11  that you haven't already testified about, your
12  various discussions with Mr. Nail in October and
13  November of 2007 and December?
14      A.   No, I don't recall.
15          MR. PAPPAS:  Mark this as Exhibit L.
16          (Defendant's Exhibit L, letter to
17  Craig Freeman from Lester Nail, November 1,
18  2007, marked for identification, this date.)
19      Q.   I will show you what has been marked
20  as Defendant's Exhibit L.  This is a letter that
21  you received from Mr. Nail in early November 2007,
22  correct?
23      A.   Yes.
24      Q.   And he says "it was good to talk to
25  you."

C. Freeman

1   C. Freeman
2       Do you see that?
3       A.   Yes.
4       Q.   Does that refer to the October 30th
5   conversation, do you know?
6       A.   Can you repeat the question, please?
7       Q.   I will move on.  He says "I am happy
8   to hear that Cedar Fair had a good year."
9       Do you see that?
10      A.   Yes.
11      Q.   Do you recall discussing with Mr. Nail
12  that Cedar Fair had a good year?
13      A.   We made some small talk and I'm sure
14  he said how are things going, and I said fine, and
15  we didn't get into any specifics.
16      Q.   Did Cedar Fair have a good year?
17      A.   By some measures.
18      Q.   By whose measure?
19      A.   I guess in terms of financial
20  measures, we were on track with the guidance that
21  we had provided the markets.
22      Q.   In Mr. Nail's letter he says, "as you
23  know, PPI has not requested my services at any
24  time for any reason since the date of my
25  termination."

C. Freeman

1
2      Do you see that?
3      A.   Yes.
4      Q.   Was that true as of November 1, 2007?
5      A.   Yes.
6      Q.   Did you ever ask Mr. Nail to perform
7  any services for either PPI or Cedar Fair at any
8  time after his termination?
9      A.   No.
10     Q.   To your knowledge did anyone at PPI or
11 Cedar Fair ever ask Mr. Nail to perform services
12 at any time after his termination?
13     A.   No.
14     Q.   Did you yourself ever consider
15 utilizing Mr. Nail's services at any time after
16 his termination?
17     A.   I don't have specific recollection of
18 any time when I did.
19     Q.   To your knowledge did anyone at PPI or
20 Cedar Fair ever consider utilizing Mr. Nail's
21 services at any time after his termination?
22     A.   Not to my knowledge.
23     Q.   Were you aware of any plans by PPI or
24 Cedar Fair to utilize Mr. Nail's services after
25 his termination?

C. Freeman

1
2      A.   No circumstances arose where that was
3  given consideration.
4      Q.   You had no plans to do that, did you?
5      A.   As I said, no circumstances arose
6  where I needed to utilize Mr. Nail's services.
7      Q.   Did PPI or Cedar Fair ever ask any of
8  the other PPI executives who were terminated to
9  perform services after they were terminated?
10     A.   Yes.
11     Q.   Which ones?
12     A.   Pat Jones.
13     Q.   Anyone else?
14     A.   Would this include asking questions or
15 consulting with?
16     Q.   Whatever you would consider utilizing
17 their services.
18     A.   OK.  There were ad hoc conversations
19 with Mr. Weber.
20     Q.   Al Weber?
21     A.   Al Weber.  Mr. Fisher.  Those were the
22 only ones I'm aware of.
23     Q.   What services were Pat Jones asked to
24 provide after her termination?
25     A.   Pat Jones was reemployed by PPI.

C. Freeman

1
2      Q.   As what?
3      A.   Vice president general manager for
4  Kings Dominion, the amusement park.
5      Q.   When was that?
6      A.   Sometime in the first half of 2007, I
7  believe.
8      Q.   Was her old employment agreement still
9  in effect at that time?
10     A.   Yes, it was.
11     Q.   And how was Mr. Al Weber's services
12 utilized?
13     A.   Ad hoc questions, nothing substantial.
14     Q.   About what?
15     A.   Maybe some of the historical things
16 that had happened.  I just don't recall
17 specifically.
18     Q.   Historical things that had happened in
19 the company or with respect to the employment
20 agreements?
21     A.   In the company.
22     Q.   How long did those ad hoc questions
23 take to ask and to answer?
24     A.   Minutes.
25     Q.   What about Mr. Fisher?

C. Freeman

1
2      A.   Same sort of situation, minutes.
3      Q.   To your knowledge did Mr. Nail ever
4  refuse to perform any services for PPI or Cedar
5  Fair after his termination when asked?
6      A.   No.
7      Q.   Denny's is not a competitor of PPI, is
8  it?
9           MS. KIRILA:  Object to the extent it
10     calls for a legal conclusion, but you can
11     answer.
12     Q.   You didn't list Denny's among the
13 competitors though that you testified about this
14 morning, right?
15     A.   I gave you the significant, the most
16 significant competitors.
17     Q.   Would you consider Denny's to be a
18 competitor of PPI or Cedar Fair?
19     A.   Under a broad definition of
20 competition for discretionary income of the
21 family, you could.
22     Q.   In that sense virtually any company
23 that provides services would be a competitor,
24 correct?
25          (Witness nodded head up and down.)

C. Freeman

1
2    Q.    It's not a competitor of the industry
3  that PPI or Cedar Fair is in, is it?
4    A.    No.
5    Q.    It's a restaurant chain, right?
6    A.    Yes.  PPI has restaurants.
7    Q.    Within its hotels or within its parks?
8    A.    Both.  I'm sorry, PPI has no hotels.
9  Cedar Fair has hotels.
10    Q.    Other than those restaurants -- how
11  many restaurants are there?
12    A.    In the hotels or adjacent to the
13  hotels?
14    Q.    Any restaurant operated by PPI or
15  Cedar Fair.
16    A.    Many, many, many, many, many.
17    Q.    And those are on the properties of the
18  various amusement parks and water parks?
19    A.    Yes.
20    Q.    And they're in the nature of
21  concession stands and things like that?
22    A.    No.  For example, at Knott's Berry
23  Farm we have a TGI Friday's that operates on the
24  property but outside the park that's accessible to
25  anybody off the street.

C. Freeman

1
2          There's also a Chicken Dinner
3  Restaurant, full service restaurant at that
4  facility at that location and again, it's outside
5  the park.  It's not part of the gated admission
6  price.  It is available to anybody.
7          Cedar Point has TGI Friday's outside
8  the park accessible to anybody.
9          Famous Dave's, outside the park.
10  Knott's also has restaurants in their hotel that
11  are accessible to anybody.
12    Q.    Do they operate restaurants
13  independently of the parks?  Restaurants other
14  than that are either on the property of the park
15  or adjacent to the park.
16    A.    The TGI Friday's in Sandusky is
17  located at a hotel property owned by Cedar Fair,
18  but about, I don't know, two, three miles away
19  from the park.
20    Q.    Other than that?
21    A.    No.
22    Q.    Assuming that he had the time to do
23  both, is there anything inherently inconsistent
24  with Mr. Nail performing services for PPI while
25  being employed by Denny's?

C. Freeman

1
2          MS. KIRILA:  Objection.  That's the
3  basis of the suit.  You can answer.
4    Q.    In your view is there anything
5  inherently inconsistent with him performing
6  services for both, assuming he had the time to do
7  both?
8    A.    Assuming he had the time to do both,
9  no.
10    Q.    To your knowledge would PPI -- was PPI
11  involved in any litigation against Denny's?
12    A.    Not to my knowledge.
13    Q.    What about Cedar Fair?
14    A.    Not to my knowledge.
15    Q.    Do you have any knowledge one way or
16  the other whether Mr. Nail would have been willing
17  or able to cease his Denny's employment if he had
18  been requested to perform services for PPI during
19  the contract term?
20          MS. KIRILA:  Object to the extent it
21  calls for a definition of a legal term in a
22  contract, but you can answer.
23    A.    I have no such knowledge.
24    Q.    If Mr. Nail had been willing to cease
25  his Denny's employment at any time if asked to

C. Freeman

1
2  perform services for PPI, do you contend that his
3  Denny's employment still rendered him unable to
4  perform services for PPI?
5          MS. KIRILA:  Same objection.  But you
6  can answer.
7    A.    Could you please repeat the question?
8    Q.    Sure, if Mr. Nail had been willing and
9  able to stop working at Denny's at any time if
10  asked to perform services for PPI, would his mere
11  employment by Denny's have rendered him unable to
12  perform exclusive services for PPI?
13          MS. KIRILA:  Same objection.
14    A.    Not from the point he would have
15  terminated his employment with Denny's.
16    Q.    In March '08 Cedar Fair hired Duffield
17  Milkie as corporate vice president and general
18  counsel; is that correct?
19    A.    February.
20    Q.    February 2008?
21    A.    Yes.
22    Q.    Do you know who hired Mr. Milkie?
23    A.    Cedar Fair.
24    Q.    Do you know the person who hired
25  Mr. Milkie?

Page 194

C. Freeman

1    C. Freeman
2    A.    He was selected by Mr. Kinzel.
3    Q.    Do you know why he was hired?
4    A.    He was hired to become corporate vice
5    president and general counsel for Cedar Fair LP.
6    Q.    They had never had that type of
7    position before, correct?
8    A.    Correct.
9    Q.    Did you discuss Mr. Milkie's hiring
10   with anyone?
11   A.    Talked with Mr. Crage, Mr. Kinzel.  HR
12   director, my assistant.
13   Q.    Was that before or after he was hired?
14   A.    Before, during and after.
15   Q.    Did you have any input into his
16   hiring?
17   A.    I did not interview Mr. Milkie.
18   Q.    Other than interviewing him did you
19   have any input into his hire?
20       MS. KIRILA:  Objection.  He testified
21   you did not interview him.
22       THE WITNESS:  No.
23   Q.    You can have input other than
24   interviewing someone.  So I am asking other than
25   interviewing did you have any input?

Page 195

1    C. Freeman
2    A.    I expressed my opinion.  You know,
3    input is given and input is taken and I don't know
4    how much my opinion was considered.
5    Q.    What was your opinion, that general
6    counsel should or should not be hired?
7    A.    I felt that the position was
8    necessary.
9    Q.    Do you know when Cedar Fair first
10   considered hiring Mr. Milkie.
11   A.    First considered.  The very -- the
12   very first contact that I'm aware of between
13   Mr. Milkie and Cedar Fair regarding a position was
14   in the summer of 2007.
15   Q.    But he wasn't hired until February '08
16   you said?
17   A.    Right.
18   Q.    I want to go back to the reversal of
19   the direct deposit.  Did you authorize that?
20   A.    Yes.  I authorized -- I authorized
21   stopping the payment of the paycheck that was to
22   be paid on the 19th.
23   Q.    Who authorized the reversal of the
24   direct deposit?
25   A.    I guess that would be me.  Because the

Page 196

1    C. Freeman
2    bank could not process my order from the 18th
3    before the money went into the account.
4    Q.    So the money was already in the
5    account and you authorized the -- who did you
6    authorize to take the money out of the account?
7        MS. KIRILA:  Object to form.  Compound
8    question.
9    Q.    The money was already in the account,
10   correct?
11   A.    Not when I -- not when I directed that
12   the payment be stopped.
13   Q.    Right, but they couldn't stop it in
14   time and some more money got put into the account,
15   correct?
16       MS. KIRILA:  Objection.  To the extent
17   you know.
18   Q.    Isn't that what you just testified to?
19   A.    The money could not be stopped from
20   going into the account based on the timing of my
21   order to stop the payment.
22   Q.    And if it could not be stopped from
23   going into the account that means that it went
24   into the account, correct?
25   A.    To my knowledge, it did.

Page 197

1    C. Freeman
2    Q.    Then what happened?
3    A.    Based on my order to stop the payment
4    on the 18th, a correction was made to reverse it.
5    Q.    Who made that correction?
6    A.    The bank.
7    Q.    Who communicated that to the bank?
8    A.    Debbie Thompson.
9    Q.    Who is Debbie Thompson?
10   A.    Payroll manager.
11   Q.    Of Cedar Fair?
12   A.    PPI.
13   Q.    PPI?  Reports to you?
14   A.    No.
15   Q.    Who does she report to?
16   A.    I believe she reports to Les --
17       THE WITNESS:  What is Les's last name,
18   Lester?  Les in IT?
19       MS. KIRILA:  You can testify to your
20   knowledge.
21   A.    Les in IT.
22       MR. PAPPAS:  Can you mark this as
23   Exhibit M.
24       (Defendant's Exhibit M, e-mail from
25   Craig Freeman to Debbie Thompson, dated

Page 198

C. Freeman

1        C. Freeman
2    October 27, 2007 and e-mail from Thompson to
3    Freeman, dated October 25, 2007, Bates No.
4    PPI000103, marked for identification, this
5    date.)
6        Q.    I show you what has been marked as
7    Defendant's Exhibit M.  The top portion is an
8    e-mail that you sent to Debbie Thompson on
9    October 27, 2007; is that correct?
10       A.    Yes.
11       Q.    And what does that refer to?
12       A.    This refers to my notifying her on
13   Thursday, October 18th, that Lester was not to be
14   paid.
15       Q.    And the e-mail below that is from
16   Debbie Thompson to you and you received that on
17   October 25, 2007; is that correct?
18       A.    Yes.
19       Q.    What does her e-mail refer to?
20       A.    Her e-mail refers to the correction
21   being made.  To reverse the direct deposit.
22       Q.    So after the direct deposit was
23   reversed that meant that Mr. Nail had only been
24   paid through the end of September, 2007; is that
25   correct?

Page 199

C. Freeman

1        C. Freeman
2        A.    Yes.
3        Q.    Did you attempt to get Mr. Nail's
4    authorization to take that money out of his
5    personal bank account?
6        A.    When I gave the direction, the money
7    was not in the account.
8        Q.    Before it was removed did anyone at
9    the company try to get Mr. Nail's authorization to
10   do that?
11       A.    Not that I know of.
12          MR. PAPPAS:  Mark this as Exhibit N.
13          (Defendant's Exhibit N, e-mail from
14       Sandy Cranford to Craig Freeman, dated
15       November 19, 2007, Bates No. PPI000765,
16       marked for identification, this date.)
17       Q.    I show you what has been marked as
18   Defendant's Exhibit N as in Nancy.
19          This is an e-mail from you -- from
20   Sandy Cranford to you dated November 19, 2007,
21   correct?
22       A.    Yes.
23       Q.    Do you know whose handwriting that is?
24       A.    Mine.
25       Q.    And what does this e-mail refer to?

Page 200

C. Freeman

1        C. Freeman
2        A.    This was to calculate the value of the
3    salary and benefits that we had overpaid between
4    February 23rd of 2007 and September 30th of 2007.
5        Q.    And what was the value?
6        A.    $99,000 plus $7,983.50.
7        Q.    Isn't that the salary and benefits
8    combined?
9        A.    Yes.
10       Q.    What is just the benefits?
11       A.    $7,983.50.
12       Q.    Is that accurate as far as you know?
13   Sitting here today.
14       A.    It does not reflect any payroll taxes
15   that would have been paid.
16       Q.    It reflects medical and dental,
17   correct?
18       A.    Life, AD and D.
19       Q.    Everything except payroll taxes?
20       A.    Everything that I'm aware of,
21   everything that I was told.
22       Q.    So other than the salary that you say
23   Mr. Nail was overpaid, and other than the payroll
24   taxes, the amount as far as the value of benefits
25   you would say he owes is what?

Page 201

C. Freeman

1        C. Freeman
2        A.    According to this calculation,
3    7,983.50.
4        Q.    Did you and Mr. Crage ever exchange
5    e-mails about the Lester Nail situation?
6        A.    Not that I recall.
7        Q.    Are you aware of any documents that
8    were in existence relating to Lester Nail's
9    situation that were deleted?
10       A.    No, I'm not.
11       Q.    Are you aware of any that were
12   destroyed?
13       A.    No, I'm not.
14       Q.    Are you aware of any that were lost?
15       A.    No, I'm not.
16          MR. PAPPAS:  Could we just take a
17       quick break?
18          MS. KIRILA:  Yes.
19          (A recess was taken from 3:09 through
20       3:15 p.m.)
21   BY MR. PAPPAS:
22       Q.    I just have a couple of more
23   questions.  Did you ever speak to anyone who was
24   formerly at CBS regarding the meaning of
25   Mr. Nail's employment agreement?

Page 202

1              C. Freeman
2      A.    No.
3      Q.    You never spoke to Al Weber about
4  that?
5      A.    Um, not without counsel present.
6      Q.    Which counsel was present?
7      A.    Jill and Mr. Milkie.
8      Q.    Mr. Weber is not employed by PPI or
9  Cedar Fair, is he?
10          MS. KIRILA:  Go ahead.  You can answer
11          that, but I am going to instruct you not to
12          answer because he was consulted in his
13          capacity as a former CEO and officer and
14          within the privilege.
15      Q.    You can answer as to whether he was an
16  employee of PPI or Cedar Fair at the time of that
17  conversation.
18      A.    No, he was not.
19      Q.    When did that conversation take place?
20      A.    Friday, April 18th, 2008.
21      Q.    How long did it last?
22      A.    Ten minutes.
23      Q.    Who was present during that
24  conversation?
25      A.    I was and the two attorneys I

Page 203

1              C. Freeman
2  mentioned.
3      Q.    And Mr. Weber?
4      A.    It was a telephone conversation, yes.
5      Q.    So you, two attorneys from the Squire
6  firm?
7      A.    One from Squire and our general
8  counsel, Mr. Milkie.
9      Q.    And then Mr. Weber was on the other
10  end of the phone?
11      A.    Yes.
12      Q.    Do you know if anybody was with him?
13      A.    I do not know.
14      Q.    Where did that take place?
15      A.    In Squire Sanders' offices in
16  Cleveland.
17      Q.    Do you know where Mr. Weber was at the
18  time?
19      A.    I believe he was in his home office.
20      Q.    Which is where?
21      A.    In North Carolina.
22      Q.    When you say his home office, an
23  office within his home?
24      A.    Yes.
25          MR. PAPPAS:  That's it.  No further

Page 204

1              C. Freeman
2  questions.
3          (Time noted:  3:18 p.m.)

Page 205

1              C. Freeman
2
3          I, the witness herein, having
4  read the foregoing testimony do hereby
5  certify it to be a true and correct
6  transcript, subject to the corrections,
7  if any, shown on the attached page.
8
9
10
11      _____
12          CRAIG FREEMAN
13
14
15
16  Subscribed and sworn to
17  before me this _____ day
18  of _____, 2008.
19
20
21
22  _____
23
24
25

Page 206

```
1
2                C E R T I F I C A T E
3      STATE OF NEW YORK    )
4                          : ss.
5      COUNTY OF SUFFOLK    )
6
7           I, THOMAS R. NICHOLS, a Notary Public
8      within and for the State of New York, do
9      hereby certify:
10          That CRAIG FREEMAN, the witness whose
11     deposition is hereinbefore set forth, was duly
12     sworn by me and that such deposition is a true
13     record of the testimony given by the witness.
14          I further certify that I am not
15     related to any of the parties to this action
16     by blood or marriage, and that I am in no way
17     interested in the outcome of this matter.
18          IN WITNESS WHEREOF, I have hereunto
19     set my hand this 30th day of April, 2008.
20
21
22          _____
23               THOMAS R. NICHOLS
24
25
```

Page 207

```
1
2                I N D E X
3      WITNESS       EXAMINATION BY     PAGE
4      CRAIG FREEMAN   MR. PAPPAS        3
5
6                E X H I B I T S
7      DEFENDANT'S EXHIBITS        PAGE LINE
8      A, memorandum dated June 30,      75  23
         2006, re:  "The Sale of
9        Paramount Parks, Inc. To
         Cedar Fair, L.P."
10
         B, document purported to be    78   9
11         Lester Nails' employment
           contract with PPI, Bates
12         Nos. LES00038 through 45
13     C, letter from Richard Kinzel    94  14
           to Lester Nail dated July
14         27, 2006
15     D, one-page document entitled    97  15
           "Personnel Action Request
16         Form," Bates No. PPI000014
17     E, 2-page letter from Craig     101  11
           Freeman to Lester Nail,
18         August 9, 2006, Bates Nos.
           LES00016 and 17
19
         F, cover letter from Craig    104   2
20         Freeman to Lester Nail,
           dated September 12, 2006,
21         with attachment entitled
           "Separation and Release
22         Agreement," Bates Nos.
           LES00021 through 29
23
         G, complaint in present action  121  9
24
25
```

Page 208

```
1
2            I N D E X (Continued.)
3               E X H I B I T S
4      DEFENDANT'S EXHIBITS         PAGE LINE
5      H, cover letter dated May 21,    130  14
         2007 from Craig Freeman to
6        Lester Nail with attached
         document titled "Declaration
7        Section," with other
         attachments
8
       I, letter to Lester Nail from    142   5
9        Craig Freeman, dated October
         19, 2007, Bates No. LES0018
10
       J, letter from Craig Freeman to  147   6
11       Lester Nail, October 23, 2007,
         Bates No. LES00019
12
       K, 3-page handwritten notes with 162  19
13       some redacted portions, Bates
         Nos. PPI00762 through 764
14
       L, letter to Craig Freeman from  184  16
15       Lester Nail, November 1, 2007
16     M, e-mail from Craig Freeman to  197  24
         Debbie Thompson, dated
17       October 27, 2007 and e-mail
         from Thompson to Freeman,
18       dated October 25, 2007,
         Bates No. PPI000103
19
       N, e-mail from Sandy Cranford to 199  13
20       Craig Freeman, dated November
         19, 2007, Bates No. PPI000765
21
22
23
24
25
```

**A**

**abide** 66:7
**ability** 6:25 7:3,9
   102:2,18 120:5
   123:22 124:3,19
   124:22 192:17
   193:9
**absolutely** 179:15
**absorb** 90:9,10,20
**absorbed** 90:24
**accept** 118:7 157:10
   161:11
**acceptable** 106:7
   117:14,18
**accepted** 160:13
**accepting** 160:12
   164:20
**access** 18:18 74:25
**accessible** 190:24
   191:8,11
**account** 145:25
   174:8 196:3,5,6,9
   196:14,20,23,24
   199:5,7
**accounts** 146:5
**accurate** 77:5
   101:25 103:4
   167:18 200:12
**accurately** 7:17
**acknowledged**
   118:4
**acquired** 23:22 24:3
   25:19 40:2 42:5,7
   45:9 77:20 80:15
   100:25
**acquiring** 40:23
**acquisition** 23:18
   25:23 26:4 28:21
   28:23 29:6 40:16
   42:2 43:3 45:10
   47:14 49:11 50:5
   50:20 51:6,9,20
   52:14 55:20 57:19
   57:24 58:13,14,16
   61:8,22 63:5,15
   64:10 65:18
**action** 97:16 98:6
   121:10,16 140:9
   175:22 176:9
   206:15 207:15,23
**active** 76:23 77:13
   124:7 140:22
**actively** 65:6 71:4
   71:12 132:25
   133:5
**activities** 68:13
**actual** 23:8
**ad** 31:13 50:16
   187:18 188:13,22

**200:18**
**added** 29:4
**additional** 26:4 29:3
   29:5
**address** 3:7 96:3
   125:10,24 126:3
   149:17
**adjacent** 37:14 46:3
   190:12 191:15
**adjustment** 146:24
**administering** 79:18
**administration** 20:2
   22:10 23:13 24:12
   24:15 27:10,12
   107:15,16
**administrative**
   24:19 29:13 53:18
   55:24 56:3,18 57:7
   59:11,20 71:19
   72:12 73:8 74:5,16
   75:6 81:9,13 83:23
   88:16
**admission** 43:18
   191:5
**advance** 160:12
**advanced** 161:24
**Adventure** 44:14
**advice** 111:15,25
   179:4
**advised** 125:20
   126:2
**advising** 88:12
**advisory** 37:7
**affect** 6:25 7:3,6,9
**affirmative** 72:23
**age** 151:24 154:13
   154:18,21 170:3
   170:11
**ago** 5:14
**agreed** 138:5 162:8
**agreement** 1:17 8:6
   8:7 24:2,5 44:19
   45:16,17 62:9,18
   62:22 66:11,16
   82:10 90:17
   102:22 104:5
   105:20,23 106:21
   111:2 112:22
   113:6,18,21,24
   115:8 116:13,15
   120:6 122:9
   124:17 125:2,14
   136:21 137:25
   145:11 152:24
   164:8,15,19 174:2
   180:14 182:23
   184:8 188:8
   201:25 207:22
**agreements** 24:19
   25:7,9,14,17 48:18

**62:2,14 63:17,21**
   65:3,16,25 66:6,8
   66:20 80:23 81:22
   82:11 83:17,18
   96:24 106:7 107:2
   107:17 160:6
   188:20
**agrees** 112:25
   123:12
**aha** 11:6
**ahead** 47:2 71:8
   99:20 138:22
   139:21 177:6
   202:10
**ahold** 99:13
**airport** 135:13
   136:11
**Al** 54:5,6 71:24
   187:20,21 188:11
   202:3
**alcoholic** 6:15
**alive** 154:18 170:3
**allege** 130:8
**alleges** 121:19 125:9
   126:23 134:20
**allowed** 105:24
**all-day** 50:8 51:13
**ambiguous** 152:10
   155:24 164:25
**America** 22:25 24:3
   27:7 30:2 35:25,25
   44:9 45:14 64:19
**amount** 105:21
   106:21 108:20
   117:20 153:17,18
   157:17 177:24
   200:24
**amounts** 109:11
**amusement** 42:17
   42:20 43:6,9,15
   45:21 46:4 188:4
   190:18
**and/or** 43:14 76:24
   124:13
**answer** 3:24 9:18
   12:3,17 14:8 33:5
   46:24 51:12 52:2,5
   52:6 55:22 59:3
   78:3 85:2 93:11
   98:19 99:25
   107:24 110:19
   111:5 116:2
   122:17,22 129:16
   136:7 146:19
   160:9 178:14
   188:23 189:11
   192:3,22 193:6
   202:10,12,15
**answered** 84:23
   128:16

**answering** 5:2
**answers** 4:19 5:5
**anybody** 49:18 68:7
   93:17 190:25
   191:6,8,11 203:12
**anyway** 119:10
   133:9
**apologize** 84:24
   152:20
**apparently** 173:24
**appears** 78:17 98:5
   132:7,18
**applicable** 124:13
**applied** 40:25
   155:15
**apply** 113:14 114:15
   114:22
**appreciated** 180:7
**approached** 25:23
**appropriate** 105:21
   106:4 108:20
   173:23
**approval** 35:9
   138:14
**approve** 33:7 34:15
   34:19 38:14,18
   144:11 149:10
   178:22
**approved** 68:22
**approving** 38:22
**approximately** 32:4
   87:24 88:3,4,9
   101:4
**April** 1:10 10:7
   12:10 202:20
   206:19
**area** 50:11 56:24
**arm** 5:25
**arose** 187:2,5
**arts** 20:6
**ascertain** 70:23
**asked** 11:14 26:25
   50:15 51:10,11,18
   51:21,22 82:20
   83:25 84:10,22,25
   86:21,25 87:4,21
   88:22 89:4 126:5
   126:19 127:14
   133:8 136:6 153:8
   163:25 187:23
   189:5 192:25
   193:10
**asking** 3:23 15:18
   51:24 76:17 77:8
   81:23 122:8
   135:22 165:14
   181:12 187:14
   194:24
**Aspirin** 6:22
**asset** 24:20

**answering** 5:2

**assignment** 64:11
**assimilated** 26:2
**assist** 25:10,12
**assistance** 18:5
   141:19
**assistant** 17:24
   29:13 149:7
   194:12
**assisting** 88:14
**associate** 20:6
**associated** 46:4
   108:3 175:9
**assume** 4:11 156:12
**assumed** 24:5 28:14
   99:22 100:21
   119:8
**Assumes** 99:24
   146:18
**assuming** 86:18
   124:21 191:22
   192:6,8
**attached** 130:16,24
   131:4,5,9 205:7
   208:6
**attachment** 104:4
   104:12 105:4
   207:21
**attachments** 130:18
   208:7
**attempt** 150:5,9
   199:3
**attend** 31:14
**attendance** 50:12
**attended** 16:19
   29:23
**attendees** 33:13
**attention** 59:6 69:11
   110:21
**attorney** 9:13 11:7
   13:10 14:12 16:17
   91:6 111:7 112:13
   112:17,20 114:4
   173:15 181:22
   182:4
**attorneys** 2:5,13
   3:13 12:25 49:3,24
   173:24 202:25
   203:5
**attraction** 45:5
**August** 82:7 98:16
   101:12,17 207:18
**author** 77:10
**authority** 138:13
   181:15
**authorization** 199:4
   199:9
**authorize** 195:19
   196:6
**authorized** 195:20
   195:20,23 196:5

**authorizes** 33:6
**available** 191:6
**Avenue** 1:16,24
    2:14
**Average** 31:18
**aware** 40:24 60:22
    61:25 62:4 67:13
    82:18 93:17
    108:14 159:25
    186:23 187:22
    195:12 200:20
    201:7,11,14
**a.m** 1:10 56:14
    94:10,11

_____

**B**

**B** 78:8,9,15 112:23
    207:6,10 208:3
**bachelor's** 19:23
**back** 8:14 26:23
    34:9,12 109:8
    112:21 118:25
    119:3,16,20 125:8
    132:16 134:19
    153:7,19 157:12
    159:11 170:8
    178:8 195:18
**background** 128:12
    128:22 130:4
**balance** 166:11
**ballpark** 71:16
**bank** 145:25 146:5
    146:11,12,13,15
    152:14 157:5
    196:2 197:6,7
    199:5
**based** 41:7 60:8
    68:17 69:9 79:24
    96:12 111:24
    146:10,19,21
    157:25 168:11
    173:21 196:20
    197:3
**basically** 23:10
    72:23 84:5 137:10
**basis** 31:13 50:16
    70:21 87:2 157:11
    192:3
**Bates** 78:11 97:17
    101:13 104:5
    131:3,23 142:7
    147:8 162:21
    198:3 199:15
    207:11,16,18,22
    208:9,11,13,18,20
**bcc** 104:21
**began** 176:13
**beginning** 27:8
**behalf** 26:3,3
**believe** 21:24 23:7

43:9 47:7,17 50:21
    65:8,9 72:14 73:9
    80:8 82:6 102:2
    104:17 106:3
    112:23 116:21
    121:24 122:5,18
    152:3 156:17
    157:13 159:24
    163:17,20 164:22
    164:24 165:14
    166:21 167:5
    172:13 173:15
    174:6 175:16
    180:15 183:15,23
    188:7 197:16
    203:19
**believed** 19:17
    167:8
**believes** 182:5
**benefit** 33:17 37:5
    48:3,9 102:21
    107:6,11 108:7
**benefits** 18:22,23
    36:21 48:4,5,19
    49:24,25 77:24
    102:14,15 107:19
    121:21 122:3,11
    122:23 123:9,17
    123:18,21 124:2,5
    124:6,13,22 125:3
    125:23 128:4
    130:9,24 132:5
    134:6 200:3,7,10
    200:24
**benefitted** 107:8
**Bernes** 48:11 49:23
**Berry** 23:17,25,25
    24:4,13 43:24
    190:22
**best** 67:5 82:3 89:8
    103:19
**better** 127:15 129:2
    155:19
**beverages** 6:16
**beyond** 16:23
**bid** 49:17
**bidding** 37:5
**big** 47:10
**Billy** 17:12 28:5
    29:2 103:14
**bit** 22:22 24:24 84:4
    153:19 173:21
    179:2
**blacked** 174:23
**blank** 131:6
**block** 174:13
**blocked** 174:13
    175:4
**blood** 206:16
**board** 91:11 145:13

**Bob** 55:8
**bono** 113:23 114:6
**boss** 13:12,13 152:3
    154:25 155:5
**bottom** 95:2
**breach** 125:14 126:9
    136:21
**breached** 121:24
    123:20 182:24
    184:8
**break** 5:6 56:8
    93:10 94:9 120:18
    201:17
**Brett** 54:15
**brief** 17:8 73:19
    177:4
**briefly** 3:19
**bring** 84:5 107:4
    110:3,4
**bringing** 177:15,18
**broad** 189:19
**broke** 5:25
**brokers** 49:25
**brought** 29:2 30:16
    109:12,16 177:7
**building** 32:9 37:11
    37:13,16
**bullet** 102:5
**bulleted** 140:4
**Busch** 47:3
**business** 16:23 20:2
    20:22 30:5,10
    36:15 42:15,18,21
    47:11 58:8 113:5
    115:21 116:4,9,16
**businesses** 46:12,15
**buy** 105:19
**buyout** 117:20

_____

**C**

**C** 2:2 3:1,2 4:1 5:1
    6:1 7:1 8:1 9:1
    10:1 11:1 12:1
    13:1 14:1 15:1
    16:1 17:1 18:1
    19:1 20:1 21:1
    22:1 23:1 24:1
    25:1 26:1 27:1
    28:1 29:1 30:1
    31:1 32:1 33:1
    34:1 35:1 36:1
    37:1 38:1 39:1
    40:1 41:1 42:1
    43:1 44:1 45:1
    46:1 47:1,5 48:1
    49:1 50:1 51:1
    52:1 53:1 54:1
    55:1 56:1 57:1
    58:1 59:1 60:1
    61:1 62:1 63:1

64:1 65:1 66:1
    67:1 68:1 69:1
    70:1 71:1 72:1
    73:1 74:1 75:1
    76:1 77:1 78:1
    79:1 80:1 81:1
    82:1 83:1 84:1
    85:1 86:1 87:1
    88:1 89:1 90:1
    91:1 92:1 93:1
    94:1,13,14,19 95:1
    96:1 97:1 98:1
    99:1 100:1 101:1
    102:1 103:1 104:1
    105:1 106:1 107:1
    108:1 109:1 110:1
    111:1 112:1 113:1
    114:1 115:1 116:1
    117:1 118:1 119:1
    120:1 121:1 122:1
    123:1 124:1 125:1
    126:1 127:1 128:1
    129:1 130:1 131:1
    132:1 133:1 134:1
    135:1 136:1 137:1
    138:1 139:1 140:1
    141:1 142:1 143:1
    143:4 144:1 145:1
    146:1 147:1 148:1
    149:1 150:1 151:1
    152:1 153:1 154:1
    155:1 156:1 157:1
    158:1 159:1 160:1
    161:1 162:1 163:1
    164:1 165:1 166:1
    167:1 168:1 169:1
    170:1 171:1 172:1
    173:1 174:1 175:1
    176:1 177:1 178:1
    179:1 180:1 181:1
    182:1 183:1 184:1
    185:1 186:1 187:1
    188:1 189:1 190:1
    191:1 192:1 193:1
    194:1 195:1 196:1
    197:1 198:1 199:1
    200:1 201:1 202:1
    203:1 204:1 205:1
    206:2,2 207:13
**calculate** 200:2
**calculation** 201:2
**calculations** 106:5
**California** 19:24
    20:9 43:24 44:2,9
    44:20,21
**call** 50:15 73:21,23
    93:20 103:20
    116:25 119:16
    120:23 145:17
    152:24 172:21

180:7
**called** 3:2 71:19
    72:4 116:23
    150:23 170:21
    171:5,6 184:7
**calling** 114:2
**calls** 78:2 92:25
    111:4 122:15
    129:6 145:4
    159:19 168:9
    189:10 192:21
**Camp** 22:24 23:6,8
    23:13,22 24:2 30:2
    35:25
**campgrounds** 46:8
    46:9
**Canada** 47:12
**Canada's** 44:6
    45:14 55:6
**capacities** 36:3,4
**capacity** 6:2 29:21
    54:21 70:2 115:3
    115:17 202:13
**capital** 44:23
**care** 72:24,25
**Carolina** 44:8
    203:21
**Carowinds** 11:20
    28:12 44:8 45:14
    55:10
**carry** 156:17
**case** 5:15,17,21 6:11
    8:14 11:4 13:9,20
    13:23 14:10 17:4,7
    17:15 18:4,16 19:2
    19:7 47:2 152:17
    158:16 181:23,25
    182:5
**cashier** 113:17
**category** 43:11,12
**cause** 65:3 72:18
    80:22 81:13 82:9
    82:15,25 83:16,24
    91:21,25 96:23,25
    99:23 101:4
    102:25 112:8
    124:9,12,24 125:4
**CBS** 25:19 40:2
    41:9 42:5 45:10
    48:4,8 49:10,19,23
    61:11 62:6 66:10
    76:8,14 201:24
**cease** 192:17,24
**Cedar** 13:17 15:25
    21:13,14,15,18,22
    21:25 23:4,16,22
    23:24,24 24:3 26:3
    26:13,14 28:8
    35:20 42:8,19 43:6
    43:21 45:19,22

46:6,11,18,18,21
47:11,15 48:22,25
52:12 61:14 66:15
67:2,16 75:25
76:10 77:20,24
78:19 80:15 82:16
82:21 91:10 99:8
100:24 115:13,16
146:7 150:9 185:8
185:12,16 186:7
186:11,20,24
187:7 189:4,18
190:3,9,15 191:7
191:17 192:13
193:16,23 194:5
195:9,13 197:11
202:9,16 207:9
**cell** 163:20
**Center** 2:6
**CEO** 13:16,17 30:9
30:20 39:11 48:24
54:8 202:13
**certain** 34:20 53:17
53:20 124:6
**Certainly** 179:3
**certainty** 70:24
**certificates** 21:5
**certify** 205:5 206:9
206:14
**CFO** 54:13
**chain** 190:5
**chairman** 13:16
**change** 25:21,22
30:15 67:22 76:25
77:15
**changed** 25:19
28:19 81:12
125:10 173:24
**characterization**
114:18
**charge** 154:19
**Charlotte** 41:7
65:12 69:18 75:17
85:5 135:13 170:3
170:7,10 172:5
173:15
**chart** 42:12
**check** 15:13 75:4,5
153:17 183:3,3
**checking** 174:7,19
**Chicken** 191:2
**chief** 30:16 35:17
**chose** 167:17
**chronologically**
152:19
**chronology** 157:12
**circumstances**
137:14 187:2,5
**city** 32:11 43:23,25
44:3,4

**claim** 182:3
**claims** 100:19
**clarify** 26:23
**Clark** 17:12,14,22
28:5 29:2 103:15
**clause** 167:22
168:16
**clear** 27:18 100:8
**Cleveland** 100:14
203:16
**close** 84:21 86:13,15
170:4,25
**closed** 51:9
**closing** 50:4,7,20
51:5 53:2,6,7,10
53:19 55:16 57:19
57:23 58:18 59:9
59:15,16 60:17
61:3,7,13,24 62:9
66:9,15 68:16,25
69:2 72:3 75:10
81:9 84:3,11 85:15
85:25 87:25
**closure** 84:5 107:4
110:4 120:12
**COBRA** 102:4,10
102:19,21 147:16
147:20
**code** 98:22
**codes** 99:4,7,9,13
**cold** 3:21 176:7
**collecting** 116:12
**college** 16:24 19:20
19:21 20:7
**Columbus** 2:8
**combined** 200:8
**come** 35:23 53:24
74:23 80:14 89:14
135:16 152:12
180:19,21
**comes** 119:3
**comfortable** 84:7
**coming** 118:25
152:19 166:4
**comment** 15:19
156:8 157:5,10
158:15 165:3
166:7 167:23
168:6,23 169:9
170:11 180:24
**comments** 161:8
172:11
**committee** 37:7
**communicate** 89:21
160:22
**communicated**
71:23,25 85:13
92:4 173:4 197:7
**communicating**
14:5 93:12

**communication**
76:13
**communications**
9:19 18:4 112:11
174:25 175:6
**commuted** 170:24
172:4
**company** 13:18
16:15 19:18 21:16
22:4 42:14,15,19
60:5 64:12 69:15
79:23 80:8 85:14
86:12 90:19 92:5
106:8 119:20
125:3 132:21
133:13 188:19,21
189:22 199:9
**compared** 105:22
**compensated** 114:6
114:7
**compensation** 20:25
107:19 166:12
**competition** 189:20
**competitive** 49:17
**competitiveness**
46:25
**competitor** 113:15
189:7,18,23 190:2
**competitors** 46:21
189:13,16
**complaint** 8:12,15
8:16 121:9,15
125:8 126:23
134:20 175:20,21
175:22,25 176:4
207:23
**complete** 54:3 65:9
89:6,7 131:19
133:17 165:20,23
**completed** 89:5
98:12 136:7
**completely** 7:17
58:20,21 123:5
**complex** 37:15,16
**comply** 81:20
**Compound** 196:7
**concerned** 151:23
**concerning** 157:5
177:5
**concerns** 133:25
**concession** 190:21
**concessionaires**
25:8
**conclusion** 60:7,10
60:11 78:2 89:21
111:5 114:2
122:15 189:10
**conclusions** 58:12
**concurrent** 76:9
**conditions** 66:8

**conducts** 35:4
**conferences** 9:23,25
**confirm** 140:17,21
**confirmed** 52:9
**conflict** 31:22
**consider** 186:14,20
187:16 189:17
**considerable** 110:13
**consideration** 187:3
**considered** 22:11
195:4,10,11
**considering** 58:23
**consistent** 32:14
37:24 79:6 80:5
**constitutes** 125:13
**consultants** 49:25
50:2
**consultation** 176:2
179:5
**consulted** 32:25
38:12,20 152:16
202:12
**consulting** 143:18
174:19 187:15
**consumed** 6:15
**consummated** 26:5
**contact** 48:10
125:20,23,24
126:3 140:20
141:16 150:6,9
153:13 159:4,20
176:5 195:12
**contacted** 118:23
134:3 136:20,22
137:17 141:5,12
143:17 152:2
154:25 158:21,25
159:5,7 160:11
**contacting** 140:25
**contain** 68:12
**contemplated** 125:2
**contemplating**
90:25
**contend** 113:9
123:19 125:13
193:2
**context** 91:20 96:19
140:6
**contingent** 161:13
**continuation** 172:20
**continue** 51:19
55:20 56:4 71:12
83:17 102:18
124:13,22 125:3
160:5,14
**continued** 73:14
82:12 107:18
115:9 172:19
208:2
**continuing** 63:7

99:18 102:14,15
113:25 122:21
140:8
**continuously** 174:19
**contract** 23:3 43:17
67:6,9 68:5 71:5
71:14 77:19 78:3
78:11,16,18,22
96:5,24 101:5,7
110:9 115:3,18
121:25 122:12,19
126:9 133:14
152:9 155:24
164:25 166:23
167:6,7 168:15
184:5 192:19,22
207:11
**contracts** 20:25
34:15,16,20,22
38:18,21 56:6
65:11 67:3,17
68:12 73:14 79:21
80:17 90:22 96:3,4
106:11 108:11
153:12 158:20
160:8,15
**contractual** 24:24
25:2,5
**controlled** 23:10,10
**Cont'd** 143:6
**convenience** 131:20
133:18
**convenient** 56:9
**conversation** 13:2,7
73:16,18 75:14
83:6 85:12 86:6,9
86:18,21 87:19
91:15 92:13,17,20
93:22 115:4
117:11,12 118:11
118:13,15,18,22
119:2,6 127:8,13
127:19,24 128:15
129:18 135:15,17
138:4,7,25 139:3,6
139:7,8,10 141:10
151:2,6,7 154:7,9
156:6 158:10
159:8 162:4
163:14 166:19
168:11 169:24
171:24 172:2,18
173:17,18,22,25
179:18,23 180:3
182:13 183:19
184:3,9 185:5
202:17,19,24
203:4
**conversations** 9:20
12:4 14:9,11,18

15:7 18:8 19:8
30:7 50:23 73:20
83:12 144:25
151:10,16,20
153:3,5,25 154:2
160:18 161:9,16
163:3,4 174:20
176:12,24,25
179:20 187:18
**conversion** 128:5
**convert** 83:22
**converting** 48:4
**convey** 14:7
**conveyed** 118:17
**cooperative** 41:19
**copies** 81:17
**copy** 99:14 149:18
**corporate** 17:9
18:13 22:9 24:17
26:12 27:10,12
28:22,25,25 35:17
36:2,14 41:4,8
80:11 84:21 86:13
86:16 88:17 90:11
90:21 193:17
194:4
**corporate-wide**
99:10
**corporation** 2:12
21:17 22:12
**corporation's** 80:2
**correct** 7:24 8:16
19:15 24:9 33:7
35:10 39:14 41:11
42:23 47:18 49:15
57:8 58:19 66:3
74:7,18 77:17,21
78:16,23 81:10,15
83:9 84:11 86:14
89:12 92:2,3,10,24
94:21 97:12 98:16
99:17 100:6 101:5
101:8,18 103:2
104:14 108:24
110:9 121:16
124:24 129:9,13
130:22,25 131:6
131:20 133:6,7,18
140:2 141:13,20
143:12 144:3,8
148:14 149:20
150:24 155:10,25
156:13 157:2
159:2 164:25
165:6,8 166:14,17
168:4 169:19
170:4,17,19 172:2
172:8,22 174:8
175:14 176:17
178:15 179:11

180:22 181:19
182:10,17 184:22
189:24 193:18
194:7,8 196:10,15
196:24 198:9,17
198:25 199:21
200:17 205:5
**correction** 146:23
146:24 197:4,5
198:20
**corrections** 205:6
**correctly** 102:17
165:11 168:21
171:3
**correspondence**
8:14 17:7,14 115:4
115:6
**cost** 178:3
**costs** 107:13 177:23
**counsel** 7:19,21
10:11 12:23 14:12
15:5 16:13 24:23
25:6 39:22 61:23
70:2 76:14,15 79:3
79:11 80:2,5,6,12
81:20 91:9 95:5,5
97:7,7 100:3,8,24
101:22,23 103:13
104:17 106:3
111:13,25 112:12
137:12 141:19
143:15,17,18
144:6,20 149:5,6
152:16 171:5,7
174:20,21,25
176:24 178:14
179:5 193:18
194:5 195:6 202:5
202:6 203:8
**counsels** 100:12
**counsel's** 111:15
**counterclaim**
153:22 158:16
166:6 169:7
**counteroffer** 119:17
**counterproposal**
118:25 121:2
**County** 43:25 206:5
**couple** 32:8 36:17
37:10 50:6 55:13
98:8 117:4 141:17
201:22
**course** 39:9 127:13
137:15 179:4
**courses** 16:23
**court** 1:2 4:19,23
5:4 8:16 121:15
122:16 134:20
168:4,15 175:21
176:9 177:23

**cover** 104:2,16
130:14 131:10
133:16 207:19
208:5
**coverage** 102:3,16
102:18 132:19
**coworker** 35:15
**Crage** 19:6,9,10
35:12,21 36:25
37:18,24 38:3 49:3
103:6 105:4,6,16
106:2 109:6
137:14 138:22
141:11 142:2
143:21 144:13,22
148:21 156:13,23
160:20 178:12
180:22 194:11
201:4
**Crage's** 37:8
**Craig** 1:14 3:8 19:6
101:12 104:3
130:15 142:6
147:7 184:17
197:25 199:14
205:12 206:10
207:4,17,19 208:5
208:9,10,14,16,20
**Cranford** 11:17
13:7 17:2,23 28:10
48:7 49:23 98:10
103:15 127:8
134:3 199:14,20
208:19
**crazy** 155:13
**create** 28:24
**creative** 54:21
**Crosstree** 3:9
**current** 26:21 28:15
31:10 35:6 36:6
40:7 125:20 126:2
155:16
**currently** 21:12
28:11 42:3
**cut** 137:25 140:16
141:7
**cutting** 138:9
**CV** 1:6

**— D —**

**D** 97:14,15,20
200:18 207:2,15
208:2
**Dale** 55:4
**data** 48:18
**date** 41:25 50:4,7,20
51:5 53:2,6,7,10
53:19 55:12,16
57:19,23 59:9,15
59:16 61:4,7,13,24

62:12 63:9 64:22
66:9 68:16,25 69:2
72:3 74:10 75:10
76:2 78:13 81:10
84:3,11 85:16,25
87:25 88:6 92:11
94:16 97:18 98:15
101:14 104:7
121:11 130:19
132:25 142:8
147:9 157:15
158:6,7 162:2,22
167:12,15 171:21
171:25 175:13
176:19 179:16
183:17 184:18
185:24 198:5
199:16
**dated** 75:24 94:15
94:20 104:3
130:15 142:6
163:11 166:17
197:25 198:3
199:14,20 207:8
207:13,20 208:5,9
208:16,18,20
**dates** 14:17 175:9
180:4 183:7
**Dave's** 191:9
**David** 54:14
**day** 31:23 136:23
143:16 144:25
170:24 175:7
205:17 206:19
**days** 55:13,13,15
150:2,19
**deal** 69:10 106:24
**dealings** 93:6,15
**Deb** 48:11 49:23
**debate** 109:3
**debated** 108:20
**Debbie** 137:4
141:12 145:18
197:8,9,25 198:8
198:16 208:16
**December** 23:20
101:6,8 114:9
182:9 184:13
**decide** 168:4,15
**decided** 55:18 82:24
83:3,22 89:10
176:3
**decision** 53:16 56:19
56:21,23 59:10,13
59:15,17 63:13
68:15,19 72:2
84:13 145:10
176:16,20 178:17
**decisions** 40:22
53:13,15 59:8 84:6

94:6
**Declaration** 130:17
208:6
**declares** 132:24
**decrease** 110:12
**defendant** 1:8 2:13
121:19 125:9
126:24 130:8
134:22 135:2
**Defendant's** 75:21
75:23 76:4 78:9,15
94:13,14,19 97:15
97:20 101:11,16
104:2,9 121:9,13
130:14,21 142:5
147:6 148:12
162:19,24 184:16
184:20 197:24
198:7 199:13,18
207:7 208:4
**define** 63:19
**definitely** 49:9
**definition** 189:19
192:21
**degree** 19:23,25
20:3,6
**degrees** 20:5
**delegated** 100:2
**deleted** 201:9
**Dempsey** 1:15 2:4
**Denny's** 134:22
135:2,14 136:11
136:14 140:18,21
141:2,4,5,8 150:4
155:3,8,10,13,19
157:15 158:5,8
164:20 167:15,17
170:21 171:5,7,19
171:20 189:7,12
189:17 191:25
192:11,17,25
193:3,9,11,15
**denominated** 78:5
**dental** 132:18
200:16
**department** 136:22
137:17
**depending** 32:21
140:5
**depends** 39:6
**deposed** 6:2
**deposit** 146:2
195:19,24 198:21
198:22
**deposited** 146:24
**deposition** 1:14 3:20
5:8 6:7 9:16,22
10:4 11:9,13 60:15
206:11,12
**deposits** 146:14

**Depot** 113:18
**describe** 30:8
**described** 20:15,19
51:14
**design** 54:21
**designate** 10:2
**designated** 85:6
**destroyed** 201:12
**detail** 96:17 140:6
**detailed** 140:3
**details** 127:10
**determination**
122:16
**determine** 106:5
**determined** 87:15
89:18 161:15
**determining** 106:4
161:13
**develop** 109:8
**development** 20:23
**Dick** 13:14 26:16
48:24 52:17
152:12 153:14,15
156:12 180:19
181:11,18
**Diego** 44:3
**differences** 80:13
96:6
**different** 23:21 32:9
96:5 108:10,11
119:21 167:7
169:10
**differing** 160:8
**diligence** 25:25 40:3
40:17 47:18 48:16
48:23 49:2,6,12,13
49:16 62:5
**Dinner** 191:2
**dipping** 116:10
**direct** 27:25 28:13
85:8 146:2 195:19
195:24 198:21,22
**directed** 12:16 66:2
75:2 141:7 196:11
**directing** 110:20
**direction** 14:20
65:24 146:17
148:8,9 199:6
**directly** 14:6 26:19
27:20 29:7,15 42:7
126:24 141:5
156:23 178:21
**director** 11:19 17:9
17:10 22:14 23:13
24:12 100:21
170:23 171:16
194:12
**Disagrees** 164:7
**discharged** 80:18
**disclose** 9:19 111:12

112:10 167:12
171:25
**disclosed** 68:10
**disclosing** 123:20
**discontinuing**
161:11
**discovery** 8:12,21
18:6 19:2 98:5
141:2
**discretion** 39:11
**discretionary**
189:20
**discrimination**
151:24 154:13,18
154:22 170:3,12
**discuss** 18:15 57:20
57:25 61:8,14 69:7
96:15,18 97:4
103:9,12 105:11
133:22 144:5
148:20,23 154:16
160:17 194:9
**discussed** 10:24
12:13 14:23 40:19
53:9 55:23 58:3,6
61:19 65:22,23
68:3 69:5 83:12
90:2 91:23 96:4,21
103:14,16 105:17
109:7,21 117:10
118:17 137:22
139:2,25 141:24
141:25 151:5
160:23 161:10,19
161:23 176:8
177:19,21 181:10
183:19 184:2
**discussing** 11:11
25:15 60:23 121:3
145:9 162:14,17
164:23 170:9
185:11
**discussion** 11:16,21
11:22,23 12:11,19
52:10,21,22,24
66:19 68:18,23
73:12 83:6 85:20
86:20,24 90:4
91:17 105:20
106:3 140:8
161:25 162:11
169:12 173:20
183:14
**discussions** 15:9,23
16:13 17:3,5,6,13
17:20 19:12 51:6
52:12,16,25 53:10
55:17 56:16 57:6
57:10,13,15,18,22
58:17 60:8,17,24

61:2,18 65:15,20
66:10,14 69:25
83:8 108:18,22
109:2,5,17,22
111:13 112:11
117:15 119:13
120:9 157:13
169:15 178:11
183:8 184:12
**Disney** 47:4
**dispute** 46:23
**distinguish** 151:15
**distribute** 175:10
**distributed** 33:23
34:5
**DISTRICT** 1:2,2
**document** 76:12,14
76:16,20 77:9 78:9
78:25 82:3 97:16
98:18 99:19
130:16 133:20
207:10,15 208:6
**documentation**
146:10
**documents** 8:2,5,10
8:19,22 9:9 10:21
11:2 18:6 201:7
**doing** 91:7 113:21
136:13
**Dominion** 44:7
45:14 64:4 188:4
**Dorney** 44:10
**double** 116:10
**doubt** 69:3
**Dowd** 18:10
**downsizing** 41:4
**draft** 111:14
**drafted** 81:20
101:21,22,23
104:17 137:9,11
141:19 143:15
**drafting** 144:20
**drafts** 95:16
**dramatically** 26:10
**drugs** 6:18
**due** 25:24 40:3,17
47:18 48:15,23
49:2,6,12,13,16
62:5 145:22
**Duff** 10:14 13:5
15:2,4
**Duffield** 193:16
**duly** 3:3 206:11
**dust** 84:3
**duties** 24:14,19
25:18 26:2,7 56:3
58:25 59:21 65:7
72:3 79:10,17 80:4
88:16 99:22
100:20 107:3

**E**

**E** 2:2,2 3:2,2 101:10
101:11,16 143:2,2
143:4,4 206:2,2
207:2,6,17 208:2,3
**earlier** 47:17 71:24
77:18 81:8 96:4
110:3 152:15
153:10 166:8
168:24 169:2
174:10 180:24
**earliest** 131:20
133:17
**early** 30:16 157:14
184:21
**Easiest** 183:2
**easy** 46:18
**education** 20:14
**effect** 15:11 65:18
77:20 78:19,23
188:9
**effective** 41:25
53:18 72:3,10,16
74:10 82:6 130:9
145:17
**either** 4:8 17:19
34:10 43:7 86:9
93:23 94:3,8 98:23
101:23 103:9
105:3,12 115:5
138:7 145:9
178:11 186:7
191:14
**elaborate** 5:21 27:4
154:15 178:25
**elaborating** 19:19
**eleven** 43:9
**eligibility** 123:20
**eligible** 99:17
121:20 122:2,10
123:8,16 134:5
**else's** 141:22
**employ** 63:14
**employed** 21:12
22:16,23 23:21,23
24:6,13 40:8 41:24
51:20 55:20 56:4
65:7,11 71:4,13
79:2 122:25
126:25 140:18,21
150:4 153:8,9
161:14 191:25
202:8
**employee** 39:5,7,7
67:6 102:10 112:7
121:21 122:3,23
123:9,18,25 124:2
124:4,7 130:8,10
132:24 134:21,25
202:16

**employees** 32:17
34:24 35:3 38:4,24
63:5 72:11 76:9,23
76:24 77:14,14
96:24 102:20
**employer** 21:16,19
23:5,15,22 76:25
77:15 112:6
118:10
**employment** 5:18
5:20 8:6,7 25:14
25:17 26:25 34:15
34:16,19,22 38:18
38:21 39:19 40:19
56:6 62:2,9,14
63:8,16,21 65:3,16
65:24 66:11 67:3,8
71:5,13 72:17
76:22 77:19 78:10
78:16 79:21 80:17
80:23 81:21 82:10
82:10 83:16 88:13
96:23 101:5
102:22 105:20,23
106:11 107:2,16
107:17 110:8
111:2 112:22,25
113:11,11,14,15
113:16 114:12
115:8,24 116:7,12
116:14 120:6
121:25 122:7,9
123:13 124:14
125:14 126:9
136:21 137:24
141:4 145:11
152:24 153:12
155:24 157:15
158:3,21 160:5
164:15,19 167:15
170:23 171:17
174:2 182:23
188:8,19 192:17
192:25 193:3,11
193:15 201:25
207:11
**enclosed** 149:18
**ended** 152:5
**enforce** 110:12
112:6
**enforceable** 111:3
111:18,23
**enforced** 112:16
**engage** 113:2,3
123:14
**engaged** 42:16,17
42:20 46:11,15
**engaging** 113:10
**enlisting** 18:5
**enroll** 132:18

**enrolling** 133:12
**enrollment** 125:22
  130:9 132:5 133:2
**entail** 69:23 79:20
**enter** 25:8
**entertainment**
  13:17 25:8 47:3,4
  47:9 113:4
**entire** 5:2 174:18
**entitled** 76:21 97:16
  98:14 104:4
  164:18 178:9
  207:15,21
**entity** 35:19 39:23
  40:24 42:12 80:12
**entity's** 21:23
**entry** 163:10 166:3
  166:10,16,22
  167:20 168:3,19
  172:13 174:6
  175:13 179:11
  180:5,12,18 181:9
  182:9
**epiphanies** 11:6
**equal** 179:13
**ESQ** 2:9,16,17
**essence** 102:19
**estate** 24:20
**estimate** 71:16
**events** 11:3 140:24
**eventually** 153:9
**everybody** 64:25
  110:5
**evidence** 82:3 99:25
**evolving** 87:11
**exact** 54:11,18
  106:11
**exactly** 67:20,21
**EXAMINATION**
  3:10 143:6 207:3
**examined** 3:4
**example** 39:8
  190:22
**examples** 36:17
**exchange** 90:7 201:4
**exchanged** 8:20
**exclusive** 120:5
  123:5 124:19
  193:12
**exclusively** 100:11
**executive** 20:24
  53:17,20 62:13
  63:19 64:3,11 85:5
  112:25 113:2
  123:12,13 124:8
  124:11,18 125:4
  184:5
**executives** 34:15
  38:18,22 51:8 61:4
  61:25 63:4,12,14

63:18 65:10,17
67:4 80:17,24
91:22 133:14
153:11 158:20,24
187:8
**Executive's** 123:4
**exhibit** 75:22,23
  76:4 78:9,15 94:13
  94:14,19 97:14,15
  97:20 101:10,11
  101:16 103:25
  104:2,9 110:7
  112:22 116:21
  120:2 121:8,9,13
  130:13,14,21
  131:23 142:4,5
  143:8,11 147:5,6
  147:11,12 148:12
  149:14 150:16
  162:19,24 184:15
  184:16,20 197:23
  197:24 198:7
  199:12,13,18
**EXHIBITS** 207:7
  208:4
**existence** 201:8
**expectation** 118:24
**experience** 32:16
  34:14,23 79:24
**expired** 101:8
  102:22
**explain** 3:19 102:8
**expressed** 136:5,5
  195:2
**extend** 102:3
**extended** 102:19
**extent** 12:14 14:5
  33:3 58:10 59:5
  69:25 77:8,25 82:2
  91:5 110:18
  122:15 124:16
  153:24 154:17
  160:8 189:9
  192:20 196:16
**eye** 180:20
**e-mail** 86:4 197:24
  198:2,8,15,19,20
  199:13,19,25
  208:16,17,19
**e-mails** 159:18
  201:5

—————
**F**
—————
**F** 3:2 103:25 104:2,9
  110:7 116:21
  120:2 143:2,4
  206:2 207:19
**facility** 191:4
**fact** 30:12 85:14
  86:25 167:21

**facts** 11:10,13 12:18
  12:21 99:24
  146:19
**factual** 165:21,25
**failing** 121:25
**Fair** 13:17 15:25
  21:13,14,15,18,22
  21:25 23:4,16,22
  23:24 24:3 26:3,13
  26:14 35:20 42:8
  42:19 43:7 44:11
  45:19,22 46:6,11
  46:18,19 47:11,15
  48:22 49:2 52:12
  61:14 66:15 75:25
  76:10 77:20,24
  78:19 80:15 82:17
  82:21 99:8 100:24
  115:13,16 146:7
  150:9 185:8,12,16
  186:7,11,20,24
  187:7 189:5,18
  190:3,9,15 191:17
  192:13 193:16,23
  194:5 195:9,13
  197:11 202:9,16
  207:9
**fairly** 32:14 37:24
  117:2
**Fair's** 46:21 67:2,17
  91:10
**Falfas** 30:22,23
**familiar** 97:25
**familiarity** 132:12
**family** 151:24
  172:14 189:21
**Famous** 191:9
**far** 4:16 34:9 38:22
  41:19 47:24 98:13
  103:5 108:14
  119:19,25 147:21
  150:8,12 181:4
  200:12,24
**Farm** 23:17,25,25
  24:4,13 43:24
  190:23
**February** 158:12
  170:23 171:22
  193:19,20 195:15
  200:4
**feel** 173:22 182:23
  184:8
**feeling** 111:9
**Feels** 181:24,25
**fees** 177:23
**fell** 5:24
**felt** 152:9,16 153:6
  155:24 195:7
**file** 153:21,21
  158:15 166:5

169:6
**filed** 8:16 13:23,25
  169:13 175:20,25
  179:7,8 180:10
  182:3,6
**filing** 176:9
**filings** 68:11
**filled** 98:9
**final** 56:21,23 84:13
  182:9
**finalizing** 144:20
**Finally** 4:25 5:6
**financial** 35:18
  36:21 37:4 107:11
  185:19
**find** 75:3 127:16
  129:2 157:21
  170:2,6,10
**fine** 110:22 119:10
  185:14
**finish** 4:25 89:3
**finished** 107:24
**finite** 63:7
**firm** 100:9 203:6
**firms** 100:16
**first** 35:23 62:11
  76:22 92:4 109:12
  136:16 138:11
  147:4 159:20
  161:24 163:10,14
  163:22 165:24
  166:22 176:8
  177:8 179:10
  180:5 181:2
  183:23 188:6
  195:9,11,12
**firsthand** 131:8
**Fisher** 54:9 71:24
  81:2 159:3,13
  187:21 188:25
**five** 12:12 46:7,8
  56:11
**Flags** 47:3
**flexibility** 182:21
**Focusing** 53:5
**following** 16:25
  136:23 143:16,20
**follows** 3:5 143:5
**follow-up** 140:8
  154:20 170:16
**forced** 30:11
**foregoing** 205:4
**forget** 102:11
**forgot** 143:16
**form** 59:2 71:7 93:7
  97:17,24 98:2,4,6
  98:9 132:3,6,8,10
  132:16,20 133:2,4
  133:8,11,13,14
  134:2,5,13 155:21

196:7 207:16
**former** 152:3,3
  154:25 155:5
  202:13
**formerly** 201:24
**forms** 96:5 125:22
  130:24 131:4,19
  133:15
**forth** 8:14 14:18
  18:6,22 80:11
  100:19 153:19
  157:21 177:23
  206:11
**forward** 36:8 42:2
  156:18 157:11,20
**forwarded** 149:17
**found** 153:12
  158:21 162:2,5
  184:5
**four** 46:10,10
**frame** 151:8 153:3
  162:3 183:16
**Frantz** 100:14
**fraud** 122:6
**Freeman** 1:14 3:1,8
  4:1 5:1 6:1 7:1 8:1
  9:1 10:1 11:1 12:1
  13:1 14:1 15:1
  16:1 17:1 18:1
  19:1 20:1 21:1
  22:1 23:1 24:1
  25:1 26:1 27:1
  28:1 29:1 30:1
  31:1 32:1 33:1
  34:1 35:1 36:1
  37:1 38:1 39:1
  40:1 41:1 42:1
  43:1 44:1 45:1
  46:1 47:1 48:1
  49:1 50:1 51:1
  52:1 53:1 54:1
  55:1 56:1 57:1
  58:1 59:1 60:1
  61:1 62:1 63:1
  64:1 65:1 66:1
  67:1 68:1 69:1
  70:1 71:1 72:1
  73:1 74:1 75:1
  76:1 77:1 78:1
  79:1 80:1 81:1
  82:1 83:1 84:1
  85:1 86:1 87:1
  88:1 89:1 90:1
  91:1 92:1 93:1
  94:1 95:1 96:1
  97:1 98:1 99:1
  100:1 101:1,12
  102:1 103:1 104:1
  104:3 105:1 106:1
  107:1 108:1 109:1

110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
130:15 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1,6
143:1 144:1 145:1
146:1 147:1,7
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1,17 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
197:25 198:1,3
199:1,14 200:1
201:1 202:1 203:1
204:1 205:1,12
206:10 207:4,17
207:20 208:5,9,10
208:14,16,17,20
**frequently** 36:14
37:17 41:22
**Friday** 10:7 11:25
12:4,7 202:20
**Friday's** 190:23
191:7,16
**front** 105:10 143:8
**full** 28:15 77:19
105:23,24 106:6
134:22 135:2
153:17,18 177:24
191:3
**Fullerton** 20:7,10
**Fun** 44:12,13
**function** 24:18
26:12 28:23,25
39:6 79:19 90:20
154:20
**functions** 50:10
59:23 90:10 100:4
**funneled** 49:18
**further** 69:11 107:2

119:13 120:13
143:5 161:16
203:25 206:14
**future** 126:17
**F-a-l-f-a-s** 30:24

**_____ G _____**

**G** 3:2 98:14 121:8,9
121:13 143:4
207:23
**Gardens** 43:16
**garlic** 44:22,23
**gated** 43:18 191:5
**gather** 18:6
**gathering** 18:17,20
25:25 48:17,19
**GC** 170:22
**general** 6:3 10:11
14:12,19 17:16
22:24 23:17 24:11
24:23 25:6 27:7
28:11 29:25 30:17
30:18 32:23 33:13
33:22 35:24 39:22
55:6,9 61:23 64:4
64:18 70:2 79:3,11
80:2,4,5,6,11 82:4
82:5 83:25 90:6
95:22 100:19,24
148:5 169:12
171:5,7 177:5
188:3 193:17
194:5 195:5 203:7
**generally** 31:21
41:21 54:19 70:3,4
79:13,25 80:3
83:14,15 86:8 90:9
92:15 96:14,18
102:2 109:25
110:2 118:14
136:4 139:24
151:18 162:14
177:14 183:22,23
184:2,9
**geographic** 114:21
**geographical**
114:13
**getting** 14:20 152:6
157:12 162:6
**Gilroy** 43:16 44:17
44:21 45:15
**gist** 118:22 119:2
128:14 138:4,25
**give** 4:18 51:12 54:2
56:22 60:12 87:7
87:10 136:9 176:6
**given** 36:13 57:2
58:7 65:23 75:6
77:23 78:5 93:6,15

147:19 187:3
195:3 206:13
**giving** 42:10
**GM** 23:5
**go** 19:20,21 31:14
41:16,16 47:2,6
52:13 53:11 60:18
61:5 69:17 71:7
93:21 99:20 109:8
112:21 138:22
139:21 157:25
183:2 195:18
202:10
**goes** 130:7 153:19
169:15
**going** 3:23 5:3 12:2
34:12 36:8 39:9,11
42:2 43:19 46:25
48:17 63:10 69:24
74:14 75:10 77:7
81:25 85:4,6 90:20
102:3,19 108:3
111:11 112:21
119:5 125:8
127:14 128:4
132:15 133:22
134:19 145:2
147:2,4 152:4
157:11 160:7
163:23 176:4
185:14 196:20,23
202:11
**good** 3:12 56:10
184:24 185:8,12
185:16
**Gordon** 104:22
**Gosh** 20:22
**gotten** 141:3
**governance** 80:11
**great** 44:9 45:14
64:19 154:16
**greater** 70:23
**GREENHOUSE**
1:23
**ground** 3:19 85:5
**group** 55:9,12 59:11
91:22
**grown** 30:10
**guess** 15:3 30:11
47:4 49:25 88:3
116:8 136:5
138:12 140:23
185:19 195:25
**guidance** 185:20

**_____ H _____**

**H** 130:13,14,21
207:6 208:3,5
**half** 10:20 188:6
**hand** 206:19

**handed** 95:10,19
**handing** 95:22
**hands-on** 30:9
**handwriting** 163:7
199:23
**handwritten** 162:20
208:12
**happen** 51:7 74:11
74:14 91:18
**happened** 55:14,15
77:12,13 127:18
138:18 159:19
188:16,18 197:2
**happening** 137:11
**happy** 185:7
**hard** 5:4
**harder** 4:23
**Hawkinson** 100:23
**head** 3:20 4:21
189:25
**headquartered**
42:22
**headquarters** 41:8
65:12 75:17
**heads** 176:6 180:8
**health** 121:20 122:2
**hear** 3:20 4:7,8 7:3
72:8 130:5 149:22
149:25 150:14,16
150:20 185:8
**heard** 4:12,15
119:23 128:12,21
129:18 136:16,19
150:23
**held** 1:14 60:7 79:8
**help** 84:21 86:13,15
**hereinbefore** 206:11
**hereof** 123:6
**hereunder** 124:20
**hereunto** 206:18
**Herschend** 47:4
**he'll** 166:5
**high** 2:7 20:13
**higher** 67:4
**hire** 194:19
**hired** 39:14 193:16
193:22,24 194:3,4
194:13 195:6,15
**hiring** 34:24 35:2,10
38:24 194:9,16
195:10
**historical** 188:15,18
**history** 26:25
**hoc** 31:13 50:16
187:18 188:13,22
**hold** 31:19
**holding** 42:15
**holds** 31:24
**home** 3:7 85:10
93:21 113:18

163:19 203:19,22
203:23
**honor** 65:24 66:6,19
83:17
**hotel** 45:24 46:5
191:10,17
**hotels** 46:7,8 190:7
190:8,9,12,13
**hours** 6:16,19 10:20
141:17
**How's** 127:14
**HR** 17:9 26:12 41:2
69:17 154:19
194:11
**Hufnagle** 18:2 28:5
29:4
**human** 11:19 17:9
18:13,14,18 21:8
24:18 28:22,24
36:23 40:13 47:22
58:9 69:13
**hundred** 52:8 71:2
**Huntington** 2:6
**H-e-r-s-c-h-e-n-d**
47:5

**_____ I _____**

**idea** 83:21 107:21
108:15 128:2
141:22 165:24
173:12 177:7,15
177:18
**identification** 76:2
78:12 94:16 97:18
101:14 104:7
121:10 130:18
142:8 147:9
162:22 184:18
198:4 199:16
**identify** 28:4 115:21
116:4,17
**ignore** 161:21
**imagine** 14:13
**immediate** 145:13
**immediately** 64:9
72:11,17 73:7,21
136:23,24 138:2
138:10 141:12
143:17
**implications** 36:22
**impression** 16:6
84:2 154:10
155:12,14,18,21
**include** 43:10 59:10
187:14
**including** 11:13
43:16
**income** 189:20
**inconsistent** 191:23
192:5

**increased** 26:10
28:24
**incumbent** 51:8
80:16 85:10
**indefinitely** 63:8
**independent** 112:3
**independently**
191:13
**indicate** 4:10,11
117:23
**indicated** 19:13
51:11 64:25 83:18
87:13 109:14
117:13 127:12
128:10 145:12
151:21 152:2,9,22
153:16,20 171:6
173:24 179:16
183:11 184:4
**indicating** 115:7
170:9 182:4
**indirectly** 126:24
**individual** 27:16
81:21 121:2
**individuals** 55:18
56:17,20,25 57:3,7
59:19 60:13 71:20
71:23 72:17 73:2
73:13 74:3 75:5
81:8 82:14,25
83:22 84:8 102:24
106:10 120:22
159:22 160:4,6
**industry** 159:23
160:2 190:2
**infer** 129:10
**inference** 119:7
**inferred** 51:23
119:6
**inform** 73:6 121:25
135:9 137:13
**information** 12:5,22
18:17,19,21 25:12
25:25 48:17,20
74:25 77:9 87:8,10
125:20,23,24
126:3 128:6 135:8
136:10 141:3
147:15,20,22,25
153:10
**informed** 72:5 75:9
86:11 87:20 92:22
134:25
**informing** 72:25
**inherently** 191:23
192:5
**inherited** 24:4
**initial** 87:19 151:2,6
159:20
**initially** 171:24

**initials** 102:11
**injury** 5:17
**input** 56:22 57:3
76:11,15,18,20
194:15,19,23,25
195:3,3
**instances** 38:8 39:12
**instruct** 12:3 14:25
111:12 202:11
**instructed** 12:23
14:6 131:18
**instruction** 14:4
15:10 112:10
**insurance** 121:20
122:3 132:21
133:13
**intact** 82:11
**integration** 49:14,20
59:22
**intent** 152:10
180:13
**intention** 63:7
**interact** 36:14,23
37:18
**interacted** 41:23
**interaction** 32:13
37:23 40:9,11
**interactions** 29:18
31:11 36:9,11
41:14 47:24 50:3
50:19
**interest** 115:21
116:9,16
**interested** 156:24
206:17
**interests** 116:5
**interim** 29:22
**internal** 52:11
**Internally** 48:7
**interpretation** 114:3
114:5 117:14
164:7,16,22 167:6
167:7
**interview** 35:6 39:3
194:17,21
**interviewing** 39:13
194:18,24,25
**interviews** 35:4
**invoking** 96:22
**involved** 5:18 24:22
25:11,24 32:17,20
34:24 35:2 38:3,9
38:21,24 39:2,9,13
47:14,18,20 48:14
48:15 51:6 52:11
54:20 57:6,10
65:15 67:22 80:10
106:2,4 108:18,25
109:4,22 144:21
154:4 156:23

168:20 169:14
192:11
**involvement** 25:16
32:23,24 33:4
88:15
**involving** 69:15
**in-charge** 85:7
**Island** 44:5 45:13
64:13
**issue** 47:2 120:13
140:11 151:25
154:13 161:10,17
167:21,21 178:6
**issues** 30:6 36:21,24
40:12,14,41 20
47:21 48:4,6,9
58:8 59:5 80:9
**i.e** 76:25

_____

**J**

**J** 147:5,6,10 148:12
150:16 208:10
**Jack** 30:22
**Jean** 29:10
**Jill** 2:9 7:22 202:7
**Jim** 135:3,4
**job** 99:22 127:16
129:2 137:23
151:22 152:6,7,8
155:2,8,8,9,10,13
155:15 157:21
159:23 170:2,6,9
170:10
**joined** 60:15
**Jones** 54:25 63:2
71:25 81:3 159:14
187:12,23,25
**July** 36:7 81:14,15
87:14 88:5,8 89:15
92:10,23 94:15,20
130:9 207:13
**June** 42:6 53:2
55:14,16 64:23,25
75:24 80:16,19,20
80:21 82:13
126:23 127:21
157:19 171:2
172:7 207:8

_____

**K**

**K** 162:18,19,24
208:12
**Kaetzel** 55:4 71:25
81:3 159:7,14
**Kaiser** 104:22
**Kathy** 100:23
**keep** 34:10 125:19
126:2
**keeping** 58:23 108:4
**Kennywood** 47:8

**kind** 6:21 31:10
40:11 42:19
128:13 169:16
**Kingdom** 44:15
**Kings** 64:4 188:4
**King's** 44:5,7 45:13
45:13 64:13
**Kinzel** 13:14,20
14:3,7 15:8,14,23
16:5,13 17:3,23
19:13 26:16 27:15
27:20 29:15 30:19
31:11 32:16 33:10
34:14,23 37:12,19
48:24 52:17 55:17
56:16 57:5,13,18
57:23 58:23 60:9
60:12,17 61:3,15
61:18 65:21 66:2
66:19 67:7,14
68:18 69:8 70:9
71:22 72:4 73:6,21
75:15 83:2 84:14
84:20 85:7 89:23
90:2,7,13,16 91:11
93:21 94:5,15,20
95:6,8,10 96:7,16
97:5 103:6 105:3,6
105:16,18 109:6
118:12,21 119:2
137:13 138:14,21
141:11 142:2
143:20 144:13,21
145:13 148:21
153:15 156:12,22
156:25 159:5
160:19,22 161:7
161:16 162:5,11
162:15 176:2,10
177:2,9,19 178:11
178:19 180:22
181:19 194:2,11
207:13
**Kinzel's** 56:21 94:25
139:17
**Kirila** 2:9 7:22 9:17
10:8 12:2,14 14:4
14:15,25 15:10
33:3 46:22 55:21
56:8,11 59:2 69:19
69:24 71:7 74:15
77:7,25 81:25
84:22 85:2 92:25
93:7 96:9,12 98:18
99:18,24 107:23
108:9 110:17,22
111:4,11,19 112:9
112:18 113:25
114:17 115:25
122:14,21 124:16

129:6,14,16
133:10,19 139:21
145:4 146:18
160:7 168:9
178:13 189:9
192:2,20 193:5,13
194:20 196:7,16
197:19 201:18
202:10
**knew** 87:18 96:7
128:11 133:5
136:20,23 141:6
145:2,6 157:14
162:2
**Knott's** 23:17,25,25
24:3,13 43:24,25
44:3,4 190:22
191:10
**know** 3:22 4:8 5:3,7
8:13 10:2 14:19,20
15:4,12 20:22 25:9
29:15 32:22 35:12
35:14,23 36:5 38:8
38:11,13,14,17,20
38:23 39:16,18,25
40:5 42:9 45:8
46:5 49:7 50:23
52:4,7 54:16 55:13
57:2 59:18 60:2
61:21 62:12,15,16
66:23,25 67:20,25
68:7,12,14,24
74:20,20 76:15
79:10,14 80:9
82:22,23,24 83:3
84:3 85:13 86:11
87:3,9,13,16,17
88:10 92:4,16,18
93:3,4 95:4,8,12
95:14,18 96:7,11
97:23,24 98:9,13
99:2,6,9,10 103:5
105:3,8,15,16
106:5 107:4,23
109:19 110:24
111:7 112:13,20
115:12,15,20
117:2,6,16 119:8
119:19 122:13
126:5,7,12,14,19
126:21 127:7
128:18,24 129:3,4
129:18 131:8
132:3,15,22 134:9
134:11 139:23
140:6 141:4
144:13,16,17,18
145:6 147:21,23
147:24 148:2,6,25
149:4,13 150:8,12

150:22 153:20
154:8,14,17 155:5
156:3 157:18
159:18,18,19
161:3,3 164:13,16
165:15,22,22
167:4 168:8
169:13 171:8
175:8,24 176:15
177:24 178:18,20
179:6,9,13 180:9
182:2 185:5,23
191:18 193:22,24
194:3 195:2,3,9
196:17 199:11,23
200:12 203:12,13
203:17
**knowledge** 33:4
38:16,19 57:4
77:23 78:7 79:25
115:19 131:8
134:17 148:4,5
186:10,19,22
189:3 192:10,12
192:14,15,23
196:25 197:20
**known** 35:21
**Koontz** 54:14 71:24
81:2 159:13

_____
**L**

**L** 184:15,16,20
208:14
**Lane** 3:9
**language** 123:23
152:9
**larger** 80:7
**Larry** 173:11,16,19
173:21 183:14,20
**Las** 45:6,7
**late** 23:20 24:4
81:14,15 89:15
**law** 16:19,23 100:16
112:7,14 170:23
171:17
**lawns** 113:20
**lawsuit** 3:14 13:25
140:22 153:21
169:13 180:10
182:6
**lawsuits** 69:15
**lawyer** 172:24 173:6
**lawyers** 168:19
169:14
**leader** 48:10
**leadership** 20:22
86:19
**learn** 12:18,21
**learned** 112:11
134:21 150:3

160:3
**leave** 53:18 55:24
56:3,18 57:7 59:12
59:20 71:19 72:12
73:8 74:6,17 75:6
81:9,13 83:23
160:25
**leaving** 183:5
**Ledger** 28:6
**left** 27:6 106:21
155:19 175:16,19
182:15,16
**legal** 14:7 16:21
24:24 25:2,5 40:12
40:15,25 47:22
50:9 58:9 69:12,13
69:14 78:2 79:19
79:22 88:15 90:10
90:20 100:4 111:5
113:23 114:2
122:15 177:23
189:10 192:21
**legalities** 42:10
**legally** 4:2 111:2,18
111:23
**leisure** 113:3
**length** 59:7 154:16
**Les** 197:16,18,21
**Lester** 1:7 2:20 3:13
8:7 39:16,18 49:23
50:8 57:20 78:10
94:15 101:12
104:3 127:15
128:10,18,21
129:11,19,20
130:3,5,6,16,22
135:12,13 136:10
136:13 137:23
142:6 147:7
153:20 165:14,21
167:3,24 175:16
175:19 180:7
184:17 197:18
198:13 201:5,8
207:11,13,17,20
208:6,8,11,15
**Lester's** 127:13
129:24 130:2
168:6
**Les's** 197:17
**Les00002** 131:24
**LES0004** 131:4
**LES00005** 131:4
**LES00016** 101:13
207:18
**LES00019** 147:8
208:11
**LES00021** 104:6
207:22
**LES00038** 78:11

207:12
**LES0018** 142:7
208:9
**letter** 81:14 82:14
88:6 92:11,23 93:9
94:14,19 95:4,9,15
96:8,15 97:4,8,11
101:11,16,25
103:7,21 104:2,12
104:16 105:4,7,18
110:6,18 111:10
111:14 116:21,24
120:2 130:14,22
131:5,5,10,11,18
133:16,20 137:9
141:19,25 142:5
143:11,19,24
144:5,11,14 145:2
145:7 147:6,11
148:12,20 149:14
149:16,19,19
150:16 151:11
163:16 183:10,24
184:16,20 185:22
207:13,17,19
208:5,8,10,14
**letters** 74:9 92:2
95:19,24 96:2,20
115:6 149:23
150:5
**letting** 69:17 180:9
**let's** 63:20 94:12
110:3 119:3
**level** 29:3 32:13,18
34:20 35:5,10
37:23 38:5 39:5,7
67:4 76:15 140:6,7
155:16
**Levine** 173:11,16,19
173:21,22,25
183:15,20
**liability** 100:19
106:6
**license** 24:19
**licenses** 21:3
**Life** 200:18
**limitation** 114:14,21
**line** 132:24 161:3,3
163:22 164:6,24
165:18 169:18,22
169:23 170:21
173:10 181:21
182:22 207:7
208:4
**lines** 110:2
**list** 53:24 65:8,9
99:4,7,12 189:12
**listed** 55:19 59:19
71:20,23 102:25
**listened** 118:4

**litigation** 25:11 51:2
79:21 90:22
100:18 192:11
**little** 22:18,21 27:3
84:4 153:19
173:20 179:2,13
**Littler** 2:11 172:25
**located** 31:5,7
191:17
**location** 88:17 191:4
**long** 10:19 12:11
22:16 35:21 71:17
86:21 87:22,24
124:18 151:2
161:13,20 162:3
188:22 202:21
**longer** 30:19 55:19
70:21 82:7 89:11
89:19 91:19 92:5
93:13
**look** 76:21 112:22
112:24 126:22
131:22 147:11,12
180:19
**looked** 9:3 42:13
151:22,22
**looking** 60:4,6 70:4
147:10 152:23
**looks** 98:22 167:11
172:18
**lost** 63:11 201:14
**lot** 84:6
**low** 117:19,21 118:2
**LP** 21:14,15,18
35:20 194:5
**lump** 107:9 117:20
**luncheon** 142:9
**L.L.P** 1:16 2:4
**L.P** 75:25 207:9

_____
**M**

**M** 3:2 143:4 197:23
197:24 198:7
208:16
**Magnum** 21:16,19
22:2,5 23:2,7
24:16 42:3,7,14
**Magnum's** 22:2
**mail** 175:19,20
180:4 182:14,15
182:16 183:5
**mailing** 131:7
**making** 14:20
145:15 176:17
**mall** 22:25 23:11
24:3 27:6 30:2
35:24,25
**managed** 5:24
**management** 21:17
23:3 24:2,5 43:17

44:18 45:15,17
100:18
**manager** 6:3 18:13
18:14 22:24 23:17
24:11 27:7 28:8,12
30:2 35:24 55:6,9
64:4,19 137:4
188:3 197:10
**managers** 30:17,18
**March** 27:7 29:23
193:16
**marching** 15:17
**mark** 75:21 78:8
94:12 97:14
101:10 103:25
121:8 130:13
142:4 162:18
184:15 197:22
199:12
**marked** 76:2,3
78:12,14 94:16,18
97:17,19 101:13
101:15 116:8
121:10,12 130:18
130:20 142:7
143:10 147:5,8
148:11 162:22,23
184:18,19 198:4,6
199:16,17
**marketing** 54:23
64:13
**markets** 185:21
**marriage** 206:16
**material** 14:24
157:17
**materials** 8:20
**matter** 58:24 143:18
150:2,19 176:3
178:22 206:17
**matters** 21:9 24:24
24:25 25:3,6 36:15
36:16 40:13,13,15
40:25 41:2 47:22
50:10 51:2 59:5
69:10,12,13,14,17
70:20 71:17 79:22
79:22 88:13,16
**MBA** 20:9
**mean** 8:15 46:18
55:25 65:5 66:5
90:21 92:19
108:22 116:11
138:11,19 141:2
158:6 167:22
175:21 183:16
**meaning** 201:24
**means** 4:2 41:14
56:2 99:2 123:7,15
171:9 196:23
**meant** 129:4,9

154:21 166:25,25
167:2 168:8,12,16
198:23
**measure** 185:18
**measures** 185:17,20
**mechanics** 179:9
**mediation** 153:23
158:17 169:8,16
169:18
**medical** 200:16
**medications** 6:19,25
**meet** 9:15 30:5
31:12 32:3 41:13
152:12 156:11,16
157:2 161:7
**meeting** 9:21 10:5
10:12,19,22 11:7
33:23 34:3 50:8,13
50:17,18 51:13,16
66:18,24 139:16
139:20 140:2,12
141:15 142:2
143:17,20
**meetings** 14:24
16:12,15 29:24
31:15,20 32:2 33:9
33:16 34:11 37:21
50:22 60:23 79:15
**members** 53:17,20
53:23 139:17
**memo** 76:8
**memorandum**
75:23 207:8
**memorializing**
60:23
**memory** 7:6 82:4
159:12
**Mendelson** 2:11
172:25
**mention** 44:17
143:16 153:10
**mentioned** 17:8
49:22 139:19
140:11 154:12,24
158:19 181:3
203:2
**mere** 193:10
**message** 156:18
**messenger** 94:5
**met** 36:2 40:3 41:15
**Michael** 2:16,17
3:12 172:24
**Michelle** 28:6
**Michelle's** 28:7
**Michigan** 44:14
**Michigan's** 44:14
**Mid** 89:15
**mid-October** 134:20
**Mike** 54:13
**miles** 32:8 37:10

191:18
**Milkie** 10:14 11:8
13:5 193:17,22,25
194:17 195:10,13
202:7 203:8
**Milkie's** 194:9
**mind** 9:5,8 80:14
152:19
**Mine** 199:24
**Minnesota** 5:24
44:11
**minutes** 12:12 34:2
34:10 56:11
139:20 140:2,3,12
140:14 147:3
188:24 189:2
202:22
**misrepresentation**
122:6
**missed** 43:20 183:12
**Missouri** 44:12,13
**Misstates** 55:21
111:19 133:19
**mistake** 152:15
157:6 174:7
**misunderstanding**
166:23 167:8
**money** 16:2,3
19:14,18 146:23
174:7 196:3,4,6,9
196:14,19 199:4,6
**month** 157:22
**months** 101:4
102:16,21 170:25
172:5
**morning** 3:12
189:14
**motion** 113:4
**move** 84:4 110:5
119:11,11 126:10
185:7
**moved** 126:10
170:25 172:7
**moves** 31:25
**moving** 177:5
**mowed** 113:20
**M-e-a-n-t** 166:25
**M-i-l-k-i-e** 10:15,16

———————

**N**

**N** 2:2 3:2 143:2,2,2
143:4 199:12,13
199:18 207:2
208:2,19
**Nail** 1:7 2:20 3:13
15:12,24 19:14,18
39:16 40:8,16
41:23 47:24 50:4
50:19 51:7,10,11
52:11 57:20,25

58:3,13,23 59:14
60:15 61:8,14,19
61:25 62:22 64:24
65:13,17 68:16
70:2,23 71:12,18
75:9,15,16 77:23
78:25 79:15 81:6,7
82:18,22 84:9,19
84:20 85:3,9,14
87:4,25 88:21
90:23 91:2,18,25
92:5,22 93:6,13,20
94:3,15,20 97:12
99:17 101:3,12,17
102:24 103:20
104:3,13 106:10
108:13 110:14
113:10 114:25
115:13,16,22
116:6,20,22
117:13 118:6,9,18
118:23,24 119:4
119:14,24 120:4
121:24 125:19
126:8,13,15,20
128:25 129:12
130:16,22 131:6
131:19 132:17,18
133:5,16 134:2,4
134:12 136:25
137:9 139:5
141:13,20 142:6
143:11 145:11,16
147:7,19 148:13
149:13,22 150:4,6
150:9,17,23
151:21 153:6
154:9,12,24 155:7
155:12,23 157:2
158:2,19 160:9,18
160:23 161:7,9,14
162:11 163:3,15
164:9 166:13,20
167:16 168:24
169:12 170:8
171:12 172:16,21
173:4,14,22
175:24 176:6,10
176:13,17,21
177:3,8 178:12,18
181:12 182:17
183:4,9,24 184:12
184:17,21 185:11
186:6,11 189:3
191:24 192:16,24
193:8 198:23
200:23 201:5
207:13,17,20
208:6,8,11,15
**Nails** 78:10 207:11

**Nail's** 8:7 18:21
40:18 58:10 59:6,9
61:21 62:8 66:11
66:16 77:18 78:15
79:10 80:4 87:12
89:11,18 90:12
98:15 99:22 100:5
103:24 108:10
110:8 129:4
140:16 146:15
156:11 157:5
158:15 161:11
165:3 185:22
186:15,20,24
187:6 199:3,9
201:8,25
**name** 3:7,12 10:14
17:12 29:10
163:18 173:16
197:17
**names** 43:19 159:10
**Nancy** 199:18
**nature** 190:20
**nearby** 46:3
**necessarily** 152:7,19
155:8
**necessary** 195:8
**need** 5:6 82:2 88:7
90:12 119:11
120:17 126:16
**needed** 40:21,21,24
69:11 89:11,19
91:6,19 93:14
137:25 140:7
153:7 187:6
**needing** 92:6
**needs** 25:10 58:7
70:24
**negotiate** 181:11,13
181:15
**negotiating** 120:24
**neither** 119:19
**never** 103:24 121:19
125:9 126:11
134:8 184:6 194:6
202:3
**new** 1:2,16,16,20,24
1:24 2:15,15 34:16
112:7,14 125:22
149:17 168:4,15
172:24,25 173:6
181:22 182:4
206:3,8
**Nichols** 1:18 206:7
206:23
**nod** 4:20
**nodded** 189:25
**nonattorney** 16:14
**nonattorneys** 17:4
**noncompete** 46:23

110:7 111:17
112:6,16
**noncompetition**
110:25 111:22
114:15,18
**noncompetitor**
115:23 116:6
**North** 44:8 203:21
**Nos** 78:11 97:17
101:13 104:6
162:21 207:12,16
207:18,22 208:13
**Notary** 1:19 3:3
206:7
**note** 165:19 179:17
179:22
**noted** 143:3 204:3
**notes** 33:14,15,23
34:10 60:16,20
139:20 162:20
163:2,10 165:20
166:16 174:11,17
174:21 175:10
178:24 179:10,19
180:25 182:12,15
183:8,13 208:12
**notice** 1:17 74:14,21
74:21,22 75:6
**notifications** 159:16
**notified** 82:14
121:19 125:9
160:4 162:5
**notify** 123:8,16
126:10
**notifying** 82:6 93:8
122:10 137:10,10
198:12
**November** 166:17
172:21 175:14
176:20 179:11,17
184:13,17,21
186:4 199:15,20
208:15,20
**nullify** 165:21,25
**number** 118:2,6
133:24 151:12
163:18,19,21
**numbered** 131:3,23

———————

**O**

**O** 143:2,2,2
**oath** 3:25
**object** 12:2 14:5
59:2 69:24 71:7
77:7,25 81:25
111:11 124:16
118:19 192:7
192:20 196:7
**objection** 9:17 12:14
33:3 46:22 55:21

69:19 74:15 84:22
92:25 93:7 96:9
98:18 99:19,24
107:23 108:9
110:17 111:4,19
112:9,18 113:25
114:17 115:25
122:14,22 129:6
129:14 133:10,19
139:21 145:4
146:18 168:9
178:13 192:2
193:5,13 194:20
196:16
**obligated** 4:2
**obligation** 114:15
**obligations** 82:12
107:3 114:22
115:8
**observations** 96:13
**obtain** 12:6,16,23
20:3
**obtained** 36:5
**occasion** 57:20,24
**occasional** 30:6
**occasions** 41:15
**occupation** 113:3
114:5 116:14
123:14
**occur** 30:15 67:19
**occurred** 14:11 84:3
139:16 173:20
**Oceans** 44:13
**October** 142:7
143:12 145:17,20
145:22 146:22
147:7 148:13
149:14,15,19,19
150:16 151:11
163:11,15 176:13
176:20 183:9
184:12 185:4
198:2,3,9,13,17
208:9,11,17,18
**offer** 70:9 90:25
105:19,21 106:7,9
106:11 108:15,19
109:23 117:13,15
152:6 155:2,20
156:11,15
**offered** 102:10
106:13,16,20
120:23
**offering** 106:23
109:13 180:21
**office** 31:5 32:6,7
37:8,9 41:5 69:18
74:23,24 84:21
86:13,16 203:19
203:22,23

**officer** 22:11 30:17
35:18 202:13
**officers** 85:10
**offices** 1:15 88:17
203:15
**oh** 11:6 45:4 49:3
56:24 76:19
137:15
**Ohio** 2:8 3:9 31:6
41:11,17 42:22
43:21,23 44:5,15
**Ohlemacher** 29:10
**OK** 3:16 16:3 19:12
43:20 45:4 46:19
54:4 56:25 63:10
65:8 70:10 76:19
102:13 108:22
114:4 119:10
127:15 152:25
167:2 187:18
**old** 188:8
**once** 5:12 6:10
160:13 161:15
**ones** 45:12 47:10
53:5 63:3,20,23
106:14 174:23
187:11,22
**one-minute** 120:18
**one-page** 97:15
207:15
**ongoing** 40:20 69:14
70:21,24 88:14,15
93:6,15 107:16
**Ontario** 44:6
**opening** 117:15
119:9,9
**operate** 43:7,13,15
191:12
**operated** 45:19
190:14
**operates** 45:22 46:6
190:23
**operating** 25:9
30:17
**operations** 30:14
**opinion** 111:16,21
111:24 112:3
123:10 125:16
195:2,4,5
**opportunity** 102:15
102:20
**opposed** 63:8
108:20 151:16
**options** 147:16,20
**oral** 159:16
**Orange** 43:25
**order** 120:13 146:21
196:2,21 197:3
**orders** 15:17
**organization** 39:8

39:10 60:4 70:5,7
**organizational**
30:12
**organizations** 59:23
**orientation** 50:9
**originally** 27:2
**outcome** 206:17
**outline** 169:16
**outside** 16:15 39:10
39:14 47:12 91:9
95:5 97:7 100:3,8
100:12 178:13
190:24 191:4,7,9
**outsource** 91:8
**outstanding** 50:10
59:5 69:10 70:20
71:17
**overlap** 22:22 27:14
27:14
**overlapping** 5:5
**overpaid** 182:24
200:3,23
**oversight** 28:25
**owed** 19:18
**owes** 15:13,25 16:2
19:14 200:25
**owned** 21:21,24
23:2,8,9,9 41:9
42:3 191:17
**owns** 22:5 42:11
45:18 46:6 47:7
**O-h-l-e-m-a-c-h-e-r**
29:11

_____

**P**

**P** 2:2,2,16
**packages** 37:5
**page** 76:22 104:21
112:23 131:23
172:19 174:24
178:24 179:10
205:7 207:3,7
208:4
**pages** 131:3
**paid** 73:14 113:20
116:13 153:7
195:22 198:14,24
200:15
**Palm** 44:4
**paperwork** 108:4
**Pappas** 2:16 3:11,13
56:10,12,15 75:21
78:8 84:24 94:9,12
94:17 97:14
101:10 103:25
108:13 110:20
120:17,21 121:8
130:13 142:4
143:7 147:4
162:18 178:15

184:15 197:22
199:12 201:16,21
203:25 207:4
**paragraph** 110:8,16
110:25 112:24
114:8,14,21,22
120:6 121:18,19
122:25 123:2,2,3,4
123:11,12 125:5,6
125:8,15 126:22
130:7 134:19
147:14
**paralegal** 50:15
91:2
**Paramount** 1:4 3:14
3:15 28:21 75:25
76:9,23,24 107:6
113:5 123:6
124:12,12 207:9
**paraphrasing**
124:10
**Parc** 47:6
**parent** 21:15 22:4
**parentheses** 170:3,4
170:24,25
**park** 1:16 5:23 6:3
24:2 30:2,4 42:17
42:20 44:10 45:4,5
64:19 99:11 113:4
159:23,23 188:4
190:24 191:5,8,9
191:14,15,19
**parks** 1:4 3:14,16
25:7,10 26:4 30:18
43:6,9,10,13,16,17
43:18 45:21 46:2,4
75:25 76:10,23,24
190:7,18,18
191:13 207:9
**Park's** 107:6
**part** 8:11,13,21
26:13 39:3 55:8
73:15 86:16 91:3
107:14,14 120:12
125:6 129:17
143:19 152:11,15
157:7 165:25
173:25 180:14
191:5
**participate** 50:17
**participated** 130:8
**particular** 39:5 50:9
132:3,10 179:22
**parties** 107:2 120:13
206:15
**partnership** 23:10
**passing** 135:15,17
**Pat** 54:25 187:12,23
187:25
**pay** 78:6,6 125:3

138:9 140:16
141:7 152:23
153:7,17,17 160:5
160:14
**paycheck** 195:21
**payday** 136:24
**paying** 145:10
157:11
**payment** 107:9,18
117:20 136:24
141:13 161:12
195:21 196:12,21
197:3
**payments** 78:5
145:15,19,21,24
146:3,4 176:17
**payout** 105:23 107:9
**payroll** 136:22
137:3,4,17 141:16
197:10 200:14,19
200:23
**peers** 36:13
**Pennsylvania** 44:10
**people** 27:24 29:7
30:13,13 39:13
49:10,21 56:5
57:10 69:18 91:24
**people's** 128:7
**percent** 52:8 71:2
**perform** 82:16,20
88:24 89:4 92:6
186:6,11 187:9
189:4 192:18
193:2,4,10,12
**performed** 91:6
100:5
**performing** 65:7
87:25 88:11
191:24 192:5
**period** 13:22 27:4
27:14,14 56:4
82:21 84:10 85:15
86:13 87:21 88:11
88:22,25 150:10
161:20
**periodically** 50:16
**permanent** 63:6
87:2
**permanently** 58:24
63:4
**permitted** 52:5
**person** 32:3 33:22
41:13,15 49:9
57:16 75:16 85:7
86:3 121:4 124:21
152:5 154:19
193:24
**personal** 5:17 34:10
50:22 59:6 199:5
**personally** 33:15

62:8 67:10 75:16
76:17,19 84:20
114:25 125:25
131:7 134:12
152:12 156:11
**personnel** 97:16
98:6 207:15
**Peter** 19:6 35:12,21
49:3 152:12
156:12 180:20
**Petit** 54:15,15,22
71:25 81:3 159:14
159:15
**Petite** 54:22
**phone** 30:6 31:12,17
50:22 57:15 86:3
128:16 129:17
163:19,20 203:10
**pick** 151:12
**picked** 75:16 84:20
**picture** 113:4
**piece** 100:17
**place** 45:18 53:5,7
60:5 65:25 68:23
85:22 92:18,21
127:19 202:19
203:14
**placed** 56:18 59:11
59:19 71:18 72:11
73:8 81:9
**Plaintiff** 1:5 2:5
**plan** 37:7 90:10
91:12
**plans** 124:13 186:23
187:4
**plate** 58:9
**play** 58:4
**please** 3:6,22 4:8,18
4:25 115:14 116:3
121:18 133:16
185:6 193:7
**plus** 182:24 200:6
**point** 28:9 36:2
43:21 49:10,21
56:9 87:14,22
102:6 117:17
152:22 173:11
174:2 181:16
191:7 193:14
**points** 87:16,17
**policies** 48:19
**poorly** 164:25
**portion** 100:20
198:7
**portions** 162:21
208:13
**position** 13:15 22:8
22:17,20 23:12,18
24:7,8,11 26:21
27:2,9 28:7,15

29:12,22 31:3,8,10
35:7,16 36:6 39:20
40:7 54:7,10,16
55:2,5 61:21 63:25
64:7,16 79:7 80:10
118:5 119:9
137:24 151:22
155:17 159:25
164:20 171:15,16
171:17,18 182:21
194:7 195:7,13
**positions** 35:5,10
60:6 70:5,6 160:12
160:13 184:6
**possibility** 119:9
141:24 157:23
176:9
**possibly** 55:19
109:13
**post** 20:13
**postacquisition** 58:5
60:6 64:2,8,12,17
70:8
**postemployment**
68:13
**potential** 177:20
**potentially** 107:13
177:2
**PPI** 3:16 8:8,16 16:2
16:2 22:3,4,6
25:19,24,24 39:19
39:21,23,24,25
40:8 42:5 43:5
45:10 47:15 49:11
51:8 54:7 56:6
61:4,9,21,25 62:2
62:14 63:4,12,13
63:14,18 65:11,17
66:10 76:8 77:14
77:14,19,20,24
78:11,16 79:2,8,11
79:19 80:5,15,16
82:16,21 85:10
87:25 88:15 90:10
98:5 99:5,13 100:4
100:25 107:7,8,11
108:8 110:8
113:12 115:12,15
115:22,23 116:5,6
116:8 120:3,10
121:19,25 122:2
122:10 123:8,16
124:5,5 125:9
126:10,16,25
130:10 132:15
133:6 134:9,16,21
134:25 145:15
146:5,6 150:8
153:17 157:11
160:3,5,14 185:23

186:7,10,19,23
187:7,8,25 189:4,7
189:18 190:3,6,8
190:14 191:24
192:10,10,18
193:2,4,10,12
197:12,13 202:8
202:16 207:11
**PPI's** 41:8 42:3
53:20 78:19 90:20
110:11 157:7
**PPI000014** 97:17
207:16
**PPI000103** 198:4
208:18
**PPI000765** 199:15
208:20
**PPI00762** 162:21
208:13
**practice** 67:2,17,23
91:10
**pre** 63:25 64:7,16
**preclosing** 61:18
**predecessor** 22:22
27:5
**premises** 45:25
**preparation** 8:3
9:10,22 10:22 11:9
**prepare** 9:12,15,24
10:6
**preparing** 10:3
73:23
**prescription** 6:23
**presence** 14:11
178:14
**present** 2:19 10:11
12:25 13:6,24 15:5
16:14,14 37:25
52:20 57:12 66:18
66:22 72:6 121:10
127:23 139:12,18
154:8,11 176:24
202:5,6,23 207:23
**presented** 109:18
**president** 13:16,17
22:9 24:15 27:10
30:9 32:18 35:17
38:4 54:20,23 55:3
64:3,11,13,18 79:2
79:11 135:7 188:3
193:17 194:5
**president/CEO**
26:16
**presume** 35:9
**pretty** 30:8 50:7
73:19 128:14
153:24 162:4
**preventing** 115:22
116:5,9
**previous** 27:12

147:11 173:17
179:19
**previously** 48:21
49:22 83:18 87:13
145:12 173:14
**price** 191:6
**primarily** 48:7
**Primary** 48:10
**prior** 24:12 28:21
29:6,14,25 43:3
50:4,19 51:5 55:16
57:19,23 58:17
59:9,15,16 60:17
61:3,7,13,22,24
62:9 64:9 66:9,14
79:12 85:24 92:22
176:12 183:12
**privilege** 202:14
**privileged** 14:24
17:15 163:8
174:14
**pro** 113:23 114:6
**probably** 35:22
71:15 74:22
137:11 140:15
153:22 158:16
169:7 183:12,16
**probing** 178:7,7
**problems** 7:8
133:25
**proceed** 83:15 176:4
**proceeding** 6:5
**process** 8:12,21
25:25 39:4,10 40:4
40:17,21 48:23
49:2,12,19 62:5
169:17 170:9
174:18 179:5
196:2
**produced** 8:22 98:5
**professional** 1:18
2:12 20:17,18,23
21:3,5 73:11
**programs** 37:6
**progress** 14:19
**prohibited** 113:10
**prohibition** 114:8
**projects** 29:24
**pronounced** 19:10
**properties** 45:9,23
45:24 46:5 47:8
190:17
**property** 23:11
190:24 191:14,17
**proposal** 116:21
119:5,14,21,24
120:23 161:11
**proposals** 107:22
108:16
**propose** 118:6

**proposed** 138:9,21
**protected** 14:14
**provide** 127:10
172:14 187:24
**provided** 62:6 74:13
120:5 185:21
**provides** 189:23
**providing** 151:23
**provision** 82:9
110:7,13,21,25
111:17,22 112:6
112:16 113:9
114:19 122:20
156:3
**provisions** 65:3
80:23 91:22 96:23
123:19
**public** 1:19 3:4
68:10 206:7
**publicly** 80:7,12
**purchase** 102:15
**purchased** 23:16
**purchases** 36:17,20
**purchasing** 28:8
**purported** 78:10
207:10
**purpose** 10:3 18:25
65:6 106:23,25
107:5 132:2
**purposes** 108:11
**pursuant** 1:17 113:5
144:24
**pursue** 162:6
**purview** 39:14
**put** 30:13 53:16,17
56:19 105:10
196:14
**putting** 55:23
103:18
**P-a-r-c** 47:7
**P-e-t-i-t** 54:15
**p.m** 120:20 142:10
143:3 201:20
204:3

―――――――――――
**Q**
―――――――――――
**question** 4:6,12 5:2
5:3 9:18 46:24
52:3 57:21 63:11
70:13 71:9 93:8,10
109:17 115:14
116:3 160:10
163:25 185:6
193:7 196:8
**questions** 3:24,24
5:5 17:2 50:16
98:8 103:21
133:21,22 134:2
154:21 170:17
187:14 188:13,22

201:23 204:2
**quick** 201:17
**quite** 24:24 34:12,12

———————— **R** ————————
**R** 1:18 2:2 3:2,2
143:2,4,4 206:2,7
206:23
**ramification** 37:4
**ran** 135:12 136:10
**Rankin** 62:25 64:15
**rational** 83:6
**rationale** 108:12
**reached** 58:12
133:23
**reaction** 70:12
73:10
**read** 159:11 163:22
164:6 165:11
166:3,24 167:20
168:20 171:3
173:10 175:17,18
180:5,12 181:9
182:19 205:4
**ready** 120:4 123:22
124:3,19,22
**real** 24:20
**really** 12:22 18:24
26:8 28:22 49:18
155:21 156:22
157:25 175:17
**reason** 7:13,16 60:3
67:25 185:24
**reasoning** 60:13
69:7 70:15 83:6
**reasons** 59:18 108:7
**recall** 7:9 8:18 9:11
11:6,23 14:17 15:8
15:22 16:11 17:18
18:24 19:5,8,19
21:23 38:10 48:11
49:5 50:6,14 51:4
53:6,9 54:11,18,19
57:11,14,17 59:17
60:14,19,21,25
61:6,10,12,16,17
62:25 63:3 67:20
69:4 70:11,14
72:21 73:5,15,17
73:25 74:8,12,19
75:11,13,18,19,20
76:19 83:5,7,11
85:19,22 86:2,8,23
87:3 88:20 89:25
90:4,6 91:14 92:15
92:16,19,21 94:7
97:3 101:21
102:17 103:16,22
105:17 108:17
109:2,7,12,15,20

109:24 117:25,25
118:13,14,20
119:15,18,25
121:7 127:25
128:23 129:23
130:4 131:12
132:11 135:24
136:2,4,12,15
138:6 139:4,9
140:10,13,23,25
141:23 143:25
144:7 151:5
154:23 156:5
157:8 160:21
161:24 162:14
164:4,11 165:5,8,9
165:17 166:2
167:10 168:2,18
170:13,20 172:12
173:9 174:5
176:11 177:10,12
177:14 178:10
180:17 181:4,8
182:8 183:6,18,25
184:10,14 185:11
188:16 201:6
**recalling** 55:11
**receipt** 149:16
150:21
**receive** 74:3 92:2
121:20 122:2,10
123:9,17 124:5
**received** 74:21
132:16 145:19
147:25 149:13,15
150:21 183:24
184:21 198:16
**receiving** 123:25
147:15
**recess** 56:13 94:10
120:19 142:9
201:19
**recognize** 97:21
121:13
**recollection** 11:3
15:6 42:12 48:13
50:24 51:22 52:19
66:21 67:5 72:15
82:5 84:2 85:3,11
86:5,7 89:8 90:15
95:21 98:3 106:16
106:19 116:22
117:5,12 120:25
144:19 145:8
148:22 150:18,25
153:2,25 162:13
162:16 169:11
186:17
**recollections** 49:8
**recommendation**

68:21 69:8,9 70:10
70:16,18,19,22
84:14
**recommendations**
14:20 109:9,10
**recommended**
157:24
**record** 3:7 206:13
**recorded** 33:10,12
140:2
**recovering** 177:24
**recruited** 170:22
171:13
**redacted** 162:20
163:8 174:14
208:13
**redundant** 59:23
**reemployed** 187:25
**refer** 3:15 40:15
82:2 163:24
165:13 167:14
170:7 185:4
198:11,19 199:25
**reference** 114:11
152:5 155:2
**referred** 50:15
152:15 166:7
174:10 180:24
**referring** 100:10
102:5 154:14
155:2,10 156:4
167:4,5
**refers** 110:7 127:7
164:13 165:25
168:23 173:12
180:9 182:2
198:12,20
**reflect** 200:14
**reflected** 183:7
**reflects** 200:16
**refresh** 11:3 159:11
**refuse** 88:24 189:4
**regard** 88:12 122:6
141:3 182:5
**regarding** 11:10,12
12:5 14:10 17:4,7
17:14 18:21 21:9
36:14 40:12,15
48:23 50:25 51:2,7
52:12 53:10 56:17
57:6 66:11,15,24
73:12 74:3 76:14
90:3,7 91:17
109:10,11,22
120:24 134:2
147:15,20 161:8
169:12 170:11
176:3 177:2
178:12 195:13
201:24

**Registered** 1:18
**regularly** 38:7
**rehire** 99:16,17,21
**Rein** 135:3,5 136:9
**Reiterated** 180:13
**related** 47:22 48:20
48:21 108:4,22
174:21 206:15
**relates** 12:22 36:21
**relating** 20:21,24
79:22 201:8
**relation** 32:6 37:9
41:5 53:2
**relationship** 22:3
**relayed** 127:9,24
128:2
**Release** 104:5
207:21
**Relevance** 46:22
115:25
**relieve** 106:25
120:13
**relieved** 56:2 58:25
59:20 72:2
**relocate** 91:3
**relying** 111:15
**remain** 65:17 71:4
75:17 76:24 82:11
87:25 124:21
**remainder** 40:18
71:5,13 115:3,18
124:14 152:23
**remained** 23:23
24:6 32:14 37:24
77:14,19 78:22
**remaining** 65:6
69:18 85:4 101:5
**remember** 5:15
11:24 17:13 22:19
49:9 54:2 81:19,23
92:8,12 93:22,24
94:2 118:5 151:4
151:19 156:9
158:18
**removed** 30:11
199:8
**render** 120:5 124:19
**rendered** 193:3,11
**repayment** 161:12
162:7 166:5
**repeat** 4:9 57:21
115:14 116:3
185:6 193:7
**rephrase** 4:10
114:20
**report** 13:19 14:3
26:15 27:22,24
28:10 30:4 48:22
197:15
**reported** 13:12

26:19 29:7 30:19
30:19 48:24 91:2
105:15 118:12,23
**reporter** 1:19 3:6
4:19,23 5:4
**reporting** 1:23
27:11,15,16,20
29:15 178:21
**reports** 14:19 27:25
28:11,14 197:13
197:16
**represent** 98:4
129:12
**representative**
126:25 173:23
**represented** 7:19
126:24 129:21
**request** 97:16 98:6
207:15
**requested** 12:5
185:23 192:18
**requests** 19:2
**require** 59:6 84:8
124:7
**required** 59:25 82:8
123:8,16
**requirement** 120:4
**resale** 55:3
**resolution** 40:21
**resolve** 153:16
165:15
**resolved** 70:20
71:18
**resource** 29:5 40:13
69:13
**resources** 11:19
17:9 18:13,14,18
21:8 24:18 28:22
28:24 36:23 47:22
58:9
**respect** 12:3 38:12
56:24,25 74:5,16
76:16 88:13,16
105:22 111:13
188:19
**respond** 12:24 51:25
72:22 164:2
**responded** 15:18
118:20,21
**responding** 18:25
**response** 15:16,20
87:6 112:19
116:19 118:3
124:25 127:15
128:8 135:18,23
156:7,10,15,21
157:4,9 158:14,18
164:4,11 165:5,16
167:9,25 168:17
172:10 173:8

174:4 177:17
178:8 180:16
181:5,7 182:7
**responsibilities**
24:15 25:18 26:2,8
26:9,10 27:11 29:4
48:20 79:17 90:23
100:20
**responsibility** 40:23
50:11 100:18
107:3 120:14
**responsible** 24:17
26:11 79:18 90:23
**rest** 71:20
**restate** 63:10
**restaurant** 190:5,14
191:3,3
**restaurants** 190:6
190:10,11 191:10
191:12,13
**restrictions** 68:13
**Restroom** 56:8
**restructuring** 69:20
69:21,23 84:6
88:14
**result** 12:18 45:9
77:2,15
**resumed** 143:4
**retain** 63:13 68:15
70:19,20,22 84:16
**retained** 63:5,24
64:6,15,21,24,25
65:5,6,12 70:6
75:10
**retired** 22:22 27:8
**retirement** 37:7
**retiring** 27:5
**return** 131:19
133:17 134:5,13
147:2 149:16
150:21
**returned** 180:7
**reveals** 12:15
**reversal** 195:18,23
**reverse** 197:4
198:21
**reversed** 198:23
**review** 9:6 10:21
31:14 95:16 97:8
103:6 131:13
133:22 149:2
**reviewed** 8:2,5,19
8:25 9:2,3,9 11:2
40:20 95:8,12,14
95:18,21,22
104:18 105:4,7
144:2,14 149:4
**reviewing** 48:18
**revisions** 143:23
**Richard** 94:15,20

207:13
**ride** 36:17,19,20,20
45:2
**right** 6:7 7:23 42:25
43:15 44:25 45:2
46:13 49:14 69:16
78:20 84:15 87:23
94:23 103:19
104:19 107:20
117:8 122:8
129:25 131:16
133:9 141:9 157:3
167:13 168:25
169:20 170:5
182:15 189:14
190:5 195:17
196:13
**rights** 110:12
**RK** 182:20
**role** 58:4 86:19
146:20
**rolling** 157:20
**room** 181:10,13
**rose** 140:7,7
**Ross** 64:6
**roundabout** 51:23
**rules** 3:19
**run** 43:19 105:24
**Ruth** 18:2 28:5 29:4
**Ryan** 135:4
**R-e-i-n** 135:5
**r-i-d-e** 36:19,20

———————
**S**
**S** 2:2,9 143:2,2,2
207:6 208:3
**safety** 100:21
**salary** 200:3,7,22
**sale** 75:24 76:9
78:19,23 79:12
207:8
**sales** 24:20
**San** 44:3
**Sanders** 1:15 2:4
49:4,24 100:9
105:2 203:15
**Sandusky** 3:9 31:6
91:3 191:16
**Sandy** 11:17 12:4
13:7 17:2 28:10
48:7 49:23 98:10
103:15 127:8,12
127:17,23 129:10
129:18,20 133:22
134:3 199:14,20
208:19
**satisfaction** 155:17
**save** 107:13,15
**saw** 62:11,15,16
**saying** 4:24 75:18

92:20 118:2 130:5
130:6 151:14
161:6
**says** 97:24 98:11,23
104:22 112:25
120:3 123:4,12
124:8,15 125:5,7
132:23 163:8
164:24 165:10
166:4,22 168:3,19
169:18 170:2,21
172:13,20,24
174:6,14 175:16
181:21,22 184:24
185:7,22
**school** 16:19 20:13
**scope** 26:9 40:23
**se** 28:23
**search** 170:9
**SEC** 80:9
**second** 102:5 104:21
110:15 131:22
147:14
**secretary** 149:8
**section** 76:21 98:14
130:17 208:7
**sections** 174:22
**see** 62:8,13,16 75:5
77:3 79:4 98:24
104:23 110:15
113:7 119:3 120:7
121:22 125:11
127:2,5 130:11
132:23 134:23
147:17 163:12
173:2 174:15
185:2,9 186:2
**seeing** 132:11
**seeking** 161:12
**seen** 76:4 94:23 98:2
98:7 104:9 132:8
146:11
**select** 56:19 106:15
**selected** 59:19 194:2
**selecting** 57:6 60:13
**seminars** 20:20 21:9
**send** 181:6
**sending** 92:23 96:19
141:25 144:20
183:9
**senior** 35:4,10 53:17
79:2,11 85:4
170:23 171:16
**sense** 177:25 189:22
**sent** 74:9 76:8 81:14
85:10 96:16 97:5,9
97:11 101:17
103:21 104:13
115:7 116:20
125:22 131:5,14

132:20 133:4,11
143:11 144:3,11
144:14 145:7
148:2,7,13,21,24
149:23 150:5,15
151:11 163:15
198:8
**separate** 43:11,12
43:18
**separately** 43:17
137:20
**Separating** 49:13
**separation** 78:6
98:14 104:5
207:21
**September** 22:21
27:9,19 28:16,19
29:23 32:14 36:8
37:25 104:4,13
110:6 198:24
200:4 207:20
**sequence** 140:24
**series** 3:23 16:25
**service** 191:3
**services** 58:11 59:24
82:7,16,21 84:8
88:25 89:11,19
90:12 91:19 92:6
93:13 120:5 123:5
124:19 126:16
185:23 186:7,11
186:15,21,24
187:6,9,17,23
188:11 189:4,23
191:24 192:6,18
193:2,4,10,12
**set** 206:11,19
**settled** 84:4
**settlement** 105:19
106:12,24 107:22
108:16 109:11
116:20 120:23
168:20 169:15
**settlements** 108:19
109:13,23
**settling** 177:20
**severance** 77:24
78:6
**shake** 4:20
**shared** 153:9
**short** 94:9
**Shortly** 127:18
**show** 76:3 78:14
94:18 97:19
101:15 104:8
121:12 130:20
143:10 148:11
162:23 184:19
198:6 199:17
**shown** 205:7

132:20 133:4,11
**side** 8:22 48:11
119:12 153:4
154:5,6,9
**sign** 131:19 133:8
133:17 179:14
**signature** 94:25
98:11 131:16,17
144:8 148:18
**signed** 95:9,11,13,19
96:8 98:10 104:19
120:3 131:13
144:2
**significant** 48:13
106:20 189:15,16
**silent** 99:21
**similar** 50:25
**simply** 60:10 178:7
**sincere** 166:22
167:8
**sit** 140:10
**site** 48:18
**sitting** 7:23 200:13
**situation** 49:17
87:12 102:10
108:10 110:3
153:15 189:2
201:5,9
**situational** 32:22
**situations** 40:20
110:4
**six** 35:22 43:18 47:3
**Sixth** 1:24
**skipped** 169:22,23
**slash** 113:3 168:20
180:19
**slight** 3:20 96:6
**small** 185:13
**Snoopy** 22:25 23:6,8
23:14,23 24:2 30:2
35:25
**Soak** 43:23,25 44:3
44:4
**somebody** 45:18
53:25 92:22 141:8
**somewhat** 51:22
**soon** 53:6 116:24
117:3 141:15
150:15 179:25
**sorry** 16:2 33:11
43:14 54:16 71:9
88:7 106:19 108:2
127:4 147:13
150:13,14 152:17
178:25 190:8
**sort** 14:21 34:2 37:4
118:25 179:7
184:9 189:2
**sorted** 87:15
**sought** 152:8 155:9
**source** 121:21 122:4

122:11 123:9,17
123:21
**South** 2:7
**Southern** 1:2 19:24
**space** 169:21,22
**Spartanburg** 170:25
172:5,7
**speak** 6:25 19:6
109:18 118:10
128:11,19 137:2
137:19 152:25
180:22 183:4
201:23
**speakerphone** 72:20
**speaks** 98:19 99:19
110:18 124:17
133:20
**special** 64:10 133:12
133:14
**specific** 8:18 14:17
15:6,7 17:16,18
18:19 26:13 31:23
32:22 42:9 49:8
50:24 52:8,19 57:4
62:12 66:21 70:11
83:5 90:4 92:17
95:15 96:3 99:11
109:24 118:6,13
145:8 147:22
148:4 156:6
162:12,16 186:17
**specifically** 9:7,21
10:3 12:15 51:4
53:12 57:11 63:17
66:12,16 68:24
69:4 83:13,20
91:14 96:2,3
109:21 117:2,6
122:8 135:16
136:2 137:2 138:6
151:17 156:4
159:24 161:3
164:14 170:13
177:13 183:21
188:17
**specifics** 83:7
185:15
**speculating** 138:19
**speculation** 93:2
96:9 129:7,8 145:5
168:10
**spelled** 47:7
**spoke** 118:9 129:24
130:2,3 202:3
**spoken** 11:8 103:24
**Springs** 44:4
**Squire** 1:15 2:4 49:4
49:24 105:2 203:5
203:7,15
**Squires** 100:9

**ss** 206:4
**stack** 95:10
**staff** 18:12 25:13
28:24 29:23 31:14
31:19 32:2 33:9
34:11 36:14 37:21
41:4 85:5 88:17
90:11,21,24 91:4
100:2 139:16,17
139:20,25 140:11
148:10
**stamp** 163:8
**stand** 9:5,7 102:11
**standpoint** 30:12
58:9 107:6 178:4
**stands** 190:21
**Star** 45:2,13
**start** 30:15 63:20
157:21 158:6,7
170:23 171:21
**started** 22:19 24:11
29:14 89:9 143:18
158:2,4,8,11,12
165:19 167:17
170:8
**starting** 117:17
**state** 1:19 3:6 20:9
99:16 110:11
128:25 206:3,8
**stated** 77:18
**statement** 154:17
**states** 1:2 76:22
98:15
**status** 14:10 30:4
51:18 52:8 59:9
74:4 81:12 87:5,12
92:23 99:16,21
128:7 177:5
**stay** 52:13 53:11
60:18 61:4 84:10
84:20 85:15 86:12
86:22,25 87:21
126:16
**staying** 86:18
**steps** 140:17,20
**stewardship** 30:3
**stick** 63:20
**stock** 22:5
**stop** 136:24 141:12
145:10,15 176:17
193:9 196:13,21
197:3
**stopped** 157:11
196:12,19,22
**stopping** 195:21
**straddled** 23:18
**strange** 128:13
**strategy** 14:7
**street** 2:7 190:25
**strictly** 107:12

154:2,5 178:3
**strike** 71:22 137:7
**strong** 152:17
181:22,25 182:5
**structure** 21:24
42:12 70:5
**structured** 70:7
**subject** 205:6
**Subscribed** 205:16
**subsequent** 85:24
158:9 159:8
176:14 182:13
**subsequently** 67:16
80:22 145:25
**subsidiaries** 43:8
46:14,19 76:25
**subsidiary** 21:17,21
80:7
**substance** 14:22
15:7 94:4 105:11
160:23 161:4
**substantial** 188:13
**substantive** 18:3
139:25
**sue** 166:5,12 176:21
178:18
**sued** 5:25
**SUFFOLK** 206:5
**suggested** 176:5,5
**suing** 139:5 177:3,7
178:12
**suit** 177:22 179:7
192:3
**Suite** 1:24
**sum** 107:9 117:20
**summarized** 161:2
**summary** 16:8
161:8
**summer** 195:14
**support** 60:5
**supposed** 127:20,21
148:6
**sure** 3:17 4:18 11:5
15:2 17:8 26:24
46:20 47:5 50:22
52:23 56:12 57:22
58:20,21 59:4
70:17,25 71:11
83:10 85:17 86:15
86:17,17 87:22
92:7 116:4 118:12
131:15 136:6
151:21 161:2,18
164:3 179:15
184:7 185:13
193:8
**surprise** 136:6
**surprised** 135:19
**surrounding** 18:8
**sworn** 3:3,25 205:16

206:12
**system** 18:18

———————
**T**
**T** 143:2 206:2,2
207:6 208:3
**take** 4:20 6:23 33:15
60:16,20 68:23
71:17 72:24,25
92:20 94:9 106:18
112:24 120:17
126:22 131:22
140:17,20 147:10
147:12 188:23
196:6 199:4
201:16 202:19
203:14
**taken** 5:9 6:18 9:6
56:13 94:10
120:19 142:9
145:25 146:4
195:3 201:19
**takes** 33:13
**talk** 18:19 31:12,16
139:5 155:16
181:11,18 184:24
185:13
**talked** 13:9,11
153:14 161:4
173:20 182:20
183:24 194:11
**talking** 122:23
130:3 157:17,22
164:17 165:21
166:11
**taxes** 200:14,19,24
**team** 48:10 53:17,21
**technicalities** 179:9
**Technically** 21:16
**technology** 135:8
**telephone** 9:23,25
86:6 118:18
159:19 203:4
**television** 113:4
**tell** 4:2 14:22 43:20
57:9 70:15 72:16
75:15 84:19 85:9
93:20 94:3 114:25
119:4 124:10
126:8 127:17
128:21 129:20
134:4,7,12,16
135:16 136:13
151:8,18 152:13
154:17 158:4,7,9
162:10,24 167:17
176:23 180:20
**Ten** 202:22
**term** 71:5,14 101:8
105:24 106:6

113:2 114:12
115:3,18 123:6,13
124:14 192:19,21
**terminate** 82:24
**terminated** 72:18
82:15 91:25 96:25
99:23 101:3
102:25 112:7
113:11 115:23
116:7 124:9,11,23
125:4,21 187:8,9
193:15
**termination** 32:17
32:21 38:4 65:2
80:22 81:13 82:9
83:16,23 91:21
93:9 96:22 98:15
98:22 99:4,7,9,12
100:5 102:9,16
185:25 186:8,12
186:16,21,25
187:24 189:5
**terminations** 33:2
38:12,15
**terms** 11:6 26:7
42:11 66:8 81:21
177:22 179:6
185:19
**testified** 3:4 6:4
47:17,23 56:17
81:8 84:9 91:24
143:4 163:5
168:24 169:2
184:11 189:13
194:20 196:18
**testify** 7:14,17 14:15
15:3 70:3 77:11
82:4 89:9 93:2
96:10 114:3 145:5
197:19
**testimony** 8:3 9:10
9:12 55:22 84:15
111:20 205:4
206:13
**TGI** 190:23 191:7
191:16
**theme** 113:3 159:23
**thing** 14:21 48:2
179:8 183:15
**things** 8:11,13 10:24
20:20 25:7 31:13
40:22 48:14 87:15
129:2 139:24,25
140:4 165:21,25
185:14 188:15,18
190:21
**think** 7:9 15:20 46:7
46:10,13 47:10
55:8 100:15 118:5
119:7 138:15,20

139:8 140:24
152:4
**thinking** 16:7
119:10 157:16
**thinks** 16:3
**third** 2:14 132:23
**Thomas** 1:18 206:7
206:23
**Thompson** 137:4
141:12 145:18
197:8,9,25 198:2,8
198:16 208:16,17
**Thornton** 54:14,17
62:25 71:24 81:5,6
159:3,13
**Thornton's** 159:25
**thought** 128:13
138:11 145:13
165:23 172:13
**three** 22:18 27:3
28:3,13 31:18
46:10 139:13
151:13 170:24
172:5 191:18
**throwing** 117:16
**Thursday** 198:13
**tied** 122:5
**till** 114:9
**Tim** 54:9
**time** 5:7 9:6 13:22
13:23,25 26:20
27:6,8,11 28:14,15
29:14 30:18 41:23
41:24 42:13,25
52:4,7 59:7,24
62:11 67:15 70:19
71:4,11,21 78:19
82:13 83:4,22 84:4
84:7,10 85:15
86:13 87:17,18,21
88:11,22,25 89:10
89:14 90:11,25
95:11 100:25
101:3 106:21
107:10 111:9,21
117:7 128:5 133:4
134:22 135:2
136:16 141:6
143:3 146:23
150:3,4,10 151:8
151:24 153:3
157:16,17,21
161:20 162:3,3
167:16 170:24
176:8 181:2
183:16,24 185:24
186:8,12,15,18,21
188:9 191:22
192:6,8,25 193:9
196:14 202:16

203:18 204:3
**times** 5:11 9:15
13:19,21 31:18
37:20 42:2 87:4
**timing** 196:20
**title** 54:11,18
**titled** 130:16 208:6
**today** 7:14,17 8:3
9:10,13 25:16
140:10 200:13
**told** 52:2 72:10
115:13,16 126:11
126:12 128:25
129:10 130:4
133:16 134:8,9
136:22,24 138:15
138:17 141:8
153:6,11,14
154:12 155:23
156:17,25 158:19
166:13 171:12,15
171:21 172:4,16
181:6,11 182:20
184:7 200:21
**top** 132:24 198:7
**topic** 90:8 109:13
147:2
**topics** 90:5
**total** 44:25
**touch** 126:16
**track** 108:4 185:20
**traded** 80:8,12
**training** 16:22 20:18
21:7
**transaction** 42:10
77:2,16 152:14
157:6
**transactions** 24:20
**transcript** 205:6
**transition** 27:4,13
40:12,14 41:20
47:21,21 48:3,6,9
89:4
**transitional** 51:2
58:7
**treasurer** 36:2
**Trek** 45:2,13
**trial** 6:13
**tried** 53:24
**triggered** 65:4 80:24
80:25
**triggering** 82:8
91:21
**trip** 50:6
**tripped** 5:24
**true** 102:23 186:4
205:5 206:12
**truth** 4:3
**truthfully** 7:14
**try** 75:2 110:4 199:9

**trying** 21:23 83:5
103:18 140:23
165:20 169:16
**Turn** 112:23 121:18
**twelve** 6:16 43:15
**two** 10:20 154:3,6
180:4 191:18
202:25 203:5
**type** 5:15 16:21 17:5
17:6 25:5 32:21
42:14,15 50:25
62:21 106:12
132:5,8 179:7
194:6
**types** 26:7 36:11,16
**typical** 102:9
**typically** 32:17 37:3
38:3,11

**U**

**uh-huh** 4:22
**uh-uh** 4:22
**ultimately** 58:25
59:14 178:17
**um** 5:23 21:9 23:9
23:24 30:13 36:18
36:20 37:14 38:6
50:14 51:21 53:16
65:2 66:7 67:6
68:10 70:11 87:11
105:22 106:3
118:23 128:4,6
140:4 153:6 167:5
179:7 202:5
**unable** 146:22 193:3
193:11
**unacceptable**
117:24
**understand** 3:21 4:4
4:7,9,13,23 5:2
7:4 15:25 19:14
66:5 146:10
152:21
**understanding** 54:3
58:22 77:12 78:4
79:7,16 80:6 111:8
112:5,15 114:10
114:23,24 157:18
168:12,14
**understood** 4:12,15
15:21
**undetermined** 87:14
**undocumented**
183:19
**unemployed** 127:3,4
129:11,13,21
157:20
**union** 21:9
**UNITED** 1:2
**Universal** 47:4

**University** 19:24
20:9
**update** 128:6
**updated** 40:19
**updates** 14:19 17:17
177:5
**use** 72:13,19 152:5
**usually** 31:24
**utilize** 186:24 187:6
**utilized** 188:12
**utilizing** 58:10
186:15,20 187:16
**U.S** 47:8,12

**V**

**vague** 49:7 85:11
**Valley** 44:11
**value** 110:13 177:22
200:2,5,24
**variations** 62:19,20
**various** 24:18 25:9
30:5 36:15 79:22
100:16 130:24
160:17 184:12
190:18
**Vegas** 45:6,7
**vendors** 37:5
**verbally** 4:19 93:12
**Veronica** 18:10
**versus** 76:9 177:23
**vice** 22:9 24:15 27:9
32:18 35:17 38:4
54:20,23 55:3 64:3
64:11,12,18 79:2
79:11 135:7 188:3
193:17 194:4
**view** 70:9 71:3,11
123:7,15 161:22
161:22,25 178:5,6
192:4
**violate** 113:18,21,24
122:20 123:3,11
123:24 180:14
184:7
**violated** 122:11
137:24 164:19
**violates** 122:18,25
122:25
**violation** 116:14
**Virginia** 44:7
**virtually** 189:22
**virtue** 114:11
164:19
**visiting** 5:23
**visits** 30:3
**vitamin** 6:22
**VM** 175:17,19
**voice** 175:19,19
180:4 182:14,15
182:16 183:5

**volume** 26:9 29:3
**VP** 27:12
**vs** 1:6

**W**

**wait** 4:25 119:3
**waive** 120:3,10
**want** 4:21 87:10
161:6 171:25
176:23 178:8,25
195:18
**wanted** 27:3,17
85:14 86:12
**Ward** 100:14
**wasn't** 117:18
129:17 155:13
179:15 180:23
195:15
**water** 43:10,13,17
43:18 44:15 45:4
45:21 159:23
190:18
**way** 33:10 40:16
47:20 51:23 75:19
75:20 93:24 94:2,7
107:12 110:24
111:16 115:5
117:24 122:13
128:24 147:23,24
153:16 155:22
183:2 192:15
206:16
**Weber** 2:17 54:4,5,6
71:24 72:4,9,10,16
72:20 73:6,7,13,22
74:2 81:2 159:4,13
172:24 187:19,20
187:21 202:3,8
203:3,9,17
**Weber's** 73:10
188:11
**week** 31:18,23 37:20
42:2
**weekly** 31:21 33:9
**weeks** 32:5 50:7
117:4
**went** 6:13 41:18
101:6 103:7 105:5
106:6 116:24
149:3,11 170:8
196:3,23
**weren't** 52:5 58:21
70:25 74:9,13
87:22
**we'll** 4:11 47:6
166:5
**we're** 5:5 11:10
25:15 37:4,6
122:23 166:4,11
178:8

**WHEREOF** 206:18
**White** 55:8 71:25
  81:3 159:14
**wholly** 21:21,24
**wife** 103:23,24
  127:13 128:25
  129:4,25 130:2
**Wild** 44:15
**willing** 118:7 120:3
  120:4,10 123:22
  124:3,18,22
  157:10 192:16,24
  193:8
**willingness** 110:12
**wish** 156:25
**withdrawal** 157:5
**witness** 3:3,8 6:4
  14:13 189:25
  194:22 197:17
  205:3 206:10,13
  206:18 207:3
**woman** 5:23
**wondered** 15:24
  19:13
**Wonderland** 44:6
  45:15 55:7
**word** 166:24
**words** 4:20 27:13
  72:13,19 83:24
  94:4 107:18
**work** 24:23 25:6
  29:24 48:5,8,25
  49:18 88:2,10 89:3
  89:5 91:5 113:17
  113:24 115:2,17
  132:25 133:5
**worked** 23:24 39:20
  41:3 49:6,11,22
  144:19 152:4
  170:22 171:8,10
  173:14
**working** 49:9
  115:22 116:6
  134:13,22 135:2
  135:13 136:11
  141:8 193:9
**world** 44:23 114:16
  114:23
**Worlds** 44:12
**worth** 121:3
**wouldn't** 38:6,6
  128:11,18 166:12
**write** 15:13 95:6
  101:20 104:16
  131:10 143:14
  148:16 153:17
  183:3,3
**writing** 60:22 66:24
  74:3 159:17
  174:24

**written** 67:3,8,17
  74:13,21 75:6 96:2
  164:25
**wrong** 124:10
  152:11
**wrote** 95:4 111:9
  182:19

———————
          **X**
———————
**X** 1:3,9 207:2,6
  208:2,3

———————
          **Y**
———————
**yeah** 46:7 51:15
**year** 20:3 185:8,12
  185:16
**years** 5:14 22:18
  27:3 35:22
**York** 1:2,16,16,20
  1:24,24 2:15,15
  112:7,14 168:4,15
  172:25 181:22
  182:4 206:3,8

———————
          **Z**
———————
**Zimmerman** 63:2
  63:24

———————
          **$**
———————
**$100,000** 182:24
**$7,983.50** 200:6,11
**$99,000** 200:6

———————
          **0**
———————
**05** 27:19
**07** 1:6
**08** 193:16 195:15

———————
          **1**
———————
**1** 184:17 186:4
  208:15
**1st** 82:7 98:16 130:9
**1:48** 143:3
**10/2** 98:23
**10/30** 173:18 183:13
  183:17
**10:22** 56:13
**10:31** 56:14
**10001** 1:24
**10022-4834** 2:15
**101** 207:17
**102** 98:23
**104** 207:19
**10595(SS)** 1:6
**11** 110:8 111:2
  112:24 114:8,14
  114:21,22 123:2
  123:11,12 207:17
**11/29** 179:22 180:6
**11:30** 94:10

**11:48** 94:11
**12** 104:4,13 110:6
  207:20
**12:25** 120:19
**12:27** 120:20
**12:56** 142:10
**121** 207:23
**13** 208:19
**130** 208:5
**1300** 2:6
**14** 207:13 208:5
**142** 208:8
**147** 208:10
**15** 207:15
**16** 208:14
**162** 208:12
**17** 101:4,13 207:18
**1716** 1:24
**18** 44:25 102:16,21
**18th** 10:7 12:8
  145:17,20,22
  146:22 176:20
  196:2 197:4
  198:13 202:20
**184** 208:14
**19** 142:7 143:12
  149:14 199:15,20
  208:9,12,20
**19th** 149:19 195:22
**197** 208:16
**1977** 20:4
**199** 208:19
**1996** 24:11
**1997** 23:17,19,20
  24:4,10

———————
          **2**
———————
**2** 207:19
**2-page** 101:11
  207:17
**20** 42:6 82:13
**2000** 130:21 150:16
**2005** 22:21 27:8,9
  28:16,20 30:16
  32:14 36:7,8 37:25
**2006** 42:6 45:10
  53:2 64:23 67:2,5
  75:24 80:16 81:15
  82:13 88:5,8 89:16
  92:10 94:16,20
  98:16 101:13,17
  104:4,13 110:7
  117:7 207:8,14,18
  207:20
**2007** 100:6 101:6,8
  114:9 126:23
  127:22 130:9,15
  134:21 142:7
  143:12 147:8
  148:14 149:14

**151**:11 158:13
  166:17 175:14
  179:11 182:10
  183:10 184:13,18
  184:21 186:4
  188:6 195:14
  198:2,3,9,17,24
  199:15,20 200:4,4
  208:5,9,11,15,17
  208:18,20
**2008** 1:10 193:20
  202:20 205:18
  206:19
**21** 130:15,21 208:5
**212** 1:25
**22** 121:18,19
**23** 1:10 125:9,15
  147:7 148:13
  150:16 170:23
  183:9 207:8
  208:11
**23rd** 149:15,19
  151:11 158:12
  163:15 171:22
  200:4
**24** 126:22 208:16
**25** 134:19 198:3,17
  208:18
**27** 88:8 94:15,20
  175:14 198:2,9
  207:14 208:17
**27th** 87:14 88:4,5
  92:23 176:20
**279-5108** 1:25
**29** 104:6 207:22
**29th** 179:11,17

———————
          **3**
———————
**3** 207:4
**3-page** 162:19
  208:12
**3:09** 201:19
**3:15** 201:20
**3:18** 204:3
**30** 75:24 80:16
  207:8
**30th** 53:2 55:14,16
  64:23,25 80:19,20
  80:21 163:11
  176:13 185:4
  200:4 206:19
**31** 101:6,8 114:9
**350** 1:16

———————
          **4**
———————
**41** 2:7
**43215-6197** 2:8
**44870** 3:9
**45** 78:12 207:12
**48** 6:19

———————
          **5**
———————
**5** 112:23 122:25
  123:3,4 166:17
  208:8
**5th** 172:21

———————
          **6**
———————
**6** 208:10

———————
          **7**
———————
**7** 182:9
**7th** 180:3
**7(c)** 120:6 123:2,22
  123:24 124:8
  125:5,6 173:11
  174:2
**7,983.50** 201:3
**75** 207:8
**764** 162:21 208:13
**78** 207:10

———————
          **8**
———————
**849** 3:9
**875** 1:24
**885** 2:14

———————
          **9**
———————
**9** 101:12,17 207:10
  207:18,23
**9:02** 1:10
**94** 207:13
**97** 207:15



July 27, 2006

PLF
EXHIBIT NO.
TRN    DEFT
FOR ID 4-23-08    C

Mr. Lester C. Nail
9027 Kirkley Court
Charlotte, North Carolina 28277

      Re:    Notice of Termination of Employment

Dear Mr. Nail:

      On June 30, 2006 (the "Closing Date"), Bombay Hook LLC and CBS Corporation finalized the transaction with Cedar Fair, L.P. and Magnum Management Corporation (the "Company"), (collectively, the "Cedar Fair Entities"), pursuant to which the Company acquired 100 percent of the outstanding shares of capital stock of Paramount Parks Inc. ("PPI") As a result, your employment agreement, effective as of January 1, 2006 ("Employment Agreement"), has become the benefit and obligation of PPI, as legal successor and/or assign.

      Please be advised that PPI has determined that your services will no longer be needed after August 1, 2006. Accordingly, this letter is your notice under your Employment Agreement that your employment is terminated without cause as of August 1, 2006, and that you will be entitled to receive, subject to applicable taxes and withholdings, and subject to any other terms of the Employment Agreement, the amounts identified in paragraph 7(c) of your Employment Agreement. PPI reminds you of both (1) your non-compete obligations under paragraph 11 of the Employment Agreement, and (2) the "willing, ready and able to render exclusive services" requirement of paragraph 7(c), and any other post-termination obligations of the Employment Agreement.

      PPI is currently considering making an alternative separation proposal to you, which would incorporate a lump sum severance payment, along with other terms in a separation agreement. You will hear from PPI in the near future should it decide to present an alternative separation proposal to you. Should you have any questions, please contact Paramount Parks Inc. c/o Craig Freeman, Cedar Fair, L.P., One Cedar Point Drive, Sandusky, Ohio 44870, (419) 627-2391.

Very truly yours,

Richard L. Kinzel
President
Paramount Parks, Inc.

LES00015



October 19, 2007

PLF   DEFT   *I*
EXHIBIT NO. _____
TRN   FOR ID   4-23-08

Lester C. Nail
9027 Kirkley Court
Charlotte, North Carolina 28277

     Re:    Employment Agreement with Paramount Parks Inc.

Dear Mr. Nail:

     As you know, as of July 31, 2006, pursuant to the terms of your Employment Agreement, your employment with Paramount Parks Inc. ("PPI") was terminated without cause. Since that time, PPI has been providing you, subject to applicable taxes and withholdings, and subject to any other terms of the Employment Agreement, the amounts identified in paragraph 7(c) of your Employment Agreement.

     We have recently learned that you have secured alternate employment and are, therefore, no longer able to render exclusive services to PPI. Accordingly, PPI will discontinue providing the above payments and benefits effective immediately, as provided under paragraph 7(c) of your Employment Agreement. You will be receiving information regarding your options under COBRA. You also have the obligation to pay back any amounts that PPI paid to you since you have been otherwise employed.

     Please contact me as soon as possible to discuss the commencement of your new employment. Thank you in advance for your anticipated cooperation.

Very truly yours,

PARAMOUNT PARKS INC.

Craig Freeman

Craig Freeman

LES00018



October 23, 2007

PLF
EXHIBIT NO. J
TRN    FOR ID
V-23-08

Lester C. Nail
9027 Kirkley Court
Charlotte, North Carolina 28277

Dear Mr. Nail:

I attempted to deliver the enclosed letter to you via UPS overnight delivery and have been informed that you no longer live at the address we have on file.

This is my second attempt via certified U.S. mail in anticipation that they will have a forwarding address for you.

I look forward to hearing from you.

Yours truly,

Craig J. Freeman

enc.

LES00019

**Page 1**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

FILE NO.: 07 Civ. 10595 (SHS)


PARAMOUNT PARKS, INC.        )

ONE CEDAR POINT DRIVE        )

SANDUSKY, OHIO               )

44870-5259,                  )

                             )

Plaintiff,                   ) Case No. 07 Civ. 10595

                             ) (SHS)

vs.                          ) ECF CASE

                             )

LESTER NAIL 375 SOUTH        )

MONTEREY DRIVE MOORE,        )

SOUTH CAROLINA 29369,        )

                             )

Defendant.                   )


DEPOSITION OF SANDY CRANFORD

(Taken by the Defendants)

Charlotte, North Carolina

Thursday, May 29th, 2008


Reported in Stenotype by

Joy R. Dick, Court Reporter

Transcript produced by computer-aided transcription



Paramount Parks, Inc. v. Lester Nail
Sandy Cranford

07 Civ. 10595 (SHS)
May 29, 2008

**2 (Pages 2 to 5)**

---

**Page 2**

```
1              APPEARANCES
2   ON BEHALF OF THE PLAINTIFF:
3      Jill S. Kirila, Esquire
       Squire, Sanders & Dempsey, LLP
4      1300 Huntington Center
       41 South High Street
5      Columbus, Ohio 43215
       Jkirila@ssd.com
6
7   ON BEHALF OF THE DEFENDANT:
       Michael P. Pappas, Esquire (via telephone)
8      Littler Mendelson, PC
       885 Third Avenue
9      New York, New York 10022
       (212) 583-9600
10
11
12
13
14
15
16
17
18
19
20     DEPOSITION OF SANDY CRANFORD, a witness called
21  on behalf of the Defendant, before Joy R. Dick,
22  Notary Public, in and for the State of North
23  Carolina, at 14532 Carowinds Boulevard, Charlotte,
24  North Carolina, on Thursday, the 29th day of May
25  2008, commencing at 1:58 p.m.
```

---

**Page 3**

```
1          INDEX OF EXAMINATIONS
2                 PAGE
3   BY MR. PAPPAS            4
4
5
6          INDEX OF EXHIBITS
7
8   NUMBER  EXHIBIT            MARKED
9     A    Payroll Check Request Form  34
10    B    Payroll Register            37
11
12     PREVIOUSLY-MARKED EXHIBITS REFERENCED
13  NUMBER  BATES NUMBER          PAGE
14    H    LES00001 to LES00008    17
15    D    PPI000014               23
16    N    PPI000765               31
17
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
1              SANDY CRANFORD,
2   having first been duly sworn, was examined and
3            testified as follows:
4              EXAMINATION
5   BY MR. PAPPAS:
6      Q.  Good morning, Ms. Cranford.  My name's
7   Michael Pappas.  How are you?
8      A.  Hi there.
9      Q.  Can you hear me okay?
10     A.  Yes.  Can you hear me okay?
11     Q.  I can hear you fine.
12     A.  Okay.
13     Q.  I'm an attorney for Lester Nail in the
14  Paramount Parks lawsuit against him.
15     A.  Okay.
16     Q.  Have you ever had your deposition taken
17  before?
18     A.  I have previously with Paramount Parks.
19     Q.  Okay.  So you're somewhat familiar with
20  the process, correct?
21     A.  That's correct.
22     Q.  Okay.  I just want to make a few
23  preliminary remarks about how the deposition will
24  proceed.  I'm going to be asking you some
25  questions, and you've been sworn to tell the truth.
```

---

**Page 5**

```
1   Do you understand that?
2      A.  Yes, I do.
3      Q.  Again, we're by phone.  So if you don't
4   hear any of my questions, please let me know, and
5   I'll repeat it, okay?
6      A.  Okay.
7      Q.  If you do hear my question but you don't
8   know or understand what I'm trying to ask, let me
9   know, and I'll try to rephrase it where it's more
10  understandable.
11     A.  Okay.
12     Q.  If you don't indicate otherwise, I will
13  assume that you've heard and understood the
14  question, okay?
15     A.  Okay.
16     Q.  Also, since we're on the phone, I need
17  you to answer verbally.  Don't shake your head or
18  nod your head because, obviously, I can't see you.
19  And the court reporter can't take that down anyway.
20  So please give all your answers verbally.
21     A.  I will.
22     Q.  And let me finish my entire question
23  before answering.
24     A.  Okay.
25     Q.  Even if you think you know what the rest
```

**Page 6**

1  of the question will be, it's easier for the court
2  reporter to take down if you wait until the whole
3  question is out before you answer. And if you want
4  to take a break at any time, please let me know.
5  Although, I don't anticipate this taking too long
6  of a time.
7      Have you consumed any alcoholic beverages
8  in the last 24 hours?
9      A. No.
10     Q. Have you taken any drugs or medications
11  in the last 24 hours?
12     A. No.
13     Q. Is there any reason that you won't be
14  able to testify truthfully and accurately today?
15     A. No.
16     Q. Okay. And are you being represented by
17  an attorney at this deposition?
18     A. Yes, I am.
19     Q. Who is that?
20     A. Jill Kirila.
21     Q. And she's sitting there in the room with
22  you, correct?
23     A. Yes, she is.
24     Q. Did you review any documents in
25  preparation for your testimony?

**Page 7**

1      A. Yes.
2      Q. What documents?
3      A. One that we call a PARF, which is a
4  Personal Action Request Form and another one, some
5  benefit enrollment forms.
6      Q. Okay. Anything else?
7      A. No. Not that I recall.
8      Q. Did you prepare for your testimony with
9  an attorney?
10     A. Yes.
11     Q. How many times?
12     A. Once in person and briefly for a
13  conference call.
14     Q. Okay. How long was the in-person
15  preparation?
16     A. Approximately two hours.
17     Q. How long was the telephone preparation?
18     A. No more than probably 20, 30 minutes.
19     Q. Did anyone attend those preparation
20  sessions other than you and your attorney?
21     A. The conference call included
22  Lori Zancourides. Did I say that right?
23     MS. KIRILA: That's right.
24     Q. Anyone else?
25     A. No.

**Page 8**

1      Q. Other than meeting with your attorneys,
2  did you speak to anyone else regarding your
3  deposition?
4      A. Craig Freeman.
5      Q. When did you speak to Mr. Freeman about
6  your deposition?
7      A. Probably about three weeks ago. He just
8  wanted to give me a heads up that I'd probably be
9  deposed.
10     Q. Were there any attorneys present during
11  that conversation?
12     A. No.
13     Q. Do you remember anything else that you
14  and he discussed?
15     A. Only -- I gave him some dates that I
16  would not be available.
17     Q. Did he tell you why he thought that you
18  would likely have your deposition taken?
19     A. No.
20     Q. You're not an attorney, are you?
21     A. No, I'm not.
22     Q. Okay. I just wanted to ask some
23  questions about your background. Can you give me
24  your highest level of education?
25     A. I have an associate degree in accounting,

**Page 9**

1  and I have a certification, professional human
2  resources certification.
3      Q. And how long have you been employed at
4  Paramount Parks?
5      A. 22 years.
6      Q. And what's your current position there?
7      A. Director of Human Resources.
8      Q. For Paramount Parks?
9      A. No. For Carowinds.
10     Q. And Carowinds is what?
11     A. Carowinds is owned by Cedar Fair. It's
12  an amusement park.
13     Q. Were you employed in the Paramount Parks'
14  organization before it was acquired by Cedar Fair?
15     A. Yes, I was.
16     Q. So you were there when Viacom owned it?
17     A. Yes.
18     Q. How long have you been in your current
19  position?
20     A. Since last October of 2007.
21     Q. What was your position before that?
22     A. Manager of Human Resources for corporate.
23     Q. When you say "corporate," do you mean the
24  whole Paramount Parks corporation?
25     A. That's correct.

Paramount Parks, Inc. v. Lester Nail
Sandy Cranford

07 Civ. 10595 (SHS)
May 29, 2008

4 (Pages 10 to 13)

---

**Page 10**

1    Q.   So whereas before you worked generally
2  for Paramount Parks, and now your duties are
3  limited to Carowinds; is that accurate?
4    A.   That's accurate.
5    Q.   When did you become -- what was your
6  previous title?  I'm sorry.  Manager of human
7  resources?
8    A.   Correct.
9    Q.   When did you become manager of human
10 resources for Paramount Parks?
11   A.   I believe in 1998.
12   Q.   What was your position before that?
13   A.   Manager of Human Resources <Information
14 Systems and Benefits.
15   Q.   And before that?
16   A.   Corporate accountant.
17   Q.   And what was your first position at
18 Paramount Parks?
19   A.   Corporate accountant.
20   Q.   Okay.  What were your duties and
21 responsibilities during the time that you were a
22 manager of human resources for Paramount Parks?
23   A.   My main responsibility was the human
24 resources information system.  And that is a system
25 that drives our benefits, our payroll and our human

---

**Page 11**

1  resources information.  I also was responsible for
2  unemployment, very little hiring.
3    Q.   Anything else?
4    A.   Administering any benefit claims or
5  issues for employees; reconciling any issues that
6  they had; retirement plans; and then just general
7  duties such as attendance, vacation, tracking
8  information, like that.
9    Q.   And that was your position from
10 approximately 1998 through when?
11   A.   Through October of 2007, up to
12 October 2007.
13   Q.   Was your change in position from
14 Paramount Parks to Carowinds -- was that a
15 promotion, demotion or lateral move?
16   A.   That was a promotion.
17   Q.   Have you ever spoken to Lester Nail?
18   A.   Yes.
19   Q.   When was the first time you spoke to him?
20   A.   When he worked with our company.
21   Q.   And by "our company," what are you
22 referring to?
23   A.   When he worked with Paramount Parks.
24   Q.   Okay.  Do you recall a specific month and
25 year?

---

**Page 12**

1    A.   No, I don't.
2    Q.   Was it before Paramount Parks was
3  acquired by Cedar Fair?
4    A.   Yes.
5    Q.   Did you ever speak to Mr. Nail after
6  Paramount Parks was acquired by Cedar Fair?
7    A.   Yes.  Probably briefly.
8    Q.   Do you remember when that was?
9    A.   Probably in late July of '07.
10   Q.   '07 or '06?
11   A.   No.  Excuse me.  '06.  Sorry.
12   Q.   Okay.  Do you recall what the subject of
13 that conversation was?
14   A.   No.
15   Q.   Who do you report to -- or who did you
16 report to as manager of human resources for
17 Paramount Parks?
18   A.   My last person I reported to was
19 Mike Koontz, K-o-o-n-t-z.
20   Q.   What was his position?
21   A.   Senior VP of Finance.
22   Q.   How long did you report to him?
23   A.   Eight months.
24   Q.   Who did you report to before that?
25   A.   Beth Bayes, B-a-y-e-s.

---

**Page 13**

1    Q.   Beth Bayes?
2    A.   Yes.
3    Q.   What was her position?
4    A.   Vice President of Human Resources.
5    Q.   How long did you report to her?
6    A.   From 1986 until November '07.
7    Q.   So did you report to her simultaneously
8  when you reported to Mr. Koontz at any point?
9    A.   No.
10   Q.   Who do you report to now?
11   A.   John Shanrock.
12   Q.   And his position is what?
13   A.   General Manager and Vice President for
14 Carowinds.
15   Q.   During the time that you were manager of
16 human resources for Paramount Parks, did anyone
17 report to you?
18   A.   Yes.
19   Q.   How many people?
20   A.   Three.
21   Q.   What were their positions?
22   A.   I had a coordinator of health and welfare
23 benefits, a coordinator for retirement plans and a
24 coordinator for human resources information
25 systems.

---

**Paramount Parks, Inc. v. Lester Nail**
**Sandy Cranford**

07 Civ. 10595 (SHS)
May 29, 2008

5 (Pages 14 to 17)

---

**Page 14**

1    Q.   Were they always the same people, or did
2   they change over time?
3       A.   No.  They were always the same people.
4       Q.   Can you give me the names?
5       A.   Yes.  Veronica Dowd, human resources
6   information systems; Erica Little was coordinator
7   for health and welfare plans; and Carolyn Helms was
8   coordinator for retirement plans.
9       Q.   Do you know when Lester Nail's employment
10  was terminated by Paramount Parks?
11      A.   I believe that was around August '06.
12  Yes.
13      Q.   Did you ever speak to him after that?
14      A.   No.
15      Q.   Did you ever have any written
16  correspondence with him after that?
17      A.   No.
18      Q.   Did you ever speak to Mr. Nail's wife
19  after his termination?
20      A.   Yes.
21      Q.   How many times?
22      A.   Two times.
23      Q.   When was the first time?
24      A.   The first time was around January '07.
25      Q.   When was the second time?

---

**Page 15**

1       A.   Would have been late May or first part of
2   June of '07.
3       Q.   You spoke to her on the phone?
4       A.   Yes.
5       Q.   Let's talk about the January '07
6   conversation.  Did you call her, or did she call
7   you?
8       A.   She called me.
9       Q.   Okay.  And what was she calling you
10  about?
11      A.   Lester had been hospitalized, and they
12  were having some problems with their claims at the
13  hospital.
14      Q.   And do you recall what was discussed in
15  that conversation?
16      A.   I just contacted the carrier to get the
17  claims straightened out for them.
18      Q.   Anything else?
19      A.   No.
20      Q.   Was there any discussion about whether
21  Mr. Nail was employed elsewhere in that
22  conversation?
23      A.   No.
24      Q.   So that conversation, at least, was
25  strictly about this medical issue?

---

**Page 16**

1       A.   That's correct.
2       Q.   Was anyone else present during that
3   conversation?
4       A.   No.
5       Q.   Okay.  And the next conversation was in
6   late May or early June 2007 you said?
7       A.   That's correct.
8       Q.   Did you call her, or did she call you?
9       A.   No.  She called me.
10      Q.   And what was she calling about?
11      A.   She had the open enrollment package.  And
12  she wanted to make sure she had all the forms
13  completed correctly so she could send them back to
14  me.
15      Q.   And I'd like you to describe as
16  accurately as you can remember what was discussed
17  in that conversation and the order it was
18  discussed, if you can remember it that well.
19      A.   Okay.  Yeah.  The claims form we went
20  through was an Anthem medical form, a MetLife
21  dental form and a VSP vision form.  And we just
22  went through those to make sure she had everything
23  completed before she faxed them over to me.  I
24  asked her how Lester was doing.  And she said that
25  he was doing good.  She just wished he could find a

---

**Page 17**

1   job.  He was enjoying spending some time with the
2   kids.  I could hear him in the background playing.
3   And so I told her to tell Lester I said hello and
4   wish him well.
5       Q.   Do you remember anything else about that
6   conversation?
7       A.   No.
8       Q.   Do you recall whether Ms. Nail said that
9   she wished he could find a job period or whether
10  she was referring to him finding a job near where
11  they lived?
12      A.   No.  She just said she wished he could
13  find a job.
14      Q.   And do you know where she was calling
15  from?
16      A.   No, I don't.
17      Q.   Was it from their home?  Was that your
18  impression?
19      A.   I don't know that.  I do know she said
20  they were outside.
21      Q.   You said you heard Mr. Nail in the
22  background.  How did you know it was him?
23      A.   I know Lester's voice.  I could hear him
24  playing with the kids.
25      Q.   What was he saying?

---

Case 1:07-cv-10595-SHS    Document 31-7    Filed 07/11/2008    Page 6 of 21

**Paramount Parks, Inc. v. Lester Nail**
**Sandy Cranford**

07 Civ. 10595 (SHS)
May 29, 2008

6 (Pages 18 to 21)

**Page 18**

1    A. I couldn't hear what he was saying.
2    Q. So you just generally recognized his
3 voice, but you couldn't make out the words?
4    A. Correct.
5    Q. Was there any discussion in that
6 conversation about where they were living?
7    A. No.
8    Q. Was there any discussion in that
9 conversation about them changing addresses?
10    A. No.
11    Q. Or about them moving?
12    A. No.
13    Q. Is there anything else at all that you
14 recall about that conversation?
15    A. No. It was very short.
16    Q. I want you to take a look at one of the
17 documents that you should have there, Defendant's
18 Exhibit H.
19    MS. KIRILA: Michael, would you just
20 describe what that is so we know?
21    MR. PAPPAS: Sure. It's the May 21st,
22    2000 letter to Mr. Nail from Mr. Freeman with
23    attachments, and it's LES00001 through 8.
24    MS. KIRILA: Okay. We do have that.
25    A. I got it.

**Page 19**

1    Q. Okay. Do you recognize that document?
2    A. Yes.
3    Q. What is it?
4    A. It was a letter that corporate mailed out
5 to Lester.
6    Q. And there are certain forms attached to
7 it, correct?
8    A. Yes.
9    Q. And are these the forms that you reviewed
10 or talked about with Ms. Nail in your phone
11 conversation?
12    A. Yes.
13    Q. Do you recall any specific questions she
14 had about them?
15    A. No, I don't.
16    Q. Do you recall anything you said about how
17 to fill them out?
18    A. Just to fill out all the open spaces;
19 anything that was marked out, she did not have to
20 complete; and sign and date it.
21    Q. If you turn to the fourth page, which is
22 LES00004.
23    A. Yes.
24    Q. It's like a handwritten -- almost looks
25 like a fax cover sheet or something that says,

**Page 20**

1 "Attention: Sandy Cranford." Do you see that?
2    A. Yes.
3    Q. And it's "Re: insurance forms
4 Lester C. Nail." Do you see that?
5    A. Yes.
6    Q. Did you receive these forms by fax from
7 the Nails?
8    A. Yes, I did.
9    Q. Okay. And when you received them, they
10 were filled out as indicated in this exhibit,
11 correct?
12    A. Correct.
13    Q. Except where it's redacted, which was
14 done by the attorneys.
15    A. Can you repeat that? I couldn't hear
16 you.
17    Q. Sure. Except as where redacted, which
18 was done by the attorneys after the fact.
19    A. Yes. I see down at the bottom.
20    Q. Okay. Take a look at the second page of
21 the exhibit. There's a declaration section. Do
22 you see that?
23    A. Yes.
24    Q. Was this for all of the benefits or for
25 only certain benefits?

**Page 21**

1    A. This would have been for his dental
2 benefits.
3    Q. Okay. And you see, I think the second
4 line down says: "The employee declares that he or
5 she is actively at work on the date of this
6 enrollment form." Do you see that?
7    A. Yes.
8    Q. As far as you know, was there a
9 requirement by either the insurance company or
10 Paramount Parks that the person, in order to be
11 eligible for these benefits, had to be actively at
12 work?
13    A. I would not know that.
14    Q. Do you know whether terminated employees
15 were eligible for these benefits?
16    A. No.
17    Q. Do you know whether terminated employees
18 would not be eligible for these benefits?
19    A. No.
20    Q. There's handwriting on the first page
21 below -- next to Mr. Freeman's signature. Do you
22 see that?
23    A. On the first page?
24    Q. Right.
25    A. Okay.

**Page 22**

1   Q.  Do you see that?
2   A.  Yes.
3   Q.  Do you know who's handwriting that is?
4   A.  I do not.  It's not mine.
5   Q.  Do you know what it refers to?  It looks
6   like it says Core and Buy-up with dollar signs next
7   to it.
8   A.  Those are the names of the two medical
9   plans.
10  Q.  What was Core?
11  A.  Core is the Anthem Core Plan.
12  Q.  Is that medical?
13  A.  Yes, that's a medical plan.  That's one
14  of the options.
15  Q.  And what was Buy-up?
16  A.  Buy-up is the name of the second option.
17  Q.  Bear with me one second.
18  A.  Okay.
19  Q.  After your telephone conversation with
20  Ms. Nail in late May, early June 2007, did you have
21  any discussion with anyone else about that
22  conversation?
23  A.  Yes.
24  Q.  Who?
25  A.  Craig Freeman.

**Page 23**

1   Q.  And when did you discuss it with him?
2   A.  Probably a couple weeks after I would
3   have talked to Linda Carol.
4   Q.  Linda Carol is Mr. Nail's wife, correct?
5   A.  That's correct.
6   Q.  And what did you discuss with Mr. Freeman
7   about that?
8   A.  He wanted to know if I had received all
9   the forms back from all of the executives and if I
10  had heard from them all.
11  Q.  What else?
12  A.  That was it.  He just wanted to make sure
13  that we had all the forms.  So I told him that I
14  had everybody's forms in.  I had spoken with a
15  couple of executives, and he asked me about each
16  one of them.
17  Q.  Did you give him any specifics about your
18  conversation with Ms. Nail?
19  A.  Yes.  I told him what I had talked to her
20  about.
21  Q.  What specifically did you tell him?
22  A.  I told him that we went through all the
23  forms to make sure she had everything correct and
24  that Lester was there at the time, but I didn't
25  talk to him.  He didn't talk to me.  Lester had not

**Page 24**

1   spoken with me since he left the company.  I also
2   told him that Linda said she wished he could find a
3   job and things would be better and wished him well.
4   Q.  Anything else?
5   A.  No.
6   Q.  Did Mr. Freeman have any response to
7   that?
8   A.  No.
9   Q.  Sorry.  Just to go back to the exhibit,
10  Defendant's H.  If you go to the fifth page, it
11  looks like a fax transmittal report.  Do you see
12  that?
13  A.  Yes.
14  Q.  And this indicates that it was faxed on
15  May 29th, 2007.  Do you see that?
16  A.  Yes.
17  Q.  Is that when you received these forms?
18  A.  That would be correct, I believe.
19  Q.  Okay.  Take a look at Defendant's D as in
20  David, which is the Personnel Action Request Form,
21  PPI000014.
22  A.  I have it.
23  Q.  Okay.  Is this the Personnel Action
24  Request Form that you referred to earlier when you
25  were talking about the documents you reviewed for

**Page 25**

1   the deposition?
2   A.  Yes.
3   Q.  And you filled this out, correct?
4   A.  Correct.
5   Q.  That's your signature down where it says
6   completed by?
7   A.  Yes.
8   Q.  And the date next to it, August 18th,
9   2006, was that the date you filled this out?
10  A.  Yes.
11  Q.  And up in the upper right, it says
12  effective date August 1, '06.  Do you see that?
13  A.  Yes.
14  Q.  What does that stand for?
15  A.  That would be the effective date of the
16  information that's on this form.
17  Q.  Okay.  And then if you go down towards
18  section G, separation -- do you see that?
19  A.  Yes.
20  Q.  The first box is date of termination
21  August 1, 2006, correct?
22  A.  Yes.
23  Q.  As you understood it, that was the
24  effective date of Mr. Nail's termination from
25  Paramount Parks, correct?

Case 1:07-cv-10595-SHS    Document 31-7    Filed 07/11/2008    Page 8 of 21

Paramount Parks, Inc. v. Lester Nail
Sandy Cranford

07 Civ. 10595 (SHS)
May 29, 2008

8 (Pages 26 to 29)

**Page 26**

1    A.  Yes.
2    Q.  There's some kind of squiggly line next
3  to the date there.  Do you see that?
4    A.  Yes.
5    Q.  Do you know what that is?
6    A.  That's 10Z.
7    Q.  And what is that?
8    A.  That is a termination code that is used
9  in our HRS system.
10    Q.  Oh.  So you put that in the wrong box, and
11  then you crossed it out?
12    A.  Yes, I did.
13    Q.  And then the next box over, termination
14  code, it looks like it says 10Z.
15    A.  Yes.
16    Q.  Is that what it says?
17    A.  That's correct.
18    Q.  Okay.  So that's what you originally put
19  in the first box, and then you put it in the
20  correct box under termination code, right?
21    A.  Right.
22    Q.  It looks like there's a line through the
23  Z.  Do you just put lines through your Zs, or is
24  that crossed out?
25    A.  I do not know where that line came from.

**Page 27**

1  I don't put lines through my Zs.
2    Q.  But in any event, the termination code
3  you put down was 10Z; is that right?
4    A.  Correct.
5    Q.  Do you know what that stands for?
6    A.  Yes.  It means termination other.
7    Q.  Termination other.  And what is
8  termination other?
9    A.  We use "other" whenever none of the other
10  termination codes in our system really apply.
11    Q.  Was there a termination code for
12  termination without cause?
13    A.  No.
14    Q.  Was there any typical situation where the
15  10Z code would be used?
16    A.  The only other reason maybe would be for
17  confidential reasons.
18    Q.  In other words, if the company didn't
19  want to disclose on this form what the specific
20  reason was?
21    A.  Right.
22    Q.  And the box next to that says rehire
23  status.  Do you see that?
24    A.  Yes.
25    Q.  And then it says circle one, and the

**Page 28**

1  letters N as in Nancy, P as in Peter, R as in
2  Robert and X as in Xavier.  Do you see that?
3    A.  Yes.
4    Q.  What do each of those letters stand for?
5    A.  Okay.  N stands for possible rehire the
6  next year.  P stands for possible rehire.  R stands
7  for rehire eligible.  And X stands for see file.
8    Q.  I'm sorry.  What does X stand for?
9    A.  See file.
10    Q.  Oh.  See file?
11    A.  Uh-huh.
12    Q.  So none of those letters stand for no,
13  this person will not be rehired?
14    A.  The X possibly could.
15    Q.  The X?
16    A.  Yes.
17    Q.  So the N doesn't stand for no.  It stands
18  for maybe next year?
19    A.  It stands for next year.  These codes are
20  used primarily for seasonals.
21    Q.  I see.  And you said X stands for see
22  file.  What does see file mean?
23    A.  See file means that something happened
24  with that employee that we would want to go back
25  and review their file before we would look at

**Page 29**

1  rehiring them.
2    Q.  Is there any handbook or key or anything
3  like that that would document what each of these
4  letters stands for as you just described?
5    A.  In our HRS system, there would be.
6    Q.  What is the HRS system?
7    A.  Cyborg.
8    Q.  That's a computer software system?
9    A.  That's correct.
10    Q.  Would you be able to get a copy of that?
11    A.  Yes.
12    Q.  Now, I notice here that you did not
13  circle any one of those letters; is that correct?
14    A.  That's correct.
15    Q.  Why didn't you?
16    A.  We didn't ever use this field for
17  full-time employees because if you were going to
18  rehire a full-time employee, you would always go
19  back through their file anyway.  It's primarily
20  used for seasonals because we employ -- over a
21  year, all of Paramount Parks employs 30,000
22  seasonals.  So it just makes it an easier way to
23  handle that volume of employees.
24    Q.  If you take a look near the top of the
25  form, the Paramount Parks logo, do you see that?

**Paramount Parks, Inc. v. Lester Nail**
**Sandy Cranford**

07 Civ. 10595 (SHS)
May 29, 2008

9 (Pages 30 to 33)

Page 30

1    A.  Yes.
2    Q.  And under it it says "A Viacom Company,"
3  right?
4    A.  Yes.
5    Q.  So is it accurate that you continued to
6  use these same forms after it was no longer a
7  Viacom Company?
8    A.  It took us a while for us to get all of
9  our forms changed over and get new ones printed.
10   Q.  So, yes, you continued to use these forms
11 after it was no longer a Viacom Company?
12   A.  Yes.
13   Q.  The next box over it says, "Medical
14 Termination Date."  Do you see that?
15   A.  Yes.
16   Q.  And you wrote 12/31/07, correct?
17   A.  Correct.
18   Q.  What does that stand for?
19   A.  That was the date that was given to me to
20 continue his medical benefits through.
21   Q.  Given to you by who?
22   A.  Craig Freeman.
23   Q.  Did you have any discussion with anyone
24 about how to fill out the rehire status box on this
25 form?

Page 31

1    A.  No.
2    Q.  The next box that you filled out -- down,
3  it says, "Severance/Separation Pay to Be Paid."  Do
4  you see that?
5    A.  Yes.
6    Q.  And there's a little dollar sign?
7    A.  Yes.
8    Q.  And then you wrote, "through 12/31/07,"
9  correct?
10   A.  Correct.
11   Q.  What does that refer to?
12   A.  That was the date that Craig gave me to
13 continue payments on Lester.
14   Q.  And you understood those payments to be
15 severance or separation pay?
16   A.  It was really payments based upon
17 employment contract information that Craig had
18 given me.
19   Q.  Do you have any understanding or view as
20 to whether those payments constituted either
21 severance or separation pay?
22   A.  No.
23   Q.  If you go down to the bottom of the form,
24 there's a couple of spaces for approvals.  Do you
25 see that?

Page 32

1    A.  Yes.
2    Q.  Vision HR approval and then corporate HR
3  approval, correct?
4    A.  Correct.
5    Q.  Did this form have to be approved by
6  either of those people?
7    A.  No.
8    Q.  As a matter of course, do you get
9  approval for these forms?
10   A.  At my level, I was allowed to complete
11 those forms and provide them to payroll.  Payroll
12 was the second approval.
13   Q.  Okay.  So you did not need to get those
14 approvals listed on the forms?
15   A.  Correct.
16   Q.  Take a look at Defendant's Exhibit N as
17 in Nancy, which is the e-mail from you to
18 Craig Freeman, November 19th, 2007, number
19 PPI000765.
20   A.  I have it.
21   Q.  Okay.  There's some handwriting on this.
22 Is that yours or Mr. Freeman's?
23   A.  It's not mine.  I don't know if it's
24 Craig's or not.
25   Q.  But you know it's not yours?

Page 33

1    A.  It's not mine.
2    Q.  And what is this e-mail about?
3    A.  This is -- Craig had asked me to come up
4  with a calculation for medical and dental for the
5  specific pay periods listed.
6    Q.  And this represented the value of the
7  medical and dental benefits provided to Lester Nail
8  for a certain period of time?
9    A.  Yes.
10   Q.  And how did you calculate these?
11   A.  The first column is the total cost to the
12 company for medical and dental.
13   Q.  Right.
14   A.  And then next over would have been the
15 deductions that the employee would pay.  And then
16 the last column would be the net of the company
17 cost less the employee cost, so, therefore, what
18 the company would pay towards his medical and
19 dental.
20   Q.  And do you see it says February to June
21 2007, and then there's the number $5,620.20?  Do
22 you see that?
23   A.  Yes.
24   Q.  How did you arrive at that sum?  The
25 reason I asked that is because if you look at the

Paramount Parks, Inc. v. Lester Nail
Sandy Cranford

07 Civ. 10595 (SHS)
May 29, 2008

**10 (Pages 34 to 37)**

Page 34

1  total in the columns underneath, it only comes to
2  $1,124.04.
3      A.  Take that amount times five months.
4      Q.  So the $1,124.04 was the monthly cost?
5      A.  That's correct.
6      Q.  Okay.  And the same with the time period
7  below that, July through September of 2007, the
8  monthly net cost to the company was $814.  And the
9  total for that time period was $2,442?
10     A.  That's correct.
11     Q.  Then below that you wrote, "I didn't know
12 if you wanted me to figure severance too, but I
13 came up with," and then there are some things
14 crossed out.  Do you see that?
15     A.  Yeah.  I miscalculated that.  The amount
16 was wrong.
17     Q.  So when you refer to severance, you mean
18 the -- basically the salary that he continued to be
19 paid --
20     A.  Yes.
21     Q.  -- as opposed to the value of the
22 benefits, correct?
23     A.  Yeah.  That would have been the total
24 cost of regular wages due during that pay period.
25     Q.  How did you miscalculate that?

Page 35

1      A.  Okay.  I've got to go back and look at
2  it.  I just remember miscalculating it.
3      Q.  It looks like you have $109,000.02
4  originally.
5      A.  I know why.  Because we only figured
6  benefits to September.  And I had only figured the
7  regular wages up to September.
8      Q.  So that was too much or too little?
9      A.  I believe that would have been -- well, I
10 know what it was because February to September are
11 even months, and our pay periods are two week --
12 bi-weekly pay periods.  So what makes up eight
13 months of benefits, I just estimated the severance
14 at the same eight months instead of two-week pay
15 periods.  Does that make sense?
16     Q.  Yes.
17     A.  Okay.
18     Q.  I asked your attorneys to bring some
19 documents that they had produced.  The first set is
20 a bunch of payroll check request forms starting
21 with PPI000018 and ending with PPI000049.
22         MR. PAPPAS:  I'd like to mark those all
23     as one exhibit.
24 (CRANFORD EXHIBIT A WAS MARKED FOR IDENTIFICATION)
25 BY MR. PAPPAS:

Page 36

1      Q.  Do you have those in front of you?
2      A.  Yes, I do.
3      Q.  Okay.  I'll show you what's been marked
4  as Exhibit -- Cranford A.  Can you tell me what
5  these are?
6      A.  These are payroll request forms.  And
7  what we do is we complete these any time we have
8  payments to go to payroll to instruct them what to
9  pay.
10     Q.  You filled all of these out, correct?
11     A.  I'm just flipping through them all to
12 make sure they're all mine.
13     Q.  Okay.
14     A.  Yep.  They're all mine.
15     Q.  Okay.  And these were payroll check
16 request forms for Mr. Nail from check date 08/11/06
17 through check date 10/19/07, correct?
18     A.  Yes.
19     Q.  Take a look at the form that's on top
20 PPI000018.
21     A.  Okay.
22     Q.  And in the section entitled Pay OP
23 Information -- is that what it says?
24     A.  It's called Pay CP Information.
25     Q.  Pay CP Information, do you see that?

Page 37

1      A.  Yes.
2      Q.  And then there's an amount written next
3  to severance pay $6,346.15.  Do you see that?
4      A.  Yes.
5      Q.  And I believe on all of these forms the
6  payment is indicated to be severance pay; is that
7  correct?
8      A.  Yes.  That's the line that we paid it
9  under.
10     Q.  Okay.  Did you have any understanding one
11 way or the other whether those payments were
12 severance pay or some other kind of pay?
13     A.  No.
14     Q.  But you did not characterize this as
15 regular pay, correct?
16     A.  Correct.
17     Q.  And then near the bottom it says the
18 "reason for check," and then you wrote, "severance
19 agreement."  Do you see that?
20     A.  Yes.
21     Q.  What does that refer to?
22     A.  That would have been his payment -- his
23 contract payment, his employee agreement based upon
24 the information Craig Freeman would have given me.
25 That would have been how much we owed him.

**Page 38**

1    Q.   Why did you refer to that as a severance
2  agreement?
3    A.   That's probably just what I'm used to
4  putting on these forms.
5    Q.   Why didn't you put down that it was an
6  employment agreement?
7    A.   I don't know.
8    Q.   Take a look at the next batch of
9  documents which looks like a combined register --
10 or it says PPI000052 through 150.
11    MR. PAPPAS:  And I'd like to mark those
12    as one exhibit also, Cranford B.
13 (CRANFORD EXHIBIT B WAS MARKED FOR IDENTIFICATION)
14 BY MR. PAPPAS:
15    Q.   Do you have that in front of you?
16    A.   Yes.
17    Q.   What is it?
18    A.   These look like payroll registers.
19    Q.   Are they payroll registers?
20    A.   Yes.
21    Q.   Okay.  And who keeps these records?
22    A.   Payroll would.
23    Q.   Payroll of Paramount Parks?
24    A.   Yes.
25    Q.   Is this kept in the computer, and this is

**Page 39**

1  a computer printout?  Do you know?
2    A.   To be honest, I don't.  I think all this
3  stuff is kept electronically.
4    Q.   And these are regular records that are
5  kept with respect to all employees; is that
6  correct?
7    A.   I wouldn't know because I wasn't
8  responsible for payroll.
9    Q.   Okay.  But you recognize these as payroll
10 records, right?
11    A.   Yes.
12    Q.   And can you tell what time period these
13 are for?
14    A.   The one on the top is period ending
15 01/08/06.
16    Q.   And what do they go through?  What date
17 do they go through?
18    A.   The very last one I see is October 14th,
19 '07.
20    Q.   Okay.  And on the last page, do you see
21 where it says total pay, and then there's a
22 negative $6,383.65.  Do you see that?
23    A.   Yes.
24    Q.   And does that represent the reversal of
25 the direct deposit?

**Page 40**

1    MS. KIRILA:  Objection.  Assumes facts.
2    Go ahead.
3    A.   I wouldn't know that because I'm not
4  responsible for payroll.
5    Q.   Okay.  Do you have any understanding of
6  what the negative amount would mean?
7    A.   No.
8    Q.   Were you involved in any way in any
9  discussions regarding other reversal of a direct
10 deposit from Mr. Nail's account?
11    A.   No.
12    Q.   Do you know anything about that?
13    A.   No, I don't.
14    Q.   Have you ever had any discussions with
15 Richard Kinzel about Mr. Nail?
16    A.   No.
17    MR. PAPPAS:  Can you give me a couple
18    minutes?  I just want to see if I have any
19    other questions.
20    MS. KIRILA:  Sure.
21    (RECESS TAKEN)
22    MR. PAPPAS:  Okay.  I don't have any
23    other questions.
24    MS. KIRILA:  Thank you.  We'll read.
25    THE COURT REPORTER:  Mr. Pappas, do you

**Page 41**

1  need to order?
2    MR. PAPPAS:  Yes.
3    THE COURT REPORTER:  Would you like a
4  regular copy, a condensed or an e-tran or all
5  of the above?
6    MR. PAPPAS:  All of the above, I guess.
7    THE COURT REPORTER:  Okay.  Thank you.
8  (DEPOSITION CONCLUDED AT 2:44 P.M.)
9    (SIGNATURE RESERVED)
10    --oOo--
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Paramount Parks, Inc. v. Lester Nail
Sandy Cranford

07 Civ. 10595 (SHS)
May 29, 2008

**12 (Pages 42 to 44)**

| Page 42 | Page 44 |
|---|---|
| 1   STATE OF NORTH CAROLINA | 1  Page _____ Line _____ should read:_____ |
| 2   COUNTY OF MECKLENBURG | 2  Reason for change:_____ |
| 3     REPORTER'S CERTIFICATE | 3  Page _____ Line _____should read:_____ |
| 4     I, Joy R. Dick, a Notary Public in and for | 4  Reason for change:_____ |
| 5  the State of North Carolina, do hereby certify that | 5 |
| 6  there came before me on Thursday, the 29th day of | 6  Page_____ Line _____should read:_____ |
| 7  May 2008, the person hereinbefore named, who was by | 7  Reason for change:_____ |
| 8  me duly sworn to testify to the truth and nothing | 8 |
| 9  but the truth of his knowledge concerning the | 9  Page _____ Line _____should read:_____ |
| 10  matters in controversy in this cause; that the | 10  Reason for change:_____ |
| 11  witness was thereupon examined under oath, the | 11 |
| 12  examination reduced to typewriting under my | 12  Page _____ Line _____should read:_____ |
| 13  direction, and the deposition is a true record of | 13  Reason for change:_____ |
| 14  the testimony given by the witness. | 14 |
| 15     I further certify that I am neither | 15  Page _____ Line _____should read:_____ |
| 16  attorney or counsel for, nor related to or employed | 16  Reason for change:_____ |
| 17  by, any attorney or counsel employed by the parties | 17 |
| 18  hereto or financially interested in the action. | 18  Signature |
| 19     IN WITNESS WHEREOF, have hereto set my | 19  Sworn to and Subscribed before me |
| 20  hand, this the 3rd day of June 2008. | 20  _____, Notary Public. |
| 21 | 21  This _____ day of |
| 22 | 22  _____, 2007. |
|      Joy R. Dick, Notary Public | 23  My Commission Expires:_____ |
| 23     Notary Number: 200713700188 | 24 |
| 24 | 25 |
| 25 | |

| Page 43 | |
|---|---|
| 1     ERRATA SHEET | |
| 2 | |
| 3     Pursuant to Rule 30 (7) (e) of the Federal | |
| 4  Rules of Civil Procedure, any changes in form or | |
| 5  substance which you desire to make to your | |
| 6  deposition testimony shall be entered upon the | |
| 7  deposition with a statement of the reasons given | |
| 8  for making them. | |
| 9 | |
| 10     To assist you in making any such | |
| 11  corrections, please use the form below. If | |
| 12  supplemental or additional pages are necessary, | |
| 13  please furnish same and attach them to this errata | |
| 14  sheet. | |
| 15 | |
| 16     I, the undersigned, Sandy Cranford, do | |
| 17  hereby certify that I have read the foregoing | |
| 18  deposition and that to the best of my knowledge | |
| 19  said deposition is true and accurate (with the | |
| 20  exception of the following corrections listed | |
| 21  below). | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Paramount Parks, Inc. v. Lester Nail
Sandy Cranford

07 Civ. 10595 (SHS)
May 29, 2008
Page 45

## A

able
6:14 29:10
account
40:10
accountant
10:16,19
accounting
8:25
accurate
10:3,4 30:5 43:19
accurately
6:14 16:16
acquired
9:14 12:3,6
action
7:4 24:20,23 42:18
actively
21:5,11
additional
43:12
addresses
18:9
Administering
11:4
ago
8:7
agreement
37:19,23 38:2,6
ahead
40:2
alcoholic
6:7
allowed
32:10
amount
34:3,15 37:2 40:6
amusement
9:12
answer
5:17 6:3
answering
5:23
answers

5:20
Anthem
16:20 22:11
anticipate
6:5
anyway
5:19 29:19
APPEARANCES
2:1
apply
27:10
approval
32:2,3,9,12
approvals
31:24 32:14
approved
32:5
approximately
7:16 11:10
arrive
33:24
asked
16:24 23:15 33:3
33:25 35:18
asking
4:24
assist
43:10
associate
8:25
assume
5:13
Assumes
40:1
attach
43:13
attached
19:6
attachments
18:23
attend
7:19
attendance
11:7

Attention
20:1
attorney
4:13 6:17 7:9,20
8:20 42:16,17
attorneys
8:1,10 20:14,18
35:18
August
14:11 25:8,12,21
available
8:16
Avenue
2:8

## B

B
3:10 38:12,13
back
16:13 23:9 24:9
28:24 29:19 35:1
background
8:23 17:2,22
based
31:16 37:23
basically
34:18
batch
38:8
BATES
3:13
Bayes
12:25 13:1
Bear
22:17
behalf
2:2,7,21
believe
10:11 14:11 24:18
35:9 37:5
benefit
7:5 11:4
benefits
10:14,25 13:23

20:24,25 21:2,11
21:15,18 30:20
33:7 34:22 35:6
35:13
best
43:18
Beth
12:25 13:1
better
24:3
beverages
6:7
bi-weekly
35:12
bottom
20:19 31:23 37:17
Boulevard
2:23
box
25:20 26:10,13,19
26:20 27:22 30:13
30:24 31:2
break
6:4
briefly
7:12 12:7
bring
35:18
bunch
35:20
Buy-up
22:6,15,16
B-a-y-e-s
12:25

## C

C
20:4
calculate
33:10
calculation
33:4
call
7:3,13,21 15:6,6

16:8,8
called
2:20 15:8 16:9
36:24
calling
15:9 16:10 17:14
Carol
23:3,4
Carolina
1:10,17 2:23,24
42:1,5
Carolyn
14:7
Carowinds
2:23 9:9,10,11 10:3
11:14 13:14
carrier
15:16
Case
1:7,8
cause
27:12 42:10
Cedar
1:5 9:11,14 12:3,6
Center
2:4
certain
19:6 20:25 33:8
CERTIFICATE
42:3
certification
9:1,2
certify
42:5,15 43:17
change
11:13 14:2 44:2,4,7
44:10,13,16
changed
30:9
changes
43:4
changing
18:9
characterize

Paramount Parks, Inc. v. Lester Nail
Sandy Cranford

07 Civ. 10595 (SHS)
May 29, 2008

Page 46

37:14
**Charlotte**
1:17 2:23
**check**
3:9 35:20 36:15,16
   36:17 37:18
**circle**
27:25 29:13
**Civ**
1:2,7
**Civil**
43:4
**claims**
11:4 15:12,17
   16:19
**code**
26:8,14,20 27:2,11
   27:15
**codes**
27:10 28:19
**Columbus**
2:5
**column**
33:11,16
**columns**
34:1
**combined**
38:9
**come**
33:3
**comes**
34:1
**commencing**
2:25
**Commission**
44:23
**company**
11:20,21 21:9 24:1
   27:18 30:2,7,11
   33:12,16,18 34:8
**complete**
19:20 32:10 36:7
**completed**
16:13,23 25:6

**computer**
29:8 38:25 39:1
**computer-aided**
1:24
**concerning**
42:9
**CONCLUDED**
41:8
**condensed**
41:4
**conference**
7:13,21
**confidential**
27:17
**constituted**
31:20
**consumed**
6:7
**contacted**
15:16
**continue**
30:20 31:13
**continued**
30:5,10 34:18
**contract**
31:17 37:23
**controversy**
42:10
**conversation**
8:11 12:13 15:6,15
   15:22,24 16:3,5
   16:17 17:6 18:6,9
   18:14 19:11 22:19
   22:22 23:18
**coordinator**
13:22,23,24 14:6,8
**copy**
29:10 41:4
**Core**
22:6,10,11,11
**corporate**
9:22,23 10:16,19
   19:4 32:2
**corporation**

9:24
**correct**
4:20,21 6:22 9:25
   10:8 16:1,7 18:4
   19:7 20:11,12
   23:4,5,23 24:18
   25:3,4,21,25
   26:17,20 27:4
   29:9,13,14 30:16
   30:17 31:9,10
   32:3,4,15 34:5,10
   34:22 36:10,17
   37:7,15,16 39:6
**corrections**
43:11,20
**correctly**
16:13
**correspondence**
14:16
**cost**
33:11,17,17 34:4,8
   34:24
**counsel**
42:16,17
**COUNTY**
42:2
**couple**
23:2,15 31:24
   40:17
**course**
32:8
**court**
1:1,23 5:19 6:1
   40:25 41:3,7
**cover**
19:25
**CP**
36:24,25
**Craig**
8:4 22:25 30:22
   31:12,17 32:18
   33:3 37:24
**Craig's**
32:24

**Cranford**
1:15 2:20 4:1,6
   20:1 35:24 36:4
   38:12,13 43:16
**crossed**
26:11,24 34:14
**current**
9:6,18
**Cyborg**
29:7

────────────
**D**

**D**
3:15 24:19
**date**
19:20 21:5 25:8,9
   25:12,15,20,24
   26:3 30:14,19
   31:12 36:16,17
   39:16
**dates**
8:15
**David**
24:20
**day**
2:24 42:6,20 44:21
**declaration**
20:21
**declares**
21:4
**deductions**
33:15
**Defendant**
1:11 2:7,21
**Defendants**
1:16
**Defendant's**
18:17 24:10,19
   32:16
**degree**
8:25
**demotion**
11:15
**Dempsey**

2:3
**dental**
16:21 21:1 33:4,7
   33:12,19
**deposed**
8:9
**deposit**
39:25 40:10
**deposition**
1:15 2:20 4:16,23
   6:17 8:3,6,18 25:1
   41:8 42:13 43:6,7
   43:18,19
**describe**
16:15 18:20
**described**
29:4
**desire**
43:5
**Dick**
1:23 2:21 42:4,22
**direct**
39:25 40:9
**direction**
42:13
**Director**
9:7
**disclose**
27:19
**discuss**
23:1,6
**discussed**
8:14 15:14 16:16
   16:18
**discussion**
15:20 18:5,8 22:21
   30:23
**discussions**
40:9,14
**DISTRICT**
1:1,1
**document**
19:1 29:3
**documents**

6:24 7:2 18:17
24:25 35:19 38:9
**doing**
16:24,25
**dollar**
22:6 31:6
**Dowd**
14:5
**DRIVE**
1:5,9
**drives**
10:25
**drugs**
6:10
**due**
34:24
**duly**
4:2 42:8
**duties**
10:2,20 11:7

_____
**E**

**e**
43:3
**earlier**
24:24
**early**
16:6 22:20
**easier**
6:1 29:22
**ECF**
1:8
**education**
8:24
**effective**
25:12,15,24
**eight**
12:23 35:12,14
**either**
21:9 31:20 32:6
**electronically**
39:3
**eligible**
21:11,15,18 28:7

**employ**
29:20
**employed**
9:3,13 15:21 42:16
42:17
**employee**
21:4 28:24 29:18
33:15,17 37:23
**employees**
11:5 21:14,17
29:17,23 39:5
**employment**
14:9 31:17 38:6
**employs**
29:21
**enjoying**
17:1
**enrollment**
7:5 16:11 21:6
**entered**
43:6
**entire**
5:22
**entitled**
36:22
**Erica**
14:6
**errata**
43:1,13
**Esquire**
2:3,7
**estimated**
35:13
**event**
27:2
**everybody's**
23:14
**examination**
4:4 42:12
**EXAMINATIONS**
3:1
**examined**
4:2 42:11
**exception**

43:20
**Excuse**
12:11
**executives**
23:9,15
**exhibit**
3:8 18:18 20:10,21
24:9 32:16 35:23
35:24 36:4 38:12
38:13
**EXHIBITS**
3:6,12
**Expires**
44:23
**e-mail**
32:17 33:2
**e-tran**
41:1

_____
**F**

**fact**
20:18
**facts**
40:1
**Fair**
9:11,14 12:3,6
**familiar**
4:19
**far**
21:8
**fax**
19:25 20:6 24:11
**faxed**
16:23 24:14
**February**
33:20 35:10
**Federal**
43:3
**field**
29:16
**fifth**
24:10
**figure**
34:12

**figured**
35:5,6
**file**
1:2 28:7,9,10,22,22
28:23,25 29:19
**fill**
19:17,18 30:24
**filled**
20:10 25:3,9 31:2
36:10
**Finance**
12:21
**financially**
42:18
**find**
16:25 17:9,13 24:2
**finding**
17:10
**fine**
4:11
**finish**
5:22
**first**
4:2 10:17 11:19
14:23,24 15:1
21:20,23 25:20
26:19 33:11 35:19
**five**
34:3
**flipping**
36:11
**following**
43:20
**follows**
4:3
**foregoing**
43:17
**form**
3:9 7:4 16:19,20,21
16:21 21:6 24:20
24:24 25:16 27:19
29:25 30:25 31:23
32:5 36:19 43:4
43:11

**forms**
7:5 16:12 19:6,9
20:3,6 23:9,13,14
23:23 24:17 30:6
30:9,10 32:9,11
32:14 35:20 36:6
36:16 37:5 38:4
**fourth**
19:21
**Freeman**
8:4,5 18:22 22:25
23:6 24:6 30:22
32:18 37:24
**Freeman's**
21:21 32:22
**front**
36:1 38:15
**full-time**
29:17,18
**furnish**
43:13
**further**
42:15

_____
**G**

**G**
25:18
**general**
11:6 13:13
**generally**
10:1 18:2
**give**
5:20 8:8,23 14:4
23:17 40:17
**given**
30:19,21 31:18
37:24 42:14 43:7
**go**
24:9,10 25:17
28:24 29:18 31:23
35:1 36:8 39:16
39:17 40:2
**going**
4:24 29:17

Paramount Parks, Inc. v. Lester Nail
Sandy Cranford

07 Civ. 10595 (SHS)
May 29, 2008

Page 48

**good**
4:6 16:25
**guess**
41:6

**H**

**H**
3:14 18:18 24:10
**hand**
42:20
**handbook**
29:2
**handle**
29:23
**handwriting**
21:20 22:3 32:21
**handwritten**
19:24
**happened**
28:23
**head**
5:17,18
**heads**
8:8
**health**
13:22 14:7
**hear**
4:9,10,11 5:4,7
17:2,23 18:1
20:15
**heard**
5:13 17:21 23:10
**hello**
17:3
**Helms**
14:7
**hereinbefore**
42:7
**hereto**
42:18,19
**Hi**
4:8
**High**
2:4

**highest**
8:24
**hiring**
11:2
**home**
17:17
**honest**
39:2
**hospital**
15:13
**hospitalized**
15:11
**hours**
6:8,11 7:16
**HR**
32:2,2
**HRS**
26:9 29:5,6
**human**
9:1,7,22 10:6,9,13
10:22,23,25 12:16
13:4,16,24 14:5
**Huntington**
2:4

**I**

**IDENTIFICATI...**
35:24 38:13
**impression**
17:18
**included**
7:21
**INDEX**
3:1,6
**indicate**
5:12
**indicated**
20:10 37:6
**indicates**
24:14
**information**
10:13,24 11:1,8
13:24 14:6 25:16
31:17 36:23,24,25

37:24
**instruct**
36:8
**insurance**
20:3 21:9
**interested**
42:18
**involved**
40:8
**in-person**
7:14
**issue**
15:25
**issues**
11:5,5

**J**

**January**
14:24 15:5
**Jill**
2:3 6:20
**Jkirila@ssd.com**
2:5
**job**
17:1,9,10,13 24:3
**John**
13:11
**Joy**
1:23 2:21 42:4,22
**July**
12:9 34:7
**June**
15:2 16:6 22:20
33:20 42:20

**K**

**keeps**
38:21
**kept**
38:25 39:3,5
**key**
29:2
**kids**
17:2,24
**kind**

26:2 37:12
**Kinzel**
40:15
**Kirila**
2:3 6:20 7:23 18:19
18:24 40:1,20,24
**know**
5:4,8,9,25 6:4 14:9
17:14,19,19,22,23
18:20 21:8,13,14
21:17 22:3,5 23:8
26:5,25 27:5
32:23,25 34:11
35:5,10 38:7 39:1
39:7 40:3,12
**knowledge**
42:9 43:18
**Koontz**
12:19 13:8
**K-o-o-n-t-z**
12:19

**L**

**late**
12:9 15:1 16:6
22:20
**lateral**
11:15
**lawsuit**
4:14
**left**
24:1
**Lester**
1:9 4:13 11:17 14:9
15:11 16:24 17:3
19:5 20:4 23:24
23:25 31:13 33:7
**Lester's**
17:23
**LES00001**
3:14 18:23
**LES00004**
19:22
**LES00008**

3:14
**letter**
18:22 19:4
**letters**
28:1,4,12 29:4,13
**Let's**
15:5
**level**
8:24 32:10
**limited**
10:3
**Linda**
23:3,4 24:2
**line**
21:4 26:2,22,25
37:8 44:1,3,6,9,12
44:15
**lines**
26:23 27:1
**listed**
32:14 33:5 43:20
**little**
11:2 14:6 31:6 35:8
**Littler**
2:8
**lived**
17:11
**living**
18:6
**LLP**
2:3
**logo**
29:25
**long**
6:5 7:14,17 9:3,18
12:22 13:5
**longer**
30:6,11
**look**
18:16 20:20 24:19
28:25 29:24 32:16
33:25 35:1 36:19
38:8,18
**looks**

19:24 22:5 24:11
26:14,22 35:3
38:9
**Lori**
7:22

___ **M** ___

**mailed**
19:4
**main**
10:23
**making**
43:8,10
**manager**
9:22 10:6,9,13,22
12:16 13:13,15
**mark**
35:22 38:11
**marked**
3:8 19:19 35:24
36:3 38:13
**matter**
32:8
**matters**
42:10
**mean**
9:23 28:22 34:17
40:6
**means**
27:6 28:23
**MECKLENBURG**
42:2
**medical**
15:25 16:20 22:8
22:12,13 30:13,20
33:4,7,12,18
**medications**
6:10
**meeting**
8:1
**Mendelson**
2:8
**MetLife**
16:20

**Michael**
2:7 4:7 18:19
**Mike**
12:19
**mine**
22:4 32:23 33:1
36:12,14
**minutes**
7:18 40:18
**miscalculate**
34:25
**miscalculated**
34:15
**miscalculating**
35:2
**MONTEREY**
1:9
**month**
11:24
**monthly**
34:4,8
**months**
12:23 34:3 35:11
35:13,14
**MOORE**
1:9
**morning**
4:6
**move**
11:15
**moving**
18:11

___ **N** ___

**N**
3:16 28:1,5,17
32:16
**Nail**
1:9 4:13 11:17 12:5
15:21 17:8,21
18:22 19:10 20:4
22:20 23:18 33:7
36:16 40:15
**Nails**

20:7
**Nail's**
14:9,18 23:4 25:24
40:10
**name**
22:16
**named**
42:7
**names**
14:4 22:8
**name's**
4:6
**Nancy**
28:1 32:17
**near**
17:10 29:24 37:17
**necessary**
43:12
**need**
5:16 32:13 41:1
**negative**
39:22 40:6
**neither**
42:15
**net**
33:16 34:8
**new**
1:1 2:9,9 30:9
**nod**
5:18
**North**
1:17 2:22,24 42:1,5
**Notary**
2:22 42:4,22,23
44:20
**notice**
29:12
**November**
13:6 32:18
**number**
3:8,13,13 32:18
33:21 42:23

___ **O** ___

**oath**
42:11
**Objection**
40:1
**obviously**
5:18
**October**
9:20 11:11,12
39:18
**Oh**
28:10
**Ohio**
1:5 2:5
**okay**
4:9,10,12,15,19,22
5:5,6,11,14,15,24
6:16 7:6,14 8:22
10:20 11:24 12:12
15:9 16:5,19
18:24 19:1 20:9
20:20 21:3,25
22:18 24:19,23
25:17 26:18 28:5
32:13,21 34:6
35:1,17 36:3,13
36:15,21 37:10
38:21 39:9,20
40:5,22 41:7
**Once**
7:12
**ones**
30:9
**oOo**
41:10
**OP**
36:22
**open**
16:11 19:18
**opposed**
34:21
**option**
22:16
**options**
22:14

**order**
16:17 21:10 41:1
**organization**
9:14
**originally**
26:18 35:4
**outside**
17:20
**owed**
37:25
**owned**
9:11,16

___ **P** ___

**P**
2:7 28:1,6
**package**
16:11
**page**
3:2,13 19:21 20:20
21:20,23 24:10
39:20 44:1,3,6,9
44:12,15
**pages**
43:12
**paid**
31:3 34:19 37:8
**Pappas**
2:7 3:3 4:5,7 18:21
35:22,25 38:11,14
40:17,22,25 41:2
41:6
**Paramount**
1:4 4:14,18 9:4,8
9:13,24 10:2,10
10:18,22 11:14,23
12:2,6,17 13:16
14:10 21:10 25:25
29:21,25 38:23
**PARF**
7:3
**park**
9:12
**Parks**

Paramount Parks, Inc. v. Lester Nail
Sandy Cranford

07 Civ. 10595 (SHS)
May 29, 2008

Page 50

1:4 4:14,18 9:4,8
9:13,24 10:2,10
10:18,22 11:14,23
12:2,6,17 13:16
14:10 21:10 25:25
29:21,25 38:23
**part**
15:1
**parties**
42:17
**pay**
31:3,15,21 33:5,15
33:18 34:24 35:11
35:12,14 36:9,22
36:24,25 37:3,6
37:12,12,15 39:21
**payment**
37:6,22,23
**payments**
31:13,14,16,20
36:8 37:11
**payroll**
3:9,10 10:25 32:11
32:11 35:20 36:6
36:8,15 38:18,19
38:22,23 39:8,9
40:4
**PC**
2:8
**people**
13:19 14:1,3 32:6
**period**
17:9 33:8 34:6,9,24
39:12,14
**periods**
33:5 35:11,12,15
**person**
7:12 12:18 21:10
28:13 42:7
**Personal**
7:4
**Personnel**
24:20,23
**Peter**

28:1
**phone**
5:3,16 15:3 19:10
**Plaintiff**
1:7 2:2
**plan**
22:11,13
**plans**
11:6 13:23 14:7,8
22:9
**playing**
17:2,24
**please**
5:4,20 6:4 43:11,13
**point**
1:5 13:8
**position**
9:6,19,21 10:12,17
11:9,13 12:20
13:3,12
**positions**
13:21
**possible**
28:5,6
**possibly**
28:14
**PPI000014**
3:15 24:21
**PPI000018**
35:21 36:20
**PPI000049**
35:21
**PPI000052**
38:10
**PPI000765**
3:16 32:19
**preliminary**
4:23
**preparation**
6:25 7:15,17,19
**prepare**
7:8
**present**
8:10 16:2

**President**
13:4,13
**previous**
10:6
**previously**
4:18
**PREVIOUSLY-...**
3:12
**primarily**
28:20 29:19
**printed**
30:9
**printout**
39:1
**probably**
7:18 8:7,8 12:7,9
23:2 38:3
**problems**
15:12
**Procedure**
43:4
**proceed**
4:24
**process**
4:20
**produced**
1:24 35:19
**professional**
9:1
**promotion**
11:15,16
**provide**
32:11
**provided**
33:7
**Public**
2:22 42:4,22 44:20
**Pursuant**
43:3
**put**
26:10,18,19,23
27:1,3 38:5
**putting**
38:4

**p.m**
2:25 41:8

_____
Q
_____
**question**
5:7,14,22 6:1,3
**questions**
4:25 5:4 8:23 19:13
40:19,23

_____
R
_____
**R**
1:23 2:21 28:1,6
42:4,22
**read**
40:24 43:17 44:1,3
44:6,9,12,15
**really**
27:10 31:16
**reason**
6:13 27:16,20
33:25 37:18 44:2
44:4,7,10,13,16
**reasons**
27:17 43:7
**recall**
7:7 11:24 12:12
15:14 17:8 18:14
19:13,16
**receive**
20:6
**received**
20:9 23:8 24:17
**RECESS**
40:21
**recognize**
19:1 39:9
**recognized**
18:2
**reconciling**
11:5
**record**
42:13
**records**
38:21 39:4,10

**redacted**
20:13,17
**reduced**
42:12
**refer**
31:11 34:17 37:21
38:1
**REFERENCED**
3:12
**referred**
24:24
**referring**
11:22 17:10
**refers**
22:5
**regarding**
8:2 40:9
**register**
3:10 38:9
**registers**
38:18,19
**regular**
34:24 35:7 37:15
39:4 41:4
**rehire**
27:22 28:5,6,7
29:18 30:24
**rehired**
28:13
**rehiring**
29:1
**related**
42:16
**remarks**
4:23
**remember**
8:13 12:8 16:16,18
17:5 35:2
**repeat**
5:5 20:15
**rephrase**
5:9
**report**
12:15,16,22,24

Paramount Parks, Inc. v. Lester Nail
Sandy Cranford

07 Civ. 10595 (SHS)
May 29, 2008
Page 51

13:5,7,10,17
24:11
**reported**
1:23 12:18 13:8
**reporter**
1:23 5:19 6:2 40:25
41:3,7
**REPORTER'S**
42:3
**represent**
39:24
**represented**
6:16 33:6
**request**
3:9 7:4 24:20,24
35:20 36:6,16
**requirement**
21:9
**RESERVED**
41:9
**resources**
9:2,7,22 10:7,10,13
10:22,24 11:1
12:16 13:4,16,24
14:5
**respect**
39:5
**response**
24:6
**responsibilities**
10:21
**responsibility**
10:23
**responsible**
11:1 39:8 40:4
**rest**
5:25
**retirement**
11:6 13:23 14:8
**reversal**
39:24 40:9
**review**
6:24 28:25
**reviewed**

19:9 24:25
**Richard**
40:15
**right**
7:22,23 21:24
25:11 26:20,21
27:3,21 30:3
33:13 39:10
**Robert**
28:2
**room**
6:21
**Rule**
43:3
**Rules**
43:4

_____

**S**

**S**
2:3
**salary**
34:18
**Sanders**
2:3
**SANDUSKY**
1:5
**Sandy**
1:15 2:20 4:1 20:1
43:16
**saying**
17:25 18:1
**says**
19:25 21:4 22:6
25:5,11 26:14,16
27:22,25 30:2,13
31:3 33:20 36:23
37:17 38:10 39:21
**seasonals**
28:20 29:20,22
**second**
14:25 20:20 21:3
22:16,17 32:12
**section**
20:21 25:18 36:22

**see**
5:18 20:1,4,19,22
21:3,6,22 22:1
24:11,15 25:12,18
26:3 27:23 28:2,7
28:9,10,21,21,22
28:23 29:25 30:14
31:4,25 33:20,22
34:14 36:25 37:3
37:19 39:18,20,22
40:18
**send**
16:13
**Senior**
12:21
**sense**
35:15
**separation**
25:18 31:15,21
**September**
34:7 35:6,7,10
**sessions**
7:20
**set**
35:19 42:19
**severance**
31:15,21 34:12,17
35:13 37:3,6,12
37:18 38:1
**Severance/Separ...**
31:3
**shake**
5:17
**Shanrock**
13:11
**sheet**
19:25 43:1,14
**short**
18:15
**show**
36:3
**SHS**
1:2,7
**sign**

19:20 31:6
**signature**
21:21 25:5 41:9
44:18
**signs**
22:6
**simultaneously**
13:7
**sitting**
6:21
**situation**
27:14
**software**
29:8
**somewhat**
4:19
**sorry**
10:6 12:11 24:9
28:8
**South**
1:9,10 2:4
**SOUTHERN**
1:1
**spaces**
19:18 31:24
**speak**
8:2,5 12:5 14:13,18
**specific**
11:24 19:13 27:19
33:5
**specifically**
23:21
**specifics**
23:17
**spending**
17:1
**spoke**
11:19 15:3
**spoken**
11:17 23:14 24:1
**squiggly**
26:2
**Squire**
2:3

**stand**
25:14 28:4,8,12,17
30:18
**stands**
27:5 28:5,6,6,7,17
28:19,21 29:4
**starting**
35:20
**State**
2:22 42:1,5
**statement**
43:7
**STATES**
1:1
**status**
27:23 30:24
**Stenotype**
1:23
**straightened**
15:17
**Street**
2:4
**strictly**
15:25
**stuff**
39:3
**subject**
12:12
**Subscribed**
44:19
**substance**
43:5
**sum**
33:24
**supplemental**
43:12
**sure**
16:12,22 18:21
20:17 23:12,23
36:12 40:20
**sworn**
4:2,25 42:8 44:19
**system**
10:24,24 26:9

Paramount Parks, Inc. v. Lester Nail
Sandy Cranford

07 Civ. 10595 (SHS)
May 29, 2008

Page 52

27:10 29:5,6,8
**systems**
10:14 13:25 14:6

_____

**T**
**take**
5:19 6:2,4 18:16
20:20 24:19 29:24
32:16 34:3 36:19
38:8
**taken**
1:16 4:16 6:10 8:18
40:21
**talk**
15:5 23:25,25
**talked**
19:10 23:3,19
**talking**
24:25
**telephone**
2:7 7:17 22:19
**tell**
4:25 8:17 17:3
23:21 36:4 39:12
**terminated**
14:10 21:14,17
**termination**
14:19 25:20,24
26:8,13,20 27:2,6
27:7,8,10,11,12
30:14
**testified**
4:3
**testify**
6:14 42:8
**testimony**
6:25 7:8 42:14 43:6
**Thank**
40:24 41:7
**things**
24:3 34:13
**think**
5:25 21:3 39:2
**Third**

2:8
**thought**
8:17
**three**
8:7 13:20
**Thursday**
1:18 2:24 42:6
**time**
6:4,6 10:21 11:19
13:15 14:2,23,24
14:25 17:1 23:24
33:8 34:6,9 36:7
39:12
**times**
7:11 14:21,22 34:3
**title**
10:6
**today**
6:14
**told**
17:3 23:13,19,22
24:2
**top**
29:24 36:19 39:14
**total**
33:11 34:1,9,23
39:21
**tracking**
11:7
**Transcript**
1:24
**transcription**
1:24
**transmittal**
24:11
**true**
42:13 43:19
**truth**
4:25 42:8,9
**truthfully**
6:14
**try**
5:9
**trying**

5:8
**turn**
19:21
**two**
7:16 14:22 22:8
35:11
**two-week**
35:14
**typewriting**
42:12
**typical**
27:14

_____

**U**
**Uh-huh**
28:11
**underneath**
34:1
**undersigned**
43:16
**understand**
5:1,8
**understandable**
5:10
**understanding**
31:19 37:10 40:5
**understood**
5:13 25:23 31:14
**unemployment**
11:2
**UNITED**
1:1
**upper**
25:11
**use**
27:9 29:16 30:6,10
43:11

_____

**V**
**vacation**
11:7
**value**
33:6 34:21
**verbally**
5:17,20

**Veronica**
14:5
**Viacom**
9:16 30:2,7,11
**Vice**
13:4,13
**view**
31:19
**vision**
16:21 32:2
**voice**
17:23 18:3
**volume**
29:23
**VP**
12:21
**vs**
1:8
**VSP**
16:21

_____

**W**
**wages**
34:24 35:7
**wait**
6:2
**want**
4:22 6:3 18:16
27:19 28:24 40:18
**wanted**
8:8,22 16:12 23:8
23:12 34:12
**wasn't**
39:7
**way**
29:22 37:11 40:8
**week**
35:11
**weeks**
8:7 23:2
**welfare**
13:22 14:7
**went**
16:19,22 23:22

**We'll**
40:24
**we're**
5:3,16
**WHEREOF**
42:19
**wife**
14:18 23:4
**wish**
17:4
**wished**
16:25 17:9,12 24:2
24:3
**witness**
2:20 42:11,14,19
**words**
18:3 27:18
**work**
21:5,12
**worked**
10:1 11:20,23
**wouldn't**
39:7 40:3
**written**
14:15 37:2
**wrong**
26:10 34:16
**wrote**
30:16 31:8 34:11
37:18

_____

**X**
**X**
28:2,7,8,14,15,21
**Xavier**
28:2

_____

**Y**
**Yeah**
16:19 34:15,23
**year**
11:25 28:6,18,19
29:21
**years**
9:5

**Yep**
36:14
**York**
1:1 2:9,9

_____

**Z**

**Z**
26:23
**Zancourides**
7:22
**Zs**
26:23 27:1

_____

**$**

**$1,124.04**
34:2,4
**$109,000.02**
35:3
**$2,442**
34:9
**$5,620.20**
33:21
**$6,346.15**
37:3
**$6,383.65**
39:22
**$814**
34:8

_____

**0**

**01/08/06**
39:15
**06**
12:10,11 14:11
25:12
**07**
1:2,7 12:9,10 13:6
14:24 15:2,5
39:19
**08/11/06**
36:16

_____

**1**

**1**
25:12,21

**1:58**
2:25
**10Z**
26:6,14 27:3,15
**10/19/07**
36:17
**10022**
2:9
**10595**
1:2,7
**12/31/07**
30:16 31:8
**1300**
2:4
**14th**
39:18
**14532**
2:23
**150**
38:10
**17**
3:14
**18th**
25:8
**19th**
32:18
**1986**
13:6
**1998**
10:11 11:10

_____

**2**

**2:44**
41:8
**20**
7:18
**2000**
18:22
**2006**
25:9,21
**2007**
9:20 11:11,12 16:6
22:20 24:15 32:18
33:21 34:7 44:22

**200713700188**
42:23
**2008**
1:18 2:25 42:7,20
**21st**
18:21
**212**
2:9
**22**
9:5
**23**
3:15
**24**
6:8,11
**29th**
1:18 2:24 24:15
42:6
**29369**
1:10

_____

**3**

**3rd**
42:20
**30**
7:18 43:3
**30,000**
29:21
**31**
3:16
**34**
3:9
**37**
3:10
**375**
1:9

_____

**4**

**4**
3:3
**41**
2:4
**43215**
2:5
**44870-5259**
1:6

_____

**5**

**583-9600**
2:9

_____

**7**

**7**
43:3

_____

**8**

**8**
18:23
**885**
2:8

LEXSEE 1998 N.Y. MISC. LEXIS 701



Cited
As of: Jul 11, 2008

**MTV NETWORKS, A DIVISION OF VIACOM INTERNATIONAL INC., Plaintiff, v. FOX KIDS WORLDWIDE, INC., NEWS CORP. LTD., and RICHARD CRONIN, Defendants.**

**Index No. 605580/97**

**SUPREME COURT OF NEW YORK, NEW YORK COUNTY**

*1998 N.Y. Misc. LEXIS 701*

**February 4, 1998, Decided
May 13, 1998, Filed**

**NOTICE:**

[*1] THE LEXIS PAGINATION OF THIS DOCUMENT IS SUBJECT TO CHANGE PENDING RELEASE OF THE FINAL PUBLISHED VERSION.

**DISPOSITION:** The motion for a preliminary injunction is granted. The preliminary injunction will expire on June 30, 1998.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, a cable television network, brought a motion for a preliminary injunction to enjoin defendant employee from working for defendant competitor for the one year period set forth in the non-competition agreement.

**OVERVIEW:** Defendant employee was employed by plaintiff, a cable television network. Defendant employee entered into an employment contract with one of defendant competitor, to commence at the conclusion of his contract with plaintiff. When it discovered the arrangement, plaintiff discharged defendant employee for cause, and sought a preliminary injunction to prevent defendant employee from competing for one year, as set forth in the non-compete clause of defendant employee's

employment contract with plaintiff. The court determined that plaintiff was entitled to such relief to prevent irreparable injury. The evidence established that defendant employee was a senior executive with unique talents, and that he played a key role in developing programming for plaintiff and setting goals and strategies. The court also rejected defendant employee's argument that he was entitled to make career plans to commence at the conclusion of his contract with plaintiff. Despite the fact that his employment with defendant competitor was not to begin until the end of plaintiff's contract, defendant employee received stock options from defendant corporation, creating a conflict of interest.

**OUTCOME:** The court granted plaintiff's, a cable television network, motion for a preliminary injunction to bar defendant employee from working for defendant competitor because plaintiff demonstrated that it would be irreparably injured if defendant employee was not prevented from violating the terms of his non-compete agreement.

**CORE TERMS:** employment agreement, termination, network, competitor, notice, terminate, cure, preliminary injunction, confidential information, trade secrets, stock option, front, employment contract, terminated, hereunder, signing, bonus, restrictive covenants,

irreparable, enforceable, cable network, written notice, base salary, non-compete, terminating, television, advertisers, expiration, fiduciary, salary

**LexisNexis(R) Headnotes**

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
[HN1] Generally, in order to obtain a preliminary injunction, a movant must show a likelihood of success on the merits, the potential for irreparable injury if the injunction is not granted, and a balance of the equities in movant's favor.

*Contracts Law > Types of Contracts > Covenants*
*Trade Secrets Law > Civil Actions > Remedies > Injunctive Relief > General Overview*
*Trade Secrets Law > Misappropriation Actions > Unfair Competition*
[HN2] While the courts of New York have adopted a strict approach in construing non-competition agreements and restrictive covenants in employment agreements, such agreements have been enforced when reasonable in scope, duration, and geographical area, when an injunction is necessary to protect the employer from unfair competition that stems from the employee's use or disclosure of trade secrets, or where the employee's services are unique or extraordinary.

*Contracts Law > Types of Contracts > Covenants*
*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements*
[HN3] While restrictive covenants which prevent employees from pursuing a similar vocation after termination of employment are disfavored, an employer is entitled to protection from unfair or illegal conduct that causes economic injury, especially where the employee's ability to earn a living is not impaired.

*Contracts Law > Contract Interpretation > General Overview*
[HN4] A contract should be interpreted to give meaning and effect to every provision, and anomalous consequences should be avoided.

**JUDGES:** HERMAN CAHN, J.S.C.

**OPINION BY:** HERMAN CAHN

**OPINION**

**CAHN, J.:**

Plaintiff, MTV Networks, A Division of Viacom International, Inc. ("MTVN") moves to enjoin defendant Richard Cronin ("Cronin") from working for any competitor of MTVN, including specifically defendant Fox Kids Worldwide, Inc. ("Fox Kids") until July 1, 1998, and to enjoin Fox Kids from employing Cronin through June 30, 1998.

The parties voluntarily agreed that Cronin would not work for Fox Kids pending the issuance of this decision, rendered after the hearing on the motion for a preliminary injunction. In view of that agreement, the court did not sign a temporary restraining order. An evidentiary hearing at which the parties presented documentary evidence and testimony, was held.

MTVN is a cable television network which owns TV Land, Nick-at-Nite, and Nickelodeon. Cronin was employed by MTVN since 1984; he was a member of the Nickelodeon "executive team" since July 1987. Pursuant to a three year employment [*2] contract, executed in July 1995, Cronin became president of MTVN's TV Land, a newly launched cable network specializing in "classic television". He also supervised Nick-at-Nite, a sister network to TV Land specializing in "classic" situation comedies. The "executive team" for the various networks reviews operations, budgets, and strategic plans for the network. Substantially, all the operating information and plans are made available to and considered by the "executive team". Cronin was also a spokesman for Nick-at-Nite and TV Land, filling the role of master of ceremonies for Nick-at-Nite and TV Land's annual "up front" presentations to advertisers. Plaintiff's witnesses testified that he was considered its "public face."

Cronin's employment contract provides for a period of employment from July 1, 1995, through June 30, 1998.

The agreement defines his duties during the term of the agreement:

2. Duties. During the Employment Term, you agree to devote your entire business time, attention and energies to the business of MTVN and its subsidiaries. You will be President, Nick-at-Nite's TV Land, MTV Networks, a division of Viacom International, Inc. and you agree to perform **[*3]** such duties, and such other duties reasonable and consistent with such office as may be assigned to you from time to time by the President of Nickelodeon and Nick-at-Nite or such other individual as may be designated by the Chief Executive Officer of MTVN (the "CEO"), provided that such other individual either (i) reports to or is such CEO or (ii) is the COO of Nickelodeon. Such duties shall also include supervisory responsibility for Nick-at-Nite at least through October 15, 1997. Your principal place of business shall be at MTVN's headquarters in the New York City Metropolitan area.

Cronin's employment agreement also includes a non-competition clause which provides:

6. Exclusive Employment, Confidential Information, Etc.

(a) Non-Competition. You agree that your employment hereunder is on an exclusive basis, and that during the shorter of (x) the period remaining in the Employment Term on any given date and (y) one (1) year after the termination of your employment pursuant to paragraph 8(a), 8(b), or 8(c) hereof (the "Non-Compete" Period), you will not engage in any other business activity which is in conflict with your duties and obligations hereunder. You **[*4]** agree that during the Non-Compete Period you shall not directly or indirectly engage in or participate as an officer, employee, director, agent of or consultant for any business directly competitive with that of MTVN, nor shall you make any investments in any company or business

competing with MTVN; provided, however, that nothing herein shall prevent you from investing as less than a one (1%) percent shareholder in the securities of any company listed on a national securities exchange or quoted on an automated quotation system.

* * *

(i) Injunctive Relief. MTVN has entered into this Agreement in order to obtain the benefit of your unique skills, talent, and experience. You acknowledge and agree that any violation of paragraphs 6(a) through (h) hereof will result in irreparable damage to MTVN and Viacom, and, accordingly, MTVN and Viacom may obtain injunctive and other equitable relief for any breach or threatened breach of such paragraphs, in addition to any other remedies available to MTVN and Viacom.

(j) Survival: Modification of Terms. Your obligations under paragraph 6(a) through (i) hereof shall remain in full force and effect for the entire period provided therein **[*5]** notwithstanding the termination of the Employment Term pursuant to paragraph 8 hereof or otherwise; provided however, that your obligations under paragraph 6(a) shall cease if you terminate your employment for "Good Reason" or MTVN terminates your employment without "cause" (as such terms are defined in paragraph 8) and you notify MTVN in writing that you have elected to waive your right to receive, or to continue to receive, payments and benefits pursuant to clauses (i), (ii), (iii), (iv) and (v) of paragraph 8(d). You and MTVN agree that the restrictions and remedies contained in paragraphs 6(a) through (i) are reasonable and all it is your intention and the intention of MTVN that such restrictions and remedies shall be enforceable to the fullest extent permissible by law. If it shall be found by a court of competent jurisdiction that any

such restriction or remedy is unenforceable but would be enforceable if some part thereof were deleted or the period or area of application reduced, then such restriction or remedy shall apply with such modification as shall be necessary to make it enforceable.

The contract further provides:

8. Termination.

(a) Termination **[*6]** for Cause. MTVN may, at its option, terminate this Agreement forthwith for "cause", and MTVN shall thereafter have no further obligations under this Agreement, including, without limitation, any obligation to pay Salary or Bonus or provide benefits under this Agreement. For purposes of this Agreement, termination of this Agreement for "cause" shall mean termination for... willful unauthorized disclosure of confidential information, or if you at any time materially breach this Agreement.... Anything herein to the contrary notwithstanding, MTVN will give you written notice prior to terminating this Agreement for you material breach setting forth the exact nature of any alleged breach and the conduct required to cure such breach. You shall have ten (10) business days from the giving of such notice within which to cure.

(b) Good Reason Termination. You may terminate your employment hereunder for "Good Reason" at any time during the Employment Term by written notice to MTVN not more than (30) days after the occurrence of the event constituting "Good Reason". Such notice shall sate an effective date no later than ten (10) business days after the date is given. Good Reason shall **[*7]** mean, without your prior written consent, other than in connection with the termination of your employment for "cause" (as defined above) or in connection with your permanent disability, the assignment to

you by MTVN or Viacom of duties substantially inconsistent with your positions, duties, responsibilities, titles or offices, the withdrawal of a material part of your responsibilities as set forth in paragraph 2, or the breach by MTVN of any of its material obligations hereunder.

(c) Termination Without Cause. MTVN may terminate your employment hereunder without "cause" (as defined above) at any time during the Employment Term by written notice to you.

* * *

(f) Non Renewal Notice, Etc. Viacom shall notify you in writing in the event that MTVN elects not to extend or renew this Agreement. If MTVN gives you such notice less than twelve (12) months before the Employment Term, or your employment terminates pursuant to paragraph 8(b) or 8(c) hereof during the final twelve (12) months of the Employment Term, you shall be entitled to receive salary as provided in paragraph 3(a), payable in accordance with MTVN's then effective payroll practices, subject to applicable **[*8]** withholding requirements, for the period commencing after the end of the Employment Term which, when added to the portion of the Employment Term, if any, remaining when the notice is given or the termination occurs, equals twelve (12) months; provided however, you shall be required to mitigate the amount of any payment pursuant to this paragraph 8(f) by seeking other employment or otherwise, and the amount of any such payment shall be reduced by any compensation earned by you from a third person. The payments provided for in this paragraph 8(f) in lieu of any severance or income continuation or protection under any MTVN or Viacom plan that may now or hereafter exist.

During the latter part of August 1997, Haim Saban, Chairman and CEO of Fox Kids, contacted Cronin to explore the possibility of his becoming the President and

CEO of the Fox Family and Fox Kids cable network, and the Fox Kids broadcast network. The Fox group of networks were viewed by MTVN as potential competitors of the Nickelodeon group. In fact, it is clear from the testimony that the two groups are potential, if not yet actual competitors, and that the Fox group is aiming at the same market as MTVN.

In response, **[*9]** Cronin told Saban that he was under contract with MTVN through June 30, 1998, so any offer would be considered only if his employment were to begin after that date. Saban found that acceptable, and negotiations continued through October 17, 1997, at which time Cronin signed a contract with Fox Kids to be employed starting July 1, 1998.

The signed employment agreement contains an indemnification clause, by which Fox Kids agreed to indemnify Cronin for any legal costs or judgments that may arise out of any legal action taken by MTVN or Viacom, including the within action. The indemnification clause also requires Fox Kids to pay Cronin's MTVN base salary of $ 375,000.00 and $ 400,000.00 bonus until he actually begins working for Fox Kids and provide benefits should MTVN not pay his salary or provide benefits for any reason. The agreement further provides:

> "As we have discussed by offering you a position of employment with Fox Kids, commencing on July 1, 1998, we have no intention of interfering with or changing in any way your relationship with your current employer."

The financial terms of Cronin's employment agreement with Fox Kids includes a base annual salary of over $ 1,000,000.00, **[*10]** a signing bonus of $ 500,000.00 on the first day of employment, contingent and annual bonus based on revenue and Cronin's achievement of certain goals. Additionally, the employment agreement grants Cronin a ten-year non-qualified stock option "covering an aggregate of 161,637 shares of class A common stock... which Fox Kids represents reflects no less than 1% of the current voting securities of Fox Kids diluted for this stock option, at an exercise price of $ 111.37 per share" based on a current $ 1.8 billion valuation of Fox Kids. (emphasis added) The option vests in increments over a period of five years.

Prior to signing the Fox Kids contract, Cronin reported the offer to two MTVN executives. MTVN sought unsuccessfully to have Cronin remain in its employ, offering him a new contract substantially raising the compensation he received pursuant to his then existing contract. When it was apparent that these efforts were not bearing fruit, MTVN sent Cronin a letter dated October 13, 1997, stating:

> This letter constitutes formal notice to you that you are not permitted, either under your employment agreement with MTVN dated as of July 1, 1995, or pursuant to your fiduciary **[*11]** obligations as President, Nick-at-Nite's TV Land, to enter into any other employment agreements, arrangements or understandings with any competitor of MTVN, prior to the expiration of your employment agreement on June 30, 1998. We also wish to advise that permitting or authorizing any public announcement or disclosure of your prospective employment by a competitor of MTVN would constitute a further - and compounding - breach of your legal and fiduciary obligations to the company.

After Cronin signed the employment agreement with Fox Kids on October 17, 1997, MTVN sent Cronin a letter dated October 21, 1997, terminating his employment with MTVN for cause, effective November 5, 1997. The cause asserted was his entering into an agreement to become the President and Chief Executive Officer of a direct competitor. MTVN offered to pay Cronin severance pay as provided in his contract, which consisted of continuing his base salary payments through June 30, 1998. The offer of severance pay was made on condition that Cronin comply with all the terms of paragraph six of the employment agreement and specifically did not commence employment with Fox Kids until after June 30, 1998.

MTVN also **[*12]** issued a press release announcing Cronin's departure. Cronin responded by letter dated October 30, 1997. In the letter, he denied that there was anything in his employment agreement barring him from planning his future career at the end of the employment term. He further stated that due to MTVN's actions in

directing him to stop performing his duties, and publicly announcing that he was being terminated, he was giving notice that he was terminating his employment at MTVN for "Good Reason" as provided in paragraph 8(b) of his employment agreement, effective immediately. He also turned down MTVN's offer to continue paying his base salary through the end of his employment term.

MTVN commenced this action on October 31, 1997, seeking a preliminary injunction preventing Cronin from working for Fox Kids until the expiration of the term set forth in his MTVN employment agreement - June 30, 1998. The complaint contains seven causes of action: (1) breach of fiduciary duty against Cronin; (2) breach of contract against Cronin; (3) unauthorized use of trade secrets against Cronin; (4) aiding and abetting breach of fiduciary duty against Fox Kids and News Corp.; (5) tortious interference against [*13] Fox Kids and News Corp.; (6) unfair competition against Fox Kids and News Corp.; and (7) the imposition of a constructive trust against Fox Kids and News Corp.

[HN1] Generally, in order to obtain a preliminary injunction, a movant must show a likelihood of success on the merits, the potential for irreparable injury if the injunction is not granted, and a balance of the equities in movant's favor. ( *W. T. Grant v Srogi, 52 N.Y.2d 496, 438 N.Y.S.2d 761, 420 N.E.2d 953*; *Chernoff Diamond v Fitzmaurice, Inc., 234 A.D.2d 200, 651 N.Y.S.2d 504*). [HN2] While the courts of New York have adopted a strict approach in construing non-competition agreements and restrictive covenants in employment agreements ( *Reed, Roberts Associates v Strauman, 40 N.Y.2d 303, 386 N.Y.S.2d 677, 353 N.E.2d 590*), such agreements have been enforced when reasonable in scope, duration and geographical area *(see, Gelder Med. Group v. Webber, 41 N.Y.2d 680, 394 N.Y.S.2d 867, 363 N.E.2d 573; Columbia Ribbon & Carbon Mfg. Co. v A-1-A Corp., 42 N.Y.2d 496, 398 N.Y.S.2d 1004, 369 N.E.2d 4; Family Affair Haircutters v Detling, 110 A.D.2d 745, 488 N.Y.S.2d 204; Matter of Schachter, 52 A.D.2d 121, 383 N.Y.S.2d 316,* [*14] *aff'd 41 N.Y.2d 1067, 396 N.Y.S.2d 175, 364 N.E.2d 840),* when an injunction is necessary to protect the employer from unfair competition that stems from the employee's use or disclosure of trade secrets, or where the employee's services are unique or extraordinary. ( *Columbia Ribbon & Carbon Mfg. v A-1-A Corp., supra.; Chernoff Diamond v Fitzmaurice, Inc., supra.; Maltby v Harlow Meyer Savage Inc., 166 Misc. 2d 481, 633 N.Y.S.2d 926, affd 223 A.D.2d 516,* *637 N.Y.S.2d 110*).

[HN3] While restrictive covenants which prevent employees from pursuing a similar vocation after termination of employment are disfavored ( *American Para Professional Systems Inc. v Examination Management Services, Inc., 214 A.D.2d 413, 625 N.Y.S.2d 33*), an employer is entitled to protection from unfair or illegal conduct that causes economic injury, especially where the employee's ability to earn a living is not impaired. ( *American Broadcasting Cos. Inc. v Wolf, 52 N.Y.2d 394, 438 N.Y.S.2d 482, 420 N.E.2d 363*). "Acknowledging the tension between the freedom of individuals to contract, and the reluctance [*15] to see one barter away his freedom, the State enforces limited restraints on an employee's employment mobility where a mutuality of obligation is bargained for by the parties". ( *Post v. Merrill Lynch Pierce Fenner & Smith, 48 N.Y.2d 84, 89, 421 N.Y.S.2d 847, 397 N.E.2d 358*). "Indeed, the modern trend in the case law seems to be in favor of according such covenants full effect when they are not unduly burdensome". ( *Mohawk Maintenance Co. v. Kessler, 52 N.Y.2d 276, 284, 437 N.Y.S.2d 646, 419 N.E.2d 324*).

Notwithstanding the above discussion, the court notes that this is not simply a "non-compete" case. The relief sought in this motion is not that Cronin be barred from competing with his former employer after the term of their agreement ends. Rather, it is a claim by plaintiff that Cronin should be held to the original term of the agreement only. Plaintiff argues that it terminated Cronin's employment "for cause", and it is thus entitled to require Cronin not to compete until the end of the agreement's term. Defendants assert that Cronin was not terminated "for cause", and that plaintiff's actions gave Cronin sufficient reason to resign.

The [*16] testimony at the hearing showed that Cronin is a uniquely talented executive who played a key role in launching TV Land, and in developing strategies which led to making Nick-At-Nite the top rated cable network in its time period. Documents submitted further support the conclusion that Cronin was a key player in setting goals and devising strategies for the network, including long term strategies. These strategies included, among other things, methods of dealing with competitors, and suggestions for seizing opportunities before competitors, expressly including Fox Kids, take advantage of them.

There was testimony by Mark Rosenthal, President and Chief Operating Officer of MTVN, and Herb Scannell, President of Nickelodeon Networks, that Cronin had access to confidential information, especially in the area of MTVN's plans for competing with, among others, Fox Kids. They also testified that Cronin had detailed knowledge of MTVN's budget process.

Rosenberg, Scannell, and to a degree Cronin himself testified that Cronin was also very visibly involved in relationships with advertisers. He was the "public face" of MTVN, who represented the network at many public functions and in contacts [*17] with firms with which MTVN dealt. As master of ceremonies at the "up front" presentations ("up fronts"), at which the network presents its plans and hopes for the coming season(s) to advertisers and media buyers, and attempts to sell advertising; he was one of the network's representatives in dealing with cable operators. Cronin was aware of his importance, as demonstrated by his 1996 self-evaluation, in which he takes credit for being the best possible key spokesman for Nick-at-Nite and TV Land. He also had regular contact with the trade press, with whom he has excellent relations, and appeared at industry conventions regularly, where personal relationships are invaluable.

The court finds this testimony to be credible. The evidence amply demonstrates that Cronin qualifies as a unique employee, and is in possession of confidential information, and is, therefore, subject to a restrictive covenant which may otherwise be enforceable. (See, Maltby v Harlow Meyer Savage, supra). Cronin's reliance upon Feiger v. Iral Jewelry, Ltd., (41 N.Y.2d 928, 394 N.Y.S.2d 626, 363 N.E.2d 350), is misplaced. The Court of Appeals in Feiger explicitly stated [*18] that its opinion was based "on the finding of facts in this case, meticulously detailed by the court at trial." In the underlying trial decision in Feiger (85 Misc. 2d 994, 382 N.Y.S.2d 216), Justice Shainswit found that the plaintiff

"was only in the most technical sense an employee of defendant. he was treated as one for defendant's benefit insurance wise; in actuality, he was a commissioned salesman, representing at least one other company and sometimes more... The fact is that, regardless of his technical status, plaintiff was in substance a salesman, whose earnings related directly to the sales he obtained for defendant; his situation

was thus entirely different from that of the true employees involved in the cases cited by defendant. ( Id. at 998).

In contrast, in this action, Cronin is a unique employee with unique skills and knowledge. In addition, Cronin was a very senior executive at MTVN with much responsibility for the success of two major cable networks with tens of millions of viewers unlike the plaintiff jewelry salesman who sued for commission in Feiger.

Another issue involves whether Cronin was properly terminated "for cause," [*19] which would enable MTVN to enforce the non-compete provision of the employment contract.

Cronin and Fox Kids argue that there is nothing in his contract which prevented him from planning for his future after the expiration of his contract. While the contract provides for continued payment to Cronin for twelve months after his term of employment is over, in the event that MTVN chose not to renew the contract, they contend that Cronin was entitled to make future plans before the expiration of the employment term, to ensure against his being unemployed in the event that he chose not to continue working for MTVN.

Although it is true that the contract does not expressly state that Cronin may not enter into an employment agreement with another company during the term of his employment, the contract states that he must not engage in any other business activity during its term which is in conflict with his duties and obligations under his contract.

Cronin claims that he would have been able to perform most of his functions without any change, notwithstanding his signing the contract with Fox Kids. However, even he acknowledges that certain sensitive issues would have been difficult, if [*20] not impossible, for him to be involved in. The most obvious of those involves strategy relating to competition with Fox Kids and the Family Channel. Accordingly, by Cronin's own admission, there were areas of his MTVN job in which he would no longer be able to function effectively. Cronin also acknowledges that the announcement that he signed with Fox Kids would amount to an endorsement of that network, which is prohibited by his contract. Although Cronin claimed that he had an understanding that the

signing would not be announced, Saban denied any such understanding, and it was acknowledged that the news could not remain a secret indefinitely.

There was also undisputed evidence that once Cronin signed the contract with Fox Kids, the valuation of his future stock options at Fox Kids was fixed. This created a problem of divided loyalties, since it was in Cronin's interest to see Fox Kids succeed in order to increase the value of his stock options. Cronin's stock options create an unavoidable conflict of interest. As Fox Kids stock becomes more valuable, so too Cronin's options become more valuable. Cronin can not be expected to complete his employment term with MTVN, perform his required [*21] duties under his MTVN agreement and ignore his interest in Fox Kids. Furthermore, the court finds that defendant's construction of the 1% limit on investment in Cronin's MTVN agreement too narrow. The distinction between vested and non-vested options in this context is simply artificial. The fact that Cronin has a future interest in the Fox Kids stock options, breaches the clause in his MTVN contract.

Cronin argues that MTVN's termination for cause was invalid because MTVN failed to give him written notice prior to terminating his employment setting forth the exact nature of the alleged breach, the conduct required to cure such breach, and ten days within which to cure, as provided by the contract. However, before Cronin signed the contract, MTVN wrote him stating that if he signed a contract with Fox Kids, he would be in breach of his MTVN employment agreement. Obviously, by informing Cronin that signing an employment contract with another company constituted a breach, MTVN was advising him that to avoid a breach, he must not sign. Once Cronin signed with Fox Kids, there was, in effect, no way to cure the breach, therefore MTVN was unable to advise him of how to cure the breach. [*22] Nonetheless, it gave him ten business days until the termination was effective.

It is well established that [HN4] a contract should be interpreted to give meaning and effect to every provision, and anomalous consequences should be avoided. *Browning-Ferris Industries of New York, Inc. v County of Monroe, 103 A.D.2d 1040, 478 N.Y.S.2d 428, affd 64 N.Y.2d 1046, 489 N.Y.S.2d 902, 479 N.E.2d 247*. If the court were to conclude that MTVN's termination of Cronin was ineffective for failure to advise him how to cure the breach within ten days, MTVN would be unable

to terminate him for any reason that was not susceptible to cure. Under such a scenario, MTVN would be unable to terminate him for some of the express examples included in the provision, including conviction of a felony. Such a result is clearly not within the intent of the parties, and the court declines to construe the document in a way to allow that unintended result.

Once Cronin signed the contract with Fox Kids, after having been warned in the October 13, 1997 Roskin letter not to sign, he had irreversibly breached his employment agreement with MTVN. In other words, "All the king's horses and all [*23] the king's men, couldn't put Humpty together again." As Rosenberg and Scannell convincingly testified, once Cronin entered into his employment agreement with Fox Kids, he could no longer be trusted to perform his duties at MTVN or act as a credible spokesman for TV Land or Nick-at-Nite. The court finds that, under the conditions presented, MTVN abided by the terms of the Termination for Cause section of the employment contract. Therefore, Cronin was properly terminated for cause, and the injunctive relief provided for by contract is available.

Cronin argues that it would cause him irreparable injury to be forced to remain outside the industry until June 30, 1998. He testified that there was damage to his reputation which has been tarnished and he wants to restore his good name. Cronin and Saban further testified that being forced to stay on the sidelines for eight months in the fast paced cable TV industry will weaken Cronin's skills. However, these arguments must be balanced against MTVN's contractual right not to have Cronin compete during this time, and the potential injury to MTVN in having Cronin working for Fox Kids during this time.

The evidence produced at the hearing show [*24] that the "up fronts" for adult programming, which are crucial for obtaining advertising for the upcoming television season, take place in April through June. MTVN demonstrated that contracting with advertisers during the "up fronts" is critical to its success for the coming season. Cronin has long been publicly associated with MTVN, and was an integral player in the preparation and presentation of the up-fronts. The potential detriment to MTVN in having Cronin represent a competitor at this critical time outweighs Cronin's frustration at not being "part of things." This is especially true since there is no danger of Cronin's being unable to

work after June 30, 1998, or not earning a living during this time. Cronin is still scheduled to begin working for Fox Kids on July 1, 1998, as the parties bargained for. Furthermore, under the agreement with Fox Kids, Cronin is being paid not only his base salary ($ 375,000 per year) during this period, but will also be paid a $ 400,000 bonus in February, even if he is not working. Thus, there is no financial hardship to Cronin.

The court notes there was much testimony about Cronin's possession of trade secrets and MTVN documents at his home while **[*25]** he was negotiating with Fox Kids. The plaintiff made much of the fact that Cronin returned seven boxes of documents to MTVN containing sensitive confidential documents. The testimony revealed that there was no explicit firm rule or regulation barring executives from bringing and leaving home documents. In any event, there was no evidence adduced at the hearing that Cronin revealed any confidential information to Fox Kids or Saban, or that MTVN was damaged in any way by the retention of the documents. It is clear that there are trade secrets which Cronin possesses, and MTVN is entitled to have protected. It is true that much of such confidential information is eventually released to the public through the media and trade publications. In that sense, the cable television industry does not have trade secrets akin to formulas and models held secret indefinitely. Yet until strategic plans and budgeting, etc. are implemented or released to the public, they are trade secrets.

Consequently, the court finds that the restrictive covenant at issue herein is reasonable and that MTVN has shown a likelihood of success on the merits, irreparable harm and a balance of the equities in its favor. Maintaining **[*26]** the preliminary injunction through June 30, 1998, is reasonable because that is the time period for which the parties contracted, it is during that time period that the "up fronts" take place, and that will allow MTVN to recover from Cronin's unexpected early departure and prevent Cronin from assisting a competitor during the term of his contract.

Accordingly, the motion for a preliminary injunction is granted. The preliminary injunction will expire on June 30, 1998.

Settle order on 48 hours notice. The proposed order should contain a provision for an undertaking. Counsel may suggest the amount of the undertaking by letter to be submitted with the Notice of Settlement.

Dated: February 4, 1998

Herman Cahn

J.S.C.

LEXSEE 2006 U.S. DIST. LEXIS 56112



Analysis
As of: Jul 11, 2008

**In re CROSS MEDIA MARKETING CORPORATION, Debtors, CROSS MEDIA MARKETING CORPORATION, Plaintiff, -against- MARIE L. NIXON, Defendant.**

**06 Civ. 4228(MBM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2006 U.S. Dist. LEXIS 56112*

**August 11, 2006, Decided**

**PRIOR HISTORY:** *Cross Media Mktg. Corp. v. Nixon (In re Cross Media Mktg. Corp.), 2006 Bankr. LEXIS 4219 (Bankr. S.D.N.Y., Apr. 6, 2006)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant sought review of an order of the U.S. Bankruptcy Court of the Southern District of New York, which granted plaintiff debtor recovery for its claims of misappropriation of trade secrets, conversion, and unjust enrichment, and denied defendant's motion for a new trail.

**OVERVIEW:** The debtor, which sold bundles of magazine subscriptions, compiled customer lists, which contained confidential customer information. The debtor employed defendant's husband to perform consulting work whereby he had access to the customer lists after signing a confidentiality agreement. After filing for bankruptcy, the debtor discovered that an anonymous party was attempting to auction its customer lists over the Internet. The matter was traced to an account in defendant's maiden name. Defendant did not appear at her trial. On appeal, the court affirmed. The customer list was a trade secret since it was developed through substantial effort, it was kept in confidence, and it was not readily ascertainable to the debtor's competitors.

Defendant used the trade secret that she obtained by improper means, and the damage award was properly determined and it was adequate to compensate the debtor. The conversion and unjust enrichment claims were established by defendant's unauthorized possession of the customer list. Further, defendant was properly denied a new trial since she did not present any previously unavailable evidence or show any manifest error or law or mistake of fact.

**OUTCOME:** The court affirmed the bankruptcy court's decision.

**CORE TERMS:** customer lists, trade secret, e-mail, new trial, customer, auction, punitive damages, registered, misappropriation, confidential, protectable, competitor, conversion, converted, flight, unjustly enriched, confidentiality agreement, unjust enrichment, misappropriated, confidence, calculated, morning, wanton, maiden name, permission, wrongfully, diligence, complied, subpoena, database

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Practice & Proceedings > Appeals > Standards of Review > Clear Error Review*

Case 1:07-cv-10595-SHS    Document 31-8    Filed 07/11/2008    Page 11 of 45

Page 2
2006 U.S. Dist. LEXIS 56112, *

*Bankruptcy Law > Practice & Proceedings > Appeals > Standards of Review > De Novo Review*

[HN1] On appeal in a bankruptcy case, a bankruptcy court's conclusions of law are reviewed de novo and its findings of fact for clear error. A finding of fact is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. Further, the standard remains the same for both credibility determinations and findings based on physical or documentary evidence or inferences from other facts.

*Computer & Internet Law > Trade Secret Protection > Misappropriation > Elements*
*Trade Secrets Law > Misappropriation Actions > Elements > General Overview*

[HN2] To prevail on a claim for the misappropriation of a trade secret, a plaintiff must prove (1) it possessed a trade secret, and (2) the defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means.

*Computer & Internet Law > Trade Secret Protection > Misappropriation > General Overview*
*Trade Secrets Law > Factors > General Overview*

[HN3] New York Courts consider the following factors relevant to a determination of whether a trade secret exists: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Computer & Internet Law > Trade Secret Protection > Misappropriation > General Overview*
*Trade Secrets Law > Factors > General Overview*

[HN4] A customer list that contains information such as the identities and preferences of client contacts is a protectable trade secret.

*Computer & Internet Law > Trade Secret Protection > Misappropriation > General Overview*
*Trade Secrets Law > Factors > Novelty*

[HN5] A trade secret can exist in a combination of characteristics and components, each of which, by itself is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret.

*Computer & Internet Law > Trade Secret Protection > Misappropriation > General Overview*
*Trade Secrets Law > Factors > Novelty*

[HN6] Where it would be difficult to duplicate a customer list because it reflects individual customer preferences, trade secret protection should apply.

*Civil Procedure > Appeals > Standards of Review > General Overview*
*Trade Secrets Law > Civil Actions > Remedies > Damages > General Overview*

[HN7] Once it is determined that a trade secret was misappropriated, damages can be calculated in several ways. First, an award of damages may be measured by a plaintiff's losses, which may include the cost of developing the trade secret. Second, damages may be measured by the profits unjustly received by a defendant. Third, when a plaintiff in misappropriation of trade secret case is not adequately compensated by the aforementioned methods, the damages award can be calculated based upon a reasonable royalty. A reviewing court should accord great deference to a trial court's factual findings regarding damages. The determination of a damage award is not an exact science, and the amount need not be proven with unerring precision.

*Trade Secrets Law > Civil Actions > Remedies > Damages > General Overview*

[HN8] In a suit for the misappropriation of trade secrets, the lack of actual profits does not insulate the defendants from being obliged to pay for what they have wrongfully obtained.

*Torts > Intentional Torts > Conversion > Elements*

[HN9] Under New York law, a plaintiff alleging conversion must prove: (1) the plaintiff has an immediate right to possession of the property converted; (2) the defendant's possession of the property was unauthorized;

(3) the defendant acted to exclude the rights of the lawful owner of the property; (4) the property is specifically identifiable; and (5) the defendant is obligated to return the property.

***Contracts Law > Remedies > Equitable Relief > Quantum Meruit***
***Trade Secrets Law > Civil Actions > Remedies > Damages > Unjust Enrichment***
[HN10] To state a claim for unjust enrichment under New York law, a plaintiff must prove (1) a benefit to the defendant (2) that was acquired at the plaintiff's expense, which (3) in equity and good conscience should be restored.

***Civil Procedure > Remedies > Damages > Punitive Damages***
***Torts > Intentional Torts > Conversion > Remedies***
[HN11] Punitive damages may be awarded for conversion if the conversion was accomplished with malice or reckless disregard of the plaintiffs' rights.

***Civil Procedure > Remedies > Damages > Punitive Damages***
***Trade Secrets Law > Civil Actions > Remedies > Damages > Punitive Damages***
[HN12] Punitive damages are available for gross and wanton misappropriation of trade secrets. New York law allows the recovery of punitive damages in a trade secrets case if a defendant's conduct has been sufficiently "gross and wanton."

***Bankruptcy Law > Practice & Proceedings > Adversary Proceedings > Judgments & Remedies***
[HN13] Under Bankr. S.D. N.Y. R. 9020-1, default sanctions may be entered against a party if there is a failure of a party or counsel for a party to appear before the court at a conference, complete the necessary preparations, or be prepared to proceed at the time set for trial or hearing. Bankr. S.D. N.Y. R. 9020-1.

***Bankruptcy Law > Practice & Proceedings > Adversary Proceedings > Judgments & Remedies***
***Civil Procedure > Judgments > Relief From Judgment > Motions for New Trials***
[HN14] *Fed. R. Bankr. P. 9023* makes *Fed. R. Civ. P. 59(a)* applicable to motions for a rehearing of an issue

decided by a bankruptcy court. The standard under *Rule 59(a)* is strict; a motion for a new trial may be granted in an action tried without a jury only if there is a manifest error of law or mistake of fact. Additionally, a motion for a new trial may be granted if the moving party can demonstrate not only that the evidence existed at the time of the prior action and that it justifiably was not available to the movant but also that the evidence would be admissible and of such import as probably to have changed the result in the prior action.

***Bankruptcy Law > Practice & Proceedings > Adversary Proceedings > Judgments & Remedies***
***Civil Procedure > Judgments > Relief From Judgment > Motions for New Trials***
[HN15] A movant for a new trial must demonstrate (1) newly discovered evidence of facts that existed at the time of the trial, (2) the movant must have been justifiably ignorant of them despite due diligence, (3) the evidence must be admissible and of such importance that it probably would have changed the outcome, and (4) the evidence must not be merely cumulative or impeaching. Also, a new trial may be ordered to prevent a grave miscarriage of justice even though the newly discovered evidence supporting that order would have been available to the moving party at trial had that party exercised proper diligence. That exception applies only to cases in which the evidence is "practically conclusive."

***Bankruptcy Law > Practice & Proceedings > Adversary Proceedings > Judgments & Remedies***
***Civil Procedure > Judgments > Relief From Judgment > Motions for New Trials***
[HN16] A trial court should not grant a new trial merely because the losing party can probably present a better case on another trial.

**COUNSEL:** **[*1]** For Plaintiff: KEVIN A. FRITZ, ESQ., STORCH AMINI & MUNVES P.C., New York, NY.

MARIE LABESKY NIXON, Defendant, Pro se, Jupiter, FL.

**JUDGES:** MICHAEL B. MUKASEY, U.S. District Judge.

**OPINION BY:** MICHAEL B. MUKASEY

**OPINION**

OPINION AND ORDER

MICHAEL B. MUKASEY, U.S.D.J.

Defendant Marie Labesky Nixon appeals *pro se* from an order of the Under States Bankruptcy Court of the Southern District of New York granting plaintiff Cross Media Marketing Corporation ("Cross Media") a recovery of $ 286,000 from Nixon and denying her motion for a new trial. (Judgment at 2; Findings of Fact P 67) Cross Media was awarded $ 236,000 in actual damages after the Bankruptcy Court determined Nixon had misappropriated its trade secret, converted its property, and unjustly enriched herself at its expense. (Findings of Fact PP 50, 56, 61) Additionally, the Bankruptcy Court awarded Cross Media $ 50,000 in punitive damages resulting from Nixon's "gross and wanton" conduct in misappropriating the trade secret, her failure to comply with the preliminary injunction, and her failure to cooperate in the proceedings. (Findings of Fact PP 62-67) For the reasons stated below, the Order of the Bankruptcy Court is affirmed.

 **[*2]** I.

Cross Media sold bundles of magazine subscriptions of various lengths to consumers, and, in so doing, compiled customer lists. (Tr. at 18-20) The customer lists contained confidential customer information, including customer names, addresses, leads, credit or debit card information, titles of magazines to which each customer previously had subscribed, methods of payment, payment terms and histories, call notes, and current subscriptions coming up for renewal. (*Id.*) On January 1, 2002, Cross Media and defendant's husband Michael Nixon entered into a consulting agreement, under which Michael Nixon was to perform financial consulting services and would have access to Cross Media's customer lists. (Pl. Ex. 1) Included in the agreement signed by Michael Nixon was a confidentiality clause, requiring him to keep in confidence "all information, documents, data and know-how relating to [Cross Media], including but not limited to research, products, business and marketing plans, services, customers . . . software (including source and object code], hardware . . . methods of operation, which is disclosed by [Cross Media] or on their behalf to [Michael Nixon], either directly or **[*3]** indirectly, and in writing or orally." (Pl. Ex. 1 P 5).

On June 16, 2003, Cross Media filed a voluntary petition seeking relief under Chapter 11 of the Bankruptcy Code. In June 2003, Cross Media discovered that an anonymous party was attempting to auction its customer lists on the Internet. (Pl. Ex. 3) This auction was linked to an e-mail account held with Yahoo!, and, on June 14, 2003, Cross Media filed a claim against Yahoo! and John Does 1-99 seeking to enjoin all parties from selling or utilizing the customer lists. (Pl. Ex. 3; Compl.) On July 15, 2003, the Bankruptcy Court entered a temporary injunction to halt the auction; it found sufficient cause that Cross Media's estate had an interest in the customer lists, and the customer lists were "deemed to be property of the Debtors' estate pursuant to *Section 541 of the Bankruptcy Code*." (July 15, 2003 Order) Further, the Bankruptcy Court ordered Yahoo! to turn over the name and IP address attached to the e-mail account of the subscriber running the auction of the customer lists. On July 21, 2003, Yahoo! complied with this order and provided the name and IP address. (Pl. Ex. 4)

Cross Media contacted **[*4]** Comcast, the provider of the IP address linked to the Yahoo! e-mail account, and, on August 4, 2003, Comcast informed Cross Media that the holder of the IP address linked to the Yahoo! e-mail account running the auction was Marie Labesky. (Pl. Ex. 5) Cross Media discovered also that many documents sent to it by Michael Nixon had the name Marie Labesky listed as the document author, while others listed Michael Nixon as the document author. (Pl. Ex. 2; Tr. at 31) Marie Labesky is the maiden name of defendant Marie Nixon. (Tr. at 31-32)

On December 5, 2003, Cross Media served a notice of subpoena on Nixon and her husband Michael. (Pl. Ex. 8) On December 11, 2003, Nixon responded to the subpoena by stating "I have no knowledge of any of these matters." (Pl. Ex. 10) On January 13, 2004, Cross Media amended the complaint, dismissing the claims against Yahoo! and substituting Nixon and her husband for John Does 1 and 2. (Amended Compl.) In her answer, Nixon stated "The spreadsheets were never prepared by Marie Labesky. No such person exists." (Answer P 39)

At a final pre-trial hearing on January 25, 2006, attended by counsel for both parties, a trial date of February 27, 2006 was set. On **[*5]** February 24, 2006, upon representation to the Bankruptcy Court that Michael Nixon filed a voluntary petition for bankruptcy, the

action against him was stayed pursuant to *section 362 of the Bankruptcy Code*. On February 27, 2006, the morning of trial, the Bankruptcy Court granted Cross Media's oral motion to sever the action against Michael Nixon; only the action against Nixon proceeded. (Tr. at 6)

Nixon was not present at her trial. She did not present any witnesses or offer any documents into evidence. Her attorney requested an adjournment, claiming that Nixon was unable to secure a flight from Florida to New York to attend the trial; the Bankruptcy Court denied the request. (Tr. at 6) In her motion for a new trial, Nixon explained that she and her husband had reservations on a flight from Florida to New York on the morning of the trial, but, after arriving to the airport late, only one seat was available and Nixon opted not to travel to New York without her husband.

After trial was completed, the Bankruptcy Court found that Nixon misappropriated Cross Media's trade secret when she either auctioned or conspired to auction the customer lists. (Findings of Fact **[*6]** P 32-50) Specifically, the Bankruptcy Court found that the customer lists are a trade secret, because they consist of proprietary information about Cross Media's customers, the information was complied over many years, the information was "the lifeblood of [Cross Media's] business model," Cross Media took extensive measures to keep the information confidential in that only five individuals had access to the entire database, and a competitor who obtained the information could easily identify and approach Cross Media's best customers. (Findings of Fact PP 35-38). Further, the Court determined that Michael Nixon had access to the customer lists and that the customer lists were disclosed, placed for sale, and misused through the Yahoo! e-mail account registered to Nixon without Cross Media's authorization. (Findings of Fact PP 39-41) No facts were presented at trial to rebut the inference that Nixon had control over the Yahoo! e-mail account registered in her name. (Findings of Fact P 42) The Bankruptcy Court measured the damages found against Nixon by determining Cross Media's cost of developing the trade secret. (Findings of Fact PP 45-50)

Second, the Bankruptcy Court found that Nixon **[*7]** had converted Cross Media's property by taking unauthorized possession of the customer lists and attempting to sell or participating in a conspiracy to sell the customer lists. (Findings of Fact PP 51-56)

Third, the Bankruptcy Court held that Nixon unjustly enriched herself, because she benefitted from access to the customer lists in that she did not have to bear the cost of developing the list. (Findings of Fact PP 57-58) Further, the Court found that Nixon accepted and retained a benefit conferred upon her because she improperly used the customer lists and failed to turn them over pursuant to the Court's orders. (Findings of Fact PP 59, 61)

Fourth, the Bankruptcy Court denied Nixon's motion for a new trial, because it "sets forth no basis in law for the relief she requests" and argued only that Nixon's husband did not alert her that her trial would continue and the both Nixon and her husband could not board a morning flight on the day of the trial. (Findings of Fact P 67)

II.

[HN1] On appeal in a bankruptcy case, a Bankruptcy Court's conclusions of law are reviewed de novo and its findings of fact for clear error. *In re Bonnanzio, 91 F.3d 296, 300 (2d Cir. 1996)*. A **[*8]** finding of fact is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . . This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson v. City of Bessemer City, N. Carolina, 470 U.S. 564, 573, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985)* (internal quotation marks and citation omitted). Further, the standard remains the same for both credibility determinations and findings based "on physical or documentary evidence or inferences from other facts." *Id. at 574*. As the Seventh Circuit graphically explained, "To be clearly erroneous, a decision must strike [the court] as more than just maybe or probably wrong; it must . . . strike [the court] as wrong with the force of a five-week-old unrefrigerated dead fish." *Parts and Elec. Motors, Inc. v. Sterling Elec., Inc., 866 F.2d 228, 233 (7th Cir. 1988)*, cert. denied, *493 U.S. 847, 110 S. Ct. 141, 107 L. Ed. 2d 100 (1989)*.

A. Misappropriation **[*9]** of a Trade Secret

The determination as to whether the Cross Media customer lists constitute a trade secret that was misappropriated presents a question of fact, and the Bankruptcy Court's finding is reviewed for clear error. *See N. Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 44*

(2d Cir. 1999. As explained below, the Bankruptcy Court's factual determination exhaustively considered the relevant factors as laid out by New York and found that the customer list was a protectable trade secret that Nixon obtained through improper means. That finding was not clearly erroneous.

[HN2] To prevail on a claim for the misappropriation of a trade secret, Cross Media must prove "(1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Integrated Cash Mgmt. v. Digital Transactions, Inc., 920 F.2d 171, 173 (2d Cir. 1990).*

[HN3] New York Courts consider the following factors relevant to a determination of whether a trade secret exists:

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known **[*10]** by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Integrated Cash Mgmt., 920 F.2d at 173.* [HN4] A customer list that contains information such as the identities and preferences of client contacts is a protectable trade secret. *See N. Atl. Instruments, 188 F.3d at 44; Defiance Button Mach. Co. v. C & C Metal Prods. Corp., 759 F.2d 1053, 1063 (2d Cir.), cert. denied, 474 U.S. 844, 106 S. Ct. 131, 88 L. Ed. 2d 108 (1985)* ("A customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected at the owner's instance against disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable."). Additionally, [HN5] a "trade secret can exist in a combination of characteristics and components, each of which, by **[*11]** itself is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a

protectable secret." *Integrated Cash Mgmt., 920 F.2d at 174* (quoting *Imperial Chem. Indus. Ltd. v. Nat'l Distillers and Chem. Corp., 342 F.2d 737, 742 (2d Cir. 1965)).*

Similar to the customer lists found to be protectable trade secrets in *North Atlantic Instruments* and *Defiance Button*, Cross Media's customer lists were developed through a substantial effort spanning many years that involved gathering information from approximately 200 dealers, it was kept in confidence, and such information was not readily ascertainable to Cross Media's competitors. Further, although *Integrated Cash Management* addressed whether the architecture of computer software could constitute a trade secret, the logic of that case applies here. As Nixon argued, parts of the customer lists may be known to many parties as the information was culled from a multitude of sources and some of the information gathered in the list, such as customer addresses, may be in the public domain. That Cross Media's network of approximately **[*12]** 200 dealers contributed information to the list does not mean that the customer lists were known to many people. There is a difference between knowing a customer list exists and knowing all of the contents of such a list. The value of the customer lists lies not in the individual pieces of information they contain but in the combination of all of the information Cross Media has culled over many years. Thus, as the combination of the individual pieces of potentially well known information was not well known, it is a protectable trade secret.

Additionally, evidence was presented by Cross Media at trial that the customer lists contained confidential customer information, they were complied over several years, and Cross Media took measures, including three layers of security with password protections and providing only a few individuals with access to the entire database, to ensure the information remained confidential. (Tr. 19-22) Evidence was presented at trial that the customer lists were the key to Cross Media's business model and, if such information fell into competitors' hands, Cross Media's best customers could easily be stolen. (Tr. 22-23); *see N. Atl. Instruments, 188 F.3d at 46* **[*13]** ("Numerous cases applying New York law have held that[HN6] where, as here, it would be difficult to duplicate a customer list because it reflected individual customer preferences, trade secret protection should apply."). Nixon presented no evidence at trial to controvert Cross Media's evidence

illustrating that the customer lists were a trade secret under New York law; thus the Bankruptcy Court was not clearly erroneous in determining that the Cross Media customer lists are a trade secret.

Further, Cross Media presented ample evidence at trial that Nixon used the trade secret that she obtained by improper means. The customer lists were obtained by Nixon's husband in breach of his confidentiality agreement with Cross Media and were improperly passed on to Nixon so that they could be auctioned anonymously through an e-mail address registered in her name. (Tr. 26-38; Cross Media Ex. 3) Again, Nixon did not offer any testimony or evidence to refute the showing by Cross Media that she and her husband obtained and attempted to see the customer lists in violation of his confidentiality agreement and without the permission of Cross Media.

[HN7] Once it is determined that a trade secret was misappropriated, [*14] damages can be calculated in several ways. First, the award of damages may be measured by the plaintiff's losses, which may include the cost of developing the trade secret. *See A.F.A. Tours, Inc. v. Whitchurch, 937 F.2d 82, 87 (2d Cir. 1991); Linkco, Inc. v. Fujitsu Ltd., 232 F. Supp. 2d 182, 185 (S.D.N.Y. 2002).* Second, damages may be measured by the profits unjustly received by the defendant. *A.F.A. Tours, 937 F.2d at 87.* Third, when plaintiff in misappropriation of trade secret case is not adequately compensated by the aforementioned methods, the damages award can be calculated based upon a reasonable royalty. *See Vermont Microsystems, Inc. v. Autodesk, Inc., 88 F.3d 142, 151 (2d Cir. 1996).* A reviewing court should accord great deference to a trial court's factual findings regarding damages. *Id. at 151* ("The determination of a damage award is not an exact science, and the amount need not be proven with unerring precision.") (quoting *Del Mar Avionics, Inc. v. Quinton Instrument Co., 836 F.2d 1320, 1327 (Fed. Cir. 1987)*). The Bankruptcy Court's award of damages based [*15] upon Cross Media's loss, calculated by determining the development cost of the customer lists, was adequate to compensate Cross Media and properly determined.

Nixon presented no argument, either at trial or before this court, that the cost of developing the customer list is different from what was found by the Bankruptcy Court. The Court calculated the damages by determining that each lead on the customer list cost Cross Media 25 cents to develop and then multiplying that cost by the 944,000

leads on the customer lists. Such a calculation is acceptable under *A.F.A. Tours, Inc.*, and this court, in accordance with the deference due to a trial court's determination of damages, will not disturb the Bankruptcy Court's findings.

Further, contrary to Nixon's argument, [HN8] "the lack of actual profits does not insulate the defendants from being obliged to pay for what they have wrongfully obtained." *Univ. Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518, 536 (5th Cir. 1974)* (citing *In re Cawood Patent, 94 U.S. 695, 24 L. Ed. 238, 1877 Dec. Comm'r Pat. 341 (1876)); see also Linkco, Inc., 232 F. Supp. 2d at 190.* Thus, even though she was not successful in auctioning [*16] off Cross Media's customer lists, Nixon is responsible to pay Cross Media the cost of developing the customer lists she wrongfully obtained.

B. Conversion

[HN9] Under New York law, a plaintiff alleging conversion must prove: "(1) the plaintiff has an immediate right to possession of the property converted; (2) the defendant's possession of the property was unauthorized; (3) the defendant acted to exclude the rights of the lawful owner of the property; (4) the property is specifically identifiable; and (5) the defendant is obligated to return the property." *Wisetex Trading Ltd. v. Gindi, 2001 U.S. Dist. LEXIS 13, No. 00 Civ. 2671, 2001 WL 8591, at * 1 (S.D.N.Y. Jan. 3, 2001); Scholastic, Inc. v. Harris, 80 F. Supp. 2d 139, 152 (S.D.N.Y. 1999).*

Nixon argues that she did not convert Cross Media's property because only her husband had access to the customer lists and she rarely used her home computer. However, Nixon presented no evidence to that effect in the Bankruptcy Court; in fact, she presented no evidence or testimony to controvert Cross Media's evidence showing that it owned the customer lists, that Nixon did not have permission to view or auction the customer list [*17] through her e-mail account, that an e-mail address registered to Nixon was used to auction the customer lists, that the customer lists are specifically identifiable, and that she was obligated to return the customer lists to Cross Media. Based upon the record before it, the Bankruptcy Court's determination that Nixon converted Cross Media's property was not clearly erroneous.

The customer lists were the proprietary property of Cross Media and Cross Media did not authorize Nixon's

possession of the information. (Tr. 19-34) Nixon exercised a right of ownership over the customer lists when she attempted to auction them through her e-mail account. Further, Nixon refused to return the information to Cross Media after being ordered to do so by the Bankruptcy Court, and instead stated that she had "no knowledge of any of these matters" and stated later that an individual named Marie Labesky, which was her maiden name, did not exist. Because Nixon failed to refute any of Cross Media's evidence or present at trial an explanation as to how the customer lists were being auctioned through an e-mail address registered in her name without her knowledge, the Bankruptcy Court was not clearly erroneous **[*18]** in determining that Cross Media presented sufficient evidence to support its conversion claim.

C. Unjust Enrichment

[HN10] To state a claim for unjust enrichment under New York law, Cross Media must prove (1) a benefit to Nixon (2) that was acquired at Cross Media's expense, which (3) in equity and good conscience should be restored. *Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000); Mina Inv. Holdings Ltd. v. Lefkowitz, 16 F. Supp. 2d 355, 361 (S.D.N.Y. 1998)* (listing cases). Cross Media's unjust enrichment claim overlaps its misappropriation of trade secrets claim. As explained above, the information contained in the customer lists was not well known and thus, by taking possession of it, Nixon conferred a benefit upon herself. This benefit was acquired at Cross Media's expense and Nixon should provide restitution for what she acquired, because Nixon did not have to pay the costs of developing such a valuable collection of information. Further, as explained above, Nixon's argument that no unjust enrichment claim can lie against her because Cross Media provided no evidence that the customer lists were actually sold is without merit; she can **[*19]** be unjustly enriched even though she was unable to complete the sale of the wrongfully obtained items. The Bankruptcy Court was not clearly erroneous in determining that Nixon was unjustly enriched.

D. Punitive Damages

Punitive damages may be awarded against Nixon on several grounds. First, [HN11] punitive damages may be awarded for conversion if the conversion was accomplished "with malice or reckless disregard of plaintiffs' rights." *Hutton v. Klabal, 726 F. Supp. 67, 73*

*(S.D.N.Y. 1989)* (citing *Fraser v. Doubleday & Co., 587 F. Supp. 1284, 1288 (S.D.N.Y. 1984))*. When Nixon converted the customer lists, she did so with both malice and disregard of Cross Media's rights. Because her husband signed a confidentiality agreement with Cross Media, Nixon could have gained access to the customer lists only when her husband knowingly violated his confidentiality agreement. In taking and attempting to sell a database of her husband's employer's confidential information, Nixon could not have rationally believed that the customer lists were her rightful property or that such a compilation of information was publicly available.

Second, [HN12] punitive damages **[*20]** are available for gross and wanton misappropriation of trade secrets. *Topps Co. v. Cadbury Stani S.A.I.C., 380 F. Supp. 2d 250, 267 (S.D.N.Y. 2005)*. "New York law apparently allows the recovery of punitive damages in a trade secrets case if the defendant's conduct has been sufficiently 'gross and wanton.'" *A.F.A. Tours, 937 F.2d at 87* (quoting *Huschle v. Battelle, 33 A.D.2d 1017, 308 N.Y.S.2d 235 (1st Dep't 1970), aff'd, 31 N.Y.2d 767, 290 N.E.2d 823, 338 N.Y.S.2d 622 (1972))*. As discussed above, Nixon's behavior in taking without permission and then attempting to anonymously auction the customer lists was properly found by the Bankruptcy Court to be gross and wanton conduct.

Finally, [HN13] under the local rules for the Bankruptcy Courts of the Southern District of New York, default sanctions may be entered against a party if there is a "failure of a party or counsel for a party to appear before the Court at a conference, complete the necessary preparations, or be prepared to proceed at the time set for trial or hearing." *Rule 9020-1*. Nixon did not conduct any discovery in preparing for her trial. In response to a subpoena served **[*21]** on her by Cross Media, she stated she had no knowledge of the subject matter of the case. Yet, after her trial was concluded, she was able to present accounts of her husband's interactions with Cross Media and his use of her computer and e-mail accounts. In her answer, Nixon stated that no person named Marie Labesky existed, although Marie Labesky is Nixon's maiden name and she does, in fact, exist. (Answer PP 9-10, 38-39, 72-100) Further, Nixon did not appear at her own trial; she claims to have booked a flight from Florida to New York on the morning of her trial, but, after arriving to the airport late, the airline was unable to accommodate her husband on the flight and she decided not to travel to New York alone. Nixon's counsel

presented no evidence or witnesses at trial. Such behavior is ample evidence of Nixon's failure to prepare for trial and failure to cooperate with the court; thus, the Bankruptcy Court was justified in awarding punitive damages against her.

E. Motion for a New Trial

[HN14] *Rule 9023* of the Rules of Bankruptcy Procedure makes *Federal Rule of Civil Procedure 59(a)* applicable to motions for a rehearing of an issue decided [*22] by a bankruptcy court. The standard under *Rule 59(a)* is strict; a motion for a new trial may be granted in an action tried without a jury only if there is a manifest error of law or mistake of fact. *Ball v. Interoceanica Corp., 71 F.3d 73, 76 (2d Cir. 1995).* Additionally, a motion for a new trial may be granted if the moving party can "demonstrate not only that the evidence existed at the time of the prior action and that it justifiably was not available to the movant . . . but also that the evidence would be admissible and of such import as probably to have changed the result in the prior action." *Fed. Ins. Co. v. Sheldon, 222 B.R. 690, 693 (S.D.N.Y. 1998); see also LiButti v. United States, 178 F.3d 114, 119 (2d Cir. 1999).* [HN15] Thus, Nixon must demonstrate "(1) the newly discovered evidence was of facts that existed at the time of the trial . . ., (2) the movant must have been justifiably ignorant of them despite due diligence, (3) the evidence must be admissible and of such importance that it probably would have changed the outcome, and (4) the evidence must not be merely cumulative or impeaching." *United States v. Int'l Bhd. of Teamsters, 247 F.3d 370, 392 (2d Cir. 2001)* [*23] (examining *Fed. R. Civ. P. 60(b)(2),* which has the same legal standard as *Rule 59(a)(2)* where alleged new evidence is concerned). Also, "a new trial may be ordered to prevent a grave miscarriage of justice even though the newly discovered evidence supporting that order would have been available to the moving party at trial had that party exercised proper diligence." *Ope Shipping, Ltd. v. Underwriters at Lloyds, 100 F.R.D. 428, 432 (S.D.N.Y. 1983).* That

exception applies only to cases in which the evidence is "practically conclusive." *Id.*

Nixon has failed to establish any of these three grounds and, accordingly, is not entitled to a new trial. She does not argue that the Bankruptcy Court made a manifest error of law or mistake of fact. Her motion for a new trial is based solely upon her explanation that she had no knowledge of Cross Media's customer lists or her husband's use of such lists and that her husband primarily used the computer and e-mail address registered in her name. Although such testimony is new to the Bankruptcy Court because Nixon chose not to testify or present any evidence during her trial, it is not [*24] newly discovered evidence warranting a new trial. Such facts existed at the time of the trial; no diligence was necessary for Nixon to discover them as it is merely a recounting of Nixon's claimed ignorance of her husband's activities and his use of her computer. Further, such an explanation is not "practically conclusive," consisting as it does only of the defendant's own self-serving testimony without supporting documents or witnesses. [HN16] "A trial court should not grant a new trial merely because the losing party can probably present a better case on another trial." *Ball, 71 F.3d at 76.* The Bankruptcy Court properly denied Nixon's motion for a new trial.

* * *

For the reasons set forth above, the Order of the Bankruptcy Court is affirmed in all respects.

SO ORDERED:

Michael B. Mukasey

U.S. District Judge

Dated: New York, New York

August 11, 2006

LEXSEE 2001 U.S. DIST. LEXIS 13



Positive
As of: Jul 11, 2008

**WISETEX TRADING LTD., Plaintiff, -v.- IRWIN GINDI and WILLIAM B.
WACHTEL, Defendants.**

**00 Civ. 2671 (JSM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2001 U.S. Dist. LEXIS 13; 2001-1 U.S. Tax Cas. (CCH) P50,254*

**January 2, 2001, Decided
January 3, 2001, Filed**

**DISPOSITION:** **[*1]** Defendants' motion to dismiss
complaint granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants filed a motion
to dismiss plaintiff's action for conversion, unjust
enrichment, and for imposition of a constructive trust
against defendants.

**OVERVIEW:** Plaintiff brought an action alleging that
defendants purposefully caused a company that they
purchased to dishonor its obligations to plaintiff.
Defendants moved to dismiss. The court found that
plaintiff's claims had no merit. Plaintiff first alleged that
defendants converted the goods sold to them by plaintiff
by selling the goods in their stores and retaining the
money without paying plaintiff. To the extent that the
retention of that money could have been construed as
conversion, plaintiff had not established that it had an
immediate right to possession of any specifically
identified funds or that those particular funds were to be
treated in a certain manner. Plaintiff next argued that
defendants were unjustly enriched by their failure to pay
for goods already delivered by plaintiff. This claim failed
because it was in essence a repleading of its breach of

contract claims pending in a bankruptcy proceeding.
Third, plaintiff asked that a constructive trust be imposed.
Defendants were not unjustly enriched, no fiduciary
relationship existed, and plaintiff did not allege that
defendants were in possession of any funds upon which
the court would have imposed such a trust.

**OUTCOME:** Defendants' motion was granted; plaintiff's
complaint that it did not get paid was not legally
cognizable as conversion, the unjust enrichment claim
failed because it was a repleading of its breach of contract
claims that were pending in a bankruptcy proceeding, and
there were no grounds for imposing a constructive trust.

**CORE TERMS:** conversion, listing, unjust enrichment,
constructive trust, contract claims, enriched, right to
possession, non-payment, converted, fiduciary,
customers, unjustly, paying, personally, trading, apparel

**LexisNexis(R) Headnotes**

*Torts > Intentional Torts > Conversion > Elements*
[HN1] Under New York law, the elements of conversion
are: (1) the plaintiff has an immediate right to possession
of the property converted; (2) the defendant's possession

2001 U.S. Dist. LEXIS 13, *1; 2001-1 U.S. Tax Cas. (CCH) P50,254

of the property was unauthorized; (3) the defendant acted to exclude the rights of the lawful owner of the property; (4) the property is specifically identifiable; and (5) the defendant is obligated to return the property.

***Torts > Intentional Torts > Conversion > General Overview***

[HN2] A claim for conversion that is redundant of a breach of contract claim should be dismissed, and a mere obligation to pay money does not support a claim for conversion.

***Contracts Law > Remedies > Equitable Relief > General Overview***
***Contracts Law > Sales of Goods > Damages & Remedies > General Overview***
***Contracts Law > Types of Contracts > Implied-in-Law Contracts***

[HN3] To state a claim for unjust enrichment, a plaintiff must allege that the defendant was enriched at the plaintiff's expense and that the circumstances are such that equity and good conscience require that defendant make restitution. Because unjust enrichment is quasi-contractual in nature, such claims are typically unenforceable where a valid contract governs the transaction.

***Estate, Gift & Trust Law > Trusts > Constructive Trusts***
***Governments > Fiduciary Responsibilities***

[HN4] A constructive trust may be appropriate where there exists: (1) a confidential or fiduciary relation, (2) a promise, express or implied, (3) a transfer made in reliance on that promise, and (4) unjust enrichment.

***Estate, Gift & Trust Law > Trusts > Constructive Trusts***

[HN5] Mere non-payment of a debt where the debtor is permitted to commingle the funds is an insufficient ground for imposition of a constructive trust.

**COUNSEL:** For plaintiff: J. Joseph Bainton, New York, NY.

For defendants: Alexander H. Schmidt, New York, NY. Steven J. Cohen, New York, NY.

**JUDGES:** JOHN S. MARTIN, JR., U.S.D.J.

**OPINION BY:** JOHN S. MARTIN, Jr.

## OPINION

### OPINION and ORDER

JOHN S. MARTIN, Jr., District Judge:

Wisetex Trading Ltd. ("Plaintiff") brings this action for conversion, unjust enrichment, and for imposition of a constructive trust against Irwin Gindi ("Gindi") and William B. Wachtel ("Wachtel") (collectively "Defendants"). Defendants' motion to dismiss for failure to state a claim is granted.

For the purposes of this motion to dismiss, the allegations in the complaint are accepted as true. In March 1999, Defendants, through their holding company Cherry Holdings, Inc., purchased CWT Specialty Stores, Inc. ("CWT"). Gindi became CEO of CWT, and Wachtel became Executive Vice President. When Defendants purchased CWT it was indebted to Foothill Capital Corp. ("Foothill"). Defendants personally guaranteed the debt to Foothill.

Plaintiff, a trading company that acts as an agent between buyers and sellers of merchandise, had been employed by CWT since 1992. In the course [*2] of dealing between the companies, Plaintiff would place apparel orders for CWT with third-party vendors, who would then ship the goods to Plaintiff. Plaintiff would in turn send the apparel to CWT for sale in its Cherry & Webb stores.

Despite placing orders with Plaintiff after its acquisition by Defendants, CWT at some point refused to pay for goods that had already been delivered, refused to pick up goods stored at a nearby warehouse, and repudiated CWT's obligations on orders it had placed for the Spring and Fall 1999 seasons. Plaintiff duly brought breach of contract claims against CWT. When CWT filed for bankruptcy, those claims were stayed by the Trustee.

Plaintiff subsequently brought this action against Defendants personally. Plaintiff alleges that Defendants purposefully caused CWT to dishonor its obligations to Plaintiff in order to capitalize the failing CWT and therefore reduce their personal exposure on the debt to Foothill. Plaintiff also alleges that Defendants acted out of personal animus toward Edward Finkelstein, CWT's CEO until several days after the purchase. Finkelstein was a 15% shareholder of Plaintiff and was also the

Case 1:07-cv-10595-SHS    Document 31-8    Filed 07/11/2008    Page 21 of 45

Page 3

2001 U.S. Dist. LEXIS 13, *2; 2001-1 U.S. Tax Cas. (CCH) P50,254

father of Plaintiff's CEO. Plaintiff does [*3] not allege, however, that Defendants removed any money from the corporation for their own personal use.

Plaintiff's claims have no merit. Plaintiff first alleges that Defendants converted the goods sold to them by Plaintiff by selling the goods in their stores and retaining the money paid to them by their customers without paying Plaintiff. Defendants were thus able to reduce their personal liability on the loan to Foothill. [HN1] Under New York law, the elements of conversion are: (1) the plaintiff has an immediate right to possession of the property converted; (2) the defendant's possession of the property was unauthorized; (3) the defendant acted to exclude the rights of the lawful owner of the property; (4) the property is specifically identifiable; and (5) the defendant is obligated to return the property. *See Scholastic, Inc. v. Harris, 80 F. Supp. 2d 139, 152 (S.D.N.Y. 1999)* (citing *Key Bank v. Grossi, 227 A.D.2d 841, 642 N.Y.S.2d 403 (App. Div. 1996))*. [HN2] A claim for conversion that is redundant of a breach of contract claim should be dismissed, *see id.* (listing cases), and a mere obligation to pay money does not support a claim for conversion, [*4] *see Ehrlich v. Howe, 848 F. Supp. 482, 492 (S.D.N.Y. 1994)* (listing cases).

CWT was in rightful possession of the funds when its customers paid for their goods. To the extent that CWT's retention of that money could be construed as conversion, Plaintiff has not established that it had an immediate right to possession of any specifically identified funds or that those particular funds were to be treated in a certain manner. Rather, Plaintiff is making the simple and straightforward complaint that it did not get paid. Such a claim is not legally cognizable as conversion.

Plaintiff next argues that Defendants were unjustly enriched by their failure to pay for goods already delivered by Plaintiff. [HN3] To state a claim for unjust enrichment, a plaintiff must allege that the defendant "was enriched at the plaintiff's expense and that the circumstances are such that equity and good conscience require that defendant make restitution." *Mina Inv.*

*Holdings Ltd. v. Lefkowitz, 16 F. Supp. 2d 355, 361 (S.D.N.Y. 1998)* (listing cases). Because unjust enrichment is quasi-contractual in nature, such claims are typically unenforceable where a valid contract governs the [*5] transaction. *See id.* (listing cases). Plaintiff's claim is in essence a repleading of its breach of contract claims currently pending in the related bankruptcy proceeding, and therefore must fail.

Third, Plaintiff asks that a constructive trust be imposed in the amount of CWT's profits from the goods that Plaintiff sold them. [HN4] A constructive trust may be appropriate where there exists: (1) a confidential or fiduciary relation, (2) a promise, express or implied, (3) a transfer made in reliance on that promise, and (4) unjust enrichment. *See Bankers Sec. Life Ins. Soc'y v. Shakerdge, 49 N.Y.2d 939, 428 N.Y.S.2d 623, 624, 406 N.E.2d 440 (1980)* (listing cases). Plaintiff concedes that no fiduciary relationship exists here. More importantly, [HN5] mere non-payment of a debt where the debtor is permitted to commingle the funds is an insufficient ground for imposition of a constructive trust. *See McKee v. Paradise, 299 U.S. 119, 122, 57 S. Ct. 124, 125, 81 L. Ed. 75 (1936); In re Black & Geddes, Inc., 35 B.R. 830, 836-37 (Bankr. S.D.N.Y. 1984)*. Plaintiff's allegation that Defendants caused CWT to refrain from paying its debt to Plaintiff simply [*6] amounts to a claim for non-payment where the money remained in the corporation and Defendants were not unjustly enriched. In addition, Plaintiff does not allege that Defendants are currently in possession of any funds upon which the Court would impose such a trust.

For the foregoing reasons, Defendants' motion to dismiss the complaint is granted.

**SO ORDERED.**

Dated: New York, New York

January 2, 2001

JOHN S. MARTIN, JR., U.S.D.J.

LEXSEE 2004 U.S. DIST. LEXIS 11575



Positive
As of: Jul 11, 2008

**CHRISTOPH E. KULL, Plaintiff -against- DAVIDOFF OF GENEVA (NY), INC.,
DAVIDOFF OF GENEVA (CT), INC., DAVIDOFF DIRECT, INC., DAVIDOFF
OF GENEVA, INC., DAVIDOFF OF GENEVA LICENSING CORP., DAVIDDOFF
OF GENEVA (USA), INC., and OETTINGER IMEX, AG, Defendants.**

**01 Civ. 4831 (LMM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2004 U.S. Dist. LEXIS 11575*

**June 22, 2004, Decided
June 23, 2004, Filed**

**DISPOSITION:** [*1] Defendants' motion for summary judgment was granted in part and denied in part. Kull's motion for summary judgment as to Defendants' counterclaims was denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employee sued defendant related companies for retaliatory discharge in violation of Title VII of the Civil Rights Act of 1964 and New York human rights law, for claims under the Connecticut Fair Employment Practices Act (CFEPA), as well as claims for breach of contract, promissory estoppel, breach of the covenant of good faith and fair dealing, unjust enrichment, and intentional and negligent infliction of emotional distress.

**OVERVIEW:** The employee alleged that the companies unlawfully terminated his employment in retaliation for bringing forward the sexual harassment allegations of his wife, and his secretary. Two of the companies counterclaimed for breach of the fiduciary duty of loyalty and tortious interference with contract advantage or prospective economic advantage, based on the employee's alleged acceptance of kickbacks from a vendor. The companies moved for summary judgment. The employee moved for summary judgment as to the counterclaims. Inter alia, the court held that although the employee performed some duties at the companies' New York retail store, he lived and worked in Connecticut and the decision to terminate him was not effected in New York, precluding the New York human rights law claim. However, the court had jurisdiction over the Title VII and CFEPA retaliation claims, which survived because there was total disagreement between the parties as to both the kickback and harassment claims. The employee claimed that an employment agreement was laid out in a missing letter, which the companies claimed did not exist, so summary judgment on that claim was inappropriate as well.

**OUTCOME:** The companies' motion for summary judgment was granted with respect to the employee's claims for retaliation under the New York Executive Law, promissory estoppel, breach of the covenant of good faith and fair dealing, and unjust enrichment, and denied as to all other claims. The employee's motion for summary judgment as to the counterclaims was denied.

**CORE TERMS:** termination, summary judgment,

Case 1:07-cv-10595-SHS    Document 31-8    Filed 07/11/2008    Page 23 of 45

Page 2
2004 U.S. Dist. LEXIS 11575, *1

kickback, notice, cigar, retaliation, harassment, terminate, emotional distress, entity, infliction, supervisor, sexual harassment, issue of fact, protected activity, tortious interference, terminated, outrageous, good faith, unjust enrichment, imputed, fair dealing, contract claims, promissory estoppel, counterclaims, employment practice, dinner party, citations omitted, retaliatory, impropriety

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Legal Entitlement*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN1] Under *Fed. R. Civ. P. 56*, an action will be dismissed on summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Fed. R. Civ. P. 56(c)*.

*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN2] On a motion for summary judgment, the court must view all evidence in the light most favorable to the nonmoving party.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
[HN3] On a motion for summary judgment, once a moving party presents appropriate support showing that there is no genuine issue of material fact, the nonmoving party must present similar support setting forth specific facts about which a genuine issue remains. *Fed. R. Civ. P. 56(e)*. The party with the burden of proof at trial must make a showing sufficient to establish the existence of an element essential to that party's case.

*Civil Procedure > Summary Judgment > Standards > Appropriateness*

*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN4] On a motion for summary judgment, mere conclusory allegations will not suffice. *Fed. R. Civ. P. 56(e)*. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper.

*Labor & Employment Law > Discrimination > Retaliation > General Overview*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN5] Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, prohibits retaliation for behavior protected under its provisions. The statute states that it is an unlawful employment practice for an employer to discriminate against any of his employees because he has opposed any practice made an unlawful employment practice or because he has made a charge of an unlawful employment practice. *42 U.S.C.S. § 2000e-3(a)*. Both New York and Connecticut have similar state laws codified as part of their human rights laws. *N.Y. Exec. Law § 296(3-a)(c)* (2001 & Supp. 2004); *Conn. Gen. Stat. § 46a-60(a)(4)* (2003).

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN6] Although there are exceptions in general, acts committed outside New York against a nonresident are not covered by the New York statute.

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Coverage & Definitions > Employers*
[HN7] See *42 U.S.C.S. § 2000e(b)*.

*Labor & Employment Law > Discrimination > Actionable Discrimination*
[HN8] The Connecticut human rights law requires a minimum of three employees for an entity to be subject to its provisions. *Conn. Gen. Stat. § 46a-51(10)*.

*Labor & Employment Law > Discrimination >*

2004 U.S. Dist. LEXIS 11575, *1

**Actionable Discrimination**
[HN9] See *Conn. Gen. Stat. § 46a-51(10).*

**Labor & Employment Law > Discrimination > Actionable Discrimination**
**Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview**
[HN10] The term "employer" has been construed liberally under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.* Accordingly, the United States Court of Appeals for the Second Circuit uses the single employer doctrine in order to determine whether two entities will be regarded as a single employer subject to joint liability for employment-related acts. Because application of the doctrine results in the treatment of two or more ostensibly separate entities as a single, integrated enterprise, the number of employees of each entity can be aggregated when examining jurisdictional thresholds. There are four factors used in determining whether two entities can be considered a single employer: (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control. The most important of the four factors is the second -- centralized control of labor relations. No one factor is controlling, and not every factor is required. Whether entities can be joined as a single employer is a question of fact. These factors also apply to a claim brought under the Connecticut Fair Employment Practices Act, *Conn. Gen. Stat. § 46a-51 et seq.*

**Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices > Interference With Protected Activities**
**Labor & Employment Law > Discrimination > Retaliation > General Overview**
**Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview**
[HN11] A claim for retaliation under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, requires proof of the following four elements: (1) the plaintiff was engaged in a protected activity; (2) the employer was aware of the participation; (3) the plaintiff was subject to an adverse employment action; and (4) there is a nexus between the activity and the action taken.

**Evidence > Procedural Considerations > Circumstantial & Direct Evidence**

**Labor & Employment Law > Discrimination > Retaliation > General Overview**
[HN12] Without direct evidence of retaliation, courts use the order and allocation of proof established in McDonnell-Douglas Corp. v. Green. Under this framework, once a plaintiff, establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its actions. If the defendant is successful, the plaintiff must prove by a preponderance of the evidence that the defendant's proffered reason was pretextual, and was instead an unlawful retaliation.

**Labor & Employment Law > Discrimination > Retaliation > General Overview**
[HN13] The analysis for a retaliation claim is substantially the same under the Connecticut Fair Employment Practices Act, *Conn. Gen. Stat. § 46a-51 et seq.* as under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*

**Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Employer Liability > Coworkers**
**Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Employer Liability > Supervisors**
**Labor & Employment Law > Discrimination > Retaliation > General Overview**
[HN14] In a number of retaliation cases, the courts have imputed to the employer knowledge held by an employer's agent, such as a supervisor, of unlawful actions in order to hold the employer itself liable for those actions.

**Labor & Employment Law > Discrimination > Retaliation > General Overview**
[HN15] To establish a prima facie retaliation case, the plaintiff must still demonstrate a connection between his protected activity and the adverse employment action against him. With respect to proving this connection, then, the question as to whether the knowledge of the protected activity can be imputed is more or less beside the point.

**Civil Procedure > Summary Judgment > Standards > General Overview**

[HN16] A court cannot resolve conflicting testimony on a motion for summary judgment.

*Civil Rights Law > Practice & Procedure > Limitation Periods*
*Labor & Employment Law > Discrimination > Retaliation > General Overview*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN17] A Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.* retaliation claim plaintiff must show that the allegedly adverse actions occurred in circumstances from which a reasonable jury could infer retaliatory intent. In the absence of direct evidence of a retaliatory motive, the requisite nexus between the protected activity and the adverse employment action can be shown through a close temporal proximity. Although there is no bright-line rule, a variety of time limits within a year have been used to raise a question regarding the nexus between a protected activity and retaliatory action.

*Civil Procedure > Summary Judgment > Opposition > General Overview*
*Labor & Employment Law > Discrimination > Retaliation > General Overview*
[HN18] A retaliation plaintiff can defeat a motion for summary judgment by producing sufficient evidence to support a rational finding that the employer's proffered nondiscriminatory reason was false and that discrimination was the real reason.

*Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview*
[HN19] Pursuant to New York choice-of-law rules, contract claims are governed by a "center of gravity" or "grouping of contacts" test, under which courts apply factors such as the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties. The places of contracting and performance are given the greatest weight.

*Contracts Law > Types of Contracts > Express Contracts*
*Labor & Employment Law > Employment Relationships > At-Will Employment > Duration of Employment*
*Labor & Employment Law > Employment Relationships*

*> At-Will Employment > Exceptions > Implied Contracts*
[HN20] Under Connecticut law, all employer-employee relationships not governed by express contracts involve some type of implied contract of employment. Generally, contracts of permanent employment for an indefinite term are at-will. The parties can modify this default rule by agreement.

*Contracts Law > Types of Contracts > General Overview*
*Labor & Employment Law > Employment Relationships > Employment Contracts > General Overview*
*Labor & Employment Law > Wrongful Termination > Breach of Contract > Employer Handbooks*
[HN21] Terms of an employment contract can differ from the provisions set forth in general company literature.

*Contracts Law > Consideration > Enforcement of Promises > Forbearance*
*Contracts Law > Consideration > Promissory Estoppel*
[HN22] In Connecticut, a claim for promissory estoppel has three prongs: (1) a clear and definite promise; (2) a change in position in reliance; and (3) resulting injury. A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. Promissory estoppel is a doctrine often used in the absence of a contractual relationship -- for instance, where consideration is lacking -- to place liability on the promisor. It is therefore not inconsistent to find the absence of a contract, yet find liability based on promissory estoppel.

*Contracts Law > Consideration > Enforcement of Promises > General Overview*
*Contracts Law > Consideration > Promissory Estoppel*
[HN23] Mere lack of seeking another job is not the sort of change in position that an employee can use to support a claim of promissory estoppel against an employer.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*
*Contracts Law > Types of Contracts > Covenants*
[HN24] Under Connecticut law, every contract carries an implied covenant of good faith and fair dealing requiring

that neither party do anything that will injure the right of the other to receive the benefits of the agreement. The claim exists to fulfill the reasonable expectations of the contracting parties as they presumably intended. The claim is separate from and can be maintained in addition to a breach of contract claim.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*

[HN25] The elements of a bad faith claim are as follows: (1) plaintiff and defendant entered into a contract under which the plaintiff had a reasonable expectation of benefits; (2) the defendant undertook actions that undermined the plaintiff's right to collect certain benefits; and (3) the defendant acted in bad faith.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*

[HN26] Bad faith means more than more negligence; it involves a dishonest purpose.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*
*Labor & Employment Law > Employment Relationships > At-Will Employment > General Overview*
*Labor & Employment Law > Wrongful Termination*

[HN27] In a bad faith termination case, an at-will employee must establish that his dismissal was for a demonstrably improper reason, the impropriety of which is derived from a violation of some important public policy.

*Contracts Law > Types of Contracts > Covenants*
*Labor & Employment Law > Discrimination > Age Discrimination > Remedies > General Overview*
*Labor & Employment Law > Wrongful Termination > Public Policy*

[HN28] A plaintiff bringing a claim for violation of the implied covenant of good faith and fair dealing must also establish that he does not otherwise have an adequate means of vindicating that public policy.

*Contracts Law > Types of Contracts > Implied-in-Law Contracts*

[HN29] A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good

conscience for one to retain a benefit which has come to him at the expense of another. The elements of the claim are that (1) the defendant benefitted; (2) the defendant unjustly failed to pay the plaintiff for the benefits; and (3) the failure of payment was to the plaintiff's detriment.

*Contracts Law > Remedies > Equitable Relief > General Overview*
*Contracts Law > Types of Contracts > Implied-in-Law Contracts*
*Labor & Employment Law > Wrongful Termination > Breach of Contract > Formation*

[HN30] Unjust enrichment applies whenever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract. Indeed, lack of a remedy under the contract is a precondition for recovery based upon unjust enrichment.

*Torts > Intentional Torts > Intentional Infliction of Emotional Distress > Elements*

[HN31] Under Connecticut law, to establish a claim for intentional infliction of emotional distress, a plaintiff must prove the following: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe.

*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*
*Torts > Intentional Torts > Intentional Infliction of Emotional Distress > Elements*

[HN32] On an intentional infliction of emotional distress claim under Connecticut law, where the primary dispute has to do with the second prong: the extreme or outrageous nature of the conduct, whether the defendant's conduct is sufficient to satisfy the extreme and outrageous standard is a question, in the first instance, for the court. Where reasonable minds can differ, however, it becomes an issue for the jury. The conduct in question must exceed all bounds usually tolerated by decent society. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in

a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Torts > Intentional Torts > Intentional Infliction of Emotional Distress > General Overview*
[HN33] In the context of an intentional infliction of emotional distress claim in Connecticut, both Connecticut and federal courts in the circuit have been reluctant to find conduct of defendants to be extreme and outrageous. However, extreme or outrageous conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests.

*Torts > Negligence > Actions > Negligent Infliction of Emotional Distress > Elements*
[HN34] To succeed on a claim for negligent infliction of emotional distress, a plaintiff must prove that the defendant should have: (1) realized its conduct involved an unreasonable risk of causing plaintiff distress; and (2) realized the distress, if caused, might result in illness or bodily harm.

*Torts > Negligence > Actions > Negligent Infliction of Emotional Distress > General Overview*
[HN35] In Connecticut, in the work context, a claim for negligent infliction of emotional distress arises only when it is based upon unreasonable conduct of the defendant during the termination process. The requirement that the behavior be linked to the termination process, however, has been interpreted more broadly under Connecticut law. Courts have dismissed plaintiffs' claims when, for instance, he or she remains employed or if the termination was wrongful, but involved no egregious conduct.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > Pendent Claims*
*Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview*
*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*
[HN36] A federal court sitting in diversity or adjudicating state law claims that are pendent to a federal claim must

apply the choice of law rules of the forum state.

*Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview*
*Governments > Fiduciary Responsibilities*
[HN37] Under New York law, a claim for breach of fiduciary duty against a corporation is governed by the law of the relevant company's state of incorporation.

*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*
[HN38] Where neither side has argued that another nation's law be applied, it is initially assumed that the other nation's law is the same as the forum state's law, and either party may challenge that assumption at any time in the litigation by providing "reasonable written notice" of its intent to raise the issue. *Fed. R. Civ. P. 44.1.*

*Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview*
[HN39] In tort cases, New York courts apply an "interest analysis," under which the law of the jurisdiction with the greatest interest in the matter is applied.

*Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview*
[HN40] Under New York's choice of law formulation, the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort. If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders.

*Contracts Law > Formation > General Overview*
[HN41] Without a mutual assent, or a meeting of the minds, there cannot be a valid accord. Whether a meeting of the minds has occurred is a factual determination.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Waiver & Preservation*
[HN42] Waiver is the intentional relinquishment of a known right. The four elements of waiver are as follows: (1) the existence of a right or defense; (2) the opportunity to apply and use that right or defense; (3) the knowledge of the ability to use that right or defense; and (4) actions

of the party who possesses that right or defense that amount to a relinquishment of that right.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
*Governments > Fiduciary Responsibilities*
[HN43] A president of a corporation is in a fiduciary relationship to the corporation. The president occupies a position of the highest trust and therefore he is bound to use the utmost good faith and fair dealing in all his relationships with the corporation.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Governments > Fiduciary Responsibilities*
[HN44] In the context of a breach of fiduciary duty claim, the factfinder must determine whether a transaction between a corporation and its officer is of a type that would lead to the burden-shifting regime set out in Murphy, and, if so, whether the officer can meet such burden.

*Business & Corporate Law > Agency Relationships > Duties & Liabilities > Knowledge & Notice > General Overview*
*Business & Corporate Law > Corporations > Formation > Corporate Existence, Powers & Purpose > Powers > General Overview*
*Torts > Business Torts > Commercial Interference > General Overview*
[HN45] In Connecticut, the elements of tortious interference are the existence of a contractual or beneficial relationship, the defendants' knowledge of that relationship, the intent to interfere with it, and the consequent actual loss suffered by the plaintiff. Under Connecticut law, an agent of a corporation may be held liable for interfering with a contract of that corporation if he was not acting legitimately within the scope of his duties, but was using corporate power improperly for his personal gain. He acts for personal gain if he seeks personal financial gain or is motivated by personal animus. To sustain the claim, the claimants must show that the agent's actions were tortious; that is, that they involved fraud, misrepresentation, intimidation, or

molestation, or that he acted maliciously. The claim requires some showing of improper means or motive. The tort does not require a breach of contract.

*Torts > Business Torts > Commercial Interference > Contracts > General Overview*
[HN46] Although parties claiming tortious interference with a contract may have trouble showing that they lost a business opportunity, damages may be recoverable where the interference causes the performance to be more expensive or burdensome.

**COUNSEL:** For Christoph E. Kull, Plaintiff: Alan S. Pralgever, LEAD ATTORNEY, Wolf, Block, Brach & Eichler Hammer & Gladstone, P.C., Roseland, NJ.

For Davidoff of Geneva (NY), Inc., Davidoff of Geneva (USA), Inc., Defendants: Elise M. Bloom, LEAD ATTORNEY, Jackson Lewis, LLP, New York, NY.

For Davidoff of Geneva (NY), Inc., Davidoff of Geneva (CT), Inc., Davidoff Direct, Inc., Davidoff of Geneva, Inc., Davidoff of Geneva Licensing Corporation, Davidoff of Geneva (USA), Inc., Oettinger Imex, AG, Defendants: Jennifer B. Courtian, LEAD ATTORNEY, Jackson Lewis, LLP, New York, NY.

For Davidoff of Geneva (CT), Inc., Davidoff Direct, Inc., Davidoff of Geneva, Inc., Davidoff of Geneva Licensing Corporation, Oettinger Imex, AG, Defendants: Elise M. Bloom, LEAD ATTORNEY, Jackson Lewis, LLP, White Plains, NY.

For Davidoff of Geneva (CT), Inc., Oettinger [*2] Imex, AG, Counter Claimants: Elise M. Bloom, LEAD ATTORNEY, Jackson Lewis, L.L.P., White Plains, NY.

For Davidoff of Geneva (CT), Inc., Oettinger Imex, AG, Counter Claimants: Jennifer B. Courtian, LEAD ATTORNEY, Jackson Lewis, L.L.P., New York, NY.

For Christoph E. Kull, Counter Defendant: Alan S. Pralgever, LEAD ATTORNEY, Brach, Eichler, Rosenberg, Silver, Bernstein, Hammer & Gladstone, P.C., Roseland, NJ.

**JUDGES:** Lawrence M. McKenna, U.S.D.J.

**OPINION BY:** Lawrence M. McKenna

**OPINION**

*MEMORANDUM AND ORDER*

McKENNA, D.J.

Plaintiff brings this action against the Swiss company Oettinger Imex, AG (referred to here as "Oettinger") and its United States corporate entities Davidoff of Geneva (NY), Inc., Davidoff of Geneva (CT), Inc., Davidoff Direct, Inc., Davidoff of Geneva, Inc., Davidoff of Geneva Licensing Corp., and Davidoff of Geneva (USA), Inc. (collectively "Davidoff"), alleging retaliatory discharge in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e-1 et seq.* (Title VII), *Article 15 of the New York State Executive Law, § 290 et seq.,* and the Connecticut Fair Employment Practices Act (CFEPA), *Conn. Gen. Stat. § 46a-51* **[*3]** *et seq.* He also brings common law claims for breach of contract, promissory estoppel, breach of the covenant of good faith and fair dealing, unjust enrichment, and intentional and negligent infliction of emotional distress. Plaintiff alleges that Defendants unlawfully terminated his employment in retaliation for bringing forward the sexual harassment allegations of his wife, Theres Kull, and his secretary, Alexandra Domond.

Defendants Oettinger and Davidoff of Geneva (CT) bring counterclaims for breach of the fiduciary duty of loyalty and tortious interference with contract advantage or prospective economic advantage, arising from Plaintiff's alleged acceptance of kickbacks from one of Defendants' vendors, Avo Uvezian.

Defendants have filed motions for summary judgment pursuant to *Rule 56 of the Federal Rules of Civil Procedure* with respect to all of Plaintiff's claims, as well as Davidoff of Geneva's and Oettinger's two counterclaims, and Plaintiff has filed a motion for summary judgment with respect to both of the counterclaims. For the reasons set forth below, Defendants' motion is granted in part and denied in part, and Plaintiff's **[*4]** motion is denied.

**Background**

Oettinger is a Swiss corporation whose principal business is the retail sale of cigars, smoking products, perfumes, wines, chocolates, fine writing instruments, and other accessories. (Def. 56.1 Stmt. P 1). [1] In 1986, Oettinger decided to expand its business. To that end, it created five United States subsidiaries and one United States holding company. (*Id.* P 2.) The United States operation sells primarily Davidoff tobacco and related products. (*Id.* P 3). In conjunction with this expansion, Oettinger hired Christoph Kull, who relocated to the United States in 1987 with his wife and, at the time, two children. (*Id.* 4-5.) In 1989, Kull purchased a home in Riverside, Connecticut, with the aid of a loan from Oettinger. (*Id.* P 6; Kull Dep. at 146-47.) Kull began his employment as president of each of Oettinger's United States corporations on January 1, 1987, overseeing the operations of the companies. (Def. 56.1 Stmt. PP 7-8.) Although, upon moving to the United States, Kull was paid by Davidoff of Geneva (NY), once the Connecticut operations were created, he was paid by Davidoff of Geneva (CT). (Kull Dep. at 45-46; *see also* Def. **[*5]** 56.1 Stmt. P 15.) His office was located in Stamford, Connecticut. (Def. 56.1 Stmt. P 8.)

1    Both parties, pursuant to Local *Rule 56.1,* have submitted statements of undisputed material facts in support of their motions for summary judgment, as well as counter-statements in opposition to the other parties' statements. The two documents connected to Defendants' motion for summary judgment will be referred to as "Def. 56.1 Stmt." and "Pl. Opp. 56.1 Stmt." Likewise, the two documents connected to Plaintiff's motion will be referred to as "Pl. 56.1 Stmt." and "Def. Opp. 56.1 Stmt." Similarly, the memoranda associated with the Defendants' motion will be referred to as "Def. Mem.", "Pl. Opp.", and "Def. R. Mem.", while the documents associated with Plaintiff's motion will be referred to as "Pl. Mem.", "Def. Opp.", and "Pl. R. Mem." Because multiple affidavits with both lettered or numbered exhibits have been submitted, each affidavit will be referred to by name and date, along with the exhibit number or letter, if necessary.

**[*6]** From the commencement of his employment until January 1, 1998, Kull reported directly to Dr. Ernst Schneider, president of Oettinger, and George Schelker, one of Oettinger's directors. (*Id.* PP 4, 9.) On January 1, 1997, Schneider hired Dr. Reto Cina as chief executive operator of Oettinger and its United States subsidiaries. (Id. P 10.) Cina reported to Schneider and Schelker and as of January of 1998, Kull reported directly to Cina. (*Id.* PP 13-14. )

Avo Uvezian was an independent supplier of cigars to Oettinger and its United States companies from 1988 until March of 1995. (*Id.* P 19.) His cigars included the brand AVO XO, which he began producing in 1993 and first sold to Davidoff in 1994. (*Id.* P 25; Uvezian Dep. at 36.) Oettinger eventually bought Uvezian's trademark, AVO, as well as the production rights to AVO cigars; the deal went into effect on March 1, 1995. (Def. 56.1 Stmt. P 20.) At the same time, Uvezian became a consultant to Oettinger regarding the marketing and production of AVO cigars. (*Id.* P 21.) Throughout this time period and until his dismissal -- from 1988 until March of 2000 -- Kull was Uvezian's primary contact with Oettinger, and Kull placed [*7] all orders for Uvezian's cigars. (*Id.* P 22.)

Aside from the facts listed above, the parties' accounts of the underlying allegations in this dispute differ significantly. The dispute is primarily based on two sets of alleged activities, about which there is considerable disagreement: first, a financial arrangement between Kull and Uvezian, and second, the alleged sexual harassment by Cina of Kull's wife and secretary and Kull's subsequent reaction. In addition, there is a dispute over the terms of Kull's contract.

First, it is undisputed that there was a financial arrangement between Kull and Uvezian that was outside their professional dealings. Defendants argue this was a kickback scheme Kull devised and imposed on Uvezian; Kull, on the other hand, argues that he accepted a loan from Uvezian, which he paid back in full.

According to Defendants' version of the facts, when Uvezian began producing AVO XO cigars in 1993, Kull used the opportunity to begin a kickback scheme with Uvezian. (*Id.* PP 25-30.) In 1993, Defendants say, Uvezian informed Kull of the new line of cigars and presented him with a price list. Kull then placed an order for the cigars, but arranged the transaction [*8] so that Davidoff was charged an extra $ 0.25 per cigar than that indicated on the price list. (*Id.* PP 25-27.) Kull allegedly told Uvezian that, upon receipt of payments, Uvezian should transfer the extra amount directly to him. (*Id.* P 28.) To facilitate this transfer, Kull directed Uvezian to open a bank account in Puerto Rico, which Uvezian did on May 9, 1994, and told him to deposit the additional money there. (*Id.* P 29; Uvezian Dep. at 66.) After that, Uvezian withdrew money from that account a number of times and issued checks in varying amounts at Kull's

direction. (Def. 56.1 Stmt. PP 30-31.) Uvezian also allegedly made cash payments to Kull from his own personal savings after Davidoff bought the rights to the AVO brand. (*Id.* P 32; Uvezian Dep. at 71.)

According to Defendants, Oettinger and Davidoff first became aware of the kickback scheme when Uvezian approached Cina with the information at a tobacco products trade show in Las Vegas in July of 1999. (Def. 56.1 Stmt. PP 23-24.) Cina asked for documentary evidence, and Uvezian agreed to provide it by September of 1999. (*Id.* PP 33-34.) In the meantime, Uvezian returned to Switzerland and informed Schneider and [*9] Schelker of Uvezian's allegations. (*Id.* P 35.) On August 4, 1999, Schneider and Schelker informed a committee of Oettinger's board of directors of the allegations, and the committee concluded that, should the allegations be substantiated, Kull would be terminated. (*Id.* P 37; Minutes of August 4, 1999, Meeting, Bloom Aff. of 2/28/03 Ex. K.) By August 9, Oettinger had begun to look for Kull's replacement and had retained Halter & Partner, a Swiss managerial recruiting firm. (Def. 56.1 Stmt. P 40; Letter from Halter & Partner to Oettinger of 8/9/99, Bloom Aff. of 2/28/03 Ex. L (confirming contract for "the search for and selection of a managing director for America for the firm Oettinger Imex AG").)

In September of 1999, Uvezian provided Cina with the requested documentation of his dealings with Kull, consisting of a bankbook, withdrawal forms, and copies of checks, which Cina forwarded to Schneider and Schelker. (Def. 56.1 Stmt. PP 42-43.) On November 8, 1999, Schelker met with Uvezian to discuss the arrangement. (*Id.* P 45.) The Oettinger board members decided to wait to terminate Kull until after the Christmas holidays and after a replacement was found, reasoning that under [*10] Cina's close supervision and scrutiny, Kull would be unable to engage in any further financial impropriety. (*Id.* P 46-47.) On February 25, 2000, Oettinger's board of directors executed its decision to terminate Kull, and on March 3, 2000, in Kull's Stamford office, Schelker informed Kull of the decision and terminated his employment. (*Id.* PP 48-49.)

Kull's version of the events leading up to his termination, unsurprisingly, differs dramatically. Kull admits to having financial interactions with Uvezian apart from Oettinger's business, but disputes many of the details of Defendants' version. Kull maintains that any money Uvezian gave him was a loan -- one Uvezian

himself suggested -- for personal reasons. (Kull. Dep. at 100; Pl. Opp. 56.1 Stmt. P 30, at 3.) [2] Furthermore, Kull states that Uvezian, not Kull, suggested opening the account in Puerto Rico, at least in part to give Kull access to local ATMs, and that any activity was due to Uvezian's acting on his own. (Kull Dep. at 98, 104.) Additionally, any increase in the price of the cigars, Kull testified, was a result of expenses that Uvezian did not initially realize he had to bear as the trademark holder. (Kull Dep. at [*11] 97.)

> 2  Both parties' counter 56.1 statements provide a paragraph-by-paragraph response to the moving party's 56.1 statement, and then lists additional facts, restarting the paragraph numbering at 1. AS a result, both documents will be cited with both paragraph number and page number.

As for Oettinger's knowledge of any financial interactions between Kull and Uvezian, Kull maintains that Oettinger first learned of the arrangement in 1995, when Uvezian informed Rene Hollenstein, head of purchasing, production, and product development. (Pl. 56.1 Stmt. P 11.) Hollenstein then did nothing with the information. (Pl. Opp. 56.1 Stmt. P 20(1), at 13; Uvezian Dep. at 49.) Contrary to Cina's testimony, Uvezian testified that he did not mention a kickback scheme to Cina in Las Vegas in July, but first mentioned it to him at a dinner party on September 27, 1999, at Hollenstein's request. (Pl. 56.1 Stmt. P 18; Uvezian Dep. at 116-18; *see also* Fax from Cina to Uvezian of 4/26/00, Koenigsberg Aff. of 3/3/03 Ex. Q (confirming [*12] date of dinner party).) Kull acknowledges that there is a document purporting to be the minutes of an August 4, 1999, meeting at which the kickbacks were allegedly discussed, but calls its validity into question, and questions whether the meeting actually occurred. (Pl. Opp. 56.1 Stmt. P 38, at 4.) At most, Kull says, the minutes appear only to authorize an investigation. (*Id.* P 20(4), at 14.) [3] Kull also disputes the meaning bestowed upon the August 9 letter from the management selection firm Halter & Partner. (*Id.* P 41, at 4.) Because Kull maintains that Cina first found out about Uvezian's allegations in late September 1999, and not at a trade show in July, he also denies that Cina requested documents regarding a kickback scheme from Uvezian in July of 1999. (*Id.* P 42, at 4.) Furthermore, he takes issue with the rationale that Cina could prevent any impropriety through close scrutiny, as he says that he had no supervisors in the United States, nor did he have daily or even weekly contact with any

supervisors. (*Id.* P 47, at 5.)

> 3  Kull refers to an August 6 letter, although the Court assumes he is referring to the minutes of the meeting that purportedly occurred on August 4.

[*13]  The second set of activities involves alleged sexual harassment by Cina. Kull asserts that, instead of being terminated because of any financial impropriety, he was terminated because he reported the sexual harassment of his wife and secretary. Both parties dispute the other's allegations having to do with the timing of events leading up to Kull's termination. According to Kull's version, on July 8, 1999, Davidoff held a company picnic in Connecticut at which Cina, Kull, and Kull's wife, Theres, were in attendance. (Pl. 56.1 Stmt. P 13.) On July 26, 1999, Mrs. Kull contacted Robert C. Edmonds, in-house counsel at Davidoff, and informed him that at the picnic, Cina had behaved in a sexually inappropriate manner towards her. (Pl. 56.1 Stmt. P 12; Letter from Edmonds to Schneider of 8/30/99, Koenigsberg Aff. of 4/3/2003 Ex G, at 3.) Meanwhile, on July 20, 1999, Kull's secretary, Alexandra Domond, reported to Edmonds that Cina had behaved in a sexually inappropriate manner toward her. (Pl. 56.1 Stmt. P 15.) Edmonds, along with Davidoff's director of human resources, conducted a preliminary investigation into the allegation on July 30. (Def. 56.1 Stmt. P 52; Letter from Edmonds to Schneider [*14] of 8/30/99, at 2.) On August 10, Edmonds informed Kull of his plans to arrange a meeting with the Oettinger principals regarding the alleged harassment. (Def. 56.1 Stmt. P 54.) On August 11, Edmonds scheduled that meeting for August 19. (E-mail from Edmonds to Schweizer [Schneider's Assistant] of 8/11/99, Bloom Aff. of 2/28/03 Ex. S.) In response, on August 13, 1999, Kull himself went to Switzerland and informed Schneider and Schelker of the allegations against Cina. (Def. 56.1 Stmt. P 55.)

According to Defendants, although Edmonds scheduled his meeting on August 11, he did not inform them of the purpose of the meeting. (Def. 56.1 Stmt. PP 52-53.) Therefore, according to Defendants, Schneider and Schelker first heard of the allegations on August 13, when Kull informed them in person. At the scheduled August 19 meeting with Edmonds, Schneider and Schelker informed Edmonds that if the allegations were found to be true, Cina would be discharged. (*Id.* P 57.) As far as Domond's allegations are concerned, Defendants insist that her report to Edmonds was made at Kull's

urging. (Def. 56.1 Stmt. P 58). Indeed, on August 16, 1999, Domond withdrew her complaint and stated she did not want [*15] to pursue "any action whatsoever" in relation to the allegations. (Letter from Edmonds to Schneider of 8/30/99, at 2.) According to Defendants, however, even though Edmonds informed them that Domond expressed her wishes to withdraw her complaint, Schneider and Schelker suggested that he continue the investigation, including interviewing Cina himself, and re-interviewing Domond and the coworker who allegedly witnessed the impropriety. (Def. 56.1 Stmt. P 59.) According to Defendants, Cina first heard of the allegations of sexual harassment on August 26, 1999. (*Id.* P 60.)

Roughly one month later, according to Kull, at the dinner party in September of 1999, Rene Hollenstein asked Uvezian to tell Cina about the incident regarding the money. Oettinger then decided to terminate Kull on February 25, 2000. (Pl. 56.1 Stmt. PP 18-19.) Defendants deny this, and aver that the money was not discussed at the dinner party, and that the decision to terminate Kull was made on August 4, pending the outcome of any investigation of the kickback scheme. (Def. Opp. 56.1 Stmt. PP 18-19, at 6-7.)

The final disputed issue underlying the above allegations and Kull's termination has to do with the terms [*16] of Kull's employment contract. A letter, dated September 23, 1986, sets forth the general terms and conditions of Kull's employment with Davidoff; Kull signed it soon after receiving it. (Letter from Oettinger to Kull of 9/23/86, Bloom Aff. of 2/28/03 Ex. V.) Notably, the letter does not state that the parties must give advance notice before dissolution of the employment relationship, or that termination could be effected only for cause. (*Id.*) The letter does, however, state that the details of the contract along with a description of the responsibilities were still being worked out. (Letter from Oettinger to Kull of 9/23/86, at 2.) Defendants claim that no such detailed contract was ever executed, while Kull maintains that they did subsequently issue a letter that stated that both parties agreed to give the other six months' notice before terminating the employment relationship. (Def. 56.1 Stmt. P 65; Pl. Opp. 56.1 Stmt. P 65, at 6.)

Related to this issue is the handbook for employees of Davidoff. Both parties agree that the provisions of the handbook state that all employment with Davidoff is "at will," and that Davidoff could terminate an employee's employment with or without [*17] cause or notice. (Def. 56.1 Stmt. P 69.) Kull, however, argues that the language of the handbook was overridden by the contract between them. (Pl. Opp. 56.1 Stmt. P 69, at 6.)

**Standard of Review**

[HN1] Under *Rule 56*, an action will be dismissed on summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *Silver v. City Univ. of New York, 947 F.2d 1021, 1022 (2d Cir. 1991)*. [HN2] The court must view all evidence in the light most favorable to the nonmoving party. *Eastman Kodak Co. v. Image Technical Servs., 504 U.S. 451, 456, 119 L. Ed. 2d 265, 112 S. Ct. 2072 (1992)* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*; *Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986))*.

[HN3] Once a moving party presents appropriate support showing that there is no genuine issue of material fact, the nonmoving [*18] party must present similar support setting forth specific facts about which a genuine issue remains. *Fed. R. Civ. P. 56(e)*; *see Anderson, 477 U.S. at 256*. The party with the burden of proof at trial must "make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. [HN4] Mere conclusory allegations will not suffice. *Fed. R. Civ. P. 56(e)*. "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)*.

**Discussion**

**I. Retaliation under Title VII, the New York Executive Law, and the Connecticut Fair Employment Practices Act**

[HN5] Title VII prohibits retaliation for behavior protected under its provisions. The statute states that it is an "unlawful employment practice for an employer to

discriminate against any of his employees [*19] ... because he has opposed any practice made an unlawful employment practice ... or because he has made a charge" of an unlawful employment practice. *42 U.S.C.A. § 2000e-3(a) (West 2003)*. Both New York and Connecticut have similar state laws codified as part of their human rights laws. *See* N.Y. Exec. L. *§ 296(3-a)(c)* (McKinney 2001 & Supp. 2004); *Conn. Gen. Stat. § 46a-60(a)(4)* (2003).

### A. Jurisdiction under the New York Executive Law

Defendants argue that Kull cannot bring a claim under the New York Executive Law because he is a nonresident complaining of acts of retaliation that occurred outside the state of New York, for which the New York statute provides no remedy. (Def. Mem. at 16.)

[HN6] Although there are exceptions, *see* N.Y. Exec. L. *§ 298-a*, in general, acts committed outside New York against a nonresident are not covered by the New York statute. *See, e.g., Duffy v. Drake Beam Morin, 1998 U.S. Dist. LEXIS 7215, No. 96 Civ. 5606, 1998 WL 252063, at *12 (S.D.N.Y. May 19, 1998)* ("*The State Human Rights Law* affords no remedy to a non-New York resident who suffers discrimination outside New York State," despite that company [*20] was headquartered in *New York City); Beckett v. Prudential Ins. Co. of America, 893 F. Supp. 234, 241 (S.D.N.Y. 1995)* (*New York Human Rights Law* does not apply to actions taken outside New York state by non-New York corporation); *Iwankow v. Mobil Corp., 150 A.D.2d 272, 541 N.Y.S.2d 428, 428 (App. Div. 1st Dep't 1989)* (Canadian citizen and London, England, resident who was terminated by New York corporation not covered by statute).

That Kull performed some of his duties at the New York retail store does not exempt him from this rule. Since at least 1989, when he bought his home in Riverside, Connecticut, he has been a resident of the state of Connecticut. Kull's office is in Connecticut, and the decision to terminate him was effected by a Swiss corporation in either Basel, Switzerland, where the decision was made, or Stamford, Connecticut, where the termination actually occurred.

Defendants' motion for summary judgment is therefore granted with respect to the retaliation claim under the New York Executive Law.

### B. Defendants' Status as an Employer Under Title VII and the Connecticut Fair Employment Practices Act

Defendants argue that the retaliation [*21] claims against Davidoff Direct, Davidoff of Geneva, Davidoff of Geneva Licensing, Davidoff of Geneva (USA), and Davidoff of Geneva (NY) should be dismissed, as those entities do not have enough employees to be subject to the requirements of Title VII. Similarly, they argue that three of those entities -- Davidoff Direct, Davidoff of Geneva Licensing, and Davidoff of Geneva (USA) -- each of which has zero employees, do not have enough employees to fall under Connecticut's Fair Employment Practices Act.

[HN7] Under Title VII, an employer is "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person ...." *42 U.S.C.A. § 2000e(b)*. Similarly, the [HN8] Connecticut statute requires a minimum of three employees for an entity to be subject to its provisions. *Conn. Gen. Stat. § 46a-51(10)* [HN9] (defining employer as "any person or employer with three or more persons in such person's or employer's employ").

[HN10] The term "employer" has been construed liberally under Title VII. Accordingly, the Second Circuit [*22] uses the single employer doctrine in order to determine "whether two entities will be regarded as a single employer subject to joint liability for employment-related acts." *Murray v. Miner, 74 F.3d 402, 404 (2d Cir. 1996)*. Because application of the doctrine results in the treatment of two or more ostensibly separate entities as a single, integrated enterprise, the number of employees of each entity can be aggregated when examining jurisdictional thresholds like those at issue here. *See Smith v. K&F Indus., Inc., 190 F. Supp.2d 643, 647 (S.D.N.Y. 2002)*.

There are four factors used in determining whether two entities can be considered a single employer: (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control. *Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1240 (2d Cir. 1995)*. The most important of the four factors is the second -- centralized control of labor relations. *See Cook, 69 F.3d at 1240*. No one factor is controlling, and not every factor is required. *Lihli Fashions Corp. v. NLRB, 80 F.3d 743,*

*747 (2d Cir. 1996).* **[*23]** Whether entities can be joined as a single employer is a question of fact. *Id.*

The *Cook* factors also apply to a claim brought under the CFEPA. *See Zoldak v. Tacala, Inc.,* 2000 U.S. Dist. LEXIS 21621, No. 3:99 CV 1565, 2000 WL 1576419, at *4 n.13 (D. Conn. Sept. 27, 2000) (citing *Levy v. Comm'n on Human Rights & Opportunities, 35 Conn. App. 474, 480, 646 A.2d 893 (1994)*).

Here, the economic relationships among the various Davidoff entities in the United States are significant, and Kull has raised an issue of fact as to their integrated nature. Kull submitted an affidavit stating that the enterprise was run in an integrated manner, sharing a board of directors and a single stockholder. (Kull Aff. PP 3-4.) The entities shared accounting, and profitability was measured for the enterprise as a whole. (*Id.* P 4.) As for centralized control of labor relations, the most important factor, the entities shared their management functions and used the same human resources departments, all from the Connecticut offices. (*Id.* P 4.) *See Smith, 190 F. Supp.2d at 647* (use of common human resources department significant factor in finding single employer relationship).

**[*24]** Although the defendants are entitled to show at trial that the entities were separate and should not be integrated, for the purposes of this motion integration is a question of fact, and it is undisputed that, if integrated, the enterprise employed enough people to meet all relevant jurisdictional thresholds. Summary judgment is therefore inappropriate on those grounds.

## C. Retaliation Under Title VII and the CFEPA

[HN11] A claim for retaliation under Title VII requires proof of the following four elements: (1) the plaintiff was engaged in a protected activity; (2) the employer was aware of the participation; (3) the plaintiff was subject to an adverse employment action; and (4) there is a nexus between the activity and the action taken. *Duffy, 1998 U.S. Dist. LEXIS 7215, 1998 WL 252063, at *6* (citing *Wanamaker v. Columbian Rope Co., 108 F.3d 462, 465 (2d Cir. 1997)*).

[HN12] Without direct evidence of retaliation, courts use the order and allocation of proof established in *McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). See Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir. 1995)*. Under this framework, once a plaintiff, establishes **[*25]** a prima

facie case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its actions. If the defendant is successful, the plaintiff must prove by a preponderance of the evidence that the defendant's proffered reason was pretextual, and was instead an unlawful retaliation. *Id.*

[HN13] The analysis for a retaliation claim is substantially the same under the CFEPA as under Title VII. *See Arnold v. Yale New Haven Hosp., 213 F. Supp.2d 142, 151 (D. Conn. 2002)* (citing *Brittell v. Dep't of Correction, 247 Conn. 148, 164, 717 A.2d 1254 (1998)); Pascal v. Storage Tech. Corp., 152 F. Supp.2d 191, 196 n.1 (D. Conn. 2001)* (citations omitted).

## 1. Kull's Prima Facie Case

Here, neither side disputes that Kull engaged in a protected activity. An internal complaint of discrimination, such as Kull's notification to Schneider and Schelker of Cina's alleged harassment, satisfies that prong. *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc., 957 F.2d 59, 65 (2d Cir. 1992)*. Likewise, Kull's termination is unquestionably an adverse act. The disputed issues here, therefore, relate to the second and **[*26]** fourth prongs: whether Defendants were aware of Kull's actions before deciding to terminate him, and, if so, whether his protected actions were, in fact, the reason for his termination.

Kull must demonstrate that Defendants were aware of his activity regarding the sexual harassment claims at the time they decided to terminate him. Defendants insist that the decision to terminate Kull was originally made at the August 4, 1999, meeting, pending confirmation of his wrongdoing. (Def. Mem. at 21.) Although Theres Kull and Alexandra Domond had already approached Edmonds, Davidoff's in-house counsel, about their alleged harassment by Cina, and Edmonds had begun his investigation, Defendants maintain that the board of directors was not aware of the allegations until Kull himself informed Schelker and Schneider on August 13, 1999. (Def. Mem. at 22.)

Kull, on the other hand, states that because Kull notified Edmonds, the corporation as a whole should be treated as having knowledge of his allegations prior to the August 4, 1999, meeting. (Pl. Opp. at 15.) Kull cites *Old Republic Ins. Co. v. Landauer Assoc., Inc.,* 1989 U.S. Dist. LEXIS 13422, No. 88 Civ. 434, 1989 WL 652570 (S.D.N.Y. Nov. 9, 1989), for **[*27]** the proposition that

notice to an officer can be imputed to the corporation. *Landauer Assoc.,* however, involved the construction of an insurance policy. There, the senior vice president did not disclose a potential claim against the insured company. Imputing the officer's knowledge to the corporation itself, the court excluded the undisclosed claim from the corporation's coverage. 1989 U.S. Dist. LEXIS 13422, [WL] at *8.

Although that case is distinguishable on a number of grounds (as Defendants point out), similar imputation of knowledge has been used in the Title VII context. [HN14] In a number of cases, the courts have imputed to the employer knowledge held by an employer's agent, such as a supervisor, of unlawful actions in order to hold the employer itself liable for those actions. For example, in *Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir. 1998),* the plaintiff sued her employer for the hostile work environment created by the sexual harassment of her coworker. Because the harassment was attributable to a coworker, however, rather than a supervisor, the company was liable only for its own negligence; therefore, an important issue existed as to whether the company knew or should have **[*28]** known of the situation. *157 F.3d at 63.* But because the plaintiff had informed her (and her coworker's) immediate supervisor, and because that supervisor had a duty to relay sexual harassment complaints to the company, the court imputed the supervisor's knowledge of the harassment to the company itself. [4] *Id. at 64.* Similarly, *Torres v. Pisano, 116 F.3d 625 (2d Cir.), cert. denied, 522 U.S. 997, 139 L. Ed. 2d 404, 118 S. Ct. 563 (1997),* also involved sexual harassment in the workplace -- this time by an immediate supervisor. The plaintiff there complained to Pisano, the supervisor who was in charge of the department and who became the harasser's immediate supervisor. *116 F.3d at 628.* The court imputed Pisano's knowledge to the employer. *Id. at 636-37.* The knowledge was imputed on the grounds that, as the harasser's supervisor, Pisano had a duty to act on the information and stop the harassment, and on the alternative grounds that Pisano had a duty to inform the employer of the harassment. *Id. at 637.*

> 4    The court's imputation was based both on general agency principles as well as the company's express written policy. *157 F.3d at 64.*

**[*29]** Here, however, Kull is attempting to impute the knowledge, not of the harassing behavior itself, but of his protected activity; that is, his complaints about the harassment to Edmonds. Although most cases involving imputation of knowledge in the Title VII context involve the former, at least one court has also imputed knowledge of the protected activity. *See Sales v. YM & YWHA of Washington Heights & Inwood, 2003 U.S. Dist. LEXIS 839, Nos. 00 Civ. 8641, 01 Civ. 1796, 2003 WL 164276, at *7-8 (S.D.N.Y. Jan. 22, 2003)* (employee complained of harassment to mid-level supervisor; knowledge of complaint imputed to the Y) (citing *Torres, 116 F.3d at 636-37*) .

[HN15] To establish a prima facie case, however, Kull must still demonstrate a connection between his protected activity -- alerting members of the corporation to Cina's alleged harassment -- and his termination. With respect to proving this connection, then, the question as to whether the knowledge of the protected activity can be imputed is more or less beside the point. Without actual knowledge, it would be illogical to find that Oettinger's termination of Kull was retaliatory. [5]

> 5    Likewise, in *Sales,* the plaintiff's retaliation claim was dismissed because, although the court imputed the knowledge of the protected activity to the Y, the plaintiff could show no causal connection between the protected activity and his termination. *2003 U.S. Dist. LEXIS 839, 2003 WL 164276, at *8.*

**[*30]** However, there is an issue of material fact as to whether Schneider and Schelker had actual knowledge of Kull's actions with respect to Cina before deciding to terminate Kull. Because Kull informed Edmonds of the harassment, and Edmonds had to communicate with Schneider and Schelker in order to set up the meeting regarding the harassment, an issue of fact is raised as to whether they had actual knowledge of the allegations before August 13, when Kull informed them himself. [6] (*See* Pl. Opp. at 15.) Furthermore, Kull maintains that investigation into any financial impropriety did not begin until after the dinner party on September 27, 1999, when Hollenstein asked Uvezian to inform Cina about his relationship with Kull. (*Id.* at 16; Uvezian Dep. at 116-18.) Although Cina testified that Uvezian told him about a kickback scheme in July of 1999 (Cina Dep. at 103-04), his testimony conflicts with Uvezian's testimony denying that he mentioned it to Cina in July (Uvezian Dep. at 122). The dinner party referred to was well after Schelker and Schneider, as well as Cina, were made aware of Kull's complaints about Cina. [HN16] The

Court cannot resolve conflicting testimony on a motion for summary [*31] judgment.

> 6  The e-mail from Edmonds to Schweizer, Schneider's assistant, setting up the meeting, however, does not mention the reason for the meeting. (E-mail from Edmonds to Schweizer of 8/11/99.)

Finally, Kull was not actually terminated until February 25, 2000, and he disputes the validity of the August 4 meeting minutes that Defendants have put into evidence. Because of the numerous disagreements surrounding the timing of the events -- including the conflict between Cina's and Uvezian's testimony -- issues of fact abound as to Oettinger's actual knowledge of Kull's allegations regarding Cina.

As for the fourth prong, [HN17] a Title VII retaliation claim plaintiff must show that "the allegedly adverse actions occurred in circumstances from which a reasonable jury could infer retaliatory intent." *Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002)*. In the absence of direct evidence of a retaliatory motive, the requisite nexus between the protected activity and the adverse employment action [*32] can be shown through a close temporal proximity. *Id.* (citing *Cifra v. GE, 252 F.3d 205, 217 (2d Cir. 2001))*. Although there is no bright-line rule, a variety of time limits within a year have been used to raise a question regarding the nexus between a protected activity and retaliatory action. *See Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 554-55 & n.5 (2d Cir. 2001)* (collecting cases).

Construing the facts in the light most favorable to Kull, it is possible that Hollenstein learned of the alleged kickback scheme in 1995 and did nothing about it. Further, Oettinger's principals could have known of the alleged harassment perpetrated by Cina at least by August 4, 1999, when the board decided to terminate him, pending the results of an investigation. In the alternative, it could be found that the allegations were first brought to Oettinger's attention in September of 1999, soon after Kull made his allegations of sexual harassment, and were acted upon soon thereafter. In any event, Oettinger's subsequent written decision of February 25 to terminate Kull is in close enough proximity to raise an issue of fact as to the causal [*33] link between Kull's protected activity and his termination.

**2. Defendants' Proffered Legitimate, Non-Retaliatory**

**Reason for Kull's Termination**

Defendants must articulate a legitimate, non-retaliatory reason for Kull's termination. Defendants maintain that their decision to terminate Kull's employment had nothing to do with his report of Cina's sexual harassment, but rather was the result of their reasonable belief that Kull had solicited and accepted kickbacks from Uvezian. (Def. R. Mem. at 6.)

As described above, Defendants maintain that, once they heard of the allegations of the kickbacks, when Uvezian told Cina in July of 1999 at the trade show in Las Vegas, they immediately began considering Kull's termination. This process began, they state, before Schneider and Schelker heard of Kull's allegations of sexual harassment on August 13, or when Cina first heard about the allegations on August 26. (Def. Mem. at 22.) To prove that the termination procedure was already underway, Defendants have submitted the minutes of the August 4 meeting and the August 9 letter from Halter & Partner, the managerial recruitment firm.

In support of their allegations that Kull was taking kickbacks [*34] from Uvezian, Defendants have put forth the deposition of Uvezian, in which he testified that Kull placed orders for his cigars at a price of $ .25 more per cigar than Uvezian gave on his price list (Uvezian Dep. at 36), and that Uvezian deposited the money into an account opened in May of 1999 in Puerto Rico and either issued checks from that account to Kull or, after Oettinger bought Uvezian's trademark, paid Kull cash. (Def. Mem. at 23; Uvezian Dep. at 66-68, 70-71, 78.) Additionally, they submit deposits made to the Puerto Rican bank, checks drawn, and a chart of all payments made. (Uvezian Aff. Exs. A-E.)

Uvezian's deposition, affidavit, and minutes of the meeting satisfy the Defendats' burden of production with respect their legitimate, non-retaliatory reason for terminating Kull.

[HN18] Kull can defeat Defendants' motion for summary judgment by "producing sufficient evidence to support a rational finding that the employer's proffered nondiscriminatory reason was false and that discrimination was the real reason." *Rose v. James River Paper Co., 2 F. Supp.2d 245, 253 (D. Conn. 1998)*. Kull, in fact, raises a number of factual issues regarding the validity of Defendants' [*35] assertions. Fundamentally, Kull states the exchange of money between Uvezian and

him was a loan, and one that Uvezian himself suggested. (Kull Dep. at 100.) Additionally, as stated above, Kull asserts that, contrary to Defendants' assertions, Uvezian first informed Hollenstein of his financial arrangements with Kull in 1995, long before Defendants acted on the information. (Uvezian Dep. at 48-49.) Although Defendants indicate that the information Hollenstein received was quite vague and not something that would normally be cause for further investigation (Hollenstein Dep. at 18-19), Uvezian's deposition testimony appears to relate a very specific description of the transactions (Uvezian Dep. at 49), and therefore an issue of fact exists as to whether Hollenstein knew of Kull's and Uvezian's arrangement and chose to do nothing about it. Uvezian testified that, at Hollenstein's urging, he told Cina about the financial scheme at a dinner party at Cina's residence in Zurich in September of 1999. (Uvezian Dep. at 116-17.) Oettinger's lack of action until after Kull reported Cina's alleged behavior therefore raises an issue of fact as to the defendants' motive.

There are also conflicting [*36] accounts as to the amount of money at issue. In Defendants' version of the story, Davidoff paid an extra $ .25 for each cigar in the AVO brand, an amount that would have added up to approximately $ 50,000. (*See* Uvezian Aff. P 10 & Ex. B (chart listing all sales of AVO XO cigars and payments from Uvezian to Kull between Jan. 10, 1994, and May 20, 1997).) Kull states, however, that Uvezian's submitted records include bank deposit statements equaling only $ 22,500. (Uvezian Aff. Ex. A; *see also* Pl. Opp. at 8-9.) Kull states that he repaid the loan of $ 22,500 on June 6, 2000, after his termination. (Letter from Kull to Uvezian of 6/6/00 & Check from Kull to Uvezian of 6/6/00, Koenigsberg Aff. of 4/3/03 Ex. M.) Uvezian testified that further cash payments were made out of his own account after he sold his trademark (Uvezian Dep. at 71); however, he stated at another point that he wanted clear records of any transactions and therefore did not want to deal in cash (Uvezian Dep. at 67-68.) The timing issues discussed above also contribute to the factual dispute. In any event, Kull vehemently denies taking kickbacks (Kull Dep. at 124), and the issue is unquestionably a disputed one.

[*37] In short, the total disagreement between the parties regarding both the kickback and harassment claims makes disposition by summary judgment on both the Title VII and the CFEPA claims impossible. [7]

7   Kull also brought to the Court's attention the Supreme Court case *Desert Palace, Inc. v. Costa, 539 U.S. 90, 156 L. Ed. 2d 84, 123 S. Ct. 2148 (2003)*, regarding a mixed-motive instruction to a jury in a Title VII case. Although the issue of mixed motives may come up during the course of trial, the issue is not relevant to the current motions.

## II. Kull's Contract Claims

The crux of Kull's contract claims has to do with the amount of notice given before he was terminated. According to Kull, his contract with Davidoff required both parties to give the other at least six months' notice before terminating the employment relationship. Because Oettinger and Davidoff gave Kull no notice, Kull is suing for breach of contract and other related claims. [8]

8   Defendants argue that Connecticut law should govern Kull's contract claims. (Def. Mem. at 26-27.) Although Kull does not directly contest this, he cites both Connecticut and New York law in his discussion regarding his contract claims. (Pl. Opp. at 26.) [HN19] Pursuant to New York choice-of-law rules, contract claims are governed by a "center of gravity" or "grouping of contacts" test, under which courts apply factors such as the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties. *Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1539 (2d Cir.), cert. denied, 522 U.S. 864, 139 L. Ed. 2d 112, 118 S. Ct. 169 (1997)* (quoting *Brink's Ltd. v. S. African Airways, 93 F.3d 1022, 1030-31 (2d Cir. 1996), cert. denied, 519 U.S. 1116, 136 L. Ed. 2d 845, 117 S. Ct. 959 (1997)* (citing *In re All-state Ins. Co. & Stolarz, 81 N.Y.2d 219, 597 N.Y.S.2d 904, 908, 613 N.E.2d 936 (N.Y. 1993)))*. The places of contracting and performance are given the greatest weight. *Id.*

In this particular case, neither party directly addresses the location of contract, although Kull states in his deposition that the original place of business for the United States operations was New York. (Kull Dep. at 45.) However, Kull cites primarily Connecticut law and, absent further evidence on the issue, the Court will apply Connecticut law.

**[*38] A. Breach of Contract**

[HN20] Under Connecticut law, "all employer-employee relationships not governed by express contracts involve some type of implied 'contract' of employment." *Torosyan v. Boehringer Ingelheim Pharms., Inc.,* 234 Conn. 1, 13, 662 A.2d 89 (1995). Generally, contracts of permanent employment for an indefinite term are at-will. *Id. at 14* (citing *D'Ulisse-Cupo v. Bd. of Dirs. of Notre Dame High Sch.,* 202 Conn. 206, 211 n.1, 520 A.2d 217 (1987)). The parties can modify this default rule by agreement. *Id. at 15.*

In order to prevail on his claim that the contract between Davidoff and Kull did, in fact, contain a clause requiring six months' notice before termination, Kull must put forth evidence showing that Davidoff "agreed, either by words or action or conduct, to undertake any form of actual contract commitment" requiring such notice before termination. *Therrien v. Safeguard Mfg. Co.,* 180 Conn. 91, 94-95, 429 A.2d 808 (1980), *quoted in D'Ulisse-Cupo,* 202 Conn. at 211 n.2.

Although the original letter of September 23, 1986, which lays out the employment agreement between Kull and [*39] Davidoff, mentions nothing about the required notice period prior to termination, the letter explicitly states that a more detailed contract will follow. Both parties agree that this more detailed instrument never materialized; however, Kull testified in his deposition that he received a letter signed by Schelker after his employment began. (Kull. Dep. at 51-52.) That letter, he testified, contained a reciprocal agreement between Kull and Oettinger to give six months' notice before termination -- desirable because of the distance between the operations. Kull also testified that Schelker contacted him about the agreement. (*Id.* at 51.)

Although Defendants deny that such a letter ever existed, and Kull cannot produce the letter, claiming it was missing when he cleaned his office (Kull Dep. at 51), Kull's testimony at least raises an issue of fact with respect to his claim. *See Torosyan,* 234 Conn. at 12, 662 A.2d at 96 (in trial over contract dispute in which plaintiff stated that defendants made statements regarding his job security and defendants denied having made statements, trial court found the plaintiff's version to be credible).

Defendants cite two cases [*40] to support their assertion that Kull's testimony alone is insufficient to raise an issue of fact: *Drew v. Sears, Roebuck & Co.,* 1997 U.S. Dist LEXIS 23843, at *39, No. 3:95 CV 1746 (D. Conn. Feb. 24, 1997), and *Reynolds v. Chrysler First Commercial Corp.,* 40 Conn. App. 725, 732, 673 A.2d 573 (1996). In *Drew,* however, the court stated specifically that the plaintiff did not "set forth any oral representations made by Defendant that would give rise to an implied contract." *1997 U.S. Dist. LEXIS 23843, at *39.* In *Reynolds,* similarly, the plaintiff put forth no other evidence than his own feelings and beliefs about the existence of a contract. *40 Conn. App. at 732.* Here, in contrast, Kull has testified to behavior that could potentially give rise to a contract.

Defendants also refer to the Davidoff personnel manual to defeat Kull's claim. The manual in question states that all contracts are at-will, and that termination may be effected at any time without notice. (Davidoff Personnel Manual, Bloom Aff. of 2/28/03 Ex. W, at 2.) However, its existence does not foreclose the possibility that Kull had a different contract [*41] with Davidoff. [HN21] Terms of an employment contract can differ from the provisions set forth in general company literature. *See Torosyan,* 234 Conn. at 13-14 (in order to find that implied employment contract incorporates representations in employee publication, trier of fact required to find that issuance of handbook was offer that employee then accepted); *see also Tutko v. James River Paper Co.,* No. 3:96 CV 1256, 1998 U.S. Dist. LEXIS 20664, at *18 (D. Conn. Nov. 12, 1998), *aff'd,* 199 F.3d 1323 (2d Cir. 1999) (company's strategy statements did not create implied contract to terminate only for cause because, even if characterized as offers, no evidence that plaintiff accepted) (citing *Torosyan,* 234 Conn. at 13-14).

Defendants' motion for summary judgment on Kull's breach of contract claim is therefore denied.

**B. Promissory Estoppel**

[HN22] In Connecticut, a claim for promissory estoppel has three prongs: (1) a clear and definite promise; (2) a change in position in reliance; and (3) resulting injury. *Hood v. Aerotek, Inc.,* 2002 U.S. Dist. LEXIS 3513, No. 3:98 CV 1524, 2002 WL 294762, at *5 (D. Conn. Feb. 19, 2002); *see also D'Ulisse-Cupo,* 202 Conn. at 213 [*42] ("A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." (quoting Restatement (Second) of Contracts §

90)).

Promissory estoppel is a doctrine often used in the absence of a contractual relationship -- for instance, where consideration is lacking -- to place liability on the promisor. *Stewart v. Cendant Mobility Servs. Corp., 267 Conn. 96, 104, 837 A.2d 736 (2003)*. It is therefore not inconsistent to find the absence of a contract, yet find liability based on promissory estoppel. *Stewart, 267 Conn. at 110*.

This particular case does the opposite. As mentioned above, an issue of fact exists as to the contract claim; that is, there is an issue of fact as to an offer with respect to the alleged six months' notice provision. Such offer is a promise, satisfying the first prong of the inquiry. *Stewart, 267 Conn. at 105* ("Although 'an offer is nearly always a promise,' all promises are not offers.") (quoting **[*43]** 1 E. Farnsworth, *Contracts* § 3.3, at 188 (2d ed. 1998)).

Where Kull's claim falls short, however, is the second prong: reliance. Kull has not put forth any evidence of reliance on the alleged promise of six months' notice before termination. Kull does claim that he did not actively seek other employment. (Pl. Opp. at 27; Kull Dep. at 283.) [HN23] Mere lack of seeking another job, however, is not the sort of change in position that can be used to support a claim of promissory estoppel. In *Tutko*, for example, the defendant's motion for summary judgment on plaintiff's promissory estoppel claim was granted when plaintiff could not prove detrimental reliance. *1998 U.S. Dist. LEXIS 20664, *20-21*. The plaintiff in *Tutko* merely said he "had never entertained the thought of leaving." 1998 U.S. Dist. LEXIS 20664, at *21. Here, similarly, Kull has put forth no evidence that he detrimentally relied on the alleged promise of six months' notice before termination. Defendants' motion for summary judgment as to Kull's promissory estoppel claim, therefore, is granted.

## C. Breach of the Covenant of Good Faith and Fair Dealing

[HN24] Under Connecticut law, "every contract carries an implied covenant of **[*44]** good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Habetz v. Condon, 224 Conn. 231, 238, 618 A.2d 501 (1992)*. The claim exists to "fulfill the reasonable expectations of the contracting parties as they presumably intended." *Magnan v. Anaconda Indus., Inc.,*

*193 Conn. 558, 567, 479 A.2d 781 (1984)*. The claim is separate from and can be maintained in addition to a breach of contract claim. *Martin v. Dupont Flooring Sys., Inc., 2004 U.S. Dist. LEXIS 9373, No. 3:01 CV 2189, 2004 WL 726903, at *6 (D. Conn. Mar. 31, 2004)* (citing *Buckman v. People Express, Inc., 205 Conn. 166, 170-71, 530 A.2d 596 (1987)*). [HN25] The elements of this claim are as follows: (1) plaintiff and defendant entered into a contract under which the plaintiff had a reasonable expectation of benefits; (2) the defendant undertook actions that undermined the plaintiff's right to collect certain benefits; and (3) the defendant acted in bad faith. *Martin, 2004 U.S. Dist. LEXIS 9373, 2004 WL 726903, at *7* (citing *Fairfield Fin. Mortgage Group, Inc. v. Salazar, 2002 Conn. Super. LEXIS 1352, No. CV 000339752S, 2002 WL 1009809,* **[*45]** *at *3 (Conn. Super. Ct. Apr. 23, 2002)*). [HN26] "Bad faith means more than mere negligence; it involves a dishonest purpose." *Habetz, 224 Conn. at 237*. Furthermore, [HN27] in a termination case, an at-will employee "must establish that his dismissal was for a demonstrably improper reason, the impropriety of which is derived from a violation of some important public policy." *Rose, 2 F. Supp.2d at 255* (citing *Johnson v. Chesebrough-Pond's, 918 F. Supp. 543, 550 n.4 (D. Conn. 1996)); see also Magnan, 193 Conn. at 572*.

As set out in the section discussing Kull's retaliation claims, Kull has raised issues of material fact as to Defendants' retaliatory termination, which, if true, would violate an important public policy as set forth in Title VII. However, if there is an adequate remedy under statutory law, then the claim cannot stand separately. [HN28] "A plaintiff bringing a claim for violation of the implied covenant of good faith and fair dealing must also establish that he does not otherwise have an adequate means of vindicating that public policy." *Rose, 2 F. Supp.2d at 255* (dismissing claim because plaintiff had adequate **[*46]** remedy under *Age Discrimination in Employment Act*); *Tutko,* 1998 U.S. Dist. LEXIS 20664, at *23-24 (same). [9] Here, because an adequate remedy is potentially provided under both Title VII and CFEPA, Kull's claim is entirely duplicative, and defendants' motion for summary judgment with respect to Kull's claim for breach of the implied covenant of good faith and fair dealing is granted.

9    Both *Rose* and *Tutko* cite *Bennett v. Beiersdorf, Inc., 889 F. Supp. 46, 49 (D. Conn. 1995)*, in which the federal district court denied the plaintiff's claim for breach of the implied

covenant of good faith and fair dealing for race discrimination in her employment, because of the existence of sufficient remedy under the federal statutory scheme. *Bennett*, in turn, cites *Atkins v. Bridgeport Hydraulic Co., 5 Conn. App. 643, 648, 501 A.2d 1223 (1985)*, a much-cited Connecticut appellate case. *Atkins* discussed a common law wrongful discharge claim, and also required a violation of public policy and the absence of sufficient remedy. More recently, the Connecticut Supreme Court decided *Burnham v. Karl & Gelb, P.C., 252 Conn. 153, 158-59, 745 A.2d 178 (2000)*, in which it discussed *Atkins* and affirmed its holding, again in the context of a common law wrongful discharge claim. The decision was not unanimous, however, and although the dissent agreed with the basic premise (and cited *Bennett*), it pointed out that the remedy under federal statutory law ought to be truly sufficient, and not an inadequate administrative process, as it believed to be the case in *Burnham. 252 Conn. at 172* (McDonald, C.J., dissenting). The dissent also noted that the requisite public policy violation can be predicated on the violation of public policy expressed in a federal statute, as here. *Id.* (quoting *Faulkner v. United Technologies Corp., 240 Conn. 576, 585-86, 693 A.2d 293 (1997)*). In Kull's case, the statutory remedy is sufficient, and fits within both the dissenting and majority opinions of *Burnham.*

**[*47] D. Unjust Enrichment**

[HN29] "'A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another.'" *Gagne v. Vaccaro, 255 Conn. 390, 408, 766 A.2d 416 (2001)* (quoting *Franks v. Lockwood, 146 Conn. 273, 278, 150 A.2d 215 (1959)*) (other citations omitted). The elements of the claim are that (1) the defendant benefitted; (2) the defendant unjustly failed to pay the plaintiff for the benefits; and (3) the failure of payment was to the plaintiff's detriment. *Gagne, 255 Conn. at 409* (citations omitted).

Kull brings this cause of action based on the lack of notice given to him by Davidoff, discussed above. Defendants assert that Kull's recovery under the doctrine of unjust enrichment is barred because his behavior in

accepting kickbacks would prevent his receiving an equitable remedy. *See Bauer v. Waste Mgmt. of Conn., Inc., 239 Conn. 515, 525, 686 A.2d 481 (1996)* (discussing defense of unclean hands to equitable relief). Defendants also argue **[*48]** the claim fails because of Kull's lack of proof of the agreement, and because he does not allege that he was not paid for the work he performed. (Def. Mem. at 32-33.)

As stated above, there are material issues of fact with regard to both the notice provision of the parties' employment contract, as well as Kull's alleged acceptance of kickbacks. However, if it is shown at trial that Kull and Davidoff did have an enforceable contract requiring notice before termination, then such contract would bar Kull's recovery under an unjust enrichment theory. [HN30] "Unjust enrichment applies whenever 'justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract ....' Indeed, lack of a remedy under the contract is a precondition for recovery based upon unjust enrichment." *Gagne v. Vaccaro, 255 Conn. at 401* (quoting 12 S. Williston, *Contracts § 1479, at 272 (3d ed. 1970)*).

Furthermore, it is not alleged that Defendants withheld pay for any work performed by Kull. *See Mitchell v. Town of Orange, 2001 Conn. Super. LEXIS 3611, No. CV 000069298S, 2001 WL 1707084, at *2 (Conn. Super. Ct. Dec. 20, 2001)* ("It is **[*49]** also true, in an analysis of unjust enrichment, that the town did not receive any benefit from plaintiff for which it did not pay.")

Because Kull potentially has a remedy under contract law, his claim under the doctrine of unjust enrichment is dismissed.

**III. Kull's Tort Claims**

Kull claims that Defendants' retaliatory termination of his employment after falsely accusing him of receiving kickbacks constitutes intentional and negligent infliction of emotional distress. [10]

> 10   Kull also apparently bases his claim upon the theory that Cina's harassment of Mrs. Kull constitutes an infliction of emotional distress upon Kull. Defendants state that Kull does not meet the evidentiary requirements for a plaintiff to make a claim for bystander liability, including

that of severe physical injury or death on the part of the victim. *See Clohessy v. Bachelor, 237 Conn. 31, 56, 675 A.2d 852 (1996)*. Because summary judgment is denied on other grounds, the Court does not address this issue.

### A. [*50] Intentional Infliction of Emotional Distress

[HN31] Under Connecticut law, to establish a claim for intentional infliction of emotional distress, a plaintiff must prove the following: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Bd. of Educ. of Stonington, 254 Conn. 205, 210, 757 A.2d 1059 (2000)* (citing *Petyan v. Ellis, 200 Conn. 243, 253, 510 A.2d 1337 (1986)*).

[HN32] The primary dispute here has to do with the second prong: the extreme or outrageous nature of the conduct. Whether the defendant's conduct is sufficient to satisfy the extreme and outrageous standard is a question, in the first instance, for the Court. *Etienne v. Wal-Mart Stores, Inc., 186 F. Supp.2d 129, 136 (D. Conn. 2001)*. Where reasonable minds can differ, however, it becomes an issue for the jury. *Bell v. Bd. of Educ. of West Haven, 55 Conn. App. 400, 410, 739 A.2d 321 (1999)* [*51] (citing *Mellaly v. Eastman Kodak Co., 42 Conn. Supp. 17, 18-19, 597 A.2d 846 (Conn. Super. Ct. 1991)*). The conduct in question must exceed "'all bounds usually tolerated by decent society.'" *Appleton, 254 Conn. at 210* (quoting *Petyan, 200 Conn. at 254 n.5* (quoting W. Prosser & W. Keeton, *Torts* § 12, at 60 (5th ed. 1984))).

"Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"

*Appleton, 254 Conn. at 210-11 (2000)* (quoting 1 *Restatement (Second) of Torts* § 46 cmt. d, at 73 (1965)).

[HN33] Both Connecticut and federal courts in this circuit have been reluctant to find conduct of defendants to be extreme and outrageous. *See Etienne, 186 F. Supp. 2d at 137-38* (collecting cases). However, [*52] extreme or outrageous conduct "may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." 1*Restatement (Second) of Torts* § 46 cmt. e, quoted in *Mellaly, 42 Conn. Supp. 17, 20, 597 A.2d 846* (employer who taunted employee about his alcoholism and harassed in other ways when he knew of employee's disease of alcoholism reached required threshold of outrageousness).

*Talit v. Peterson, 44 Conn. Supp. 490, 692 A.2d 1322 (Conn. Super. Ct. 1995)*, a similar case to the current one, involved a plaintiff who alleged that defendants criticized her and caused her to lose her employment in retaliation for filing a grievance. The court found that the claim survived a motion to dismiss. *44 Conn. Supp. at 497-98*. At a minimum, the court stated, reasonable minds could differ as to whether the conduct was extreme and outrageous, and the question therefore had to go to a jury. *Id. at 498* (citing 1 *Restatement (Second) of Torts* § 46 cmt. h). *See also* [*53] *Nguyen v. Newberry Industries, Inc., 1997 Conn. Super. LEXIS 3120, No. CV 970571319, 1997 WL 746442, at *5 (Conn. Super. Ct. Nov. 14, 1997)* (encouragement to conceal work-related injury followed by termination within statute of limitation period for filing workers' compensation claim, plus additional conduct, potentially extreme and outrageous).

Kull has presented evidence which, when construed in the light most favorable to him, could show that he was an innocent employee whose whose spouse and secretary were harassed, and when he reported the matter, he was accused of accepting kickbacks and then terminated. There are issues appropriate for determination by a jury, including whether Defendants' behavior was extreme and outrageous, and Defendants' claim for summary judgment as to Kull's claim of intentional infliction of emotional distress is therefore denied.

### B. Negligent Infliction of Emotional Distress

[HN34] To succeed on a claim for negligent infliction of emotional distress, a plaintiff must prove that

the defendant should have: (1) realized its conduct involved an unreasonable risk of causing plaintiff distress; and (2) realized the distress, if caused, might result in illness or bodily [*54] harm. *Etienne v. Wal-Mart Stores, Inc., 186 F. Supp.2d 129, 138* (citing *Barrett v. Danbury Hosp., 232 Conn. 242, 260-61, 654 A.2d 748 (1995)).* [HN35] In the work context, a claim for negligent infliction of emotional distress arises only when it is based upon unreasonable conduct of the defendant during the termination process. *Perodeau v. City of Hartford, 259 Conn. 729, 744, 762-63, 792 A.2d 752 (2002).*

Defendants argue that because there is no evidence -- and Kull does not allege -- that Schelker acted unreasonably when he went to Kull's office to terminate him, the claim must fail. (Def. Mem. at 35-36.) The requirement that the behavior be linked to the termination process, however, has been interpreted more broadly under Connecticut law. Courts have dismissed plaintiffs' claims when, for instance, he or she remains employed, *see, e.g., White v. Martin, 23 F. Supp.2d 203, 208 (D. Conn. 1998)*; *Perodeau, 259 Conn. at 744*, or if the termination was wrongful, but involved no egregious conduct, *see, e.g., Belanger v. Commerce Clearing House, Inc., 25 F. Supp.2d 83, 84-85 (D. Conn. 1998)* (no [*55] claim where defendant stated it would consider plaintiff for open position, then terminated her, because plaintiff alleged no inconsiderate, humiliating, or embarrassing actions); *Parsons v. United Techs. Corp., 243 Conn. 66, 88-89, 700 A.2d 655 (1997)* ("The mere termination of employment, even where it is wrongful, is ... not, by itself, enough to sustain a claim for negligent infliction of emotional distress."); *Pavliscak v. Bridgeport Hosp., 48 Conn. App. 580, 598, 711 A.2d 747, cert. denied, 245 Conn. 911, 718 A.2d 17 (1998)* (at-will employee termination in private, albeit without warning, did not satisfy requirements for negligent infliction of emotional distress). In contrast, Kull's allegations of retaliation and accusations, for which he has sufficiently raised factual issues, are closely enough related to the "termination process" to fit within this requirement of the claim. *See, e.g., Copeland v. Home & Cmty. Health Servs., Inc., 285 F. Supp.2d 144, 153 (D. Conn. 2003)* (insensitivity about health problems and related inflexibility about return date to work, resulting in termination, stated claim); *Grossman v. Computer Curriculum Corp., 131 F. Supp.2d 299, 309-10 (D. Conn. 2000)* [*56] (false accusations about job performance, bad-mouthing to customers, and other efforts designed to bring about termination satisfied requirement that conduct involve termination process).

Defendants' motion for summary judgment with respect to Kull's claim for negligent infliction of emotional distress is therefore denied.

**IV. Defendants' Tort Claims**

Defendants Oettinger and Davidoff of Geneva (CT), Inc., bring counterclaims against Kull for breach of his fiduciary duty of loyalty and for tortious interference with contract advantage or tortious interference with prospective economic advantage. For these claims, Kull argues that New York law should apply (Pl. R. Mem. at 10); Defendants argue that Connecticut law applies (Def. Opp. at 11).

[HN36] "A federal court sitting in diversity or adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state." *Rogers v. Grimaldi, 875 F.2d 994, 1002 (2d Cir. 1989)* (citing *Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941)).* Therefore, New York's choice of law rules govern the choice in this case.

[HN37] Under New York law, a [*57] claim for breach of fiduciary duty against a corporation is governed by the law of the relevant company's state of incorporation -- here, Connecticut. [11] *High View Fund, L.P. v. Hall,* 27 F. Supp.2d 420, 428 n. 6; *Hart v. General Motors Corp., 129 A.D.2d 179, 517 N.Y.S.2d 490, 492 (App. Div. 1st Dep't 1987)* (citing *Diamond v. Oreamuno, 24 N.Y.2d 494, 248 N.E.2d 910, 301 N.Y.S.2d 78, 85 (N.Y. 1969)).*

> 11    Although Oettinger AG is incorporated in Switzerland, [HN38] neither side has argued that Swiss law be applied. It is therefore initially assumed that Swiss law is the same as Connecticut law, and either party may challenge that assumption at any time in the litigation by providing "reasonable written notice" of its intent to raise the issue. *Fed. R. Civ. P. 44.1*; *see also Fairmont Foods Co. v. Manganello, 301 F. Supp. 832, 837 (S.D.N.Y. 1969).*

The governing law for Defendants' claim for tortious interference is also chosen [*58] using New York's choice of law rules. [HN39] In tort cases, New York

courts apply an "interest analysis," under which the law of the jurisdiction with the greatest interest in the matter is applied. *AroChem Int'l, Inc. v. Buirkle, 968 F.2d 266, 270 (2d Cir. 1992); see also Babcock v. Jackson, 12 N.Y.2d 473, 191 N.E.2d 279, 240 N.Y.S.2d 743, 749 (N.Y. 1963).* [HN40] "Under this formulation, the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort." *Schultz v. Boy Scouts of Am., Inc., 65 N.Y.2d 189, 480 N.E.2d 679, 491 N.Y.S.2d 90, 95 (N.Y. 1985).* "If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Cooney v. Osgood Mach., Inc., 81 N.Y.2d 66, 612 N.E.2d 277, 595 N.Y.S.2d 919, 922 (N.Y. 1993).*

Although it is true, as Kull argues, that Davidoff of Geneva (NY) is a New York corporation, and that Uvezian's cigars were sold in New York (Pl. R. Mem. at 10), Davidoff of Geneva (NY) is not a party to the counterclaims. Davidoff of Geneva (CT), one of the counterclaiming defendants, **[\*59]** is incorporated in Connecticut. (Cmplt. P 8).

Furthermore, the location of the torts is focused in Connecticut. Kull's office was in Connecticut, and the majority of Davidoff employees worked in Connecticut. That AVO cigars were sold in New York does not change the result of the inquiry. Therefore, the Court will apply Connecticut law to both of Defendants' counterclaims.

### A. Kull's Defenses

As a preliminary matter, Kull has raised two defenses to Defendants' counterclaims, discussed briefly below.

### 1. Accord and satisfaction

Kull argues that his repayment of the loan to Uvezian results in accord and satisfaction, and that therefore Defendants cannot maintain their claims. (Pl. Mem. at 13.)

[HN41] "'Without a mutual assent, or a meeting of the minds, there cannot be a valid accord.' Whether a meeting of the minds has occurred is a factual determination." *M.J. Daly & Sons, Inc. v. City of West Haven, 66 Conn. App. 41, 48, 783 A.2d 1138, cert. denied, 258 Conn. 944, 786 A.2d 430 (2001)* (quoting and citing *Munroe v. Emhart Corp., 46 Conn.App. 37, 42-43,*

*699 A.2d 213, cert. denied, 243 Conn. 926, 701 A.2d 658 (1997)).*

Because **[\*60]** issues of fact exist as to whether money is still outstanding and whether Defendants intended to release Kull of those sums, Kull's defense of accord and satisfaction fails.

### 2. Waiver and the Statute of Limitations

Kull argues that, by waiting for five years after Uvezian informed Hollenstein about the arrangement with Kull, Defendants have waived their right to sue for tortious interference. (Pl. Mem. at 13.) [HN42] "Waiver is the intentional relinquishment of a known right." *Wadia Enters., Inc. v. Hirschfeld, 224 Conn. 240, 251, 618 A.2d 506 (1992)* (citations omitted). The four elements of waiver are as follows: (1) the existence of a right or defense; (2) the opportunity to apply and use that right or defense; (3) the knowledge of the ability to use that right or defense; and (4) actions of the party who possesses that right or defense that amount to a relinquishment of that right.*Greenwich Plaza, Inc. v. Whitman & Ransom, 1996 Conn. Super. LEXIS 984, No. CV 95054081, 1996 WL 240458, at \*9 (Conn. Super. Ct. Mar. 19, 1996)* (citing *Novella v. Hartford Accident & Indemn., 163 Conn. 552, 562, 316 A.2d 394 (1972)).*

Because there is an issue of fact with respect **[\*61]** to the second element -- that is, Defendants maintain they did not find out about Kull's activity until July of 1999 -- the defense fails. Kull's statute of limitations defense with respect to Defendants' claim for tortious interference fails for the same reason. [12]

> 12   Connecticut's statute of limitations for torts is three years, as set forth in *Conn. Gen. Stat. § 52-577.*

### B. Breach of Fiduciary Duty

Defendants argue that Kull's activities in accepting kickbacks entailed a breach of his fiduciary duty of loyalty.

[HN43] As president of Davidoff, Kull was in a fiduciary relationship to the corporation. *Katz Corp. v. T.H. Canty & Co., Inc., 168 Conn. 201, 207, 362 A.2d 975 (1975)* (citing *Arrigoni v. Adorno, 129 Conn. 673, 681, 31 A.2d 32 (1943)).* Kull "occupied a position of the highest trust and therefore he [was] bound to use the

utmost good faith and fair dealing in all his relationships with the corporation." *Id.* (citations omitted).

Defendants **[*62]** argue that the burden-shifting regime described in *Murphy v. Wakelee, 247 Conn. 396, 721 A.2d 1181 (1998)*, under which Kull would be required to prove by clear and convincing evidence that his financial arrangement with Uvezian was made in good faith, should govern. *247 Conn. at 400.* Because Kull cannot meet this heightened burden of proof, Defendants state, summary judgment should be granted in Defendants' favor. (Def. Opp. at 16.)

*Murphy,* however, was a case affirming a jury verdict. The current case is in a significantly different posture. [HN44] A factfinder must determine whether the transaction is of a type that would lead to the burden-shifting regime set out in *Murphy,* and, if so, whether Kull can meet such burden. *See Murphy, 247 Conn. at 405* (applying burden-shifting only to cases that involve, *inter alia,* fraud, self-dealing, conflict of interest, or suspicious circumstances). "The recitation of this standard does not allow the court to conclude ... that [Kull's] factual denials do not raise genuine issues of material fact, and the court does not, in the context of summary judgment, decide the weight of the facts or **[*63]** resolve factual disputes."*Conn. Nat'l Bank v. Rytman, 2002 Conn. Super. LEXIS 2759, No. X01CV870159941S, 2002 WL 31126311, at *3 (Conn. Super. Ct. Aug. 21, 2002)* (citation omitted).

Multiple factual issues, as discussed in various sections above, remain with respect to this claim. Therefore, with respect to Defendants' claim of breach of fiduciary duty, summary judgment as to both sides is denied.

### C. Intentional Interference with Business Relations

Defendants claim that Kull intentionally interfered with their contract relationship or business relations with Uvezian. [13]

> 13   In their cross-complaints, Davidoff of Geneva (CT) and Oettinger label their claim "Tortious Interference With Contract Advantage and/or Tortious Interference With Prospective Economic Advantage," but refer to "tortious interference with business relations" in their memoranda to the Court. (Def. Opp. at 19.) The differences are irrelevant here. *See Swift v. Ball, 2003 Conn.*

*Super. LEXIS 2770, No. CV 010344047S, 2003 WL 22413406, at *2 (Conn. Super. Ct. Oct. 6, 2003)* (discussing distinction between contract advantage and business relations); *Warner v. Dembinski, 2003 Conn. Super. LEXIS 1103, CV020079206, 2003 WL 1995932, at *2 (Conn. Super. Ct. Apr. 4, 2003)* (discussing prospective economic advantage).

**[*64]** [HN45] "The elements of tortious interference are the existence of a contractual or beneficial relationship, the defendants' knowledge of that relationship, the intent to interfere with it, and the consequent actual loss suffered by the plaintiff." *Hart, Nininger & Campbell Assoc., Inc. v. Rogers, 16 Conn. App. 619, 629, 548 A.2d 758 (1988)* (citing *Solomon v. Aberman, 196 Conn. 359, 383, 493 A.2d 193 (1985)*; *Harry A. Finman & Son, Inc. v. Conn. Truck & Trailer Serv. Co., 169 Conn. 407, 415, 363 A.2d 86 (1975)*). Under Connecticut law, an agent of a corporation -- here, Kull -- may be held liable for interfering with a contract of that corporation if he was not acting legitimately within the scope of his duties, but was using corporate power improperly for his personal gain. *Metro. Entm't Co. v. Koplik, 20 F. Supp.2d 354, 361 (D. Conn. 1998)* (citing *Murray v. Bridgeport Hosp., 40 Conn. Supp. 56, 60-61, 480 A.2d 610 (Conn. Super. Ct. 1984)*). He acts for personal gain if he seeks personal financial gain or is motivated by personal animus. *Id.* (citing *Bennett v. Beiersdorf, Inc., 889 F. Supp. 46, 52 (D. Conn. 1995)*). **[*65]** To sustain the claim, Defendants must show that Kull's actions were tortious; that is, that they involved fraud, misrepresentation, intimidation, or molestation, or that he acted maliciously. The claim requires some showing of improper means or motive. *Weiss v. Wiederlight, 208 Conn. 525, 536, 546 A.2d 216 (1988)* (citations omitted). The tort does not require a breach of contract. *Automatic Bus. Prods. Co. v. Hankinson, 1992 Conn. Super. LEXIS 1523, No. 47066, 1992 WL 117777, at *5 (Conn. Super. Ct. May 19, 1992)*.

Kull argues that Uvezian's loans to him did not harm the relationship between Defendants and Uvezian. He argues that because Davidoff purchased Uvezian's trademark and line of cigars, and that a profitable relationship continued between Uvezian and Defendants after Kull's termination, Defendants cannot show any injury resulting from the alleged interference. (Pl. Mem. at 8-9.) [HN46] Although Defendants may have trouble showing that they lost a business opportunity, *see*

*Automatic Bus. Prods. Co., 1992 U.S. Dist. LEXIS 1523, 1992 WL 117777, at *5*, damages may be recoverable "where the interference causes the performance 'to be more expensive or burdensome.'" *Herman v. Endriss, 187 Conn. 374, 376-77, 446 A.2d 9 (1982)* **[*66]** (quoting *4 Restatement (Second) of Torts § 766A)*, for which Defendants have put forth evidence.

Both parties have set forth sufficient evidence to show genuine issues of material fact as to Kull's propriety or impropriety, as well as Defendants' resulting loss or lack thereof; therefore, summary judgment for both parties is denied.

**Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment is granted with respect to Kull's claims for retaliation under the *New York Executive Law*, promissory estoppel, breach of the covenant of good faith and fair dealing, and unjust enrichment, and denied as to all other claims. Kull's motion for summary judgment as to Defendants' counterclaims is denied.

So Ordered.

Dated: June *22,* 2004

Lawrence M. McKenna

U.S.D.J.