UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

PARAMOUNT PARKS INC.                      :
                                          :
                    Plaintiff,            :        CASE NO.  07 CV 10595 (SHS)
                                          :
          v.                              :
                                          :
LESTER NAIL                               :
                                          :
                    Defendant.            :

------------------------------------------------------x

---

**MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
OF PARAMOUNT PARKS INC.**

---

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................. 1

II. RELEVANT UNDISPUTED FACTS ................................................................ 2

    A.    Defendant And PPI Agreed To Abide By The Terms Of His Written
    Employment Agreement For A Defined "Employment Term" That Ran
    From January 1, 2006 Until December 31, 2007 .................................... 2

    B.    PPI Continues Defendant's Pay And Benefits Under The Employment
    Agreement Following The Sale of the Company and Defendant's
    Resulting Layoff ...................................................................................... 4

    C.    Defendant's Failure To Comply With His Obligations Under The
    Agreement And Deceptive Conduct ....................................................... 6

III. LAW AND ANALYSIS ...................................................................................... 9

    A.    As A Matter Of Law Defendant Breached The Employment Agreement ........... 10

        1.    Defendant Was Not Entitled To Continued Compensation And
        Benefits Under the Agreement Once He Was No Longer Willing,
        Ready And Able To Provide Exclusive Services To PPI And His
        Continued Acceptance Of Payment From PPI Breached The Terms
        Of The Agreement ................................................................... 11

        2.    Defendant's Employment With Denny's Breached The Terms Of
        The Agreement Not To Engage In Any Other Occupation During
        The Employment Term .............................................................. 14

        3.    Defendant's Employment With Denny's Breached The Terms Of
        The Agreement To Provide Exclusive Services To PPI During The
        Employment Term ................................................................... 16

        4.    Defendant's Breach of Contract Claim Fails As A Matter Of Law,
        As Defendant's Breach Of The Agreement Excused PPI From
        Continuing To Pay Defendant ................................................... 16

    B.    At Minimum, Defendant Was Unjustly Enriched By His Continued
    Acceptance Of Compensation And Benefits Under the Employment
    Agreement Once He Began Working For Denny's ............................. 17

    C.    Defendant's Claim For Conversion Should Be Dismissed As A Matter Of
    Law ........................................................................................................ 19

        1.    Defendant Cannot Prove An Immediate Right To Possession Of
        Any Property .......................................................................... 19

        2.    Defendant's Conversion Claim Is Redundant Of His Breach Of
        Contract Claim ....................................................................... 20

IV. CONCLUSION .................................................................................................. 20

i

## I.    <u>INTRODUCTION</u>

The crux of this case, as has been acknowledged by both parties, is a straight forward contract interpretation issue, with no key facts in dispute.  Plaintiff Paramount Parks Inc. ("PPI" or the "Company"). commenced this action against Defendant, the former Senior Vice President / General Counsel of PPI, when it discovered that, unbeknownst to the Company and contrary to Defendant's written Employment Agreement with PPI, Defendant had been working full time for another company for almost 8 months, all the while receiving pay and benefits under his Employment Agreement for rendering exclusive services to PPI and remaining "willing, ready, and able to render exclusive services" to PPI.

Certainly, as a matter of law, and according to the plain meaning of the terms of the Employment Agreement, Defendant was not "willing, ready and able to render exclusive services" to PPI as the Senior Vice President / General Counsel when he began working for Denny's as senior in-house counsel.  No credible argument can be put forth to the contrary. Moreover, as soon as Defendant began working for Denny's he engaged in another occupation and he ceased rendering exclusive services to PPI, additional and independent requirements under his Employment Agreement, and additional and independent breaches of the Agreement. For these reasons, as are more fully explained below and in PPI's Statement of Undisputed Material Facts, PPI moves this Court for summary judgment on Counts One (breach of contract), Two (breach of contract), and Three (unjust enrichment) of Plaintiff's Complaint and Counts One (breach of contract) and Two (conversion) of Defendant's Counterclaims against PPI.  In short, there are no genuine issues as to any material facts on those claims, entitling PPI to judgment as a matter of law.

## II.    RELEVANT UNDISPUTED FACTS

### A.    Defendant And PPI Agreed To Abide By The Terms Of His Written Employment Agreement For A Defined "Employment Term" That Ran From January 1, 2006 Until December 31, 2007.

In early 2006, Defendant, the former Senior Vice President / General Counsel for PPI, and PPI entered into a written employment agreement (the "Agreement" or "Employment Agreement").    The term of the Agreement was expressly defined to extend through December 31, 2007:

> 1.    (a)    The term of this Agreement shall be for the period commencing January 1, 2006 and ending December 31, 2007 (the "Employment Term"). Paramount shall employ Executive, and Executive shall accept employment as Senior Vice President / General Counsel.

(Deposition of Defendant Lester Nail ("Nail Dep.") at 40-41, Def. Ex. B, ¶ 1).[1]

According to the terms of the Employment Agreement, Defendant (or "Executive" under the Agreement) understood and agreed that he was receiving a written employment contract, a change from his former at-will relationship, because of his importance to the Company.  (Nail Dep. 40-41, Def. Ex. B, ¶ 14).  As consideration for the promises being made by PPI in the Agreement, Defendant agreed to, among other things, all of the following:

> 5.    Executive agrees to devote all customary business time and attention to the affairs of Paramount, except during vacation periods and reasonable periods of illness or other incapacity consistent with the practices of Paramount for executives in comparable positions, and *agrees that Executive's services shall be completely exclusive to Paramount during the term hereof*.
>
> . . . .
>
> 11.    *Executive agrees that during the Employment Term, Executive will not engage in any other occupation* or engage in the leisure/theme park, motion picture, television, or entertainment business, except for Paramount pursuant to this Agreement.

---

[1] A copy of the transcript of Defendant's deposition, along with copies of all other exhibits referenced herein, has been filed as an attachment to the Declaration of Jill S. Kirila, which is being filed contemporaneously with PPI's Motion for Summary Judgment and this Memorandum of Law.

(Nail Dep. 40-41, Def. Ex. B, ¶¶ 5, 11) (Emphasis added).   In exchange for Defendant's promises to serve as PPI's Senior Vice President / General Counsel under the terms of the Agreement, PPI agreed to provide various compensation and benefits to Defendant during the Employment Term, including a salary in the amount of $165,000.00 a year.  (Nail Dep. 40-41, Def. Ex. B, ¶ 2(a)).

Additionally, under the Agreement the parties specifically agreed to additional obligations that would arise in the event that Defendant's active employment with PPI ended as a result of PPI terminating his employment "without cause."  According to Paragraph 7(c) of the Agreement:

> If, during the term of this Agreement, the employment of Executive by Paramount should be terminated by Paramount other than for Cause as defined herein or for Executive's incapacity, then Paramount shall be obligated both to pay to Executive all applicable base salary pursuant to paragraph 2(a) of this Agreement and also Paramount shall continue all applicable plans and/or benefits pursuant to paragraph 3 hereof for the remainder of the Employment Term, *so long as Executive is willing, ready and able to render exclusive services hereunder during such remainder of the Employment Term.  Nothing herein shall obligate Paramount to utilize Executive's services* . . . .

(Nail Dep. 40-41, Def. Ex. B, ¶ 7(c)) (Emphasis added).

It is undisputed that Defendant, an attorney and high-level executive, signed the Employment Agreement without any negotiation or revision.  (Nail Dep. 46-48).   In fact, Defendant did not ask any questions regarding the meaning of any language or terms before signing the Agreement.  (Nail Dep. 53-56).[2]

---

[2] Prior to the parties entering into the Employment Agreement, Defendant's employment with PPI was at-will, i.e. it could be terminated without cause at any time and for any reason.  (Nail Dep. 33).  Defendant had already been working for PPI as the associate general counsel from January 2002 to the fall of 2005 and as general counsel from then forward.   (Nail Dep. 31-32, 36).  Defendant worked at PPI's then-headquarters in Charlotte, North Carolina.  (Nail Dep. 34, 94).

**B.      PPI Continues Defendant's Pay And Benefits Under The Employment Agreement Following The Sale of the Company and Defendant's Resulting Layoff.**

On June 30, 2006, Cedar Fair, L.P. acquired PPI.  (Deposition of Craig Freeman ("Freeman Dep.") at 80).  Unlike some other PPI contract executives, after the acquisition, Defendant continued working for PPI during the transition to assist with legal and human resources matters; however, during that transition, PPI soon assessed that it did not need a full corporate staff in North Carolina, and, in particular it did not need in-house general counsel for PPI.  In fact, at that time, Cedar Fair, the publicly-traded parent company of PPI, did not have an in-house counsel or any legal staff.  (Freeman Dep. 68-70, 90-91).  Accordingly, as admitted by Defendant, after working for PPI for a few weeks after the transaction, there was no work for him to do.  Indeed, Defendant asked to be placed on administrative leave or simply go home, rather than having to go to the office.  (Nail Dep. 93-94).  Thereafter, as part of the transition plan, effective August 1, 2006, PPI triggered Paragraph 7(c), the termination without cause provision of Defendant's Employment Agreement (as it did with some other PPI executives). (Freeman Dep., Ex. C).

Defendant admits that PPI had the right to terminate his employment without cause at any time under the terms of the Employment Agreement.  (Nail Dep. 61, 70).  Indeed, he was expecting it.  (Nail Dep. 95).[3]  And in fact, the express terms of the Agreement provided that PPI was not required to use Defendant's services during the Employment Term – "Nothing herein shall obligate Paramount to utilize Executive's services."  (Nail Dep. 40-41, Def. Ex. B, ¶ 7(c)). In triggering the termination without cause provisions, PPI communicated to Defendant in a July 27, 2006 letter its intentions to comply with its continuing pay and benefit obligations under the

_____
[3] Indeed, Defendant received a separate $175,000 transaction bonus, paid out in 2006 and 2007 relating to the sale of the Company.  (Nail Dep. 162-63, Exs. 14-17).

Agreement, as well PPI's expectation that Defendant likewise continue to comply with his own obligations under the Agreement, including Paragraph 7(c) to remain willing, ready and able to render exclusive services under the Agreement for the remainder of the Employment Term. (Nail Dep., Def. Ex. C). Defendant did not respond to the July 27 letter or even talk to anyone at PPI about it. (Nail Dep. 99). Thereafter, on August 9, 2006 PPI sent a letter to Defendant to address logistics regarding his compensation and benefits for the balance of the Employment Term of the Agreement. Again, PPI communicated that "[o]f course, the continuation of any of the above referenced payments or benefits are subject to any other applicable provisions of your employment agreement." (Nail Dep., Def. Ex. E).

Then again, on September 12, 2006, PPI communicated its expectations regarding Defendant's continuing obligations under the Agreement, this time through a lump sum settlement proposal. (Nail Dep. 110-11, Def. Ex. F). After considering its rights and obligations under the Employment Agreement, and similar agreement that PPI had with other executives that had been terminated relative to the Cedar Fair acquisition, PPI was interested in obtaining some closure on its relationships with Defendant and the other executives. For this reason, PPI offered Defendant what it viewed as a mutually beneficial resolution of both parties' respective obligations under the Agreement, which would have included a significant lump sum payment (at less than the amount should PPI have to pay Defendant through December 2007) and a waiver of substantially all of Defendant's obligations to PPI. (Freeman Dep. 106-07). As was clearly communicated in PPI's letter to Defendant, "In particular, by offering to waive the 'willing, ready and able' requirement, PPI is offering to both pay you a significant sum and allow you to seek employment without affecting that sum." (Nail Dep., Def. Ex. F). In fact, Defendant understood that the settlement proposal was intended to relieve both parties of their continuing

obligations under the Agreement – "My understanding is they pay me this lump sum and we both walk away having no other obligations other than I believe there was a, there may have been a continuing obligation on the noncompete." (Nail Dep. 111).[4]

Defendant acknowledges that he continued to be under contract with PPI until December 2007. (Nail Dep. 106). Defendant likewise agrees that PPI had the right to use Defendant's services after triggering the termination without cause provision of the Agreement at any time during the Employment Term. (Nail Dep. 104). Moreover, it is undisputed that PPI paid Defendant his full base salary from August 1, 2006 through the pay period ending September 30, 2007, amounting to over $196,000.00 in compensation, and continued his benefits, at no additional cost to Defendant, in compliance with its own obligations under Agreement. (Nail Dep. 117).

**C.    Defendant's Failure To Comply With His Obligations Under The Agreement And Deceptive Conduct.**

Despite his contractual obligations, and despite the fact that PPI was continuing to fulfill its own obligations under the Agreement, unbeknownst to PPI, on February 23, 2007 Defendant began working for Denny's, Inc. as senior in-house counsel at full pay and benefits. (Nail Dep. 148-49). Despite his new employment, Defendant continued to accept compensation and benefits from PPI. Over nearly eight months while he was working for and being paid by another, Defendant received nearly $100,000.00 in compensation from PPI, and was continued on PPI's health insurance benefit plans. (Nail Dep. 117, Def. Ex. B). Indeed, Defendant did not inform PPI of his employment with Denny's. (Nail Dep. 125). Likewise, Defendant did not inform Denny's that he was still under contractual obligations with PPI. (Nail Dep. 155-56).

---

[4] Defendant did not express any disagreement with PPI's description in the September 12 letter of the parties' ongoing obligations, including that Defendant could not work elsewhere and still collect pay and benefits under the Agreement, or otherwise respond to the letter. (Nail Dep. 112-14). He simply thought the lump sum amount offered was too low. (Nail Dep. 113-14; Freeman Dep. 117-18).

In fact, in April 2007 Defendant sold his house in Charlotte and, by at least early June 2007 Defendant had bought a half million dollar home and relocated permanently to South Carolina (site of Denny's headquarters), approximately an hour and half away from Charlotte. (Nail Dep., 181-82, Pl. Exs. 22-23).   Despite this, on May 29, 2007 Defendant submitted enrollment forms for continued enrollment in PPI medical benefits (commencing July 1, 2007) and listed his Charlotte home on those forms.  (Nail Dep. 135-37, Def. Ex. H).  Defendant never informed PPI of any change of address.  (Nail Dep. 122).

Moreover, around the time Defendant was enrolling in medical benefits through PPI, Defendant's wife had a telephone conversation with Sandy Cranford, Human Resources Manager for PPI, regarding some benefits related questions.  Admittedly, Defendant was present during this conversation between Ms. Cranford and Ms. Nail, and Ms. Cranford asked how Defendant was doing.   (Deposition of Sandy Cranford ("Cranford Dep.") at 16-18).   The response was anything but honest – according to Ms. Cranford, she was told that Defendant would be doing fine if he could just find a job.  (Cranford Dep. 16-18).  Clearly this comment was made with the intention of concealing, if not actively deceiving PPI, as Defendant had been working for Denny's for approximately three months at that time.  (Nail Dep. 148-49).  Despite the fact that he remained under contract with PPI, Defendant did nothing to explain his wife's comment or otherwise disclose his work situation.

Indeed, it was only through luck and happenstance that PPI discovered Defendant's employment at Denny's.   In October 2007, Defendant ran into an acquaintance and former colleague from PPI, Jim Rein, at the Charlotte airport.  (Nail Dep. 126-27).  When asked, he informed Mr. Rein that he had been working at Denny's.  (Nail Dep. 127).  Mr. Rein, in turn, relayed that information to PPI.  (Freeman Dep. 133-34).  Surprised, and in light of the terms of

the Agreement, PPI immediately sent Defendant a letter notifying him that his compensation and benefits under the Employment Agreement were being terminated effective immediately pursuant the terms of the Agreement.  (Freeman Dep. 135, 143-44, 147-49, Exs. I, J; Nail Dep. 122-25).  PPI also requested that Defendant provide it with the date on which he began his employment at Denny's.  (Freeman Dep., Ex. I).  PPI also notified its bank to stop the direct payments to Defendant effective immediately.[5]  (Freeman Dep. 136-37).

It is beyond dispute that the employment package that Defendant was eligible to receive and did receive from Denny's was significant.  Upon his employment, Defendant's salary was $175,000.00 a year, and by May 2007 that salary had already increased to $180,000.00.   (Nail Dep. 143-44, Pl. Exs. 6, 7).  Moreover, Defendant was provided with full reimbursement for his relocation expenses, totaling over $22,000.00, the value of which he would have had to repay had he terminated his relationship with Denny's within 12 months of the relocation.  (Nail Dep., Pl. Exs. 12, 13).   Additionally, Defendant was entitled to a 30% target bonus (and received a $10,000.00 special bonus in May 2007), an annual car allowance, stock options, and a full spectrum of pension, 401(k) and insurance benefits.  (Nail Dep. Pl. Exs. 5-10).

In total, unbeknownst to PPI, Defendant received (or was eligible to receive) all of the following compensation and benefits from Denny's beginning February 23, 2007, all the while he continued to accept $99,000.00 in salary and continuation of benefits from PPI for his expected compliance with the Employment Agreement:

- $175,000.00 in annual salary, increased to $180,000.00 as of May 2008

- $22,777.54 in reimbursement for relocation expenses

- $10,000.00 special bonus

---

[5] Do to the timing of the instruction to the bank, Defendant has alleged that a check was deposited into his account from PPI and then deducted.  However, Defendant authorized PPI to make any adjustment, credit or debit, if corrections in the credit amount were required.  (Nail Dep. 128, Pl. Ex. 2).

- $ 3,510.00 annual car allowance

- Participation in Denny's 2007 Incentive Program with a target incentive of 30% of Defendant's base salary

- Eligible to participate in medical, dental, vision, and additional life insurance coverage[6]

- Eligible to join Denny's Deferred Compensation Plan, a fully vested, matched savings plan and Denny's 401(k) Plan

- Eligible to participate in Denny's 2007 Long-Term Growth Incentive Program

- Denny's Corporation Stock Option Award

(Nail Dep., 143-153, 159-62, Pl. Exs. 5-13).

## III.    LAW AND ANALYSIS

PPI is entitled to judgment as a matter of law on its contract and unjust enrichment claims, and Defendant's breach of contract and conversion claims, as there are no genuine issues of material fact relevant to such claims.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  "On a motion for summary judgment, the construction of an unambiguous contract is a question of law for the court to pass on, and the circumstances extrinsic to the agreement or varying interpretations of the contract provisions will not be considered, where, as here, the intention of the parties can be gathered from the instrument itself."  Lake Constr. & Dev. Corp. v. City of New York, 211 A.D.2d 514, 515, 621 N.Y.S.2d 337, 338 (1st Dep't 1995).  Where parties set down an agreement in a clear document, evidence outside the four corners as to what was really intended or unstated is generally inadmissible to add to or vary the writing.  W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990).

---

[6] Interestingly, Defendant chose not to enroll in Denny's benefit plans while he was under contract with PPI and remained on PPI's instead.  (Nail Dep. 153).  Obviously, had he enrolled in Denny's health plans and cancelled or not reenrolled in PPI's plans during the contract term, PPI would have had reason to suspect that he was eligible for coverage through another employer.

**A.    As A Matter Of Law Defendant Breached The Employment Agreement.**

The Agreement in this case is clear and unambiguous – to receive continuing payments and benefits throughout the contract term, among other things, Defendant was separately required to do all of the following: (a) remain willing, ready, and able to render exclusive services to PPI during the Employment Term; (b) not to engage in any other occupation during the Employment Term; and (c) not to otherwise provide services to anyone other than PPI during the Employment Terms.    New York courts have consistently held that "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." R/S Assocs. v. New York Job Development Auth., 98 N.Y.2d 29, 31, 771 N.E.2d 240, 242 (2002).    "Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to **the plain meaning of its terms**." Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 568, 780 N.E.2d 166, 170 (2002) (Emphasis added).  Certainly, once Defendant began working for Denny's as their in-house counsel he was no longer exclusively serving or able to exclusively serve PPI as its Senior Vice President and General Counsel and was clearly engaging in another occupation.

Moreover, "[i]t is well established that a contract should be interpreted to give meaning and effect to every provision, and anomalous consequences should be avoided." MTV Networks v. Fox Kids Worldwide, Inc., 1998 N.Y. Misc. LEXIS 701 (New York County May 13, 1998).[7] Accordingly, the provisions of the Agreement, including the "willing, ready, and able to render exclusive services" clause, as well as Defendant's independent agreements to render exclusive services to PPI and not to engage in any other occupations during the Employment Term, must

---

[7] Copies of all unreported cases are included in the Appendix to the Declaration of Jill S. Kirila, which is being filed contemporaneously with PPI's Motion for Summary Judgment and this Memorandum of Law.

be read as a whole to require Defendant's continued services and loyalty to PPI *for the duration of the Agreement, i.e., the defined Employment Term, in exchange for the consideration being provided by PPI, e.g. continued salary and benefits*. The Agreement is clear on its face that the parties both had contractual obligations to each other after the termination without cause provision of Paragraph 7(c) was triggered.

> **1.    Defendant Was Not Entitled To Continued Compensation And Benefits Under the Agreement Once He Was No Longer Willing, Ready And Able To Provide Exclusive Services To PPI And His Continued Acceptance Of Payment From PPI Breached The Terms Of The Agreement.**

Under the clear terms of the Agreement, Defendant was not entitled to receive continued compensation and benefits once he began working for Denny's because a condition for such payments was no longer satisfied – he was no longer "willing, ready and able to render exclusive services" to PPI. The Agreement clearly provides that PPI was only obligated to continue to pay Defendant for "so long as Executive is willing, ready and able to render exclusive services hereunder during such remainder of the Employment Term." (Nail Dep. 40-41, Def. Ex. B, ¶ 7(c)). Although Defendant contends that he was willing, ready and able to work for PPI, he has not and cannot contend that he was willing ready and able to provide ***exclusive services to PPI*** as its Senior Vice President / General Counsel. The entire provision of the contract must be read as a whole. See Mionis v. Bank Julius Baer & Co., 301 A.D.2d 104, 109, 749 N.Y.S.2d 497, 502 (N.Y. App. Div. 2002) ("Courts are obliged to interpret a contract so as to give meaning to all of its terms."). As will be more fully addressed below, under any reading of the terms, Defendant was simply not *able* to provide exclusive services to PPI when he was simultaneously employed by Denny's, even if he was "willing" to provide "some" services.[8]

---

[8] Nor is it credible for Defendant to claim that he was even "willing" or "ready" to provide services to PPI, in light of the significant compensation and benefits he was receiving from Denny's, his move to South Carolina and

Because Defendant was not entitled to continued compensation and benefits from PPI under the Agreement once he began working for Denny's in February 2007, his acceptance of such payments also constitutes a breach of the Agreement.  To get around the plain meaning of Paragraphs 7(c) of the Agreement, Defendant attempts to rewrite the Agreement to include an obligation on PPI to request his services.  He also contends that PPI's intention not to use his services after he was laid off somehow should override his ongoing obligations under of the Agreement.  However, as Defendant concedes, the Agreement is expressly to the contrary – it does not require PPI to use Defendant's services. "***Nothing herein shall obligate Paramount to utilize Executive's services*** . . . ."  (Nail Dep. 40-41, Def. Ex. B, ¶ 7(c)) (Emphasis added). Furthermore, under New York law, Defendant (or any party to a written contract) is not entitled to rewrite the Agreement.  Paragraph 15 of the Agreement expressly provides that the Agreement can only be changed by a writing signed by both parties.   (Nail Dep. 40-41, Def. Ex. B). Accordingly, Defendant would have to offer proof of a written and signed amendment to the Employment Agreement to support this "modification" – this he cannot do.  Under the plain meaning of the Agreement, Defendant clearly did not meet his obligation to remain ready, willing and able to provide exclusive services once he chose to accept employment and serve Denny's.

In addition, regardless of the fact that Defendant did not have an express obligation in the Agreement to notify PPI of his employment with Denny's, Defendant's acceptance of payments under the Agreement, all the while knowing that he was no longer able to provide exclusive services to PPI as Senior Vice President /  General Counsel as a result of his new senior in-house

---

purchase of a half million dollar home for him and his family, and even his concealing of his new job and address. PPI does not need to rely on the plain meaning of "willing" or "ready" however, to prevail on this count because the undisputed facts show that Defendant did not remain "able" to provide exclusive services to PPI throughout the contract term once he actually provided any services to another.  One cannot provide services for two principals while still claiming exclusivity to one.

counsel position at Denny's, was contrary to the terms of the Agreement (not to mention obligations of good faith and fair dealing). Simply because the Agreement does not include an express obligation that Defendant inform PPI of new employment that does not give Defendant the prerogative to secure new employment and continue to accept compensation and benefits under the Agreement all the while knowing he was no longer able to provide exclusive services to PPI.

Separately, Defendant's continued acceptance of compensation and benefits from PPI despite knowing he was no longer satisfying the conditions on such payment, and failing to disclose his employment with Denny's, certainly breached Defendant's implied covenant and obligation of fair dealing and good faith. Implicit in the performance of all contracts is an implied covenant and obligation of fair dealing and good faith. See Kalisch-Jarcho, Inc. v. City of New York, 58 N.Y.2d 377, 384, 448 N.E.2d 413, 416 (1983). "[A] party may be in breach of its implied duty of good faith and fair dealing even if it is not in breach of its express contractual obligations." Chase Manhattan Bank v. Keystone Distributors, Inc., 873 F. Supp. 808, 815 (S.D.N.Y. 1994). The implied covenant of good faith and fair dealing "precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement." Leberman v. John Blair & Co., 880 F.2d 1555, 1560 (2d Cir. 1989); see also Don King Productions, Inc. v. Douglas, 742 F. Supp. 741, 767 (S.D.N.Y.1990).

Defendant concedes that he was still under contract with PPI when his relationship with Denny's began. (Nail Dep. 106). "[R]egardless of intent, motive, illicit purpose, or pecuniary loss, such secret payments improperly create interests for agents that are 'adverse to that of their principal' and the principal's complete knowledge and approval is required of 'any substantial advantage received by an agent' from third persons." Black v. MTV Networks Inc., 172 A.D.2d

8 (N.Y. App. Div. 1991).  Defendant should have informed PPI when he accepted employment with Denny's to give PPI notice of its rights under the terms of the Agreement.  By failing to inform PPI of his new position with Denny's, if not actively concealing the new position, entitlement to benefits, and change of address accompanying such position, Defendant undoubtedly breached the Agreement.

Whether Defendant's conduct in continuing to accept compensation and benefits from PPI once he was no longer able to provide exclusive services to PPI is considered a "breach" or a "failure to satisfy a condition" is of no consequence – either way Defendant was not entitled to compensation and benefits under the Agreement, and PPI was damaged by Defendant's breach or continued acceptance.

> **2.      Defendant's Employment With Denny's Breached The Terms Of The Agreement Not To Engage In Any Other Occupation During The Employment Term.**

Under a separate and equally clear provision of the Agreement, Defendant had an obligation not to "engage in any other occupation" throughout the Employment Term, from January 1, 2006 until December 31, 2007.  (Nail Dep. 40-41, Def. Ex. B, ¶ 11).  The Agreement expressly contemplated and provided that Employment Term did not end when Defendant's employment was terminated without cause – on the contrary, if that was the case, PPI would have had no obligation to pay Defendant whatsoever.  (See Nail Dep. 40-41, Def. Ex. B, ¶ 7(c), which provides that the payment of compensation and benefits after a without cause termination were for the remainder of the "Employment Term.")  In fact, Defendant concedes that he remained under contract with PPI for the duration of the Employment Term.  (Nail Dep. 106).  Moreover, from August 1, 2006 through October 18, 2007, after the termination of his active employment, Defendant reaped the benefit of those continued contractual obligations, to the tune of nearly $200,000.00.  (Nail Dep. 40-41, Def. Ex. B).

Defendant admits that he began working for Denny's on or about February 23, 2007, during the period of the Employment Term. (Nail Dep. 148-49). Clearly, Defendant's employment with Denny's was another occupation. Accordingly, Defendant cannot dispute that he breached the Agreement, thus entitling PPI to recover its damages related to its continuation of pay and benefits to Defendant from February 23, 2007 through October 18, 2007.

Bound by the express terms, Defendant has attempted instead to argue that Paragraph 11 of the Employment Agreement is somehow a non-competition provision. However, that is a red herring. By definition, a noncompete provision restrains an individual from earning a livelihood after the relationship with the employer has ended. Here, Paragraph 11 of the Agreement clearly does not restrain Defendant's ability to earn a livelihood, because ***PPI and Defendant had an ongoing relationship and PPI continued to pay him and provide benefits during the period of the Employment Term***, pursuant to the terms of the Agreement. Indeed, his pay was generous – amounting to nearly $200,000 in salary alone from August 2006 through October 2007. As is admitted by both parties (and was continuously acknowledged by PPI after August 1, 2006), PPI's triggering of Paragraph 7(c) of the Agreement ***did not terminate PPI's obligations to Defendant***. ***On the contrary, there was continuing consideration being paid for his loyalty and good will as was bargained and agreed by the parties.***

Indisputably, PPI and Defendant bargained for "a mutuality of obligation." PPI had a continuing duty to pay Defendant in consideration for his continued loyalty and good will of not engaging in any other employment. Significantly, Defendant's breach of the provisions of the Agreement has not led to any injunctive relief or other restraint. This case was not brought by PPI for such relief. Rather, PPI commenced this lawsuit not to stop Defendant from working for

Denny's but to recover the value of compensation and benefits that he improperly received (and refused to return) after he began working for Denny's.

> **3.    Defendant's Employment With Denny's Breached The Terms Of The Agreement To Provide Exclusive Services To PPI During The Employment Term.**

In yet another flagrant disregard for his obligations under the Agreement, Defendant likewise has ignored and, in fact, breached his agreement that "Executive's services shall be completely exclusive to Paramount during the term of hereof." (Nail Dep. 40-41, Def. Ex. B, ¶ 5). The plain and ordinary meaning of this provision, particularly when read in light of the other provisions of the Agreement, clearly required Defendant to be loyal to only one entity – PPI. "Exclusive" means "shutting out all others from a part or share" or "single or sole." (Dictonary.com) See also In re Application of Union Ferry Co., 98 N.Y. 139, 151 (1885) ("The word 'exclusive' is derived from '*ex*,' out, and '*claudere*,' to shut."). By definition, PPI cannot be the single or sole recipient of Defendant services if he is providing them to a third party. In fact, Defendant understood this exclusive services requirement in the Agreement. In his own words, "I could not go work for Bank of America as a general counsel or any other company in that capacity. Now, if you're asking could I go be a stocker at Home Depot or Lowe's? I doubt it, but, you know." (Nail Dep. 73). As such, Defendant cannot dispute that his employment at Denny's caused him to breach this separate and independent obligation in the Employment Agreement, entitling Defendant to damages resulting from such breach.

> **4.    Defendant's Breach of Contract Claim Fails As A Matter Of Law, As Defendant's Breach Of The Agreement Excused PPI From Continuing To Pay Defendant.**

As discussed above, Defendant's employment at Denny's during the Employment Term of the Agreement and continued acceptance of compensation and benefits from PPI clearly constitutes a breach (and in fact, three breaches) of the Employment Agreement. (Nail Dep.

40-41, Def. Ex. B, ¶¶ 5, 7(c) and 11).  As such, PPI was excused from its obligations under the Agreement, i.e. providing compensation and benefits pursuant to Paragraph 7(c).  <u>See</u> <u>Breiterman v. Breiterman</u>, 239 A.D. 709, 711, 268 N.Y.S. 628, 631 (N.Y. App. Div. 1934) ("On the default of a party in the performance of a contract, the other party may treat the contract as terminated and sue for damages for the breach.").

Moreover, under the plain language of the Employment Agreement, PPI was only required to provide Defendant with compensation and benefits under Paragraph 7(c) for the remainder of the Employment Term for so long as Defendant remained "willing, ready and able to render exclusive services hereunder during such remainder of the Employment Term."  (Nail Dep. 40-41, Def. Ex. B, ¶ 7(c)).  Indisputably, Defendant was not able to render exclusive services to PPI as the Senior Vice President / General Counsel once he began working as in-house counsel for Denny's.  Therefore, Defendant's failure to satisfy this condition relieved PPI of its obligation to pay Defendant under Paragraph 7(c).

For these reasons, Defendant's breach of contract claim against PPI fails as a matter of law.

> **B.**     **<u>At Minimum, Defendant Was Unjustly Enriched By His Continued Acceptance Of Compensation And Benefits Under the Employment Agreement Once He Began Working For Denny's.</u>**

As a matter of law, even if Defendant's conduct did constitute a technical breach of the Agreement, it certainly constitutes unjust enrichment.  Under New York law, to state a claim for unjust enrichment, PPI must show (1) a benefit to Defendant (2) that was acquired at PPI's expense, which (3) in equity and good conscience should be restored.  <u>See</u> <u>In re Cross Media Marketing Corp.</u>, 2006 U.S. Dist. LEXIS 56112 (S.D.N.Y. 2006); <u>Wisetex Trading Ltd. v. Gindi</u>, 2001 U.S. Dist. LEXIS 13 (S.D.N.Y. 2001); <u>see</u> <u>also</u> <u>Murphy v. EEG Enter., Inc.</u>, 245 A.D.2d 495, 666 N.Y.S.2d 693 (N.Y. App. Div. 1997).

- 17 -

Although certainly PPI believes that it is entitled to recover the compensation and value of benefits that it provided to Defendant after he started working for Denny's under the terms of the Employment Agreement, even assuming *arguendo* that one or more of the provisions discussed above are unenforceable, that would not entitle Defendant to retain the compensation and benefits that he was provided. Rather, the equitable doctrine of unjust enrichment should apply in such instance, as clearly Defendant accepted compensation and benefits from PPI, to the detriment of PPI, under circumstances that are unjust, inequitable, and that in equity and in good conscience should not be permitted. See, e.g. Seiden Assoc., Inc. v. ANC Holdings, Inc., 754 F. Supp. 37, 41 (S.D.N.Y. 1991) ("In the event that there is no enforceable contract between plaintiff and defendants, plaintiff may be able to recover under its alternative theories of quantum meruit and/or unjust enrichment depending on the particular circumstances of the transaction."). "Unjust enrichment applies whenever 'justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract ….' Indeed, lack of a remedy under the contract is a precondition for recovery based upon unjust enrichment." Kull v. Davidoff of Geneva (NY), Inc., 2004 U.S. Dist. LEXIS 11575 (S.D.N.Y. June 22, 2004) (quoting Gagne v. Vaccaro, 255 Conn. at 401). It is beyond dispute that Defendant benefited, at PPI's expense, from his failure to disclose his position as in-house counsel with Denny's and from collecting from two employers at the same time. From February 23, 2007 to October 18, 2007 Defendant received nearly $100,000.00 in compensation, as well as the continuation of full benefits from PPI. (Nail Dep. 40-41, Def. Ex. B). In fact, once PPI knew of Defendant's new employment, PPI immediately ceased making such payments. (Freeman Dep. 136).

**C.    Defendant's Claim For Conversion Should Be Dismissed As A Matter Of Law.**

      **1.    Defendant Cannot Prove An Immediate Right To Possession Of Any Property.**

Because Defendant had no immediate right to possession of any money from PPI and PPI's stop-payment on its check to Defendant lawful as it was the rightful owner of the money under the Agreement and separately because the reversal of payment was authorized by Defendant, Defendant's claim of conversion must fail.    To prevail on a conversion claim, Defendant must prove: (1) Defendant has an immediate right to possession of the property converted; (2) PPI's possession of the property was unauthorized; (3) PPI acted to exclude the rights of the lawful owner of the property; (4) the property is specifically identifiable; and (5) PPI is obligated to return the property.    See Wisetex Trading Ltd. v. Gindi, 2001 U.S. Dist. LEXIS 13, *3 (S.D.N.Y. 2001); In re: Harvard Knitwear, Inc., 153 B.R. 617 (E.D.N.Y. 1993). In this instance, PPI was entitled to cease paying Defendant under the Employment Agreement as a result of his breach and/or his failure to satisfy the conditions necessary to receive ongoing payments through the end of the Employment Term, i.e. his failure to remain able to render exclusive services to PPI.    As such, there can be no claim for conversion, as Defendant had no legal rights to any money from PPI.

Moreover, Defendant clearly authorized PPI to make any adjustment, credit or debit to make corrections in the credit amount.    (Nail Dep. 128, Pl. Ex. 2).    In fact, it was not PPI that reversed the payments to Defendant – it was his bank.    PPI simply instructed that the payment

- 19 -

should be stopped.  (Freeman Dep. 136).  As such, Defendant's claim for conversion must fail as a matter of law.[9]

2.      **Defendant's Conversion Claim Is Redundant Of His Breach Of Contract Claim.**

Defendant's conversion claim should also be dismissed because it is relies on his breach of contract claim.  As this Court has previously held, a "claim for conversion that is redundant of a breach of contract claim should be dismissed, and a mere obligation to pay money does not support a claim for conversion."  Wisetex Trading Ltd., 2001 U.S. Dist. LEXIS 13, *3-4 (S.D. New York 2001).  In essence, Defendant's conversion claim relies on his theory that he was entitled to money under the Employment Agreement.  Accordingly, the conversion claim cannot survive summary judgment as it is duplicative of his breach of contract claim.

IV.     **CONCLUSION**

For all of the foregoing reasons, PPI is entitled to summary judgment on its breach of contract and unjust enrichments claims against Defendant.  Likewise, PPI is entitled to summary judgment on the breach of contract and conversion claims brought by Defendant.

Dated: New York, New York
       July 11, 2008

---

[9] Further, Defendant testified that he was not even aware of the bank reversal until he received his statement the next month. (Nail. Dep123).  Thus, PPI did not exclude the rights of Defendant to alleged property if he did not even know the transaction had occurred.

Respectfully submitted,

**SQUIRE, SANDERS & DEMPSEY L.L.P.**


By:  /s/ Jill S. Kirila

Steven Skulnik (SS-7821)
350 Park Avenue
New York, New York 10022
(212) 872-9800

Jill S. Kirila (Ohio # 0068593)
Lori Maiorca Zancourides (Ohio # 0076342)
(pro hac vice admission)
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
1300 Huntington Center
41 South High Street
Columbus, Ohio 43215

Attorneys for Plaintiff
Paramount Parks Inc.