UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
PARAMOUNT PARKS INC.                  :
                                      :
               Plaintiff,              :     CASE NO.  07 CV 10595 (SHS)
                                      :
          v.                          :     PLAINTIFF'S STATEMENT OF
                                      :     UNCONTESTED MATERIAL
LESTER NAIL                           :     FACTS
                                      :
               Defendant.              :
-------------------------------------------------------x

       Plaintiff Paramount Parks Inc. ("PPI") submits this Statement of Material Facts as to which there is allegedly no material dispute pursuant to Local Civil Rule 56.1, as follow:

       1.     In early 2006, Defendant, the former Senior Vice President / General Counsel for PPI, and PPI entered into a written employment agreement (the "Agreement" or "Employment Agreement"). (Deposition of Defendant Lester Nail ("Nail Dep.") at 40-41, Def. Ex. B)[1]

       2.     The term of the Agreement was expressly defined to extend through December 31, 2007: "The term of this Agreement shall be for the period commencing January 1, 2006 and ending December 31, 2007 (the "Employment Term"). Paramount shall employ Executive, and Executive shall accept employment as Senior Vice President / General Counsel." (Nail Dep. 40-41, Def. Ex. B, ¶ 1)

       3.     According to the terms of the Employment Agreement, Defendant (or "Executive" under the Agreement) understood and agreed that he was receiving a written employment contract, a change from his former at-will relationship, because of his importance to the Company. (Nail Dep. 40-41, Def. Ex. B, ¶ 14).

---

[1] A copy of the transcript of Defendant's deposition, along with copies of all other exhibits referenced herein, has been filed as an attachment to the Declaration of Jill S. Kirila, which is being filed contemporaneously with PPI's Motion for Summary Judgment and this Statement of Uncontested Material Facts.

4. As consideration for the promises being made by PPI in the Agreement, Defendant agreed to, among other things, all of the following:

> 5. Executive *agrees to devote all customary business time and attention to the affairs of Paramount*, except during vacation periods and reasonable periods of illness or other incapacity consistent with the practices of Paramount for executives in comparable positions, and *agrees that Executive's services shall be completely exclusive to Paramount during the term hereof*.
>
> . . . .
>
> 11. *Executive agrees that during the Employment Term, Executive will not engage in any other occupation* or engage in the leisure/theme park, motion picture, television, or entertainment business, except for Paramount pursuant to this Agreement.

(Nail Dep. 40-41, Def. Ex. B, ¶¶ 5, 11) (Emphasis added).

5. In exchange for Defendant's promises to serve as PPI's Senior Vice President / General Counsel under the terms of the Agreement, PPI agreed to provide various compensation and benefits to Defendant during the Employment Term, including a salary in the amount of $165,000.00 a year. (Nail Dep. 40-41, Def. Ex. B, ¶ 2(a)).

6. Additionally, under the Agreement the parties specifically agreed to additional obligations that would arise in the event that Defendant's active employment with PPI ended as a result of PPI terminating his employment "without cause." According to Paragraph 7(c) of the Agreement:

> If, during the term of this Agreement, the employment of Executive by Paramount should be terminated by Paramount other than for Cause as defined herein or for Executive's incapacity, then Paramount shall be obligated both to pay to Executive all applicable base salary pursuant to paragraph 2(a) of this Agreement and also Paramount shall continue all applicable plans and/or benefits pursuant to paragraph 3 hereof for the remainder of the Employment Term, *so long as Executive is willing, ready and able to render exclusive services hereunder during such remainder of the Employment Term. Nothing herein shall obligate Paramount to utilize Executive's services* . . . .

(Nail Dep. 40-41, Def. Ex. B, ¶ 7(c)) (Emphasis added).

7. Prior to the parties entering into the Employment Agreement, Defendant's employment with PPI was at-will. (Nail Dep. 33). Defendant had already been working for PPI as the associate general counsel from January 2002 to the fall of 2005 and as general counsel from then forward. (Nail Dep. 31-32, 36).

8. Defendant worked at PPI's then-headquarters in Charlotte, North Carolina. (Nail Dep. 34, 94).

9. Defendant signed the Employment Agreement without any negotiation or revision. (Nail Dep. 46-48).

10. Defendant did not ask any questions regarding the meaning of any language or terms before signing the Agreement. (Nail Dep. 53-56).

11. On June 30, 2006, Cedar Fair, L.P. acquired PPI. (Deposition of Craig Freeman ("Freeman Dep.") at 80).

12. Unlike some other contract executives, after the acquisition, Defendant continued working for PPI during the transition to assist with legal and human resources matters; however, during that transition, PPI soon assessed that it did not need a full corporate staff in North Carolina, and, in particular it did not need in-house general counsel for PPI. In fact, at that time, Cedar Fair, the publicly-traded parent company of PPI, did not have an in-house counsel or any legal staff. (Freeman Dep. 68-70, 90-91).

13. After working for PPI for a few weeks after the transaction, there was no work for Defendant to do. Defendant asked to be placed on administrative leave or simply go home, rather than having to go to the office. (Nail Dep. 93-94).

14. Thereafter, as part of the transition plan, effective August 1, 2006, PPI triggered Paragraph 7(c), the termination without cause provision of Defendant's Employment Agreement

(as it did with some other PPI executives).  (Freeman Dep., Ex. C).

15. PPI had the right to terminate Defendant's employment without cause at any time under the terms of the Employment Agreement.  (Nail Dep. 61, 70).

16. The express terms of the contract provided that PPI was not required to use Defendant's services during the Employment Term – "Nothing herein shall obligate Paramount to utilize Executive's services."  (Nail Dep. 40-41, Def. Ex. B, ¶ 7(c)).

17. In triggering the termination without cause provisions, PPI communicated to Defendant in its July 27, 2006 letter its intentions to comply with its continuing obligations under the Agreement, as well PPI's expectation that Defendant likewise continue to comply with his own obligations under the Agreement, including Paragraph 7(c) to remain willing, ready and able to render exclusive services under the Agreement for the remainder of the Employment Term, as well as his obligations under paragraph 11 of the Agreement.  (Nail Dep., Def. Ex. C).

18. Defendant did not respond to the July 27 letter or talk to anyone at PPI about it.  (Nail Dep. 99).

19. Thereafter, on August 9, 2006 PPI sent a letter to Defendant to address logistics regarding his compensation and benefits for the balance of the Employment Term of the Agreement.  Again, PPI communicated that "[o]f course, the continuation of any of the above referenced payments or benefits are subject to any other applicable provisions of your employment agreement."  (Nail Dep., Def. Ex. E).

20. Then again on September 12, 2006, PPI communicated its expectations regarding Defendant's continuing obligations under the Agreement, this time through a settlement proposal.  (Nail Dep. 110-11, Ex. F).

21. After considering its rights and obligations under the Employment Agreement,

and similar agreement that PPI had with other executives that had been terminated relative to the Cedar Fair acquisition, PPI was interested in obtaining some closure on its relationships with Defendant and the other executives. For this reason, PPI offered Defendant what it viewed as a mutually beneficial resolution of both parties' respective obligations under the Agreement, which would have included a significant lump sum payment (at less than the amount should PPI have to pay Defendant through December 2007) and a waiver of substantially all of Defendant's obligations to PPI. (Freeman Dep. 106-07).

22. As was clearly communicated in PPI's letter to Defendant, "In particular, by offering to waive the 'willing, ready and able' requirement, PPI is offering to both pay you a significant sum and allow you to seek employment without affecting that sum." (Nail Dep., Def. Ex. F).

23. In fact, Defendant understood the settlement as follows – "My understanding is they pay me this lump sum and we both walk away having no other obligations other than I believe there was a, there may have been a continuing obligation on the noncompete." (Nail Dep. 111).

24. Defendant did not express any disagreement with PPI's interpretation in the September 12 letter of the parties' ongoing obligations under the Agreement or otherwise respond to the letter. (Nail Dep. 112-14).

25. Defendant continued to be under contract with PPI until December 2007. (Nail Dep. 106).

26. PPI had the right, but was not required, to use Defendant's services after triggering the termination without cause provision of the Agreement during the Employment Term. (Nail Dep. 104, Def. Ex. B, ¶ 7(c)).

27. PPI paid Defendant his full base salary from August 1, 2006 through the pay period ending September 30, 2007, amounting in over $196,000.00 in compensation, and continued his benefits, at no additional cost to Defendant, in compliance with its own obligations under Agreement. (Nail Dep. 117).

28. On February 23, 2007 Defendant began working for Denny's, Inc. as senior in-house counsel at full pay and benefits. (Nail Dep. 148-49).

29. Defendant continued to accept compensation and benefits from PPI. Over nearly eight months while he was working for and being paid by another, Defendant received nearly $100,000.00 in compensation from PPI, and was continued on PPI's health insurance benefit plans. (Nail Dep. 117, Def. Ex. B).

30. Defendant did not inform PPI of his employment with Denny's. (Nail Dep. 125).

31. Defendant did not inform Denny's that he was still under contractual obligations with PPI. (Nail Dep. 155-56).

32. In April 2007 Defendant sold his house in Charlotte and, by at least early June 2007 Defendant had bought a half million dollar home and relocated permanently to South Carolina (site of Denny's headquarters), approximately an hour and half away from Charlotte. (Nail Dep., 181-82, Pl. Exs. 22-23).

33. On May 29, 2007 Defendant submitted enrollment forms for continued enrollment in PPI medical benefits (commencing July 1, 2007) and listed his Charlotte home on those forms. (Nail Dep. 135-37, Def. Ex. H).

34. Defendant never informed PPI of any change of address. (Nail Dep. 122).

35. In October 2007, Defendant ran into an acquaintance and former colleague from PPI, Jim Rein, at the Charlotte airport. (Nail Dep. 126-27).

36. When asked, he informed Mr. Rein that he had been working at Denny's. (Nail Dep. 127).

37. Mr. Rein, in turn, relayed that information to PPI. (Freeman Dep. 133-34).

38. PPI immediately sent Defendant a letter notifying him that his compensation and benefits under the Employment Agreement were being terminated effective immediately pursuant the terms of the Agreement. (Freeman Dep. 135, 143-44, 147-49, Exs. I, J; Nail Dep. 122-25). PPI also requested that Defendant provide it with the date on which he began his employment at Denny's. (Freeman Dep., Ex. I).

39. PPI also notified its bank to stop the direct payments to Defendant effective immediately. (Freeman Dep. 136-37).

40. Pursuant to the Paramount Parks Authorization Agreement for Automatic Deposits, Defendant authorized PPI to make any adjustment, credit or debit, if corrections in the credit amount were required. (Nail Dep. 128, Pl. Ex. 2).

41. Upon his employment, Defendant's salary was $175,000.00 a year, and by May 2007 that salary had already increased to $180,000.00. (Nail Dep. 143-44, Pl. Exs. 6, 7).

42. Defendant was provided with full reimbursement for his relocation expenses, totaling over $22,000.00, the value of which he would have had to repay had he terminated his relationship with Denny's within 12 months of the relocation. (Nail Dep., Pl. Exs. 12, 13).

43. Additionally, Defendant was entitled to a 30% target bonus (and received a $10,000.00 special bonus in May 2007), an annual car allowance, stock options, and a full spectrum of pension, 401(k) and insurance benefits. (Nail Dep. Pl. Exs. 5-10).

44. Unbeknownst to PPI, Defendant received (or was eligible to receive) all of the following compensation and benefits from Denny's beginning February 23, 2007, all the while

he continued to accept $99,000.00 in salary and continuation of benefits from PPI for his expected compliance with the Employment Agreement:

- $175,000.00 in annual salary, increased to $180,000.00 as of May 2008
- $22,777.54 in reimbursement for relocation expenses
- $10,000.00 special bonus
- $ 3,510.00 annual car allowance
- Participation in Denny's 2007 Incentive Program with a target incentive of 30% of Defendant's base salary
- Eligible to participate in medical, dental, vision, and additional life insurance coverage
- Eligible to join Denny's Deferred Compensation Plan, a fully vested, matched savings plan and Denny's 401(k) Plan
- Eligible to participate in Denny's 2007 Long-Term Growth Incentive Program
- Denny's Corporation Stock Option Award

(Nail Dep., 143-153, 159-62, Pl. Exs. 5-13).

45.     Defendant chose not to enroll in Denny's benefit plans while he was under contract with PPI and remained on PPI's instead.  (Nail Dep. 153).


Dated: New York, New York
       July 11, 2008

8

Respectfully submitted,

**SQUIRE, SANDERS & DEMPSEY L.L.P.**

By: /s/ Jill S. Kirila

Steven Skulnik (SS-7821)
350 Park Avenue
New York, New York 10022
(212) 872-9800

Jill S. Kirila (Ohio # 0068593)
Lori Maiorca Zancourides (Ohio # 0076342)
(pro hac vice admission)
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
1300 Huntington Center
41 South High Street
Columbus, Ohio 43215

Attorneys for Plaintiff
Paramount Parks Inc.