LITTLER MENDELSON, P.C.
A. Michael Weber (AW-8760)
Michael P. Pappas (MP-6716)
885 Third Avenue
New York, New York 10022
(212) 583-9600

Attorneys for Defendant
 Lester Nail


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

PARAMOUNT PARKS, INC.,

               Plaintiff,

        -against-                        Case No. 07 Civ. 10595 (SHS) (MJD)

LESTER NAIL,

               Defendant.

_____


**DEFENDANT'S RESPONSE TO PLAINTIFF'S RULE 56.1
STATEMENT, AND STATEMENT OF MATERIAL FACTS
<u>AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED</u>**

Pursuant to Local Civil Rule 56.1 of the United States District Court for the Southern

District of New York, Defendant Lester Nail, by his attorneys, Littler Mendelson, P.C., hereby

responds to "Plaintiff's Statement of Uncontested Material Facts," and, with respect to

Defendant's cross-motion, states the material facts as to which there is no genuine issue to be

tried.[1]

---

[1]       The facts set forth herein are undisputed for purposes of Defendant's cross-motion for summary judgment only, and should not be construed as admissions or stipulations of fact with respect to any other part of this action.

## DEFENDANT'S RESPONSES TO PLAINTIFF'S RULE 56.1 STATEMENT

1.      Admits.

2.      Admits, except states that the Employment Term was subject to termination as stated in the Agreement.  For example, Section 7 of the Agreement provided that PPI could terminate the Employment Term in the event of Mr. Nail's death, disability, termination with cause, or termination without cause (subject to PPI's obligation to pay Mr. Nail the remaining compensation due under the Agreement).  (Deposition of Lester Nail dated April 23, 2008 ("Nail Dep.") at 40-41, Ex. B.)[2]

3.      Denies, except admits that Mr. Nail received a written employment contract from PPI, and admits that, prior to entering into the Agreement, Mr. Nail was employed at will by PPI. (Nail Dep., Ex. B.)

4.      Denies, except admits that PPI accurately quotes the first sentence of Section 5 of the Agreement and accurately quotes Section 11 of the Agreement.  (Nail Dep., Ex. B.)

5.      Admits, except denies that PPI's agreement to provide such compensation was solely in consideration for Mr. Nail's agreement to serve as PPI's Senior Vice President/General Counsel.  (Nail Dep., Ex. B.)

6.      Admits that the parties agreed to Section 7(c) of the Agreement and that PPI accurately quotes from that provision, but denies that Mr. Nail had any "additional obligations" in the event PPI terminated his employment without cause.  (Nail Dep., Ex. B.)

7.      Admits, except states that Mr. Nail's employment as Vice President/General Counsel was terminated without cause by PPI effective August 1, 2006.  (Nail Dep. at 95, Ex. C; Deposition of Craig Freeman dated April 23, 2008 ("Freeman Dep.") at 94-97, Ex. C.)

---

[2]      Deposition excerpts and exhibits cited herein are annexed to the Declaration of Michael P. Pappas dated July 25, 2008 ("Pappas Dec."), submitted herewith .

8.    Admits.

9.    Admits, except states that Mr. Nail was told by PPI that it would not be in his best interests to try to negotiate the terms of the Agreement, and that Mr. Nail believed he had no alternative but to sign the Agreement as is.  (Nail Dep. at 46-47.)

10.    Admits, except states that Mr. Nail may have stated to Al Weber that he viewed certain provisions of the Agreement as vague.  (Nail Dep. at 54.)

11.    Admits.

12.    Admits.

13.    Admits.

14.    Admits, except denies knowledge of whether Mr. Nail's termination without cause was "part of the transition plan."

15.    Admits, except states that such right was subject to PPI's obligations stated in Section 7(c) of the Agreement.  (Nail Dep., Ex. B.)

16.    Denies.  In Section 1(a) of the Agreement, PPI expressly promised that it would employ Mr. Nail during the entire Employment Term.  Section 7(c) simply provides that PPI was not obligated to utilize Mr. Nail's services *after* terminating his employment without cause and during the period when it continued to pay him the remaining compensation due under the Agreement.  (Nail Dep., Ex. B.)

17.    Admits that PPI provided the July 27, 2006, letter to Mr. Nail, and states that the content of that letter speaks for itself, but denies that Mr. Nail had any obligations under Section 11 of the Agreement after PPI terminated his employment without cause.  (Nail Dep. at 95, Exs. B, C; Freeman Dep. at 94-97, Ex. C.)

18.    Admits.

19.     Admits that PPI provided the August 9, 2006, letter to Mr. Nail, and states that the content of that letter speaks for itself.  (Nail Dep. at 107-08, Ex. E.)

20.     Denies, except admits that PPI made a proposal to Mr. Nail to pay him less than the amount due to him under the Agreement, and states that the specifics of that proposal are set forth in PPI's September 12, 2006, letter to Mr. Nail.  (Nail Dep. at 109-10, Ex. F.)

21.     Denies.  Mr. Freeman testified that the purpose of the proposal was to financially benefit PPI.  (Freeman Dep. at 106-07.)

22.     Admits that the quoted language was contained in PPI's September 12, 2006, letter to Mr. Nail, but denies that Mr. Nail had any obligation under the Agreement to refrain from seeking or obtaining other employment after his termination by PPI without cause.  (Nail Dep. at 109-10, Exs. B, F.)

23.     Admits that Mr. Nail so testified regarding his understanding of the proposal made by PPI, but denies that Mr. Nail believed he had (or actually had) any continuing non-compete obligation to PPI after his termination by PPI without cause.  (Nail Dep. at 58-60, 65, 110-12, Ex. B.)

24.     Admits that Mr. Nail did not respond to PPI regarding its September 12, 2006, letter, but denies that Mr. Nail did not express any disagreement with PPI's interpretation of the parties' obligations under the Agreement.  Mr. Nail informed PPI both verbally and in writing that he disagreed with PPI's interpretation of the parties' obligations under the Agreement.  (Freeman Dep. at 164, 184, Ex. L.)

25.     Denies, except admits that the contractual obligations set forth in Section 7(c) of the Agreement remained in effect through December 2007.  (Nail Dep., Ex. B.)

26.    Admits, except denies that PPI had the "right" to use Mr. Nail's services inasmuch as Mr. Nail would not have been contractually obligated to provide such services if asked.  (Nail Dep., Ex. B.)

27.    Admits, and states that Mr. Nail was contractually entitled to such payments and benefits.  (Nail Dep., Ex. B.)

28.    Admits.

29.    Admits, and states that Mr. Nail was contractually entitled to such payments and benefits.  (Nail Dep., Ex. B.)

30.    Denies.  Mr. Nail informed Jim Rein of PPI that he was employed by Denny's, even though Mr. Nail had no contractual or other legal obligation to so notify PPI.  (Nail Dep. at 125-27; Freeman Dep. at 134-36.)

31.    Admits, and states that any contractual obligation Mr. Nail may have had to PPI was unaffected by, and did not affect, his employment at Denny's.  (Nail Dep. at 155-56, Ex. B.)

32.    Admits, except denies that Mr. Nail's relocation to South Carolina was "permanent" in that Mr. Nail obviously was free to relocate elsewhere subsequent to his move to South Carolina.

33.    Denies, except admits that PPI directed Mr. Nail to "complete, sign and return the forms," admits that Mr. Nail's wife submitted such forms to PPI pursuant to PPI's request, and admits that she listed Mr. Nail's accurate current address on those forms.  (Freeman Dep. at 130-31, Ex. H; Nail Dep. at 134-36, Ex. H.)

34.    Admits, and states that Mr. Nail had no contractual or other legal obligation to notify PPI of his change of address.  (Nail Dep., Ex. B; Freeman Dep. at 125-26; Deposition of Richard Kinzel dated June 6, 2008 ("Kinzel Dep.") at 52-53.)

35.    Admits.

36.    Admits.

37.    Admits upon information and belief.

38.    Admits that PPI sent Mr. Nail the letters marked as Exhibit I and J to Mr. Freeman's deposition, and states that the content of those letters speaks for itself.  (Freeman Dep. at 142-44, 148, Exs. I, J.)

39.    Admits, and states that PPI also unlawfully directed that monies be removed from Mr. Nail's bank account without Mr. Nail's knowledge or authorization.  (Freeman Dep. at 195-99.)

40.    Denies.  Mr. Nail never authorized PPI to remove from his bank account monies representing compensation that was legitimately in dispute, and such removal violated New York law.  (Freeman Dep. at 195-99.)

41.    Assuming PPI is referring to Mr. Nail's employment at Denny's, admits that his annual base salary was increased from $175,000 to $180,000 in May 2007.  (Nail Dep. at 148-49, Exs. 5, 6.)

42.    Assuming PPI is referring to Mr. Nail's employment at Denny's, admits, and states that Mr. Nail would have been willing to repay that amount given that PPI's remaining payment obligation under the Agreement amounted to significantly more, and also states that, in any event, Mr. Nail could have complied with his obligations under Section 7(c) of the Agreement without permanently terminating his employment relationship with Denny's.  (Nail Dep., Ex. B; Declaration of Lester C. Nail dated July 25, 2008 ("Nail Decl."), ¶ 17.)

43.    Assuming PPI is referring to Mr. Nail's employment at Denny's, admits, except denies that Mr. Nail was "entitled" to such bonuses, stock options, and fringe benefits; rather,

Mr. Nail was eligible for such bonuses, stock options, and fringe benefits in accordance with the terms and conditions of Denny's various plans and policies relating thereto.  (Nail Dep., Exs. 5-10.)

44.    Admits, and states that Mr. Nail was contractually entitled to such compensation and benefits from PPI and had no contractual or other legal obligation to notify PPI regarding his Denny's employment.  (Nail Dep., Ex. B.)

45.    Denies, except admits that Mr. Nail chose not to enroll in Denny's medical, dental, vision, disability, and life insurance benefit plans and remained on the corresponding PPI plans until such time as PPI unlawfully terminated his enrollment, and denies that Mr. Nail was "under contract" with PPI after his termination without cause in any respect other than the parties' obligations set forth in Section 7(c) of his PPI Agreement.  (Nail Dep. at 152-55, Ex. B.)

## DEFENDANT'S STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

1.    In January 2002, Mr. Nail was hired by PPI as an in-house attorney.  (Nail Dep. at 31-32.)

2.    In approximately the Fall of 2005, Mr. Nail was promoted to general counsel of PPI.  (Nail Dep. at 36.)

3.    In approximately early 2006, Mr. Nail's superiors at PPI handed him a written employment agreement (the "Agreement"), told him to sign it, and stated that it would not be in his best interests to try to negotiate.  (Nail Dep. at 46-47.)

4.    Shortly thereafter, Mr. Nail signed the Agreement.  (Nail Dep. at 46-47.)

5.    Effective June 30, 2006, Cedar Fair, L.P., acquired PPI (the "Acquisition"). (Freeman Dep. at 80.)

6.      After the Acquisition, all active employees of PPI remained employees of PPI --
that is, their employer did not change as a result of the Acquisition.  (Freeman Dep. at 76-77, Ex.
A.)

7.      Pursuant to the Acquisition, as legal successor and/or assign, Cedar Fair assumed
PPI's employment agreements with its employees.  Therefore, Mr. Nail's Agreement with PPI
remained in full force and effect after the Acquisition.  (Freeman Dep. at 76-78, Ex. A.)

8.      Shortly after the Acquisition, PPI notified numerous executives who had
employment agreements that they were being placed on "administrative leave," that is, they
would still be considered employees of PPI and would still be paid, but would be allowed to go
home and would not be expected to perform any work.  (Freeman Dep. at 55-56, 72-73; Kinzel
Dep. at 32-34.)

9.      PPI made a distinction between "administrative leave" and termination.
Employees placed on administrative leave were still considered employees of PPI and would still
be paid, but would not be expected to come to work or perform any services.  (Freeman Dep. at
55-56, 64-65, 72-73; Kinzel Dep. at 32-34.)  Employees who were terminated were no longer
considered employees of PPI and may or may not be entitled to additional compensation
depending on the terms of their employment agreement, if any.  (Nail Dep. at 95, Ex. C; Freeman
Dep. at 81-84, 94-97, Ex. C; Kinzel Dep. at 36-37.)

10.     The fact that PPI made a distinction between "administrative leave" and
termination is demonstrated by the fact that, approximately 30 days after placing the above-
referenced contract executives on administrative leave, PPI terminated their employment by
invoking the "termination without cause" provisions of their employment agreements.  (Freeman
Dep. at 80-84.)

11.     Mr. Nail was not among the PPI executives placed on administrative leave immediately after the Acquisition.  Rather, he remained an active employee and was required to continue performing work.  Specifically, Mr. Nail was asked to assist in the transition of legal matters and to handle various legal and human resources matters, such as laying off numerous PPI employees at PPI's corporate office.  (Nail Dep. at 91-93; Freeman Dep. at 59, 68-71, 81, 84-89; Kinzel Dep. at 33-34.)

12.     Mr. Nail satisfactorily performed all of the work requested of him by PPI after the Acquisition.  (Freeman Dep. at 88-89.)

13.     After several weeks of performing work for PPI after the Acquisition, Mr. Nail was no longer being provided with any work to do.  Therefore, he asked Craig Freeman, PPI's Corporate Vice President of Administration, if he could be placed on administrative leave or just go home.  Mr. Freeman tentatively agreed to Mr. Nail's request, but shortly thereafter informed Mr. Nail that Cedar Fair's CEO, Richard Kinzel, wanted Mr. Nail to continue coming to the office.  Mr. Nail complied with Mr. Kinzel's directive and continued reporting to the office on a daily basis.  (Nail Dep. at 92-94.)

14.     Approximately 10-14 days later, Mr. Freeman informed Mr. Nail by phone that he was free to go home and that PPI would be sending him something in writing shortly.  (Nail Dep. at 92-94; Freeman Dep. at 92.)

15.     On July 27, 2006, PPI notified Mr. Nail in writing that his employment "is terminated without cause as of August 1, 2006."  PPI also expressly advised Mr. Nail in writing that his services would "no longer be needed after August 1, 2006."  (Nail Dep. at 95, Ex. C; Freeman Dep. at 94-97, Ex. C.)

16.    PPI terminated Mr. Nail's employment without cause effective August 1, 2006. (Nail Dep. at 95, Ex. C; Freeman Dep. at 94-97, Ex. C.)

17.    PPI could have placed Mr. Nail on administrative leave if it so desired, but instead chose to terminate his employment outright, without cause.  (Nail Dep. at 95, Ex. C; Freeman Dep. at 55-56, 72-73; Kinzel Dep. at 32-34.)

18.    Mr. Nail's employment with PPI ended effective August 1, 2006, and he was no longer an active or inactive employee of PPI as of that date. (Nail Dep. at 95, Ex. C; Freeman Dep. at 94-97, Ex. C.)

19.    Section 7(c) of Mr. Nail's Agreement with PPI is the *only* provision in the Agreement governing PPI's obligation to pay Mr. Nail in the event PPI terminated his employment without cause.  It provides:

> If, during the term of this Agreement, the employment of Executive by Paramount should be terminated by Paramount other than for Cause as defined herein or for executive's incapacity, then Paramount shall be obligated both to pay to Executive all applicable base salary pursuant to paragraph 2(a) of this Agreement and also Paramount shall continue all applicable plans and/or benefits pursuant to paragraph 3 hereof for the remainder of the Employment Term, so long as Executive is willing, ready and able to render exclusive services hereunder during the remainder of the Employment Term.  Nothing herein shall obligate Paramount to utilize Executive's services, and Paramount shall have fulfilled all of its obligations hereunder by payment to Executive of the applicable amounts set forth herein for the Employment Term of this Agreement subject to the terms of this paragraph 7(c).    Notwithstanding the above, if the employment of Executive is also terminated by Paramount for cause or by reason of disability or death, this paragraph 7(c) shall not be applicable.

(Nail Dep., Ex. B.)

20.    Under the express terms of Section 7(c), PPI was obligated to pay Mr. Nail the remaining compensation due under the Agreement "so long as" Mr. Nail was "willing, ready and able to render exclusive services" to PPI.    Nothing in Section 7(c) references or requires

compliance with any other purported non-competition obligations set forth elsewhere in the Agreement.  (Nail Dep., Ex. B.)

21.    Mr. Nail was willing, ready, and able to perform exclusive services for PPI throughout the term of the Agreement.  (Nail Decl., ¶¶ 13-28;  Nail Dep. at 155-57; Kinzel Dep. at 59; Freeman Dep. at 155, 192.)

22.    Mr. Nail was unemployed from August 1, 2006, through February 22, 2007. (Nail Dep. at 114-16, 148-49, 162.)

23.    On or about February 23, 2007, Mr. Nail became employed as an in-house attorney for Denny's.  (Nail Dep. at 142-49, Ex. 7.)

24.    Mr. Nail's hiring by Denny's did not render him unable to perform exclusive services for PPI if he had been asked.  (Nail Decl., ¶¶ 13-26, Exs. 1-3; Freeman Dep. at 193; Kinzel Dep. at 55-56.)

25.    Mr. Nail was employed at will by Denny's and could have left Denny's employ at any time, for any reason, without notice.  (Nail Decl., ¶ 14, Ex. 1.)

26.    Mr. Nail did not have an employment contract with Denny's, and had no restrictions on leaving Denny's employ.  (Nail Decl., ¶ 15, Ex. 1.)

27.    Mr. Nail did not have a non-competition agreement or any other legal obligation to Denny's that would have prevented him from leaving Denny's employ and immediately providing services to PPI.  (Nail Decl., ¶ 15, Ex. 1.)

28.    No policy of Denny's would have prevented Mr. Nail from resigning and immediately providing services to PPI.  (Nail Decl., ¶ 16, Ex. 1.)

29.     Mr. Nail was dissatisfied with his employment at Denny's and would have been willing to immediately leave if PPI had asked him to return.  (Nail Decl., ¶ 18; Nail Dep. at 114-16, 137-38, 148-49, 155-57, 162; Freeman Dep. at 152, 155.)

30.     Mr. Nail had no personal obligations that would have precluded him from immediately leaving Denny's employ to perform services for PPI.  Further, even if he had been required to render such services in person, his new home in South Carolina was within commuting distance of PPI's offices in Charlotte.  (Nail Decl., ¶ 17; Pl. Rule 56.1 Stmt., ¶ 32.)

31.     PPI concedes that if Mr. Nail ceased his employment at Denny's in response to a request by PPI for him to perform services, his mere employment by Denny's would not have violated his obligations under Section 7(c) of the Agreement.  (Freeman Dep. at 193; Kinzel Dep. at 65-66.)

32.     In addition to his ability to leave Denny's employ at any time, for any reason, without notice and without restriction on his post-employment activity, Mr. Nail also would have been able to temporarily leave his duties at Denny's to perform exclusive services for PPI if he had been asked.  (Nail Decl., ¶¶ 19-26, Exs. 2-3; Nail Dep. at 155-56.)

33.     For example, Mr. Nail was available nights and weekends to perform exclusive services for PPI if asked.  (Nail Decl., ¶ 20.)

34.     Mr. Nail also could have taken vacation or personal days off to perform exclusive services for PPI if asked.  (Nail Decl., ¶ 20, Ex. 2.)

35.     Mr. Nail also could have taken a leave of absence from Denny's to perform exclusive services for PPI if asked.  (Nail Decl., ¶ 21, Ex. 2.)

36.     Mr. Nail had a good relationship with his superiors at Denny's, including Rhonda Parrish, and was confident that if PPI ever called on him to provide services he could make

arrangements to temporarily absent himself from his Denny's employment.  (Nail Decl., ¶ 23; Nail Dep. at 155-65.)

37.     Mr. Nail did not have an exclusive services agreement with Denny's.  Further, Denny's policy clearly permitted Mr. Nail to provide services for PPI during a leave of absence/time off: "You may hold another job outside of Denny's if the outside work does not interfere with your work performance here and does not create an actual or potential conflict of interest or breach of confidentiality."  (Nail Decl., ¶ 22, Ex. 3.)

38.     Mr. Nail's performance of exclusive services for PPI during a leave of absence/time off from Denny's would not have created a conflict of interest, would not have resulted in the disclosure of confidential information, and would not have violated any contract or legal or ethical duty.  (Nail Decl., ¶ 24.)

39.     PPI and Denny's are not competitors.  (Nail Decl., ¶ 25; Freeman Dep. at 42, 46-47, 189-90.)

40.     PPI and Denny's are in different industries altogether.  (Nail Decl., ¶ 25; Freeman Dep. at 42, 46-47, 189-90.)

41.     There is no confidential information of Denny's that would be useful to PPI, or vice versa.  (Nail Decl., ¶ 25; Freeman Dep. at 42, 46-47, 189-90.)

42.     PPI and Denny's have not been adversaries in any legal matter, nor have they had adverse interests in any such matter, so as to prevent Mr. Nail from rendering legal advice to either.  (Nail Decl., ¶ 25; Freeman Dep. at 192.)

43.     As stated above, Mr. Nail had no employment contract, non-compete agreement, or similar legal obligations to Denny's that would have prohibited him from providing exclusive services for PPI during a leave of absence/time off.  (Nail Decl., ¶¶ 14-22, Ex. 1.)

13

44.     PPI concedes that there would have been nothing inherently inconsistent with Mr. Nail performing services for PPI while still employed by Denny's, assuming he had the time to do both.  (Freeman Dep. at 192.)

45.     PPI has identified no cognizable business interest that would have prohibited Mr. Nail from performing excusive services to PPI either after leaving his employment at Denny's or during a leave of absence/time off from Denny's.  (Freeman Dep. at 115-16.)

46.     Mr. Nail was not a unique or extraordinary employee with respect to his employment at either PPI or Denny's.  (Nail Decl., ¶ 25.)

47.     PPI can identify only 3 former PPI executives who it asked to provide services after their PPI employment was terminated:  Pat Jones, Al Weber, and Tim Fisher.  Pat Jones was rehired by PPI as a full-time employee.  Al Weber and Tim Jones were merely asked a few ad hoc questions that literally took only minutes to answer.  (Freeman Dep. at 187-89.)

48.     PPI did not seek to utilize Mr. Nail's services at any time after his termination without cause on August 1, 2006.  (Freeman Dep. at 185-86; Kinzel Dep. at 60, 68.)

49.     PPI did not ask Mr. Nail to provide any services at any time after his termination without cause on August 1, 2006.  (Freeman Dep. at 185-86; Kinzel Dep. at 60, 68.)

50.     PPI did not wish to utilize Mr. Nail's services at any time after his termination without cause on August 1, 2006.  (Freeman Dep. at 186-87;  Kinzel Dep. at 60-61.)

51.     PPI had no plans or intention to utilize Mr. Nail's services at any time after his termination without cause on August 1, 2006.  (Freeman Dep. at 186-87;  Kinzel Dep. at 60-61.)

52.     PPI had no internal discussions about utilizing Mr. Nail's services at any time after his termination without cause on August 1, 2006.  (Freeman Dep. at 185-87;  Kinzel Dep. at 60-61.)

53.     PPI did not even consider utilizing Mr. Nail's services at any time after his termination without cause on August 1, 2006.  (Freeman Dep. at 186-87;  Kinzel Dep. at 60-61.)

54.     No circumstances ever arose in which PPI would have needed to utilize Mr. Nail's services after his termination without cause on August 1, 2006.  (Freeman Dep. at 186-87.)

55.     After PPI discontinued payments and benefits to Mr. Nail in September 2007, Mr. Nail notified PPI in writing that he remained "willing, ready and able to render exclusive services" to PPI.  (Freeman Dep. at 184, Ex. L.)  Despite Mr. Nail's assurance and tender of continued performance, PPI did not ask Mr. Nail to provide any services or otherwise demand performance.  PPI never even contacted Mr. Nail to inquire about his ability to provide services to PPI.  (Nail Decl., ¶ 28; Freeman Dep. at 150, 185-87; Kinzel Dep. at 60, 68.)

56.     In or about the Summer of 2007, Cedar Fair decided to create a new general counsel position responsible for, among other entities, PPI, and began interviewing candidates for the position.  However, PPI did not offer the position to Mr. Nail, did not invite him to interview, did not contact him, and did not even consider him for the position.  At the time, Cedar Fair and PPI were unaware that Mr. Nail had obtained employment at Denny's, and believed him to be unemployed.  (Freeman Dep. at 193-95; Kinzel Dep. at 69-70.)

57.     Mr. Nail's Agreement with PPI contained no provision requiring Mr. Nail to inform PPI of any change in address after his PPI employment was terminated without cause. (Nail Dep., Ex. B; Freeman Dep. at 125-26; Kinzel Dep. at 52-53.)

58.     Mr. Nail's Agreement with PPI contained no provision requiring Mr. Nail to inform PPI that he obtained other employment after his PPI employment was terminated without cause.  (Nail Dep., Ex. B.)

59.     Mr. Nail's current home address as of May 29, 2007, was 9027 Kirkley Court, Charlotte, North Carolina 28277.  (Nail Dep. at 135-36.)

Dated: July 25, 2008

By:      _____S/_____

A. Michael Weber (AW-8760)
Michael P. Pappas (MP-6716)
LITTLER MENDELSON, P.C.
885 Third Avenue
New York, New York 10022-4834
(212) 583-9600

Attorneys for Defendant
 Lester Nail