LITTLER MENDELSON, P.C.
A. Michael Weber (AW-8760)
Michael P. Pappas (MP-6716)
885 Third Avenue
New York, New York 10022
(212) 583-9600

Attorneys for Defendant
 Lester Nail

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PARAMOUNT PARKS, INC.,

                Plaintiff,

-against-

LESTER NAIL,

                Defendant.

Case No. 07 Civ. 10595 (SHS) (MJD)

## DECLARATION OF LESTER C. NAIL

I, Lester C. Nail, hereby declare under penalty of perjury that the following is true and correct

1.     I am the Defendant in this action. I make this declaration in opposition to Plaintiff's motion for summary judgment and in support of Defendant's cross-motion for summary judgment.

2.     I was employed as an in-house attorney for Paramount Parks, Inc. ("PPI") from approximately January 2002 until August 1, 2006, when PPI notified me that it was terminating my employment without cause. I was initially employed by PPI as an associate counsel, and was promoted to general counsel in or about the Fall of 2005.

3. Some time in early 2006 (it may have been March), Al Weber, who was the Chief Operating Officer of PPI at the time, handed me an employment agreement (the "Agreement"). Mr. Weber told me to sign it, and stated in words of substance that it would not be in my best interests to try to negotiate the terms. I believe that another PPI executive, Michael Koontz, also instructed me that it would not be in my best interests to try to negotiate the terms, and that I should "just sign it and move on." In short, I had no real opportunity to negotiate the terms of the Agreement and felt that I had no alternative but to sign it. Therefore, I signed the Agreement.

4. My Agreement with PPI was a two-year employment contract for the definite term of January 1, 2006, through December 31, 2007, and PPI promised to employ me for that entire term.

5. On or about June 30, 2006, a company called Cedar Fair, L.P., acquired PPI from CBS Corp. (the "Acquisition"). Based on communications from CBS, it was my understanding that all active employees of PPI remained employees of PPI -- that is, our employer did not change as a result of the Acquisition. It was also my understanding that Cedar Fair, as legal successor and/or assign, assumed PPI's employment agreements with its employees, and that my Agreement with PPI remained in full force and effect after the Acquisition.

6. Shortly after the closing date of the sale, most or all of the other contract executives who had been employed by PPI prior to the Acquisition were placed on paid leave (but not terminated) and allowed to go home. (It is my understanding that their employment was terminated about 30 days later). However, PPI asked me to stay on for a period of time and continue performing work. Specifically, I was asked to assist in the

transition of legal matters and to handle various legal and human resources matters, such as laying off numerous PPI employees at PPI's corporate office. I performed all of the work requested of me by PPI to the best of my ability and worked hard assisting PPI with the transition.

7.  After several weeks of performing work for PPI after the Acquisition, I was no longer being provided with any work to do. I thought it was useless for me to continue coming in the office with no work to perform. Therefore, I asked Craig Freeman, PPI's Corporate Vice President of Administration, if I could be placed on paid leave (like the other PPI executives) or just go home. Mr. Freeman tentatively agreed to my request, but shortly thereafter informed me that Cedar Fair's CEO, Richard Kinzel, wanted me to continue coming to the office. I complied with Mr. Kinzel's request and continued reporting to the office on a daily basis.

8.  Approximately 10-14 days later, Mr. Freeman informed me by phone that there was nothing more for me to do, that I was free to go home, and that PPI "would be sending me something in writing shortly."

9.  On July 27, 2006, PPI notified me in writing that my employment "is terminated without cause as of August 1, 2006." PPI also expressly advised me in writing that my services would "no longer be needed after August 1, 2006."

10. My employment with PPI ended effective August 1, 2006, and I was no longer an active or inactive employee of PPI as of that date. No one at PPI ever told me that I remained employed by PPI after that date. On the contrary, I was expressly and unequivocally told in writing by the CEO, Mr. Kinzel, that my employment relationship with PPI was *terminated*.

11. Section 7(c) of my Agreement with PPI is the *only* provision in the Agreement governing PPI's obligation to pay me in the event PPI terminated my employment without cause. It provides:

> If, during the term of this Agreement, the employment of Executive by Paramount should be terminated by Paramount other than for Cause as defined herein or for executive's incapacity, then Paramount shall be obligated both to pay to Executive all applicable base salary pursuant to paragraph 2(a) of this Agreement and also Paramount shall continue all applicable plans and/or benefits pursuant to paragraph 3 hereof for the remainder of the Employment Term, so long as Executive is willing, ready and able to render exclusive services hereunder during the remainder of the Employment Term. Nothing herein shall obligate Paramount to utilize Executive's services, and Paramount shall have fulfilled all of its obligations hereunder by payment to Executive of the applicable amounts set forth herein for the Employment Term of this Agreement subject to the terms of this paragraph 7(c). Notwithstanding the above, if the employment of Executive is also terminated by Paramount for cause or by reason of disability or death, this paragraph 7(c) shall not be applicable.

12. Under the express terms of Section 7(c), PPI was obligated to pay me the remaining compensation due under the Agreement "so long as" I was "willing, ready and able to render exclusive services" to PPI. Nothing in Section 7(c) references or requires compliance with any other purported non-competition obligations set forth elsewhere in the Agreement. Also, Section 7(c) does not say that I was precluded from engaging in any other employment after my termination by PPI. Indeed, Al Weber, who was the CEO of PPI at the time I signed the Agreement, has told me that this provision was *not* intended to keep me from working at another job after termination, but rather to ensure that I would be available if PPI needed me for something (which I was).

13. PPI's allegation that I breached Section 7(c) (or any other provision of the Agreement) is totally without merit. I was at all times willing, ready, and able to perform

exclusive services for PPI throughout the term of the Agreement, and my hiring by Denny's did not render me unable to perform exclusive services for PPI if I had been asked. There were a number of options available to me that would have enabled me to perform exclusive services to PPI in the event PPI had sought to utilize them.

14. First, I could have immediately resigned my employment at Denny's. I was employed at will by Denny's and could have left Denny's employ at any time, for any reason, without notice. Attached hereto as Exhibit 1 is an excerpt from Denny's Employee Handbook setting forth its "Employment-At-Will" policy. It states, in relevant part: "Your employment relationship with Denny's is considered 'at-will.' This means that either you or Denny's may terminate your employment at any time, for any reason, without or without cause or notice."

15. I did not have an employment contract with Denny's (for a definite term or otherwise), and had no restrictions on leaving Denny's employ. Nor did I have a non-competition agreement or any other legal obligation to Denny's that would have prevented me from leaving Denny's employ and immediately providing services to PPI.

16. I am aware of no policy of Denny's (and PPI has identified none) that would have prevented me from resigning and immediately providing services to PPI.

17. I had no personal obligations that would have precluded me from immediately leaving Denny's employ to perform services for PPI. Although I had moved to South Carolina in June 2007, my new home was within commuting distance of Charlotte. (I would have been more than willing to repay Denny's my relocation expenses if I needed to, given that PPI's remaining payment obligation under the

5

Agreement amounted to significantly more.) I also had no restrictions on moving back to North Carolina (or anywhere else) if I so desired.

18. I was dissatisfied with my employment at Denny's at the time and would have been willing to immediately leave if PPI had asked me to return.

19. Second, in addition to my ability to leave Denny's employ at any time, I also would have been able to temporarily leave my duties at Denny's to perform exclusive services for PPI if I had been asked.

20. I was available nights and weekends to perform exclusive services for PPI if asked. Or, I could have taken vacation or personal days off to perform exclusive services for PPI if called upon. I was eligible for 3 weeks of vacation annually at Denny's.

21. I also could have taken a leave of absence from Denny's to perform exclusive services for PPI if asked. For example, Denny's policies permit employees to take "leaves of absence" or "excused absences" for personal reasons. (A copy of Denny's leave policy is attached hereto as Exhibit 2.)

22. I did not have an exclusive services agreement with Denny's. In fact, Denny's policy clearly would have permitted me to provide services for PPI during a leave of absence/time off: "You may hold another job outside of Denny's if the outside work does not interfere with your work performance here and does not create an actual or potential conflict of interest or breach of confidentiality." (A copy Denny's "Employment Outside Denny's" policy is attached hereto as Exhibit 3.)

23. Perhaps even more importantly, I had a very good relationship with my superiors at Denny's, including Rhonda Parrish, who I had known personally and

6

professionally for quite some time. I was confident that if PPI ever called on me to provide services (which was highly unlikely), I could make arrangements to temporarily absent myself from my Denny's employment.

24. Furthermore, my performance of exclusive services for PPI during a leave of absence/time off from Denny's would not have created a conflict of interest, would not have resulted in the disclosure of confidential information, and would not have violated any contract or legal or ethical duty.

25. PPI (an amusement park company) and Denny's (a restaurant chain) are not competitors. They are in different industries altogether. There is no confidential information of Denny's that would be useful to PPI, or vice versa. In addition, as far as I am aware, PPI and Denny's have not been adversaries in any legal matter, nor have they had adverse interests in any such matter, so as to prevent me from rendering legal advice to either. Finally, I was not a "unique or extraordinary employee" with respect to my employment at PPI. I was simply an in-house attorney, who PPI has already replaced. The fact that PPI summarily discharged me without cause within a month after the Acquisition, and admittedly had no intention of ever utilizing my services again, is the clearest indication that PPI did not view me as a unique or extraordinary employee.

26. In short, I was ready and willing to leave my employment at Denny's or arrange for a leave of absence or time off from my responsibilities if PPI had called upon me to provide services, and it would have been well within my power to do so.

27. It is difficult to understand how PPI can now assert that I was unwilling or unable to provide services, since it never asked me to do so, admits that it has no idea what I would have done if I had been asked, and concedes that my Denny's employment

would not necessarily have prevented me from fulfilling my obligations under Section 7(c).

28. Indeed, after PPI discontinued payments and benefits to me in September 2007, I notified PPI in writing that I remained "willing, ready and able to render exclusive services" to PPI, just as I had been all along. Despite my assurance and offer of continued performance, PPI still did not ask me to provide any services or otherwise demand performance. PPI never even contacted me to inquire about my ability to provide services to PPI.

29. PPI makes a number of other allegations that, although irrelevant to the legal issues, merit a response. Specifically, in a transparent attempt to prejudice the Court and deflect attention from its weak claims, PPI makes a number of false and misleading allegations that I engaged in so-called "deceptive conduct."

30. At no time did I intentionally conceal from PPI my employment by Denny's. I simply saw no need to affirmatively notify PPI that I had obtained employment, for several reasons. First, there was nothing in my Agreement with PPI that required me to do so. Second, it was clear to me that my mere employment by Denny's did not violate my obligations under the Agreement, since I was still willing and able to provide exclusive service if asked. Third, although I remained willing, ready and able to perform services for PPI if asked, I knew (and PPI has since confirmed), based on PPI's own actions and statements, that it was highly unlikely I would ever be called upon to do so. If I had been actively seeking to conceal my Denny's employment, I would never have told Jim Rein, whom I knew full well was an employee of PPI, that I was now working at Denny's.

31. PPI's reliance on an alleged statement by my wife (supposedly made over the phone to a PPI employee) that I was still unemployed is particularly inappropriate and misleading. My wife and I strongly dispute that such a statement was made. Rather, as PPI neglects to inform the Court, I testified that I heard my wife tell the PPI employee that "things would be better if Lester could find a job *in Charlotte*," *i.e.*, rather than commuting to South Carolina. (I was commuting from my home in North Carolina to Denny's offices in South Carolina at the time.) There is simply no credible evidence that my wife or I ever misrepresented my employment status to anyone at PPI.

32. Also, at no time did I or my wife ever misrepresent our home address to PPI. My wife filled out the PPI benefit enrollment forms (at PPI's request) on May 29, 2007. Our home address on that date was 9027 Kirkley Court, Charlotte, North Carolina, which is the exact address my wife wrote on the form.

33. Likewise, there was nothing nefarious about the fact that I did not later inform PPI that I had moved. As I stated above, I saw no need to do so because I did not believe my mere employment by Denny's violated my obligations under Section 7(c) of the Agreement, and because I knew that PPI had absolutely no interest in ever retaining my services. If I was trying to conceal my new address, I would not have provided it to the post office as a forwarding address. It took PPI little or no time to locate me when it sought to advise me that it was ceasing payments under the Agreement.

34. Finally, PPI harps on the fact that for a period of time I received compensation from both PPI and Denny's. There was nothing inequitable about my receiving payments from PPI during that period. I was a loyal, dedicated, and effective employee for PPI since 2002. Even though PPI had expressly promised to employ me

during the entire term of the Agreement, it broke that promise and summarily discharged me without cause and without notice with almost a year-and-a-half left on my contract. PPI's actions significantly disrupted my life and caused me and my family great stress and inconvenience. I was unemployed for almost 6 months and ultimately was forced to uproot my family, sell our house, and move to another state to take a lower-level position that I did not enjoy. Under the circumstances, it can hardly be deemed inequitable that I received the compensation that was due to me. Just as significantly, I was contractually entitled to those payments under an agreement PPI itself had drafted, and I had complied with my obligation to be willing, ready and able to perform services for PPI if called upon.

Dated: July 25, 2008

_____
Lester C. Nail

# NAIL DECL.

# EXHIBIT 1

# DENNY'S SUPPORT CENTER
# EMPLOYEE HANDBOOK
### Disclaimer and Acknowledgment

My signature below indicates that I have received a copy of the Denny's Support Center Employee Handbook. I understand that this handbook supersedes and replaces all prior handbooks which I may have received. I recognize that it contains important information concerning the Company's policies, procedures and benefit plans. I also understand that it is my responsibility to read the handbook and become familiar with its contents, and adhere to the Company's policies.

I understand that the Company reserves the right to amend, supplement, rescind and revise any policy, practice or benefit described in this handbook other than the employment-at-will provisions, as it deems appropriate in its sole and absolute discretion. Again, I understand that this handbook has been updated and supersedes any old or existing versions.

IN ACCORDANCE WITH SECTION 41-1-110, CODE OF LAWS OF SOUTH CAROLINA, THE LANGUAGE USED IN THIS HANDBOOK SHALL NOT CREATE AN EXPRESS OR IMPLIED CONTRACT OF EMPLOYMENT BETWEEN ME AND THE COMPANY. I UNDERSTAND THAT MY EMPLOYMENT IS AT WILL AND THAT THE COMPANY RESERVES THE RIGHT TO END MY EMPLOYMENT AT ANY TIME WITH OR WITHOUT NOTICE OR REASON.

MY SIGNATURE BELOW ACKNOWLEDGES AND DOCUMENTS MY UNDERSTANDING THAT THIS HANDBOOK DOES NOT CREATE AN EMPLOYMENT CONTRACT

_____
Print Your Name

_____  _____
Your Signature                Date

_____
Social Security Number

This handbook describes portions of existing Company policies, procedures and benefit plans. If any conflict arises, the official Company policies, procedures and benefit plans are the ruling documents.



---



Who We Are    What We Believe    Benefits

# Denny's
# Employee Handbook
### Support Center



Working Together    Security    Pay Procedures

*Great Food and Great Service by Great People... Every Time!*

## Introduction

This handbook describes the policies and benefits of the Denny's Support Center. As a Denny's employee, you are expected to follow these standards and adhere to the procedures outlined in this handbook.

The policies described in this handbook are intended as guidelines only. Complete and detailed policies have been adopted and may change from time to time, so be sure to talk to your supervisor or to someone in the Human Resources Department when making plans and interpreting policies.

**The language used in this handbook should not be interpreted as a contract of employment between you and Denny's. Although we hope that your employment relationship with us will be long-term, either you or the Company may terminate this relationship at any time, for any reason, with or without cause or notice.**

Please understand that no manager or Company representative, other than the Senior Vice President of Human Resources, has the authority to enter into any agreement with you for employment for any specified period of time or to make any promises or commitments contrary to the Company policies.

## What We Believe

Denny's has hired you because you were the most qualified person for the job. We trust that you have accepted the job because you believe Denny's is the best employment opportunity for you. We hope you will do your best, share your ideas for improvement, and understand that your job is extremely important to the Company.

As a Denny's employee, you should:

- Arrive at work on time, ready to work;
- Keep a good attendance record;
- Apply your skills fully;
- Continuously look for ways to improve the way you do your job;
- Act professionally toward your fellow employees and any customers and suppliers you meet, be respectful, courteous, thoughtful and helpful, and;
- Make a personal commitment to living our values.

Denny's has some very important policies that we all need to understand.

## Equal Employment Opportunity

Denny's will employ and treat all employees fairly, regardless of race, color, religion, sex, sexual orientation, age, national origin, citizenship status, disability or any other status protected by the federal, state or local equal opportunity laws. All employees are expected to support and abide by this policy with their words, actions and behaviors.

Denny's supports the employment of persons with disabilities (including persons with life-threatening illnesses) who are able to meet acceptable performance standards and whose condition does not pose a direct threat to themselves, to other employees, or to customers. Denny's will attempt to reasonably accommodate a person's disability, where such accommodation would not result in an undue hardship to the Company. If you need additional information on this subject, please contact the Human Resources department.

## Employment-At-Will

Your employment relationship with Denny's is considered "at-will." This means that either you or Denny's may terminate your employment at any time, for any reason, with or without cause or notice.

Although you may leave Denny's at any time for any reason, we request that you give at least a two-week notice so that a suitable replacement can be found without interruption of your work.





## CERTIFICATION

_Louise Smith_, being first duly sworn, says that he/she is employed as the _Employee Info Specialist 3_ for _Denny's Corporation_ and that as part of the affiant's duties he/she is the custodian of records for Denny's Corporation and Denny's, Inc. ("Denny's"). Affiant has examined the _____ pages attached hereto and certifies (1) said attachments are all exact copies of records of this office of which affiant is the custodian; (2) the originals of said attachments were all prepared in the usual course of the business of this office; (3) the originals of said attachments were all prepared at or about the time of the events and conditions they recorded; (4) the originals of said attachments were all prepared and maintained by employees of said office in the normal and usual manner that records are prepared and maintained, and (5) said attachments constitute complete and exact copies of the records in the custodian's possession of this office regarding _Lester C. Nail_, Social Security Number _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_.

_Louise Smith_

SWORN TO BEFORE ME and subscribed in my presence this _12th_ day of _May_, 2008.

_Kaye M. Martin_
Notary Public

Kaye M. Martin
NOTARY PUBLIC
State of South Carolina
My Commission Expires
October 18, 2014

# NAIL DECL.

# EXHIBIT 2



"roll-over" into the next calendar year up to 24 hours of unused excused absence hours.

## Leaves of Absence

Denny's understands that sometimes employees need time away from work because of their own medical or personal needs or the needs of an immediate family member who is seriously ill. Some employees may need time away from work after the birth or adoption of a child, at the death of an immediate family member, for jury duty or to attend to other personal matters. Members of the reserve forces of the U.S. Armed Forces or the National Guard may also need to have time to fulfill those duties.

The federal Family and Medical Leave Act (FMLA) provides for periods of leave when you are unable to work because of your own medical needs, the medical needs of certain seriously ill family members, or after the birth or adoption of a child. Described briefly are the types of leaves available under the FMLA, any eligibility requirements, and procedures you will need to follow. We have also summarized our personal, bereavement, and jury duty/witness leave policies. If you have any questions about any of these matters, please be sure to contact the Human Resources Department.

## Medical Leave

Regular (non-temporary) employees become eligible for medical leave after 30 days of employment, so long as they work an average of 24 or more hours each week. This leave covers situations when you cannot work because of your own medical condition. The leave can extend up to 26 weeks in any rolling 12-calendar-month period. As long as you have completed at least 6 months of regular employment, part of your salary may be continued during the leave.

If you need a medical leave, please contact the Benefits Department at extension 8433 as soon as possible. You will receive a form that you, your manager, and doctor must complete. We may ask an outside medical agency to verify your inability to work. You also may be required to obtain another medical opinion and/or to provide recertification of your medical condition during your absence.

An employee must be totally disabled for more than five (5) consecutive working days while actively employed in order to apply for the short term disability (STD) benefits.

During a medical leave, your benefits will continue as long as you pay your share of the cost. You will need to contact the Group Benefits Department to arrange for payment during your leave.



Denny's also sponsors a student loan program for all Denny's employees and their families through Campus Door. Campus Door provides access to both federal student loans and Campus Door's private, credit-based loans. For more information contact a Campus Door representative at 1-888-581-1769 or through their website at www.yourtuitionsource.com/dennys.

The Company may also pay your membership fees for joining a professional organization that is related to your work. Be sure to discuss this with your supervisor in advance of joining.

Sometimes, Denny's may also ask you to attend a special training course or seminar. When this happens, you will be paid as if you were at work for the time spent at these classes.

## When You Can't Be at Work

One of the most important things you can do to help keep your department running smoothly is to keep your supervisor informed. Any time you can't be at work when you are expected, talking to your supervisor should be one of the first things you do. If you are going to be late, let your supervisor know as soon as possible. If you have to make an emergency appointment or have a conference with your child's teacher, talk with your supervisor to work out the best time for you to be away from work. If you have children or others in your care, you should have backup arrangements for times when regular caregivers are not able to attend to your dependents.

If you are tardy or absent, or if you are absent without letting your supervisor know when to expect you to return, your whole department suffers. For this reason, Denny's may take appropriate action to make sure that your job functions are completed in a timely manner.

If you fail to report to work for three days in a row without notifying your supervisor or if you fail to return from leave on the date you are expected, Denny's will assume that you have voluntarily resigned and replace you.

## Excused Absence

Regular full-time, non-exempt employees receive up to 56 hours of excused absence leave each calendar year to use for unexpected family emergencies or appointments that just cannot be scheduled outside of regular work hours. During your first calendar year of employment, your leave hours are prorated. Excused absence leave may be used in increments as small as one hour. Remember to let your supervisor know as soon as possible (preferably in advance) if you will need to use excused absence leave. Also, because we value your work, eligible employees will be paid half-time pay after year-end for all unused excused absence hours. In lieu of a cash payout, you may



The Company provides paid time off for regular, full-time employees. As a general rule, paid bereavement leave may not exceed 3 working days. Unpaid time off may also be available to employees.

### Jury Duty/Witness Leave

We believe it is your right and duty to serve on a jury or to testify as a witness in a legal proceeding. Regular, full-time employees are eligible for paid jury duty and witness leave. Other employees are eligible for unpaid leave. Paid witness leave is only available if you are not a party to the legal action.

If you receive a jury duty or witness notice, contact your supervisor immediately so that arrangements can be made to cover your absence. You are expected to report to work during your regular work hours if your presence at the courthouse is not required.

If you are eligible for paid leave, your regular pay will continue while you are out. If you receive any jury duty or witness pay (other than reimbursements for meals, mileage and parking), you will need to give the Payroll Department a receipt for the amount you received. This amount will then be deducted from your next check.

### Vacation

Employees earn hours of vacation time based on months worked. Your anniversary date is a factor in determining the amount to be earned each month, specifically at 5 and 10 year anniversaries, which warrant increased hours per month.

| Salaried Vacation Schedule: | Length of Continuous Full Time Employment | Hours Earned Each Month |
|---|---|---|
| If Adjusted Date of Hire is prior to 6/1/1999: | Less than 4 years | 6.67 |
|  | 4 but less than 9 years | 10.00 |
|  | 9 or more years | 13.33 |
| If Adjusted Date of Hire is on or after 6/1/1999: | Less than 5 years | 6.67 |
|  | 5 but less than 10 years | 10.00 |
|  | 10 or more years | 13.33 |

The number of hours earned max out at twelve months accumulation. For example, a three year employee can have a maximum of 80 hours earned (one year accumulation).

No additional hours will be added to the employee's account for months worked until he/she takes vacation and reduces the balance.



Vacation hours accrued while on medical leave are not available for use until the employee has returned to work for a period of 30 consecutive work days.

If you return to work within 12 weeks, you are entitled to return to the same or equivalent position. If you return to work after 12 weeks, but before the end of the maximum 26-week period, the Company will review the circumstances and make an appropriate decision as to whether the same position, a comparable position, or any other position is available.

### Family Leave

Regular employees become eligible for family leave after 12 months of employment, if they have worked at least 1,250 hours during the previous 12 months. (Exempt employees are credited with 173 hours for each full month of active employment.) You will need to contact the Group Benefits Department if you need to take a family leave of absence.

Family leave is unpaid and may last for up to 12 weeks in any rolling 12-calendar-month period. However, you will need to use any available paid leave days (such as excused absence days, floating holidays or vacation days) before beginning an unpaid family leave. Also, if you have taken a medical leave for a reason related to the family leave (such as the birth of a child), the two leaves will be combined when determining the maximum 12-week leave.

As is the case with medical leave, your insurance benefits will remain in effect as long as you pay your share of the cost. You must contact the Group Benefits Department to arrange for payment during your leave. Finally, if you return to work within the 12-week period you will return to the same or an equivalent position.

### Personal Leave

Unpaid personal leave up to 12 weeks is available for regular, full-time employees who have completed at least 12 months of employment. The leave request may be approved or denied based on the Company's business needs. Any available paid leave must be used before taking an unpaid personal leave. If the leave extends beyond 2 weeks, you must pay the full cost of your benefit coverages.

### Bereavement Leave

Bereavement leave allows you to take time off after the death of an immediate family member including your spouse, domestic partner, children, parents, siblings, grandparents, grandchildren, current parents-in-law, current daughters-in-law, current sons-in-law, step-parents, step-children, and step-siblings.





Hours for the month will be earned on the day of the month coinciding with the employee's anniversary date, based upon length of continuous employment.

Example: The employee's service date is August 17th. Each month on the 17th, vacation hours will be earned.

After six months of employment, you may use up to one week of paid vacation for the rest of your first year of employment. You would then have one more week you could take until the end of your second year of employment.

Some other important notes about vacation:

- After six months of employment, unused vacation time is paid upon the end of employment, unless you have been terminated for a specific type of misconduct.
- You may not choose to receive cash instead of vacation time.
- If a Company holiday occurs during your vacation time, the time will be charged as a holiday and not a vacation day.
- Vacation can be taken only in half-days or full days.
- All employees (exempt and non-exempt) must record all vacation time on a time card, and submit it to their supervisor and Payroll for record-keeping purposes.
- Finally, it's very important to remember that your supervisor must approve in **advance** your vacation request. To be sure that you can take a vacation when you want, arrange it as far in advance as possible.

## Holidays

Paid holidays for regular Denny's Support Center employees typically are:
New Year's Day
Martin Luther King, Jr.'s Birthday
Presidents' Day
Memorial Day
Independence Day
Labor Day
Thanksgiving Day
Day after Thanksgiving Day
Christmas

If a holiday falls on a Saturday or Sunday, the Company usually makes either the Friday before or the Monday after the weekend the official holiday. You will be notified in advance of the holiday schedule. Generally, you will receive up to two "floating days" each year. However, in some years you will have fewer than two, such as when we add extra days to the paid holiday list. This can happen when an official holiday falls, for example, on a Thursday, and the Company decides to close the office on Friday as well.



Floating holidays, like vacation, must be approved in advance by your supervisor. During your first year of employment, your number of floating holidays may be limited based on your start date. Before the beginning of each year, the Company will publish the holiday schedule, which will include the number of floating holidays. All employees (exempt and non-exempt) are to record their floating holidays on a time card.

Special rules apply for people who work on holidays or who are on a leave of absence during holidays. Please see your supervisor or Human Resources Representative if this applies to you.

## Security & the Work Environment

### Building Security

Only Denny's employees, approved vendors/contractors, and authorized visitors are allowed in our office buildings. You will be issued an identification badge which must be kept with you at all times. Security officers issue identification passes to visitors and check incoming and outgoing parcels.

### Tobacco Free Workplace

Recognizing the increasing evidence of the health and safety concerns related to second-hand smoke, we have designated specific areas outside of each office building for our employees who smoke. In order to be sensitive to our non-smoking coworkers and guests, please do not smoke outside near building entrances/exits. We ask that all employees be respectful of each other, and allow others the freedom to smoke in designated areas without being treated differently than any other employee.

### Alcohol & Drugs

Denny's wants to provide you with a safe, healthy, and pleasant workplace. You can help by reporting unsafe or unhealthy situations, including problems you see that may involve alcohol or drugs. Denny's policy is to maintain an alcohol and drug-free environment for everyone.

You may be terminated for using alcohol or drugs on Company property, reporting to work under the influence of alcohol or drugs, having alcohol or drugs on the Company's premises, or operating a vehicle or equipment leased, owned, or rented by Denny's while under the influence of alcohol



# NAIL DECL.

# EXHIBIT 3

Employees have internet "web" access for business reasons. Network browsers may not be used to:

- Access obscene, profane, abusive, or otherwise offensive material
- Download software from the internet
- Access internet web sites for personal or entertainment purposes

If you have any questions about the appropriate use of any Company communications tool, please check with your manager.

### Standards of Employment

Making our departments, as well as the Company successful depends on all of us conducting ourselves courteously, ethically, efficiently and cooperatively.

While not every possible misconduct or performance problem that can result in discipline can be listed, the following are examples of conduct that may result in disciplinary action, up to and including immediate termination.

- Falsely completing a time card or completing/signing another employee's time card.
- Writing false or misleading answers or leaving out important information in an employment application or any other Company document.
- Unsatisfactory work performance or attitude.
- Unexcused or repeated tardiness or absences.
- Violation of Company policy.
- Being rude, discourteous, or unlawfully harassing other Denny's employees, clients, or customers.
- Mishandling, stealing, or attempting to steal Denny's funds or property, or the funds or property of another employee or customer.
- Possession, sale, use, distribution, or being under the influence of alcohol or illegal drugs while on Denny's property, while on duty, or while operating a vehicle or equipment leased, owned, or rented by Denny's.
- Possessing or bringing dangerous or unauthorized materials or weapons on Company property.
- Placing yourself, others or Company property in jeopardy by violating security procedures or codes of safety.
- Working unauthorized overtime, failing to work assigned overtime, or not recording overtime.
- Private recording of conversations (including voice mail) without pre-authorization from the Human Resources Department, Assets Protection Department, or Legal Department.
- Accessing or downloading offensive material via the internet or e-mail.
- Failure to report a criminal conviction (except for minor traffic violations).
- Improper use or disclosure of trade secrets, confidential information, or other information that belongs to the Company. (If you are ever in doubt about whether information you possess may be released outside the Company, just ask your manager.)
- Refusing to carry out the instructions of a supervisor, unless you have reason to believe it would violate another Denny's policy, and you raise the issue promptly with a Human Resources Representative.
- Fighting or disorderly/immoral conduct.
- Neglecting duties or wasting time.
- Willful damage to Company property or the property of others.
- Use of threatening or abusive language or actions toward a fellow employee, client, or customer.

### Distribution of Literature and Solicitation

In order to avoid disrupting our coworkers and customers, employees may not distribute literature or solicit other employees during working time or in working areas. Persons not employed by Denny's may not distribute literature or solicit on Company property at any time. Charitable activities (such as solicitations for the United Way) are permitted only if cleared in advance by the Human Resources Department.

### Employment Outside of Denny's

You may hold another job outside of Denny's if the outside work does not interfere with your work performance here and does not create an actual or potential conflict of interest or breach of confidentiality. You must let your supervisor know if you are doing work outside your job at Denny's, so that together we can ensure that no issues or problems exist.

### Employment of Relatives, Favoritism and Fraternization

To avoid the appearance of favoritism, Denny's generally does not allow a supervisor/subordinate relationship to exist between relatives.

Denny's also prohibits Support Center management from dating or having a romantic or sexual relationship with any employee at the unit level or with any Support Center employee where a direct or indirect reporting relationship exists. Additionally, the Company strongly discourages all employees from engaging in these types of relationships since efforts to pursue such a relationship may create an uncomfortable environment for another employee which could lead to disciplinary action.

