LITTLER MENDELSON, P.C.
A. Michael Weber (AW-8760)
Michael P. Pappas (MP-6716)
885 Third Avenue
New York, New York 10022
(212) 583-9600

Attorneys for Defendant
 Lester Nail

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

PARAMOUNT PARKS, INC.,

                              Plaintiff,                    Case No. 07 Civ. 10595 (SHS) (MJD)

            -against-

LESTER NAIL,

                              Defendant.
_____

## DECLARATION OF MICHAEL P. PAPPAS

        Michael P. Pappas, an attorney duly admitted to this court, hereby declares under penalty of perjury as follows:

        1.        I am a member of the firm Littler Mendelson, P.C., attorneys of record for the Defendant in this action.  I make this declaration in opposition to Plaintiff's motion for summary judgment and in support of Defendant's cross-motion for summary judgment.

        2.        Attached hereto as Exhibit 1 are true and correct copies of pages from the transcript of Craig Freeman's deposition, taken on April 23, 2008.

3.    Attached hereto as Exhibit 2 are true and correct copies of Exhibits A, C, H, I, J, and L, marked and identified at the deposition of Craig Freeman taken on April 23, 2008.

4.    Attached hereto as Exhibit 3 are true and correct copies of pages from the transcript of Richard Kinzel's deposition, taken on June 6, 2008.

5.    Attached hereto as Exhibit 4 are true and correct copies of pages from the transcript of Lester Nail's deposition, taken on April 23, 2008.

6.    Attached hereto as Exhibit 5 are true and correct copies of Exhibits B, C, E, F, H, 5, 6, 7, 8, 9, and 10, marked or introduced and identified at the deposition of Lester Nail taken on April 23, 2008.

Dated: July 25, 2008                    _____S/_____
                                        Michael P. Pappas

PAPPAS DECL.

EXHIBIT 1

CERTIFIED COPY

1

2 UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

3 ----------------------------X

4 PARAMOUNT PARKS, INC.,

5                    Plaintiff,

6            vs.                    No. 07 CV 10595(SS)

7 LESTER NAIL,

8                    Defendant.

9 ----------------------------X

10                    April 23, 2008

                    9:02 a.m.

11

12

13

14        Deposition of CRAIG FREEMAN, held at

15 the offices of Squire, Sanders & Dempsey

16 L.L.P., 350 Park Avenue, New York, New York,

17 pursuant to Notice and Agreement, before

18 Thomas R. Nichols, a Registered Professional

19 Reporter and a Notary Public of the State of

20 New York.

21

22

23

                    GREENHOUSE REPORTING, INC.

24            875 Sixth Avenue - Suite 1716

                    New York, New York  10001

25                    (212) 279-5108

2

1

2   A P P E A R A N C E S:

3

4   SQUIRE, SANDERS & DEMPSEY L.L.P.

5   Attorneys for Plaintiff

6          1300 Huntington Center

7          41 South High Street

8          Columbus, Ohio 43215-6197

9   BY:    JILL S. KIRILA, ESQ.

10

11  LITTLER MENDELSON

12  A Professional Corporation

13  Attorneys for Defendant

14         885 Third Avenue

15         New York, New York 10022-4834

16  BY:    MICHAEL P. PAPPAS, ESQ.

17         A. MICHAEL WEBER, ESQ.

18

19  ALSO PRESENT:

20         LESTER NAIL

21

22

23

24

25

3

1          C. Freeman

2  C R A I G   F R E E M A N , called as a

3      witness, having been duly sworn by a Notary

4      Public, was examined and testified as

5      follows:

6          THE REPORTER:  Could you please state

7      your name and home address for the record.

8          THE WITNESS:  Craig Freeman,

9      849 Crosstree Lane, Sandusky, Ohio 44870.

10 EXAMINATION BY

11 MR. PAPPAS:

12      Q.    Good morning.  My name is Michael

13 Pappas.  I am one of the attorneys for Lester Nail

14 in Paramount Parks' lawsuit against him.

15          From now on I'll refer to Paramount

16 Parks as PPI.  Is that OK?

17      A.    Sure.

18      Q.    Before I begin, I would like to

19 briefly explain some of the ground rules for the

20 deposition.  As you can hear, I have a slight head

21 cold, so if you can't understand what I say,

22 please let me know.

23          I'm going to be asking you a series of

24 questions and you will answer those questions

25 under oath.  You have already been sworn.  That

42

1                          C. Freeman

2    acquisition going forward, several times a week.

3         Q.     PPI's currently owned by Magnum is it?

4         A.     Yes.

5         Q.     When was PPI acquired from CBS?

6         A.     June 20, 2006.

7         Q.     And it was acquired directly by Magnum

8    or by Cedar Fair?

9         A.     I -- I don't know the specific

10   legalities of the transaction.  What I'm giving

11   you in terms of who owns who is from my

12   recollection of the entity structure chart the

13   last time I looked at it.

14        Q.     What type of company is Magnum?  Is it

15   a holding company?  What type of business is it

16   engaged in?

17        A.     It's engaged in the amusement park

18   business.

19        Q.     What kind of company is Cedar Fair?

20        A.     It's engaged in the amusement park

21   business as well.

22        Q.     And it's headquartered in Ohio,

23   correct?

24        A.     Yes.

25        Q.     And it has been for some time, right?

46

1                      C. Freeman

2   the parks?

3        A.     They are on or adjacent to or nearby.

4   They are associated with the amusement parks.

5        Q.     Do you know how many hotel properties

6   that Cedar Fair owns or operates?

7        A.     Five hotels, yeah, I think they are

8   five hotels and there are campgrounds.

9        Q.     How many campgrounds?

10       A.     I think three or four.  Four.

11       Q.     Is Cedar Fair engaged in any other

12  businesses?

13       A.     Not that I can think of right now.

14       Q.     Does it have any subsidiaries that are

15  engaged in any other businesses?

16       A.     No.

17       Q.     Who are -- from now on when I say

18  Cedar Fair, just to make it easy, I mean Cedar

19  Fair and its subsidiaries, OK?

20       A.     Sure.

21       Q.     Who are Cedar Fair's competitors?

22              MS. KIRILA:  Objection.  Relevance.

23       There's no dispute over noncompete here.

24              You can answer the question, but I'm

25       not going to get into competitiveness when

Greenhouse Reporting, Inc.                    (212)279-5108
                   (212) 279-5108

47

1                    C. Freeman

2          this isn't an issue in the case.  Go ahead.

3          A.     Six Flags, Busch Entertainment, I

4    guess Disney, Universal, Herschend Entertainment,

5    H-e-r-s-c-h-e-n-d.  I am not sure the C is in

6    there, but we'll go with it.  Parc, which is

7    P-a-r-c, I believe is how it's spelled, owns

8    several properties in the U.S.  Kennywood

9    Entertainment.

10                 Those are the big ones I can think of.

11         Q.     Does Cedar Fair do any business

12   outside of the U.S. and Canada?

13         A.     No.

14         Q.     Were you involved in the acquisition

15   of PPI by Cedar Fair?

16         A.     Yes.

17         Q.     I believe you testified earlier you

18   were involved in the due diligence, correct?

19         A.     Yes.

20         Q.     Were you involved in any other way?

21         A.     Transition, the transition issues

22   related to human resources and legal matters.

23         Q.     That's what you testified to before as

24   far as your interactions with Mr. Nail.

25         A.     Yes.

55

1                           C. Freeman

2          Q.      Position?

3          A.      Vice president resale.

4                  Dale Kaetzel.

5          Q.      What was his position?

6          A.      He was the general manager at Canada's

7   Wonderland.

8                  I think Bob White might have been part

9   of that group.   He was the general manager at

10  Carowinds.

11                 That's all I'm recalling, and even

12  that group I'm -- I'm -- the date, there might be

13  a couple of days, a few days of, you know, where

14  something happened on June 30th and others

15  happened a few days later.

16         Q.      So prior to the June 30th closing date

17  you had discussions with Mr. Kinzel in which it

18  was decided that the individuals that you just

19  listed and possibly others would no longer

20  continue to be employed after the acquisition?

21             MS. KIRILA:   Objection.   Misstates his

22         testimony.   You can answer.

23         A.      We discussed putting them on

24  administrative leave.

25         Q.      What does that mean?

56

1                          C. Freeman

2         A.      That means that they would be relieved

3    of their duties during the administrative leave

4    period and continue to be employed.

5         Q.      Did all of those people have

6    employment contracts with PPI?

7         A.      Yes.

8              MS. KIRILA:   Restroom break when you

9         get to a convenient point?

10             MR. PAPPAS:   Now is good.

11             MS. KIRILA:   Five minutes?

12             MR. PAPPAS:   Sure.

13             (A recess was taken from 10:22 to

14        10:31 a.m.)

15   BY MR. PAPPAS:

16        Q.      In your discussions with Mr. Kinzel

17   regarding the individuals that you just testified

18   about being placed on administrative leave, as you

19   put it, who made the decision to select those

20   individuals?

21        A.      The final decision was Mr. Kinzel's.

22        Q.      Did you have, give him any input into

23   that final decision?

24        A.      With respect to the area that I -- oh,

25   OK.  Not with respect to those individuals.

59

1                    C. Freeman

2          MS. KIRILA:   Object to form.   You can

3      answer.

4      A.    We were -- we were not sure to what

5   extent the outstanding issues and matters would

6   require Mr. Nail's personal attention and for what

7   length of time.

8      Q.    So were any decisions made about

9   Mr. Nail's status prior to the closing date?

10      A.    A decision was made not to include him

11   in the group that was placed on administrative

12   leave.

13      Q.    Then no decision was made as to what

14   would ultimately become of Mr. Nail.  At least no

15   decision was made prior to the closing date.

16      A.    Prior to the closing date I don't

17   recall a decision was made.

18      Q.    Do you know the reasons why those

19   individuals you listed were selected to be placed

20   on administrative leave and relieved of their

21   duties?

22      A.    Because with the integration of the

23   organizations their functions became redundant and

24   so therefore at that time their services were not

25   required.

64

1                          C. Freeman
2      postacquisition?
3              A.      He was executive vice president
4      general manager of Kings Dominion.
5              Q.      Anyone else?
6              A.      Mr. Ross was retained.
7              Q.      What was his position pre- and
8      postacquisition?
9              A.      Well, immediately prior to the
10     acquisition he was -- he was like on a special
11     assignment.  He was an executive vice president of
12     the company.  Postacquisition he was the vice
13     president of marketing for King's Island.
14             Q.      Anyone else?
15             A.      Mr. Rankin was retained.
16             Q.      What was his position pre- and
17     postacquisition?
18             A.      He was the vice president and general
19     manager of the Great America Park.
20             Q.      Anyone else?
21             A.      When you say retained, as of what
22     date?
23             Q.      After June 30th, 2006.
24             A.      Mr. Nail was retained.  Actually, as I
25     indicated, as of June 30th everybody was retained

65

1                          C. Freeman

2    because they were -- the, um, termination without

3    cause provisions of their employment agreements

4    had not yet been triggered.

5           Q.     When I say retained, I mean who was

6    retained for the purpose of remaining actively

7    employed and performing their duties?

8           A.     OK.   I believe the list I just gave

9    you, I believe that is a complete list.

10          Q.     Were any of the executives with

11   contracts who were employed at the PPI

12   headquarters in Charlotte retained other than

13   Mr. Nail?

14          A.     No.

15          Q.     Were you involved in any discussions

16   about whether the employment agreements of

17   Mr. Nail and the other PPI executives would remain

18   in effect after the acquisition?

19          A.     Yes.

20          Q.     Who were those discussions with?

21          A.     Mr. Kinzel.

22          Q.     What was discussed?

23          A.     What was discussed was I was given

24   direction that we were to honor the employment

25   agreements that were in place.

68

C. Freeman

1

2      A.      No.

3      Q.      Had you discussed it with anyone?

4      A.      No.

5      Q.      Did you get a contract yourself?

6      A.      No.

7      Q.      Do you know of anybody who did?

8      A.      Yes.

9      Q.      Who?

10     A.      They're disclosed in the, um, public

11  filings.

12     Q.      Do you know if those contracts contain

13  any restrictions on postemployment activities?

14     A.      I don't know.

15     Q.      Who made the decision to retain

16  Mr. Nail after the closing date?

17     A.      That would have been based on a

18  discussion I would have had with Mr. Kinzel.

19     Q.      So did he make the decision or did

20  you?

21     A.      I made the recommendation.  He

22  approved it.

23     Q.      When did that discussion take place?

24     A.      I don't know specifically.  It would

25  have been at or around the closing date.

69

C. Freeman

1

2    Q.    Was it after the closing date?

3    A.    I doubt it.

4    Q.    Do you recall what specifically was

5    discussed?

6    A.    No.

7    Q.    Did you discuss the reasoning for your

8    recommendation with Mr. Kinzel?

9    A.    My recommendation was based on the

10   outstanding matters that we had to deal with that

11   needed further attention.

12   Q.    Legal matters?

13   A.    Legal and human resource matters.

14   Q.    And legal matters were ongoing

15   lawsuits and what not involving the company?

16   A.    Right.

17   Q.    And HR matters were letting go the

18   remaining people in the Charlotte office?

19          MS. KIRILA:  Objection.

20   A.    Restructuring.

21   Q.    Restructuring?

22   A.    Yes.

23   Q.    What did the restructuring entail?

24          MS. KIRILA:  I am just going to object

25      to the extent that you had discussions with

70

C. Freeman

1

2       Mr. Nail in his capacity as general counsel

3       about that, but you can testify generally.

4       A.      Generally we were looking at the

5   organization structure and which positions would

6   be retained and which positions would not and how

7   the organization would be structured

8   postacquisition.

9       Q.      Did Mr. Kinzel offer any view of your

10   recommendation or did he just say, OK?

11       A.      I don't recall any specific, um,

12   reaction.

13       Q.      Did he question you about it?

14       A.      I don't recall.

15       Q.      Did you tell him what your reasoning

16   was for the recommendation?

17       A.      I'm sure I did.

18       Q.      Did your recommendation -- was your

19   recommendation to retain him until such time as

20   the outstanding matters were resolved or to retain

21   him on an ongoing longer basis?

22       A.      My recommendation was to retain

23   Mr. Nail until we could ascertain with greater

24   certainty what the ongoing needs would be.

25       Q.      So you weren't sure?

71

1                         C. Freeman

2        A.      Not a hundred percent, no.

3        Q.      But it was not likely in your view at

4   the time that he would remain actively employed

5   for the remainder of his employment contract term,

6   was it?

7                MS. KIRILA:   Object to form.   Go

8           ahead.

9        A.      I'm sorry.   Could you ask the question

10  again?

11       Q.      Sure.   At the time was it your view

12  that Mr. Nail would continue to be actively

13  employed for the remainder of this employment

14  contract term?

15       A.      Probably not.

16       Q.      Did you have any ballpark estimate of

17  how long it would take for the outstanding matters

18  to be resolved and Mr. Nail could be placed on

19  administrative leave, as you called it, along with

20  the rest of the individuals you listed?

21       A.      Not at that time.

22       Q.      So Mr. Kinzel did not -- strike that.

23  Who communicated to the individuals you listed

24  earlier, Mr. Al Weber, Fisher, Koontz, Thornton,

25  Petit, Jones, Kaetzel and White?   Who communicated

72

C. Freeman

```
1
2    to them the decision that they would be relieved
3    of their duties effective the closing date?
4         A.    Mr. Kinzel called Mr. Weber and
5    informed him.
6         Q.    Were you present?
7         A.    Yes.
8         Q.    What did you hear him say to
9    Mr. Weber?
10        A.    He told Mr. Weber that effective
11   immediately that those employees would be placed
12   on administrative leave.
13        Q.    Did he use those words?
14        A.    I believe he did.  That's my
15   recollection.
16        Q.    He didn't tell Mr. Weber effective
17   immediately those individuals' employment was
18   terminated without cause?
19        A.    He did not use those words.
20        Q.    Was Mr. Weber on speakerphone?
21        A.    As I recall, yes.
22        Q.    And what did he respond to that?
23        A.    Basically in the affirmative, that he
24   would -- he would take care of it.
25        Q.    He would take care of informing those
```

73

C. Freeman

2    individuals?

3        A.    Yes.

4        Q.    Anything else?

5        A.    Not that I recall.

6        Q.    Did Mr. Kinzel inform Mr. Weber that

7    Mr. Weber himself was also being immediately

8    placed on administrative leave?

9        A.    I believe so.

10       Q.    What was Mr. Weber's reaction to that?

11       A.    He was professional and...

12       Q.    Was there any discussion regarding

13   whether Mr. Weber and the other individuals

14   continued to be paid under their contracts?

15       A.    I don't recall whether that was part

16   of that conversation.

17       Q.    Do you recall anything else about that

18   conversation?

19       A.    It was pretty brief.

20       Q.    Did you have any conversations with

21   Mr. Kinzel immediately before or after that call

22   to Mr. Weber?

23       A.    Just preparing for the call and --

24       Q.    What was said?

25       A.    I don't recall.

76

C. Freeman

1

2  marked for identification, this date.)

3      Q.    I show you what has been marked as

4  Defendant's Exhibit A.  Have you ever seen that

5  before?

6      A.    Yes.

7      Q.    What is it?

8      A.    It's a memo that CBS sent to the PPI

9  employees concurrent with the sale of Paramount

10  Parks to Cedar Fair.

11      Q.    Did you have any input into this

12  document?

13      A.    There was some communication between

14  our counsel and CBS regarding this document and I

15  don't know what level of input our counsel had

16  with respect to this document.

17      Q.    I was asking if you personally had any

18  input into it.

19      A.    Oh, me personally, OK.  I don't recall

20  having any input into this document.

21      Q.    If you look under the section entitled

22  "Employment" on the first page, it states that

23  "all active employees of Paramount Parks will

24  remain employees of Paramount Parks, and/or its

25  subsidiaries, i.e., your employer will not change

77

1                          C. Freeman

2    as a result of the transaction."

3               Do you see that?

4        A.    Yes.

5        Q.    Is that accurate?

6        A.    Yes.

7               MS. KIRILA:  I am just going to object

8          to the extent that you're asking him for

9          information on a document that he was not

10         the author of.

11              But you can testify as to your

12         understanding as to what happened.

13       Q.    Is that what happened, all active

14   employees of PPI remained employees of PPI and

15   their employer did not change as a result of the

16   transaction?

17       A.    That is correct.

18       Q.    As you stated earlier, Mr. Nail's

19   employment contract with PPI remained in full

20   effect after PPI was acquired by Cedar Fair,

21   correct?

22       A.    Yes.

23       Q.    To your knowledge was Mr. Nail given

24   any severance benefits from PPI or Cedar Fair?

25              MS. KIRILA:  Just object to the extent

78

C. Freeman

1
2      it calls for a legal conclusion under his

3      contract, but you can answer as to your

4      understanding.

5          Q.    Was he given any payments denominated

6      severance pay or separation pay?

7          A.    No, not to my knowledge.

8                MR. PAPPAS:  Mark this as B.

9                (Defendant's Exhibit B, document

10          purported to be Lester Nails' employment

11          contract with PPI, Bates Nos. LES00038

12          through 45, marked for identification, this

13          date.)

14          Q.    I show you what has been marked as

15      Defendant's Exhibit B.  And this is Mr. Nail's

16      employment contract with PPI, correct?

17          A.    It appears to be.

18          Q.    This is the contract that was in

19      effect at the time of PPI's sale to Cedar Fair,

20      right?

21          A.    Yes.

22          Q.    And this is the contract that remained

23      in effect after that sale, correct?

24          A.    Yes.

25          Q.    According to this document Mr. Nail

80

C. Freeman

1

2  corporation's general counsel does?

3      A.      Generally.

4      Q.      And were Mr. Nail's duties as general

5  counsel of PPI consistent with your own general

6  understanding of what a general counsel does?

7      A.      As a subsidiary of a larger publicly

8  traded company, there would -- I don't believe

9  there would have been the SEC, you know, issues

10 involved in the position and perhaps some of the

11 corporate governance, so forth, that a general

12 counsel for a publicly traded entity would have.

13     Q.      Any other differences?

14     A.      Not that come to mind.

15     Q.      When Cedar Fair acquired PPI on

16 June 30, 2006, were any of the incumbent PPI

17 executives who had employment contracts

18 discharged?

19     A.      On June 30th?

20     Q.      After, on or after June 30th.

21     A.      On or after June 30th.  Yes,

22 subsequently the termination without cause

23 provisions of those employment agreements for

24 several of the executives were triggered.

25     Q.      Who were they triggered for and when?

81

1                      C. Freeman

2         A.    Mr. Weber, Mr. Fisher, Mr. Koontz,

3    Ms. Jones, Mr. Kaetzel, Mr. White, Mr. Petit,

4    and --

5         Q.    Mr. Thornton?

6         A.    Mr. Thornton.  And Mr. Nail.

7         Q.    Other than Mr. Nail those were the

8    same individuals that you earlier testified were

9    placed on administrative leave after the closing

10   date, correct?

11        A.    Yes.

12        Q.    When was their status changed from

13   administrative leave to termination without cause?

14        A.    They were sent a letter in late July.

15        Q.    Late July of 2006, correct?

16        A.    Yes.

17        Q.    Do you still have copies of those?

18        A.    Yes.

19        Q.    Do you remember what they said?

20        A.    They were drafted by counsel to comply

21   with the terms of the individual employment

22   agreements.

23        Q.    I am just asking if you remember what

24   they said.

25               MS. KIRILA:  I am just going to object

82

1                      C. Freeman

2          to the extent that you need to refer to a

3          document that's the best evidence.  You can

4          testify as to your general memory.

5          A.    My general recollection is that we

6    were notifying them that effective, I believe it

7    was August 1st, that their services were no longer

8    required and we would be triggering the

9    termination without cause provision of their

10   employment agreement and that their employment

11   agreements would remain intact and their

12   obligations continued.

13         Q.    In between June 20, 2006, and the time

14   these individuals were notified by letter that

15   they were being terminated without cause, did any

16   of them perform any services for PPI or Cedar

17   Fair?

18         A.    Other than Mr. Nail, I'm not aware of

19   any.

20         Q.    Were any of them asked to perform

21   services for PPI or Cedar Fair during that period?

22         A.    Other than Mr. Nail, no, I don't know.

23         Q.    You don't know?

24         Do you know who decided to terminate

25   those individuals without cause?

83

1                          C. Freeman

2          A.      That would have been Mr. Kinzel.

3          Q.      Do you know why he decided to do that

4    at that time?

5          A.      I'm trying to recall a specific

6    conversation or discussion and rational reasoning.

7    I just don't recall specifics.

8          Q.      But you did have discussions with him

9    about that, correct?

10         A.      I'm sure I did.

11         Q.      But you don't recall anything that was

12   discussed in those conversations?

13         A.      Not specifically.

14         Q.      Generally?

15         A.      Generally it was to proceed with the

16   termination without cause, under the employment

17   agreements that we would continue to honor those

18   agreements as I indicated previously.

19         Q.      Anything else?

20         A.      Not specifically, no.

21         Q.      Do you have any idea why it was

22   decided at that time to convert these individuals

23   from administrative leave to termination without

24   cause?  In other words, why that?

25         A.      You've asked for my general

84

C. Freeman

1

2 recollection and impression and it would be that,

3 you know, the closing date had occurred.  The dust

4 had settled a little bit and it was time to move

5 on and basically bring it to closure and we had

6 made the, a lot of the restructuring decisions and

7 we were comfortable that at that time we did not

8 require the services of those individuals.

9       Q.    As you've already testified, Mr. Nail

10 was asked to stay on for a period of time after

11 the closing date, correct?

12      A.    Yes.

13      Q.    And that final decision was made by

14 Mr. Kinzel upon your recommendation according to

15 your testimony, right?

16      A.    To retain him?

17      Q.    Yes.

18      A.    Yes.

19      Q.    Didn't you tell Mr. Nail that

20 Mr. Kinzel had personally picked Mr. Nail to stay

21 and help close the corporate office?

22          MS. KIRILA:   Objection.  Asked and

23      answered.

24          MR. PAPPAS:  I apologize if I already

25      asked it.

85

C. Freeman

MS. KIRILA:    You can answer again.

A.    My recollection is that since Mr. Nail

was going to be the only remaining senior

executive on staff and on the ground in Charlotte,

that he was going to be designated, if you will,

as the in-charge person and that yes, Mr. Kinzel

did direct that.

Q.    Did you tell Mr. Nail that all of the

other incumbent PPI officers had been sent home?

A.    I have a vague recollection of that

conversation.

Q.    Do you know who communicated to

Mr. Nail the fact that the company wanted him to

stay on for a period of time after the closing

date?

A.    That would have been -- I am sure that

might have been me.

Q.    Do you recall anything about that

discussion?

A.    No.

Q.    Do you recall when it took place?

A.    No.

Q.    Was it prior or subsequent to the

closing date?

86

C. Freeman

1

2    A.    I don't recall.

3    Q.    Was it in person, on the phone or by

4    e-mail?

5    A.    My recollection is it would have been

6    a telephone conversation, but that's just my

7    recollection.

8    Q.    Do you recall generally anything that

9    either you or he said in that conversation?

10   A.    No.

11   Q.    But you know that you informed him

12   that the company wanted him to stay on for a

13   period of time to help close the corporate office,

14   correct?

15   A.    I'm sure I did.  To help close the

16   corporate office part of that, what you just said,

17   I'm not sure about, but I'm sure we had a

18   conversation about him staying on and assuming a

19   leadership role.

20   Q.    Was there any discussion in that

21   conversation about how long he was being asked to

22   stay on?

23   A.    I don't recall.

24   Q.    Was there any discussion about the

25   fact that although he was being asked to stay on

87

1                        C. Freeman

2    it would not be on a permanent basis?

3          A.    I don't recall.  I know that there

4    were several times where Mr. Nail asked me about

5    his status.

6          Q.    And what was your response?

7          A.    I couldn't -- I couldn't give him any

8    information.

9          Q.    You didn't know or you didn't --

10   didn't want to give him that information?

11         A.    It was a, um, as it was an evolving

12   situation wherein Mr. Nail's status was, as I

13   indicated previously, you know, it was

14   undetermined at one point and then by July 27th it

15   became determined as we sorted things out.

16               So, you know, there were points in

17   time where I didn't know.  There were points in

18   time where I knew, but I couldn't say.

19         Q.    At least in the initial conversation

20   you had with him where you informed him that he

21   was being asked to stay for a period of time, you

22   weren't sure at that point how long that would be.

23         A.    Right.

24         Q.    Approximately how long after the

25   closing date did Mr. Nail remain at PPI performing

88

1                          C. Freeman

2   work?

3        A.        Approximately, I guess until

4   approximately the 27th.

5        Q.        July 27th, 2006?

6        A.        Yes, that was the date of the letter.

7        Q.        Sorry, I just need a yes.  That was

8   July 27, 2006?

9        A.        You said approximately, so yes.

10       Q.        Do you know what work he was

11  performing during that time period?

12       A.        He was advising me with regard to some

13  employment matters with respect to the

14  restructuring and assisting me, ongoing -- he had

15  some involvement in some ongoing PPI legal

16  matters, some administrative duties with respect

17  to the corporate offices and the staff on location

18  there.

19       Q.        Anything else?

20       A.        That's all I recall.

21       Q.        Did Mr. Nail do everything that was

22  asked of him during that time period?

23       A.        Yes.

24       Q.        Did he ever refuse to perform any

25  services during that time period?

89

C. Freeman

1

2      A.      No.

3      Q.      Did he finish all the work that he had

4  been asked to perform during the transition?

5      A.      The work that could be completed.

6      Q.      So everything he could complete he did

7  complete?

8      A.      To the best of my recollection.

9      Q.      As you started to testify about

10  before, there came a time when it was decided that

11  Mr. Nail's services were no longer needed,

12  correct?

13      A.      Yes.

14      Q.      When did that time come?

15      A.      Mid to late July.

16      Q.      Of 2006?

17      A.      Yes.

18      Q.      Who determined that Mr. Nail's

19  services were no longer needed?

20      A.      I did.

21      Q.      Did you communicate that conclusion to

22  anyone?

23      A.      Mr. Kinzel.

24      Q.      Anyone else?

25      A.      Not that I recall.

92

                        C. Freeman

1

2  and receive one of those letters, correct?

3      A.    Correct.

4      Q.    Do you know who first communicated to

5  Mr. Nail that the company would no longer be

6  needing him to perform services?

7      A.    I'm sure it was me.

8      Q.    Do you remember when that was?

9      A.    No.

10     Q.    Sometime in July 2006 though, correct?

11     A.    On or about the date of that letter.

12     Q.    Do you remember anything about that

13 conversation?

14     A.    No.

15     Q.    Do you recall generally what was said?

16     A.    I don't know -- I don't even recall

17 the specific conversation.

18     Q.    Other than you know it took place.

19     A.    I mean, I -- I don't recall the

20 conversation.  I'm not saying it didn't take

21 place, but I just don't recall it.

22     Q.    Somebody informed Mr. Nail prior to

23 sending out the July 27th letter what his status

24 was, correct?

25         MS. KIRILA:  Objection.  Calls for

94

C. Freeman

1

2     A.    I don't remember one way or the other.

3     Q.    Did you ever tell Mr. Nail either in

4  words or substance that you were just the

5  messenger and that Mr. Kinzel makes all of the

6  decisions?

7     A.    I don't recall one way or the other on

8  that one either.

9          · MR. PAPPAS:  Take a short break.

10         (A recess was taken from 11:30 a.m. to

11     11:48 a.m.)

12         MR. PAPPAS:  Let's mark this as

13     Defendant's Exhibit C.

14         (Defendant's Exhibit C, letter from

15     Richard Kinzel to Lester Nail dated July 27,

16     2006, marked for identification, this date.)

17  BY MR. PAPPAS:

18     Q.    I show you what has been marked as

19  Defendant's Exhibit C, which is a letter from

20  Richard Kinzel to Mr. Nail dated July 27, 2006,

21  correct?

22     A.    Yes.

23     Q.    You have seen this before, right?

24     A.    Yes.

25     Q.    And is that Mr. Kinzel's signature at

95

                              C. Freeman

1

2   the bottom?

3        A.    Yes.

4        Q.    Do you know who wrote this letter?

5        A.    Counsel.  Outside counsel.

6        Q.    Mr. Kinzel didn't write it.

7        A.    No.

8        Q.    Do you know if Mr. Kinzel reviewed

9   this letter before he signed it?

10        A.    I handed Mr. Kinzel a stack of these

11   and he signed them all at the same time.

12        Q.    Do you know if he reviewed it before

13   he signed it?

14        A.    I don't know if he reviewed this

15   specific letter.

16        Q.    Did he review drafts?

17        A.    No.

18        Q.    Do you know if he reviewed any of the

19   other letters that you handed him before he signed

20   those?

21        A.    My recollection is that he reviewed

22   them and he reviewed in general what I was handing

23   him.

24        Q.    Were all the letters the same as this

25   one?

96

1                          C. Freeman

2          A.     The letters were written specifically

3    to address specifically contracts, specific

4    contracts as we discussed earlier.  There were

5    different contract forms, so there may have been

6    some slight differences.

7          Q.     Do you know whether Mr. Kinzel knew

8    what this letter said before he signed it?

9              MS. KIRILA:  Objection.  Speculation.

10        If you can testify --

11        Q.     If you know.

12             MS. KIRILA:  -- based on your

13        observations.

14        A.     Generally, yes.

15        Q.     Did you discuss this letter with

16   Mr. Kinzel before it was sent out?

17        A.     Not in detail.

18        Q.     Did you discuss it generally?

19        A.     Within the context of sending out all

20   of the letters, yes.

21        Q.     What was discussed?

22        A.     That we were invoking the termination

23   without cause provisions of the employment

24   agreements for these contract employees that were

25   being terminated without cause.

97

C. Freeman

1

2      Q.    Anything else?

3      A.    Not that I recall.

4      Q.    Did you discuss this letter with

5  anyone other than Mr. Kinzel before it was sent

6  out?

7      A.    Counsel, outside counsel.

8      Q.    Did you review this letter before it

9  was sent out?

10     A.    Yes.

11     Q.    And this letter was actually sent to

12  Mr. Nail, correct?

13     A.    Yes.

14          MR. PAPPAS:  Mark this as Exhibit D.

15          (Defendant's Exhibit D, one-page

16      document entitled "Personnel Action Request

17      Form," Bates Nos. PPI000014, marked for

18      identification, this date.)

19     Q.    I show you what has been marked as

20  Defendant's Exhibit D.

21          Do you recognize this?

22     A.    No.

23     Q.    Do you know what it is?

24     A.    I know what it says.  It's not a form

25  I'm familiar with.

106

1          C. Freeman

2          A.     Actually, Mr. Crage was involved in

3    the discussion and we, um, and I believe counsel

4    was involved in determining the appropriate

5    calculations to, you know, again determine what

6    was our liability if we went full term with the

7    agreements, what was an offer that was acceptable

8    to the company.

9          Q.     This was an offer that was made to

10   Mr. Nail only or to the other individuals who had

11   employment contracts?  Not the exact offer, but

12   this type of settlement.

13         A.     It was offered to others as well.

14         Q.     All of the other ones or to only

15   select?

16         A.     My recollection is it was offered to

17   all of them.

18         Q.     Did anyone take it?

19         A.     I'm sorry.  My recollection is that it

20   was offered to all of them who had a significant

21   amount of time left on their agreement.

22                No one took it.

23         Q.     What was the purpose of offering this

24   settlement deal?

25         A.     The purpose was to relieve the, both

107

C. Freeman

1

2   parties to the employment agreements from further

3   responsibility and obligations and duties and, you

4   know, just bring it to closure.

5        Q.    What was the purpose of it from

6   Paramount Park's standpoint?  How did it benefit

7   PPI?

8        A.    It would have benefitted PPI by the

9   lump sum payment was less than what the payout

10  would have been over time.  So there would have

11  been some financial benefit to PPI.

12       Q.    So was it done strictly as a way to

13  potentially save costs?

14       A.    That was part of it.  The other part

15  of it was to save the administration of the

16  employment, the ongoing administration of the

17  employment agreements.

18       Q.    In other words, the continued payment

19  of compensation benefits and what not.

20       A.    Right.

21       Q.    Whose idea was it to make these

22  settlement proposals?

23            MS. KIRILA:  Objection.  I don't know

24       that you were finished with your answer, but

25       if you were.

112

C. Freeman

1

2    Q.    Other than that did you have any

3 independent opinion?

4    A.    No.

5    Q.    Do you have any understanding whether

6 an employer can enforce a noncompete provision

7 under New York law when an employee was terminated

8 without cause?

9        MS. KIRILA:  Same objection and

10       instruction, do not disclose anything you

11       learned from discussions or communications

12       with your counsel.

13    A.    I am not an attorney and I don't know

14 New York law.

15    Q.    Do you have any understanding as to

16 whether a noncompete provision can be enforced

17 against an attorney?

18       MS. KIRILA:  Same objection.

19    A.    Same response.  I do not.  I am not an

20 attorney and I don't know.

21    Q.    I am going to ask you to go back and

22 look at the employment agreement, which is Exhibit

23 B, I believe.  Turn to page 5.

24       Take a look at paragraph 11 where it

25 says:  Executive agrees that during the employment

113

C. Freeman

1

2  term executive will not engage in any other

3  occupation or engage in a leisure, slash, theme

4  park, motion picture, television, or entertainment

5  business, except for Paramount pursuant to this

6  agreement.

7           Do you see that?

8      A.    Yes.

9      Q.    Do you contend that this provision

10 prohibited Mr. Nail from engaging in other

11 employment after his employment was terminated by

12 PPI?

13     A.    Yes.

14     Q.    And does that apply only to employment

15 with a competitor or any employment at all?

16     A.    Any employment at all.

17     Q.    So if he had gone to work as a cashier

18 at Home Depot that would violate the agreement?

19     A.    Yes.

20     Q.    If he mowed lawns and got paid for

21 doing that, that would violate the agreement?

22     A.    Yes.

23     Q.    What about if he did pro bono legal

24 work, would that violate the agreement?

25           MS. KIRILA:  Continuing objection as

114

C. Freeman

  to calling for a legal conclusion, but you

  can testify as to your interpretation.

  A. OK, again, I'm not an attorney, but my

interpretation is an occupation is something

you're compensated for.  So pro bono you're not

compensated, so...

  Q. And that prohibition in paragraph 11

would last till December 31, 2007.  Was that your

understanding?

  A. By virtue of the reference to the

employment term, yes.

  Q. And since there's no geographical

limitation in paragraph 11 would this

noncompetition obligation apply anywhere in the

world?

  MS. KIRILA:  Objection to the

  characterization of it as a noncompetition

  provision.

  Q. I will rephrase it.  Since there's no

geographic limitation in paragraph 11, the

obligations in paragraph 11 would apply anywhere

in the world.  Is that your understanding?

  A. That's my understanding.

  Q. Did you personally ever tell Mr. Nail

115

1                           C. Freeman
2    that he could not work for anyone anywhere in any
3    capacity for the remainder of the contract term?
4         A.     In conversation or in correspondence?
5         Q.     Either way.
6         A.     In correspondence through the letters
7    that were sent to him indicating that his
8    obligations under the employment agreement
9    continued.
10        Q.     Other than that.
11        A.     Other than that, no.
12        Q.     Do you know whether anyone at PPI or
13   Cedar Fair ever told Mr. Nail that?
14        A.     Please repeat the question?
15        Q.     Do you know whether anyone else at PPI
16   or Cedar Fair ever told Mr. Nail that he could not
17   work for anyone anywhere in any capacity for the
18   remainder of his contract term?
19        A.     I have no such knowledge.  I don't
20   know.
21        Q.     Can you identify any business interest
22   that PPI has in preventing Mr. Nail from working
23   for a noncompetitor after PPI terminated his
24   employment?
25             MS. KIRILA:  Objection.  Relevance.

116

C. Freeman

2       You can answer.

3       A.      Please repeat the question?

4       Q.      Sure.  Can you identify any business

5   interests that PPI would have in preventing

6   Mr. Nail from working for a noncompetitor of PPI

7   after his employment was terminated?

8       A.      I guess I would say PPI would have a

9   business interest in preventing someone from

10  double dipping, yes.

11      Q.      What do you mean by that?

12      A.      Well, collecting under the employment

13  agreement while they were being paid for another

14  occupation in violation of the employment

15  agreement.

16      Q.      Is there any other business interest

17  that you can identify?

18      A.      No.

19      Q.      Did you ever get a response from

20  Mr. Nail after you sent him the settlement

21  proposal letter which is Exhibit F I believe?

22      A.      My recollection is that Mr. Nail

23  called me, yes.

24      Q.      How soon after the letter went out did

25  you get a call from him?

125

1              C. Freeman

2        Q.    So the agreement contemplated that the

3   company would continue to pay benefits even after

4   the executive was terminated without cause.  Isn't

5   that what paragraph 7(c) says?

6        A.    That is part of what paragraph 7(c)

7   says.

8        Q.    Going back to the complaint, paragraph

9   23 alleges that defendant never notified PPI that

10  his address had changed.

11            Do you see that?

12       A.    Yes.

13       Q.    Do you contend that that constitutes a

14  breach of the employment agreement?

15       A.    Paragraph 23 in and of itself in my

16  opinion does not.

17       Q.    Does not?

18       A.    No.

19       Q.    Did you ever ask Mr. Nail to keep you

20  advised of his current contact information after

21  he was terminated?

22       A.    We sent him enrollment forms for new

23  benefits with contact information on it or with

24  address and contact information on it.

25       Q.    Other than that did you personally

126

C. Freeman

1

2    ever ask him to keep you advised of his current

3    contact information and address?

4         A.    No.

5         Q.    Do you know if anyone else asked him

6    to do that?

7         A.    I do not know.

8         Q.    Did you ever tell Mr. Nail that it

9    would breach his employment contract if he were to

10   move and not notify PPI that he moved?

11        A.    I never told him that.

12        Q.    Do you know if anyone else ever told

13   Mr. Nail that?

14        A.    I don't know.

15        Q.    Did you yourself ever ask Mr. Nail to

16   stay in touch because PPI might need his services

17   in the future?

18        A.    No, I didn't.

19        Q.    Do you know if anyone else asked

20   Mr. Nail to do that?

21        A.    No.  I don't know.

22        Q.    Take a look at paragraph 24 of the

23   complaint which alleges on or about June 2007

24   defendant directly or indirectly represented to a

25   PPI representative that he was still employed.

131

C. Freeman

1

2      A.      Yes.

3      Q.      Other than the pages Bates numbered

4  LES00004 and LES00005, the forms attached to this

5  letter were attached when you sent the letter to

6  Mr. Nail, correct?  Except that they were blank?

7      A.      I didn't personally do the mailing, so

8  I don't know.  I don't have firsthand knowledge

9  that they were attached.

10     Q.      Did you write the letter, the cover

11  letter?

12     A.      I don't recall.

13     Q.      Did you review it before you signed it

14  and sent it out?

15     A.      I'm sure I did.

16     Q.      That's your signature, right?

17     A.      That is my signature.

18     Q.      And in this letter you instructed

19  Mr. Nail to complete, sign and return these forms

20  at your earliest convenience, correct?

21     A.      Yes.

22     Q.      And if you take a look at the second

23  page of this exhibit, which is Bates numbered

24  Les00002.  Are you there?

25     A.      Yes.

130

C. Freeman

1

2      A.     She spoke about what Lester's wife

3  said.  She spoke about Lester talking in the

4  background.  I don't recall if she told me what

5  Lester was saying or if she even could hear what

6  Lester was saying.

7      Q.     In the same paragraph it goes on to

8  allege that defendant participated in the employee

9  benefits enrollment effective July 1st, 2007 as an

10 employee of PPI.

11         Do you see that?

12     A.     Yes.

13         MR. PAPPAS:  Mark this as Exhibit H.

14         (Defendant's Exhibit H, cover letter

15     dated May 21, 2007 from Craig Freeman to

16     Lester Nail with attached document titled

17     "Declaration Section," with other

18     attachments, marked for identification, this

19     date.)

20     Q.     I show you what has been marked as

21 Defendant's Exhibit H, and this is a May 21, 2000

22 letter from you to Lester Nail, correct?

23     A.     Yes.

24     Q.     With attached various benefits forms,

25 correct?

134

1                            C. Freeman

2     or questions regarding the form, Mr. Nail could

3     have contacted Sandy Cranford.

4          Q.    Did you ever tell Mr. Nail not to

5     return this form even if he was even eligible for

6     benefits somewhere else?

7                Did you ever tell him that?

8          A.    I never told him that.

9          Q.    Do you know if anyone at PPI told him

10    that?

11         A.    I don't know.

12         Q.    Did you personally ever tell Mr. Nail

13    not to return this form if he was working

14    somewhere else?

15         A.    No.

16         Q.    Did anyone at PPI tell him that to

17    your knowledge?

18         A.    No.

19         Q.    Going back to paragraph 25 of the

20    court complaint, it alleges that in mid-October

21    2007 PPI learned from another employee that

22    defendant was working full time at Denny's, Inc.

23                Do you see that?

24         A.    Yes.

25         Q.    Who is the employee who informed PPI

135

C. Freeman

1
2  that defendant was working full time at Denny's?
3      A.    Jim Rein.
4      Q.    Jim Ryan?
5      A.    Rein, R-e-i-n.
6      Q.    Who is he?
7      A.    He is our vice president of
8  information technology.
9      Q.    Who did he inform?
10     A.    Me.
11     Q.    What did he say?
12     A.    He said he ran into Lester at the
13 Charlotte airport and Lester was working for
14 Denny's.
15     Q.    Was this a passing conversation or did
16 he come specifically to tell you that?
17     A.    It was a passing conversation.
18     Q.    What did you say in response?
19     A.    I was surprised.
20     Q.    You said that?
21     A.    I said that?  What did I say?
22     Q.    I am just asking what you said in
23 response.
24     A.    I don't recall.
25     Q.    If anything.

136

C. Freeman

1

2     A.    I don't recall specifically what I
3   said.

4     Q.    Do you recall generally?

5     A.    I expressed, I guess I expressed
6   surprise and asked him if he was sure and...

7     Q.    Have you completed your answer?

8     A.    Yes.

9     Q.    Did Mr. Rein give you any other
10  information other than he ran into Lester at the
11  airport and he was working at Denny's?

12    A.    Not that I recall.

13    Q.    Did he tell you what Lester was doing
14  at Denny's?

15    A.    Not that I recall.

16    Q.    This is the first time you had heard
17  of it?

18    A.    Yes.

19    Q.    What did you do after you heard this?

20    A.    I contacted our -- because I knew this
21  was a breach of the employment agreement, I
22  contacted our payroll department and told them to
23  immediately, and I knew the following day was a
24  payday.  I told them to immediately stop payment
25  to Mr. Nail.

137

C. Freeman

1

2      Q.      Who specifically did you speak to in

3  payroll?

4      A.      Debbie Thompson, our payroll manager.

5      Q.      Was that done?

6      A.      Yes.

7      Q.      Who else -- strike that.  What did you

8  do then?

9      A.      I drafted a letter to Mr. Nail

10  notifying him that, basically notifying him what

11  was happening.  I probably drafted it with

12  counsel.

13      Q.      You didn't inform Mr. Kinzel or

14  Mr. Crage about the circumstances?

15      A.      Oh, yes, of course.

16      Q.      Did you do that before or after you

17  contacted the payroll department?

18      A.      Before.

19      Q.      Did you speak to both of them together

20  or separately?

21      A.      Together.

22      Q.      And what was discussed?

23      A.      Just that this, Lester had a job and

24  another position that violated his employment

25  agreement and we needed to cut him off

138

1                           C. Freeman

2   immediately.

3        Q.     You said that to them?

4        A.     That was the gist of the conversation.

5   And then they agreed.

6        Q.     Do you recall anything specifically

7   that either of them said in that conversation?

8        A.     No.

9        Q.     Who proposed cutting off his pay

10  immediately?

11       A.     I mean, that was my first thought.  So

12  I guess it was me.

13       Q.     Did you have the authority to do that

14  without approval from Mr. Kinzel?

15       A.     I think I would have done it and told

16  him I did it.

17       Q.     Told him after it was done.

18       A.     Yes.  That's not what happened, but, I

19  mean, I'm speculating.  Would I have or could I

20  have done it?  Yes, I think so.

21       Q.     You proposed this to Mr. Kinzel and

22  Mr. Crage and they said go ahead?

23       A.     Yes.

24       Q.     What else --

25       A.     That's the gist of the conversation.

142

1                           C. Freeman

2    meeting with Mr. Kinzel and Mr. Crage?

3            A.      No.

4                   MR. PAPPAS:   Mark this as Exhibit I.

5                   (Defendant's Exhibit I, letter to

6        Lester Nail from Craig Freeman, dated

7        October 19, 2007, Bates No. LES0018, marked

8        for identification, this date.)

9                   (A luncheon recess was taken at

10       12:56 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

143

1                          C. Freeman

2          A F T E R N O O N      S E S S I O N.

3                  (Time noted:  1:48 p.m.)

4     C R A I G    F R E E M A N ,  resumed and testified

5          further as follows:

6     EXAMINATION BY (Cont'd.)

7     MR. PAPPAS:

8          Q.     Do you have Exhibit I in front of you?

9          A.     Yes.

10         Q.     I show you what has been marked as

11    Exhibit I.  And you sent this letter to Mr. Nail

12    on or about October 19, 2007; is that correct?

13         A.     Yes.

14         Q.     Did you write it?

15         A.     It was drafted by counsel.  And I

16    forgot to mention that the day before following

17    that meeting I contacted counsel immediately and

18    started consulting with counsel on this matter.

19    So this letter was part of that.

20         Q.     Following the meeting with Mr. Kinzel

21    and Mr. Crage?

22         A.     Yes.

23         Q.     Did you make any revisions to this

24    letter?

25         A.     Not that I recall.

144

C. Freeman

1

2      Q.    And you reviewed it before you signed

3  it and sent it out, correct?

4      A.    Yes.

5      Q.    Did you discuss the letter with anyone

6  other than counsel?

7      A.    Not that I recall.

8      Q.    That's your signature, correct?

9      A.    Yes.

10     Q.    Did anyone other than you have to

11  approve of this letter before it was sent?

12     A.    No.

13     Q.    Do you know whether Kinzel or Crage

14  ever reviewed the letter before it was sent?

15     A.    No, they didn't.

16     Q.    You know that they did not?

17     A.    I know that they did not.

18     Q.    How do you know that?

19     A.    My recollection is that I worked with

20  counsel on drafting and finalizing it and sending

21  it out and I would not have involved Mr. Kinzel

22  and Mr. Crage in that.

23     Q.    Why not?

24     A.    Because it was pursuant to the

25  conversations we had had the day before.

145

C. Freeman

1

2      Q.      They knew the letter was going out

3    though, didn't they?

4           MS. KIRILA:    Objection.    Calls for

5         speculation, but you can testify.

6      Q.      Do you know if they knew that the

7    letter such as this was being sent?

8      A.      I don't have a specific recollection

9    of discussing it with either one of them.

10     Q.      Who made the decision to stop paying

11   Mr. Nail under his employment agreement?

12     A.      As I indicated previously, that was my

13   immediate thought and Mr. Kinzel was on board with

14   that.

15     Q.      When did PPI stop making payments to

16   Mr. Nail?

17     A.      Effective with my October 18th call to

18   Debbie Thompson.

19     Q.      So he received all payments through

20   October 18th?

21     A.      All payments that were, that would

22   have been due up to October 18th would have been

23   made.

24     Q.      Were any of those payments

25   subsequently taken out of his bank account via

150

C. Freeman

1

2      A.      Within a matter of days.

3      Q.      Between the time that you learned that

4  Mr. Nail was employed at Denny's and the time you

5  sent out these letters did you make any attempt to

6  contact Mr. Nail?

7      A.      No.

8      Q.      As far as you know did anyone at PPI

9  or Cedar Fair make any attempt to contact Mr. Nail

10  during that time period?

11      A.      No.

12      Q.      As far as you know?

13      A.      I'm sorry, I said no.

14      Q.      I am sorry, I didn't hear you.

15              How soon after you sent out the

16  October 23, 2000 letter, Exhibit J, did you hear

17  from Mr. Nail?

18      A.      My recollection is it was within a

19  matter of days.

20      Q.      Did you hear from him before or after

21  you received the return receipt?

22      A.      I don't know.

23      Q.      When you heard from Mr. Nail he called

24  you, correct?

25      A.      That's my recollection, yes.

152

C. Freeman

1
2          He indicated that he contacted a
3   former, I believe it was a former boss that he had
4   worked for and I think he was just -- he was going
5   to use this person for a reference and ended up
6   getting a job offer and that it was not
7   necessarily a job that he would have gone out and
8   sought, but it was -- it was a job, and he
9   indicated that he felt that the contract language
10  was ambiguous and that there was no intent on his
11  part to do anything wrong, that he would, he would
12  come up and personally meet with Dick and Peter
13  and tell them that.
14          He said that the bank transaction that
15  you referred to earlier was a mistake on our part,
16  that he had consulted with his counsel and felt he
17  had a very strong case.  He said -- I'm sorry that
18  this is not -- this is according to how it's
19  coming to mind, not necessarily chronologically,
20  so I apologize for that.
21      Q.    I understand.
22      A.    He indicated at one point that if all
23  we were looking to do was not pay the remainder of
24  his employment agreement and just call it even so
25  to speak, that he would be OK with that.

155

C. Freeman

1
2    reference and got a job offer.  Was he referring

3    to Denny's?

4         A.    Yes.

5         Q.    Do you know who the former boss was?

6         A.    No.

7         Q.    And according to you Mr. Nail said

8    that the Denny's job was not necessarily a job

9    that he would have sought, but it was a job.  He

10   was referring to his Denny's job, correct?

11        A.    Yes.

12        Q.    Was it your impression that Mr. Nail

13   wasn't crazy about his job at Denny's?

14        A.    My impression was that it was not a

15   job that he would have gone out for and applied

16   for.  We didn't talk about his current level of

17   satisfaction with the position.

18        Q.    Did you get the impression that he

19   would have left Denny's if he had got a better

20   offer somewhere else?

21        A.    I didn't really form an impression one

22   way or the other.

23        Q.    You said Mr. Nail told you that he

24   felt his employment contract was ambiguous; is

25   that correct?

164

1                          C. Freeman

2        Q.    Did you respond to that?

3        A.    I'm sure I did.

4        Q.    Do you recall what your response was?

5        A.    No, I don't.

6        Q.    Can you read the next line?

7        A.    "Disagrees with our interpretation of

8   the agreement."

9        Q.    That's something Mr. Nail said?

10       A.    Yes.

11       Q.    Do you recall your response to that?

12       A.    No.

13       Q.    Do you know what that refers to

14   specifically?

15       A.    The employment agreement.

16       Q.    Do you know what interpretation he is

17   talking about?

18       A.    That we were entitled to -- that he

19   had violated the employment agreement by virtue of

20   accepting the position with Denny's.

21       Q.    Anything else?

22       A.    I believe that's the interpretation we

23   were, that we were discussing.

24       Q.    And the next line I believe says

25   "contract poorly written, ambiguous," correct?

184

                              C. Freeman

1

2   discussed generally?

3        A.    That would have been the conversation

4   where I indicated to him that he was the only

5   contract executive that -- the others found

6   positions, but he was the only one who never

7   called and I'm sure he told me he didn't violate,

8   he didn't feel like he had breached the agreement.

9   Generally that sort of conversation.

10       Q.    Do you recall anything else at all

11  that you haven't already testified about, your

12  various discussions with Mr. Nail in October and

13  November of 2007 and December?

14       A.    No, I don't recall.

15            MR. PAPPAS:  Mark this as Exhibit L.

16            (Defendant's Exhibit L, letter to

17       Craig Freeman from Lester Nail, November 1,

18       2007, marked for identification, this date.)

19       Q.    I will show you what has been marked

20  as Defendant's Exhibit L.  This is a letter that

21  you received from Mr. Nail in early November 2007,

22  correct?

23       A.    Yes.

24       Q.    And he says "it was good to talk to

25  you."

185

1                    C. Freeman

2              Do you see that?

3      A.      Yes.

4      Q.      Does that refer to the October 30th

5    conversation, do you know?

6      A.      Can you repeat the question, please?

7      Q.      I will move on.  He says "I am happy

8    to hear that Cedar Fair had a good year."

9              Do you see that?

10     A.      Yes.

11     Q.      Do you recall discussing with Mr. Nail

12   that Cedar Fair had a good year?

13     A.      We made some small talk and I'm sure

14   he said how are things going, and I said fine, and

15   we didn't get into any specifics.

16     Q.      Did Cedar Fair have a good year?

17     A.      By some measures.

18     Q.      By whose measure?

19     A.      I guess in terms of financial

20   measures, we were on track with the guidance that

21   we had provided the markets.

22     Q.      In Mr. Nail's letter he says, "as you

23   know, PPI has not requested my services at any

24   time for any reason since the date of my

25   termination."

186

1                          C. Freeman

2              Do you see that?

3         A.     Yes.

4         Q.     Was that true as of November 1, 2007?

5         A.     Yes.

6         Q.     Did you ever ask Mr. Nail to perform

7    any services for either PPI or Cedar Fair at any

8    time after his termination?

9         A.     No.

10        Q.     To your knowledge did anyone at PPI or

11   Cedar Fair ever ask Mr. Nail to perform services

12   at any time after his termination?

13        A.     No.

14        Q.     Did you yourself ever consider

15   utilizing Mr. Nail's services at any time after

16   his termination?

17        A.     I don't have specific recollection of

18   any time when I did.

19        Q.     To your knowledge did anyone at PPI or

20   Cedar Fair ever consider utilizing Mr. Nail's

21   services at any time after his termination?

22        A.     Not to my knowledge.

23        Q.     Were you aware of any plans by PPI or

24   Cedar Fair to utilize Mr. Nail's services after

25   his termination?

187

1                              C. Freeman

2          A.     No circumstances arose where that was

3     given consideration.

4          Q.     You had no plans to do that, did you?

5          A.     As I said, no circumstances arose

6     where I needed to utilize Mr. Nail's services.

7          Q.     Did PPI or Cedar Fair ever ask any of

8     the other PPI executives who were terminated to

9     perform services after they were terminated?

10         A.     Yes.

11         Q.     Which ones?

12         A.     Pat Jones.

13         Q.     Anyone else?

14         A.     Would this include asking questions or

15     consulting with?

16         Q.     Whatever you would consider utilizing

17     their services.

18         A.     OK.  There were ad hoc conversations

19     with Mr. Weber.

20         Q.     Al Weber?

21         A.     Al Weber.  Mr. Fisher.  Those were the

22     only ones I'm aware of.

23         Q.     What services were Pat Jones asked to

24     provide after her termination?

25         A.     Pat Jones was reemployed by PPI.

188

C. Freeman

1
2    Q.    As what?

3    A.    Vice president general manager for

4  Kings Dominion, the amusement park.

5    Q.    When was that?

6    A.    Sometime in the first half of 2007, I

7  believe.

8    Q.    Was her old employment agreement still

9  in effect at that time?

10    A.    Yes, it was.

11    Q.    And how was Mr. Al Weber's services

12  utilized?

13    A.    Ad hoc questions, nothing substantial.

14    Q.    About what?

15    A.    Maybe some of the historical things

16  that had happened.  I just don't recall

17  specifically.

18    Q.    Historical things that had happened in

19  the company or with respect to the employment

20  agreements?

21    A.    In the company.

22    Q.    How long did those ad hoc questions

23  take to ask and to answer?

24    A.    Minutes.

25    Q.    What about Mr. Fisher?

189

1                              C. Freeman

2          A.      Same sort of situation, minutes.

3          Q.      To your knowledge did Mr. Nail ever

4    refuse to perform any services for PPI or Cedar

5    Fair after his termination when asked?

6          A.      No.

7          Q.      Denny's is not a competitor of PPI, is

8    it?

9                  MS. KIRILA:   Object to the extent it

10             calls for a legal conclusion, but you can

11             answer.

12         Q.      You didn't list Denny's among the

13   competitors though that you testified about this

14   morning, right?

15         A.      I gave you the significant, the most

16   significant competitors.

17         Q.      Would you consider Denny's to be a

18   competitor of PPI or Cedar Fair?

19         A.      Under a broad definition of

20   competition for discretionary income of the

21   family, you could.

22         Q.      In that sense virtually any company

23   that provides services would be a competitor,

24   correct?

25                 (Witness nodded head up and down.)

190

1          C. Freeman

2          Q.    It's not a competitor of the industry

3     that PPI or Cedar Fair is in, is it?

4          A.    No.

5          Q.    It's a restaurant chain, right?

6          A.    Yes.  PPI has restaurants.

7          Q.    Within its hotels or within its parks?

8          A.    Both.  I'm sorry, PPI has no hotels.

9     Cedar Fair has hotels.

10         Q.    Other than those restaurants -- how

11    many restaurants are there?

12         A.    In the hotels or adjacent to the

13    hotels?

14         Q.    Any restaurant operated by PPI or

15    Cedar Fair.

16         A.    Many, many, many, many, many.

17         Q.    And those are on the properties of the

18    various amusement parks and water parks?

19         A.    Yes.

20         Q.    And they're in the nature of

21    concession stands and things like that?

22         A.    No.  For example, at Knott's Berry

23    Farm we have a TGI Friday's that operates on the

24    property but outside the park that's accessible to

25    anybody off the street.

192

1          C. Freeman

2          MS. KIRILA:  Objection.  That's the

3      basis of the suit.  You can answer.

4          Q.    In your view is there anything

5      inherently inconsistent with him performing

6      services for both, assuming he had the time to do

7      both?

8          A.    Assuming he had the time to do both,

9      no.

10         Q.    To your knowledge would PPI -- was PPI

11     involved in any litigation against Denny's?

12         A.    Not to my knowledge.

13         Q.    What about Cedar Fair?

14         A.    Not to my knowledge.

15         Q.    Do you have any knowledge one way or

16     the other whether Mr. Nail would have been willing

17     or able to cease his Denny's employment if he had

18     been requested to perform services for PPI during

19     the contract term?

20         MS. KIRILA:  Object to the extent it

21      calls for a definition of a legal term in a

22      contract, but you can answer.

23         A.    I have no such knowledge.

24         Q.    If Mr. Nail had been willing to cease

25     his Denny's employment at any time if asked to

193

1                          C. Freeman

2    perform services for PPI, do you contend that his

3    Denny's employment still rendered him unable to

4    perform services for PPI?

5              MS. KIRILA:  Same objection.  But you

6         can answer.

7         A.    Could you please repeat the question?

8         Q.    Sure, if Mr. Nail had been willing and

9    able to stop working at Denny's at any time if

10   asked to perform services for PPI, would his mere

11   employment by Denny's have rendered him unable to

12   perform exclusive services for PPI?

13             MS. KIRILA:  Same objection.

14        A.    Not from the point he would have

15   terminated his employment with Denny's.

16        Q.    In March '08 Cedar Fair hired Duffield

17   Milkie as corporate vice president and general

18   counsel; is that correct?

19        A.    February.

20        Q.    February 2008?

21        A.    Yes.

22        Q.    Do you know who hired Mr. Milkie?

23        A.    Cedar Fair.

24        Q.    Do you know the person who hired

25   Mr. Milkie?

194

1                        C. Freeman

2        A.      He was selected by Mr. Kinzel.

3        Q.      Do you know why he was hired?

4        A.      He was hired to become corporate vice

5   president and general counsel for Cedar Fair LP.

6        Q.      They had never had that type of

7   position before, correct?

8        A.      Correct.

9        Q.      Did you discuss Mr. Milkie's hiring

10  with anyone?

11       A.      Talked with Mr. Crage, Mr. Kinzel.   HR

12  director, my assistant.

13       Q.      Was that before or after he was hired?

14       A.      Before, during and after.

15       Q.      Did you have any input into his

16  hiring?

17       A.      I did not interview Mr. Milkie.

18       Q.      Other than interviewing him did you

19  have any input into his hire?

20            MS. KIRILA:  Objection.  He testified

21       you did not interview him.

22            THE WITNESS:  No.

23       Q.      You can have input other than

24  interviewing someone.  So I am asking other than

25  interviewing did you have any input?

195

C. Freeman

1

2     A.     I expressed my opinion.  You know,

3     input is given and input is taken and I don't know

4     how much my opinion was considered.

5     Q.     What was your opinion, that general

6     counsel should or should not be hired?

7     A.     I felt that the position was

8     necessary.

9     Q.     Do you know when Cedar Fair first

10    considered hiring Mr. Milkie?

11    A.     First considered.  The very -- the

12    very first contact that I'm aware of between

13    Mr. Milkie and Cedar Fair regarding a position was

14    in the summer of 2007.

15    Q.     But he wasn't hired until February '08

16    you said?

17    A.     Right.

18    Q.     I want to go back to the reversal of

19    the direct deposit.  Did you authorize that?

20    A.     Yes.  I authorized -- I authorized

21    stopping the payment of the paycheck that was to

22    be paid on the 19th.

23    Q.     Who authorized the reversal of the

24    direct deposit?

25    A.     I guess that would be me.  Because the

196

1              C. Freeman

2    bank could not process my order from the 18th

3    before the money went into the account.

4         Q.    So the money was already in the

5    account and you authorized the -- who did you

6    authorize to take the money out of the account?

7              MS. KIRILA:  Object to form.  Compound

8         question.

9         Q.    The money was already in the account,

10   correct?

11        A.    Not when I -- not when I directed that

12   the payment be stopped.

13        Q.    Right, but they couldn't stop it in

14   time and some more money got put into the account,

15   correct?

16             MS. KIRILA:  Objection.  To the extent

17        you know.

18        Q.    Isn't that what you just testified to?

19        A.    The money could not be stopped from

20   going into the account based on the timing of my

21   order to stop the payment.

22        Q.    And if it could not be stopped from

23   going into the account that means that it went

24   into the account, correct?

25        A.    To my knowledge, it did.

197

C. Freeman

Q.    Then what happened?

A.    Based on my order to stop the payment on the 18th, a correction was made to reverse it.

Q.    Who made that correction?

A.    The bank.

Q.    Who communicated that to the bank?

A.    Debbie Thompson.

Q.    Who is Debbie Thompson?

A.    Payroll manager.

Q.    Of Cedar Fair?

A.    PPI.

Q.    PPI?  Reports to you?

A.    No.

Q.    Who does she report to?

A.    I believe she reports to Les --

THE WITNESS:  What is Les's last name, Lester?  Les in IT?

MS. KIRILA:  You can testify to your knowledge.

A.    Les in IT.

MR. PAPPAS:  Can you mark this as Exhibit M.

(Defendant's Exhibit M, e-mail from Craig Freeman to Debbie Thompson, dated

198

                        C. Freeman

1

2      October 27, 2007 and e-mail from Thompson to

3      Freeman, dated October 25, 2007, Bates No.

4      PPI000103, marked for identification, this

5      date.)

6           Q.    I show you what has been marked as

7   Defendant's Exhibit M.  The top portion is an

8   e-mail that you sent to Debbie Thompson on

9   October 27, 2007; is that correct?

10          A.    Yes.

11          Q.    And what does that refer to?

12          A.    This refers to my notifying her on

13  Thursday, October 18th, that Lester was not to be

14  paid.

15          Q.    And the e-mail below that is from

16  Debbie Thompson to you and you received that on

17  October 25, 2007; is that correct?

18          A.    Yes.

19          Q.    What does her e-mail refer to?

20          A.    Her e-mail refers to the correction

21  being made.  To reverse the direct deposit.

22          Q.    So after the direct deposit was

23  reversed that meant that Mr. Nail had only been

24  paid through the end of September, 2007; is that

25  correct?

199

C. Freeman

1

2       A.      Yes.

3       Q.      Did you attempt to get Mr. Nail's

4  authorization to take that money out of his

5  personal bank account?

6       A.      When I gave the direction, the money

7  was not in the account.

8       Q.      Before it was removed did anyone at

9  the company try to get Mr. Nail's authorization to

10  do that?

11      A.      Not that I know of.

12              MR. PAPPAS:  Mark this as Exhibit N.

13              (Defendant's Exhibit N, e-mail from

14      Sandy Cranford to Craig Freeman, dated

15      November 19, 2007, Bates No. PPI000765,

16      marked for identification, this date.)

17      Q.      I show you what has been marked as

18  Defendant's Exhibit N as in Nancy.

19              This is an e-mail from you -- from

20  Sandy Cranford to you dated November 19, 2007,

21  correct?

22      A.      Yes.

23      Q.      Do you know whose handwriting that is?

24      A.      Mine.

25      Q.      And what does this e-mail refer to?

206

1

2                    C E R T I F I C A T E

3    STATE OF NEW YORK      )

4                          : ss.

5    COUNTY OF SUFFOLK      )

6

7            I, THOMAS R. NICHOLS, a Notary Public

8    within and for the State of New York, do

9    hereby certify:

10           That CRAIG FREEMAN, the witness whose

11   deposition is hereinbefore set forth, was duly

12   sworn by me and that such deposition is a true

13   record of the testimony given by the witness.

14           I further certify that I am not

15   related to any of the parties to this action

16   by blood or marriage, and that I am in no way

17   interested in the outcome of this matter.

18           IN WITNESS WHEREOF, I have hereunto

19   set my hand this 30th day of April, 2008.

20

21

22   _____

23            THOMAS R. NICHOLS

24

25

**PAPPAS DECL.**

**EXHIBIT 2**



PLF   DEF   A
EXHIBIT NO.
TRN   FOR ID   4-23-08

From:  CBS Corporation Human Resources
To:     **CBS Corporation's Paramount Parks Inc. Employees Eligible for CBS Benefits**
Date:  June 30, 2006

**RE: THE SALE OF PARAMOUNT PARKS, INC. TO CEDAR FAIR, L.P.**

As you know, today June 30, 2006 (the "Closing Date"), CBS Corporation ("CBS") announced the completion of the sale of its Paramount Parks Inc. subsidiary ("Paramount Parks") to Cedar Fair, L.P.("Cedar Fair"). This letter is intended to summarize the compensation and benefits provisions contained in the purchase agreement and how your CBS benefits are affected as a result of this transaction. Your eligibility for coverage under the Cedar Fair benefit plans begins immediately after July 31, 2006. Cedar Fair will provide you with information about Cedar Fair's benefit plans and programs prior to July 31, 2006

## Employment

As of the Closing Date, all stock of Paramount Parks will be acquired by a wholly-owned subsidiary of Cedar Fair. As such, all active employees of Paramount Parks will remain employees of Paramount Parks and/or its subsidiaries, i.e. your "employer" will not change as a result of the transaction. Under the terms of the purchase agreement, for a period of not less than twelve months following the Closing Date and except for pension, retiree medical and non-qualified defined contribution plan coverage, Cedar Fair will provide employee benefit plans, programs, policies and arrangements, severance, salaries, bonus and incentive plans that are comparable, in the aggregate, to the salaries, bonus and incentive plans and benefits provided to employees immediately prior to the Closing Date, provided you remain an employee of the company during that time period. (See pension and retiree medical sections below) Your service with Paramount Parks prior to the Closing Date will be recognized for purposes of eligibility, vesting and determination of level of benefits for all applicable benefit plans, programs, policies and arrangements to the extent that such service was recognized under these benefit plans, programs, policies and arrangements immediately prior to the Closing Date. Any unused vacation and sick time accrued prior to the Closing Date will be honored. In addition, any annual co-payments and deductibles incurred under the CBS health and welfare plans prior to the Closing Date will be recognized under the Cedar Fair plans for satisfying any applicable annual deductible and/or out-of-pocket maximum requirements under the Cedar Fair plans. Please note however, that not withstanding the terms outlined above, unless you are covered by an employment agreement, you are and will remain an at-will employee and, as such, your employment may be terminated by Cedar Fair at any time and for any reason or no reason.

## Severance

Under the terms of the purchase agreement, for a period of twelve months following the Closing Date, any employee who is terminated by Cedar Fair *without cause* will be provided severance benefits that will be the greater of 1) the severance benefits provided to similarly situated employees of Cedar Fair, or 2) the benefits provided under the Severance Policy for Full-Time Regular Employees of Paramount Parks in effect immediately prior to the Closing Date.

## Health & Welfare Plan Transition Services Agreement



In order to provide Cedar Fair sufficient time to establish new plans for Paramount Parks employees, CBS has agreed to maintain some of your current CBS health and welfare plans and programs through July 31, 2006. However, your employment with CBS and participation in other CBS plans are not affected by this transition services agreement and will end as of the Closing Date as described above.



## CBS Benefits

*Generally, unless otherwise noted in the following pages, your participation in the CBS benefit plans and programs ends as of July 31, 2006 provided that you remain employed during that time period. (Please note: Depending on your actual participation in CBS's benefit plans and programs, some of the information described herein may not apply to you.)*

### CBS Medical and Dental Coverage

CBS medical and dental coverage for yourself and any eligible, enrolled dependents **ceases as of July 31, 2006.**

Any eligible claims incurred through July 31, 2006 should continue to be forwarded to the appropriate CBS medical and dental claims administrator for processing. (**Please note:** The claim-filing deadline for all medical and dental claims is June 30 of the calendar year following the year in which the claim was incurred.)

In accordance with the terms of the purchase agreement, you will be given credit for your 2006 CBS health plan deductible and out-of-pocket maximum balances under the Cedar Fair health plan(s).

### *HIPAA Certificates*

Under federal law (HIPAA), CBS is required to issue *A Certificate of Prior Coverage* to all employees and their covered dependents at the time their CBS medical coverage terminates. The certificate may be requested by a future employer or insurer in order for medical coverage to become effective under a new plan.



If you are a participant in a United Healthcare (UHC) medical option at the time your employment terminates, UHC will issue your HIPAA certificate. If you are a participant in the Aetna Select Plan, Aetna is responsible for issuing your HIPAA certificate. If you are a participant in a Company-sponsored HMO, your HMO is responsible for issuing your HIPAA certificate. You should keep your certificate(s) in a safe place in the event you need them at some point in the future.

### *Certain Treatment- In-Process Dental Procedures*

If you were a participant in the CBS Dental Plan (PPO or DMO Option), and you or a covered dependent is currently receiving treatment for any of the dental procedures below, then benefits will be payable
under the CBS Dental Plan for work completed within 30 days following July 31, 2006.

- Pulp chamber opened for root canal therapy,
- Tooth or teeth prepared for a crown, bridge or gold restoration
- Impression taken for an appliance other than an orthodontic appliance

### CBS Prescription Drug Program

If you were a participant in the CBS Prescription Drug Program (i.e., covered under one of the two United Healthcare medical options), coverage under this program ends on July 31, 2006.

### Health Advocate Services

If you were enrolled in a CBS-sponsored medical or dental program, you were automatically eligible to receive services from Health Advocate. Your eligibility for Health Advocate's services ends on July 31, 2006.

### CBS Employee Assistance Program (EAP)



Your eligibility for CBS EAP benefits ends on July 31, 2006.

### CBS Flexible Spending Account Plan (FSA)

*Health Care Flexible Spending Account*



If you were contributing to a Health Care FSA, your participation in the CBS Health Care FSA ends on July 31, 2006. See below for instructions on filing your 2006 FSA claims.

*Dependent Care Flexible Spending Account*

If you were contributing to a Dependent Care FSA, your participation in the CBS Dependent Care FSA ends on July 31, 2006. See below for instructions on filing your 2006 FSA claims.

## Filing Your 2006 FSA Claims

If you elected to participate in the CBS Health Care and/or Dependent Care FSA's for calendar year 2006, <u>and you incurred eligible claims during the period of 1/01/2006 through July 31, 2006 which have not yet been submitted to the applicable FSA Plan</u>, you should file these 2006 FSA claims after July 31, 2006 with Cedar Fair's FSA claims administrator. As soon as possible after July 31, 2006, the unclaimed balance remaining in your 2006 CBS FSA account(s) will be transferred to the Cedar Fair FSA Plan. You may use this money to reimburse eligible 2006 FSA expenses you incurred as a CBS employee from January 1 through July 31, 2006 to the extent not previously submitted as well as to reimburse eligible FSA expenses you incur as a participant in the Cedar Fair FSA Plan after July 31, 2006.

For example, let's assume you elected to fund a $500 Health Care FSA with CBS for 2006. Under IRS rules, the full $500 was pre-funded in January and made available to you immediately. If you filed $300 in claims under the CBS FSA Plan with SHPS and were already paid $300 of your $500 annual election, then you have $200 remaining uncollected that will be transferred to the Cedar Fair FSA Plan after July 31, 2006. Any 2006 claims that have not already been filed under CBS's FSA Plan with SHPS should not be sent to SHPS at this time, regardless of when they were incurred. SHPS will not process 2006 FSA under the CBS FSA Plan claims received after July 31, 2006.

## CBS Claim-Filing Deadlines



Any eligible claims incurred on or before July 31, 2006 should continue to be forwarded to the appropriate CBS claims administrator to be processed.

**Please note the following claim filing deadlines:**

| | |
|---|---|
| UnitedHealthcare Choice Plus & Basic Options | |
| United Behavioral Health | |
| Express Scripts, Inc. | June 30 of calendar year following |
| Davis Vision, Inc. | date of service |
| Aetna Select Plan | |
| Aetna Dental Plans | |
| 2006 Flexible Spending Account expenses that were not already filed with SHPS | File with Cedar Fair's FSA Plan after July 31, 2006. FSA balances will be transferred from CBS to Cedar Fair. |
| FlexBen Commuter Reimbursement Account | September 30, 2006 |

## CBS Life Insurance Plans

*Basic Term Life Insurance*



Under the CBS Basic Life Insurance Plan, you had Company-paid term life insurance coverage equal to two times your annual base/benefit pay. The basic term life insurance you had as a CBS employee will remain in force for 31 days following July 31, 2006. This 31-day period is your "conversion period" during which time you may elect to convert your life insurance coverage to an individual policy with Prudential.



To be eligible for a conversion policy, you must make an application to Prudential within this 31-day conversion period. You may obtain information on your conversion rights by calling Prudential at **1-800-562-9874**.

*Group Universal Life (GUL) and Spousal GUL Insurance*

If you are enrolled for supplemental life insurance for yourself only or for yourself and your spouse or same-sex partner under the CBS Group Universal Life Insurance Plan, this insurance is portable. Upon leaving CBS, you may take GUL coverage with you and arrange for a direct billing relationship with Prudential. You will automatically receive information from Prudential concerning your GUL direct billing option approximately 4 weeks following July 31, 2006. If you have any questions about this coverage, contact Prudential at **1-800-562-9874**.

*Dependent Life Insurance*

If you elected to cover your dependent children under the CBS Dependent Life Insurance program, this coverage ends on July 31, 2006. You may elect to convert your dependent life insurance coverage to an individual policy with Prudential. To do so, you must contact Prudential within 31 days of July 31, 2006 to request the appropriate paperwork to convert the insurance.

## CBS Long Term Care Insurance Plan

If you were participating in the CBS Long Term Care Insurance Plan on July 31, 2006, you may elect to continue your Group Long Term Care insurance on an individual direct payment basis beyond July 31, 2006. You have the right to continue the same or a lesser daily nursing home benefit for yourself and/or your enrolled spouse or same-sex partner with Continental Casualty Company (CNA) without being required to pay a higher premium than that which was in effect prior to July 31, 2006.



You will automatically receive information from CNA regarding this option. If you wish to continue your and/or your enrolled spouse's/same-sex partner's coverage and be directly billed for the premiums, you must respond to CNA as directed. You will be required to pay all premiums due since your CBS off-payroll date on a timely basis, or your insurance will lapse. If you have any questions regarding your coverage, you should call **CNA** at **1-888-825-0351**.

## CBS Accidental Death & Dismemberment (AD&D) Insurance Plans

Under the CBS Basic Life Insurance Plan, you had Company-paid AD&D insurance coverage equal to two times your annual base/benefit pay. This Company-paid Basic AD&D insurance ends on July 31, 2006. There is no conversion available for Basic AD&D insurance coverage.

If you are enrolled for Optional AD&D coverage, your coverage will remain in effect through July 31, 2006..

## CBS Long Term Disability (LTD) Coverage

Your CBS Long Term Disability insurance ends on July 31, 2006. There is no conversion option available under this Plan.

## AFLAC Cancer Care Insurance

If you and/or a dependent had coverage in the AFLAC Cancer Care Insurance plan on July 31, 2006, you may transfer your group coverage to an individual insurance policy with AFLAC. As long as you contributed at least one full month's premium under the group plan with CBS prior to July 31, 2006, your premium for the coverage will not change. (Please note: If you elect to transfer your group coverage to an individual policy with AFLAC, AFLAC will bill you directly for the premiums. However, unlike your current pre-tax payroll deductions, these direct bill premiums will be made on an after-tax basis.)



You will receive correspondence regarding transferring to a direct payment policy directly from AFLAC generally within 30 days of your off-payroll date. You may call AFLAC at 1-800-462-3522 with any questions.



## Pension Plan Benefits

Under the terms of the purchase agreement, Cedar Fair will not offer a pension plan. Therefore, as of the Closing Date, your active participation in the CBS Retirement Plan (formerly known as the Viacom Pension Plan) will end. In other words, if you were eligible to participate in the CBS Retirement Plan prior to the Closing Date, you will not accrue any future pension benefits after the Closing Date, although any vested pension benefits you already accrued will remain in the Plan. Under the CBS Retirement Plan, you must you must be at least 21 years of age and have at least 5-years of service to be vested. If you have less than five years of credited Company service under the Plan, or are under age 21 on the Closing Date, you are not vested under the CBS Retirement Plan, and no benefit is payable to you.

If you are eligible to receive a benefit from the CBS Retirement Plan, you will automatically receive a pension calculation from CBS's pension administrator, the Benefits Access Center (BAC). You should expect to receive this package approximately 4-6 weeks following the Closing Date. Questions related to your CBS Retirement Plan benefit should be directed to the Benefits Access Center (BAC) at **1-800-581-4222.**

## Retiree Medical

Under the terms of the purchase agreement, Cedar Fair will not offer retiree medical benefits. Under the CBS Retiree Medical Plans, you must be at least 55 years old with at least 10 years of service as of the Closing Date to be eligible for retiree medical benefits with CBS. If as of the Closing Date you do not meet these age and service requirements, then no retiree medical benefits are available to you.

## CBS 401(k) Plan



Upon the Closing Date, your active participation in the CBS 401(k) Plan will end and you will no longer be eligible to contribute to the Plan.

If you have a balance in the CBS 401(k) Plan, in accordance with the terms of the purchase agreement, you may elect to roll over your CBS 401(k) Plan account and any outstanding loans you have under the CBS 401(k) Plan to the Cedar Fair Savings and Profit Sharing Plan (the "Cedar Fair Plan").

You will soon be receiving written communication from ACS (the CBS 401(k) Plan Administrator) which will include a rollover form for the CBS 401(k) Plan and a Rollover Contribution Form for the Cedar Fair Savings and Profit Sharing Plan. If you do not receive these materials by mid-July, please contact ACS at 1-800-517-4015 and speak to a Customer Services Representative and request that they send you these materials.
Please note that if you have an outstanding loan, you must roll over the loan to the Cedar Fair Plan or repay the loan by August 31, 2006. Otherwise the loan will be defaulted and will be subject to taxes plus a 10% early withdrawal penalty. To obtain the loan payoff amount, please contact ACS and speak to a Customer Services Representative.

You will be able to (a) roll over your account and any loans to the Cedar Fair Plan (if the roll over form is received by ACS before August 31, 2006) (b) roll over your account to the Cedar Fair Plan and pay off any outstanding loan (if the roll over form is received by ACS before August 31, 2006); (c) roll over your account to the Cedar Fair Plan and default any outstanding loan; or (d) roll over your account to another institution and either pay off any loans or default any loans. If you do not affirmatively make a distribution/rollover election as described above, your account balance will remain in the CBS 401(k) Plan, however, if your account balance is less than $1,000, you will receive a lump sum distribution.

Cedar Fair will also be providing information to you regarding the Cedar Fair Plan.

## Stock Options



Generally, if you received stock option grants under either the Long Term Management Incentive Plan (LTMIP), or the *Share the Vision* Plan, you will have 6 months from the Closing Date to exercise your vested options. Any unvested stock options, restricted stock units and restricted shares will be canceled as of the Closing Date.



The Company utilizes Smith Barney as the sole authorized broker for stock option transactions. Smith Barney's website is www.benefitaccess.com and their regular toll-free customer service line (1-877-203-7047) serve as your source for stock option grant information and program documentation. If you have not yet registered on the Smith Barney website, or if you have misplaced your user name or password, please read the attached instruction sheet.

Should you have any questions regarding the information described above, please email your questions to parksquestions@cbs.com .

## CBS STOCK OPTIONS

# INSTRUCTIONS FOR ACCESSING YOUR SMITH BARNEY ACCOUNT

You may access your CBS stock option account using Smith Barney's interactive website at http://www.benefitaccess.com. Please follow the instructions under one of the following scenarios to access your account:

*Scenario 1:*
If you have not yet registered for the Smith Barney website, please follow these instructions to request a Welcome Kit:
- Log onto http://www.benefitaccess.com
- Click on the Registration tab [Under the section                    ]
- Enter your (i) social security number, (ii) the Company ticker symbol: CBS and (iii) the first three letters of your first name
- You will receive 2 separate mailings at your address of record within the next 10 business days which will include the following items required to activate your account online:

    A. Welcome Letter containing:
        (i) Temporary Internet User Name and Trading PIN (required to execute orders online for those participants who can exercise online).
        (ii) Brochure(s) that highlights the site's features and provides instructions for using the web site.

    B. Temporary Internet Password (mailed separately).



*Scenario 2:*
If you have already registered and received your Welcome Kit containing your Internet User Name, Trading PIN and Password, you are now ready to activate your account online:
- Log onto http://www.benefitaccess.com
- Click on the First Time Users tab to activate your account
- Enter your user name and password and click on Logon to Benefit Access
- Follow instructions to logon and/or change your user name or password

*Scenario 3:*
If you have already registered, received your Welcome Kit and activated your account, but have forgotten your user name, password or PIN number, please follow these instructions:
- Log onto http://www.benefitaccess.com
- Click on the Forgot User Name/Password tab
- Choose Stock Options/Restricted Stock, and hit Continue to proceed
- Step One: Enter your (i) social security number, (ii) the Company ticker symbol: CBS and (iii) the first three letters of your first name
- Step Two: Please choose which logon credentials you have forgotten, and click Continue
- Follow additional instructions on the screen (You will be supplied a hint to remember your username or password. If you cannot remember your username/password after being supplied the hint or if you cannot remember your PIN number, Smith Barney will resend your credentials to your address of record.)

If after following the above instructions, you have any issues accessing your stock option account, please contact a Smith Barney Customer Service Representative at CBS's dedicated toll-free number, 1-877-203-7047.





**IMPORTANT TELEPHONE NUMBERS**

| | |
|---|---|
| UnitedHealthcare (Choice Plus & Basic Options medical claims administrator) | 1-877-884-2266 |
| Kaiser Permanente (HMO) | 1-800-464-4000 |
| Pacificare California (HMO) | 1-800-624-8822 |
| Pacificare Nevada (HM) | 1-800-347-8600 |
| Express Scripts Inc. (prescription drug claims administrator for UHC Options) | 1-888-610-8258 |
| United Behavioral Health (mental health claims administrator for UHC Options) | 1-800-582-4213 |
| Davis Vision (vision claims administrator for UHC Options) | 1-800-999-5431 |
| Aetna Select Plan | 1-800-843-1726 |
| Aetna Dental (dental claims administrator) | 1-877-238-6200 |
| The Prudential Insurance Company (life insurance administrator) | 1-800-562-9874 |
| SHPS Inc. (FSA administration) | 1-800-678-6684 |
| AFLAC Cancer Care Insurance | 1-800-462-3522 |
| CNA (Long Term Care Insurance administrator) | 1-888-825-0351 |
| ACS HR Solutions – 401(k) Plan administration | 1-800-517-4015 |
| Benefits Access Center (for Pension Plan information) | 1-800-581-4222 |





*Paramount Parks*

July 27, 2006

PLF
EXHIBIT NO. C
TRN    FOR ID 4-23-08

Mr. Lester C. Nail
9027 Kirkley Court
Charlotte, North Carolina 28277

    Re:    <u>Notice of Termination of Employment</u>

Dear Mr. Nail:

    On June 30, 2006 (the "Closing Date"), Bombay Hook LLC and CBS Corporation finalized the transaction with Cedar Fair, L.P. and Magnum Management Corporation (the "Company"), (collectively, the "Cedar Fair Entities"), pursuant to which the Company acquired 100 percent of the outstanding shares of capital stock of Paramount Parks Inc. ("PPI") As a result, your employment agreement, effective as of January 1, 2006 ("Employment Agreement"), has become the benefit and obligation of PPI, as legal successor and/or assign.

    Please be advised that PPI has determined that your services will no longer be needed after August 1, 2006. Accordingly, this letter is your notice under your Employment Agreement that your employment is terminated without cause as of August 1, 2006, and that you will be entitled to receive, subject to applicable taxes and withholdings, and subject to any other terms of the Employment Agreement, the amounts identified in paragraph 7(c) of your Employment Agreement. PPI reminds you of both (1) your non-compete obligations under paragraph 11 of the Employment Agreement, and (2) the "willing, ready and able to render exclusive services" requirement of paragraph 7(c), and any other post-termination obligations of the Employment Agreement.

    PPI is currently considering making an alternative separation proposal to you, which would incorporate a lump sum severance payment, along with other terms in a separation agreement. You will hear from PPI in the near future should it decide to present an alternative separation proposal to you. Should you have any questions, please contact Paramount Parks Inc. c/o Craig Freeman, Cedar Fair, L.P., One Cedar Point Drive, Sandusky, Ohio 44870, (419) 627-2391.

Very truly yours,

Richard L. Kinzel
President
Paramount Parks, Inc.

LES00015



PLF
EXHIBIT DEPT
NO.
TRN    FOR ID    H
4/23/08

May 21, 2007

Lester Nail
9027 Kirkley Court
Charlotee, NC 28277

Dear Lester,

Effective July 1, 2007, Paramount Parks, Inc. will be changing its benefit plans. Enclosed are the relevant forms you need to complete in order to continue your coverage under the new plans. Please complete, sign and return these forms at your earliest convenience, but in no event later than May 30, 2007. You may also fax them.

Forms should be sent to:

Sandy Cranford
Carowinds
14523 Carowinds Blvd.
P.O. Box 410289
Charlotte, NC 28273
Fax: (704) 583-9133

Sandy will be contacting you early next week to review and discuss any questions you may have or she can be reached at (704) 831-4450.

Sincerely,

Craig Freeman

## DECLARATION SECTION

Each person signing below declares that all the information given in this enrollment form is true and complete to the best of his/her knowledge and belief.

The employee declares that he or she is actively at work on the date of this enrollment form.

#### For Changes Requested After Initial Enrollment Period Expires

I understand that if dental coverage is not elected, a waiting period may be required before I can enroll for such coverage after the initial enrollment period has expired.

#### For Payroll Deduction Authorization By the Employee

I authorize my employer to deduct the required contributions from my pay for the coverage requested in this enrollment form. This authorization applies to such coverage until I rescind it in writing.

#### Fraud Warning:

If you reside in or are applying for insurance under a policy issued in one of the following states, please read the applicable warning.

<u>New York</u> [only applies to Accident and Health Benefits (AD&D/Disability/Dental)]: Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

<u>Florida</u>: Any person who knowingly and with intent to injure, defraud or deceive any insurer files a statement of claim or an application containing any false, incomplete or misleading information is guilty of a felony of the third degree.

<u>Massachusetts</u>: Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, and may subject such person to criminal and civil penalties.

<u>New Jersey</u>: Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

<u>Oklahoma</u>: Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

<u>Kansas, Oregon, and Vermont</u>: Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto may be guilty of insurance fraud, and may be subject to criminal and civil penalties.

<u>Puerto Rico</u>: Any person who, knowingly and with the intent to defraud, presents false information in an insurance request form, or who presents, helps or has presented, a fraudulent claim for the payment of a loss or other benefit, or presents more than one claim for the same damage or loss, will incur a felony, and upon conviction will be penalized for each violation with a fine no less than five thousand (5,000) dollars nor more than ten thousand (10,000), or imprisonment for a fixed term of three (3) years, or both penalties. If aggravated circumstances prevail, the fixed established imprisonment may be increased to a maximum of five (5) years; if attenuating circumstances prevail, it may be reduced to a minimum of two (2) years.

<u>Virginia and Washington</u>: It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

<u>All other states</u>:
Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or a statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which may be a crime and may subject such person to criminal and civil penalties.

**Signature(s):** The employee must sign in all cases. Each person signing below acknowledges that they have read and understand the statements and declarations made in this enrollment form.

| _Lester C Nail_ | _Lester C Nail_ | _5/29/07_ |
| Employee Signature | Print Name | Date Signed (Mo./Day/Yr.) |

LES00002



**MetLife**
Metropolitan Life Insurance Company, New York, NY



## DENTAL ENROLLMENT/CHANGE FORM FOR Cedar Fair, L.P.

### SECTION TO BE COMPLETED BY EMPLOYER

| Name of Employer (Please Print)<br>Cedar Fair, L.P. | | Group Report No.<br>35244 | Sub Division | Branch |
|---|---|---|---|---|
| Employer's Street Address | City | State | Zip Code | Employee's Work Location |

| Date of Hire (Mo./Day/Yr.) | Coverage Effective Date (Mo./Day/Yr.) |
|---|---|

Work Status: ☐ New Hire ☐ Active ☐ Retired ☐ Disabled  ☐ Rehire ☐ On Layoff/Leave of Absence

Hours Worked Per Week

☐ Hourly Paid ☐ Salaried  ☐ Full-Time ☐ Part-Time

☐ Original COBRA Effective Date (Mo./Day/Yr.) _____

Reason for Enrollment: ☐ New Coverage ☐ New Hire/First Time Eligible ☐ Change in Enrollment
☐ Family Status Change (not applicable to new enrollments) Date (Mo./Day/Yr.) _____

### SECTION TO BE COMPLETED BY EMPLOYEE

| Name (print)   First   Middle   Last<br>Lester  C  Nail | Social Security No. | Date of Birth (Mo./Day/Yr.)<br>03-28-60 | ☒ Male ☐ Female |
|---|---|---|---|
| Address  Street   City   State  Zip Code<br>9027 Kirkley Ct Charlotte NC 28277 | | Marital Status: ☐ Single ☒ Married ☐ Widowed ☐ Divorced | |
| E-mail Address | Phone No. (include area code) | | |

### COVERAGE REQUEST DATA:

I have received and read a copy of my employer's current announcement of the group plan. I want to be covered under the group plan for the benefits for which I am or may become eligible, requested below.

**I request the following coverage:**

**Coverage Options** (Note: Only one of the following may be selected)

☐ Employee Only   ☒ Employee + Spouse + Child(ren)   ☐ Employee + One Dependent

**If applying for Dependent coverage (Spouse and Child), complete section below:**

Number of dependents (including spouse) __3__

| Name of Spouse (Last, First, MI)<br>Nail, Lindacarol S | Date of Birth<br>3-9-58 | Sex (M/F)<br>F | |
|---|---|---|---|

| Name(s) of Child(ren) (Last, First, MI) | Date of Birth | Sex (M/F) | Is child a full-time student? |
|---|---|---|---|
| Nail, | 8-9-96 | F | ☒ Yes |
| Nail, | 8-4-99 | F | ☒ Yes |
| | | | ☐ Yes |
| | | | ☐ Yes |

REDACTED



GEF02-1
ADM

**Please Retain A Copy Of The Fully-Completed Form For Your
Records And Return The Original To Your Employer**

Cedar Fair, L.P. (04/07)

LES00003

Attention :    Sardy Cranford
Carolinds
fax (704) 583 - 9133

Re.    insurance forms
Lester C. Nail

LES00004

x x x Immediate TX Result Report ( May.29. 2007 10:15AM ) x x x

| Date | Time | Destination | Mode | TXtime Page | Result | user Name | File No. |
|------|------|-------------|------|-------------|--------|-----------|----------|
| May.29. | 10:11AM | 704-683-9100 | OSTD | 3'51" P. 6 | OK | | 0024 |

```
#  : Batch              C : Confidential      S : Transfer        P : Polling
M  : Memory             L : Send later        M : Forwarding      E : ECM
   : Standard           D : Detail            F : For             : Super Fine
   : Resolution         H : Stored/D.Server    : LAN-Fax          + : Delivery
Q  : RX Notice Req.     A : RX Notice
```

LES00005

Please Select One: _____ Core Plan - 001
[X] Buy-Up Plan - 002

# Enrollment Application

**Anthem** ♦ ♥

Anthem provides administrative claims payment services only, and does not assume any financial risk or obligation with respect to claims.

Please complete in ink and return to your employer. Use extra sheets of paper if necessary. *All information given should apply to this employer.*
Anthem's Primary Care Physician (PCP) listings, for HMO/POS products can be obtained through www.anthem.com.

| 1. Employer Use: Employer Name and Address: | Cedar Fair, L.P. | | | | |
|---|---|---|---|---|---|
| Group # 003329766 | Sub-group # | Request Effective Date 7/1/07 | Replicant #/Plan Name | | |
| Anthem use: Plan: | Health Effective Date / / | Dental Effective Date / / | Vision Effective Date / / | PCP [ ]Yes [ ]No | COB [ ]Yes [ ]No | Pre-ex (date) / / |

**2. Reason for Application**
[X] New enrollment
[ ] Waiver
[ ] Annual open enrollment
[ ] COBRA
[ ] Conversion
      Qualifying event _____
[ ] New hire
[ ] Rehire (date) ___/___/___
[ ] Add dependent (see section 3)
      Event date ___/___/___

**3. Status Change/Event**
Event date ___/___/___
[ ] Marriage
[ ] Birth
*Include legal documentation.*
[ ] Adoption
[ ] Legal guardianship
[ ] Other _____

**4. Type of Coverage/Plan**

Health Coverage
[ ] HMO* (not applicable to Ohio)
[ ] Blue Traditional
[ ] POS    [X] PPO
[ ] EPO (Ohio only)

[ ] Employee only
[ ] Employee + spouse
[ ] Employee + child(ren)
[X] Family coverage
[ ] No coverage

Dental Coverage
[ ] PPO
[ ] Traditional
      (Indiana and Ohio only)

[ ] Employee only
[ ] Employee + spouse
[ ] Employee + child(ren)
[ ] Family coverage
[ ] No coverage

Vision Coverage
[ ] Vision

[ ] Employee only
[ ] Employee + spouse
[ ] Employee + child(ren)
[ ] Family coverage
[ ] No coverage

**5. Employee Information** *Only complete Primary Care Physician (PCP) information if enrolling in HMO or POS products.*

| Last name NAIL | First name, M.I. LESTER, C. | Date of birth 3/28/60 | Age 47 | Sex [X]M [ ]F | Social Security # | [ ]Single [ ]Divorced [X]Married |
|---|---|---|---|---|---|---|
| Home address 9027 Kirkley Ct. | City Charlotte | State NC | ZIP code 28277 | County (KY residents include Municipality) Mecklenburg | | |
| Home telephone (704) | Business telephone | Email Address | | | | |
| Are you: Retired? [ ]Yes [X]No | Disabled? [ ]Yes [X]No | Hospitalized? [ ]Yes [X]No | Occupation | Full time job date | Hours working per week | Income reported by: [ ]W2 [ ]1099 [ ]Other: |
| Anthem PCP name and address* Do Not Complete | | | Anthem PCP ID number Do Not Complete | | | New patient? [ ]Yes [ ]No |

**6. Family Information** *Spouse and dependents to be enrolled. (Attach a separate sheet if necessary.) *Only complete Primary Care Physician (PCP) information if enrolling in HMO or POS products.*

| 1 Last name NAIL | First name, M.I. LINDA CAROL | Relationship to applicant [X]Spouse [ ]Daughter [ ]Son [ ]Other | Full-time student? [ ]Yes [ ]No |
|---|---|---|---|
| Is dependent's address different than applicant's address? [ ]Yes [X]No (If Yes, provide full address) | | | |
| Date of birth 3/9/58 | Sex [ ]M [X]F | Social Security # | Eligible for federal income tax exemption? [ ]Yes [X]No<br>Court ordered health care benefits? [ ]Yes [X]No (If yes, include legal documentation)<br>Currently hospitalized or disabled? [ ]Yes [X]No (If yes, give reason) |
| Anthem PCP name and address* Do Not Complete | | Anthem PCP ID number Do Not Complete | New patient? [ ]Yes [ ]No |

| 2 Last name NAIL | First name, M.I. | Relationship to applicant [ ]Spouse [X]Daughter [ ]Son [ ]Other | Full-time student? [X]Yes [ ]No |
|---|---|---|---|
| Is dependent's address different than applicant's address? [ ]Yes [X]No (If Yes, provide full address) | | | |
| Date of birth 8/9/96 | Sex [ ]M [X]F | Social Security # | Eligible for federal income tax exemption? [ ]Yes [X]No<br>Court ordered health care benefits? [ ]Yes [X]No (If yes, include legal documentation)<br>Currently hospitalized or disabled? [ ]Yes [X]No (If yes, give reason) |
| Anthem PCP name and address* Do Not Complete | | Anthem PCP ID number Do Not Complete | New patient? [ ]Yes [ ]No |

| 3 Last name NAIL | First name, M.I. | Relationship to applicant [ ]Spouse [ ]Daughter [X]Son [ ]Other | Full-time student? [ ]Yes [ ]No |
|---|---|---|---|
| Is dependent's address different than applicant's address? [ ]Yes [X]No (If Yes, provide full address) | | | |
| Date of birth 8/4/99 | Sex [X]M [ ]F | Social Security # | Eligible for federal income tax exemption? [ ]Yes [X]No<br>Court ordered health care benefits? [ ]Yes [X]No (If yes, include legal documentation)<br>Currently hospitalized or disabled? [ ]Yes [X]No (If yes, give reason) |
| Anthem PCP name and address* Do Not Complete | | Anthem PCP ID number Do Not Complete | New patient? [ ]Yes [ ]No |

| 4 Last name | First name, M.I. | Relationship to applicant [ ]Spouse [ ]Daughter [ ]Son [ ]Other | Full-time student? [ ]Yes [ ]No |
|---|---|---|---|
| Is dependent's address different than applicant's address? [ ]Yes [ ]No (If Yes, provide full address) | | | |
| Date of birth / / | Sex [ ]M [ ]F | Social Security # | Eligible for federal income tax exemption? [ ]Yes [ ]No<br>Court ordered health care benefits? [ ]Yes [ ]No (If yes, include legal documentation)<br>Currently hospitalized or disabled? [ ]Yes [ ]No (If yes, give reason) |
| Anthem PCP name and address* Do Not Complete | | Anthem PCP ID number Do Not Complete | New patient? [ ]Yes [ ]No |

A-77 1/03    LG-ASO

REDACTED                2

Other Health Coverage ____ Please check one. ☐ YES (complete below.) ☐ NO.
On the day your coverage begins, list family members, including yourself, who will be covered by any other health coverage.

N|A

| Provide name, phone number and address of the HMO or insurance company | | Policy/certificate number | | Effective date / / |
|---|---|---|---|---|
| Policy/certificate holder's name | Social Security number | Date of birth / / | Relationship to applicant | |

If you and / or your dependents are enrolled in Medicare Part A or Medicaid, complete the following.

| Enrollee's name(s) | Medicare/Medicaid ID # | Medicare Part A effective date / / | Medicare Part B effective date / / | ESRD onset date / / |
|---|---|---|---|---|
| N|A | | | | |

Reason for Medicare entitlement:
☐ Age  ☐ Disability  ☐ ESRD & Disability  ☐ End Stage Renal Disease (ESRD)

---

8. Prior Health Coverage ____ Please check one: ☒ YES (complete below.) ☐ NO.

| Have you been covered by Anthem within the past two (2) years? ☐ Yes ☒ No | Dates policy in effect: / / — / / |
|---|---|
| Policy/Certificate #: | |
| Have you and / or your dependents had prior coverage with another carrier(s) within the past two (2) years? ☒ Yes ☐ No | Dates policy in effect: / / — / / |

Please check the type of prior coverage:
☐ Employee  ☐ Employee / Spouse  ☐ Employee / Child(ren)  ☒ Employee / Spouse / Child(ren)

Termination reason: ☐ Divorce/legal separation  ☐ Death of spouse  ☐ COBRA coverage exhausted  ☐ Employment terminated  ☐ Group plan terminated  ☐ Employer/group contribution ceased
☐ Other:

---

## Significant Terms, Conditions and Authorizations (TERMS)

*Please read this section carefully before signing the application.*

1. I may not assign any payment under my Anthem Blue Cross and Blue Shield administered benefit plan.

2. I authorize deduction from my wages/pension, if necessary for the required payment for the benefit for which I, or any dependents have applied.

3. I am applying for the benefit selected on this application. If I select a coverage, or combination of coverages, not available to me and / or a class for which I am not eligible, I agree that my selection(s) is hereby automatically amended to be consistent with the employer's application.

4. I understand that, to the extent permitted by law, Anthem reserves the right to accept or decline this application and that no right whatsoever is created by this application. I also understand that this coverage, if approved, may exclude coverage for pre-existing conditions.

5. I am responsible to timely notify my employer of any change that would make me or any dependent ineligible for benefits.

6. By signing this application, I agree and consent to the recording and / or monitoring of any telephone conversation between Anthem and myself.

I acknowledge that I have read the Significant Terms, Conditions and Authorizations, and I accept such provisions as a condition of enrollment. I represent that the answers given to all questions on this application are true and accurate to the best of my knowledge and I understand they are being relied on by Anthem in accepting this application. I understand that any misstatements or failure to report new medical information prior to my effective date may result in a material change to benefits or rates. Any

material misrepresentation or significant omission found in this application may result in denial of benefits or rescission or cancellation of my benefits.

*Kentucky:* Any person who knowingly and with intent to defraud any insurance company, health maintenance organization, self-insured plan, or other person, files an application for insurance or other form of health care coverage containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

I give this authorization for and on behalf of any eligible dependents and myself if covered by the Plan. I am acting as their agent and representative.

Your health benefit plan will be administered by one of the following companies based upon the state in which your employer is located:
In Indiana: Anthem Blue Cross and Blue Shield is the trade name of Anthem Insurance Companies, Inc.
In Kentucky: Anthem Blue Cross and Blue Shield is the trade name of Anthem Health Plans of Kentucky, Inc.
In Ohio: Anthem Blue Cross and Blue Shield is the trade name of Community Insurance Company.

*Thank you for choosing Anthem Blue Cross and Blue Shield.*

---

9. Read the TERMS section above carefully before signing. Please review your application for errors or omissions.
By signing this, I am indicating that I have read and understand the language in the TERMS section of this application and agree to all of its terms.

| Applicant Signature | Date 5 26 07 |
|---|---|

Please complete the waiver on the next page if you and / or any eligible dependent are not enrolling.

A-77 1/03    LG-ASO

3

LES00007

# VISION SERVICE PLAN

## MEMBERSHIP ENROLLMENT FORM

*(Please print or type)*

**Name of Group** Cedar Fair, L.P.    **Date of Enrollment** 7/1/07

**1.**

| SOCIAL SECURITY NO. | MEMBER LAST NAME | MEMBER FIRST NAME | MIDDLE INITIAL | DATE OF BIRTH MO/DAY/YEAR |
|---|---|---|---|---|
| | Nail | Lester | C | 3-28-60 |

**2.**

Do you have dependent children?  ☒ Yes  ☐ No

Do your dependent children, if over 18, attend school full time?  ☐ Yes  ☐ No

Are you enrolling your dependents in the VSP plan?  ☐ Yes  ☒ No

**3.**

Does your spouse have a vision plan?  ☐ Yes  ☒ No

If yes, who is covered?  ☐ Yourself  ☐ Spouse  ☐ Dependent

## PLEASE LIST ALL OF YOUR DEPENDENTS
## (IF FAMILY COVERAGE IS AVAILABLE AND SELECTED BY YOU)

**4.**

| LAST NAME | FIRST NAME | M.I. | DATE OF BIRTH |
|---|---|---|---|
| 2. Spouse Nail | Lindacarol | S. | 3-9-58 |
| 3. Children (include surname if different) | | | |
| | | | |
| | | | |
| | | | |

For HR Dept. Use Only:

DIV: _____    COVERAGE CODE:  A  B  C

Coverage Code Key:  A = Family
B = Employee + 1
C = Employee Only

REDACTED



October 19, 2007

PLF    DEFT        I
EXHIBIT NO.
TRN        FOR ID   4-23-08

Lester C. Nail
9027 Kirkley Court
Charlotte, North Carolina 28277

Re:    Employment Agreement with Paramount Parks Inc.

Dear Mr. Nail:

As you know, as of July 31, 2006, pursuant to the terms of your Employment Agreement, your employment with Paramount Parks Inc. ("PPI") was terminated without cause. Since that time, PPI has been providing you, subject to applicable taxes and withholdings, and subject to any other terms of the Employment Agreement, the amounts identified in paragraph 7(c) of your Employment Agreement.

We have recently learned that you have secured alternate employment and are, therefore, no longer able to render exclusive services to PPI. Accordingly, PPI will discontinue providing the above payments and benefits effective immediately, as provided under paragraph 7(c) of your Employment Agreement. You will be receiving information regarding your options under COBRA. You also have the obligation to pay back any amounts that PPI paid to you since you have been otherwise employed.

Please contact me as soon as possible to discuss the commencement of your new employment. Thank you in advance for your anticipated cooperation.

Very truly yours,

PARAMOUNT PARKS INC.

Craig Freeman

Craig Freeman

LES00018



October 23, 2007

PLF  DEF
EXHIBIT NO. _____
TRN   FOR ID

4-23-08

Lester C. Nail
9027 Kirkley Court
Charlotte, North Carolina 28277

Dear Mr. Nail:

I attempted to deliver the enclosed letter to you via UPS overnight delivery and have been informed that you no longer live at the address we have on file.

This is my second attempt via certified U.S. mail in anticipation that they will have a forwarding address for you.

I look forward to hearing from you.

Yours truly,

Craig J. Freeman

Craig J. Freeman

enc.

Lester Nail
375 South Monterey Drive
Moore, SC 29369

PLF   DEFT
EXHIBIT NO. _____
TRN   FOR ID
4-23-8

November 1, 2007

Mr. Craig Freeman
Paramount Parks Inc.
One Cedar Point Drive
Sandusky, OH 44870-5259

Dear Craig:

It was good to talk to you and I am happy to hear that Cedar Fair had a good year.

I write to you to express my disagreement with your letter of October 19, 20007. Contrary to your assertion, I have not violated any term or condition of my employment contract. Since my termination, I have been and remain, "willing, ready and able to render exclusive services" to PPI within the clear meaning of those terms. As you know, PPI has not requested my services at any time for any reason since the date of my termination.

Therefore, I respectfully request that you restore and continue my salary and benefits as required under the contract. I will be happy to discuss this further with if necessary.

Best Regards,

Lester Nail

LES00020

PAPPAS DECL.

EXHIBIT 3

ORIGINAL

1

1    IN THE UNITED STATES DISTRICT COURT

2        SOUTHERN DISTRICT OF NEW YORK

3    PARAMOUNT PARK, INC.,                :

4            Plaintiff                    :

5                                         :

6     -vs-                                :   No. 07 CV 10595(SS)

7    LESTER NAIL,                         :

8            Defendant                    :

9                               - - - - -

10   Deposition of **RICHARD L. KINZEL**, a witness herein,

11   taken by the Defendant as upon cross-examination

12   before Lori L. Delhees, Stenotype Reporter and Notary

13   Public in and for the State of Ohio, at the Castaway

14   Bay Resort, 2001 Cleveland Road, Sandusky, Ohio on

15   June 6th, 2008 at 12:00 p.m., pursuant to Notice.

16

17                               - - - - -

18

19

20

21

22

23

24

25

1

2    APPEARANCES:

3        **Jill S. Kirila, Esquire**
         SQUIRE, SANDERS & DEMPSEY, L.L.P.
4        1300 Huntington Center
         41 South High Street
5        Columbus, OH  43215

6                On behalf of Plaintiff

7        **A. Michael Weber, Esquire**
         LITTLER MENDELSON
8        885 Third Avenue, 16th Floor
         New York, New York  10022-4834
9
                On behalf of Defendant
10

11
                        - - - - -
12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

| 1 | | |
|---|---|---|
| 2 | | **RICHARD L. KINZEL**, of lawful age, a witness |
| 3 | | herein, called by the Defendant as upon |
| 4 | | cross-examination, pursuant to the Rules of |
| 5 | | Civil Procedure, being first duly sworn |
| 6 | | according to law, was examined and testified as |
| 7 | | follows: |
| 8 | | **CROSS-EXAMINATION OF RICHARD L. KINZEL** |
| 9 | | **BY MR. WEBER:** |
| 10 | Q | Mr. Kinzel, my name is Michael Weber. I'm one of the |
| 11 | | attorneys for Lester Nail in the lawsuit that PPI, if |
| 12 | | I may refer to it as PPI, everybody knows what that |
| 13 | | is, brought against him. |
| 14 | A | Uh-huh. |
| 15 | Q | I'm going to ask you a series of questions; you're |
| 16 | | obligated to testify under oath, as I'm sure you're |
| 17 | | aware. The reporter would like you to answer |
| 18 | | verbally so she can take down specific answers to my |
| 19 | | questions and not with a nod of a head or any other |
| 20 | | gesture, you understand that direction? |
| 21 | A | Yes. |
| 22 | Q | Have you ever been deposed before? |
| 23 | A | Yes. |
| 24 | Q | How many times? |
| 25 | A | Approximately three or four. |

```
 1          decided on Mr. Milkie.

 2   Q      Okay.  Does he have an employment contract?

 3   A      No.  I'm not sure, but I think we might have even

 4          gone to a headhunter, I'm not sure, but I just don't

 5          know.

 6   Q      I may have asked you this and if I did I apologize,

 7          but did you know what Mr. Nail's duties were as the

 8          counsel for PPI?

 9   A      Yes.  He was, he was counsel for, for that division

10          of CBS.

11   Q      And do you know what he did?

12   A      No.  I did not know, I did not see his job

13          description.

14   Q      After Cedar Fair acquired PPI, I believe it was in

15          June of '06 --

16   A      Correct.

17   Q      -- some of the PPI executives were put on what was

18          called, I believe, an administrative leave?

19   A      Yes.

20   Q      Is that right?

21   A      Yes.  Uh-huh.

22   Q      Do you know which ones were put on administrative

23          leave?

24   A      No, I don't.  I know there were, there were some that

25          were put on, I believe four or five, put on
```

| | | |
|---|---|---|
| 1 | | administrative leave until we decided what to do. |
| 2 | Q | What did you understand that term to mean, |
| 3 | | "administrative leave?" |
| 4 | A | Well, basically they were -- we were honoring their |
| 5 | | contracts; they were sent home until we could decide |
| 6 | | exactly what course we wanted to take. |
| 7 | Q | Of the senior executives of PPI, were any of them not |
| 8 | | put on administrative leave? |
| 9 | A | I don't know. |
| 10 | Q | I believe Mr. Nail was not, that he was asked to stay |
| 11 | | with the company? |
| 12 | A | That could be correct, yes. |
| 13 | Q | You don't know that of your own knowledge? |
| 14 | A | No.  I knew we had someone to stay to watch over the |
| 15 | | headquarters in Charlotte. |
| 16 | Q | Was the intent, from your vision, is to eventually |
| 17 | | reduce the head count for the PPI individuals, as it |
| 18 | | would be duplicative of the Cedar Fair individuals? |
| 19 | A | Yes. |
| 20 | Q | When the individuals who you described were sent home |
| 21 | | on administrative leave, are you aware of any |
| 22 | | restrictions on what they could or couldn't do? |
| 23 | A | We just expected them to uphold the terms of their |
| 24 | | employment contract. |
| 25 | Q | Were they obligated to come into the physical office? |

1   A    No.

2   Q    Were they obligated to be available to provide any

3        information to the company?

4              MS. KIRILA:      Just let me get an

5        objection on the record, to the extent the agreement

6        governs what exactly they can and cannot do, it would

7        speak for itself.  But you can testify as to your

8        understanding and knowledge.

9   Q    That's all I'm asking.

10   A    I'm sorry, could you just repeat it?

11   Q    Sure.  What was your understanding as far as what

12        obligations, if any, the individuals on

13        administrative leave were required of once they were

14        on administrative leave?

15   A    None.  We were just, we just were re-thinking how we

16        were going to use them, if we were going to use them

17        or not.

18   Q    At all.  Was it your decision to place these

19        individuals on administrative leave?

20   A    It was ultimately my decision, yes.

21   Q    Was that consistent with what your vision was of

22        merging the companies?

23   A    Yes.

24   Q    I think Mr. Nail was not put on administrative leave,

25        but was the individual left to, was it wind up the

| | | |
|---|---|---|
| 1 | A | No.  Other than the title "Counsel." |
| 2 | Q | Did anyone tell you that Mr. Nail was not doing what |
| 3 | | he was supposed to do? |
| 4 | A | No. |
| 5 | Q | Did anybody tell you that Mr. Nail was not doing what |
| 6 | | he was directed to? |
| 7 | A | No. |
| 8 | Q | To your knowledge, did Mr. Nail perform his |
| 9 | | obligations for the company after the acquisition? |
| 10 | A | I don't know any different than that. |
| 11 | Q | There came a time when Mr. Nail's employment was |
| 12 | | terminated; do you recall that? |
| 13 | A | By terminated, you mean when we stopped payment? |
| 14 | Q | No.  I mean, prior to that time that his -- he was |
| 15 | | told -- |
| 16 | A | Yes.  Yes. |
| 17 | Q | Do you remember approximately when that was? |
| 18 | A | I don't remember the time, no. |
| 19 | Q | Was that your decision to terminate his employment? |
| 20 | A | Ultimately, yes. |
| 21 | Q | And did you discuss that with anyone? |
| 22 | A | Just Craig Freeman. |
| 23 | Q | And tell me what discussions you and Mr. Freeman had |
| 24 | | regarding terminating Mr. Nail's employment? |
| 25 | A | You know, I just don't recall; we discussed each one |

|    |   |                                                          |
|----|---|----------------------------------------------------------|
| 1  |   | of them on an individual basis.  The decision was         |
| 2  |   | made at that time.                                        |
| 3  | Q | Was the decision based on the fact that you didn't        |
| 4  |   | need his services?                                        |
| 5  | A | That would certainly be part of it, yes.                  |
| 6  | Q | What was the other part?                                  |
| 7  | A | That was mainly it.  We just didn't need his services     |
| 8  |   | and we didn't have a corporate counsel; we had no         |
| 9  |   | intentions of having counsel on staff.                    |
| 10 | Q | You hadn't had one before, right?                         |
| 11 | A | No.                                                       |
| 12 | Q | Other than discussions with Mr. Freeman regarding         |
| 13 |   | Mr. Nail's termination, do you recall talking to          |
| 14 |   | anyone else at Cedar Fair or PPI about Mr. Nail's         |
| 15 |   | services?                                                 |
| 16 | A | No.  The only, you know, the only other person that       |
| 17 |   | mentioned it was, you know, an employee that              |
| 18 |   | mentioned that they happened to see Mr. Nail and he       |
| 19 |   | was working, but that's the only time.                    |
| 20 |   | MR. WEBER:          Could you read that       |
| 21 |   | back for me?                                              |
| 22 |   | THEREUPON, the Reporter read the requested     |
| 23 |   | portion of the record.                                    |
| 24 | Q | I just wanted to make clear I understand your             |
| 25 |   | answer.  Prior to his termination and I don't mean        |

| | | |
|---|---|---|
| 1 | | question, please? |
| 2 | | THEREUPON, the Reporter read the requested |
| 3 | | portion of the record. |
| 4 | A | I felt that everything in the contract was |
| 5 | | enforceable. |
| 6 | Q | Did you have an independent personal knowledge of |
| 7 | | whether a noncompete was enforceable against an |
| 8 | | attorney? |
| 9 | | MS. KIRILA:        The same objection. |
| 10 | A | I don't know. |
| 11 | Q | I'll show you Mr. Nail's contract, paragraph 11. |
| 12 | | I'll ask you to read paragraph 11, Exhibit B. |
| 13 | | MS. KIRILA:        Wait a second, please, |
| 14 | | before you answer.  And I'm just going to object to |
| 15 | | this question on the grounds he testified he's never |
| 16 | | seen this document before; he shouldn't be asked |
| 17 | | about the language in there. |
| 18 | | THE WITNESS:        Can I answer? |
| 19 | | MS. KIRILA:        I don't know what the |
| 20 | | question is. |
| 21 | Q | Well, let me ask you a question; I just wanted you to |
| 22 | | read it.  In reading that, is it your understanding |
| 23 | | that Mr. Nail could do nothing of any employment |
| 24 | | nature whatsoever after he was terminated from PPI? |
| 25 | | MS. KIRILA:        The same objection. |

| 1 | | Again, it calls for a legal interpretation of a |
| 2 | | contract. If you have an understanding -- |
| 3 | Q | Do you have an understanding? |
| 4 | | MS. KIRILA:            -- based on this |
| 5 | | agreement, you can testify. |
| 6 | A | I had the understanding that he couldn't work for |
| 7 | | anyone. |
| 8 | Q | Anyone? |
| 9 | A | Anyone. |
| 10 | Q | Could he do anything at all, in any -- for any |
| 11 | | employer? |
| 12 | | MS. KIRILA:         The same objection. |
| 13 | | MR. WEBER:         Noted for the record. |
| 14 | A | I'm not an attorney, but the way I would read it, he |
| 15 | | couldn't do anything. |
| 16 | Q | Could he work for a cashier at Home Depot? |
| 17 | A | No. |
| 18 | | MS. KIRILA:         Objection. |
| 19 | Q | Could he mow lawns? |
| 20 | A | Not for pay. |
| 21 | Q | Could he do pro bono legal work? |
| 22 | A | Yes. |
| 23 | | MS. KIRILA:         Objection. Go ahead. |
| 24 | A | If he was not getting paid. |
| 25 | Q | So he could not receive any pay from any employer, no |

| 1 | | matter where or where that employer was? |
|---|---|---|
| 2 | A | Yes. |
| 3 | Q | Your answers, I believe, are based on discussions you |
| 4 | | had with Mr. Freeman; is that correct? |
| 5 | A | Correct. |
| 6 | Q | And based on Mr. Freeman's reading of the contract, |
| 7 | | is that right? |
| 8 | | MS. KIRILA:              Objection.  To the |
| 9 | | extent it calls for speculation and you don't know |
| 10 | | what Mr. Freeman was relying on.  If you can answer. |
| 11 | Q | My question is that you were relying -- you had not |
| 12 | | seen this contract until today, correct? |
| 13 | A | To the best of my recollection, yes. |
| 14 | Q | And the basis of your understanding of the agreement |
| 15 | | was based on what Mr. Freeman told you? |
| 16 | A | Correct. |
| 17 | Q | No one else? |
| 18 | A | Correct. |
| 19 | Q | Do you know if Mr. Nail attempted to speak with you |
| 20 | | in 2007 about this dispute? |
| 21 | A | To the best of my knowledge, Mr. Nail never tried to |
| 22 | | make contact with me. |
| 23 | Q | Mr. Freeman never shared with you Mr. Nail's desire |
| 24 | | to speak with you? |
| 25 | A | No. |

|     |     |                                                                 |
| --- | --- | --------------------------------------------------------------- |
| 1   |     | claim?                                                          |
| 2   | A   | No.                                                             |
| 3   | Q   | Do you know of any documents that require any                  |
| 4   |     | employee who is terminated to advise PPI or Cedar              |
| 5   |     | Fair of eligibility to receive benefits somewhere              |
| 6   |     | else?                                                          |
| 7   | A   | Not to my knowledge.                                           |
| 8   | Q   | Paragraph 23 states, "Defendant never notified PPI             |
| 9   |     | that his address had changed."  Did I read that                |
| 10  |     | correctly?                                                     |
| 11  | A   | Correct.  Yes.                                                 |
| 12  | Q   | Did you ever ask Mr. Nail to advise you that -- if             |
| 13  |     | his address had changed?                                       |
| 14  | A   | No.                                                            |
| 15  | Q   | Do you know of any obligation in Mr. Nail's                    |
| 16  |     | employment contract that obligates him to advise PPI           |
| 17  |     | of a change of address?                                        |
| 18  | A   | No.                                                            |
| 19  |     | MS. KIRILA:          Objection.  Objection                     |
| 20  |     | for the record, to the extent it's asking for the              |
| 21  |     | contents of a legal agreement that he testified he             |
| 22  |     | never saw and calls for a legal conclusion, but you            |
| 23  |     | can answer.                                                    |
| 24  | A   | To my knowledge, no.                                           |
| 25  | Q   | Do you know of any requirements that PPI or Cedar              |

```
 1              Fair have that require an individual who leaves the

 2         company to notify the company of a change of address?

 3              MS. KIRILA:              The same objection.  Go

 4         ahead.

 5    A    I don't know the answer to that.

 6    Q    Did you ever tell Mr. Nail it would be a breach of

 7         his employment agreement if he moved and he didn't

 8         tell you that he changed address?

 9    A    No.

10    Q    Do you know if anybody else did?

11    A    I don't know.

12    Q    Did you ever ask Mr. Nail to keep in contact with you

13         in case his services would be needed?

14    A    To the best of my knowledge, I've never spoken to

15         Mr. Nail.

16    Q    Do you know if anybody else asked him to stay in

17         touch in case his services were needed?

18    A    I don't know.

19    Q    Paragraph 24 states, "On or about June 2007 Defendant

20         directly or indirectly represented to PPI

21         representative that he was still employed --

22         unemployed.  Further, Defendant participated in an

23         employee benefit enrollment effective July 1, 2007 as

24         an employee of PPI."  Did I read that correctly?

25    A    Yes.
```

| | | |
|---|---|---|
| 1 | | allegation, why he believed that Mr. Nail represented |
| 2 | | that he was unemployed in June of '07? |
| 3 | A | No. |
| 4 | Q | The next paragraph, 25 states, "Then in mid October |
| 5 | | 2007 PPI learned from another employee that Defendant |
| 6 | | was working full-time for Denny's Inc., paren, |
| 7 | | (Denny's)," did I read that correctly? |
| 8 | A | Yes. |
| 9 | Q | Do you know how PPI learned that Mr. Nail was working |
| 10 | | for Denny's? |
| 11 | A | Yes. |
| 12 | Q | How do you know? |
| 13 | A | A fellow employee of Mr. Nail and now a member of |
| 14 | | our, of our company had ran across Mr. Nail at an |
| 15 | | airport and in small talk, why, Mr. Nail indicated to |
| 16 | | him that he was now working for Denny's, and in |
| 17 | | conversation with this employee he just happened to |
| 18 | | mention it. |
| 19 | Q | And your understanding, from the story being related |
| 20 | | back, was that Mr. Nail told this individual that he |
| 21 | | was working for Denny's? |
| 22 | | MS. KIRILA:          Objection.  Go ahead. |
| 23 | A | What I was told was he was corporate counsel for |
| 24 | | Denny's, yes. |
| 25 | Q | Do you know who told you that? |

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Who was that? |
| 3 | A | Jim Ryan. |
| 4 | Q | And Jim Ryan was the individual that Mr. Nail met |
| 5 | | with? |
| 6 | A | Well, they actually -- no, they met in the airport, |
| 7 | | yes, they didn't have a meeting. |
| 8 | Q | I meant that.  Mr. Ryan was the individual that |
| 9 | | Mr. Nail spoke with at the airport? |
| 10 | A | Yes. |
| 11 | Q | What else did Mr. Ryan tell you? |
| 12 | A | Nothing.  Just small talk and he just mentioned that |
| 13 | | he happened to run across Mr. Nail and he was working |
| 14 | | at Denny's.  I just about dropped my -- my jaw |
| 15 | | dropped open and that's what prompted it. |
| 16 | Q | Tell me what else you discussed with Mr. Ryan at that |
| 17 | | time? |
| 18 | A | Nothing. |
| 19 | Q | Did you discuss anything subsequent to that time with |
| 20 | | Mr. Ryan about Mr. Nail? |
| 21 | A | No.  To the best of my knowledge, no. |
| 22 | Q | I'd like you to look at paragraph C of the employment |
| 23 | | agreement -- I'm sorry, 7C of the employment |
| 24 | | agreement. |
| 25 | A | Do I have that here? |

```
 1              don't know anything else about it.
 2    Q         Did you make the decision to stop paying Mr. Nail?
 3    A         Yes.
 4    Q         And how did you go about implementing that decision?
 5              MS. KIRILA:          Objection.  It assumes
 6              facts, but go ahead.
 7    A         I just instructed to Mr. Freeman to cease salary and
 8              benefits as -- at that date.
 9    Q         I'll show you what's been previously marked as
10              Defendant's Exhibit L and ask if you've ever seen
11              this letter?
12    A         No, I've never -- to the best of my knowledge, I've
13              never seen this letter.
14    Q         Mr. Freeman never showed that to you?
15              MS. KIRILA:          Objection.  Go ahead.
16    A         To the best of my knowledge, I've never seen it.
17    Q         Did Mr. Freeman ever tell you that Mr. Nail remained
18              ready, willing, and able to provide exclusive
19              services to PPI?
20    A         No.
21    Q         Do you know if Mr. Nail was available -- or strike
22              that.  Do you know if Mr. Nail was ready, willing,
23              and able to provide exclusive services to PPI?
24              MS. KIRILA:          Objection.  Go ahead.
25    A         I don't know.
```

60

| | | |
|---|---|---|
| 1 | Q | Did you ever ask Mr. Nail to perform services for PPI |
| 2 | | after his termination? |
| 3 | A | No, I don't know.  No, I don't -- I did not, no. |
| 4 | Q | Did you ever direct anyone to ask Mr. Nail to perform |
| 5 | | services for PPI after his employment was terminated |
| 6 | | in 2006? |
| 7 | A | No. |
| 8 | Q | To your knowledge, did any employee of PPI or Cedar |
| 9 | | Fair ever ask Mr. Nail to perform any services |
| 10 | | whatsoever for PPI or Cedar Fair at any time after |
| 11 | | August 2006? |
| 12 | A | Not to the best of my knowledge. |
| 13 | Q | And you would know that, would you not? |
| 14 | | MS. KIRILA:                Objection. |
| 15 | A | I don't know everything, but I probably would.  To |
| 16 | | the best of my knowledge, no one asked him to work. |
| 17 | Q | You never considered using, utilizing Mr. Nail's |
| 18 | | services after August 2006, did you? |
| 19 | A | No. |
| 20 | Q | And to your knowledge, no one else at PPI or Cedar |
| 21 | | Fair considered utilizing his services after August |
| 22 | | 2006, correct? |
| 23 | | MS. KIRILA:                Objection.  Calls for |
| 24 | | speculation.  You can answer. |
| 25 | A | It certainly wasn't discussed with me, if anyone was. |

| | | |
|---|---|---|
| 1 | Q | It wasn't discussed in any of your weekly meetings |
| 2 | | with the executives that you referred to before? |
| 3 | A | No. |
| 4 | Q | Correct? |
| 5 | A | Correct. |
| 6 | Q | And if I asked this before I apologize.  Just so it's |
| 7 | | clear, did you have any conversation with anybody at |
| 8 | | PPI or Cedar Fair after August 2006 about utilizing |
| 9 | | Mr. Nail's services? |
| 10 | A | To the best of my knowledge, no, I did not. |
| 11 | Q | And just so it's clear, you had no intention of |
| 12 | | utilizing his services after August 2006, correct? |
| 13 | | MS. KIRILA:              Objection.  You can |
| 14 | | answer. |
| 15 | A | There was no position available for him. |
| 16 | Q | And you had no intention of utilizing his services, |
| 17 | | correct? |
| 18 | A | Perhaps if a position became available we might have |
| 19 | | considered him, but there was no position that became |
| 20 | | available. |
| 21 | Q | And you never -- and -- strike that, I've asked |
| 22 | | that.  To your knowledge, did PPI or Cedar Fair |
| 23 | | request the services of any other individuals who |
| 24 | | were terminated in the acquisition to perform any |
| 25 | | services whatsoever after they were let go? |

|    |   |                                                                      |
|----|---|----------------------------------------------------------------------|
| 1  |   | with Mr. Nail works for Denny's; we have a Johnny                    |
| 2  |   | Rocket's, we have two Johnny Rocket's, which are                     |
| 3  |   | branded food concepts; we have a Famous Dave's, and                  |
| 4  |   | we have three or four Subway locations, all branded                  |
| 5  |   | food locations, which are in direct competition with                 |
| 6  |   | Denny's.                                                             |
| 7  | Q | If he's -- if he could somehow divide his time to do                 |
| 8  |   | work for Denny's and PPI, any reason why he couldn't                 |
| 9  |   | do that?                                                             |
| 10 |   | MS. KIRILA:        Objection.  Rights and                            |
| 11 |   | obligations are governed by agreement, but you can                   |
| 12 |   | testify.                                                             |
| 13 | A | I couldn't even answer that question.                                |
| 14 | Q | If Denny's said you can take a leave of absence and                  |
| 15 |   | go work for PPI if they request it, would that be                    |
| 16 |   | acceptable to you?                                                   |
| 17 |   | MS. KIRILA:        Objection.  Calls for                             |
| 18 |   | speculation, is governed by his rights and                           |
| 19 |   | obligations and governed by legal agreement, but you                 |
| 20 |   | can --                                                               |
| 21 | A | I don't know.  It all would depend on what, you know,                |
| 22 |   | what kind of responsibilities we would need at the                   |
| 23 |   | time.                                                               |
| 24 | Q | You don't have any knowledge, one way or the other,                  |
| 25 |   | about Mr. Nail's willingness to do work for PPI from                 |

1       August '06 through December 31, '07, do you?

2                   MS. KIRILA:              Objection.  To the

3       extent it calls for a definition of a legal term in

4       the contract, but you can answer.

5   A   No, I don't.

6   Q   If Mr. Nail had been willing and able to cease his

7       Denny's employment at any time in order to perform

8       services for PPI, do you still contend that his

9       Denny's employment rendered him unable to perform

10      exclusive services for PPI?

11                  MS. KIRILA:              Objection.  Calls for a

12      legal conclusion.  I don't know even how you can

13      answer, but you can, if you can.

14  A   I don't know how to answer that.  It all depends on

15      the circumstances and what would be available at the

16      time.

17  Q   Well, my question is, you never asked him to perform

18      services, we know that, correct?

19  A   Correct.

20  Q   Had you done so and had he decided to leave Denny's,

21      would he be in compliance with his agreement?

22                  MS. KIRILA:              Calls for speculation

23      and calls for a legal conclusion.

24  A   I don't know.

25  Q   Okay.  So it would be, you would speculate what

1    Mr. Nail would do if you had asked him to come back,

2    correct?

3            MS. KIRILA:              Objection.

4  Q    That would be a speculation; you wouldn't know?

5  A    I don't know how to answer it.  If Nail would have

6    called me and said, "I, you know, we could settle

7    this by me coming back to work," we probably would

8    have done something, or, you know, but he didn't.

9    Well, I can't speculate, I don't know.  I mean, what

10   went through his mind.  He should have let us know

11   that he had another job, and if he would have called

12   me and said, "I want to work something out or I'm

13   going to go to work," we would have worked something

14   out.

15 Q    And the basis for your belief that he had that

16   obligation is what?

17 A    The contract.

18 Q    Okay. Would it surprise you that Mr. Nail did call

19   Mr. Freeman after he received the letter?

20 A    I don't know that.

21 Q    What's your understanding, and not a legal, but a

22   practical understanding of the terms ready, willing,

23   and able?

24           MS. KIRILA:              Objection.  Calls for a

25   pure legal conclusion.  If he even has an

1    understanding, it hasn't been established, but you

2    can testify.

3  A    What I assume by reading the contract and with the

4    noncompete and ready, willing and able, that he was

5    available to come back to work for us and if he went

6    to work -- in other words, we were paying him to sit

7    home and to get his resume ready for when the

8    contract ended, that he would be able to go back into

9    the workplace. But up until the time that the

10    contract ended, he was under our guidance and

11    direction to do what we, you know, if we requested

12    his services, why, he would be there for us to do it.

13  Q    If you requested them?

14  A    If we requested it.

15  Q    And you never did?

16  A    We never did, no, at that time.

17  Q    At any time you never requested his services?

18  A    Not up until today, not up -- no, you're right.  From

19    there and then until now we have not asked for his

20    services.

21  Q    And his contract expired December 31, 2007, correct?

22         MS. KIRILA:          Objection.  It calls

23    for a legal conclusion.  As to when that contract

24    terminated by actions or otherwise is a legal

25    conclusion.  If you have an understanding.

| 1 | A | No, I don't know, even know when it expired. |
| 2 | Q | Do you know when Mr. Nail's obligations ended to PPI |
| 3 | | or Cedar Fair? |
| 4 | A | No, I don't. |
| 5 | Q | I think you said that one of the reasons you needed |
| 6 | | to hire Mr. Milkie was that the company had grown? |
| 7 | A | (Nod indicating yes.) |
| 8 | Q | What has been the growth of the company in the last |
| 9 | | year? |
| 10 | | MS. KIRILA:          Objection, relevance. |
| 11 | | Mr. Freeman hasn't -- I mean, Mr. Nail hasn't been |
| 12 | | on -- |
| 13 | | MR. WEBER:          I withdraw the |
| 14 | | question. |
| 15 | A | Okay. |
| 16 | Q | When did you first think about hiring a general |
| 17 | | counsel? |
| 18 | A | Probably after we had the -- probably 12 to 16, 18 |
| 19 | | months after the acquisition we found out how |
| 20 | | complicated it was.  We not only doubled the |
| 21 | | business, we also doubled our strategy; our business |
| 22 | | strategy going forward was, was always to have a very |
| 23 | | low corporate staff, we outsourced a lot.  Probably, |
| 24 | | I don't know, at 12 to 18 months into it we found out |
| 25 | | that we're paying an awful a lot of money in outside |

|    |   |                                                                              |
|----|---|------------------------------------------------------------------------------|
| 1  |   | contractors and at that point, why, I decided we                             |
| 2  |   | needed corporate counsel.                                                    |
| 3  | Q | Was Mr. Nail ever considered for the general counsel                         |
| 4  |   | position?                                                                    |
| 5  | A | You know, Mr. Nail was an attorney for a subsidiary                          |
| 6  |   | to CBS and what I was looking for was a corporate                            |
| 7  |   | attorney that could handle the whole company.                               |
| 8  | Q | So would the answer be no?                                                   |
| 9  | A | No, yes -- yes.                                                              |
| 10 | Q | I take it you were not aware of the direct deposit                          |
| 11 |   | reversal of Mr. Nail's checks, correct?                                      |
| 12 | A | I'm not a -- not aware of that, no.                                          |
| 13 | Q | I think you said that it was your decision to                               |
| 14 |   | initiate the suit, correct?                                                  |
| 15 | A | I did, yes.                                                                  |
| 16 | Q | Other than your attorneys, I don't want you to talk                         |
| 17 |   | to me about a conversation with them, what did you                          |
| 18 |   | tell Mr. Freeman about initiating the suit?                                  |
| 19 | A | What did I tell him?                                                         |
| 20 | Q | (Nod indicating yes.)                                                        |
| 21 | A | I asked him, you know, if, how strongly he felt on                          |
| 22 |   | the contract and to get advice if Mr. Nail had                              |
| 23 |   | violated the contract, and if that indeed that we                           |
| 24 |   | felt that he had violated the terms of the contract                         |
| 25 |   | we should try to get our money back.                                        |

1                          <u>CERTIFICATE</u>

2    STATE OF OHIO      )
                        )   ss.
3    COUNTY OF ERIE     )

4

5        I, Lori L. Delhees, Stenotype Reporter and
     Notary Public within and for the State aforesaid,
6    duly commissioned and qualified, do hereby certify
     that the within named RICHARD L. KINZEL was by me,
7    before the giving of his deposition, first duly sworn
     to testify the truth, the whole truth and nothing but
8    the truth in the cause aforesaid; that the deposition
     as above set forth was reduced to writing by me by
9    means of Computer-Aided Transcription; that the said
     deposition was taken pursuant to Notice and was
10   completed without adjournment; that I am not a
     relative or attorney of either party or otherwise
11   interested in the eventual outcome of this action.

12       IN WITNESS WHEREOF, I have hereunto set my hand
     and seal of office at Sandusky, Ohio, this 2nd day of
13   July, 2008.

14

15

16                          HUNTLEY REPORTING SERVICE
                            Lori L. Delhees
17                          Notary Public
                            P. O. Box 1067
18                          Sandusky, Ohio  44870

19                          My commission expires 11/24/2012

20

21

22

23

24

25

**PAPPAS DECL.**

**EXHIBIT 4**

# CERTIFIED COPY

1

1

2

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

3

----------------------------X

4

PARAMOUNT PARKS, INC.,

5

Plaintiff,

6

vs.                    No. 07 CV 10595(SS)

7

LESTER NAIL,

8

Defendant.

9

----------------------------X

10

April 23, 2008

3:27 p.m.

11

12

** REDACTED TRANSCRIPT **

13

14

15

Deposition of LESTER NAIL, held at the

16

offices of Squire, Sanders & Dempsey L.L.P.,

17

350 Park Avenue, New York, New York, pursuant

18

to Notice and Agreement, before Thomas R.

19

Nichols, a Registered Professional Reporter

20

and a Notary Public of the State of New York.

21

22

23

GREENHOUSE REPORTING, INC.

24

875 Sixth Avenue - Suite 1716

New York, New York  10001

25

(212) 279-5108

2

1

2    A P P E A R A N C E S:

3

4    SQUIRE, SANDERS & DEMPSEY L.L.P.

5    Attorneys for Plaintiff

6         1300 Huntington Center

7         41 South High Street

8         Columbus, Ohio 43215-6197

9    BY:   JILL S. KIRILA, ESQ.

10

11   LITTLER MENDELSON

12   A Professional Corporation

13   Attorneys for Defendant

14         885 Third Avenue

15         New York, New York 10022-4834

16   BY:   A. MICHAEL WEBER, ESQ.

17

18

19

20

21

22

23

24

25

3

L. Nail

L E S T E R   N A I L , called as a witness,

having been duly sworn by a Notary Public,

was examined and testified as follows:

THE REPORTER:  Would you please state

your name and home address for the record.

THE WITNESS:  Lester Nail, 375 South

Monterey Drive, Moore, South Carolina 39369.

EXAMINATION BY

MS. KIRILA:

Q.    Good afternoon, Mr. Nail.  In case you

missed it, my name is Jill Kirila and I'm with the

law firm of Squire Sanders and representing

Paramount Parks in this lawsuit.  I know you sat

through most of Mr. Freeman's deposition today.

But do you understand that you are

here for your deposition today?

A.    Yes.

Q.    Have you ever been deposed before?

A.    Once by telephone many, many years

ago.

Q.    Do you recall the case in which you

were deposed?

A.    It was a Wal-Mart case.

Q.    In your capacity as counsel?

11

L. Nail

A.    I remember the conversation with Sandy
Cranford.  So I don't remember if I discussed it
with -- I don't believe I discussed it with Linda.

Q.    Just to skip ahead and cover that now
while we're on the subject, what do you recall
about a conversation with your wife and Sandy
Cranford?

A.    Well, what I remember fairly clearly
and to put it in context, my wife and I were on
the back deck of our porch having a fairly
emotional conversation about the fact that I had
not been able to find a job in Charlotte.  I was
commuting three and a half hours to Denny's, and
we were going to have to put the house on the
market.

And it was during this conversation
that Sandy called and Linda talked to Sandy and,
you know, Linda was going in and out.  She was
going into the kitchen.  The girls were in and out
of the house.  She was walking around on the cell
phone and I was sitting out on the back deck.

So she was in and out and I know that
I told her to tell Sandy that I said hi.  And, you
know, at some point in the conversation she told

12

L. Nail

 1  Sandy, you know, things would be better if Lester

 2  could find a job in Charlotte.

 3      Q.    So you were present for that --

 4      A.    Yes.

 5      Q.    -- part of the conversation?

 6      A.    Yes.

 7            And let me go back a minute.

 8      Q.    Sure.

 9      A.    I'm not positive whether Linda called

10  Sandy or Sandy called us.  I know there was some

11  issues with, you know, the medical forms going

12  back and forth.

13      Q.    So this would have been during the

14  benefits enrollment --

15      A.    Yes.

16      Q.    -- period?

17      A.    I believe that's when it took place.

18  It was about that time frame.

19      Q.    In June of 2000 --

20      A.    No, no, I think it was in May.

21      Q.    May of 2007?

22      A.    It had to have been in May.

23      Q.    In May of 2007?

24      A.    Correct.

31

L. Nail

1

2    A.    Uh-huh.

3    Q.    Have you ever been involved in any

4    other litigation personally?

5    A.    No.   No.

6    Q.    Have you ever testified as a witness

7    in any other proceeding?

8    A.    Yes.

9    Q.    In what context?

10   A.    In Arkansas in the early or the

11   mid-eighties there my landlord was in some type of

12   dispute with I believe a -- his contractor and

13   asked me to testify.

14   Q.    What did you testify about in that

15   case?

16   A.    It was something about the yard.  The

17   common areas wouldn't drain properly and water

18   would back up.  And he asked me to testify to my

19   personal observations about that.

20   Q.    Is there anything on this résumé as of

21   this date that you would change?  That's listed on

22   here.

23   A.    No.

24   Q.    Mr. Nail, you were hired at Paramount

25   Parks in January of 2002; is that correct?

32

L. Nail

1

2      A.     Correct.

3      Q.     And you started as vice president,

4  associate counsel?

5      A.     I don't --

6      Q.     Why don't you tell me what you did

7  when you started?

8      A.     At Paramount Parks.

9      Q.     Yes, at Paramount Parks.

10      A.     I literally don't remember what my

11  titles was.

12      Q.     What were your duties?

13      A.     To handle all the contracts, all the

14  litigation, with some exceptions.  At the time I

15  was hired there was a general counsel and there

16  were some things that he retained.  Some

17  litigation he handled.

18      But for the most part I took over most

19  of the litigation, most if not all the contract

20  review and any legal advice to the business units,

21  employment issues.  That sort of thing.

22      Q.     When you say handled the contracts,

23  what type of contracts?

24      A.     It could be anything from a 20,000

25  lawn mowing contract to mow the yard, you know,

36

L. Nail

1
2  to act as general counsel for PPI?

3      A.    It was sometime shortly after

4  Mr. Taylor left.

5      Q.    Sometime in 2002?

6      A.    Correct.

7      Q.    How long did he stay as general

8  counsel?

9      A.    He stayed as general counsel I believe

10 through the fall of '06.  Or was it '05?

11     Q.    Try it this way.

12     A.    When did Cedar Fair buy us?

13     Q.    Cedar Fair bought in June of '06.

14     A.    OK.  June of '06, so --

15     Q.    Your employment agreement was '05.

16     A.    '05.  So Mike left before -- it would

17 have been the fall of '05.

18     Q.    When he left how did that affect your

19 position?

20     A.    I became general counsel.

21     Q.    In the fall of '05?

22     A.    Yes.

23     Q.    Did your duties at all change from the

24 point that Mr. Taylor left and when you became --

25 before you became general counsel in the fall of

40

L. Nail

1

2       point of fall of 2005.

3            A.    What do you mean by administration?

4            Q.    Well, let me ask it this way.  What

5       role did you have with respect to those employment

6       contracts?  If any.

7            A.    I don't -- well, I did not negotiate

8       them.  I did not draft them.  I think it's fair to

9       say I had just had general knowledge that those

10      individuals had contracts.

11           Q.    Do you know whether -- this was before

12      this general knowledge of the employment

13      contracts -- if this was before or after you

14      signed your employment agreement with PPI?

15           A.    This was before.

16           Q.    Before.  So these individuals would

17      have had existing contracts at the time that you

18      entered into yours?  Is that your understanding?

19           A.    Yes.

20           Q.    Do you know who was involved in the

21      drafting of those contracts for those individuals

22      that you listed?

23           A.    I do not.

24           Q.    I'm going to hand you what was

25      previously marked as Defendant's Exhibit B, which

41

L. Nail

1
2     I believe is your contract with Paramount Parks.

3                 If I say PPI in exchange for Paramount

4     Parks will you understand?

5          A.    Yes.

6          Q.    Is this in fact your employment

7     agreement with PPI?

8          A.    I believe it is.

9          Q.    And that's your signature on the last

10    page.

11         A.    Yes, it is.

12         Q.    Is this the only employment agreement

13    that you signed with PPI?

14         A.    Yes.

15         Q.    Tell me the circumstances how you came

16    to have an agreement with PPI.  You were

17    previously at will and then you came to sign this.

18    How did that happen?

19         A.    After Mike Bartok left and Al informed

20    me that I would be promoted to general counsel, he

21    started talking about getting a contract for me.

22              MR. WEBER:  This is Al Weber?

23              THE WITNESS:  This is Al Weber.

24         A.    And over the course of time eventually

25    Al delivered this contract to me and that's how it

46

L. Nail

1

2      received it what did you do with it?

3              A.      I signed it.

4              Q.      Did you sign it that day?

5              A.      I don't remember.

6              Q.      Did you retain counsel to review it?

7              A.      No.

8              Q.      Did you discuss it with anyone?

9              A.      I may have discussed it with my wife.

10     I may have discussed it with Mike Koontz.  And I'm

11     certain I discussed it with Al Weber.

12             Q.      Let me start with Mr. Koontz.  What

13     did you discuss with respect to the agreement with

14     Mr. Koontz?

15             A.      Whether or not I should attempt to

16     negotiate it or just sign it and move on.

17             Q.      What did he say?

18             A.      Sign it and move on.

19             Q.      Did he say why?

20             A.      Because we were hot and heavy into due

21     diligence.  We were extremely busy.  He did not

22     feel like it would be in my best interest to try

23     to, you know, negotiate it.

24             Q.      So when this agreement was presented

25     to you, you were aware that the company was

47

L. Nail

potentially going to be sold?

    A.    Yes.

    Q.    And what was your level of awareness? How much did you know at the time you were given this?

    A.    I knew quite a bit.

    Q.    Did Mr. Weber say anything as a reason for presenting you with this agreement was related to that upcoming sale?

    A.    No.

    Q.    Anything else that Mr. Koontz and you discussed?

    A.    No.  It was a very short conversation.

    Q.    How about Mr. Weber, what did you discuss with Mr. Weber regarding this agreement at or about the time you received and signed it?

    A.    It was essentially the same conversation.

    Q.    Whether you should try to negotiate?

    A.    Correct.

    Q.    And he said no?

    A.    Well, no, no.  Al said, you know, do what you think you need to do.  But the inference was don't mess around.

54

L. Nail

on it.  Which is why I don't think I signed it
right away.  And then after -- my memory is I read
it a few times, I slept on it, probably the next
day came in and had those two conversations that
I've already testified with Mike and Al and then
signed it and handed it to Al.

Q.    If I understand your testimony
regarding your conversation with Mr. Koontz and
Weber regarding the agreement, you would not have
discussed particular provisions or language of the
agreement with any specificity.

Is that fair to say?

A.    No, I'm not, you know, I may have -- I
may have made a comment to Al about, you know,
there were some terms in here that, you know, that
I consider vague.

I know I had a -- if you will note,
it's not dated, and the reason why it's not dated
is because I wanted -- in my mind I was thinking
about since it was, you know, it could have been
early March that I was thinking to ask that it be
dated from, you know, the term is from March 1,
you know, rather than January 1.

Q.    And did you suggest that be changed to

58

L. Nail

1  making 150, but I'm not sure.

2

3      Q.    I direct your attention to paragraph

4  5.  I'll just read that into the record:

5          "Executive agrees to devote all

6  customary business time and attention to the

7  affairs of Paramount, except during vacation

8  periods and reasonable periods of illness or other

9  incapacity consistent with the practices of

10  Paramount for executives in comparable positions,

11  and agrees that executive services shall be

12  completely exclusive to Paramount during the term

13  hereof.  Executive further agrees to comply with

14  all applicable Paramount policies, as described in

15  the Paramount Personnel Policy Manual."

16          My question to you goes to the clause

17  with respect to "agrees that executive's services

18  shall be completely exclusive to Paramount during

19  the term hereof."

20          How did you interpret that clause with

21  respect to --

22          MR. WEBER:  Objection.  Calls for a

23      legal conclusion.

24      Q.    You can still answer.  How do you

25  interpret that clause with respect to that your

59

L. Nail

1
2   services shall be completely exclusive to
3   Paramount?  What does that mean to you?
4        A.    What that means to me is while I am
5   actively employed by Paramount Park, Inc., that I
6   am to -- my services shall be completely exclusive
7   to Paramount.
8        Q.    But you would agree with me that the
9   term of this agreement could conceivably extend
10  beyond your employment termination.
11       A.    No.
12            MR. WEBER:  Objection as to the form.
13       A.    No, I do not agree with you.
14       Q.    So you do not agree that the
15  employment term is defined to include a period of
16  time that could extend beyond your employment
17  termination without cause under this agreement?
18            MR. WEBER:  Objection as to form.
19        Rephrase it?
20            MS. KIRILA:  I can rephrase that.
21       Q.    Are you saying that the employment
22  term defined in paragraph 1(a) could be shorter
23  than December 31, 2007?
24       A.    I'm sorry, say that again?
25       Q.    Sure.  I'm trying to understand your

60

L. Nail

interpretation.  My interpretation is that this
employment term runs until December of '1, 2007
regardless of whether you have been terminated
without cause.

A.    Well, that is where I disagree with
you.

Q.    And tell me why.

A.    I think once I am terminated without
cause that this sentence does not apply.

Q.    Which sentence are you referring to?

A.    The sentence that says -- well,
actually, the entire paragraph 5.  It does not
apply once I am terminated without cause and I am
notified my services are no longer needed by PPI.

Q.    And I'm trying to get just your
general understanding as to whether you would
agree with me that the employment term as defined
herein could extend beyond your termination
without cause by this agreement.

MR. WEBER:  Objection, asked and
answered.

Q.    You can answer again.

A.    I don't agree with you.

Q.    OK.  So you believe that the

65

L. Nail

1

2     A.    I believe number 10 would continue.

3           I do not know about 11.  If 11 is a

4 noncompete, I'm not sure that its legally

5 enforceable.

6     Q.    Aside from the legal enforceability of

7 that, do you have an opinion of whether or not

8 that obligation would continue post your

9 termination without cause?

10         MR. WEBER:  Objection.

11     A.    Yes.

12         MR. WEBER:  Calls for legal

13 conclusion.  You may answer.

14     Q.    What is that?

15     A.    My opinion is that this does not apply

16 posttermination with cause.

17     Q.    Why is that?

18         MR. WEBER:  Without cause?

19         THE WITNESS:  Without cause.

20     Q.    Why is that your opinion?

21     A.    Because it doesn't make sense.  When

22 you read the contract as a whole and you consider

23 the intent of the entire contract, and especially

24 the paragraph 7(c), it doesn't make sense.

25     Q.    And you've already testified you

66

                              L. Nail

1

2    weren't involved in the drafting of this

3    agreement, correct?

4        A.    That's correct.  I did not draft this

5    document.  I did not have any input into this

6    document.

7        Q.    Let's look at 11.  Would you agree

8    with me that it states in capital letters or

9    capitalized, "Employment Term," in that paragraph?

10   Do you see that?

11       A.    Yes, I do.

12       Q.    With you agree with me that that's

13   defined in this agreement to run until

14   December 31, 2007?

15       A.    I would agree with you that that is,

16   yes, that's a defined term that is explained or

17   set forth in paragraph 1(a).

18       Q.    The other part of that 11, "Executive

19   will not engage in any other occupation," is it

20   your position that that just doesn't apply

21   posttermination without cause or -- explain to me.

22       A.    Yes.

23       Q.    Just because you think it doesn't make

24   sense in the whole scheme of the contract.

25       A.    When you read the entire contract, the

67

L. Nail

context of the entire contract, especially the

"termination without clause" paragraph, it would

not seem -- it defies common sense, but it also is

vague.  That paragraph in and of itself is vague.

Q.    Paragraph 11?

A.    Yes.

Q.    In what way is paragraph 11 vague?

A.    "Will not engage in any other

occupation."  Does it mean any occupation at all

or is it an and/or?

Q.    Well, it says "any other occupation."

A.    I read that as being somewhat vague as

to meaning any other occupation in the leisure

theme park, motion picture, television or

entertainment business except for Paramount

pursuant to this agreement.

Q.    Mr. Nail, you are an attorney,

correct?

A.    Yes.

MR. WEBER:  Objection.

Q.    With a background in employment law.

A.    That is correct.

Q.    Are you familiar with the purpose of

the use of the word "or" in the drafting of

69

L. Nail

1

2              Probably 13(a), 13(b), (c).

3              I'm not sure about 14.

4              15 is legalese.

5              16 is just a notice provision.

6         Q.    OK, let me direct you back to

7    paragraph 5.

8         A.    Can we take a break?

9              MS. KIRILA:  We sure can.

10             (A recess was taken from 5:04 p.m. to

11             5:14 p.m.)

12   BY MS. KIRILA:

13        Q.    Let's go back to your employment

14   agreement at paragraph 5.  And I understand your

15   interpretation is that this exclusive services

16   provision that I'll call it didn't apply to you

17   after you were terminated without cause; is that

18   correct?  Your interpretation?

19        A.    Well, I think you have to read it in

20   context with paragraph 7.  In other words, let's

21   cut to the chase, if PPI called me after

22   termination without cause and said, Lester, we

23   have something we want you to do, pursuant to

24   paragraph 7(c), then, you know, paragraph 5 may

25   apply during that, but I don't think you can cut

70

L. Nail

1  and paste.

2          I think that the primary obligation is

3  to be ready, willing and able to perform services

4  for PPI when they call and say, Lester, we got

5  something we want you to do.

6          At that moment I have a choice.  I

7  have a decision.  I can say, Nope, not going to do

8  it.  And they can say, Fine.  We're not going to

9  pay you anymore.  You've just violated 7(c).  Or I

10  can say, You betcha.  I'd love to help you.  Tell

11  me what to do.  And I have complied with paragraph

12  7(c).

13          Q.    You'd would agree with me that

14  Paramount had the right under this contract to

15  terminate you without cause.

16          A.    Yes.

17          Q.    At any time.

18          A.    Yes.

19          Q.    And you'd agree with me that they had

20  a right under that 7(c) to call you back, or at

21  least contact you if they wanted you to perform

22  services as you just testified about.

23          A.    I'm sorry, say that again.

24          Q.    Would they have a right to call you

71

L. Nail

1
2   back after your termination without cause to
3   see --
4         MR. WEBER:  I just want to make a
5         clarification of the term "call you back."
6         Q.    Would you agree with me, and let me
7   just restate the question, that after you were
8   terminated without cause under this agreement that
9   PPI would have the right to use your services as
10  long as you were getting paid under that 7(c)?
11        A.    PPI would have the right to call me
12  and request that I perform services for PPI.
13        Q.    OK.  As you said, if you said no, then
14  they would have the right to stop paying you and
15  providing benefits.
16        A.    Yes.
17        Q.    Back to paragraph 5, just as this
18  would apply, and I understand your interpretation,
19  let's just say before you were terminated without
20  cause, how would you interpret this clause that
21  executive services shall be completely exclusive
22  to Paramount?  What does that mean to you?
23        MR. WEBER:  Objection.  Calls for a
24        legal conclusion and asked and answered.
25        A.    Before termination --

91

L. Nail

1
2  assumption was.

3       Q.    And at some point you were asked to
4  stay past the closing, correct?

5       A.    Well, here's what happened.

6       Q.    Tell me about it.

7       A.    The day of closing Al, early in the
8  day Al called us, all the VPs who had contracts
9  into the office, or I'm assuming all the ones who
10 had contracts, into the conference room and said
11 that he had just talked to Mr. Kinzel and
12 Mr. Kinzel said that effective immediately
13 everyone was on administrative leave, whatever
14 that means, and then he turned and looked at me,
15 "except for you."  And "Dick wants you to stay.
16 You're not on leave."

17      Q.    Anything else said in that
18 conversation with Al Weber other than what you
19 just said?

20      A.    I recall, I recall asking Al, you
21 know, What am I supposed to do?  And he had he
22 didn't know, but he was sure someone from Cedar
23 Fair would be in touch with me shortly.

24      Q.    Is that the first you learned that you
25 would be staying on at least for some time after

92

L. Nail

1    the closing?

2    A.    Correct.

3    Q.    Did someone from Cedar Fair follow up?

4    A.    Yes.

5    Q.    Who was that?

6    A.    I believe it was Mr. Freeman.

7    Q.    What do you recall with respect to any
8    conversations or communications regarding what
9    would happen with your position at that point?

10    A.    Oh, I don't recall anything was said
11    about what would happen with my position.

12    Q.    When did you first learn that the
13    termination without cause provisions under your
14    employment contract were being triggered?

15    A.    I guess when I received the letter
16    from Mr. Kinzel.

17    Q.    So you don't recall any previous
18    conversations with Mr. Freeman regarding what was
19    going to happen or not happen?

20    A.    Well, yes.  I remember -- yes.  I
21    mean, let me just take you through the scenario.

22    Q.    Sure.

23    A.    After all the other execs left and I
24    was there, I'm sure I received a phone call from

93

L. Nail

1
2    Mr. Freeman and we, you know, it became very clear
3    to me, you know, probably through his direction
4    that my role was to, as he said earlier, be the
5    person in charge of the corporate office.

6            And, you know, we would go through the
7    litigation.  We would go through the contracts.
8    We would go through the basically the layoffs in
9    the corporate office.

10            And I can't remember if he asked me to
11   participate or I volunteered to participate, but I
12   certainly agreed to participate in those layoffs,
13   telling the individuals, and I know that's when
14   Craig came down several times and he and I would
15   call the people in and inform them that they were
16   being laid off and here was a severance package
17   and try to answer their questions.

18            As time went by, either over the
19   phone, you know, there were contract issues.
20   There were issues over what contracts Cedar Fair
21   could terminate immediately versus what couldn't
22   be and what had successors clauses.  Just a myriad
23   of things over the course of several weeks.

24            There did come a point in time where I
25   literally had nothing to do.  I mean, absolutely

94

L. Nail

1  literally there was nothing to do.

2          And I know I called Craig and asked

3  him, you know, Craig, there's nothing to do.  Can

4  I be on administrative leave or can I just go

5  home?  I can be back at the office in 20 minutes.

6  It's really pointless for me just to come sit in

7  the office.

8          And he agreed or at least tentatively

9  agreed, and I think it was late in the day to

10 begin with.  I'm not remembering.  But I do

11 remember immediately the next morning getting a

12 call from Mr. Freeman saying I needed to be back

13 at the corporate office.  And was this the

14 conversation where Craig said, Lester, you need to

15 go back to the corporate office because Dick

16 personally picked you to be in charge of the

17 corporate office and he will be upset if you're

18 not there.

19         And I said OK.  That's -- I

20 understand.  And I got in my car and drove to the

21 corporate office and stayed there another,

22 probably, you know, two weeks, ten days, until I

23 got the phone call from Craig saying, you know,

24 Lester, you can go home now and we'll be sending

95

L. Nail

1    you something in writing shortly.

3         Q.    But you knew there was a chance you
4    would be terminated without cause at that point.
5    Is that fair to say?

6         A.    Oh, sure.

7         Q.    Any other specifics about your
8    conversation with Mr. Freeman regarding your
9    status that you recall that you haven't told me
10   about?  Prior to getting the letter that was dated
11   July 27, 2006.

12        A.    I'm not recalling.

13        Q.    I am going to refer you to what we
14   previously marked as Exhibit C, which is the
15   July 27, 2006 notice letter.

16              Do you have that in front of you?

17        A.    Yes, the letter that says "your
18   services will no longer be needed after August 1,
19   2006"?

20        Q.    Yes.

21        A.    Yes.

22        Q.    And did you in fact receive this?

23        A.    Yes, I did.

24        Q.    Were you surprised to get this?

25        A.    No.

107

L. Nail

1  terminated without cause?

2       A.    No, I was not an employee.

3       Q.    But still under contract.

4       A.    Whatever that means.  I had an
5  employment agreement.

6       Q.    My question is, after your termination
7  without cause would you agree that you were still
8  under contract after that point?

9           MR. WEBER:  Objection, calls for legal
10          conclusion.  You can answer.

11      A.    I will agree that I had an employment
12  contract after I was terminated without cause.

13      Q.    I'm going to hand to you what has been
14  marked as Exhibits E and F in Mr. Freeman's
15  deposition.  The first one is an August 9, 2006
16  letter to you from Mr. Freeman.

17          Did you receive this letter?

18      A.    I do not have a present recollection
19  of receiving this letter.

20      Q.    So you don't know whether you received
21  it or not?

22      A.    I think I did.  I just don't remember.
23  I just don't remember seeing it.

24      Q.    And I will represent the Bates label

108

L. Nail

2    at the bottom indicates that this came from --

3          A.     From me?

4          Q.     Yes, your side.

5          A.     I mean, I'm not --

6          Q.     And I understand you may not have a

7    recollection --

8          A.     Right.

9          Q.     -- of it.

10          Do you recall whether you were

11    following up with anyone from Cedar Fair or

12    Paramount regarding this letter?

13          A.     And I don't want to rehash the same

14    conversation we had on the Exhibit C, but I had

15    multiple -- well, strike that.  I had -- I had

16    some conversations, my wife had conversations with

17    Sandy Cranford about the whole -- it's the bullet

18    point two or the second bullet point, the whole

19    insurance/COBRA issue, but we didn't specifically

20    refer to this letter in any of those

21    conversations.

22          Q.     Do you recall the time frame that you

23    first would have had discussions with Sandy?

24          A.     Yes.

25          Q.     When was that?

109

L. Nail

1

2     A.     August 2nd.

3     Q.     2006.

4     A.     Correct.  Well, no.  I'm sorry.  It

5  would have been -- well, actually my wife did have

6  a conversation with her on August 2nd.  And then I

7  had a conversation with her after that, shortly

8  after that.

9     Q.     So it would have been in this general

10  time frame.

11     A.     Correct.

12     Q.     And I believe you told me what those

13  conversations with Sandy Cranford would have

14  referred to in your benefits claims; is that

15  correct?

16     A.     Yes.

17     Q.     Anything else you would have discussed

18  with Sandy during that time frame, this August

19  2006 time frame?

20     A.     No.

21     Q.     Take a look at the other exhibit,

22  which I believe is a September 12, 2006 letter and

23  proposal.

24           Do you have that?

25     A.     Yes.  Exhibit F?

110

1          L. Nail

2          Q.    Yes.   Exhibit F.  Do you recall

3    receiving that?

4          A.    Let me look at it.  Yes, I recall

5    receiving this.

6          Q.    What was your understanding of what

7    Paramount was proposing here?

8               MR. WEBER:  Again, objection.  Calls

9          for a legal conclusion to the extent it

10         does.

11         A.    My understanding is what is set forth

12   in the September 12th, 2006 cover letter by

13   Mr. Freeman.

14         Q.    In your words what did you understand

15   this to mean?

16         A.    That Cedar Fair wanted to buy out my

17   employment agreement.

18         Q.    It says, paragraph 2, it would be (1)

19   a lump sum payment of $160,786; (2) a waiver of

20   the requirement that you be willing, ready and

21   able to render exclusive services as provided in

22   paragraph 7(c) of the employment agreement to

23   recover the sum; and (3) modification of the

24   noncompete obligations contained in paragraph 11

25   of the employment agreement so that such

111

L. Nail

1  obligation shall end six months after the

2  termination date.

3

4      What did you understand, or if you did

5  have an understanding, of what Paramount was

6  offering to waive with respect to Item (2)?

7      A.    Well, first of all, I think this

8  supports my argument that those other paragraphs

9  we discussed do not apply, because he is only

10  referencing paragraph 7(c), which is the

11  termination for cause, the ready willing and able.

12      My understanding is they pay me this

13  lump sum and we both walk away having no other

14  obligations other than I believe there was a,

15  there may have been a continuing obligation on the

16  noncompete, but I'm not sure because I have not

17  read this document in a very long time.

18      Q.    If you look at the third paragraph of

19  this letter, the sentence that states, "In

20  particular, by offering to waive the, quote,

21  willing, ready, and able, quote, requirement, PPI

22  is offering to both pay you a significant sum and

23  allow you to seek employment without affecting

24  that sum."

25      A.    Right, that's what it says.

112

L. Nail

Q.     Did you understand that PPI was interpreting your agreement to mean that you could not be employed while receiving continuing payments under the agreement?

A.     I'm sorry.  Repeat the question?

Q.     Sure.  Even if you did form an impression, did you have an understanding of what PPI was saying to you in that sentence that I just read?

A.     No, I do not know -- I am not able to form an opinion of what was in PPI's head when they wrote these words.

Q.     Sure, and that's fair.  I guess I am asking you, did you see that and say, Oh, that interpretation is different than my interpretation?

Do you remember thinking that?

A.     No.  I do not remember -- as you've stated it that's not what I remember.

Q.     What do you remember, if anything?

A.     I don't really remember a whole lot about it because I remember receiving the letter and frankly setting it aside.

Q.     Why did you set it aside?

114

L. Nail

1  ever dug it back out and looked at it again.

2  

3      Q.    Did you engage an attorney to review

4  the proposal?

5      A.    I called -- yes, I engaged an

6  attorney. I don't think I sent him this document.

7  I may have discussed it with him --  well, I'm

8  sure I discussed it with him, but, and that's as

9  far as I think I should go with that.

10      Q.    Sure. What attorney did you engage?

11      A.    At this time it was Larry Levine.

12      Q.    But you did not have him respond on

13  your behalf to this?

14      A.    No. Or if he did, I did not authorize

15  it to my memory.

16      Q.    At this time when you received this

17  letter in September 2006, did you have plans at

18  that time to seek alternative employment?

19      A.    Yes.

20      Q.    What were your plans at that point?

21      A.    To look for a job.

22      Q.    Had you started looking at that point?

23      A.    This is in September? I'm sure the

24  answer is yes. I can't pinpoint a specific date,

25  you know, I mean, you know, did I get on

115

L. Nail

1
2  monster.com and look for jobs?  Did I, you know,
3  start talking to people about jobs?  You know,
4  yes.  During this time frame I was, I'm sure I was
5  actively starting the process of looking.
6       Q.    Do you recall where you interviewed
7  other than eventually at Denny's?
8       A.    Yes.
9            MR. WEBER:  Objection as to relevancy.
10      A.    Yes.
11      Q.    You can still answer unless your
12 counsel instructs you not to.
13      A.    Well, I am waiting for you to ask me
14 who.
15      Q.    OK, who?
16      A.    I interviewed at Lowe's Home
17 Improvement.
18      Q.    Anybody else?
19      A.    I had some telephone interviews with
20 recruiters, headhunters.  I had one face-to-face
21 interview with a recruiter.  That's all I can
22 remember right now.
23      Q.    Were you offered a position at Lowe's?
24      A.    No.
25      Q.    Were you offered a position anywhere

116

L. Nail

1   other than Denny's?

2       A.    No.  Well, I take that back.  I had an

3   outstanding offer to open my own practice in a

4   legal aid type setting.  Actually, it was to

5   create a legal aid office, which is why I was in

6   the process of applying for my North Carolina law

7   license.

8       Q.    Did you ever obtain that?

9       A.    No.

10      Q.    What happened with the legal aid

11  position?

12      A.    It never came about or I never pursued

13  it beyond just the talking stage.

14      Q.    Why not?

15      A.    Because the job at Denny's became

16  available.

17      Q.    Do you recall how many applications

18  you submitted for different legal positions?

19      A.    The only application I remember is the

20  Lowe's application.  But I, you know, well, that's

21  the only application I remember filling out.

22      Q.    And you had one at Denny's?

23      A.    Oh, yeah, yeah, yeah, sure, of course,

24  one at Denny's.

117

L. Nail

1

2    Q.    And following your termination without

3    cause from PPI for some point you did continue to

4    receive pay and benefits pursuant to your

5    agreement?

6    A.    Correct.

7    Q.    At what point did you feel you were no

8    longer receiving the benefits and pay after you

9    were terminated without cause?

10    A.    Well, when I received Mr. Freeman's

11    letters, you know, at some point figured out that

12    the check had been reversed or had been taken out

13    of my checking account, and I put two and two

14    together and knew at that point my pay and

15    benefits were stopped.

16    Q.    Did you have any idea why at that

17    time?

18    A.    I knew what was stated in

19    Mr. Freeman's letters.

20    Q.    Up until that point was there any

21    payment or benefit ever provided to you late

22    before you were cut off in October --

23    A.    Yes.

24    Q.    -- two thousand --

25    A.    Yes.

125

L. Nail

1

2          MR. WEBER:  It would be easier if he

3      reads it himself and saves some time.

4          MS. KIRILA:  I'll conduct the

5      deposition, thank you.

6          Q.   As I was saying, "and are, therefore,

7      no longer able to render exclusive services to

8      PPI."

9              You did not tell Paramount when you

10     did obtain employment at Denny's, correct?

11         MR. WEBER:  Asked and answered.

12         A.   Can you put a time frame on that?

13         Q.   Prior to October 19th, 2007.

14         A.   No.  Well, back up a minute.  I mean,

15     I told Jim Rein before October 19th that I was

16     employed with Denny's.

17         Q.   And that was in October of 2007?

18         A.   That's correct.

19         Q.   Why didn't you tell Paramount when you

20     did obtain a job with Denny's?

21         A.   Well, for several reasons.  Number

22     one, I had no legal duty to tell them.  There's

23     nothing in that contract that requires me to tell

24     them.

25              I have not had any communication with

126

L. Nail

anyone from PPI about my services.  It was clear
to me through the totality of the circumstances
that PPI had no intentions of using my services.

I quite frankly just didn't think
that, um, I don't know.  I wasn't thinking about
Cedar Fair when I started my employment with
Denny's.

Q.    Tell me what your conversation was
with Jim Rein.

MR. WEBER:  Asked and answered.

MS. KIRILA:  No, I didn't ask him what
his conversation was.  He said he told Jim
Rein.  I didn't ask the circumstances of
that.  I am now.

A.    Could you repeat the question?

Q.    Sure.  What were the circumstances in
which you told Jim Rein that you were employed at
Denny's?

A.    I was in the Charlotte airport.  I was
going to my gate.  Jim Rein was standing and there
was some sporting event that was on that night.
Jim Rein was standing there outside the restaurant
bar watching it.  I immediately recognized him as
Jim Rein, someone I had worked with for the entire

127

L. Nail

1  time I was at Paramount Parks.

2

3       I went up, said, hey Jim, how are you

4  doing?  We did some small talk.

5       He said, Where are you working now?

6       I said, I'm working at Denny's.

7       What are you doing?

8       I'm going to, I don't know, wherever I

9  was going.

10      And we talked about -- we probably did

11  the, you know, have you heard from so-and-so.  We

12  probably caught up with mutual people we knew and

13  then I went on to my gate.

14      Q.    So he asked you what are you doing now

15  and you told him.

16      A.    I don't recall.  I don't recall who,

17  you know, who said what.  It was a meeting of two

18  friends.

19      May I add to that?

20      Q.    Sure.

21      A.    I knew full well that Jim Rein was

22  still employed by Cedar Fair.

23      MS. KIRILA:  Mark this as Plaintiff's

24  Exhibit 2.

25      (Plaintiff's Exhibit 2, document

134

L. Nail

1  automatic deposits were rejected.  Or the

2  automatic withdrawals, or automatic payments, to

3  be specific.

4

5      Q.    I will refer you to previously marked

6  exhibit H, Defendant's.  Looking at that exhibit,

7  is that the packet of information with respect to

8  enrollment in benefits that you received with a

9  cover letter from Sandy Cranford?

10     A.    Well, this is what I had in my file.

11 Is this everything that was provided to you

12 pursuant to your request for documents?  I mean,

13 and the answer is I don't know if this is

14 everything, but this is all I had in my files.

15     Q.    The letter on the first page of that

16 exhibit is from Sandy Cranford.  In that letter is

17 a reference to -- oh, I'm sorry, it is from Craig

18 Freeman, isn't it?

19     A.    Correct.

20     Q.    There is a reference to Sandy calling.

21         Do you have a specific recollection of

22 whether Sandy Cranford in fact called with respect

23 to that enrollment process?

24     A.    You know, this may have been the call

25 that she made in that conversation we discussed at

135

L. Nail

1 the very beginning of the deposition.  I don't

2 have an immediate recollection.

3      Q.     The date of that letter is, what is

4 it?  May?

5      A.     May 21st.

6      Q.     At that point had you sold your home

7 in North Carolina yet?

8      A.     I don't -- I don't think so, but I'm

9 not sure.

10      Q.     Would you open up that exhibit to the

11 next page, after that.  Looking at the MetLife.

12            Is that your handwriting where it says

13 Lester C. Nail?

14      A.     No, it's not.

15      Q.     Whose handwriting is that?

16      A.     I believe it's my wife's.

17      Q.     So your wife completed this page?

18      A.     Yes.  I believe so.

19      Q.     It's not your handwriting?

20      A.     It is not my handwriting.

21      Q.     And the address, was that your current

22 address at the time that these forms were

23 completed by your wife or you?

24      A.     Yes, I believe it was.

136

L. Nail

1

2    Q.    And if you look at the date that these

3    forms were signed, for example, on the previous

4    page you have got a date of May 29, 2007.

5    A.    Right.

6    Q.    Is that your signature?

7    A.    No, it's not.

8    Q.    Who wrote that employee's signature

9    there?  Do you know?

10    A.    I -- I do not know.

11    Q.    Do you think your wife wrote it or do

12    you think someone else wrote your name there?

13    A.    I believe my wife signed that.

14    Q.    Did you tell her to sign your name for

15    you?

16    A.    I asked her to fill out these

17    documents.

18    Q.    As of May 29, 2007, was your current

19    address the Kirkley Court, Charlotte,

20    North Carolina address?

21    A.    I believe it was, but I'm not one

22    hundred percent sure.  I mean, we were still in

23    the house.

24    Q.    OK.  Tell me how that worked.  Because

25    you mentioned before it was complicated.  But

137

L. Nail

1    after the closing you remained in the house for a

2

3    week or two?

4        A.    My memory is when we finally decided

5    to put the house on the market we received a

6    contract almost immediately, which shocked us.  I

7    mean, literally the same day.  We got a contract

8    on the house the same day.

9            The reason why it's complicated is I

10   did not want to sell the house and I did not want

11   to move from Charlotte.  And so, you know, I was,

12   you know, the reason why I said it was complicated

13   is because there were these, you know, extra

14   issues involved.  It wasn't a simple real estate

15   transaction.

16           But once we accepted the contract, you

17   know, there was a closing date and my memory is

18   that got changed several times.  And then after

19   closing we stayed in the house, and it may not

20   have been a week.  It may have been a day or two

21   or it may have been over a weekend.  I just don't

22   remember.

23           I mean, again, this was a very

24   emotionally trying time.  I've got two little

25   girls.  They were both crying every night about

138

L. Nail

1    leaving Charlotte.  Leaving their friends, leaving

2    their school.  Like I said, so forgive me if I

3    don't, you know, you tend to blank out some of

4    that.

5         Q.    Now, you were being paid by Paramount

6    under the contract potentially through December

7    2007, correct?

8         A.    Pursuant to my, the employment

9    agreement, correct.

10        Q.    Why didn't you just wait to get a job

11   until that, those payments ran out?

12        A.    It became very clear to me that

13   getting a job was going to be extremely difficult.

14        Q.    So how did that impact your decision

15   to -- you would need more time to obtain a job?

16   So explain to me why, how that impacted your

17   decision not to stay in Charlotte longer while you

18   were receiving pay from Paramount.

19        A.    I'm sorry, I am not understanding the

20   question.

21        Q.    My question was, you were receiving

22   pay from Paramount potentially through December

23   '07.

24        A.    Uh-huh.

142

L. Nail

1  the entire suit and whether that's a

2

3  violation of the agreement or not.

4          MR. WEBER:  Is there any dispute about

5  that?

6          MS. KIRILA:  I think that's why we're

7  here.

8          MR. WEBER:  Any dispute about him

9  being employed by Denny's and when he was?

10         MS. KIRILA:  No, but I need to get

11  these into the record.

12         MR. WEBER:  OK.

13  BY MR. KIRILA:

14     Q.    You applied for -- Denny's is

15  reflected on this Exhibit 4; is that correct?

16     A.    The answer is this appears to be a job

17  application.

18     Q.    Did you complete this?

19     A.    This appears to be my handwriting.

20     Q.    Did you sign it on the last page?

21     A.    Yes, that is my signature.

22     Q.    And I believe you already testified

23  how you came to find the position at Denny's,

24  correct?  I don't remember if you did or not.

25         In a nutshell, tell me how you came to

143

L. Nail

1
2   get the position at Denny's.

3       A.    Just real quickly, I was -- in filling

4   out the application for my North Carolina bar exam

5   you have to list attorneys, two or three attorneys

6   who know you in every location you have practiced

7   law.

8           Rhonda Parish and I both worked at

9   Wal-Mart at the same time.  So I called her to get

10  her updated contact information and ask her

11  permission to use her as a reference on my

12  North Carolina bar application.

13          In the course of that conversation

14  she, you know, What are you doing?  Blah blah blah

15  blah.  And she informed me that she needed an

16  employment attorney and would I be interested.

17          And I said, you know, I don't

18  remember, recall the exact words, but one thing

19  led to another and I ended up talking to -- I

20  probably said tell me more about it.  And that's

21  when she directed me to Tim Flemming, who -- Tim

22  and I, Tim, um, had some conversations.

23      Q.    What was his position?

24      A.    Tim is general counsel of Denny's Inc.

25      Q.    OK, I'm going to go to Exhibit 7 next,

144

L. Nail

1   which appears to be your offer from Denny's; is

2   that correct?

3       A.      Yes, that's correct.

4       Q.      You signed this on February 15, 2007?

5       A.      That's what is reflected on the

6   document.

7       Q.      So the offer was base salary, you

8   would be making 175,000; is that correct?

9       A.      That's correct.

10      Q.      And that was more than under your

11  employment contract with PPI.

12      A.      I would have to look at it.  It

13  probably is.

14      Q.      We can let the document speak for

15  itself.

16      A.      Yes.

17      Q.      You also had an opportunity for annual

18  incentive at Denny's; is that correct?

19      A.      I am not sure what that means.

20      Q.      Did you get a bonus?

21      A.      Yes.

22      Q.      Was it 30 percent of your base salary?

23      A.      I don't think so.

24      Q.      Do you recall how much in bonus you

145

L. Nail

1

2    received for the year 2007?

3            MR. WEBER:   Objection as to relevancy.

4        The document speaks for itself.

5        A.    I don't remember the percentage, but I

6    don't think it was 30 percent.

7        Q.    But you did get a bonus and are

8    eligible for a bonus from Denny's.

9        A.    Yes.

10       Q.    You also received relocation

11   assistance?

12       A.    Yes.

13       Q.    And a car allowance; is that correct?

14       A.    Correct.

15       Q.    You did not get a car allowance at

16   PPI.

17       A.    No.  Well, I did not get a car

18   allowance under my agreement, but I did get a car

19   allowance prior to my agreement.

20       Q.    But under your employment agreement

21   from January 2006 forward.

22       A.    Correct.

23       Q.    Is it fair to say you would be making

24   more in compensation from Denny's than you did

25   under your employment agreement at PPI?

146

L. Nail

A.    No.

Q.    Why not?

A.    Because of the bonus.  I think PPI probably had a greater bonus potential, but I'm not sure about that.

I'm not going to sit here and do the math in my head at 7:15 after being up for -- I got up at 4:30 this morning.

MR. WEBER:  It is irrelevant anyway.

MS. KIRILA:  No, it's not irrelevant. This goes to whether or not -- your story is that he had to get another job.  He made less.

MR. WEBER:  What's the difference if he did or he didn't?  How is that relevant to anything?

MS. KIRILA:  It goes to your explanation as to why he did what he did. It's also relevant --

MR. WEBER:  You asked him the question.  He gave an explanation.  Neither is relevant.  Neither your question nor his explanation, whether he went to work then.

MS. KIRILA:  I disagree with that.

147

L. Nail

This is my deposition and this is a case of

breach of contract, misrepresentation and I

am entitled to know whether or not his

package with Denny's was enough to make him

not willing to return to PPI.  So it is

relevant.

    MR. WEBER:  Well, ask him that

question, because you haven't asked him that

question.

    MS. KIRILA:  I don't have to tell you

my legal strategy.

    MR. WEBER:  Well, none of the

questions so far are relevant.  That is my

objection.

    MR. KIRILA:  You either instruct him

not to answer --

    MR. WEBER:  It's on the record.  He

can answer all your questions.  We'll be

here tonight and tomorrow for your full

period and then we're going to proceed with

your other depositions, because we'll set

some time --

    MR. KIRILA:  Are you done?

    MR. WEBER:  -- we'll set some time for

148

L. Nail

1
2    Mr. Kinzel's deposition because we're going
3    to take his deposition and you're going to
4    have to move if you want to preclude it,
5    among others.  The deposition started at
6    3:30.  We'll continue for your seven hours.
7         MS. KIRILA:  Just for the record, the
8    deposition of Mr. Freeman lasted more than
9    five and a half hours and out of convenience
10   I'm continuing past business hours when we
11   can reconvene in the morning.
12        MR. WEBER:  And we appreciate that.  I
13   just don't understand why you're asking
14   questions that are not relevant.
15        MS. KIRILA:  Will you stop
16   interrupting my deposition?  Just because
17   you don't understand the relevance of it.
18   You either instruct him not to answer or
19   let's proceed.
20   BY MS. KIRILA:
21        Q.    You also were eligible for, let's look
22   at Exhibit Number 5.  This appears just to be an
23   employment action form regarding your hiring.
24   Let's go to -- and your first day of employment
25   for the record was February 23, 2007?

149

L. Nail

1

2      A.      Correct.

3      Q.      If you will look at Exhibit 6.  It

4  looks like it's an employee action form with

5  respect to a 2.9 percent raise that you received

6  in -- when did you receive this raise?

7      A.      I'm sorry.

8      Q.      There's a May 16, 2007 date.  Is that

9  consistent with your recollection?

10     A.      Probably.

11     Q.      There's also noted at the bottom here

12  a $10,000 special bonus.

13     A.      Uh-huh.

14     Q.      What was that for?

15     A.      I remember receiving it.  I don't -- I

16  just remember it was a bonus.

17     Q.      OK.

18     A.      I'm sorry, where do you see that?

19     Q.      It's at the bottom.  Do you see the

20  stamp date "entered May 18, 2007"?

21     A.      Oh, I see it, yes.

22     Q.      No memory of what that was for.

23     A.      You know, I don't remember if that was

24  related to the relocation or -- no, I don't

25  remember.

152

L. Nail

1

2      A.    Whatever the document reflects is what

3  it is.  I will tell you I have very little

4  immediate recollection of this.

5      Q.    But this was a document provided by

6  you as reflected by the Bates number in the

7  bottom, correct?

8      A.    I think it was probably -- no.  Well,

9  I don't know if it was me or whether it was

10  pursuant to your subpoena to Denny's.

11      Q.    I will just represent that the Bates

12  numbers with the LES were provided by your

13  counsel.

14      A.    OK, then it is what it is.

15      MS. KIRILA:  Mark this as 10.

16      (Plaintiff's Exhibit 10, document

17      headed "2007 Salaried Enrollment options,"

18      marked for identification, this date.)

19      Q.    You have been handed what has been

20  marked as Exhibit 10.  It appears to be a summary

21  of your benefit options at Denny's; is that

22  correct?

23      A.    Yes.

24      Q.    Do you know whether the employee

25  portion that you would have to pay for these

153

L. Nail

2 benefits here was more or less at Denny's versus

3 PPI?

4        A.    I have no idea.

5        Q.    You never did that calculation?

6        A.    No.

7        Q.    Would it surprise you to learn that

8 your contribution would have been more at PPI

9 under PPI benefits versus Denny's?

10        A.    I'm sorry, you're saying I would have

11 paid more?

12        Q.    For your employee portion.

13        A.    Portion.

14        Q.    Under PPI's plans versus Denny's.

15        A.    Yes, that would surprise me.

16        Q.    But you never did that analysis --

17        A.    No.

18        Q.    -- or calculation.

19        A.    No.

20        Q.    Why didn't you enroll in Denny's

21 benefits once you were eligible?

22        MR. WEBER:  Objection.

23        A.    Because I had a general -- several

24 reasons.  Number one, I had a general thought that

25 the benefits were better under the PPI.  As I just

154

L. Nail

1  said, I would be shocked to learn that the

2  employee cost was more under PPI. I wasn't sure

3  when -- and let me preface all this by saying

4  again, my wife, I have delegated benefit decisions

5  to my wife.

6        I remember having a discussion with

7  her about it and her thought was, Look, we know

8  who our doctors are under the PPI. We don't want

9  to change doctors. I had a medical condition that

10  I did not want to have to change doctors. And in

11  fact, I still intend to continue using the doctor

12  in Charlotte. The same thing with the girls.

13        So for all those reasons and probably

14  more, we decided just to leave it the way it was.

15      Q.   Did you know that you couldn't see

16  those doctors under Denny's benefits plans?

17      A.   I made an assumption.

18        The only thing I know that I looked at

19  hard was the life insurance and I know the life

20  insurance was not as good under the Denny's plan,

21  or at least I came to that conclusion. I'm not

22  sure the deductibles are equivalent either.

23      MS. KIRILA: Mark this as Exhibit 11.

24      (Plaintiff's Exhibit 11, one-page

155

L. Nail

letter dated March 12, 2007, from Nelson
Marchioli to Lester Nail, Bates No.
LES00085, marked for identification, this
date.)

A.    I would like to add one more reason.
Another reason is, quite frankly when I had to
fill these out I didn't know how long I was going
to stay at Denny's.

Q.    Why was that?

A.    Because almost, you know, shortly
after arriving there and, you know, I became --
well, became unhappy.  I was commuting three and a
half hours.  For all the other reasons we talked
about, selling the house.

And I know I had a conscious thought
of I need to keep the PPI benefits in case I
decide to stop working at Denny's.

Q.    Did you tell anyone at Denny's about
your employment agreement before you accepted the
job, your employment agreement with PPI before you
accepted the job?

A.    No.

Q.    So you didn't tell anyone at Denny's
that there was a chance you might be called back

156

L. Nail

1  
2   by your former employer?

3       A.    I didn't see a need to.

4       Q.    Why not?

5       A.    Because Rhonda and I go back a long

6   ways, back to the Wal-Mart days.  I had no idea if

7   I went to Rhonda and said, Lo and behold, didn't

8   think it would happen, but PPI called me -- by the

9   way, again, I knew PPI from the day I left the

10  corporate office, I knew PPI was not going to call

11  me to ask me to do anything.  But if per chance

12  they did, I could go to Rhonda and say, Rhonda,

13  PPI has a case that they need my help with and I

14  need to do whatever.  And there's, there was no

15  doubt in my mind if that situation came up we

16  could work it out.

17      Q.    What if PPI said, Hey, we want you to

18  come back?

19          MR. WEBER:  Hypothetical objection.

20      You may answer.

21      A.    I would have seriously considered it.

22      Q.    After you moved to South Carolina and

23  didn't have to commute anymore, did you enjoy your

24  job at Denny's from that point forward?

25      A.    No.

157

L. Nail

Q.     Why not?

A.     Denny's is in -- Denny's, you know,

well, first of all, there's some things I can't

discuss because of attorney-client privilege.

Q.     That's fine.

        MR. WEBER:  I would like to designate

this portion confidential, anything that

relates to Denny's, so he can candidly tell

you.

        Is that agreeable.

        MS. KIRILA:  That's fine, sure.


        (Page 158 has been deemed,

"Confidential" and is bound under separate

cover.)

162

1                              L. Nail

2  me finish.

3          A.     Sorry.

4          Q.     -- terminated your employment within

5  twelve months of the relocation?

6          A.     Yes, I was fully aware of that.

7          Q.     Am I safe to assume you did not have

8  any other employment prior to Denny's after

9  Paramount?

10         A.     No, I did not.  I mean, no.  I mean --

11         Q.     Did you receive any payments --

12         A.     No.

13         Q.     -- for services from anyone?

14         A.     No.

15         Q.     Did you get unemployment compensation?

16         A.     No.

17              MS. KIRILA:  Mark this as 14.

18              (Plaintiff's Exhibit 14, one-page

19  letter dated July 7, 2006, from Chuck Becker

20  to Lester Nail, Bates No. LES00236, marked

21  for identification, this date.)

22              MS. KIRILA:  And this is 15.

23              (Plaintiff's Exhibit 15, one-page

24  letter dated August 4, 2006, to Lester Nail,

25  Bates No. LES00237, marked for

Greenhouse Reporting, Inc.

(212) 279-5108                           (212)279-5108

164

L. Nail

1

2      Q.    If you look at Exhibit 17, second

3   page, is that your signature at the bottom?

4      A.    Yes.

5      Q.    And you in fact received the payments

6   in connection with this retention incentive?

7      A.    Yes.

8      Q.    Am I correct that you would have

9   received an initial payment of 50,000 in 2006 an

10  additional payment of 125,000 in 2007 from CBS?

11     A.    That sounds correct.

12     Q.    Is it fair to say that essentially you

13  just had to stay through the closing date to

14  receive that retention?

15     A.    I'm sorry?  Start over.

16     Q.    Sure.  Is it fair to say that you only

17  had to stay through the closing date and sign a

18  release in order to receive --

19     A.    I don't think so.  I think, um, and

20  I'm going to have to read the letter.  It's my

21  understanding it wasn't just staying to the day of

22  closing.  It was -- well, let's just read the

23  letter.

24     Q.    Sure.

25     A.    Yes, look in the middle of the letter:

167

L. Nail

1    accurate sitting here tonight at whatever time it

2    is.  7:45.

3           Q.    Do you need a break?

4           A.    Real quick?

5           Q.    Yes.

6                 (A recess was taken 7:43 p.m. to

7           7:57 p.m.)

8    BY MS. KIRILA:

9           Q.    Mr. Nail, you testified earlier about

10   getting a referral to Larry Levine from David

11   Thornton in your limited conversation you had with

12   David Thornton about his situation.

13                Did you have any other conversations

14   or communications with David Thornton after you

15   were terminated without cause from PPI?

16          A.    Yes.

17          Q.    What other conversations have you had

18   with him?

19          A.    We talked about cars, politics and

20   coffee.

21          Q.    How often did you talk with

22   Mr. Thornton?

23          A.    I lost contact with David in the fall

24   of, was that that fall of, um, '06, I guess.

**PAPPAS DECL.**

**EXHIBIT 5**

PLF
EXHIBIT NO. ___ DEFT ___ *B*
TRN ___ FOR ID *4-23-08*

AGREEMENT made as of the ____ day of _____, 2006, by and between Paramount Parks Inc. ("Paramount"), which is a division of CBS Corporation, and Lester C. Nail ("Executive"), whose address is 9027 Kirkley Court, Charlotte, North Carolina 28277.

<u>W I T N E S S E T H:</u>

WHEREAS, Paramount desires to secure the services of Executive as Senior Vice President / General Counsel, and Executive is willing to perform such services, upon the terms, provisions and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the promises and the mutual covenants hereinafter contained, it is agreed between Paramount and Executive as follows:

1.      (a)      The term of this Agreement shall be for the period commencing January 1, 2006 and ending December 31, 2007 (the "Employment Term"). Paramount shall employ Executive, and Executive shall accept employment as Senior Vice President / General Counsel.

2.      (a)      Paramount agrees to pay Executive, and Executive agrees to accept from Paramount for Executive's services hereunder, a base salary of One Hundred Sixty Five Thousand Dollars ($165,000) per annum payable in accordance with the regular payroll practices of Paramount. Base salary shall be payable biweekly or in such other manner as Paramount may designate for employees generally. Executive acknowledges and agrees that he is not eligible for a car allowance.

(b)      Paramount agrees Executive shall be eligible to be considered for participation in the CBS Corporation ("CBS") Short Term Incentive Plan ("STIP"), *i.e.*, Paramount's current bonus plan, or any successor plans to STIP. The target annual incentive award for Executive's position will be thirty five percent (35%) of Executive's base salary. The

1

LES00038

payment of a STIP bonus, if any, and the precise amount of such payments shall be determined on an annual basis at the sole discretion of the Board of Directors of CBS, or the appropriate committee of such Board.

(c)    Paramount agrees Executive shall be eligible to be considered for participation in the CBS Long Term Incentive Plan ("LTIP"), *i.e.*, Paramount's current stock option plan, or any successor plans to LTIP. The award of a stock option grant, if any, and the precise amount of such options that may be granted, shall be determined on an annual basis at the sole discretion of the Board of Directors of CBS, or the appropriate committee of such Board.

3.    Executive shall be included in all plans now existing or hereafter adopted for the general benefit of Paramount employees, subject to the provisions of such plans as the same may be in effect from time to time. To the extent Executive participates in any benefit plan, such participation shall be based upon Executive's base salary, unless otherwise indicated in the plan document.

4.    Executive's vacation entitlement shall be governed in accordance with Paramount policy.

5.    Executive agrees to devote all customary business time and attention to the affairs of Paramount, except during vacation periods and reasonable periods of illness or other incapacity consistent with the practices of Paramount for executives in comparable positions, and agrees that Executive's services shall be completely exclusive to Paramount during the term hereof. Executive further agrees to comply with all applicable Paramount policies, as described in the Paramount Personnel Policy Manual.

6.    (a)    Executive acknowledges receipt of the CBS Business Conduct Statement. Executive further acknowledges that Executive has read and fully understands all of the

2



requirements thereof, and acknowledges that at all times during the term hereof, Executive shall perform Executive's services hereunder in full compliance with the CBS Business Conduct Statement, and with any revisions thereof or additions thereto that are provided to Executive in writing, including without limitation any notice provisions therein (notwithstanding any notice provisions to the contrary which may be contained in paragraph 16 of this Agreement).

      (b)    Executive acknowledges that Paramount is an equal opportunity employer. Executive agrees to comply with Paramount policies regarding employment practices and with applicable Federal, state and local laws prohibiting discrimination on the basis of race, color, national origin, religion, sex, age, sexual orientation, disability, veteran's status, marital status, or height or weight.

      7.    (a)    In the event of the death of Executive, salary payments to be paid pursuant to this Agreement shall cease immediately; provided, however, in the event of death, the estate of Executive shall receive any salary due and not yet paid through the date of Executive's death.

      (b)    If, during the term of this Agreement, Paramount properly terminates the employment of Executive for Cause, which for these purposes is defined as (i) fraud, misappropriation or embezzlement on the part of Executive, (ii) Executive's willful failure to perform services hereunder or (iii) Executive's intentional breach of the provisions of paragraph 5 or of paragraph 6 hereof, or for Executive's incapacity, then Paramount shall immediately have the right to terminate this Agreement without further obligation; provided, however, that in the event of Executive's incapacity Paramount may terminate this Agreement effective only after the expiration of a period the length of which shall be determined by the Paramount Human Resources Department pursuant to the then applicable Paramount sick leave policy for Paramount exempt staff employees as though such policy were applicable to this Agreement, but

3

LES00040



in any event not less than four (4) consecutive weeks.

(c)    If, during the term of this Agreement, the employment of Executive by Paramount should be terminated by Paramount other than for Cause as defined herein or for Executive's incapacity, then Paramount shall be obligated both to pay to Executive all applicable base salary pursuant to paragraph 2(a) of this Agreement and also Paramount shall continue all applicable plans and/or benefits pursuant to paragraph 3 hereof for the remainder of the Employment Term, so long as Executive is willing, ready and able to render exclusive services hereunder during such remainder of the Employment Term. Nothing herein shall obligate Paramount to utilize Executive's services, and Paramount shall have fulfilled all of its obligations hereunder by payment to Executive of the applicable amounts set forth herein for the Employment Term of this Agreement subject to the terms of this paragraph 7(c). Notwithstanding the above, if the employment of Executive is also terminated by Paramount for Cause or by reason of disability or death, this paragraph 7(c) shall not be applicable.

8.    Paramount shall own all right, title and interest in perpetuity to the results of Executive's services and all artistic materials and intellectual properties which are, in whole or in part, created, developed or produced by Executive during the term of this Agreement and which are suggested by or related to Executive's employment hereunder or any activities to which Executive is assigned, and Executive shall not have or claim to have any right, title or interest therein of any kind or nature.  Nothing in the preceding sentence is intended to constitute a waiver of the Conflicts Policy.

9.    Executive agrees that, during the Employment Term and for one (1) year thereafter, Executive shall not, in any communications with the press or other media or any customer, client or supplier of Paramount, CBS or any of CBS's affiliated companies, criticize,

4

LES00041

ridicule or make any statement which disparages or is derogatory of Paramount, CBS, or any of CBS's affiliated companies or any of their respective directors or senior officers.

10.    Executive agrees that, during the Employment Term and for one (1) year thereafter, Executive shall not, directly or indirectly: (i) employ or solicit the employment of any person who is then or has been within six (6) months prior thereto, an employee of Paramount, CBS, or any of CBS's affiliated companies; or (ii) do any act or thing to cause, bring about, or induce any interference with, disturbance to, or interruption of any of the then-existing relationships (whether or not such relationships have been reduced to formal contracts) of Paramount, CBS, or any of CBS's affiliated companies with any customer, employee, consultant or supplier.

11.    Executive agrees that during the Employment Term, Executive will not engage in any other occupation or engage in the leisure/theme park, motion picture, television, or entertainment business, except for Paramount pursuant to this Agreement.

12.    Executive agrees that during the Employment Term or at any time thereafter, (i) Executive shall not use for any purpose other than the duly authorized business of Paramount or CBS, or disclose to any third party, any information relating to Paramount, CBS or any of its affiliated companies which is proprietary to Paramount, CBS, or any of its affiliated companies ("Confidential Information"), including any trade secret or any written (including in any electronic form) or oral communication incorporating Confidential Information in any way (except as may be required by law or in the performance of Executive's duties under this Agreement consistent with Paramount's and CBS's policies); and (ii) Executive will comply with any and all confidentiality obligations of Paramount and CBS to a third party, whether arising under a written agreement or otherwise.  Information shall not be deemed Confidential

5

LES00042

Information which (x) is or becomes generally available to the public other than as a result of a disclosure by Executive or at Executive's direction or by any other person who directly or indirectly receives such information from Executive, or (y) is or becomes available to Executive on a non-confidential basis from a source which is entitled to disclose it to Executive.

13.    (a)    Executive agrees that, during the Employment Term, for one (1) year thereafter and, if longer, during the pendency of any litigation or other proceeding, (x) Executive shall not communicate with anyone (other than Executive's own attorneys and tax advisors), except to the extent necessary in the performance of Executive's duties under this Agreement, with respect to the facts or subject matter of any pending or potential litigation, or regulatory or administrative proceeding involving Paramount, CBS or any of CBS's affiliated companies, other than any litigation or other proceeding in which Executive is a party-in-opposition, without giving prior notice to Paramount or its counsel; and (y) in the event that any other party attempts to obtain information or documents from Executive with respect to such matters, either through formal legal process such as a subpoena or by informal means such as interviews, Executive shall promptly notify Paramount or its counsel before providing any information or documents.

(b)    Executive agrees to cooperate with Paramount and its attorneys, both during and after the termination of Executive's employment, in connection with any litigation or other proceeding arising out of or relating to matters in which Executive was involved prior to the termination of Executive's employment.  Executive's cooperation shall include, without limitation, providing assistance to Paramount's counsel, experts or consultants, and providing truthful testimony in pretrial and trial or hearing proceedings.  In the event that Executive's cooperation is requested after the termination of Executive's employment, Paramount will (x) seek to minimize interruptions to Executive's schedule to the extent consistent with its interests

6

LES00043

in the matter; and (y) reimburse Executive for all reasonable and appropriate out-of-pocket expenses actually incurred by Executive in connection with such cooperation upon reasonable substantiation of such expenses.

   (c) Executive agrees that Executive will not testify voluntarily in any lawsuit or other proceeding which directly or indirectly involves Paramount, CBS or any of CBS's affiliated companies, or which may create the impression that such testimony is endorsed or approved by Paramount, CBS or any of CBS's affiliated companies, without advance notice (including the general nature of the testimony) to and, if such testimony is without subpoena or other compulsory legal process the approval of, the Executive Vice President, General Counsel of CBS.

  14. Paramount has entered into this Agreement in order to obtain the benefit of Executive's unique skills, talent, and experience.  Executive acknowledges and agrees that any violation of paragraphs 8 through 13 of this Agreement will result in irreparable damage to Paramount and CBS, and, accordingly, Paramount and CBS may obtain injunctive and other equitable relief for any breach or threatened breach of such paragraphs, in addition to any other remedies available to Paramount and CBS.

  15. This Agreement contains the entire understanding of the parties with respect to the subject matter thereof, supersedes any and all prior agreements of the parties with respect to the subject matter thereof, and cannot be changed or extended except by a writing signed by both parties hereto.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective legal representatives, executors, heirs, administrators, successors and assigns; provided, however, that Executive shall have no right to assign this Agreement or delegate Executive's obligations hereunder.  This Agreement and all matters and issues collateral thereto

7

LES00044

shall be governed by the laws of the State of New York applicable to contracts entered into and performed entirely within the State of New York, with respect to the determination of any claim, dispute or disagreement, which may arise out of the interpretation, performance or breach of this Agreement, and will be subject to enforcement and interpretation solely in the appropriate courts of the State of New York. If any provision of this Agreement, as applied to either party or to any circumstance, shall be adjudged by a court to be void or unenforceable, the same shall in no way affect any other provision of this Agreement or the validity or enforceability thereof.

16. All notices or other communications hereunder shall be given in writing and shall be deemed given if served personally or mailed by registered or certified mail, return receipt requested (in which case notice shall be deemed to have been given three (3) days from the date of mailing), to Executive at the address above indicated. In the case of Paramount, directed to: (Attn: Anthony Ambrosio, Executive Vice President Human Resources, CBS Corporation, 51 West 52nd Street, (35th Floor) New York, New York 10019), or at such other addresses as they may hereafter designate in writing.

IN WITNESS WHEREOF, the parties have executed this Agreement as of _____ ___, 2006.

Paramount Parks Inc.

By: _____

By: _____
         Lester C. Nail

8

LES00045



*Paramount Parks*

July 27, 2006

PLF
EXHIBIT NO.   C
TRN   FOR ID 4-23-08

Mr. Lester C. Nail
9027 Kirkley Court
Charlotte, North Carolina 28277

     Re:   Notice of Termination of Employment

Dear Mr. Nail:

     On June 30, 2006 (the "Closing Date"), Bombay Hook LLC and CBS Corporation finalized the transaction with Cedar Fair, L.P. and Magnum Management Corporation (the "Company"), (collectively, the "Cedar Fair Entities"), pursuant to which the Company acquired 100 percent of the outstanding shares of capital stock of Paramount Parks Inc. ("PPI") As a result, your employment agreement, effective as of January 1, 2006 ("Employment Agreement"), has become the benefit and obligation of PPI, as legal successor and/or assign.

     Please be advised that PPI has determined that your services will no longer be needed after August 1, 2006. Accordingly, this letter is your notice under your Employment Agreement that your employment is terminated without cause as of August 1, 2006, and that you will be entitled to receive, subject to applicable taxes and withholdings, and subject to any other terms of the Employment Agreement, the amounts identified in paragraph 7(c) of your Employment Agreement. PPI reminds you of both (1) your non-compete obligations under paragraph 11 of the Employment Agreement, and (2) the "willing, ready and able to render exclusive services" requirement of paragraph 7(c), and any other post-termination obligations of the Employment Agreement.

     PPI is currently considering making an alternative separation proposal to you, which would incorporate a lump sum severance payment, along with other terms in a separation agreement. You will hear from PPI in the near future should it decide to present an alternative separation proposal to you. Should you have any questions, please contact Paramount Parks Inc. c/o Craig Freeman, Cedar Fair, L.P., One Cedar Point Drive, Sandusky, Ohio 44870, (419) 627-2391.

Very truly yours,

Richard L. Kinzel
President
Paramount Parks, Inc.

LES00015



PLF
EXHIBIT NO. *E*
TRN      FOR ID
4-29-08

August 9, 2006

Mr. Lester C. Nail
9027 Kirkley Court
Charlotte, NC  28277

Dear Mr. Nail:

Due to the termination of your employment with Paramount Parks, Inc., you may have questions regarding how compensation and benefits will continue for the balance of the Employment Term under your employment agreement.  We wanted to address in this letter some issues that may be of immediate concern to you.

- You will continue to be paid on the pay cycle and in the manner that you were last paid as an active PPI employee.  For example, this Friday you will receive your final paycheck as a PPI employee and your first severance payment.  If you had previously elected direct deposit, this compensation will be processed accordingly.  This arrangement will continue for as long as you are entitled to receive post-termination compensation and/or benefits under your employment agreement.  In the unlikely event that PPI changes its payroll procedures for active employees, the pay procedures for you would follow.

- The medical and dental insurance carriers have not changed (although new ID cards are being mailed to all participants).  You may continue on the plan in which you were last enrolled as an active employee.  In order for coverage to be uninterrupted, you must elect COBRA coverage in accordance with COBRA rules.  You will be receiving enrollment information shortly.  PPI will pay the COBRA premium representing the employer's contribution, but you will continue to be responsible for any employee contribution, which will continue in the form of a deduction from your severance payments.

- In accordance with the terms of your employment agreement, your life insurance will continue pursuant to the current PPI policy for the duration of the severance period (or the "Employment Term") set forth in your employment agreement.

LES00016

Mr. Lester C. Nail
August 9, 2006
Page 2

Of course, the continuation of any of the above referenced payments or benefits are subject to any other applicable provisions of your employment agreement.

Please don't hesitate to contact me should you have additional questions.

Sincerely,

Craig J. Freeman

Cc:    Billy Clark



PLF
EXHIBIT NO. _____  E
TRN    FOR ID
4-23-00

September 12, 2006

Mr. Lester C. Nail
9027 Kirkley Court
Charlotte, North Carolina 28277

      **Re:   Employment Agreement**

Dear Lester,

      At this time, Paramount Parks Inc. ("PPI") would like to offer you a separation proposal to effectuate a mutually beneficial resolution of your employment and relationship with PPI.

      We are proposing that, in full settlement of any amounts still owed to you under the Employment Agreement or otherwise and in exchange for your signing a full separation and release agreement, PPI would provide to you: (1) a lump sum payment of $160,786.00; (2) a waiver of the requirement that you be "willing, ready and able to render exclusive services" (as provided in Paragraph 7(c) of the Employment Agreement) to recover this sum; and (3) modification of the non-compete obligations contained in paragraph 11 of the Employment Agreement so that such obligation shall end six (6) months after the Termination Date.

      I have enclosed a Separation and Release Agreement for you herein. As I believe you will conclude, this offer is more than generous under the terms of your Employment Agreement. In particular, by offering to waive the "willing, ready, and able" requirement, PPI is offering to both pay you a significant sum and allow you to seek employment without affecting that sum. Receiving this amount in one lump sum is certainly also advantageous.

      Further, under the terms of the Separation and Release Agreement, PPI would also be willing to significantly decrease its rights to enforce the non-competition provision contained in Paragraph 11 of the Employment Agreement. We believe this would be a considerable value to you.

      We look forward to hearing from you once you have had an opportunity to review the terms of the enclosed agreement.

                  Sincerely,

                  Craig Freeman

LES00021

Mr. Nail
Page 2

September 12, 2006

bcc:    Gordon Kaiser
        Jill S. Kirila

LES00022

## SEPARATION AND RELEASE AGREEMENT

This is a SEPARATION AND RELEASE AGREEMENT (the "**Agreement**") between PARAMOUNT PARKS INC. ("**PPI**") and LESTER C. NAIL, an individual ("**Mr. Nail**"), (collectively, the "**Parties**").

### RECITALS

WHEREAS, Mr. Nail has been employed by PPI and/or CBS Corporation ("**CBS**") and/or an affiliate, business unit, or predecessor of CBS (collectively, "**CBS Entities**") pursuant to an Employment Agreement commencing January 1, 2006, (the "**Employment Agreement**," a copy of which is attached hereto as Exhibit A); and

WHEREAS, as of June 30, 2006, as a result of the stock acquisition of PPI, PPI has become a subsidiary of Magnum Management Corporation, which is a wholly owned subsidiary of Cedar Fair, L.P., and, to the extent it was not already, the Employment Agreement has been assigned to and /or has become the benefit and obligation of PPI as legal successor thereto; and

WHEREAS, PPI has decided to terminate Mr. Nail's employment, effective August 1, 2006; and

WHEREAS, the Parties desire to amicably terminate the Employment Agreement through a buyout and agree to certain other terms relating to the termination of Mr. Nail's employment; and

WHEREAS, the Parties desire to set forth this negotiated Agreement to effectuate the terms of their agreement;

### AGREEMENT

NOW, THEREFORE, for the mutual consideration provided herein, the adequacy of which is hereby acknowledged, the Parties agree as follows:

1.  **Effect of Transaction.**

Mr. Nail acknowledges and agrees that on June 30, 2006 (the "**Closing Date**"), to the extent it was not already, PPI became a legal successor and PPI is entitled to enforce and has assumed obligations under the Employment Agreement as a successor and/or assign as a result of the stock acquisition of PPI (the "**Transaction**"). Mr. Nail acknowledges and agrees that as of the Closing Date, he is no longer an employee, officer, manager, member, or in any other way associated with the CBS Entities.

2.  **Termination.**

Effective August 1, 2006 (the "**Termination Date**"), Mr. Nail agrees that his employment with PPI is terminated. To the extent applicable, Mr. Nail also resigns, effective as of the Termination Date, from any and all officer and/or director positions of PPI and/or related entities, and as a member of any other boards or committees or from any other positions on or in

LES00023



which Mr. Nail served for or on behalf of PPI and/or the CBS Entities, to the extent such resignation has not already occurred as part of the Transaction. Mr. Nail agrees to cooperate in the completion of any paperwork or provision of any information necessary or requested to complete such resignations.

### 3.    Severance Payments and Other Consideration Provided to Mr. Nail.

Effective August 1, 2006, PPI will treat Mr. Nail as terminated other than for cause under paragraph 7(c) of the Employment Agreement.

PPI agrees to pay Mr. Nail a single sum of One Hundred Sixty Thousand Seven Hundred Eighty-Six Dollars ($160,786.00) less all applicable taxes and withholdings and less all amounts paid to or on behalf of Mr. Nail after September 3, 2006 pursuant to paragraph 8(c) of the Employment Agreement (except for any payment for the pay period ending September 3, 2006, which amount shall not be deducted from the above lump sum amount), to be paid to Mr. Nail within ten (10) days after the "Effective Date" (as hereafter defined). This amount does not include payment for any accrued and unused vacation or holiday pay, which the Parties agree was previously paid in Mr. Nail's final paycheck. Mr. Nail and PPI agree that Mr. Nail is no longer obligated or required to be willing, ready and able to render exclusive services to PPI. The Parties also agree that the non-compete obligations contained in paragraph 11 of the Employment Agreement will be modified in the sole respect that the Non-Compete Period shall end six (6) months after the Termination Date. The Parties acknowledge and agree that the consideration provided to Mr. Nail under the terms of this Agreement includes a buyout of any rights, payments or benefits that have or may become due to Mr. Nail under the Employee Agreement, including, but not limited to, any payments under Paragraph 7 therein or under any other company policy/plan or otherwise.

Mr. Nail acknowledges and agrees that all participation in any benefit plans or policies that continued after the Termination Date and all payments made therefore will end on the Effective Date, except that medical and dental coverage may continue thereafter pursuant to a group health plan continuation coverage COBRA election made by Mr. Nail, in accordance with COBRA's election requirements, at Mr. Nail's cost for COBRA premiums.

The Parties expressly acknowledge and agree that all payments, benefits, and obligations to or of the Parties under the Employment Agreement are hereby, except for certain continuing obligations of Mr. Nail as provided in this Agreement, terminated and forfeited, as applicable. The Parties expressly acknowledge and agree that all payments and benefits under this paragraph are conditioned upon Mr. Nail's performance of his obligations under this Agreement and will be terminated and/or forfeited, as applicable, if Mr. Nail breaches his obligations under paragraph 5 hereunder or otherwise under this Agreement. However, termination or forfeiture of these payments will not preclude PPI from seeking additional damages arising from any such breach by Mr. Nail.

### 4.    Release and Waiver of Claims.

(a)    Mr. Nail, on behalf of himself and his heirs, administrators, executors, personal representatives, and assigns, forever releases PPI, the CBS Entities, and each such

- 2 -

LES00024

entities' Related Persons (which term "**Related Persons**" includes, as applicable, affiliates and each of their successors, assigns, predecessors, directors, officers, shareholders, members, partners (both general and limited), employees, representatives, agents, counsel and insurers, and the heirs, administrators, executors, successors, and assigns of each of the foregoing, including but not limited to Cedar Fair, L.P., Magnum Management Corporation and those entities' affiliates) from, and covenants not to bring suit or otherwise institute legal proceedings against any of them arising in whole or in part from, all claims arising from events occurring prior to the execution of this Agreement that Mr. Nail now has or may have of any nature whatsoever, be they common law or statutory, legal or equitable, in contract (expressly including but not limited to foregoing any rights he may have under the Employment Agreement) or tort, including but not limited to claims arising out of Mr. Nail's employment with the CBS Entities and/or PPI and/or the termination of that employment or Employment Agreement. This release includes, but is not limited to, any claim of discrimination on any basis, including race, color, national origin, religion, sex, age or handicap arising under any federal, state, or local statute, ordinance, order or law, including the Age Discrimination in Employment Act, as amended; any claim for advance notice of termination; and any claim that the Released Parties, jointly or severally, breached any contract or promise, express or implied, or any term or condition of Mr. Nail's employment; any claim for promissory estoppel arising out of Mr. Nail's employment with PPI; and any claims under any employee benefit plans or programs or arrangements, and any claims under the Employee Retirement and Income Security Act of 1974, as amended ("**ERISA**"), except as provided in paragraph 6(d); and any other issue arising out of Mr. Nail's employment with PPI and/or his resignation or separation from such employment. Mr. Nail hereby waives all rights to assert a claim for relief available under any laws, including but not limited to attorney fees, damages, reinstatement, back pay, or injunctive relief. Should Mr. Nail institute any claim released by this paragraph 4, or should any other person institute such a claim on his behalf, Mr. Nail will reimburse PPI or applicable party, as applicable, for any legal fees and expense incurred in defending such a claim.

(b)     Mr. Nail hereby represents and warrants that he has not assigned to any third party or filed with any agency or court any claim released by this paragraph 4.

5.    **Other Covenants.**

(a)     Mr. Nail agrees to abide by and reaffirms those covenants in paragraphs 8; 9; 10; 11 (as modified in this Agreement); 12; 13; and, solely to the extent they relate to paragraphs 8, 9, 10, 12 and 13, paragraph 14; and paragraph 16 of the Employment Agreement that survive the termination of the Employment Agreement or his employment thereunder, and Mr. Nail understands and agrees that such covenants run to the benefit of PPI.

(b)     Mr. Nail agrees that his confidentiality obligations contained in paragraph 12 of the Employment Agreement extend to all information shared with him in his capacity as an employee, officer, director, member, agent, or representative of the CBS Entities and/or PPI that is or was proprietary to the CBS Entities and/or PPI or their Related Persons.

(c)     Mr. Nail agrees to keep the terms of this Agreement completely confidential and not to disclose any information concerning the Agreement to anyone other than his attorneys, tax accountants, or financial advisors as is reasonably necessary, provided that, if

- 3 -

Mr. Nail makes a disclosure to any such person and such person makes a disclosure that, if made by Mr. Nail, would breach this paragraph 5(c), such disclosure will be considered to be a breach of this paragraph 5(c) by Mr. Nail.

      **(d)**    Mr. Nail agrees to refrain from any publication, oral or written, of a disparaging, defamatory, or otherwise derogatory nature pertaining to the Transaction, PPI, and/or PPI's Related Persons.

      **(e)**    Mr. Nail agrees to reasonably cooperate with PPI in the defense of any claims, demands, allegations, or other assertion of legal rights made against PPI, its Related Persons, and/or the CBS Entities by a third party and relating to events occurring prior to the execution of this Agreement of which Mr. Nail has or may have knowledge. Mr. Nail agrees that he will not communicate in any fashion with any party, including any representative thereof or legal counsel therefor, engaged in or considering legal proceedings against PPI, its Related Persons, and/or the CBS Entities other than as required by a facially valid subpoena, court order, administrative order, or other legal process requiring such communication and, further, that within 5 business days of his receipt of any such legal process will provide the at-issue entity/ies with notice thereof. Mr. Nail further agrees to reasonably cooperate with any efforts of PPI, its Related Persons, and/or the CBS Entities to quash any such legal process.

      **(f)**    Mr. Nail agrees to make himself reasonably available in person and by phone, fax, and e-mail to consult with PPI and others designated by it about matters about which he has knowledge arising from his employment with the CBS Entities and/or PPI and otherwise as PPI determines is appropriate.

      **(g)**    Mr. Nail represents and warrants that he has returned all confidential information (as defined in the Employment Agreement) and all other property, both tangible and intangible, of PPI, the CBS Entities, and such entities' Related Persons to PPI.

6.    **Miscellaneous.**

      **(a)**    The Parties agree and understand that this Agreement and all rights hereunder shall inure to the benefit of, shall be enforceable by, and shall be binding upon Mr. Nail's personal representatives, heirs executors, and administrators, and shall inure to the benefit of, shall be enforceable by, and shall be binding upon the successors and assigns of PPI. The Parties agree that this Agreement may not be assigned by Mr. Nail.

      **(b)**    Mr. Nail acknowledges and agrees that PPI is, in entering into Agreement, relying upon the representations and warranties made by Mr. Nail in this Agreement and, in the absence of those representations and warranties, would not have entered into this Agreement.

      **(c)**    All notices or communications required to be given under this Agreement shall be given in writing, by personal delivery or mail at the Parties' respective addresses as follows, or at such other address as may be designated in writing by either party:

Paramount Parks Inc.          Lester C. Nail
c/o Cedar Fair, L.P.           9027 Kirkley Court
One Cedar Point Drive        Charlotte, North Carolina 28277

- 4 -

LES00026

Sandusky, Ohio 44870
Attention: Craig Freeman

As of the Termination Date, all notices to be given under the Employment Agreement shall be sent to PPI at the above listed address.

(d)     This Agreement contains the entire agreement of the Parties about the subjects in it, and it replaces all prior contemporaneous oral or written agreements, understandings, statements, representations, and promises by either party.    Mr. Nail acknowledges and agrees that any payments made to him or his estate under this Agreement are in full settlement and discharge of any and all rights or claims which Mr. Nail or his estate may have against PPI, the CBS Entities, and/or any Related Person of such entities arising out of Mr. Nail's Employment Agreement, employment with CBS Entities and/or PPI, or the termination thereof, that he is entitled to no additional payments from PPI, the CBS Entities, or any Related Person of such entities not specifically referenced in this Agreement (other than claims against the CBS Entities for benefits, if any, to which Mr. Nail is entitled under the CBS 401(k) Plan, CBS Excess 401(k) Plan, CBS Bonus Deferred Plan, CBS Retirement Plan, CBS 2004 Long Term Management Incentive Plan, CBS Senior Executive Short Term Incentive Plan, CBS Health Plan, or the PPI group health plan), and that he has no outstanding business or other expenses reimbursable by PPI and/or the CBS Entities that have not been submitted to PPI and, accordingly, that no reimbursement is owed for such. To the extent any term in this Agreement is inconsistent with any term in the Employment Agreement, this Agreement will govern.

(e)     Each provision of this Agreement is severable.    Should any court, arbitrator, or other tribunal of competent jurisdiction declare any provision(s) of this Agreement invalid or unenforceable by reason of any rule of law or public policy, all other provisions hereof will remain in full force and effect.

(f)     The Parties hereby authorize any court, arbitrator or other tribunal of competent jurisdiction to modify any provision(s) of this Agreement held to be invalid or unenforceable to the extent necessary to permit such provision(s) to be legally enforced to the maximum extent permissible and to then enforce the provision(s) as modified.

(g)     To the extent permitted by federal law, this Agreement and any post-termination obligations under the Employment Agreement that survive herein will be governed by and construed in accordance with the laws of Ohio.

(h)     The Parties hereby acknowledge and agree that each Party had the opportunity for individual negotiation of this Agreement and that this Agreement reflects the individually negotiated agreement of the Parties.

7.     <u>**Mr. Nail's Consideration of this Agreement.**</u>

(a)     Mr. Nail agrees that no promises or agreements have been made to him except those contained in this Agreement.

(b)     Mr. Nail agrees that he has been advised to consult with an attorney before executing this Agreement. Mr. Nail has been given at least 21 calendar days after receipt of this

- 5 -

LES00027

Agreement (the "**Consideration Period**"), if he so desires, to consider this agreement before signing it. If Mr. Nail signs this Agreement, the date on which he signs the Agreement shall be the "Execution Date." If not signed and returned to PPI so that it is received no later than the end of the Consideration Period, this Agreement will not be valid. In addition, if Mr. Nail during the Consideration Period engages in conduct that would have breached the terms of this Agreement if it had been effective, the offer of this Agreement will be withdrawn and his execution of this Agreement will not be valid. In the event Mr. Nail executes and returns this Agreement prior to the end of the Consideration Period, he acknowledges that the decision to do so was voluntary and that Mr. Nail had the opportunity to consider this Agreement for the entire Consideration Period.

      (c)     The Parties agree that this Agreement will not become effective until 7 calendar days after the Execution Date and that Mr. Nail may, within 7 calendar days after the Execution Date, revoke the Agreement in its entirety by written notice to PPI. If written notice of revocation is not received by the 8th day after the execution of this Agreement by Mr. Nail, this Agreement will become effective and enforceable on that day (the "**Effective Date**").

      **Mr. Nail represents and agrees that he has fully read and understands the meaning of this Agreement and is voluntarily entering into this Agreement with the intention of giving up all claims against PPI, the CBS Entities, and any Related Person of such entities. Mr. Nail acknowledges that he is not in entering into this Agreement relying on any representations by PPI, the CBS Entities, and any Related Person of such entities concerning the meaning of any aspect of this Agreement.**

Date: _____, 2006      _____

                                         **Lester C. Nail**

                                         **PARAMOUNT PARKS INC.**

Date: _____, 2006      By: _____

                                         Name: _____

                                         Title: _____

- 6 -

**EXHIBIT A**
**TO**
**SEPARATION AND RELEASE AGREEMENT**

**EMPLOYMENT AGREEMENT COMMENCING JANUARY 1, 2006 IS ATTACHED HERETO AND MADE A PART HEREOF.**

- 7 -

LES00029





May 21, 2007

Lester Nail
9027 Kirkley Court
Charlotee, NC 28277

Dear Lester,

Effective July 1, 2007, Paramount Parks, Inc. will be changing its benefit plans. Enclosed are the relevant forms you need to complete in order to continue your coverage under the new plans. Please complete, sign and return these forms at your earliest convenience, but in no event later than May 30, 2007. You may also fax them.

Forms should be sent to:

Sandy Cranford
Carowinds
14523 Carowinds Blvd.
P.O. Box 410289
Charlotte, NC 28273
Fax: (704) 583-9133

Sandy will be contacting you early next week to review and discuss any questions you may have or she can be reached at (704) 831-4450.

Sincerely,

Craig Freeman

LES00001

## DECLARATION SECTION

Each person signing below declares that all the information given in this enrollment form is true and complete to the best of his/her knowledge and b... f.

The employee declares that he or she is actively at work on the date of this enrollment form.

**For Changes Requested After Initial Enrollment Period Expires**

I understand that if dental coverage is not elected, a waiting period may be required before I can enroll for such coverage after the initial enrollment period has expired.

**For Payroll Deduction Authorization By the Employee**

I authorize my employer to deduct the required contributions from my pay for the coverage requested in this enrollment form. This authorization applies to such coverage until I rescind it in writing.

**Fraud Warning:**

If you reside in or are applying for insurance under a policy issued in one of the following states, please read the applicable warning.

**New York** [only applies to Accident and Health Benefits (AD&D/Disability/Dental)]: Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**Florida:** Any person who knowingly and with intent to injure, defraud or deceive any insurer files a statement of claim or an application containing any false, incomplete or misleading information is guilty of a felony of the third degree.

**Massachusetts:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, and may subject such person to criminal and civil penalties.

**New Jersey:** Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

**Oklahoma:** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**Kansas, Oregon, and Vermont:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto may be guilty of insurance fraud, and may be subject to criminal and civil penalties.

**Puerto Rico:** Any person who, knowingly and with the intent to defraud, presents false information in an insurance request form, or who presents, helps or has presented, a fraudulent claim for the payment of a loss or other benefit, or presents more than one claim for the same damage or loss, will incur a felony, and upon conviction will be penalized for each violation with a fine no less than five thousand (5,000) dollars nor more than ten thousand (10,000), or imprisonment for a fixed term of three (3) years, or both penalties. If aggravated circumstances prevail, the fixed established imprisonment may be increased to a maximum of five (5) years; if attenuating circumstances prevail, it may be reduced to a minimum of two (2) years.

**Virginia and Washington:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

**All other states:**
Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or a statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which may be a crime and may subject such person to criminal and civil penalties.

**Signature(s):** The employee must sign in all cases. Each person signing below acknowledges that they have read and understand the statements and declarations made in this enrollment form.

| _Zeta C Nail_ | _Lester C Nail_ | _5/29/07_ |
|---|---|---|
| Employee Signature | Print Name | Date Signed (Mo./Day/Yr.) |

LES00002

**MetLife**
Metropolitan Life Insurance Company, New York, NY

## DENTAL ENROLLMENT/CHANGE FORM FOR Cedar Fair, L.P.

### SECTION TO BE COMPLETED BY EMPLOYER

| Name of Employer (Please Print) | | Group Report No. | Sub Division | Branch |
|---|---|---|---|---|
| Cedar Fair, L.P. | | 35244 | | |

| Employer's Street Address | City | State | Zip Code | Employee's Work Location |
|---|---|---|---|---|
| | | | | |

| Date of Hire (Mo./Day/Yr.) | Coverage Effective Date (Mo./Day/Yr.) |
|---|---|
| | |

Work Status: ☐ New Hire ☐ Active ☐ Retired ☐ Disabled  ☐ Rehire ☐ On Layoff/Leave of Absence

Hours Worked Per Week

☐ Hourly Paid ☐ Salaried  ☐ Full-Time ☐ Part-Time

☐ Original COBRA Effective Date (Mo./Day/Yr.) _____

Reason for Enrollment: ☐ New Coverage ☐ New Hire/First Time Eligible ☐ Change in Enrollment ☐ Family Status Change (not applicable to new enrollments)  Date (Mo./Day/Yr.) _____

### SECTION TO BE COMPLETED BY EMPLOYEE

| Name (print)  First  Middle  Last | Social Security No. | Date of Birth (Mo./Day/Yr.) | ☒ Male ☐ Female |
|---|---|---|---|
| Lester   C   Nail | | 03-28-60 | |

Address  Street  City  State  Zip Code
9027 Kirkley Ct Charlotte  NC  28277

Marital Status: ☐ Single ☒ Married ☐ Widowed ☐ Divorced

E-mail Address

Phone No. (include area code)

**COVERAGE REQUEST DATA:**
I have received and read a copy of my employer's current announcement of the group plan. I want to be covered under the group plan for the benefits for which I am or may become eligible, requested below.

I request the following coverage:

Coverage Options (Note: Only one of the following may be selected)

☐ Employee Only ☒ Employee + Spouse + Child(ren) ☐ Employee + One Dependent

If applying for Dependent coverage (Spouse and Child), complete section below:
Number of dependents (including spouse) __3__

| Name of Spouse (Last, First, MI) | Date of Birth | Sex (M/F) | |
|---|---|---|---|
| Nail, Lindacarol S | 3-9-58 | F | |

| Name(s) of Child(ren) (Last, First, MI) | Date of Birth | Sex (M/F) | Is child a full-time student? |
|---|---|---|---|
| Nail, | 8-9-96 | F | ☒ Yes |
| Nail, | 8-4-99 | F | ☒ Yes |
| | | | ☐ Yes |
| | | | ☐ Yes |

REDACTED

GEF02-1
ADM

**Please Retain A Copy Of The Fully-Completed Form For Your Records And Return The Original To Your Employer**

Cedar Fair, L.P. (04/07)

LES00003

Attention:  Sandy Cranford
            Carowinds
            fax (704) 583-9133


Re:  insurance forms
     Lester C. Nail

LES00004

x   x   x   Immediate TX Result Report ( May. 29. 2007 10:15AM )  x   x   x

| Date | Time | Destination | Mode | TXtime | Page | Result | User Name | File No. |
|------|------|-------------|------|--------|------|--------|-----------|----------|
| May. 29. | 10:11AM | 704-583-9133 | GSTD | 3'51" | P. | 6 OK | | 0024 |

```
#  : Batch              C  : Confidential       S  : Transfer        P  : Polling
M  : Memory             L  : Send later         4  : Forwarding      E  : ECM
D  : Standard           D  : Detail             F  : Fine            U  : Super Fine
   : Reduction          H  : Stored/D.Server                         +  : Delivery
Q  : RX Notice Req.     A  : RX Notice
```

LES00005

**Please Select One:** _____ Core Plan - 001
[X] Buy-Up Plan - 002

# Enrollment Application

**Anthem** ⊕⊗

Anthem provides administrative claims payment services only, and does not assume any financial risk or obligation with respect to claims.

Please complete in ink and return to your employer. Use extra sheets of paper if necessary. All information given should apply to this employer.
Anthem's Primary Care Physician (PCP) listings, for HMO/POS products can be obtained through www.anthem.com.

| 1. Employer Use: Employer Name and Address: | Cedar Fair, L.P. | | | | |
|---|---|---|---|---|---|
| Group # 00 33 29766 | Sub-group # | | Request Effective Date 7/1/07 | Applicant Name/Dept name | |
| Anthem use:  Plan | Health Effective Date / / | Dental Effective Date / / | Vision Effective Date / / | PCP ☐ Yes ☐ No | COB ☐ Yes ☐ No | Pre-ex (date) / / |

**2. Reason for Application**
[X] New enrollment    ☐ New hire
☐ Waiver    ☐ Retire (date) /  /
☐ Annual open enrollment    ☐ Add dependent (see section 3)
☐ COBRA
☐ Conversion
Qualifying event _____    Event date /  /

**Status Change/Event**
Event date /  /    ☐ Adoption*
☐ Marriage    ☐ Legal guardianship*
☐ Birth    ☐ Other _____
*Include legal documentation.

**Type of Coverage/Plan**

Health Coverage
☐ HMO* (not applicable to Ohio)
☐ Blue Traditional
☐ POS
☐ EPO (Ohio only)

☐ Employee only
☐ Employee + spouse
☐ Employee + child(ren)
[X] Family coverage
☐ No coverage

Dental Coverage
☐ PPO
☐ Traditional
(Indiana and Ohio only)

☐ Employee only
☐ Employee + spouse
☐ Employee + child(ren)
☐ Family coverage
☐ No coverage

Vision Coverage
☐ Vision

☐ Employee only
☐ Employee + spouse
☐ Employee + child(ren)
☐ Family coverage
☐ No coverage

**5. Employee Information** *Only complete Primary Care Physician (PCP) information if enrolling in HMO or POS products.

| Last name NAIL | First name, M.I. LESTER, C. | Date of birth 3/28/60 | Age 47 | Sex ☐M [X]F | Social Security # | ☐ Single ☐ Divorced [X] Married |
|---|---|---|---|---|---|---|
| Home address 9027 Kirkley Ct. | City Charlotte | State NC | ZIP Code 28277 | County (KY residents include Municipality) Mecklenburg | | |
| Home telephone ( 704 ) | Business telephone | | eMail Address | | | |
| Are you: Retired? ☐Yes [X]No  Disabled? ☐Yes [X]No  Hospitalized? ☐Yes [X]No | Occupation | | Full time job date | Hours working per week | Income reported by: ☐W2 ☐Other | |
| Anthem PCP name and address: Do Not Complete | | | Anthem PCP ID number: Do Not Complete | | | |

**6. Family Information** Spouse and dependents to be enrolled. (Attach a separate sheet if necessary.) *Only complete Primary Care Physician (PCP) information if enrolling in HMO or POS products.*

**1** | Last name NAIL | First name, M.I. LINDA CAROL | Relationship to applicant [X]Spouse ☐Son ☐Daughter ☐Other | Full time student? ☐Yes ☐No
Is dependent's address different than applicant's address? ☐Yes [X]No (If Yes, provide full address)

| Date of birth 3/9/58 | Sex ☐M [X]F | Social Security # | Eligible for federal income tax exemption? ☐Yes [X]No (If yes, include legal documentation) |
| | | | Court ordered health care benefits? ☐Yes [X]No (If yes, give reason) |
| | | | Currently hospitalized or disabled? ☐Yes [X]No |
| Anthem PCP name and address: Do Not Complete | | Anthem PCP ID number: Do Not Complete | New patient? ☐Yes ☐No |

**2** | Last name NAIL | First name, M.I. | Relationship to applicant ☐Spouse ☐Son ☐Daughter ☐Other | Full time student? ☐Yes ☐No
Is dependent's address different than applicant's address? ☐Yes [X]No (If Yes, provide full address)

| Date of birth 8/9/96 | Sex ☐M ☐F | Social Security # | Eligible for federal income tax exemption? ☐Yes [X]No (If yes, include legal documentation) |
| | | | Court ordered health care benefits? ☐Yes [X]No (If yes, give reason) |
| | | | Currently hospitalized or disabled? ☐Yes [X]No |
| Anthem PCP name and address: Do Not Complete | | Anthem PCP ID number: Do Not Complete | New patient? ☐Yes ☐No |

**3** | Last name NAIL | First name, M.I. | Relationship to applicant ☐Spouse ☐Son ☐Daughter ☐Other | Full time student? ☐Yes ☐No
Is dependent's address different than applicant's address? ☐Yes [X]No (If Yes, provide full address)

| Date of birth 8/4/99 | Sex ☐M ☐F | Social Security # | Eligible for federal income tax exemption? ☐Yes [X]No (If yes, include legal documentation) |
| | | | Court ordered health care benefits? ☐Yes [X]No (If yes, give reason) |
| | | | Currently hospitalized or disabled? ☐Yes [X]No |
| Anthem PCP name and address: Do Not Complete | | Anthem PCP ID number: Do Not Complete | New patient? ☐Yes ☐No |

**4** | Last name | First name, M.I. | Relationship to applicant ☐Spouse ☐Son ☐Daughter ☐Other | Full time student? ☐Yes ☐No
Is dependent's address different than applicant's address? ☐Yes ☐No (If Yes, provide full address)

| Date of birth /  / | Sex ☐M ☐F | Social Security # | Eligible for federal income tax exemption? ☐Yes ☐No (If yes, include legal documentation) |
| | | | Court ordered health care benefits? ☐Yes ☐No (If yes, give reason) |
| | | | Currently hospitalized or disabled? ☐Yes ☐No |
| Anthem PCP name and address: Do Not Complete | | Anthem PCP ID number: Do Not Complete | New patient? ☐Yes ☐No |

A-77 1/05    LG-ASO

REDACTED

2

7. Other Health Coverage    *Please check one:*  ☐ YES (complete below)    ☐ NO
On the day your coverage begins, list family members, including yourself, who will be covered by any other health coverage.

N|A

| Provide name, phone number and address of the HMO or insurance company | | Policy/certificate number | Effective date / / |
|---|---|---|---|
| Policy/certificate holder's name | Social Security number - - | Date of birth / / | Relationship to applicant |

If you and / or your dependents are enrolled in Medicare Part A or Medicaid, complete the following.

| Enrollee's name(s) | Medicare/Medicaid ID # | Medicare Part A effective date / / | Medicare Part B effective date / / | ESRD onset date / / |
|---|---|---|---|---|
| N|A | | | | |

Reason for Medicare entitlement
☐ Age   ☐ Disability   ☐ ESRD & Disability   ☐ End Stage Renal Disease (ESRD)

8. Prior Health Coverage    *Please check one:*  ☒ YES (complete below)    ☐ NO

| Have you been covered by Anthem within the past two (2) years? ☐ Yes ☒ No | Dates policy in effect / / — / / |
|---|---|
| Policy/Certificate #: | |
| Have you and / or your dependents had prior coverage with another carrier(s) within the past two (2) years? ☒ Yes ☐ No | Dates policy in effect / / — / / |

Please check the type of prior coverage
☐ Employee   ☐ Employee / Spouse   ☐ Employee / Child(ren)   ☒ Employee / Spouse / Child(ren)

Termination reason:  ☐ Divorce/legal separation   ☐ Death of spouse   ☐ COBRA coverage exhausted   ☐ Employment terminated   ☐ Group plan terminated   ☐ Employee/group contribution ceased
☐ Other:

## Significant Terms, Conditions and Authorizations (TERMS)

*Please read this section carefully before signing the application.*

1. I may not assign any payment under my Anthem Blue Cross and Blue Shield administered benefit plan.
2. I authorize deduction from my wages/pension, if necessary for the required payment for the benefit for which I, or any descendants have applied.
3. I am applying for the benefit selected on this application. If I select a coverage, or combination of coverages, not available to me and / or a class for which I am not eligible, I agree that my selection(s) is hereby automatically amended to be consistent with the employer's application.
4. I understand that, to the extent permitted by law, Anthem reserves the right to accept or decline this application and that no right whatsoever is created by this application. I also understand that this coverage, if approved, may exclude coverage for pre-existing conditions.
5. I am responsible to timely notify my employer of any change that would make me or any dependent ineligible for benefits.
6. By signing this application, I agree and consent to the recording and / or monitoring of any telephone conversation between Anthem and myself.

I acknowledge that I have read the Significant Terms, Conditions and Authorizations, and I accept such provisions as a condition of enrollment. I represent that the answers given to all questions on this application are true and accurate to the best of my knowledge and I understand they are being relied on by Anthem in accepting this application. I understand that any misstatements or failure to report new medical information prior to my effective date may result in a material change to benefits or rates. Any

material misrepresentation or significant omission found in this application may result in denial of benefits or rescission or cancellation of my benefits.

Kentucky: Any person who knowingly and with intent to defraud any insurance company, health maintenance organization, self-insured plan, or other person, files an application for insurance or other form of health care coverage containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

I give this authorization for and on behalf of any eligible dependents and myself if covered by the Plan. I am acting as their agent and representative.

Your health benefit plan will be administered by one of the following companies based upon the state in which your employer is located:
In Indiana: Anthem Blue Cross and Blue Shield is the trade name of Anthem Insurance Companies, Inc.
In Kentucky: Anthem Blue Cross and Blue Shield is the trade name of Anthem Health Plans of Kentucky, Inc.
In Ohio: Anthem Blue Cross and Blue Shield is the trade name of Community Insurance Company.

*Thank you for choosing Anthem Blue Cross and Blue Shield.*

9. Read the TERMS section above carefully before signing. Please review your application for errors or omissions.
By signing this, I am indicating that I have read and understand the language in the TERMS section of this application and agree to all of its terms.

| Applicant Signature | Date 5 26 07 |
|---|---|

Please complete the waiver on the next page if you and / or any eligible dependent are not enrolling.

A-77 1/03    LG-ASO

3

# VISION SERVICE PLAN

## MEMBERSHIP ENROLLMENT FORM

*(Please print or type)*

**Name of Group**  Cedar Fair, L.P.    **Date of Enrollment**  7/1/07

**1.**

| SOCIAL SECURITY NO. | MEMBER LAST NAME | MEMBER FIRST NAME | MIDDLE INITIAL | DATE OF BIRTH MO/DAY/YEAR |
|---|---|---|---|---|
| | Nail | Lester | C | 3-28-60 |

**2.**

Do you have dependent children?  ☒ Yes  ☐ No

Do your dependent children, if over 18, attend school full time?  ☐ Yes  ☐ No

Are you enrolling your dependents in the VSP plan?  ☐ Yes  ☒ No

**3.**

Does your spouse have a vision plan?  ☐ Yes  ☒ No

If yes, who is covered?  ☐ Yourself  ☐ Spouse  ☐ Dependent

## PLEASE LIST ALL OF YOUR DEPENDENTS
## (IF FAMILY COVERAGE IS AVAILABLE AND SELECTED BY YOU)

**4.**

| LAST NAME | FIRST NAME | M.I. | DATE OF BIRTH |
|---|---|---|---|
| 2. Spouse  Nail | Lindacarol | S. | 3-9-58 |
| 3. Children (include surname if different) | | | |
| | | | |
| | | | |
| | | | |

For HR Dept. Use Only:

DIV: _____    **COVERAGE CODE:**  A   B   C

Coverage Code Key:  A = Family
B = Employee + 1
C = Employee Only

REDACTED

# Employee Action Form (EAF): New Hire

**Status: Approved**

**Hiring Manager:** Tim Flemming ⌄

View history...

## Employee Information

| Employee Social Security Number (no spaces or hyphens) | Employee Number | Assigned Unit/Dept | Work State | Process Level | Action | Effective Date This Action | Date of Birth |
|---|---|---|---|---|---|---|---|
| 241742222 | 462228 ⌄ | 8725 ⌄ | SC | 2009 | 02/23/2007 | 01/01/26 | 03-28-60 |

**Employee Last Name:** NAIL
**First Name:** LESTER
**Middle In.:** C
**Gender:** ● Male ○ Female
**Date of Hire:** 02/14/2007

**Driver's License #**
**Drug Test Required:** ○ Yes ● No

## Work Location
○ Support Center ○ Field    ○ Unit

**Home Phone:** 704-341-7883
**Office Phone:** 704-341-7883
**Mobile Phone:** 704-975-0182

**Emergency Contact:** Linda Nail
**Emergency Number:** 704-341-7883
**Paper Number/Pin:**
**Fax Number:** 704-341-7883

## EEOC
● White-WH
○ Black-BL
○ Asian or Pacific Islander-AS
○ Hispanic-HI
○ American Native-AN

## Address
**Street Address:** 6027 Kirkley Ct
**City:** Charlotte
**State:** NC
**Zip Code:** 28277

## Alignment
**Division:** S950
**Region:** S160
**Area:**

## Section A - New Hire or Old Job/Rate

○ Salaried Exempt
○ Salaried Non-Exempt
○ Hourly
○ Temporary
○ Contractor

**Rate of Pay (Annual):** $175,000.00

**Supervisor:** Tim Flemming
**Job Code:** 20LDLEA ⌄

**Job Title:** LEAD LITIGATION & EMPLOYMENT ATTORNEY

## New Hire - Complete Section A Only

### Section B - New Job/Rate
○ Salaried Exempt
○ Salaried Non-Exempt
○ Hourly
○ Temporary
○ Contractor

**Supervisor:**
**Job Code:** ⌄
**Job Title:**
**Rate of Pay (Annual):**

## Transfer
**From Unit/Dept:** State
**To Unit/Dept:** State
**% Increase**

## Termination
**Last Day Worked:**
**Reason Code:**

## Leave of Absence
○ Personal     ○ Medical
○ Military     ○ Family
○ School       ○ Workers Comp

**Start**
**Return**
**Last Day Worked:**
**Return Date:**

## Job Code/Rate of Pay Functional Requirements
☒ LAPTOP HARDWARE        ☐ FLEET (CAR)
☐ DESKTOP HARDWARE       ☐ FLASH REPORT INFORMATI
☐ PHONE CALLING CARD     ☒ CAR ALLOWANCE
☒ VOICE MAIL             ☐ OTHER
☒ AMERICAN EXPRESS CARD  ☐ NONE

## Approvals

| | Name | Date |
|---|---|---|
| Human Resources | Tania Patino | 02/16/2007 |
| 1st Level Supervisor's Name | Tim Flemming | 02/16/2007 |
| 2nd Level Supervisor's Name | | |

**Special Requests:** Please set laptop up with all proper access ASAP.

Debbie, Pay for 4 days worked via 02/28/2007.
30% annual incentive, ratio, $3510 annual car allowance, 3 weeks vacation

PLF EXHIBIT NO.
DEPT
FOR ID
TRN

ENTERED FEB 20 2007

# Employee Action Form (EAF): Other Adjustment

Status: Approved

**View history** ▾

## Hiring Manager: Rhonda Parish ▾

| Employee Social Security Number | Employee Number | Assigned Unit/Dept Work State | | Effective Date This | Date of Birth |
|---|---|---|---|---|---|
| 24174Z222 | 462231 | 9725 | SC | 03/26/060 | |
| (no spaces or hyphens) | | Process | Level | Date of | |
| | | 2009 | 05/17/2007 | Action | |

### Employee Last Name
NAIL

### First Name
LESTER

### Middle In
C

### Preferred Name
LESTER

### Gender
○ Male  ○ Female

### Date of Hire

### Driver's License #
○ Yes ● No
Drug Test Required

### Work Location
● Support Center  ○ Field
○ Unit

### Home Phone

### Office Phone
8952

### Mobile Phone

### Emergency Contact

### Emergency Number

### Fax Number

### EEOC
● White-WH
○ Black-BL
○ Asian or Pacific Islander-AS
○ Hispanic-H
○ American Native-AN

### Address
Street Address
8427 Kirksey Court

City
Charlotte

State
NC

Zip Code
28277

### Alignment
Region
$180

Area

Paper Number/Pin

From Unit/Dept State

To Unit/Dept State

Transfer

## Section A – New Hire or Old Job/Rate
● Salaried Exempt
○ Salaried Non-Exempt
○ Hourly
○ Temporary
○ Contractor

Rate of Pay (Annual)
$175,000.00

Supervisor:
Rhonda Parish

Job Code

Job Title
SR. DIR. LITIGATION & EMPLOYMENT
200RSLE ▾

### Other Adjustment– Complete Sections A, B, & Comment

#### Section B - New Job/Rate
● Salaried Exempt
○ Salaried Non-Exempt
○ Hourly
○ Temporary
○ Contractor

Rate of Pay (Annual)
$180,000.00

Supervisor:
Rhonda Parish

Job Code

Job Title
SR. DIR. LITIGATION & EMPLOYMENT
200RSLE ▾

% Increase
2.9%

## Job Code/Rate of Pay

### Leave of Absence
○ Start
○ Return
○ Medical
○ Family
○ Workers Comp

Last Day Worked

Return Date

### Termination
Last Day Worked

Reason Code

## Functional Requirements
☐ LAPTOP HARDWARE
☐ DESKTOP HARDWARE
☐ PHONE CALLING CARD
☐ VOICE MAIL
☐ AMERICAN EXPRESS CARD

☐ FLEET (CAR)
☐ FLASH REPORT INFORMATI
☐ CAR ALLOWANCE
☐ OTHER
☒ NONE

### Comments

## Approvals
Human Resources
Tania Patino

1st Level Supervisor's Name
Rhonda Parish

2nd Level Supervisor's Name

### Approvals (type)
○ Personal
○ Military
○ School

| Date | |
|---|---|
| 05/16/2007 | |
| 05/16/2007 | |

$10,000 special bonus

Special Request:

ENTERED MAY 1 8 2007

PL'F
DEF'T
EXHIBIT NO. 6
FOR ID
TRN
4/23/08

PLF      DEFT
EXHIBIT NO.
TRN      FOR ID

7

4/23/08

Mr. Lester C. Nail
9027 Kirkley Ct
Charlotte, NC  28277

February 14, 2007

Dear Lester,

We enjoyed getting reacquainted yesterday and are delighted to offer you the opportunity to join Denny's as our lead litigation and employment attorney.  Reporting to you will be the entire investigations group, in Spartanburg and the field, and the three legal assistants in Spartanburg who currently support litigation and investigations analysis.

This letter outlines the terms of our offer.

## START DATE
We look forward to what you decide.

## BASE SALARY
Your annual base salary will be $175,000.00 and will be paid to you biweekly via direct deposit.

## ANNUAL INCENTIVE
You will participate in Denny's 2007 Incentive Program.  For 2007, your target incentive will be 30% of your base salary.  Payouts depend upon the achievement of predetermined goals, which are established annually.  The program (including bonus targets and performance goals) is governed by a plan document and changes each year.

## RELOCATION
We will assist you with your relocation to the Greenville/Spartanburg area.  We provide an extremely comprehensive relocation assistance program.  Please contact Vickie Ferguson at 864-597-7439 to begin the relocation process.

## BENEFITS
You will be eligible to enroll in our group benefits program immediately.  You may enroll for medical, dental, vision, and additional life coverage at any time during your first 30 days of employment.  These coverages can be effective retroactive to your date of hire or may be deferred until 30 days after your date of hire.  You will be eligible to join the Denny's Deferred Compensation Plan, a fully vested, matched savings plan, and our 401(k) plan after six months of service.

## CAR ALLOWANCE

You will receive an annual car allowance of $3,510 paid biweekly via direct deposit. Applicable taxes will be withheld. You will, however, be reimbursed for all reasonable and documented business mileage.

## VACATION

You will be eligible for 3 weeks of vacation annually.

We have already shared the good news with the whole legal team, which has breathed a collective sigh of relief. We look forward to leadership to put us on the best footing possible as we manage claims and rebuild a first-class people function.

If these terms are acceptable, please sign one copy of this letter and return it to me. Should you have any questions about any portion of this offer, please call me directly.

Welcome to the Denny's team!

Sincerely,



**Timothy E. Flemming**

**ACKNOWLEDGED:**

Lester c Null

Feb 15, 2007

PLF
EXHIBIT
TRN
DEFT
NO.
FOR ID
8

4/23/08

**Denny's**

# Denny's 2007 Long-Term Growth Incentive Program

## Program Concept

The Compensation Committee of the Board of Directors has approved the 2007 Long-Term Growth Incentive (LTGI) Program, an incentive compensation program pursuant to and subject to the Denny's Corporation 2004 Omnibus Incentive Plan.

Under the program, participants are granted awards consisting of a target number of performance shares (which convert to and are settled in shares of Denny's stock on a one-for-one basis) and a target number of performance units (which pay out in cash based on the value of Denny's stock on the date of grant). From 0% to 200% of the target award of performance shares and performance units may be earned based on the level of achievement of certain pre-established performance criteria.

Example: Assume the participant has been awarded 1,000 performance shares and 1,000 performance units. If the fair market value of Denny's common stock on the date of grant is $4.70, the target cash award for the performance units is $4,700 (1,000 units x $4.70). Subject to the Company's achievement of the performance goals described below, the target award that would be earned if target level goals are achieved is 1,000 shares of stock and $4,700. The minimum award that could be earned is 0 shares of stock and $0, and the maximum award that could be earned is 2,000 shares of stock and $9,400.

## Eligibility

Director-level employees and above are eligible for 2007 awards.

## Performance Period

Performance shares and performance units will be earned based on Company performance during a one-year fiscal period ending December 26, 2007. Earned awards will vest according to the schedule set forth below.

## How Performance Is Measured

For the 2007 grant, the number of performance shares and performance units earned will depend on the actual results of two Company metrics: 2007 Systemwide Revenues and 2007 Cash Available to Pay Down Debt. Cash Available to Pay Down Debt is defined as Free Cash Flow plus proceeds from asset sales and re-franchisings

Each of the two 2007 performance measures has a 50% weighting and is calculated independently. Thus, if one measure is met but the other is not, there will still be some level of payout.

The actual results for the two performance metrics will be measured as soon as practicable after the last day of the performance period.

1

LES00075

The grid below shows the performance/payout relationship. Payout for performance between points is interpolated on a straight-line basis.

| Systemwide Revenues (50% Weight) | | | Cash Available to Pay Down Debt (50% Weight) | | |
|---|---|---|---|---|---|
| Performance Level | Goal ($M) | Payout as % of Target | Performance Level | Goal ($M) | Payout as % of Target |
| Outstanding | $2,504 | 200% | Outstanding | $45 | 200% |
| Target | $2,480 | 100% | Target | $30 | 100% |
| Threshold (Plan) | $2,440 | 50% | Threshold (Plan) | $15 | 50% |
| Below Threshold | < $2,440 | 0% | Below Threshold | < $15 | 0% |

## Vesting Schedule

Earned awards vest according to the following schedule:

- 15% of the earned performance shares and performance units vests on December 26, 2007
- 35% of the earned performance shares and performance units vests on December 31, 2008
- 50% of the earned performance shares and performance units vests on December 30, 2009

Participants must be employed on the vesting date in order to vest in the award (except in cases of death, disability or retirement as noted below).

Termination for cause creates an exception to the vesting rule. Such a termination results in forfeiture of any unpaid award, even if it otherwise had vested.

## Form and Timing of Payout

The portion of the award granted as performance shares will pay out in Denny's stock while the portion granted as performance units will pay out in cash. No stock or cash is transferred until the date of the payout. Payout will occur as soon as practicable after vesting, but no later than the first March 15th that occurs after vesting.

Any required tax withholding will be made first from the cash portion of the award, then from the stock portion.

LES00076

## Impact of Termination Events

The following table shows the impact of various termination events:

| Termination Event | Payout |
|---|---|
| Death | • Death during the performance period will result in the participant earning a pro rata amount of the target award, paid out as soon as administratively practicable at the end of the performance period.<br>• Death during the vesting period will result in full and accelerated vesting of earned awards, paid out as soon as administratively practicable. |
| Long-Term Disability | • Long-term disability during the performance period will result in the participant earning a pro rata amount of the award that otherwise would have been earned (e.g., at actual performance), paid out in accordance with the regular vesting and payout schedule.<br>• Long-term disability during the vesting period will result in continued vesting of earned awards as if no termination of employment had occurred, paid out in accordance with the regular vesting and payout schedule. |
| Retirement | • Retirement during the performance period will result in the participant earning a pro rata amount of the award that otherwise would have been earned (e.g., at actual performance), paid out in accordance with the regular vesting and payout schedule.<br>• Retirement during the vesting period will result in continued vesting of earned awards, as if no termination of employment had occurred, paid out in accordance with the regular vesting and payout schedule. |
| Termination for Cause | • Vested and unvested awards will be forfeited. No payout will occur even if awards had vested. |
| Other Voluntary or Involuntary Termination | • Vested, but unpaid awards will be paid out in accordance with the regular vesting and payout schedule. Unvested awards will be forfeited. |
| Change in Control | • All awards will be paid out in full at target immediately prior to the effective date of the Change in Control. |

## Impact on Other Plans

Awards are not considered pay for purposes of Denny's retirement or welfare plans.

## Stock Ownership Requirements

Participants in the plan must retain 50% of the shares delivered until separation from the Company.

## Deferral Opportunities

There will be no specific deferral opportunities under this plan.

## Financial Statements

The Company will provide electronically to all plan participants annually a copy of either its annual report to shareholders or its Annual Report on Form 10-K, which shall include the Company's audited financial statements for the Company's most recent fiscal year. Copies of the above documents are available upon request.

LES00077

# Denny's Corporation
# Stock Option Award Agreement

Lester Nail
9027 Kirkley Court
Charlotte, NC 28277

PLF
EXHIBIT NO. ___  DEFT ___
TRN    FOR ID ___

9

4/23/08

Dear Lester,

Congratulations on your selection as a participant in the Denny's stock option program. You have been granted the right to purchase from Denny's Corporation (the "Company") shares of its common stock, $.01 par value, pursuant to the provisions of the Denny's Corporation 2004 Omnibus Incentive Plan ("the Plan") and to the terms and conditions set forth in this Agreement.

Terms used in this Agreement that are defined in the Plan shall have the initial letter of the word capitalized and shall have the meanings ascribed to them in the Plan. If there is any inconsistency between the terms of this Agreement and the terms of the Plan, the Plan's terms shall supersede and replace the conflicting terms of this Agreement.

The options granted to you under this Agreement are nonqualified stock options.

## Overview of Your Stock Option

1. **Number of Options Granted:**    3,600

2. **Date of Grant:**    03/06/07

3. **Exercise Price:**    $4.61

4. **Option Term:** The Options have been granted for a period of ten (10) years from the Date of Grant (the "Option Term").

5. **Vesting and Exercise:** Options do not provide you with any rights or interests until they vest and become exercisable. Unless vesting is accelerated in accordance with the Plan or in the discretion of the Committee, the Options shall vest as shown below:

| Percentage of Option That Vests | Date on Which percentage of Option Vests, Assuming You Remain Employed On The Applicable Date |
|---|---|
| 33 1/3% | 03/06/08 |
| 33 1/3% | 03/06/09 |
| 33 1/3% | 03/06/10 |

6. **How to Exercise:** The Options hereby granted shall be exercised by (1) contacting the Company's Stock Option Coordinator (currently, Kelly Land) at (864/597-8671), (2) submitting a written notice (in the form required by the Company on the date of exercise) specifying the number of shares you then desire to purchase. Unless the exercise is through a broker-assisted "cashless exercise" (as described

1

LES00086

below) or any other cashless exercise arrangement approved by the Compensation and Incentives Committee of the Board of Directors, such written notice must be accompanied by full payment in cash, shares of stock of the Company previously acquired by you (which shares may be delivered by attestation or actual delivery of one or more certificates), or any combination thereof, for the applicable Exercise Price, plus any applicable tax withholding amount; provided, however, that if shares of stock are used for this purpose, such shares must have been held by you for at least such period of time, if any, as necessary to avoid the recognition of an expense under generally accepted accounting principles as a result of the exercise of the Options. The fair market value of the surrendered shares of stock as of the last trading day immediately prior to the exercise date shall be used in valuing and shares used in payment of the Option Price or applicable tax withholding amounts. To the extent permitted under Regulation T of the Federal Reserve Board, and subject to applicable securities laws and at the discretion of Compensation and Incentives Committee, the Option may be exercised through a broker in a so-called "cashless exercise" whereby the broker sells the Option shares and delivers cash sales proceeds to the Company in payment of the exercise price. In such case, the date of exercise shall be deemed to be the date on which notice of exercise is received by the Company and the exercise price shall be delivered to the Company on the settlement date.)

Notwithstanding the above, the Company has the authority and the right to deduct or withhold an amount sufficient to satisfy federal, state, and local taxes (including any FICA obligation) required by law to be withheld with respect to any taxable event arising as a result of the exercise of the Option. Such withholding requirement may be satisfied, in whole or in part, at the election of the Company, by withholding Option shares having a fair market value on the date of withholding equal to the minimum amount (and not any greater amount) required to be withheld for tax purposes, all in accordance with such procedures as the Committee establishes.

As soon as practicable after receipt of such written notification and payment and satisfaction of applicable tax withholding requirements, the Company shall issue or transfer to you, when applicable, the number of Shares with respect to which such Options shall be so exercised and shall deliver to you either a certificate or certificates for such shares or evidence of book entry of such Shares registered in your name.

**7. Impact of Termination of Employment:** The vesting and term of your options will change if you terminate employment during the Option Term, according to the following table (but in no event shall the term of an Option be extended beyond the original Option Term):



| Employment Event | Impact of Termination on Vesting | Exercise Period for Vested Options Following Termination (After Which the Options Shall Lapse) |
|---|---|---|
| Leave of absence < 90 days ................. | Continue vesting | No change |
| Death ........................................ | Vest fully | 1 year |
| Disability [1] ............................... | Continue vesting until lapse | 1 year |
| Retirement [2] .............................. | Continue vesting until lapse | 1 year |
| Voluntary resignation......................... | Vesting stops | 60 days |

2

LES00087

| Employment Event | Impact of Termination on Vesting | Exercise Period for Vested Options Following Termination (After Which the Options Shall Lapse) |
|---|---|---|
| Involuntary termination other than for Cause[3]………………................................ | Vesting stops | 60 days |
| Involuntary termination for Cause[3]………. | Vesting stops | None. Must exercise prior to termination |
| Involuntary termination within 24 months of a Change in Control[4]………………….. | Vest fully | 5 years |

[1] Disability means any physical or mental condition which would qualify a Participant for a disability benefit under the long-term disability plan maintained by the Company and applicable to that particular Participant.

[2] Retirement means the voluntary termination of employment from the Company or an Affiliate for any reason other than a leave of absence, death or disability on or after attainment of the age of fifty-five.

[3] Cause as a reason for a Participant's termination of employment shall have the meaning assigned such term in the employment agreement, if any, between such Participant and the Company or an Affiliate, provided, however that if there is no such employment agreement in which such term is defined, "Cause" shall mean any of the following acts by the Participant, as determined by the Board: gross neglect of duty, prolonged absence from duty without the consent of the Company, intentionally engaging in any activity that is in conflict with or adverse to the business or other interests of the Company, or willful misconduct, misfeasance or malfeasance of duty which is reasonably determined to be detrimental to the Company.

[4] Please see the definition of Change in Control in the Plan.

**8. Restrictions on Transfer and Pledge:** No right or interest in the Options may be pledged, encumbered, or hypothecated to or in favor of any party other than the Company, or shall be subject to any lien, obligation, or liability to any other party other than the Company. The Options are not assignable or transferable by you other than by will or the laws of descent and distribution or pursuant to a domestic relations order that would satisfy Section 414(p)(1)(A) of the Code if such Section applied to an Option under the Plan; provided, however, that the Committee may (but need not) permit other transfers. The Options may be exercised during your lifetime only by you or any permitted transferee.

**9. Beneficiary Designation:** You may, in the manner determined by the Committee, designate a beneficiary to exercise your rights hereunder and to receive any distribution with respect to the Options upon your death. A beneficiary, legal guardian, legal representative, or other person claiming any rights hereunder is subject to all terms and conditions of this Agreement and the Plan, and to any additional restrictions deemed necessary or appropriate by the Committee. If no beneficiary has been designated or survives you, the Options may be exercised by the legal representative of your estate, and payment shall be made to your estate. Subject to the foregoing, a beneficiary designation may be changed or revoked by you at any time provided the change or revocation is filed with the Company.

---

3

LES00088

**10. Limitation of Rights:** The Options do not confer to you any rights of a shareholder of the Company unless and until Shares are in fact issued in connection with the exercise of the Options. Nothing in this Agreement shall interfere with or limit in any way the right of the Company to terminate your service at any time, nor confer upon you any right to continue in the service of the Company.

**11. Covenants:** Without the prior written consent of the Company, which may be granted or withheld in the Company's sole and absolute discretion, during the term of your employment with the Company, and for a period of twelve (12) calendar months thereafter, you hereby agree that you shall not, directly or indirectly:

a) **Disclosure of Information.** Use, attempt to use, disclose, or otherwise make known to any person (other than in the course of employment with the Company or any Subsidiaries or Affiliate thereof) any knowledge or information of a confidential or proprietary nature (including all unpublished matters) relating to, without limitation, the business, strategy, plans, properties, accounting, books and records, trade secrets, or memoranda of the Company or its Affiliates.

(b) **Solicitation.** Whether for your own account or for the account of any other Person, solicit, employ, or retain (or arrange to have any other Person to solicit, employ, or retain) or otherwise participate in the employment or retention of any individual who is or has been within one (1) year an employee or consultant of the Company or any of its Subsidiaries.

**12. Requirements of Law:** The granting of Options and the issuance of Shares under the Plan shall be subject to all applicable laws, rules, and regulations, and to such approvals by any governmental agencies or national securities exchanges as may be required.

**13. Restrictions on Issuance of Shares:** If at any time the Committee shall determine in its discretion, that registration, listing or qualification of the Shares covered by the Options upon any Exchange or under any foreign, federal, or local law or practice, or the consent or approval of any governmental regulatory body, is necessary or desirable as a condition to the exercise of the Options, the Options may not be exercised in whole or in part unless and until such registration, listing, qualification, consent or approval shall have been effected or obtained free of any conditions not acceptable to the Committee.

**14. Applicable Laws and Consent to Jurisdiction:** The validity, construction, interpretation, and enforceability of this Agreement shall be determined and governed by the laws of the state of Delaware without giving effect to the principles of conflicts of law. For the purpose of litigating any dispute that arises under this Agreement, the parties hereby consent to exclusive jurisdiction and agree that such litigation shall be conducted in the federal or state courts of the state of Delaware, county of New Castle.

**15. Financial Statements:** The Company will provide to you annually a copy of either its annual report to shareholders or its Annual Report on Form 10-K, which shall include the Company's audited financial statements for the Company's most recent fiscal year.

**16. Successors:** This Agreement shall be binding upon any successor of the Company, in accordance with the terms of this Agreement and the Plan.

**17. Plan Controls:** The terms contained in the Plan are incorporated into and made a part of this Agreement and this Agreement shall be governed by and construed in accordance with the Plan. In the event of any actual or alleged conflict between the provisions of the Plan and the provisions of this Agreement, the provisions of the Plan shall be controlling and determinative.

LES00089



**18. Severability:** If any one or more of the provision contained in the Agreement is invalid, illegal or unenforceable, the other provision of this Agreement will be construed and enforced as if the invalid, illegal or unenforceable provision had never been included.

**19. Notice:** Notices and communications under this Agreement must be in writing and either personally delivered or sent by registered or certified United States mail, return receipt requested, postage prepaid. Notices to the Company must be addressed to:

Denny's Corporation
203 East Main Street
Spartanburg, South Carolina 29319-0001
Attn: Secretary

or any other address designated by the Company in a written notice to you. Notices to you will be directed to your address then currently on file with the Company, or at any other address given by you in a written notice to the Company.

Please refer any questions you may have regarding your stock options to the Stock Option Coordinator (currently, Kelly Land) of the Legal Department at (864/597-8671). Once again, congratulations on receipt of your stock option.

Sincerely,

Denny's Corporation
Rhonda J. Parish
Executive Vice President, Chief Legal Officer
and Secretary


Please acknowledge your agreement to participate in the Plan and this Agreement, and to abide by all of the governing terms and provisions, by signing the following representation:

**Agreement to Participate**

By signing a copy of this Agreement and returning it to the Stock Option Coordinator of the Legal Department of Denny's Corporation, I acknowledge that I have read the Plan, and that I fully understand all of my rights under the Plan, as well as all of the terms and conditions which may limit my eligibility to exercise this Option.


_____
Participant

5

LES00090

203 East Main Street, Spartanburg, SC 29319
864-597-8000

# Denny's

REDACTED

*Performance Share and Performance Unit
Award Certificate*

**Denny's Corporation**
ID: 13-3487402
203 East Main Street
Spartanburg, SC 29319

Lester Nail
9027 Kirkley Court
Charlotte, NC 28277

You have been awarded performance shares and performance units under the 2007 Long-Term Growth Incentive Program pursuant to the Denny's Corporation 2004 Omnibus Incentive Plan which provides you the opportunity to receive shares of Denny's Corporation $.01 par value common stock and cash at a future time under the terms indicated below:

**Effective Date of Awards:**  03/06/07

**Number of Performance Shares Awarded:**  3,600

**Number of Performance Units Awarded:**  3,600   ( $16,600 )

No right or interest in these awards may be pledged, encumbered, or hypothecated to or in favor of any party other than Denny's Corporation (the "Company"), or shall be subject to any lien, obligation, or liability to any party other than the Company. This award is not assignable or transferable by you other than by will or the laws of descent and distribution.

This award is governed by the terms of the 2007 Long-Term Growth Incentive Program and the Denny's Corporation 2004 Omnibus Incentive Plan, both of which are attached to this award certificate for your reference.

_____
For Denny's Corporation

_____
Date

"Great Food and Great Service by Great People... Every Time!"

LES00091

PLF DEFT **10**
EXHIBIT NO.
TRN FOR ID  4/23/08

## 2007 SALARIED ENROLLMENT OPTIONS

### 1. Medical Plan Options

| | Emp Only | Emp + 1 | Emp + 2 or more |
|---|---|---|---|
| ☐ $500 deductible - Aetna PPO Nationwide | $70.81 | $149.47 | $256.80 |
| ☐ $1500 deductible - Aetna PPO Nationwide | $47.76 | $103.33 | $187.62 |
| ☐ $150 deductible (limited coverage) | $34.93 | $77.65 | $149.11 |
| ☐ Blue Choice - SC (HMO #126) | $67.37 | $164.22 | $285.25 |
| ☐ No Medical Coverage | $0.00 | $0.00 | $0.00 |

### 2. Dental Plan Options

| | Emp Only | Emp + 1 | Emp + 2 or more |
|---|---|---|---|
| ☐ $25 deductible (full coverage) | $9.42 | $19.58 | $40.34 |
| ☐ $50 deductible (basic coverage) | $4.48 | $10.24 | $20.99 |
| No dental coverage | $0.00 | $0.00 | $0.00 |

### 3. Vision Plan Options

| | Emp Only | Emp + 1 | Emp + 2 or more |
|---|---|---|---|
| ☐ Vision coverage | $3.62 | $5.25 | $9.42 |
| No vision coverage | $0.00 | $0.00 | $0.00 |

### 4. Employee Life Insurance Plan

| | | Costs |
|---|---|---|
| A. Company paid: 1 x base pay | ( ) | $0.00 |
| B. Additional 1 x base pay | ( ) | $0.81 |
| C. Additonal 2 x base pay | ( ) | $1.67 |
| D. Additonal 3 x base pay | ( ) | $2.48 |
| E. Additonal 4 x base pay | ( ) | $3.29 |
| No additional coverage | ( ) | $0.00 |

### 5. Spousal Life Insurance Plan

| | | Costs |
|---|---|---|
| A. $20,000 of coverage | ( ) | $1.11 |
| B. $40,000 of coverage | ( ) | $2.22 |
| C. $60,000 of coverage | ( ) | $3.32 |
| D. $80,000 of coverage | ( ) | $4.43 |
| E. $100,000 of coverage | ( ) | $5.54 |
| No spousal life coverage | ( ) | $0.00 |

### 6. Children Life Insurance Plan

| | | Costs |
|---|---|---|
| A. $5,000 - each child | ( ) | $0.34 |
| B. $10,000 - each child | ( ) | $0.70 |
| No children's life coverage | ( ) | $0.00 |

### 7. Long Term Disability Plan

| | | Costs |
|---|---|---|
| A. Basic Coverage (50% of base pay) | ( ) | $1.72 |
| B. Supplemental Coverage (60% of base pay) | ( ) | $5.03 |

### 8. Personal Accident Insurance Plan

| | | Emp Only | | Emp & Fam |
|---|---|---|---|---|
| A. $25,000 | ( ) | $0.17 | ) | $0.29 |
| B. $50,000 | ( ) | $0.35 | ) | $0.58 |
| C. $100,000 | ( ) | $0.69 | ) | $1.15 |
| D. $150,000 | ( ) | $1.04 | ) | $1.73 |
| E. $250,000 | ( ) | $1.73 | ) | $2.89 |
| No personal accident coverage | ( ) | $0.00 | ) | $0.00 |

