LITTLER MENDELSON, P.C.
A. Michael Weber (AW-8760)
Michael P. Pappas (MP-6716)
885 Third Avenue
New York, New York 10022
(212) 583-9600

Attorneys for Defendant
 Lester Nail

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

PARAMOUNT PARKS, INC.,

                    Plaintiff,

          -against-                              Case No. 07 Civ. 10595 (SHS) (MJD)

LESTER NAIL,

                    Defendant.
_____


**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF CROSS-MOTION
FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

PAGE

INTRODUCTION ........................................................................................... 1

NATURE OF CLAIMS AND SUMMARY OF RELEVANT FACTS ....................................... 1

SUMMARY OF ARGUMENT .......................................................................... 4

ARGUMENT ............................................................................................... 6

    I.    PPI CANNOT ESTABLISH A BREACH BY MR. NAIL ................................. 6

        A.    PPI Cannot Establish a Failure of Due Performance By Mr. Nail............ 6

        B.    PPI Cannot Establish An Anticipatory Repudiation By Mr. Nail ............ 7

        C.    PPI's Interpretation of Section 7(c) Would Impose Additional Obligations That Were Not Bargained For .............................................. 13

        D.    The Purported Non-Competition Obligations in Sections 5 and 11 of the Agreement Are Inapplicable and Unenforceable ......................... 14

            (1)    Sections 5 and 11 of the Agreement Are Inapplicable Here........ 15

            (2)    Even If Section 5 and 11 of the Agreement Are Deemed Post-Employment Restrictive Covenants, They Are Unenforceable .......................................................................... 18

    II.    THE GOOD FAITH AND FAIR DEALING CLAIM SHOULD BE DISMISSED ........................................................................................ 22

    III.    PPI's TORT CLAIMS SHOULD BE DISMISSED ........................................... 22

    IV.    PPS's ATTEMPT TO SMEAR MR. NAIL, ALTHOUGH HAVING NO RELEVANCE TO THE MERITS, IS WITHOUT FOUNDATION................... 23

CONCLUSION............................................................................................ 25

TABLE OF AUTHORITIES

PAGE(S)

*Adelaide Productions, Inc. v. BKN Int'l, A.G.*, 38 A.D.3d 221, 834 N.Y.S.2d 3 (1st Dep't 2007) ............................................................................................ 23

*Broder v. Cablevision Sys. Corp.*, 418 F.3d 187 (2d Cir. 2005) .......................... 22

*Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp.*, 42 N.Y.2d 496, 398 N.Y.S.2d 1004 (1977) .......................................................................................... 19

*Command Cinema Corp. v. VCA Labs, Inc.*, 464 F. Supp.2d 191 (S.D.N.Y. 2006) ................. 13

*Computer Possibilities Unltd., Inc. v. Mobil Oil Corp.*, 301 A.D.2d 70, 747 N.Y.S.2d 468 (1st Dep't 2002), *app. denied*, 100 N.Y.2d 504, 762 N.Y.S.2d 874 (2003) ............................................................................................................ 8

*Cooper, Baumdo, Hecht & Longworth, LLP v. Kuczinski*, 14 A.D.3d 644, 789 N.Y.S.2d 508 (2d Dep't 2005) .............................................................................. 23

*Cruden v. Bank of N.Y.*, 957 F.2d 961 (2d Cir. 1992) ....................................... 13

*Emanuel Law Outlines v. Multi-State Legal Studies, Inc.*, 899 F. Supp. 1081 (S.D.N.Y. 1995) ................................................................................................... 8

*Food Lion v. Capital Cities/ABC, Inc.*, 194 F.3d 505 (4th Cir. 1999) ................. 11

*Gardiner Int'l, Inc. v. J.W. Townsend & Assocs., Inc.*, 13 A.D.3d 246, 788 N.Y.S.2d 312 (1st Dep't 2004) ...................................................................... 6, 8

*General Elec. Co. v. Compagnie Euralair*, 945 F. Supp. 527 (S.D.N.Y. 1996), *aff'd*, 164 F.3d 617 (2d Cir. 1998) ..................................................................... 16

*In re Asia Global Crossing, Ltd.*, 326 B.R. 240 (S.D.N.Y. 2005) .................. 12, 13

*In the Matter of Charles Boas, Inc.*, 284 A.D. 586, 132 N.Y.S.2d 429 (3d Dep't 1954) ................................................................................................................. 11

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195 (2d Cir. 2005) ................................................................................................................. 17

*Lumex, Inc. v. Highsmith*, 919 F. Supp. 624 (E.D.N.Y. 1996) .......................... 20

*Marcoux v. Farm Svc. & Supplies, Inc.*, 290 F. Supp.2d 457 (S.D.N.Y. 2003) .......... 13

*Morris v. Schroder Capital Mgmt. Int'l*, 7 N.Y.3d 616, 825 N.Y.S.2d 697 (2006) ................. 18

*NLRB v. Town & Country Elec.*, 516 U.S. 85 (1995) ........................................ 11

*N.Y.S. Elec. & Gas Corp. v. State of N.Y.*, 218 A.D.2d 868, 630 N.Y.S.2d 412 (3d Dep't), *app. denied*, 87 N.Y.2d 803, 639 N.Y.S.2d 310 (1995) ......................... 6, 7

*NJP Enters. v. Shooze, Inc.*, 280 A.D.2d 533, 720 N.Y.S.2d 190 (2d Dep't 2001) ................. 6, 7

*Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 682 N.Y.S.2d 664 (1998) ..................................................................................... 8

TABLE OF AUTHORITIES
(CONTINUED)

PAGE(S)

*Pierce v. Merrill Lynch, Pierce, Fenner & Smith*, 48 N.Y.2d 84 421 N.Y.S.2d 847 (1979) ................................................................................................................. 18

*Purchasing Assocs. v. Weitz*, 13 N.Y.2d 267, 246 N.Y.S.2d 600 (1963) ..................................... 19

*Red Ball Demolition Corp. v. Palmadessa*, 173 F.3d 481 (2d Cir. 1999) ..................................... 13

*Reed, Roberts Assoc. v. Strauman*, 40 N.Y.2d 303, 386 N.Y.S.2d 677 (1976) ........................... 19

*Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59 (2d Cir. 2000) .............................................. 14, 17

*Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017 (2d Cir. 1985) .................................... 20

*Ruttenberg v. Davidge Data Sys. Corp.*, 215 A.D.2d 191, 626 N.Y.S.2d 174 (1st Dep't 1995) ................................................................................................................. 17

*Singer Asset Fin. Co. v. Melvin*, 33 A.D.3d 355, 822 N.Y.S.2d 68 (1st Dep't 2006) ................................................................................................................. 23

*Ticaki v. Roman Catholic Diocese*, 41 F. Supp.2d 249 (E.D.N.Y.), *aff'd*, 201 F.3d 432 (2d Cir. 1999) ................................................................................................. 13

*Tierney v. Capricorn Investors, L.P.*, 189 A.D.2d 629, 592 N.Y.S.2d 700 (1st Dep't), *app. denied*, 81 N.Y.2d 710, 599 N.Y.S.2d 804 (1993) ............................................. 23

*Vista Co. v. Columbia Pictures Indus., Inc.*, 725 F. Supp. 1286 (S.D.N.Y. 1989) ..................... 23

*V.S. Int'l, S.A. v. Boyden World Corp.*, 862 F. Supp. 1188 (S.D.N.Y. 1994) ................................ 6

*Williamson v. Moltech Corp.*, 261 A.D.2d 538, 690 N.Y.S.2d 628 (2d Dep't 1999) ................. 20

## INTRODUCTION

Defendant Lester Nail, by his attorneys, Littler Mendelson, P.C., respectfully submits this memorandum of law in opposition to PPI's motion for summary judgment and in support of his cross-motion for summary judgment. PPI has failed to demonstrate that it is entitled to judgment as a matter of law. To the contrary, the undisputed material facts warrant summary judgment in favor of Mr. Nail on all counts.

## NATURE OF CLAIMS AND SUMMARY OF RELEVANT FACTS

This case involves the interpretation of a termination pay provision in an employment contract. Mr. Nail had an employment contract with PPI for a definite term commencing on January 1, 2006, and ending on December 31, 2007 (hereinafter the "Agreement"). (Deposition of Lester Nail dated April 23, 2008 ("Nail Dep.") at 40-41, Ex. B.)[1] Section 7(c) of the Agreement addressed the parties' obligations in the event PPI terminated Mr. Nail's employment without cause prior to the end of the term. It provided:

> If, during the term of this Agreement, the employment of Executive by Paramount should be terminated by Paramount other than for Cause as defined herein or for executive's incapacity, then Paramount shall be obligated both to pay to Executive all applicable base salary pursuant to paragraph 2(a) of this Agreement and also Paramount shall continue all applicable plans and/or benefits pursuant to paragraph 3 hereof for the remainder of the Employment Term, so long as Executive is willing, ready and able to render exclusive services hereunder during the remainder of the Employment Term. Nothing herein shall obligate Paramount to utilize Executive's services, and Paramount shall have fulfilled all of its obligations hereunder by payment to Executive of the applicable amounts set forth herein for the Employment Term of this Agreement subject to the terms of this paragraph 7(c). Notwithstanding the above, if the employment of Executive is also terminated by Paramount for cause or by reason of disability or death, this paragraph 7(c) shall not be applicable.

(Id. at § 7(c).)

---

[1]    Deposition excerpts and exhibits cited herein are annexed to the Declaration of Michael P. Pappas dated July 25, 2008 ("Pappas Dec."), submitted herewith.

Thus, under the express terms of Section 7(c), PPI was obligated to pay Mr. Nail all remaining compensation and benefits due under the Agreement if PPI terminated his employment without cause, provided only that Mr. Nail be "willing, ready and able" to perform exclusive services for PPI if asked.  (Id.) (See also Deposition of Richard Kinzel dated June 6, 2008 ("Kinzel Dep.") at 67-68 (A. ...[U]p until the time that the contract ended, he was under our guidance and direction to do what, you know, if we requested his services, why, he would be there for us to do it.  Q: If you requested them?  A: If we requested it.") (emphasis supplied.)

On August 1, 2006, PPI terminated Mr. Nail's employment without cause and informed him that his "services will no longer be needed."  (Nail Dep. at 95, Ex. C; Deposition of Craig Freeman dated April 23, 2008 ("Freeman Dep.") at 94-97, Ex. C.)  Pursuant to its obligations under Section 7(c) of the Agreement, PPI initially continued to pay Mr. Nail the remaining compensation and benefits due to him.  (Nail Dep. at 117.)  At no time after PPI terminated Mr. Nail's employment did it ask him to provide any services under Section 7(c) or otherwise. (Freeman Dep. at 185-86; Kinzel Dep. at 60, 68.)  Indeed, PPI acknowledges that it had no intention of ever seeking Mr. Nail's services, that it did not wish him to perform services, and that it never contemplated asking him to do so.  (Freeman Dep. at 186-87;  Kinzel Dep. at 60-61.)  PPI further acknowledges that no circumstances ever even arose in which it would have needed to utilize Mr. Nail's services.  (Freeman Dep. at 186-87.)

After his firing by PPI without cause, Mr. Nail remained unemployed for approximately 6 months.  (Nail Dep. at 114-16, 148-49, 162.)  On or about February 23, 2007, he obtained employment as an in-house attorney with Denny's.  (Id. at 142-49, Ex. 7.)  Mr. Nail's employment at Denny's did not preclude him from providing services to PPI if he had been asked. Mr. Nail had no employment contract with Denny's.  (Declaration of Lester C. Nail dated

July 25, 2008 ("Nail Decl."), ¶ 15.)  He was employed by Denny's at will and was free to leave at any time, for any reason, with or without notice.  (Id. at ¶¶ 14-15, Ex. 1.)  Nor did Mr. Nail have any non-competition or exclusive services agreements with Denny's, or any other contractual or legal restrictions on his post-employment activities.  (Id.)  Denny's (a restaurant chain) and PPI (an amusement park operator) are not even competitors.  (Freeman Dep. at 42, 46-47, 189-90.)  Further, no Denny's policy restricted Mr. Nail from resigning without notice and immediately providing services to another employer.  (Nail Decl., ¶ 16.)

In addition, Denny's had no policy, and Mr. Nail had no contractual or other obligation to Denny's, that would have prohibited him from providing services to another company during a leave of absence or time off.  (Nail Decl., ¶¶ 19-25.)  Indeed, Denny's policy expressly permitted it: "You may hold another job outside of Denny's if the outside work does not interfere with your work performance here and does not create an actual or potential conflict of interest or breach of confidentiality."  (Id. at ¶ 22, Ex. 3.)

Of course, PPI never asked Mr. Nail to provide services after it terminated his employment, so Mr. Nail had no opportunity to exercise the freedoms that Denny's policies and his at-will status provided.  (Freeman Dep. at 185-87; Kinzel Dep. at 60, 68.)  Further, as PPI's Chief Executive Officer and Corporate Vice President of Administration each testified, PPI had no idea whether Mr. Nail would have been "willing, ready and able" to provide exclusive services because it never asked him:

> Q:    Do you know if Mr. Nail was ready, willing, and able to provide exclusive services to PPI?
>
> A.    I don't know.
>
> Q:    Did you ever ask Mr. Nail to perform services for PPI after his termination?
>
> A:    No, I don't know.  No, I don't – I did not, no.
>
> . . . .

3

> Q: To your knowledge, did any employee of PPI or Cedar Fair ever ask Mr. Nail to perform any services whatsoever for PPI or Cedar Fair at any time after August 2006?
>
> A: Not to the best of my knowledge.

(Kinzel Dep. at 59-60.)

> Q: Do you have any knowledge one way or the other whether Mr. Nail would have been willing or able to cease his Denny's employment if he had been requested to perform services for PPI during the contract term?
>
> A: I have no such knowledge.

(Freeman Dep. at 192.)

In or about September 2007, PPI learned that Mr. Nail was employed at Denny's, and immediately ceased making payments to him under Section 7(c) of the Agreement. (Freeman Dep. at 134-38, 145, Ex. I.) Although PPI had never asked or had any intention of asking Mr. Nail to provide services, it asserted that his mere re-employment automatically extinguished PPI's obligations under Section 7(c) of the Agreement. (Id. at 142-44, Ex. I.) When PPI notified Mr. Nail that it was ceasing payments, Mr. Nail assured PPI that he remained "willing, ready and able" to provide exclusive services if PPI so desired. (Id. at 184, Ex. L.) Notwithstanding this assurance, PPI still made no request that Mr. Nail perform services. (Freeman Dep. at 185-87; Kinzel Dep. at 60, 68.) Moreover, if PPI had any concerns regarding Mr. Nail's ability to provide services given his employment at Denny's, it made no attempt to obtain additional information from Mr. Nail regarding his status. (Freeman Dep. at 150; Nail Decl., ¶ 28.)

## SUMMARY OF ARGUMENT

PPI cannot satisfy its burden of establishing that Mr. Nail breached Section 7(c) of the Agreement, which was the only provision addressing the parties' respective obligations in the event of a termination without cause. Specifically, PPI has failed to demonstrate that Mr. Nail would have been unwilling or unable to perform exclusive services if he had been asked.

First, it is undisputed that PPI never demanded performance under Section 7(c), *i.e.*, it never asked Mr. Nail to provide exclusive services after his termination. Because PPI never demanded (or had any intention to demand) that Mr. Nail actually perform services, Mr. Nail's performance under Section 7(c) never became due. Thus, there was no failure of due performance, and PPI cannot establish a breach by Mr. Nail.

Second, PPI cannot establish an anticipatory repudiation by Mr. Nail because: (i) Mr. Nail never notified PPI that he would not perform exclusive services if asked; and (ii) Mr. Nail's mere employment by Denny's did not render it impossible for him to provide exclusive services to PPI if asked. To the contrary, the undisputed evidence shows that Mr. Nail was at all times both willing and able to perform exclusive services for PPI, but PPI never asked or even contemplated asking him to do so. Mr. Nail was free to immediately leave Denny's at any time, and had no contractual or other restrictions on his ability to permanently or temporarily cease his employment at Denny's in order to perform services for PPI. Furthermore, Mr. Nail testified without contradiction that he would have been willing to resign or otherwise arrange an absence from Denny's if PPI had asked. By asserting that Mr. Nail's re-employment automatically extinguished PPI's payment obligations under Section 7(c), PPI is seeking to impose requirements that simply do not exist under that provision's express terms. All Section 7(c) required was for Mr. Nail to be willing, ready and able to perform exclusive services for PPI if called upon, and there is no evidence he breached that obligation. PPI drafted the Agreement. If PPI had intended Section 7(c) to constitute a blanket prohibition on engaging in other employment, it easily could have said so. It did not, and the Court should decline PPI's invitation to re-write the parties' contract.

In short, PPI has utterly failed to demonstrate that Mr. Nail's mere employment by Denny's forever rendered him unable to perform exclusive services for PPI. PPI offers nothing more than the conclusory and unsupported opinions of its counsel, which are not evidence and are plainly insufficient to satisfy its burden of proof. Therefore, as a matter of law, PPI cannot prove its breach of contract claim, and Mr. Nail is entitled to summary judgment.

## ARGUMENT

## I.    PPI CANNOT ESTABLISH A BREACH BY MR. NAIL

PPI has the burden of proof with respect to its breach of contract claim. V.S. Int'l, S.A. v. Boyden World Corp., 862 F. Supp. 1188, 1195 (S.D.N.Y. 1994). To establish a breach of contract, PPI must prove that: (1) Mr. Nail failed to perform his contractual obligations when performance came due; or (2) engaged in conduct sufficient to constitute an anticipatory repudiation. See, e.g., Gardiner Int'l, Inc. v. J.W. Townsend & Assocs., Inc., 13 A.D.3d 246, 247, 788 N.Y.S.2d 312, 314 (1st Dep't 2004); N.Y.S. Elec. & Gas Corp. v. State of N.Y., 218 A.D.2d 868, 870, 630 N.Y.S.2d 412, 414 (3d Dep't), app. denied, 87 N.Y.2d 803, 639 N.Y.S.2d 310 (1995). As a matter of law, PPI cannot establish either a failure of due performance or an anticipatory repudiation by Mr. Nail. Accordingly, PPI's contractual obligation to pay Mr. Nail the remaining compensation and benefits due under the Agreement was not excused, and Mr. Nail's cross-motion for summary judgment on his breach of contract claim must be granted.

### A.    PPI Cannot Establish a Failure of Due Performance By Mr. Nail

It is well-established that "[n]onperformance of a required duty under a contract is not a breach of the contract until the performance is due." See N.Y.S. Elec. & Gas Corp., 218 A.D.2d at 870, 630 N.Y.S.2d at 414 (citing Restatement of Contracts (Second), § 235, comment b); NJP Enters. v. Shooze, Inc., 280 A.D.2d 533, 534, 720 N.Y.S.2d 190, 191 (2d Dep't 2001) (same).

Here, PPI's Chief Executive Officer clearly testified that Mr. Nail's duty under Section 7(c) was simply to be "willing, ready and able" to perform services *if PPI requested them*:

> Q:    What's your understanding, and not a legal, but a practical understanding of the terms ready, willing, and able?
>
> A:    What I assume by reading the contract and with the noncompete and ready, willing and able, that he was available to come back to work for us and if he went to work -- in other words, we were paying him to sit home and to get his resume ready for when the contract ended, that he would be able to go back into the workplace.  But up until the time that the contract ended, he was under our guidance and direction to do what we, you know, *if we requested his services*, why, he would be there for us to do it.
>
> Q:    If you requested them?
> A:    *If we requested it*.

(Kinzel Dep. at 67-68) (emphasis supplied).

It is undisputed that PPI never requested that Mr. Nail provide any services whatsoever after it terminated his employment without cause.  (Freeman Dep. at 185-86; Kinzel Dep. at 60, 68.)  Indeed, PPI never even considered utilizing Mr. Nail's services.  (Freeman Dep. at 186-87; Kinzel Dep. at 60-61.)  Thus, although PPI clearly had the option to demand performance under Section 7(c) of the Agreement, it failed to do so.  Because PPI never demanded performance by Mr. Nail, his performance under Section 7(c) never "came due," and there was no breach of contract.  See N.Y.S. Elec. & Gas Corp., 218 A.D.2d at 534, 630 N.Y.S.2d at 191.  See also NJP Enters., Inc., 280 A.D.2d at 534, 720 N.Y.S.2d at 191 (allegation that party was not "ready, willing, and able" to perform contractual duties cannot establish breach where there was no claim that party asserting breach ever requested services and other party failed to provide them).

### B.    PPI Cannot Establish An Anticipatory Repudiation By Mr. Nail

PPI contends that it was not required to demand performance by Mr. Nail because Section 7(c) states that PPI was not obligated to utilize Mr. Nail's services.  According to PPI,

Mr. Nail's conduct alone amounted to a breach, even in the absence of a demand for performance.[2] Thus, PPI is effectively arguing that Mr. Nail's actions constituted an anticipatory repudiation, *i.e.*, that his employment by Denny's would have precluded him from performing exclusive services for PPI even if PPI had asked him to do so.

A party asserting anticipatory repudiation bears a heavy burden of proof.  To establish anticipatory repudiation, PPI must establish: (1) that Mr. Nail clearly and unequivocally communicated his intention not to perform his contractual obligations; or (2) that Mr. Nail committed a voluntary affirmative act that rendered it impossible for him to perform those obligations.  See, e.g., Emanuel Law Outlines v. Multi-State Legal Studies, Inc., 899 F. Supp. 1081, 1088 (S.D.N.Y. 1995);  Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp., 92 N.Y.2d 458, 463, 682 N.Y.S.2d 664, 667 (1998).

To establish anticipatory repudiation through affirmative acts, PPI must show that Mr. Nail completely divested himself of the ability perform in accordance with Section 7(c).  See Gardiner Int'l, 13 A.D.3d at 247, 788 N.Y.S.2d at 314;  Computer Possibilities Unltd., Inc. v. Mobil Oil Corp., 301 A.D.2d 70, 77, 747 N.Y.S.2d 468, 474-75 (1st Dep't 2002) (party repudiates a contract where he "puts it out of his power to keep his contract" or "voluntarily disables himself from complying"), app. denied, 100 N.Y.2d 504, 762 N.Y.S.2d 874 (2003).

PPI does not allege that Mr. Nail ever communicated an intention not to perform. (Quite the opposite -- Mr. Nail assured PPI that he remained "willing, able and ready" to perform exclusive services if called upon, yet PPI still never demanded performance. (Freeman Dep. at

---

[2]    The contract language to which PPI refers simply states that PPI had no obligation under Section 7(c) to utilize Mr. Nail's services after his termination without cause, and that PPI's only obligation was to pay the remaining compensation and benefits due. (Nail Dep., Ex. B at § 7(c)). It does not mean that PPI can assert a breach by Mr. Nail without ever demanding due performance.  The fact is, PPI had the right (if not the obligation) to demand that Mr. Nail perform exclusive services, and it chose not to exercise that right.  Because PPI, by its own election, failed to demand performance by Mr. Nail under Section 7(c), it cannot now assert that he failed to perform his contractual obligations under that very same provision.

184, Ex. L.))  Thus, to prove an anticipatory repudiation or breach, PPI must demonstrate that Mr. Nail's actions made it *impossible* for him to perform exclusive services for PPI if asked.  PPI clearly cannot meet that burden.  It has provided no evidence that Mr. Nail, by merely accepting employment at Denny's, completely "disabled himself" or "put it out of his power" to perform exclusive services for PPI if PPI had so demanded.

On the contrary, the undisputed evidence shows that Mr. Nail was ready and willing to leave his employment at Denny's or arrange for a leave of absence or time off from his responsibilities if PPI had called upon him to provide services.  (Nail Decl., ¶¶ 13-28; Nail Dep. at 155-57; Kinzel Dep. at 59; Freeman Dep. at 155, 192.)  The undisputed evidence further shows that it would have been well within Mr. Nail's power to do so.  For example:

- Mr. Nail was employed at will by Denny's and could have left Denny's employ at any time, for any reason, without notice.  (Nail Decl., ¶ 14, Ex. 1.)

- Mr. Nail did not have an employment contract with Denny's, and had no restrictions on leaving Denny's employ.  (Id. at ¶ 15, Ex. 1.)

- Mr. Nail did not have a non-competition agreement or any other legal obligation to Denny's that would have prevented him from leaving Denny's employ and immediately providing services to PPI.  (Id.)

- No policy of Denny's would have prevented Mr. Nail from resigning and immediately providing services to PPI.  (Id. at ¶ 16, Ex. 1.)

- Mr. Nail had no personal obligations that would have precluded him from immediately leaving Denny's employ to perform services for PPI.  (Id. at ¶ 17.)  Even if he had been required to render such services in person, his new home in South Carolina was within commuting distance of Charlotte.  (Pl. Rule 56.1 Stmt., ¶ 32.)

- Mr. Nail had a good relationship with his superiors at Denny's, and was confident that if PPI ever called on him to provide services he could make arrangements to temporarily absent himself from his Denny's employment. (Nail Decl., ¶ 23; Nail Dep. at 155-56.)

- Mr. Nail was available nights and weekends to perform exclusive services for PPI if asked; he also could have taken vacation or personal days off, or a personal leave of absence, to perform such services.[3] (Nail Decl., ¶¶ 20-21, Ex. 2.)

- Mr. Nail did not have an exclusive services agreement with Denny's. Further, no policy of Denny's would have prevented him from providing services for PPI during a leave of absence/time off. In fact, Denny's policy permitted it: "You may hold another job outside of Denny's if the outside work does not interfere with your work performance here and does not create an actual or potential conflict of interest or breach of confidentiality." (Id. at ¶ 22, Ex. 3.)

Thus, there were a number of options available to Mr. Nail that would have enabled him to perform exclusive services to PPI in the event PPI had sought to utilize them. In contrast, PPI has not identified any contractual or other legal limitations that would have rendered it impossible for Mr. Nail to perform exclusive services for PPI if he had been asked.

Nor has PPI identified any inherent conflicts that would have rendered such performance impossible. It has provided no evidence that Mr. Nail's performance of exclusive services for PPI (either subsequent to his Denny's employment or during a leave of absence/time off) would have created a conflict of interest, resulted in the disclosure of confidential information, or violated any contract or legal or ethical duty. PPI and Denny's are not competitors, and are engaged in different industries altogether. (Freeman Dep. at 42, 46-47, 189-90.) There is no

---

[3]    Given PPI's testimony that the "services" it requested from other former PPI executives consisted of nothing more than asking a few questions that literally took only "minutes" to answer, it would have been more than feasible for Mr. Nail to make arrangements with Denny's that would have allowed him to perform such services for PPI during a temporary absence. (Freeman Dep. at 187-89.)

confidential information of Denny's that would be useful to PPI, or vice versa. (Nail Decl., ¶ 25.) Mr. Nail, an in-house attorney, was not a unique or extraordinary employee. (Id.) Further, PPI and Denny's have not been adverse in any legal matter so as to prevent Mr. Nail from rendering legal advice to either. (Freeman Dep. at 192.) Even PPI concedes that there would have been nothing inherently inconsistent with Mr. Nail performing services for PPI while still employed by Denny's:

> Q:    In your view is there anything inherently inconsistent with him performing services for both, assuming he had the time to do both?
>
> A:    Assuming he had the time to do both, no.

(Freeman Dep. at 192.) See, e.g., Food Lion v. Capital Cities/ABC, Inc., 194 F.3d 505, 516 (4th Cir. 1999) (employee does not breach duty of loyalty "simply by holding two jobs."). See also NLRB v. Town & Country Elec., 516 U.S. 85, 94-95 (1995) ("person may be the servant of two masters ... if the service to one does not involve abandonment of the service to the other."); In the Matter of Charles Boas, Inc., 284 A.D. 586, 588, 132 N.Y.S.2d 429, 430-31 (3d Dep't 1954) ("It is elemental that a servant may have two masters.").

In sum, there is no basis for concluding that Mr. Nail's mere employment by Denny's forever rendered it impossible for him to perform exclusive services to PPI if he had been asked. Significantly, PPI admits that if Mr. Nail ceased his employment at Denny's in response to a request to perform services for PPI, his employment by Denny's *would not have violated his obligations under Paragraph 7(c) of the Agreement*:

> Q:    [I]f Mr. Nail had been willing and able to stop working at Denny's at any time if asked to perform services for PPI, would his mere employment by Denny's have rendered him unable to perform exclusive services for PPI?
>
> A:    Not from the point he would have terminated his employment at Denny's.

(Freeman Dep. at 193.)

PPI further <u>admits</u> that Mr. Nail's employment at Denny's would not necessarily have rendered him unable to perform exclusive services for PPI:

> Q:   If Denny's said you can take a leave of absence and go work for PPI if they request it, would that be acceptable to you?
>
> A:   I don't know.  It would all depend on what, you know, what kind of responsibilities we would need at the time.
>
> *  *  *
>
> Q:   If Mr. Nail had been willing and able to cease his Denny's employment at any time in order to perform services for PPI, do you still contend that his Denny's employment rendered him unable to perform exclusive services for PPI?
>
> A:   I don't know how to answer that.  It all depends on the circumstances and what would be available at the time.

(Kinzel Dep. at 65-66.)

Hence, by PPI's own admission, Mr. Nail had the power to comply with his obligations under the Agreement, and his mere employment by Denny's did not render him unable to perform under Section 7(c).  <u>See</u> <u>In re Asia Global Crossing, Ltd.</u>, 326 B.R. 240, 255-56 (S.D.N.Y. 2005) (no anticipatory repudiation where party retained power to abandon contract with third party and perform under original agreement).  Accordingly, PPI cannot possibly meet its burden of establishing that Mr. Nail's conduct rose to the level of an anticipatory repudiation, and no breach of contract claim lies.

In the face of the overwhelming evidence (and PPI's own deposition admissions) that Mr. Nail retained the ability to provide exclusive services to PPI if asked, PPI offers nothing more than the wholly unsupported, conclusory opinion of its counsel that Mr. Nail's employment by Denny's "certainly" breached the Agreement.   The opinion of counsel (particularly one unsupported by any reasoned analysis or legal authorities) is not evidence, and cannot carry PPI's burden with respect to either its motion for summary judgment or Mr. Nail's cross-motion.

See Fed.R.Civ.P. 56(e) (personal knowledge requirement); Marcoux v. Farm Svc. & Supplies, Inc., 290 F. Supp.2d 457, 481 (S.D.N.Y. 2003) ("[A]rguments of counsel are not evidence.").

In the end, PPI's arguments rest solely upon its own subjective opinion that Mr. Nail probably would not have been willing to permanently or temporarily cease working for Denny's if PPI had called upon him. However, since PPI never *asked* Mr. Nail to perform services, it should not be permitted to surmise what he would have done if he *had* been asked.[4] Clearly, it would have been a breach if Mr. Nail had refused a request for performance. But PPI has no evidence that Mr. Nail would have refused to perform, and any conjecture regarding what he may or may not have done is simply that, conjecture. It cannot be the basis for finding a breach.

### C.    PPI's Interpretation of Section 7(c) Would Impose Additional Obligations That Were Not Bargained For

It is a fundamental principle of contract law that "a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." Cruden v. Bank of N.Y., 957 F.2d 961, 976 (2d Cir. 1992). Therefore, "courts must take care not to alter or go beyond the terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself." Red Ball Demolition Corp. v. Palmadessa, 173 F.3d 481, 484 (2d Cir. 1999); Command Cinema Corp. v. VCA Labs, Inc., 464 F. Supp.2d 191, 198 (S.D.N.Y. 2006).

Here, PPI asserts that *any* employment by Mr. Nail subsequent to his termination automatically extinguished its obligation under Section 7(c) to pay him the remaining

---

[4]    If PPI had doubts about Mr. Nail's willingness or ability to perform, it could have demanded an assurance of performance, and if none was forthcoming it could have treated the failure as an anticipatory breach. See In re Asia Global Crossing, Ltd., 326 B.R. at 250; Ticaki v. Roman Catholic Diocese, 41 F. Supp.2d 249, 258 (E.D.N.Y.), aff'd, 201 F.3d 432 (2d Cir. 1999). However, PPI sought no such assurance from Mr. Nail, nor did it even attempt to communicate with him to determine whether the circumstances of his Denny's employment would have permitted him to comply with a demand for services from PPI. (Freeman Dep. at 150; Nail Decl., ¶ 28.) For this additional reason, PPI has no right to assert an anticipatory breach. See id.

13

compensation and benefits due under the Agreement. Thus, PPI's purported interpretation of Section 7(c) amounts to a blanket prohibition on re-employment during the term of the Agreement. However, Section 7(c) does not *say* that Mr. Nail was obligated to refrain from all employment. It simply states that he must be "willing, ready and able to perform exclusive services" for PPI if asked -- nothing more. (Nail Dep., Ex. B at § 7(c).) As Mr. Nail has amply shown (and PPI admitted at deposition), it was quite possible for him to have performed exclusive services for PPI if he had been called upon to do so, simply by immediately ceasing his at-will employment at Denny's (either on a permanent or temporary basis). As discussed, PPI concedes that if Mr. Nail ceased his employment at Denny's in response to a request to perform services, the mere fact that he was employed by Denny's would *not* have violated his obligations under Paragraph 7(c) of the Agreement. (Kinzel Dep. at 65-66; Freeman Dep. at 193.)

By urging that Section 7(c) be construed as a blanket prohibition on re-employment, PPI is asking the Court to impose an additional, onerous obligation that Mr. Nail never agreed to and that simply does not exist under that provision's express terms. PPI drafted the Agreement, and if it had intended Section 7(c) to constitute a complete prohibition on engaging in other employment, it easily could have said so. It did not, and the Court should decline PPI's invitation to rewrite the parties' Agreement by imposing more restrictive terms.

Finally, even if the terms of Section 7(c) could be deemed unclear, any doubt must be construed against PPI as drafter, and in favor of Mr. Nail, who had no voice in the selection of its language. See Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 67 (2d Cir. 2000).

### D. The Purported Non-Competition Obligations in Sections 5 and 11 of the Agreement Are Inapplicable and Unenforceable

Perhaps recognizing that Section 7(c) does not, by its terms, prohibit Mr. Nail from obtaining other employment, PPI attempts to rely on purported non-competition provisions

elsewhere in the Agreement. However, those provisions are inapplicable to the parties' obligations under Section 7(c), did not survive Mr. Nail's termination without cause, and, in any event, are unenforceable as a matter of law.

**(1)    Sections 5 and 11 of the Agreement Are Inapplicable Here**

Section 7(c) is the *only* provision in the Agreement that addresses PPI's obligation to pay Mr. Nail if it terminated his employment without cause. (Nail Dep., Ex. B.) It is a self-contained a complete expression of the parties' respective obligations in the event of such a termination. (<u>Id.</u> at § 7(c).) According to the express terms of Section 7(c), PPI was obligated to pay Mr. Nail the remaining compensation and benefits due so long as he was "willing, ready and able" to render exclusive services to PPI. (<u>Id.</u>) Thus, Mr. Nail's entitlement to payment depended solely on whether he was willing, ready and able to perform exclusive services for PPI if asked. (<u>Id.</u>; <u>see also</u> Kinzel Dep. at 67-68.)

PPI's attempt to import Sections 5 and 11 into Section 7(c) finds no support either in the Agreement or in the law. Section 7(c), the only provision addressing termination without cause, makes no explicit or implicit reference to Sections 5 or 11, nor do Sections 5 and 11 make any reference to Section 7(c). (Nail Dep., Ex. B at §§ 5, 7(c), 11.) Further, there is no evidence that the parties intended to incorporate the purported non-compete obligations of Sections 5 and 11 into Section 7(c), or that the parties intended to condition PPI's payment obligation under Section 7(c) upon Nail's compliance with those other, separate sections. (<u>Id.</u> at § 7(c).) Importantly, PPI specifically states in Section 7(c) that its obligation to pay Mr. Nail in the event of a termination without cause is "subject to the terms of *this* paragraph 7(c)," not any other provisions of the Agreement. (<u>Id.</u>) (emphasis supplied).

In short, Mr. Nail's *only* obligation under Section 7(c) was to be "willing, ready and able" to perform exclusive services for PPI if called upon. PPI has demonstrated no basis for incorporating other, more onerous obligations not referenced in Section 7(c).

Established rules of contract construction also preclude PPI's attempt to incorporate Sections 5 and 11 into Section 7(c). As discussed, Section 7(c) is the only provision specifically addressing the parties' obligations in the event of a termination without cause. In contrast, Sections 5 and 11 are general provisions that purport to restrict engaging in other employment *during* the Employment Term. (Id. at §§ 5, 11.) They do not specifically (or even generally) refer to terminations without cause. (Id.) "[W]here there are general and specific provisions relating to the same matter, the specific provisions control, even if there is an inconsistency." General Elec. Co. v. Compagnie Euralair, 945 F. Supp. 527, 533 (S.D.N.Y. 1996), aff'd, 164 F.3d 617 (2d Cir. 1998). Section 7(c) specifically and exclusively sets forth the parties' obligations in the event of a termination without cause; therefore, Section 7(c) controls and PPI's attempt to import the general obligations of Sections 5 and 11 should be rejected. See id.

In any event, there is no basis for PPI's assertion that Sections 5 and 11 survived the termination of Mr. Nail's employment without cause. Those Sections were clearly intended to address Mr. Nail's performance obligations *during* his employment, not after his employment was terminated. (Nail Dep., Ex. B at §§ 5, 11.) There is no evidence that either of those provisions were intended as a post-employment restriction on competition. Indeed, when PPI intended an obligation to survive employment termination, it explicitly said so. (See id. at §§ 9, 10, 12, 13 ("Executive agrees that, during the Employment Term *and for one (1) year thereafter*....") (emphasis supplied). Tellingly, no such post-termination language is included in Sections 5 and 11.

16

Furthermore, PPI's assertion that Section 5 and 11 survived Mr. Nail's termination without cause would negate Section 7(c) of the Agreement and render it entirely superfluous. If Sections 5 and 11 applied post-termination (and assuming they would be legally enforceable if so applied, which they are not),[5] then any employment *at all* by Mr. Nail after his termination would have resulted in him automatically breaching the Agreement and extinguishing PPI's payment obligations. If that had been intended, there would have been no need for Section 7(c), which expressly (and less restrictively) spells out the parties' respective obligations in the event of a termination without cause. In short, Section 7(c) would be rendered meaningless.

Again, under established rules of contract construction, courts will not read a contract so as to render a term meaningless surplusage. Ruttenberg v. Davidge Data Sys. Corp., 215 A.D.2d 191, 196, 626 N.Y.S.2d 174, 177 (1st Dep't 1995). See also LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005). Therefore, an interpretation of the Agreement in which Sections 5 and 11 impose additional post-employment obligations upon Mr. Nail after a termination without cause, which would render Section 7(c) meaningless or superfluous, should be rejected. See id.

Finally, any doubt regarding whether the obligations of Sections 5 and 11 were intended to survive termination and be incorporated into Section 7(c) should be construed against PPI as drafter of the Agreement. See Revson, 221 F.3d at 67.

In sum, PPI has failed to demonstrate that Sections 5 and 11 of the Agreement should be, or were intended to be, read *in pari materia* with Section 7(c). Therefore, those Sections are inapplicable to this case and irrelevant to whether the parties' satisfied their respective obligations under Section 7(c).

---

[5]    See discussion, infra at 18-21.

> **(2)    Even If Sections 5 and 11 of the Agreement Are Deemed Post-**
> **Employment Restrictive Covenants, They Are Unenforceable**

Even if Sections 5 and 11 are deemed post-employment restrictive covenants, they are unenforceable as a matter of law.  Sections 5 and 11 would impose the broadest possible post-employment restriction in that they would unconditionally forbid Mr. Nail from engaging in any occupation, anywhere on Earth, for up to two years after his termination.  (Nail Dep., Ex. B at §§ 5, 11;  Freeman Dep. at 112-14; Kinzel Dep. at 47-49.)  Thus, if PPI's interpretation of the Agreement were to be credited, PPI would have had the right to fire Mr. Nail without cause the day after he entered into the Agreement, and he would have been precluded from engaging in any employment whatsoever (including non-competitive employment) until January 1, 2008. (See id.)  This type of restriction is clearly invalid under New York law.

First, it is well-established that an employer cannot seek to enforce a non-compete provision against an employee who it terminated involuntarily and without cause.  See Morris v. Schroder Capital Mgmt. Int'l, 7 N.Y.3d 616, 621, 825 N.Y.S.2d 697 (2006);  Pierce v. Merrill Lynch, Pierce, Fenner & Smith, 48 N.Y.2d 84, 89, 421 N.Y.S.2d 847, 849 (1979).  Since it is undisputed that PPI terminated Mr. Nail's employment involuntarily, without cause, the non-compete restrictions of Sections 5 and 11 are unenforceable as to Mr. Nail.[6]  (Nail Dep. at 95, Ex. C; Freeman Dep. at 94-97, Ex. C.)

Second, even if a non-compete provision were enforceable against an employee terminated without cause, the non-compete restrictions in Sections 5 and 11 of the PPI Agreement are unsupported by any legitimate business interest.  It is black letter law in New

---

[6]    Unlike Section 7(c), the purported non-compete restrictions in Sections 5 and 11 are unconditional in that they would not provide Mr. Nail the right to "opt out" in exchange for forfeiting the remaining compensation due under the Agreement.  (Nail Dep., Ex. B at §§ 5, 11.)  In any event, PPI cannot rely upon the "employee choice" doctrine to enforce Sections 5 and 11 without regard to their reasonableness, since it terminated Mr. Nail's employment involuntarily and without cause. See Morris, 7 N.Y.3d at 621.

York that, to enforce a post-employment restrictive covenant, a plaintiff must establish, among other things, that the covenant is necessary to prevent the use or disclosure of trade secrets or the loss of "unique or extraordinary" employees. See, e.g., Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp., 42 N.Y.2d 496, 499, 398 N.Y.S.2d 1004, 1006-07 (1977); Reed, Roberts Assoc. v. Strauman, 40 N.Y.2d 303, 307-08, 386 N.Y.S.2d 677, 679-80 (1976).

Here, PPI has not demonstrated (or even advanced) any cognizable business interest in prohibiting Mr. Nail from obtaining other employment after he was terminated without cause. Indeed, PPI conceded at deposition that it could not identify any such interest. (Freeman Dep. at 115-16.) Furthermore, there is no evidence that Mr. Nail possessed any trade secrets or, if he did, that such secrets would have been of any use to a non-competitor (such as Denny's). (Id. at 42, 46-47, 189-90.) Just as clearly, there is no basis for asserting that Mr. Nail was a "unique or extraordinary" employee who justified such a sweeping prohibition on obtaining new employment. See Purchasing Assocs. v. Weitz, 13 N.Y.2d 267, 274, 246 N.Y.S.2d 600, 605-06 (1963) (plaintiff asserting employee was "unique or extraordinary" must demonstrate that the employees' services "are of such a character as to make [their] replacement impossible or that the loss of such services would cause the employer irreparable injury.").

Finally, the restrictions in Sections 5 and 11 are impermissibly broad in scope. As discussed, they would purport to prohibit Mr. Nail from engaging in any employment whatsoever, anywhere in the world, for up to two years after his termination. PPI testified that it interprets these restrictions as forbidding Mr. Nail from engaging in *any* employment for pay, regardless of whether it was in any way competitive with PPI (including activities such as working as a cashier or mowing lawns). (Freeman Dep. at 112-14; Kinzel Dep. at 47-49.) It is difficult to imagine a restrictive covenant that is broader in scope. As a matter of law, these

types of grossly overbroad restrictions are unenforceable in New York. See, e.g., Lumex, Inc. v. Highsmith, 919 F. Supp. 624, 628-29 (E.D.N.Y. 1996) ("It is well-established that restrictive covenants ... will be enforced only if reasonably limited in scope and duration, and then only to the extent necessary to protect the employer from unfair competition...").

Undoubtedly aware that the restrictions in Sections 5 and 11 are patently unreasonable and unenforceable, PPI argues that they are not really "post-employment" restrictions because Mr. Nail still had an employment relationship with PPI during the term of the Agreement. According to PPI, its express termination of Mr. Nail's employment was not really a termination because PPI continued to pay him what he was owed. PPI's assertion is frivolous. PPI expressly notified Mr. Nail in writing that his employment "is terminated without cause as of August 1, 2006." (Nail Dep. at 95, Def. Ex. C; Freeman Dep. at 94-97, Def. Ex. C; Kinzel Dep. at 36-37.) PPI's written notice of termination to Mr. Nail conclusively refutes its current assertion that the employment relationship remained intact.

PPI's argument is also contrary to New York law and belied by its own conduct. Under New York law, an employee who has a contract for a definite term (as Mr. Nail had here) and is terminated without cause before the expiration of the term is entitled to be paid for the entire term, even though he is indisputably no longer employed. See, e.g., Rothenberg v. Lincoln Farm Camp, Inc., 755 F.2d 1017, 1020-21 (2d Cir. 1985); Williamson v. Moltech Corp., 261 A.D.2d 538, 690 N.Y.S.2d 628, 629 (2d Dep't 1999). Thus, mere contractual entitlement to payment under an employment contract does not establish continued employment, particular where, as here, the employer expressly terminated that relationship in writing.

PPI was also well aware, under its own policies, that when it terminated Mr. Nail's employment without cause it was completely severing the parties' employment relationship.

Shortly after the Acquisition, PPI notified numerous contract executives that they were being placed on "administrative leave," that is, they would still be employees of PPI and would still be paid, but could go home and would not be expected to perform any work. (Freeman Dep. at 55-56, 72-73; Kinzel Dep. at 32-34.)  PPI made a distinction between "administrative leave" and "termination."  Whereas employees placed on administrative leave were still considered paid employees of PPI, employees who were terminated *were no longer considered employees*, and may or may not have been entitled to additional compensation depending on the terms of their individual employment agreements, if any.[7]  (Nail Dep. at 95, Ex. C; Freeman Dep. at 81-84, 94-97, Ex. C; Kinzel Dep. at 36-37.)

It is undisputed that Mr. Nail was *not* among the PPI executives placed on administrative leave after the Acquisition.  (Freeman Dep. at 59, 81; Kinzel Dep. at 33-34.)  Rather, PPI decided to terminate his employment outright under Section 7(c). (Nail Dep. at 95, Ex. C; Freeman Dep. at 94-97, Ex. C; Kinzel Dep. at 36-37.)  Thus, although PPI could have placed Mr. Nail on administrative leave if it so desired, thereby continuing the employment relationship and his employment agreement (including Sections 5 and 11) in full effect, it instead chose to terminate his employment altogether.  PPI cannot have it both ways.  Having consciously chosen to terminate Mr. Nail's employment outright rather than place him on administrative leave, PPI cannot credibly assert that it continued to have some form of employment relationship with Mr. Nail. Accordingly, PPI's attempt to save the unenforceable provisions of Sections 5 and 11 by characterizing them as something other than post-employment restrictions is unavailing.

---

[7]    That PPI made a distinction between "administrative leave" and "termination" is most vividly illustrated by the fact that, 30 days after placing the contract executives on administrative leave, PPI terminated their employment by invoking the "termination without cause" provisions of their employment agreements. (Freeman Dep. at 81-84.)  PPI obviously had a reason for converting these administrative leaves to terminations, and that reason was to officially terminate the employment relationship and avoid any continuing obligations associated therewith to the fullest extent possible.

## II.    THE GOOD FAITH AND FAIR DEALING CLAIM SHOULD BE DISMISSED

Although not alleged in the Complaint, PPI now apparently asserts a claim for breach of the implied contractual duty of good faith and fair dealing.  Specifically, PPI contends that Mr. Nail violated that duty by: (i) accepting compensation from PPI after he obtained employment at Denny's, and (ii) failing to disclose his employment at Denny's.  Even if this claim had been timely asserted, it is deficient as a matter of law and must be dismissed.

Under New York law, the implied obligation of good faith and fair dealing does not create obligations that go beyond those intended and stated in the language of the contract, and cannot be used to create independent obligations beyond the contract.  See Broder v. Cablevision Sys. Corp., 418 F.3d 187, 198-99 (2d Cir. 2005).  Here, PPI has not established that Mr. Nail did anything inconsistent with his contractual obligations. As shown above, PPI has not established that Mr. Nail's mere employment by Denny's breached his Agreement with PPI.  Therefore, *a fortiori*, Mr. Nail's continued acceptance of compensation from PPI and alleged failure to disclose his Denny's employment did not deprive PPI of any benefits of the Agreement.  Simply put, Mr. Nail either breached the Agreement or he did not.  If he did not (as the evidence shows), then his actions did not violate any implied contractual duty to PPI.

## III.    PPI's TORT CLAIMS SHOULD BE DISMISSED

PPI's tort claims for fraudulent misrepresentation and unjust enrichment are likewise deficient as a matter of law and should be dismissed.[8]  Neither of these claims is legally viable because each relates solely to Mr. Nail's alleged breach of contract, and neither alleges distinct conduct that would entitle PPI to damages outside of the contract.

---

[8]    Although PPI did not move for summary judgment with respect to the fraud claim, it is not clear whether it has abandoned that claim.  If the claim has not been abandoned, it should be dismissed.

With respect to the fraud claim, it is well-established that "[a] cause of action for fraud does not arise when the only fraud charged relates to a breach of contract." Tierney v. Capricorn Investors, L.P., 189 A.D.2d 629, 671-72, 592 N.Y.S.2d 700, 703 (1st Dep't), app. denied, 81 N.Y.2d 710, 599 N.Y.S.2d 804 (1993). See also Vista Co. v. Columbia Pictures Indus., Inc., 725 F. Supp. 1286, 1294 (S.D.N.Y. 1989) ("The inclusion of allegations of intent and/or concealment in the complaint does not change the nature of the action ... from an action upon contract to an action upon fraud.") (internal quotation marks and citations omitted). Here, PPI's only allegation of so-called "fraud" was that Mr. Nail allegedly tried to conceal the fact that he had purportedly breached his Agreement by going to work for Denny's. (Complaint, ¶¶ 49-62.) Thus, it clearly relates to the breach of contract claim and is not separately actionable. See id.

Similarly, an unjust enrichment claim that is merely duplicative of a breach of contract claim is invalid and will be dismissed. See, e.g., Cooper, Baumdo, Hecht & Longworth, LLP v. Kuczinski, 14 A.D.3d 644, 645, 789 N.Y.S.2d 508, 510 (2d Dep't 2005). It is well-settled that the existence of a contract precludes an unjust enrichment cause of action. See Adelaide Productions, Inc. v. BKN Int'l, A.G., 38 A.D.3d 221, 225, 834 N.Y.S.2d 3, 7 (1st Dep't 2007); Singer Asset Fin. Co. v. Melvin, 33 A.D.3d 355, 358, 822 N.Y.S.2d 68, 71 (1st Dep't 2006) (same). Here, neither party disputes the existence of a contract that governed their obligations. Therefore, no claim for unjust enrichment can be maintained. See id.

## IV. PPI's ATTEMPT TO SMEAR MR. NAIL, ALTHOUGH HAVING NO RELEVANCE TO THE MERITS, IS WITHOUT FOUNDATION

Perhaps recognizing the weakness of its legal claims, PPI seeks to prejudice the Court against Mr. Nail by making false and misleading statements regarding his so-called "deceptive conduct." These allegations are baseless and, in any event, irrelevant to the merits.

First, at no time did Mr. Nail intentionally conceal from PPI his employment by Denny's. It is clear (and PPI has presented no evidence to the contrary) that Mr. Nail correctly believed that his mere employment by Denny's did not violate his obligations under the Agreement. (Nail Dep. at 58-60, 65-67, 69-71, 155-56, 164, 167; Nail Decl., ¶ 30.) Further, he knew, based on PPI's own actions and statements, that it was highly unlikely he would be called upon to provide services. (Nail Dep. at 125-26.) Under the circumstances, no bad faith or duplicity can be inferred from Mr. Nail's failure to formally notify PPI that he had obtained employment. Indeed, if Mr. Nail had been actively trying to conceal anything, he would not have told Jim Rein, whom he knew to be an employee of PPI, that he was now working at Denny's. (Nail Dep. at 125-27.)[9]

Second, at no time did Mr. Nail misrepresent his home address to PPI. The enrollment forms cited by PPI were filled out by Mr. Nail's wife on May 29, 2007, and it is undisputed that they accurately reflected the Nails' home address on that date. (Nail Dep. at 134-36, Ex. H.) There is absolutely no evidence that either Mr. Nail or his wife ever misrepresented their home address to PPI. It is PPI that is being deceptive by claiming otherwise. Finally, Mr. Nail did not notify PPI that he had moved because he did not believe he was in violation of his obligations under the Agreement, and he accurately believed that PPI had no interest in ever retaining his services. Mr. Nail provided the post office with his forwarding address, and it took PPI little or no time to locate him when it needed to. (Nail Decl., ¶ 33.) Mr. Nail had no obligation to directly notify PPI of his change of address. (Freeman Dep. at 125-26; Kinzel Dep. at 52-53.)

Finally, PPI makes much of the fact that for a period of time Mr. Nail received compensation from both PPI and Denny's. However, there was nothing inequitable about Mr.

---

[9]    PPI's reliance on an alleged hearsay statement by Mr. Nail's wife that Mr. Nail was still unemployed is particularly inappropriate and misleading. Mr. Nail and his wife strongly dispute that such a statement was made. Rather, Mr. Nail testified that he heard his wife tell the PPI employee that "things would be better if Lester could find a job *in Charlotte*," *i.e.*, rather than commuting to South Carolina. (Nail Dep. at 11-12) (emphasis supplied).

Nail receiving payments from PPI during that period.  He was contractually entitled to them under an agreement the parties had bargained for, and he had complied with his obligations.  Mr. Nail had been a loyal, dedicated, and effective employee for PPI since 2002.  (Nail Dep. at 31-32.)  Although PPI had expressly promised to employ him during the entire term of the Agreement, it broke that promise and summarily discharged him without cause and without notice with almost a year-and-a-half left on his contract.  (Id., Exs. B, C.)  PPI's actions significantly disrupted Mr. Nail's life and caused him and his family great stress and inconvenience.  He was unemployed for almost 6 months and ultimately was forced to uproot his family, sell his house, and move to another state to take a lower-level position that he did not enjoy.  (Nail Dep. at 114-16, 137-38, 148-49, 155-57, 162; Freeman Dep. at 152, 155.)  Under the circumstances, it can hardly be deemed inequitable for Mr. Nail to receive the compensation that was due to him.

## CONCLUSION

For all of the foregoing reasons, Defendant respectfully requests that the Court issue an order: (i) denying PPI's motion for summary judgment in all respects; (ii) granting Defendant's cross-motion in its entirety and dismissing the Complaint with prejudice and awarding Defendant summary judgment on his breach of contract counterclaim; and (iii) awarding Defendant its reasonable costs and attorneys' fees, as well as such other or further relief as the Court deems appropriate.

Dated:     New York, New York          Respectfully submitted,
           July 25, 2008
                                        LITTLER MENDELSON, P.C.


                            By:    _____S/_____
                                   A. Michael Weber (AW-8760)
                                   Michael P. Pappas (MP-6716)