UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
PARAMOUNT PARKS INC.                            :
                                                :
                        Plaintiff,              :          CASE NO.  07 CV 10595 (SHS)
                                                :
            v.                                  :
                                                :
LESTER NAIL                                     :
                                                :
                        Defendant.              :
-------------------------------------------------------x

        Jill S. Kirila, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury as

follows:

        1.      I am a member of the bar of the State of Ohio and admitted *pro hac vice* in this

Court in the above matter.  I am a partner in the law firm of Squire, Sanders & Dempsey L.L.P.,

attorneys for Plaintiff Paramount Parks Inc. ("PPI").

        2.      I submit this declaration in support of PPI's Memorandum of Law in Opposition

to Defendant's Cross-Motion for Summary Judgment and Reply in Support of Plaintiff's Motion

for Summary Judgment (the "Memorandum of Law") filed contemporaneously herewith.

        3.      Attached hereto as Exhibit 1 is a copy of the transcript of Mr. Richard Kinzel.

        4.      Attached hereto as Appendix 1 are copies of all unreported, docketed cases cited

in PPI's Memorandum of Law.

        I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and understanding.

        Executed this 8th day of August, 2008.

                                        _____
                                            /s/ Jill S. Kirila
                                            Jill S. Kirila

**Page 1**

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF NEW YORK
 3    PARAMOUNT PARK, INC.,          :
 4              Plaintiff
 5                                   :
 6      -vs-                         : No. 07 CV 10595(SS)
 7    LESTER NAIL,                   :
 8              Defendant            :
 9                          - - - - -
10    Deposition of RICHARD L. KINZEL, a witness herein,
11    taken by the Defendant as upon cross-examination
12    before Lori L. Delhees, Stenotype Reporter and Notary
13    Public in and for the State of Ohio, at the Castaway
14    Bay Resort, 2001 Cleveland Road, Sandusky, Ohio on
15    June 6th, 2008 at 12:00 p.m., pursuant to Notice.
16
17                          - - - - -
18
19
20
21
22
23
24
25
```

**Page 2**

```
 1
 2    APPEARANCES:
 3         Jill S. Kirila, Esquire
 4         SQUIRE, SANDERS & DEMPSEY, L.L.P.
           1300 Huntington Center
 5         41 South High Street
           Columbus, OH  43215
 6              On behalf of Plaintiff
 7
 8         A. Michael Weber, Esquire
           LITTLER MENDELSON
 9         885 Third Avenue, 16th Floor
           New York, New York  10022-4834
10              On behalf of Defendant
11
12                          - - - - -
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1
 2                        INDEX
 3
 4
 5    RICHARD L. KINZEL
 6
 7         Cross-examination by Mr. Weber        4 - 9
 8
 9
10                       EXHIBITS
11    Referenced
12    A - Agreement                             27 - 18
13    B - Mr. Nail's employment Contract With CBS 29 - 5
14    C - Letter                                38 - 9
15    F- Document & Attachment                   42 - 2
16    G - Complaint                             50 - 2
17    I - Document/Letter                       58 - 8
18    L - Letter                                59 - 10
19
20
21
22
23
24
25
```

**Page 4**

```
 1
 2         RICHARD L. KINZEL, of lawful age, a witness
 3    herein, called by the Defendant as upon
 4    cross-examination, pursuant to the Rules of
 5    Civil Procedure, being first duly sworn
 6    according to law, was examined and testified as
 7    follows:
 8         CROSS-EXAMINATION OF RICHARD L. KINZEL
 9    BY MR. WEBER:
10 Q  Mr. Kinzel, my name is Michael Weber.  I'm one of the
11    attorneys for Lester Nail in the lawsuit that PPI, if
12    I may refer to it as PPI, everybody knows what that
13    is, brought against him.
14 A  Uh-huh.
15 Q  I'm going to ask you a series of questions; you're
16    obligated to testify under oath, as I'm sure you're
17    aware.  The reporter would like you to answer
18    verbally so she can take down specific answers to my
19    questions and not with a nod of a head or any other
20    gesture, you understand that direction?
21 A  Yes.
22 Q  Have you ever been deposed before?
23 A  Yes.
24 Q  How many times?
25 A  Approximately three or four.
```

Page 5

1 Q  Can you tell me the kind of cases they were or the
2    type of depositions they were?
3 A  Yes.  One of them was for an, I believe one of them
4    was for an environmental problem we had and there was
5    another one for an employment contract problem we
6    had; I believe those were the only two.
7 Q  Tell me about the employment contract deposition.
8 A  19 -- 1987, 1988 a termination was challenged by a
9    member of our management team.
10 Q  And you testified in a deposition there?
11 A  Yes.
12 Q  Did you also testify in a court proceeding there?
13 A  Yes.
14 Q  You were a witness in that proceeding?
15 A  Yes.
16 Q  Were you a witness in any other proceedings, other
17    than that one?
18 A  Just the other one I mentioned, the environmental
19    one --
20 Q  And do you recall the --
21 A  -- to the best of my knowledge, I don't think -- go
22    ahead.
23 Q  Do you remember when?  In our discussion, that's
24    fine.
25 A  Yes, I'll mention, those are the only two I remember

Page 6

1    right now.
2 Q  Do you remember the results of the employment case?
3 A  Yes.  It went to a jury and the individual was
4    awarded a certain amount of money.
5 Q  Have you consumed any alcoholic beverages in the last
6    24 hours?
7 A  No.
8 Q  Have you taken any medications or drugs in the last
9    48 hours?
10 A  Lipitor.  That's the only prescription; vitamin pill
11    if you're interested in that.
12 Q  They don't affect your ability to --
13 A  No.
14 Q  -- remember things or to testify truthfully?
15 A  No.
16 Q  Have you reviewed any documents in connection with
17    this deposition?
18 A  I just looked over my affidavit this morning and
19    maybe one other one.
20 Q  Did you look at the complaint in the case?
21 A  No, I have not.
22 Q  Did you read anyone's deposition in the case?
23 A  No, I have not.
24 Q  You didn't read Mr. Freeman's deposition?
25 A  No, I did not.

Page 7

1 Q  Did you prepare for this deposition in any way?
2 A  I met with my attorney for about an hour before,
3    before you came into the room.
4 Q  Is that the only preparation you've had?
5 A  Yes.
6 Q  And just you and your attorney were present for that
7    preparation?
8 A  Our corporate attorney was here.
9 Q  And who was that?
10 A  Duffield Milkie.
11 Q  So just the three of you?
12 A  Yes.
13 Q  And it was at that meeting that you looked at your
14    affidavit?
15 A  Yes.
16 Q  And no other documents?
17 A  There was one other, I can't even remember what it
18    was.
19 Q  Do you remember what it looked like?
20 A  It was just a piece on paper and I was asked
21    something and said yes and --
22        MS. KIRILA:        I'm just going to
23    object one second and just remind you, instruct you
24    not to disclose anything that we talked about at the
25    meeting.

Page 8

1        THE WITNESS:        Okay.
2 Q  I don't want you to talk about --
3 A  Okay.
4 Q  -- just if you can identify the document, that's all
5    I want to hear.
6 A  No, I cannot.
7 Q  I don't want to know anything about any conversations
8    with your attorney.
9 A  No.
10 Q  Have you talked about this lawsuit with anyone, other
11    than your attorneys?
12 A  With Craig Freeman -- Craig Freeman, our Vice
13    President of Human Resources, Administrative Vice
14    President.
15 Q  And how often have you talked to him about this
16    lawsuit?
17 A  Periodically.
18 Q  About how many times?
19 A  Oh, approximately 12 times.
20 Q  When was the last time you talked to him about this
21    lawsuit?
22 A  I might have in passing asked him how it was going,
23    but I've never really sat down and got details from
24    him as to far -- as to how far the case is going.
25 Q  Did you talk to him after he was deposed in the case?

PARAMOUNT PARK vs. L. NAIL    Condenselt!    RICHARD L. KINZEL

Case 07-cv-0595-SHS    Document 41-2    Filed 08/08/2008    Page 3 of 31

Page 9

1 A    I don't know. I didn't even know he was deposed.
2 Q    Have you ever had any discussion with Al Weber about
3       this case?
4 A    No, not about this case. I've had discussions with
5       Al Weber on other subjects, but not this case.
6 Q    Have you ever had any discussion with him about his
7       obligations to his former employer?
8 A    Could you explain to me?
9 Q    Well --
10 A   Could you explain in more detail what you mean by
11      that?
12 Q   Yes. Do you know who employed Al Weber?
13 A   Yes.
14 Q   Who is that; is that Cedar Fair?
15 A   No. He was employed by PPI, Paramount, CBS.
16 Q   And was his employment terminated?
17 A   Yes.
18 Q   And did he have any obligations to PPI after his
19      termination?
20         MS. KIRILA:        I'm just going to
21      object to the extent it's covered by an employment
22      agreement or other agreements, those would speak for
23      itself, he's not a lawyer, but you can answer.
24 Q   To the best of your knowledge, do you know if he had
25      any obligations to PPI?

Page 10

1 A    Just under the employment contract.
2 Q    And did you ever talk to him about those obligations?
3 A    Yes.
4 Q    And tell me about those conversations.
5 A    Al was a Chief Executive Officer, we were on the same
6       level, and when the buy out occurred he indicated
7       that he -- that we didn't really need two CEO's in
8       the company and we worked out an agreement to, that
9       he was going to separate his employment from the
10      company.
11 Q   Was there, did you have one conversation with him or
12      more than one?
13 A   I'm sure more than one.
14 Q   I want to separate two things: Prior to his leaving
15      and after his leaving?
16 A   Prior to his leaving.
17 Q   You may have had a number?
18 A   Yes.
19 Q   I'm less concerned about those.
20 A   Yes, we did a little of a -- we did a little
21      negotiating, yes.
22 Q   Right. I'm not asking that. After he left, were
23      there any conversations about any obligations he had
24      to PPI?
25 A   No. No.

Page 11

1 Q    Do you know where he's employed now?
2 A    No.
3 Q    Do you know if he's employed?
4 A    I know -- no, I don't.
5 Q    Do you know if he's still receiving any payments from
6       PPI?
7 A    I do not know that.
8 Q    Do you know if he received payments from PPI after he
9       left PPI?
10         MS. KIRILA:        I'm just going to
11      object to the extent it's covered by a confidential,
12      any type of confidentiality agreement. It's not
13      relevant to the lawsuit and it would be confidential,
14      but you can testify generally as to your memory?
15 A   But you mean -- excuse me, if I could just ask a
16      question? By PPI, do you mean now the company who
17      owns, now owns PPI, if we're paying him now?
18 Q   Right. Or any entities of division --
19 A   No. There was a payout.
20 Q   A lump sum payout?
21 A   Yes.
22 Q   Okay. Can you just give me a little bit of your
23      educational background?
24 A   Yes. I grew up in Toledo, Ohio and went to high
25      school there; went to one year of college at

Page 12

1       Wisconsin State College, La Crosse, Wisconsin, and
2       that's the extent of my formal education.
3 Q    You're the CEO of Cedar Fair?
4 A    Correct.
5 Q    And how long have you held that position?
6 A    Since 1986, December of 1986.
7 Q    And have you had any other training or professional
8       training of any nature?
9 A    No.
10 Q   On the job training?
11 A   Yes.
12 Q   What are your duties as CEO?
13 A   I oversee the company and I'm the visionary for the
14      company.
15 Q   Have your duties changed since '86?
16 A   The company has got bigger, but my basic overall
17      responsibilities have remained the same, and that is
18      to grow the company.
19 Q   And pretty much everybody reports to you?
20 A   No. I have my direct reports, but, you know,
21      certainly there's things that are delegated out.
22 Q   Tell me who directly reports to you?
23 A   Craig Freeman, who you're aware of; Duffield Milkie,
24      our corporate attorney, Jack Falfas is our Chief
25      Operating Officer and Peter Crage is our Chief

Page 13

1 Financial Officer and Robert Decker is our corporate
2 Vice President of Planning and Design, Architecture.
3 Q How long has Mr. Freeman worked for you?
4 A Mr. Freeman came with us when we bought Knots Berry
5 Farm in 1997.
6 Q And has he directly reported to you since that time?
7 A No, he has not.
8 Q How long has he been directly reporting to you?
9 A Approximately two years.
10 Q Can you give me an estimate of when he started
11 directly reporting to you?
12 A No, I can't.
13 Q 2006?
14 A Roughly in that area.
15 Q Can you tell me why he started reporting to you
16 directly approximately in 2006?
17 A Yes. We had a management contract with the Mall of
18 America in Minneapolis, Minnesota. When that
19 contract expired he was one of our employees and I
20 brought Craig back to report to me under his present
21 responsibilities.
22 Q Since he's been reporting to you directly, do you
23 have daily contact with him?
24 A No.
25 Q Weekly?

Page 14

1 A Weekly, yes.
2 Q Do you have regular meetings that you have with him
3 and others?
4 A Yes.
5 Q Are they weekly?
6 A Pretty much we try to make them weekly.
7 Q What topics are generally covered at those meetings?
8 A Basically the over -- everything, everything to do
9 with the company.
10 Q All aspects?
11 A All aspects of the company, yes.
12 Q Can you tell me who attends those meetings?
13 A Yes. There is myself, there's Crage, Jim Ryan; there
14 is -- I'm going down the table, excuse me -- Duff
15 Milkie, Monte Jasper, Jack Falfas, Lee Ann Alexakos,
16 Craig I mentioned, and Rob Decker.
17 Q Would it be fair to describe those individuals as the
18 senior executives?
19 A Yes.
20 Q Are you typically involved in the termination of
21 certain level employees with the company?
22 A I'm aware of them, yes.
23 Q Are you consulted with respect to those terminations?
24 A Yes.
25 Q Do you have to approve them?

Page 15

1 A Yes.
2 Q Would it be fair to say that you have to approve all
3 terminations of senior executives?
4 A Yes.
5 Q Do you approve employment contracts with executives
6 at certain levels?
7 A Yes.
8 Q What level?
9 A We don't have that many contracts, so I would say all
10 levels of contracts.
11 Q Are you involved in the hiring of certain level
12 employees also?
13 A I have veto power, but I generally, my management
14 style is that they, they make the selection, but if I
15 look and see the qualifications are not there I have
16 veto power.
17 Q Is there a certain level of employee that you want to
18 approve before they're hired?
19 A No. Well, you mean to physically see or --
20 Q Well, not just to physically see, but to actually
21 approve the hiring?
22 A Yes. If it's, you know, a corporate position I
23 certainly would want to review it.
24 Q For example, Mr., is it Milkie, you just mentioned?
25 A Duff Milkie, yes.

Page 16

1 Q Were you involved in his hiring?
2 A Yes.
3 Q Did you approve it?
4 A Yes.
5 Q Did you have any interaction with Mr. Crage, if I'm
6 pronouncing it correctly, in 2006, 2007?
7 A Crage? I'm sorry, Pete Crage?
8 Q Yes.
9 A In the hiring of him? No.
10 Q Well, do you have daily or weekly interaction?
11 A We have daily.
12 Q As the CFO?
13 A Yes.
14 Q And how long have you had daily contacts with him?
15 A Since he started with the company.
16 Q And that was in '97?
17 A No. No. He hasn't been here that long.
18 Q That was Mr. Freeman, I'm sorry.
19 A You know, Mr. Crage was here, then he left the
20 company and I recruited him back, or he was recruited
21 back, I think he's been here four years now, four or
22 five years, as CFO.
23 Q And it would be fair to say in that period you've had
24 daily contact with him?
25 A Yes.

Page 17

1 Q  Do you know Lester Nail?
2 A  I just know the name.
3 Q  Have you ever met him?
4 A  I believe I met him once, I believe.
5 Q  Do you know who he is?
6 A  Yes.
7 Q  Do you know what position he held?
8 A  Yes.
9 Q  What position was that?
10 A  He was counsel for Paramount Parks.
11 Q  Did you have any interaction with him?
12 A  No.
13 Q  Any communications with him when he was an employee?
14 A  No.
15 Q  PPI is currently owned by Cedar Fair, right?
16 A  Correct.
17 Q  Was it your idea to acquire PPI?
18 A  The board ultimately approved it, but it was my
19     recommendation to acquire them, yes.
20 Q  And can you describe PPI and Cedar Fair to me?
21 A  Yes.  PPI was a company owned by CBS, Viacom, five
22     amusement parks, and Cedar Fair at the time had six
23     amusement parks and we just felt it was a good, a
24     good merger.
25 Q  Similar businesses?

Page 18

1 A  Yes.
2 Q  When you -- strike that.  PPI had five amusement
3     parks and Cedar Fair had six?
4 A  Yes.
5 Q  Did Cedar Fair have any other businesses?
6 A  Yes.
7 Q  What businesses?
8 A  We have hotels, we have indoor water parks, an indoor
9     water park where you're at today; we have branded
10     food concepts, we have three Fridays; things like
11     that.
12 Q  Who would you describe as Cedar Fair's competitors?
13        MS. KIRILA:        Objection.  You can
14     testify.
15 A  We're in competition with the discretionary dollar.
16     Certainly we're in competition with fast food
17     restaurants, restaurants, amusement parks, movie
18     theaters, anywhere that there is a -- well, anywhere
19     that we're trying to get the discretionary dollar.
20 Q  So any discretionary dollar is a competition?
21 A  Yes.
22 Q  And would that be the same with PPI's competitors, as
23     well?
24 A  Yes.
25 Q  In the acquisition of PPI by Cedar Fair, was that a

Page 19

1     stock transaction?
2 A  No.
3 Q  Tell me what that transaction was?
4 A  It was cash.
5 Q  And did you purchase the assets or the stock of PPI?
6 A  I believe the assets.  I'm not sure, I think it's the
7     assets.
8 Q  I understand.  What was your rationale for acquiring
9     PPI?
10 A  To grow the business.
11 Q  What was your intent after acquiring PPI vis-a-vis
12     the merging the operations, you know what I mean?
13 A  Uh-huh.
14 Q  Was this a thought that you could reduce overhead by
15     merging a similar entity?
16 A  We thought there were synergies there.  We thought we
17     had five actual amusement parks and it grew the
18     company and we thought it was a good investment.
19 Q  In doing your analysis of PPI, were you thinking
20     that, "I'm not going to need two CFO's and two back
21     of the house groups and two lawyers," when you were
22     doing this?
23 A  Yes.
24 Q  What was the price you paid for PPI?
25        MS. KIRILA:        I'm just going to

Page 20

1     object for a second and ask you --
2        (Ms. Kirila conferring with Mr. Kinzel.)
3        MS. KIRILA:        Yeah.  Okay, I thought
4     so.  Go ahead.
5 A  1.4 billion dollars.  There might be a couple more
6     numbers behind that four, I'm not sure what that is.
7 Q  Close enough.  Okay.  Is it separately valued on your
8     books today or is it part of Cedar Fair?
9 A  It's part of Cedar Fair.
10 Q  Prior to the closing of PPI, were you involved in any
11     discussions regarding which employees would be
12     retained and which would not be?
13 A  Yes.
14 Q  Tell me what your recollection is of those
15     discussions?
16 A  We basically went over the organizational chart to
17     see where we thought there were some synergies and
18     where we could apply those synergies.
19 Q  Can you remember more specifically about what your
20     analysis was?
21 A  Not really, no.
22 Q  Can I assume that there were certain types of
23     positions at Cedar Fair and certain types of
24     positions at PPI that were similar, if not identical?
25 A  Yes.

PARAMOUNT PARK vs. NAIL          Condensit!          RICHARD L. KINZEL

PARAMOUNT PARK 2:06-5LS-N2   Document 41-2   Filed 08/08/2008   Page 6 of 31

Page 21

| | | |
|---|---|---|
| 1 | Q | Was your thinking that you didn't need both positions |
| 2 | | when the merger took place? |
| 3 | A | Correct. |
| 4 | Q | Do you remember any discussions regarding Mr. Nail's |
| 5 | | employment specifically? |
| 6 | A | No. |
| 7 | Q | Do you remember any discussions regarding anyone's |
| 8 | | employment specifically? |
| 9 | A | Of course the CEO, who is and was a friend of mine, |
| 10 | | Al Weber, you know, I, we -- I had, you know, |
| 11 | | conversations with Al during the whole, the whole |
| 12 | | time. |
| 13 | Q | Right. |
| 14 | A | But that would be the only one that I had |
| 15 | | conversations with prior to the acquisition. |
| 16 | Q | Did Al share any of his views on individuals that |
| 17 | | were employed by PPI prior to the acquisition? |
| 18 | A | No. |
| 19 | Q | You knew Al Weber before? |
| 20 | A | Yes. |
| 21 | Q | And how did you know him? |
| 22 | A | Mr. Weber was the general manager of King's Island |
| 23 | | and we just knew each other through the associations, |
| 24 | | being in the same business. |
| 25 | Q | Did you know what Mr. Nail's position was at PPI? |

Page 22

| | | |
|---|---|---|
| 1 | A | Prior to the acquisition? |
| 2 | Q | Yes. |
| 3 | A | No. |
| 4 | Q | Did you know what it was after the acquisition? |
| 5 | A | Yes. |
| 6 | Q | And what position was that? |
| 7 | A | He was counsel. |
| 8 | Q | Did Cedar Fair have a counsel at the time? |
| 9 | A | No. Not an in-house counsel. |
| 10 | Q | I understand. |
| 11 | A | Okay. |
| 12 | Q | Is Mr. Milkie the first in-house counsel you've had? |
| 13 | A | Correct. |
| 14 | Q | And was Squire Sanders your outside firm? |
| 15 | A | Yes. |
| 16 | Q | Prior to the closing were you aware of the fact that |
| 17 | | individuals had employment contracts at PPI? |
| 18 | A | Yes. |
| 19 | Q | And how did you become aware of that? |
| 20 | A | Mr. Freeman -- we incorporated, you know, during the |
| 21 | | course of doing due diligence. |
| 22 | Q | Doing due diligence? |
| 23 | A | Yes. |
| 24 | Q | And were you generally aware of what those contracts |
| 25 | | provided, not specifically, but generally? |

Page 23

| | | |
|---|---|---|
| 1 | A | Generally, yes. |
| 2 | Q | Were you aware that Mr. Nail had an employment |
| 3 | | contract? |
| 4 | A | Yes. |
| 5 | Q | Were you generally aware of what it provided? |
| 6 | A | Generally, yes. |
| 7 | Q | You obviously didn't draft that agreement or had it |
| 8 | | drafted, right? |
| 9 | A | No. We inherited that. |
| 10 | Q | That was done by CBS? |
| 11 | A | Yes. |
| 12 | Q | Do know who at CBS was involved in the drafting |
| 13 | | of that agreement? |
| 14 | A | I do not. |
| 15 | Q | Do you know if Mr. Weber was? |
| 16 | A | I don't know. |
| 17 | Q | Did you ever look at his contract? |
| 18 | A | No. |
| 19 | Q | Did you ever talk to anybody about the terms of the |
| 20 | | contract? |
| 21 | A | Your talking about Mr. Nail's now? |
| 22 | Q | Yes. |
| 23 | A | Just with Craig Freeman. |
| 24 | Q | And tell me about the conversations you had with Mr. |
| 25 | | Freeman about Mr. Nail's contract? |

Page 24

| | | |
|---|---|---|
| 1 | A | I, you know, I don't even remember what they were |
| 2 | | about. I just knew that he had in the con -- he had |
| 3 | | in his agreement that we were going to pay him |
| 4 | | through the term of the contract and if he chose |
| 5 | | other employment, why, we were to cease paying him. |
| 6 | Q | Tell me when you had that discussion with |
| 7 | | Mr. Freeman? |
| 8 | A | It was really brought to light after we found out |
| 9 | | that Mr. Nail was employed by another company. |
| 10 | Q | Prior to that time, though, you didn't have any |
| 11 | | discussions about what the contract provided? |
| 12 | A | No. We assumed he was not working. |
| 13 | Q | Did Cedar Fair retain any of the senior executives |
| 14 | | from PPI after the acquisition? |
| 15 | A | Yes. |
| 16 | Q | Which ones? |
| 17 | A | Mr. Ryan; there's a general manager by the name of |
| 18 | | Pat Jones; a Regional Vice President by the name of |
| 19 | | Richard Zimmerman and, you know, needless to say, |
| 20 | | numerous employees underneath those, but those would |
| 21 | | be the -- |
| 22 | Q | The senior -- |
| 23 | A | I might have forgot one or two, but those are the |
| 24 | | keys ones I remember right now. |
| 25 | Q | To the best of your recollection? |

Page 25

1 A    Yes.

2 Q    Do you remember the individuals that were not

3      retained, that were let go?

4 A    You know, I don't even know their names, I just --

5      yes, I know we left -- most of them that were under

6      contract, why, were not retained.

7 Q    Were not retained?

8 A    Yes.

9 Q    Obviously Mr. Weber was let go?

10 A    Yes.

11 Q    And other senior executives?

12 A    Yes.

13 Q    Were you aware of the terms of the employment

14      agreements generally with these individuals?

15 A    Yes. I had a general understanding of what they

16      were.

17 Q    Was it your understanding that after the acquisition

18      you were going to let people go and pay them for

19      their terms of the contract?

20 A    We were going to honor the contract, yes.

21 Q    Honor the contract. Prior to the closing did you

22      have any discussions with anybody at CBS or Viacom

23      regarding what the contracts meant or what was

24      intended?

25 A    No.

Page 26

1 Q    No discussions about the terms and conditions?

2 A    No.

3 Q    In 2006 did Cedar Fair typically have employment

4      contracts with its senior executives?

5 A    In 2006 I believe I was the only one that had an

6      employment contract. Certainly, you know, I believe

7      at that time I was the only one that had an

8      employment contract.

9 Q    Has the policy of Cedar Fair changed since then,

10     where you now have employment contracts with senior

11     executives?

12 A    A limited number of senior executives do have

13      contracts, yes.

14 Q    Do you know which ones?

15 A    Yes. Crage, Crage and Falfas and Decker.

16 Q    Just the three?

17 A    And myself, yes.

18 Q    And yourself. And those three -- Mr. Crage is the

19      CFO?

20 A    Correct.

21 Q    Mr. Falfas is?

22 A    COO.

23 Q    Mr. Decker?

24 A    Is Architecture, Planning and Design.

25 Q    Are you aware of any of the terms generally that are

Page 27

1      contained in those agreements?

2         MS. KIRILA:    Just objection,

3      relevance, but go ahead.

4 A    I just know the basics. You know, I understand what

5      they mean -- or I know that we're going to honor them

6      and the length of term that they are.

7 Q    Do you know if any of them contain any restrictions

8      after their employment has ended?

9 A    I don't know.

10        MS. KIRILA:    Just an objection to

11     the extent --

12 A    I don't know. I don't know if they can't --

13 Q    If you know?

14 A    No, I don't know.

15 Q    You've seen them before, I take it?

16 A    Yes. Uh-huh.

17      I'm showing you a document that has been marked

18      previously as Exhibit A, and ask you if you've ever

19      seen this document?

20 A    No, I have not.

21 Q    Other than your comment before that your intent was

22      to honor the contracts of PPI employees who were

23      going to be let go, did you have any other

24      discussions with anybody at Cedar Fair or PPI

25      regarding any other aspects of employment terms and

Page 28

1      conditions, other than simply complying with the

2      contracts?

3 A    No, not that I can recall.

4 Q    This agreement makes reference to severance on the

5      first page, there's a paragraph about severance,

6      employees getting severance?

7 A    Yes.

8 Q    Was it your understanding that employees from PPI

9      that were not retained would get severance?

10 A    The ones that were not covered by contracts, yes.

11 Q    That was your understanding?

12 A    Yes.

13 Q    As I read that section I don't see a limitation that

14      you just described, that being those individuals that

15      didn't have contracts, so let me ask you a question.

16      Was there any discussion in connection with the

17      acquisition thereafter that only individuals that

18      didn't have contracts would get severance?

19 A    I don't recall. I don't recall any conversation like

20      that.

21 Q    Mr. Nail didn't get a severance, correct?

22        MS. KIRILA:    Objection.

23 Q    You may answer.

24        MS. KIRILA:    It's a legal term, but

25     you can -- if you understand the question, answer.

PARAMOUNT PARK vs. NAIL    Condensed!    RICHARD L. KINZEL

MOUNT PARK 0595 L SN3 Document 11 2    Filed 08/08/2008    Page 8 of 31

Page 29

1 A    I know we honored what Mr. Nail got of the contract,
2      whether he got severance or not, I don't know.  To
3      the best of my knowledge, he did not.
4 Q    Okay.  I'd like to show you what's been marked
5      previously as Exhibit B.  I'll represent to you that
6      it's Mr. Nail's employment contract with CBS.  Take a
7      look at it, if you would.  Have you ever seen that
8      before?
9 A    No, I have not.
10 Q   Never before, this is first time you're seeing it?
11 A   To the best of my knowledge, it's the first time I've
12     seen it.
13 Q   Okay.  And other than the -- strike that.  Did you
14     have a conversation with Mr. Freeman about the terms
15     and conditions of Mr. Nail's contract with PPI?
16 A   Yes.
17 Q   And did you discuss with him -- strike that.  Did
18     Mr. Freeman relate to you what was contained in the
19     agreement?
20 A   Yes.
21 Q   Tell me what he said was in the agreement?
22 A   That we had an obligation to pay him through a
23     certain period of time and if he accepted employment
24     prior to that date, the contract, you know, we --
25     that would be the end of the contract.

Page 30

1 Q    That's what Mr. Freeman related to you was in the
2      contract?
3 A    To the best of my knowledge, something to that.  I
4      was under the impression after talking to Mr. Freeman
5      that basically we had a contract with Mr. Nail, we
6      were going to honor it through the end, and, but if
7      he took a job prior to that, the end of the contract,
8      why, our responsibilities would end.
9 Q    And that's what Mr. Freeman related to you was in the
10     contract?
11 A   Yes, very much so.
12 Q   Do you remember if Mr. Freeman related anything else
13     to you about any other terms and conditions in
14     Mr. Nail's contract?
15 A   No, I don't.
16 Q   That was the only thing?
17 A   To the best of my knowledge, yes.
18 Q   Other than discussions with Mr. Freeman, related to
19     Mr. Nail's contract, did you discuss Mr. Nail's
20     contract with any other individual at Cedar Fair or
21     PPI?
22 A   I probably discussed it with Duff Milkie.
23         MS. KIRILA:    And I'll just --
24 Q   I'm not going to ask you any questions about --
25 A   Okay.

Page 31

1 Q    -- a conversation with your lawyer, but I'll just ask
2      you this; when was Mr. Milkie hired?
3 A    Four months ago; he was hired in --
4 Q    January of '08?
5 A    Somewhere in that time frame, I believe.
6 Q    So after the -- strike that.  After the lawsuit was
7      filed, correct?
8 A    Yes.  Uh-huh.
9 Q    I think you said that you -- prior to hiring
10     Mr. Milkie, Cedar Fair did not have an in-house
11     counsel, correct?
12 A   Correct.
13 Q   And it never had an in-house counsel?
14 A   That is correct.
15 Q   Until the hiring of Mr. Milkie?
16 A   Correct.
17 Q   And why was it you decided to hire an in-house
18     counsel?
19 A   The business had just grown; it had doubled and we
20     felt it was time now to bring in a corporate counsel.
21 Q   And how did you learn of Mr. Milkie?
22 A   Actually, what I did was we did a -- how did we find
23     him?  He was local and he had good experience -- I
24     can't remember how exactly.  I've known, I've known
25     Mr. Milkie and we interviewed a couple of people and

Page 32

1      decided on Mr. Milkie.
2 Q    Okay.  Does he have an employment contract?
3 A    No.  I'm not sure, but I think we might have even
4      gone to a headhunter, I'm not sure, but I just don't
5      know.
6 Q    I may have asked you this and if I did I apologize,
7      but did you know what Mr. Nail's duties were as the
8      counsel for PPI?
9 A    Yes.  He was, he was counsel for, for that division
10     of CBS.
11 Q   And do you know what he did?
12 A   No.  I did not know, I did not see his job
13     description.
14 Q   After Cedar Fair acquired PPI, I believe it was in
15     June of '06 --
16 A   Correct.
17 Q   -- some of the PPI executives were put on what was
18     called, I believe, an administrative leave?
19 A   Yes.
20 Q   Is that right?
21 A   Yes.  Uh-huh.
22 Q   Do you know which ones were put on administrative
23     leave?
24 A   No, I don't.  I know there were, there were some that
25     were put on, I believe four or five, put on

**Page 33**

1   administrative leave until we decided what to do.
2 Q   What did you understand that term to mean,
3   "administrative leave?"
4 A   Well, basically they were -- we were honoring their
5   contracts; they were sent home until we could decide
6   exactly what course we wanted to take.
7 Q   Of the senior executives of PPI, were any of them not
8   put on administrative leave?
9 A   I don't know.
10 Q   I believe Mr. Nail was not, that he was asked to stay
11   with the company?
12 A   That could be correct, yes.
13 Q   You don't know that of your own knowledge?
14 A   No. I knew we had someone to stay to watch over the
15   headquarters in Charlotte.
16 Q   Was the intent, from your vision, is to eventually
17   reduce the head count for the PPI individuals, as it
18   would be duplicative of the Cedar Fair individuals?
19 A   Yes.
20 Q   When the individuals who you described were sent home
21   on administrative leave, are you aware of any
22   restrictions on what they could or couldn't do?
23 A   We just expected them to uphold the terms of their
24   employment contract.
25 Q   Were they obligated to come into the physical office?

**Page 34**

1 A   No.
2 Q   Were they obligated to be available to provide any
3   information to the company?
4   MS. KIRILA:   Just let me get an
5   objection on the record, to the extent the agreement
6   governs what exactly they can and cannot do, it would
7   speak for itself. But you can testify as to your
8   understanding and knowledge.
9 Q   That's all I'm asking.
10 A   I'm sorry, could you just repeat it?
11 Q   Sure. What was your understanding as far as what
12   obligations, if any, the individuals on
13   administrative leave were required of once they were
14   on administrative leave?
15 A   None. We were just, we just were re-thinking how we
16   were going to use them, if we were going to use them
17   or not.
18 Q   At all. Was it your decision to place these
19   individuals on administrative leave?
20 A   It was ultimately my decision, yes.
21 Q   Was that consistent with what your vision was of
22   merging the companies?
23 A   Yes.
24 Q   I think Mr. Nail was not put on administrative leave,
25   but was the individual left to, was it wind up the

**Page 35**

1   affairs? Would that be fair to say?
2 A   Well, I think, you know, he was sort of the
3   historian; he certainly knew all the legal and
4   someone had to be there to keep track of the building
5   and make sure that, you know, the door was locked at
6   night and someone turned the lights out. And my
7   recollection, now that you mentioned it, it must have
8   been Mr. Nail.
9 Q   Was it your recommendation that he be the one to sort
10   of keep an eye on things afterwards, or someone else?
11 A   It must have been someone else's.
12 Q   You don't know who that was, do you?
13 A   No.
14 Q   Do you remember how long it was after the closing,
15   which I believe was in or about June of 2006, that
16   Mr. Nail's -- Mr. Nail continued to come to work? Do
17   you know how long that was?
18 A   No, I don't.
19 Q   Do you know who would know that?
20 A   Probably Craig Freeman.
21 Q   Was Mr. Freeman the one who was more directly
22   involved with dealing with Mr. Nail?
23 A   Yes.
24 Q   Do you know what responsibilities, if any, Mr. Nail
25   had?

**Page 36**

1 A   No. Other than the title "Counsel."
2 Q   Did anyone tell you that Mr. Nail was not doing what
3   he was supposed to do?
4 A   No.
5 Q   Did anybody tell you that Mr. Nail was not doing what
6   he was directed to?
7 A   No.
8 Q   To your knowledge, did Mr. Nail perform his
9   obligations for the company after the acquisition?
10 A   I don't know any different than that.
11 Q   There came a time when Mr. Nail's employment was
12   terminated; do you recall that?
13 A   By terminated, you mean when we stopped payment?
14 Q   No. I mean, prior to that time that his -- he was
15   told --
16 A   Yes. Yes.
17 Q   Do you remember approximately when that was?
18 A   I don't remember the time, no.
19 Q   Was that your decision to terminate his employment?
20 A   Ultimately, yes.
21 Q   And did you discuss that with anyone?
22 A   Just Craig Freeman.
23 Q   And tell me what discussions you and Mr. Freeman had
24   regarding terminating Mr. Nail's employment?
25 A   You know, I just don't recall; we discussed each one

Page 37

1  of them on an individual basis.  The decision was
2  made at that time.
3  Q  Was the decision based on the fact that you didn't
4     need his services?
5  A  That would certainly be part of it, yes.
6  Q  What was the other part?
7  A  That was mainly it.  We just didn't need his services
8     and we didn't have a corporate counsel; we had no
9     intentions of having counsel on staff.
10  Q  You hadn't had one before, right?
11  A  No.
12  Q  Other than discussions with Mr. Freeman regarding
13     Mr. Nail's termination, do you recall talking to
14     anyone else at Cedar Fair or PPI about Mr. Nail's
15     services?
16  A  No.  The only, you know, the only other person that
17     mentioned it was, you know, an employee that
18     mentioned that they happened to see Mr. Nail and he
19     was working, but that's the only time.
20        MR. WEBER:      Could you read that
21     back for me?
22        THEREUPON, the Reporter read the requested
23     portion of the record.
24  Q  I just wanted to make clear I understand your
25     answer.  Prior to his termination and I don't mean

Page 38

1     stopping payment --
2  A  Uh-huh.
3  Q  -- prior to his physical termination of the company,
4     did you talk to anyone, other than Mr. Freeman, about
5     terminating Mr. Nail or the services he was
6     performing?
7  A  No.
8  Q  I'd like to show you what's been previously marked as
9     Exhibit C, if you could review that letter.
10  A  Yes.
11  Q  Is that your signature?
12  A  Yes, sir.
13  Q  Did you write this letter?
14  A  No.
15  Q  Did Mr. Freeman prepare it on your behalf?
16        MS. KIRILA:      Objection.  To the
17     extent you know, you can answer.
18  A  I don't know who, I don't know who drafted it.
19     Mr. Freeman presented it to me; whether he wrote it
20     or not, I don't know.
21  Q  Okay, fine.  He presented it to you?
22  A  Yes.
23  Q  Was this letter prepared at your direction or
24     Mr. Freeman's direction?
25  A  At my direction.

Page 39

1  Q  You reviewed it before you signed it?
2  A  Yes.
3  Q  Did you discuss the letter with Mr. Freeman before
4     you sent it out?
5  A  I'm sure we talked about it, yes.
6  Q  Do you remember what was discussed with Mr. Freeman?
7  A  No, I don't.
8  Q  Did you discuss the contents of the letter with
9     anyone else?
10  A  No, not that I'm aware of.
11  Q  Do you know of your own knowledge if Mr. Freeman
12     drafted it?
13        MS. KIRILA:      Objection.  Asked and
14     answered.  Go ahead, you can answer it again.
15  A  I don't know who drafted it.
16  Q  Do you know, and I don't want the specifics, but do
17     you know if an attorney drafted it?
18  A  I don't know.
19  Q  In this letter you notify Mr. Nail that as follows:
20     "Please be advised that PPI has determined that your
21     services will no longer be needed after August 1 of
22     2006."  I believe you say that in the first
23     paragraph?
24  A  Yes.
25  Q  Maybe not the first paragraph, but I'm sorry, the

Page 40

1     second paragraph?
2  A  Uh-huh.
3  Q  See that?
4  A  Yes.
5  Q  Do you have any understanding what that statement
6     meant?
7  A  Yes.  That basically that we weren't going to need
8     him, but we were going to honor our contract and that
9     he was, he was -- we just weren't going to use him.
10  Q  You didn't need him?
11  A  We didn't need him, correct.
12  Q  You also say that his employment is being terminated
13     without cause as of August 1, 2006; I believe that
14     next sentence down, right?
15        MS. KIRILA:      I'm just going to
16     object to the extent he testified he didn't write
17     this letter or draft it.  If you have an
18     understanding, based on when you read it, you can
19     testify to that.  I don't want you to testify as to
20     the drafter's intent.
21  Q  And I'll ask you the question that your counsel has
22     posed.  Did you have an understanding of what that
23     sentence meant?
24  A  You know, the way -- yes.  What it was intended, was
25     basically we were going to honor the contract until

Page 41

1    he took another position. If he took another
2    position then our responsibilities would end.
3 Q  And you based that on any contract or document, or
4    based on what Mr. Freeman told you?
5 A  I don't know.
6 Q  You don't have any recollection?
7 A  No, I don't.
8 Q  I believe you said you weren't aware of his job
9    duties and responsibilities, so I was going to ask
10   you, do you know who assumed his responsibilities
11   after his termination, but that may not be an
12   accurate or correct question to ask you if you didn't
13   know what his responsibilities were. So with that
14   preface, do you know if anybody assumed his
15   responsibilities or were they just not taken over?
16 A  They just were not taken over.
17 Q  Does Mr. Milkie have a job description?
18 A  Yes.
19 Q  Is there a written one?
20 A  Yes.
21      MR. WEBER:    I'll call for the
22   production of that and put it in writing for you.
23 Q  And that's the first time you had a job description
24   for an in-house lawyer, correct?
25 A  Correct.

Page 42

1 Q  I'll show you what's been marked previously as
2    Defendant's Exhibit F and ask if you're familiar with
3    this document and the attachment? Have you ever seen
4    that document before?
5 A  I can't recall seeing it, no.
6 Q  Do you recall speaking to anyone about a settlement
7    with Mr. Nail under his contract?
8 A  Yes. We talked about that.
9 Q  You talked to Mr. Freeman about it?
10 A  Yes.
11 Q  Did you talk to anybody else about it?
12 A  No.
13 Q  Tell me about your discussion with Mr. Freeman?
14 A  Well, basically it wasn't just limited to Mr. Nail,
15   it was all the people that were under contract. We
16   tried to work something out, and if they wanted to go
17   to work and divorce themselves of Cedar Fair and get
18   back into their life-styles, we would be willing to
19   talk to them about reaching a negotiated settlement
20   and signing a release and -- but it was not only
21   limited to Mr. Nail, it was limited to several other
22   people also.
23 Q  Was the proposal that we're looking at here offered
24   to all of the PPI individuals who were under
25   contract?

Page 43

1 A  I don't know. To the best of my knowledge, it was.
2 Q  Who would know that?
3 A  Mr. Freeman.
4 Q  And to the best of your knowledge, and I'm not
5    holding you to it, you think it was probably offered
6    to most, if not all, the PPI employees under
7    contract?
8 A  The ones that did not stay with us, yes.
9 Q  Right.
10 A  Uh-huh.
11 Q  I think you said maybe three or four did. Do you
12   know if anybody accepted their proposal?
13 A  I don't know.
14 Q  Who would know that?
15 A  I do know, if I think just a second. Of course
16   Mr. Weber did.
17 Q  Right.
18 A  Other than Mr. Weber, I don't know. I just can't
19   recall.
20 Q  And was this an offer the pay something less than 100
21   cents on the dollar remaining on the contract?
22 A  Yes.
23 Q  And Mr. Weber accepted it?
24 A  Yes.
25 Q  Do you know if any of the other individuals did not,

Page 44

1    to your recollection?
2 A  I just can't recall.
3 Q  Do you know if Mr. Weber had a job at the time he
4    accepted that proposal?
5 A  No, I do not.
6 Q  Do you know if any other individuals had jobs after
7    they left PPI?
8 A  I do not know that.
9 Q  Do you know to this day if they have jobs?
10 A  A few of them, I do know, have jobs.
11 Q  Do you know who has a job?
12 A  Yes. Mr. Kretzel was the General Manager of Canada's
13   Wonderland and now General Manager of the Hard Rock
14   Amusement Park.
15 Q  Do you know when he obtained that position?
16 A  They just opened this week, so he's probably been
17   there -- I don't know how long, but he's been there
18   for awhile.
19 Q  Do you know of anyone else who got employment?
20 A  I'm just trying to go through the list of names and I
21   don't even know the names, their names to be very --
22   oh. Tim, their COO, I believe he's working for
23   somewhere in the industry. Other than those two,
24   those are the only ones that I'm aware of. I can't
25   even remember Tim's last name.

Page 45

1 Q    And do you recall the intent of offering this
2      proposal to Mr. Nail?
3 A    It would have been the same as the intent for
4      everyone, to see if they wanted to terminate their
5      contracts and get on with their lives.
6 Q    And on the individuals who were made the offers,
7      similar to Mr. Nail's, did they have contracts that
8      were similar to Mr. Nail?
9           MS. KIRILA:        I'm just going to
10     object and --
11 A   I don't know.
12 Q   To your knowledge?
13 A   No, I don't know.  I don't know the individual
14     contracts.
15 Q   And who would know them?
16 A   Craig Freeman.
17 Q   And do you have any independent recollection of any
18     similarities with Mr. Nail's contract and anyone
19     else?
20 A   I know that all of them had the clause in there that,
21     you know, that they had a noncompete and that if they
22     went back to work that ended the contract.
23 Q   They all had that clause?
24 A   I'm quite sure that had it all in there.
25         MR. WEBER:       We'll call for the

Page 46

1      production of those contracts.
2           MS. KIRILA:         And I'll object to
3      that.  The documents will speak to itself as to their
4      similarities or not.
5           MR. WEBER:        We'll take this
6      witness's testimony and I'd like to see the
7      documents.
8 Q    Did you have an understanding of what Mr. Nail's
9      noncompete obligations were?
10 A   No.  Except what normal noncompete obligations are,
11     that you can't work for someone that's in your
12     business.
13 Q   Did you discuss the obligations, the noncompete
14     obligations with anyone?
15 A   No.
16 Q   Do you have an understanding of whether those
17     obligations are enforceable where somebody is
18     terminated?
19         MS. KIRILA:        Objection.  It calls
20     for a legal conclusion beyond the scope of this
21     witness's knowledge.
22         MR. WEBER:        I'm asking for his
23     knowledge only, that's all.
24 A   Could you repeat it real quick?
25         MR. WEBER:       Could you repeat that

Page 47

1      question, please?
2           THEREUPON, the Reporter read the requested
3      portion of the record.
4 A    I felt that everything in the contract was
5      enforceable.
6 Q    Did you have an independent personal knowledge of
7      whether a noncompete was enforceable against an
8      attorney?
9           MS. KIRILA:        The same objection.
10 A   I don't know.
11 Q   I'll show you Mr. Nail's contract, paragraph 11.
12     I'll ask you to read paragraph 11, Exhibit B.
13         MS. KIRILA:        Wait a second, please,
14     before you answer.  And I'm just going to object to
15     this question on the grounds he testified he's never
16     seen this document before; he shouldn't be asked
17     about the language in there.
18         THE WITNESS:        Can I answer?
19         MS. KIRILA:        I don't know what the
20     question is.
21 Q   Well, let me ask you a question; I just wanted you to
22     read it.  In reading that, is it your understanding
23     that Mr. Nail could do nothing of any employment
24     nature whatsoever after he was terminated from PPI?
25         MS. KIRILA:        The same objection.

Page 48

1      Again, it calls for a legal interpretation of a
2      contract.  If you have an understanding --
3 Q    Do you have an understanding?
4           MS. KIRILA:        -- based on this
5      agreement, you can testify.
6 A    I had the understanding that he couldn't work for
7      anyone.
8 Q    Anyone?
9 A    Anyone.
10 Q   Could he do anything at all, in any -- for any
11     employer?
12         MS. KIRILA:        The same objection.
13         MR. WEBER:         Noted for the record.
14 A   I'm not an attorney, but the way I would read it, he
15     couldn't do anything.
16 Q   Could he work for a cashier at Home Depot?
17 A   No.
18         MS. KIRILA:        Objection.
19 Q   Could he mow lawns?
20 A   Not for pay.
21 Q   Could he do pro bono legal work?
22 A   Yes.
23         MS. KIRILA:        Objection.  Go ahead.
24 A   If he was not getting paid.
25 Q   So he could not receive any pay from any employer, no

Page 49

1   matter where or where that employer was?

2 A   Yes.

3 Q   Your answers, I believe, are based on discussions you

4    had with Mr. Freeman; is that correct?

5 A   Correct.

6 Q   And based on Mr. Freeman's reading of the contract,

7    is that right?

8      MS. KIRILA:     Objection. To the

9    extent it calls for speculation and you don't know

10    what Mr. Freeman was relying on. If you can answer.

11 Q   My question is that you were relying -- you had not

12    seen this contract until today, correct?

13 A   To the best of my recollection, yes.

14 Q   And the basis of your understanding of the agreement

15    was based on what Mr. Freeman told you?

16 A   Correct.

17 Q   No one else?

18 A   Correct.

19 Q   Do you know if Mr. Nail attempted to speak with you

20    in 2007 about this dispute?

21 A   To the best of my knowledge, Mr. Nail never tried to

22    make contact with me.

23 Q   Mr. Freeman never shared with you Mr. Nail's desire

24    to speak with you?

25 A   No.

Page 50

1 Q   I'd like to show you what's been previously marked

2    Defendant's Exhibit G, just a complaint in this

3    case. Have you ever seen that before? Take a look

4    at it and then I'll ask you a question.

5      THE WITNESS:     Is this his

6    deposition?

7      MS. KIRILA:     No, it's their records

8    --

9 A   I've never seen this before.

10 Q   I'll represent that this is the legal complaint --

11 A   Oh, okay.

12 Q   -- that was filed in this case by PPI against

13    Mr. Nail, in the Southern District of New York --

14 A   Okay.

15 Q   -- District Court. You never saw it before?

16 A   No. No, I don't think I've ever seen this before. I

17    knew it was happening, but I don't think I ever read

18    the document.

19 Q   Was it your decision to terminate Mr. Nail?

20 A   I -- ultimately, yes.

21 Q   Was it your decision to institute a lawsuit against

22    him?

23 A   Yes.

24 Q   I'd like to refer you to paragraph 22 of the

25    complaint.

Page 51

1      MS. KIRILA:     The same objection.

2    He's never seen this document. I object to the

3    extent you're going to ask him about language in it.

4    But you can, we'll hear what the question is.

5 A   22, sir, did you say?

6 Q   Paragraph 22 on page 5.

7 A   Oh, paragraph. Okay.

8 Q   I'll read it. It says, "Defendant never notified PPI

9    that he was eligible to receive health insurance or

10    other employee benefits from any other source." Did

11    I read that correctly?

12 A   Yes.

13 Q   Do you have an understanding of whether Mr. Nail had

14    any obligation to PPI, to inform PPI that he was

15    eligible to receive health insurance or other

16    employee benefits from any other source?

17      MS. KIRILA:     Objection to the extent

18    it asks for a legal conclusion or something governed

19    by a legal document, but you can answer.

20 A   No.

21 Q   In this lawsuit PPI contends that Mr. Nail breached

22    his obligations to PPI by not informing the company

23    that he was eligible to receive health insurance or

24    other employee benefits from other sources. Do you

25    have any knowledge yourself of the basis for that

Page 52

1    claim?

2 A   No.

3 Q   Do you know of any documents that require any

4    employee who is terminated to advise PPI or Cedar

5    Fair of eligibility to receive benefits somewhere

6    else?

7 A   Not to my knowledge.

8 Q   Paragraph 23 states, "Defendant never notified PPI

9    that his address had changed." Did I read that

10    correctly?

11 A   Correct. Yes.

12 Q   Did you ever ask Mr. Nail to advise you that -- if

13    his address had changed?

14 A   No.

15 Q   Do you know of any obligation in Mr. Nail's

16    employment contract that obligates him to advise PPI

17    of a change of address?

18 A   No.

19      MS. KIRILA:     Objection. Objection

20    for the record, to the extent it's asking for the

21    contents of a legal agreement that he testified he

22    never saw and calls for a legal conclusion, but you

23    can answer.

24 A   To my knowledge, no.

25 Q   Do you know of any requirements that PPI or Cedar

Page 53

1 Fair have that require an individual who leaves the
2 company to notify the company of a change of address?
3     MS. KIRILA:    The same objection. Go
4 ahead.
5 A I don't know the answer to that.
6 Q Did you ever tell Mr. Nail it would be a breach of
7 his employment agreement if he moved and he didn't
8 tell you that he changed address?
9 A No.
10 Q Do you know if anybody else did?
11 A I don't know.
12 Q Did you ever ask Mr. Nail to keep in contact with you
13 in case his services would be needed?
14 A To the best of my knowledge, I've never spoken to
15 Mr. Nail.
16 Q Do you know if anybody else asked him to stay in
17 touch in case his services were needed?
18 A I don't know.
19 Q Paragraph 24 states, "On or about June 2007 Defendant
20 directly or indirectly represented to PPI
21 representative that he was still employed --
22 unemployed. Further, Defendant participated in an
23 employee benefit enrollment effective July 1, 2007 as
24 an employee of PPI." Did I read that correctly?
25 A Yes.

Page 54

1 Q Do you know what that refers to?
2 A No.
3     MS. KIRILA:    Objection. Go ahead.
4 A No. I take it that --
5     MS. KIRILA:    I'm going to object and
6 instruct you not to speculate. If you know, you can
7 testify.
8 A I don't know. No, I don't know.
9 Q Did you discuss with any employee of PPI or Cedar
10 Fair the allegations in that paragraph 24?
11 A I believe that Craig Freeman and I talked about that.
12 Q Tell me what you and Mr. Freeman discussed?
13 A All I remember is when we were talking about the case
14 he mentioned that Mr. Nail had, had done that, which
15 led him to believe that he knew what he was doing by
16 not reporting that he was working.
17 Q When you say done, had done that?
18 A Had made a change in his, in his Defendant -- or, I
19 mean, I'm sorry, in his enrollment benefits and his
20 benefits, employee benefits.
21 Q And represented that he was unemployed?
22 A Yes.
23 Q That's the issue you're talking about?
24 A Yes, I believe that's what Mr. Freeman related to me.
25 Q Did Mr. Freeman tell you the basis of that

Page 55

1 allegation, why he believed that Mr. Nail represented
2 that he was unemployed in June of '07?
3 A No.
4 Q The next paragraph, 25 states, "Then in mid October
5 2007 PPI learned from another employee that Defendant
6 was working full-time for Denny's Inc., paren,
7 (Denny's)," did I read that correctly?
8 A Yes.
9 Q Do you know how PPI learned that Mr. Nail was working
10 for Denny's?
11 A Yes.
12 Q How do you know?
13 A A fellow employee of Mr. Nail and now a member of
14 our, of our company had ran across Mr. Nail at an
15 airport and in small talk, why, Mr. Nail indicated to
16 him that he was now working for Denny's, and in
17 conversation with this employee he just happened to
18 mention it.
19 Q And your understanding, from the story being related
20 back, was that Mr. Nail told this individual that he
21 was working for Denny's?
22     MS. KIRILA:    Objection. Go ahead.
23 A What I was told was he was corporate counsel for
24 Denny's, yes.
25 Q Do you know who told you that?

Page 56

1 A Yes.
2 Q Who was that?
3 A Jim Ryan.
4 Q And Jim Ryan was the individual that Mr. Nail met
5 with?
6 A Well, they actually -- no, they met in the airport,
7 yes, they didn't have a meeting.
8 Q I meant that. Mr. Ryan was the individual that
9 Mr. Nail spoke with at the airport?
10 A Yes.
11 Q What else did Mr. Ryan tell you?
12 A Nothing. Just small talk and he just mentioned that
13 he happened to run across Mr. Nail and he was working
14 at Denny's. I just about dropped my -- my jaw
15 dropped open and that's what prompted it.
16 Q Tell me what else you discussed with Mr. Ryan at that
17 time?
18 A Nothing.
19 Q Did you discuss anything subsequent to that time with
20 Mr. Ryan about Mr. Nail?
21 A No. To the best of my knowledge, no.
22 Q I'd like you to look at paragraph C of the employment
23 agreement -- I'm sorry, 7C of the employment
24 agreement.
25 A Do I have that here?

Page 57

1  Q    There it is on top there.  That document on top.
2  A    7C?
3  Q    If you would.
4        MS. KIRILA:    Just an objection for
5        the record; any questions regarding this agreement
6        that the witness testified he's never seen.
7  A    Okay.
8  Q    Did you get a chance to read paragraph 7C of Exhibit
9        B?
10 A    Yes.
11 Q    That states, "If Mr. Nail is terminated without cause
12       they will pay him his base salary and all applicable
13       plans and/or benefits pursuant to this agreement,"
14       correct?
15       MS. KIRILA:    Objection.  The
16       document speaks for itself and there's --
17 A    I --
18       MS. KIRILA:    -- it takes more than
19       that, but go ahead.
20 A    No.  I agree.  There's more to it than that, just
21       this paragraph.  It reflects other paragraphs like
22       noncompete and things like that.
23 Q    We'll get to that in a second.
24 A    Okay.
25 Q    This paragraph, subparagraph 7C though, provides that

Page 58

1        he was to receive employee benefits after his
2        termination, correct?
3        MS. KIRILA:    Objection.
4  Q    You may answer.
5  A    Yes.
6  Q    Okay.  Put this aside for a second and come back to
7        it in one minute.  I'll show you what's been marked
8        as Defendant's Exhibit I and ask if you've ever seen
9        that document?
10 A    No.  To the best of my knowledge, I have not seen
11       this.
12 Q    Did you know that it was being sent by Mr. Freeman?
13 A    Yes.
14 Q    Did you direct him to do it?
15 A    Yes.
16 Q    Based on your conversation with Mr. Ryan?
17 A    Yes.
18 Q    Are you aware go Mr. Nail called Mr. Freeman after
19       receiving this letter?
20 A    I don't know.
21 Q    Are you aware of whether Mr. Nail responded to this
22       letter from Mr. Freeman?
23 A    I don't know.
24 Q    Exhibit I?
25 A    I don't know.  I know they had conversation, but I

Page 59

1        don't know anything else about it.
2  Q    Did you make the decision to stop paying Mr. Nail?
3  A    Yes.
4  Q    And how did you go about implementing that decision?
5        MS. KIRILA:    Objection.  It assumes
6        facts, but go ahead.
7  A    I just instructed to Mr. Freeman to cease salary and
8        benefits as -- at that date.
9  Q    I'll show you what's been previously marked as
10       Defendant's Exhibit L and ask if you've ever seen
11       this letter?
12 A    No, I've never -- to the best of my knowledge, I've
13       never seen this letter.
14 Q    Mr. Freeman never showed that to you?
15       MS. KIRILA:    Objection.  Go ahead.
16 A    To the best of my knowledge, I've never seen it.
17 Q    Did Mr. Freeman ever tell you that Mr. Nail remained
18       ready, willing, and able to provide exclusive
19       services to PPI?
20 A    No.
21 Q    Do you know if Mr. Nail was available -- or strike
22       that.  Do you know if Mr. Nail was ready, willing,
23       and able to provide exclusive services to PPI?
24       MS. KIRILA:    Objection.  Go ahead.
25 A    I don't know.

Page 60

1  Q    Did you ever ask Mr. Nail to perform services for PPI
2        after his termination?
3  A    No, I don't know.  No, I don't -- I did not, no.
4  Q    Did you ever direct anyone to ask Mr. Nail to perform
5        services for PPI after his employment was terminated
6        in 2006?
7  A    No.
8  Q    To your knowledge, did any employee of PPI or Cedar
9        Fair ever ask Mr. Nail to perform any services
10       whatsoever for PPI or Cedar Fair at any time after
11       August 2006?
12 A    Not to the best of my knowledge.
13 Q    And you would know that, would you not?
14       MS. KIRILA:    Objection.
15 A    I don't know everything, but I probably would.  To
16       the best of my knowledge, no one asked him to work.
17 Q    You never considered using, utilizing Mr. Nail's
18       services after August 2006, did you?
19 A    No.
20 Q    And to your knowledge, no one else at PPI or Cedar
21       Fair considered utilizing his services after August
22       2006, correct?
23       MS. KIRILA:    Objection.  Calls for
24       speculation.  You can answer.
25 A    It certainly wasn't discussed with me, if anyone was.

PARAMOUNT PARK vs. E. NAIL     Condenseit!®     RICHARD L. KINZEL

Case No. 07-cv-10595-SHS    Document 41-2    Filed 08/08/2008    Page 16 of 31

Page 61

1 Q   It wasn't discussed in any of your weekly meetings
2    with the executives that you referred to before?
3 A   No.
4 Q   Correct?
5 A   Correct.
6 Q   And if I asked this before I apologize. Just so it's
7    clear, did you have any conversation with anybody at
8    PPI or Cedar Fair after August 2006 about utilizing
9    Mr. Nail's services?
10 A   To the best of my knowledge, no, I did not.
11 Q   And just so it's clear, you had no intention of
12    utilizing his services after August 2006, correct?
13      MS. KIRILA:      Objection. You can
14    answer.
15 A   There was no position available for him.
16 Q   And you had no intention of utilizing his services,
17    correct?
18 A   Perhaps if a position became available we might have
19    considered him, but there was no position that became
20    available.
21 Q   And you never -- and -- strike that, I've asked
22    that. To your knowledge, did PPI or Cedar Fair
23    request the services of any other individuals who
24    were terminated in the acquisition to perform any
25    services whatsoever after they were let go?

Page 62

1      MS. KIRILA:      Objection. Those with
2    employment contracts?
3      MR. WEBER:      Yes.
4 A   I believe Pat Jones.
5 Q   Pat Jones remained employed?
6 A   I'm not sure of the story on her. She left and then
7    she came back and she's presently a General Manager
8    with us now.
9 Q   With the exception of Pat Jones, who obviously asked
10    to come back and she did, was anyone else asked to
11    perform services that had an employment agreement
12    with PPI after they were terminated?
13 A   I don't recall anyone.
14 Q   Okay. Did anybody ever tell you that they asked them
15    to perform services, "them" meaning the individuals
16    with employment contracts?
17 A   No.
18 Q   To your knowledge, did any former PPI employee who
19    had an employment contract contact you to tell you
20    that they had new employment?
21 A   No.
22 Q   Do you know if any of those individuals that had
23    employment contracts with PPI contacted anyone else
24    at PPI or Cedar Fair that they had new employment?
25 A   I don't know of any.

Page 63

1 Q   Other than Mr. Nail, did Cedar Fair or PPI stop
2    paying any former PPI employee after they were
3    terminated from the company?
4      MS. KIRILA:      Objection, to the
5    extent they had different agreements or whatnot, but
6    you can answer, to your knowledge.
7 A   I don't know.
8 Q   Whether they had different agreements or not, are you
9    aware of any decision or action taken to stop paying
10    anyone who left PPI in connection with the
11    termination of their services?
12 A   Prior to them signing their release?
13 Q   Yes.
14 A   Yes. No.
15 Q   And other than Mr. Weber signing his release, did
16    anybody else sign a release?
17 A   Yes.
18 Q   Who was that?
19 A   Tim, I'm sorry I don't know his last name, I'm sure
20    he signed a release; Kretzel signed a release. Those
21    are the only two I'm aware of, but I believe everyone
22    else signed releases.
23 Q   Was that in connection with the offer that was made
24    to Mr. Nail as well, about receiving some payments?
25 A   A lump sum payment, yes. It was the same, different

Page 64

1    numbers of course, but it was a lump sum payment to
2    be relieved of their responsibilities.
3 Q   Okay.
4      MS. KIRILA:      I need a rest room
5    stop.
6      MR. WEBER:      Let's take it right
7    now.
8      THEREUPON, there was a brief recess.
9 Q   To your knowledge, did Mr. Nail ever refuse to
10    perform any services for PPI or Cedar Fair at any
11    time after August 1, 2006?
12 A   Not to my knowledge.
13 Q   Assuming Denny's had no objection, do you contend it
14    would violate Mr. Nail's contract for him to perform
15    services for PPI while employed at Denny's?
16      MS. KIRILA:      Objection. Go ahead.
17 A   I'm sorry. Yes.
18 Q   Denny's is not a competitor of PPI, is it?
19      MS. KIRILA:      Objection. Go ahead.
20 A   Yes.
21 Q   You view it as a competitor. And do you base that on
22    your earlier testimony, that any discretionary dollar
23    spent is a competitor, spent?
24 A   Well, that along with the facts that we have three
25    TGI Fridays which are in direct competition with --

Page 65

1   with Mr. Nail works for Denny's; we have a Johnny
2   Rocket's, we have two Johnny Rocket's, which are
3   branded food concepts; we have a Famous Dave's, and
4   we have three or four Subway locations, all branded
5   food locations, which are in direct competition with
6   Denny's.
7 Q  If he's -- if he could somehow divide his time to do
8   work for Denny's and PPI, any reason why he couldn't
9   do that?
10     MS. KIRILA:     Objection. Rights and
11   obligations are governed by agreement, but you can
12   testify.
13 A  I couldn't even answer that question.
14 Q  If Denny's said you can take a leave of absence and
15   go work for PPI if they request it, would that be
16   acceptable to you?
17     MS. KIRILA:     Objection. Calls for
18   speculation, is governed by his rights and
19   obligations and governed by legal agreement, but you
20   can --
21 A  I don't know. It all would depend on what, you know,
22   what kind of responsibilities we would need at the
23   time.
24 Q  You don't have any knowledge, one way or the other,
25   about Mr. Nail's willingness to do work for PPI from

Page 66

1   August '06 through December 31, '07, do you?
2     MS. KIRILA:     Objection. To the
3   extent it calls for a definition of a legal term in
4   the contract, but you can answer.
5 A  No, I don't.
6 Q  If Mr. Nail had been willing and able to cease his
7   Denny's employment at any time in order to perform
8   services for PPI, do you still contend that his
9   Denny's employment rendered him unable to perform
10   exclusive services for PPI?
11     MS. KIRILA:     Objection. Calls for a
12   legal conclusion. I don't know even how you can
13   answer, but you can, if you can.
14 A  I don't know how to answer that. It all depends on
15   the circumstances and what would be available at the
16   time.
17 Q  Well, my question is, you never asked him to perform
18   services, we know that, correct?
19 A  Correct.
20 Q  Had you done so and had he decided to leave Denny's,
21   would he be in compliance with his agreement?
22     MS. KIRILA:     Calls for speculation
23   and calls for a legal conclusion.
24 A  I don't know.
25 Q  Okay. So it would be, you would speculate what

Page 67

1   Mr. Nail would do if you had asked him to come back,
2   correct?
3     MS. KIRILA:     Objection.
4 Q  That would be a speculation; you wouldn't know?
5 A  I don't know how to answer it. If Nail would have
6   called me and said, "I, you know, we could settle
7   this by me coming back to work," we probably would
8   have done something, or, you know, but he didn't.
9   Well, I can't speculate, I don't know. I mean, what
10   went through his mind. He should have let us know
11   that he had another job, and if he would have called
12   me and said, "I want to work something out or I'm
13   going to go to work," we would have worked something
14   out.
15 Q  And the basis for your belief that he had that
16   obligation is what?
17 A  The contract.
18 Q  Okay. Would it surprise you that Mr. Nail did call
19   Mr. Freeman after he received the letter?
20 A  I don't know that.
21 Q  What's your understanding, and not a legal, but a
22   practical understanding of the terms ready, willing,
23   and able?
24     MS. KIRILA:     Objection. Calls for a
25   pure legal conclusion. If he even has an

Page 68

1   understanding, it hasn't been established, but you
2   can testify.
3 A  What I assume by reading the contract and with the
4   noncompete and ready, willing and able, that he was
5   available to come back to work for us and if he went
6   to work -- in other words, we were paying him to sit
7   home and to get his resume ready for when the
8   contract ended, that he would be able to go back into
9   the workplace. But up until the time that the
10   contract ended, he was under our guidance and
11   direction to do what we, you know, if we requested
12   his services, why, he would be there for us to do it.
13 Q  If you requested them?
14 A  If we requested it.
15 Q  And you never did?
16 A  We never did, no, at that time.
17 Q  At any time you never requested his services?
18 A  Not up until today, not up -- no, you're right. From
19   there and then until now we have not asked for his
20   services.
21 Q  And his contract expired December 31, 2007, correct?
22     MS. KIRILA:     Objection. It calls
23   for a legal conclusion. As to when that contract
24   terminated by actions or otherwise is a legal
25   conclusion. If you have an understanding.

| Page 69 |
|---|

1   A    No, I don't know, even know when it expired.

2   Q    Do you know when Mr. Nail's obligations ended to PPI

3       or Cedar Fair?

4   A    No, I don't.

5   Q    I think you said that one of the reasons you needed

6       to hire Mr. Milkie was that the company had grown?

7   A    (Nod indicating yes.)

8   Q    What has been the growth of the company in the last

9       year?

10         MS. KIRILA:       Objection, relevance.

11       Mr. Freeman hasn't -- I mean, Mr. Nail hasn't been

12       on --

13         MR. WEBER:       I withdraw the

14       question.

15   A    Okay.

16   Q    When did you first think about hiring a general

17       counsel?

18   A    Probably after we had the -- probably 12 to 16, 18

19       months after the acquisition we found out how

20       complicated it was. We not only doubled the

21       business, we also doubled our strategy; our business

22       strategy going forward was, was always to have a very

23       low corporate staff, we outsourced a lot. Probably,

24       I don't know, at 12 to 18 months into it we found out

25       that we're paying an awful a lot of money in outside

| Page 70 |
|---|

1       contractors and at that point, why, I decided we

2       needed corporate counsel.

3   Q    Was Mr. Nail ever considered for the general counsel

4       position?

5   A    You know, Mr. Nail was an attorney for a subsidiary

6       to CBS and what I was looking for was a corporate

7       attorney that could handle the whole company.

8   Q    So would the answer be no?

9   A    No, yes -- yes.

10   Q    I take it you were not aware of the direct deposit

11       reversal of Mr. Nail's checks, correct?

12   A    I'm not a -- not aware of that, no.

13   Q    I think you said that it was your decision to

14       initiate the suit, correct?

15   A    I did, yes.

16   Q    Other than your attorneys, I don't want you to talk

17       to me about a conversation with them, what did you

18       tell Mr. Freeman about initiating the suit?

19   A    What did I tell him?

20   Q    (Nod indicating yes.)

21   A    I asked him, you know, if, how strongly he felt on

22       the contract and to get advice if Mr. Nail had

23       violated the contract, and if that indeed that we

24       felt that he had violated the terms of the contract

25       we should try to get our money back.

| Page 71 |
|---|

1   Q    What did Mr. Freeman say in response?

2         MS. KIRILA:       I'm just going to

3       object and instruct you not to reveal any

4       communications that he had with counsel that he

5       shared with you.

6   A    He just got back to me, he told me he had a very

7       strong case.

8   Q    I don't want you to say, tell me what he might have

9       said to counsel, but did he say if he spoke to

10       counsel?

11   A    I'm sure he did.

12   Q    Do you regularly communicate by e-mail?

13   A    No. Sorry, wrong generation.

14   Q    That's why I asked it, I'm close to you. Were you

15       aware of any documents related to Mr. Nail's

16       employment, the termination thereof, or any of the

17       issues surrounding this lawsuit that have been

18       destroyed for any reason?

19   A    No.

20         MR. WEBER:       Let's just take a few

21       minutes, I think I'm probably almost done.

22         THEREUPON, there was a brief recess.

23         MR. WEBER:       Mr. Kinzel, I'm all

24       done. Thank you very much for your time.

25         THE WITNESS:       Very nice meeting you.

| Page 72 |
|---|

1         MR. WEBER:       Nice meeting you.

2       THEREUPON, the deposition concluded at 1:32 p.m.

3       /S/

Page 73

```
 1              C O R R E C T I O N S
 2      PAGE      LINE      CORRECTIONS/COMMENTS
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 75

```
 1                      CERTIFICATE
 2      STATE OF OHIO
 3      COUNTY OF
 4
 5          I certify that this deposition was
 6      signed in my presence by RICHARD L. KINZEL on the
 7          day of          , 2008.
 8          IN WITNESS WHEREOF, I have hereunto set my
 9      hand and affixed my seal of office at        , Ohio
10      on this    day of          , 2008.
11
12
13                  Notary Public
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 74

```
 1                      CERTIFICATE
 2      STATE OF OHIO    )
 3      COUNTY OF ERIE   )  ss.
 4
 5          I, Lori L. Delhees, Stenotype Reporter and
        Notary Public within and for the State aforesaid,
 6      duly commissioned and qualified, do hereby certify
        that the within named RICHARD L. KINZEL was by me,
 7      before the giving of his deposition, first duly sworn
        to testify the truth, the whole truth and nothing but
 8      the truth in the cause aforesaid; that the deposition
        as above set forth was reduced to writing by me by
 9      means of Computer-Aided Transcription; that the said
        deposition was taken pursuant to Notice and was
10      completed without adjournment; that I am not a
        relative or attorney of either party or otherwise
11      interested in the eventual outcome of this action.
12          IN WITNESS WHEREOF, I have hereunto set my hand
        and seal of office at Sandusky, Ohio, this    day of
13          , 2008.
14
15
16              HUNTLEY REPORTING SERVICE
                Lori L. Delhees
17              Notary Public
                P. O. Box 1067
18              Sandusky, Ohio  44870
19          My commission expires 11/24/2012
20
21
22
23
24
25
```

-'-

'06 [2]    32:15    66:1
'07 [1]    55:2    66:1
'08 [1]    31:4
'86 [1]    12:15
'97 [1]    16:16

---

-vs [1]    1:6

-/-

/S/ [1]    72:3

-0-

07 [1]    1:6

-1-

1 [4]    39:21    40:13
53:23    64:11
1.4 [1]    20:5
10 [1]    3:18
100 [1]    43:20
10022-4834 [1]
2:8
10595 [1]    1:6
1067 [1] 74:17
11 [2]    47:11    47:12
11/24/2012 [1] 74:18
12 [3]    8:19    69:18
69:24
12:00 [1]    1:15
1300 [1] 2:4
16 [1]    69:18
16th [1] 2:8
18 [3]    3:12    69:18
69:24
19 [1]    5:8
1986 [2] 12:6    12:6
1987 [1] 5:8
1988 [1] 5:8
1997 [1] 13:5
1:32 [1]    72:2

-2-

2 [2]    3:15    3:16
2001 [1] 1:14
2006 [15]    13:13
13:16    16:6    26:3
26:5    35:15    39:22
40:13    60:6    60:11
60:18    60:22    61:8
61:12    64:11
2007 [6] 16:6    49:20
53:19    53:23    55:5
68:21
2008 [4] 1:15    74:13
75:7    75:10
22 [3]    50:24    51:5

51:6
23 [1]    52:8
24 [3]    6:6    53:19
54:10
25 [1]    55:4
27 [1]    3:12
29 [1]    3:13

-3-

31 [2]    66:1    68:21
38 [1]    3:14

-4-

4 [1]    3:7
41 [1]    2:4
42 [1]    3:15
43215 [1]    2:5
44870 [1]    74:17
48 [1]    6:9

-5-

5 [2]    3:13    51:6
50 [1]    3:16
58 [1]    3:17
59 [1]    3:18

-6-

6th [1]    1:15

-7-

7C [4]    56:23    57:2
57:8    57:25

-8-

8 [1]    3:17
885 [1]    2:8

-9-

9 [2]    3:7    3:14

-A-

ability [1]    6:12
able [6]    59:18    59:23
66:6    67:23    68:4
68:8
about [55]    5:7
7:2    7:24    8:2
8:7    8:10    8:15
8:18    8:20    9:2
9:4    9:6    10:2
10:4    10:19    10:23
20:19    23:19    23:21
23:24    23:25    24:2
24:11    26:1    28:5
29:14    30:13    30:24
35:15    37:14    38:4
39:5    42:6    42:8
42:9    42:11    42:13
42:19    47:17    49:20

51:3    53:19    54:11
54:13    54:23    56:14
56:20    59:1    59:4
61:8    63:24    65:25
69:16    70:17    70:18
above [1]    74:8
absence [1]    65:14
acceptable [1]    65:16
accepted [4]    29:23
43:12    43:23    44:4
according [1]    4:6
accurate [1]    41:12
acquire [2]    17:17
17:19
acquired [2]    32:14
acquiring [2]    19:8
19:11
acquisition [11] 18:25
21:15    21:17    22:1
22:4    24:25    25:17
28:17    36:9    61:24
69:19
across [2]    55:14
56:13
action [2]    63:9
74:10
actions [1]    68:24
actual [1]    19:17
address [5]    52:9
52:13    52:17    53:2
53:8
adjournment [1]
74:9
administrative [11]
8:13    32:18    32:22
33:1    33:3    33:8
33:21    34:13    34:14
34:19    34:24
advice [1]    70:22
advise [3]    52:4
52:12    52:16
advised [1]    39:20
affairs [1]    35:1
affect [1]    6:12
affidavit [2]    6:18
7:14
affixed [1]    75:9
aforesaid [1]    74:5
74:7
after [37]    8:25
9:18    10:15    10:22
11:8    19:11    22:4
24:8    24:14    25:17
27:8    30:4    31:6
31:6    32:14    35:14
36:9    39:21    41:11
44:6    47:24    58:1
58:18    60:2    60:5
60:10    60:18    60:21
61:8    61:12    61:25
62:12    63:2    64:11
67:19    69:18    69:19
afterwards [1]    35:10
against [1]    4:13
47:7    50:12    50:21
answered [1]    39:14

age [1]    4:2
ago [1]    31:3
agree [1] 57:20
agreement [23]    3:12
9:22    10:8    11:12
23:7    23:13    24:3
28:4    29:19    29:21
34:5    48:5    49:14
52:21    53:7    56:23
56:24    57:5    57:13
62:11    65:11    65:19
66:21
agreements [5]    9:22
25:14    27:1    63:5
63:8
ahead [14]    5:22
20:4    27:3    39:14
48:23    53:4    54:3
55:22    57:19    59:6
59:15    59:24    64:16
64:19
airport [3]    55:15
56:6    56:9
Al [8]    9:2    9:5
9:12    10:5    21:10
21:11    21:16    21:19
alcoholic [1]    6:5
Alexakos [1]    14:10
all [22]    8:4    14:10
14:11    15:2    15:9
34:9    34:18    35:3
42:15    42:24    43:6
45:20    45:23    45:24
46:23    48:10    54:13
57:12    65:4    65:21
66:14    71:23
allegation [1]    55:1
allegations [1]    54:10
almost [1]    71:21
along [1]    64:24
also [5]    5:12    15:12
40:12    42:22    69:21
always [1]    69:22
America [1]    13:18
amount [1]    6:4
amusement [6]    17:22
17:23    18:2    18:17
19:17    44:14
analysis [1]    19:19
20:20
and/or [1]    57:13
Ann [1]    14:15
another [6]    5:5
24:9    41:1    41:1
55:5    67:11
answer [23]    4:17
9:23    28:23    28:25
37:25    38:17    39:14
47:14    47:18    49:10
51:19    52:23    53:5
58:4    60:24    61:14
63:6    65:13    66:4
66:13    66:14    67:5
70:8

answers [2]    4:18
49:3
any [91]    4:19    5:16
6:5    6:8    6:16
7:1    8:7    9:2
9:6    9:18    9:25
10:23    10:23    11:5
11:12    11:18    12:7
12:8    16:5    17:11
17:13    18:5    18:20
20:10    21:4    21:7
21:16    24:10    24:13
25:22    26:25    27:7
28:16    28:19    30:13
30:20    30:24    33:7
33:21    34:2    34:12
35:24    36:10    40:5
41:3    41:6    43:25
44:6    45:17    45:17
47:23    48:10    48:10
48:25    48:25    51:10
51:14    51:16    51:25
52:3    52:3    52:13
52:25    54:9    57:5
60:8    60:9    60:10
61:1    61:7    61:23
61:24    62:18    62:22
62:25    63:2    63:9
64:10    64:10    64:22
65:8    65:24    66:7
68:17    71:3    71:15
71:16    71:18
anybody [12]    23:19
25:22    27:24    36:5
41:14    42:11    43:12
53:10    53:16    61:7
62:14    63:16
anyone [19]    8:10
36:2    36:21    37:14
38:4    39:9    42:6
44:19    45:18    46:14
48:7    48:8    48:9
60:4    60:25    62:10
62:13    62:23    63:10
anyone's [2]    6:22
21:7
anything [7]    7:24
8:7    30:12    48:10
48:15    56:19    59:1
anywhere [2]    18:18
18:18
apologize [2]    32:6
61:6
APPEARANCES [1]
2:2
applicable [1]    57:12
apply [1]    20:18
approve [1]    14:25
15:2    15:5    15:18
15:21    16:3
approved [1]    17:18
Architecture [2]
13:2    26:24
area [1]    13:14
as [37]    1:11    4:3
4:6    4:12    4:16
8:24    11:14

| | | |
|---|---|---|
| 12:12 14:17 16:12 | **B** [4] 3:13 29:5 | **Box** [1] 74:17 |
| 16:22 18:12 18:22 | 47:12 57:9 | **branded** [2] 18:9 |
| 27:18 28:13 29:5 | **background** [1] 11:23 | 65:3 65:4 |
| 32:7 33:17 34:7 | **base** [2] 57:12 64:21 | **breach** [1] 53:6 |
| 34:11 34:11 38:8 | **based** [9] 3:11 | **breached** [1] 51:21 |
| 39:19 40:13 40:19 | 40:18 41:3 41:4 | **brief** [2] 64:8 71:22 |
| 42:1 45:3 46:3 | 48:4 49:3 49:6 | **bring** [1] 31:20 |
| 53:23 58:8 59:8 | 49:15 58:16 | **brought** [3] 4:13 |
| 59:9 63:24 64:21 | **basic** [1] 12:16 | 13:20 24:8 |
| 68:23 74:8 | **basically** [7] 14:8 | **building** [1] 35:4 |
| **aside** [1] 58:6 | 20:16 30:5 33:4 | **business** [6] 19:10 |
| **asked** [18] 7:20 | 40:7 40:25 42:14 | 21:24 31:19 46:12 |
| 8:22 32:6 33:10 | **basics** [1] 27:4 | 69:21 69:21 |
| 39:13 47:16 53:16 | **basis** [5] 37:1 49:14 | **businesses** [3] 17:25 |
| 60:16 61:6 61:21 | 51:25 54:25 67:15 | 18:5 18:7 |
| 62:9 62:10 62:14 | **Bay** [1] 1:14 | **buy** [1] 10:6 |
| 66:17 67:1 68:19 | **became** [2] 61:18 | **by** [37] 1:11 3:7 |
| 70:21 71:14 | 61:19 | 4:3 4:9 5:8 |
| **asking** [4] 10:22 | **become** [1] 22:19 | 9:10 9:15 9:21 |
| 34:9 46:22 52:20 | **been** [22] 4:22 | 11:11 11:16 17:15 |
| **asks** [1] 51:18 | 13:8 13:22 16:17 | 17:21 18:25 19:14 |
| **aspects** [3] 14:10 | 16:21 27:17 29:4 | 21:7 23:10 24:9 |
| 14:11 27:25 | 35:8 35:11 38:8 | 24:17 24:18 28:10 |
| **assets** [3] 19:5 | 42:1 44:16 44:17 | 36:13 50:12 51:19 |
| 19:6 19:7 | 45:3 50:1 58:7 | 51:22 54:15 58:12 |
| **associations** [1] | 59:9 66:6 68:1 | 65:11 65:18 65:19 |
| 21:23 | 69:8 69:11 71:17 | 67:7 68:3 68:24 |
| **assume** [2] 20:22 | **behalf** [3] 2:6 | 71:12 74:6 74:8 |
| 68:3 | 2:9 38:15 | 74:8 75:6 |
| **assumed** [3] 24:12 | **behind** [1] 20:6 | |
| 41:10 41:14 | **belief** [1] 67:15 | **-C-** |
| **assumes** [1] 59:5 | **believe** [23] 5:3 | |
| **Assuming** [1] 64:13 | 5:6 17:4 17:4 | **C** [5] 3:14 38:9 |
| **attachment** [2] 3:15 | 19:6 26:5 26:6 | 56:22 73:1 73:1 |
| 42:3 | 31:5 32:14 32:18 | **call** [3] 41:21 45:25 |
| **attempted** [1] 49:19 | 32:55 33:10 35:15 | 67:18 |
| **attends** [1] 14:12 | 39:22 40:13 41:8 | **called** [5] 4:3 |
| **attorney** [11] 7:2 | 44:22 49:3 54:11 | 32:18 58:18 67:6 |
| 7:6 7:8 8:8 | 54:15 54:24 62:4 | 67:11 |
| 12:24 39:17 47:8 | 63:21 | **calls** [12] 46:19 |
| 48:14 70:5 70:7 | **believed** [1] 55:1 | 48:1 49:9 52:22 |
| 74:10 | **benefit** [1] 53:23 | 60:23 65:17 66:3 |
| **attorneys** [3] 4:11 | **benefits** [10] 51:10 | 66:11 66:24 66:23 |
| 8:11 70:16 | 51:16 51:24 52:5 | 67:24 68:22 |
| **August** [9] 39:21 | 54:19 54:20 54:20 | **came** [4] 7:3 13:4 |
| 40:13 60:11 60:18 | 57:13 58:1 59:8 | 36:11 62:7 |
| 60:21 61:8 61:12 | **Berry** [1] 13:4 | **Canada's** [1] 44:12 |
| 64:11 66:1 | **best** [19] 5:21 9:24 | **cannot** [2] 8:6 |
| **available** [7] 34:2 | 24:25 29:3 29:11 | 34:6 |
| 59:21 61:15 61:18 | 30:3 30:17 43:1 | **case** [14] 6:2 6:20 |
| 61:20 66:15 68:5 | 43:4 49:13 49:21 | 6:22 8:24 8:25 |
| **Avenue** [1] 2:8 | 53:14 56:21 58:10 | 9:3 9:4 9:5 |
| **awarded** [1] 6:4 | 59:12 59:16 60:12 | 50:3 50:12 53:13 |
| **aware** [21] 4:17 | 60:16 61:10 | 53:17 54:13 71:7 |
| 12:23 14:22 22:16 | **beverages** [1] 6:5 | **cases** [1] 5:1 |
| 22:19 22:24 23:2 | **beyond** [1] 46:20 | **cash** [1] 19:4 |
| 23:5 25:13 26:25 | **bigger** [1] 12:16 | **cashier** [1] 48:16 |
| 33:21 39:10 41:8 | **billion** [1] 20:5 | **Castaway** [1] 1:13 |
| 44:24 58:18 58:21 | **bit** [1] 11:22 | **cause** [2] 40:13 |
| 63:9 63:21 70:10 | **board** [1] 17:18 | 57:11 74:7 |
| 70:12 71:15 | **bono** [1] 48:21 | **CBS** [5] 3:13 9:15 |
| **awful** [1] 69:25 | **books** [1] 20:8 | 17:21 23:10 23:12 |
| **awhile** [1] 44:18 | **both** [1] 21:1 | 25:22 29:6 32:10 |
| | **bought** [1] 13:4 | 70:6 |
| **-B-** | | **cease** [3] 24:5 |

| | |
|---|---|
| 59:7 66:6 | **coming** [1] 67:7 |
| **Cedar** [35] 9:14 | **comment** [1] 27:21 |
| 12:3 17:15 17:20 | **commission** [1] 74:18 |
| 17:22 18:3 18:5 | **commissioned** [1] |
| 18:12 18:25 20:8 | 74:5 |
| 20:9 20:23 22:8 | **communicate** [1] |
| 24:13 26:3 26:9 | 71:12 |
| 27:24 30:20 31:10 | **communications** [2] |
| 32:14 33:18 37:14 | 17:13 71:4 |
| 42:17 52:4 52:25 | **companies** [1] 34:22 |
| 54:9 60:8 60:10 | **company** [27] 10:8 |
| 60:20 61:8 61:22 | 10:10 11:16 12:13 |
| 62:24 63:1 64:10 | 12:14 12:16 12:18 |
| 69:3 | 14:9 14:11 14:21 |
| **Center** [1] 2:4 | 16:15 16:20 17:22 |
| **cents** [1] 43:21 | 19:18 24:9 33:11 |
| **CEO** [3] 12:3 12:12 | 34:3 36:9 38:3 |
| 21:9 | 51:22 53:2 53:2 |
| **CEO's** [1] 10:7 | 55:14 63:3 69:6 |
| **certain** [8] 6:4 | 69:8 70:7 |
| 14:21 15:6 15:16 | **competition** [5] 18:15 |
| 15:17 20:22 20:23 | 18:16 18:20 64:25 |
| 29:23 | 65:5 |
| **certainly** [7] 12:21 | **competitor** [3] 64:18 |
| 15:23 18:16 26:6 | 64:21 64:23 |
| 35:3 37:5 60:25 | **competitors** [2] 18:12 |
| **CERTIFICATE** [2] | 18:22 |
| 74:1 75:1 | **complaint** [5] 3:16 |
| **certify** [2] 74:5 | 6:20 50:2 50:10 |
| 75:5 | 50:25 |
| **CFO** [3] 16:12 16:22 | **completed** [1] 74:9 |
| 26:19 | **compliance** [1] 66:21 |
| **CFO's** [1] 19:20 | **complicated** [1] |
| **challenged** [1] 5:8 | 69:20 |
| **chance** [1] 57:8 | **complying** [1] 28:1 |
| **change** [2] 52:17 | **Computer-Aided** [1] |
| 53:2 54:18 | 74:8 |
| **changed** [5] 12:15 | **con** [1] 24:2 |
| 26:9 52:9 52:13 | **concepts** [2] 18:10 |
| 53:8 | 65:3 |
| **Charlotte** [1] 33:15 | **concerned** [1] 10:19 |
| **chart** [1] 20:16 | **concluded** [1] 72:2 |
| **checks** [1] 70:11 | **conclusion** [8] 46:20 |
| **Chief** [1] 10:5 | 51:18 52:22 66:12 |
| 12:24 12:25 | 66:23 67:25 68:23 |
| **chose** [1] 24:4 | 68:25 |
| **circumstances** [1] | **conditions** [4] 26:1 |
| 66:15 | 28:1 29:15 30:13 |
| **Civil** [1] 4:5 | **conferring** [1] 20:2 |
| **claim** [1] 52:1 | **confidential** [2] |
| **clause** [2] 45:20 | 11:11 11:13 |
| 45:23 | **confidentiality** [1] |
| **clear** [3] 37:24 61:7 | 11:12 |
| 61:11 | **connection** [4] 6:16 |
| **Cleveland** [1] 1:14 | 28:16 63:10 63:23 |
| **close** [2] 20:7 71:14 | **considered** [4] 60:17 |
| **closing** [2] 20:10 | 60:21 61:19 70:3 |
| 22:16 25:21 35:14 | **consistent** [1] 34:21 |
| **college** [2] 11:25 | **consulted** [1] 14:23 |
| 12:1 | **consumed** [1] 6:5 |
| **Columbus** [1] 2:5 | **contact** [5] 13:23 |
| **come** [6] 33:25 35:16 | 16:24 49:22 53:12 |
| 58:6 62:10 67:1 | 62:19 |
| 68:5 | **contacted** [1] 62:23 |

**contacts** [1] 16:14
**contain** [1] 27:7
**contained** [2] 27:1
29:18
**contend** [2] 64:13
66:8
**contends** [1] 51:21
**contents** [2] 39:8
52:21
**continued** [1] 35:16
**contract** [60] 3:13
5:5  5:7  10:1
13:17  13:19  23:3
23:17  23:20  23:25
24:4  24:11  25:6
25:19  25:20  25:21
26:6  26:8  29:1
29:6  29:15  29:24
29:25  30:2  30:5
30:7  30:10  30:14
30:19  30:20  32:2
33:24  40:8  40:25
41:3  42:7  42:15
42:25  43:17  43:21
45:18  45:22  47:4
47:11  48:2  49:6
49:12  52:16  62:19
64:14  66:4  67:17
68:3  68:8  68:10
68:21  68:23  70:22
70:23  70:24
**contractors** [1] 70:1
**contracts** [22] 15:5
15:9  15:10  22:17
22:24  25:23  26:4
26:10  26:13  27:22
28:2  28:10  28:15
28:18  33:5  45:5
45:7  45:14  46:1
62:2  62:16  62:23
**conversation** [9]
10:11  28:19  29:14
31:1  55:17  58:16
58:25  61:7  70:17
**conversations** [6]
8:7  10:4  10:23
21:11  21:15  23:24
**COO** [2] 26:22  44:22
**corporate** [10]  7:8
12:24  13:1  15:22
31:20  37:8  55:23
69:23  70:2  70:6
**correct** [36]  12:4
17:16  21:3  22:13
26:20  28:21  31:7
31:11  31:12  31:14
31:16  32:16  33:12
40:11  41:12  41:24
41:25  49:4  49:5
49:12  49:16  49:18
52:11  57:14  58:2
60:22  61:4  61:5
61:12  61:17  66:18
66:19  67:2  68:21
70:11  70:14
**CORRECTIONS/COMMENTS**
[1]  73:2
**correctly** [5]  16:6

**51:11  52:10  53:24**
55:7
**couldn't** [5]  33:22
48:6  48:15  65:8
65:13
**counsel** [22]  17:10
22:7  22:8  22:9
22:12  31:11  31:13
31:18  31:20  32:8
32:9  36:1  37:8
37:9  40:21  55:23
69:17  70:2  70:3
71:4  71:9  71:10
**count** [1]  33:17
**COUNTY** [2]  74:3
75:3
**couple** [2]  20:5
31:25
**course** [5]  21:9
22:21  33:6  43:15
64:1
**court** [3] 1:1  5:12
50:15
**covered** [4]  9:21
11:11  14:7  28:10
**Crage** [9]  12:25
14:13  16:5  16:7
16:7  16:19  26:15
26:15  26:18
**Craig** [10]  8:12
8:12  12:23  13:20
14:16  23:23  35:20
36:22  45:16  54:11
**cross-examination** [4]
1:11  3:7  4:4
4:8
**Crosse** [1]  12:1
**currently** [1]  17:15
**CV** [1]  1:6

**-D-**

**daily** [5] 13:23  16:10
16:11  16:14  16:24
**date** [2]  29:24  59:8
**Dave's** [1]  65:3
**day** [4]  44:9  74:12
75:7  75:10
**dealing** [1]  35:22
**December** [3]  12:6
66:1  68:21
**decide** [1]  33:5
**decided** [5]  31:17
32:1  33:1  66:20
70:1
**decision** [11]  34:18
34:20  36:19  37:1
37:3  50:19  50:21
59:2  59:4  63:9
70:13
**Decker** [4]  13:1
14:16  26:15  26:23
**Defendant** [10]  1:8
1:11  2:9  4:3
51:8  52:8  53:19
53:22  54:18  55:5

**Defendant's** [4]
42:2  50:2  58:8
59:10
**definition** [1]  66:3
**delegated** [1]  28:21
**Delhees** [1]  1:12
74:4  74:16
**DEMPSEY** [1] 2:3
**Denny's** [17]  55:6
55:7  55:10  55:16
55:21  55:24  56:14
64:13  64:15  64:18
65:1  65:6  65:8
65:14  66:7  66:9
66:20
**depend** [1]  65:21
**depends** [1]  66:14
**deposed** [3]  4:22
8:25  9:1
**deposit** [1]  70:10
**deposition** [13]  1:10
5:7  5:10  6:17
6:22  6:24  7:1
50:6  72:2  74:6
74:7  74:9  75:5
**depositions** [1] 5:2
**Depot** [1]  48:16
**describe** [3]  14:17
17:20  18:12
**described** [2]  28:14
33:20
**description** [3] 32:13
41:17  41:23
**Design** [2]  13:2
26:24
**desire** [1]  49:23
**destroyed** [1]  71:18
**detail** [1]  9:10
**details** [1]  8:23
**determined** [1]  39:20
**different** [5]  36:10
63:5  63:8  63:25
**diligence** [1]  22:21
22:22
**direct** [1]  12:20
58:14  60:4  64:25
65:5  70:10
**directed** [1]  36:6
**direction** [5]  4:20
38:23  38:24  38:25
68:11
**directly** [8]  12:22
13:6  13:8  13:11
13:16  13:22  35:21
53:20
**disclose** [1]  7:24
**discretionary** [4]
18:15  18:19  18:20
64:22
**discuss** [8]  29:17
30:19  36:21  39:3
39:8  46:13  54:9
56:19
**discussed** [7]  30:22

**36:25  39:6  54:12**
56:16  60:25  61:1
**discussion** [6]  5:23
9:2  9:6  24:6
28:16  42:13
**discussions** [13]
9:4  20:11  20:15
21:4  21:7  24:11
25:22  26:1  27:24
30:18  36:23  37:12
49:3
**dispute** [1]  49:20
**District** [4]  1:1
1:2  50:13  50:15
**divide** [1]  65:7
**division** [1]  11:18
32:9
**divorce** [1]  42:17
**document** [14]  3:15
8:4  27:17  27:19
41:3  42:3  42:4
47:16  50:18  51:2
51:19  57:1  57:16
58:9
**Document/Letter** [1]
3:17
**documents** [6]  6:16
7:16  46:3  46:7
52:3  71:15
**Does** [2] 32:2  41:17
**doing** [7]  19:19
19:22  22:21  22:22
36:2  36:5  54:15
**dollar** [1]  18:15
18:19  18:20  43:21
64:22
**dollars** [1]  20:5
**done** [8] 23:10  54:14
54:17  54:17  66:20
67:8  71:21  71:24
**door** [1]  35:5
**doubled** [1]  31:19
69:20  69:21
**down** [4]  4:18
8:23  14:14  40:14
**draft** [1] 23:7  40:17
**drafted** [1]  23:8
38:18  39:12  39:15
39:17
**drafter's** [1]  40:20
**drafting** [1]  23:12
**dropped** [2]  56:14
56:15
**drugs** [1]  6:8
**due** [2]  22:21  22:22
**Duff** [3] 14:14  15:25
30:22
**Duffield** [2]  7:10
12:23
**duly** [3]  4:5  74:5
74:6
**duplicative** [1] 33:18
**during** [2]  21:11
22:20

**duties** [4]  12:12
12:15  32:7  41:9

**-E-**

**E** [1]  73:1
**e-mail** [1]  71:12
**each** [2] 21:23  36:25
**earlier** [1]  64:22
**education** [1]  12:2
**educational** [1] 11:23
**effective** [1]  53:23
**either** [1]  74:10
**eligibility** [1]  52:5
**eligible** [3]  51:9
51:15  51:23
**else** [19]  30:12  35:10
37:14  39:9  42:11
44:19  45:19  49:17
52:6  53:10  53:16
56:11  56:16  59:1
60:20  62:10  62:23
63:16  63:22
**else's** [1]  35:11
**employed** [9]  9:12
9:15  11:1  11:3
21:17  24:9  53:21
62:5  64:15
**employee** [18]  15:17
17:13  37:17  51:10
51:16  51:24  52:4
53:23  53:24  54:9
54:20  55:5  55:13
55:17  58:1  60:8
62:18  63:2
**employees** [9]  13:19
14:21  15:22  20:11
24:20  27:22  28:6
28:8  43:6
**employer** [4]  9:7
48:11  48:25  49:1
**employment** [46]
3:13  5:15  5:7
6:2  9:16  9:21
10:1  10:9  15:5
21:5  21:8  22:17
23:2  24:5  25:13
26:3  26:6  26:8
26:10  27:8  27:25
29:6  29:23  32:2
33:24  36:11  36:19
36:24  40:12  44:19
47:23  52:16  53:7
56:22  56:23  60:5
62:2  62:11  62:16
62:19  62:20  62:23
62:24  66:7  66:9
71:16
**end** [5]  29:25  30:6
30:7  30:8  41:2
**ended** [5]  27:8
45:22  68:8  68:10
69:2
**enforceable** [3] 46:17
47:5  47:7
**enough** [1]  20:7

PARAMOUNT PARK vs. E. NAIL          Condensit!™          enrollment - insurance
Case 1:07-cv-10595-SHS   Document 41-2   Filed 08/08/2008   Page 23 of 31
RICHARD L. KINZEL

enrollment [2]   53:23
54:19
entities [1]   11:18
entity [1]   19:15
environmental [2]
5:4   5:18
ERIE [1]   74:3
Esquire [2]   2:3
2:7
established [1]   68:1
estimate [1]   13:10
even [11]   7:17
9:1   24:1   25:4
32:3   44:21   44:25
65:13   66:12   67:25
69:1
eventual [1]   73:16
eventually [1]   14:16
everybody [2]   4:12
12:19
everyone [2]   45:4
63:21
everything [4]   14:8
14:8   47:4   60:15
exactly [3]   31:24
33:6   34:6
examined [1]   4:6
example [1]   15:24
Except [1]   46:10
exception [1]   62:9
exclusive [1]   59:18
59:23   66:10
excuse [2]   11:15
14:14
Executive [1]   10:5
executives [11]   14:18
15:3   15:5   24:13
25:11   26:4   26:11
26:12   32:17   33:7
61:2
Exhibit [10]   27:18
29:5   38:9   42:2
47:12   50:2   57:8
58:8   58:24   59:10
EXHIBITS [1]   3:10
expected [1]   33:23
experience [1]   31:23
expired [1]   13:19
68:21   69:1
expires [1]   74:18
explain [1]   9:8
9:10
extent [13]   9:21
11:11   12:2   27:11
34:5   38:17   40:16
49:9   51:3   51:17
52:20   63:5   66:3
eye [1]   35:10

-F-

F [2]   3:15   42:2
fact [2]   22:16   37:3

facts [1]   59:6   64:24
fair [38]   9:14   12:3
14:17   15:2   16:23
17:15   17:20   17:22
18:3   18:5   18:25
20:8   20:9   20:23
22:8   24:13   26:3
26:9   27:24   30:20
31:10   32:14   33:18
35:1   37:14   42:17
52:5   53:1   54:10
60:9   60:10   60:21
61:8   61:22   62:24
63:1   64:10   69:3
Fair's [1]   18:12
Falfas [4]   12:24
14:15   26:15   26:21
familiar [1]   42:2
Famous [1]   65:3
far [3]   8:24   8:24
34:11
Farm [1]   13:5
fast [1]   18:16
fellow [1]   55:13
felt [5]   17:23   31:20
47:4   70:21   70:24
few [2]   44:10   71:20
filed [2]   31:7   50:12
Financial [1]   13:1
find [1]   31:22
fine [2]   5:24   38:21
firm [1]   22:14
first [10] 4:5   22:12
28:5   29:10   29:11
39:22   39:23   41:23
69:16   74:6
five [5]   16:22   17:21
18:2   19:17   32:25
Floor [1]   2:8
follows [1]   4:7
39:19
food [4]   18:10   18:16
65:3   65:5
forgot [1]   24:23
formal [1]   12:2
former [3]   9:7
62:18   63:2
forth [1]   74:8
forward [1]   69:22
found [2]   24:8
69:19   69:24
four [8]   4:25   16:21
16:21   20:6   16:21
32:25   43:11   65:4
frame [1]   31:5
Freeman [51]   8:12
8:12   12:23   13:3
13:4   16:18   22:20
23:23   23:25   24:7
29:14   29:18   30:1
30:4   30:9   30:12
30:18   35:20   35:21
36:22   36:23   37:21
38:4   38:15   38:19

39:3   39:6   39:11
41:4   42:9   42:13
43:3   45:16   49:4
49:10   49:15   49:23
54:11   54:12   54:24
54:25   58:12   58:18
58:22   59:7   59:14
59:17   67:19   69:11
70:18   71:1
Freeman's [3]   6:24
38:24   49:6
Fridays [1]   18:10
64:25
friend [1]   21:9
full-time [1]   55:6
Further [1]   53:22

-G-

G [2]   3:16   50:2
general [8]   21:22
24:17   25:15   44:12
44:13   62:7   69:16
70:3
generally [10]   11:14
14:7   15:13   22:14
22:25   23:1   23:5
23:6   25:14   26:25
generation [2]   71:13
gesture [1]   40:24
get [12]   18:19   28:9
28:18   28:21   34:4
42:17   45:5   57:8
57:23   68:7   70:22
70:25
getting [2]   28:6
48:24
giving [1]   74:6
going [32]   4:15
7:22   8:22   8:24
9:20   10:9   11:10
14:14   19:20   19:25
24:3   25:18   25:20
27:5   27:23   30:6
30:24   34:16   34:16
40:7   40:8   40:9
40:15   40:25   41:9
45:9   47:14   51:3
54:5   67:13   69:22
71:2
gone [1]   32:4
good [4]   17:23   17:24
19:18   31:23
got [6]   8:23   12:16
29:1   29:2   44:19
71:6
governed [4]   51:18
65:11   65:18   65:19
governs [1]   34:6
grew [1]   71:24   19:17
grounds [1]   47:15
groups [1]   19:21
grow [2]   12:18   19:10
grown [2]   31:19
69:6
growth [1]   69:8

guidance [1]   68:10

-H-

hadn't [1]   37:10
hand [2]   74:12   75:9
handle [1]   37:18
happened [3]   37:18
55:17   56:13
happening [1]   50:17
Hard [1]   44:13
hasn't [4]   44:17
68:1   69:11   69:11
having [1]   37:9
he's [13] 9:23   11:1
11:3   11:5   13:22
16:21   44:16   44:17
44:22   47:15   51:2
57:6   65:7
head [2]   4:19   33:17
headhunter [1]   32:4
headquarters [1]
33:15
health [3]   51:9
51:15   51:23
held [2]   12:5   17:7
her [1]   62:6
hereby [1]   74:5
herein [1]   1:10
4:3
hereunto [2]   74:12
75:8
high [2]   2:4   11:24
hire [2]   31:17   69:6
hired [3]   15:18   31:2
31:3
hiring [7]   15:11
15:21   16:1   16:9
31:9   31:15   69:16
his [61]   9:6   9:7
9:16   9:18   10:9
10:14   10:15   10:16
13:20   16:1   21:16
23:17   24:3   32:12
36:8   36:14   36:19
37:4   37:7   37:25
38:3   40:12   41:8
41:10   41:11   41:13
41:14   42:7   46:22
50:5   51:22   52:9
52:13   53:7   53:13
53:17   54:13   54:18
54:19   54:19   57:12
58:1   60:2   60:5
60:21   61:12   61:16
63:15   63:19   65:7
65:18   66:6   66:8
66:21   67:10   68:7
68:12   68:17   68:19
68:21   74:6
historian [1]   35:3
holding [1]   43:5
home [4]   33:5
33:20   48:16   68:7
honor [7]   25:20

25:21   27:5   27:22
30:6   40:8   40:25
honored [1]   29:1
honoring [1]   33:4
hotels [1]   18:8
hour [1]   7:2
hours [2]   6:6
6:9
house [1]   19:21
Human [1]   8:13
Huntington [1]   2:4
HUNTLEY [1]   74:15

-I-

idea [1]   17:17
identical [1]   20:24
identify [1]   8:4
implementing [1]
59:4
impression [1]   30:4
in-house [6]   22:9
22:12   31:10   31:13
31:17   41:24
Inc [2]   1:3   55:6
incorporated [1]
22:20
indeed [1]   70:23
independent [2]
45:17   47:6
INDEX [1]   3:2
indicated [2]   10:6
55:15
indicating [2]   69:7
70:20
indirectly [1]   53:20
individual [9]   6:3
30:20   34:25   37:1
45:13   53:1   55:20
56:4   56:8
individuals [19]
14:17   21:16   22:17
25:2   25:14   28:14
28:17   33:17   33:18
33:20   34:12   34:19
42:24   43:25   44:6
45:6   61:23   62:15
62:22
indoor [2]   18:8
18:8
industry [1]   44:24
inform [1]   51:14
information [3] 14:3:3
informing [1]   51:22
inherited [1]   23:9
initiate [1]   70:14
initiating [1]   70:18
institute [1]   50:21
instruct [3]   7:23
54:6   71:3
instructed [1]   59:7
insurance [3]   51:9
51:15   51:23

Case 1:07-cv-10595-SHS    Document 41-2    Filed 08/08/2008    Page 24 of 31    intended - Mr

PARAMOUNT PARK vs. L. NAIL    Condenselt!    RICHARD L. KINZEL

**intended** [2]    25:24
40:24

**intent** [6]    19:11
27:21    33:16    40:20
45:1    45:3

**intention** [2]    61:11
61:16

**intentions** [1]    37:9

**interaction** [3]    16:5
16:10    17:11

**interested** [2]    6:11
74:10

**interpretation** [1]
48:1

**interviewed** [1] 31:25

**into** [5]    7:3    33:25
42:18    48:9    69:24

**investment** [1] 19:18

**involved** [6]    14:20
15:11    16:1    20:10
23:12    35:22

**Island** [1]    21:22

**issue** [1] 54:23

**issues** [1]    71:17

**itself** [4] 9:23    34:7
46:3    57:16

**-J-**

**Jack** [2]  12:24    14:15

**January** [1]    31:4

**Jasper** [1]    14:15

**jaw** [1]  56:14

**Jill** [1]  2:3

**Jim** [1]  14:13    56:3
56:4

**job** [9]    12:10    30:7
32:12    41:8    41:17
41:23    44:3    44:11
67:11

**jobs** [3] 44:6    44:9
44:10

**Johnny** [1]    65:1
65:2

**Jones** [4]    24:18
62:4    62:5    62:9

**July** [1] 53:23

**June** [5]  1:15    32:15
35:15    53:19    55:2

**jury** [1]  6:3

**-K-**

**keep** [3] 35:4    35:10
53:12

**keys** [1] 24:24

**kind** [2] 5:1    65:22

**King's** [1]    1:10

**Kinzel** [9]    1:10
3:5    4:2    4:8
4:10    20:2    71:23
74:6    75:6

**Kirila** [62]    2:3
7:22    9:20    11:10

18:13    19:25    20:2
20:3    27:2    27:10
28:22    28:24    30:23
34:4    38:16    39:13
40:15    45:9    46:2
46:19    47:9    47:13
47:19    47:25    48:4
48:12    48:18    48:23
49:8    50:7    51:1
51:17    52:19    53:3
54:3    54:5    55:22
57:4    57:15    57:18
58:3    59:5    59:15
59:24    60:14    60:23
61:13    62:1    63:4
64:4    64:16    64:19
65:10    65:17    66:2
66:11    66:22    67:3
67:24    68:22    69:10
71:2

**Knots** [1]    13:4

**knowledge** [36] 5:21
9:24    29:3    29:11
30:3    30:17    33:13
34:8    36:8    39:11
43:1    43:4    45:12
46:21    46:23    47:6
49:21    51:25    52:7
52:24    53:14    56:21
58:10    59:12    59:16
60:8    60:12    60:16
60:20    61:10    61:22
62:18    63:6    64:9
64:12    65:24

**known** [2]    31:24
31:24

**knows** [1]    4:12

**Kretzel** [2]    44:12
63:20

**-L-**

**L** [11]    1:10    1:12
3:5    3:18    4:2
4:8    59:10    74:4
74:6    74:16    75:6

**L.L.P** [1]    2:3

**La** [1]    12:1

**language** [2]    47:17
51:3

**last** [6]    6:5    6:8
8:20    44:25    63:19
69:8

**law** [1]  4:6

**lawful** [1]    4:2

**lawns** [1]    48:19

**lawsuit** [9]    4:7
8:10    8:16    8:21
11:13    31:6    50:21
51:21    71:17

**lawyer** [1]    9:23
31:1    41:24

**lawyers** [1]    19:21

**learn** [1] 31:21

**learned** [2]    55:5
55:9

**leave** [12]    32:18

32:23    33:1    33:3
33:8    33:21    34:13
34:14    34:19    34:24
65:14    66:20

**leaves** [1]    53:1

**leaving** [3]    10:14
10:15    10:16

**led** [1]  54:15

**Lee** [1]  14:15

**left** [8]  10:22    11:9
16:19    25:5    34:25
44:7    62:6    63:10

**legal** [18]    28:24
35:3    46:20    48:1
48:21    50:10    51:18
51:19    52:21    52:22
51:19    66:3    66:12
66:23    67:21    67:25
68:23    68:24

**length** [1]    27:6

**less** [2]  10:19    43:20

**Lester** [3]    1:7
4:11    17:1

**Let's** [2] 64:6    71:20

**letter** [14]    3:14
3:18    38:9    38:13
38:23    39:3    39:8
39:19    40:17    58:19
58:22    59:11    59:13
67:19

**level** [1] 10:6    14:21
15:8    15:11    15:17

**levels** [2]    15:6
15:10

**life-styles** [1]    42:18

**light** [1] 24:8

**lights** [1]    35:6

**limitation** [1]    28:13

**limited** [4]    26:12
42:14    42:21    42:21

**LINE** [1]    73:2

**Lipitor** [1]    6:10

**list** [1]  44:20

**little** [3] 10:20    10:20
11:22

**LITTLER** [1]    2:7

**lives** [1] 45:5

**local** [1] 31:23

**locations** [1]    65:4
65:5

**locked** [1]    35:5

**long** [8]  12:5    13:3
13:8    16:14    16:17
35:14    35:17    44:17

**longer** [1]    39:21

**look** [6]  6:20    15:15
23:17    29:7    50:3
56:22

**looked** [3]    6:18
7:13    7:19

**looking** [2]    42:23
70:6

**Lori** [3]  1:12    74:4

74:16

**lot** [2]  69:23    69:25

**low** [1]  69:23

**lump** [3] 11:20    63:25
64:1

**-M-**

**made** [4]    37:2
45:6    54:18    63:23

**mainly** [1]    37:7

**make** [6]    14:6
15:14    35:5    37:24
49:22    59:2

**makes** [1]    28:4

**Mall** [1] 13:17

**management** [3]
5:9    13:17    15:13

**manager** [5]    21:22
24:17    44:12    44:13
62:7

**many** [3]    4:24
8:18    15:9

**marked** [7]    27:17
29:4    38:8    42:1
50:1    58:7    59:9

**matter** [1]    49:1

**may** [6]  4:12    10:17
28:23    32:6    41:11
58:4

**maybe** [3]    6:19
39:25    43:11

**mean** [13]    9:10
11:15    11:16    15:19
19:12    27:5    33:2
36:13    36:14    37:25
54:19    67:9    69:11

**meaning** [1]    62:15

**means** [1]    74:8

**meant** [4]    25:23
40:6    40:23    56:8

**medications** [1]
6:8

**meeting** [5]    7:13
7:25    56:7    71:25
72:1

**meetings** [4]    14:2
14:7    14:12    61:1

**member** [2]    5:9
55:13

**memory** [1]    11:14

**MENDELSON** [1]
2:7

**mention** [1]    5:25
55:18

**mentioned** [8]    5:18
14:16    15:24    35:7
37:17    37:18    54:14
56:12

**merger** [2]    17:24
21:2

**merging** [3]    19:12
19:15    34:22

**met** [5]  7:2    17:3

74:16

**lot** [2]  69:23    69:25

17:4    56:4    56:6

**Michael** [2]    2:7
4:10

**mid** [1]  55:4

**might** [3]    8:22
20:5    24:23    32:3
61:18    71:8

**Milkie** [15]    7:10
12:23    14:15    15:24
15:25    22:12    30:22
31:2    31:10    31:15
31:21    31:25    32:1
41:17    69:6

**mind** [1] 67:10

**mine** [1] 21:9

**Minneapolis** [1]
13:18

**Minnesota** [1]  13:18

**minute** [1]    58:7

**minutes** [1]    71:21

**money** [3]    6:4
69:25    70:25

**Monte** [1]    14:16

**months** [3]    31:3
69:19    69:24

**more** [8] 9:10    10:12
10:13    20:5    20:19
35:21    57:18    57:20

**morning** [1]    6:18

**most** [2] 25:5    43:6

**moved** [1]    53:7

**movie** [1]    18:17

**mow** [1] 48:19

**Mr** [188]  3:7    3:13
4:9    4:10    6:24
13:3    13:4    13:25
16:5    16:18    16:19
20:2    21:4    21:22
21:25    22:12    22:20
23:2    23:15    23:21
23:24    24:5    24:7
24:9    24:17    25:9
26:18    26:21    26:23
28:21    29:1    29:6
29:14    29:15    29:18
30:1    30:4    30:5
30:9    30:12    30:14
30:18    30:19    30:19
31:2    31:10    31:15
31:21    31:25    32:1
35:8    35:16    35:16
35:21    35:22    35:24
36:2    36:5    36:8
36:11    36:23    36:24
37:12    37:13    37:14
37:18    37:20    38:4
38:5    38:15    38:19
38:24    39:3    39:6
39:11    39:19    41:4
41:17    41:21    42:7
42:9    42:13    42:14
42:21    43:3    43:16
43:18    43:23    44:3
44:12    45:2    45:7
44:15    45:18    45:25
46:5    46:8    46:22

46:25 47:11 47:23
48:13 49:4 49:6
49:10 49:15 49:19
49:21 49:23 49:23
50:13 50:19 51:13
51:21 52:12 52:15
53:6 53:12 53:15
54:12 54:14 54:24
54:25 55:1 55:9
55:13 55:14 55:15
55:20 56:4 56:8
56:9 56:11 56:13
56:16 56:20 56:20
57:11 58:12 58:16
58:18 58:18 58:21
58:22 59:2 59:7
59:14 59:17 59:17
59:21 59:22 60:1
60:4 60:9 60:17
61:9 62:3 63:1
63:15 63:24 64:6
64:9 64:14 65:1
65:25 66:6 67:1
67:18 67:19 69:2
69:6 69:11 69:11
69:13 70:3 70:5
70:11 70:18 70:22
71:1 71:15 71:20
71:23 71:23 72:1

**Ms** [61] 7:22 9:20
11:10 18:13 19:25
20:2 20:3 27:2
27:10 28:22 28:24
30:23 34:4 38:16
39:13 40:15 45:9
46:2 46:19 47:9
47:13 47:19 47:25
48:4 48:12 48:18
48:23 49:8 50:7
51:1 51:17 52:19
53:3 54:3 54:5
55:22 57:4 57:15
57:18 58:3 59:5
59:15 59:24 60:14
60:23 61:13 62:1
63:4 64:4 64:16
64:19 65:10 65:17
66:2 66:11 66:22
67:3 67:24 68:22
69:10 71:2
**much** [4] 12:19
14:6 30:11 71:24
**must** [2] 35:7 35:11
**myself** [2] 14:13
26:17

**-N-**

**N** [1] 73:1
**Nail** [69] 1:7 4:11
17:1 23:2 24:9
28:21 29:1 30:5
33:10 34:24 35:8
35:16 35:22 35:24
36:2 36:5 36:8
37:18 38:5 39:19
42:7 42:14 42:21
45:2 45:8 47:23
49:19 49:21 50:13
50:19 51:13 51:21

52:12 53:6 53:12
53:15 54:14 55:1
55:9 55:13 55:14
55:15 55:20 56:4
56:9 56:13 56:20
57:11 58:18 58:21
59:2 59:17 59:21
59:22 60:1 60:4
60:9 63:1 63:24
64:9 65:1 66:6
67:1 67:5 67:18
69:11 70:3 70:5
70:22
**Nail's** [29] 3:13
21:4 21:25 23:21
23:25 29:6 29:15
30:14 30:19 30:19
32:7 35:16 36:11
36:24 37:13 37:14
45:7 45:18 46:8
47:11 49:23 52:15
60:17 61:9 64:14
65:25 69:2 70:11
71:15
**name** [6] 4:10
17:2 24:17 24:18
44:25 63:19
**named** [1] 74:6
**names** [4] 25:4
44:20 44:21 44:21
**nature** [2] 12:8
47:24
**need** [10] 10:7
19:20 21:1 37:4
37:7 40:7 40:10
40:11 64:4 65:22
**needed** [5] 39:21
53:13 53:17 69:5
70:2
**needless** [1] 24:19
**negotiated** [1] 42:19
**negotiating** [1] 10:21
**never** [24] 8:23
29:10 31:13 47:15
49:21 49:23 50:9
50:15 51:2 51:8
52:8 52:22 53:14
57:6 59:12 59:13
59:14 59:16 60:17
61:21 66:17 68:15
68:16 68:17
**new** [6] 1:2 2:8
2:8 50:13 62:20
62:24
**next** [2] 40:14 55:4
**nice** [2] 71:25 72:1
**night** [1] 35:6
**no** [123] 1:6 6:7
6:13 6:15 6:21
6:23 6:25 7:16
8:6 8:9 9:4
9:15 10:25 10:25
11:2 11:4 11:19
12:9 12:20 13:7
13:12 13:24 15:19
16:9 16:17 16:17
17:12 17:14 18:3
20:21 21:6 21:18

22:3 22:9 23:9
23:18 24:12 25:25
26:1 26:2 27:14
27:20 28:3 29:9
30:15 32:3 32:12
32:24 33:14 34:1
35:13 35:18 36:1
36:4 36:7 36:14
36:18 37:8 37:11
37:16 38:14 38:14
39:7 39:10 39:21
41:7 42:5 42:12
44:5 45:13 46:10
46:15 48:17 48:25
49:17 49:25 50:7
50:16 50:16 51:20
52:2 52:14 52:18
52:24 53:9 54:2
54:4 54:8 55:3
56:6 56:21 56:24
57:20 58:10 59:12
59:20 60:3 60:3
60:3 60:7 60:16
60:19 60:20 61:3
61:10 61:11 61:15
61:16 61:19 62:17
62:21 63:14 64:13
69:1 69:4 70:8
70:9 70:12 71:13
71:19
**nod** [3] 4:19 69:7
70:20
**noncompete** [7] 45:21
46:9 46:10 46:13
47:7 57:22 68:4
**None** [1] 34:15
**normal** [1] 46:10
**Notary** [4] 1:12
74:5 74:14 75:13
**Noted** [1] 48:13
**nothing** [4] 47:23
56:12 56:18 74:7
**Notice** [2] 1:15
74:9
**notified** [1] 51:8
52:8
**notify** [2] 39:19
53:2
**number** [2] 10:17
26:12
**numbers** [1] 20:6
64:1
**numerous** [1] 24:20

**-O-**

**O** [3] 73:1 73:1
74:17
**oath** [1] 4:16
**object** [11] 7:23
9:21 11:11 20:1
40:16 45:10 46:2
47:14 51:2 54:5
71:3
**objection** [43] 18:13
22:20 25:9 27:22
34:5 38:16 39:13

46:19 47:9 47:25
48:12 48:18 48:23
49:8 51:1 51:17
52:19 52:19 53:3
54:3 54:22 57:4
57:15 58:3 59:5
59:15 59:24 60:14
60:23 61:13 62:1
63:4 64:13 64:16
64:19 65:10 65:17
66:2 66:11 67:3
67:24 68:22 69:10
**obligated** [3] 4:16
33:25 34:2
**obligates** [1] 52:16
**obligation** [4] 29:22
51:14 52:15 67:16
**obligations** [16] 9:7
9:18 9:25 10:2
10:23 34:12 36:9
46:9 46:10 46:13
46:14 46:17 51:22
65:11 65:19 69:2
**obtained** [1] 44:15
**obviously** [3] 23:7
25:9 62:9
**occurred** [1] 10:6
**October** [1] 55:4
**offer** [2] 43:20 63:23
**offered** [2] 42:23
43:5
**offering** [1] 45:1
**offers** [1] 45:6
**office** [3] 33:25
74:12 75:9
**Officer** [1] 10:5
12:25 13:1
**often** [1] 8:15
**oh** [5] 2:5 8:19
44:22 50:11 51:7
**Ohio** [8] 1:13 1:14
11:24 74:2 74:12
74:17 75:2 75:9
**once** [2] 17:4 34:13
**one** [31] 4:10 5:3
5:3 5:5 5:17
5:18 5:19 6:19
6:19 7:17 7:23
10:11 10:12 10:13
11:25 13:19 21:14
24:23 26:5 26:7
35:9 35:21 36:25
37:10 41:19 49:17
58:7 60:16 60:20
65:24 69:5
**ones** [7] 24:16 24:24
26:14 28:10 32:22
43:8 44:24
**only** [17] 5:6 5:25
6:10 7:4 21:14
26:5 26:7 28:17
30:16 37:16 37:16
37:19 42:20 44:24
46:23 62:3 69:20
**open** [1] 56:15
**opened** [1] 44:16

46:19 47:9 47:25
48:12 48:18 48:23
49:8 51:1 51:17
52:19 52:19 57:4
57:15 58:3 59:5
59:15 59:24 60:14
60:23 61:13 62:1
63:4 64:13 64:16
64:19 65:10 65:16
66:2 66:11 67:3
67:24 68:22 69:10
**obligated** [3] 4:16
33:25 34:2
**obligates** [1] 52:16
**obligation** [4] 29:22
51:14 52:15 67:16
**obligations** [16] 9:7
9:18 9:25 10:2
10:23 34:12 36:9
46:9 46:10 46:13
46:14 46:17 51:22
65:11 65:19 69:2
**others** [1] 14:3
**otherwise** [2] 68:24
74:10
**our** [18] 5:9 5:23
7:8 8:12 12:24
12:19 12:25 13:1
13:19 30:8 40:8
41:2 55:14 55:14
68:10 69:21 69:21
70:25
**out** [11] 10:6 10:8
12:21 24:8 35:6
39:4 42:16 67:12
67:14 69:19 69:24
**outcome** [1] 74:10
**outside** [2] 22:14
69:25
**outsourced** [1] 69:23
**over** [6] 6:18 14:8
20:16 33:14 41:15
41:16
**overall** [1] 12:16
**overhead** [1] 19:14
**oversee** [1] 12:13
**own** [2] 33:13 39:11
**owned** [2] 17:15
17:21
**owns** [2] 11:17 11:17

**-P-**

**P** [1] 74:17
**p.m** [2] 1:15 72:2
**page** [2] 28:5 51:6
73:2
**paid** [2] 19:24 48:24
**paper** [1] 7:20
**paragraph** [17] 28:5
39:23 39:25 40:1
47:11 47:14 50:13
51:6 51:7 52:8
53:19 54:10 55:4
56:22 57:8 57:21
57:25
**paragraphs** [1] 57:21

**Paramount** [3] 1:3
9:15 17:10
**paren** [1] 55:6
**park** [3] 1:3 18:9
44:14
**parks** [7] 17:10
17:22 17:23 18:3
18:8 18:17 19:17
**part** [4] 20:8 20:9
37:5 37:6
**participated** [1] 53:22
**party** [1] 74:10
**passing** [1] 8:22
**Pat** [4] 24:18 62:4
62:5 62:9
**pay** [7] 24:3 25:18
29:22 43:20 48:20
48:25 57:12
**paying** [7] 11:17
24:5 59:2 63:2
63:9 68:6 69:25
**payment** [4] 36:13
38:1 63:25 64:1
**payments** [3] 11:5
11:8 63:24
**payout** [1] 11:19
11:20
**people** [4] 25:18
31:25 42:15 42:22
**perform** [12] 36:8
60:1 60:4 60:9
61:24 62:11 62:15
64:10 64:14 66:7
66:9 66:17
**performing** [1] 38:6
**Perhaps** [1] 61:18
**period** [2] 16:23
29:23
**Periodically** [1]
8:17
**person** [1] 37:16
**personal** [1] 47:6
**Pete** [1] 16:7
**Peter** [1] 12:25
**physical** [1] 33:25
38:3
**physically** [2] 15:19
15:20
**piece** [1] 7:20
**pill** [1] 6:10
**place** [2] 21:2
34:18
**Plaintiff** [1] 1:4
2:6
**Planning** [1] 13:2
26:24
**plans** [1] 57:13
**please** [3] 39:20
47:1 47:13
**point** [1] 70:1
**policy** [1] 26:9
**portion** [1] 37:23
47:3

**posed** [1] 40:22
**position** [13] 12:5
15:22 17:7 17:9
21:25 22:6 41:1
41:2 44:5 61:15
61:18 61:19 70:4
**positions** [3] 20:23
20:24 21:1
**power** [2] 15:13
15:16
**PPI** [84] 4:11 4:12
9:15 9:18 9:25
10:24 11:6 11:8
11:9 11:16 11:17
17:15 17:17 17:20
17:21 18:2 18:25
19:5 19:9 19:11
19:19 19:24 20:10
20:24 21:17 21:25
22:17 24:14 27:22
27:24 28:9 29:15
30:21 32:8 32:14
32:17 33:7 33:17
37:14 39:20 42:24
43:6 44:7 47:24
50:12 51:8 51:14
51:14 51:21 51:22
52:4 52:8 52:16
52:25 53:20 53:24
54:9 55:5 55:9
59:19 59:23 60:1
60:5 60:8 60:10
60:20 61:8 61:22
62:12 62:18 62:23
62:24 63:1 63:2
63:10 64:10 64:15
64:18 65:8 65:15
65:25 66:8 66:10
69:2
**PPI's** [1] 18:22
**practical** [1] 67:22
**preface** [1] 41:14
**preparation** [2] 7:4
7:7
**prepare** [2] 7:1
38:15
**prepared** [1] 38:23
**prescription** [1]
6:10
**presence** [1] 75:6
**present** [2] 7:6
13:20
**presented** [1] 38:19
38:21
**presently** [1] 62:7
**President** [3] 8:13
8:14 13:2 24:18
**pretty** [2] 12:19
14:6
**previously** [6] 27:18
29:5 38:8 42:1
50:1 59:9
**price** [1] 19:24
**prior** [16] 10:14
10:16 20:10 21:15
21:17 22:1 22:16
24:10 25:21 29:24

30:7 31:9 36:14
37:25 38:3 63:12
**pro** [1] 48:21
**probably** [10] 30:22
35:20 43:5 44:16
60:15 67:7 69:18
69:18 69:23 71:16
**problem** [2] 5:4
5:5
**Procedure** [1] 4:5
**proceeding** [2] 5:12
5:14
**proceedings** [1] 5:16
**production** [2] 41:22
46:1
**professional** [1]
12:7
**prompted** [1] 56:15
**pronouncing** [1]
16:6
**proposal** [1] 42:23
43:12 44:4 45:2
**provide** [3] 34:2
59:18 59:23
**provided** [2] 22:25
23:5 24:11
**provides** [1] 57:25
**Public** [1] 1:13
74:5 74:16 75:13
**purchase** [1] 19:5
**pure** [1] 67:25
**pursuant** [1] 1:15
4:4 57:13 74:9
**put** [8] 32:17 32:22
32:25 32:25 33:8
34:24 41:22 58:6

**-Q-**

**qualifications** [1]
15:15
**qualified** [1] 74:5
**question** [15] 11:16
28:15 28:25 40:21
41:12 47:1 47:15
47:20 47:21 49:11
50:4 51:4 65:13
66:17 69:14
**questions** [4] 4:15
4:19 30:24 57:5
**quick** [1] 46:24
**quite** [1] 45:24

**-R-**

**R** [2] 73:1 73:1
**ran** [1] 55:14
**rationale** [1] 19:8
**re-thinking** [1] 34:15
**reaching** [1] 42:19
**read** [17] 6:22 6:24
28:13 37:20 37:22
40:18 47:2 47:12
47:22 48:14 50:17

51:8 51:11 52:9
53:24 55:7 57:8
**reading** [1] 47:22
49:6 68:3
**ready** [5] 59:18
59:22 67:22 68:4
68:7
**real** [1] 46:24
**really** [4] 8:23
10:7 20:21 24:8
**reason** [2] 65:8
71:18
**reasons** [1] 69:5
**recall** [13] 5:20
28:3 28:19 28:19
36:12 36:25 37:13
42:5 42:6 43:19
44:2 45:1 62:13
**receive** [6] 48:25
51:9 51:15 51:23
52:5 58:1
**received** [2] 11:8
67:19
**receiving** [1] 11:5
58:19 63:24
**recess** [2] 64:8
71:22
**recollection** [7] 20:14
24:25 35:7 41:6
44:1 45:17 49:13
**recommendation** [2]
17:19 35:9
**record** [6] 34:5
37:23 47:3 48:13
52:20 57:5
**records** [1] 50:7
**recruited** [1] 16:20
16:20
**reduce** [2] 19:14
33:17
**reduced** [1] 74:8
**refer** [2] 4:12 50:24
**reference** [1] 28:4
**Referenced** [1] 3:11
**referred** [1] 61:2
**refers** [1] 54:1
**reflects** [1] 57:21
**refuse** [1] 64:9
**regarding** [8] 20:11
21:4 21:7 25:23
27:25 36:24 37:12
57:5
**Regional** [1] 24:18
**regular** [1] 14:2
**regularly** [1] 71:12
**relate** [1] 29:18
**related** [7] 30:1
30:9 30:12 30:18
54:24 55:19 71:15
**relative** [1] 74:10
**release** [6] 42:20
63:12 63:15 63:16
63:20 63:20

**releases** [1] 63:22
**relevance** [2] 27:3
69:10
**relevant** [1] 11:13
**relieved** [1] 64:2
**relying** [1] 49:10
49:11
**remained** [3] 12:17
59:17 62:5
**remaining** [1] 43:21
**remind** [1] 7:23
**rendered** [1] 66:9
**repeat** [3] 34:10
46:24 46:25
**report** [1] 13:20
**reported** [1] 13:6
**reporter** [5] 1:12
4:17 37:22 47:2
74:4
**reporting** [6] 13:8
13:11 13:15 13:22
54:16 74:15
**reports** [2] 12:19
12:20 12:22
**represent** [2] 29:5
50:10
**representative** [1]
53:21
**represented** [3] 53:20
54:21 55:1
**request** [2] 61:23
65:15
**requested** [6] 37:22
47:2 68:11 68:13
68:14 68:17
**require** [2] 52:3
53:1
**required** [1] 44:13
**requirements** [1]
52:25
**Resort** [1] 1:14
**Resources** [1] 8:13
**respect** [1] 14:23
**responded** [1] 58:21
**response** [1] 71:1
**responsibilities** [11]
12:17 13:21 30:8
35:24 41:2 41:9
41:10 41:13 41:15
64:2 65:22
**rest** [1] 64:4
**restaurants** [1] 18:17
18:17
**restrictions** [2] 27:7
33:22
**results** [1] 6:2
**resume** [1] 68:7
**retain** [1] 24:13
**retained** [5] 20:12
25:3 25:6 25:7
28:9
**reveal** [1] 71:3

**reversal** [1] 70:11
**review** [2] 15:23
38:9
**reviewed** [2] 6:16
39:1
**Richard** [7] 1:10
3:5  4:2  4:8
24:19  74:6  75:6
**right** [15] 6:1
10:22  11:18  17:15
21:13  23:8  24:24
32:20  37:10  40:14
43:9  43:17  49:7
64:6  68:18
**rights** [2] 65:10
65:18
**Road** [1] 1:14
**Rob** [1] 14:16
**Robert** [1] 13:1
**Rock** [1] 44:13
**Rocket's** [2] 65:2
65:2
**room** [2] 7:3  64:4
**Roughly** [1] 13:14
**Rules** [1] 4:4
**run** [1] 56:13
**Ryan** [9] 14:13  24:17
56:3  56:4  56:8
56:11  56:16  56:20
58:16

**-S-**

**S** [2] 2:3  73:1
**said** [12] 7:21  29:21
31:9  41:8  43:11
65:14  67:6  67:12
69:5  70:13  71:9
74:8
**salary** [2] 57:12
59:7
**same** [11] 10:5
12:17  18:22  21:24
45:3  47:9  47:25
48:12  51:1  53:3
63:25
**Sanders** [2] 2:3
22:14
**Sandusky** [3] 1:14
74:12  74:17
**sat** [1] 8:23
**saw** [2] 50:15  52:22
**say** [12] 15:2  15:9
16:23  24:19  35:1
39:22  40:12  51:5
54:17  71:1  71:8
71:9
**says** [1] 51:8
**school** [1] 11:25
**scope** [1] 46:20
**seal** [2] 74:12  75:9
**second** [7] 7:23
20:1  40:1  43:15
47:13  57:23  58:6

**section** [1] 28:13
**see** [10] 15:15  15:19
15:20  20:17  28:13
32:12  37:18  40:3
45:4  46:6
**seeing** [2] 29:10
42:5
**seen** [17] 27:15  27:19
29:7  29:12  42:3
47:16  49:12  50:3
50:9  50:16  51:2
57:6  58:8  58:10
59:10  59:13  59:16
**selection** [1] 15:14
**senior** [9] 14:18
15:3  24:13  24:22
25:11  26:4  26:10
26:12  33:7
**sent** [4] 33:5  33:20
39:4  58:12
**sentence** [2] 40:14
40:23
**separate** [2] 10:9
10:14
**separately** [1] 20:7
**series** [1] 14:15
**SERVICE** [1] 74:15
**services** [30] 37:4
37:7  37:15  38:5
39:21  53:13  53:17
59:19  59:23  60:1
60:5  60:9  60:18
60:21  61:9  61:12
61:16  61:23  61:25
62:11  62:15  63:11
64:10  64:15  66:8
66:10  66:18  68:12
68:17  68:20
**set** [3] 74:8  74:12
75:8
**settle** [1] 67:6
**settlement** [2] 42:6
42:19
**several** [1] 42:21
**severance** [7] 28:4
28:5  28:6  28:9
28:18  28:21  29:2
**share** [1] 21:16
**shared** [2] 49:23
71:5
**she's** [1] 62:7
**shouldn't** [1] 47:16
**show** [3] 29:4  38:8
42:1  47:11  50:1
58:7  59:9
**showed** [1] 59:14
**showing** [1] 27:17
**sign** [1] 63:16
**signature** [1] 38:11
**signed** [5] 39:1
63:20  63:20  63:22
75:6
**signing** [3] 42:20
63:12  63:15

**similar** [5] 17:25
19:15  20:24  45:7
45:8
**similarities** [2] 45:18
46:4
**simply** [1] 28:1
**since** [6] 12:6  12:15
13:6  13:22  16:15
26:9
**sir** [2] 38:12  51:5
**sit** [1] 68:6
**six** [2] 17:22  18:3
**small** [1] 55:15
56:12
**somebody** [1] 46:17
**somehow** [1] 65:7
**someone** [6] 33:14
35:4  35:6  35:10
35:11  46:11
**something** [8] 7:21
30:3  42:16  43:20
51:18  67:8  67:12
67:13
**somewhere** [3] 31:5
44:23  52:5
**sorry** [9] 16:7  16:18
34:10  39:25  54:19
56:23  63:19  64:17
71:13
**sort** [2] 35:2  35:9
**source** [2] 51:10
51:16
**sources** [1] 51:24
**South** [1] 2:4
**Southern** [1] 1:2
50:13
**speak** [5] 9:22
34:7  46:3  49:19
49:24
**speaking** [1] 42:6
**speaks** [1] 57:16
**specific** [1] 4:18
**specifically** [4] 20:19
21:5  21:8  22:25
**specifics** [1] 39:16
**speculate** [1] 54:6
66:25  67:9
**speculation** [5] 49:9
60:24  65:18  66:22
67:4
**spent** [2] 64:23
64:23
**spoke** [2] 56:9
71:9
**spoken** [1] 53:14
**Squire** [2] 2:3
22:14
**ss** [2] 1:6  74:2
**staff** [1] 37:9  69:23
**started** [3] 13:10
13:15  16:15
**State** [5] 1:13  12:1
74:2  74:5  75:2

**statement** [1] 40:5
**states** [5] 1:1
52:8  53:19  55:4
57:11
**stay** [4] 33:10  33:14
43:8  53:16
**Stenotype** [2] 1:12
74:4
**still** [3] 11:5  53:21
66:8
**stock** [2] 19:1
19:5
**stop** [4] 59:2  63:1
63:9  64:5
**stopped** [1] 36:13
**stopping** [1] 38:1
**story** [2] 55:19  62:6
**strategy** [2] 69:21
69:22
**Street** [1] 2:4
**strike** [6] 18:2
29:13  29:17  31:6
59:21  61:21
**strong** [1] 71:7
**strongly** [1] 70:21
**style** [1] 15:14
**subjects** [1] 9:5
**subparagraph** [1]
57:25
**subsequent** [1] 56:19
**subsidiary** [1] 70:5
**Subway** [1] 65:4
**suit** [2] 70:14  70:18
**sum** [3] 11:20  63:25
64:1
**supposed** [1] 36:3
**sure** [13] 4:16  10:13
19:6  20:6  32:3
32:4  34:11  35:5
39:5  45:24  62:6
63:19  71:11
**surprise** [1] 67:18
**surrounding** [1]
71:17
**sworn** [2] 4:5
74:6
**synergies** [3] 19:16
20:17  20:18

**-T-**

**T** [1] 73:1
**table** [1] 14:14
**take** [11] 4:18  27:15
29:6  33:6  46:5
50:3  54:4  64:6
65:14  70:10  71:20
**taken** [6] 1:11
6:8  41:15  41:16
63:9  74:9
**takes** [1] 57:18
**talk** [10] 8:2  8:25
10:2  23:19  38:4

**42:11  42:19  55:15
56:12  70:16
**talked** [8] 7:24
8:10  8:15  8:20
39:5  42:8  42:9
54:11
**talking** [5] 23:21
30:4  37:13  54:13
54:23
**team** [1] 5:9
**tell** [27] 5:1  5:7
10:4  12:22  13:15
14:12  19:3  20:14
23:24  24:6  29:21
36:2  36:5  36:23
42:13  53:6  53:8
54:12  54:25  56:11
56:16  59:17  62:14
62:19  70:18  70:19
71:8
**term** [5] 24:4  27:6
28:24  33:2  66:3
**terminate** [3] 36:19
45:4  50:19
**terminated** [13] 9:16
36:12  36:13  40:12
46:18  47:24  52:4
57:11  60:5  61:24
62:12  63:3  68:24
**terminating** [2] 36:24
38:5
**termination** [11]
5:8  9:19  14:20
37:13  37:25  38:3
41:11  58:2  60:2
63:11  71:16
**terminations** [2]
14:23  15:3
**terms** [11] 23:19
25:13  25:19  26:1
26:25  27:25  29:14
30:13  33:23  67:22
70:24
**testified** [6] 4:6
5:10  40:16  47:15
52:21  57:6
**testify** [13] 4:16
5:12  6:14  11:14
18:14  34:7  40:19
40:19  48:5  54:7
65:12  68:2  74:7
**testimony** [2] 46:6
64:22
**TGI** [1] 64:25
**Thank** [1] 71:24
**theaters** [1] 18:18
**them** [25] 5:3
5:3  14:6  14:22
14:25  17:19  25:5
25:18  27:5  27:7
27:15  33:7  33:23
34:16  34:16  37:1
42:19  44:10  45:15
45:20  62:14  62:15
63:12  68:13  70:17
**themselves** [12] 42:17
**then** [7] 16:19  26:9

| | | |
|---|---|---|
| 41:2 | 50:4 | 55:4 |
| 62:6 | 68:19 | |

**there's** [6]    12:21
14:13   24:17   28:5
57:16   57:20

**thereafter** [1]    28:17

**thereof** [1]    71:16

**THEREUPON** [5]
37:22   47:2   64:8
71:22   72:2

**thing** [1] 30:16

**things** [6]    6:14
10:14   12:21   18:10
35:10   57:22

**think** [16]    5:21
16:21   19:6   31:9
32:3   34:24   35:2
43:5   43:11   43:15
50:16   50:17   69:5
69:16   70:13   71:21

**thinking** [2]    19:19
21:1

**Third** [1]    2:8

**though** [2]    24:10
57:25

**thought** [6]    19:12
19:16   19:16   19:18
20:3   20:17

**three** [8] 4:25    7:11
18:10   26:16   26:18
43:11   64:24   65:4

**through** [7]    21:23
24:4   29:22   30:6
44:20   66:1   67:10

**Tim** [2] 44:22   63:19

**Tim's** [1]    44:25

**time** [31] 8:20    13:6
17:22   21:12   22:8
24:10   26:7   29:10
29:11   29:23   31:5
31:20   36:11   36:14
36:18   37:2   37:19
41:23   44:3   56:17
56:19   60:10   64:11
65:7   65:23   66:7
66:16   68:9   68:16
68:17   71:24

**times** [1]    4:24
8:18   8:19

**title** [1] 36:1

**today** [4]    18:9
20:8   49:12   68:18

**told** [7] 36:15   41:4
49:15   55:20   55:23
55:25   71:6

**Toledo** [1]    11:24

**took** [4] 21:2   30:7
41:1   41:1

**top** [2] 57:1    57:1

**topics** [1]    14:7

**touch** [1]    53:17

**track** [1] 35:4

**training** [1]    12:7
12:8   12:10

**transaction** [2] 19:1

---

| | |
|---|---|
| 19:3 | |

**Transcription** [1]
74:8

**tried** [2] 42:16   49:21

**truth** [3] 74:7    74:7
74:7

**truthfully** [1]    6:14

**try** [2]   14:6   70:25

**trying** [2]    18:19
44:20

**turned** [1]    35:6

**two** [12] 5:6    5:25
10:7   10:14   13:9
19:20   19:20   19:21
24:23   44:23   63:21
65:2

**type** [2] 5:2    11:12

**types** [2]    20:22
20:23

**typically** [1]    14:20
26:3

**-U-**

**Uh-huh** [8]    4:14
19:13   27:16   31:8
32:21   38:2   40:2
43:10

**ultimately** [4]    17:18
34:20   36:20   50:20

**unable** [1]    66:9

**under** [10]    4:16
10:1   13:20   25:5
30:4   42:7   42:15
42:24   43:6   68:10

**underneath** [1] 44:25

**understand** [7] 4:20
19:8   22:10   27:4
28:25   33:2   37:24

**understanding** [22]
25:15   25:18   28:8
28:11   34:8   34:11
40:5   40:18   40:22
46:8   46:16   47:22
48:2   48:3   48:6
49:14   51:13   55:19
67:21   67:22   68:1
68:25

**unemployed** [3]
53:22   54:21   55:2

**UNITED** [1]    1:1

**until** [8] 31:15   33:1
33:5   40:25   49:12
68:9   68:18   68:19

**up** [5]    11:24   14:25
68:9   68:18   68:18

**uphold** [1]    33:23

**upon** [2] 1:11   4:3

**us** [6]   13:4   43:8
62:8   67:10   68:5
68:12

**use** [3]   34:16   34:16
40:9

**using** [1]    60:17

**utilizing** [5]    60:17

---

| | | |
|---|---|---|
| 60:21 | 61:8 | 61:12 |
| 61:16 | | |

**-V-**

**valued** [1]    20:7

**verbally** [1]    4:18

**very** [6] 30:11   44:21
69:22   71:6   71:24
71:25

**veto** [2] 15:13   15:16

**Viacom** [2]    17:21
25:22

**Vice** [4] 8:12    8:13
13:2   24:18

**view** [1] 64:21

**views** [1]    21:16

**violate** [1]    64:14

**violated** [1]    70:23
70:24

**vis-a-vis** [1]    19:11

**vision** [1]    33:16
34:21

**visionary** [1]    12:13

**vitamin** [1]    6:10

**-W-**

**Wait** [1] 47:13

**want** [11]    8:2
8:5   8:7   10:14
15:17   15:23   19:16
40:19   67:12   70:16
71:8

**wanted** [5]    33:6
37:24   42:16   45:4
47:21

**wasn't** [3]    42:14
60:25   61:1

**watch** [1]    33:14

**water** [1]    18:8
18:9

**way** [4] 7:1    40:24
48:14   65:24

**we'll** [4] 45:25   46:5
51:4   57:23

**Weber** [30]    2:7
3:7   4:9   4:10
9:2   9:5   9:12
21:10   21:19   21:22
23:15   25:9   37:20
41:21   43:16   43:18
43:23   44:3   45:25
46:5   46:22   46:25
48:13   62:3   63:15
64:6   69:13   71:20
72:3   72:1

**week** [1] 44:16

**weekly** [6]    13:25
14:1   14:5   14:6
16:10   61:1

**well** [15] 9:9    15:19
15:20   16:10   18:18
18:23   33:4   35:2
42:11   42:21   56:6
63:24   64:24   66:17

---

| | | |
|---|---|---|
| 67:9 | | |

**went** [7] 6:3    11:24
11:25   20:16   45:22
67:10   68:5

**weren't** [3]    40:7
40:9   41:8

**what** [85]
7:17   7:19   9:10
12:12   14:7   15:8
17:7   17:9   18:7
19:3   19:8   19:11
19:12   19:24   20:6
20:14   20:19   21:25
22:4   22:6   22:24
23:5   24:1   24:11
25:15   25:23   25:23
27:4   29:1   29:18
29:21   30:1   30:9
31:22   32:7   32:11
32:17   33:1   33:2
33:6   33:22   34:6
34:11   34:11   34:21
35:24   36:2   36:5
36:23   37:6   39:6
40:5   40:22   40:24
41:4   41:13   46:8
46:10   47:19   49:10
49:15   51:4   54:1
54:12   54:15   54:24
55:23   56:11   56:15
56:16   65:21   65:22
66:15   66:25   67:9
67:16   68:3   68:11
69:8   70:6   70:17
70:19   71:1   71:8

**what's** [7]    29:4
38:8   42:1   50:1
58:7   59:9   67:21

**whatnot** [1]    63:5

**whatsoever** [3] 47:24
60:10   61:25

**WHEREOF** [2] 74:12
75:8

**whether** [7]    29:2
38:19   46:16   47:7
51:13   58:21   63:8

**while** [1]    64:15

**whole** [4]    21:11
21:11   70:7   74:7

**willing** [6]    42:18
59:18   59:22   66:6
67:22   68:4

**willingness** [1] 65:25

**wind** [1] 34:25

**Wisconsin** [2]   12:1
12:1

**withdraw** [1]    69:13

**within** [2]    74:5
74:6

**without** [3]    40:13
57:11   74:9

**witness** [11]    1:10
4:2   5:14   5:16
8:1   47:18   50:5
57:6   71:25   74:12
75:8

**witness's** [1]    46:6

---

| | |
|---|---|
| 46:21 | |

**Wonderland** [1]
44:13

**words** [1]    68:6

**work** [17]    35:16
42:16   42:17   45:22
46:11   48:6   48:16
48:21   60:16   65:8
65:15   65:25   67:7
67:12   67:13   68:5
68:6

**worked** [2]    10:8
13:3   67:13

**working** [9]    24:12
37:19   44:22   54:16
55:6   55:9   55:16
55:21   56:13

**workplace** [1] 68:9

**works** [1]    65:1

**wouldn't** [1]    67:4

**write** [2] 38:13   40:16

**writing** [2]    41:22
74:8

**written** [1]    41:19

**wrong** [1]    71:13

**wrote** [1]    38:19

**-Y-**

**Yeah** [1] 20:3

**year** [2]   11:25   69:9

**years** [3]    13:9
16:21   16:22

**yes** [146] 4:21    4:23
5:3   5:11   5:13
5:15   5:25   6:3
7:5   7:12   7:15
7:21   9:12   9:13
9:17   10:3   10:18
10:20   10:21   11:21
11:24   12:11   13:17
14:1   14:4   14:11
14:13   14:19   14:22
14:24   15:1   15:4
15:7   15:12   15:25
16:2   16:4   16:8
16:13   16:25   17:6
17:8   17:9   17:21
18:1   18:4   18:6
18:21   18:24   19:23
20:13   20:25   21:20
22:2   22:5   22:15
22:18   22:23   23:1
23:4   23:6   23:11
23:22   24:15   25:1
25:5   25:8   25:10
25:12   25:15   25:20
26:13   26:15   26:17
27:16   28:7   28:10
28:12   29:16   29:20
30:11   30:17   31:8
32:9   32:19   32:21
33:12   33:19   34:20
34:23   35:23   36:16
36:16   36:20   37:5
38:10   38:12   38:22
39:2   39:5   39:24
40:4   40:7   40:24

| | | |
|---|---|---|
| 41:18 | 41:20 | 42:8 |
| 42:10 | 43:8 | 43:22 |
| 43:24 | 44:12 | 48:22 |
| 49:2 | 49:13 | 50:20 |
| 50:23 | 51:12 | 52:11 |
| 53:25 | 54:22 | 54:24 |
| 55:8 | 55:11 | 55:24 |
| 56:1 | 56:7 | 56:10 |
| 57:10 | 58:5 | 58:13 |
| 58:15 | 58:17 | 59:3 |
| 62:3 | 63:13 | 63:14 |
| 63:17 | 63:25 | 64:17 |
| 64:20 | 69:7 | 70:9 |
| 70:9 | 70:15 | 70:20 |

**York** [4] 1:2    2:8
  2:8    50:13

**yourself** [2]    26:18
  51:25

-Z-

**Zimmerman** [1]
  24:19

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

STATE OF OHIO

COUNTY OF


        I certify that this deposition was

signed in my presence by RICHARD L. KINZEL on the

_____ day of_____, 2008.

        IN WITNESS WHEREOF, I have hereunto set my

hand and affixed my seal of office at_____, Ohio

on this_____ day of_____, 2008.




                              _____
                              Notary Public

1                    C  O  R  R  E  C  T  I  O  N  S

2         PAGE              LINE              CORRECTIONS/COMMENTS

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LEXSEE 2005 U.S. DIST. LEXIS 25108

**SKYMALL, INC. and GEMSTAR-TV GUIDE INTERATIONAL, INC., Plaintiffs, -against- ALAN BUDD ZUCKERMAN and GENESIS SELECT CORPORATION, Defendants.**

**05 Civ. 3534 (SHS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2005 U.S. Dist. LEXIS 25108*

**October 25, 2005, Decided**
**October 25, 2005, Filed**

**DISPOSITION:** **[*1]** Plaintiffs' motion for summary judgment in their favor on both their claim and Zuckerman's counterclaim granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, a merchandising corporation and an entertainment company, sued defendants, a financial consultant and its president, seeking a declaration as to their obligations under a warrant to purchase common stock and the assumption and amendment to the warrant agreement which the corporation had issued to the president. The consultant and president counterclaimed for breach of contract. The corporation and company moved for summary judgment.

**OVERVIEW:** The corporation and company claimed that the assumption and amendment to the warrant agreement, executed after the corporation merged with the company, did not alter the original exercise price that the president was required to pay under the warrant to purchase the corporation's stock. The court initially held that it would exercise its discretion to hear the claim for declaratory relief because rendering judgment would serve the useful purpose of clarifying the parties' rights and duties under the assumption and amendment to the warrant agreement, a judgment would finalize the controversy and offer relief from uncertainty, and the determination of a contractual term would enable the parties to complete their transaction in dispute. The court

then held that the assumption and amendment to the warrant agreement clearly and unambiguously set forth the exercise price of the corporation's stock to which the president was entitled pursuant to the original warrant agreement, and that the corporation and company did not breach the agreement because the president did not tender the agreed-upon exercise price of the corporation's stock as required under the agreement.

**OUTCOME:** Summary judgment was granted for the corporation and company on both their claim and the consultant's and president's counterclaim.

**CORE TERMS:** exercise price, common stock, per share, stock, summary judgment, declaratory relief, counterclaim, merger, unambiguously, unambiguous, aggregate, breach of contract, exercisable, number of shares, specific terms, contractual, susceptible, ambiguous, differing, annexed, Amendment to Warrant Agreement, issuable, contract language, entitled to purchase, useful purpose, legal systems, reasonable basis, declaratory, consulting, guaranteed

**LexisNexis(R) Headnotes**

*Civil Procedure > Declaratory Judgment Actions*
[HN1] The decision whether to entertain a claim for declaratory relief rests within the court's unique and substantial discretion in deciding whether to declare the

rights of litigants. The United States Court of Appeals for the Second Circuit has delineated five factors courts should consider in deciding whether to hear a claim for declaratory relief: (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; (2) whether the judgment will finalize the controversy and offer relief from uncertainty; (3) whether the proposed remedy is being used merely for procedural fencing or as a race to res judicata; (4) whether the use of a declaratory judgment will increase friction between sovereign legal systems; and (5) whether there is a better or more effective remedy.

*Civil Procedure > Summary Judgment*
*Contracts Law > Contract Interpretation > General Overview*
[HN2] In a contract action, the court's general objective should be to give effect to the intentions of the parties in entering into the agreements. If a contract is unambiguous on its face, its proper construction is a question of law, and the issue may be resolved by summary judgment. If the language unambiguously conveys the parties' intent, extrinsic evidence may not properly be received. Whether the language of a contract is unambiguous, and if so, what construction is proper, are legal questions.

*Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem*
[HN3] Contract language is unambiguous if it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion. On the contrary, a contract is ambiguous if the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another. Contractual language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation. Finally, a court should not find language ambiguous on the basis of the interpretation urged by one party, where that interpretation would strain the contract language beyond its reasonable and ordinary meaning.

**COUNSEL:** For Skymall Inc., Gemstar-TV Guide International, Inc., Plaintiffs: David Emanuel Miller, Paul D. Sarkozi, Hogan & Hartson LLP, New York, NY.

For Alan Budd Zuckerman, Genesis Select Corporation,

Defendants: Andrew Mark Schauer, Krys Boyle, P.C, Denver, CO.

For Alan Budd Zuckerman, Genesis Select Corporation, Counter Claimants: Andrew Mark Schauer, Krys Boyle, P.C, Denver, CO.

For Skymall Inc., Gemstar-TV Guide International, Inc., Counter Defendants: David Emanuel Miller, Hogan & Hartson L.L.P., New York, NY.

**JUDGES:** Sidney H. Stein, U.S.D.J.

**OPINION BY:** Sidney H. Stein

**OPINION**

OPINION & ORDER

    SIDNEY H. STEIN, U.S. District Judge.

    SkyMall, Inc., and Gemstar-TV Guide International, Inc. (collectively, "SkyMall") seek a declaration with respect to their rights and obligations under a "Warrant to Purchase Common Stock" (the "Warrant") issued to Alan Budd Zuckerman and Genesis Select Corporation (collectively, "Zuckerman") and a subsequent "Assumption and Amendment to Warrant Agreement" (the "Agreement"), by which Gemstar assumed SkyMall's obligations under the **[*2]** Warrant. Defendants counterclaim for breach of contract. Plaintiffs have moved for summary judgment on both their claim and Zuckerman's counterclaim. At issue is whether the exercise price of the Warrant is $ 2.00 per share of the SkyMall stock to which Zuckerman was entitled by the original Warrant or whether instead the price is $ 2.00 per share of the Gemstar stock to which Zuckerman became entitled by the terms of the Agreement. Because the Agreement unambiguously provides that the exercise price is $ 2.00 for each original SkyMall share, plaintiffs' motion for summary judgment is granted.

I. BACKGROUND

    SkyMall is a corporation that sells a variety of merchandise through catalogues, distributed to passengers on commercial airlines, and through the internet. (Compl. at P13.) On June 30, 2000, SkyMall issued a "Warrant to Purchase Common Stock" to Zuckerman as partial compensation for the financial

consulting services he had rendered to it. (Plaintiff's Local Civil *Rule 56.1* Statement of Undisputed Facts ("Pl.'s 56.1") at P1; Decl. of David E. Miller dated August 22, 2005 ("Miller Decl."), Ex. A at 7, 15.) Zuckerman is, and was at that time, President of Genesis Select [**3**] Corporation, a financial consulting company through which he rendered his financial advice to SkyMall. (Compl. at P1; Pl.'s 56.1 at P3; Miller Decl., Ex. A at 7.) The Warrant entitled Zuckerman to buy 150,000 shares of SkyMall stock for $ 2.00 per share at any time in the next five years. (Pl.'s 56.1 at P8; Miller Decl., Ex. A at 7, 15.) Zuckerman assigned his right to purchase 810 of the 150,000 shares to his assistant at Genesis Select, Cynthia Cox. (Pl.'s 56.1 at P9; Miller Decl., Ex. D at 111.)

Approximately one year after the Warrant was issued, SkyMall merged with Gemstar, a publicly traded entertainment and technology company that develops and distributes consumer entertainment products and services. (Compl. at PP13, 14; Pl.'s 56.1 at P10; Miller Decl., Ex. A at 8.) At the time of the merger, Gemstar, SkyMall and Genesis Select also entered into an "Assumption and Amendment to Warrant Agreement." (Pl.'s 56.1 at PP2, 11; Miller Decl., Ex. A at 9.) That Agreement provided that, pursuant to the merger, the Warrant would become exercisable for Gemstar stock in lieu of SkyMall stock according to the following formula:

> The SkyMall Warrant shall be assumed by Gemstar and shall [**4**] be deemed to be amended so that the warrant is exercisable solely for, in lieu of SkyMall common stock: (a) the aggregate number of shares of Gemstar Common Stock equal to the product of (i) the aggregate number of shares of SkyMall common stock issuable upon full exercise of the SkyMall Warrant, multiplied by (ii) .03759, and (b) cash in the amount equal to the product of (i) the aggregate number of shares of SkyMall common stock issuable upon full exercise of the SkyMall Warrant, multiplied by (ii) $ 1.50.

(Agreement, annexed to Miller Decl., Ex. A at 30.)

The formula therefore provides that in place of the 149,190 SkyMall shares Zuckerman was originally entitled to purchase, Zuckerman is instead entitled to receive 5,608 Gemstar shares (149,190 x .03759 = 5,608) and $ 223,785 in cash (149,190 x $ 1.50 = 223,785). The Agreement was expressly styled as an agreement by Gemstar to assume SkyMall's obligations: "each warrant to acquire SkyMall common stock outstanding . . . shall be assumed by Gemstar and shall be deemed to constitute a warrant to acquire, for each share of SkyMall common stock issuable upon exercise of the SkyMall Warrant immediately prior to the Merger, . [**5**] 03759 of a share of Gemstar common stock . . . and $ 1.50 in cash." (Pl.'s 56.1 at P14; Miller Decl., Ex. A at 30.)

The Agreement also established an exercise price. First, the Agreement stated that the original Warrant entitled the holder "to purchase an aggregate of 149,190 shares of SkyMall common stock at an exercise price of $ 2.00 per share." This was labeled "the Original Exercise Price." (Agreement, annexed to Miller Decl., Ex. A at 30.) The Agreement then stated that "the exercise price of the Assumed Warrant shall be the same as the Original Exercise Price." (Id. at 31.) Finally, the Agreement clarified that "except as set forth in this Agreement and to the extent practicable, the specific terms and conditions of the SkyMall Warrant shall remain as they were prior to the Merger, and the Assumed Warrant shall be exercisable as provided in the SkyMall Warrant immediately prior to the Merger." (Id.)

In March 2005, Zuckerman attempted to exercise the Warrant by tendering to Gemstar a check in the amount of $ 11,216.50. (Compl. at P25; Ans. at P25.) SkyMall, claiming that the amount Zuckerman tendered was insufficient, refused to honor the Warrant on those terms. (Countercl. [**6**] at P26.)

SkyMall then commenced this action, seeking declaratory relief. (See Compl.) SkyMall asserts that the Agreement did not alter the exercise price of the Warrant and that this price therefore remains at $ 2.00 per share of SkyMall stock. (Compl. at P20.) SkyMall contends that Zuckerman is required to pay $ 2.00 per share of SkyMall stock, or $ 298,380, in order to purchase the 5,608 shares of Gemstar common stock and receive the $ 223,785 in cash to which the Agreement entitles him. (Compl. at P22.)

Defendants counterclaimed for breach of contract. (See Ans. & Countercl.) Defendants assert that because the Agreement "expressly amended the specific terms and conditions of the SkyMall Warrant such that the Warrant is no longer a warrant for the purchase of SkyMall

common stock, but rather is a warrant for the purchase of Gemstar common stock and cash," the term "Warrant Shares" in the Agreement "is necessarily amended to mean, in this case, 5,608 shares of Gemstar common stock." (Response in Opposition to Plaintiffs' Motion for Summary Judgment ("Opp.") at 7.) Defendants reason that because the term "Warrant Shares" in the Agreement refers to shares of Gemstar, "the [*7] exercise price of the Warrant, which is now deemed a warrant for the purchase of Gemstar common stock, should be determined by multiplying the number of shares of Gemstar common stock for which the Warrant is being exercised by $ 2.00." (Id.) Accordingly, defendants arrive at the exercise price of $ 11,216 by multiplying 5,608 Gemstar shares by $ 2.00. (Countercl. at P15.) Defendants claim that, by tendering the exercise price contemplated by the Agreement, Zuckerman performed all conditions precedent to SkyMall's obligation to perform. Therefore, defendants claim, plaintiffs breached the Agreement by failing to deliver the Gemstar shares and cash.

## II. DISCUSSION

### A. Declaratory Relief is Appropriate

[HN1] The decision whether to entertain a claim for declaratory relief rests within the Court's "unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co., 515 U.S. 277, 286, 115 S. Ct. 2137, 132 L. Ed. 2d 214 (1995)*; see also *Dow Jones & Co., Inc. v. Harrods, Ltd., 346 F.3d 357 (2d Cir. 2003)*.

The U.S. Court of Appeals for the Second Circuit has delineated five factors courts should [*8] consider in deciding whether to hear a claim for declaratory relief: (1) whether the judgment "will serve a useful purpose in clarifying or settling the legal issues involved"; (2) whether the judgment will finalize the controversy and offer relief from uncertainty; (3) whether the proposed remedy is being used merely for procedural fencing or as a race to *res judicata;* (4) whether the use of a declaratory judgment will increase friction between sovereign legal systems; and (5) whether there is a better or more effective remedy. *Dow Jones, 346 F.3d at 359-60*.

In this action, rendering judgment will "serve a useful purpose." Both parties seek clarification of their rights and duties under the Assumption and Amendment to Warrant Agreement, as evidenced by the defendants'

counterclaim for breach of contract. Moreover, the judgment will finalize the controversy and offer relief from uncertainty. The Court has been asked to pass upon the meaning of a contractual term; the Court's determination will enable the parties to choose whether or not to complete a transaction that their disagreement currently prevents them from completing. Finally, this lawsuit neither implicates [*9] the sovereignty of another legal system nor does it appear to be part of a strategy of procedural fencing. Therefore, the Court exercises its discretion to hear plaintiffs' claim for declaratory relief.

### B. Summary Judgment on SkyMall's Claim for Declaratory Relief is Appropriate

[HN2] "In a contract action, the court's general objective should be to give effect to the intentions of the parties in entering into the agreements." *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc., 906 F.2d 884, 889 (2d Cir. 1990)*. If a contract is unambiguous on its face, its proper construction is a question of law, and the issue may be resolved by summary judgment. Id; see also *Omni Quartz, Ltd. v. CVS Corp., 287 F.3d 61, 64 (2d Cir. 2002)*. "If the language unambiguously conveys the parties' intent, extrinsic evidence may not properly be received." *Seiden Assoc., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992)*. Whether the language of a contract is unambiguous, and if so, what construction is proper, are legal questions. *Id. at 429*.

[HN3] Contract language is unambiguous if it has "a definite and precise meaning, unattended by [*10] danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Metropolitan Life Ins., 906 F.2d at 889*. On the contrary, a contract is ambiguous if "the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another." *Seiden Assoc., 959 F.2d at 428*. Contractual language "whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation." *Metropolitan Life Ins., 906 F.2d at 889*. Finally, the court should not find language ambiguous "on the basis of the interpretation urged by one party, where that interpretation would strain the contract language beyond its reasonable and ordinary meaning." *Seiden Assoc., 959 F.2d at 428*.

The Agreement unambiguously defines the stock exercise price as $ 2.00 per share of SkyMall common

stock. Given the plain language of the Agreement, this is the only reasonable interpretation of the meaning of the term "Original Exercise Price." First, the Agreement defines "Original Exercise Price" by stipulating [*11] that, pursuant to the original Warrant, Zuckerman was entitled "to purchase an aggregate of 149,190 shares of SkyMall common stock at an exercise price of $ 2.00 per share (the 'Original Exercise Price')." (Agreement, annexed to Miller Decl., Ex. A at 30.) The Agreement then provides that "the exercise price of the Assumed Warrant shall be the same as the Original Exercise Price" and that "except as otherwise set forth in this Agreement . . . the specific terms and conditions of the SkyMall Warrant shall remain as they were prior to the Merger, and the Assumed Warrant shall be exercisable as provided in the SkyMall Warrant." (Id. at 31.) The Agreement does not contain any provision declaring that the "Original Exercise Price" is no longer for each SkyMall share assumed by Gemstar, but is instead the price for each Gemstar share purchased. On the contrary, the Agreement specifically defines the "Original Exercise Price" as the price per SkyMall share, and reiterates that the price under the Warrant "shall be the same." In sum, the contract language is not "susceptible to differing interpretations, each of which may be said to be as reasonable as another." *Seiden Assoc., 959 F.2d at 428.* [*12] Rather, the contract unambiguously sets the exercise price as $ 2.00 for each SkyMall share to which Zuckerman was entitled under the original Warrant.

Moreover, the language of the Agreement is clear that it constitutes an assumption by Gemstar of SkyMall's earlier obligations as set forth in the Warrant. There is nothing on the face of the Agreement to indicate that the parties had any other intention apart from Gemstar's assumption of SkyMall's limited obligation. Zuckerman's interpretation of the Agreement would entitle him to a substantial and guaranteed profit. The original Warrant contained no such guarantee. Therefore, Zuckerman's interpretation significantly expands the scope of Gemstar's duties beyond a mere assumption of SkyMall's obligations. Pursuant to Zuckerman's reading, the Agreement transforms the character of the agreement between the parties from one that was limited to one that is incapable of going "out of the money." As is evident from the face of the Agreement, if Zuckerman could exercise the Warrant for $ 11,216 and receive $ 223,785 in cash, plus the Gemstar shares, then he is guaranteed a profit of $ 212,569, even if the Gemstar shares are completely worthless [*13] at the time he exercises the

Warrant. Pursuant to SkyMall's reading, by contrast, Zuckerman receives the $ 223,785 and the Gemstar shares only after he tenders a payment of $ 298,380. Under the latter reading, whether Zuckerman makes a profit depends on the value of the Gemstar shares, and, presumably, he would choose not to exercise the Warrant if he did not anticipate making a profit on the transaction. Because there is nothing in the Agreement to explain why Gemstar's obligations would be increased in order to guarantee Zuckerman a substantial profit, or to explain that the Agreement was meant to do more than allow Gemstar to assume SkyMall's original obligation under the Warrant, there is no "reasonable basis for a difference in opinion" as to the meaning of the contractual terms. *Metropolitan Life Ins., 906 F.2d at 889.*

In sum, the Agreement unambiguously sets forth the exercise price as $ 2.00 per share of the SkyMall stock to which Zuckerman was entitled pursuant to the original Warrant. Because the contract is unambiguous, its construction is a matter of law for the court, *Omni Quartz, 287 F.3d at 64*, and the Court grants summary judgment [*14] to plaintiffs on their prayer for declaratory relief.

**C. Defendants' Counterclaim for Breach of Contract is Denied**

Because the Court finds that the language of the Agreement is not "susceptible to differing interpretations," *Seiden Assoc., 959 F.2d at 428*, and that SkyMall's interpretation is the only reasonable one, Zuckerman's counterclaim for breach of contract is denied. Pursuant to the terms of the Agreement, Zuckerman was required to tender $ 2.00 per SkyMall share, or $ 298,380, but instead he tendered only $ 11,216. Because Zuckerman did not tender the agreed-upon exercise price, plaintiffs' obligations under the contract did not arise, and they are thus not in breach of the Agreement.

**III. CONCLUSION**

Because the terms of the Agreement are unambiguous, plaintiffs' motion for summary judgment in their favor on both their claim and Zuckerman's counterclaim is granted.

Dated: New York, New York

October 25, 2005

2005 U.S. Dist. LEXIS 25108, *14

SO ORDERED:                                     Sidney H. Stein, U.S.D.J.

LEXSEE 1998 N.Y. MISC. LEXIS 701



Cited
As of: Jul 11, 2008

MTV NETWORKS, A DIVISION OF VIACOM INTERNATIONAL INC., Plaintiff,
v. FOX KIDS WORLDWIDE, INC., NEWS CORP. LTD., and RICHARD
CRONIN, Defendants.

Index No. 605580/97

SUPREME COURT OF NEW YORK, NEW YORK COUNTY

*1998 N.Y. Misc. LEXIS 701*

February 4, 1998, Decided
May 13, 1998, Filed

**NOTICE:**

[*1] THE LEXIS PAGINATION OF THIS DOCUMENT IS SUBJECT TO CHANGE PENDING RELEASE OF THE FINAL PUBLISHED VERSION.

**DISPOSITION:** The motion for a preliminary injunction is granted. The preliminary injunction will expire on June 30, 1998.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, a cable television network, brought a motion for a preliminary injunction to enjoin defendant employee from working for defendant competitor for the one year period set forth in the non-competition agreement.

**OVERVIEW:** Defendant employee was employed by plaintiff, a cable television network. Defendant employee entered into an employment contract with one of defendant competitor, to commence at the conclusion of his contract with plaintiff. When it discovered the arrangement, plaintiff discharged defendant employee for cause, and sought a preliminary injunction to prevent defendant employee from competing for one year, as set forth in the non-compete clause of defendant employee's

employment contract with plaintiff. The court determined that plaintiff was entitled to such relief to prevent irreparable injury. The evidence established that defendant employee was a senior executive with unique talents, and that he played a key role in developing programming for plaintiff and setting goals and strategies. The court also rejected defendant employee's argument that he was entitled to make career plans to commence at the conclusion of his contract with plaintiff. Despite the fact that his employment with defendant competitor was not to begin until the end of plaintiff's contract, defendant employee received stock options from defendant corporation, creating a conflict of interest.

**OUTCOME:** The court granted plaintiff's, a cable television network, motion for a preliminary injunction to bar defendant employee from working for defendant competitor because plaintiff demonstrated that it would be irreparably injured if defendant employee was not prevented from violating the terms of his non-compete agreement.

**CORE TERMS:** employment agreement, termination, network, competitor, notice, terminate, cure, preliminary injunction, confidential information, trade secrets, stock option, front, employment contract, terminated, hereunder, signing, bonus, restrictive covenants,

irreparable, enforceable, cable network, written notice, base salary, non-compete, terminating, television, advertisers, expiration, fiduciary, salary

**LexisNexis(R) Headnotes**

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
[HN1] Generally, in order to obtain a preliminary injunction, a movant must show a likelihood of success on the merits, the potential for irreparable injury if the injunction is not granted, and a balance of the equities in movant's favor.

*Contracts Law > Types of Contracts > Covenants*
*Trade Secrets Law > Civil Actions > Remedies > Injunctive Relief > General Overview*
*Trade Secrets Law > Misappropriation Actions > Unfair Competition*
[HN2] While the courts of New York have adopted a strict approach in construing non-competition agreements and restrictive covenants in employment agreements, such agreements have been enforced when reasonable in scope, duration, and geographical area, when an injunction is necessary to protect the employer from unfair competition that stems from the employee's use or disclosure of trade secrets, or where the employee's services are unique or extraordinary.

*Contracts Law > Types of Contracts > Covenants*
*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements*
[HN3] While restrictive covenants which prevent employees from pursuing a similar vocation after termination of employment are disfavored, an employer is entitled to protection from unfair or illegal conduct that causes economic injury, especially where the employee's ability to earn a living is not impaired.

*Contracts Law > Contract Interpretation > General Overview*
[HN4] A contract should be interpreted to give meaning and effect to every provision, and anomalous consequences should be avoided.

**JUDGES:** HERMAN CAHN, J.S.C.

**OPINION BY:** HERMAN CAHN

**OPINION**

**CAHN, J.:**

Plaintiff, MTV Networks, A Division of Viacom International, Inc. ("MTVN") moves to enjoin defendant Richard Cronin ("Cronin") from working for any competitor of MTVN, including specifically defendant Fox Kids Worldwide, Inc. ("Fox Kids") until July 1, 1998, and to enjoin Fox Kids from employing Cronin through June 30, 1998.

The parties voluntarily agreed that Cronin would not work for Fox Kids pending the issuance of this decision, rendered after the hearing on the motion for a preliminary injunction. In view of that agreement, the court did not sign a temporary restraining order. An evidentiary hearing at which the parties presented documentary evidence and testimony, was held.

MTVN is a cable television network which owns TV Land, Nick-at-Nite, and Nickelodeon. Cronin was employed by MTVN since 1984; he was a member of the Nickelodeon "executive team" since July 1987. Pursuant to a three year employment [*2] contract, executed in July 1995, Cronin became president of MTVN's TV Land, a newly launched cable network specializing in "classic television". He also supervised Nick-at-Nite, a sister network to TV Land specializing in "classic" situation comedies. The "executive team" for the various networks reviews operations, budgets, and strategic plans for the network. Substantially, all the operating information and plans are made available to and considered by the "executive team". Cronin was also a spokesman for Nick-at-Nite and TV Land, filling the role of master of ceremonies for Nick-at-Nite and TV Land's annual "up front" presentations to advertisers. Plaintiff's witnesses testified that he was considered its "public face."

Cronin's employment contract provides for a period of employment from July 1, 1995, through June 30, 1998.

The agreement defines his duties during the term of the agreement:

2. Duties. During the Employment Term, you agree to devote your entire business time, attention and energies to the business of MTVN and its subsidiaries. You will be President, Nick-at-Nite's TV Land, MTV Networks, a division of Viacom International, Inc. and you agree to perform **[*3]** such duties, and such other duties reasonable and consistent with such office as may be assigned to you from time to time by the President of Nickelodeon and Nick-at-Nite or such other individual as may be designated by the Chief Executive Officer of MTVN (the "CEO"), provided that such other individual either (i) reports to or is such CEO or (ii) is the COO of Nickelodeon. Such duties shall also include supervisory responsibility for Nick-at-Nite at least through October 15, 1997. Your principal place of business shall be at MTVN's headquarters in the New York City Metropolitan area.

Cronin's employment agreement also includes a non-competition clause which provides:

6. Exclusive Employment, Confidential Information, Etc.

(a) Non-Competition. You agree that your employment hereunder is on an exclusive basis, and that during the shorter of (x) the period remaining in the Employment Term on any given date and (y) one (1) year after the termination of your employment pursuant to paragraph 8(a), 8(b), or 8(c) hereof (the "Non-Compete" Period), you will not engage in any other business activity which is in conflict with your duties and obligations hereunder. You **[*4]** agree that during the Non-Compete Period you shall not directly or indirectly engage in or participate as an officer, employee, director, agent of or consultant for any business directly competitive with that of MTVN, nor shall you make any investments in any company or business

competing with MTVN; provided, however, that nothing herein shall prevent you from investing as less than a one (1%) percent shareholder in the securities of any company listed on a national securities exchange or quoted on an automated quotation system.

* * *

(i) Injunctive Relief. MTVN has entered into this Agreement in order to obtain the benefit of your unique skills, talent, and experience. You acknowledge and agree that any violation of paragraphs 6(a) through (h) hereof will result in irreparable damage to MTVN and Viacom, and, accordingly, MTVN and Viacom may obtain injunctive and other equitable relief for any breach or threatened breach of such paragraphs, in addition to any other remedies available to MTVN and Viacom.

(j) Survival: Modification of Terms. Your obligations under paragraph 6(a) through (i) hereof shall remain in full force and effect for the entire period provided therein **[*5]** notwithstanding the termination of the Employment Term pursuant to paragraph 8 hereof or otherwise; provided however, that your obligations under paragraph 6(a) shall cease if you terminate your employment for "Good Reason" or MTVN terminates your employment without "cause" (as such terms are defined in paragraph 8) and you notify MTVN in writing that you have elected to waive your right to receive, or to continue to receive, payments and benefits pursuant to clauses (i), (ii), (iii), (iv) and (v) of paragraph 8(d). You and MTVN agree that the restrictions and remedies contained in paragraphs 6(a) through (i) are reasonable and all it is your intention and the intention of MTVN that such restrictions and remedies shall be enforceable to the fullest extent permissible by law. If it shall be found by a court of competent jurisdiction that any

1998 N.Y. Misc. LEXIS 701, *5

such restriction or remedy is unenforceable but would be enforceable if some part thereof were deleted or the period or area of application reduced, then such restriction or remedy shall apply with such modification as shall be necessary to make it enforceable.

The contract further provides:

8. Termination.

(a) Termination **[*6]** for Cause. MTVN may, at its option, terminate this Agreement forthwith for "cause", and MTVN shall thereafter have no further obligations under this Agreement, including, without limitation, any obligation to pay Salary or Bonus or provide benefits under this Agreement. For purposes of this Agreement, termination of this Agreement for "cause" shall mean termination for... willful unauthorized disclosure of confidential information, or if you at any time materially breach this Agreement.... Anything herein to the contrary notwithstanding, MTVN will give you written notice prior to terminating this Agreement for you material breach setting forth the exact nature of any alleged breach and the conduct required to cure such breach. You shall have ten (10) business days from the giving of such notice within which to cure.

(b) Good Reason Termination. You may terminate your employment hereunder for "Good Reason" at any time during the Employment Term by written notice to MTVN not more than (30) days after the occurrence of the event constituting "Good Reason". Such notice shall sate an effective date no later than ten (10) business days after the date is given. Good Reason shall **[*7]** mean, without your prior written consent, other than in connection with the termination of your employment for "cause" (as defined above) or in connection with your permanent disability, the assignment to

you by MTVN or Viacom of duties substantially inconsistent with your positions, duties, responsibilities, titles or offices, the withdrawal of a material part of your responsibilities as set forth in paragraph 2, or the breach by MTVN of any of its material obligations hereunder.

(c) Termination Without Cause. MTVN may terminate your employment hereunder without "cause" (as defined above) at any time during the Employment Term by written notice to you.

* * *

(f) Non Renewal Notice, Etc. Viacom shall notify you in writing in the event that MTVN elects not to extend or renew this Agreement. If MTVN gives you such notice less than twelve (12) months before the Employment Term, or your employment terminates pursuant to paragraph 8(b) or 8(c) hereof during the final twelve (12) months of the Employment Term, you shall be entitled to receive salary as provided in paragraph 3(a), payable in accordance with MTVN's then effective payroll practices, subject to applicable **[*8]** withholding requirements, for the period commencing after the end of the Employment Term which, when added to the portion of the Employment Term, if any, remaining when the notice is given or the termination occurs, equals twelve (12) months; provided however, you shall be required to mitigate the amount of any payment pursuant to this paragraph 8(f) by seeking other employment or otherwise, and the amount of any such payment shall be reduced by any compensation earned by you from a third person. The payments provided for in this paragraph 8(f) in lieu of any severance or income continuation or protection under any MTVN or Viacom plan that may now or hereafter exist.

During the latter part of August 1997, Haim Saban, Chairman and CEO of Fox Kids, contacted Cronin to explore the possibility of his becoming the President and

CEO of the Fox Family and Fox Kids cable network, and the Fox Kids broadcast network. The Fox group of networks were viewed by MTVN as potential competitors of the Nickelodeon group. In fact, it is clear from the testimony that the two groups are potential, if not yet actual competitors, and that the Fox group is aiming at the same market as MTVN.

In response, **[*9]** Cronin told Saban that he was under contract with MTVN through June 30, 1998, so any offer would be considered only if his employment were to begin after that date. Saban found that acceptable, and negotiations continued through October 17, 1997, at which time Cronin signed a contract with Fox Kids to be employed starting July 1, 1998.

The signed employment agreement contains an indemnification clause, by which Fox Kids agreed to indemnify Cronin for any legal costs or judgments that may arise out of any legal action taken by MTVN or Viacom, including the within action. The indemnification clause also requires Fox Kids to pay Cronin's MTVN base salary of $ 375,000.00 and $ 400,000.00 bonus until he actually begins working for Fox Kids and provide benefits should MTVN not pay his salary or provide benefits for any reason. The agreement further provides:

> "As we have discussed by offering you a position of employment with Fox Kids, commencing on July 1, 1998, we have no intention of interfering with or changing in any way your relationship with your current employer."

The financial terms of Cronin's employment agreement with Fox Kids includes a base annual salary of over $ 1,000,000.00, **[*10]** a signing bonus of $ 500,000.00 on the first day of employment, contingent and annual bonus based on revenue and Cronin's achievement of certain goals. Additionally, the employment agreement grants Cronin a ten-year non-qualified stock option "covering an aggregate of 161,637 shares of class A common stock... which Fox Kids represents reflects no less than 1% of the current voting securities of Fox Kids diluted for this stock option, at an exercise price of $ 111.37 per share" based on a current $ 1.8 billion valuation of Fox Kids. (emphasis added) The option vests in increments over a period of five years.

Prior to signing the Fox Kids contract, Cronin reported the offer to two MTVN executives. MTVN sought unsuccessfully to have Cronin remain in its employ, offering him a new contract substantially raising the compensation he received pursuant to his then existing contract. When it was apparent that these efforts were not bearing fruit, MTVN sent Cronin a letter dated October 13, 1997, stating:

> This letter constitutes formal notice to you that you are not permitted, either under your employment agreement with MTVN dated as of July 1, 1995, or pursuant to your fiduciary **[*11]** obligations as President, Nick-at-Nite's TV Land, to enter into any other employment agreements, arrangements or understandings with any competitor of MTVN, prior to the expiration of your employment agreement on June 30, 1998. We also wish to advise that permitting or authorizing any public announcement or disclosure of your prospective employment by a competitor of MTVN would constitute a further - and compounding - breach of your legal and fiduciary obligations to the company.

After Cronin signed the employment agreement with Fox Kids on October 17, 1997, MTVN sent Cronin a letter dated October 21, 1997, terminating his employment with MTVN for cause, effective November 5, 1997. The cause asserted was his entering into an agreement to become the President and Chief Executive Officer of a direct competitor. MTVN offered to pay Cronin severance pay as provided in his contract, which consisted of continuing his base salary payments through June 30, 1998. The offer of severance pay was made on condition that Cronin comply with all the terms of paragraph six of the employment agreement and specifically did not commence employment with Fox Kids until after June 30, 1998.

MTVN also **[*12]** issued a press release announcing Cronin's departure. Cronin responded by letter dated October 30, 1997. In the letter, he denied that there was anything in his employment agreement barring him from planning his future career at the end of the employment term. He further stated that due to MTVN's actions in

directing him to stop performing his duties, and publicly announcing that he was being terminated, he was giving notice that he was terminating his employment at MTVN for "Good Reason" as provided in paragraph 8(b) of his employment agreement, effective immediately. He also turned down MTVN's offer to continue paying his base salary through the end of his employment term.

MTVN commenced this action on October 31, 1997, seeking a preliminary injunction preventing Cronin from working for Fox Kids until the expiration of the term set forth in his MTVN employment agreement - June 30, 1998. The complaint contains seven causes of action: (1) breach of fiduciary duty against Cronin; (2) breach of contract against Cronin; (3) unauthorized use of trade secrets against Cronin; (4) aiding and abetting breach of fiduciary duty against Fox Kids and News Corp.; (5) tortious interference against [*13] Fox Kids and News Corp.; (6) unfair competition against Fox Kids and News Corp.; and (7) the imposition of a constructive trust against Fox Kids and News Corp.

[HN1] Generally, in order to obtain a preliminary injunction, a movant must show a likelihood of success on the merits, the potential for irreparable injury if the injunction is not granted, and a balance of the equities in movant's favor. ( *W. T. Grant v Srogi, 52 N.Y.2d 496, 438 N.Y.S.2d 761, 420 N.E.2d 953*; *Chernoff Diamond v Fitzmaurice, Inc., 234 A.D.2d 200, 651 N.Y.S.2d 504*). [HN2] While the courts of New York have adopted a strict approach in construing non-competition agreements and restrictive covenants in employment agreements ( *Reed, Roberts Associates v Strauman, 40 N.Y.2d 303, 386 N.Y.S.2d 677, 353 N.E.2d 590*), such agreements have been enforced when reasonable in scope, duration and geographical area *(see, Gelder Med. Group v. Webber, 41 N.Y.2d 680, 394 N.Y.S.2d 867, 363 N.E.2d 573; Columbia Ribbon & Carbon Mfg. Co. v A-1-A Corp., 42 N.Y.2d 496, 398 N.Y.S.2d 1004, 369 N.E.2d 4; Family Affair Haircutters v Detling, 110 A.D.2d 745, 488 N.Y.S.2d 204; Matter of Schachter, 52 A.D.2d 121, 383 N.Y.S.2d 316,* [*14] *aff'd 41 N.Y.2d 1067, 396 N.Y.S.2d 175, 364 N.E.2d 840),* when an injunction is necessary to protect the employer from unfair competition that stems from the employee's use or disclosure of trade secrets, or where the employee's services are unique or extraordinary. ( *Columbia Ribbon & Carbon Mfg. v A-1-A Corp., supra.; Chernoff Diamond v Fitzmaurice, Inc., supra.; Maltby v Harlow Meyer Savage Inc., 166 Misc. 2d 481, 633 N.Y.S.2d 926, affd 223 A.D.2d 516,* 637 N.Y.S.2d 110).

[HN3] While restrictive covenants which prevent employees from pursuing a similar vocation after termination of employment are disfavored ( *American Para Professional Systems Inc. v Examination Management Services, Inc., 214 A.D.2d 413, 625 N.Y.S.2d 33*), an employer is entitled to protection from unfair or illegal conduct that causes economic injury, especially where the employee's ability to earn a living is not impaired. ( *American Broadcasting Cos. Inc. v Wolf, 52 N.Y.2d 394, 438 N.Y.S.2d 482, 420 N.E.2d 363*). "Acknowledging the tension between the freedom of individuals to contract, and the reluctance [*15] to see one barter away his freedom, the State enforces limited restraints on an employee's employment mobility where a mutuality of obligation is bargained for by the parties". ( *Post v. Merrill Lynch Pierce Fenner & Smith, 48 N.Y.2d 84, 89, 421 N.Y.S.2d 847, 397 N.E.2d 358).* "Indeed, the modern trend in the case law seems to be in favor of according such covenants full effect when they are not unduly burdensome". ( *Mohawk Maintenance Co. v. Kessler, 52 N.Y.2d 276, 284, 437 N.Y.S.2d 646, 419 N.E.2d 324).*

Notwithstanding the above discussion, the court notes that this is not simply a "non-compete" case. The relief sought in this motion is not that Cronin be barred from competing with his former employer after the term of their agreement ends. Rather, it is a claim by plaintiff that Cronin should be held to the original term of the agreement only. Plaintiff argues that it terminated Cronin's employment "for cause", and it is thus entitled to require Cronin not to compete until the end of the agreement's term. Defendants assert that Cronin was not terminated "for cause", and that plaintiff's actions gave Cronin sufficient reason to resign.

The [*16] testimony at the hearing showed that Cronin is a uniquely talented executive who played a key role in launching TV Land, and in developing strategies which led to making Nick-At-Nite the top rated cable network in its time period. Documents submitted further support the conclusion that Cronin was a key player in setting goals and devising strategies for the network, including long term strategies. These strategies included, among other things, methods of dealing with competitors, and suggestions for seizing opportunities before competitors, expressly including Fox Kids, take advantage of them.

There was testimony by Mark Rosenthal, President and Chief Operating Officer of MTVN, and Herb Scannell, President of Nickelodeon Networks, that Cronin had access to confidential information, especially in the area of MTVN's plans for competing with, among others, Fox Kids. They also testified that Cronin had detailed knowledge of MTVN's budget process.

Rosenberg, Scannell, and to a degree Cronin himself testified that Cronin was also very visibly involved in relationships with advertisers. He was the "public face" of MTVN, who represented the network at many public functions and in contacts [*17] with firms with which MTVN dealt. As master of ceremonies at the "up front" presentations ("up fronts"), at which the network presents its plans and hopes for the coming season(s) to advertisers and media buyers, and attempts to sell advertising; he was one of the network's representatives in dealing with cable operators. Cronin was aware of his importance, as demonstrated by his 1996 self-evaluation, in which he takes credit for being the best possible key spokesman for Nick-at-Nite and TV Land. He also had regular contact with the trade press, with whom he has excellent relations, and appeared at industry conventions regularly, where personal relationships are invaluable.

The court finds this testimony to be credible. The evidence amply demonstrates that Cronin qualifies as a unique employee, and is in possession of confidential information, and is, therefore, subject to a restrictive covenant which may otherwise be enforceable. *(See, Maltby v Harlow Meyer Savage, supra)*. Cronin's reliance upon *Feiger v. Iral Jewelry, Ltd., (41 N.Y.2d 928, 394 N.Y.S.2d 626, 363 N.E.2d 350),* is misplaced. The Court of Appeals in *Feiger* explicitly stated [*18] that its opinion was based "on the finding of facts in this case, meticulously detailed by the court at trial." In the underlying trial decision in *Feiger (85 Misc. 2d 994, 382 N.Y.S.2d 216)*, Justice Shainswit found that the plaintiff

"was only in the most technical sense an employee of defendant. he was treated as one for defendant's benefit insurance wise; in actuality, he was a commissioned salesman, representing at least one other company and sometimes more... The fact is that, regardless of his technical status, plaintiff was in substance a salesman, whose earnings related directly to the sales he obtained for defendant; his situation

was thus entirely different from that of the true employees involved in the cases cited by defendant. ( *Id. at 998*).

In contrast, in this action, Cronin is a unique employee with unique skills and knowledge. In addition, Cronin was a very senior executive at MTVN with much responsibility for the success of two major cable networks with tens of millions of viewers unlike the plaintiff jewelry salesman who sued for commission in *Feiger.*

Another issue involves whether Cronin was properly terminated "for cause," [*19] which would enable MTVN to enforce the non-compete provision of the employment contract.

Cronin and Fox Kids argue that there is nothing in his contract which prevented him from planning for his future after the expiration of his contract. While the contract provides for continued payment to Cronin for twelve months after his term of employment is over, in the event that MTVN chose not to renew the contract, they contend that Cronin was entitled to make future plans before the expiration of the employment term, to ensure against his being unemployed in the event that he chose not to continue working for MTVN.

Although it is true that the contract does not expressly state that Cronin may not enter into an employment agreement with another company during the term of his employment, the contract states that he must not engage in any other business activity during its term which is in conflict with his duties and obligations under his contract.

Cronin claims that he would have been able to perform most of his functions without any change, notwithstanding his signing the contract with Fox Kids. However, even he acknowledges that certain sensitive issues would have been difficult, if [*20] not impossible, for him to be involved in. The most obvious of those involves strategy relating to competition with Fox Kids and the Family Channel. Accordingly, by Cronin's own admission, there were areas of his MTVN job in which he would no longer be able to function effectively. Cronin also acknowledges that the announcement that he signed with Fox Kids would amount to an endorsement of that network, which is prohibited by his contract. Although Cronin claimed that he had an understanding that the

signing would not be announced, Saban denied any such understanding, and it was acknowledged that the news could not remain a secret indefinitely.

There was also undisputed evidence that once Cronin signed the contract with Fox Kids, the valuation of his future stock options at Fox Kids was fixed. This created a problem of divided loyalties, since it was in Cronin's interest to see Fox Kids succeed in order to increase the value of his stock options. Cronin's stock options create an unavoidable conflict of interest. As Fox Kids stock becomes more valuable, so too Cronin's options become more valuable. Cronin can not be expected to complete his employment term with MTVN, perform his required **[*21]** duties under his MTVN agreement and ignore his interest in Fox Kids. Furthermore, the court finds that defendant's construction of the 1% limit on investment in Cronin's MTVN agreement too narrow. The distinction between vested and non-vested options in this context is simply artificial. The fact that Cronin has a future interest in the Fox Kids stock options, breaches the clause in his MTVN contract.

Cronin argues that MTVN's termination for cause was invalid because MTVN failed to give him written notice prior to terminating his employment setting forth the exact nature of the alleged breach, the conduct required to cure such breach, and ten days within which to cure, as provided by the contract. However, before Cronin signed the contract, MTVN wrote him stating that if he signed a contract with Fox Kids, he would be in breach of his MTVN employment agreement. Obviously, by informing Cronin that signing an employment contract with another company constituted a breach, MTVN was advising him that to avoid a breach, he must not sign. Once Cronin signed with Fox Kids, there was, in effect, no way to cure the breach, therefore MTVN was unable to advise him of how to cure the breach. **[*22]** Nonetheless, it gave him ten business days until the termination was effective.

It is well established that [HN4] a contract should be interpreted to give meaning and effect to every provision, and anomalous consequences should be avoided. *Browning-Ferris Industries of New York, Inc. v County of Monroe, 103 A.D.2d 1040, 478 N.Y.S.2d 428, affd 64 N.Y.2d 1046, 489 N.Y.S.2d 902, 479 N.E.2d 247.* If the court were to conclude that MTVN's termination of Cronin was ineffective for failure to advise him how to cure the breach within ten days, MTVN would be unable

to terminate him for any reason that was not susceptible to cure. Under such a scenario, MTVN would be unable to terminate him for some of the express examples included in the provision, including conviction of a felony. Such a result is clearly not within the intent of the parties, and the court declines to construe the document in a way to allow that unintended result.

Once Cronin signed the contract with Fox Kids, after having been warned in the October 13, 1997 Roskin letter not to sign, he had irreversibly breached his employment agreement with MTVN. In other words, "All the king's horses and all **[*23]** the king's men, couldn't put Humpty together again." As Rosenberg and Scannell convincingly testified, once Cronin entered into his employment agreement with Fox Kids, he could no longer be trusted to perform his duties at MTVN or act as a credible spokesman for TV Land or Nick-at-Nite. The court finds that, under the conditions presented, MTVN abided by the terms of the Termination for Cause section of the employment contract. Therefore, Cronin was properly terminated for cause, and the injunctive relief provided for by contract is available.

Cronin argues that it would cause him irreparable injury to be forced to remain outside the industry until June 30, 1998. He testified that there was damage to his reputation which has been tarnished and he wants to restore his good name. Cronin and Saban further testified that being forced to stay on the sidelines for eight months in the fast paced cable TV industry will weaken Cronin's skills. However, these arguments must be balanced against MTVN's contractual right not to have Cronin compete during this time, and the potential injury to MTVN in having Cronin working for Fox Kids during this time.

The evidence produced at the hearing show **[*24]** that the "up fronts" for adult programming, which are crucial for obtaining advertising for the upcoming television season, take place in April through June. MTVN demonstrated that contracting with advertisers during the "up fronts" is critical to its success for the coming season. Cronin has long been publicly associated with MTVN, and was an integral player in the preparation and presentation of the up-fronts. The potential detriment to MTVN in having Cronin represent a competitor at this critical time outweighs Cronin's frustration at not being "part of things." This is especially true since there is no danger of Cronin's being unable to

work after June 30, 1998, or not earning a living during this time. Cronin is still scheduled to begin working for Fox Kids on July 1, 1998, as the parties bargained for. Furthermore, under the agreement with Fox Kids, Cronin is being paid not only his base salary ($ 375,000 per year) during this period, but will also be paid a $ 400,000 bonus in February, even if he is not working. Thus, there is no financial hardship to Cronin.

The court notes there was much testimony about Cronin's possession of trade secrets and MTVN documents at his home while **[*25]** he was negotiating with Fox Kids. The plaintiff made much of the fact that Cronin returned seven boxes of documents to MTVN containing sensitive confidential documents. The testimony revealed that there was no explicit firm rule or regulation barring executives from bringing and leaving home documents. In any event, there was no evidence adduced at the hearing that Cronin revealed any confidential information to Fox Kids or Saban, or that MTVN was damaged in any way by the retention of the documents. It is clear that there are trade secrets which Cronin possesses, and MTVN is entitled to have protected. It is true that much of such confidential information is eventually released to the public through the media and trade publications. In that sense, the cable television industry does not have trade secrets akin to formulas and models held secret indefinitely. Yet until strategic plans and budgeting, etc. are implemented or released to the public, they are trade secrets.

Consequently, the court finds that the restrictive covenant at issue herein is reasonable and that MTVN has shown a likelihood of success on the merits, irreparable harm and a balance of the equities in its favor. Maintaining **[*26]** the preliminary injunction through June 30, 1998, is reasonable because that is the time period for which the parties contracted, it is during that time period that the "up fronts" take place, and that will allow MTVN to recover from Cronin's unexpected early departure and prevent Cronin from assisting a competitor during the term of his contract.

Accordingly, the motion for a preliminary injunction is granted. The preliminary injunction will expire on June 30, 1998.

Settle order on 48 hours notice. The proposed order should contain a provision for an undertaking. Counsel may suggest the amount of the undertaking by letter to be submitted with the Notice of Settlement.

Dated: February 4, 1998

Herman Cahn

J.S.C.

1 of 1 DOCUMENT

**Bear, Stearns & Co. Inc., Plaintiff, v. Douglas A. Sharon, Defendant.**

**Civil Action No. 08-10505-NMG**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

*550 F. Supp. 2d 174; 2008 U.S. Dist. LEXIS 35294*

**April 4, 2008, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employer sued defendant former employee, alleging breach of contract, misappropriation of confidential information, and wrongful recruitment of colleagues. The former employer moved for a temporary restraining order (TRO) and a preliminary injunction. The court entered the requested TRO. The former employer moved to convert the TRO into a preliminary injunction.

**OVERVIEW:** The employee resigned from his job as a broker and managing director and began working for a competitor the next day. The former employer alleged that an employment contract required the employee to give at least 90 days' prior written notice before resigning, he misappropriated confidential information, and wrongfully induced other employees and clients to leave the former employer. The court determined that there was no evidence that the employee misappropriated confidential information or persuaded clients to take any action other than to protect the security of their assets, but there was a reasonable likelihood that the former employer would prevail on its breach of contract action at law because there was a binding contract between the parties and the employee's resignation without 90 days' prior written notice constituted a breach of that contract. However, a preliminary injunction was not warranted, because (1) the former employer failed to demonstrate that it would suffer irreparable harm due to the employee's employment at the competitor, (2) the balance of hardships favored the employee, and (3) the 90-day notice provision could not be enforced at equity.

**OUTCOME:** The court denied the former employer's motion for a preliminary injunction.

**CORE TERMS:** base salaries, preliminary injunction, irreparable harm, injunction, hardship, confidential information, resignation, colleagues, printed, annual, injunctive relief, arbitration, notice, restraining order, written notice, misappropriation, misappropriated, weekend, notice provision, specific performance, citation omitted, solicitation, resigned, customer, managing director, employment contract, wrongful conduct, arbitration panel, contract action, public policy

**LexisNexis(R) Headnotes**

*Civil Procedure > Remedies > Injunctions > Elements > General Overview*
[HN1] To obtain preliminary injunctive relief under *Fed. R. Civ. P. 65*, a movant must demonstrate (1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest. Likelihood of success on the merits is the critical factor in the analysis.

*Contracts Law > Consideration > Adequate Consideration*
[HN2] A contract is not void for inadequacy of consideration.

550 F. Supp. 2d 174, *; 2008 U.S. Dist. LEXIS 35294, **

*Civil Procedure > Remedies > Injunctions > Elements > Irreparable Harm*

[HN3] In order to be entitled to injunctive relief, a movant must demonstrate that it will, absent such relief, suffer "irreparable harm," i.e. harm that cannot be recompensed by money damages. Although damage to client relationships and customer goodwill has been held to be "irreparable harm" under Massachusetts law, the financial services industry is uniquely skilled at computing the economic value of a given client.

*Contracts Law > Remedies > Specific Performance*
*Labor & Employment Law > Employment Relationships > Employment Contracts > Breach*

[HN4] There is a general prohibition against specific performance of employment contracts.

**COUNSEL:** [**1] For Bear, Stearns & Company, Inc., Plaintiff: Jordan D. Becker, PRO HAC VICE, Paduano & Weintraub LLP, New York, NY; Michael B. Cosentino, LEAD ATTORNEY, Seegel, Lipshutz & Wilchins, P.C., Wellesley, MA; Joseph E. Gasperetti, Leonard Weintraub, LEAD ATTORNEYS, PRO HAC VICE, Paduano & Weintraub LLP, New York, NY; Sara E. Hirshon, LEAD ATTORNEY, Hanify & King, Boston, MA.

For Douglas A Sharon, Defendant: Michael P Boudett, Foley Hoag LLP, Boston, MA.

For Morgan Stanley & Co. Inc., Deponent: Michael L. Chinitz, Rose, Chinitz & Rose, Boston, MA.

**JUDGES:** Nathaniel M. Gorton, United States District Judge.

**OPINION BY:** Nathaniel M. Gorton

**OPINION**

[*175] **MEMORANDUM AND ORDER**

    **GORTON, J.**

    The defendant, Douglas A. Sharon ("Sharon") was employed by the plaintiff, Bear, Stearns & Co., Inc. ("Bear Stearns") as a broker and managing director of its Boston office. On March 26, 2008, following Sharon's abrupt resignation, Bear Stearns filed this Complaint and

a Motion for a Temporary Restraining Order ("TRO") and a Preliminary Injunction to enjoin Sharon's continued employment at a competing firm as well as other alleged wrongful conduct.

    This Court convened a hearing on that motion and entered the requested TRO on March 27, 2008. Now before [**2] the Court is Bear Stearns's motion to convert the TRO into a Preliminary Injunction which would remain in effect until the arbitration panel of the Financial Industry Regulatory Association [*176] ("FINRA") renders its decision on the merits of this dispute.

    I. *Background*

    In the midst of the well-publicized turmoil surrounding Bear Stearns, Sharon resigned from the firm on March 17, 2008, and immediately accepted a position with its competitor, Morgan Stanley & Co., Inc. ("Morgan Stanley"). Bear Stearns alleges that 1) the terms of Sharon's employment required that he give at least 90 days' prior written notice before resigning, 2) Sharon has misappropriated Bear Stearns's confidential information and 3) he has wrongfully induced employees (and clients) of Bear Stearns leave that firm and become employed by (or customers of) Morgan Stanley.

**A. The Breach of Contract Claim**

    Bear Stearns alleges that in December, 2005, it distributed a memorandum to all of its Senior Managing Directors, including Sharon, under the subject line "Terms of Employment at Bear Stearns - United States". That memorandum provides, in relevant part, that the recipients could accept a raise in their base salaries, among other [**3] benefits, subject to

        A notice provision of not less than 90 days - which means that although you remain an employee at will, if you decide to leave Bear Stearns you must give prior written notice of your intention to leave. Once notice is given, for the ensuing 90 days . . . Bear Stearns will pay your base salary, during which time you may be asked to perform all, some or none of your work duties in Bear Stearns's sole discretion. The notice period is enforceable by a temporary restraining order which Bear Stearns can enforce in

Case 1:07-cv-10595-SHS    Document 41-3    Filed 08/08/2008    Page 18 of 44

Page 3

550 F. Supp. 2d 174, *176; 2008 U.S. Dist. LEXIS 35294, **3

court.

Although there is some confusion regarding the dates on which the memorandum was distributed and executed, the record indicates that Sharon received it and executed it, indicating his acceptance of its terms, on December 12, 2005.

On March 17, 2008, Sharon submitted notice of his resignation from Bear Stearns, effective immediately. He began work for his new employer, Morgan Stanley, the next morning. Bear Stearns seeks, in this action, to enforce specifically the provision of the "Terms of Employment" agreement cited above.

**B. The Claim of Other Wrongful Conduct**

Bear Stearns alleges that, in addition to breaching his employment contract, Sharon also misappropriated **[**4]** Bear Stearns's confidential information and solicited his colleagues and clients to follow him to Morgan Stanley. The evidence in support of those allegations is sparse to negligible and will be discussed only briefly.

With respect to misappropriation of confidential information, Bear Stearns describes electronic records of what was printed by specific users (in this case, Sharon and his assistant, Frederic Debaets ("Debaets")) during the days leading up to Sharon's resignation. It asserts that during the weekend of March 15, 2008, Sharon printed 65 documents containing client information and that Debaets printed a great deal more.

Sharon responds in his sworn affidavit that he was working over the weekend to reassure his clients that their savings were safe and that he took no documents with him when he left. Debaets admits to printing information pertaining to prospective clients whom he had been pursuing but states that he took those documents home only for protection in case Bear Stearns did not open for business the following Monday. He denies that he printed anything that weekend at Sharon's behest. Neither affidavit is contradicted on the record and there is no evidence that **[*177]** Sharon **[**5]** misappropriated Bear Stearns's confidential information in any way.

The wrongful recruitment of colleagues is alleged to have occurred during informal conversations between Sharon and his colleagues. Bear Stearns reports, second-hand (and third-hand), conversations in which

Sharon expressed concern over the stability of Bear Stearns and satisfaction with his new situation at Morgan Stanley. He is also alleged to have provided contact information for Morgan Stanley's regional recruiting director and to have offered unspecified "help" for his Bear Stearns colleagues.

It is undisputed that most, if not all, of Sharon's clients have transferred their accounts at Bear Stearns to Morgan Stanley. There is also no dispute that Sharon was in telephone contact with many of his clients in the days leading up to his resignation and that he informed them of the fact that he was leaving Bear Stearns and would be working at Morgan Stanley. There is no evidence of any effort on Sharon's part to persuade his clients to take any action other than to protect the security of their assets.

**II.** *Analysis*

**A. Legal Standard**

[HN1] To obtain preliminary injunctive relief under *Fed. R. Civ. P. 65*, **[**6]** a movant must demonstrate

> (1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest.

*Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003)* (citation omitted). Likelihood of success on the merits is the critical factor in the analysis. *Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993)* (citations omitted).

**B. Application**

**1. Likelihood of Success on the Merits**

**a. The Solicitation and Misappropriation**

As noted above, Bear Stearns's allegations of misappropriation of confidential information and tortious interference with contractual and business relationships simply have not been substantiated on the record. The plaintiff was suspicious of the circumstances under which Sharon left its employment and it drew not unreasonable inferences about his contact with colleagues and clients

Case 1:07-cv-10595-SHS    Document 41-3    Filed 08/08/2008    Page 19 of 44

Page 4

550 F. Supp. 2d 174, *177; 2008 U.S. Dist. LEXIS 35294, **6

but it can point to no direct evidence of wrongdoing. Because there is no demonstrable likelihood that it will succeed on the merits of these claims, this Court need go no further in its analysis of this aspect of [**7] the motion for a Preliminary Injunction. The motion will, with respect to these claims, be denied.

### b. The Contract Claim

The defendant's first defense against the claim of breach of contract is that he does not recall ever seeing the two-page Memorandum re: Terms of Employment and that if he had understood the memorandum to limit his professional freedom, he never would have signed it. Sharon does not dispute that the signature on the document is his, however, and notwithstanding the confusion surrounding the date of signing, this Court is satisfied that he did sign it and has, therefore, accepted its terms.

Sharon contends next that the contract fails for lack of consideration although it purports to increase his annual base salary from $ 200,000 to $ 250,000. He states that his annual compensation comes in three parts: base salary, annual bonus and commissions and has recently amounted to about ten times his "base salary" in the [*178] aggregate. He asserts, moreover, that the determination of his bonus takes into account the amount he was paid in base salary and, therefore, the subject "increase" in his base salary had no effect on his overall compensation. He concludes that his "salary" [**8] was nothing more than an advance on (and a very small percentage of) his annual compensation.

[HN2] A contract is not void for inadequacy of consideration. *See* 7 WILLISTON ON CONTRACTS § 21. Even if a $ 50,000 increase in base salary is deemed insignificant by Sharon, it is a guaranteed increase and is more than sufficient consideration to support a binding contract.

The Court is satisfied that there is a reasonable likelihood that Bear Stearns will prevail on its breach of contract action at law because there was a binding contract between the parties and Sharon's resignation without 90 days' prior written notice constitutes a breach of that contract. Bear Stearns has, therefore, met the first element of the test for entry of a preliminary injunction.

### 2. Irreparable Harm

[HN3] In order to be entitled to injunctive relief, however, Bear Stearns must also demonstrate that it will, absent such relief, suffer "irreparable harm", i.e. harm that cannot be recompensed by money damages. Although damage to client relationships and customer goodwill has been held to be "irreparable harm" under Massachusetts law, *e.g. All Stainless, Inc. v. Colby, 364 Mass. 773, 308 N.E.2d 481 (1974)*, the financial services industry is uniquely [**9] skilled at computing the economic value of a given client. It is uncertain how many of Sharon's clients, if any, would have remained at Bear Stearns had he not resigned but that issue will be resolved by the FINRA arbitration board and, in any event, difficulty in calculating damages does not render them irreparable. Bear Stearns has failed to demonstrate that it will suffer irreparable harm due to Sharon's employment at Morgan Stanley and an injunction against such employment would, therefore, be inappropriate.

### 3. Balance of the Hardships

In light of the pending FINRA arbitration, the hardship to Bear Stearns of permitting Sharon to resume his employment at Morgan Stanley is minimal. Bear Stearns's counsel suggested at the most recent hearing that dissolution of the restraining order would somehow undermine the ability of the arbitration panel to grant permanent injunctive relief. This Court was not inhibited from entering the TRO after Sharon began to work at Morgan Stanley the first time and it is unapparent why the arbitrator should be so inhibited in the future if good cause is shown. Furthermore, Bear Stearns's ability to retain (or regain) the business of its clients will not [**10] be unduly impaired if Sharon is permitted to provide advice to them from another location.

Sharon's financial wherewithal and ability to earn a living are not in jeopardy but an injunction will likely result in a loss of professional standing and the inability to advise his clients in times of economic turmoil. The loss from such a prohibition may not ever be fully restored. The balance of the hardships, therefore, favors Sharon and further weighs against the entry of a preliminary injunction.

### 4. Public Policy

Finally, Sharon contends and the Court agrees that the 90-day notice provision cannot be enforced at equity. Because the effect of specific performance in this case would be to require the defendant to continue an at-will

Case 1:07-cv-10595-SHS    Document 41-3    Filed 08/08/2008    Page 20 of 44

Page 5

550 F. Supp. 2d 174, *178; 2008 U.S. Dist. LEXIS 35294, **10

employment relationship against his will, it is unenforceable in that manner. *Restatement (Second) of Contracts, § 367.* The so-called "garden leave" provision is not a simple restrictive covenant against competition or the solicitation **[*179]** of clients. If it were, a different result might be warranted but to give it full effect would be to force Sharon to submit to Bear Stearns's whim regarding his employment activity in the near future.

In addition to [HN4] the general prohibition **[**11]** against specific performance of employment contracts, Sharon expresses concern over the well-being of his clients who face the prospect of being cut off from their trusted financial adviser. Although the Court is properly concerned foremost with the litigants before it, it agrees that the investors deserve some consideration. If the Arbitration Board, in its evaluation of the merits of this dispute, determines that Sharon has acted wrongfully, he will face the consequences of that determination in the form of monetary damages but his clients will not be disadvantaged.

**ORDER**

Notwithstanding this Court's finding that Bear Stearns is likely to prevail on the merits of its contract action against Sharon, i.e., that the parties entered into an enforceable contract that Sharon breached, a preliminary injunction does not lie. Because 1) a legal remedy is available and no irreparable harm is likely to befall the plaintiff, 2) the balance of the hardships is not in its favor and 3) public policy militates against this injunction, Bear Stearns's Motion for a Preliminary Injunction (Docket No. 3) is **DENIED.**

**So ordered.**

/s/ Nathaniel M. Gorton

Nathaniel M. Gorton

United States District Judge

Dated April **[**12]** 4, 2008

LEXSEE 2004 U.S. DIST. LEXIS 11575



Positive
As of: Jul 11, 2008

**CHRISTOPH E. KULL, Plaintiff -against- DAVIDOFF OF GENEVA (NY), INC.,
DAVIDOFF OF GENEVA (CT), INC., DAVIDOFF DIRECT, INC., DAVIDOFF
OF GENEVA, INC., DAVIDOFF OF GENEVA LICENSING CORP., DAVIDDOFF
OF GENEVA (USA), INC., and OETTINGER IMEX, AG, Defendants.**

**01 Civ. 4831 (LMM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2004 U.S. Dist. LEXIS 11575*

**June 22, 2004, Decided
June 23, 2004, Filed**

**DISPOSITION:** [*1] Defendants' motion for summary judgment was granted in part and denied in part. Kull's motion for summary judgment as to Defendants' counterclaims was denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employee sued defendant related companies for retaliatory discharge in violation of Title VII of the Civil Rights Act of 1964 and New York human rights law, for claims under the Connecticut Fair Employment Practices Act (CFEPA), as well as claims for breach of contract, promissory estoppel, breach of the covenant of good faith and fair dealing, unjust enrichment, and intentional and negligent infliction of emotional distress.

**OVERVIEW:** The employee alleged that the companies unlawfully terminated his employment in retaliation for bringing forward the sexual harassment allegations of his wife, and his secretary. Two of the companies counterclaimed for breach of the fiduciary duty of loyalty and tortious interference with contract advantage or prospective economic advantage, based on the employee's alleged acceptance of kickbacks from a vendor. The companies moved for summary judgment. The employee moved for summary judgment as to the counterclaims. Inter alia, the court held that although the employee performed some duties at the companies' New York retail store, he lived and worked in Connecticut and the decision to terminate him was not effected in New York, precluding the New York human rights law claim. However, the court had jurisdiction over the Title VII and CFEPA retaliation claims, which survived because there was total disagreement between the parties as to both the kickback and harassment claims. The employee claimed that an employment agreement was laid out in a missing letter, which the companies claimed did not exist, so summary judgment on that claim was inappropriate as well.

**OUTCOME:** The companies' motion for summary judgment was granted with respect to the employee's claims for retaliation under the New York Executive Law, promissory estoppel, breach of the covenant of good faith and fair dealing, and unjust enrichment, and denied as to all other claims. The employee's motion for summary judgment as to the counterclaims was denied.

**CORE TERMS:** termination, summary judgment,

2004 U.S. Dist. LEXIS 11575, *1

kickback, notice, cigar, retaliation, harassment, terminate, emotional distress, entity, infliction, supervisor, sexual harassment, issue of fact, protected activity, tortious interference, terminated, outrageous, good faith, unjust enrichment, imputed, fair dealing, contract claims, promissory estoppel, counterclaims, employment practice, dinner party, citations omitted, retaliatory, impropriety

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Legal Entitlement*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN1] Under *Fed. R. Civ. P. 56*, an action will be dismissed on summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Fed. R. Civ. P. 56(c)*.

*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN2] On a motion for summary judgment, the court must view all evidence in the light most favorable to the nonmoving party.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
[HN3] On a motion for summary judgment, once a moving party presents appropriate support showing that there is no genuine issue of material fact, the nonmoving party must present similar support setting forth specific facts about which a genuine issue remains. *Fed. R. Civ. P. 56(e)*. The party with the burden of proof at trial must make a showing sufficient to establish the existence of an element essential to that party's case.

*Civil Procedure > Summary Judgment > Standards > Appropriateness*

*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN4] On a motion for summary judgment, mere conclusory allegations will not suffice. *Fed. R. Civ. P. 56(e)*. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper.

*Labor & Employment Law > Discrimination > Retaliation > General Overview*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN5] Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, prohibits retaliation for behavior protected under its provisions. The statute states that it is an unlawful employment practice for an employer to discriminate against any of his employees because he has opposed any practice made an unlawful employment practice or because he has made a charge of an unlawful employment practice. *42 U.S.C.S. § 2000e-3(a)*. Both New York and Connecticut have similar state laws codified as part of their human rights laws. *N.Y. Exec. Law § 296(3-a)(c)* (2001 & Supp. 2004); *Conn. Gen. Stat. § 46a-60(a)(4)* (2003).

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN6] Although there are exceptions in general, acts committed outside New York against a nonresident are not covered by the New York statute.

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Coverage & Definitions > Employers*
[HN7] See *42 U.S.C.S. § 2000e(b)*.

*Labor & Employment Law > Discrimination > Actionable Discrimination*
[HN8] The Connecticut human rights law requires a minimum of three employees for an entity to be subject to its provisions. *Conn. Gen. Stat. § 46a-51(10)*.

*Labor & Employment Law > Discrimination >*

Case 1:07-cv-10595-SHS    Document 41-3    Filed 08/08/2008    Page 23 of 44

Page 3
2004 U.S. Dist. LEXIS 11575, *1

**Actionable Discrimination**
[HN9] See *Conn. Gen. Stat. § 46a-51(10).*

**Labor & Employment Law > Discrimination > Actionable Discrimination**
**Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview**
[HN10] The term "employer" has been construed liberally under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.* Accordingly, the United States Court of Appeals for the Second Circuit uses the single employer doctrine in order to determine whether two entities will be regarded as a single employer subject to joint liability for employment-related acts. Because application of the doctrine results in the treatment of two or more ostensibly separate entities as a single, integrated enterprise, the number of employees of each entity can be aggregated when examining jurisdictional thresholds. There are four factors used in determining whether two entities can be considered a single employer: (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control. The most important of the four factors is the second -- centralized control of labor relations. No one factor is controlling, and not every factor is required. Whether entities can be joined as a single employer is a question of fact. These factors also apply to a claim brought under the Connecticut Fair Employment Practices Act, *Conn. Gen. Stat. § 46a-51 et seq.*

**Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices > Interference With Protected Activities**
**Labor & Employment Law > Discrimination > Retaliation > General Overview**
**Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview**
[HN11] A claim for retaliation under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, requires proof of the following four elements: (1) the plaintiff was engaged in a protected activity; (2) the employer was aware of the participation; (3) the plaintiff was subject to an adverse employment action; and (4) there is a nexus between the activity and the action taken.

**Evidence > Procedural Considerations > Circumstantial & Direct Evidence**

**Labor & Employment Law > Discrimination > Retaliation > General Overview**
[HN12] Without direct evidence of retaliation, courts use the order and allocation of proof established in McDonnell-Douglas Corp. v. Green. Under this framework, once a plaintiff, establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its actions. If the defendant is successful, the plaintiff must prove by a preponderance of the evidence that the defendant's proffered reason was pretextual, and was instead an unlawful retaliation.

**Labor & Employment Law > Discrimination > Retaliation > General Overview**
[HN13] The analysis for a retaliation claim is substantially the same under the Connecticut Fair Employment Practices Act, *Conn. Gen. Stat. § 46a-51 et seq.* as under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*

**Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Employer Liability > Coworkers**
**Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Employer Liability > Supervisors**
**Labor & Employment Law > Discrimination > Retaliation > General Overview**
[HN14] In a number of retaliation cases, the courts have imputed to the employer knowledge held by an employer's agent, such as a supervisor, of unlawful actions in order to hold the employer itself liable for those actions.

**Labor & Employment Law > Discrimination > Retaliation > General Overview**
[HN15] To establish a prima facie retaliation case, the plaintiff must still demonstrate a connection between his protected activity and the adverse employment action against him. With respect to proving this connection, then, the question as to whether the knowledge of the protected activity can be imputed is more or less beside the point.

**Civil Procedure > Summary Judgment > Standards > General Overview**

[HN16] A court cannot resolve conflicting testimony on a motion for summary judgment.

*Civil Rights Law > Practice & Procedure > Limitation Periods*
*Labor & Employment Law > Discrimination > Retaliation > General Overview*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN17] A Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.* retaliation claim plaintiff must show that the allegedly adverse actions occurred in circumstances from which a reasonable jury could infer retaliatory intent. In the absence of direct evidence of a retaliatory motive, the requisite nexus between the protected activity and the adverse employment action can be shown through a close temporal proximity. Although there is no bright-line rule, a variety of time limits within a year have been used to raise a question regarding the nexus between a protected activity and retaliatory action.

*Civil Procedure > Summary Judgment > Opposition > General Overview*
*Labor & Employment Law > Discrimination > Retaliation > General Overview*
[HN18] A retaliation plaintiff can defeat a motion for summary judgment by producing sufficient evidence to support a rational finding that the employer's proffered nondiscriminatory reason was false and that discrimination was the real reason.

*Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview*
[HN19] Pursuant to New York choice-of-law rules, contract claims are governed by a "center of gravity" or "grouping of contacts" test, under which courts apply factors such as the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties. The places of contracting and performance are given the greatest weight.

*Contracts Law > Types of Contracts > Express Contracts*
*Labor & Employment Law > Employment Relationships > At-Will Employment > Duration of Employment*
*Labor & Employment Law > Employment Relationships*

*> At-Will Employment > Exceptions > Implied Contracts*
[HN20] Under Connecticut law, all employer-employee relationships not governed by express contracts involve some type of implied contract of employment. Generally, contracts of permanent employment for an indefinite term are at-will. The parties can modify this default rule by agreement.

*Contracts Law > Types of Contracts > General Overview*
*Labor & Employment Law > Employment Relationships > Employment Contracts > General Overview*
*Labor & Employment Law > Wrongful Termination > Breach of Contract > Employer Handbooks*
[HN21] Terms of an employment contract can differ from the provisions set forth in general company literature.

*Contracts Law > Consideration > Enforcement of Promises > Forbearance*
*Contracts Law > Consideration > Promissory Estoppel*
[HN22] In Connecticut, a claim for promissory estoppel has three prongs: (1) a clear and definite promise; (2) a change in position in reliance; and (3) resulting injury. A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. Promissory estoppel is a doctrine often used in the absence of a contractual relationship -- for instance, where consideration is lacking -- to place liability on the promisor. It is therefore not inconsistent to find the absence of a contract, yet find liability based on promissory estoppel.

*Contracts Law > Consideration > Enforcement of Promises > General Overview*
*Contracts Law > Consideration > Promissory Estoppel*
[HN23] Mere lack of seeking another job is not the sort of change in position that an employee can use to support a claim of promissory estoppel against an employer.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*
*Contracts Law > Types of Contracts > Covenants*
[HN24] Under Connecticut law, every contract carries an implied covenant of good faith and fair dealing requiring

that neither party do anything that will injure the right of the other to receive the benefits of the agreement. The claim exists to fulfill the reasonable expectations of the contracting parties as they presumably intended. The claim is separate from and can be maintained in addition to a breach of contract claim.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*

[HN25] The elements of a bad faith claim are as follows: (1) plaintiff and defendant entered into a contract under which the plaintiff had a reasonable expectation of benefits; (2) the defendant undertook actions that undermined the plaintiff's right to collect certain benefits; and (3) the defendant acted in bad faith.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*

[HN26] Bad faith means more than more negligence; it involves a dishonest purpose.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*
*Labor & Employment Law > Employment Relationships > At-Will Employment > General Overview*
*Labor & Employment Law > Wrongful Termination*

[HN27] In a bad faith termination case, an at-will employee must establish that his dismissal was for a demonstrably improper reason, the impropriety of which is derived from a violation of some important public policy.

*Contracts Law > Types of Contracts > Covenants*
*Labor & Employment Law > Discrimination > Age Discrimination > Remedies > General Overview*
*Labor & Employment Law > Wrongful Termination > Public Policy*

[HN28] A plaintiff bringing a claim for violation of the implied covenant of good faith and fair dealing must also establish that he does not otherwise have an adequate means of vindicating that public policy.

*Contracts Law > Types of Contracts > Implied-in-Law Contracts*

[HN29] A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another. The elements of the claim are that (1) the defendant benefitted; (2) the defendant unjustly failed to pay the plaintiff for the benefits; and (3) the failure of payment was to the plaintiff's detriment.

*Contracts Law > Remedies > Equitable Relief > General Overview*
*Contracts Law > Types of Contracts > Implied-in-Law Contracts*
*Labor & Employment Law > Wrongful Termination > Breach of Contract > Formation*

[HN30] Unjust enrichment applies whenever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract. Indeed, lack of a remedy under the contract is a precondition for recovery based upon unjust enrichment.

*Torts > Intentional Torts > Intentional Infliction of Emotional Distress > Elements*

[HN31] Under Connecticut law, to establish a claim for intentional infliction of emotional distress, a plaintiff must prove the following: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe.

*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*
*Torts > Intentional Torts > Intentional Infliction of Emotional Distress > Elements*

[HN32] On an intentional infliction of emotional distress claim under Connecticut law, where the primary dispute has to do with the second prong: the extreme or outrageous nature of the conduct, whether the defendant's conduct is sufficient to satisfy the extreme and outrageous standard is a question, in the first instance, for the court. Where reasonable minds can differ, however, it becomes an issue for the jury. The conduct in question must exceed all bounds usually tolerated by decent society. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in

a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Torts > Intentional Torts > Intentional Infliction of Emotional Distress > General Overview*
[HN33] In the context of an intentional infliction of emotional distress claim in Connecticut, both Connecticut and federal courts in the circuit have been reluctant to find conduct of defendants to be extreme and outrageous. However, extreme or outrageous conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests.

*Torts > Negligence > Actions > Negligent Infliction of Emotional Distress > Elements*
[HN34] To succeed on a claim for negligent infliction of emotional distress, a plaintiff must prove that the defendant should have: (1) realized its conduct involved an unreasonable risk of causing plaintiff distress; and (2) realized the distress, if caused, might result in illness or bodily harm.

*Torts > Negligence > Actions > Negligent Infliction of Emotional Distress > General Overview*
[HN35] In Connecticut, in the work context, a claim for negligent infliction of emotional distress arises only when it is based upon unreasonable conduct of the defendant during the termination process. The requirement that the behavior be linked to the termination process, however, has been interpreted more broadly under Connecticut law. Courts have dismissed plaintiffs' claims when, for instance, he or she remains employed or if the termination was wrongful, but involved no egregious conduct.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > Pendent Claims*
*Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview*
*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*
[HN36] A federal court sitting in diversity or adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state.

*Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview*
*Governments > Fiduciary Responsibilities*
[HN37] Under New York law, a claim for breach of fiduciary duty against a corporation is governed by the law of the relevant company's state of incorporation.

*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*
[HN38] Where neither side has argued that another nation's law be applied, it is initially assumed that the other nation's law is the same as the forum state's law, and either party may challenge that assumption at any time in the litigation by providing "reasonable written notice" of its intent to raise the issue. *Fed. R. Civ. P. 44.1.*

*Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview*
[HN39] In tort cases, New York courts apply an "interest analysis," under which the law of the jurisdiction with the greatest interest in the matter is applied.

*Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview*
[HN40] Under New York's choice of law formulation, the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort. If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders.

*Contracts Law > Formation > General Overview*
[HN41] Without a mutual assent, or a meeting of the minds, there cannot be a valid accord. Whether a meeting of the minds has occurred is a factual determination.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Waiver & Preservation*
[HN42] Waiver is the intentional relinquishment of a known right. The four elements of waiver are as follows: (1) the existence of a right or defense; (2) the opportunity to apply and use that right or defense; (3) the knowledge of the ability to use that right or defense; and (4) actions

of the party who possesses that right or defense that amount to a relinquishment of that right.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
*Governments > Fiduciary Responsibilities*
[HN43] A president of a corporation is in a fiduciary relationship to the corporation. The president occupies a position of the highest trust and therefore he is bound to use the utmost good faith and fair dealing in all his relationships with the corporation.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Governments > Fiduciary Responsibilities*
[HN44] In the context of a breach of fiduciary duty claim, the factfinder must determine whether a transaction between a corporation and its officer is of a type that would lead to the burden-shifting regime set out in Murphy, and, if so, whether the officer can meet such burden.

*Business & Corporate Law > Agency Relationships > Duties & Liabilities > Knowledge & Notice > General Overview*
*Business & Corporate Law > Corporations > Formation > Corporate Existence, Powers & Purpose > Powers > General Overview*
*Torts > Business Torts > Commercial Interference > General Overview*
[HN45] In Connecticut, the elements of tortious interference are the existence of a contractual or beneficial relationship, the defendants' knowledge of that relationship, the intent to interfere with it, and the consequent actual loss suffered by the plaintiff. Under Connecticut law, an agent of a corporation may be held liable for interfering with a contract of that corporation if he was not acting legitimately within the scope of his duties, but was using corporate power improperly for his personal gain. He acts for personal gain if he seeks personal financial gain or is motivated by personal animus. To sustain the claim, the claimants must show that the agent's actions were tortious; that is, that they involved fraud, misrepresentation, intimidation, or molestation, or that he acted maliciously. The claim requires some showing of improper means or motive. The tort does not require a breach of contract.

*Torts > Business Torts > Commercial Interference > Contracts > General Overview*
[HN46] Although parties claiming tortious interference with a contract may have trouble showing that they lost a business opportunity, damages may be recoverable where the interference causes the performance to be more expensive or burdensome.

**COUNSEL:** For Christoph E. Kull, Plaintiff: Alan S. Pralgever, LEAD ATTORNEY, Wolf, Block, Brach & Eichler Hammer & Gladstone, P.C., Roseland, NJ.

For Davidoff of Geneva (NY), Inc., Davidoff of Geneva (USA), Inc., Defendants: Elise M. Bloom, LEAD ATTORNEY, Jackson Lewis, LLP, New York, NY.

For Davidoff of Geneva (NY), Inc., Davidoff of Geneva (CT), Inc., Davidoff Direct, Inc., Davidoff of Geneva, Inc., Davidoff of Geneva Licensing Corporation, Davidoff of Geneva (USA), Inc., Oettinger Imex, AG, Defendants: Jennifer B. Courtian, LEAD ATTORNEY, Jackson Lewis, LLP, New York, NY.

For Davidoff of Geneva (CT), Inc., Davidoff Direct, Inc., Davidoff of Geneva, Inc., Davidoff of Geneva Licensing Corporation, Oettinger Imex, AG, Defendants: Elise M. Bloom, LEAD ATTORNEY, Jackson Lewis, LLP, White Plains, NY.

For Davidoff of Geneva (CT), Inc., Oettinger **[*2]** Imex, AG, Counter Claimants: Elise M. Bloom, LEAD ATTORNEY, Jackson Lewis, L.L.P., White Plains, NY.

For Davidoff of Geneva (CT), Inc., Oettinger Imex, AG, Counter Claimants: Jennifer B. Courtian, LEAD ATTORNEY, Jackson Lewis, L.L.P., New York, NY.

For Christoph E. Kull, Counter Defendant: Alan S. Pralgever, LEAD ATTORNEY, Brach, Eichler, Rosenberg, Silver, Bernstein, Hammer & Gladstone, P.C., Roseland, NJ.

**JUDGES:** Lawrence M. McKenna, U.S.D.J.

**OPINION BY:** Lawrence M. McKenna

**OPINION**

## MEMORANDUM AND ORDER

McKENNA, D.J.

Plaintiff brings this action against the Swiss company Oettinger Imex, AG (referred to here as "Oettinger") and its United States corporate entities Davidoff of Geneva (NY), Inc., Davidoff of Geneva (CT), Inc., Davidoff Direct, Inc., Davidoff of Geneva, Inc., Davidoff of Geneva Licensing Corp., and Davidoff of Geneva (USA), Inc. (collectively "Davidoff"), alleging retaliatory discharge in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e-1 et seq.* (Title VII), *Article 15 of the New York State Executive Law, § 290 et seq.,* and the Connecticut Fair Employment Practices Act (CFEPA), *Conn. Gen. Stat. § 46a-51* **[*3]** *et seq.* He also brings common law claims for breach of contract, promissory estoppel, breach of the covenant of good faith and fair dealing, unjust enrichment, and intentional and negligent infliction of emotional distress. Plaintiff alleges that Defendants unlawfully terminated his employment in retaliation for bringing forward the sexual harassment allegations of his wife, Theres Kull, and his secretary, Alexandra Domond.

Defendants Oettinger and Davidoff of Geneva (CT) bring counterclaims for breach of the fiduciary duty of loyalty and tortious interference with contract advantage or prospective economic advantage, arising from Plaintiff's alleged acceptance of kickbacks from one of Defendants' vendors, Avo Uvezian.

Defendants have filed motions for summary judgment pursuant to *Rule 56 of the Federal Rules of Civil Procedure* with respect to all of Plaintiff's claims, as well as Davidoff of Geneva's and Oettinger's two counterclaims, and Plaintiff has filed a motion for summary judgment with respect to both of the counterclaims. For the reasons set forth below, Defendants' motion is granted in part and denied in part, and Plaintiff's **[*4]** motion is denied.

## Background

Oettinger is a Swiss corporation whose principal business is the retail sale of cigars, smoking products, perfumes, wines, chocolates, fine writing instruments, and other accessories. (Def. 56.1 Stmt. P 1). [1] In 1986, Oettinger decided to expand its business. To that end, it

created five United States subsidiaries and one United States holding company. (*Id.* P 2.) The United States operation sells primarily Davidoff tobacco and related products. (*Id.* P 3). In conjunction with this expansion, Oettinger hired Christoph Kull, who relocated to the United States in 1987 with his wife and, at the time, two children. (*Id.* 4-5.) In 1989, Kull purchased a home in Riverside, Connecticut, with the aid of a loan from Oettinger. (*Id.* P 6; Kull Dep. at 146-47.) Kull began his employment as president of each of Oettinger's United States corporations on January 1, 1987, overseeing the operations of the companies. (Def. 56.1 Stmt. PP 7-8.) Although, upon moving to the United States, Kull was paid by Davidoff of Geneva (NY), once the Connecticut operations were created, he was paid by Davidoff of Geneva (CT). (Kull Dep. at 45-46; *see also* Def. **[*5]** 56.1 Stmt. P 15.) His office was located in Stamford, Connecticut. (Def. 56.1 Stmt. P 8.)

1   Both parties, pursuant to Local *Rule 56.1,* have submitted statements of undisputed material facts in support of their motions for summary judgment, as well as counter-statements in opposition to the other parties' statements. The two documents connected to Defendants' motion for summary judgment will be referred to as "Def. 56.1 Stmt." and "Pl. Opp. 56.1 Stmt." Likewise, the two documents connected to Plaintiff's motion will be referred to as "Pl. 56.1 Stmt." and "Def. Opp. 56.1 Stmt." Similarly, the memoranda associated with the Defendants' motion will be referred to as "Def. Mem.", "Pl. Opp.", and "Def. R. Mem.", while the documents associated with Plaintiff's motion will be referred to as "Pl. Mem.", "Def. Opp.", and "Pl. R. Mem." Because multiple affidavits with both lettered or numbered exhibits have been submitted, each affidavit will be referred to by name and date, along with the exhibit number or letter, if necessary.

**[*6]** From the commencement of his employment until January 1, 1998, Kull reported directly to Dr. Ernst Schneider, president of Oettinger, and George Schelker, one of Oettinger's directors. (*Id.* PP 4, 9.) On January 1, 1997, Schneider hired Dr. Reto Cina as chief executive operator of Oettinger and its United States subsidiaries. (Id. P 10.) Cina reported to Schneider and Schelker and as of January of 1998, Kull reported directly to Cina. (*Id.* PP 13-14. )

Avo Uvezian was an independent supplier of cigars to Oettinger and its United States companies from 1988 until March of 1995. (*Id.* P 19.) His cigars included the brand AVO XO, which he began producing in 1993 and first sold to Davidoff in 1994. (*Id.* P 25; Uvezian Dep. at 36.) Oettinger eventually bought Uvezian's trademark, AVO, as well as the production rights to AVO cigars; the deal went into effect on March 1, 1995. (Def. 56.1 Stmt. P 20.) At the same time, Uvezian became a consultant to Oettinger regarding the marketing and production of AVO cigars. (*Id.* P 21.) Throughout this time period and until his dismissal -- from 1988 until March of 2000 -- Kull was Uvezian's primary contact with Oettinger, and Kull placed [*7] all orders for Uvezian's cigars. (*Id.* P 22.)

Aside from the facts listed above, the parties' accounts of the underlying allegations in this dispute differ significantly. The dispute is primarily based on two sets of alleged activities, about which there is considerable disagreement: first, a financial arrangement between Kull and Uvezian, and second, the alleged sexual harassment by Cina of Kull's wife and secretary and Kull's subsequent reaction. In addition, there is a dispute over the terms of Kull's contract.

First, it is undisputed that there was a financial arrangement between Kull and Uvezian that was outside their professional dealings. Defendants argue this was a kickback scheme Kull devised and imposed on Uvezian; Kull, on the other hand, argues that he accepted a loan from Uvezian, which he paid back in full.

According to Defendants' version of the facts, when Uvezian began producing AVO XO cigars in 1993, Kull used the opportunity to begin a kickback scheme with Uvezian. (*Id.* PP 25-30.) In 1993, Defendants say, Uvezian informed Kull of the new line of cigars and presented him with a price list. Kull then placed an order for the cigars, but arranged the transaction [*8] so that Davidoff was charged an extra $ 0.25 per cigar than that indicated on the price list. (*Id.* PP 25-27.) Kull allegedly told Uvezian that, upon receipt of payments, Uvezian should transfer the extra amount directly to him. (*Id.* P 28.) To facilitate this transfer, Kull directed Uvezian to open a bank account in Puerto Rico, which Uvezian did on May 9, 1994, and told him to deposit the additional money there. (*Id.* P 29; Uvezian Dep. at 66.) After that, Uvezian withdrew money from that account a number of times and issued checks in varying amounts at Kull's

direction. (Def. 56.1 Stmt. PP 30-31.) Uvezian also allegedly made cash payments to Kull from his own personal savings after Davidoff bought the rights to the AVO brand. (*Id.* P 32; Uvezian Dep. at 71.)

According to Defendants, Oettinger and Davidoff first became aware of the kickback scheme when Uvezian approached Cina with the information at a tobacco products trade show in Las Vegas in July of 1999. (Def. 56.1 Stmt. PP 23-24.) Cina asked for documentary evidence, and Uvezian agreed to provide it by September of 1999. (*Id.* PP 33-34.) In the meantime, Cina returned to Switzerland and informed Schneider and [*9] Schelker of Uvezian's allegations. (*Id.* P 35.) On August 4, 1999, Schneider and Schelker informed a committee of Oettinger's board of directors of the allegations, and the committee concluded that, should the allegations be substantiated, Kull would be terminated. (*Id.* P 37; Minutes of August 4, 1999, Meeting, Bloom Aff. of 2/28/03 Ex. K.) By August 9, Oettinger had begun to look for Kull's replacement and had retained Halter & Partner, a Swiss managerial recruiting firm. (Def. 56.1 Stmt. P 40; Letter from Halter & Partner to Oettinger of 8/9/99, Bloom Aff. of 2/28/03 Ex. L (confirming contract for "the search for and selection of a managing director for America for the firm Oettinger Imex AG").)

In September of 1999, Uvezian provided Cina with the requested documentation of his dealings with Kull, consisting of a bankbook, withdrawal forms, and copies of checks, which Cina forwarded to Schneider and Schelker. (Def. 56.1 Stmt. PP 42-43.) On November 8, 1999, Schelker met with Uvezian to discuss the arrangement. (*Id.* P 45.) The Oettinger board members decided to wait to terminate Kull until after the Christmas holidays and after a replacement was found, reasoning that under [*10] Cina's close supervision and scrutiny, Kull would be unable to engage in any further financial impropriety. (*Id.* P 46-47.) On February 25, 2000, Oettinger's board of directors executed its decision to terminate Kull, and on March 3, 2000, in Kull's Stamford office, Schelker informed Kull of the decision and terminated his employment. (*Id.* PP 48-49.)

Kull's version of the events leading up to his termination, unsurprisingly, differs dramatically. Kull admits to having financial interactions with Uvezian apart from Oettinger's business, but disputes many of the details of Defendants' version. Kull maintains that any money Uvezian gave him was a loan -- one Uvezian

himself suggested -- for personal reasons. (Kull. Dep. at 100; Pl. Opp. 56.1 Stmt. P 30, at 3.) [2] Furthermore, Kull states that Uvezian, not Kull, suggested opening the account in Puerto Rico, at least in part to give Kull access to local ATMs, and that any activity was due to Uvezian's acting on his own. (Kull Dep. at 98, 104.) Additionally, any increase in the price of the cigars, Kull testified, was a result of expenses that Uvezian did not initially realize he had to bear as the trademark holder. (Kull Dep. at **[*11]** 97.)

> 2  Both parties' counter 56.1 statements provide a paragraph-by-paragraph response to the moving party's 56.1 statement, and then lists additional facts, restarting the paragraph numbering at 1. AS a result, both documents will be cited with both paragraph number and page number.

As for Oettinger's knowledge of any financial interactions between Kull and Uvezian, Kull maintains that Oettinger first learned of the arrangement in 1995, when Uvezian informed Rene Hollenstein, head of purchasing, production, and product development. (Pl. 56.1 Stmt. P 11.) Hollenstein then did nothing with the information. (Pl. Opp. 56.1 Stmt. P 20(1), at 13; Uvezian Dep. at 49.) Contrary to Cina's testimony, Uvezian testified that he did not mention a kickback scheme to Cina in Las Vegas in July, but first mentioned it to him at a dinner party on September 27, 1999, at Hollenstein's request. (Pl. 56.1 Stmt. P 18; Uvezian Dep. at 116-18; *see also* Fax from Cina to Uvezian of 4/26/00, Koenigsberg Aff. of 3/3/03 Ex. Q (confirming **[*12]** date of dinner party).) Kull acknowledges that there is a document purporting to be the minutes of an August 4, 1999, meeting at which the kickbacks were allegedly discussed, but calls its validity into question, and questions whether the meeting actually occurred. (Pl. Opp. 56.1 Stmt. P 38, at 4.) At most, Kull says, the minutes appear only to authorize an investigation. (*Id.* P 20(4), at 14.) [3] Kull also disputes the meaning bestowed upon the August 9 letter from the management selection firm Halter & Partner. (*Id.* P 41, at 4.) Because Kull maintains that Cina first found out about Uvezian's allegations in late September of 1999, and not at a trade show in July, he also denies that Cina requested documents regarding a kickback scheme from Uvezian in July of 1999. (*Id.* P 42, at 4.) Furthermore, he takes issue with the rationale that Cina could prevent any impropriety through close scrutiny, as he says that he had no supervisors in the United States, nor did he have daily or even weekly contact with any

supervisors. (*Id.* P 47, at 5.)

> 3  Kull refers to an August 6 letter, although the Court assumes he is referring to the minutes of the meeting that purportedly occurred on August 4.

**[*13]**  The second set of activities involves alleged sexual harassment by Cina. Kull asserts that, instead of being terminated because of any financial impropriety, he was terminated because he reported the sexual harassment of his wife and secretary. Both parties dispute the other's allegations having to do with the timing of events leading up to Kull's termination. According to Kull's version, on July 8, 1999, Davidoff held a company picnic in Connecticut at which Cina, Kull, and Kull's wife, Theres, were in attendance. (Pl. 56.1 Stmt. P 13.) On July 26, 1999, Mrs. Kull contacted Robert C. Edmonds, in-house counsel at Davidoff, and informed him that at the picnic, Cina had behaved in a sexually inappropriate manner towards her. (Pl. 56.1 Stmt. P 12; Letter from Edmonds to Schneider of 8/30/99, Koenigsberg Aff. of 4/3/2003 Ex G, at 3.) Meanwhile, on July 20, 1999, Kull's secretary, Alexandra Domond, reported to Edmonds that Cina had behaved in a sexually inappropriate manner toward her. (Pl. 56.1 Stmt. P 15.) Edmonds, along with Davidoff's director of human resources, conducted a preliminary investigation into the allegation on July 30. (Def. 56.1 Stmt. P 52; Letter from Edmonds to Schneider **[*14]** of 8/30/99, at 2.) On August 10, Edmonds informed Kull of his plans to arrange a meeting with the Oettinger principals regarding the alleged harassment. (Def. 56.1 Stmt. P 54.) On August 11, Edmonds scheduled that meeting for August 19. (E-mail from Edmonds to Schweizer [Schneider's Assistant] of 8/11/99, Bloom Aff. of 2/28/03 Ex. S.) In response, on August 13, 1999, Kull himself went to Switzerland and informed Schneider and Schelker of the allegations against Cina. (Def. 56.1 Stmt. P 55.)

According to Defendants, although Edmonds scheduled his meeting on August 11, he did not inform them of the purpose of the meeting. (Def. 56.1 Stmt. PP 52-53.) Therefore, according to Defendants, Schneider and Schelker first heard of the allegations on August 13, when Kull informed them in person. At the scheduled August 19 meeting with Edmonds, Schneider and Schelker informed Edmonds that if the allegations were found to be true, Cina would be discharged. (*Id.* P 57.) As far as Domond's allegations are concerned, Defendants insist that her report to Edmonds was made at Kull's

urging. (Def. 56.1 Stmt. P 58). Indeed, on August 16, 1999, Domond withdrew her complaint and stated she did not want [*15] to pursue "any action whatsoever" in relation to the allegations. (Letter from Edmonds to Schneider of 8/30/99, at 2.) According to Defendants, however, even though Edmonds informed them that Domond expressed her wishes to withdraw her complaint, Schneider and Schelker suggested that he continue the investigation, including interviewing Cina himself, and re-interviewing Domond and the coworker who allegedly witnessed the impropriety. (Def. 56.1 Stmt. P 59.) According to Defendants, Cina first heard of the allegations of sexual harassment on August 26, 1999. (*Id.* P 60.)

Roughly one month later, according to Kull, at the dinner party in September of 1999, Rene Hollenstein asked Uvezian to tell Cina about the incident regarding the money. Oettinger then decided to terminate Kull on February 25, 2000. (Pl. 56.1 Stmt. PP 18-19.) Defendants deny this, and aver that the money was not discussed at the dinner party, and that the decision to terminate Kull was made on August 4, pending the outcome of any investigation of the kickback scheme. (Def. Opp. 56.1 Stmt. PP 18-19, at 6-7.)

The final disputed issue underlying the above allegations and Kull's termination has to do with the terms [*16] of Kull's employment contract. A letter, dated September 23, 1986, sets forth the general terms and conditions of Kull's employment with Davidoff; Kull signed it soon after receiving it. (Letter from Oettinger to Kull of 9/23/86, Bloom Aff. of 2/28/03 Ex. V.) Notably, the letter does not state that the parties must give advance notice before dissolution of the employment relationship, or that termination could be effected only for cause. (*Id.*) The letter does, however, state that the details of the contract along with a description of the responsibilities were still being worked out. (Letter from Oettinger to Kull of 9/23/86, at 2.) Defendants claim that no such detailed contract was ever executed, while Kull maintains that they did subsequently issue a letter that stated that both parties agreed to give the other six months' notice before terminating the employment relationship. (Def. 56.1 Stmt. P 65; Pl. Opp. 56.1 Stmt. P 65, at 6.)

Related to this issue is the handbook for employees of Davidoff. Both parties agree that the provisions of the handbook state that all employment with Davidoff is "at will," and that Davidoff could terminate an employee's employment with or without [*17] cause or notice. (Def. 56.1 Stmt. P 69.) Kull, however, argues that the language of the handbook was overridden by the contract between them. (Pl. Opp. 56.1 Stmt. P 69, at 6.)

**Standard of Review**

[HN1] Under *Rule 56*, an action will be dismissed on summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *Silver v. City Univ. of New York, 947 F.2d 1021, 1022 (2d Cir. 1991)*. [HN2] The court must view all evidence in the light most favorable to the nonmoving party. *Eastman Kodak Co. v. Image Technical Servs., 504 U.S. 451, 456, 119 L. Ed. 2d 265, 112 S. Ct. 2072 (1992)* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*; *Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)).*

[HN3] Once a moving party presents appropriate support showing that there is no genuine issue of material fact, the nonmoving [*18] party must present similar support setting forth specific facts about which a genuine issue remains. *Fed. R. Civ. P. 56(e)*; *see Anderson, 477 U.S. at 256*. The party with the burden of proof at trial must "make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* [HN4] Mere conclusory allegations will not suffice. *Fed. R. Civ. P. 56(e)*. "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).*

**Discussion**

**I. Retaliation under Title VII, the New York Executive Law, and the Connecticut Fair Employment Practices Act**

[HN5] Title VII prohibits retaliation for behavior protected under its provisions. The statute states that it is an "unlawful employment practice for an employer to

discriminate against any of his employees [*19] ... because he has opposed any practice made an unlawful employment practice ... or because he has made a charge" of an unlawful employment practice. *42 U.S.C.A. § 2000e-3(a) (West 2003)*. Both New York and Connecticut have similar state laws codified as part of their human rights laws. *See* N.Y. Exec. L. *§ 296(3-a)(c)* (McKinney 2001 & Supp. 2004); *Conn. Gen. Stat. § 46a-60(a)(4)* (2003).

**A. Jurisdiction under the New York Executive Law**

Defendants argue that Kull cannot bring a claim under the New York Executive Law because he is a nonresident complaining of acts of retaliation that occurred outside the state of New York, for which the New York statute provides no remedy. (Def. Mem. at 16.)

[HN6] Although there are exceptions, *see* N.Y. Exec. L. *§ 298-a*, in general, acts committed outside New York against a nonresident are not covered by the New York statute. *See, e.g., Duffy v. Drake Beam Morin, 1998 U.S. Dist. LEXIS 7215, No. 96 Civ. 5606, 1998 WL 252063, at *12 (S.D.N.Y. May 19, 1998)* ("*The State Human Rights Law* affords no remedy to a non-New York resident who suffers discrimination outside New York State," despite that company [*20] was headquartered in *New York City); Beckett v. Prudential Ins. Co. of America, 893 F. Supp. 234, 241 (S.D.N.Y. 1995)* (*New York Human Rights Law* does not apply to actions taken outside New York state by non-New York corporation); *Iwankow v. Mobil Corp., 150 A.D.2d 272, 541 N.Y.S.2d 428, 428 (App. Div. 1st Dep't 1989)* (Canadian citizen and London, England, resident who was terminated by New York corporation not covered by statute).

That Kull performed some of his duties at the New York retail store does not exempt him from this rule. Since at least 1989, when he bought his home in Riverside, Connecticut, he has been a resident of the state of Connecticut. Kull's office is in Connecticut, and the decision to terminate him was effected by a Swiss corporation in either Basel, Switzerland, where the decision was made, or Stamford, Connecticut, where the termination actually occurred.

Defendants' motion for summary judgment is therefore granted with respect to the retaliation claim under the New York Executive Law.

**B. Defendants' Status as an Employer Under Title VII and the Connecticut Fair Employment Practices Act**

Defendants argue that the retaliation [*21] claims against Davidoff Direct, Davidoff of Geneva, Davidoff of Geneva Licensing, Davidoff of Geneva (USA), and Davidoff of Geneva (NY) should be dismissed, as those entities do not have enough employees to be subject to the requirements of Title VII. Similarly, they argue that three of those entities -- Davidoff Direct, Davidoff of Geneva Licensing, and Davidoff of Geneva (USA) -- each of which has zero employees, do not have enough employees to fall under Connecticut's Fair Employment Practices Act.

[HN7] Under Title VII, an employer is "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person ...." *42 U.S.C.A. § 2000e(b)*. Similarly, the [HN8] Connecticut statute requires a minimum of three employees for an entity to be subject to its provisions. *Conn. Gen. Stat. § 46a-51(10)* [HN9] (defining employer as "any person or employer with three or more persons in such person's or employer's employ").

[HN10] The term "employer" has been construed liberally under Title VII. Accordingly, the Second Circuit [*22] uses the single employer doctrine in order to determine "whether two entities will be regarded as a single employer subject to joint liability for employment-related acts." *Murray v. Miner, 74 F.3d 402, 404 (2d Cir. 1996)*. Because application of the doctrine results in the treatment of two or more ostensibly separate entities as a single, integrated enterprise, the number of employees of each entity can be aggregated when examining jurisdictional thresholds like those at issue here. *See Smith v. K&F Indus., Inc., 190 F. Supp.2d 643, 647 (S.D.N.Y. 2002)*.

There are four factors used in determining whether two entities can be considered a single employer: (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control. *Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1240 (2d Cir. 1995)*. The most important of the four factors is the second -- centralized control of labor relations. *See Cook, 69 F.3d at 1240*. No one factor is controlling, and not every factor is required. *Lihli Fashions Corp. v. NLRB, 80 F.3d 743,*

*747 (2d Cir. 1996).* **[\*23]** Whether entities can be joined as a single employer is a question of fact. *Id.*

The *Cook* factors also apply to a claim brought under the CFEPA. *See Zoldak v. Tacala, Inc.,* 2000 U.S. Dist. LEXIS 21621, No. 3:99 CV 1565, 2000 WL 1576419, at \*4 n.13 (D. Conn. Sept. 27, 2000) (citing *Levy v. Comm'n on Human Rights & Opportunities, 35 Conn. App. 474, 480, 646 A.2d 893 (1994)).*

Here, the economic relationships among the various Davidoff entities in the United States are significant, and Kull has raised an issue of fact as to their integrated nature. Kull submitted an affidavit stating that the enterprise was run in an integrated manner, sharing a board of directors and a single stockholder. (Kull Aff. PP 3-4.) The entities shared accounting, and profitability was measured for the enterprise as a whole. (*Id.* P 4.) As for centralized control of labor relations, the most important factor, the entities shared their management functions and used the same human resources departments, all from the Connecticut offices. (*Id.* P 4.) *See Smith, 190 F. Supp.2d at 647* (use of common human resources department significant factor in finding single employer relationship).

**[\*24]** Although the defendants are entitled to show at trial that the entities were separate and should not be integrated, for the purposes of this motion integration is a question of fact, and it is undisputed that, if integrated, the enterprise employed enough people to meet all relevant jurisdictional thresholds. Summary judgment is therefore inappropriate on those grounds.

## C. Retaliation Under Title VII and the CFEPA

[HN11] A claim for retaliation under Title VII requires proof of the following four elements: (1) the plaintiff was engaged in a protected activity; (2) the employer was aware of the participation; (3) the plaintiff was subject to an adverse employment action; and (4) there is a nexus between the activity and the action taken. *Duffy, 1998 U.S. Dist. LEXIS 7215, 1998 WL 252063, at \*6* (citing *Wanamaker v. Columbian Rope Co., 108 F.3d 462, 465 (2d Cir. 1997)).*

[HN12] Without direct evidence of retaliation, courts use the order and allocation of proof established in *McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). See Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir. 1995).* Under this framework, once a plaintiff, establishes **[\*25]** a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its actions. If the defendant is successful, the plaintiff must prove by a preponderance of the evidence that the defendant's proffered reason was pretextual, and was instead an unlawful retaliation. *Id.*

[HN13] The analysis for a retaliation claim is substantially the same under the CFEPA as under Title VII. *See Arnold v. Yale New Haven Hosp., 213 F. Supp.2d 142, 151 (D. Conn. 2002)* (citing *Brittell v. Dep't of Correction, 247 Conn. 148, 164, 717 A.2d 1254 (1998)); Pascal v. Storage Tech. Corp., 152 F. Supp.2d 191, 196 n.1 (D. Conn. 2001)* (citations omitted).

## 1. Kull's Prima Facie Case

Here, neither side disputes that Kull engaged in a protected activity. An internal complaint of discrimination, such as Kull's notification to Schneider and Schelker of Cina's alleged harassment, satisfies that prong. *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc., 957 F.2d 59, 65 (2d Cir. 1992).* Likewise, Kull's termination is unquestionably an adverse act. The disputed issues here, therefore, relate to the second and **[\*26]** fourth prongs: whether Defendants were aware of Kull's actions before deciding to terminate him, and, if so, whether his protected actions were, in fact, the reason for his termination.

Kull must demonstrate that Defendants were aware of his activity regarding the sexual harassment claims at the time they decided to terminate him. Defendants insist that the decision to terminate Kull was originally made at the August 4, 1999, meeting, pending confirmation of his wrongdoing. (Def. Mem. at 21.) Although Theres Kull and Alexandra Domond had already approached Edmonds, Davidoff's in-house counsel, about their alleged harassment by Cina, and Edmonds had begun his investigation, Defendants maintain that the board of directors was not aware of the allegations until Kull himself informed Schelker and Schneider on August 13, 1999. (Def. Mem. at 22.)

Kull, on the other hand, states that because Kull notified Edmonds, the corporation as a whole should be treated as having knowledge of his allegations prior to the August 4, 1999, meeting. (Pl. Opp. at 15.) Kull cites *Old Republic Ins. Co. v. Landauer Assoc., Inc.,* 1989 U.S. Dist. LEXIS 13422, No. 88 Civ. 434, 1989 WL 652570 (S.D.N.Y. Nov. 9, 1989), for **[\*27]** the proposition that

notice to an officer can be imputed to the corporation. *Landauer Assoc.,* however, involved the construction of a insurance policy. There, the senior vice president did not disclose a potential claim against the insured company. Imputing the officer's knowledge to the corporation itself, the court excluded the undisclosed claim from the corporation's coverage. 1989 U.S. Dist. LEXIS 13422, [WL] at *8.

Although that case is distinguishable on a number of grounds (as Defendants point out), similar imputation of knowledge has been used in the Title VII context. [HN14] In a number of cases, the courts have imputed to the employer knowledge held by an employer's agent, such as a supervisor, of unlawful actions in order to hold the employer itself liable for those actions. For example, in *Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir. 1998),* the plaintiff sued her employer for the hostile work environment created by the sexual harassment of her coworker. Because the harassment was attributable to a coworker, however, rather than a supervisor, the company was liable only for its own negligence; therefore, an important issue existed as to whether the company knew or should have [*28] known of the situation. *157 F.3d at 63.* But because the plaintiff had informed her (and her coworker's) immediate supervisor, and because that supervisor had a duty to relay sexual harassment complaints to the company, the court imputed the supervisor's knowledge of the harassment to the company itself. [4] *Id. at 64.* Similarly, *Torres v. Pisano, 116 F.3d 625 (2d Cir.), cert. denied, 522 U.S. 997, 139 L. Ed. 2d 404, 118 S. Ct. 563 (1997),* also involved sexual harassment in the workplace -- this time by an immediate supervisor. The plaintiff there complained to Pisano, the supervisor who was in charge of the department and who became the harasser's immediate supervisor. *116 F.3d at 628.* The court imputed Pisano's knowledge to the employer. *Id. at 636-37.* The knowledge was imputed on the grounds that, as the harasser's supervisor, Pisano had a duty to act on the information and stop the harassment, and on the alternative grounds that Pisano had a duty to inform the employer of the harassment. *Id. at 637.*

> 4    The court's imputation was based both on general agency principles as well as the company's express written policy. *157 F.3d at 64.*

[*29] Here, however, Kull is attempting to impute the knowledge, not of the harassing behavior itself, but of his protected activity; that is, his complaints about the harassment to Edmonds. Although most cases involving imputation of knowledge in the Title VII context involve the former, at least one court has also imputed knowledge of the protected activity. *See Sales v. YM & YWHA of Washington Heights & Inwood, 2003 U.S. Dist. LEXIS 839, Nos. 00 Civ. 8641, 01 Civ. 1796, 2003 WL 164276, at *7-8 (S.D.N.Y. Jan. 22, 2003)* (employee complained of harassment to mid-level supervisor; knowledge of complaint imputed to the Y) (citing *Torres, 116 F.3d at 636-37).*

[HN15] To establish a prima facie case, however, Kull must still demonstrate a connection between his protected activity -- alerting members of the corporation to Cina's alleged harassment -- and his termination. With respect to proving this connection, then, the question as to whether the knowledge of the protected activity can be imputed is more or less beside the point. Without actual knowledge, it would be illogical to find that Oettinger's termination of Kull was retaliatory. [5]

> 5    Likewise, in *Sales,* the plaintiff's retaliation claim was dismissed because, although the court imputed the knowledge of the protected activity to the Y, the plaintiff could show no causal connection between the protected activity and his termination. *2003 U.S. Dist. LEXIS 839, 2003 WL 164276, at *8.*

[*30] However, there is an issue of material fact as to whether Schneider and Schelker had actual knowledge of Kull's actions with respect to Cina before deciding to terminate Kull. Because Kull informed Edmonds of the harassment, and Edmonds had to communicate with Schneider and Schelker in order to set up the meeting regarding the harassment, an issue of fact is raised as to whether they had actual knowledge of the allegations before August 13, when Kull informed them himself. [6] (*See* Pl. Opp. at 15.) Furthermore, Kull maintains that investigation into any financial impropriety did not begin until after the dinner party on September 27, 1999, when Hollenstein asked Uvezian to inform Cina about his relationship with Kull. (*Id.* at 16; Uvezian Dep. at 116-18.) Although Cina testified that Uvezian told him about a kickback scheme in July of 1999 (Cina Dep. at 103-04), his testimony conflicts with Uvezian's testimony denying that he mentioned it to Cina in July (Uvezian Dep. at 122). The dinner party referred to was well after Schelker and Schneider, as well as Cina, were made aware of Kull's complaints about Cina. [HN16] The

Court cannot resolve conflicting testimony on a motion for summary [*31] judgment.

> 6    The e-mail from Edmonds to Schweizer, Schneider's assistant, setting up the meeting, however, does not mention the reason for the meeting. (E-mail from Edmonds to Schweizer of 8/11/99.)

Finally, Kull was not actually terminated until February 25, 2000, and he disputes the validity of the August 4 meeting minutes that Defendants have put into evidence. Because of the numerous disagreements surrounding the timing of the events -- including the conflict between Cina's and Uvezian's testimony -- issues of fact abound as to Oettinger's actual knowledge of Kull's allegations regarding Cina.

As for the fourth prong, [HN17] a Title VII retaliation claim plaintiff must show that "the allegedly adverse actions occurred in circumstances from which a reasonable jury could infer retaliatory intent." *Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002)*. In the absence of direct evidence of a retaliatory motive, the requisite nexus between the protected activity and the adverse employment action [*32] can be shown through a close temporal proximity. *Id.* (citing *Cifra v. GE, 252 F.3d 205, 217 (2d Cir. 2001))*. Although there is no bright-line rule, a variety of time limits within a year have been used to raise a question regarding the nexus between a protected activity and retaliatory action. *See Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 554-55 & n.5 (2d Cir. 2001)* (collecting cases).

Construing the facts in the light most favorable to Kull, it is possible that Hollenstein learned of the alleged kickback scheme in 1995 and did nothing about it. Further, Oettinger's principals could have known of the alleged harassment perpetrated by Cina at least by August 4, 1999, when the board decided to terminate him, pending the results of an investigation. In the alternative, it could be found that the allegations were first brought to Oettinger's attention in September of 1999, soon after Kull made his allegations of sexual harassment, and were acted upon soon thereafter. In any event, Oettinger's subsequent written decision of February 25 to terminate Kull is in close enough proximity to raise an issue of fact as to the causal [*33] link between Kull's protected activity and his termination.

## 2. Defendants' Proffered Legitimate, Non-Retaliatory

## Reason for Kull's Termination

Defendants must articulate a legitimate, non-retaliatory reason for Kull's termination. Defendants maintain that their decision to terminate Kull's employment had nothing to do with his report of Cina's sexual harassment, but rather was the result of their reasonable belief that Kull had solicited and accepted kickbacks from Uvezian. (Def. R. Mem. at 6.)

As described above, Defendants maintain that, once they heard of the allegations of the kickbacks, when Uvezian told Cina in July of 1999 at the trade show in Las Vegas, they immediately began considering Kull's termination. This process began, they state, before Schneider and Schelker heard of Kull's allegations of sexual harassment on August 13, or when Cina first heard about the allegations on August 26. (Def. Mem. at 22.) To prove that the termination procedure was already underway, Defendants have submitted the minutes of the August 4 meeting and the August 9 letter from Halter & Partner, the managerial recruitment firm.

In support of their allegations that Kull was taking kickbacks [*34] from Uvezian, Defendants have put forth the deposition of Uvezian, in which he testified that Kull placed orders for his cigars at a price of $ .25 more per cigar than Uvezian gave on his price list (Uvezian Dep. at 36), and that Uvezian deposited the money into an account opened in May of 1999 in Puerto Rico and either issued checks from that account to Kull or, after Oettinger bought Uvezian's trademark, paid Kull cash. (Def. Mem. at 23; Uvezian Dep. at 66-68, 70-71, 78.) Additionally, they submit deposits made to the Puerto Rican bank, checks drawn, and a chart of all payments made. (Uvezian Aff. Exs. A-E.)

Uvezian's deposition, affidavit, and minutes of the meeting satisfy the Defendats' burden of production with respect their legitimate, non-retaliatory reason for terminating Kull.

[HN18] Kull can defeat Defendants' motion for summary judgment by "producing sufficient evidence to support a rational finding that the employer's proffered nondiscriminatory reason was false and that discrimination was the real reason." *Rose v. James River Paper Co., 2 F. Supp.2d 245, 253 (D. Conn. 1998)*. Kull, in fact, raises a number of factual issues regarding the validity of Defendants' [*35] assertions. Fundamentally, Kull states the exchange of money between Uvezian and

him was a loan, and one that Uvezian himself suggested. (Kull Dep. at 100.) Additionally, as stated above, Kull asserts that, contrary to Defendants' assertions, Uvezian first informed Hollenstein of his financial arrangements with Kull in 1995, long before Defendants acted on the information. (Uvezian Dep. at 48-49.) Although Defendants indicate that the information Hollenstein received was quite vague and not something that would normally be cause for further investigation (Hollenstein Dep. at 18-19), Uvezian's deposition testimony appears to relate a very specific description of the transactions (Uvezian Dep. at 49), and therefore an issue of fact exists as to whether Hollenstein knew of Kull's and Uvezian's arrangement and chose to do nothing about it. Uvezian testified that, at Hollenstein's urging, he told Cina about the financial scheme at a dinner party at Cina's residence in Zurich in September of 1999. (Uvezian Dep. at 116-17.) Oettinger's lack of action until after Kull reported Cina's alleged behavior therefore raises an issue of fact as to the defendants' motive.

There are also conflicting [*36] accounts as to the amount of money at issue. In Defendants' version of the story, Davidoff paid an extra $ .25 for each cigar in the AVO brand, an amount that would have added up to approximately $ 50,000. (*See* Uvezian Aff. P 10 & Ex. B (chart listing all sales of AVO XO cigars and payments from Uvezian to Kull between Jan. 10, 1994, and May 20, 1997).) Kull states, however, that Uvezian's submitted records include bank deposit statements equaling only $ 22,500. (Uvezian Aff. Ex. A; *see also* Pl. Opp. at 8-9.) Kull states that he repaid the loan of $ 22,500 on June 6, 2000, after his termination. (Letter from Kull to Uvezian of 6/6/00 & Check from Kull to Uvezian of 6/6/00, Koenigsberg Aff. of 4/3/03 Ex. M.) Uvezian testified that further cash payments were made out of his own account after he sold his trademark (Uvezian Dep. at 71); however, he stated at another point that he wanted clear records of any transactions and therefore did not want to deal in cash (Uvezian Dep. at 67-68.) The timing issues discussed above also contribute to the factual dispute. In any event, Kull vehemently denies taking kickbacks (Kull Dep. at 124), and the issue is unquestionably a disputed one.

[*37] In short, the total disagreement between the parties regarding both the kickback and harassment claims makes disposition by summary judgment on both the Title VII and the CFEPA claims impossible. [7]

7 Kull also brought to the Court's attention the Supreme Court case *Desert Palace, Inc. v. Costa, 539 U.S. 90, 156 L. Ed. 2d 84, 123 S. Ct. 2148 (2003),* regarding a mixed-motive instruction to a jury in a Title VII case. Although the issue of mixed motives may come up during the course of trial, the issue is not relevant to the current motions.

## II. Kull's Contract Claims

The crux of Kull's contract claims has to do with the amount of notice given before he was terminated. According to Kull, his contract with Davidoff required both parties to give the other at least six months' notice before terminating the employment relationship. Because Oettinger and Davidoff gave Kull no notice, Kull is suing for breach of contract and other related claims. [8]

8 Defendants argue that Connecticut law should govern Kull's contract claims. (Def. Mem. at 26-27.) Although Kull does not directly contest this, he cites both Connecticut and New York law in his discussion regarding his contract claims. (Pl. Opp. at 26.) [HN19] Pursuant to New York choice-of-law rules, contract claims are governed by a "center of gravity" or "grouping of contacts" test, under which courts apply factors such as the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties. *Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1539 (2d Cir.), cert. denied, 522 U.S. 864, 139 L. Ed. 2d 112, 118 S. Ct. 169 (1997)* (quoting *Brink's Ltd. v. S. African Airways, 93 F.3d 1022, 1030-31 (2d Cir. 1996), cert. denied, 519 U.S. 1116, 136 L. Ed. 2d 845, 117 S. Ct. 959 (1997)* (citing *In re All-state Ins. Co. & Stolarz, 81 N.Y.2d 219, 597 N.Y.S.2d 904, 908, 613 N.E.2d 936 (N.Y. 1993))).* The places of contracting and performance are given the greatest weight. *Id.*

In this particular case, neither party directly addresses the location of contract, although Kull states in his deposition that the original place of business for the United States operations was New York. (Kull Dep. at 45.) However, Kull cites primarily Connecticut law and, absent further evidence on the issue, the Court will apply Connecticut law.

**[*38] A. Breach of Contract**

[HN20] Under Connecticut law, "all employer-employee relationships not governed by express contracts involve some type of implied 'contract' of employment." *Torosyan v. Boehringer Ingelheim Pharms., Inc.,* 234 Conn. 1, 13, 662 A.2d 89 (1995). Generally, contracts of permanent employment for an indefinite term are at-will. *Id. at 14* (citing *D'Ulisse-Cupo v. Bd. of Dirs. of Notre Dame High Sch.,* 202 Conn. 206, 211 n.1, 520 A.2d 217 (1987)). The parties can modify this default rule by agreement. *Id. at 15*.

In order to prevail on his claim that the contract between Davidoff and Kull did, in fact, contain a clause requiring six months' notice before termination, Kull must put forth evidence showing that Davidoff "agreed, either by words or action or conduct, to undertake any form of actual contract commitment" requiring such notice before termination. *Therrien v. Safeguard Mfg. Co.,* 180 Conn. 91, 94-95, 429 A.2d 808 (1980), *quoted in D'Ulisse-Cupo,* 202 Conn. at 211 n.2.

Although the original letter of September 23, 1986, which lays out the employment agreement between Kull and [*39] Davidoff, mentions nothing about the required notice period prior to termination, the letter explicitly states that a more detailed contract will follow. Both parties agree that this more detailed instrument never materialized; however, Kull testified in his deposition that he received a letter signed by Schelker after his employment began. (Kull. Dep. at 51-52.) That letter, he testified, contained a reciprocal agreement between Kull and Oettinger to give six months' notice before termination -- desirable because of the distance between the operations. Kull also testified that Schelker contacted him about the agreement. (*Id.* at 51.)

Although Defendants deny that such a letter ever existed, and Kull cannot produce the letter, claiming it was missing when he cleaned his office (Kull Dep. at 51), Kull's testimony at least raises an issue of fact with respect to his claim. *See Torosyan,* 234 Conn. at 12, 662 A.2d at 96 (in trial over contract dispute in which plaintiff stated that defendants made statements regarding his job security and defendants denied having made statements, trial court found the plaintiff's version to be credible).

Defendants cite two cases **[*40]** to support their assertion that Kull's testimony alone is insufficient to raise an issue of fact: *Drew v. Sears, Roebuck & Co.,* 1997 U.S. Dist LEXIS 23843, at *39, No. 3:95 CV 1746 (D. Conn. Feb. 24, 1997), and *Reynolds v. Chrysler First Commercial Corp.,* 40 Conn. App. 725, 732, 673 A.2d 573 (1996). In *Drew,* however, the court stated specifically that the plaintiff did not "set forth any oral representations made by Defendant that would give rise to an implied contract." *1997 U.S. Dist. LEXIS 23843, at *39.* In *Reynolds,* similarly, the plaintiff put forth no other evidence than his own feelings and beliefs about the existence of a contract. *40 Conn. App. at 732.* Here, in contrast, Kull has testified to behavior that could potentially give rise to a contract.

Defendants also refer to the Davidoff personnel manual to defeat Kull's claim. The manual in question states that all contracts are at-will, and that termination may be effected at any time without notice. (Davidoff Personnel Manual, Bloom Aff. of 2/28/03 Ex. W, at 2.) However, its existence does not foreclose the possibility that Kull had a different contract **[*41]** with Davidoff. [HN21] Terms of an employment contract can differ from the provisions set forth in general company literature. *See Torosyan,* 234 Conn. at 13-14 (in order to find that implied employment contract incorporates representations in employee publication, trier of fact required to find that issuance of handbook was offer that employee then accepted); *see also Tutko v. James River Paper Co.,* No. 3:96 CV 1256, 1998 U.S. Dist. LEXIS 20664, at *18 (D. Conn. Nov. 12, 1998), *aff'd,* 199 F.3d 1323 (2d Cir. 1999) (company's strategy statements did not create implied contract to terminate only for cause because, even if characterized as offers, no evidence that plaintiff accepted) (citing *Torosyan,* 234 Conn. at 13-14).

Defendants' motion for summary judgment on Kull's breach of contract claim is therefore denied.

**B. Promissory Estoppel**

[HN22] In Connecticut, a claim for promissory estoppel has three prongs: (1) a clear and definite promise; (2) a change in position in reliance; and (3) resulting injury. *Hood v. Aerotek, Inc.,* 2002 U.S. Dist. LEXIS 3513, No. 3:98 CV 1524, 2002 WL 294762, at *5 (D. Conn. Feb. 19, 2002); *see also D'Ulisse-Cupo,* 202 Conn. at 213 **[*42]** ("A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." (quoting Restatement (Second) of Contracts §

90)).

Promissory estoppel is a doctrine often used in the absence of a contractual relationship -- for instance, where consideration is lacking -- to place liability on the promisor. *Stewart v. Cendant Mobility Servs. Corp., 267 Conn. 96, 104, 837 A.2d 736 (2003)*. It is therefore not inconsistent to find the absence of a contract, yet find liability based on promissory estoppel. *Stewart, 267 Conn. at 110*.

This particular case does the opposite. As mentioned above, an issue of fact exists as to the contract claim; that is, there is an issue of fact as to an offer with respect to the alleged six months' notice provision. Such offer is a promise, satisfying the first prong of the inquiry. *Stewart, 267 Conn. at 105* ("Although 'an offer is nearly always a promise,' all promises are not offers.") (quoting **[*43]** 1 E. Farnsworth, *Contracts* § 3.3, at 188 (2d ed. 1998)).

Where Kull's claim falls short, however, is the second prong: reliance. Kull has not put forth any evidence of reliance on the alleged promise of six months' notice before termination. Kull does claim that he did not actively seek other employment. (Pl. Opp. at 27; Kull Dep. at 283.) [HN23] Mere lack of seeking another job, however, is not the sort of change in position that can be used to support a claim of promissory estoppel. In *Tutko*, for example, the defendant's motion for summary judgment on plaintiff's promissory estoppel claim was granted when plaintiff could not prove detrimental reliance. *1998 U.S. Dist. LEXIS 20664, *20-21*. The plaintiff in *Tutko* merely said he "had never entertained the thought of leaving." *1998 U.S. Dist. LEXIS 20664, at *21*. Here, similarly, Kull has put forth no evidence that he detrimentally relied on the alleged promise of six months' notice before termination. Defendants' motion for summary judgment as to Kull's promissory estoppel claim, therefore, is granted.

## C. Breach of the Covenant of Good Faith and Fair Dealing

[HN24] Under Connecticut law, "every contract carries an implied covenant of **[*44]** good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Habetz v. Condon, 224 Conn. 231, 238, 618 A.2d 501 (1992)*. The claim exists to "fulfill the reasonable expectations of the contracting parties as they presumably intended." *Magnan v. Anaconda Indus., Inc.,*

*193 Conn. 558, 567, 479 A.2d 781 (1984)*. The claim is separate from and can be maintained in addition to a breach of contract claim. *Martin v. Dupont Flooring Sys., Inc., 2004 U.S. Dist. LEXIS 9373, No. 3:01 CV 2189, 2004 WL 726903, at *6 (D. Conn. Mar. 31, 2004)* (citing *Buckman v. People Express, Inc., 205 Conn. 166, 170-71, 530 A.2d 596 (1987)*). [HN25] The elements of this claim are as follows: (1) plaintiff and defendant entered into a contract under which the plaintiff had a reasonable expectation of benefits; (2) the defendant undertook actions that undermined the plaintiff's right to collect certain benefits; and (3) the defendant acted in bad faith. *Martin, 2004 U.S. Dist. LEXIS 9373, 2004 WL 726903, at *7* (citing *Fairfield Fin. Mortgage Group, Inc. v. Salazar, 2002 Conn. Super. LEXIS 1352, No. CV 000339752S, 2002 WL 1009809,* **[*45]** *at *3 (Conn. Super. Ct. Apr. 23, 2002)*). [HN26] "Bad faith means more than mere negligence; it involves a dishonest purpose." *Habetz, 224 Conn. at 237*. Furthermore, [HN27] in a termination case, an at-will employee "must establish that his dismissal was for a demonstrably improper reason, the impropriety of which is derived from a violation of some important public policy." *Rose, 2 F. Supp.2d at 255* (citing *Johnson v. Chesebrough-Pond's, 918 F. Supp. 543, 550 n.4 (D. Conn. 1996)); see also Magnan, 193 Conn. at 572*.

As set out in the section discussing Kull's retaliation claims, Kull has raised issues of material fact as to Defendants' retaliatory termination, which, if true, would violate an important public policy as set forth in Title VII. However, if there is an adequate remedy under statutory law, then the claim cannot stand separately. [HN28] "A plaintiff bringing a claim for violation of the implied covenant of good faith and fair dealing must also establish that he does not otherwise have an adequate means of vindicating that public policy." *Rose, 2 F. Supp.2d at 255* (dismissing claim because plaintiff had adequate **[*46]** remedy under *Age Discrimination in Employment Act*); *Tutko,* 1998 U.S. Dist. LEXIS 20664, at *23-24 (same). [9] Here, because an adequate remedy is potentially provided under both Title VII and CFEPA, Kull's claim is entirely duplicative, and defendants' motion for summary judgment with respect to Kull's claim for breach of the implied covenant of good faith and fair dealing is granted.

9      Both *Rose* and *Tutko* cite *Bennett v. Beiersdorf, Inc., 889 F. Supp. 46, 49 (D. Conn. 1995)*, in which the federal district court denied the plaintiff's claim for breach of the implied

covenant of good faith and fair dealing for race discrimination in her employment, because of the existence of sufficient remedy under the federal statutory scheme. *Bennett,* in turn, cites *Atkins v. Bridgeport Hydraulic Co., 5 Conn. App. 643, 648, 501 A.2d 1223 (1985)*, a much-cited Connecticut appellate case. *Atkins* discussed a common law wrongful discharge claim, and also required a violation of public policy and the absence of sufficient remedy. More recently, the Connecticut Supreme Court decided *Burnham v. Karl & Gelb, P.C., 252 Conn. 153, 158-59, 745 A.2d 178 (2000)*, in which it discussed *Atkins* and affirmed its holding, again in the context of a common law wrongful discharge claim. The decision was not unanimous, however, and although the dissent agreed with the basic premise (and cited *Bennett*), it pointed out that the remedy under federal statutory law ought to be truly sufficient, and not an inadequate administrative process, as it believed to be the case in *Burnham. 252 Conn. at 172* (McDonald, C.J., dissenting). The dissent also noted that the requisite public policy violation can be predicated on the violation of public policy expressed in a federal statute, as here. *Id.* (quoting *Faulkner v. United Technologies Corp., 240 Conn. 576, 585-86, 693 A.2d 293 (1997)*). In Kull's case, the statutory remedy is sufficient, and fits within both the dissenting and majority opinions of *Burnham.*

**[*47] D. Unjust Enrichment**

[HN29] "'A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another.'" *Gagne v. Vaccaro, 255 Conn. 390, 408, 766 A.2d 416 (2001)* (quoting *Franks v. Lockwood, 146 Conn. 273, 278, 150 A.2d 215 (1959)*) (other citations omitted). The elements of the claim are that (1) the defendant benefitted; (2) the defendant unjustly failed to pay the plaintiff for the benefits; and (3) the failure of payment was to the plaintiff's detriment. *Gagne, 255 Conn. at 409* (citations omitted).

Kull brings this cause of action based on the lack of notice given to him by Davidoff, discussed above. Defendants assert that Kull's recovery under the doctrine of unjust enrichment is barred because his behavior in

accepting kickbacks would prevent his receiving an equitable remedy. *See Bauer v. Waste Mgmt. of Conn., Inc., 239 Conn. 515, 525, 686 A.2d 481 (1996)* (discussing defense of unclean hands to equitable relief). Defendants also argue **[*48]** the claim fails because of Kull's lack of proof of the agreement, and because he does not allege that he was not paid for the work he performed. (Def. Mem. at 32-33.)

As stated above, there are material issues of fact with regard to both the notice provision of the parties' employment contract, as well as Kull's alleged acceptance of kickbacks. However, if it is shown at trial that Kull and Davidoff did have an enforceable contract requiring notice before termination, then such contract would bar Kull's recovery under an unjust enrichment theory. [HN30] "Unjust enrichment applies whenever 'justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract ....' Indeed, lack of a remedy under the contract is a precondition for recovery based upon unjust enrichment." *Gagne v. Vaccaro, 255 Conn. at 401* (quoting 12 S. Williston, *Contracts* § 1479, at 272 (3d ed. 1970)).

Furthermore, it is not alleged that Defendants withheld pay for any work performed by Kull. *See Mitchell v. Town of Orange, 2001 Conn. Super. LEXIS 3611, No. CV 000069298S, 2001 WL 1707084, at *2 (Conn. Super. Ct. Dec. 20, 2001)* ("It is **[*49]** also true, in an analysis of unjust enrichment, that the town did not receive any benefit from plaintiff for which it did not pay.")

Because Kull potentially has a remedy under contract law, his claim under the doctrine of unjust enrichment is dismissed.

**III. Kull's Tort Claims**

Kull claims that Defendants' retaliatory termination of his employment after falsely accusing him of receiving kickbacks constitutes intentional and negligent infliction of emotional distress. [10]

> 10   Kull also apparently bases his claim upon the theory that Cina's harassment of Mrs. Kull constitutes an infliction of emotional distress upon Kull. Defendants state that Kull does not meet the evidentiary requirements for a plaintiff to make a claim for bystander liability, including

that of severe physical injury or death on the part of the victim. *See Clohessy v. Bachelor, 237 Conn. 31, 56, 675 A.2d 852 (1996)*. Because summary judgment is denied on other grounds, the Court does not address this issue.

**A. [*50] Intentional Infliction of Emotional Distress**

[HN31] Under Connecticut law, to establish a claim for intentional infliction of emotional distress, a plaintiff must prove the following: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Bd. of Educ. of Stonington, 254 Conn. 205, 210, 757 A.2d 1059 (2000)* (citing *Petyan v. Ellis, 200 Conn. 243, 253, 510 A.2d 1337 (1986)*).

[HN32] The primary dispute here has to do with the second prong: the extreme or outrageous nature of the conduct. Whether the defendant's conduct is sufficient to satisfy the extreme and outrageous standard is a question, in the first instance, for the Court. *Etienne v. Wal-Mart Stores, Inc., 186 F. Supp.2d 129, 136 (D. Conn. 2001)*. Where reasonable minds can differ, however, it becomes an issue for the jury. *Bell v. Bd. of Educ. of West Haven, 55 Conn. App. 400, 410, 739 A.2d 321 (1999)* [*51] (citing *Mellaly v. Eastman Kodak Co., 42 Conn. Supp. 17, 18-19, 597 A.2d 846 (Conn. Super. Ct. 1991)*). The conduct in question must exceed "'all bounds usually tolerated by decent society.'" *Appleton, 254 Conn. at 210* (quoting *Petyan, 200 Conn. at 254 n.5* (quoting W. Prosser & W. Keeton, *Torts* § 12, at 60 (5th ed. 1984))).

"Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"

*Appleton, 254 Conn. at 210-11 (2000)* (quoting 1 *Restatement (Second) of Torts § 46 cmt. d,* at 73 (1965)).

[HN33] Both Connecticut and federal courts in this circuit have been reluctant to find conduct of defendants to be extreme and outrageous. *See Etienne, 186 F. Supp. 2d at 137-38* (collecting cases). However, [*52] extreme or outrageous conduct "may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." 1*Restatement (Second) of Torts § 46 cmt. e, quoted in Mellaly, 42 Conn. Supp. 17, 20, 597 A.2d 846* (employer who taunted employee about his alcoholism and harassed in other ways when he knew of employee's disease of alcoholism reached required threshold of outrageousness).

*Talit v. Peterson, 44 Conn. Supp. 490, 692 A.2d 1322 (Conn. Super. Ct. 1995)*, a similar case to the current one, involved a plaintiff who alleged that defendants criticized her and caused her to lose her employment in retaliation for filing a grievance. The court found that the claim survived a motion to dismiss. *44 Conn. Supp. at 497-98*. At a minimum, the court stated, reasonable minds could differ as to whether the conduct was extreme and outrageous, and the question therefore had to go to a jury. *Id. at 498* (citing 1 *Restatement (Second) of Torts § 46 cmt. h*). *See also* [*53] *Nguyen v. Newberry Industries, Inc., 1997 Conn. Super. LEXIS 3120, No. CV 970571319, 1997 WL 746442, at *5 (Conn. Super. Ct. Nov. 14, 1997)* (encouragement to conceal work-related injury followed by termination within statute of limitation period for filing workers' compensation claim, plus additional conduct, potentially extreme and outrageous).

Kull has presented evidence which, when construed in the light most favorable to him, could show that he was an innocent employee whose whose spouse and secretary were harassed, and when he reported the matter, he was accused of accepting kickbacks and then terminated. There are issues appropriate for determination by a jury, including whether Defendants' behavior was extreme and outrageous, and Defendants' claim for summary judgment as to Kull's claim of intentional infliction of emotional distress is therefore denied.

**B. Negligent Infliction of Emotional Distress**

[HN34] To succeed on a claim for negligent infliction of emotional distress, a plaintiff must prove that

the defendant should have: (1) realized its conduct involved an unreasonable risk of causing plaintiff distress; and (2) realized the distress, if caused, might result in illness or bodily [*54] harm. *Etienne v. Wal-Mart Stores, Inc., 186 F. Supp.2d 129, 138* (citing *Barrett v. Danbury Hosp., 232 Conn. 242, 260-61, 654 A.2d 748 (1995)).* [HN35] In the work context, a claim for negligent infliction of emotional distress arises only when it is based upon unreasonable conduct of the defendant during the termination process. *Perodeau v. City of Hartford, 259 Conn. 729, 744, 762-63, 792 A.2d 752 (2002).*

Defendants argue that because there is no evidence -- and Kull does not allege -- that Schelker acted unreasonably when he went to Kull's office to terminate him, the claim must fail. (Def. Mem. at 35-36.) The requirement that the behavior be linked to the termination process, however, has been interpreted more broadly under Connecticut law. Courts have dismissed plaintiffs' claims when, for instance, he or she remains employed, *see, e.g., White v. Martin, 23 F. Supp.2d 203, 208 (D. Conn. 1998)*; *Perodeau, 259 Conn. at 744*, or if the termination was wrongful, but involved no egregious conduct, *see, e.g., Belanger v. Commerce Clearing House, Inc., 25 F. Supp.2d 83, 84-85 (D. Conn. 1998)* (no [*55] claim where defendant stated it would consider plaintiff for open position, then terminated her, because plaintiff alleged no inconsiderate, humiliating, or embarrassing actions); *Parsons v. United Techs. Corp., 243 Conn. 66, 88-89, 700 A.2d 655 (1997)* ("The mere termination of employment, even where it is wrongful, is ... not, by itself, enough to sustain a claim for negligent infliction of emotional distress."); *Pavliscak v. Bridgeport Hosp., 48 Conn. App. 580, 598, 711 A.2d 747, cert. denied, 245 Conn. 911, 718 A.2d 17 (1998)* (at-will employee termination in private, albeit without warning, did not satisfy requirements for negligent infliction of emotional distress). In contrast, Kull's allegations of retaliation and accusations, for which he has sufficiently raised factual issues, are closely enough related to the "termination process" to fit within this requirement of the claim. *See, e.g., Copeland v. Home & Cmty. Health Servs., Inc., 285 F. Supp.2d 144, 153 (D. Conn. 2003)* (insensitivity about health problems and related inflexibility about return date to work, resulting in termination, stated claim); *Grossman v. Computer Curriculum Corp., 131 F. Supp.2d 299, 309-10 (D. Conn. 2000)* [*56] (false accusations about job performance, bad-mouthing to customers, and other efforts designed to bring about termination satisfied requirement that conduct involve termination process).

Defendants' motion for summary judgment with respect to Kull's claim for negligent infliction of emotional distress is therefore denied.

## IV. Defendants' Tort Claims

Defendants Oettinger and Davidoff of Geneva (CT), Inc., bring counterclaims against Kull for breach of his fiduciary duty of loyalty and for tortious interference with contract advantage or tortious interference with prospective economic advantage. For these claims, Kull argues that New York law should apply (Pl. R. Mem. at 10); Defendants argue that Connecticut law applies (Def. Opp. at 11).

[HN36] "A federal court sitting in diversity or adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state." *Rogers v. Grimaldi, 875 F.2d 994, 1002 (2d Cir. 1989)* (citing *Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941)).* Therefore, New York's choice of law rules govern the choice in this case.

[HN37] Under New York law, a [*57] claim for breach of fiduciary duty against a corporation is governed by the law of the relevant company's state of incorporation -- here, Connecticut. [11] *High View Fund, L.P. v. Hall, 27 F. Supp.2d 420, 428 n. 6; Hart v. General Motors Corp., 129 A.D.2d 179, 517 N.Y.S.2d 490, 492 (App. Div. 1st Dep't 1987)* (citing *Diamond v. Oreamuno, 24 N.Y.2d 494, 248 N.E.2d 910, 301 N.Y.S.2d 78, 85 (N.Y. 1969)).*

> [11] Although Oettinger AG is incorporated in Switzerland, [HN38] neither side has argued that Swiss law be applied. It is therefore initially assumed that Swiss law is the same as Connecticut law, and either party may challenge that assumption at any time in the litigation by providing "reasonable written notice" of its intent to raise the issue. *Fed. R. Civ. P. 44.1; see also Fairmont Foods Co. v. Manganello, 301 F. Supp. 832, 837 (S.D.N.Y. 1969).*

The governing law for Defendants' claim for tortious interference is also chosen [*58] using New York's choice of law rules. [HN39] In tort cases, New York

courts apply an "interest analysis," under which the law of the jurisdiction with the greatest interest in the matter is applied. *AroChem Int'l, Inc. v. Buirkle, 968 F.2d 266, 270 (2d Cir. 1992); see also Babcock v. Jackson, 12 N.Y.2d 473, 191 N.E.2d 279, 240 N.Y.S.2d 743, 749 (N.Y. 1963)*. [HN40] "Under this formulation, the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort." *Schultz v. Boy Scouts of Am., Inc., 65 N.Y.2d 189, 480 N.E.2d 679, 491 N.Y.S.2d 90, 95 (N.Y. 1985)*. "If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Cooney v. Osgood Mach., Inc., 81 N.Y.2d 66, 612 N.E.2d 277, 595 N.Y.S.2d 919, 922 (N.Y. 1993)*.

Although it is true, as Kull argues, that Davidoff of Geneva (NY) is a New York corporation, and that Uvezian's cigars were sold in New York (Pl. R. Mem. at 10), Davidoff of Geneva (NY) is not a party to the counterclaims. Davidoff of Geneva (CT), one of the counterclaiming defendants, **[*59]** is incorporated in Connecticut. (Cmplt. P 8).

Furthermore, the location of the torts is focused in Connecticut. Kull's office was in Connecticut, and the majority of Davidoff employees worked in Connecticut. That AVO cigars were sold in New York does not change the result of the inquiry. Therefore, the Court will apply Connecticut law to both of Defendants' counterclaims.

### A. Kull's Defenses

As a preliminary matter, Kull has raised two defenses to Defendants' counterclaims, discussed briefly below.

### 1. Accord and satisfaction

Kull argues that his repayment of the loan to Uvezian results in accord and satisfaction, and that therefore Defendants cannot maintain their claims. (Pl. Mem. at 13.)

[HN41] "'Without a mutual assent, or a meeting of the minds, there cannot be a valid accord.' Whether a meeting of the minds has occurred is a factual determination." *M.J. Daly & Sons, Inc. v. City of West Haven, 66 Conn. App. 41, 48, 783 A.2d 1138, cert. denied, 258 Conn. 944, 786 A.2d 430 (2001)* (quoting and citing *Munroe v. Emhart Corp., 46 Conn.App. 37, 42-43,*

*699 A.2d 213, cert. denied, 243 Conn. 926, 701 A.2d 658 (1997)).*

Because **[*60]** issues of fact exist as to whether money is still outstanding and whether Defendants intended to release Kull of those sums, Kull's defense of accord and satisfaction fails.

### 2. Waiver and the Statute of Limitations

Kull argues that, by waiting for five years after Uvezian informed Hollenstein about the arrangement with Kull, Defendants have waived their right to sue for tortious interference. (Pl. Mem. at 13.) [HN42] "Waiver is the intentional relinquishment of a known right." *Wadia Enters., Inc. v. Hirschfeld, 224 Conn. 240, 251, 618 A.2d 506 (1992)* (citations omitted). The four elements of waiver are as follows: (1) the existence of a right or defense; (2) the opportunity to apply and use that right or defense; (3) the knowledge of the ability to use that right or defense; and (4) actions of the party who possesses that right or defense that amount to a relinquishment of that right.*Greenwich Plaza, Inc. v. Whitman & Ransom, 1996 Conn. Super. LEXIS 984, No. CV 95054081, 1996 WL 240458, at *9 (Conn. Super. Ct. Mar. 19, 1996)* (citing *Novella v. Hartford Accident & Indemn., 163 Conn. 552, 562, 316 A.2d 394 (1972)).*

Because there is an issue of fact with respect **[*61]** to the second element -- that is, Defendants maintain they did not find out about Kull's activity until July of 1999 -- the defense fails. Kull's statute of limitations defense with respect to Defendants' claim for tortious interference fails for the same reason. [12]

> 12  Connecticut's statute of limitations for torts is three years, as set forth in *Conn. Gen. Stat. § 52-577.*

### B. Breach of Fiduciary Duty

Defendants argue that Kull's activities in accepting kickbacks entailed a breach of his fiduciary duty of loyalty.

[HN43] As president of Davidoff, Kull was in a fiduciary relationship to the corporation. *Katz Corp. v. T.H. Canty & Co., Inc., 168 Conn. 201, 207, 362 A.2d 975 (1975)* (citing *Arrigoni v. Adorno, 129 Conn. 673, 681, 31 A.2d 32 (1943)).* Kull "occupied a position of the highest trust and therefore he [was] bound to use the

utmost good faith and fair dealing in all his relationships with the corporation." *Id.* (citations omitted).

Defendants **[*62]** argue that the burden-shifting regime described in *Murphy v. Wakelee, 247 Conn. 396, 721 A.2d 1181 (1998)*, under which Kull would be required to prove by clear and convincing evidence that his financial arrangement with Uvezian was made in good faith, should govern. *247 Conn. at 400*. Because Kull cannot meet this heightened burden of proof, Defendants state, summary judgment should be granted in Defendants' favor. (Def. Opp. at 16.)

*Murphy*, however, was a case affirming a jury verdict. The current case is in a significantly different posture. [HN44] A factfinder must determine whether the transaction is of a type that would lead to the burden-shifting regime set out in *Murphy*, and, if so, whether Kull can meet such burden. *See Murphy, 247 Conn. at 405* (applying burden-shifting only to cases that involve, *inter alia,* fraud, self-dealing, conflict of interest, or suspicious circumstances). "The recitation of this standard does not allow the court to conclude ... that [Kull's] factual denials do not raise genuine issues of material fact, and the court does not, in the context of summary judgment, decide the weight of the facts or **[*63]** resolve factual disputes."*Conn. Nat'l Bank v. Rytman, 2002 Conn. Super. LEXIS 2759, No. X01CV870159941S, 2002 WL 31126311, at *3 (Conn. Super. Ct. Aug. 21, 2002)* (citation omitted).

Multiple factual issues, as discussed in various sections above, remain with respect to this claim. Therefore, with respect to Defendants' claim of breach of fiduciary duty, summary judgment as to both sides is denied.

### C. Intentional Interference with Business Relations

Defendants claim that Kull intentionally interfered with their contract relationship or business relations with Uvezian. [13]

        13   In their cross-complaints, Davidoff of Geneva (CT) and Oettinger label their claim "Tortious Interference With Contract Advantage and/or Tortious Interference With Prospective Economic Advantage," but refer to "tortious interference with business relations" in their memoranda to the Court. (Def. Opp. at 19.) The differences are irrelevant here. *See Swift v. Ball, 2003 Conn.*

*Super. LEXIS 2770, No. CV 010344047S, 2003 WL 22413406, at *2 (Conn. Super. Ct. Oct. 6, 2003)* (discussing distinction between contract advantage and business relations); *Warner v. Dembinski, 2003 Conn. Super. LEXIS 1103, CV020079206, 2003 WL 1995932, at *2 (Conn. Super. Ct. Apr. 4, 2003)* (discussing prospective economic advantage).

**[*64]** [HN45] "The elements of tortious interference are the existence of a contractual or beneficial relationship, the defendants' knowledge of that relationship, the intent to interfere with it, and the consequent actual loss suffered by the plaintiff." *Hart, Nininger & Campbell Assoc., Inc. v. Rogers, 16 Conn. App. 619, 629, 548 A.2d 758 (1988)* (citing *Solomon v. Aberman, 196 Conn. 359, 383, 493 A.2d 193 (1985)*; *Harry A. Finman & Son, Inc. v. Conn. Truck & Trailer Serv. Co., 169 Conn. 407, 415, 363 A.2d 86 (1975)*). Under Connecticut law, an agent of a corporation -- here, Kull -- may be held liable for interfering with a contract of that corporation if he was not acting legitimately within the scope of his duties, but was using corporate power improperly for his personal gain. *Metro. Entm't Co. v. Koplik, 20 F. Supp.2d 354, 361 (D. Conn. 1998)* (citing *Murray v. Bridgeport Hosp., 40 Conn. Supp. 56, 60-61, 480 A.2d 610 (Conn. Super. Ct. 1984)*). He acts for personal gain if he seeks personal financial gain or is motivated by personal animus. *Id.* (citing *Bennett v. Beiersdorf, Inc., 889 F. Supp. 46, 52 (D. Conn. 1995)*). **[*65]** To sustain the claim, Defendants must show that Kull's actions were tortious; that is, that they involved fraud, misrepresentation, intimidation, or molestation, or that he acted maliciously. The claim requires some showing of improper means or motive. *Weiss v. Wiederlight, 208 Conn. 525, 536, 546 A.2d 216 (1988)* (citations omitted). The tort does not require a breach of contract. *Automatic Bus. Prods. Co. v. Hankinson, 1992 Conn. Super. LEXIS 1523, No. 47066, 1992 WL 117777, at *5 (Conn. Super. Ct. May 19, 1992)*.

Kull argues that Uvezian's loans to him did not harm the relationship between Defendants and Uvezian. He argues that because Davidoff purchased Uvezian's trademark and line of cigars, and that a profitable relationship continued between Uvezian and Defendants after Kull's termination, Defendants cannot show any injury resulting from the alleged interference. (Pl. Mem. at 8-9.) [HN46] Although Defendants may have trouble showing that they lost a business opportunity, *see*

*Automatic Bus. Prods. Co., 1992 U.S. Dist. LEXIS 1523, 1992 WL 117777, at *5*, damages may be recoverable "where the interference causes the performance 'to be more expensive or burdensome.'" *Herman v. Endriss, 187 Conn. 374, 376-77, 446 A.2d 9 (1982)* **[*66]** (quoting *4 Restatement (Second) of Torts § 766A*), for which Defendants have put forth evidence.

Both parties have set forth sufficient evidence to show genuine issues of material fact as to Kull's propriety or impropriety, as well as Defendants' resulting loss or lack thereof; therefore, summary judgment for both parties is denied.

**Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment is granted with respect to Kull's claims for retaliation under the *New York Executive Law*, promissory estoppel, breach of the covenant of good faith and fair dealing, and unjust enrichment, and denied as to all other claims. Kull's motion for summary judgment as to Defendants' counterclaims is denied.

So Ordered.

Dated: June *22,* 2004

Lawrence M. McKenna

U.S.D.J.